IANJKET1                    Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                           17 Cr. 00243 (SHS)

5    ANDREW OWIMRIN, a/k/a "Andrew Owens,"
     a/k/a "Jonathan Stewart," and
6    SHAHRAM KETABCHI, a/k/a "Steve Ketabchi,"

7              Defendants.

8    ------------------------------x
                                            October 23, 2018
9                                           10:30 a.m.

10   Before:

11                     HON. SIDNEY H. STEIN,

12                                          District Judge
                                              and a jury

13                         APPEARANCES

14
     GEOFFREY S. BERMAN
15       United States Attorney for the
         Southern District of New York
16   KIERSTEN A. FLETCHER
     ROBERT B. SOBELMAN
17   BENET J. KEARNEY
         Assistant United States Attorneys
18
     SAM A. SCHMIDT
19   ABRAHAM J. ABEGAZ-HASSEN
         Attorneys for Defendant Owimrin
20
     KENNETH A. PAUL
21   JACOB MITCHELL
         Attorneys for Defendant Ketabchi
22
     Also Present:
23       CHRISTOPHER BASTOS, Detective NYPD and HSI
         CHRISTINE LEE, Paralegal Specialist USAO
24

25

IANJKET1                    Trial

1              (In open court; jury not present)

2              THE COURT:  Good morning, all of you.  Please be

3      seated.  All right.  Is the estimate of the time for this

4      trial, Government, still two weeks?

5              MS. FLETCHER:  Your Honor, depending on whether the

6      government has to call a certain number of records custodians,

7      we would expect it would probably be closer to a week and a

8      half.

9              THE COURT:  Is that issue the issue that was teed-up

10     last night and yesterday in the emails?

11             MS. FLETCHER:  The records custodian issues is a

12     consequence of the issues that were teed-up.

13             THE COURT:  We'll deal with that in a minute.

14             Does anyone disagree with the government's estimate;

15     in other words, sometime next week?

16             What I am focusing on is what I should tell the jury.

17     Given what I know now, I'll tell the jury everyone expects it

18     to end sometime next week, but one can never know, so for their

19     planning purposes there is a small possibility it may go over

20     to the following week.  Defense, any problem with my telling

21     the jury that?

22             MR. SCHMIDT:  No, your Honor.  I would think it might

23     be one or two days, a possibility it would extend for an

24     additional day or two into the following week.

25             THE COURT:  You do not think it will go there or you

1   do not think it will go longer than that?

2          MR. SCHMIDT:  I do not think it will go longer than an

3   extra day or two in that following week.

4          MR. PAUL:  I think that is fair, Judge.

5          THE COURT:  That may present problems for the jury.  I

6   was thinking of having two alternates.  Maybe perhaps three now

7   that you say it may go for a third week.  My sense is two

8   alternates should do it.  What is the position of the defense?

9          MR. PAUL:  I think two alternates should be fine,

10  Judge.

11         MR. SCHMIDT:  Your Honor, I think that if the third

12  alternate is available as a result of the voir dire, we do not

13  order anybody else, I think it would be useful.

14         THE COURT:  The government?

15         MS. FLETCHER:  We would agree with Mr. Schmidt.

16         THE COURT:  All right.  Let's talk for a few moments.

17         I think we can get the panel up whenever we call them

18  because they would have had their orientation and film

19  yesterday.  I hope this is not the second week for some of them

20  because that may make it more difficult.  Let's talk about the

21  correspondence yesterday in regard to the authenticity issue.

22  Let me tell you how I understand the underlying facts just to

23  save time, and if I am incorrect, the parties will tell me.

24         The issue is a stipulation on authenticity, which I

25  really expect under normal circumstances from the parties, but

IANJKET1                    Trial

1   there seems to be some concern about that.  Apparently there is

2   a possibility that the defense will be using certain documents

3   on cross-examination of the government witnesses.  The defense

4   does not want to preview its cross-examination, so it doesn't

5   want to give the government the documents in advance, the

6   documents that the defense may use on cross-examination of

7   government witnesses.

8          The government is reluctant to enter into a

9   stipulation of authenticity unless and until it knows what

10  those documents are.  That's the basic dispute.

11         As I understand it, there are certain materials that

12  were received from the government as a result of warrants, and

13  they were given by the government to Emma Greenwood, our

14  coordinating discovery attorneys.  Ms. Greenwood is not in the

15  courtroom now, all right.  I take it that is the bulk of the

16  materials that these cross-examination materials will come

17  from.

18         In addition to that, apparently -- and we'll call

19  those CDA materials because that is what these papers do.  When

20  I say "these papers," it is Document 303, 304 and 305 in the

21  ECF file -- in addition to the CDA documents, it looks like

22  because of the rush of things over the weekend or maybe the end

23  of last week, at the request of the defense, because Ms.

24  Greenwood couldn't get these up on the Case Point Platform for

25  reviewing by the defense, the government just simply forwarded

IANJKET1                    Trial

1   some of those materials, some new materials to the defense.  So

2   those are not the CDA materials.  Those are additional

3   materials.

4          In addition, if I understand it correctly, the

5   government Bates stamped the cover of files, but it didn't

6   Bates stamp every document within each particular file, but Ms.

7   Greenwood did.  Are those facts correct, Government?

8          (Off-the-record discussion)

9          MS. FLETCHER:  That's correct, with one exception,

10  your Honor.  The timing of the conversation about how defense

11  wished additional discovery to be forwarded to them was not a

12  conversation that took place within the last week or two.  It

13  was over a month ago.  So discovery productions from late

14  September until now have been provided directly to defense

15  counsel.

16         THE COURT:  Why?

17         MS. FLETCHER:  At their request.

18         THE COURT:  All right, as long as I have the facts

19  correctly.  Mr. Schmidt, tell me what your issue is.

20         MR. SCHMIDT:  Mr. Abegaz-Hassen.

21         MR. ABEGAZ-HASSEN:  Good morning, your Honor.

22         THE COURT:  Those counsel who made their appearances,

23  two on the defense side, two for -- I am sorry -- two for

24  Mr. Owimrin and two for Mr. Ketabchi.  Either attorney can

25  address any particular point, but for any witness, there is

IANJKET1                              Trial

1      just one attorney who is going to be doing the questioning.

2              Proceed, sir.

3              MR. ABEGAZ-HASSEN:  Thank your Honor.

4              So basically I think your Honor outlined the situation

5      fairly accurately.

6              THE COURT:  Because, by the way, this is a very easy

7      resolution, but let me hear it all.

8              MR. ABEGAZ-HASSEN:  Those additional materials I do

9      not waive are of concern your Honor just mentioned.  The main

10     concern we have is with the CDA materials.  It had been our

11     understanding from the time that those materials were given to

12     Ms. Greenwood's office that there would not be authentication

13     issues, that those materials -- we would proceed as normally a

14     trial would proceed, that the government had some system in

15     place to easily identify those documents or accept the

16     authentication that was on the documents.

17             In our papers we mentioned, we listed an example of

18     one of those Bates numbers and how it appears to us.  So what

19     happened is after discussions on the additional materials and

20     specifically the devices which, is a whole other cache of

21     discovery --

22             THE COURT:  We are only talking about CDA materials,

23     is that what is at issue here?

24             MR. ABEGAZ-HASSEN:  That is the main issue.

25             THE COURT:  Go ahead.

IANJKET1                    Trial

1          MR. ABEGAZ-HASSEN:  The conversation we had with the

2    government on Sunday started out by discussing these other

3    materials, but what we came to realize --

4          THE COURT:  If the issue is the CDA materials, let's

5    talk about that.

6          MR. ABEGAZ-HASSEN:  Fair enough.

7          So basically the government has told us that those

8    Bates numbers that were put on the documents by Ms. Greenwood's

9    office and by them are not sufficient for their authentication

10   purposes and that we, therefore, would have to give any of

11   those documents to them ahead of time.

12         THE COURT:  Let me stop you right there.

13         Government, why isn't the Bates stamp numbers applied

14   by you, I take it, on the cover of each file and by Ms.

15   Greenwood, I take it, on the interior documents sufficient?

16         MS. FLETCHER:  There are a couple of issues, your

17   Honor.  When the government produced electronic discovery -- an

18   email account, for example, is a good example -- the government

19   produces a single electronic file that contained within it

20   thousands of emails.  That single electronic file was given a

21   Bates number by the government.

22         THE COURT:  That is what I called the cover of it.

23         Go ahead.

24         MS. FLETCHER:  Yes.  The government did not Bates

25   stamp all of the underlying documents within that email chain.

IANJKET1                    Trial

1          THE COURT:  I just told you that.  Next.

2          MS. FLETCHER:  The Bates numbered applied by Ms.

3    Greenwood are not numbers the government has ever seen.

4          THE COURT:  Okay.

5          MS. FLETCHER:  If during the witness's testimony or

6    during one of the government's witnesses cross-examination,

7    that document is shown to a witness, the government will never

8    have seen the Bates number on that document, will not, I

9    suspect, immediately recognize that document and will not --

10   your Honor is squinting.

11         THE COURT:  No.  I am squinting to see if it was Ms.

12   Greenwood who was coming in.

13         MS. FLETCHER:  I apologize.  The government will not

14   be able to authenticate any individual document on-the-fly in

15   order to determine the document is what defense counsel

16   warrants it to be.

17         THE COURT:  You want to see it.  I got it.  Back to

18   you.

19         MR. ABEGAZ-HASSEN:  So, in essence --

20         THE COURT:  They're assuming everyone is acting in

21   good faith.  They just want the opportunity to make sure it was

22   in the CDA materials they gave to Ms. Greenwood.

23         MR. ABEGAZ-HASSEN:  What they're saying is --

24         MR. SCHMIDT:  Let me take over.

25         THE COURT:  No.  You gave it to him.  Let me hear him.

IANJKET1                    Trial

1          MR. SCHMIDT:  Okay.

2          THE COURT:  You can whisper, but I don't want to be

3    two-timed.

4          THE COURT:  Doubled-timed, whatever it is.

5          MS. FLETCHER:  Double-teamed.

6          MR. ABEGAZ-HASSEN:  I think that is not what is

7    happening.  When we signed a stipulation, we assumed that it

8    went both ways, right?  We assumed, when the government gives

9    us --

10          THE COURT:  Just tell me there is no reason for them

11    to doubt the Bates stamp number on it because you're only going

12    to give them documents that you downloaded from the Case Point

13    Platform.  Can you say that?

14          MR. ABEGAZ-HASSEN:  That is exactly what we --

15          THE COURT:  Thank you.  Government.

16          MS. FLETCHER:  Your Honor, in providing to the

17    government its five unmarked exhibits just this weekend, we

18    have already seen documents that are not documents that we

19    provided to defense.

20          THE COURT:  Do they have Bates stamp numbers?

21          MS. FLETCHER:  They do not.

22          THE COURT:  So that is not what we're talking about.

23    We're only talking about document -- Mr. Abegaz-Hassen, are we

24    only talking about documents that have Bates stamp numbers?

25          MR. ABEGAZ-HASSEN:  Yes.  Our main issue is that.

IANJKET1                    Trial

1          MS. FLETCHER:  We have never seen those Bates numbers,

2     your Honor.  Any person could --

3          THE COURT:  No, no.  I understand that.  If you have a

4     representation from counsel that they're only using documents

5     that were on the Case Point Platform, Bates stamped by Ms.

6     Greenwood, isn't that sufficient?

7          MS. FLETCHER:  The fact of a document being Bates

8     stamped by Ms. Greenwood does not itself authenticate the

9     document.

10          So, for example, the government drafted an email

11     stipulation -- I suspect this issue relates primarily to

12     emails -- the government drafted an email stipulation that

13     provides that certain email accounts were searched and that the

14     government exhibits listed in the schedule of those email

15     accounts were taken from the particular email accounts laid out

16     in the stipulation.

17          When we initially discussed the stipulation with

18     counsel for both defendants, we told them so long as you want

19     us -- if you want us to stipulate to particular email accounts,

20     tell us where they came from and add them to the schedule so

21     that we know not just that they were produced to the defense,

22     but know where they came from.

23          For example, is a Bates stamped document a hard copy

24     document taken from Owimrin and Ketabchi's residence or is it a

25     document taken from a particular Defendant's email account

IANJKET1                          Trial

```
 1   or --
 2              THE COURT:  If you are given a document in advance
 3   with a Bates stamp, is it the touch of a button that will
 4   enable you to know where that document came from?
 5              MS. FLETCHER:  It is not, your Honor.
 6              THE COURT:  What is it?
 7              MS. FLETCHER:  What we have requested the defense do
 8   is provide us the document, tell us where it came from, and
 9   then we'll agree to include that location or that email account
10   into the stipulation and agree that that document is authentic
11   as from where they say it's from.
12              THE COURT:  Let me ask it again.
13              If you get the document from them, and that document
14   has a Bates stamp on it --
15              MS. FLETCHER:  Yes.
16              THE COURT:  -- what will it take for you to determine
17   from whence that document came, or another way, what will it
18   take for you to determine whether or not that document is
19   authentic?
20              MS. FLETCHER:  Your Honor, it depends on whether we
21   are provided with an index of what the Bates numbers mean
22   because again those Bates numbers are not ours.
23              So there are a number of documents that I understand
24   Ms. Greenwood applied Bates numbers to, and we don't know what
25   those Bates numbers correspond to.
```

IANJKET1                    Trial

1           THE COURT:  Got it.  I understand.  I understand.

2           MS. FLETCHER:  If that information is provided, it

3    would, for example, if Mr. Abegaz-Hassen wanted to provide

4    those documents to us today, we could look overnight at the

5    location for all of them.

6           THE COURT:  They don't want you to know what their

7    cross-examination is going to be.  They don't have to let you

8    know what their cross-examination is going to be.

9           MS. FLETCHER:  I agree completely, your Honor, I agree

10   completely.  I perfectly understand why the defendants do not

11   want to preview their cross-examination, but what they're

12   essentially asking for is the opportunity to have their cake

13   and eat it, too, to show pre-authenticated documents to the

14   government's witnesses and offer those documents through the

15   government's witnesses, without giving the government an

16   opportunity to authenticate them.

17          THE COURT:  I understand your position.

18          Mr. Abegaz-Hassen.

19          MR. ABEGAZ-HASSEN:  I need to add one -- it is not

20   correct there is no government Bates stamp on the document.  It

21   might be useful to see one of the documents.

22          THE COURT:  Go ahead.  Hand it up.

23          (Off-the-record discussion).

24          MR. ABEGAZ-HASSEN:  I am just showing you can see the

25   Bates stamp.

IANJKET1                    Trial

1          THE COURT:  I see the Bates stamp, U.S.

2          MR. ABEGAZ-HASSEN:  First the number, U.S. followed by

3     an 8 or 9 digit number is the number that the government

4     assigned.

5          THE COURT:  Is this where you're going to tell me

6     48458 would identify it, for example, as an olive branch?

7          MR. ABEGAZ-HASSEN:  Correct.

8          THE COURT:  Coming from olive branch, and after the

9     underlining is the interior of the file that Ms. Greenwood put

10    on?

11         MR. ABEGAZ-HASSEN:  Correct.  So the government's

12    discovery production letter identifies the source through that

13    first Bates number.

14         THE COURT:  Ms. Fletcher, is that accurate?

15         MS. FLETCHER:  Without having seen the document, if

16    that document contains a government Bates number, a Bates

17    number beginning in U.S --

18         THE COURT:  Are all of these going to have U.S. Bates

19    numbers?

20         MR. ABEGAZ-HASSEN:  Yes, the documents at issue, yes.

21         MS. FLETCHER:  The government would be able, assuming

22    we had that document, to look at the document, determine the

23    source of that document.

24         THE COURT:  According to the Bates stamp, it is

25    something you've put on it and you would know, for example, it

IANJKET1                    Trial

1    comes from olive branch, go ahead.

2            MS. FLETCHER:  From a particular olive branch email

3    account, I suspect, not having seen the document.

4            THE COURT:  Yes.

5            MS. FLETCHER:  In order to determine that that

6    particular document, for example, was contained in that

7    production, the government would have to look in our electronic

8    files for that particular document.

9            THE COURT:  I understand, but you could go to the Case

10   Point Platform.

11           MS. FLETCHER:  We don't have access to the Case Point

12   Platform, your Honor.

13           THE COURT:  Would you have to look through -- you

14   wouldn't have to look through every document in the olive

15   branch file to locate this particular email, would you?

16           MS. FLETCHER:  We would have to run a search through

17   that email account on our database, which is a web-based

18   database which, as I understand it, we don't have access to

19   search in the courtroom.  It is an internet-based database.

20           THE COURT:  If I give you access to the internet

21   somehow, can it then be done in the courtroom?

22           MS. FLETCHER:  It could be, but for every document

23   that is shown to our witness, the government would have to ask

24   for a moment, search, find the document and --

25           THE COURT:  Okay.  I got it.  I understand.  We are

IANJKET1                        Trial

1     not going to do it that way.  Sir?

2          MR. ABEGAZ-HASSEN:  So part of the problem here is

3     that this logistical issue that the government has shouldn't be

4     our burden to overcome.

5          THE COURT:  How many documents are we talking about,

6     roughly?  Are we talking about a hundred or 20?

7          MR. ABEGAZ-HASSEN:  In the database or what the

8     defense intends to offer?

9          THE COURT:  The later.

10          MR. SCHMIDT:  Your Honor, that would end up as an

11     exhibit, depending on what the witness says, I'd say between 10

12     and 40.

13          THE COURT:  Total, not per witness?

14          MR. SCHMIDT:  No.  I am going to be cross-examining

15     Mr. Sinclair.  Mr. Abegaz-Hassen is going to be doing

16     Mr. Finocchiaro, so I can't say for him.  If I can add one

17     thing, your Honor.

18          The government gave us a thousand or more exhibits,

19     and they do not have Bates stamps on it, but we accept them, as

20     professionals, that we did not need a month adjournment to go

21     through all of their un-Bates stamped exhibits to make sure

22     that they are real exhibits that they didn't make it up.

23          THE COURT:  I understand.

24          MR. SCHMIDT:  We accepted their good-faith

25     presentation of it, and that is really what it comes down to,

IANJKET1                          Trial

1     we are going to be making these up?  That is ridiculous.

2               THE COURT:  Here is what I suggest.

3               Sometime in the course of the government's direct,

4     let's see if this works, the defense will give a set of the

5     exhibits that it may use on cross-examination of that witness.

6     The government's paralegal will then go wherever the

7     government's paralegal has to go to verify the authenticity of

8     the documents and then we start the cross-examination.

9               MR. SCHMIDT:  Your Honor, if --

10              THE COURT:  That way you're not previewing your cross

11    because it is in the hands of the paralegal, who is not going

12    to discuss what the documents are with the attorneys for the

13    government, and that way the government has a certain amount of

14    time to check where those documents came from.

15              MR. SCHMIDT:  As long as there is that wall, then I

16    have no objection.

17              THE COURT:  The government?

18              MS. FLETCHER:  May I have a moment, your Honor?

19              THE COURT:  Yes, of course.

20              (Off-the-record discussion)

21              THE COURT:  We can easily impose this on your

22    paralegal because she is not here.

23              MS. FLETCHER:  One of the issues we are discussing is

24    whether we can get another paralegal because during the

25    direct --

IANJKET1                     Trial

1          THE COURT:  Go ahead and discuss.  I think I have the

2    means.  I have signed orders where you can have internet access

3    in the courtroom, just so you're aware of that.

4          (Off-the-record discussion)

5          THE COURT:  Ms. Blakely, bring the panel up.  Do I

6    have a list of witnesses and a list of places?

7          MS. FLETCHER:  You do, your Honor.

8          THE COURT:  Where is it?

9          (Pause)

10          THE COURT:  Yes, ma'am.

11          MS. FLETCHER:  After discussing with my colleagues,

12    your Honor's proposal is workable, with the understanding the

13    paralegal we enlist to do this will not be the paralegal who is

14    sitting with us at counsel table because that paralegal will

15    have to --

16          THE COURT:  So much better, it seems to me.

17          MS. FLETCHER:  Yes, although the paralegal may not be

18    as familiar with the database, and depending on the volume of

19    documents, it is not going to be an instantaneous process.

20          So long as your Honor's process, the documents are

21    provided at some point during the direct, does not turn into

22    five minutes before the end of direct, I think this is

23    workable.

24          THE COURT:  No, it won't.

25          MR. SCHMIDT:  The documents we are talking about are,

IANJKET1                      Trial

1    indeed, those emails and they look like the email the

2    government is offering into evidence as exhibits, so it should

3    not be particularly difficult to put the date and the name.

4              THE COURT:  By the same token, there is really no

5    problem with your giving to the government paralegals the

6    relevant documents as the ones you intend to use at the

7    cross-examination at the beginning of the government's direct

8    because the lawyers aren't going to have access to those

9    documents.

10             MR. SCHMIDT:  The only problem, we need access to a

11   copying machine so we can make a copy here of what we have.

12             THE COURT:  Great.  You have lunch, okay?  This will

13   work out.  There is less here than meets the eye.  If everyone

14   is acting in good faith, it won't be a problem.

15             MS. FLETCHER:  Not to rain on that optimism, this I

16   think resolves the issue related to email communications, but

17   there is a separate issue which is actually the issue that

18   created the email issue related to documents and reports from

19   electronic devices.

20             THE COURT:  Mr. Abegaz-Hassen, is that part of what

21   you're talking about?

22             MR. ABEGAZ-HASSEN:  That's not the issue we are

23   bringing today.

24             THE COURT:  No, that is not the question.  I noticed

25   that hedge in your responses.  Are there documents that you

IANJKET1                    Trial

 1    intend to use that come from devices rather than from the Case

 2    Point Platform?

 3              MR. ABEGAZ-HASSEN:  We have a very small number of

 4    those documents that we believe we can accommodate, work out

 5    with the government.

 6              THE COURT:  All right.  Do it.  Thank you.  I am going

 7    to step off the Bench.  My Deputy will seat each of the venire

 8    people and then we'll go.

 9              MS. FLETCHER:  There are just a couple of housekeeping

10    matters we put off until today.

11              THE COURT:  You have until that back door opens and

12    the panel is here.  Proceed.

13              MS. FLETCHER:  One is allocution on each of the

14    defendants with respect to plea offers.

15              THE COURT:  Go ahead.

16              MS. FLETCHER:  Your Honor, the government extended a

17    plea offer to Shahram Ketabchi, which we understand was

18    rejected.  The government also extended two plea offers to Mr.

19    Andrew Owimrin, both of which were rejected.

20              THE COURT:  Thank you.  What else?

21              MR. ABEGAZ-HASSEN:  Could I get my documents back?

22              MR. SCHMIDT:  Your Honor, also we put in a request for

23    the transcript that has not been authorized yet.

24              THE COURT:  I haven't seen it.  Next?

25              MR. SCHMIDT:  Your Honor just so --

IANJKET1                    Trial

1          THE COURT:  You can get the transcript.  You're CJA?

2          MR. SCHMIDT:  CJA.  We want the nightly copy.  The

3     government is getting realtime copy.  We'll be satisfied with

4     nightly copy.

5          THE COURT:  Okay.  Done.  Next.

6          MS. FLETCHER:  Your Honor set a number of deadlines

7     with respect to defense exhibits 26.2 material.  The government

8     to date has not received any Rule 16 material from either

9     defendant.  We have received seven marked exhibits from Shahram

10    Ketabchi which were the subject of the oral argument before

11    your Honor.  We have not received any marked exhibits from

12    Mr. Schmidt and Mr. Abegaz-Hassen.

13         In addition to that, we have also received notice from

14    Mr. Schmidt about a proposed expert witness.  It was a notice

15    we received approximately two weeks ago.  We have requested

16    numerous times any 26.2 material for that witness and any

17    research that that witness relied upon informing his opinion.

18         THE COURT:  Mr. Schmidt.

19         MR. SCHMIDT:  Your Honor, they received notice as soon

20    as your Honor authorized the expert and I was able to speak

21    with him.  I have included recently his CV, actually the

22    information I forward the CV this weekend.  The access, the CV

23    lists his own research --

24         THE COURT:  No, no.  The research behind the opinions

25    he is going to give.

IANJKET1                      Trial

1        MR. SCHMIDT:  It lists his research that is related to

2    the opinions he is going to give as well as an article -- I

3    will forward the article -- where he indicates with footnotes

4    where the studies of this occurred, including one of his own

5    studies.  I think that that material --

6        THE COURT:  I don't understand.  It sounds like you're

7    giving the government generic material on this man.

8        MR. SCHMIDT:  No.  I am giving his material.  His CV

9    has his articles that he wrote on these issues, including the

10   footnotes that express where it was not from his own studies,

11   it is where he got that information from.

12       If I need to, I will then go into the footnotes and

13   take the footnotes out of his articles and give that

14   information separately, but it is a matter of reading the

15   articles.

16       THE COURT:  Government.

17       MS. FLETCHER:  Your Honor, the government received a

18   short expert notice.  The government, as Mr. Schmidt indicated,

19   received the expert's CV this weekend.  The government --

20       THE COURT:  What is the expert witness noticing?

21       MS. FLETCHER:  I am sorry?

22       THE COURT:  Was it simply a notice that they were

23   going to call an expert?

24       MS. FLETCHER:  It was a notice they were going to call

25   an expert, who the government understands will opine as to the

IANJKET1                     Trial

1    reasons why people in the telemarketing industry use phone

2    names as opposed to using their own names, and that at least

3    one of the reasons why a telemarketing salesperson might use a

4    phone name is the telemarketing salesperson has a name that

5    sounds like it belongs to a particular ethnicity, and so the

6    salesperson, rather than use his difficult-to-pronounce name,

7    with an identifiable cultural background, uses a generic name.

8              So here, for example, Mr. Owimrin used --

9              THE COURT:  Owens.

10             MS. FLETCHER:  Owens, correct.  That is essentially

11   what the notice says.  It is a two paragraph --

12             THE COURT:  Let me see it.  Let me see it.  Ms.

13   Blakely, are they in the back?

14             THE CLERK:  No, not yet.

15             (Pause)

16             THE COURT:  All right.  I see the notice.  Go ahead,

17   government.

18             MS. FLETCHER:  The government's issue chiefly relates

19   to the last sentence in the notice.  Under Rule 16 (b)(1)(C),

20   the government is entitled to, upon its request, the reasons

21   and bases for the expert's opinions.

22             THE COURT:  Let me just take a look at it.

23             (Pause)

24             THE COURT:  Yes, go ahead.  Mr. Schmidt cited the

25   wrong section, so I found it, yes.

IANJKET1                          Trial

1             MS. FLETCHER:  Your Honor, 16 (b)(1)(C).

2             THE COURT:  That is the right section.  Mr. Schmidt's

3     letter cites 16 (a)(1)(G).  That is all right.  I have it.

4             MS. FLETCHER:  What the government is looking for here

5     is the summary that describes the witness's opinions, the bases

6     and the reasons for those opinions.

7             THE COURT:  You're saying the notice is too generic,

8     is that what you're telling me?

9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IAN8KET2

1          MS. FLETCHER:  Yes.  And we were informed that we

2     would receive the research underlying those opinions and any

3     26.2 material for this proposed witness, but we have received

4     neither.

5          THE COURT:  Mr. Schmidt, I think they are entitled to

6     more than that rather generic statement.  You opine that the

7     use of Americanized and easy to pronounce names levels the

8     playing field.  I think they are entitled to more than a CV.

9     It seems to me they are entitled to more specificity on what

10    his opinion will be, and literally the bases and the reasons

11    for those opinions, in other words, an identification of what

12    the studies are that he is using or the experiments he has

13    done.  It requires more than handing the CV to him, which he

14    uses to get expert gigs or whatever.

15         MR. SCHMIDT:  Your Honor, the opinion is actually set

16    forth there.  This is not complicated testimony.  That is going

17    to be his opinion.  Everything else then is perhaps explaining

18    that opinion.

19         THE COURT:  No.  It's giving the bases and reasons for

20    those opinions.  They are entitled to that.

21         MR. SCHMIDT:  I will then prepare the list of studies

22    and articles and books that are reflected in his --

23         THE COURT:  That he used and that he relied on in

24    coming to the opinion that foreign or difficult-to-pronounce

25    names has a discriminatory effect, and thereby penalizes the

IAN8KET2

1    use of such names, and his opinion that the use of Americanized

2    and easy to pronounce names levels the playing field, in other

3    words, counteracts the discriminatory effect which penalizes

4    the use of foreign or difficult-to-pronounce names.

5              That's how I read this.  Get it to them.

6              Government, anything else?

7              MS. FLETCHER:  Your Honor, only that the lack of 26.2

8    material for the proposed expert Mr. Alter is an issue for all

9    defense witnesses.  We have received no 26.2 material from any

10   defense witness.

11             THE COURT:  Mr. Schmidt.

12             MR. SCHMIDT:  Your Honor, there were a couple of

13   potential witnesses other than my client, and it's not clear

14   that anyone is going to be called as a witness.  So if they are

15   not going to be called as a witness, there is no material to

16   give them.

17             THE COURT:  OK.  But don't hide the ball here.

18             MR. SCHMIDT:  Your Honor, if they end up testifying,

19   then my guess is that there will be one or two pages of

20   material to give them that they will be able to handle rather

21   quickly.

22             THE COURT:  I will rely on your good faith, sir.  I

23   don't want the government to think they are going to have an

24   onslaught of defense witnesses.  Don't hide the ball.  Get it

25   to them in adequate time.

IAN8KET2

1                  I am going to step off so the panel can be seated.

2                  Bring that panel in.

3                  (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  Ms. Blakely, please swear the jury in.

3    Ladies and gentlemen of the jury, if you would rise.

4          (A jury of 14 were duly impaneled and sworn)

5          THE COURT:  Ladies and gentlemen of the jury, now that

6    you've been sworn, I wish to give you some general guide

7    guidelines as to how to comport yourself over the next week and

8    a half or two weeks.

9          As you know, you're going to decide what the facts are

10   from the evidence that is presented in court.  There are two

11   kinds of evidence.  There is direct evidence and circumstantial

12   evidence that you're going to hear.  Evidence, by the way,

13   comes in in three different ways:

14         One, from testimony of live witnesses here on the

15   witness stand;

16         Two, from documents and other things that I admit, and

17   you'll know when that happens because somebody will seek the

18   admission of a particular document, and I'll either grant that

19   motion for admission or I'll deny it.  So you'll know when

20   something is admitted that is a document or something else.

21   That is the second way evidence comes in;

22         The third way is through stipulations of the parties.

23   Stipulations are simply agreements of the parties that a

24   certain thing is true.  Again I'll let you know when that

25   happens.

IANJKET3                          Openings

1          So the evidence is presented in open court is accepted

2     into evidence by witnesses testifying live or through a

3     videotape, you'll see that, and the second way is through the

4     admission of documents and other things, and the third way is

5     through stipulations of the parties.

6          Within that there are two different types of evidence;

7     direct and circumstantial evidence.  Direct evidence very

8     simply is evidence from somebody that that person did something

9     or saw something or heard something.  In other words, it is

10    direct.

11         Circumstantial evidence is slightly different, but it

12    is also logical when you think about it.  It is you inferring

13    from a known piece of evidence to another fact.  The example

14    that is always given in my courtroom, and I think most

15    courtrooms is as follows:

16         Assume somebody comes into the back of the courtroom

17    with a wet umbrella, and assume you can't look outside.  You

18    have direct evidence that that umbrella is wet.  You are

19    entitled to infer from the fact of that wet umbrella to another

20    fact.  The logical inference is that it is raining outside.

21    That is all there is to circumstantial evidence, ladies and

22    gentlemen.  It is inferring, on the basis of reason and common

23    sense -- not guess -- reason and common sense from a known fact

24    to a fact that you can't see or know directly.

25         Now, I do wish to point out to you that maybe it

IANJKET3                         Openings

wasn't raining outside.  Maybe the person put the umbrella

under a faucet, maybe they washed it, but certainly it is a

logical inference for you to draw from the fact of a wet

umbrella to your inference it is raining outside.  That is all

there is to circumstantial evidence.

        The law does not weight direct evidence above

circumstantial evidence or circumstantial evidence above direct

evidence.  They're of theoretical equal weight.  The main

point, though, you, the jury, decides what piece of evidence

you accept or reject regardless of whether it is circumstantial

evidence, then you, the jury, for those pieces of evidence,

whether direct or circumstantial, that you accept, you put your

own weight on it.  I really put weight on this fact and not so

much weight on that fact.  You see, you decide the weight to

put on any piece of evidence that you believe to be credible.

        You will determine which of the witnesses to believe

and of that, of their testimony, what to believe and what not

to believe and how to weight that testimony.

        You've all seen this happen in TV trials.  The lawyer

will ask a witness a question, and the other lawyer jumps up --

don't worry there is no jumping in this courtroom -- but the

other lawyer will stand up and say, "I object."  Then my job is

called upon.  I have to decide whether or not it is a proper

question under the rules of evidence.

        If I believe it is an appropriate and legal question,

1    one that tries to adduce relevant evidence, I will say

2    objection overruled, and the witness will answer.  If, however,

3    I believe it is not a question that is proper under the rules

4    of evidence, I will say, "objection sustained."  You don't have

5    to memorize this.  You will see it play out.  That means the

6    witness cannot answer.  Then the lawyer will go on to another

7    question.

8              Now, let's say there is a question from a lawyer and

9    an objection, and I sustain the objection so that the witness

10   can't answer.  What can you take from that exchange?  The

11   answer is nothing because there has been no evidence.  The

12   questions of lawyers are not evidence.  It is just the answers

13   that are evidence.  So in the example I gave you, because the

14   witness hasn't answered, you can't take anything from that

15   exchange.

16             Anything the lawyers say during the course of this

17   trial is not evidence, or I should put it a different way.

18   Nothing the lawyers say is evidence.  That goes for the

19   openings.  You're about to hear the opening argument of each

20   side.  I want you to listen to the openings, and at the end of

21   the case I want you to listen to the closing arguments and see

22   whether you agree with them or not.

23             What the lawyers say the evidence is doesn't make it

24   evidence.  You decide what the evidence was.  So anything a

25   lawyer says is not evidence.  Anything I say in the course of

this trial is not evidence, all right?  I am going to be

dealing with issues of law, not issues of fact.  I may ask

witnesses some questions.  I most likely will.  Almost always I

am asking questions because I want to elucidate something that

I think may be unclear to the jury, or I may just ask it

myself.  I have no view of the facts here, I assure you of

that.  What I say, any question I ask the witnesses is not

evidence, okay?

          Don't be influenced by questions I ask or notes I may

take.  I have other matters, and I may be working on some other

matter.  I may ask my clerks -- my clerks are at that table,

yes -- or my Deputy things having to do with other cases.

Don't worry about that.  Don't concern yourself with that.  It

has nothing to do with this trial and if, indeed, it does have

something to do with this trial, it has to be over a legal

matter, and that also is of no concern of yours.

          Similarly, I know there will be precious few sidebars

during the course of this trial, very few, but if there are,

and sometimes there just has to be, I will go with the lawyers

over there, and whatever we do there is of no concern of the

jury's because it concerns legal issues.

          If a lawyer asks a question, and I sustain the

objection, you have that question hanging out in the air with

no answer.  You can't draw any inference from the question.

This is similar to what I just told you, there is no evidence

1    from an unanswered question.

2              So I've told you in part what is not evidence; that

3    is, the questions, objections of the lawyers are not evidence,

4    anything I say is not evidence, anything you may see or hear

5    when the court is not in session is not evidence.  Again I want

6    you to have no contact with the witnesses or the lawyers or the

7    parties, and again as I told you before, if you do have any

8    contact, you need to tell my Deputy, Ms. Blakely, that and she

9    will tell me and we'll deal with that.

10             Do not do any internet research.  Do not do any type

11   of research about this case.  It is important that the 14 of

12   you will all hear the same evidence and see exactly what is

13   happening in court, and nothing that happens outside of court

14   is relevant here.  Don't do any research, don't go to any of

15   the locations, don't look up any of these people or those

16   entity's names or anything along those lines.  Just keep an

17   open mind until the end of the case when you deliberate, when

18   you start deliberating.

19             Don't talk to each other about the case.  It is

20   important that you just simply keep an open mind and listen to

21   what happens in court.

22             When you do start deliberating at the end of the case,

23   you will have the ability to look at any of the pieces of

24   evidence.  You just ask me.  I'll go over the procedure and

25   send that evidence back into the jury room, and if you want a

IANJKET3                        Openings

read-back of testimony, we'll find the testimony and bring you into the courtroom again and read that testimony back, so you don't need to memorize anything.

Don't talk to each other.  The reason is I don't want you being influenced by the early thinking of the juror who by definition hasn't heard all of the evidence.  Don't talk to each other about this case.  Talk about your families, the weather, whatever you like, but not the case.

To my knowledge, there isn't going to be any publicity about this case, but I tell all my jurors if you see anything on the radio, TV, newspapers, just turn the page or turn the radio dial or shut the TV off, and then tell Ms. Blakely about it when you come in in the morning.  I don't want you to listen to or read any of the publicity.  Again, I have absolutely no reason to believe there will be any publicity.  I tell all of my jurors that.

Remember this is a criminal case.  The two defendants have been indicted, and an indictment is not evidence.  Each of those pled not guilty.  Any defendant, each defendant, is presumed innocent, and the government is obligated to prove that individual defendant guilty beyond a reasonable doubt on every element of each of the two counts against each of the two defendants, and I will explain at the end of the trial what the elements are.

The trial is going to start, and in essence it has

IANJKET3                         Openings

already started, but the next phase of the trial, which is a

better way to phrase it, is the opening statements.  The order

of the opening statements and, for that matter, the order of

closing statements of the attorneys is set by law.  They have

no choice in that.  The government will go first with the

opening because the government has the burden of proof.  Then

each defendant's attorney will give their opening statement.

          In the opening statement, they will undoubtedly tell

you what they think the evidence is going to show and the

conclusion they want you to draw from the evidence.  Remember

you decide what the evidence actually shows.  Listen to them

and then in essence test what they're telling you against the

evidence as it comes in.  The important thing here is what they

say is not evidence.  When they're done, the government will

present its case, and the defense can cross-examine those

witnesses.

          Then if the defendants choose, they can put on their

own case, and the government will cross-examine their

witnesses, but as I think I've told you -- and, in any event, I

tell you now -- in our system of justice, the defendant is not

obligated to put on any case at all because the burden is

always on the government to prove its case beyond a reasonable

doubt.

          At the end of the evidentiary portion of this trial,

there will be closing arguments, which are similar to the

1    opening arguments insofar as the attorneys will tell you what

2    they believe the evidence did show and the conclusions they

3    want you to draw, and again it is up to you to decide what the

4    evidence actually did show.

5            Then you will hear my charge on the law, and I'll tell

6    you what the law is that you have to follow, and you apply that

7    law to the facts of this case as you find them to be.  After my

8    instructions on the law, your deliberations will then start.

9    Keep an open mind until you enter the deliberation room and you

10   begin deliberating.  Keep an open mind even then, but what I

11   mean is don't reach any conclusions until you hear from your

12   fellow jurors in the jury deliberation room.

13           The timing of the trial may change slightly every day.

14   Normally it will be 9:00, 9:15, 9:30 when we start and we'll

15   try to go as long as -- it will depend upon the witnesses.  In

16   other words, if a witness is about to finish up, and it is 5:00

17   o'clock, I will let the witness finish up, that sort of thing.

18           By the same token, if it is a quarter to 5:00, and the

19   next witness will take two hours, we'll let you go early.  So

20   basically it is 9:00 to 5:00-ish.  We'll keep to the pattern of

21   a mid-morning break for about 15 minutes and a mid-afternoon

22   break of about 15 minutes.

23           Please be here on time.  We can't begin until all 14

24   of you are here, so it is quite impolite to be keeping the

25   lawyers and the parties and 13 of your fellow jurors waiting if

IANJKET3                     Opening – Mr. Sobelman

1    you're late, so everyone will appreciate it if you're on time.

2         Tomorrow we are going to start at later.  Now,

3    counsel, that is different than the timing I gave you earlier,

4    but we're going to start at 9:30.  Not only that, but the

5    mid-morning break has to be a little longer than normal.  It

6    will be a half hour.  We'll take that mid-morning break at

7    11:00 simply because I have other matters that I have to attend

8    to at that time.  We will get a full day of trial tomorrow and

9    every day.

10        Opening arguments.  The government goes first.  For

11   the government, Mr. Sobelman, sir, you're on.

12        MR. SOBELMAN:  Your Honor, may I have a moment to

13   rearrange the podium?

14        THE COURT:  Of course.  Anyone can stand wherever they

15   like.  (Pause)

16        MR. SOBELMAN:  This is a case about two fraudsters.

17   One is a con man who called people and lied to them in order to

18   get their money.  That con man is Andrew Owimrin.  The other

19   fraudster lied to credit card companies in order to keep the

20   money that Owimrin and his partners in crime had taken from

21   their victims.  That fraudster is Shahram Ketabchi.

22        Both defendants were members of the telemarketing

23   scheme.  They both worked for telemarketing companies that were

24   set up to rip people off.  Owimrin and other salespeople called

25   their victims on the phone and scammed them out of money

1    through a series of lies and false promises.

2           You will learn that many of those victims were

3    elderly.  Owimrin said he was selling services to help the

4    victims with at home or internet businesses that would make the

5    victims money.  He told them that his other customers were

6    making money.  He told them that they would make their money

7    back within just a few months.  He told them to put it all on

8    their credit cards because they would make tens of thousands of

9    dollars by the end of the year, but he knew that all of that

10   was lies.

11          Ketabchi had a different role, but one that was

12   critical to keeping the scheme going.  His job was to fight the

13   credit card companies to keep the victims' money, but Owimrin

14   and his partners in crime charged up thousands of dollars on

15   the victims' credit cards for these so-called business

16   services, but the victims received virtually nothing in return.

17          Many of the victims realized they had been lied to and

18   tried to get their money back.  Owimrin and his partners

19   refused because that's not how the scheme worked.  Instead,

20   they tried to convince the victims to stick with it just a

21   little bit longer.  Owimrin got a commission for each sale.  He

22   wanted that money.  He and his partners knew the victims were

23   never going to make their money back, but they did not care.

24          Sometimes the victims realized they had been

25   defrauded.  If Owimrin and his partners couldn't convince the

1    victims to keep waiting, the victims complained to their credit

2    card companies.  The credit card companies then asked Owimrin

3    and his partners to explain themselves.  That's where Ketabchi

4    came in.  Even though he knew the victims had been lied to and

5    that none of them made any money, he blamed the victims.  He

6    told the credit card companies that the victims were the real

7    liars and that Owimrin and his partners in crime had done

8    nothing wrong.

9            This was a simple, shameless fraud and the defendants

10   were at the center of it.  What were their roles in the fraud?

11   Owimrin and Ketabchi are charged with two crimes:

12           First, they're charged with participating in a

13   conspiracy to commit wire fraud.  The evidence will show this

14   was an agreement between Owimrin, Ketabchi and their partners

15   in crime to commit fraud on the victims of their telemarketing

16   scheme.  They're also charged with participating in a

17   conspiracy to commit money laundering.

18           The evidence will show that this was an agreement

19   between Owimrin, Ketabchi and their partners in crime to

20   transact in the proceeds of their fraud for the purpose of

21   continuing the scheme.

22           To be clear, we're not here today just because

23   Owimrin, Ketabchi and their partners in crime sold things to

24   people over the phone.  We're here today because the defendants

25   used telemarketing to defraud victims and fought back against

1    the victims' efforts to get their monies back.

2            This opening statement is our opportunity to give you

3    a preview of what we expect will happen at this trial.  I am

4    going to do that in two parts:

5            First, I'll talk about what the evidence will show;

6            Second, I'll describe how we're going to prove beyond

7    a reasonable doubt that the defendants are guilty.

8            What is the evidence going to show?

9            You're going to learn that the defendants worked for

10   two telemarketing companies that were part of the fraud scheme.

11   Owimrin was a phone salesperson, a telemarketer.  Owimrin told

12   lies to victims and made sales.  Ketabchi told lies to credit

13   card companies to keep those sales.

14           So what was Owimrin selling?  What he called business

15   opportunities, or biz op for short.  He called them business

16   services for at-home or internet-based businesses.  They

17   weren't businesses at all.  They were just on paper copy and

18   paste business plans.

19           Owimrin and his partners told the victims, hundreds of

20   people who were all over the country, including here in New

21   York, that they would set up businesses and websites, make sure

22   customers visited the websites and bought things from them, and

23   that all they would have to do is pick up the checks from the

24   mailbox as the profits came rolling in.

25           Owimrin told some of the victims they would make back

1    their initial payment, usually between 5 to $10,000.00, in just

2    weeks or months and that they would make many times that within

3    a year.  He told some of the victims that they would receive

4    their first check within 60 or 90 days.  He told impressive

5    stories about how much money his other customers were making.

6    He even told them that they did not need to put any time or

7    effort into the business, just pay him money, he would take

8    care of the rest.

9         These so-called business opportunities that Owimrin

10   was selling might sound to you like they were too good to be

11   true.  That's because they were.  The evidence will show that

12   it was all a lie.  None of the victims made any money, and they

13   were never meant to.  That was not what Owimrin, Ketabchi and

14   their partners were focused on.  They were focused on lining

15   their own pockets.

16        So the telemarketing scheme was set up to take the

17   victims' money, but the fraudsters also had to find a way to

18   keep that money after the victims told their credit card

19   companies they had been defrauded.  So what did the fraudsters

20   do?  They made the victims sign sham contracts.  They

21   threatened lawsuits when victims asked for their money back.

22   They lied to credit card companies.

23        That's where they brought in Shahram Ketabchi.  The

24   evidence will show that his role was to keep the victims' money

25   at all costs.  He knew his partners lied to the victims and

IANJKET3                    Opening - Mr. Sobelman

took advantage of them.  He knew that the victims hadn't made a

dime.  He knew that the victims had told their credit card

companies how they were defrauded.  What did he do?

He didn't apologize.  He certainly didn't give them

their money back, no.  He doubled-down.  He fought back with

more lies.  He sent the credit card companies the sham

contracts.  He told them the victims were lying, and sometimes

he won.  But sometimes the victims won, and the companies who

processed the credit card charges took notice.

Those processing accounts are known as merchant

accounts.  Any company that wants to accept credit card

payments has to have it and a bank account to go with it.  You

will learn that a regular, legitimate company might have one or

two of these merchant accounts and bank accounts to go with it.

You will learn the defendants and their partners had

several merchant accounts.  Why?  They needed those accounts to

launder the proceeds of the scheme, and their merchant accounts

kept getting shut down due to large number of customer

complaints and requests for their money back.

So what did Owimrin and his partners in crime do?

The evidence will show that Owimrin wasn't able to get

a merchant account on his own, so someone else had to do it for

him.  Owimrin didn't give up.  He wanted to do whatever he

could to help the scheme succeed, so he opened a bank account

with the name of another company that existed only on paper but

IANJKET3                     Opening – Mr. Sobelman

was linked to a merchant account that one of his partners in

crime had opened.  That way Owimrin and his partner could

charge up victims' credit cards using the merchant account and

then transfer that money into Owimrin's bank account.  They did

that for two reasons:

          First, so they could spend the money for themselves;

and

          Second, so the processing company couldn't take the

money back when the victims disputed the charges.

          Ketabchi did his part, too.  The lies he told to the

credit card companies helped him and his partners in crime keep

the victims' money.  It also was critical to keeping those

merchant accounts open.  You will learn that if Ketabchi had

told the truth, the victims would have gotten their money back

and the merchant accounts would have been shut down because too

many refunds are a red flag for fraud.

          Let's talk about how we're going to prove that each

defendant is guilty.  The evidence will come in in a few forms,

including documents, evidence recovered from search warrants

and witness testimony.  You're going to see several types of

documents during the trial.

          For example, you will see the sham contracts that

Owimrin and his partners had the victims sign.  You will see

emails between Owimrin, Ketabchi and other members of the

scheme where they discussed victims who wanted their money back

1    and fake names that Owimrin and the other salespeople used on

2    the phone.  You will also see the proceeds of the scheme, bank

3    documents and credit card statements showing the victim

4    payments to companies operated by Owimrin, Ketabchi and their

5    partners in crime.

6            You will also see evidence obtained from search

7    warrants.  You will learn that a search of Shahram Ketabchi's

8    apartment in California revealed a treasure trove of evidence;

9    copies of complaints filed by victims, copies of the sham

10   contracts and copies of letters filled with lies that Ketabchi

11   sent to credit card companies in order to keep them from giving

12   the victims their money back.  You will also hear from

13   witnesses, and they will fit into two main categories:

14           First, you will hear from some of the defendants'

15   partners in crime.  They're co-conspirators, individuals who

16   participated in the telemarketing fraud scheme and who

17   defrauded victims with the defendants.  These witnesses will

18   take you inside the scheme like no other witnesses could.

19   They're going to tell you how the fraud worked, how salespeople

20   that Owimrin trained, how payments were processed, how money

21   was made, how Ketabchi lied to the credit card companies to

22   keep that money and keep the merchant accounts open.

23           They'll tell you how victims that had access to lots

24   of money, who they called whales were passed around so everyone

25   could get a piece of the action.  You will find no one who

1    worked for these telemarketing operations actually thought they

2    were selling a real functioning business or actually believed

3    that the victims would make any money.  These witnesses know

4    all of this because they were there.

5         Now, let me say a few words about these witnesses.

6    They have pled guilty to serious crimes for their role in the

7    telemarketing fraud scheme and they're cooperating with the

8    government in the hopes of getting a reduced sentence, so you

9    should scrutinize their testimony carefully.  When you do, you

10   will learn how each one's testimony is consistent with the

11   testimony of the others and consistent with all the other

12   evidence in the case.

13        Who else will you hear from?

14        Some of the victims of Owimrin's and Ketabchi's

15   scheme, the victims will tell you about the lies they were told

16   when they received calls from Owimrin and the other

17   salespeople.  You will learn that the victims paid money to

18   those companies as a result of those lies, thousands of dollars

19   each.

20        You will learn how some of them made more than one

21   purchase from these companies because they were told that if

22   they spent just a few thousand dollars more, they would finally

23   start making their money back.  They never did.  Some of the

24   victims you will hear from spoke directly with Owimrin and were

25   told some of those lies by Owimrin himself.  They knew him by

IANJKET3                          Opening – Mr. Sobelman

1    the fake names he used on the phone, Andrew Owens and Jonathan

2    Stewart.

3           Other victims you will hear from wrote complaints

4    about the fraud found in Ketabchi's apartment, complaints he

5    read, but then fought back against to try to keep their money

6    for himself and the other members of the scheme, and also to

7    keep their merchant accounts open so that he and his partners

8    could continue racking up charges on the victims' credit cards.

9           As I have explained, you are going to see many

10   documents, hear testimony from several witnesses in this case.

11   That evidence is how we're going to prove to you beyond a

12   reasonable doubt that Andrew Owimrin and Shahram Ketabchi are

13   guilty.

14          Ultimately, this is a simple case.  It is a case about

15   two fraudsters.  Owimrin is a con man who lied to people on the

16   phone to take their money.  Ketabchi is a fraudster who lied to

17   credit card companies to keep the victims' money.  They were

18   both members of a fraud scheme that stole thousands of dollars

19   from each victim.

20          Before I sit down, I am going to ask you to do three

21   things during this trial:

22          First, please pay close attention to the evidence;

23          Second, please listen carefully to Judge Stein's

24   instructions on the law; and

25          Third, use your common sense as you see the evidence,

1    the same common sense you use to make decisions in your

2    everyday lives.

3         If you do those three things, the defendants will get

4    a fair trial and the government will get a fair trial.  At the

5    end of the trial you will return the only verdict that is

6    consistent with the evidence, and that is that the defendants

7    are guilty.

8         THE COURT:  I thank you Mr. Sobelman.

9         Ladies and gentlemen, you now will hear the opening, a

10   statement by Mr. Schmidt, the attorney for Mr. Owimrin.  Sir.

11        MR. SCHMIDT:  Good afternoon, ladies and gentlemen.

12        I agree absolutely with the government's evidence,

13   that near the end what your job is is to listen and pay close

14   attention and use your common sense because your common sense

15   is going to tell you many things that the government did not

16   present to you.

17        Now, first, you heard an opening statement by the

18   government.  You will hear witnesses testify.  This whole case

19   will wrap up in less than two weeks, so you will have all this

20   information given to you in two weeks, and it is going to be a

21   lot of information, and a lot of that is going to be lies, lies

22   that some people told the victims, some that witnesses will

23   testify to.

24        What I need you to do as a juror, as the person making

25   this decision, is something that is very different and very

IANJKET3                        Opening  - Mr. Schmidt

difficult because this is a case where Andrew Owimrin first

started at his first telemarketing company back in March and

April of 2014.  He left the two marketing companies that is the

subject of this case in the summer of 2016, over that period of

time.

       At no point did all of these facts, complaints come

together to him in one container.  I spent hours thinking and

talking to people how to describe how differently you must look

at the case, in a way that they'll understand it.  The best I

did was to come up with an example of a very slow drip in the

faucet.

       Now, if you have a faucet and you know it is going to

cost a plumber $300.00 to come in and fix it, and it is such a

slow drip, you don't pay attention to it, you let it go.  You

don't think about every single drip.  You don't think about how

much water has now flowed over the course of two years through

that faucet.

       What the government is doing, they become the bucket.

They want you not to think of this as this little drip at a

time of information, but as all of that water, drip-by-drip,

that took two years to fill this huge bucket, and that's why

you knew Andrew Owimrin knew that it was a fraud because you're

looking at this huge bucket of water, but Andrew Owimrin is

not.

       What you will find out about Andrew Owimrin is that he

IANJKET3                         Opening  - Mr. Schmidt

1    grew up in New Jersey as a first generation American, and at

2    the 10th grade he left high school because his father needed

3    him to work in his flooring business.  So his educational

4    background is the 10th grade.  He worked there for six and a

5    half years, and when his father's health meant that he couldn't

6    work any more, Mr. Owimrin worked doing handyman work.

7           Now, when that business moved out of New Jersey, he

8    started working at pizza places, delivering pizza, serving

9    people, busing pizza.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        MR. SCHMIDT:  And he wanted to better himself.  And he

2   applied for a police job in a local town in New Jersey, took

3   the test, did what he had to and was waiting, and he knew it

4   was going to be many months, when he was asked by his cousin to

5   come to apply for this job in this marketing firm that his

6   cousin just started.  And he went.  And he met and was

7   interviewed by three people who appear to be, indeed,

8   experienced fraudsters:  William Sinclair, or Bill; Michael

9   Finocchiaro, or Fino; and Arash Ketabchi, who was the boyfriend

10  of one of Andrew's cousins.

11       And this young man, who is about 24 at the time, who

12  had nothing to do with marketing before, had nothing to do with

13  business before, he was impressed.  Bill Sinclair sold him,

14  persuaded him that this is a job that he could make a lot of

15  money.  He said, I will teach you everything.  I will listen to

16  your calls, I will tell you what to say, and you will be

17  successful, and you will make $80,000 a year.  And if you

18  don't, at least you gave it a good try.

19       Now, to a young man with, at this point, a GED, this

20  was a marvelous opportunity.  He did not go into this job

21  thinking that he was selling nothing to people who were going

22  to use their life savings.  He thought that he had a real

23  marketing job.  And he was taught how to do it.  And he was

24  trained how to do it.  He had a script how to do it.

25       Importantly, he was taught the difference between how

IAN8KET4                          Opening – Mr. Schmidt

1    to do it correctly and how not to do it, how it was wrong or

2    illegal to do it another way.  And during the course as he is

3    working, he sees the guys who are doing it the wrong way

4    getting punished and even fired.  He knows that his calls are

5    being monitored, and when he makes a mistake, he has to do some

6    training and try to correct it.  And he made some mistakes.

7    But his intent was always to do it correctly.

8            And he had his trust in the men who trained him.  He

9    developed trust.  But those people not only failed him by

10   involving him in their schemes, which appears that they tried

11   to do it the right way at first, but they failed him because

12   they took this 24-year-old and made him into an oxycodone

13   junkie.  They were doing oxycodone.  They were making it

14   available.  And yes, Andrew could have said no, and Andrew made

15   mistakes and said yes, and he did oxycodone with them.  They

16   were dealing it.  They were lying to doctors to get it.  And he

17   was paying just about everything that he was making to get

18   these pills until he had nothing left, and even lost his

19   apartment.  He even went back to these people, after he cleaned

20   himself up, and he started up again.

21           So you will learn that Andrew is a person with many

22   faults.  But one of those faults is not being a scam artist.

23   One of those faults is not wanting to take money from people

24   under false pretenses.

25           You will learn and I expect your introduction to this

1    is going to come out of the government cooperating witnesses,

2    because his bosses will tell you how this kind of operation

3    works, and how after a sale is made the salesman has almost,

4    usually very little contact with the customer.  But he is

5    explained, and you will hear it, how they are supposed to be

6    fulfillment people.  For example, if you sell somebody an LLC

7    to be prepared and filed, there is supposed to be somebody who

8    then prepares and files the LLC.  If you sell somebody a

9    business plan, there is supposed to be a person who is going to

10   train and assist the customer with the business plan.

11          You will hear that when the company that was called

12   Youngevity was being sold, that what was supposed to come with

13   the purchase was a Web site, marketing, social media, SEO, a

14   search engine optimization plan, and there was supposed to be

15   people to fulfill it.  And you will find there were people to

16   fulfill it, and you will find out that there were lots of

17   problems with the people fulfilling these obligations.  But you

18   will find out that that information rarely ever went back to

19   the salesperson, because the owners wanted the salespersons to

20   believe what they told them, that people were getting what they

21   were supposed to, that people were making money.  And Andrew

22   Owimrin trusted them when they told him that.

23          He trusted them, and so when he made a representation

24   he believed it was true.  The fact that it was not always true

25   because of the real scam artists not doing what they promised

1    to do, he did not know that.  The fact that the scam artists

2    had to pay somewhere between 15 and 40 percent to the people

3    handling the credit card accounts on their behalf just so they

4    could use a credit card was not given to Andrew Owimrin.  The

5    fact that the people who were supposed to fulfill the

6    obligations were only getting 10 percent of the money was not

7    told to Andrew Owimrin.

8            So you will hear about scams and you will hear about

9    scammers.

10           The people that you will hear are those people are the

11   government cooperators who have pled guilty to their crimes,

12   who were Andrew Owimrin's trusted bosses.  And you will hear

13   from them how they tried to set it up in a way that actually

14   did something, actually did provide some services, maybe not

15   the full services that the victims thought they were going to

16   get, but they tried.  And it's my understanding you are going

17   to hear from another cooperating witness, one who did not do

18   anything honestly in her life, one who sold lies.  So you will

19   see the difference between someone who is a real scammer and a

20   24- or 25- or 26-year-old, with a GED degree, who trusted these

21   older men, who made friends with him, who treated him

22   correctly, who treated him nicely.  So you will see the

23   difference.

24           I am not going to tell you that you will not see real

25   victims on the witness stand.  You will see real victims on the

1   witness stand.  Some of those victims lost money.  Some victims

2   were lucky, they did not lose money.  But all of them lost some

3   of their own self-respect.

4           But at least one is a victim that you see right now,

5   and he is sitting right over there.  He is not a victim that

6   lost money.  Oh, he made a lot of money, and he spent most of

7   that money on drugs.  But he became a drug addict because of

8   them.  He is ashamed now looking back of what he participated

9   in, and it will be very difficult for him to watch the

10  witnesses testify about losing their life savings.  And he is

11  sitting here now with the power and the authority of the

12  government of the United States trying to put him away.

13          He might not be as sympathetic as a victim as some of

14  the people that you will hear on the stand, but he is indeed a

15  victim.  And you will see the difference, maybe not on direct

16  examination when the government prepares their witnesses and

17  have them testify the way they expect to, but on

18  cross-examination at least, the difference between someone who

19  is a scammer and someone who worked for them and became a

20  victim of theirs.

21          So, yes, I ask you to do the same thing as the

22  government asked you.  Watch, listen, and think.  Think common

23  sense, your life experience, but think in a way not here

24  looking at this huge tub of water, but how this happens by drip

25  by drip, in the eyes of a young man who thinks he has now the

IAN8KET4

opportunity of his life to become a real middle-class person

and not a pizza delivery boy.

    If you do that, he will have a fair trial, and I am

very confident that the verdict that you will reach is that the

government failed to prove their case beyond a reasonable

doubt, because there is no case against Andrew Owimrin.

    Thank you very much.

    THE COURT:  Thank you, Mr. Schmidt.

    MR. SOBELMAN:  May we have a very brief sidebar?  I

tried not to interrupt out of courtesy to counsel.

    THE COURT:  Very brief.  Sidebar.

    (At the sidebar)

    THE COURT:  I take it you don't like the fact that the

government is trying to put these people away, is that what you

don't like?

    MR. SOBELMAN:  That and the comment about the power of

the government trying to put him away.  We think that was

plainly an inappropriate comment, and I expect the Court will

instruct the jury at the end of the case that they are not to

consider punishment, and that would contradict that direction

completely.

    THE COURT:  I am not sure --

    MR. SOBELMAN:  The government expects that the Court

views the law that counsel may not make arguments about

punishment, and that the jury may not consider punishment

IAN8KET4

1    during the course of the case.

2          THE COURT:  That's true.  Wait.

3          Yes, it is true that they will be instructed

4    punishment is only for me; they may not consider whether or not

5    there is to be punishment or what the punishment is in the

6    event of a conviction.

7          MR. SOBELMAN:  Mr. Schmidt's comment about the

8    government putting his client away and the power of the

9    government putting his client away both puts the government on

10   trial, which is inappropriate, and also an inappropriate

11   reference to incarceration.

12         MR. SCHMIDT:  Certainly I agree with your Honor that

13   what punishment Mr. Owimrin will receive if he is convicted

14   after trial is something for you to decide and not the jury to

15   decide.  Absolutely.  And I am sure in your Honor's charge to

16   the jury you will instruct them on that.

17         I basically tried to be as vague as possible of what

18   the power of the government is trying to do.  Using the word to

19   convict him, basically what they are trying to do is convict

20   him, and putting him away is just sort of an expression to fit

21   with that.

22         THE COURT:  Just to conjure up bars in front of the

23   man.

24         Here is what I will do.  I understand what you are

25   doing.  I do think you did cross the bar.  I will tell the jury

1    that there was a reference -- I will simply tell the jury that

2    the issue of punishment is for me and that they are not to

3    consider that in any way.

4              MR. SOBELMAN:  We would also ask, your Honor, that the

5    instruction about the government not being on trial, whether

6    you want to do it at this moment or some point after the

7    opening statement, might be appropriate at this time.  Because

8    making it about the government using its power, appropriately

9    or inappropriately, we don't view as fair argument.

10             MR. SCHMIDT:  If I may, the government is using its

11   power to try to convict my client of this crime.  That's what

12   they are doing.  They are not on trial.  Their case is on

13   trial.

14             THE COURT:  Let's go.

15             (In open court)

16             THE COURT:  Ladies and gentlemen, you heard a

17   reference by Mr. Schmidt to the effect the government is trying

18   to put Mr. Owimrin away.

19             I want to remind you of two things.  First, the issue

20   of punishment in the event of conviction is entirely for me to

21   decide.  The issue of whether or not a defendant, upon

22   conviction, is to be punished, and if so, how, is not to enter

23   into your deliberations at all.  I do punishment.  You

24   determine whether or not the government has met its burden of

25   proving its case beyond a reasonable doubt against each

1    defendant.  That and nothing more.

2                It's Mr. Owimrin and Mr. Ketabchi who are on trial

3    here.  The government is not on trial.

4                Let's proceed.  Let's have the opening statement of

5    Mr. Paul on behalf of Mr. Shahram Ketabchi.

6                Sir.

7                MR. PAUL:  Thank you, your Honor.

8                Counsel, good afternoon, ladies and gentlemen.

9                I know it's late in the day, but I just ask for your

10   attention a little bit longer.  And I would like to take this

11   opportunity to reintroduce myself.

12               My name is Kenneth Paul.  I am the attorney

13   representing Steven Ketabchi, who is sitting there.  And

14   joining me during this trial will be my associate counsel,

15   Jacob Mitchell.

16               You will learn that Steven Ketabchi's birth name is

17   Shahram Ketabchi, as indicated in the indictment itself.  But

18   he chose to Americanize his name to Steven many years ago.  And

19   so he decided that the Shahram name was too difficult to

20   pronounce and it was easier just to change his name to Steven

21   to make it easy for everybody.

22               As you have heard to this point, Steven Ketabchi has

23   been charged with knowingly and intentionally participating in

24   a fraud.  You have all been chosen as jurors to determine his

25   fate.  Both the government and the defense have decided and

1    agreed that each one of you would be fair and impartial and

2    objective.  So congratulations.

3          I say that because all of us like to be looked at as

4    fair and impartial and having no biases or prejudices.  And we

5    all like to think of ourselves, if we were sitting there, that

6    we would be good jurors in determining our own fate.

7          So we have entrusted you as the jurors in this case to

8    listen carefully and apply the facts to the law as Judge Stein

9    will give it to you at the conclusion of this trial.

10          You have already been instructed by the Court in some

11   preliminary remarks -- which will be given again at the

12   conclusion of this trial -- that my client is presumed to be

13   innocent.  Those are not just words, but rather, it is

14   essential that you all understand, acknowledge, and fully

15   accept that concept as the law throughout this trial.

16          I like to equate the presumption of innocence with

17   being similar to a shield, a shield that protects my client

18   now, as he sits there before you, and continues to do so

19   throughout the conclusion of this trial, after all of the

20   evidence has been presented to you.  It continues to protect

21   him even when his Honor, Judge Stein, has given you his

22   instructions on the law at the conclusion of this trial and you

23   get up and go into that jury room to begin your deliberations.

24          This protective shield of presumption of innocence is

25   only shattered when and if -- and again I emphasize if -- all

1    of you determine that the evidence in this case that the

2    government has presented has satisfied their burden of having

3    proven him guilty beyond a reasonable doubt.

4            Now, why do I keep emphasizing this presumption of

5    innocence to you?  Because though it seems so easy to

6    understand on its surface, it really is quite difficult to

7    truly follow.  What do I mean and why do I say that?

8            As an example, I would bet that when many of you came

9    into this courtroom and looked around to see who was who, and

10   finally determined which were the defendants, that some of you,

11   perhaps not all, but some of you may have said, What do you

12   think these guys did?, rather than, What do you think these

13   guys are accused of having done?  And that's where presumption

14   of innocence comes in.  They are accused of having done

15   something.

16           So put out of your mind, as some of you may have when

17   you entered -- I don't know for sure -- put out of your mind

18   that they did something until the government has proven to your

19   satisfaction that they have.

20           You have also heard -- and will again at the

21   conclusion of this case by the Court -- that the burden of

22   proof always rests with the government, meaning that the burden

23   of proving this charge is with the government at all times, and

24   therefore always remains at this table throughout the entire

25   trial.  And that is because they have presented an indictment

IAN8KET4                        Opening - Mr. Paul

1    accusing my client of committing a crime for which he has said

2    "I'm not guilty."

3                This burden that remains on this table never shifts to

4    this table.  So even the defense has no burden at all to

5    present anything to you.  If the defense chooses to present any

6    evidence during the course of this trial, that does not mean

7    that the burden of proving anything has shifted to the defense

8    table.  It always, even in that situation, remains with the

9    government.  Never shifts to the defense.  My client has said

10   he is not guilty and therefore, as I indicated, he is presumed

11   to be innocent, and the burden of having to prove his guilt

12   beyond a reasonable doubt rests solely and completely with the

13   government at all times.

14               So what is this case all about?  This is a case about

15   fraud being committed by some on many who were vulnerable

16   targets.  These potential customers were, for the most part,

17   elderly individuals, who either had money or good credit, and

18   were ready, willing and able to spend it on any get-rich-quick

19   scheme that they could find.

20               You will learn that the fraud involved in this case

21   consisted of a sophisticated system where the salespeople would

22   have a list of potential targets to call and pitch any number

23   of merchandise items to purchase or various services to be

24   provided.

25               These customers were led to believe that they wouldn't

1    have to do anything, except, perhaps, in some cases, take

2    coaching lessons that were to be provided to them as part of

3    the sale so they would be in a better position to make money

4    from their Web sites that were set up for them.  They would

5    then just have to sit back and wait to receive their checks,

6    checks that, to no one's surprise, would ever arrive.

7            Obviously, I would never even suggest that this group

8    of individuals, who each themselves knowingly and intentionally

9    became involved in this fraudulent scheme, are sympathetic in

10   any way.  Just the opposite.

11           I know Steven will not like me saying this, because

12   it's about his own brother, Arash Ketabchi, who no matter what

13   he still loves and forgives as a true brother.  But Steven's

14   misfortune and the difficulty he finds himself in today is

15   because he happens to be the trusting brother of Arash

16   Ketabchi.

17           Arash Ketabchi is someone you are going to hear a lot

18   about during this trial.  Because he was one of several of the

19   first-class con men involved in this fraud.  He conned some of

20   these customers into spending their money for something he knew

21   was never going to make the customers any money at all.  He

22   conned anyone and everyone, including, unfortunately, his own

23   brother Steven.

24           And I remind you, during the course of this trial, you

25   are going to hear the name Ketabchi a lot.  Just make sure you

IAN8KET4                         Opening - Mr. Paul

factor into your thinking when we are talking about Arash

Ketabchi and not confuse him with Steven Ketabchi, my client.

        Steven, being the loving brother that he is, over the

course of many years, had always done menial and everyday basic

tasks for Arash, because either Arash didn't want to be

bothered or wasn't very proficient on a computer.  And Steven

was capable and willing to do these errands or tasks without

much difficulty.

        Included in the many tasks -- and these are just

some -- that Steven did for his brother were, among other

things, the following:  Paying many of Arash's everyday bills,

helping him to apply for unemployment insurance with the New

York State Department of Labor, helping him apply for Social

Security, assisting in getting Arash a refund on an airline

ticket on a trip that was canceled, helping Arash fill out

paperwork for a home mortgage, helping him with rental

contracts and related issues, purchasing merchandise for him,

helping Arash with issues he had with the Department of Motor

Vehicles or health insurance issues, or maintaining Arash's

bank accounts, helping him to gather information for his taxes,

even arranging to send flowers to Arash's girlfriend on behalf

of his brother.  No task was too small for Arash to ask and

have Steven do.

        Steven was more than willing to do these tasks and

paperwork for his brother even though he was often very busy

1    himself while driving for Uber and/or Lyft just to make ends

2    meet while he was trying to make his own failing business.

3          In addition to doing these many tasks for his brother

4    over the past several years, he was also asked by Arash to

5    handle some of the chargebacks filed by customers when Arash

6    began his own business, namely, the A1 business.  This task was

7    simply added to the many tasks that Steven was already doing,

8    and continued to do for his brother.

9          For taking this job seriously, and helping his brother

10   by contesting what is referred to as chargebacks, Steven has

11   now been charged by the government with having knowingly and

12   intentionally participated in this fraud.  The truth is Steven

13   didn't either.  He did not participate in this fraudulent

14   scheme, either knowingly nor intentionally.

15         As you will learn when the Court instructs you on the

16   law, one has to both knowingly and intentionally participate in

17   the charged conspiracy in order to have committed wire fraud.

18   These are just two of the elements of the charged crime that

19   the government must prove beyond a reasonable doubt before

20   Steven's presumption of innocence, as we have discussed, can

21   even be challenged.

22         You are going to hear a lot during this trial about

23   chargebacks.  So what is a chargeback?

24         First, let me say that in almost any business there

25   are going to be complaints made by customers and requests by

IAN8KET4                          Opening - Mr. Paul

 1   them for their money to be returned or their credit card
 2   refunded.  There is nothing unusual with this happening.  It
 3   happens every day in every business.  The credit card company
 4   would then, in such a case, reach out to the merchant who sold
 5   them the item, or items, for which the customer is contesting
 6   and request from the merchant their response in order to avoid
 7   a refund.  Assuming it exists, the merchant would then send a
 8   copy of the customer's contract, along with proof of the items,
 9   or service purchased, having been provided to the customer.
10         These supporting documents are often provided to the
11   merchant by a fulfillment company whose job it is to fulfill
12   the contract obligations by sending the merchandise to the
13   customer.  Obviously, the merchant does not want to have to
14   refund the money to the customer, for obvious reasons.  Besides
15   not wanting to lose the sale, it does not want its merchant
16   account to be flagged with too many chargebacks and not be
17   able, in those circumstances, to continue doing business.
18         So how is the government going to prove this case?
19   Well, for one, at least as I understand it, the government is
20   going to call as their own cooperating witnesses some of the
21   most callous and crooked individuals, who you would never want
22   to come across or make contact in your own life, who were
23   themselves admittedly involved in participating in fraudulent
24   telemarketing schemes over several years.  You will hear from
25   these witnesses and how they participated in the scheme and how

1    they knowingly took advantage of targeted individuals.

2           They have since pleaded guilty as part of their

3    cooperation agreement with the government.  Such a cooperation

4    agreement allows for these individuals to receive, in return

5    for their cooperation with the government, a significant

6    reduction in their sentencing when they come before their

7    sentencing judge.  Instead of facing many years in jail for

8    their crimes they have admittedly committed, they could

9    potentially walk away with little or no jail time at all in

10   return for cooperating with the government.

11          Listen to what these cooperating witnesses have to say

12   on the witness stand; not only about their own conduct, but the

13   conduct of others.  Listen carefully to what they have to say,

14   or not say, about my client, Steven Ketabchi.

15          Will they tell you, the jury, that Steven was well

16   aware of the fraud being committed by his brother and others?

17   No.  Not a one.

18          Will they tell you, unlike them, that Steven ever

19   communicated with potential customers, or made any sales

20   pitches, or made any ridiculous promises to anyone?  No.

21          Will they tell you that Steven ever did anything more,

22   other than being a pain in the ass, in his diligent attempts to

23   gather and provide the contracts and supporting documents and

24   then forward them on to the credit card companies where

25   customers were requesting refunds for any number of reasons?

IAN8KET4                          Opening – Mr. Paul

1    No.

2          In other words, as you will learn, Steven's role was

3    to simply challenge the chargebacks by forwarding supporting

4    documentation to the credit card companies.  That was his role.

5    And that is what Steven did regarding these chargebacks.  No

6    more.  No less.

7          Does the fact that Steven simply received and then

8    forwarded the supporting documents in contesting these

9    chargebacks show beyond a reasonable doubt that he had the

10   knowledge and intent required to be found guilty of having

11   participated in this fraud?  No.

12         You are going to be shown diagrams by the government

13   of how the offices where these individuals actually worked, how

14   they were laid out, where people were sitting, where their

15   offices were.  You will see from these diagrams that the

16   salespeople were in the middle of the office floor, and they

17   were making their sales pitches.  And the cooperating

18   witnesses, they had their offices on the outside, as did Arash

19   Ketabchi and others.  They had their own separate offices away

20   from the salespeople, who all congregated in the middle, on the

21   phone, I assume making sales pitches, some honestly making

22   sales pitches, some obviously promising things that were never

23   going to be provided.

24         And where was my client located during the months that

25   the government contends he was involved in this fraud?  Was he

1     on the sales floor where the salespeople were working and could

2     be overheard calling potential customers and pitching their

3     goods?  No.

4             Was he ever aware of what the salespeople may have

5     been promising in these calls to some of the customers over the

6     phone that were often outside the scope of the contract that

7     was entered into with them?  No.

8             In fact, was he ever on the phone at any time

9     communicating with any potential customer, or, in fact, victim

10    in this case?  No.  Never.

11            So where was Steven Ketabchi when this so-called fraud

12    was being committed?  He was in his own apartment located in

13    California, residing there, driving an Uber and a Lyft car.

14    And at all times during this alleged wire fraud conspiracy, and

15    for many years before and to this day, my client was living and

16    working in California.  He never once worked in any office

17    alongside any of these salespeople, in a New Jersey office or

18    any other such location.

19            That is why when any of these customers or victims

20    testify at this trial about how they may have been ripped off

21    or promised things that never happened, I probably will not

22    have many questions, if any, of them, since they had no contact

23    with my client.

24            If anything, with some of these victims, Steven may

25    have been presented with the task of challenging their requests

1   for chargebacks.  In other words, he may have provided the

2   credit card company with a boilerplate letter, along with

3   supporting documents, showing the signed contract and that it

4   had been honored.  That is it.  That is all.  That is their

5   case against my client.

6          And what does Steven do today, as I indicated?  He

7   drives an Uber, sometimes for Lyft.  And does that sound like

8   someone who has made lots of money off the misfortune of others

9   who were victimized in this fraud?

10          Let me also remind you that there are going to be two

11   trials going on in this courtroom.  These two defendants are

12   being tried together simply as a convenience, and for no other

13   reason.  I would submit that sitting as a juror in any criminal

14   trial is enough of a difficult job in and of itself.  It's a

15   rough task to ask of each of you.  However, to make your job

16   even more difficult, as if it needed to be, in this case you

17   are going to be listening to two separate trials.  So you will

18   have to evaluate and determine how the testimony and evidence

19   may apply or not apply to each of these individual defendants.

20   I only ask that you be very careful in deciphering the

21   evidence, or lack of evidence, and how it applies to my client,

22   Steven Ketabchi.

23          In conclusion, let me just say that I always view a

24   criminal trial like a jigsaw puzzle.  And by that I mean a

25   jigsaw puzzle has lots of pieces, as we all know.  And the task

IAN8KET4

of presenting these pieces is on this table, as I have

indicated.  They are the ones who are responsible.  In fact,

they have the job of presenting the evidence or the pieces of

the puzzle.  And it's also their job, while they present these

pieces of the puzzle, to make sure at the conclusion of the

case they have presented a fair, untarnished picture, like you

get when you put all the pieces together of a puzzle.  That's

their job.  It's not my job to present a picture of my client's

innocence.  It's their job to present a picture of my client's

guilt beyond a reasonable doubt.

      And when I stand up here at the conclusion of this

trial, and we go over the evidence that has been presented, or

the lack of evidence that has not been presented, with regard

to my client, we will review the pieces of this puzzle and we

will determine together -- hopefully you will agree with me --

that at the conclusion of the case the government has in fact

failed in their job in presenting a clear, untarnished, very

clear picture of my client's guilt.  And I will ask you as a

consequence, in following your oath as jurors, that because the

government has failed in their task of the burden of proving my

client guilty beyond a reasonable doubt that, in fact, he is

not guilty.  And that should be your verdict on both counts of

this indictment.

      Thank you.

      THE COURT:  Thank you, Mr. Paul.

IAN8KET4                    Weissenberger - Direct

1            Ladies and gentlemen, let's take a ten-minute break.
2    Then we will hear testimony.  You have not heard a word of
3    testimony yet.
4            What I would like you to do is when you leave and when
5    you come into the courtroom, leave in order and come this way.
6            So, Juror No. 1, you will be the first person out.
7    And Ms. Blakely will take you to the jury deliberation room.
8    That's the room you will come to in the morning.  Don't come to
9    this courtroom, come to the jury deliberation room.
10           Go ahead.  Ten-minute break, ladies and gentlemen.
11           (Jury exits courtroom)
12           THE COURT:  Government, who is your first witness and
13   how long is the projected direct?
14           MR. SOBELMAN:  Diane Weissenberger.  She will be
15   somewhere between 30 and 45 minutes on direct.
16           THE COURT:  At least on direct you will be done before
17   5.
18           MR. SOBELMAN:  Likely.
19           THE COURT:  We will see what the cross is and if we
20   can finish her today.  Great.
21           OK.  Ten minutes.
22           (Recess)
23           THE COURT:  Bring the jury in.  Take your places.
24           Jury entering.
25           (Continued on next page)

 1              (Jury present)

 2              THE COURT:  Please be seated in the courtroom.

 3              Government, call your first witness, please.

 4              MR. SOBELMAN:  The government calls Diane

 5    Weissenberger.

 6              THE COURT:  Ms. Weissenberger, if you would please

 7    rise, my deputy will speak to you.

 8     DIANE WEISSENBERGER,

 9         called as a witness by the government,

10         having been duly sworn, testified as follows:

11              THE DEPUTY CLERK:  State your name for the record.

12              THE WITNESS:  Diane Weissenberger,

13    W-E-I-S-S-E-N-B-E-R-G-E-R.

14              THE COURT:  Please be seated.

15              Welcome, Ms. Weissenberger.

16              Your witness, Mr. Sobelman.

17    DIRECT EXAMINATION

18    BY MR. SOBELMAN:

19    Q.  Good evening, Ms. Weissenberger.

20              Ms. Weissenberger, where do you live?

21    A.  Indianapolis, Indiana.

22    Q.  What is your educational background?

23    A.  High school graduate.

24    Q.  Are you employed?

25    A.  Not now.

IAN8KET4                        Weissenberger - Direct

1    Q.  When were you last employed?

2    A.  I retired in 2004.

3    Q.  Where did you work at that time?

4    A.  J.C. Penney.

5    Q.  What was your job at J.C. Penney?

6    A.  I was a sales associate.

7    Q.  Why did you stop working?

8    A.  I retired on disability.

9    Q.  I would like to direct your attention to the fall of 2015.

10   At that time, did you have an income?

11   A.  Yes.

12   Q.  What was your income?

13   A.  Social Security and a small pension from Penney's.

14   Q.  Were you interested in increasing your income at that time?

15   A.  Yes.

16   Q.  What, if anything, did you do to try to increase your

17   income?

18   A.  Nothing until I was called.

19   Q.  What type of people called you?

20   A.  People who wanted me to start a home business.

21   Q.  Did you make any payments to those people?

22   A.  Yes, I did.

23   Q.  Did the telemarketers or people that called you say what

24   businesses they were calling from?

25   A.  Yes.  The first person that called me was Business

1   Development Center.

2   Q.  Do you recall the names of any of the other companies you

3   were called from?

4   A.  Yeah.  A1 something consultants and a Web site.  There were

5   two or three others, but I can't recall the others without

6   looking at my notes.

7   Q.  I am going to ask you some questions about Business

8   Development Center.  Do you know if that was the real name of

9   the company you were called from?

10  A.  As far as I know.

11  Q.  Who did you speak with at Business Development Center?

12  A.  Andrew Owens and Owen -- I can't think of the name right

13  now.  I'm too nervous.

14  Q.  Ms. Weissenberger, take your time.

15          THE COURT:  I understand that.  I assume you haven't

16  testified in federal court before, is that correct?

17          THE WITNESS:  Not in any court.

18          THE COURT:  Just take your time.  Relax, take a deep

19  breath.  Everyone here is just people.

20  Q.  Ms. Weissenberger, is there anything that would refresh

21  your recollection about the other person you spoke with from

22  Business Development Center?

23  A.  Probably, if I saw my notes, it would give me a chance.

24          I think it came to me.  Andrew Owens and Owen Roberts.

25  Q.  What did Andrew Owens tell you about his role with Business

1    Development Center?

2    A.  He was the senior adviser with Business Development Center.

3    Q.  By the way, do you know if Andrew Owens was his real name?

4    A.  As far as I know.  I had no reason to think it wasn't.

5    Q.  Approximately how many times did you speak to Andrew Owens?

6    A.  A few, maybe three to five.  I couldn't say the number

7    exactly.

8    Q.  What, if anything, did Andrew Owens try to sell you?

9    A.  It was a Web site for selling health products.

10   Q.  What, if anything, did you tell Andrew Owens about what

11   your role would be with any business you would purchase?

12   A.  I told him that I was not interested in working, period.  I

13   was 70 years old.  I didn't want to make phone calls.  I didn't

14   want to work the Internet.  I didn't want to do anything.

15   Q.  How did he respond when you said that?

16   A.  He said, Oh, Ms. Weissenberger, you don't have to, we will

17   take care of everything for you.

18   Q.  What, if anything, did Mr. Owens say about how much money

19   you would make?

20   A.  I was given a one-year goal of six figures.

21   Q.  What did you understand that to mean?

22   A.  To me, a goal means something you strive for, you hope to

23   make it.  And if you don't make it at all, you will probably

24   get close to it; it's a goal and you work for it.

25   Q.  What, if anything, did Mr. Owens say about whether any

1   money you paid to him would be tax deductible?

2   A.  He said the first $15,000 would be 100 percent tax

3   deductible.

4   Q.  Did you ultimately pay him and his company money?

5   A.  Yes.

6           MR. SOBELMAN:  Ms. Lee, could you please show the

7   witness what has been marked for identification as Government

8   Exhibit 150.

9   Q.  Ms. Weissenberger, do you recognize this?

10  A.  Yes.

11  Q.  What is it?

12  A.  It's a service agreement.

13  Q.  Did you review this exhibit in preparation for your

14  testimony today?

15  A.  Yes.

16  Q.  Is this a true and accurate copy of that service agreement?

17  A.  Yes.

18          MR. SOBELMAN:  Your Honor, the government offers

19  Government Exhibit 150.

20          MR. SCHMIDT:  If I may have a moment, your Honor.

21          THE COURT:  Any objection?

22          MR. SCHMIDT:  I do want to look at the paper.

23          THE COURT:  Go ahead.  Look.

24          MR. SCHMIDT:  I have no objection.

25          THE COURT:  Admitted without objection Government

1   Exhibit 150.

2              It may be published to the jury.

3              Ladies and gentlemen, publishing it to the jury in

4   human language just means you can take a look at it.

5              (Government's Exhibit 150 received in evidence)

6              THE COURT:  Proceed, Mr. Sobelman.

7              Again, remember, you can see any of these things that

8   I admit.

9              Can everyone see it there?  OK.

10             Can it be enlarged?

11             MR. SOBELMAN:  We will zoom in on certain portions.

12             THE COURT:  Enlarge the entire thing now if you can.

13             MR. SOBELMAN:  Ms. Lee, is it able to be enlarged at

14   all?

15             THE COURT:  Let's proceed.

16             Go ahead, Mr. Sobelman.

17             MR. SOBELMAN:  Ms. Lee, can you please enlarge the top

18   half of the document for us to start with.

19   BY MR. SOBELMAN:

20   Q.  Ms. Weissenberger, are you able to read it on the screen?

21   A.  Yes.

22   Q.  Is it too small or would you like me to make it larger?

23   A.  I can read it I believe.

24   Q.  Ms. Weissenberger, whose handwriting in highlighting do we

25   see on this page?

IAN8KET4                     Weissenberger - Direct

1    A.   Mine.

2    Q.   What is the business that's listed in the first paragraph?

3    A.   Business Development Center.

4    Q.   Whose name is listed later in the sentence?

5    A.   Mine.

6    Q.   What is the date of this document?

7    A.   September the 9th, 2015.

8    Q.   What amount is listed under products and/or services?

9    A.   $4,995.

10   Q.   Can you please read what is listed under products and/or

11   services?

12   A.   "Entity setup tax plan."

13   Q.   Ms. Weissenberger, at the time you were provided this

14   service agreement, what was your understanding of what "entity

15   setup" meant?

16   A.   That they would set up the things to get the business

17   running.

18   Q.   Do you recall ever receiving an entity setup from Business

19   Development Center?

20   A.   No.

21   Q.   What was your understanding of what tax plan meant at the

22   time that you received this agreement?

23   A.   A tax plan, as far as I am concerned, is something that

24   shows income and outgo so that you know what to pay for taxes.

25   Q.   Did you ever receive that from Business Development Center?

IAN8KET4                         Weissenberger - Direct

1   A.  No.

2              MR. SOBELMAN:  Ms. Lee, if you could please go to page

3   3.

4              If you could please zoom in on -- perfect.

5              THE COURT:  Can you make that larger?

6              Go ahead.

7   Q.  Ms. Weissenberger, there are four digits on a credit card

8   number listed in the middle of the page.  Is that a credit card

9   number you held at the time?

10  A.  Yes.

11  Q.  What amount is listed underneath that credit card four

12  digits?

13  A.  $4,995.

14  Q.  At the bottom of the page there is a signature.  Is this

15  your signature?

16  A.  It's an e-signature.

17  Q.  What do you mean by an e-signature?

18  A.  It's done on the computer, and I don't understand the

19  technicalities but I know it was done on the computer.

20  Q.  So this agreement, just to be clear, was sent to you online

21  or by e-mail?

22  A.  Yes.

23  Q.  And you executed it online?

24  A.  Yes.

25  Q.  So that's not --

1          THE COURT:  Did you affix your signature there?

2          THE WITNESS:  It looks like my signature.  Some of

3     them were and some of them weren't.

4     Q.  To be clear, you did e-sign this particular contract?

5     A.  Yes.

6          MR. SOBELMAN:  Ms. Lee, could you please display what

7     is marked for identification, just to the witness, Government

8     Exhibit 151.

9          THE COURT:  Ladies and gentlemen of the jury, just so

10    you understand, when something is not admitted, the jury isn't

11    permitted to see it.  That's why your screens will be black.

12    Once I admit it, that means the jury can see it, and it will

13    pop up on your screens.

14    Q.  Ms. Weissenberger, can you see that document?

15    A.  Yes.

16    Q.  Do you recognize this?

17    A.  Yes.

18    Q.  What is it?

19    A.  It's a copy of one of my credit card statements.

20    Q.  Is this a true and accurate copy of that bill as you

21    received it?

22    A.  Yes.

23         MR. SOBELMAN:  Your Honor, the government offers

24    Government Exhibit 151.

25         MR. SCHMIDT:  No objection, your Honor.

IAN8KET4                        Weissenberger - Direct

1              THE COURT:  Admitted without objection.

2              (Government's Exhibit 151 received in evidence)

3              MR. SOBELMAN:  Ms. Lee, could you please display it

4    for the jury.

5    Q.  Ms. Weissenberger, whose handwriting in highlighting do we

6    see on this page?

7              THE COURT:  Make it larger if you can.

8              MR. SOBELMAN:  Maybe we can take just the top half of

9    the page.

10   Q.  Ms. Weissenberger, whose handwriting in highlighting do we

11   see on this page?

12   A.  Mine.

13   Q.  What is the last four digits that's listed on this credit

14   card bill?

15   A.  4720.

16   Q.  To be clear, is that the same four digits that was on the

17   contract that we just looked at?

18   A.  Yes.

19   Q.  What is the date range on this bill?

20   A.  August 18 to September the 17th, 2015.

21   Q.  In the top of the transaction section, can you please read

22   whose name is on this bill?

23   A.  Mine, Diane Weissenberger, the name, transactions for Diane

24   Weissenberger.

25   Q.  On the top left of the page, how much was the credit limit

IAN8KET4                         Weissenberger - Direct

1    on this card at this time?

2    A.  I have to find it.

3               $10,200.

4    Q.  How much available credit was there at this time?

5    A.  Zero.

6    Q.  Looking underneath the transaction section, can you please

7    read us the details of the last transaction that's listed

8    there?

9    A.  Yes.  9th of September, Business Development Center, with a

10   phone number in New York City, $3,995.

11   Q.  Is that the amount you agreed to pay in the contract we

12   just looked at?

13   A.  It's actually $1,000 less than what was on the contract.

14   Q.  Do you know why you were charged $1,000 less than what was

15   on the contract?

16   A.  Because I didn't have enough line of credit left on my

17   charge card.

18   Q.  After making this purchase from Mr. Owens, were you

19   contacted by any other phone salespeople?

20   A.  Yes.  I talked to Andrew Owens and --

21   Q.  Let me stop you there.  Earlier you mentioned a company

22   named A1?

23   A.  Yes, A1.  I can't remember the last two names in it.  But

24   that was Jonathan Stewart that I talked to from that company.

25   Q.  Approximately how long after your purchase from Mr. Owens

1   were you contacted by Mr. Stewart?

2   A.  I couldn't tell you exactly, but it was a number of days.

3   Q.  Did Mr. Stewart provide you with his phone number at any

4   point?

5   A.  Yes.

6   Q.  Do you recall Mr. Stewart's phone number as you sit here

7   today?

8   A.  Not by heart, but I'm sure it's on my notes.

9   Q.  Did you take notes during your conversations with Mr.

10  Stewart?

11  A.  Yes.

12  Q.  Were those notes accurate when you took them?

13  A.  Yes.

14          MR. SOBELMAN:  Ms. Lee, can you please show the

15  witness what is marked for identification as Government Exhibit

16  159.

17  Q.  Ms. Weissenberger, do you recognize this?

18  A.  Yes.

19  Q.  What is it?

20  A.  It's notes that I wrote down when I talked to different

21  people.

22  Q.  Is this a true and accurate copy of your notes?

23  A.  Yes.

24          MR. SCHMIDT:  If I may, could I voir dire on this

25  exhibit, please?

IAN8KET4                        Weissenberger - Direct

1          MR. SOBELMAN:  We are not going to seek to admit it.

2     Q.  Do these notes include the phone number you wrote down for

3     Mr. Stewart?

4     A.  Yes.

5     Q.  Please read the phone number that you wrote down for Mr.

6     Stewart.

7          MR. SCHMIDT:  Objection, your Honor.

8          THE COURT:  Read it to yourself.

9          MR. SOBELMAN:  Your Honor, this is a recorded

10    recollection.

11         THE COURT:  Past recollection recorded?

12         MR. SOBELMAN:  Yes, your Honor.

13         THE COURT:  Yes, sir.  Mr. Schmidt.

14         MR. SCHMIDT:  I have an objection and I would like to

15    make my record on this issue.

16         THE COURT:  I really want the sidebars kept down to a

17    minimum.

18         Come on.

19         (Continued on next page)

20

21

22

23

24

25

IAN8KET4                        Weissenberger - Direct

```
 1                  (At the sidebar)
 2                  THE COURT:  Government, what is the past recollection
 3       recorded number?  I am looking for it.
 4                  MR. SOBELMAN:  Federal Rule of Evidence 803(5).
 5                  THE COURT:  Yes, sir.  Mr. Schmidt.
 6                  MR. SCHMIDT:  Your Honor, in the 3500 material that we
 7       received, which includes this exhibit, there are different
 8       colored pens --
 9                  THE COURT:  I see.  Next.
10                  MR. SCHMIDT:  -- in different places here.  There is
11       also --
12                  THE COURT:  In different places here?  I am looking at
13       your copy and Government Exhibit 159 has different colored ink.
14                  Next.
15                  MR. SCHMIDT:  I inquired today, because there are many
16       repetitions in a number of the 3500 material received from
17       this, how they received it so we can understand when these
18       notes were written, since they are obviously written at
19       different times.  So that's why I don't think they laid the
20       proper foundation yet of present recollection recorded based on
21       you have a sheet of paper that looks like it was written down
22       on different times.
23                  THE COURT:  I don't know that.  Let's find out.  Mr.
24       Sobelman will answer that.
25                  What can you tell us?
```

IAN8KET4                          Weissenberger - Direct

1          MR. SOBELMAN:  I laid a textbook foundation under past

2    recollection recorded, and she testified that these were some

3    of the notes that she took during conversations with Mr.

4    Stewart.

5          THE COURT:  Let me just look at the testimony.  Hold

6    on.

7          She said that it's notes that she wrote down when she

8    talked to different people.  Establish that her notes were made

9    when she talked to the various people.

10         MR. SOBELMAN:  OK.  I will, your Honor.

11         THE COURT:  Mr. Schmidt.

12         MR. SCHMIDT:  Well, your Honor, based on looking at

13   this, and the government hasn't apparently preserved the

14   originals, it's impossible to see which ones were written down

15   together and when.  If she can actually indicate --

16         THE COURT:  803(5) is a record that -- it's on a

17   matter that she once knew, but now cannot recall well enough to

18   recall.

19         I think she has testified to that; is that correct,

20   sir?

21         MR. SOBELMAN:  Yes, your Honor.

22         THE COURT:  That it was made by her when it was fresh

23   in the witness's memory.  And she will answer one way or the

24   other about whether it was written down when she talked to

25   various people and accurately reflects the witness's knowledge.

IAN8KET4                          Weissenberger – Direct

1    Once that foundation is laid, I am going to let him ask this

2    question.

3              Sir, you clearly knew this was an issue.  So these

4    types of questions need to be brought to my attention, if they

5    can't be worked out by the parties, before we start in the

6    morning or after we are done.

7              MR. SCHMIDT:  First of all, I did not know she was

8    going to be called as the first witness.

9              MR. SOBELMAN:  We told you days ago.

10             THE COURT:  Gentlemen, move on.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Ladies and gentlemen, what happens at

3     sidebar are only legal matters and they are of no concern of

4     yours.

5          Mr. Sobelman, next question.

6          MR. SOBELMAN:  Yes, your Honor.

7     BY MR. SOBELMAN:

8     Q.  Ms. Weissenberger, with respect to Mr. Stewart's phone

9     number that he provided you, is that something you once knew

10    but cannot recall as you sit here today?

11    A.  I never knew it by heart.

12         THE COURT:  Not by heart.  You don't have to know it

13    by heart.

14         THE WITNESS:  I know it was his number because he gave

15    it to me on the phone.  Is that what you're asking?

16         THE COURT:  No.  That's what he is asking.

17    Q.  Ms. Weissenberger, the notes that are reflected in

18    Government Exhibit 159, were those made by you when the matter

19    was fresh in your memory?

20    A.  Yes.  I wrote that phone number down while I was speaking

21    to him on the phone.

22    Q.  And do you have any doubt that those notes are an accurate

23    reflection of what your knowledge was at that time?

24    A.  No.  They are accurate.

25    Q.  Ms. Weissenberger, please read the number you wrote down

1     for Mr. Jonathan Stewart into the record.

2     A.  201-838-7774.

3          MR. SOBELMAN:  Ms. Lee, please take down Government

4     Exhibit 159 now.

5     Q.  Approximately how many times did you speak to Mr. Stewart?

6     A.  I couldn't say the number exactly, but it was several.

7     Q.  What, if anything, did Mr. Stewart try to sell you?

8     A.  He told me that he would be doing -- giving the business

9     credit and I think the taxes.  I would know more if I saw my

10    notes.

11    Q.  What, if anything, did you tell Mr. Stewart about the type

12    of work you were interested in doing?

13    A.  I told him that I did not want to do any working.  I did

14    not want to make phone calls or monitor Web sites or watch a

15    computer or do anything.

16    Q.  How did he respond when you told him that?

17    A.  He said that that was fine, that the company did everything

18    for me.

19    Q.  What, if anything, did Mr. Stewart say about how much money

20    you would make?

21    A.  I'm not sure if he quoted me a price, a number.

22    Q.  By the way, do you know whether Jonathan Stewart was his

23    real name?

24    A.  I have no idea.  I assumed it was when I talked to him on

25    the phone.  That's what he told me.

IAN8KET4                          Weissenberger – Direct

1    Q.  Do you know if Andrew Owens and Jonathan Stewart are

2    actually the same person?

3    A.  It never occurred to me that they were.

4    Q.  Did you pay Mr. Stewart and his company any money?

5    A.  Yes.

6            MR. SOBELMAN:  Ms. Lee, could you please show the

7    witness what is marked for identification as Government Exhibit

8    152.

9    Q.  Ms. Weissenberger, do you recognize this?

10   A.  Yes.

11   Q.  What is it?

12   A.  It's a product and services agreement with A1 Business

13   Consultants.

14   Q.  Did you review this exhibit in preparation for your

15   testimony today?

16   A.  Yes.

17   Q.  Is this a true and accurate copy of that contract?

18   A.  Yes.

19           MR. SOBELMAN:  Your Honor, the government offers

20   Government Exhibit 152.

21           MR. SCHMIDT:  I have no objection.

22           THE COURT:  Admitted without objection.

23           (Government's Exhibit 152 received in evidence)

24           MR. SOBELMAN:  Ms. Lee, can you please display it to

25   the jury.

1            If we can zoom in on the top half.

2    Q.  Ms. Weissenberger, could you please read the title of the

3    document?

4    A.  "Product and services agreement with A1 Business

5    Consultants."

6    Q.  What company is listed in the first paragraph?

7    A.  A1 Business Consultants LLC.

8    Q.  Whose name is in the paragraph after that?

9    A.  Mine.

10   Q.  What is the date on this document?

11   A.  17th day of September 2015.

12   Q.  Is that just about eight days after the other contract we

13   looked at with respect to Mr. Owens?

14   A.  Yes, right about there.

15   Q.  What is the price that's listed on this document?

16   A.  I can't see it.

17   Q.  Under product and services.

18   A.  $5,000.  I'm sorry.

19   Q.  Could you please read the two items that are listed under

20   product/services?

21   A.  Corporate credit and bookkeeping.

22   Q.  What was your understanding at the time you received this

23   contract of what "corporate credit" meant?

24   A.  It meant that they would be giving me credit in corporate

25   business names other than -- in my business name other than my

1    personal credit.

2    Q.  Did you ever receive that?

3    A.  No.

4    Q.  What was your understanding of what "bookkeeping" meant

5    under product and services?

6    A.  That they would be doing my bookkeeping for me.

7    Q.  Did you ever receive those services from A1?

8    A.  No.

9            MR. SOBELMAN:  Ms. Lee, if you could please go to page

10   3.

11           THE COURT:  Ladies and gentlemen, in the page you just

12   saw, some of that material was blacked out.  Did you see that?

13   Lawyers call those redactions.  It's simply blacking out things

14   that are irrelevant.  You don't have to be concerned with it.

15   Normally it's personal information.  It's credit card numbers,

16   addresses, things of that nature.  If it's blacked out it's not

17   your concern.

18           MR. SOBELMAN:  Ms. Lee, could you please zoom in on

19   the bottom half of the page.

20   Q.  Ms. Weissenberger, could you please read the last four

21   digits of the credit card number that's listed?

22   A.  8239.

23   Q.  What is the amount that's on this contract?

24   A.  $5,000.

25   Q.  Is this a document that you e-signed?

1    A.  Yes.

2          MR. SOBELMAN:  Ms. Lee, could you please show the

3    witness what is marked for identification as Government Exhibit

4    153.

5    Q.  Ms. Weissenberger, do you recognize this?

6    A.  Yes.

7    Q.  What is it?

8    A.  It's a cardholder continuation of services agreement.

9    Q.  Is this a true and accurate copy of an agreement you

10   received?

11   A.  Yes.

12         MR. SOBELMAN:  Your Honor, the government offers

13   Government Exhibit 153.

14         MR. SCHMIDT:  I have no objection, your Honor.

15         THE COURT:  Admitted without objection.

16         (Government's Exhibit 153 received in evidence)

17         MR. SOBELMAN:  Ms. Lee, could you please display it

18   for the jury.

19         If we can zoom in on the top half.  Maybe just put up

20   the first paragraph with the title.

21   Q.  Ms. Weissenberger, could you please read the title of the

22   document?

23   A.  "Cardholder continuation of services agreement."

24   Q.  Whose name is listed?

25   A.  Mine.

IAN8KET4                         Weissenberger - Direct

1    Q.  What is the company that's listed?

2    A.  Business Development Center.

3    Q.  What is the date on this document?

4    A.  18th of September 2015.

5    Q.  Is that just the day after the contract we just looked at?

6    A.  I believe so, yes.

7    Q.  Could you please read the entire paragraph?

8    A.  "I, Diane Weissenberger, Indianapolis, Indiana --"

9             THE COURT:  Ladies and gentlemen of the jury, read it

10   yourselves.  We don't have to have this witness go through the

11   trouble of reading that.  Just read it to yourselves right now.

12            MR. SOBELMAN:  May I pause for a moment for them to do

13   so?

14            THE COURT:  You will need to.

15            MR. SOBELMAN:  Thank you, your Honor.

16            THE COURT:  Proceed.

17   BY MR. SOBELMAN:

18   Q.  Ms. Weissenberger, what is the amount that's listed at the

19   end of the paragraph?

20   A.  $9,999.

21   Q.  What is the last four digits of the credit card number

22   listed in the last sentence?

23   A.  8239.

24   Q.  Is that the same last four digits of the credit card number

25   we looked at in the contract from the day before?

1   A.  Yes.

2               MR. SOBELMAN:  Ms. Lee, could you please

3   display -- I'm sorry.  Withdrawn.

4   Q.  Ms. Weissenberger, what was your understanding of this

5   agreement at the time it was provided to you?

6   A.  At this point in time, without reading it through slowly, I

7   can't answer that.

8               MR. SOBELMAN:  Ms. Lee, could you please display

9   Government Exhibit 152 next to Government Exhibit 153.

10              If we could just zoom in on the product/services

11  section on 152.

12  Q.  What is the purchase price on this contract?

13  A.  $5,000.

14              MR. SOBELMAN:  If we could just go back to 153 for a

15  moment.

16  Q.  Look at the bottom half of the page.

17              How many amounts are listed here?

18  A.  Two.

19  Q.  What are those two amounts?

20  A.  $5,000 and $4,999.

21  Q.  For the same credit card or two different credit cards?

22  A.  Same card.

23  Q.  Do you know what the $4,999 charge was for?

24  A.  No.

25              MR. SOBELMAN:  Ms. Lee, could you please show the

IAN8KET4                        Weissenberger – Direct

1    witness what is marked for identification as Government Exhibit

2    154.

3    Q.  Ms. Weissenberger, do you recognize this?

4    A.  Yes.

5    Q.  What is it?

6    A.  A refund authorization form.

7    Q.  Is it a true and accurate copy of a form that was provided

8    to you?

9    A.  Yes.

10          MR. SOBELMAN:  Your Honor, the government offers

11   Government Exhibit 154.

12          MR. SCHMIDT:  If I may briefly, your Honor?

13          THE COURT:  Yes.

14   VOIR DIRE EXAMINATION

15   BY MR. SCHMIDT:

16   Q.  The handwritten in blue ink at the bottom, is that your

17   handwriting?

18   A.  Yes.

19   Q.  Do you know when you wrote that?

20   A.  No, because I don't have a date on it.

21   Q.  Do you know how long after you received this form that you

22   wrote on it?

23   A.  Long enough for me to receive my next credit card

24   statement.

25   Q.  So it was sometime between the credit card statement?

IAN8KET4                    Weissenberger - Direct

1    A.  Yes.

2              MR. SCHMIDT:  I have no objection, your Honor.

3              THE COURT:  Admitted.

4              (Government's Exhibit 154 received in evidence)

5              MR. SOBELMAN:  Ms. Lee, please display Government

6    Exhibit 154 for the jury.

7              If we can zoom in on the top half of the page.

8    BY MR. SOBELMAN:

9    Q.  Ms. Weissenberger, would you please read the title of this

10   document?

11   A.  "Refund authorization form."

12   Q.  What company is listed next to company name?

13   A.  A1 Business Consultants LLC.

14   Q.  What is the date on this document?

15   A.  September 18, 2015.

16   Q.  Is that the same date on the continuation of sales

17   agreement we just looked at?

18   A.  Yes.

19   Q.  Whose name is listed under customer information?

20   A.  Mine.

21   Q.  What is the amount to be refunded listed on this document?

22   A.  $5,000.

23             MR. SOBELMAN:  I will pause so that the jury may read

24   the paragraph under "please read carefully."

25             THE COURT:  Jury, please read that paragraph

IAN8KET4                        Weissenberger - Direct

1    carefully.

2              Yes, sir.

3    BY MR. SOBELMAN:

4    Q.  Ms. Weissenberger, what is the last four digits of the

5    credit card number that's listed in that paragraph?

6    A.  8239.

7    Q.  What is the amount of money that's listed in that

8    paragraph?

9    A.  $5,000.

10   Q.  Is 8239 the same credit card number that was listed in the

11   continuation of services agreement in the contract we just

12   looked at?

13   A.  Yes.

14   Q.  Did you ever receive the refund referenced in this form?

15   A.  No.

16             MR. SOBELMAN:  Ms. Lee, could you please show the

17   witness what is marked for identification as Government Exhibit

18   155.

19   Q.  Ms. Weissenberger, do you recognize this?

20   A.  Yes.

21   Q.  What is it?

22   A.  It's a copy of my credit card statement.

23   Q.  Is this a true and accurate copy of that bill?

24   A.  Yes.

25             MR. SOBELMAN:  Your Honor, the government offers

1  Government Exhibit 155.

2              MR. SCHMIDT:  I have no objection.

3              THE COURT:  Admitted without objection.

4              (Government's Exhibit 155 received in evidence)

5              MR. SOBELMAN:  Ms. Lee, please display it for the

6  jury.

7              If you could please zoom in on the document.

8  Q.  Ms. Weissenberger, could you please read what entity this

9  bill is issued by in the upper left-hand corner?

10 A.  The Third Bank.

11 Q.  What type of credit card was it for?

12 A.  Platinum MasterCard.

13 Q.  What are the dates on this bill?

14 A.  From August the 28th, 2015, to September the 27th, 2015.

15 Q.  For the first transaction that's listed, could you please

16 read to us the transaction date, postdate, description and

17 amount?

18 A.  Transaction date 9/17, postdate 9/21, Business Development

19 C, with a New York phone number, in the amount of $4,999.

20 Q.  Could you please do the same for the second transaction

21 listed?

22 A.  Transaction date 9/17, postdate 9/21, Bis Dev Cent, phone

23 number in Deer Park, New York, for $5,000.

24 Q.  Was either of those charges ever refunded to you?

25 A.  No.

1          MR. SOBELMAN:  Ms. Lee, could you please show the

2     witness what is marked for identification as Government Exhibit

3     411B.

4     Q.  Ms. Weissenberger, do you recognize this?

5     A.  Yes.

6     Q.  What is it?

7     A.  A copy of a product and services agreement with A1 Business

8     Consultants LLC.

9     Q.  Is this a true and accurate copy of this contract?

10    A.  Yes.

11         MR. SOBELMAN:  Your Honor, the government offers

12    Government Exhibit 411B.

13         THE COURT:  Take a look at it on the screen, sir.

14         MR. SCHMIDT:  I really can't, your Honor.  It's hard

15    to read.

16         THE COURT:  Blow it up.

17         MR. SCHMIDT:  Thank you.

18         THE COURT:  Any objection?

19         Any objection?

20         MR. SCHMIDT:  We don't have this in our folders.  I

21    would really like to look at the whole document.

22         THE COURT:  Can the government provide a paper copy of

23    that electronic document to the defendant?

24         MR. SOBELMAN:  Yes.  We will do it now.

25         THE COURT:  Mr. Schmidt, do you have it?

IAN8KET4                              Weissenberger – Direct

1          MR. SCHMIDT:  I do have it now.

2          THE COURT:  Government, you don't have to provide it.

3          MR. SOBELMAN:  Thank you, your Honor.

4          MR. SCHMIDT:  I have no objection, your Honor.

5          THE COURT:  Admitted without objection.

6          (Government's Exhibit 411B received in evidence)

7          MR. SOBELMAN:  Ms. Lee, can you please display

8    Government Exhibit 411B for the jury.

9          Please zoom in on the top half of the page.

10   BY MR. SOBELMAN:

11   Q.  Ms. Weissenberger, could you please read the title of this

12   document?

13   A.  "Product and services agreement with A1 Business

14   Consultants LLC."

15   Q.  What company is listed in the first paragraph?

16   A.  A1 Business Consultants LLC.

17   Q.  Whose name is listed?

18   A.  Mine.

19   Q.  What is the date on this document?

20   A.  7th day of October 2015.

21   Q.  What is the price that's listed on the document under

22   product/services?

23   A.  $14,495.

24   Q.  Whose initials appear in handwriting on this page?

25   A.  Mine.

1   Q.  Did you write that?

2   A.  Yes.

3   Q.  Could you please read what the two items are underneath

4   product/services?

5   A.  Business plan and corporate credit.

6   Q.  At the time you received this contract, what was your

7   understanding of what "business plan" would mean?

8   A.  A business plan to me would be what the business consisted

9   of, the plan for the sales or whatever, the Web site, whatever

10  was going to be done with the business.

11  Q.  Do you recall ever receiving such a document?

12  A.  No.

13  Q.  What was your understanding of what "corporate credit"

14  meant?

15  A.  Corporate credit is a credit card that's issued in the

16  business name and not my personal name.

17  Q.  Did you ever receive that from A1?

18  A.  No.

19          MR. SOBELMAN:  Ms. Lee, could you please go to page 3

20  of this document.

21          If you could please zoom in on the bottom half of the

22  page.

23  Q.  Ms. Weissenberger, did you sign this document?

24  A.  Yes.

25  Q.  Is that your handwritten signature or an e-signature?

1    A.  Handwritten signature.

2    Q.  How many credit cards are listed here?

3    A.  Two.

4    Q.  How many charges are listed?

5    A.  Two.

6    Q.  Why are there two different credit cards?

7    A.  Because neither one of the credit cards had enough line of

8    credit on it for the full amount.

9    Q.  Could you please read us the amounts that were to be

10   charged to each?

11   A.  $7,495 and $7,000 even.

12            MR. SOBELMAN:  Ms. Lee, could you please show the

13   witness what is marked for identification as Government Exhibit

14   157.

15   Q.  Ms. Weissenberger, do you recognize this?

16   A.  Yes.

17   Q.  What is it?

18   A.  It's a copy of my credit card statement.

19   Q.  Is this a true and accurate copy of the bill as you

20   received it?

21   A.  Yes.

22            MR. SOBELMAN:  Your Honor, the government offers

23   Government Exhibit 157.

24            MR. SCHMIDT:  No objection.

25            THE COURT:  Admitted.

1              (Government's Exhibit 157 received in evidence)

2              MR. SOBELMAN:  Ms. Lee, could you please display

3    Government Exhibit 157 for the jury.

4    Q.  Ms. Weissenberger, whose handwriting in highlighting do we

5    see on this page?

6    A.  Mine.

7              MR. SOBELMAN:  Ms. Lee, could you please enlarge maybe

8    the top two thirds of the page.

9              Thank you.

10   Q.  Ms. Weissenberger, could you please read who issued this

11   statement from the top left-hand corner?

12   A.  Slate, from Chase Bank.

13   Q.  Underneath that, who is this bill addressed to?

14   A.  Me.

15   Q.  Under the account summary section in the bottom left-hand

16   corner, could you please read the opening and closing dates?

17   A.  In the bottom?  I'm sorry.  I don't see it.

18   Q.  It's in yellow highlighting.

19   A.  I'm sorry.  Yes.  9/13/15 and 10/12/15.

20   Q.  What was the credit limit?

21   A.  $12,000.

22   Q.  What available credit was there at this time?

23   A.  Zero.

24             MR. SOBELMAN:  If we could zoom back out and look at

25   purchases at the bottom of the page.

1    Q.  Ms. Weissenberger, could you please read us the information

2    that's listed for the one purchase on the bill?

3    A.  Purchase on 10/08, A1 Business Consultants, telephone

4    number in New Jersey, $7,000.

5    Q.  Is this one of the two charges from the contract we just

6    looked at?

7    A.  Yes.

8             MR. SOBELMAN:  Ms. Lee, could you please show the

9    witness what is marked for identification as Government Exhibit

10   158.

11   Q.  Ms. Weissenberger, do you recognize this?

12   A.  Yes.

13   Q.  What is it?

14   A.  It's a copy of another credit card statement.

15   Q.  Is this a true and accurate copy of a bill you received?

16   A.  Yes.

17            MR. SOBELMAN:  Your Honor, the government offers

18   Government Exhibit 158.

19            MR. SCHMIDT:  No objection.

20            THE COURT:  Admitted.

21            (Government's Exhibit 158 received in evidence)

22            MR. SOBELMAN:  Ms. Lee, could you please display

23   Government Exhibit 158 for the jury.

24   Q.  Ms. Weissenberger, could you please read what entity this

25   is issued by in the upper left-hand corner?

1    A.   The Third Bank.

2    Q.   What type of credit card was it?

3    A.   Platinum MasterCard.

4    Q.   What are the dates on this bill?

5    A.   From September the 28th, 2015, to October the 27th, 2015.

6    Q.   Under the transaction section, could you please read us the

7    information for the one purchase that's listed there?

8    A.   Transaction date 10/08, postdate 10/09, A1 Business

9    Consultants, with a New Jersey telephone number, in amount of

10   $7,495.

11   Q.   Is this the second charge from the contract we just looked

12   at?

13   A.   Yes.

14   Q.   Ms. Weissenberger, I have a few more questions for you.

15        Why did you make so many purchases from A1?

16   A.   Because I thought it was necessary.

17   Q.   Necessary to do what?

18   A.   To have my business run properly and to make money.

19   Q.   Why did you think that?

20   A.   Because that's what they told me.

21   Q.   In total, approximately how much did you spend both with A1

22   and other similar companies that called you?

23   A.   All of them on this particular thing?  Over $70,000.

24   Q.   Were you able to make that money back?

25   A.   No.

IAN8KET4

1    Q.  Were you able to make any money?

2    A.  I got one check for $200 minus taxes.

3    Q.  Were you able to pay off the credit card debt from those

4    charges?

5    A.  No.

6              MR. SOBELMAN:  No further questions.

7              THE COURT:  Mr. Schmidt, estimate the time of

8    cross-examination, if any.

9              MR. SCHMIDT:  Probably an hour and a half to two

10   hours, your Honor.

11             THE COURT:  From this witness?

12             MR. SCHMIDT:  Yes, your Honor.

13             THE COURT:  Well, I am not going to keep you.  I

14   thought maybe we could end and have the cross-examination.

15             Let's adjourn for the evening.  Keep an open mind.

16   You have not heard all of the testimony by any stretch of the

17   imagination.  Don't discuss the case.  I will see you all by

18   9:30 in the morning.  Thank you.

19             Leave this way.  When you come in in the morning,

20   don't come here.  Come to the jury deliberation room where

21   Ms. Blakely is taking you now.  Remember, it's on the 23rd

22   floor.  23A is the courtroom.  And I am Judge Stein.

23             (Jury exits courtroom)

24             THE COURT:  Please be seated.

25             Ms. Weissenberger, you're excused for now.  We will

IAN8KET4

1   see you tomorrow by 9:30.

2              MR. SOBELMAN:  Your Honor, if I may, would your Honor

3   please instruct Ms. Weissenberger that we will not be speaking

4   to her now that she is on cross-examination, so that she

5   shouldn't try to contact us, except for logistical issues with

6   the agents that she has been in touch with.

7              THE COURT:  Did you understand that?  In other words,

8   don't talk to the government lawyers.  The agent -- I take it

9   that's Detective Bastos -- apparently you have been dealing

10  with him about where to go and so forth.  That's fine.

11             MR. SOBELMAN:  And Special Agent Picarella as well.

12             THE COURT:  Special agent as well.

13             MR. SOBELMAN:  Thank you, your Honor.

14             THE COURT:  Mr. Paul, do you expect to have

15  cross-examination of this witness?

16             MR. PAUL:  I do, your Honor.

17             THE COURT:  Mr. Schmidt, I am not telling you not to,

18  but you really estimate an hour and a half or was that just an

19  effort to get me to dismiss the jury for the evening?

20             MR. SCHMIDT:  Your Honor, there is this much in the

21  way of 3500 material of relevant material in there that

22  obviously Ms. Weissenberger is going to need some help going

23  over.  So we are going to try to organize it so it's a little

24  quicker, but there is lot of material.

25             THE COURT:  That is relevant.

IAN8KET4

|      |                                                                          |
|------|--------------------------------------------------------------------------|
| 1    | MR. SCHMIDT:  That's absolutely relevant.                                |
| 2    | THE COURT:  Mr. Schmidt was holding his hands about a                    |
| 3    | foot apart.                                                              |
| 4    | See everybody tomorrow by 9:30.  Remember, at 11:00 I                    |
| 5    | need to take a half hour break.                                         |
| 6    | Yes, ma'am.                                                             |
| 7    | MS. KEARNEY:  Your Honor, there is one evidentiary                       |
| 8    | issue that I expect will arise tomorrow morning.                        |
| 9    | THE COURT:  Let's do it now.                                            |
| 10   | MS. KEARNEY:  The government's next witness is William                   |
| 11   | Sinclair.  The government intends to introduce a recording              |
| 12   | through Mr. Sinclair subject to connection.  The recording was          |
| 13   | provided to the government by a witness who will testify later.          |
| 14   | Only that witness can explain how he came into possession of            |
| 15   | the recording.  But Mr. Sinclair, we expect, will testify               |
| 16   | regarding the voices, the identities of the voices on the               |
| 17   | recording.                                                              |
| 18   | THE COURT:  Is he a participant in the recording.                        |
| 19   | MS. KEARNEY:  He was not, but he knows the other                         |
| 20   | people who are on the recording and he has been able to                 |
| 21   | identify their voices.                                                   |
| 22   | So what we intend to do is to introduce that recording                   |
| 23   | through him tomorrow subject to connection.  So we just wanted           |
| 24   | to raise that with your Honor in case it creates an evidentiary          |
| 25   | issue with Mr. Schmidt.                                                  |

IAN8KET4

1          THE COURT:  The connection will be what, a later

2    witness will testify to what?

3          MS. KEARNEY:  How he came into possession of the

4    recording.

5          THE COURT:  Did he make the recording?

6          MS. KEARNEY:  No.  The recording is actually, we

7    expect will be explained, Arash Ketabchi called David Kandar,

8    who is a later witness in this trial, leaves him a voice

9    mail --

10          THE COURT:  Is that a victim witness?

11          MS. KEARNEY:  It's a relative of a victim.

12          MR. SCHMIDT:  Your Honor, I can short-circuit this.

13    As long as the government is telling us that Mr. Kandar will

14    testify to explain how that occurred, I have no objection.

15          THE COURT:  Government.

16          MS. KEARNEY:  No issue then.

17          THE COURT:  Thank you.  Bring these up outside of the

18    hearing of the jury before the day begins, preferably after the

19    jury has left, just as the government did.

20          MR. PAUL:  Excuse me for a moment.  It's my

21    understanding there is a transcript that correlates with the

22    audio, and I would intend to ask the Court at that time to

23    instruct the jury, because it keeps referring to Ketabchi, that

24    that is Arash Ketabchi that is referred to in the recording,

25    not my client.

IAN8KET4

1          THE COURT:  Is there any objection to that?

2          MS. KEARNEY:  No, your Honor.  And if there is any

3    concern to Mr. Paul, we can also amend the transcript.

4          MR. PAUL:  I would appreciate that.  They would

5    easier.

6          THE COURT:  How could you amend the transcript?

7          MR. PAUL:  They could say Arash Ketabchi instead of it

8    saying just Ketabchi.

9          THE COURT:  But not in the words of the recording.

10   You mean in the attribution.

11         MR. PAUL:  Correct.

12         THE COURT:  Fine.  Thank you.

13         (Adjourned to October 24, 2018 at 9:30 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        INDEX OF EXAMINATION

2     Examination of:                              Page

3     DIANE WEISSENBERGER

4     Direct By Mr. Sobelman . . . . . . . . . . . .71

5                      GOVERNMENT EXHIBITS

6     Exhibit No.                               Received

7      150   . . . . . . . . . . . . . . . . . . .76

8      151   . . . . . . . . . . . . . . . . . . .80

9      152   . . . . . . . . . . . . . . . . . . .89

10     153   . . . . . . . . . . . . . . . . . . .92

11     154   . . . . . . . . . . . . . . . . . . .96

12     155   . . . . . . . . . . . . . . . . . . .98

13     411B  . . . . . . . . . . . . . . . . . . 100

14     157   . . . . . . . . . . . . . . . . . . 103

15     158   . . . . . . . . . . . . . . . . . . 104

16

17

18

19

20

21

22

23

24

25
```