IAO8KET1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------x

UNITED STATES OF AMERICA,

           v.                                    17 Cr. 00243 (SHS)

ANDREW OWIMRIN, a/k/a "Andrew Owens,"
a/k/a "Jonathan Stewart," and
SHAHRAM KETABCHI, a/k/a "Steve Ketabchi,"

          Defendants.

---------------------------------------x
                              October 24, 2018
                              9:30 a.m.

Before:

                  HON. SIDNEY H. STEIN,

                              District Judge
                               and a jury

                    APPEARANCES

GEOFFREY S. BERMAN
    United States Attorney for the
    Southern District of New York
KIERSTEN A. FLETCHER
ROBERT B. SOBELMAN
BENET J. KEARNEY
    Assistant United States Attorneys

SAM A. SCHMIDT
ABRAHAM J. ABEGAZ-HASSEN
    Attorneys for Defendant Owimrin

KENNETH A. PAUL
JACOB MITCHELL
    Attorneys for Defendant Ketabchi

Also Present:
    CHRISTOPHER BASTOS, Detective NYPD and HSI
    CHRISTINE LEE, Paralegal Specialist USAO
    SAMUEL TUREFF, Paralegal

IAO8KET1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  The jurors are all here.

3          Bring the jury in.

4          The clients and lawyers are all here.

5          Mr. Paul, I am informed that the records show that

6    because Mr. Ketabchi was in California when I arraigned Mr.

7    Owimrin on S8, he was not arraigned.

8          MR. PAUL:  He was arraigned, Judge.

9          THE COURT:  He was arraigned?

10         MR. PAUL:  Yes.  Mr. Sobelman and I appeared in

11   magistrate court and he was arraigned.

12         THE COURT:  That's why I don't have it in my records.

13   Thank you.

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2    DIANE WEISSENBERGER, resumed.

3           THE COURT:  Please be seated in the courtroom.

4           Good morning, ladies and gentlemen.  Thank you for

5    being here in a timely fashion.  I appreciate it.  We had a few

6    things to do, but we are being very efficient.

7           We are now going to have the cross-examination of Ms.

8    Weissenberger by Mr. Schmidt, and we are going to break for the

9    only time, for approximately a half hour break, at ten or five

10   to 11.

11          Ms. Weissenberger, you understand you remain under

12   oath, is that correct?

13          THE WITNESS:  Yes.

14          THE COURT:  Mr. Schmidt, your witness, sir.

15   CROSS-EXAMINATION

16   BY MR. SCHMIDT:

17   Q.  Good morning, Ms. Weissenberger.

18          We have never met, have we?

19   A.  No.

20   Q.  Except for earlier today we have never talked to each

21   other?

22   A.  No.

23   Q.  Is that correct?

24   A.  That's correct.

25   Q.  You had many conversations with the people sitting at the

1    first table?

2    A.  Some, not many, yes.

3    Q.  You talked to them on the phone as well as in person?

4    A.  Yes.

5    Q.  Now, I think you testified that there were a few people

6    that you talked to concerning your attempts to start up a home

7    business, is that right?

8    A.  Yes.

9    Q.  Do you remember the number of people that you spoke with?

10   A.  No.

11   Q.  Do you know approximately how many you spoke to?

12   A.  Five or six.

13   Q.  Now, you told us that the first person that you spoke with

14   about this was the person who told you that the goal for one

15   year would be six figures, is that right?

16   A.  Yes.

17   Q.  And you are telling us that you believe that the person

18   that you spoke to about that was Andrew Owens, is that right?

19   A.  I didn't hear you.  I'm sorry.

20   Q.  You told us that the person that you spoke to about that

21   was Andrew Owens, is that right?

22   A.  Yes.

23   Q.  Now, in August of 2015 -- withdrawn.

24          Prior to speaking to anybody, did you make any kind of

25   requests or telephone calls in relation to starting up a home

1   business?

2   A.  Did I call anyone?

3   Q.  Did you call anyone or answer any kind of e-mails or

4   telephone questions?

5   A.  I didn't make any phone calls; I received a phone call.

6   Q.  You're saying the first phone call that you received was

7   from Andrew Owens?

8   A.  No.  The first one from that company was from Andrew Owens.

9   Previously I had phone calls with Elite.

10  Q.  That was about a month earlier that you had conversations

11  with Elite?

12  A.  I don't recall how long it was.

13  Q.  Did you enter into a contract with Elite?

14  A.  Yes.

15  Q.  What was that contract for?

16  A.  I don't recall.

17  Q.  So the first people that you spoke to were Elite in

18  relation to anything to do with a home business, is that right?

19  A.  Yes.

20  Q.  So it wasn't Andrew Owens?

21  A.  I'm sorry?

22  Q.  It was not Andrew Owens?

23  A.  Not the very first person I spoke to about a home business,

24  no.

25  Q.  I am going to show you what is marked 3511-25 and I would

IAO8KET1                    Weissenberger - Cross

1    like you to take a look at that.

2            THE COURT:  Can you get the focus on that better?

3    There seems to be an issue with the focus.

4    Q.  Now, do you see that document?

5    A.  Yes.

6            MR. SCHMIDT:  Can you go down to the bottom of that

7    document.

8    Q.  Is that your signature?

9    A.  Yes.

10   Q.  Is that the date next to it of your signature?

11   A.  I don't recall the exact date, but it's on the document so

12   I assume that's the date.

13           MR. SCHMIDT:  Your Honor, I offer that as Exhibit DW1.

14           THE COURT:  Sir.

15           MR. SOBELMAN:  This is a 30-page document and he is

16   showing Ms. Weissenberger one page of it.  We are not clear

17   what it's being offered for.

18           MR. SCHMIDT:  It's not a 30-page document.  Documents

19   may have been given in 3500 material.

20           THE COURT:  You must know what the request is.  Are

21   you requesting that this one page be admitted?

22           MR. SCHMIDT:  That is correct.

23           MR. SOBELMAN:  No objection, your Honor.

24           THE COURT:  That page is admitted without objection.

25           (Defendant's Exhibit DW1 received in evidence)

1          THE COURT:  Ladies and gentlemen, you can all see it,

2     right?

3          No.  Put it up, please, for the jury to see.

4          MR. TUREFF:  Your Honor, we have been having issues

5     with the display this morning.

6          THE COURT:  It's a little late.

7          All right.  Ladies and gentlemen, we are going to

8     proceed.  You can view this in the jury deliberation room for

9     deliberations.

10          Proceed with your next question.

11     BY MR. SCHMIDT:

12     Q.  Is this a contract with Elite Business Strategies?

13          THE JURY:  We have got it now.

14          THE COURT:  All right.

15          Just a moment.  Can everyone see it?

16          THE JURY:  Now it's gone.

17          Now it's back.

18     Q.  This is a contract with Elite Business Strategies?

19     A.  Yes.

20     Q.  There is also a mention on the left-hand side of Higharchy

21     LLC.  Do you see that?

22     A.  Yes.

23     Q.  Can you tell us what that is?

24     A.  It's part of the Elite business.

25     Q.  It indicates there that you were supposed to get an

1    upgraded Web site, is that right?

2    A.  That's what it says, yes.

3    Q.  Did you have a Web site already?

4    A.  No.

5    Q.  Was it your understanding they were going to make a Web

6    site for you?

7    A.  Yes.

8    Q.  If we can go a little bit lower now to where there are

9    initials.

10          Are those your initials on the left-hand side?

11   A.  Yes.

12   Q.  And your signature and the date, is that right?

13   A.  Yes.

14   Q.  And you said -- is this an Internet signature?

15   A.  I think it's my actual signature but it's difficult to

16   know.

17   Q.  Were you billed for those services?

18   A.  It went on a credit card, yes.

19   Q.  Do you know what company was listed on your credit card for

20   that?

21   A.  Higharchy LLC, I believe, on the credit card.  I would have

22   to see the statement to remember exactly.

23          MR. SCHMIDT:  Can we show now, just for identification

24   purposes, page 3511-03, page 7.

25   Q.  Is that the entry for your credit card of the payment to

IAO8KET1                    Weissenberger – Cross

1    Higharchy?

2    A.  Yes.

3              MR. SCHMIDT:  Your Honor, I offer that into evidence

4    as DW1-2.

5              MR. SOBELMAN:  If the offer is just with respect to

6    that page there is no objection.

7              THE COURT:  Is it?

8              MR. SCHMIDT:  Just that page.

9              THE COURT:  Yes, sir.  Admitted.

10             (Defendant's Exhibit DW1-2 received in evidence)

11   Q.  Do you remember the names of the people that you dealt with

12   at Elite, also known as Higharchy?

13   A.  Not offhand.  It would be in my notes.

14   Q.  I am going to ask you about a number of names and if you

15   could tell me if you recognize those people.

16             THE COURT:  Those names?

17             MR. SCHMIDT:  Those names.

18   Q.  David Bradshaw?

19   A.  Yes.

20   Q.  Do you recall what company he is from?

21   A.  No.  I just recognize the name.  He is from one of these

22   companies that called me on the phone.

23   Q.  Mark Murray?

24   A.  Yes.

25   Q.  Do you recall what company he is from?

IAO8KET1                    Weissenberger - Cross

1   A.  He is with BDC in the Youngevity program.

2   Q.  Emily Miller?

3   A.  She must have been a receptionist or secretary.  I don't

4   recall which company she was with.

5   Q.  Brent Smith?

6   A.  It sounds vaguely familiar but I couldn't tell you.

7   Q.  Sophia?

8   A.  Probably a female receptionist.  Any females were

9   receptionists or secretaries.

10          THE COURT:  No.  The question is, do you recognize

11   that name?

12          THE WITNESS:  Yes.

13          THE COURT:  OK.

14   Q.  Do you remember what company she is from?

15   A.  No.

16   Q.  Owen Roberts?

17   A.  Yes.

18   Q.  Do you remember what company he is from?

19   A.  Business Development Center.

20   Q.  Did he describe himself as a senior adviser?

21   A.  Yes.

22   Q.  A woman named Melanie?

23   A.  I don't recall that name.

24   Q.  A woman named Lisa?

25          You have to say it out loud.

1    A.  I don't recall that name.

2    Q.  A man named Brian Church?

3    A.  No.

4    Q.  A man named Connor Swenson?

5    A.  I'm sorry?

6    Q.  Connor Swenson?

7    A.  No.

8    Q.  A person named Chad?

9    A.  Not offhand, no.

10   Q.  A woman named Michelle Smith?

11   A.  No.

12   Q.  A man named Bill Sinclair?

13   A.  That's familiar, yes.  I remember that name.

14   Q.  Do you remember from where?

15   A.  No.

16   Q.  A man named Mike Foster?

17   A.  No.

18   Q.  A person named Jason?

19           THE COURT:  Did you say Mike Foster, sir?

20           MR. SCHMIDT:  Yes.

21           THE COURT:  Now you're asking about?

22           MR. SCHMIDT:  Jason.

23   A.  No.

24   Q.  A woman named Lana?

25   A.  No.

1   Q.  Let me ask you about some names of companies other than the

2   ones that you previously mentioned.

3           A company named Creative Web?

4   A.  Yes.

5   Q.  Did you have a contract with Creative Web?

6   A.  I don't recall.

7   Q.  A company named WOM Distribution?

8   A.  I'm sorry.  I didn't understand you.

9   Q.  A company named WOM Distribution?

10  A.  I don't remember that one.

11  Q.  A company named Impact Rankings?

12  A.  Yes.

13  Q.  A company named Direct Web Solutions?

14  A.  Yes.

15  Q.  A company named E-Biz.

16  A.  Yes.

17  Q.  A company named Optimal Web Solutions?

18  A.  I didn't understand the first word you said.

19  Q.  Optimal Web Solutions.

20  A.  I don't recall that.

21  Q.  Now, during your conversations with the company that you

22  had the first contract with, which was Elite Strategies, also

23  known as Higharchy, did you have conversations with people from

24  there for many months?

25  A.  No, not many months.

1    Q.  For how long do you think you had conversations with him?

2    A.  A few weeks.

3    Q.  Now, exactly what, if you remember, was that company

4    supposed to do for you?

5    A.  Are we speaking about Elite?

6    Q.  Yes.

7    A.  That company was going to be putting credit card readers in

8    retail outlets.

9    Q.  How was that supposed to benefit you?

10   A.  I would make commissions on the usage of those readers.

11   Q.  Were you supposed to have a Web site?

12   A.  I don't recall.

13   Q.  Did you ever see any of the information or proof that

14   these -- withdrawn.

15              Was it these merchant terminals that you were supposed

16   to make money from?

17   A.  Yes.

18   Q.  Was it explained to you how you were supposed to make money

19   from these merchant terminals?

20   A.  The terminals themselves kept track somehow of -- I don't

21   understand the technology of it -- the usage, and I would make

22   commission off the usage of these.

23   Q.  Did you take notes when you were talking to the people?

24   A.  Yes, I am sure I did.

25   Q.  You took notes when you were talking to just about

1   everybody, is that right?

2   A.   Yes.

3   Q.   Talking to the people who were trying to sell things to

4   you?

5   A.   Yes.

6   Q.   To the people who came after the people who tried to sell

7   you things, people who were supposed to do the work for you?

8   A.   Yes.

9   Q.   Credit card companies?

10   A.   No.

11   Q.   The notes that you took were in a notebook or on separate

12   pieces of paper?  How did you take those notes?

13   A.   Just pieces of paper, notepaper.

14   Q.   Did you write on the same piece of paper on different dates

15   and times?

16   A.   I could have, yes.  Without looking at them, it's been

17   three years, I don't remember exactly how many pages that I

18   wrote about the companies.

19   Q.   Do you know the company Tri-Star?

20   A.   It sounds familiar, yes.

21   Q.   Did you believe that they were a fulfillment company?

22   A.   I don't recall what it was.

23   Q.   Did you ever hear of the word "fulfillment" before?

24   A.   I have heard the word "fulfillment," yes.

25   Q.   What was your understanding of what that term was?

IAO8KET1                    Weissenberger - Cross

1    A.  I don't recall at the time.  It's been too long ago, but I

2    remember the word.

3             THE COURT:  Do you believe you heard the word

4    "fulfillment" in connection with the things Mr. Schmidt is

5    asking you about?

6             THE WITNESS:  Yes.

7    Q.  Did you have a Web site DWonline?

8    A.  Yes.

9    Q.  Who made that Web site, if you recall?

10   A.  Someone from Business Development Center.

11   Q.  Do you recall an e-mail address emilyinvoice@gmail.com?

12   A.  I don't understand what you said.

13   Q.  Do you know of an e-mail address that's

14   emilyinvoice@gmail.com?

15   A.  No.

16            MR. SCHMIDT:  Can we put up 3511-23, page 11, just for

17   the witness.

18   Q.  I ask you to take a look at the bottom of that page.  Do

19   you recognize that?

20   A.  Yes.

21   Q.  Do you recognize that e-mail?

22   A.  It's my handwriting.  I recognize my handwriting.

23   Q.  Now, on that page there's different colored ink.  Would

24   that mean that you wrote it at different times?

25   A.  Yes, usually.

IAO8KET1                         Weissenberger - Cross

1   Q.  Now, in that you have -- there are names in there of Brent

2   Smith and Emily Miller.  Do you see that?

3           MR. SOBELMAN:  Objection, your Honor.  The document is

4   not in evidence.

5           MR. SCHMIDT:  I withdraw that question.

6   Q.  Does that document refresh your recollection of who Brent

7   Smith and Emily Miller were?

8   A.  Pardon me?

9   Q.  Does looking at that document refresh your recollection of

10  who Emily Miller and Brent Smith were?

11  A.  They had something to do with the company name at the top

12  of that page.

13  Q.  That would be Elite Business?

14          MR. SOBELMAN:  This is improper refreshment.

15          THE COURT:  Let's move on.

16          Ms. Weissenberger, the question was, does looking at

17  those names refresh your recollection?

18          The idea is, apparently earlier you had said you

19  didn't know who those people were.  So what Mr. Schmidt is

20  asking you to do is take a look at that, and sometimes looking

21  at something, no matter what it is, will make you say, Oh,

22  yeah, I remember that name, and sometimes it won't.

23          That's what he is asking.  He is not asking you simply

24  to think, because the name is here, therefore such and such is

25  true.  It's just, does looking at that name give you a new

1    recollection in light of the fact that earlier you couldn't

2    recall.  OK?

3              THE WITNESS:  Yes.

4              THE COURT:  Next question.

5    Q.  Do you recall what company they were affiliated with?

6    A.  Elite.

7    Q.  Now, did you call somebody from Elite and ask them about

8    what's going on with the product that you purchased from them?

9              MR. SOBELMAN:  Your Honor, if the refreshment is

10   complete, we would ask that the exhibit be put down.

11             THE COURT:  The exhibit should be taken down.  That's

12   correct.

13   A.  Would you repeat the question, please?

14   Q.  Did you call somebody from Elite and ask them what's

15   happening to the business that you purchased?

16   A.  I might have.

17   Q.  Do you recall if that was sold to you by Brent Smith?

18   A.  The name is familiar.

19             THE COURT:  So again, please, I am not trying to put

20   words in your mouth.  I just want it to be clear to the jury.

21   The question was, do you recall if that was sold to you by

22   Brent Smith?  And you said the name is familiar.

23             Do you mean to say you don't recall if it was sold to

24   you by Brent Smith and simply the name is familiar, or do you

25   mean that you do recall it was sold to you by Brent Smith?

IAO8KET1                      Weissenberger - Cross

1          THE WITNESS:  The name is familiar and I presume,

2     since it's on these notes with Elite, that he was the one that

3     I spoke to that sold me that business.

4          THE COURT:  All right.

5     Q.  Do you know if First Trend was related to Elite?

6     A.  In some way, yes.

7     Q.  Do you know if Tri-Star was related to Elite?

8     A.  In some way, yes.

9     Q.  Do you have a recollection of when you spoke to -- you

10    tried to reach the people from Elite about your business?

11    A.  No.

12    Q.  It would be fair to say, though, that Brent Smith is the

13    first person that sold you something related to your home

14    business, is that right?

15    A.  I'm trying to think of the sequences.  The name is

16    familiar.  It was with Elite.  I don't remember if he was the

17    very first person with Elite that I spoke to or not without

18    looking at my notes.

19    Q.  But whether it was Brent Smith or another person, it's

20    Elite, that was the first people?

21    A.  I believe so, yes.

22    Q.  And they sold you merchant terminals that you were somehow

23    going to make money from?

24    A.  Yes.

25    Q.  Did they tell you how much money that you were going to

1    make from that?

2    A.  I don't recall an amount.

3    Q.  Isn't it a fact that they told you that you're looking at

4    making up to six figures by your investment in merchant

5    processing?

6    A.  No, not with Elite.  I wasn't told that figure.

7    Q.  Do you know a company named Vibrant?

8    A.  Yes.  It's familiar.

9    Q.  Do you know which company they are related to?

10   A.  I don't recall at this time.

11   Q.  Do you know a person named Cassandra Carrion?

12   A.  I'm sorry?

13   Q.  Do you know a person named Cassandra Carrion?

14   A.  I don't recall that name.

15   Q.  Do you recall asking Emily at Elite for the information

16   about the Web site that you were supposed to receive?

17   A.  No.

18   Q.  Do you recall trying to call her?

19   A.  I beg your pardon?

20   Q.  Do you recall trying to reach her by telephone?

21   A.  No.

22   Q.  I ask you to take a look at 3511-23, page 1, the middle

23   paragraph.

24          Would you read that to yourself, please?

25          Does that refresh your recollection of either calling

1    or trying to call Emily at Elite?

2    A.   I don't remember doing it, but I did because the notes are

3    there and they are in my handwriting.

4    Q.   Now, would you have written those notes at the time that

5    you were considering calling her?

6    A.   Yes.

7    Q.   Would they have been accurate at that time?

8    A.   Yes.

9    Q.   Could you read that paragraph starting from "call Emily"?

10   A.   Did I read it?  Yes, I just read it.

11   Q.   Can you read it out loud?

12   A.   You want me to read that paragraph out loud, is that what

13   you're asking me?

14   Q.   That's correct.

15   A.   "Call Emily at Elite Friday.  602-309-3998.

16   Emily.ebs2014@gmail.com.  Need $600.  Need list of all services

17   and who is providing them.  Info on Web site.  Charges are

18   different on credit card than/verify the credit card

19   authorization.  What is Creative Web?  Change $4,995."

20           THE COURT:  Is that change or charge?

21           THE WITNESS:  I think it's charge.

22           THE COURT:  What is the word at an angle on the right

23   of that?

24           THE WITNESS:  I'm sorry?

25           THE COURT:  The word that's written at an angle on the

IAO8KET1                        Weissenberger - Cross

1   right of --

2              THE WITNESS:  Gone.  G-O-N-E, gone.

3              THE COURT:  Is that your handwriting?

4              THE WITNESS:  Yes.

5   Q.  Did you call someone from Elite to find out if they had

6   been using your merchant ID?

7   A.  I don't recall.

8   Q.  I ask you to look at 3511-23, page 7.

9              Could you read the first four lines to yourself,

10  please.

11  A.  "Have they been using -- "

12             THE COURT:  To yourself.  Just take a look at it.

13             THE WITNESS:  OK.

14  Q.  Does that refresh your recollection as to trying to find

15  out whether Elite was using your merchant ID?

16             THE COURT:  In other words, as I said before, when Mr.

17  Schmidt, or any lawyer for that matter, uses the formulation of

18  "does it refresh your recollection," just because something may

19  or may not be written on a page is irrelevant.  The issue is,

20  does looking at what he directed you to look at give you any

21  recollection, oh, my, I now remember whatever it is, or, no, it

22  doesn't refresh my recollection?

23             THE WITNESS:  I don't remember.  No.

24  Q.  When you wrote those notes down, is that what you were

25  thinking at the time?

IAO8KET1                    Weissenberger - Cross

1          THE COURT:  Is what was she thinking?

2    Q.  Is what you wrote down on the document your handwriting?

3    A.  Yes, it's my handwriting.

4    Q.  Did you write it down when you were thinking about it?

5    A.  Yes.

6    Q.  So it was fresh in your mind at the time?

7    A.  No.  I don't recall doing that.  I must have done it

8    because it's my handwriting.  It's been over three years ago.

9    I'm sorry.

10   Q.  So you know that you wrote this down?

11   A.  Yes.

12   Q.  And when you wrote this down, you had that information from

13   somewhere that you put on that piece of paper, is that right?

14   A.  Are you talking about the names and phone numbers, that

15   information?

16   Q.  The questions and the names and the phone numbers.

17   A.  Yes.

18   Q.  Could you read those first four lines, please?

19          THE COURT:  To herself?

20          MR. SCHMIDT:  Out loud.

21   A.  Starting with "have"?

22   Q.  Yes.

23   A.  "Have they been using my merchant ID?  Elite Business

24   Strategies.  Brent Smith," and a phone number, and "Emily

25   Miller," and a phone number.

1           Do you want me to read the numbers on the phone

2    number?

3    Q.  That's not necessary.  Thank you.

4           Did someone explain to you all about how you were

5    going to make money from the terminals?

6    A.  Only with what I have already said.

7    Q.  Did anyone tell you from that company that there was a

8    90-day return on your money?

9    A.  I don't recall.

10          MR. SCHMIDT:  Could you put up 3511-23, page 13.

11   Q.  Could you read the middle of that page where it starts

12   "Tri-Star" down to the bottom of "V&"M"?

13          MR. SOBELMAN:  To be clear, is that to herself?

14   Q.  To yourself.

15          Does that refresh your recollection about what the

16   90-day return was?

17   A.  No.

18   Q.  Were you told that by the people from Elite, that by the

19   second statement you should have made enough to pay off all

20   your charges?

21   A.  I can remember being told that, yes.

22   Q.  And it was someone from Elite?

23   A.  I don't recall who told me that.  I just remember that

24   statement being made at one time.

25   Q.  Can you look at the bottom of the page that's in front of

IAO8KET1                      Weissenberger - Cross

1    you?

2           Does it refresh your recollection that the persons who

3    told you that were from Tri-Star Merchant?

4    A.  I don't know that that's who it was from.

5    Q.  Now, would it be fair to say that the entire portion of

6    your notes on this document from Tri-Star Merchant to the

7    bottom are notes that you wrote at one time?

8    A.  Yes, I wrote them.  That's my handwriting.

9    Q.  But they are all the same color except for something that

10   surrounds it, right?

11   A.  I have no idea what the color of the ink is on this page.

12   Q.  It appears to you on this page black, right?

13   A.  Yes.

14   Q.  On the top of the page in another area there is some red,

15   is that right?

16   A.  I have no idea what color it is.  This page is not showing

17   in color.

18           MR. SCHMIDT:  May I approach, your Honor?

19           THE COURT:  Not yet.

20           Now you may, if you want to show her something else.

21           That page is not showing a color.

22   Q.  I am going to show you the same page from a piece of page.

23           THE COURT:  Just so the record is clear Ms.

24   Weissenberger's screen has a green filter on it for some

25   reason.

IAO8KET1                          Weissenberger - Cross

1              Show her what you want to show her.

2    Q.   Would it be fair to say on the top it's red ink?

3    A.   Yes.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IAOJKET2                          Weissenberger - cross

1    Q.  And from the point from here to here is all the same color?

2    A.  Yes.

3    Q.  And does it all look like it was all written by you at one

4    time?

5    A.  Yes.

6    Q.  And when you wrote this, this was something that was on

7    your mind at that particular time?

8    A.  Yes.

9    Q.  So can you read then from there starting at Tri-Star

10   Merchant.

11           MR. SOBELMAN:  Objection.

12           THE COURT:  I think 803 (5) has been met, sir.  You

13   may read.

14   BY MR. SCHMIDT:

15   Q.  Would you read that out loud, please.

16   A.  Starting with Tri-Star Merchants?

17   Q.  Yes.

18   A.  Tri-Star Merchants given by -- something at MC -- senior

19   business manager Brent Smith, 8865 HT, mid -- dash -- merchant

20   ID number, my personal.

21   Q.  And under that?

22   A.  Business loans and cash advances on each loan, 1 percent.

23   No. 2, $500.00.  No. 3, residual income, 1 percent of total

24   business each month.  I have no liability.  90 day return,

25   quality VNM Investment Program.

IAOJKET2                         Weissenberger - cross

1    Q.  And the last paragraph, the last seven lines.

2    A.  They use my merchant ID number to get merchants to use them

3    for charge card processing or getting loans.  Approximately 45

4    to 60 days no income.  Billed to my Visa and Mastercard

5    accounts.  First statement made me -- made my payment on 5,000

6    and -- $3,000 charges.  My second statement should have made

7    enough to pay off the charges.

8              THE COURT:  Is that first statement made "me" payment?

9    BY MR. SCHMIDT:

10   Q.  Was that short for minimum?

11   A.  I don't know.

12             THE COURT:  Or is it one page?  You are not sure what

13   that word is.  Is that correct?

14             THE WITNESS:  It looks like short for minimum to me.

15             THE COURT:  All right.

16   BY MR. SCHMIDT:

17   Q.  Now, did you have a conversation with a person named Katie

18   about your website?

19   A.  I don't recall doing that.

20   Q.  Do you recall whether she was from Vibrant Internet

21   Solutions?

22   A.  No.

23   Q.  Would you show her Page 17 of 3523 at the top.  Would you

24   read that at the top to yourself.

25   A.  (Pause)

1  Q.  Does that refresh your recollection that you had a

2  conversation with Katie at Vibrant Internet Solutions about

3  your website?

4  A.  I don't recall the conversation.

5  Q.  You don't recall having a conversation or you don't recall

6  what it was about?

7  A.  I don't recall it at all, but obviously I made it because I

8  wrote it down.

9  Q.  Do you recall speaking to a Chad about setting up Pay Pal?

10  A.  No.

11  Q.  Would you look at the bottom of that page.

12          Does that refresh your recollection when you spoke to

13  Chad?

14  A.  I do not remember speaking to Chad.

15  Q.  When you wrote that down, was it some information that you

16  presently had?

17  A.  Yes.

18  Q.  Did would you read what you wrote with Chad.

19  A.  Chad, 801-997-9295, set up, 8th Ave.

20  Q.  Do you know what a coach is in talking about these attempts

21  at these businesses?

22  A.  I'm not quite sure what you're saying, a coach for what?

23  Q.  Coaching, did you receive any coaching in helping you

24  either set up the business, it runs better, make it more

25  profitable?

1  A.  I don't recall most of what happened with that company.

2  Q.  Do you recall coaching, receiving coaching from any other

3  company?

4  A.  I recall I was supposed to get some.

5  Q.  Do you recall whether you got some or not?

6  A.  I did not get any.

7  Q.  Now, do you recall a mac price, via Brent and Tri-Star

8  coach?

9  A.  No.

10  Q.  At the bottom of the page there, is that your handwriting?

11  A.  Yes.

12  Q.  You obviously had that information when you wrote that down

13  at that time?

14  A.  Yes.

15  Q.  Would you read those two lines.

16  A.  Mac price, Vibrant and Tri-Star, 302-660-0754 coach.

17  Q.  Do you recall what you invested in with Creative Web?

18  A.  No, not without looking at my notes.

19  Q.  Do you recall when you invested with Creative Web?

20  A.  Not without looking at my notes.

21  Q.  Why don't we look at 3511-24, Page 1.  You can read that to

22  yourself.

23  A.  (Pause)

24  Q.  Does that help you at all remember what you invested with

25  Creative Web?

1    A.  Yes.

2    Q.  What did you invest in Creative Web?

3    A.  $4,950.00.

4    Q.  Do you know what it was for?

5    A.  No, I don't recall.  I had notes.  Do you want me to read

6    the notes to refresh my memory?

7    Q.  Do you know where those notes are?

8    A.  Right on this page that is front of me.

9    Q.  Would you please read those notes.

10            THE COURT:  To yourself?

11            MR. SCHMIDT:  To yourself, correct.

12            THE WITNESS:  (Pause)

13   BY MR. SCHMIDT:

14   Q.  Does that help you?

15   A.  Yes.

16   Q.  What was it that you invested in with Creative Web?

17   A.  They were going to create a website for my Youngevity

18   business.

19   Q.  Do you recall when you contracted with them to do so?

20   A.  No.

21   Q.  Now, did you pay by credit card with Creative Web?

22   A.  Yes.

23   Q.  Did the credit card reflect the name of the company

24   Creative Web, do you recall?

25   A.  I am sorry.  I didn't understand what you said.

IAOJKET2                      Weissenberger - cross

1   Q.  When you looked at the bill, did it, the bill reflect the

2   name Creative Web on it?

3   A.  I don't know without looking at the copy of my statement.

4   Q.  Now, I am going to show you 3511-01, Page 28.  Now, is that

5   one of your credit card bills?

6   A.  I think so, yes, it looks like my handwriting on there and

7   the highlighting.  I can't tell what credit card it is because

8   it is not showing the top of it.

9   Q.  I ask you to look at the bottom where it says purchases.

10          Does that refresh your recollection that you were

11  billed on September 9th, 20 --

12          MR. SOBELMAN:  Objection.  The document is not in

13  evidence.

14          THE COURT:  Sustained.

15          MR. SCHMIDT:  It refreshes her recollection.

16          THE COURT:  Have her look at it.

17          MR. SCHMIDT:  I asked her to look at it.

18          THE COURT:  Herself, read it to herself?

19          MR. SCHMIDT:  Yes.

20          THE COURT:  What are you reading it for?

21          MR. SCHMIDT:  I am asking her if it refreshes her

22  recollection.

23          THE COURT:  What is the question?

24  BY MR. SCHMIDT:

25  Q.  Does reading that document refresh your recollection that

IAOJKET2                          Weissenberger - cross

1    you were billed by Creative Web on September 9th --

2              MR. SOBELMAN:  Objection, your Honor.  Counsel is

3    simply reading the document.

4              THE COURT:  Just a moment.  (Pause)

5              She has testified to a lack of recollection, is that

6    what you're saying?

7              MR. SOBELMAN:  Counsel has put up a document and is

8    now reading from it.  Counsel have no objection if he wants to

9    put it in evidence.  As a matter of procedure, counsel is

10   reading from a document not in evidence.  The document is up.

11   The proper refreshment would be to show it to the witness and

12   have them refresh their recollection and offer it.

13             MR. SCHMIDT:  I will offer it into evidence as Defense

14   Exhibit DW-3.

15             MR. SOBELMAN:  Assuming it is on Page 28 of 3511-01,

16   there is no objection.

17             THE COURT:  Is it, sir?

18             MR. SCHMIDT:  Yes.

19             THE COURT:  Admitted.

20             (Defendant's Exhibit DW-3, Page 28, received in

21   evidence)

22             THE COURT:  Issue taken care of.

23   BY MR. SCHMIDT:

24   Q.  So the contract from September 9th was with Creative Web.

25   Is that right?

IAOJKET2                        Weissenberger - cross

1    A.  That's who billed me on this credit card, yes.

2    Q.  You previously had said that it was Business Development

3    Corporation.  Is that right?

4    A.  Center, Business Development Center.

5    Q.  That's correct.

6            You previously testified that that was a contract that

7    you had on September 9th.  Is that right?

8    A.  I probably had more than one contract on September the 9th.

9    Q.  Your credit card would reflect then -- one of your credit

10   cards would reflect some other contract?  Withdrawn.

11   Withdrawn.

12           I ask you to look at Government Exhibit 150.  Now,

13   that's between Business Development Center and you for

14   $4,950.00.  Is that correct?

15   A.  Yes.

16   Q.  That says entity setup and tax plan.  Is that correct?

17   A.  Yes.

18   Q.  In fact, it was Creative Web using the name of Business

19   Development Center that you had the contract with.  Isn't that

20   right?

21   A.  If I could see the statement going up against this, this

22   was put on my Capital One account.  Is that what statement you

23   were showing me before?

24           (Off-the-record discussion)

25   BY MR. SCHMIDT:

IAOJKET2                          Weissenberger - cross

1    Q.   So if this was on your Chase Slate card, this would be a

2    separate contract with Creative Web for $4,950.00.  Is that

3    correct?

4    A.   Yes.

5    Q.   And then you had another contract with Business Development

6    Center for the same amount of money on the same day?

7    A.   Probably.

8    Q.   Is it your testimony that the person that you spoke to at

9    Business Development Center was Andrew Owens?

10   A.   I had no idea who I talked to about this particular charge.

11   Q.   Were you still in contact with Elite in January 2016?

12   A.   I don't believe so, no.

13   Q.   I ask you to take a look at 3511-25, Page 4.

14          Now, do you see at the bottom of the page there is

15   some handwriting?

16   A.   Yes.

17   Q.   Is that your handwriting?

18   A.   Yes.

19   Q.   You had the information that you wrote down when you wrote

20   it down?

21   A.   I presume when I wrote this down, I was speaking to someone

22   on the phone, and I made the notes while I was speaking to them

23   on the phone.

24   Q.   You made the notes on a piece of paper that you had in

25   front of you.  Is that right?

1   A.  Yes.

2   Q.  You had that paper when you made those notes?  Do you

3   remember when you made those notes?

4   A.  No.

5   Q.  Would looking at that document refresh your recollection

6   when you made those notes?

7   A.  If you can show me the rest of the document so I can read

8   the date on it, that is the only way I would recollect.

9   Q.  Are you able to see that?

10  A.  Apparently I spoke to somebody on January the 25th, 2016,

11  at 3:49 pm.

12  Q.  The person that you spoke to, was that person from Elite?

13  A.  Can you show me the rest of the document?  Does it say on

14  there?

15  Q.  (Pause)

16  A.  It has two names and phone numbers.  I am presuming, since

17  it was on a document that was from Elite, that that is who I

18  was talking to.  I do not recall this conversation.

19  Q.  Now, one of your emails was stargazer1 at Comcast dot net?

20  A.  Yes.

21  Q.  Did you receive a number of emails from Elite in January of

22  2016?

23  A.  I don't know.

24  Q.  I ask you to look at 3511-25, Page 5.

25  A.  I can't read that.

IAOJKET2                        Weissenberger – cross

1   Q.  Now can you read it?

2   A.  Yes.

3   Q.  Does that refresh your recollection that you received

4   emails from --

5           THE COURT:  Does that refresh your recollection as to

6   whether or not you received emails?

7           THE WITNESS:  Other than the fact I see it in front of

8   me, no.

9   BY MR. SCHMIDT:

10  Q.  Do you recognize this document?

11  A.  I don't remember it, no.

12  Q.  Did you ever have a password named jaydear, a user name

13  named jaydear?

14  A.  That doesn't sound familiar to me at all.

15  Q.  Do you recall whether or not this was one of the pieces of

16  paper that you gave the government when you gave them all of

17  your notes and documents that you had related to all of the

18  companies that you had contact with?

19  A.  This went to my email address, so it was in the stack of

20  documents that I gave to the government.

21  Q.  So if it was in your email address, you had to have

22  downloaded it to obtain it?

23  A.  I had to print it off of my computer, yes.

24  Q.  So you recognize this as one of the documents?

25  A.  I do not remember this document.

IAOJKET2                        Weissenberger – cross

1    Q.  Did you, in fact, have a number of either conversations

2    and/or emails with people from Elite or Vibrant at least

3    through January of 2016?

4    A.  I don't recall.

5    Q.  Can we put up Page 9 of 3511-25.

6            Take a look at that copy of the page and then scroll

7    down.  Does this refresh your recollection?

8    A.  Yes, I recall this.

9    Q.  Is it fair to say that you had conversations in January and

10   even later than that with --

11   A.  There is no signal on my computer.

12           THE COURT:  Is anyone doing anything to correct it?

13   Everybody's is blank.

14           MR. ABEGAZ-HASSEN:  The system just broke in some way.

15           MR. SCHMIDT:  Can I show her the hard copy, your

16   Honor?

17           THE COURT:  Yes.

18           THE WITNESS:  That one.

19           MR. ABEGAZ-HASSEN:  We are back, your Honor.

20           THE COURT:  Thank you for correcting it.

21   BY MR. SCHMIDT:

22   Q.  Looking at that document, does that refresh your

23   recollection you had ongoing contact with people from Elite in

24   January and later of 2016?

25   A.  These notes were not from conversations with someone from

IAOJKET2                        Weissenberger - cross

1    Elite.

2              THE COURT:  So I take it -- again I don't want to put

3    words in your mouth, but I think what you're saying is it does

4    not refresh your recollection whether or not you had ongoing

5    contact with people from Elite in January and later in 2016.

6              Is that correct?

7              THE WITNESS:  That's correct, your Honor.

8              THE COURT:  Next question.

9    BY MR. SCHMIDT:

10   Q.  Who is Accelerated --

11   A.  I don't know.

12   Q.  Who is Reliable Business Solutions?

13   A.  I don't know.

14   Q.  Can you show Page 17 of 3511-25.

15              This is one of the documents that you gave to the

16   government, is it?

17   A.  Yes.

18   Q.  The handwriting on the document is your handwriting.  Is

19   that right?

20   A.  Yes.

21   Q.  Does this refresh your recollection about who Accelerated

22   Marketing & Reliable Business Solutions were?

23   A.  Other than the fact that they had something to do with the

24   business with Elite, that's all I can recall.

25   Q.  Who was First Trend Marketing?

IAOJKET2                          Weissenberger - cross

1   A.  Someone with Elite Business.

2   Q.  Did you have a contract with First Trend Marketing?

3   A.  I don't recall an actual contract.  I might have.  I don't

4   remember.

5   Q.  Would you look at the bottom of this document.  Is that

6   your signature?

7   A.  Yes.

8   Q.  Above it, is that your initials?

9   A.  Yes.

10  Q.  Is everything on this document your handwriting?

11  A.  Yes.

12          MR. SCHMIDT:  I offer this into evidence as DW-4, just

13  this page.

14          MR. SOBELMAN:  No objection.

15          (Pause)

16          THE COURT:  Are you seeking its admission, sir?

17          MR. SCHMIDT:  Yes.

18          THE COURT:  Admitted without objection, that page.

19          (Defendant's Exhibit DW-4, Page 17, received in

20  evidence)

21  BY MR. SCHMIDT:

22  Q.  So, in fact, on or about August 19th, 2015, you also had a

23  contract with First Trend Marketing, LLC in conjunction with

24  DX-2 and --

25  A.  Yes.

IAOJKET2                       Weissenberger - cross

1    Q.  And what were they going to do?

2    A.  I'm sorry.  I didn't understand you.

3    Q.  What were they going to do for you?

4    A.  I don't remember.

5    Q.  It says, "social media and business leads."  Do you recall

6    what those meant?

7    A.  Yes.  Social media is Facebook and Twitter.

8    Q.  Was Facebook and Twitter for what?

9    A.  For the Elite Business.  I believe they were going to

10   put -- what I remember is they were going to do something about

11   maybe putting up a website or something or putting something on

12   Facebook and Twitter regarding this.

13   Q.  Is that the merchant processing?

14   A.  I don't remember which one this is.  I would have to have

15   it with my other notes, with the other businesses to compare

16   them.

17          THE COURT:  If you don't remember, I think things will

18   be more efficient if you simply say you don't remember.

19          THE WITNESS:  Okay.  I don't remember.

20          THE COURT:  Again, please, I am not putting words in

21   your mouth.

22          THE WITNESS:  I understand.  I understand, your Honor.

23   BY MR. SCHMIDT:

24   Q.  Now, on August 20th, did you enter into a contract with

25   First Trend Marketing for $13,000?

IAOJKET2                         Weissenberger - cross

1    A.  I don't know if that was without looking at my notes.

2    Q.  Can we show her 3511-25, Page 22, and show the bottom.  Is

3    that your signature?

4    A.  It is an e-signature.

5    Q.  Is that your e-signature?

6    A.  Yes.

7    Q.  Are those your initials above it?

8    A.  Yes.

9            MR. SCHMIDT:  I offer this page, your Honor, as DW-5.

10           MR. SOBELMAN:  No objection.

11           MR. SOBELMAN:  No objection.

12           THE COURT:  Admitted.

13           (Defendant's Exhibit DW-5, Page 22, received in

14   evidence)

15   BY MR. SCHMIDT:

16   Q.  What were you supposed to get for your $13,000?

17   A.  That is what it says on the document.

18   Q.  Do you know what person you were talking to?

19   A.  No, I don't.

20   Q.  Do you know is Emily?

21   A.  No, I don't know.

22   Q.  You do know it was not Andrew Owens.  Is that right?

23           MR. SOBELMAN:  Objection.

24   A.  I don't know who I was speaking to when I had this document

25   in front of me.

IAOJKET2                        Weissenberger - cross

1   Q.  You do know it is not Jonathan Stewart, do you?

2   A.  I don't know.

3   Q.  You don't know when you first spoke to Andrew Owens?

4   A.  In the beginning of my business dealings with Business

5   Development Center, the dates would be on my notes when I spoke

6   to them.

7   Q.  (Pause)  Did you receive emails from Business Development

8   Center in relation to the business credit?

9   A.  If there are copies of it in my documents, yes.  I do not

10  recall actually reading or looking at any of them at this time.

11  Q.  Do you recall if you looked at them when you first received

12  them?

13  A.  I am assuming I did.

14  Q.  Did you receive emails from the Business Development Center

15  relating to the bookkeeping system?

16  A.  If they are in my documents, I assume I did.

17           THE COURT:  Do you know whether --

18           THE WITNESS:  I don't know.

19           THE COURT:  All right.  Next.

20  BY MR. SCHMIDT:

21  Q.  Can we put up 3511-22, Page 37.

22           Looking at that, does that refresh your recollection

23  whether or not you received email from them?

24  A.  I received this email.  I see it.

25           MR. SCHMIDT:  I offer that into evidence as DW-6.

1          MR. SOBELMAN:  No objection.

2          THE COURT:  Admitted.

3          (Defendant's Exhibit DW-6, Page 37, received in

4     evidence)

5          MR. SOBELMAN:  Assuming it is just this page?

6          THE COURT:  It is.

7          MR. SCHMIDT:  Just this page.  Can we publish this to

8     the jury?

9     BY MR. SCHMIDT:

10    Q.  Also on the page if you go up a little higher -- I mean

11    lower, lower down on the page, it says coached three, four

12    weeks, Healthy Living with D dot com.  Do you see that?

13    A.  It doesn't say "coach," it says "cards."

14    Q.  So it is cards that you were supposed to receive in three

15    or four weeks concerning Healthy Living?

16    A.  I presume so.

17    Q.  What is Healthy Living?

18    A.  It was one of the websites they were supposed to set up for

19    me.

20    Q.  Did they set up that website?

21    A.  I never saw that website, no.

22    Q.  Are you sure you didn't look at that website a number of

23    times?

24          MR. SOBELMAN:  Objection; asked and answered.

25          THE COURT:  Yes.  It is asked and answered, is that

IAOJKET2                    Weissenberger - cross

1    your objection?

2            MR. SOBELMAN:  Yes, your Honor.

3            THE COURT:  Sustained.

4    BY MR. SCHMIDT:

5    Q.  (Pause)  Did you see a Facebook page related to that

6    website?

7            MR. SOBELMAN:  Objection.

8    A.  I don't remember.

9            MR. SOBELMAN:  Form.

10           THE COURT:  I'll allow it.  The answer is, "I don't

11   remember."  Next.

12   BY MR. SCHMIDT:

13   Q.  Do you recall meeting with a number of representatives of

14   the government on or about September 20th, 2018?

15   A.  Yes.

16   Q.  Do you remember telling them that the website created for

17   Youngevity and health product sales?

18   A.  What is your question?

19           MR. SOBELMAN:  Objection to form.

20           THE COURT:  There is no question.  Why don't you start

21   again.

22   BY MR. SCHMIDT:

23   Q.  Do you remember telling the government on that day that

24   they created the website for you?

25           MR. SOBELMAN:  Objection.  Who is, "they"?

IAOJKET2                    Weissenberger – cross

1           THE COURT:  Sustained.

2           MR. SCHMIDT:  The representatives of the government.

3           THE COURT:  Start again.  Mr. Sobelman is correct, but

4    start again.

5    BY MR. SCHMIDT:

6    Q.  You met with representatives of the government on or about

7    September 20th, 2018?

8           THE COURT:  She has answered.  Next.

9    Q.  Do you recall telling the people that you met on that day

10   that they created the website?

11          THE COURT:  Who is, "they"?

12   BY MR. SCHMIDT:

13   Q.  That someone created the website for you?

14          MR. SOBELMAN:  Objection.  What website, your Honor?

15          THE COURT:  I will allow it.  Move on.  Can you answer

16   that?

17          THE WITNESS:  If you would be more concise.  I don't

18   understand the question.

19          THE COURT:  Thank you.

20   BY MR. SCHMIDT:

21   Q.  Did you tell them that a website was created for Youngevity

22   Health Product sales?

23   A.  Yes.

24   Q.  So, indeed, the website was created for Youngevity Health

25   Product sales.  Is that right?

IAOJKET2                    Weissenberger - cross

1   A.  Yes.

2   Q.  In fact, you included printouts of what appeared on the

3   website in documents you gave to the government?

4   A.  Yes.

5   Q.  Do you recall which entity created those websites?

6   A.  No.

7   Q.  Do you recall how much you paid for the website to be

8   created?

9   A.  Not without looking at my notes and documents.

10  Q.  Now, you remember a person named Owen Roberts.  Is that

11  right?

12  A.  Yes.

13  Q.  You spoke to Mr. Roberts frequently, didn't you?

14  A.  I wouldn't say frequently; a few times.

15  Q.  Now, I ask you to take a look at 3511-17, Page 6.  Is that

16  your handwriting?

17  A.  Yes.

18  Q.  Does that refresh your recollection that from between --

19  withdrawn.

20          Now, when you spoke to Mr. Roberts, did you usually

21  write down that you spoke to Mr. Roberts?

22  A.  These are not notations of speaking to Mr. Roberts.  These

23  are notations of the times that I called and tried to speak to

24  him.

25  Q.  So you attempted to speak to Mr. Roberts many, many times,

IAOJKET2                    Weissenberger - cross

1   but only were able to speak to him a few times?

2   A.  Correct.

3   Q.  In fact, when you did --

4           THE COURT:  Well, just a moment.  Apparently you spoke

5   to Mr. Roberts a few times.  Is that correct?

6           THE WITNESS:  Yes, I did.

7           THE COURT:  Were these only when he called you?

8           THE WITNESS:  These are when I attempted to speak to

9   him.  I made the phone calls.

10          THE COURT:  All right.

11  BY MR. SCHMIDT:

12  Q.  Now, so do you recall what company Mr. Roberts is from?

13  A.  The Business Development Center.

14  Q.  So would it be fair to say that you spoke with him from

15  sometime -- you spoke with him or tried to speak with him

16  sometime from September of 2015 to at least June of 2016?

17  A.  Yes.

18  Q.  Now, when you purchased the Corporate Credit, it was

19  explained to you that you would be coached in relation to

20  Corporate Credit, and that would take about three months.  Is

21  that right?

22  A.  That is not correct.

23  Q.  They explained to you it would take three months to

24  establish Corporate Credit?

25  A.  Yes.

IAOJKET2                         Weissenberger - cross

1    Q.  Were you to receive Corporate Credit coaching?

2    A.  Not that I recall.

3    Q.  I ask you to look at 3511-17, Page 8.

4           Now, at the bottom does that refresh your recollection

5    that you discussed getting coaching from Corporate Credit?

6    A.  Yes.

7    Q.  So part of receiving the Corporate Credit was also being

8    coached?

9    A.  That is what I was supposed to receive.

10   Q.  Now, do you recall the bookkeeping, who was supposed to be

11   doing the bookkeeping for you?

12   A.  They were.

13   Q.  Was it any particular person who was supposed to do that?

14   A.  I was never given the name of a bookkeeper.

15   Q.  Weren't you told that Mark Murray was supposed to be the

16   person who was responsible for the bookkeeping?

17   A.  No.

18   Q.  Would you take a look at Page 9 of the same 3511-17, in the

19   middle.  Do you see where you highlighted -- do you see the

20   highlighting of that name?

21   A.  Yes.

22   Q.  Did you do the highlighting?

23   A.  Yes.

24   Q.  Did you do the circling?

25   A.  Yes.

IAOJKET2                        Weissenberger - cross

1    Q.  Does that refresh your recollection that you believe Mark

2    Murray was the one who was responsible for getting the

3    bookkeeping done?

4                MR. SOBELMAN:  Objection, your Honor.

5                THE COURT:  Sustained.

6    BY MR. SCHMIDT:

7    Q.  Did you understand that Mark Murray was responsible to get

8    the bookkeeping done for you?

9                THE COURT:  Sustained.  The government is standing.

10   BY MR. SCHMIDT:

11   Q.  Were you given the name of the accountant who was going to

12   help you with the taxes?

13   A.  No.

14   Q.  Weren't you told a Kevin Chin was supposed to --

15   A.  That is not with Business Development Center.

16   Q.  So who was supposed to take care of the taxes, which

17   company?

18   A.  I can't answer that with a yes or no or a name.  It would

19   have to be in a sentence.

20   Q.  You can answer in a sentence.

21   A.  Business Development Center promised that my taxes would be

22   taken care of.  It never got to that point.  There was another

23   company that I called that was trying to take care of all the

24   bills that came up because of this, my investing in this

25   company, and they were going to help me with my taxes, and they

IAOJKET2                          Weissenberger - cross

1    did.  That was with Consumer Shield, which is now, I find out,

2    is affiliated with Business Development Center, but I did not

3    know it at the time.

4    Q.  So let me see if I understand.

5         Which company was supposed to take care of helping to

6    file your taxes?

7         MR. SOBELMAN:  Objection, your Honor.  The witness

8    just testified to this.

9         THE COURT:  Sustained.

10   BY MR. SCHMIDT:

11   Q.  You have given a name from somebody from Business

12   Development Corporation who was the person who was supposed to

13   contact in relation to your taxes?

14   A.  No.

15   Q.  I show you 3511-17, Page 25, at the top.  Does that refresh

16   your recollection?

17        MR. SOBELMAN:  Objection.

18        THE COURT:  Sustained.  No failure of recollection at

19   this point.

20   BY MR. SCHMIDT:

21   Q.  Isn't it a fact that you wrote down in your notes that you

22   were given the name of a tax consultant from Business

23   Development Corporation?

24   A.  By looking at my notes, yes.

25   Q.  What you said is that you ended up not using that person;

1  you used somebody from Consumer Shield.  Is that right?

2  A.  I was never contacted or I did not contact the person, that

3  person on that piece of paper.

4  Q.  So you don't know if it was your failure to get ahold of

5  him or their failure to contact you?  You don't remember?

6  A.  I remember.  It was because after there was no dealings

7  with Business Development Center after that, after making phone

8  call after phone call after phone call.

9           THE COURT:  You mean you phoning?

10          THE WITNESS:  I tried to contact them to get

11  information, yes, sir.

12          THE COURT:  And the result was what?

13          THE WITNESS:  None.

14          THE COURT:  Do you know how many times you think you

15  called them?

16          THE WITNESS:  No.  I am sorry.  A "lot" is all I can

17  say.

18          THE COURT:  I don't want you to guess, so don't guess,

19  but let's see if we can.  Was it more than five times?

20          THE WITNESS:  Yes.

21          THE COURT:  Was it more than 10 times?

22          THE WITNESS:  Yes.

23          THE COURT:  Was it more than 20 times?

24          THE WITNESS:  I don't think so.

25          THE COURT:  Was it more than 15 times?

IAOJKET2                        Weissenberger - cross

 1                  THE WITNESS:  I don't remember.

 2                  THE COURT:  Between 10 and 20?

 3                  THE WITNESS:  Yes.

 4                  THE COURT:  All right.

 5     BY MR. SCHMIDT:

 6     Q.  Now, were you told or did you speak to a Brian Church about

 7     getting coaching?

 8     A.  I don't remember.

 9     Q.  Would you look at Page 15 of 3511-17.

10                  Does that refresh your recollection as to whether or

11     not you understood that Brian Church was supposed to do

12     coaching for you?

13     A.  I'm saying that Social Media Gold.  I am not quite sure

14     what these notes mean.

15     Q.  When you wrote these notes, it was based on what you knew

16     at this time?

17     A.  I beg your pardon?

18     Q.  When you wrote these notes, it was fresh in your mind?

19     A.  It doesn't refresh my mind as to what this especially

20     means, particularly means.

21     Q.  But this was fresh in your mind when you wrote these down?

22     A.  I know I wrote them down.  It is my handwriting.

23     Q.  So is it a fact that you wrote down "Brian Church," and

24     under it, "coaching"?

25     A.  I do not remember this conversation so I cannot say exactly

1    what it entails.

2    Q.  But you wrote down, "coaching"?

3    A.  Yes.

4    Q.  Now, did you actually speak to a Melissa about training?

5    A.  I don't remember.

6    Q.  I ask you to take a look at 3511-22, Page 41.

7         Is that an email that you received?

8    A.  Yes.

9    Q.  Stargazer1 is your email?

10   A.  Yes.

11   Q.  Do you recall receiving that?

12   A.  Yes.

13   Q.  Is that the document that you gave to the government?

14   A.  Yes.

15   Q.  Does that refresh your recollection that you spoke with

16   Melissa on the day before you received that email?

17   A.  No, I don't remember speaking to her.

18   Q.  This is what you received and read.  Is that correct?

19   A.  Yes.

20   Q.  And gave to the government?

21   A.  Yes.

22            MR. SCHMIDT:  I offer that as DW-7, just that page.

23            MR. SOBELMAN:  No objection.

24            THE COURT:  Admitted.

25            (Defendant's Exhibit DW-7, Page 41, received in

1    evidence)

2              MR. SCHMIDT:  Can we publish that, please.

3              THE COURT:  Next question.  How much longer do you

4    think you have, sir?

5              MR. SCHMIDT:  Half an hour, your Honor.

6              THE COURT:  Proceed.

7    BY MR. SCHMIDT:

8    Q.  Now, do you understand that you had a coach to help you

9    with any kind of issues relating to your website?

10   A.  Yes.

11   Q.  Did you receive any training?

12   A.  No.

13   Q.  Did you request any training?

14   A.  No.

15             THE COURT:  Find a logical time to break, sir.

16             MR. SCHMIDT:  This is a good time.

17             THE COURT:  Ladies and gentlemen, you'll remember that

18   I said we have need to take a half hour break.  I did tell you

19   it would be 11:00 o'clock.  A half hour is needed because I was

20   asked to perform a wedding in the courthouse.  The bride was

21   supposed to be 11:00 o'clock.  The bride was coming in from New

22   Jersey, and the road is blocked.  She is caught in traffic.

23   She has just arrived.  I am sure she is absolutely frantic.  I

24   intend to tell her in 10 years it will make a good story to

25   tell the kids, but right now I am sure she is frazzled, so I

1    will give her a little time and perform the wedding.

2              Let's take a half hour break.  Thank you.

3              (Jury excused)

4              THE COURT:  10 to 12:00, thank you.  You may step

5    down, Ms. Weissenberger.  Again, the government can't speak

6    with you.  You can talk with the agent.

7              THE WITNESS:  Thank you.

8              (Recess)

9              THE COURT:  Bring the jury in.

10             (Jury present)

11             THE COURT:  Please be seated in the courtroom.  We now

12   will have the continuation and the conclusion of the

13   cross-examination by Mr. Schmidt, and we'll break for lunch at

14   1:00 o'clock.  Proceed, sir.

15             MR. SCHMIDT:  Thank you for your patience, your Honor.

16   BY MR. SCHMIDT:

17   Q.  Now, the Youngevity website, you recall, was activated on

18   October 22, 2015.  Is that correct?

19   A.  I don't know the exact date it was activated.

20   Q.  Do you think you might have it in your notes?

21   A.  I don't recall.  They might be in there, but I don't know.

22   Q.  Can we show her 3511-17, Page 23.  Now, can you read that

23   to yourself.  Does that refresh your recollection that the

24   website was activated on October 22, 2015?

25   A.  Yes.

IAOJKET2                        Weissenberger - cross

1   Q.  That is the Youngevity website you're talking about.  Is
2   that correct?
3   A.  Yes.
4   Q.  Now, you continued to invest in marketing for Youngevity.
5   Is that right?
6   A.  Yes.
7   Q.  Now, the person who talked you into investing more for
8   marketing was Mark Murray, wasn't it?
9   A.  Yes.
10  Q.  You also invested with Eva's Innovation and Impact on
11  October 27th, 2015 as well.  Is that right?
12  A.  Probably.
13  Q.  Now, Andrew Owens was not the first person to call you from
14  the Business Development Center.  Isn't that right?
15  A.  Yes.
16          THE COURT:  Yes, that's right?
17          THE WITNESS:  Yes, that's right.
18  BY MR. SCHMIDT:
19  Q.  The first person who called you from the Business
20  Development Center was Owen Roberts, wasn't it?
21  A.  Yes.
22  Q.  And the companies that you purchased differed in things
23  from -- some of them said they were related to Business
24  Development Center and some of them said they had other company
25  names.  Is that right?

IAOJKET2                         Weissenberger – cross

A.   Some of them had other company names.  They all told me why

they called me, that they got my name and number from Business

Development Center.

          (Continued on next page)

IAO8KET3                      Weissenberger - Cross

1   Q.  So when you say that affiliated, you meant that they

2   mentioned that they got your number from the Business

3   Development Center?

4   A.  Yes.

5   Q.  You did in fact get some money back from the credit cards,

6   didn't you?

7   A.  No.  I got $200, and I don't recall what it said on the

8   check statement, but it wasn't commission from the business.  I

9   don't remember what it was that it said on the check statement.

10  Q.  Back in July -- I am going to show you what is

11  marked -- you had a Nordstrom's credit card, didn't you?

12  A.  I beg your pardon?

13  Q.  You had a Nordstrom's credit card?

14  A.  Yes.

15  Q.  In fact, on May 6, 2016, you actually received a credit

16  from your Nordstrom's credit card?

17  A.  I don't recall that.  I don't know.

18  Q.  On May 6 you also purchased something from Monument

19  Adjustment Bureau for $3,995.  Do you recall that?

20  A.  Just because I have seen the statement.

21  Q.  Do you recall what that was?

22  A.  No.

23  Q.  That was already in May of 2016, is that right?

24  A.  If that's what you say.

25  Q.  Take a look at 3511-07, page 3.

IAO8KET3                          Weissenberger – Cross

1          Now, you did that highlighting, right?

2   A.  Yes.

3   Q.  And that is May 6, 2016, is that right?

4          MR. SOBELMAN:  Your Honor, this is a document, again,

5   that's not in evidence that Mr. Schmidt appears to be reading

6   from.

7          MR. SCHMIDT:  I apologize.

8   Q.  Does that refresh your recollection?

9   A.  Am I allowed to answer that?

10         THE COURT:  No.  There is no question.

11         Rephrase.  Start again.

12  Q.  Could you read that document to yourself, especially the

13  highlighted portion.

14         THE COURT:  What year was the charge that Mr. Schmidt

15  is referring to incurred, when was it incurred, if you know,

16  the year?

17         THE WITNESS:  2016.

18         THE COURT:  Next question.

19  Q.  Do you recall whether it was in May 2016?

20  A.  Only by the fact that it's on my statement.

21  Q.  When you highlighted it, would that have been when you

22  first saw it and recalled that charge?

23  A.  I highlighted it to bring it to my own attention as to what

24  it was.  I don't recall exactly when I highlighted it.

25  Q.  Do you recall what the purpose was for?

IAO8KET3                        Weissenberger - Cross

1           THE COURT:  The purpose of the charge?

2           MR. SCHMIDT:  The purchase.

3   Q.  What the purchase was for?

4   A.  It had something to do with the business.

5   Q.  Do you remember what it was?

6   A.  No, I don't remember.

7           MR. SCHMIDT:  Can we show page 7 of 3511-07.

8   Q.  Do you recall that document?

9   A.  No.  I just know it's mine.

10  Q.  Excuse me?

11  A.  I know it's mine.

12  Q.  Do you recall seeing that?

13  A.  Yes.

14  Q.  Does that refresh your recollection of the purpose of the

15  purchase from Monument Adjustment Bureau?

16  A.  Yes, because it says on the document what it's for.

17          THE COURT:  Again, remember, just because something is

18  on a document doesn't mean it's true.

19          THE WITNESS:  Then I don't know what it was for.

20          THE COURT:  The question is whether looking at it

21  gives you a new recollection.

22          THE WITNESS:  No.

23          MR. SCHMIDT:  One minute, your Honor.

24          May I have a moment?

25  Q.  Now, do you recall receiving a $7,000 credit from A1 and a

IAO8KET3                    Weissenberger - Cross

1  $4,995 credit from Creative Web on or about June to July of

2  2016?

3          MR. SOBELMAN:  Objection.  Compound.

4          MR. SCHMIDT:  I will withdraw that question.

5  Q.  Do you recall receiving a $7,000 credit on your credit card

6  in approximately June-July of 2016?

7  A.  No.

8  Q.  Do you recall receiving a $4,995 credit on your credit card

9  from Creative Web in the same approximate time?

10 A.  No.

11         MR. SCHMIDT:  Would you show Ms. Weissenberger

12 3511-11, page 21.

13 Q.  Do you recognize that document?

14 A.  Yes.

15 Q.  Is that your handwriting --

16 A.  Yes.

17 Q.  -- on the right?

18         Can you look at the bottom, please.

19         Does that refresh your recollection about receiving

20 those?

21 A.  Yes.

22 Q.  Indeed, you received approximately $12,000 back?

23 A.  Yes.

24 Q.  Ms. Weissenberger --

25 A.  That isn't a credit.

IAO8KET3                          Weissenberger - Cross

1   Q.  Why is that reflected in the June to July statement if it's

2   not a credit?

3                MR. SOBELMAN:  Objection, your Honor.  Again, Mr.

4   Schmidt is talking about the content of a document that is not

5   in evidence.

6                THE COURT:  Sustained.

7   Q.  What is it then?  Do you know what it is?

8                THE COURT:  You mean the entry that's 7,000 and the

9   entry that's 4,995?

10               MR. SCHMIDT:  Yes.

11               MR. SOBELMAN:  Objection.  Again, we are talking about

12   the content of a document that's not in evidence.

13               MR. SCHMIDT:  She indicated that her recollection was

14   originally refreshed and now she is unrefreshing it.

15               THE COURT:  I will allow it.

16               Go ahead.

17   Q.  Do you know what that was?

18               THE COURT:  Do you know what that reference is on that

19   document?

20               THE WITNESS:  No.

21               THE COURT:  Next question.

22   Q.  Ms. Weissenberger, you feel that you were cheated and lied

23   to by many people, is that right?

24   A.  Would you repeat that, please?

25   Q.  You feel you were cheated to and lied to by many people?

1   A.  Yes.

2   Q.  And you feel that it's unfair that you have lost all of

3   this money and have gotten very little in return, is that

4   right?

5   A.  Yes.

6   Q.  Have you expressed to others that you desire all of those

7   people to go to jail?

8   A.  If they are convicted, yes.

9   Q.  You want them to be convicted, don't you, and you have

10  expressed that, haven't you?

11  A.  Why wouldn't I?

12  Q.  Because you feel you have been cheated?

13  A.  I beg your pardon?

14  Q.  You feel you have been cheated?

15  A.  Yes.

16  Q.  You haven't met any of these people personally, is that

17  right?

18  A.  No.

19  Q.  Correct?

20  A.  Correct.

21  Q.  And the amount of times that you testified that you spoke

22  to Mr. Owens was a few times, is that right?

23  A.  Yes.

24  Q.  And the times that you spoke to Mr. Stewart was a few

25  times?

IAO8KET3                        Sinclair - Direct

1   A.  Yes.

2           MR. SCHMIDT:  I have no further questions.

3           THE COURT:  Thank you.

4           Is there any redirect on this witness?

5           MR. SOBELMAN:  No further questions.

6           THE COURT:  Thank you.

7           MR. PAUL:  I have no questions.

8           THE COURT:  Thank you.  I appreciate reminding me

9   because there are two defendants here.

10          Nobody has any more questions of you.  You may step

11  down.  You are excused, Ms. Weissenberger.

12          (Witness excused)

13          THE COURT:  Next witness for the government.

14          MS. FLETCHER:  The government calls William Sinclair.

15   WILLIAM SINCLAIR,

16      called as a witness by the government,

17      having been duly sworn, testified as follows:

18          THE DEPUTY CLERK:  State your name and spell your last

19  name for the record.

20          THE WITNESS:  William Sinclair, S-I-N-C-L-A-I-R.

21          THE COURT:  Please be seated.  Welcome, sir.

22          Your witness, Ms. Fletcher.

23          MS. FLETCHER:  Thank you, Judge.

24  DIRECT EXAMINATION

25  BY MS. FLETCHER:

IAO8KET3                          Sinclair - Direct

1    Q.  Good afternoon, Mr. Sinclair.

2    A.  Good afternoon.

3    Q.  How old are you, sir?

4    A.  39.

5    Q.  What do you currently do for a living?

6    A.  I work for a solar company.

7    Q.  What is your job for the solar company?

8    A.  Sales.

9    Q.  What do you sell?

10   A.  Solar panels, residential solar.

11   Q.  How do you sell these panels to customers, in person, over

12   the phone?

13   A.  In person.

14   Q.  Approximately how long have you worked for the solar

15   company?

16   A.  Just over a year.

17   Q.  What did you do before that?

18   A.  I briefly worked for a car dealership.

19   Q.  What did you do for work before March of --

20          THE COURT:  Were you a salesman for the car

21   dealership?

22          THE WITNESS:  I was, sir.

23          MS. FLETCHER:  Thank you, your Honor.

24   Q.  What did you do for work prior to March of 2017?

25   A.  I owned my own business, telemarketing business.

IAO8KET3                          Sinclair – Direct

1   Q.   What was the name of that business?

2   A.   Olive Branch Marketing.

3   Q.   What happened in March of 2017?

4   A.   I was arrested.

5   Q.   What were you arrested for?

6   A.   Conspiracy to commit money laundering, conspiracy to commit

7   wire fraud, and wire fraud.

8   Q.   Have you pled guilty in federal court to those crimes?

9   A.   Yes.

10  Q.   In connection with pleading guilty, did you enter into a

11  cooperation agreement with the government?

12  A.   Yes.

13  Q.   Are you testifying here today as part of that cooperation

14  agreement?

15  A.   Yes.

16  Q.   Prior to March of 2017, how long had you worked in the

17  telemarketing industry?

18  A.   Overall, since about 2005.

19  Q.   What are some of the companies that you worked for in the

20  telemarketing industry?

21  A.   From 2005 to the end of 2007, I worked Educational Direct,

22  which was a student loan consolidation company.

23           After that, starting in 2008, I worked for a company

24  named The Tax Club, located here in Manhattan.

25           In 2012, I started to venture out on my own as a

IAO8KET3                        Sinclair - Direct

1  business owner.

2  Q.  Also in telemarketing?

3  A.  Yes, ma'am.

4  Q.  Focusing on your time at The Tax Club, does The Tax Club

5  have another name?

6  A.  Manhattan Professional Group.

7  Q.  Where was that located?

8  A.  Empire State Building.

9  Q.  What was your role during your time at The Tax Club?

10 A.  Sales manager.

11 Q.  Were you a sales manager the whole time or were you

12 initially a salesperson and then got promoted?

13 A.  I was a sales representative for about a month and then

14 became promoted.

15 Q.  During your time at The Tax Club, what did you sell?

16 A.  What were referred to as biz-op products, which would range

17 from corporate setups, LLCs or corporations, business plans,

18 tax preparation, an item called Corporate Records Pro, tax

19 plans, consulting and advisory services.

20 Q.  You used the term "biz-op."  Is that short for something?

21 A.  It is.

22 Q.  What is it short for?

23 A.  Business opportunity.

24 Q.  During your time at The Tax Club, who, in general, did you

25 sell to?

IAO8KET3                          Sinclair - Direct

1   A.  Primarily older customers.

2   Q.  What, if anything, had those customers already purchased

3   when you sold to them?

4              MR. SCHMIDT:  Objection, your Honor.

5              THE COURT:  Sustained as to form.

6   Q.  When you sold to these customers, had they already made any

7   other purchases?

8   A.  They had.

9   Q.  What types of purchases had they made?

10  A.  Significant ones.

11  Q.  For what?

12  A.  For what we referred to as a coaching program.

13  Q.  What is a coaching program?

14  A.  OK.  So a coaching program is, it's a separate company, so

15  figure company A, there is a significant investment, thousands

16  of dollars.  Depending on the business type, there are so many

17  different models that they went by and offered.  They generally

18  provide what is called, like, weeks of training.  And then

19  depending on the model, it could be different types of help.

20  Q.  Did there come a time when you started your own sales

21  floor?

22  A.  Yes.

23  Q.  Focusing on the time frame beginning around early 2014,

24  were you operating your own sales floor at that time?

25  A.  Yes.

1   Q.  What was the name of the company at that time?

2   A.  Olive Branch Marketing.

3   Q.  Did you operate that company by yourself or with others?

4   A.  With others.

5   Q.  Who did you operate it with?

6   A.  My partner was Michael Finocchiaro.

7   Q.  Beginning in early 2014, where was that telemarketing

8   company located?

9   A.  Early '14, it was in Hoboken, New Jersey.

10              THE COURT:  Was it a telemarketing company?

11              THE WITNESS:  Yes.

12              THE COURT:  How do you define a telemarketing company?

13              THE WITNESS:  Sales were made over the phone.

14              MS. FLETCHER:  Thank you, Judge.

15   Q.  Did there come a time when your company moved?

16   A.  Yes, ma'am.

17   Q.  Where did it move to?

18   A.  Clifton, New Jersey, specifically, 433 Piaget Ave, in

19   Clifton.

20   Q.  Approximately when did you move to that office?

21   A.  June 3rd of 2014.

22   Q.  You mentioned you started this company with a partner?

23   A.  Yes.

24   Q.  What was your role as co-owner of the company?

25   A.  I was generally in charge of what we did.  Michael followed

IAO8KET3                        Sinclair - Direct

1    my lead.

2    Q.  Was Michael responsible for anything specific?

3    A.  Yes.

4    Q.  What was he responsible for?

5    A.  Chargebacks, clients who wanted to cancel, escalated

6    situations with unhappy customers.

7    Q.  You used the term "chargeback."  What is a chargeback?

8    A.  A chargeback is when someone uses their credit card to

9    purchase something and disputes that charge with their credit

10   card company.

11   Q.  You said Mr. Finocchiaro was also responsible for escalated

12   situations.  What do you mean by an escalated situation with a

13   customer?

14   A.  An escalated situation is something that could potentially

15   lead to a chargeback, an unhappy customer for any reason.

16   Q.  During the period between 2014 and 2015, approximately how

17   many people worked for you at any given time?

18   A.  I'd say the most was probably about 15, including myself

19   and Michael.

20   Q.  What were the roles of the people who worked for you in

21   categories?

22   A.  We had sales representatives; we had a sales manager; we

23   had a compliance department, which also set up appointments,

24   referred to as appointment setters.

25   Q.  Who was your sales manager during that time?

IAO8KET3                        Sinclair - Direct

1   A.   Arash Ketabchi.

2   Q.   During that time frame, did Arash -- I will refer to him as

3   Arash, if that's OK -- did Arash recruit any other salespeople?

4   A.   Yes.

5   Q.   Who did he recruit?

6   A.   Andrew Owimrin and Reagan Owimrin.

7   Q.   Do you have an understanding as to whether Arash Ketabchi

8   and Reagan and Andrew Owimrin were related in any way?

9   A.   Not by blood.  But through Arash's, I believe, fiancee, if

10  I am not mistaken, I believe they are cousins.

11  Q.   What is Arash's fiancee's name?

12  A.   Danielle Owimrin.

13  Q.   You said "they are cousins."  Who are cousins?

14  A.   Danielle, Reagan and Andrew.

15  Q.   Did you interview Andrew and Reagan Owimrin when they were

16  hired to work for you?

17  A.   No.

18          MS. FLETCHER:  Your Honor, I expect to show

19  Mr. Sinclair some lengthy exhibits.  Can I hand up a binder for

20  him.

21          THE COURT:  For him, yes.

22  Q.   Mr. Sinclair, you can just leave that binder there for now.

23  I will show you some documents on the screen to start.

24          MS. FLETCHER:  Ms. Lee, can we please pull up for

25  identification what has been marked as Government Exhibit 709.

IAO8KET3                         Sinclair - Direct

1    Q.  Mr. Sinclair, do you recognize Government Exhibit 709?

2    A.  Yes.

3    Q.  What is it?

4    A.  It's a picture of myself.

5           MS. FLETCHER:  The government offers Government

6    Exhibit 709.

7           THE COURT:  Any objection?

8           MR. SCHMIDT:  No objection.

9           MR. PAUL:  No objection.

10          THE COURT:  Hearing no objection, admitted.

11          (Government's Exhibit 709 received in evidence)

12          MS. FLETCHER:  Can we please pull up what has been

13   marked for identification as Government Exhibit 702.

14   Q.  Do you see 702 on your screen, sir?

15   A.  Yes.

16   Q.  Do you recognize Government Exhibit 702?

17   A.  Yes.

18   Q.  What is it?

19   A.  A picture of Michael Finocchiaro.

20          MS. FLETCHER:  The government offers Government

21   Exhibit 702.

22          THE COURT:  Hearing no objection, admitted.

23          (Government's Exhibit 702 received in evidence)

24          MS. FLETCHER:  Can we please pull up Government

25   Exhibit 703 for identification.

IAO8KET3                          Sinclair - Direct

1    Q.  Do you recognize 703, sir?

2    A.  Yes.

3    Q.  What is it?

4    A.  A picture of Arash Ketabchi.

5         MS. FLETCHER:  The government offers Government

6    Exhibit 703.

7         THE COURT:  Hearing no objection, admitted.

8         (Government's Exhibit 703 received in evidence)

9         MS. FLETCHER:  Ms. Lee, 706 for identification,

10   please.

11   Q.  Do you recognize 706, sir?

12   A.  Yes.

13   Q.  What is it?

14   A.  A picture of Andrew Owimrin.

15        MS. FLETCHER:  The government offers 706.

16        MR. PAUL:  No objection.

17        THE COURT:  Admitted.

18        (Government's Exhibit 706 received in evidence)

19        MS. FLETCHER:  707 for identification, please,

20   Ms. Lee.

21   Q.  Do you recognize 707?

22   A.  Yes.

23   Q.  What is it?

24   A.  A picture of Reagan Owimrin.

25        MS. FLETCHER:  The government offers government 707.

1    THE COURT:  Hearing no objection, admitted.

2         (Government's Exhibit 707 received in evidence)

3  Q.  Are you familiar with a man named Steve Ketabchi?

4  A.  Yes.

5  Q.  Did Mr. Steve Ketabchi ever work for you?

6  A.  No.

7  Q.  Did you come to have business dealings with him at some

8  point?

9  A.  Yes.

10  Q.  Approximately when was that?

11  A.  Starting from, I'd say, October 2015 through December of

12  2015.

13         MS. FLETCHER:  Ms. Lee, can we pull up Government

14  Exhibit 704 for identification.

15  Q.  Mr. Sinclair, do you recognize 704?

16  A.  Yes.

17  Q.  Who is that?

18  A.  Steve Ketabchi.

19  Q.  A photograph?

20  A.  A photograph of Steve Ketabchi.

21         MS. FLETCHER:  The government offers 704.

22         MR. PAUL:  No objection.

23         THE COURT:  Admitted.

24         (Government's Exhibit 704 received in evidence)

25  Q.  Mr. Sinclair, I want to go back to talking about the Piaget

1    Avenue office.

2              MS. FLETCHER:  Ms. Lee, can we pull up what has been

3    marked for identification as Government Exhibit 710.

4    Q.  Mr. Sinclair, do you recognize Government Exhibit 710?

5    A.  Yes, ma'am.

6    Q.  What is Government Exhibit 710?

7    A.  The floor plan of the office at 433 Piaget Ave in Clifton,

8    New Jersey.

9    Q.  Did you prepare this floor plan?

10   A.  Yes.

11             MS. FLETCHER:  The government offers Government

12   Exhibit 710.

13             MR. SCHMIDT:  If I may just briefly, your Honor.

14             THE COURT:  Very.

15   VOIR DIRE EXAMINATION

16   BY MR. SCHMIDT:

17   Q.  Is this drawn to scale or just approximation?

18   A.  An approximation.

19             MR. SCHMIDT:  No objection.

20             THE COURT:  Admitted.

21             (Government's Exhibit 710 received in evidence)

22             MS. FLETCHER:  Please publish.

23   Q.  Mr. Sinclair, do you recognize the area that's reflected in

24   the top right-hand corner of this document?

25   A.  Yes, ma'am.

IAO8KET3                         Sinclair - Direct

1    Q.   What is that area?

2    A.   That is the entrance and exit to the office along with

3    where appointments were set, the appointments setters sat

4    there, in addition to the compliance officers, same people.

5    Q.   The lines around that area, what do those lines denote?

6    A.   Walls.

7    Q.   How about the dark line next to the word "exit," what does

8    that denote?

9    A.   A door.

10   Q.   Could you enter the Olive Branch office through anyplace

11   other than that door?

12   A.   No, ma'am.

13   Q.   Is it fair to say you would have to walk through the

14   appointment setters' room to get into the office?

15   A.   Yes.

16   Q.   What is the room that is to the left of the appointment

17   setters' room?

18   A.   My partner, Michael Finocchiaro's office.

19   Q.   Mr. Finocchiaro, was he ever called another name?

20   A.   Fino, Mike Foster.

21   Q.   Mr. Finocchiaro's office, what is that dark line at the

22   bottom of it?

23   A.   It's the door.

24   Q.   What is the office that's just to the left of Mr.

25   Finocchiaro's office?

IAO8KET3                      Sinclair - Direct

1    A.  My office.

2    Q.  Is that dark line also a door?

3    A.  A door, yes.

4    Q.  What is this large area that's depicted at the bottom of

5    the floor plan?

6    A.  That is the sales floor, the primary sales floor.

7             THE COURT:  Are there windows anywhere here?

8             THE WITNESS:  Yes.  On the bottom of the photo, your

9    Honor, which are not denoted here.  Those are desks where sales

10   representatives sat.

11            THE COURT:  Those boxes around the big room are desks?

12            THE WITNESS:  Yes, sir.

13            THE COURT:  And windows are not denominated?

14            THE WITNESS:  There are a few on the bottom, but we

15   didn't include them.

16            THE COURT:  Where else beside the bottom line?

17            THE WITNESS:  Where there would be windows?

18            THE COURT:  Yes.

19            THE WITNESS:  Just on that side.  That was the front

20   of the building.

21            THE COURT:  Thank you.

22   BY MS. FLETCHER:

23   Q.  What is the large square in the bottom left corner?

24   A.  Arash Ketabchi's desk.

25   Q.  The lines around Arash Ketabchi's desk, do those lines also

IAO8KET3                              Sinclair - Direct

1    denotes walls?

2    A.  Inside the circle, that denotes his desk.  But if you go

3    above the line, and then below the line, yes, those are walls.

4    Q.  Did Arash Ketabchi have an office?

5    A.  No.

6    Q.  Did he sit in the sales floor like all the other

7    salespeople?

8    A.  Yes.

9    Q.  Were there any walls in the sales floor during the

10   2014-2015 time frame?

11   A.  No.  We knocked it up down when we took the office.

12   Q.  It was an open space?

13   A.  Yes.

14        MS. FLETCHER:  Ms. Lee, can we pull up what has been

15   marked for identification as Government Exhibit 731.

16   Q.  Do you recognize Government Exhibit 731?

17   A.  Yes, ma'am.

18   Q.  How do you recognize it?

19   A.  It is the front entrance to the building where the office

20   was located at 433 Piaget Ave, in Clifton, New Jersey.

21   Q.  When you say "the office," what office are you talking

22   about?

23   A.  The one we just saw a floor plan for.

24   Q.  Is that the Olive Branch office?

25   A.  Yes, ma'am.

IAO8KET3                          Sinclair – Direct

1              MS. FLETCHER:   The government offers Government

2     Exhibit 731.

3              MR. SCHMIDT:   No objection.

4              THE COURT:   Hearing no, objection admitted.

5              (Government's Exhibit 731 received in evidence)

6              MS. FLETCHER:   Please publish.

7              Can we pull up what has been marked for identification

8     as Government Exhibit 732.

9     Q.   Actually, Mr. Sinclair, I am going to show you a few

10    photographs in sequence.

11    A.   OK.

12             MS. FLETCHER:   733, please, Ms. Lee.

13             734.

14             735.

15             736.

16    Q.   Do you recognize those photographs at 732, 733, 734, 735

17    and 736?

18    A.   Yes, ma'am.

19    Q.   What is depicted generally in those photographs?

20    A.   Pictures of the office, the Olive Branch office located at

21    433 Piaget Ave.  And this last one 736 is a picture of myself

22    and Derek Larkin outside of the office.

23             MS. FLETCHER:   Can you pull up 737 for identification,

24    please.

25    Q.   Do you recognize Government Exhibit 737?

IAO8KET3                          Sinclair - Direct

1    A.   Yes.

2    Q.   What is it?

3    A.   A picture of Andrew Owimrin located outside of the 433

4    Piaget Ave office, in Clifton, New Jersey.

5              MS. FLETCHER:  The government offers Government

6    Exhibits 732 through 737.

7              MR. SCHMIDT:  Very briefly.

8              THE COURT:  Yes.

9    VOIR DIRE EXAMINATION

10   BY MR. SCHMIDT:

11   Q.   When was that picture 737 taken, do you know?

12   A.   I don't know exactly.

13   Q.   Do you know approximately?

14   A.   It would have to be in between June of '14 through spring

15   of '16.

16             MR. SCHMIDT:  No objection.

17             THE COURT:  Admitted.  That series is admitted without

18   objection.

19             (Government's Exhibits 732, 733, 734, 735, 736 and 737

20   received in evidence)

21             MS. FLETCHER:  Ms. Lee, please publish 732.

22   Q.   What is depicted in 732, Mr. Sinclair?

23   A.   This is a picture of the appointment setters' room located

24   at 433 Piaget Ave, in Clifton, New Jersey, the Olive Branch

25   office.

IAO8KET3                          Sinclair - Direct

1   Q.  You said appointments setters and also compliance people

2   sat in that room?

3   A.  Correct.

4   Q.  Do you see the windows at the top right of that photograph?

5   A.  Yes.

6   Q.  Do those windows look outside?

7   A.  No.

8   Q.  Where do they look?

9   A.  On the other side of that wall, that's just the sales

10  floor.

11  Q.  And the door that we see at the left side of that

12  photograph, what is that door?

13  A.  That was the same door that was located in the top right of

14  the floor plan.

15  Q.  The one marked "exit"?

16  A.  Yes, ma'am.

17  Q.  So that's the way you would enter the office?

18  A.  Correct.

19  Q.  Let's go to 733, please.

20          What is the area depicted in 733?

21  A.  That is part of the sales floor.

22  Q.  Is that the large room where the sales representatives sat

23  on Government Exhibit 710?

24  A.  Yes, ma'am.

25  Q.  What are the chairs and the desks there?

IAO8KET3                        Sinclair - Direct

1    A.  That is one of the boxes that would have been drawn on the

2    floor plan depicting the sales representative's workstation.

3            MS. FLETCHER:  Can we please publish 734.

4    Q.  What is depicted in 734?

5    A.  That is Michael Finocchiaro's office.

6            MS. FLETCHER:  Publish 735, please, Ms. Lee.

7    Q.  What is reflected in 735?

8    A.  My office.

9            THE COURT:  Just part of your office, right?

10           THE WITNESS:  Correct.

11           THE COURT:  So, too, it was part of the Finocchiaro

12   office?

13           THE WITNESS:  Yes, sir.

14           MS. FLETCHER:  736, please.

15   Q.  What is depicted in Government Exhibit 736?

16   A.  This is a picture of the building in which the Olive Branch

17   office is on the second floor.  Outside is a picture of me and

18   Derek Larkin.

19   Q.  Who is Derek Larkin?

20   A.  He was a sales representative from my company for a time.

21   Q.  You mentioned that your office was on the second floor.

22   Are the windows of this building the windows to your office?

23   A.  Yes.  If you look above that one there is one.

24   Q.  Which one?

25   A.  The one circled.  On the second floor.  Not the one that's

IAO8KET3                    Sinclair - Direct

1    circled right now.

2    Q.  Perhaps rather than referring to the circles, Mr. Sinclair,

3    if you could refer to where the windows are relative to the

4    signs.

5    A.  Yes.  The one above Gastronomia and the one above NJ Barber

6    Supply.

7              THE COURT:  What are those?

8              THE WITNESS:  Those are the windows that would have

9    been on the bottom of the floor plan that were not depicted.

10             THE COURT:  Into the main salesroom.  They look into

11   the main salesroom, not the individual offices?

12             THE WITNESS:  Correct.

13             MS. FLETCHER:  If we can pull up 737, please.

14   Q.  What is depicted in 737, sir?

15   A.  This is a picture of Andrew Owimrin standing outside the

16   front entrance to our building.

17             MS. FLETCHER:  Ms. Lee, can we please pull up what has

18   been marked for identification as Government Exhibit 708.

19             May I have just a moment, your Honor?

20             THE COURT:  Yes.

21   Q.  Do you recognize Government Exhibit 708?

22   A.  Yes, ma'am.

23   Q.  What is it?

24   A.  It's a picture of Ray Quiles.

25   Q.  Who was Ray Quiles?

IAO8KET3                          Sinclair - Direct

```
 1   A.   Ray Quiles owned the fulfillment company that we used for
 2   our products and services.
 3   Q.   What was the name of that company?
 4   A.   Prestige Worldwide Enterprises.
 5   Q.   You used the word "fulfillment."  Can you describe briefly
 6   what you mean by fulfillment?
 7             MR. SCHMIDT:  Objection.  I didn't hear the word
 8   fulfillment.
 9             THE COURT:  I heard it.
10             Next.
11             You may answer, sir.
12   A.   I'm sorry.  AUSA, can you repeat your question?
13             THE COURT:  This witness has said the person in the
14   picture that's on the screen owned a fulfillment company that
15   we use for our products and services.
16             Ask the question again.
17   Q.   What do you mean, just generically, by the word
18   "fulfillment"?
19   A.   So we did not do the actual work for the products and
20   services that we sold in-house; it was a separate location and
21   a separate company.  This individual owned that company and
22   actually did the work for the services and products that we
23   sold to customers.
24             MS. FLETCHER:  The government offers 708.
25             MR. SCHMIDT:  No objection.
```

IAO8KET3                        Sinclair - Direct

1          THE COURT:  Admitted.

2          (Government's Exhibit 708 received in evidence)

3          MS. FLETCHER:  Please publish.

4   Q.  Did Mr. Quiles ever work in your office?

5   A.  No.

6   Q.  Mr. Sinclair, I am going to show you a series of

7   photographs in sequence, starting with Government Exhibit 713

8   for identification.

9          Do you recognize 713?

10  A.  Yes.

11  Q.  What is it?

12  A.  It's a picture of Andrew Owimrin at his desk at 433 Piaget

13  Ave, in Clifton, New Jersey.

14  Q.  Government Exhibit 714 for identification.

15         Do you recognize 714?

16  A.  Yes.

17  Q.  What is it?

18  A.  It's a picture of, from bottom to top, Mona Ketabchi, Steve

19  Ketabchi, Ryan Hult, and Danielle Owimrin.

20  Q.  Ryan Hult is a new name.  Who is Ryan Hult?

21  A.  Ryan Hult was our sales manager at The Tax Club and

22  provided us with basically all of our leads from 2014 through

23  2015, same time frame from before.

24  Q.  We will talk more about leads, but what is a lead?

25  A.  A lead is a prospective customer.

IAO8KET3                          Sinclair - Direct

1   Q.  You also said Mona Ketabchi is in the photograph.  Who is

2   Mona Ketabchi?

3   A.  Arash and Steve Ketabchi's sister.

4            MS. FLETCHER:  Can we pull up Government Exhibit 715

5   for identification.

6   Q.  Do you recognize 715?

7   A.  I do.

8   Q.  What is it?

9   A.  It's a picture of -- the gentleman on the left I do not

10  know.  From left to right, Danielle Owimrin, Steve Ketabchi,

11  Arash Ketabchi, and the female on the right I do not know.

12           MS. FLETCHER:  Government Exhibit 716 for

13  identification.

14  Q.  What area is depicted in that photograph?

15  A.  My office at the 433 Piaget Ave in the Clifton address.

16  Q.  Who are the individuals depicted in that photograph?

17  A.  From left to right, myself, Michael Finocchiaro and Ryan

18  Hult.

19           MS. FLETCHER:  722 for identification, please.

20  Q.  Do you recognize that photograph?

21  A.  Yes.

22  Q.  Who is depicted?

23  A.  From left to right, Arash Ketabchi, Mona Ketabchi, and

24  Steve Ketabchi.

25           MS. FLETCHER:  Government Exhibit 723 for

IAO8KET3                          Sinclair - Direct

1     identification.

2     Q.  Do you recognize that photograph?

3     A.  Yes.  Again, from left to right -- I will always go left to

4     right -- Arash Ketabchi, Reagan Owimrin, and Andrew Owimrin.

5              MS. FLETCHER:  723 for identification.

6              I'm sorry.  724, please.

7     Q.  Do you recognize 724?

8     A.  Yes.

9     Q.  What is it?

10    A.  I just know him by Lance.  He was our IT guy.  Next to him

11    is Andrew Owimrin.  The individual with the hat I do not know.

12    And then Reagan Owimrin.  Again, left to right.

13    Q.  Again, this is a photograph?

14    A.  Yes, ma'am.

15             MS. FLETCHER:  725 for identification.

16    Q.  Do you recognize 725?

17    A.  Yes, ma'am.

18    Q.  What is it?

19    A.  It's a picture of -- a photograph of Arash Ketabchi, Reagan

20    Owimrin, and Andrew Owimrin.

21             MS. FLETCHER:  726, please, for identification.

22    Q.  Do you recognize 726?

23    A.  Yes, ma'am.

24    Q.  What is it?

25    A.  It's a picture of, from left to right, Andrew Owimrin,

IAO8KET3                         Sinclair - Direct

1    Reagan Owimrin, and Arash Ketabchi.

2              MS. FLETCHER:  727 for identification.

3    Q.  Do you recognize 727, sir?

4    A.  Yes, ma'am.

5    Q.  How do you recognize it?

6    A.  It's a picture, a photograph of Arash Ketabchi, Andrew

7    Owimrin, and Reagan Owimrin.

8              MS. FLETCHER:  728 for identification.

9    Q.  Do you recognize 728, sir?

10   A.  Yes, ma'am.

11   Q.  How do you recognize it?

12   A.  This is a picture taken at my office at 433 Piaget Ave, in

13   Clifton, New Jersey.

14   Q.  Who are the individuals depicted in that photograph?

15   A.  Bottom left is Andrew Owimrin.  The individual behind him I

16   forget his name.  Behind him in the gray with his arms crossed

17   is an individual named Chris Wilson who was also employed at

18   Olive Branch.  Behind them, you see Arash Ketabchi's head and

19   someone behind Chris Wilson who I cannot determine.  That's me

20   in the white T-shirt.  And then the individual bottom right is

21   Luis Jimenez.

22             MS. FLETCHER:  729 for identification.

23   Q.  Do you recognize 729, sir?

24   A.  Yes.

25   Q.  What is it?

IAO8KET3                          Sinclair - Direct

1    A.   Another photograph taken at my office at Arash Ketabchi's

2    desk.   Individual on the bottom is Andrew Owimrin.   And then in

3    the back it's Arash Ketabchi and Danielle Owimrin.

4    Q.   Last one, Government Exhibit 730 for identification.

5         Do you recognize 730, sir?

6    A.   Yes, ma'am.

7    Q.   What is it?

8    A.   This is also a picture taken at the 433 Piaget Ave location

9    of Reagan Owimrin with the hat and Andrew Owimrin without the

10   hat.

11   Q.   Thank you.

12        MS. FLETCHER:   The government does not seek to offer

13   these photographs at this time.

14        If we could please take that down.

15   Q.   Mr. Sinclair, I want to go back to talking about the type

16   of products that you sold at your telemarketing sales floor,

17   and I want to focus you on the time frame from early to

18   mid-2014 till the end of 2015.

19        Could you remind the jury what types of products you

20   sold when you were at The Tax Club?

21   A.   At The Tax Club, it was a bit more limited.   It was broken

22   down in departments.   So we sold in our department corporate

23   setups, corporation or LLC, tax preparation, a service called

24   resident agent which offers an alternative address, generally

25   for mailing purposes, consulting services, a tax plan, and

1    something else called Corporate Records Pro which tracks

2    corporate minutes.

3    Q.   You mentioned that that array of products was more limited.

4    More limited than what?

5    A.   Than what we sold at Olive Branch.

6    Q.   What did you sell at Olive Branch that was different?

7    A.   We eliminated Corporate Records Pro.  We did not do tax

8    plans.  We didn't sell resident agent, maybe a handful of times

9    over the years.  We didn't do tax preparation, again, maybe a

10   handful of times for a select few.  But what we did do was the

11   corporate setup, either a corporation or an LLC, business plan,

12   bookkeeping, any type of Internet marketing, included, but not

13   limited to, SEO, search engine optimization, social media,

14   including YouTube marketing.  We sold corporate credit for a

15   while, logos.  That about sums it up.

16   Q.   How about Youngevity?

17   A.   Youngevity as well.

18   Q.   In general, who did you sell these products to?

19   A.   Generally an older demographic.

20   Q.   What, if any, purchases had your prospective customers

21   made?

22   A.   Significant ones.  Thousands.

23   Q.   Of what --

24              MR. SCHMIDT:  Objection, your Honor.

25   Q.   Mr. Sinclair, of what type --

IAO8KET3                          Sinclair – Direct

1          THE COURT:  Next question.

2          MS. FLETCHER:  The question, your Honor, was what the

3   prospective customers had previously purchased.  And by that I

4   mean what type of product, not how much money was spent.

5          MR. SCHMIDT:  Objection.

6          THE COURT:  What is the objection?

7          MR. SCHMIDT:  It calls for a fact not in evidence yet.

8          THE COURT:  It's about to be in evidence.

9          Answer the question, if you can.

10  A.  They would make purchases with the coaching companies,

11  which essentially provide them with the business opportunity

12  that we referred to as biz-op earlier.

13  Q.  What type of business opportunities had your prospective

14  customers previously purchased?

15  A.  There would really be three models.  One is based on having

16  a Web site selling products online; the second was a merchant

17  processing referral model; and the third were grants.

18  Q.  How did you obtain the information for these prospective

19  customers?

20  A.  They were provided to us by lead brokers.

21  Q.  What is a lead broker?

22  A.  An individual who obtains customer information from the

23  coaching companies and then gives them to us in efforts to

24  upsell them for a profit.

25          THE COURT:  What does upsell mean?

1          THE WITNESS:  Sell them additional products, sir.

2          MS. FLETCHER:  Your Honor is one step ahead of me.

3  Q.  You used the term "gives," the lead broker gives you these

4  leads.  For free?

5  A.  For a profit.

6          THE COURT:  When you say for profit, what do you mean?

7  For money?

8          THE WITNESS:  Yes, sir.

9  Q.  What, in general, does the lead broker charge you for their

10  services?

11  A.  Overall, 40 percent.

12          THE COURT:  40 percent of what?

13          THE WITNESS:  So it worked on a revenue-sharing basis.

14  So if, just to make the math simple, if we sold $10,000 worth

15  of business in any given week, the following week we would owe

16  that lead broker $4,000.

17          MS. FLETCHER:  Did your Honor start to say something?

18          THE COURT:  No.

19  Q.  Did you have an understanding of how much of that 40

20  percent the lead broker would keep and how much, if any, he

21  would pass on to the lead source?

22          MR. SCHMIDT:  Objection.

23          THE COURT:  Yes.  Lay the foundation.

24  Q.  Did you have an understanding as to how much that lead

25  broker would keep?

1    A.  Yes.

2              MR. SCHMIDT:  Objection.

3              THE COURT:  Allowed.  I will allow that.

4              What is that understanding based on, sir?  How did you

5    come to that understanding?

6              THE WITNESS:  My understanding came afterwards, after

7    I went directly to said coaching companies to get the leads

8    directly from them, and came to find out exactly what they were

9    charging me directly versus what I was paying through a lead

10   broker, and how significant the markup was indeed.

11   Q.  How significant was the markup?

12   A.  5 to 10 percent.

13   Q.  So in your example, the 40 percent that you were paying to

14   the lead broker, how much of that would have been passed back

15   to the original lead source?

16   A.  30 to 35 percent, most of the time 30 percent.

17   Q.  What were some of the lead brokers that you used during

18   2014 and 2015?

19   A.  There were really only two.  Ryan Hult was responsible for

20   the overwhelming majority of our lead flow.  And there was

21   another individual named Jason Allen.

22   Q.  How did you know Ryan Hult?

23   A.  We had worked together at the student loan company that I

24   had worked for prior to The Tax Club.

25   Q.  At that time, during that 2014, 2015, was Ryan Hult

1    operating his own sales floor or solely acting as a lead

2    broker?

3    A.  He operated his own sales floor and then became just a lead

4    broker.

5              THE COURT:  You have been asked about sales floors and

6    you responded.  What is a sales floor.

7              THE WITNESS:  A sales floor is a telemarketing company

8    who attempts to sell clients over the phone products or

9    services.

10   Q.  Was Olive Branch a sales floor?

11   A.  Yes, ma'am.

12             MS. FLETCHER:  Ms. Lee, can we please pull up what has

13   been marked for identification as Government Exhibit 403.

14             Can we blow up just the top half.  Perfect.

15   Q.  Mr. Sinclair, do you recognize Government Exhibit 403?

16   A.  I do.

17   Q.  What is it?

18   A.  This is a -- looks like a lead list from Ryan Hult to me.

19             MS. FLETCHER:  The government offers Government

20   Exhibit 403.

21             THE COURT:  Any objection?

22             MR. PAUL:  We are just looking at a single right now?

23             THE COURT:  Are you seeking the admission of that

24   page?

25             MS. FLETCHER:  I am not.

IAO8KET3                          Sinclair - Direct

1   Q.  Mr. Sinclair, can you please take a look in your binder at

2   the tab marked Government Exhibit 403?

3   A.  Yes, ma'am.

4   Q.  It's a two-page document.

5   A.  403?

6   Q.  403.  Yes.  It should be about a third of the way into your

7   binder.

8   A.  OK.

9   Q.  The tab is the second one from the top.

10  A.  Got it.

11  Q.  Do you see in front of you a hard copy version of

12  Government Exhibit 403?

13  A.  I am looking at page 2 of 403, correct?

14  Q.  Why don't you take a look at both pages and describe

15  generally what is reflected on both pages.

16  A.  So there is an attachment from Ryan Hult sent to my

17  personal e-mail with a lead list from a coaching company, which

18  is another sales floor, named Elite.

19          MS. FLETCHER:  The government offers the two-page

20  document that is Government Exhibit 403.

21          THE COURT:  Mr. Schmidt.

22          MR. SCHMIDT:  I have one question.

23          I have no objection.

24          THE COURT:  Pardon me?  I didn't hear it.

25          MR. SCHMIDT:  I have no objection.

1           THE COURT:  Admitted.

2           (Government's Exhibit 403 received in evidence)

3           MS. FLETCHER:  Ms. Lee, can we please blow up the top

4    half of that e-mail chain.

5    Q.  Mr. Sinclair, do you see that blown up on your screen?

6    A.  I do.

7    Q.  Are you familiar with how these documents are oriented in

8    terms of which communication is first in time?

9    A.  Yes, ma'am.

10   Q.  How are they oriented?

11   A.  On the bottom is first, top happened after that.

12   Q.  The bottom e-mail is chronologically first?

13   A.  Right.

14   Q.  Do you see the e-mail address there at the bottom e-mail,

15   dated September 17, 2015?

16   A.  Yes.  From is Ryan Hult, and to is my personal e-mail.

17   Q.  What is that e-mail address?

18   A.  Njbill26@aol.com.

19   Q.  So going to the next e-mail in time, the one above that

20   e-mail in the chain, what are the e-mail addresses reflected in

21   that communication?

22   A.  It's from my personal e-mail to my business e-mail, which

23   olivebranchmarketingllc@gmail.com.

24   Q.  Were you the only one who had access to

25   olivebranchmarketingllc@gmail.com e-mail address?

IAO8KET3                        Sinclair - Direct

1   A.  No, ma'am.

2   Q.  Who else had access to that address?

3   A.  My partner, Michael Finocchiaro, and our executive

4   assistant at this time, Jolaina Aziz.

5   Q.  Did Jolaina Aziz also have other roles besides being your

6   executive assistant?

7   A.  Yes, ma'am.

8   Q.  What were her other roles?

9   A.  To set appointments.

10  Q.  She was an appointment setter?

11  A.  Yes.

12  Q.  What, if any, role did she have with respect to compliance?

13  A.  She was a compliance manager.

14          MS. FLETCHER:  Let's take a look at the attachment,

15  Ms. Lee.

16          We are going to need to blow that up significantly.

17          Can we blow up just the top row?

18  Q.  Are you able to read that on your screen, Mr. Sinclair?

19  A.  I can read it on the hard copy.

20  Q.  OK.

21          MS. FLETCHER:  Ms. Lee, is there a way to -- you're

22  reading my mind.  Exactly that.  Thank you.

23  Q.  Mr. Sinclair, I want to walk through what is reflected in

24  each of the columns on this lead list.

25  A.  OK.

1   Q.  Just starting with the first row as an example.  What is

2   reflected in the far left column?

3   A.  The date of when that respective sale was made.

4   Q.  Who would have made that sale?

5   A.  It does not indicate in the information shown on the

6   screen.

7   Q.  Let me ask a more specific question.  Are you able to tell,

8   based on the e-mail communication, what company these leads

9   came from?

10  A.  Yes.

11  Q.  Are you able to tell what company made the sale?

12  A.  Yes, ma'am.

13  Q.  What is the company?

14  A.  Elite.

15  Q.  But you're not able to tell the particular salesperson?

16  A.  No, ma'am.

17  Q.  So turning back to the spreadsheet.  The date 8/27/2015,

18  what does that date reflect?

19  A.  The date that this sale for Linda Purvis for $3,000 was

20  made from Elite, on Elite's sales floor.

21  Q.  Do you see here also contact information for Ms. Purvis?

22  A.  Yeah.  The phone number -- OK.  Right here, the 317 is her

23  phone number.

24  Q.  What is in the far right column in the blowup of the

25  section of the chart that you can see on your screen?

IAO8KET3                    Sinclair - Direct

1   A.  It should be her credit card or debit card number.

2   Sometimes they turn into that type of a code for some reason.

3   Q.  In the Excel spreadsheet?

4   A.  Yeah.

5          MS. FLETCHER:  Let's blow up, Ms. Lee, the second half

6   of that row, the right half of that row.

7   Q.  Just sticking with the first row, what is the other

8   information that's reflected there?

9   A.  OK.  So from this I can tell that she used a MasterCard for

10  the $3,000 purchase.  And the expiration of that MasterCard was

11  August of 2017.  The security code was 135.  I know that she

12  was at 7134 Woodside Drive, in Indianapolis, Indiana.  I can

13  see her e-mail next to that.  BS, I don't know offhand what

14  that stands for.  I can see that she was also sold 300 leads

15  for that $3,000 purchase.  And I also can tell that this is a

16  merchant processing referral business lead.

17  Q.  How are you able to tell that this is a merchant processing

18  business referral lead?

19  A.  Number one, it came from Elite; and number two, it says she

20  bought 300 leads.

21  Q.  What does it mean that she bought 300 leads?

22  A.  So in order to further her opportunity, it would be up to

23  Ms. Purvis to contact said leads in order to try to expand her

24  business, so to speak.

25  Q.  Mr. Sinclair, when you were describing that, you used your

1    fingers and made air quotes, when you said in order for her to

2    further her business.  Why did you do that?

3    A.  Because there is no business.

4    Q.  What do you mean there is no business?

5    A.  Theoretically there could be.  The idea could potentially

6    work.  It's just that these coaching companies, what they

7    advertise and what they do are two completely different things.

8    Q.  What do they advertise?

9    A.  That they are going to help people.

10   Q.  Help people in what way?

11   A.  Coaching.  They make promises quite often, earnings claims.

12   Q.  What do you mean when you say earnings claims?

13   A.  Promises a specific amount of profit.

14           THE COURT:  It's 1:00.  Why don't you find a logical

15   time to break.

16           MS. FLETCHER:  I am happy to break here.

17           THE COURT:  Let's leave it at that.  We will pick it

18   up at five after 2, just right after 2:00.

19           Enjoy your lunch.  Keep an open mind.  Don't discuss

20   the case.  It's a nice day out there.  Enjoy it for the hour.

21           (Jury exits courtroom)

22           THE COURT:  You may step down, sir.

23           Five after 2.

24           (Luncheon recess)

25

IAOJKET4                          Sinclair - direct

1              AFTERNOON SESSION

2              2:00 p.m.

3              (Trial resumes)

4              (In open court; jury not present)

5              THE COURT:  Bring the jury in.  Approximately how much

6    longer do you believe you have on direct?

7              MS. FLETCHER:  Probably about two and a half hours,

8    Judge.

9              THE COURT:  All right.

10             MS. FLETCHER:  For what it is worth, I expect

11   Mr. Sinclair is our longest witness.

12             THE COURT:  So you think you'll end direct today,

13   probably?

14             MS. FLETCHER:  I'm hoping to.

15             THE COURT:  All right.  The jury is entering.

16             (Jury present)

17             THE COURT:  Mr. Sinclair, you understand you remain

18   under oath, correct?

19             THE WITNESS:  Yes, sir, your Honor.

20             MS. FLETCHER:  Ms. Lee, can we please pull up

21   Government Exhibit 403 in evidence.

22    WILLIAM SINCLAIR,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25   DIRECT EXAMINATION (Continued)

1    Q.  Mr. Sinclair, do you see that document on your screen?

2    A.  I do.

3    Q.  This is the document we are looking at just before the

4    break?

5    A.  Yes.

6    Q.  We looked through the top row.

7         MS. FLETCHER:  Ms. Lee, can you please pull down those

8    blowups and blow up a row just about the middle of the page,.

9    If you wouldn't mind blowing up the left side of that sheet.

10   Make it a little bit bigger.

11   BY MS. FLETCHER:

12   Q.  Mr. Sinclair, can you see that blowup on your screen?

13   A.  I can.

14   Q.  Do you see the first entry there for 9-2-15?

15   A.  Yes, ma'am.

16   Q.  What is meant by that date, 9-2-2015?

17   A.  A woman named Diane Weissenberger was sold on September

18   2nd, 2015 by Elite for $7,500 on her Visa card ending in 4720.

19        MS. FLETCHER:  Ms. Lee, please pull up the right side

20   of that sheet, the same general area.  Ms. Lee, can you

21   highlight the rest of the row that corresponds with that,

22   please.

23   Q.  Do you see the highlighted row on your screen?

24   A.  Yes, ma'am.

25   Q.  Do you see in this spreadsheet what Ms. Weissenberger was

1   sold for $7,500?

2   A.  I see 700 leads.

3   Q.  What does that mean?

4   A.  700 names she was sold to further promote her merchant

5   processing referral business.

6   Q.  Do you have an understanding of what, if anything, Ms.

7   Weissenberger was supposed to do with those leads?

8   A.  She was supposed to contact them herself.

9           THE COURT:  Contact 700 names?

10          THE WITNESS:  Yes, sir.

11  BY MS. FLETCHER:

12  Q.  You used the term, "supposed to."

13          Were you on the call between Ms. Weissenberger and the

14  Elite salesperson?

15  A.  I was not.

16  Q.  Do you know what the Elite salesperson told Ms.

17  Weissenberger?

18  A.  I do not.

19  Q.  If Ms. Weissenberger wanted to earn money from her merchant

20  processing business, are you familiar with what she would have

21  to do to do so?

22          MR. SCHMIDT:  Objection.

23          THE COURT:  I'll allow it if you can answer it.

24  BY MS. FLETCHER:

25  Q.  How did you become familiar with how a merchant who was

1    processing business could earn money?

2    A.   We got a good amount of those types of leads, so I was

3    familiar that way.

4    Q.   From whom?

5    A.   From Ryan Holt, from Elite.

6    Q.   What was your understanding based on that familiarity as to

7    how someone with a merchant processing business could earn

8    money?

9              MR. SCHMIDT:  Objection.

10             MR. PAUL:  Objection.

11             MR. SCHMIDT:  Your Honor, this is just hearsay.

12             THE COURT:  Sustained.

13             MS. FLETCHER:  May we be heard at sidebar, your Honor?

14             THE COURT:  Yes.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

IAOJKET4                      Sinclair - direct

1            (At sidebar)

2            MS. FLETCHER:  801 (d)(2)(E), your Honor, these are

3    co-conspirator statements between Mr. Sinclair and Mr. Holt and

4    furthers the conspiracy.

5            MR. PAUL:  I can't hear.

6            THE COURT:  801 (d)(2)(E).

7            MR. PAUL:  Co-conspirator statement in furtherance of

8    the conspiracy?

9            THE COURT:  During and in furtherance of.

10           MR. SCHMIDT:  I don't think a foundation has been laid

11   for that exception.

12           THE COURT:  We already have him as selling leads,

13   Holt, right?

14           MS. FLETCHER:  Holt, with the Tax Club.

15           THE COURT:  And I can take it under Bourjaily.  I

16   think a prima facie case has been made of a conspiracy at least

17   involving him, so I will take it subject to more detail coming

18   in on the conspiracy.  801 (d)(2)(E).

19           (Continued on next page)

20

21

22

23

24

25

IAOJKET4                          Sinclair - direct

1              (In open court)

2              THE COURT:  Ask the question again.

3              MS. FLETCHER:  Your Honor, if I may ask a couple of

4    different questions?

5              THE COURT:  Yes, ma'am.

6    BY MS. FLETCHER:

7    Q.  Mr. Sinclair, how long did you have a business relationship

8    with Ryan Holt?

9    A.  You're talking about as him as a lead broker?

10   Q.  In any capacity?

11   A.  Business relationship with Ryan Holt, I was his supervisor

12   at the Student Loan Company from 2000 whenever he started after

13   me, so say through the end of 2007.  Then he was my manager at

14   the Tax Club from March 2008 when I started until the time I

15   left 2012.  Then we had separated, but on and off from 2005

16   through 2015.

17   Q.  When did you say be begins brokering leads to you?

18   A.  The spring of 2014.

19   Q.  After he began brokering leads to you, did you and Ryan

20   Holt discuss the type of leads that he was getting, he was

21   selling to you?

22   A.  Yes, ma'am.

23   Q.  Are those the three types of leads you discussed

24   previously?

25   A.  Yes, ma'am.

IAOJKET4                        Sinclair - direct

1   Q.  Would you remind the jury what those three types are.

2   A.  So what this particular lead source does is, maybe some of

3   are you are familiar if you go to a store and swipe your credit

4   card, that is a merchant account you're swiping your card goes

5   through.  That is how the charge goes through and shows up on

6   your bank or credit card statement.  Figure in terms of that.

7           What a lead, this company who sold this woman would do

8   or what they told her that they would do --

9           MR. SCHMIDT:  Objection, your Honor.

10          THE COURT:  Yes.  Just explain the business.

11          THE WITNESS:  Okay.

12          THE COURT:  That is the three types of --

13  BY MS. FLETCHER:

14  Q.  The three types of lead sources?

15          THE COURT:  Yes, three types of lead sources?

16          THE WITNESS:  Merchant processing referral business.

17  BY MS. FLETCHER:

18  Q.  The business you just described?

19  A.  That is this one, yes, correct.  And internet-based

20  business and grants, government grants.

21  Q.  Did you and Ryan Holt discuss the types of sales pitches --

22  without describing what those pitches were -- did you and Ryan

23  Holt discuss the types of sales pitches made, for example, to

24  Elite leads?

25  A.  Yes.

IAOJKET4                         Sinclair - direct

1   Q.  Did you discuss it once or over the course of your

2   relationship with him?

3   A.  Yes, several times throughout the course of our

4   relationship.

5   Q.  Now, turning back to the document that is in front of you,

6   Government Exhibit 403, that highlighted row from Ms.

7   Weissenberger's transaction, you were talking about the 700

8   leads.

9          Based on your conversations with Mr. Holt, do you have

10  an understanding as to how Ms. Weissenberger could have earned

11  money through her merchant processing business?

12          MR. SCHMIDT:  Objection, your Honor.

13          THE COURT:  No.  I will allow it.

14  A.  Yes.

15  Q.  What is that understanding based on?

16  A.  Conversations with Ryan Holt not specific to Ms.

17  Weissenberger, just in general.  The way the program was

18  supposed to work is that any particular client was sold for X

19  amount of dollars, and what they were given in return was that

20  they would be set up with merchant tunnels and a variety of

21  brick and mortar companies, any type of a store that would

22  accept payment in person and would be given a commission based

23  on each swipe per se.

24          If they wanted to earn additional income, that is

25  where the leads came in, where they could solicit people

1   themselves to try to earn additional income.

2   Q.  Based on your conversations with Mr. Holt, are you aware of

3   any Elite leads who, in fact, made money on a merchant terminal

4   processing business?

5   A.  No.

6            MR. PAUL:  Objection.

7            MR. SCHMIDT:  Objection.

8            THE COURT:  I will allow that.

9   A.  The answer is no.

10  Q.  You again used the term "supposed to."

11           What would a particular merchant processing business

12  owner have to do in order to earn money?

13  A.  Presumably get the help that they were told they would get.

14  Q.  That is the first Ms. Weissenberger transaction.

15           MS. FLETCHER:  Ms. Lee, can we please go back to the

16  full page again.  If we can go down and blow up the bottom

17  one-third of that page.

18  Q.  Do you see that on your screen, Mr. Sinclair?

19  A.  Yes, ma'am.

20  Q.  Do you see the two additional Diane Weissenberger entries?

21  A.  Yes, ma'am.

22  Q.  What is meant by those entries?

23  A.  So she was charged a week -- the first charge is September

24  2nd.  These two additional charges are a week later, on

25  9-9-2015, both in the amount of $2,500.00.  One was on the same

1    credit card that was charged previously, and there is a new

2    Mastercard number here for 2500 as well, and she was given an

3    extra thousand leads for this $5,000.00 purchase.

4    Q.  Are you familiar with how a lead packaged those leads?

5    A.  Can you be more specific, please.

6    Q.  She purchased a thousand leads here.

7         Are you familiar with what the deliverable was for

8    that 1,000 leads?

9             MR. SCHMIDT:  Objection.

10            THE COURT:  Sustained as to form.

11   Q.  Based on your conversations with Mr. Holt, are you aware of

12   how those leads would be packaged in order to present it to the

13   customer?

14            MR. PAUL:  Objection, your Honor.

15            THE COURT:  I'll allow that.  How they were presented?

16            Are you asking how they were presented to the

17   customer?

18            MS. FLETCHER:  Yes.

19            MR. SCHMIDT:  My objection isn't so much to the answer

20   about generally.  My objection is to specifically this, these

21   leads.

22            THE COURT:  Objection overruled.  I will allow the

23   question.

24   A.  Yes, generally they would be sent the email.

25   BY MS. FLETCHER:

IAOJKET4                          Sinclair - direct

1    Q.  What would be sent?

2    A.  A list of names, however many are suggested here.  So for

3    this particular situation, it would be a thousand names sent by

4    email.  If someone didn't have an email, theoretically they

5    could be mailed to said client.

6              THE COURT:  Do you know if these thousand names behind

7    the thousand leads were, in fact, emailed to Ms. Weissenberger?

8              THE WITNESS:  I do not know that for sure, sir.

9              MS. FLETCHER:  We can pull this down.  Thanks, Ms.

10   Lee.

11   Q.  So we've talk a bit about the leads.  Where is a lead

12   based?

13   A.  I believe Utah, possibly Arizona, out West.

14   Q.  Utah or Arizona?

15   A.  Arizona, yeah.

16   Q.  Who runs Elite?

17   A.  Individual by the name of Jason Gallagher.

18   Q.  Are you familiar with anyone else who worked for

19   Mr. Gallagher?

20   A.  Yes.

21   Q.  Who are you familiar with?

22   A.  Brooke Marcus.

23             MS. FLETCHER:  Ms. Lee, please show Mr. Sinclair what

24   has been marked for identification as Government Exhibit 705.

25   Q.  Do you recognize Government Exhibit 705, sir?

IAOJKET4                          Sinclair - direct

1    A.  Yes.

2    Q.  What is it?

3    A.  A photograph of Brooke Marcus.

4           MS. FLETCHER:  The government offers Government

5    Exhibit 705.

6           MR. SCHMIDT:  No objection.

7           MR. PAUL:  No objection.

8           THE COURT:  Admitted.

9           (Government's Exhibit 705 received in evidence)

10   BY MS. FLETCHER:

11   Q.  In what capacity did you interact with Ms. Marcus?

12   A.  Minimally.

13   Q.  How, if at all, did you communicate with her?

14   A.  Via email.

15   Q.  Did you ever speak on the phone?

16   A.  Yes, several times.

17   Q.  Do you have an understanding as to what her role was at

18   Elite?

19   A.  Basically like --

20          MR. SCHMIDT:  Objection, your Honor.  It requires a

21   yes or no at this point.

22          THE COURT:  Yes.  Just listen to the question.  It is

23   answerable right now by yes or no.

24   A.  Yes.

25   BY MS. FLETCHER:

IAOJKET4                         Sinclair - direct

1    Q.  How did you come to that understanding?

2    A.  Just with my dealings with her.

3    Q.  What was that understanding?

4    A.  That she was the liaison, I guess, even though she was an

5    employee of Elite to send out leads to floors like mine for

6    upsell purposes.

7    Q.  You said for upsell purposes.  What do you mean by,

8    "upsell"?

9    A.  For said list of clients to be sold additional products.

10   Q.  By your floor?

11   A.  Correct.

12   Q.  Are you familiar with a firm called Tri-Star?

13   A.  Yes.

14           THE COURT:  Take the picture down.

15           MS. FLETCHER:  Yes, take the photograph down.

16   BY MS. FLETCHER:

17   Q.  Are you familiar with Tri-Star?

18   A.  Yes, ma'am.

19   Q.  What is Tri-Star?

20   A.  Elite, the same people.

21   Q.  Tri-Star is another name for Elite?

22   A.  Correct.

23   Q.  And how about First Trend, are you familiar with First

24   Trend?

25   A.  Yes, I am.

IAOJKET4                          Sinclair - direct

1    Q.   What is First Trend?

2    A.   That's the same people as well.

3    Q.   When you say "the same people," do you mean Jason

4    Gallagher, Brooke Marcus?

5    A.   Yes.

6    Q.   How, if at all, did the leads provided by Tri-Star or First

7    Trend differ from the type of leads you got from Elite?

8    A.   They did not.

9    Q.   We talked a bit about the merchant processing business.

10   Let's talk about the second type of lead, the website selling

11   product company.  How did that business work?

12   A.   The same multiple sales structure.  It is just based on a

13   coaching company like Elite, but selling websites instead who

14   provide several weeks of training based on how much the

15   customer spends with them, they get a website for it and

16   product selection.

17   Q.   When you say they get a product selection, what do you mean

18   by that?

19   A.   We're supposed to help them pick out a product.

20   Q.   When you say they are supposed to help them, who is

21   supposed to help whom pick out a product?

22   A.   The coaching company is supposed to help the customer pick

23   out a product.

24   Q.   For what purpose?

25   A.   To help them make money.

1    Q.  How is the customer in that model supposed to make money?

2    A.  By selling products on the website.

3    Q.  The same questions with respect to the merchant processing

4    business.  Based on your conversations with Mr. Holt, are you

5    aware of any individuals who made money with this type of

6    business model?

7    A.  Maybe a very few over the course of a few years.

8    Q.  A very few?

9        How many is a few?

10   A.  On one hand I can count them.

11   Q.  Do you recall any of those people specifically by name?

12   A.  I do not.

13          THE COURT:  You have to speak louder and keep the mike

14   near your face or move forward.

15          THE WITNESS:  I do not.

16          THE COURT:  Did the jury hear the answers?  All right.

17   BY MS. FLETCHER:

18   Q.  Do you recall any facts or circumstances about any of those

19   individuals?

20   A.  By name?

21   Q.  No.  Do you recall whether any of those individuals, for

22   example, had prior business ownership experience?

23   A.  Oh, out of the people who made money?

24   Q.  Yes.

25   A.  Yes, I do.

IAOJKET4                          Sinclair - direct

1    Q.   What do you recall?

2    A.   A conversation with Ray Quiles at the 433 Piaget location,

3    that someone who had made money was a previous business owner.

4    Q.   Did that conversation stand out to you?

5    A.   It does.

6    Q.   Why does it stand out?

7    A.   I think part of the reason, part of the reason why nobody

8    made money aside from the fact that these --

9              MR. SCHMIDT:  Objection, your Honor.

10             THE COURT:  I will allow the answer.

11   A.   -- that these businesses were nothing from a structure

12   standpoint, from a help standpoint, it was also the

13   demographic, and that was evidenced by what we just discussed,

14   previously business owner being able to turn a profit because

15   they know what they're doing versus someone who is retired and

16   has no previous experience in that particular space.

17   Q.   Is that what you mean by the demographic?

18   A.   Yes, ma'am.

19             THE COURT:  You mean old people, right?

20             THE WITNESS:  I do.

21             THE COURT:  Next.

22   BY MS. FLETCHER:

23   Q.   Apart from the age of these individuals, was there any

24   other characteristics about your prospective customers in this

25   type of business model?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

IAOJKET4                          Sinclair - direct

1   A.   Yeah.   You're not going to find too many in Northern New

2   Jersey, Manhattan, Long Island.   It is more --

3              THE COURT:   Of what?

4              THE WITNESS:   Of customers.

5              THE COURT:   I didn't mean to interrupt your Manhattan,

6   Northern New Jersey, Long Island.   Go ahead.

7   A.   It will be more customers would be from rural America, the

8   deep south.

9   BY MS. FLETCHER:

10  Q.   So that is the second type of business model?

11             THE COURT:   There are old people in Northern New

12  Jersey and Long Island, right?

13             THE WITNESS:   There are.

14             THE COURT:   So why were they more likely to be old

15  people in the South?

16             THE WITNESS:   They're more business savvy in this

17  area.

18  BY MS. FLETCHER:

19  Q.   So that is the second business model.   You mentioned a

20  third type of lead model.   What was that?

21  A.   A government grant.

22  Q.   Are you familiar with how the initial sales pitch works to

23  a lead who purchases a government grant?

24  A.   Yes.

25  Q.   How does it work?

1    A.  Customers are charged thousands of dollars and told that

2    they're going to receive a government grant for much more than

3    that, tens of thousands, sometimes even hundreds of thousands

4    and receive absolutely nothing.

5    Q.  Does the grant even exist?

6    A.  It does not.

7    Q.  Are you familiar with the types of sales floors that

8    typically sell grants?

9    A.  I am.

10   Q.  Where are those floors generally located?

11   A.  Arizona.

12   Q.  Did you, in the course of your operation of Olive Branch,

13   ever purchase these grant leads?

14   A.  Yes.

15   Q.  For how long did you purchase -- when you purchased grant

16   leads, was it in an effort to upsell them?

17            MR. SCHMIDT:  Objection; leading, your Honor.

18            THE COURT:  Sustained.

19            THE COURT:  Did you purchase these grant leads?

20            THE WITNESS:  Yes.

21            THE COURT:  What period of time?

22            THE WITNESS:  It would have been in the summer of 2015

23   for about a month's period.

24            THE COURT:  Why did you purchase these grant leads?

25            THE WITNESS:  Because I was -- I don't have a good

1   answer for that, your Honor.

2              THE COURT:  All right.  Next question.

3              MS. FLETCHER:  Your Honor, may I ask a similar

4   question.  I think Mr. Sinclair may not understand.

5   BY MS. FLETCHER:

6   Q.  For what purpose did you purchase these grant leads?

7   A.  To make money, to upsell them.

8   Q.  What type of products were you selling to them?

9   A.  It could be anything from a corporation to business plans,

10  any of the additional products that we discussed before that we

11  offered.

12  Q.  You said you only sold to those leads for about a month.

13  Why did you stop?

14  A.  It was just, it was such a blatant lie that nothing good

15  was going to come out of that.

16  Q.  What do you mean by that?

17  A.  We were going to get in trouble at some point.

18  Q.  Okay.  How, in your mind, did selling the grant leads

19  differ from selling to, for example, merchant processing leads

20  or website business leads?

21  A.  The way that I justified it back then was that I told

22  myself if customers who purchased the website model or merchant

23  processing model, if they wanted to make that decision to

24  invest, they could, and at least they got something for it

25  versus the grant model was just a blatant lie for absolutely

1   nothing.  I drew the line there.

2   Q.  As you sit here now, do you see any difference?

3   A.  No.

4   Q.  The grant leads you talked about, who did you purchase

5   those from?

6   A.  Carl Morris primarily via Ryan Holt.

7   Q.  We talked before about how you paid for those leads.  You

8   gave the $10,000.00, 40 percent to Ryan Holt example.  Do you

9   remember that?

10  A.  Yes, ma'am.

11  Q.  Is there a term for that type of arrangement?

12  A.  It is called a reb share.

13  Q.  Are you familiar with the word, "payout"?

14  A.  Yes.

15  Q.  What is a payout?

16  A.  The same thing as a reb share.

17  Q.  What is it?

18  A.  Definition?  A payout is just how much you would pay a

19  particular lead broker or lead source for any given pay period

20  or lead, really.

21  Q.  What method of payment did you use to pay Ryan Holt, for

22  example, for leads?

23  A.  Wires, checks, cash.

24  Q.  Did you always go through a broker or did you sometimes go

25  directly to the lead source?

1    A.  Well, I had no choice.  After Ryan stopped giving us leads

2    in September of '15, I somehow found a way to get ahold of a

3    few of the coaching floors and was able to get leads directly

4    from them.  There were two of them, I believe.

5    Q.  Okay.  So once you got this lead list, like the one we saw

6    in Government Exhibit 403, what did you do with it?

7    A.  It would be given to the appointment centers that we have.

8    Q.  What would the appointment center do with it?

9    A.  They would call through the list and set up appointments,

10   and that was really the end of their responsibility with it.

11   Q.  When they set up appointments, who were the parties to the

12   appointment?

13   A.  The sales representative and the prospective customer.

14   Q.  How was it determined which sales representative would take

15   a particular appointment?

16   A.  It was up to the sales manager.

17   Q.  Who was that in 2014-2015?

18   A.  Arash Ketabchi.

19   Q.  What would take place at that appointment, generally

20   speaking?

21   A.  The goal would just be to go through a presentation and

22   sell that prospective customer our products and services.

23   Q.  Did or Arash ever discuss how appointments should be

24   distributed among the salespeople?

25   A.  Going back, we were just on the same page at that point

IAOJKET4                          Sinclair - direct

1   based on our experience working together at the Tax Club prior

2   to Olive Branch, yes.

3   Q.  What was that page you were on?

4   A.  So generally better sales reps would get better leads.  By

5   "better," I mean more productive, more sales.

6   Q.  Did you and Arash discuss who was the better salespeople,

7   who was more productive?

8   A.  Sometimes.

9   Q.  Who were the better salespeople?

10  A.  Himself, Arash, depending on what time were different

11  people there.

12  Q.  2014 to 1015?

13  A.  Pete DiQuarto, Chris Wilson would be considered -- Steve

14  Aladenoye are top.

15  Q.  Tier I?

16  A.  Tier I, yes.

17  Q.  Who was in Tier II?

18  A.  Andrew Owimrin, Luis Jiminez.  That is pretty consistent

19  Tier II.  I don't think there was much turnover.

20  Q.  What about Ray Quiles?

21  A.  Bottom, bottom third.

22  Q.  What do you mean by that?

23  A.  I would say he was the lowest on the totem pole as far as

24  productivity, and major distribution for that matter.

25  Q.  Sorry, and what?

1    A.  And lead distribution, source appointments were given to

2    him.

3    Q.  How were the appointments at Olive Branch managed?

4         Was there an online calendar, paper calendar?  What

5    was the system?

6    A.  A Google calendar.

7    Q.  Who managed that Google calendar?

8    A.  Jolaina primarily, who was our executive assistant.  I had

9    access to it.  Arash had access.

10   Q.  Arash decided who got what appointments?

11        What, if any, role did Jolaina have in the calendar?

12   A.  Really it was more than just Jolaina.  It was all the

13   appointment centers would input the information for any

14   appointment that was set, and it would be set, there was a

15   color code.

16        Every sales rep has a specific color on the calendar,

17   and you see your color and know you have an appointment, which

18   ultimately Arash would decide.

19   Q.  Did you access that Google calendar in anticipation of your

20   testimony today?

21   A.  I did.

22   Q.  Just to be clear, what account did you log into when you

23   accessed that calendar?

24   A.  Andrew Owimrin.

25   Q.  What account did you log into?

IAOJKET4                          Sinclair - direct

1    A.   The email address.

2    Q.   In order to access the Google calendar, did you have to log

3    into Google?

4    A.   I did.

5    Q.   When you logged into Google, what account did you log into?

6    A.   The Olive Branch, LLC account.

7    Q.   The account that is yours?

8    A.   Yes.

9    Q.   When you logged into that account, what did you see?

10   A.   I saw three appointments that were different times, 2015.

11   Q.   To be clear, did the government ask you to look at three

12   particular appointments?

13   A.   Yes.

14   Q.   When you looked at those appointments, did you take down

15   the email address of the particular salesperson to whom those

16   appointments were assigned?

17   A.   Yes.

18            MR. PAUL:   Objection to leading, your Honor.

19            THE COURT:   Sustained.   Rephrase.

20   BY MS. FLETCHER:

21   Q.   When you looked at the calendar, what, if anything, did the

22   government ask you to write down?

23   A.   The email address to which these appointments had belonged

24   to.

25   Q.   Did you write that email address down?

IAOJKET4                    Sinclair - direct

1   A.  Yes, ma'am.

2   Q.  Do you recall it, as you sit here?

3   A.  Yes, I do.

4   Q.  What was the email address?

5   A.  Andrew Owimrin.  It was Andrew Owens dot 0 B M at Gmail dot

6   com, I believe.

7              THE COURT:  0 B M stands for what?

8              THE WITNESS:  Olive Branch Marketing, sir.

9   BY MS. FLETCHER:

10  Q.  Who was the user of that email account?

11  A.  Andrew Owimrin.

12             MS. FLETCHER:  Ms. Lee, please pull up Government

13  Exhibit 502 for identification.

14  Q.  Mr. Sinclair, do you recognize Government Exhibit 502?

15  A.  Yes, ma'am.

16  Q.  Is this one of the three entries that you just mentioned?

17  A.  Yes, ma'am.

18             MS. FLETCHER:  The government offers Government

19  Exhibit 502.

20             MR. SCHMIDT:  If I may, your Honor.

21             (Pause)

22             MR. SCHMIDT:  No objection.

23             THE COURT:  Admitted.

24             (Government's Exhibit 502 received in evidence)

25             MS. FLETCHER:  Ms. Lee, please publish.

1    BY MS. FLETCHER:

2    Q.  Mr. Sinclair, can you see that on your screen?

3    A.  I can.

4    Q.  What are we looking at?

5    A.  We're looking at an appointment that was set up for a woman

6    named Jo Ann La Morte.

7    Q.  Who is Jo Ann La Morte?

8    A.  One of the victims.

9    Q.  Is she a prospective customer?

10   A.  Yes.

11   Q.  What is listed in the subject line?

12   A.  Jo Ann La Morte, her cell phone, her house or phone number

13   and it says, "internet business."

14   Q.  What does "internet business" mean?

15   A.  That she had previously purchased into an internet business

16   model.

17   Q.  When was her sales appointment next, please?

18   A.  Friday, July 17th, 2015, at 5:30 pm Eastern Standard Time.

19   Q.  Do you see in the body of that appointment where Ms. La

20   Morte lives?

21   A.  Yes, she lives in New York, Manhattan.

22          MS. FLETCHER:  Can we please show Mr. Sinclair what

23   has been marked for identification as Government Exhibit 503.

24   Do you recognize Government Exhibit 503? -- not yet.  Sorry.

25          (Pause)

IAOJKET4                        Sinclair - direct

1    BY MS. FLETCHER:

2    Q.  Do you recognize Government Exhibit 503?

3    A.  Yes, ma'am.

4    Q.  What is it?

5    A.  This is an upsell appointment for a customer named

6    Weissenberger.

7    Q.  Is this one of the other appointments that you mentioned

8    before?

9    A.  Yes.

10   Q.  Who is this appointment for?

11   A.  It was for Andrew, this one was for Andrew.

12   Q.  The government offers Government Exhibit 503.

13          MR. SCHMIDT:  No objection.

14          THE COURT:  Admitted.

15          (Government's Exhibit 503 received in evidence)

16          MS. FLETCHER:  May we publish.

17   BY MS. FLETCHER:

18   Q.  Mr. Sinclair, are you able to tell from the face of this

19   document that this is an Andrew Owimrin appointment?

20   A.  From what is shown right here?

21          THE COURT:  Yes.

22   A.  It does not say, no.

23   Q.  How do you know this was an Andrew Owimrin appointment?

24   A.  Because we looked at it earlier, and it was under the email

25   address that he owned at that time.

IAOJKET4                          Sinclair - direct

Q.  So it says "upsell" in the subject line?

A.  Yes.

Q.  What, if anything, does that tell you about

Ms. Weissenberger's interactions with your office?

A.  That she was sold one time at least before this.

Q.  Sold by whom?

A.  It does not say in this.

Q.  What is meant by BDC/A1?

A.  So that means that, if you look below it says total 10,000,

that $10,000.00 transaction would have been split between two

merchant accounts, one BDC, Business Development Center, A1

being the other, A1 Business Consultants.

Q.  As a reminder, what was the name of your floor?

A.  Olive Branch Marketing.

Q.  How, if at all, is Olive Branch Marketing related to BDC?

A.  BDC is just a merchant account that we used because we

needed additional purchasing or processing power really at that

point.

Q.  What do you mean by a merchant account?

A.  Where the credit card information gets entered into to

charge a customer.

Q.  What about A1, what is meant by A1?

A.  A1 is A1 Business Consultants.  The same thing, a merchant

account and LLC, checking account, et cetera, all owned by some

other individual.

IAOJKET4                         Sinclair - direct

1   Q.   Who owned the A1 account?

2   A.   Arash Ketabchi.

3   Q.   Who owned the Business Development Center account?

4   A.   To my knowledge, Jason Sager.

5   Q.   Taking a look at the body of the appointment, what is

6   reflected in the first line there?

7   A.   Signed COS.

8   Q.   What does that mean?

9   A.   There was a form that we had.  COS stands for continuation

10  of services, and that is what that means.

11  Q.   Who created the continuation of services form?

12  A.   I can say with 95 percent certainty it was Jason Sager.

13  Q.   Did your floor use the continuation of services form?

14  A.   Yes, ma'am.

15  Q.   Customers?

16  A.   Yes.

17  Q.   What was the purpose of that form?

18  A.   To prevent them from canceling.

19  Q.   Did you have an understanding as to how that form would

20  prevent customers from canceling?

21  A.   Because the language in the COS form says they waive their

22  right to cancel and move forward, so if they ever tried to

23  charge-back with the credit card, then we would send this in to

24  fight the charge-back.

25           THE COURT:  Who did you send it into?

1          THE WITNESS:  It would go to our merchant company, and

2     then they would make the decision there on the charge-back,

3     whether it is a rule in our favor or the customer's favor.

4     BY MS. FLETCHER:

5     Q.  Was the COS presented to every customer who agreed to make

6     a purchase?

7     A.  No.

8     Q.  At what point would the COS be presented?

9     A.  Only if they tried to cancel.

10    Q.  What is indicated here based on the fact that Ms.

11    Weissenberger signed a COS?

12    A.  That she tried to cancel at least one time.

13    Q.  What was the amount of her sale that is reflected here?

14    A.  It says 10,000 even.

15    Q.  Going down to the bottom of the appointment, are you able

16    to see what the lead source is?

17    A.  I am.

18    Q.  What is the lead source?

19    A.  Elite, Tri-Star.

20    Q.  The bottom section that says, "Services Sold"?

21    A.  Yes.

22    Q.  The services that are listed there, what sales floor sold

23    those services?

24    A.  Mine did.

25    Q.  What are those services, starting with the Youngevity?

IAOJKET4                        Sinclair – direct

1    A.  Youngevity is a multilevel marketing with a pyramid type of

2    a thing, where they sell health and wellness products, the

3    company themselves.  It works just like any other pyramid.  You

4    get in on top and either make money by bringing people in after

5    you or you sell their products, that is the two ways to make

6    money.

7    Q.  What about Corporate Credit?

8    A.  Corporate Credit is something that business owners try to

9    have for additional purchasing power to try to scale their

10   business.

11   Q.  Are you able to tell looking at this weather Ms.

12   Weissenberger actually got Corporate Credit?

13   A.  By looking at this, no.

14   Q.  Are you familiar with whether customers of Olive Branch

15   generally obtained Corporate Credit?

16           MR. SCHMIDT:  Objection, your Honor.

17           THE COURT:  I will allow it.  No, you may not.

18   A.  Repeat the question.

19   BY MS. FLETCHER:

20   Q.  Are you familiar with whether customers of Olive Branch

21   were able to obtain Corporate Credit?

22   A.  I am aware.

23   Q.  How did you come to that awareness?

24   A.  Through multiple complaints that they were not.

25   Q.  Did you have an understanding as to why those customers

1    were not able to obtain Corporate Credit?

2    A.   Yes.

3    Q.   How did you come to that understanding?

4    A.   Generally through the individuals servicing the Corporate

5    Credit application would explain to me why.

6    Q.   And why?

7    A.   To get approval for Corporate Credit, banks generally ask

8    for two years of financials and a track record for the

9    business, which these individuals did not have.

10   Q.   When you say "these individuals," who are you referring to?

11   A.   In particular, Diane Weissenberger.  I mean any customer

12   who went through the coaching model and then got upsold.

13   Q.   Those generally?

14   A.   Yes.

15   Q.   What about for bookkeeping?

16   A.   Bookkeeping, that was the mid-level bookkeeping package

17   that we offered.

18              THE COURT:  What was that package?  You offered a

19   package?

20              THE WITNESS:  Yes, it was bookkeeping.

21              THE COURT:  What was that package?

22              THE WITNESS:  Bookkeeping, just keeping a customer's

23   books.

24              THE COURT:  In other words, the personnel of your

25   company would keep the books for the customer?

1          THE WITNESS:  Yes, sir.

2          THE COURT:  Did they do that?

3          THE WITNESS:  There were no books to keep because

4    customers didn't make any money.

5    BY MS. FLETCHER:

6    Q.  One clarifying point on that, Mr. Sinclair.

7          Did your company -- appreciating the books didn't

8    exist -- was your company tasked with providing this

9    bookkeeping service or was that outsourced?

10   A.  It was outsourced.

11   Q.  Who was it outsourced to?

12   A.  Ray Quiles' company.

13         THE COURT:  If there was nothing to do, why did you

14   outsource it?

15         THE WITNESS:  The goal was to send -- however, this

16   bookkeeping was not a deliverable.  We for the most part tried

17   to keep it to deliverable products, tangible products, so this

18   way if customers tried to charge-back, we would have written

19   documentation on providing services to them.

20   BY MS. FLETCHER:

21   Q.  What were some of the tangible products that you provided

22   to customers?

23   A.  LLC corporate setup.

24   Q.  What type of product would that look like?  What was the

25   deliverable for that?

1   A.  The articles of either incorporation or organization.

2   Q.  What other tangible products did you sell?

3   A.  Social media marketing would be considered tangible,

4   YouTube videos, business plans, logos, to an extent Youngevity

5   was because we did receive something in the mail from them.  On

6   occasion, we sold sold some websites.  I guess you could

7   consider that a tangible.

8   Q.  And the bookkeeping, was bookkeeping tangible or not

9   tangible?

10  A.  It was not tangible.

11  Q.  Have you ever seen a bookkeeping handbook or pamphlet?

12  A.  I am sure over time, I have.  I can't picture it now,

13  though.

14  Q.  Let's go onto Government Exhibit 504.  Do you recognize

15  Government Exhibit 504?

16  A.  Yes.

17  Q.  What is it?

18  A.  This is another upsell for an individual named Joe

19  Freeland.

20  Q.  To be clear, what is the type of document you're looking

21  at?

22  A.  This is an appointment from the Google calendar for Olive

23  Branch Marketing.

24  Q.  What salesperson was this appointment assigned to?

25  A.  Two people.  To their phone and serious different from

IAOJKET4                    Sinclair - direct

1    their real names, Ken Wilson and Zack Peterson.  That is Chris

2    Wilson and Arash Ketabchi.

3              MS. FLETCHER:  The government offers Government

4    Exhibit 504.

5              MR. SCHMIDT:  No objection.

6              MR. PAUL:  No objection.

7              THE COURT:  Admitted.

8              (Government's Exhibit 504 received in evidence)

9              MS. FLETCHER:  Would you publish, Ms. Lee.

10   BY MS. FLETCHER:

11   Q.  This is an upsell appointment, right?

12   A.  Yes.

13   Q.  You identified two consultants that are listed in this

14   document, Ken Wilson and Zack Peterson.

15             Are those consultants the upsell salespeople or are

16   they the initial salespeople?

17   A.  This was the initial sale.  I am sorry.

18   Q.  The initial salespeople, what are their real names for

19   those two individuals?

20   A.  Chris Wilson and Arash Ketabchi.

21   Q.  Which salesperson was scheduled to upsell this particular

22   customer?

23   A.  Andrew Owimrin.

24   Q.  And again are you able to see this on the face of this

25   document?

IAOJKET4                      Sinclair - direct

1   A.   No, I am not.

2   Q.   How do you know it was his appointment?

3   A.   Because we looked at the documentation beforehand.

4   Q.   The same questions as the previous exhibit.  What, if

5   anything, are you able to tell about which entity previously

6   sold this individual?

7   A.   It says the lead was Smart Business Pros.  That was the

8   coaching company who had previously sold them before we did.

9   Q.   Mr. Sinclair, would you take a look at the subject line.

10       Are you able to tell whether any entities that were

11  part of Olive Branch Marketing had sold Mr. Freeland?

12  A.   Yes.

13  Q.   What entity had sold Mr. Freeland?

14  A.   A1 Business Consultants.

15  Q.   Chris Wilson and Arash Ketabchi, did they work for you?

16  A.   Yes.

17  Q.   What services were sold?

18  A.   Youngevity, the multilevel marketing.  That's what was

19  sold.  Included in that, they get everything that is

20  highlighted on the bottom, which is a website, shopping cart

21  with a back office, upgraded advertising website with links to

22  marketing sites, more shopping carts and catalogs, social media

23  marketing, business networking services and a variety, like a

24  sample product package of what Youngevity actually sells.

25  Q.   Are you able to tell looking at this what, if anything,

1   Mr. Freeland purchased from Smart Business Pros?

2   A.  I am not.

3   Q.  Are you familiar with what type of a Smart Business Pro

4   lead is?

5   A.  I am not.

6   Q.  What is the date on this upsell appointment?

7   A.  June 26th, 2015 at 12:00 noon Eastern Standard Time.

8           MS. FLETCHER:  You can take that down. Ms. Lee, can

9   you just pull up for identification Government Exhibit 404.

10  Q.  Mr. Sinclair, do you recognize Government Exhibit 404?

11  A.  It is very difficult to see.  Yes, an email.

12          MS. FLETCHER:  Ms. Lee, can you scroll down, please.

13  Q.  Do you recognize this template in this email?

14  A.  I do.

15  Q.  What, generally, is this template?

16  A.  A customer order form.

17  Q.  A customer order form for which company?

18  A.  For Olive Branch Marketing.

19          MS. FLETCHER:  The government offers Government

20  Exhibit 404.

21          MR. SCHMIDT:  No objection.

22          MR. PAUL:  No objection.

23          THE COURT:  Admitted.

24          (Government's Exhibit 404 received in evidence)

25          MS. FLETCHER:  Can you please publish, Ms. Lee.

IAOJKET4                         Sinclair – direct

1    BY MS. FLETCHER:

2    Q.  Do you see that, Mr. Sinclair?

3    A.  It is still very small, but I can almost make it out.

4    Q.  You also, Mr. Sinclair, have a hard copy in your binder if

5    it is easier to look at that.

6              THE COURT:  It was just made big bigger.  Proceed.

7    Can you see it now?

8    BY MS. FLETCHER:

9    Q.  Can you scroll down a little bit more, Ms. Lee.  This is an

10   order form for which company?

11   A.  For Olive Branch Marketing.

12   Q.  For what products were sold?

13   A.  Youngevity, Corporate Credit and Silver Bookkeeping.

14   Q.  To which customer?

15   A.  Diane Weissenberger.

16   Q.  You see her contact information?

17   A.  I do.

18             MS. FLETCHER:  Can we scroll down just a bit more, Ms.

19   Lee.

20   Q.  What is reflected in business type?

21   A.  Business type is affiliate marketing.

22   Q.  What is affiliate marketing?

23   A.  It is a website with links to other sites promoting other

24   company's products, essentially.

25             MS. FLETCHER:  Are you able to read the date on the

IAOJKET4                          Sinclair - direct

1    document, Ms. Lee?  You may need to scroll up and look at the

2    date on this email.

3               THE WITNESS:  September 17th, 2015.

4    BY MS. FLETCHER:

5    Q.  Ms. Lee, can we pull up up again Government Exhibit 503.

6               Do you see the sold date here?

7    A.  9-17.

8    Q.  Let's go back to Government Exhibit 404.  Those are the

9    same date?

10   A.  Yes.

11              MS. FLETCHER:  Can we please blow that up, the bottom

12   half of that sheet, Ms. Lee.

13   Q.  What are the services that were sold to Ms. Weissenberger

14   on September 17th?

15   A.  Youngevity, Corporate Credit and Silver Bookkeeping.

16   Q.  What is the sale amount?

17   A.  It is $13,999.00.

18   Q.  Are you able to tell from this which salespeople made this

19   sale?

20   A.  I am.

21   Q.  Which salespeople?

22   A.  Andrew Owimrin and Reagan Owimrin.

23   Q.  How are you able to tell that from this document?

24   A.  Because it says Andrew Owens and Todd Nelson.

25   Q.  Who is Andrew Owens?

1    A.   Andrew Owimrin.

2    Q.   Who is Todd Nelson?

3    A.   Reagan Owimrin.

4    Q.   Do you see the amount here 13,999?

5    A.   Yes, ma'am.

6    Q.   Go back to Government Exhibit 503.

7         What is reflected here in the sales amount for Ms.

8    Weissenberger on September 17th?

9    A.   10,000 even.

10   Q.   Do you have an understanding why those numbers were

11   different?

12   A.   Based on all the information provided, especially where it

13   says at the top signed, COS, continuation of services, what

14   what that would tell me, she was initially sold for $13,999.00

15   and then refunded $3,999.00 and moved forward with just a

16   $10,000.00 purchase instead of 13,999.

17   Q.   Okay.  Let's move on.  We can take that down.

18        How were the salespeople on your floor trained?

19   A.   Most of them were employees of the Tax Club, so they really

20   weren't trained unless they had no previous experience in this

21   industry.

22   Q.   What, if any, training were those individuals who had no

23   previous experience received?

24   A.   They would listen to other sales reps on the phone.

25   Q.   Which sales reps would inexperienced salespeople listen to?

1    A.   During which time-frame?

2    Q.   2014 to 2015?

3    A.   Arash would generally facilitate that.

4    Q.   As the sales manager?

5    A.   Correct.

6    Q.   We looked earlier at Government Exhibit 710.  Can we pull

7    that up again, Ms. Lee.

8              Do you remember 710, Mr. Sinclair?

9    A.   Yes, ma'am.

10   Q.   The orientation with ash Arash Ketabchi?

11   A.   Yes.

12   Q.   We talked about this room.  If somebody was standing in the

13   other side of the sales room would they hear Arash Ketabchi's

14   pitch?

15             MR. PAUL:  Objection.

16             THE COURT:  Sustained.

17   BY MS. FLETCHER:

18   Q.   In general, what volume did Mr. Ash Arash Ketabchi speak?

19             MR. PAUL:  Objection.

20             THE COURT:  I will allow that.  You're talking about

21   when, when he was making sales, on the phone at his desk?

22             MS. FLETCHER:  Yes.

23             THE COURT:  I'll allow that.

24   A.   Loudly.

25   BY MS. FLETCHER:

IAOJKET4                        Sinclair - direct

1    Q.  Did you sometimes have to close your door?

2    A.  Yes.

3    Q.  And again he didn't have an office?

4    A.  No.

5    Q.  So are you familiar with his sales pitch, his sales style?

6    A.  Yes.

7    Q.  How would you describe it?

8    A.  Aggressive.

9    Q.  Can you explain.

10           THE COURT:  Presumably that is what you wanted, right?

11           THE WITNESS:  Yes.

12   BY MS. FLETCHER:

13   Q.  What do you mean by, "aggressive?"

14   A.  He didn't take no for an answer until he got a credit card

15   number.

16   Q.  Did you have any rules in place about how many times

17   someone could ask for a credit card number?

18   A.  Formally, we didn't have anything in the pitch.  My rule

19   for that was if I generally asked someone three times and they

20   said no, I would stop.

21   Q.  Did Arash Ketabchi abide by that rule?

22   A.  No.

23           MR. PAUL:  Objection.

24           THE COURT:  Let's find out if he knows.

25           THE WITNESS:  No, he did not.

1          THE COURT:  "No," meaning you don't know whether or

2     not he abided by that rule?

3          THE WITNESS:  My answer is no, he did not abide to

4     that rule.

5     BY MS. FLETCHER:

6     Q.  Turning to how salespeople are compensated --

7          THE COURT:  Well, in your view, did that make him a

8     good salesman?

9          THE WITNESS:  It made him a productive salesman.

10          THE COURT:  All right.

11     BY MS. FLETCHER:

12     Q.  Mr. Sinclair, did there come a point when you no longer

13     wanted Mr. Ketabchi to be an aggressive salesperson?

14          THE COURT:  Which Mr. Ketabchi?

15     Q.  Arash Ketabchi?

16     A.  That's tough to answer.  I always wanted all of the sales

17     reps to be aggressive.  There were certain things that just

18     were not allowed to be said.

19     Q.  We'll come back to that.  Let's talk about salesperson

20     compensation.

21          If the salesperson, for example, made the $10,000.00

22     sale that you described earlier, how much of that sale would

23     the salesperson receive?

24     A.  You said 10,000?

25     Q.  Yes.

1    A.  It varied based on who it was.  Generally it was in-between

2    15 and 20 percent.

3    Q.  Did the salespeople have any sort of base salary?

4    A.  No, ma'am.

5    Q.  So were they paid in any way apart from the commission on

6    their sales?

7    A.  No, ma'am.

8    Q.  The sales commission percentage you just described, who set

9    that?

10   A.  Myself and Michael Finocchiaro.

11   Q.  Did Arash Ketabchi have any role in that?

12   A.  In his own, it was a negotiation.

13   Q.  Do you recall, as you sit here, what Mr. Owimrin's

14   commission rate was?

15   A.  I can't say with certainty.  I believe he was in-between 15

16   and 17 percent, if I remember correctly.

17   Q.  Of that $10,000.00 sale, what would the salesperson -- what

18   with would Mr. Owimrin get if he was getting 15 percent?

19   A.  1500.

20   Q.  And then how much would your lead source get, or your lead

21   broker?

22   A.  40 percent.

23   Q.  Sought is that in total?

24   A.  55 percent.

25   Q.  Did there come a time when Arash Ketabchi also got a

1    percentage of all the sales?

2    A.  Yes.

3    Q.  How did that arise?

4    A.  We started to do more business because we got more leads as

5    soon as he came aboard in the Spring of '14 from Ryan Holt, so

6    our negotiation was he would be the sales manager and get

7    what's called an override.

8           The total sales floor number, he essentially got paid

9    on his own sales twice, so whatever he did himself he got 20

10   percent on, and then he got a percentage, 2 percent on the

11   overall floor.

12   Q.  The remaining amount of that $10,000.00 sale, where are we

13   at?

14   A.  55 percent and counting.

15   Q.  55 percent plus the 2 percent override?

16   A.  Correct.

17   Q.  So 57 percent?

18   A.  Right.

19   Q.  What would happen to the remaining 43 percent of that sale?

20   A.  The merchant fees, which is broken down into separate costs

21   within that, but the total of that would be usually about 15

22   percent, maybe 18 percent, but you can call it 15.

23   Q.  So where are we at then, 72 percent?

24   A.  Yes.

25   Q.  What would happen to the remaining 28 percent?

1    A.  We had fix costs, we ran normal monthly bills and overhead

2    as far as the appointment center salaries.

3    Q.  How was Mr. Finocchiaro compensated?

4    A.  Based on what was left over between him and I.

5    Q.  And how, if at all, did you and Mr. Finocchiaro divide what

6    was left over?

7    A.  It was really different all the time.  We came to more of a

8    concrete number towards the end, but it was different based

9    just on how much it was each time.  I don't remember exactly

10   how he even did it.

11   Q.  Was it 50/50?

12   A.  It was supposed to be, but the workload simply wasn't

13   50/50, so we had arguments about that as well.

14   Q.  You got more than 50 percent?

15   A.  Yeah.

16           MR. SCHMIDT:  Objection, your Honor.

17           THE COURT:  What is the objection?

18           MR. SCHMIDT:  The leading question.

19           THE COURT:  I'll allow that.

20   BY MS. FLETCHER:

21   Q.  Let's pull up what has been marked for identification as

22   Government Exhibit 259.  We talked a bit about phone names,

23   Mr. Sinclair?

24   A.  Yes.

25   Q.  Did all of the salespeople on your floor use phone names?

IAOJKET4                          Sinclair - direct

1   A.  Yes.

2   Q.  Why were phone names used?

3   A.  It was something that people started doing at the Tax Club.

4        Now thinking back, I think part of that reason was for

5   someone who made had an ethic name to sound more Americanized,

6   being we are dealing with a lot of people from rural America.

7   Q.  Any other reasons?

8   A.  I also heard one person say that, and I believe his son --

9        MR. SCHMIDT:  Objection.

10       MR. PAUL:  Objection, your Honor.

11       THE COURT:  Sustained.

12  BY MS. FLETCHER:

13  Q.  Did you use a phone name?

14  A.  For a time.

15  Q.  What phone name did you use?

16  A.  Bill Porzio.

17  Q.  And Michael Finocchiaro, did he use a phone name?

18  A.  Yes.

19  Q.  What did he use?

20  A.  Michael Foster.

21  Q.  Do you see Government Exhibit 259?

22  A.  Yes.

23  Q.  Can you blow up the top half of that.

24       THE COURT:  The purpose of using phone names was, you

25  said, for someone who had an ethnic name, to sound more

1    Americanized, and your name is Sinclair.  Why would you use the

2    name Porzio?

3            THE WITNESS:  I don't know.  That is a good question.

4    BY MS. FLETCHER:

5    Q.  Were there other reasons why you used phone names?

6    A.  So that the second reason that I remember someone telling

7    me, yes.

8    Q.  Without saying what someone else told you?

9    A.  Yes, there was.

10   Q.  Did you learn something from someone else that caused you

11   to use a phone name?

12   A.  Me particularly, I didn't have a reason for doing it.

13           THE COURT:  Why did you do it without a reason?

14           THE WITNESS:  One of my many poor choices that I made.

15           THE COURT:  Next question.

16   BY MS. FLETCHER:

17   Q.  Taking a look at Government Exhibit 259 in front of you, do

18   you see that?

19   A.  I do.

20   Q.  Do you recognize it?

21   A.  Yes.

22   Q.  What type of form is this?

23   A.  There was something that we drafted.  We had heard that

24   according to some set of telemarketing rules, that if you

25   commit to using one name over the phone, that's an alias, it

IAOJKET4                        Sinclair - direct

1    was okay, so we had everybody sign what their name was going to

2    be and -- (inaudible).

3    Q.  Is this that document that was signed?

4    A.  Yes.

5          MS. FLETCHER:  The government offers Government

6    Exhibit 259.

7          MR. SCHMIDT:  No objection.

8          THE COURT:  Admitted.

9          MR. PAUL:  I have no objection.

10          THE COURT:  Admitted.

11          (Government's Exhibit 259 received in evidence)

12   BY MS. FLETCHER:

13   Q.  Do you see the signature on this?

14   A.  I do.

15   Q.  Whose signature is that?

16   A.  Andrew Owimrin.

17   Q.  Do you see here there is a list of Olive Branch's

18   subsidiaries?

19   A.  I do.

20          MR. SCHMIDT:  Objection, your Honor.  It is a list of

21   companies.  No one has testified --

22          THE COURT:  Sustained.  Sustained.

23          MS. FLETCHER:  Your Honor, it says, "subsidiaries".

24          THE COURT:  You can ask him the question.

25   BY MS. FLETCHER:

IAOJKET4                          Sinclair – direct

1    Q.  Do you see the word here, "subsidiaries?"

2    A.  I do.

3    Q.  Do you see the entities in the parenthetical next to the

4    word "subsidiaries"?

5    A.  Yes.

6    Q.  What are those entities?

7    A.  Champion Business Services, Paramount Business Solutions,

8    Paramount Business Consultants, A1 Business Consultants.

9    Q.  Were those entities, in fact, subsidiaries of Olive Branch?

10   A.  It maybe a matter of semantics.  It was us.  It was the

11   same people.

12   Q.  These entities, in your mind, were the same as Olive

13   Branch?

14   A.  Yes, just different merchant accounts.

15   Q.  Did Olive Branch have merchant accounts in the names of

16   each of these entities?

17   A.  Yes.

18              (Continued on next page)

19

20

21

22

23

24

25

1          THE COURT:  So, to your knowledge, these were not

2     separately incorporated subsidiary companies of Olive Branch,

3     is that right?

4          THE WITNESS:  So each one of these legal entities did

5     exist.  There were EINs, employer identification numbers, like

6     LLCs got filed for them.

7          It takes a deeper understanding of the business model

8     in general, but it all comes down to merchant accounts.

9     Merchant accounts is what allowed us to make money.  And if you

10    run out of availability in a merchant account, you can't

11    process any more payments so you need to come up with another

12    merchant account with a new name at times to do that, sometimes

13    we had to do that.

14         THE COURT:  And that's what resulted in these various

15    names?

16         THE WITNESS:  Yes, sir.

17         THE COURT:  But in your view, these names were all the

18    same thing, is that right?

19         I don't want to put words in your mouth.  I am trying

20    to understand what you are saying.

21         THE WITNESS:  It was the same company that myself and

22    Michael Finocchiaro owned.  The only difference here is that A1

23    Business Consultants was under Arash Ketabchi's name, but it

24    was the same office, if that helps answer your question.

25    BY MS. FLETCHER:

1    Q.  To be clear, in 2014 and the first three quarters of 2015,

2    did there come a point where what you just said changed?

3    A.  Yes, ma'am.

4    Q.  What about that changed?

5    A.  Well, Arash broke off to start his own company.  So A1

6    Business Consultants was no longer located at 433 Piaget Ave,

7    in Clifton, New Jersey.

8    Q.  Going back to the concept of phone names, did you ever know

9    Andrew Owimrin to use another phone name besides Andrew Owens?

10   A.  When he came back to my salesforce in 2016, briefly we were

11   selling debt leads, but it could potentially have been to some

12   of the same people we had already sold these biz-op services

13   to.  So I can say with a fairly high degree of certainty that

14   he used a different name when he came back to sell debt.

15   Q.  Do you remember what that name was?

16   A.  Offhand, I don't.

17   Q.  I want to go back to focusing on the sales pitch itself.

18           Were there sales scripts on your floor?

19   A.  Yes.

20   Q.  Where did those scripts originate from?

21   A.  At the time, at The Tax Club.  There was other material

22   from Ryan Hult's floor, located at a separate Clifton address

23   at that time.

24           MR. MITCHELL:  Can we pull up what has been marked for

25   identification as Government Exhibit 254.

IAO8KET6                          Sinclair - Direct

1   Q.  Do you recognize 254?

2   A.  I do.

3   Q.  What is it?

4   A.  This was The Tax Club script that I rewrote.

5   Q.  Is this the version as rewritten or the original?

6   A.  Rewritten.

7          MS. FLETCHER:  The government offers Government

8   Exhibit 254.

9          MR. PAUL:  No objection.

10         MR. SCHMIDT:  No objection.

11         THE COURT:  Admitted.

12         (Government's Exhibit 254 received in evidence)

13         MS. FLETCHER:  Can we please publish the top half of

14  that and blow up the portion above "corporation."

15  Q.  Was this script used on your floor in 2014 and 2015?

16  A.  Yes and no.  No one really ever went by the script

17  verbatim.  The content of it was used.

18  Q.  OK.  Taking a look at the first paragraph there, you see

19  that there are words that are bolded and bracketed?

20  A.  Yes.

21  Q.  What does that reflect?

22  A.  "Hello, this is," where it says name, if I was the one

23  making the phone call, I would say Bill.  "Calling from The Tax

24  Club," representing the company name.

25         Then the "lead source" we had referenced Elite.  That

1    would be where you would say Elite.

2           Then again where it says "lead source," you would

3    reference a company like Elite, a coaching company.

4    Q.  Would the people working on your floor refer to themselves

5    as being from The Tax Club?

6    A.  No, they would not.

7    Q.  Who were they saying they were calling on behalf of, or

8    what entity?

9    A.  Where they were calling from or -- we generally said the

10   Business Development Center.

11   Q.  Is that one of the entities that had a merchant account

12   that you guys used?

13   A.  For a time under Jason Sager.  It was really something that

14   was developed back at The Tax Club.

15   Q.  Why say Business Development Center instead of Olive Branch

16   Marketing?

17   A.  Well, because Olive Branch Marketing is most likely not

18   going to be the name on the merchant descriptor after they get

19   charged.  Not that Business Development Center would be all the

20   time either; it had a more professional ring to it.

21   Q.  Was it also more generic?

22   A.  Yes.

23           MR. SCHMIDT:  Objection.

24           THE COURT:  Sustained.  The jury will disregard the

25   answer.

1           Try not to lead.

2    Q.  Was there any other reason that you used the term "Business

3    Development Center" instead of naming a specific company?

4    A.  Offhand, that's just kind of a habit that we formed.  I

5    don't really know the rhyme or reason as to why we did it.

6    Q.  So in the initial script, the salesperson would refer to

7    the lead source.  What was the purpose of that?

8    A.  Well, because you want it to be kind of a warm type of an

9    exchange.  You want to say something that they recognize.  They

10   spent thousands of dollars with Elite so they are going to

11   listen.

12   Q.  Why are they going to listen?

13   A.  Because they just spent thousands of dollars with another

14   company and you're calling in reference to that investment.

15           THE COURT:  What if they weren't satisfied with the

16   investment they made through Elite?

17           THE WITNESS:  Each call would have a different

18   outcome, different circumstances, but that's the way we were

19   trained at The Tax Club, so that's what we carried on at Olive

20   Branch.

21   Q.  Do you see this line in the second paragraph, the reference

22   to "expert professional or more of a beginner/novice"?

23   A.  Yes.

24   Q.  Do you see a bolded line next to that?

25   A.  Yes.

IAO8KET6                         Sinclair - Direct

1    Q.  Do you know who came up with that idea to insert that

2    particular sentence?

3    A.  The beginner file, Arash.

4    Q.  Arash came up with that?

5    A.  Yes.

6    Q.  In general, were most of the customers beginners?

7    A.  Yes.

8    Q.  Let's scroll down a little bit.  I won't ask you to read

9    that.  If we could look at the part under "corporation."

10            What is the purpose of this portion of the script?

11   A.  The point of this is to establish value because we are

12   going to try to sell them a corporation, or an LLC.

13   Q.  When you say "establish value," what do you mean by that?

14   A.  Make them want to buy it.

15   Q.  Make them think it's valuable?

16            MR. SCHMIDT:  Objection, your Honor.

17            THE COURT:  Try not to lead.

18            MS. FLETCHER:  I am trying to clarify, your Honor.

19            THE COURT:  Move on.

20            MR. MITCHELL:  Can we please scroll down to the line

21   beginning "would purchase something from."

22   Q.  You see that bolded section there, "Bob and Margaret"?

23   A.  Yes.

24   Q.  What is the purpose of that portion of this pitch?

25   A.  OK.  So this probably would have been based on a couple

1    name, first names are Bob and Margaret, who were from Kansas,

2    who then instead came up with a business name BM Online

3    Enterprises Inc.  It's to make a point that you sound more

4    professional if you have an actual business name instead of

5    being online with no corporate structure, because no one knows

6    Bob and Margaret from Kansas, so in turn who is going to buy

7    from you.

8    Q.  Was anyone buying from Bob and Margaret from Kansas?

9            MR. SCHMIDT:  Objection.

10            THE COURT:  To his knowledge.  I will allow that.

11   A.  That I don't know.

12   Q.  Let's look at the last couple of lines there about tax

13   deductions.  Do you see those?

14   A.  I do.

15   Q.  Just a couple of lines below that.

16            You see the line that begins, "The first $10,000"?

17   A.  Yes.

18   Q.  What is the purpose of that line?

19   A.  As per -- to my recollection, as per accountants at The Tax

20   Club, we understood, or I could say I understood, that if you

21   invest up to $10,000 into your business, it could be up to 100

22   percent tax deductible for a deduction called initial startup

23   costs.

24   Q.  You see the next two lines, "write that down"?

25   A.  Yes.

1    Q.  "That covers your investment with the coaches?

2    A.  Yes.

3    Q.  What does that mean?

4    A.  Meaning that your investment with the coaches should fall

5    under that $10,000, but not all of them do.

6    Q.  What is the point of that?

7         In this particular example, what are you trying to get

8    the customer to purchase?

9    A.  I am trying to get them to purchase whatever we are

10   selling.

11   Q.  In order for them to have, for example, BM Online

12   Enterprises Inc., what would they have to purchase to have

13   that?

14   A.  A corporation.

15   Q.  And so how, if at all, would the purchase of the

16   corporation relate to the money that they had already invested

17   with the coaches?

18   A.  I guess it would make them feel like they are going to get

19   that money back in their tax returns.

20   Q.  OK.

21        MS. FLETCHER:  Can we go on to the next page, please.

22        If we can blow up just the bottom half of that

23   beginning with "probe/assignments."

24   Q.  Mr. Sinclair, are you familiar with this term "probe"?

25   A.  Yes.

IAO8KET6                         Sinclair - Direct

1    Q.   What is a probe?

2    A.   A probe is really just trying to find out how much money

3    they have available for your sales presentation.  So it comes

4    with a series of questions that mean absolutely nothing, until

5    you get to the point where you're finding out how much money

6    they have available to spend with you.

7    Q.   We talked about some of the products that Olive Branch

8    marketed -- bookkeeping, corporate credit, LLCs.

9              What was the range of the prices for each individual

10   product, or bundle of products?  And again, 2014, 2015 time

11   frame.

12   A.   Usually, and when I say usually I mean just about everyone,

13   would be in between the 2,000 to 15,000 bracket per sale.

14   Q.   $2,000 to $15,000?

15   A.   Yes, ma'am.

16   Q.   How, if at all, did the information gleaned from the probe

17   affect what was marketed to the customers?

18   A.   Can you repeat that?

19   Q.   How, if at all, did the information gleaned from the probe

20   affect what was marketed to the customers?

21   A.   It's really just the bottom that matters.  The rest of it

22   on top means nothing.

23   Q.   How did the bottom part matter?

24   A.   OK.  I'm sorry.  Because you're just trying to find out

25   what method they used paying for the previous investment.

IAO8KET6                          Sinclair - Direct

1    Q.  Why is that important to the salesperson?

2    A.  You're just trying to find out where the money is, that's

3    the goal.

4    Q.  Are you also trying to find out how much money there is?

5            MR. SCHMIDT:  Objection, your Honor.

6            THE COURT:  Sustained.

7            Were you trying to do anything else besides that?

8            THE WITNESS:  No, sir.

9            THE COURT:  Next.

10   Q.  The products you mentioned, they ranged in price from, I

11   think you said 3,000 to 15,000?

12   A.  I said 2,000 to 15,000.

13   Q.  I apologize.  Under what circumstances would you market a

14   $2,000 package to a customer?

15   A.  If they either didn't have money or already bought

16   everything else.

17   Q.  Under what circumstances would you market a $15,000 package

18   to the customer?

19   A.  If they have the money and there was a package we could put

20   together for them, unless they had everything else.

21   Q.  I want to talk about some rules in place for the

22   salespeople.

23           Were salespeople permitted to deviate from this

24   script?

25           MR. PAUL:  Objection.  Leading.

1          THE COURT:  I will allow that.

2     A.  To a degree.

3     Q.  Were there certain things that salespeople were not allowed

4     to say?

5     A.  Yes.

6     Q.  What are some of those things?

7     A.  They could not make blatant earnings claims.

8     Q.  What is a blatant earnings claim in your view?

9     A.  Really any earnings claim at all.  An earnings claim is, if

10    I'm on the phone with you and you're the prospective customer

11    and I tell you, AUSA Fletcher, you can make $5,000 a week doing

12    this, or you will make $5,000 a week doing this.

13    Q.  OK.  Is that something that was permitted or not permitted?

14    A.  Not permitted.

15    Q.  What was permitted instead?

16    A.  OK, how much did your coaches tell you that you would be

17    able to make with this?  If you said, up to $5,000 a week, OK,

18    great, so just do what they continue to tell you to do and you

19    will be fine.

20    Q.  Were there any other rules, things you could

21    not -- salespeople could not say to customers, or customers

22    they could not sell to?

23    A.  That's two questions.  So the first I will answer yes,

24    there were other things that they could not say.  And

25    overaggressive sales tactics was something that would merit a

1    fine or call monitoring.  I am sure there were others.  I can't

2    recall offhand.  Yes, there were a few fineable offenses.

3    Q.  How about my second question, were there types of customers

4    that could not be sold to?

5    A.  So at a point, myself and Mike Finocchiaro put in place a

6    policy where anyone over the age of 80, either myself or Mike

7    would need to speak to, just to make sure that they understood

8    what they were doing.  For example, if someone asked the same

9    question three times, or I explain something and they keep

10   asking, what are you telling me, what are you telling me, to me

11   that means that they are not mentally fit to do this.

12   Q.  Were blatant earnings claims made by the salespeople?

13   A.  Yes.

14   Q.  Were individuals sold who were not of sound mind?

15   A.  I'm sure.

16        MR. SCHMIDT:  Objection.  Move to strike the answer.

17        THE COURT:  I will allow it.

18        What is your basis for saying "I'm sure"?

19        THE WITNESS:  I know the space in which we worked.  I

20   know that our staff certainly wasn't keeping any of those

21   things in mind about what was legal and illegal.  It was about

22   them making money.

23        THE COURT:  You said you had rules.

24        THE WITNESS:  We did.

25        THE COURT:  And a means of enforcing those rules.

1            THE WITNESS:  Limited.

2            THE COURT:  You said they were subject to fines.  Is

3     it a fine you imposed or a regulatory authority imposed?

4            THE WITNESS:  Well, we had a third-party monitoring

5     company who was owned by one guy, I think he had one or two

6     employees, and it was on a limited basis.  But we had suspected

7     for a long time, and certain reps had made comments about --

8            MR. SCHMIDT:  Objection, your Honor.

9            THE COURT:  When you say "suspected," if you have no

10    basis for saying it, the jury doesn't want to hear it.  So I'm

11    not sure what suspected means.

12           THE WITNESS:  I will stop.

13           MS. FLETCHER:  Your Honor is again anticipating my

14    next set of questions.

15    BY MS. FLETCHER:

16    Q.  Mr. Sinclair, you mentioned call monitoring.  At what point

17    did you set up call monitoring?

18    A.  I want to say it was set up sometime in either late '14 or

19    early '15.

20    Q.  Who monitored the calls?

21    A.  A gentleman by the name of Paul Curtis.

22    Q.  How were the calls monitored?

23    A.  He had some type of software where he could tap into the

24    phone and listen.

25    Q.  Were the calls recorded?

IAO8KET6                          Sinclair - Direct

1    A.  They were, yeah.

2    Q.  Did Mr. Curtis -- to your knowledge, did Mr. Curtis record

3    all of the calls?

4    A.  No.

5    Q.  What proportion of the calls did he record?

6    A.  It was a random setting that we could adjust.

7    Q.  For what purpose was Mr. Curtis monitoring those calls?

8    A.  To make sure that we weren't saying anything too

9    outlandish.

10   Q.  What would be something too outlandish?

11   A.  An earnings claim.

12   Q.  Why did you set up this call monitoring?

13   A.  To keep us off the radar so we could keep making money.

14   Q.  Keep you off the radar from whom?

15   A.  Legal authorities, AGs, attorney generals.

16        MR. MITCHELL:  Let's pull up Government Exhibit 253

17   for identification.

18   Q.  Do you recognize Government Exhibit 253?

19   A.  I do.

20   Q.  What is it?

21   A.  It is our fining policy signed by Andrew Owimrin.

22   Q.  Who created the fining policy?

23   A.  I don't know if this was created by Jason -- Paul Curtis or

24   it was an internal thing.  I can't remember.

25        MS. FLETCHER:  The government offers Government

1    Exhibit 253.

2             MR. SCHMIDT:  No objection.

3             MR. PAUL:  No objection.

4             THE COURT:  Admitted.

5             (Government's Exhibit 253 received in evidence)

6             MS. FLETCHER:  Can we please publish.

7    Q.  You see the date on this form?

8    A.  Yes.

9    Q.  What is the date?

10   A.  October 8, 2014.

11   Q.  Whose signature is that?

12   A.  Andrew Owimrin's.

13   Q.  Who set this policy?

14   A.  We did cumulatively, myself, Michael, Paul Curtis.

15   Q.  Was it enforced?

16   A.  To a degree.

17   Q.  To what degree was it enforced?

18   A.  It lays it out basically right here.  The first fine you

19   could avoid -- the first offense, rather, you could avoid

20   getting a fine with training so you understood why you were

21   fined in the first place.  The second fine, basically the same

22   thing.  The third time you're supposed to double the fine with

23   mandatory training.  And by the fourth time you're supposed to

24   be fired within 180 days of the first fine.  We varied from

25   that, though.

1    Q.  In what ways did you vary?

2    A.  If it was anything too blatant.  For example, we didn't

3    have this particular policy in order yet, but when we were

4    still working out of my house in the summer of 2013, I heard a

5    sales rep who -- being that we were working out of my house, he

6    was in my bathroom on the phone with a customer, and I heard

7    him make a blatant earnings claim.  And by a blatant earnings

8    claim I mean, Mrs. So and So, you are going to be making 2 to

9    3,000 dollars within two weeks or so.  We fired him on the

10   spot.  He was gone.

11           THE COURT:  Before that time, had he been a productive

12   salesman?

13           THE WITNESS:  Well, we had really just started.  But

14   yes, he was our top producer.  That's probably why.

15   Q.  Were you aware of instances where Mr. Curtis flagged calls,

16   sales calls, made by Andrew Owimrin?

17   A.  Yeah, there were a few.

18   Q.  Do you know how many there were in total?

19   A.  I don't offhand.

20   Q.  Showing you what has been marked for identification as

21   Government Exhibit 250.

22           Do you recognize this?

23   A.  I do.

24   Q.  What is it?

25   A.  This is a fine notification for Andrew Owimrin.

IAO8KET6                          Sinclair - Direct

1   Q.  Showing you what has been marked for identification as

2   Government Exhibit 251.

3           Do you recognize 251?

4   A.  Yes.

5   Q.  What is 251?

6   A.  A fine notification for Andrew Owimrin.

7   Q.  Showing you what has been marked for identification as

8   Government Exhibit 252.

9           Do you recognize 252?

10  A.  I do.

11  Q.  What is 252?

12  A.  A third fine sheet for Andrew Owimrin.

13          MS. FLETCHER:  The government offers Government

14  Exhibits 250 through 252.

15          MR. SCHMIDT:  No objection, your Honor.

16          MR. PAUL:  No objection.

17          THE COURT:  Admitted.

18          (Government's Exhibits 250, 251 and 252 received in

19  evidence)

20          MR. MITCHELL:  Can we go back to 250, please, Ms. Lee.

21          THE COURT:  Ms. Fletcher, the jury has been here for

22  an hour and a half.  I would like to give the jury a break.  Is

23  this an all right time?

24          MS. FLETCHER:  It's fine.

25          THE COURT:  Ladies and gentlemen, let's just take ten

1    minutes to refresh yourselves.

2              (Jury exits courtroom)

3              THE COURT:  I may step down, sir.

4              Ten minutes.

5              (Recess)

6              (Jury present)

7              THE COURT:  Please be seated.

8              You may continue, Ms. Fletcher, with the direct

9    examination of Mr. Sinclair.

10             MS. FLETCHER:  Thank you, your Honor.

11             Can we pull up what is now in evidence as Government

12   Exhibit 250.

13   BY MS. FLETCHER:

14   Q.  Mr. Sinclair, do you recall looking at this just before the

15   break?

16   A.  Yes.

17   Q.  Remind the jury what this is.

18   A.  This is a fine notice.

19   Q.  What is the date of the fine notice here?

20   A.  October 29, 2014.

21   Q.  At that time, approximately how long did Mr. Owimrin work

22   for you?

23   A.  Six months, give or take a little bit.

24   Q.  Do you see the highlighted portion at the tomorrow of the

25   page with the recommended fine amount?

IAO8KET6                          Sinclair - Direct

1     A.  I do.

2     Q.  What is the fine amount?

3     A.  600.

4     Q.  Was Mr. Owimrin fined $600?

5     A.  I don't recall.

6     Q.  Were you consistent in fining your salespeople?

7     A.  It would depend what the fine was for.  That's my best

8     answer I can give you on that.

9           MS. FLETCHER:  Can we scroll down, Ms. Lee.

10    Q.  Do you see the quoted portion at the bottom of that page,

11    it says "sales quote"?

12    A.  Yes.

13    Q.  What is being quoted there?

14    A.  What is being transcribed in the call.

15    Q.  The sales call that triggered the fine?

16    A.  Yes, ma'am.

17          MR. MITCHELL:  Can we go down to, I think technically

18    it's page 3 of this document, but the second page that has any

19    text.

20    Q.  Can you see a signature here?

21    A.  I don't.

22    Q.  Let's pull up 251.

23          What is the date on this notification?

24    A.  October 20, 2014.

25    Q.  The salesperson in this notification?

1    A.  This is also for Andrew Owimrin.

2    Q.  What is the recommended fine here?

3    A.  600.

4    Q.  What is the stated reason for the proposed fine?

5    A.  It's the same tax savings claim, specific tax savings

6    claim, giving specific tax advice without a disclaimer.

7    Q.  Do you see the quoted portion at the bottom there?

8    A.  I do.

9    Q.  Again, what is that quoted from?

10   A.  That's the portion that is transcribed from the sales call

11   by Andrew Owimrin.

12          MR. MITCHELL:  Can we go on to page 3 of this

13   document, but the second page -- no, that's the page I am

14   looking for.

15   Q.  Do you see the highlighted line?

16   A.  Yes.

17   Q.  Why is that line highlighted?

18   A.  That's what drew the fine recommendation.

19   Q.  Again, do you remember whether Mr. Owimrin was fined for

20   this conversation?

21   A.  I would assume not, being that it's not signed.

22   Q.  Let's look at 252, please.

23          Who is the salesperson on this notification?

24   A.  Andrew Owimrin.

25   Q.  What is the date?

IAO8KET6                        Sinclair - Direct

1    A.  October 17, 2014.

2    Q.  What is the recommended fine here?

3    A.  600.

4    Q.  What is the reason for the fine?

5    A.  The same thing, making specific tax savings claims.

6    Q.  Did there come a time when Olive Branch stopped monitoring

7    or recording sales calls?

8    A.  Yes.

9    Q.  Approximately when was that?

10   A.  To the best of my knowledge, I would say late 2014, early

11   2015.

12   Q.  Why did you stop?

13   A.  We stopped because we were losing money left and right due

14   to a sales representative who was working for us over the

15   summer, late summer 2014 through November, literally like a

16   week or two after these fines, who was stealing our data and

17   sending it to the former employee, the individual who I had

18   referenced a short time ago before the break, who I heard in my

19   bathroom at my residence in Secaucus when we just started.

20   Q.  Mr. Sinclair, I lost you.  Why did you stop monitoring

21   calls?

22   A.  Because we were losing money, because of chargebacks.

23   Q.  Did you have to pay for having the calls monitored?

24   A.  I did.

25   Q.  How much did it cost?

A.  From what I remember, I believe we had to pay him $2,000

biweekly or weekly, Paul Curtis that is.

Q.  Did you inform the salespeople that you stopped recording

the calls?

A.  Initially, no.

Q.  Why not?

A.  Because we wanted to make sure that they still followed

what rules we had in place.

Q.  If a salesperson wanted to avoid being monitored, what, if

anything, could they do?

A.  Use their cell phone.

Q.  Were you made aware of any instances in which salespeople

had spoken on their cell phone to customers?

A.  Yes.

Q.  How were you made aware of those instances?

A.  I remember a time when I was speaking with Andrew in my

office, and we were trying to figure out if he had gotten ahold

of a customer who was either trying to cancel or wasn't

responding for whatever reason, and I asked him to make sure

that he stayed on top of it.  His response was something along

the lines of:  I am.  I even tried to call her from my cell

phone.

Q.  OK.  Let's go back to the sales call.  If after the sales

pitch the customer agreed to purchase one of the services, what

methods of payment could an Olive Branch salesperson accept?

1    A.  Credit card, debit card, check, a wire.

2    Q.  Was there a preferred method of payment from your

3    perspective?

4    A.  A check.

5    Q.  Why was that preferred?

6    A.  Because they couldn't charge back.  And off the bat we

7    would make more money because there were no merchant fees.

8    Q.  If a customer didn't have sufficient cash or a check, how

9    would they pay?

10   A.  Credit card.

11   Q.  Who would be the first person responsible for taking down

12   the customer's credit card information?

13   A.  The sales representative.

14   Q.  Would that be during the sales call or at some later time?

15   A.  At the tail end of the sales call.

16   Q.  Was the credit card run at that time?

17   A.  Shortly after that, yes.

18   Q.  Who typically ran customer credit card numbers?

19   A.  The overwhelming majority at that time, it would be me,

20   unless I was not there.

21   Q.  How did you come to possess the credit card numbers that

22   you ran?

23   A.  From the sales representatives.

24   Q.  When the sales representative brought you the credit card

25   number, what did you do with it?

IAO8KET6                          Sinclair - Direct

1   A.  I entered that information into the merchant terminal,

2   which is the online version of the swipe.

3           MR. MITCHELL:  Ms. Lee, let's bring up Government

4   Exhibit 711 for identification.

5   Q.  Mr. Sinclair, do you recognize Government Exhibit 711?

6   A.  Possibly.

7           OK.  Yes, I do.

8   Q.  How do you recognize it?

9   A.  Because we discussed this at length in one or more of our

10  meetings.

11  Q.  When you say "we," who are you referring to?

12  A.  Myself, you, and Detective Bastos.

13  Q.  Did you help to prepare this exhibit?

14  A.  I did.

15          MS. FLETCHER:  The government offers Government

16  Exhibit 711.

17          MR. SCHMIDT:  Objection, your Honor, until we get some

18  understanding of what it means.

19          THE COURT:  Mr. Paul.

20          MR. PAUL:  Could I just have the last question asked

21  before there was an objection, before it was introduced?

22          THE COURT:  Yes.

23          (Record read)

24          MR. PAUL:  Objection.

25          THE COURT:  What is 711, sir?

IAO8KET6                           Sinclair – Direct

1          THE WITNESS:  This is really the process of the money

2   flow.  So the customer -- if you follow the arrow -- provides

3   the sales representative really --

4          THE COURT:  It's the money flow, is that what it is?

5          THE WITNESS:  Yes.

6          THE COURT:  Who prepared this?

7          THE WITNESS:  I did.

8          THE COURT:  Did you use it in your business?  Did you

9   prepare it during the course of your business?

10          THE WITNESS:  No.  This was drawn up within the last

11   few weeks.

12          THE COURT:  Government.

13          MS. FLETCHER:  This is being offered as a

14   demonstrative.

15          THE COURT:  Do either of the defense counsel have

16   objections with what is depicted?  Either yes or no.

17          MR. PAUL:  Yes.

18          THE COURT:  Sidebar.

19          (Continued on next page)

20

21

22

23

24

25

IAO8KET6                          Sinclair - Direct

1          (At the sidebar)

2          THE COURT:  May I?  Thank you.

3          Mr. Schmidt wants a better understanding of this.  I

4     now realize it was prepared in connection with this litigation

5     as a demonstrative.

6          MS. FLETCHER:  Yes.  So the government prepared an

7     initial draft of this flow chart and presented it to Mr.

8     Sinclair.  Mr. Sinclair explained that it did not accurately

9     reflect how the money flowed.  He made notes on to that.  We

10    produced those notes as his 3500.  And then this flow chart is

11    a reflection of his notes.  So he didn't actually do the

12    PowerPoint portion of this, but it is something --

13         THE COURT:  Has he seen the final product?

14         MS. FLETCHER:  Yes.

15         THE COURT:  Does he agree that it's the correct flow?

16         MS. FLETCHER:  Yes.

17         THE COURT:  Gentlemen, what is the objection as a

18    demonstrative?

19         MR. PAUL:  The one I am holding now is the original.

20         MS. FLETCHER:  That's the one that we made that he

21    told us was wrong.

22         MR. PAUL:  And this is the modified one that he

23    corrected?

24         MS. FLETCHER:  Correct.

25         THE COURT:  This is 711.  Is that also 711?

IAO8KET6                          Sinclair - Direct

1          MR. PAUL:  That also was 711.

2          THE COURT:  What number does it now bear?

3          The final 711 has no horizontal orange arrows.

4          MS. FLETCHER:  And one fewer box.

5          THE COURT:  If you are going to use that one we will

6    give it a number.  But right now the 711 I am talking about has

7    no diagonal orange arrows.  And you say he says this is the

8    correct flow.

9          As a demonstrative, what is the issue?

10          MR. MITCHELL:  From Mr. Ketabchi's standpoint, we just

11    believe it is misleading.  It shows that a chargeback comes

12    from the sales floor checking account.

13          THE COURT:  You can cross him on that.  If he says

14    it's accurate, you can cross him.

15          I will allow it, but only as a demonstrative.

16          MS. FLETCHER:  Thank you, Judge.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  You may use this as a demonstrative.  It

3    may be shown to the jury.

4              Ladies and gentlemen it's not a piece of evidence.

5    It's simply to help you understand the evidence, or confuse you

6    as to the evidence, whatever it does.  But it is not evidence

7    itself.

8              MS. FLETCHER:  Hopefully not that, your Honor.  Thank

9    you.

10             Has it been published?

11             THE COURT:  Yes.

12   BY MS. FLETCHER:

13   Q.  Mr. Sinclair, do you see Government Exhibit 711 on your

14   screen?

15   A.  Yes.

16   Q.  We were talking just a moment ago about processing credit

17   card payments.  By referencing Government Exhibit 711, can you

18   explain how you would come to possess the credit card

19   information for a customer and what you would do with it?

20   A.  So, really, it's just a matter of following the arrow.  So

21   if you start on the bottom left, the customer possesses their

22   credit card information.  It's then given to the sales

23   representative, whoever is on the phone with that customer, OK.

24   That's what sales floor means.

25             Then if you go right, that credit card information at

IAO8KET6                              Sinclair - Direct

1    the end of the sales call will then get brought to me, or my

2    partner, to enter the credit card information in the computer.

3              Just to dumb it down, so I don't confuse anybody, we

4    put a hold on that money.  And then from there it gets

5    captured, and then a few days later it generally gets deposited

6    into the business checking account.  OK.

7    Q.  Mr. Sinclair, when you're talking about that deposit, what

8    arrow are you speaking about on this exhibit?

9    A.  The one on the right that points down.

10   Q.  What is meant by that arrow?

11   A.  That is when the merchant account physically deposits cash

12   into the business checking account, where I can go to the bank

13   and withdraw it if I want to.

14   Q.  And you said how long --

15             THE COURT:  Where the merchant terminal for Olive

16   Branch --

17             THE WITNESS:  Yes, sir.

18             THE COURT:  -- is crediting the sales floor checking

19   account with the money that the sales floor has run through the

20   merchant account.  Is that essentially it?

21             THE WITNESS:  Yes.

22             THE COURT:  So when it's deposited into the sales

23   floor checking account, on the bottom right of the

24   demonstrative, you have got the cash?

25             THE WITNESS:  In hand at that point.

1          THE COURT:  OK.

2     BY MS. FLETCHER:

3     Q.  How much time typically elapses between the customer

4     providing their credit card information to the sales floor and

5     the funds making their way into the sales floor checking

6     account?

7     A.  On average, five business days.

8          THE COURT:  So to make it concrete, from the time Ms.

9     Weissenberger, as an example, gives her credit card number to

10    whomever she is speaking to at Olive Branch, or one of the

11    other entities that you say is the same, until you get the cash

12    to use is about two days -- I'm sorry, five days.

13         THE WITNESS:  Right.  Total, it's five days.  There

14    are steps in between, but I wasn't asked that.

15         THE COURT:  All right.

16    Q.  You mentioned the word "chargeback" a few times.  We will

17    talk more about that a little bit later, but can you describe,

18    just in terms of fund flow, what happens when there is a

19    chargeback?

20    A.  Money comes out of the checking account, the Olive Branch

21    checking account.

22    Q.  Is that through some act on your part or on Olive Branch's

23    part or is that automatic?

24    A.  It's automatic.

25    Q.  So what step in the chargeback process triggers the

1    withdrawal of funds from the sales floor's checking account?

2    A.  It's when a customer calls their credit card company and

3    disputes a charge.

4    Q.  OK.  Then how, if at all, is Olive Branch able to get that

5    money back?

6    A.  In time, they would have to provide the merchant company --

7    top right -- with signed contracts, any proof of work that was

8    fulfilled through the third-party fulfillment company, and

9    ultimately the merchant company is going to make a decision.

10   Q.  What are some examples of a merchant company?

11   A.  There are different types of merchant accounts, but you

12   could go to Bank of America and open up a merchant account if

13   you qualify.

14   Q.  Have you ever opened a merchant account with Bank of

15   America?

16   A.  I did.

17   Q.  When did you do that?

18   A.  Right in the very beginning when we first started.  So it

19   must have been like the end of 2012.

20   Q.  What were the terms on that Bank of America merchant

21   account, generally?

22   A.  That's really for in-person transactions.  Chargebacks have

23   to be basically nonexistent to keep an account like that open,

24   and it's really for in-person transactions, not for a

25   telemarketing salesforce.

IAO8KET6                          Sinclair - Direct

1    Q.  What were the range of the merchant fees that you paid for

2    that merchant account?

3    A.  I think it was under 3 percent, or maybe 2.9 percent.

4    Q.  How long was that account open?

5    A.  A month.

6    Q.  Why did it get closed?

7    A.  It never should have been opened for starters.  But it got

8    closed because after further review, they said that our

9    business model doesn't line up with what they approve for those

10   types of accounts, which is why I said it should have never

11   been opened in the first place.

12   Q.  What, if any, requirements are there for those types of

13   accounts?

14           MR. SCHMIDT:  Objection.

15           MS. FLETCHER:  I will rephrase, your Honor.

16   Q.  Are you familiar with the requirements for those types of

17   accounts?

18   A.  For the 2.9 percent account?

19   Q.  Yes.

20   A.  I am.

21   Q.  How did you become familiar with those requirements?

22   A.  Through not qualifying myself.

23   Q.  What are those requirements?

24   A.  It's really just not for over-the-phone business.  It's for

25   like Wal-Mart or ShopRite, where someone is not going to

1    dispute buying groceries or a loaf of bread, whatever it is

2    that you would buy at Wal-Mart, things like that.

3              THE COURT:  So if you are in your local restaurant, or

4    you are going to your local bakery, or to the cafeteria in this

5    courthouse, and you want to use your credit card instead of

6    cash, it's for the cafeteria or the bakery or the whatever my

7    other example was?

8              THE WITNESS:  Yes.

9    Q.  What type of merchant account did you qualify for as a

10   telemarketing business?

11   A.  One that's called high-risk merchant account.

12   Q.  What are the typical terms of a high-risk merchant account?

13             MR. SCHMIDT:  Objection.

14             THE COURT:  If you know.

15             MR. SCHMIDT:  Objection.  He can tell personally what

16   his experience is as opposed to general.

17             THE COURT:  He may know.

18   Q.  In the course of your operation --

19             THE COURT:  Do you know personally what the typical

20   terms -- were you offered a high-risk merchant account?

21             THE WITNESS:  Several.

22             THE COURT:  Several.  What were the terms?

23             THE WITNESS:  To the best that I could remember, our

24   fees ranged anywhere from 15 to 25 percent overall instead of 3

25   percent or less.  Chargebacks were allowed to be higher, which

IAO8KET6                         Sinclair - Direct

1    is why the fees were higher.  So from what I remember,

2    chargebacks had to be kept under 5 percent, although they often

3    exceeded that.

4    Q.  OK.

5               THE COURT:  Let's go to not the high risk one.

6               I buy ten dollars worth of bread at my local bakery

7    and put it on my credit card.  Do you mean that the merchant,

8    the bakery, has to pay three dollars to the credit card

9    company?

10              THE WITNESS:  What I mean is that if -- let's just say

11   you were the consumer at a local bakery.  The bakery has to pay

12   3 percent to Bank of America in order to offer the service,

13   where they can accept your payment via debit or credit card.

14              THE COURT:  OK.  So again, I get the bread, the bakery

15   gets ten dollars, and it has to pay 3 percent of ten dollars.

16   What is 3 percent of ten dollars?  3?

17              THE WITNESS:  I was going to use one dollar.

18              THE COURT:  I get bread.  I pay for a roll one dollar.

19   The bakery gets one dollar.  And of that it has to pay three

20   cents to Bank of America, if it's a Bank of America card, or

21   Capital One, if it's a Capital One card.

22              THE WITNESS:  Right.

23              THE COURT:  But for a high-risk account done over the

24   phone, the merchant -- Olive Branch, A1, whatever it may be --

25   has to pay Bank of America, or whatever is the merchant account

IAO8KET6                        Sinclair - Direct

```
 1   issuer gets -- what was the percentage, 15 to 25 percent.  So
 2   if it's one dollar, the Bank of America would get 25 cents out
 3   of that one dollar.
 4             THE WITNESS:  That's very high.  That was for an
 5   international account.  This is a long explanation.
 6             THE COURT:  No.  Don't at this point.  It would get
 7   between 15 and 25 percent, whatever that particular deal was.
 8             THE WITNESS:  Let's say between 10 and 25.
 9             THE COURT:  OK.
10             Proceed.
11             MS. FLETCHER:  Thank you, your Honor.
12   BY MS. FLETCHER:
13   Q.  You said you had several merchant accounts --
14   A.  Yes, ma'am.
15   Q.  -- at Olive Branch?
16             What were the names of some of the entities on those
17   merchant accounts in about 2014?
18   A.  Olive Branch Marketing.  I believe Champion was set up,
19   Champion Business Services was set up in 2014.  I believe
20   Paramount Business Solutions was also set up under Michael
21   Finocchiaro's name.
22   Q.  What about Olive Branch and Champion, whose names were
23   those accounts under?
24   A.  Mine.
25   Q.  Why have multiple merchant accounts at any given time?
```

A.   So depending on the individual applying, at that time I had

800 credit, I had strong financials, so I was a strong

applicant.   I was given higher limits to each account.   And

what I mean by that is ability to process sales on a monthly

basis.   OK.   So I think my first one was 100,000.   I had one up

to 500,000 at one point.   Someone who does not have 800 credit,

and has not so strong financials, may be given a lower limit.

So that's point one.

          Point two, depending on how busy the sales floor is

and the potential to earn, the better leads that we get, the

more merchant accounts we need to process sales.

          I see heads nodding yes.   That means it makes sense.

OK.

          (Continued on next page)

Q.   Did there come a time when you lost some of those merchant

accounts?

A.   Most of them were lost.

Q.   How did you lose them?

A.   All of them were lost at some point from excessive

charge-backs.

Q.   During the 2014 time-frame, roughly what percentage of

charge-backs were processed through those accounts?   Let me

rephrase.

          During the 2014 time-frame, approximately what

percentage of Olive Branch's sales -- and I mean the entity

IAOJKET6                         Sinclair - direct

1    broadly -- resulted in a charge-back?

2    A.  Off the top of my head, I would say about 20 percent.

3    Q.  Are you familiar with the term TMF?

4    A.  I am.

5    Q.  What does TMF stand for?

6    A.  It's an acronym, The Match File.

7    Q.  What does it mean to be TMF's?

8    A.  It means you can no longer, ever in the United States set

9    up a merchant account under your name, so I personally cannot

10   ever own a merchant account ever again till I die.

11   Q.  Because you were TMF'd?

12   A.  Yes.

13   Q.  When were were you TMF'd?

14   A.  To my knowledge, in the Fall of 2014.

15   Q.  How about Mr. Finocchiaro, was he ever TMF'd?

16   A.  He was.

17   Q.  Approximately when was that?

18   A.  It was in the same vicinity.  I don't know if he, if he got

19   it first or if I did.  I can't remember.  Both -- I think both

20   were in the second half of '14, maybe early '15.

21   Q.  If you and Mr. Finocchiaro had been TMF'd, how is Olive

22   Branch able to accept credit card payments?

23   A.  Because we asked some of our employees, Arash Ketabchi

24   being the sales manager, we asked him to apply for merchant

25   accounts under his name to keep the sales floor alive.

IAOJKET6                          Sinclair - direct

1    Q.  Did he apply for a merchant account in his name?

2    A.  He did several.

3    Q.  What were some of the merchant accounts he had?

4    A.  By company name, by the company that he owned it by?

5    Q.  Yes.

6    A.  A1 Business Consultants.

7    Q.  Did he have one merchant account with the entity A1

8    Business Consultants or multiple?

9    A.  I want to say he had two.  I am not a hundred percent

10   certain.

11   Q.  Did you ask any other employees to open up merchant

12   accounts in their name?

13   A.  Yes.

14   Q.  Did any other employees do so?

15   A.  Again this is one I'm not certain on.  I believe we asked

16   just about everybody.  Some people had poor credit where they

17   would get denied.  I believe we asked Andrew to apply, and I

18   think he got denied.

19   Q.  Andrew Owimrin?

20   A.  Yes, I believe so.

21   Q.  So you think he did apply?

22   A.  I believe so.

23   Q.  When you asked the salespeople to open up merchant

24   accounts, did you tell them why you needed merchant accounts?

25   A.  Yes.

IAOJKET6                          Sinclair - direct

1    Q.  What did you tell them?

2    A.  We needed more processing ability because our lead flow

3    exceeded what we were able to process on a monthly basis.

4              THE COURT:  Does that mean you bought more lead names

5    than you were able to sell to customers?

6              THE WITNESS:  Yes.

7              THE COURT:  Meaning ms. Weissenberger?

8              THE WITNESS:  Correct.

9              THE COURT:  All right.

10   BY MS. FLETCHER:

11   Q.  Now, you told the jury that certain of your accounts were

12   shut down.  Was that something that you told the salespeople?

13   A.  Oh, yes.

14   Q.  Did you tell them why the accounts were shut down?

15   A.  Yes.

16   Q.  What did you tell them?

17   A.  Too many charge-backs.

18             THE COURT:  You said you had too many lead names to be

19   able to process them, right?

20             THE WITNESS:  Right.

21             THE COURT:  Why didn't you just reduce the number of

22   lead names you were buying?

23             THE WITNESS:  Because you wound up paying for them up

24   front.  So it wasn't like, for example, you gave me a list and

25   I handed you a check in return.  You gave me that list up

1   front, so how I did on the list and I paid you a percentage

2   based on our production, so there was really no risk on my end

3   initially as far as the lead lists were concerned.

4           At that time it was turning money down, so if we could

5   get additional processing, we explored every option to do so.

6           THE COURT:  I think what you're saying to me, in

7   answer to my question is, you didn't reduce the lead names

8   because you wanted to make more money?

9           THE WITNESS:  Yes, sir.

10          THE COURT:  All right.

11  BY MS. FLETCHER:

12  Q.  Did there come a time when anyone who worked for you asked

13  a family member to open up a merchant account?

14  A.  Yeah, twice, I believe, twice.

15  Q.  What were those two times?

16  A.  Arash had asked his cousin, Masoud to open up an account,

17  and he did.  And Michael Finocchiaro and my partner asked his

18  partner Sal Finocchiaro to open an account, and he did.

19  Q.  Focusing on the first account, do you recall the name of

20  the entity in which Masoud open up a merchant account?

21  A.  Element.

22  Q.  Did Masoud work for your company?

23  A.  No.

24  Q.  Did he ever come into your office?

25  A.  I don't remember him ever being there.  I don't think so.

1              MS. FLETCHER:  Can we put up Government Exhibit 711

2     again. .

3     Q.   In this schematic -- can we publish, please -- in this

4     schematic, the Element merchant account was that reflected in

5     one of the four squares you see on this slide?

6     A.   The top right where it says merchant, that would be

7     Element, Olive Branch, plug in whatever name you want.

8     Q.   So if customer payments were processed through the Element

9     merchant account, how would you, as manager of Olive Branch,

10    get those funds?

11    A.   Being that Masoud was not an employee of ours, it made it

12    difficult to -- it would have made it difficult to transact, so

13    we needed someone who was on our sales floor who could access

14    that money.  So we asked -- I am 99 percent sure we asked

15    Andrew to be a signer on that account, and he accepted.

16    Q.   On which account are you referring to?

17    A.   The Element business checking account at I believe Bank of

18    America in Clifton.  When I say "we," I mean Arash and I asked

19    him to do that.

20    Q.   Just to be clear, which of the boxes on this demonstrative

21    are we now referring to?

22    A.   The bottom-right.

23    Q.   Was Mr. Owimrin on the merchant account account itself, the

24    processing account?

25    A.   No, ma'am.

1    Q.  What account was he on?

2    A.  The business checking account if he walked into Bank of

3    America.

4    Q.  Why did you ask him to be on that account?

5    A.  Because Masoud wasn't accessible to us every day.  If we

6    needed to get money, we needed to get money.  He wasn't there

7    to sign checks, so we had no way to really access that money

8    unless we had someone who we could add to the checking account.

9    Q.  Did he?

10   A.  He did.

11   Q.  Who at Olive Branch was responsible for managing all of

12   these merchant accounts?

13   A.  Me.

14   Q.  Who, if anyone, decided which account to process a

15   particular customer payment through?

16   A.  Me unless it was late and I wasn't there.

17          MS. FLETCHER:  You can take down 711, please.

18   Q.  Mr. Sinclair, we were talking a few minutes ago -- we had

19   gone off on a tangent about processing.  We were talking a few

20   minutes ago about the conclusion of the sales call and how the

21   salesperson would bring you their credit card information.

22   A.  Yes, ma'am.

23   Q.  I think you said they would put a hold on it.  Do you

24   remember that?

25   A.  I do.

1    Q.  Once you put a hold on the card, what would happen next

2    with respect to that particular customer?

3    A.  Well, you're talking in terms of actually getting the

4    money?

5    Q.  I am asking in terms of the particular customer who has

6    just concluded their appointment with the salesperson.

7    A.  Okay.

8    Q.  When the salesperson brings you the credit card information

9    for that customer, does the customer remain on the phone?

10   A.  Okay.  Yeah, they're put on brief hold, then the sales rep

11   would say come into my office where I physically input the

12   credit card information into the website that needs to be put

13   into.  That is either successful or unsuccessful.

14        The sales rep would get back on the phone and inform

15   said customer of the result.  Either your purchase went

16   through, congratulations, or, unfortunately, it did not go

17   through.  Let's assume it did.  At that point there they would

18   be notified they're going to get transferred to, let's call it,

19   to make it simple for everyone, a secretary, right, which is

20   referred to in our office as a compliance officer.

21        What is going to happen at that point is they're going

22   to get the customer to sign what you is called e-sign, a

23   document sign, an electronic signature.  They sign the contract

24   electronically.  They get them to agree to the charges and set

25   up the welcome call and that is really the gist of it.

IAOJKET6                              Sinclair - direct

1    Q.   The person you mentioned that is the compliance officer,

2    who is that again?

3    A.   The manager during which specific time-frame?

4    Q.   2014-2015?

5    A.   2014 could have been a few different people, Martinez, Kate

6    Moscatelli and towards the tail end of '15, I want to say

7    Jolaina Aziz.

8    Q.   You said the purpose of that call was to get the customer

9    to sign the contract?

10   A.   Yes.

11            MS. FLETCHER:   Can you pull up what has been marked

12   for identification as Government Exhibit 433 A.

13   Q.   Do you recognize Government Exhibit 433 A?

14   A.   Yes, this is general a telemarketer's contract.

15   Q.   Who is this a contract with?

16   A.   It is with Element Business Services.

17            MS. FLETCHER:   The government offers Government

18   Exhibit 433 A.

19            MR. PAUL:   No objection.

20            MR. SCHMIDT:   No objection.

21            THE COURT:   Admitted.

22            (Government's Exhibit 433 A received in evidence)

23            MS. FLETCHER:   Can we please publish.

24   BY MS. FLETCHER:

25   Q.   You mentioned this is a contract with Element?

IAOJKET6                          Sinclair - direct

1    A.   Yes.

2    Q.   Do you see the address on this contract?

3    A.   I do.

4    Q.   What address is that?

5    A.   433 Piaget Ave, Suite 2, Clifton.  We had two offices at

6    that point in the same location.

7    Q.   What is the date on this contract?

8    A.   July 24th, 2015.

9    Q.   Who created this contract?

10   A.   Originally where the format came from, is that your

11   question?

12   Q.   Yes.

13   A.   An attorney named Eric Talin located out of the Utah, I

14   believe, who I was put in touch with by Ryan Holt.

15   Q.   What was the purpose of this contract, from your

16   perspective?

17   A.   Because if a customer ever tried to dispute a charge, we

18   would have a signed agreement saying that they authorized the

19   charge.

20            MS. FLETCHER:  Can you scroll down just a little bit,

21   Ms. Lee.

22   Q.   What are the services laid out in this particular contract?

23   A.   So this is the Youngevity Program, and it lists out the

24   starter kit, how Youngevity is the website and everything

25   offsets highlighted in yellow.

1   Q.  Can you scroll down a little bit and see the next

2   paragraph.  I am not asking you to repeat this paragraph.

3           Do you see the paragraph entitled, "Indemnity"?

4   A.  Do you want me to read it out loud?

5   Q.  No.  Just take a look at it.  What is your understanding of

6   the meaning of this paragraph?

7           Mr. Sinclair, do you have an understanding of the

8   meaning of this paragraph?

9   A.  I need to read it first before answering that.

10  Q.  Please.

11  A.  May I have a moment?

12  Q.  Yes.

13  A.  (Pause)  I'm not an attorney, so I don't know specifically

14  what this means.  What it looks like to me is that any user who

15  signs this agrees not to hold Element or any of its officers or

16  employees, et cetera, responsible for any damages, liabilities,

17  et cetera.

18  Q.  What is the purpose of that paragraph, from your

19  perspective?

20  A.  Because you're basically saying if I lose money, it is not

21  your fault.

22  Q.  Who is saying that?

23  A.  The customer, by acknowledging this, by signing this.

24          THE COURT:  Who is "I" in the example you gave?  What

25  role is "I"?  Is it the merchant?  Is it Olive Branch?  Is it

1     the customer?

2               THE WITNESS:  When did I say "I"?  I am sorry?

3               THE COURT:  You said, "because you're basically saying

4     if I lose money, it is not your fault."

5               THE WITNESS:  The customer.

6               THE COURT:  Who?

7               THE WITNESS:  "I" is the customer.  The "your" is

8     Element Business Services in that example.  Sorry.

9               THE COURT:  That is one of your companies?

10              THE WITNESS:  Yes, at that time, yes.

11              THE COURT:  All right.

12              MS. FLETCHER:  Would you please go up to the top.  Can

13    you scroll down.  I am looking for a particular paragraph that

14    deals with refunds.  Maybe it is on Page 2.

15    Q.  Do you see this paragraph here?

16    A.  I do.

17    Q.  Without reading it aloud, what is the purpose of this

18    paragraph?

19    A.  To allow -- hold on.  (Pause)  To notify customers that

20    they have a three day right of recision.

21    Q.  If a customer calls and cancels within three days of making

22    a purchase, what would happen?

23    A.  If the customer could not be saved and convinced to stay

24    aboard, they would be refunded.

25    Q.  What do you mean when you say the customer could not be

1   saved, what does it mean to save a customer?

2   A.   Convince them to stay with us and not insist a refund.

3   Q.   Who was responsible for handling saves?

4   A.   Michael Finocchiaro.

5   Q.   Are you familiar with the steps that he took to try to save

6   a customer?

7   A.   I am.   Either he would contact --

8   Q.   Let me ask the next question.

9   A.   Okay.

10  Q.   Did he share with you the stuff that he typically took?

11  A.   Yes.

12  Q.   What did he tell you he did?

13  A.   He would either call the customer and try to come to a

14  resolution or he would enlist the sales rep, the person who

15  initially got the money from the customer, to get them back on

16  the phone to try to convince them to stay aboard.

17  Q.   Do you have an understanding as to why Mr. Finocchiaro

18  would enlist the salesperson?

19  A.   It was our belief that the sales representative had an

20  established rapport with said customer.

21          MR. SCHMIDT:   Objection, your Honor, as to the "our."

22          THE COURT:   When you say "our," what do you mean?

23          THE WITNESS:   It was our belief, Michael and my

24  belief, that getting the salesperson to make the first attempt

25  at times could be beneficial to what we were trying to

1   accomplish, which was keeping the customer aboard because they

2   were the one who initially -- they, meaning the sales

3   representative -- was the initial party to establish rapport

4   with the customer.

5   BY MS. FLETCHER:

6   Q.  What would happen if the customer called in to cancel and

7   it had been more than three days since their conference?

8   A.  Depending on what was done, looking ahead to our chances of

9   winning a charge-back, it would really depend on the situation,

10  depending on how long it was.

11          For example, we'd be much more willing to refund

12  someone five days out than two months out.

13  Q.  Why?

14  A.  Because what work was already done and we'd have proof of

15  that so we could theoretically be more likely to win a

16  charge-back.

17  Q.  When you were just talking about the compliance call, you

18  also mentioned -- one more question on the contract.  Were

19  there ever instances where the customer refused to sign a

20  contract?

21  A.  Yes.

22  Q.  What would happen if the customer refused to sign a

23  contract?

24          MR. SCHMIDT:  Objection, your Honor.

25          THE COURT:  Sustained.  What did happen?

1          THE WITNESS:  Usually what would happen is --

2          MR. SCHMIDT:  I object unless we get a foundation.

3          THE COURT:  A specific, all right.  Go ahead.

4          THE WITNESS:  On a specific --

5          THE COURT:  I am sorry.  Lay a foundation.

6     BY MS. FLETCHER:

7     Q.  Were there instances where a customer refused to sign a

8     contract?

9     A.  Yes.

10    Q.  How did you become aware of those instances?

11    A.  From whoever was complying the call at the end.

12    Q.  What do you mean by whoever was complying the call?

13    A.  So we discussed the process a little while ago of what

14    happens from the point where the credit card was obtained, that

15    chart that had all the arrows in it.  So at the end of this,

16    the second step, the one on the top left, was the sales

17    representative gets the credit card info, brings it to me.

18         I enter the information in the computer.  After that's

19    all done, the sales representative then transfers the phone

20    call to someone else who I said just think of it as a

21    secretary, for all intents and purposes, who is going to then

22    get the customer to agree to the charges, get them to sign the

23    agreement.  That's where that would happen.  That is a

24    compliance call.

25    Q.  The person conducting that call would tell you of

IAOJKET6                      Sinclair - direct

1    instances --

2    A.   Yeah.

3    Q.   -- where the customer refused to sign a contract?

4    A.   Correct.

5    Q.   In those instances, what, if anything, did you instruct the

6    compliance person to do?

7    A.   It would depend.  Sometimes I could get on the call,

8    sometimes Michael could get on the call, but usually the sales

9    representative would get back on the call.  That's what would

10   happen the overwhelming majority of the time.

11   Q.   For what purpose?

12   A.   To get them to agree and sign.

13            THE COURT:  You said sometimes you would be on the

14   call?

15            THE WITNESS:  Yes, there have been, yes.

16            THE COURT:  What did you do?

17            I take your aim, from what was said, is to try to get

18   the customer to sign the contract, right?

19            THE WITNESS:  I would try to identify the problem and

20   ultimately figure out what that was and resolve it.  Maybe

21   something wasn't explained clearly.  Every phone call was

22   different so it is tough to give you just one answer on that.

23            Really the one commonality is I would try to identify

24   the problem and just take it from there.

25   BY MS. FLETCHER:

IAOJKET6                           Sinclair - direct

1    Q.   If the customer agreed to sign the contract, you mentioned

2    they would get a welcome call?

3    A.   Yes.

4    Q.   What is a welcome call?

5    A.   We had referenced the fulfillment before, the separate

6    company that would do the work that we sold.  Essentially the

7    fulfillment company would then call the customer to begin

8    providing that work, and that is where that all began.

9    Q.   Who at the fulfillment company would typically do the

10   welcome call?

11              MR. SCHMIDT:  Objection.

12              THE COURT:  No.  I will allow that.  I will allow

13   that.

14   A.   I don't remember names specifically at this point.  It has

15   been too far removed.

16   BY MS. FLETCHER:

17   Q.   When you were talking about the fulfillment company, are

18   you talking about Ray Quiles' company?

19   A.   Yes, ma'am.

20   Q.   You used the phrase the work that needs to be done a couple

21   of times.  Let's talk about what that work is.  So for your

22   customers --

23              THE COURT:  Ms. Fletcher, it is a quarter of.  I don't

24   know how long this line will take, but does it make sense to

25   break now before you talk about the work?

1    MS. FLETCHER:  Sure.  I expect this will take no more

2    than 10 minutes, but I have additional questions after that.

3            THE COURT:  Let's break now because I do have another

4    matter I have been holding from 4:30.  Let's break for the

5    evening.  Ladies and gentlemen, keep an open mind, don't

6    discuss this case amongst yourselves or with anyone else.

7    Let's start tomorrow at 9:15, and tomorrow we'll take lunch at

8    12:30.  9:15 tomorrow.  You have been very prompt so far.

9    Everyone appreciates it.  Thank you.

10           (Jury excused)

11           THE COURT:  You may step down, sir.  9:15 tomorrow.

12   We are going to have another matter on those desks, so just

13   straighten it up.  I need Mr. Sobelman and Mr. Schmidt.  We are

14   on the record.

15           MR. SCHMIDT:  There is an additional matter I would

16   like to discuss after the witness leaves the room.

17           THE COURT:  All right.

18           (The witness left the courtroom)

19           MR. SCHMIDT:  Your Honor, again we consented to the

20   admission of certain documents, including, for example, Exhibit

21   502, which is a screen-shot of a calendar entry for what

22   appears, what the government has said is from Olive Branch

23   Marketing LLC Gmail, but, of course, theirs does not have any

24   indication it is from Olive Branch Marketing LLC at Gmail.

25   We'll take their word for it because we try to be honorable

1    here.

2             We are trying to offer and we had questioned and may

3    offer other calendar entries from the same document.  Our

4    document, we may be able to print it out, says Olive Branch

5    Marketing LLC at Gmail at the bottom, and this is a document

6    the government sent to us three weeks ago, on October 4th.

7             THE COURT:  You're saying the document you're holding

8    on the bottom of it indicates it comes from Olive Branch

9    Marketing at Gmail dot com.

10            MR. SCHMIDT:  That's correct.

11            THE COURT:  The government produced it to you?

12            MR. SCHMIDT:  Produced it to me October 4th.  We have

13   had literally, if there is actually a word, a gazillion

14   documents, and now the government is indicating that this is

15   insufficient authentication for theirs to go in.  We allowed

16   this to go in without a marking.  This from them has the

17   marking and we are reaching the same problem.

18            THE COURT:  Let me see both documents.

19            MS. KEARNEY:  Can I step in here.  The government has

20   not indicated that it is insufficient.  The government has

21   indicated it needs to check in its files and we'll verify if it

22   exists.

23            THE COURT:  Done.  Do it tonight.

24            MS. KEARNEY:  Exactly what we are trying to do?

25            THE COURT:  Do it tonight.

1          MR. SCHMIDT:  We are not finished with direct

2     examination.  We are going to give them items that I am going

3     to base my cross-examination of, and they're going to be able

4     to speak to this witness --

5          THE COURT:  That I knew.

6          MR. SCHMIDT:  -- before that.  There are a number of

7     these items and it has important information that I need to be

8     able to question this witness without --

9          THE COURT:  Wait, wait, wait.  Didn't we handle this

10    on Monday in terms of timing?

11         MS. KEARNEY:  Yes, your Honor.

12         THE COURT:  Or Tuesday?

13         MS. KEARNEY:  As we agreed, defense counsel gave us a

14    closed folder of documents that they wanted us to verify when

15    Mr. Sinclair started his direct examination.

16         THE COURT:  And it goes to your paralegal.

17         MS. KEARNEY:  We handed that off to the paralegal.

18         THE COURT:  The paralegal was going to --

19         (Multiple voices)

20         THE COURT:  If she or she can verify the authenticity

21    and the lawyers are not going to be involved in it, so that

22    presumably by the time cross-examination starts, the paralegal

23    will be able to indicate if there are any authenticity issues.

24         Is that right so far?

25         MS. KEARNEY:  Correct so far.  She has been able to do

1    that for all but 10 emails.  She identified those emails by

2    Bates numbers.  We are going to see if we can get counsel those

3    Bates numbers and they can help us in tracking them down.

4              The agreement that we had yesterday was about emails,

5    not about calendar entries or electronic devices.

6              THE COURT:  Why not follow the same procedure with

7    calendars?

8              MS. KEARNEY:  That is what we are going to do, but we

9    hadn't set that up, and so she does not have access to that, so

10   we have not been able to verify it yet.

11             When we spoke to defense counsel at the break, what we

12   indicated was we were not able to do that at this point and she

13   was having difficulty.  I haven't seen the document.  I told

14   them she was having difficulty finding them.

15             THE COURT:  You told the defense?

16             MS. KEARNEY:  Yes, and we couldn't agree because she

17   couldn't find it.  Now that we know they're calendar entries,

18   we know where to look.

19             THE COURT:  What in the world is the issue?  It sounds

20   like what we have set up is in --

21             MR. SCHMIDT:  I'll go back to the office now, prepare

22   them and forwarded by email to the person, but we're told we

23   can't do that.

24             THE COURT:  Why can't he do that?

25             MS. KEARNEY:  I don't want our paralegal from our

1     office to be in direct contact with defense team.  If they

2     would like again to write out some instructions, that is fine.

3     I don't want to have a paralegal from our office in direct

4     contact is not advisable.

5                THE COURT:  I am not sure what that means.  What will

6     you going to be sending?

7                MR. SCHMIDT:  About 15 --

8                THE COURT:  No.  Just document Bates numbers or

9     documents, or what?

10               MR. SCHMIDT:  The documents we are going to use that

11    will show the date, the people and the calendar entry so that

12    she can then look it up.

13               MS. KEARNEY:  She already has those documents.

14               MR. SCHMIDT:  Because we received these on October 4th

15    and without any kind of Bates numbers that really need to see

16    the document so she can figure it out which one it is.

17               MS. KEARNEY:  I think we have all the information we

18    need.  We just needed to know the source.  Now that we know the

19    source, we will go and verify it.

20               MR. SCHMIDT:  We don't have them to give to --

21               THE COURT:  I think what the government is saying is

22    it believes it now has everything it needs to identify what

23    those documents are.  Is that what you're telling me?

24               MS. KEARNEY:  I believe so, again without having seen

25    them.  Now after conferring, we know it is beyond the original

1    scope of what we thought we were searching.

2             THE COURT:  We originally were talking emails.

3             Mr. Schmidt was saying things like the bulk of what we

4    have, the majority of what we have is emails.  He was leaving

5    open the likelihood of there being some things besides emails,

6    and now he is raising that issue.

7             MS. KEARNEY:  Yes.  We'll broaden our search.

8             THE COURT:  You think you have what you need?

9             MS. KEARNEY:  Yes.

10            THE COURT:  Okay.  I am not so sure that there is an

11   issue with Mr. Schmidt giving documents to your paralegal, but

12   I'll respect that for now and presumably you have the

13   information you need.  Goodbye, everybody.  I have another

14   matter.

15            MS. KEARNEY:  We have one issue, your Honor.  We had

16   given you the estimate of a week and a half for the

17   government's case.

18            THE COURT:  Now you want to say it is a week?

19            MS. KEARNEY:  I wish I could, your Honor.  We did not

20   anticipate the length of Ms. Weissenberger's cross-examination.

21   If it will continue in proportion to the direct examination, we

22   think we may very well go into the week after.

23            THE COURT:  You said this witness, Mr. Sinclair, is

24   your longest witness?

25            MS. KEARNEY:  That's correct.

IAOJKET6                    Sinclair - direct

1          THE COURT:  He is your longest witness as well.  Is

2     that right?

3          MS. KEARNEY:  I don't know the type, but the length of

4     direct, yes.

5          THE COURT:  Mr. Schmidt, do you have some sense of

6     whether you're going to do the same number in terms of length

7     of time on Sinclair and everyone else proportional to the

8     length of the direct that you did with Ms. Weissenberger?

9          MR. SCHMIDT:  Your Honor, this is clearly the longest

10    witness.  I am not doing every witness, so you don't have to

11    worry about me for the whole time.  Most of the other witnesses

12    except for I think two others are relatively short, so this

13    witness, based on what they've gone through, can easily take

14    four hours for this witness for cross-examination.  It may not.

15    He has been pretty straightforward so --

16         THE COURT:  That helps you, it seems to me.

17         MR. SCHMIDT:  It does, absolutely.  There is a lot to

18    go through, but if he answers the questions and he remembers,

19    it saves us a lot of time.  I would say conservatively four

20    hours.

21         THE COURT:  It would help if you have faster response

22    time on the objections, and you do have a paralegal here and a

23    second lawyer so try to do it.

24         MR. SCHMIDT:  We are trying to get these electronics

25    to work correctly.

IAOJKET6                         Sinclair – direct

1            THE COURT:  Your problem, not mine.

2            MR. SCHMIDT:  I understand that.

3            THE COURT:  Let's try to be as efficient as possible.

4       I have suggested one way we can do that, and if need

5  be, I'll lengthen the trial day, although I hate to do that to

6  the jury.  We are going to sit on Friday.  Let's just keep

7  moving forward and try to be as efficient as possible, and I

8  accept the government's estimate of one week for the trial.

9  Let's go on.  See you tomorrow.

10           The record should reflect I understand the

11  Government's estimate is longer than one week.

12           (Adjourned until Thursday, October 25, 2018, at 9:30

13  a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    DIANE WEISSENBERGER

 4    Cross By Mr. Schmidt . . . . . . . . . . . . 114

 5    WILLIAM SINCLAIR

 6    Direct By Ms. Fletcher . . . . . . . . . . . 175

 7                        GOVERNMENT EXHIBITS

 8    Exhibit No.                              Received

 9     709  . . . . . . . . . . . . . . . . . . . 183

10     702  . . . . . . . . . . . . . . . . . . . 183

11     703  . . . . . . . . . . . . . . . . . . . 184

12     706  . . . . . . . . . . . . . . . . . . . 184

13     707  . . . . . . . . . . . . . . . . . . . 185

14     704  . . . . . . . . . . . . . . . . . . . 185

15     710  . . . . . . . . . . . . . . . . . . . 186

16     731  . . . . . . . . . . . . . . . . . . . 190

17    732, 733, 734, 735, 736 and 737  . . . . . . 191

18     708  . . . . . . . . . . . . . . . . . . . 196

19     403  . . . . . . . . . . . . . . . . . . . 207

20     705  . . . . . . . . . . . . . . . . . . . 223

21     502  . . . . . . . . . . . . . . . . . . . 236

22     503  . . . . . . . . . . . . . . . . . . . 238

23     504  . . . . . . . . . . . . . . . . . . . 246

24     404  . . . . . . . . . . . . . . . . . . . 248

25     259  . . . . . . . . . . . . . . . . . . . 260
</pre>

```
 1   254   . . . . . . . . . . . . . . . . . . 264

 2   253   . . . . . . . . . . . . . . . . . . 276

 3   250, 251 and 252  . . . . . . . . . . . . . 278

 4   433 A   . . . . . . . . . . . . . . . . . . 305

 5                    DEFENDANT EXHIBITS

 6   Exhibit No.                          Received

 7   DW1   . . . . . . . . . . . . . . . . . . 117

 8   DW1-2   . . . . . . . . . . . . . . . . . . 120

 9   DW-3, Page 28,   . . . . . . . . . . . . . 143

10   DW-4, Page 17,   . . . . . . . . . . . . . 150

11   DW-5, Page 22,   . . . . . . . . . . . . . 152

12   DW-6, Page 37,   . . . . . . . . . . . . . 154

13   DW-7, Page 41,   . . . . . . . . . . . . . 164

14

15

16

17

18

19

20

21

22

23

24

25
```