IAPJKET1                    Sinclair - direct

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                      17 Cr. 00243 (SHS)

ANDREW OWIMRIN, a/k/a "Andrew Owens,"
a/k/a "Jonathan Stewart," and
SHAHRAM KETABCHI, a/k/a "Steve Ketabchi,"

                Defendants.

------------------------------x
                                        October 25, 2018
                                        9:15 a.m.

Before:

                    HON. SIDNEY H. STEIN,

                                        District Judge
                                          and a jury

                        APPEARANCES

GEOFFREY S. BERMAN
        United States Attorney for the
        Southern District of New York
KIERSTEN A. FLETCHER
ROBERT B. SOBELMAN
BENET J. KEARNEY
        Assistant United States Attorneys

SAM A. SCHMIDT
ABRAHAM J. ABEGAZ-HASSEN
        Attorneys for Defendant Owimrin

KENNETH A. PAUL
JACOB MITCHELL
        Attorneys for Defendant Ketabchi

Also Present:
        CHRISTOPHER BASTOS, Detective NYPD and HSI
        CHRISTINE LEE, Paralegal USAO
        SAMUEL TUREFF, Paralegal

IAPJKET1                        Sinclair – direct

1              (Trial resumes)

2              (In open court; jury not present)

3              THE COURT:  All right.  Bring the jury in.  The jury

4    is now here.  I think Ms. Fletcher, you said you had 10 minutes

5    on this line.  You did not indicate how much longer you thought

6    you had?

7              MS. FLETCHER:  Your Honor, given the additional

8    questions overnight, I expect to be another hour to 90 minutes.

9              THE COURT:  All right.  I am going to ask everybody to

10   pick it up when this witness is off.

11             MR. PAUL:  Sorry, your Honor?

12             THE COURT:  I said I am going to ask everybody to pick

13   up the pace after this witness is off.

14             (Jury present)

15             THE COURT:  Good morning, ladies and gentlemen.

16   Please be seated in the courtroom.  You may continue with your

17   direct examination of Mr. Sinclair.

18    WILLIAM SINCLAIR,

19        called as a witness by the Government,

20        having been previously duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MS. FLETCHER:

23   Q.  Good morning, Mr. Sinclair.

24   A.  Good morning.

25             THE COURT:  Mr. Sinclair, you understand you remain

1    under oath, correct?

2              THE WITNESS:  Yes, sir, your Honor.

3    BY MS. FLETCHER:

4    Q.  Mr. Sinclair, let's start by talking a bit more about the

5    rules and the fines that we discussed yesterday.  Do you

6    remember that?

7    A.  Yes, ma'am.

8    Q.  You looked at a couple of documents recommending fines for

9    Mr. Owimrin.  Do you remember that?

10   A.  Yes, ma'am.

11   Q.  Do you recall whether Mr. Owimrin was, in fact, fined?

12   A.  I cannot say with absolute certainty that he was or was

13   not.  My guess would be that --

14             MR. SCHMIDT:  Objection, your Honor.

15             THE COURT:  The jury does not want a guess.  Do not

16   guess.  If you have reason to believe one way or the other

17   based on experience or whatever it may be, say it, but no

18   guesses.

19             THE WITNESS:  Yes, sir.

20             THE COURT:  Only you know whether it is truly a guess

21   or not.  The question was, do you recall whether Mr. Owimrin

22   was, in fact -- do you know whether Mr. Owimrin was actually

23   fined?

24             THE WITNESS:  No, sir, your Honor.

25             THE COURT:  All right.

1    BY MS. FLETCHER:

2    Q.  Putting aside whether Mr. Owimrin was fined, did you

3    communicate with Mr. Owimrin regarding those flat calls?

4    A.  Yes.

5    Q.  Why did you do that?

6    A.  It was necessary to our overall goal.

7    Q.  What was your overall goal?

8    A.  To continue to operate, to be profitable.

9              THE COURT:  To make money, right?

10             THE WITNESS:  Yes, sir.

11   BY MS. FLETCHER:

12   Q.  Was it necessary to your goal of making money you speak

13   with Mr. Owimrin about those flat calls?

14   A.  We needed to do everything that we could to stay off of any

15   radar with federal agencies, FTC, et cetera.

16   Q.  What is the FTC?

17   A.  Federal Trade Commission.

18   Q.  How, if at all, does these FTC calls, based on your own

19   understanding, relate to telling sales force?

20   A.  They're a regulatory type of, I guess, entity who imposes

21   fines.  Basically like consumer protection.

22   Q.  What are one of the rules we talked about was earnings

23   claims.  Do you remember that?

24   A.  Yes.

25   Q.  What was the rule in the State of Florida about earnings

1   claims?

2   A.   You could not do it.  It was not permitted.

3   Q.   How, if at all, was that rule modified in the case of a

4   Youngevity sale?

5   A.   Youngevity was different because people did get checks.

6   Q.   From whom did people get checks?

7   A.   From Youngevity directly.

8   Q.   How are you aware that people got checks from Youngevity?

9   A.   Through conversations with clients directly and also

10  conversations that I've had with Anthony Medeiros, who was the

11  individual who came to us with this idea to sell Youngevity.

12  Q.   Did Mr. Medeiros work for you?

13  A.   Yes.

14  Q.   What was his role?

15  A.   In addition to orchestrating the Youngevity program, he was

16  a sales representative for a very short time.

17  Q.   Can you remind the jury exactly what Youngevity is.

18  A.   Can I have open communication?

19  Q.   You can answer the question.

20  A.   Okay.  So Youngevity is a multilevel marketing type of a

21  pyramid type of a setup where the person at the top makes money

22  off of everyone who comes in beneath them.

23        Also ways, two ways people are supposed to be able to

24  make money is that they sell healthy wellness products, that is

25  the company itself.  So you can either sell their products as

1    like an affiliate marketer of their products, or you could

2    bring other people on underneath you, and you get a commission

3    based on that as well, so there is two ways that you can earn

4    money.

5    Q.  When you started selling Youngevity, what was your

6    understanding as to how Olive Branch could make money with

7    Youngevity?

8    A.  So Olive Branch had a top spot, and all the customers we

9    brought in underneath Olive Branch were supposed to pay us

10   commissions.

11   Q.  Did it work out?

12   A.  We made some money, nowhere near what we were supposed to,

13   so it didn't work out, no.

14   Q.  You mentioned customers were getting checks.

15          Were you made aware of the amount of the checks that

16   customers were getting?

17   A.  Specifically, no.

18   Q.  Did there come a time when you were made aware of customer

19   complaints related to Youngevity?

20   A.  Yes.

21   Q.  What, if anything, did you do in response to those customer

22   complaints?

23   A.  Ultimately, we stopped selling it.

24   Q.  Did you do anything else to address the complaints?

25   A.  I had to personally write some customers checks.

1   Q.   When did that begin?

2   A.   To the best of my memory, probably late 2015.

3   Q.   Approximately how many customers did you send a check?

4   A.   Again I don't know specifics.  I'd say at least a dozen,

5   maybe a few dozen.

6   Q.   Approximately how much were the checks that you sent?

7   A.   A few hundred dollars apiece.

8   Q.   What was the purpose of you personally sending these checks

9   to these customers?

10  A.   Complaints turned into problems, and I did not want any

11  problems.

12  Q.   When we broke yesterday, we were talking about fulfillment.

13  Do you remember that?

14  A.   Yes.

15  Q.   Who did fulfillment for your floor during 2014, 2015?

16  A.   Predominantly Ray Quiles.

17  Q.   Let's talk about how Ray Quiles provided you fulfillment

18  for each of the products you sold.

19       Starting with Youngevity, what was the fulfillment for

20  Youngevity?

21  A.   The fulfillment for Youngevity was a website.  They also

22  got the products directly from Youngevity, so it was split.

23  That was a little bit different.  We go through a process with,

24  where each one of our customers where they got the website and

25  there could have been additional products that were sold as

1   add-ons as well.

2   Q.  Did Ray Quiles, did he provide that fulfillment?

3   A.  Yes.

4   Q.  How about Corporate Credit, how did the Corporate Credit

5   product fulfill by Ray?

6   A.  It really couldn't have been.

7   Q.  Why not?

8   A.  Because for Corporate Credit, most agencies or banks are

9   going to require a minimum of two years of financials, which

10  these individuals did not have.

11  Q.  How about bookkeeping, how was bookkeeping fulfilled by Ray

12  Quiles?

13  A.  Very similar to Corporate Credit.  You can't keep books for

14  a business that doesn't exist.

15  Q.  How about the LLC or corporate setup product, how was that

16  fulfilled?

17  A.  So that, you have to go through the IRS website and

18  something called an EIN is obtained, an employer identification

19  number.  If it is an LLC, you get articles of formation in the

20  mail or email.  If it is a corporation, you get articles of

21  incorporation, which is paperwork just showing your federal tax

22  email number.

23  Q.  Are you familiar with how much it costs to incorporate an

24  LLC or a corporation in the State of New Jersey?

25  A.  $125, I believe.

IAPJKET1                    Sinclair - direct

1    Q.  How is the business plan of product fulfilled?

2    A.  It's like a booklet, cookie-cutter booklet.

3    Q.  How about the YouTube video?

4    A.  A YouTube video is like a commercial for said business.

5    Q.  Were the commercials created?

6    A.  Yes.

7    Q.  How about search engine optimization, how is that

8    fulfilled?

9    A.  My understanding, and I am not a tech person at all, there

10   are --

11              MR. SCHMIDT:  Objection, your Honor.

12              THE COURT:  No.  I will allow it.

13   A.  -- there are ways to encrypt certain words, that if someone

14   types in a specific keyword into Google, et cetera, English

15   search engine, it will help prompt that website up to the top

16   higher.

17   Q.  Was that work done, to your knowledge?

18   A.  To my knowledge, it was.

19   Q.  Did there come a time when you began to tell your

20   salespeople you prefer certain of these products over others?

21   A.  Yes.

22   Q.  In general, what type of products did you prefer that your

23   salespeople sold?

24   A.  We referred to them as deliverables, which is just anything

25   tangible.

IAPJKET1                      Sinclair - direct

```
 1   Q.  What are some of the products that are more tangible than
 2   others?
 3   A.  A corporation, social media marketing, a business plan, a
 4   logo, items like that where you can touch them or see them.
 5   Q.  Why did you prefer that your salespeople sold tangible
 6   products?
 7   A.  Because on the back end of it, if someone tried to
 8   charge-back, to dispute their charges with their credit card,
 9   it was much easier to prove that we did work for said customer
10   by being able to provide proof.
11   Q.  What did your proof of fulfillment, what, if any, effect
12   did your actual proof of fulfillment have addressing that
13   charge-back?
14   A.  What effect did it have?
15   Q.  Yes.
16   A.  To the merchant company who ultimately decides if you win
17   or lose a charge-back, it shows that we performed said work for
18   them, for the customers.
19   Q.  What effect would that have, in your view, at the time?
20
21   A.  They --
22           MR. SCHMIDT:  Objection as to would have.
23           THE COURT:  Sustained as to form.
24   BY MS. FLETCHER:
25   Q.  What was your understanding as to how that would affect
```

1    your likelihood of winning the charge-back?

2    A.  It would increase it.

3    Q.  This preference for tangible products, did you communicate

4    that preference to the salespeople who worked for you?

5    A.  Yes.

6    Q.  What, if any, reasons did you provide to the salespeople as

7    to why you preferred they sold tangible products?

8    A.  I told them exactly that.

9    Q.  What did you tell them?

10   A.  It would increase our charges of winning charge-backs.

11   Q.  Were there regular staff meetings on your sales floor?

12   A.  There were, yes.  At times more regular than others, but,

13   yes, there were.

14   Q.  How regular were those meetings during the 2014, 2015

15   time-frame?

16   A.  For a time within that window, we had them on Fridays, but

17   not for the entire time 2014 and 2015.  Sometimes we just had

18   them as needed.

19   Q.  During those meetings, whether they were regular or as

20   needed, who attended?

21   A.  Everyone.

22   Q.  When you say "everyone," who do you mean?

23   A.  The entire company, the whole staff.  In addition, at times

24   Ray Quiles would come and discuss various items with us.

25   Q.  What items were discussed at those sales meetings?

 1    A.   What problems --

 2    Q.   Sorry, sales floor meetings, I should say?

 3    A.   What types of problems they were encountering on the back

 4    end of fulfillment after the sales meeting.

 5    Q.   When you say "they," who are you referring to.

 6    A.   Fulfillment.

 7    Q.   Is that Ray Quiles?

 8    A.   Yes.

 9    Q.   What problems did Quiles make known to your floor during

10    those meetings?

11    A.   That sales reps were, indeed, making promises to customers.

12    Q.   What types of promises?

13    A.   Earnings claims predominantly.

14    Q.   Approximately how many times did Mr. Quiles alert the sales

15    floor that salespeople were making earnings promises during

16    those meetings?

17    A.   I would say dozens.

18    Q.   To your knowledge, did the earnings claims stop?

19    A.   No.

20              MS. FLETCHER:  Ms. Lee, can we just pull up what is

21    marked for identification as Government Exhibit 406.

22    Q.   Do you recognize Government Exhibit 406?

23    A.   I don't see anything on my screen yet.

24              (pause).

25              THE COURT:  Can you make that larger.  (Pause)

IAPJKET1                        Sinclair - direct

1   A.  Yes.

2   BY MS. FLETCHER:

3   Q.  What is Government Exhibit 406?

4   A.  It is an email from Ray Quiles and his office to myself and

5   Michael Finocchiaro.

6   Q.  Generally what is the subject matter of this email?

7   A.  A customer named Elizabeth Marcus.

8           MS. FLETCHER:  The government offers Government

9   Exhibit 406.

10          MR. SCHMIDT:  Let's see if I have an objection, your

11  Honor, if I may?

12          THE COURT:  Take a look at the copies the prosecutor

13  is giving you.

14          (Pause)

15          THE COURT:  Mr. Paul, any objections?

16          MR. PAUL:  Judge, may I have just one second with the

17  government, please?

18          THE COURT:  Yes.

19          (Off-the-record discussion)

20          MR. PAUL:  I have no objection.

21          MR. SCHMIDT:  I have no objection.

22          THE COURT:  Did you say you have or have not?

23          MR. SCHMIDT:  I do have an objection.

24          (pause)

25          MR. PAUL:  There is confusion because one document was

IAPJKET1                    Sinclair – direct

1    replaced with the exhibit that is being presented today.  That

2    is what we're trying to figure out.  I have no objection.

3            (Pause)

4            MR. SCHMIDT:  Your Honor, we do have an objection.

5    This is hearsay on hearsay.

6            THE COURT:  I understand.  Response?

7            MS. FLETCHER:  Your Honor, this is not being offered

8    for the truth of the information in the underlying complaint.

9    It is being offered as an example of the type of issues that

10   were raised.

11           THE COURT:  Sidebar.

12           (Continued on next page)

1          (At sidebar)

2          THE COURT:  What is your objection?

3          MR. SCHMIDT:  This is hearsay.  The information is

4     obviously hearsay.

5          THE COURT:  What is the -- wait.  Marcus is the

6     customer, not the co-conspirator.

7          MR. SCHMIDT:  That is correct.

8          THE COURT:  To certain extent 801 (d)(2)(E), from the

9     standpoint it is coming from Ray, correct?  So that top half is

10    a co-conspirator statement, correct?  It is in furtherance and

11    during the course --

12         MR. SCHMIDT:  It is from --

13         THE COURT:  Ray is Ray Quiles.  So your concern is

14    with the bottom half?

15         MR. SCHMIDT:  That is correct.

16         THE COURT:  Because that's, you say, a hearsay

17    statement?

18         MR. SCHMIDT:  That is correct.  Any kind of

19    instruction that it is not being --

20         THE COURT:  I understand.

21         MS. FLETCHER:  An instruction would cure any issue

22    with respect to that.

23         THE COURT:  Why do you need that bottom half?

24         MS. FLETCHER:  In order for this particular email to

25    make sense, he is referring to what the customer is saying.

1          THE COURT:  Yes.

2          MS. FLETCHER:  He is using an example that this person

3   is going to introduce a number of other charge-backs.

4          THE COURT:  Just a second.  She has got 3, 4 total

5   other charges.  Go ahead.

6          MS. FLETCHER:  So under the rule of completeness, in

7   order for this to make sense, the jury needs to see what the

8   complaint is he is forwarding.

9          THE COURT:  Just let me read what you're saying.

10         (Pause)

11         MS. FLETCHER:  There is more on the back, Judge.

12         THE COURT:  Oh.  All right, Mr. Schmidt?

13         In other words, an instruction it is not for the truth

14   of the matter, but simply for the fact that it was said.

15         MR. SCHMIDT:  If the issue in this particular case,

16   Judge, explains to the jury that they're to ignore this for the

17   truth of it, whether it directly impacts on what the government

18   is trying to prove and how we're trying to defend, but we have

19   no opportunity to examine this particular person --

20         THE COURT:  I understand.  That is why it is hearsay.

21         MR. SCHMIDT:  It makes the charge of the jury to

22   ignore this impossible.  This is the case.  Asking them to

23   ignore this is ridiculous.  They can't possibly ignore this.  A

24   human being can't possibly ignore that.

25         THE COURT:  I take it your questions are not going to

1    focus on the bottom?

2          MS. FLETCHER:  No.

3          THE COURT:  As a matter of fact, your questions are

4    going to be about the top?

5          MS. FLETCHER:  Yes.

6          THE COURT:  I will allow it and I will give the jury

7    the instruction.  Let's proceed.  Mr. Schmidt, what you should

8    do, sir, is when the government paralegal is asked to tee-up a

9    document, you should have your paralegal go through your

10   binders and get the document because what is happening is it is

11   only after the government attorney asks that it be admitted

12   that you then turn to your binders.  Have the paralegal do that

13   and have him do it as soon as the government paralegal is asked

14   to put it up on the screen.

15         MR. SCHMIDT:  The problem is we were given three huge

16   binders plus every day additional ones to put in.

17         THE COURT:  That is what paralegals are for.  That is

18   their job.

19         MR. SCHMIDT:  They're not in any order of who is being

20   called as a witness.

21         THE COURT:  I understand, but you have not only an

22   idea, but you know the exact document once the government

23   attorney says Ms. Lee, put up document blah, blah.

24         (Multiple voices)

25         MR. SCHMIDT:  That is what we will do.  As soon as we

IAPJKET1                        Sinclair - direct

1    hear the number, we have to find --

2             THE COURT:  I was under the impression you're only

3    doing that when she was moving its admission.  All right.

4             MR. SCHMIDT:  No.

5             MR. PAUL:  Additionally, I understand, for example,

6    Ms. Kiersten gave a binder to this witness teeing up all the

7    things she was going to be asking, including exhibits, I

8    assume.  It would be helpful if we were provided a copy of that

9    so I wouldn't have to --

10            THE COURT:  I agree with that.  Whatever you're giving

11   the witness, you should give copies to the defense.  Proceed.

12            (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                (In open court)

 2                THE COURT:  Or, alternatively, government, rather than

 3      the entire book, and I will talk obliquely, you can give each

 4      document at the time you mention it to the defendants rather

 5      than the entire book in advance.  Do you understand what I am

 6      saying?

 7                MS. FLETCHER:  I, do your Honor.

 8                THE COURT:  Proceed.

 9                MS. FLETCHER:  The government offers Government

10      Exhibit 406.

11                THE COURT:  Admitted, consistent with the sidebar.

12                (Government's Exhibit 406 received in evidence)

13                THE COURT:  Ladies and gentlemen, the bottom half of

14      this document is not given to you which is, indeed, on the

15      screen.  It is not given to you for the truth of what is

16      asserted.  It is given to you simply for the fact that it was

17      said, but not for its truth.  Having said that, there are

18      probably not going to be any questions about that bottom half.

19                Proceed.

20      BY MS. FLETCHER:

21      Q.  Mr. Sinclair, do you see the date on this email chain?

22      A.  The date?

23      Q.  Yes?

24      A.  Yes, ma'am.

25      Q.  What is the date?

1    A.  November 27th, 2014.

2    Q.  Take a look just briefly at the bottom half of this email

3    chain.  Who is the sender on the first email chronologically?

4    A.  Ray Quiles.

5    Q.  I will ask you to take a look at the very bottom of that

6    page.  Scroll down, please.

7    A.  I am sorry.  (Pause)

8           MS. FLETCHER:  Ms. Lee, can you look at the bottom

9    half.

10   A.  Betty Marcus.

11          MS. FLETCHER:  Without going through what it says

12   here, can we pull up the top half of Page 2.

13   Q.  Mr. Sinclair, I am not going to ask you to read the

14   document, but what, in substance, is this email?

15   A.  This is Ray Quiles telling us to refund people before they

16   manifest into charge-backs, and this is an example of one that

17   he recommended we do so.

18   Q.  Let's look now at the email on Page 1, the email from Ray

19   Quiles.  Can we blow that up, please, Ms. Lee.

20          Do you see that email from Ray going up on your

21   screen?

22   A.  Yes.

23   Q.  I am going to direct your attention to the third sentence

24   in that.  What is that sentence, beginning messages like this?

25   A.  Messages like this need an assassin's mentality to deal

1   with the client and move on.

2   Q.  What are the next few sentences?

3   A.  This is a Stage 5 cleaner that declares rape.  She has 3, 4

4   totals in parens, other charges with the sale also manifest

5   into charge-backs.

6   Q.  Then he says he recommends some sort of retention

7   department.  What is a retention department?

8   A.  A retention department would be individuals who would be in

9   charge of dealing with keeping customers aboard or making

10  decisions to cut ties and move on.

11           THE COURT:  To your knowledge, is it part of the job

12  of a fulfillment center to help you avoid charge-backs?

13           THE WITNESS:  Yes, sir.

14  BY MS. FLETCHER:

15  Q.  Is one of the ways that the fulfillment center helps you

16  avoid charge-backs by sending you communications like this?

17  A.  Yes, ma'am.

18  Q.  Does this type of communication, is this a typical

19  communication from Mr. Quiles to you regarding these

20  charge-backs?

21           MR. PAUL:  Objection to the form.

22           THE COURT:  Yes, sustained as to form.

23  BY MS. FLETCHER:

24  Q.  Did Mr. Quiles send you communications like this after this

25  one in November of 2014?

IAPJKET1                        Sinclair - direct

1    A.  Yes.

2    Q.  For how long?

3    A.  I can't take a guess, as per your Honor's instructions

4    earlier.  I can't say definitely.

5    Q.  Weeks?

6              MR. SCHMIDT:  Objection, your Honor.

7              THE COURT:  Wait.  I don't want to mislead you.  A

8    guess is "I have no idea" is a guess.

9              Knowing something is "I saw that it and I know it,"

10   and there is some area in-between where you have reason to

11   believe this happened or that happened or the number is in the

12   range of this.  If it is in-between, the jury is entitled to

13   hear it as long as you have some basis and experience for it

14   and can testify to that or are asked about it.

15             What I don't want to hear and what the jury doesn't

16   want to hear are I guess what I referred to in the press is

17   wild eye guesses.  Does that make sense?

18             THE WITNESS:  Yes, sir.

19             THE COURT:  No wild eye guesses, but if you can give

20   reasonable either estimate or the specific because you have

21   some basis for doing so, do so.

22             THE WITNESS:  Yes, sir.

23             THE COURT:  Proceed.

24   A.  To answer your question, ma'am, I'd say through the end of

25   the time when we were selling similar products where we have

IAPJKET1                        Sinclair - direct

1   Ray Quiles as our fulfillment company, which would be at least

2   for about at year after this email which would bring us to the

3   end of 2015, possibly early 2016.

4   BY MS. FLETCHER:

5   Q.  Thank you.

6   A.  You're welcome.

7   Q.  Are you familiar with the term rebuttal in the

8   telemarketing industry?

9   A.  Yes, ma'am.

10  Q.  What is a rebuttal?

11  A.  A client objection.

12  Q.  A client objection to what?

13  A.  To purchasing products.

14  Q.  So do rebuttals happen before or after the sale is made?

15  A.  During.

16  Q.  During the sale?

17  A.  Yeah.  It could be after as well, but generally before the

18  sale is made or when that process, when the attempt is being

19  made.

20  Q.  When you did sales calls for biz-op, did you hear customers

21  give you rebuttals for objections to the sale you were trying

22  to make?

23  A.  Yes, ma'am.

24  Q.  Based on those calls, are you familiar with the type of

25  objections or rebuttals that customers made during the sales

IAPJKET1                    Sinclair – direct

1    call?

2    A.  Yes, ma'am.

3    Q.  What are some of the reasons customers give to not make a

4    purchase for a biz op product?

5           MR. SCHMIDT:  Objection.  We are talking about two

6    different time frames here.

7           THE COURT:  She can establish those time frames.

8           MR. SCHMIDT:  She has.  This is when he was making

9    sales calls, and that appears before this case.

10          MS. FLETCHER:  I am happy to lay a stronger

11   foundation.

12          THE COURT:  Go ahead.

13   BY MS. FLETCHER:

14   Q.  Mr. Sinclair, you testified yesterday that sometimes you

15   would speak to a customer when the customer did not want to

16   sign the contract during the compliance call.  Do you remember

17   that?

18   A.  Yes, ma'am.

19   Q.  Did you also hear customer rebuttals during those calls?

20   A.  Yes, ma'am.

21          THE COURT:  Let me see if I understand.

22          "Rebuttals" seems to be a fancy name for a pushback

23   the client is giving while the sales call is going on; in other

24   words, the salesman says X, and the customer says Y, or what

25   about something else or doesn't sound right to me.  It is just

1    in the ebb and flow of conversation, as you said, pushback.

2              Is that what a rebuttal is?

3              THE WITNESS:  Yes, sir, your Honor.

4              THE COURT:  Okay.

5    BY MS. FLETCHER:

6    Q.  When you were speaking to customers who didn't want to sign

7    a contract, were there certain types of rebuttals that you

8    heard often?

9    A.  Yes, ma'am.

10   Q.  What are some of those types of rebuttals or what was the

11   common way that a customer would push back against signing the

12   contract?

13   A.  The most common, I'd say, would be I don't want to spend

14   any more money or I don't want to spend money until I make

15   money, or I can't afford my credit card payments now, I can't

16   afford to spend any more money on a monthly basis, not just an

17   overall figure.  Those would be the most common.

18   Q.  Focusing on the example that you just gave, I don't want to

19   spend any more money until I make money, how did you respond to

20   that pushback?

21   A.  That would be responded to by saying well, if you truly

22   plan to give your business the best shot of being successful,

23   you want to put your best foot forward from the very beginning

24   rather than implementing things piece-by-piece, that type of

25   approach.  My semantics may be a little off.  It has been a few

IAPJKET1                        Sinclair - direct

1   years, but that is basically what it would be.

2   Q.  What message was that meant to convey to the customer?

3           MR. SCHMIDT:  Objection, your Honor.

4           THE COURT:  What did you intend by saying those words?

5           THE WITNESS:  Spend money now instead of later.

6   BY MS. FLETCHER:

7   Q.  For what purpose?  Spend money why?

8   A.  So we can make money.

9   Q.  So that is how you responded to customers who pushed back

10  to you?  How, if at all, did you instruct your salespeople to

11  respond to similar pushback?

12  A.  With a similar counter-rebuttal.

13  Q.  Sorry?  What was the word you used?

14  A.  With a similar counter-rebuttal.

15  Q.  Are you familiar with how Aresh Ketabchi instructed the

16  salespeople to respond to that particular pushback?

17  A.  The same way.

18  Q.  Let's talk about charge-backs.

19          You testified yesterday that Michael Finocchiaro was

20  responsible for addressing charge-backs.  Do you remember that?

21  A.  Yes, ma'am.

22  Q.  Did there come a time during the 2014 to 2015 time-frame

23  that you were made aware of an increase in charge-backs?

24  A.  Yes, ma'am.

25  Q.  How were you made aware of that increase?

1   A.   Because the first sign is money was being taken out of our

2   accounts in alarming rates.

3   Q.   Approximately when was that?

4   A.   Right around Labor Day 2014 and all through the fall of

5   2014 it became very, very bad.

6   Q.   Did you come to understand why the charge-backs were

7   increasing at that time?

8   A.   Yes, ma'am.

9   Q.   How did you come to that understanding?

10  A.   Conversation with a sales rep about data being stolen from

11  our database and being given to an individual who we had fired

12  previously, sales were being made without our knowledge and

13  charge-backs were being encouraged so they could charge people

14  if there wasn't enough room.

15  Q.   To clarify, who was encouraging your prior customers to

16  charge-back?

17  A.   The individual on the outside, his name is Michael Pizzaro.

18  Q.   What, if any, steps did you take to address that cause for

19  the increase in charge-backs?

20  A.   We hired an attorney.

21  Q.   What did your attorney do?

22  A.   Sued Michael Pizzaro, Joe Sickles, a few other people were

23  sued initially, but then it was dropped.  Steven Aladenoye

24  being one of them.  It was primarily just against Joe Sickles

25  and Michael Pizzaro.

1    Q.   Who is the lawyer you hired to initiate that lawsuit?

2    A.   Vafa Sarmasti.

3    Q.   How did you first become acquainted with Mr. Sarmasti?

4    A.   Arash introduced us.

5    Q.   Did you hire Mr. Sarmasti to do any other work for your

6    floor?

7    A.   Yes, ma'am.

8    Q.   What did you hire him to do?

9    A.   Primarily situations where we had customer complaints that

10   got to an attorney of the customers or any agent complaints,

11   attorney generals in different states.

12   Q.   What did Mr. Sarmasti do with respect to those complaints?

13   A.   Tried to find a resolution that would cost us the least

14   amount of money.

15   Q.   In addition to this lawsuit that you implemented, did you

16   take any other steps to remedy the increase in charge-backs?

17   A.   Yes, ma'am.

18   Q.   What steps did you take?

19   A.   We hired an individual named Paul Curtis to monitor sales

20   calls.

21   Q.   Is this the call monitoring we discussed yesterday?

22   A.   Yes, ma'am.

23   Q.   What other steps did you take?

24   A.   We implemented later on, we implemented what we call

25   retention out of the sales reps' paychecks.

IAPJKET1                    Sinclair - direct

1    Q.  Explain how your retention protocol worked.

2    A.  For each individual sales representative, individuals who

3    were making the sales, based on whatever their cancellation

4    rate was, we would hold that same percentage of their check in

5    retention to try to offset at least a piece of the money we

6    were losing due to said charge-backs.

7    Q.  Can you give an example.

8            If you had detected a salesperson, for example, had 20

9    percent of his sales resulted in charge-backs, what steps would

10   you take with respect to that salesperson's 20 percent?

11   A.  So to put it into figures, if that salesperson's paycheck

12   was $1,000.00, we would hold 200 of it.

13   Q.  When, if at all, would you return that $200.00 to the

14   salesperson?

15   A.  If a customer was saved, meaning kept on board, the way

16   that we did it, though, it was determined quarterly.  So, for

17   example, if it's January, we're looking at quarter four of the

18   previous year, and a figure is calculated on how many cancels

19   that person had versus respective sales.  So we figure out the

20   percentage that way.  So it would just adjust quarterly.

21   Q.  If a sales person's charge-backs went down, would they get

22   a portion of their retention back?

23   A.  Their retention percentage would just drop moving forward.

24   Q.  How, if at all, did that retention program improve the

25   number of charge-backs that you were seeing?

IAPJKET1                    Sinclair - direct

1    A.  It did help it at one time.

2    Q.  Approximately when was this retention program implemented?

3    A.  I'd say anywhere from late '14 to early '15.

4    Q.  Did there come a time when the charge-backs continued to

5    increase after that retention program?

6    A.  I can't say they increased, but they were certainly a

7    significant issue.

8    Q.  Approximately what percentage of the sales on the floor

9    were charge-backs in the middle of 2015?

10   A.  Roughly 20 percent.

11   Q.  Did you implement any other procedures to address the 20

12   percent charge-backs?

13   A.  I did.

14   Q.  What procedures did you implement?

15   A.  Over the summer in 2015, we implemented another policy

16   where if any sales rep had a charge-back, let's just say of

17   $3,000, that $3,000 is now their full responsibility, so $3,000

18   cash would now be taken from that sales rep's paycheck.

19   Q.  How did the sales team react to that policy?

20   A.  Poorly.

21   Q.  Did anyone quit?

22   A.  Several people.

23   Q.  Who quit?

24   A.  Arash left, Pete DiQuarto left, Andrew left, Reagan left,

25   Luis left, Steve, everybody just left.

IAPJKET1                    Sinclair - direct

1    Q.  Let's talk about Arash's departure.  Did you discuss with

2    Arash what he was going to do when he left?

3              MR. SCHMIDT:  Objection, your Honor.

4              THE COURT:  I'll allow that.  Yes or no?

5              THE WITNESS:  Yes.

6    BY MS. FLETCHER:

7    Q.  What, if anything, did he tell you he was doing?

8              MR. SCHMIDT:  Objection, your Honor; hearsay.

9              THE COURT:  Sustained.

10             MS. FLETCHER:  Your Honor, may we be heard at sidebar?

11             THE COURT:  Yes, but move on if you can and you can

12   come back.  I don't want to have so many sidebars.

13             MS. FLETCHER:  I am not sure I can move on.

14             THE COURT:  All right, sidebar.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

IAPJKET1                    Sinclair - direct

1             (At sidebar)

2             THE COURT:  The purpose of my commenting in open court

3      after the last sidebar was I realized you're giving a preview

4      of your entire direct if you give the defense the same book

5      that you give the witness, so I was saying you can do it on a

6      document-by-document basis.

7             MS. FLETCHER:  Understood.

8             THE COURT:  I think the real answer is for the defense

9      to be able to find the document itself more quickly so that we

10     can move forward, but if they can't --

11            MS. FLETCHER:  May I go back to the podium and tell

12     them the next three exhibits?

13            THE COURT:  All right.  It strikes me that it is not

14     in furtherance of the conspiracy.  I take it that is what you

15     were saying?

16            MR. PAUL:  Yes.  I join in that objection.

17            MS. FLETCHER:  It is, your Honor, even after Arash

18     leaves, Mr. Sinclair's floor continued to have business

19     dealings related to charge-backs because Mr. Sinclair was using

20     Arash's merchant account.

21            THE COURT:  Because Mr. Sinclair was using Arash's --

22            MS. FLETCHER:  Once Arash leaves, he and the floor

23     continue to --

24            THE COURT:  What do you intend to adduce from what

25     Arash said he was going to do?

IAPJKET1                          Sinclair – direct

1            MS. FLETCHER:  He was going to start his own floor so

2     he was taking some of the salespeople with him.

3            THE COURT:  So ask this man what Arash did after he

4     left him.

5            MS. FLETCHER:  Okay.

6            THE COURT:  Let's go.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2     BY MS. FLETCHER:

3     Q.  Mr. Sinclair, to your knowledge, what did Arash Ketabchi do

4     for work after he stopped working on your sales floor?

5     A.  He started up his own sales floor.

6     Q.  What was the name of that sales floor?

7     A.  A1 Business Consultants.

8     Q.  Who, if anyone, that had previously worked for you went to

9     work for Arash?

10    A.  To my knowledge, Andrew Owimrin, Reagan Owimrin, Jen Luluna

11    and Lucette Sarsuala.

12    Q.  Who are Ms. Luluna and Ms. Sarsuala?

13    A.  They were formerly two of my appointment setters/compliance

14    officers.

15    Q.  Mr. Sinclair, I am going to hand up what has been marked

16    for identification as Government Exhibit 122 and 122 T and ask

17    you to take a look at those.

18    A.  Yes, ma'am.

19    Q.  Mr. Sinclair, do you recognize Government Exhibit 122?

20    A.  Yes, ma'am.

21    Q.  What is Government Exhibit 122?

22    A.  122 is a CD, with the contents of the CD is the phone call

23    that is transcribed in 122 T.  The people on this -- okay.

24    Q.  No.  You may continue.

25    A.  The people on this recording are Arash Ketabchi, Andrew

1   Owimrin, Reagan Owimrin and who I believe to be Jen Lulunaj as

2   well.

3   Q.  Did you listen to this recording in advance of your

4   testimony today?

5   A.  Yes, ma'am.

6   Q.  Taking a look at Government Exhibit 122, how do you know

7   that the recording on that CD is the recording you listened to?

8   A.  My initials are on it.

9   Q.  When you listened to that recording, did you prepare --

10  withdrawn.

11          When you listened to that recording, were you

12  presented with a draft transcript of the call on that

13  recording?

14  A.  Yes, ma'am.

15  Q.  Did you provide edits to the transcript of that recording?

16  A.  Yes, ma'am.

17  Q.  When you were provided the draft transcript of that

18  recording, did the draft include, for example, who was speaking

19  on the recording?  Did it identify names of the speakers?

20  A.  Yes.

21  Q.  When the draft was provided to you?

22  A.  Some of it, yes.

23  Q.  Sorry?  Mr. Sinclair, did you provide edits to the draft?

24  A.  Yes, ma'am.

25  Q.  What, if any, edits did you make?

IAPJKET1                    Sinclair - direct

1   A.  Some name changes, some of the verbiage was incorrect

2   according to what I heard.

3   Q.  I now see the issue.

4           Mr. Sinclair, did you listen to the recording once

5   before being presented with a draft of the transcript?

6           MR. SCHMIDT:  Your Honor, objection; leading

7   questions.

8           THE COURT:  I think I understand the issue also.  I

9   will allow it to go forward.

10          Mr. Sinclair, did you provide to the government the

11  attributions of the speakers; in other words, do you say that

12  is Andrew Owimrin, that is Arash Ketabchi, that is Reagan

13  Owimrin?

14          THE WITNESS:  Yes, sir, your Honor.

15          THE COURT:  Next.

16  BY MS. FLETCHER:

17  Q.  To be clear, did the government ever tell you who the

18  speakers were on the recording or did you tell the government?

19  A.  I told the government.

20  Q.  The draft transcript that you were provided, did that draft

21  transcript get edited by you?

22  A.  Yes, ma'am.

23  Q.  Approximately how many times?

24  A.  Several.

25  Q.  The transcript that you have in your hand as --

IAPJKET1                          Sinclair - direct

 1              THE COURT:  What was the purpose of your edits?

 2              Edits are changes, right.

 3              THE WITNESS:  Yes.

 4              THE COURT:  Why were you making changes to the draft

 5    transcript?

 6              THE WITNESS:  For accuracy purposes.

 7    BY MS. FLETCHER:

 8    Q.  The transcript that is in front of you at Government

 9    Exhibit 122 T, does that transcript fairly and accurately

10    reflect the parties to the recording and the words that the

11    parties said, as edited by you?

12              MR. SCHMIDT:  Objection.  Simply that --

13              THE COURT:  Just a moment.  (Pause)

14              What is your objection?

15              MR. SCHMIDT:  The evidence is the actual recording.

16              THE COURT:  They will be instructed of that, yes.

17              MR. SCHMIDT:  The transcript is obviously his best

18    efforts, but --

19              THE COURT:  Objection overruled.  I am going to

20    instruct the jury.

21              MS. FLETCHER:  Your Honor, the government offers

22    Government Exhibit 122 and would ask the jury be permitted to

23    review 122 T as an aid.

24              MR. SCHMIDT:  I have no objection to that, your Honor.

25              MR. PAUL:  No objection.

 1          THE COURT:  Ladies and gentlemen, this is all rather

 2   simple.  I am admitting the disc 122.  That is evidence.  That

 3   is a recording apparently of a telephone conversation, okay?

 4          To assist you, and I assume the government is about to

 5   play that, that's correct, or at least a portion of that?

 6          MS. FLETCHER:  Yes, your Honor.

 7          THE COURT:  To assist you when you hear the recording,

 8   I'm allowing you to see a transcript of the recording, but that

 9   is just an aid to you.  The actual evidence is the recording

10   itself.  The transcript is simply an aid to assist you in

11   deciding what you're hearing.

12          If you hear something that's different than what is on

13   the transcript, it's what you hear that's the evidence.  Okay.

14   Very simple.  A lot of back-and-forth here, but quite

15   straightforward.  Next question.

16          MS. FLETCHER:  Your Honor, I would ask that Ms. Lee be

17   permitted to publish Government Exhibit 122 and play the audio.

18          THE COURT:  Yes.  Proceed.  Would they need the

19   transcript?

20          MS. FLETCHER:  Yes, they do.  May I hand those out,

21   your Honor?

22          THE COURT:  Yes.

23          (Government's Exhibit 122 received in evidence)

24          (Pause)

25   BY MS. FLETCHER:

1   Q.  To clarify one point while the transcripts are being handed

2   out, do you see the date on the front page of this transcript?

3   A.  Yes, I do.

4   Q.  Do you have any idea where that date came from?

5   A.  I don't.

6   Q.  Did you provide that date?

7   A.  I did not.

8           (Government Exhibit 122 was played)

9           MS. FLETCHER:  May I have a moment, your Honor?

10          THE COURT:  Yes.

11          (Off-the-record discussion)

12          MS. FLETCHER:  Your Honor, would you like me to

13  collect the draft transcripts?

14          THE COURT:  Yes, please.

15          (Pause)

16          THE COURT:  And if the government would be so kind,

17  the court would appreciate a transcript as well.

18          MS. FLETCHER:  I apologize, your Honor.

19          THE COURT:  That is all right.  Let's move forward.

20          (Pause)

21  BY MS. FLETCHER:

22  Q.  Mr. Sinclair, after Arash stopped working for you, did you

23  and Arash continue to communicate about your business?

24  A.  Yes.

25  Q.  Without saying specifically what he said to you, what, in

IAPJKET1                      Sinclair - direct

1   substance, did the two of you discuss?

2   A.   We had an agreement where charge-backs were supposed to be

3   paid to each other depending on dates and where they were, what

4   merchant account they were run through.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Can you explain what that arrangement was?

2    A.  Yes.  So June 29 we implemented the last policy that you

3    had asked me about, as far as retention is concerned.

4    Q.  June 29th of what year?

5    A.  2015.

6    Q.  And what was the last policy that we discussed?

7    A.  Where sales reps were responsible for the full amount of

8    the sale if charged back.

9    Q.  How did your arrangement with Arash Ketabchi relate to that

10   June 29th date?

11   A.  Anything after that date I was supposed to be compensated

12   for.  Anything before that date I would pay for him.

13   Q.  When you say anything before that date, what do you mean by

14   "anything"?

15   A.  Sales made.

16   Q.  So if a sale was made prior to June 29, 2015 and a customer

17   charged back, who was responsible for covering the amount of

18   that chargeback?

19   A.  Prior to June 29, myself and Michael Finocchiaro.

20   Q.  And if a sale was made after June 29th and a customer

21   charged back, who was responsible for covering the amount of

22   the that chargeback?

23   A.  Arash.

24   Q.  And is this arrangement with respect to any particular

25   account?

1    A.  I believe this was -- there's some gray area, but I believe

2    this was just for his A1 account -- let me think for a second.

3            The A1 account, prior to June 29, we would have had to

4    have been responsible for it, because that's his account and we

5    are no longer using A1 anymore.

6    Q.  What about the Element merchant account that we discussed

7    yesterday?

8    A.  Element as well.

9    Q.  So who was responsible and who was continuing to use the

10   Element merchant account after Arash left your floor?

11   A.  Arash.

12   Q.  When you continued to communicate with Arash after he left

13   your floor, did you communicate with him directly or did you

14   communicate through a third party?

15   A.  We communicated directly for a time.  And then we

16   communicated through his brother Steve.

17   Q.  What did you communicate about?

18   A.  Chargebacks and documentation pertinent to those

19   chargebacks.

20   Q.  What was your understanding of how Steve was involved in

21   those chargebacks?

22   A.  That he was helping Arash fight those chargebacks with the

23   merchants themselves.

24           MS. FLETCHER:  Ms. Lee, can we please pull up what has

25   been marked for identification as Government Exhibit 411.

1    Q.  Do you recognize Government Exhibit 411 that's in front of

2    you?

3    A.  Yes, ma'am.

4    Q.  What is it?

5    A.  This is an e-mail that was sent from Steve Ketabchi to

6    Arash and Heidi Brownfield.

7    Q.  Are you -- actually, Mr. Sinclair, can you look at the

8    version of 411 that's in your binder?

9           In particular, if you could look at the third page of

10   that document.

11   A.  OK.

12   Q.  What is reflected on the third page of that document?

13   A.  It's an e-mail from Heidi to Arash, Michael Wigdore, Alan

14   Waddle, and myself.

15   Q.  Is anyone listed in the "to" field?

16   A.  I'm sorry.  Steve Ketabchi as well.

17          MS. FLETCHER:  The government offers Government

18   Exhibit 411.

19          MR. SCHMIDT:  How many pages are you offering?  All of

20   it?

21          MS. FLETCHER:  The e-mail and the attachment, which is

22   about 15 pages.

23          MR. SCHMIDT:  No objection.

24          THE COURT:  Admitted.

25          (Government's Exhibit 411 received in evidence)

1          MS. FLETCHER:  Ms. Lee, can we please publish page 3

2     of the e-mail we were just discussing.

3     Q.  Mr. Sinclair, I am going to ask you to just flip through

4     the pages that follow page 3, and if you could explain what is

5     reflected in those pages.

6     A.  This is a lead list -- I'm sorry.  It's not a lead list.

7          This is a request for documentation from the merchant

8     themselves.

9     Q.  Documentation related to what?

10    A.  To customers that were sold.

11    Q.  To particular transactions?

12    A.  Yes, ma'am.

13    Q.  Do you see the data for those transactions in the remainder

14    of this document?

15    A.  Do I see the date or data?

16    Q.  The data.

17    A.  Yes.

18    Q.  Then taking a look again at page 3 of this document, the

19    e-mail from Heidi, who is Heidi Brownfield?

20    A.  Heidi Brownfield is an employee of a merchant company.

21    Q.  And you mentioned that this is an e-mail to Arash and

22    Steve.  What e-mail account did Arash use?

23    A.  Ketabchi.arash@gmail.com.

24    Q.  What e-mail account did Steve use?

25    A.  Positivefaith@gmail.com.

1   Q.  Now take a look at page 2, the follow-up e-mail in this

2   chain.

3           What does Heidi say to you in this document?

4   A.  She says she still has not received any documentation for a

5   woman named Diane Weissenberger.

6   Q.  For what charge?

7   A.  $14,495.

8   Q.  And if you flip all the way to the back of Government

9   Exhibit 411, really the last five pages, what do you see?

10  A.  I see her agreement.

11          MS. FLETCHER:  Ms. Lee, can we please pull up this

12  page.  I'm not sure what page it is of the document, but it's

13  fifth from the end.

14  A.  And her identification card as well.

15          MS. FLETCHER:  If we could just blow up the top

16  paragraph of that page.

17  Q.  Do you see the entity listed here?

18  A.  I do.

19  Q.  What is the entity?

20  A.  A1 Business Consultants LLC.

21  Q.  Do you see the address of that entity?

22  A.  Yes.

23  Q.  What is the address?

24  A.  189 Berdan Ave, Suite 418, in Wayne, New Jersey.

25  Q.  Are you familiar with that address?

1    A.  Yes.

2    Q.  What is at that address?

3    A.  Arash's home address.

4    Q.  What, if anything, does that address tell you about who

5    made this particular sale?

6    A.  Someone working for Arash, or himself.

7    Q.  Would a sale mate on your floor have that address on their

8    contract?

9    A.  No, ma'am.

10   Q.  Now let's go to the first page of 411, please.

11           Who is this e-mail from?

12   A.  From Steve Ketabchi to Heidi at the merchant company, and

13   Arash as well.

14   Q.  Are you copied on this e-mail?

15   A.  On this e-mail, no, I am not.

16   Q.  What is Steve saying in this e-mail?

17   A.  He is giving Heidi Diane Weissenberger's contract, and from

18   my interpretation, it looks like he is asking her to lower

19   their merchant fee from 17 percent to 6 percent.  And is also

20   asking to -- he is asking for a credit that appears to be held

21   by the merchant.  And he is also asking, as a fourth and final

22   item here, that I am never CC'd again.

23   Q.  Let me show you what has been marked for identification as

24   Government Exhibit 407.

25           Do you recognize 407?  And I am going to ask you to

IAP8KET2                      Sinclair - Direct

1    take a look at the second page of 407.

2    A.  Yes, I do.

3    Q.  Do you recognize this communication?

4    A.  Yes, ma'am.

5    Q.  Is this a continuation of the last e-mail chain --

6    A.  Yes.

7    Q.  -- that we looked at?

8    A.  Yes.

9         MS. FLETCHER:  The government offers Government

10   Exhibit 407.

11        MR. SCHMIDT:  I have no objection.

12        MR. PAUL:  No objection.

13        THE COURT:  Admitted.

14        (Government's Exhibit 407 received in evidence)

15        MS. FLETCHER:  Can we please publish and blow up the

16   bottom e-mail -- I'm sorry, the top e-mail on page 2.

17   Q.  Who is this e-mail from, Mr. Sinclair?

18   A.  From Heidi.

19   Q.  Let's go to the next e-mail in the chain chronologically,

20   which is the bottom e-mail on page 1.

21        Who is the sender of this e-mail?

22   A.  Arash.

23   Q.  Who is copied?

24   A.  He sends it to Heidi.  He copies Steve Ketabchi, Michael

25   Wigdore, Alan Waddle, and me.

1    Q.  Let's take a look at the final e-mail, the top e-mail in

2    this chain on page 1.

3              What is Heidi saying here in response to Arash's

4    question?

5    A.  That merchant companies can ask for documentation --

6              MR. SCHMIDT:  Objection, your Honor.  The document

7    speaks for itself and not the interpretation of the witness.

8              MS. FLETCHER:  I am happy to rephrase the question,

9    your Honor.

10             THE COURT:  Go ahead.

11   Q.  Based on your experience dealing with merchant accounts,

12   did merchants sometimes ask for documentation related to the

13   account long after the account had been opened?

14   A.  Yes, ma'am.

15   Q.  What was your understanding of the purpose of that?

16   A.  Generally they would want to keep chargebacks to a minimum.

17   Q.  Can you take a look at the second paragraph in that e-mail

18   from Heidi.

19   A.  So we are still looking at page 1 here?

20   Q.  Page 1.  The paragraph beginning "anyways."

21   A.  Yes.

22   Q.  Can you read what it says in the first -- it's actually one

23   very long sentence, beginning "anyways."

24   A.  "Anyways, considering that the account was ordered closed

25   by MasterCard, and wasn't because we were able to throw Element

IAP8KET2                          Sinclair - Direct

1    under the bus, it probably wasn't the best idea to settle the

2    largest batch you've ever had and one of only three batches

3    since August.  Lots of red flags going off there."

4    Q.  Who is copied on that e-mail?

5    A.  Steve Ketabchi, admin at the merchant themselves, Alan at

6    the merchant company, and myself.  And it was sent to Arash

7    Ketabchi.

8    Q.  Are you familiar with the fact that Element had to be

9    thrown under the bus?

10   A.  I am.

11   Q.  Did there come a point when the Element account was closed?

12   A.  Yes, ma'am.

13   Q.  What, if anything, were you asked to do with respect to the

14   Element account?

15   A.  Pay for it to be dissolved.

16   Q.  When you say "pay for it to be dissolved," what

17   specifically did you need to dissolve?

18   A.  The existence of -- the active existence of Element itself.

19   Q.  By that do you mean the entity or the merchant account?

20   A.  The entity.

21   Q.  Showing you what has been marked for identification as

22   Government Exhibit 413.

23           Do you recognize Government Exhibit 413?

24   A.  Yes.

25   Q.  What is it?

1   A.  An e-mail from Steve Ketabchi to Arash Ketabchi and me.

2           MS. FLETCHER:  The government offers Government

3   Exhibit 413.

4           MR. SCHMIDT:  I have no objection, your Honor.

5           MR. PAUL:  No objection.

6           THE COURT:  Admitted.

7           (Government's Exhibit 413 received in evidence)

8           MS. FLETCHER:  Please publish.

9   Q.  Do you see that e-mail on your screen, Mr. Sinclair?

10  A.  Yes, ma'am.

11  Q.  Do you see the line, "We received a chargeback that was on

12  your timeline"?

13  A.  Yes, ma'am.

14  Q.  Can you explain what that means?

15  A.  That it was before June 29, 2015.

16  Q.  And therefore subject to the agreement that you just

17  discussed?

18  A.  Yes, ma'am.

19  Q.  What is Steve asking you for here?

20  A.  He's asking for money.  It doesn't quite say how much

21  money.  He is also asking for documentation on another sale

22  that was made, it looks like in May, which would have been on

23  my timeline as well.  There's two separate transactions that it

24  looks like he is referring to here.

25  Q.  Again, what is the subject of this e-mail?

IAP8KET2                          Sinclair - Direct

1    A.   Chargeback deposit.

2    Q.   Showing you what has been marked for identification as

3    Government Exhibit 427.

4            Do you recognize Government Exhibit 427?

5    A.   Yes.

6    Q.   What is it?

7    A.   This is a chargeback rebuttal response for a customer named

8    Joe Freeland.

9    Q.   Is it an e-mail?

10   A.   It is, yes.

11   Q.   Is there an attachment to that e-mail?

12   A.   Yes.

13   Q.   What is the attachment?

14   A.   It's the chargeback rebuttal response for said customer Joe

15   Freeland.

16           MS. FLETCHER:  The government offers Government

17   Exhibit 427.

18           MR. SCHMIDT:  No objection.

19           MR. PAUL:  No objection.

20           THE COURT:  Admitted.

21           (Government's Exhibit 427 received in evidence)

22           MS. FLETCHER:  Ms. Lee, can you please blow up the

23   bottom portion of that e-mail, the first page of the e-mail.

24   Q.   Who is the sender of this e-mail?

25   A.   Steve Ketabchi.

1    Q.  Is that a different e-mail address?

2    A.  Yes, ma'am.

3    Q.  What is the e-mail address he is using now?

4    A.  Steve@a1businessconsultants.com.

5    Q.  Who is this e-mail sent to?

6    A.  To me and Jolaina.

7    Q.  Which e-mail account is yours and which is Jolaina's?

8    A.  My is olivebranchmarketingllc@gmail.com.  Jolaina's is

9    olivebranchmarketing1@gmail.com.

10   Q.  Can you read the first line of Steve Ketabchi's e-mail to

11   you?

12   A.  "How would you rate this chargeback for its potential for a

13   reversal?"

14   Q.  Is CB an abbreviation for chargeback?

15   A.  Yes, ma'am.

16   Q.  Take a look at the third page of the document.

17          MS. FLETCHER:  Ms. Lee, if we could pull that up.

18   Q.  Do you recognize this type of document?

19   A.  Yes, ma'am.

20   Q.  What is this document?

21   A.  This is something that you receive in the mail, or via

22   e-mail, when you receive a chargeback.

23   Q.  When you received forms like this at Olive Branch, did they

24   have the contact person filled in or the phone number of the

25   contact person filled in?

1  A.  That was, I believe, generally established at the time of

2  the account opening.  I don't remember filling my information

3  out ever on a chargeback debit advice form.

4  Q.  Did you typically handle these at Olive Branch Marketing?

5  A.  Chargebacks?

6  Q.  Yes.

7  A.  No.

8  Q.  Do you see the attachments that follow this, the next page

9  in particular?

10  A.  The back of this one?

11  Q.  Yes.

12  A.  I do.

13  Q.  Do you remember responding to Steve's question asking you

14  for feedback?

15  A.  Specifically, no.

16  Q.  How often did you receive communications like this from

17  Steve?

18  A.  During the end of 2015, frequently, more than I wanted.

19  Q.  How frequently?

20  A.  A few times a week, I would say.

21  Q.  Did you communicate with him only by e-mail or did he call

22  you as well?

23  A.  He called as well.

24         MS. FLETCHER:  Let's pull up what has been marked for

25  identification as Government Exhibit 439.

1   Q.  Do you recognize Government Exhibit 439?

2   A.  Yes.

3   Q.  What is it?

4   A.  This is an e-mail correspondence between Steve Ketabchi,

5   Arash Ketabchi -- on the bottom it's just between me and Steve.

6   Q.  And at the top?

7   A.  Arash is included as well with Steve.

8               MS. FLETCHER:  The government offers 439.

9               MR. SCHMIDT:  I have no objection.

10              MR. PAUL:  No objection.

11              THE COURT:  Admitted.

12              (Government's Exhibit 439 received in evidence)

13              MS. FLETCHER:  Can we blow up the bottom half of that

14  e-mail, the e-mail from Bill to Steve.

15  Q.  I am not going to ask you to read the e-mail, Mr. Sinclair,

16  but in general, what is the status of your relationship with

17  Arash at this time?

18  A.  Poor.  Trending downwards.

19  Q.  For what reason?

20  A.  A breach of our previous agreement that we had discussed.

21  Q.  By whom?

22  A.  Arash.

23  Q.  How did he breach the agreement?

24  A.  He didn't pay me for what we agreed upon.

25  Q.  What, if anything, are you telling Steve in this e-mail

1   about how you are going to behave going forward with respect to

2   that agreement?

3   A.  That I am no longer going to pay.

4   Q.  Let's take a look at what has been marked for

5   identification as Government Exhibit 443 and -- let's start

6   with 443.

7         Mr. Sinclair, can you take a look at 443 and 444 in

8   your binder?

9   A.  Yes.

10  Q.  Do you recognize 443 and 444?

11  A.  443 I recognize.

12        444 I recognize as well.

13  Q.  What are 443 and 444?

14  A.  A list of the chargebacks that I was owed from Arash, and

15  correspondence with Steve Ketabchi explaining that.

16  Q.  Who prepared the list of chargebacks?

17  A.  I did.

18  Q.  To whom did you send it?

19  A.  Steve Ketabchi.

20        MS. FLETCHER:  The government offers Government

21  Exhibit 443 and 444.

22        MR. SCHMIDT:  No objection, your Honor.

23        MR. PAUL:  No objection.

24        THE COURT:  Admitted.

25        (Government's Exhibits 443 and 444 received in

IAP8KET2                           Sinclair - Direct

1    evidence)

2    Q.  If we could start with 444, please, and take a look at the

3    fourth page.

4            Directing your attention, Mr. Sinclair, to the bottom

5    of the fourth page, who is the sender of that e-mail?

6    A.  Steve Ketabchi.

7    Q.  The e-mail begins "my brother said"?

8    A.  Yes.

9    Q.  What do you understand Steve to be doing here?

10   A.  Basically just talking to Arash through Steve, so he is

11   paraphrasing what Arash is telling him.

12   Q.  What, in general, is the substance of this e-mail?

13   A.  He is telling me that he never used any of those accounts,

14   that Jason Sager was winning the disputes, that sales reps were

15   given retention checks.

16   Q.  What, if anything, does he say about which account Andrew

17   Owimrin used?

18   A.  Arash's.

19   Q.  If we could go to the top of the page.

20           You see your response, Mr. Sinclair?

21   A.  I do.

22   Q.  What is the message you are conveying to Steve here?

23   A.  I am letting him know that I am tired of being questioned

24   and that what Arash is telling Steve, and then Steve is telling

25   me, is just not factual.

IAP8KET2                          Sinclair - Direct

1   Q.  OK.

2   A.  And that nobody got a retention check.

3   Q.  After Arash stopped working on your floor, what, if

4   anything, happened to your flow of leads for biz-op sales?

5   A.  It was eliminated.

6   Q.  Do you have an understanding as to why it was eliminated?

7   A.  Yes.

8   Q.  What is that understanding?

9   A.  That Arash was now getting all those leads.

10  Q.  From whom was he getting those leads?

11  A.  I'd say Ryan Hult.

12  Q.  In the latter half of 2015, did you continue to sell

13  biz-op?

14  A.  We had to stop because we didn't have those leads anymore.

15  Q.  What, if anything, did you start to sell instead?

16  A.  Debt services.

17  Q.  What do you mean when you say you started to sell debt

18  services?

19  A.  Debt elimination services.

20  Q.  Did you have leads for potential debt services sales?

21  A.  I did.

22  Q.  How did you come to have those leads?

23  A.  Because these were people we already had sold biz-op to.

24  Q.  Let's take a look at what has been marked for

25  identification as Government Exhibit 457.

1          Do you recognize 457, sir?

2    A.  Yes.

3    Q.  How do you recognize it?

4    A.  This is an e-mail between myself and one of Jason Sager's

5    employees, Samantha Kelly.

6    Q.  How, if at all, did Jason Sager have to do with your debt

7    sales?

8    A.  He came up with the entire program; it was him fulfilling

9    it and his staff.

10   Q.  Can you describe briefly what the product was that you were

11   selling to customers when you sold them debt?

12   A.  So the product was a process that was designed to help

13   customers who had credit card debt reduce that debt.

14          THE COURT:  Was some of it the same debt that had been

15   incurred by their purchasing biz-op services from you?

16          THE WITNESS:  Yes, sir, your Honor.

17   Q.  When your sales floor was calling prospective customers to

18   sell them debt, what leads were you using?

19          THE COURT:  You weren't selling them debt, were you?

20          THE WITNESS:  We were selling them a program that was

21   designed to help them get out of debt.

22          THE COURT:  Debt elimination.

23          THE WITNESS:  Yes.

24          MS. FLETCHER:  Thank you, your Honor.

25   Q.  You were selling them debt elimination services?

IAP8KET2                        Sinclair - Direct

1   A.  Yes.

2   Q.  Apart from the leads that you already had from your biz-op

3   sales, did you purchase other leads?

4   A.  Yes.

5   Q.  From whom did you purchase those leads?

6   A.  Various people.

7   Q.  Do you see Government Exhibit 457 on your screen?

8   A.  Yes.

9          MS. FLETCHER:  The government offers Government

10  Exhibit 457.

11         MR. SCHMIDT:  I have no objection.

12         MR. PAUL:  No objection.

13         THE COURT:  Admitted.

14         (Government's Exhibit 457 received in evidence)

15         MS. FLETCHER:  Can we blow up the top portion of that

16  e-mail.

17  Q.  What is the date on this e-mail chain, Mr. Sinclair?

18  A.  May 26, 2016.

19  Q.  What is the subject?

20  A.  Diane Weissenberger.

21  Q.  What is your understanding of what this e-mail chain is

22  about?

23  A.  This is --

24  Q.  If it's helpful, we can blow up the bottom portion of that

25  e-mail.

1    A.  This is a check-in to see if Diane was called.

2    Q.  During May of 2016, for what purpose would you be checking

3    in to see if someone had called Diane?

4    A.  To see if the welcome call was completed for the debt

5    elimination program that she was signed up for.

6    Q.  What was the name of the debt elimination program?

7    A.  Consumer Shield.

8    Q.  In the spring of 2016, did there come a time when you

9    sought to purchase leads from Andrew?

10   A.  Yes, ma'am.

11   Q.  Did Andrew sell you leads?

12   A.  Yes, ma'am.

13   Q.  Let's take a look at -- I am going to ask you to flip

14   through a handful of e-mails in your binder to speed this up.

15   Government Exhibits 484, 485, 486 and 487.

16         Do you recognize the e-mails that are contained in 484

17   through 487?

18   A.  Yes, ma'am.

19   Q.  What are those e-mail communications?

20   A.  These are lead lists that Andrew sent to me.

21   Q.  For what purpose did -- withdrawn.

22         Did you and Andrew discuss what you were selling at

23   that time?

24   A.  Yes.

25         THE COURT:  Andrew was Andrew Owimrin, is that

1    correct?

2            THE WITNESS:  Yes, sir.

3    Q.  Did you tell him that you were selling debt consolidation

4    services?

5    A.  Yes, ma'am.

6    Q.  What, if anything, did you pay Andrew for these leads?

7    A.  I believe a percentage of whatever was sold.  The same

8    formula, just different numbers, different amounts, because it

9    was a different business model.

10           MS. FLETCHER:  The government offers Government

11   Exhibit 484 through 487.

12           MR. SCHMIDT:  I have no objection.

13           MR. PAUL:  No objection.

14           THE COURT:  Admitted.

15           (Government's Exhibits 484, 485, 486 and 487 received

16   in evidence)

17   Q.  Let's take a look at 487.

18           MS. FLETCHER:  If we can blow up the top portion of

19   that.

20   Q.  Do you recognize this e-mail here at 487?

21   A.  Yes, ma'am.

22   Q.  What is the subject of the e-mail?

23   A.  Grants.

24   Q.  What is attached to the e-mail?

25   A.  A list of victims who purchased grants.

1   Q.  Are these the grant leads that we discussed yesterday?

2   A.  Yes.

3   Q.  Who is the sender of this list of leads?

4   A.  Andrew Owimrin.

5   Q.  Who were they sent to?

6   A.  Me.

7   Q.  That's your personal e-mail account?

8   A.  Yes, ma'am.

9   Q.  When Andrew was working on your floor, so prior to this

10  e-mail communication, what was your understanding of the

11  legitimacy of the grant pitch, in other words, the pitch that

12  was provided to these leads?

13  A.  It was a blatant lie.

14  Q.  Did you hide that understanding from Mr. Owimrin?

15  A.  No, ma'am.

16  Q.  Conversely, did you tell him that the grant scheme was a

17  blatant lie?

18  A.  I don't recall a time when I said that as a matter of fact.

19  Q.  Why not?

20  A.  Because it was understood, everyone knew.

21          MR. SCHMIDT:  Objection, your Honor.

22          THE COURT:  I will allow it.

23  Q.  You talked about two other lead types yesterday.  The

24  merchant processing leads.  What was your understanding as to

25  the legitimacy of the underlying merchant processing business

IAP8KET2                          Sinclair - Direct

 1   that your leads had purchased?

 2   A.   None.

 3   Q.   When you say "none," what do you mean?

 4   A.   There was none to it.

 5   Q.   There was no what?

 6   A.   Legitimacy to it.

 7   Q.   Again, did you hide that understanding from your

 8   salespeople, including Mr. Owimrin?

 9   A.   No, ma'am.

10   Q.   Conversely, did you tell Mr. Owimrin that these leads were

11   related to illegitimate businesses?

12   A.   No.

13   Q.   Why not?

14   A.   Again, same thing, it was understood, everyone knew.

15            MR. SCHMIDT:  Objection, your Honor.

16            THE COURT:  Same ruling.

17   Q.   The third type of lead, Web site affiliate marketing leads.

18   What was your understanding of the underlying legitimacy of

19   that business that these leads had purchased into?

20   A.   No legitimacy.

21   Q.   Did you hide that from your salespeople, including Mr.

22   Owimrin?

23   A.   No, ma'am.

24   Q.   Conversely, did you tell Mr. Owimrin that these leads were

25   operating illegitimate businesses?

IAP8KET2                          Sinclair - Direct

1    A.  No, ma'am.

2    Q.  Why not?

3    A.  Same.  It was understood, everyone knew.

4              MR. SCHMIDT:  Again, objection.

5              THE COURT:  Same ruling.

6    Q.  Did there come a time when Mr. Owimrin came back to work

7    for you?

8    A.  Yes, ma'am.

9    Q.  Approximately when was that?

10   A.  It would have been shortly after he sent these lead lists

11   to us, so spring of '16.

12   Q.  Let's take a look at Government Exhibits 260 and 261.  If

13   you could take a look in your binder.

14   A.  AUSA, how far through the binder roughly would that be?

15   Q.  Almost towards the back.

16   A.  OK.

17             THE COURT:  Ms. Fletcher, since we are going to be

18   taking lunch today around 12:30, this may be a time to give the

19   jury its mid-morning break.  I don't want to interrupt anything

20   you're in the midst of.

21             MS. FLETCHER:  This is a fine time to stop, your

22   Honor.

23             THE COURT:  Ladies and gentlemen, 15 minutes.  Refresh

24   yourselves.

25             (Jury exits courtroom)

1              THE COURT:  You may step down, sir.

2              15 minutes.

3              (Recess)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury not present)

2              THE COURT:  Bring the jury in.

3              (Jury present)

4              THE COURT:  Please be seated in the courtroom.  You

5    may continue and conclude.

6              MS. FLETCHER:  Your Honor, just before the break, I

7    had offered Government Exhibits 260 and 261.

8              THE COURT:  Counsel?

9              MR. PAUL:  I have no objection.

10             THE COURT:  Mr. Schmidt?

11             MR. SCHMIDT:  No objection.

12             THE COURT:  Admitted.

13             (Government's Exhibits 260 and 261 received in

14   evidence)

15             MS. FLETCHER:  Can we pull up 260, please, Ms. Lee.

16   If we can blow up just the first paragraph and the heading,

17   please.

18   BY MS. FLETCHER:

19   Q.  Mr. Sinclair, do you see that?

20   A.  Yes, ma'am.

21   Q.  What are you looking at?

22   A.  The point center script for the debt elimination profile.

23   Q.  Who would read this script?

24   A.  The sales reps or the appointment centers.

25   Q.  At the time when you first started selling this debt

1   elimination service, did you have separate appointment centers

2   and salespeople?

3   A.  Yes, ma'am.

4   Q.  Was this a script that the appointment center would read or

5   the salesperson would read?

6   A.  Both people because it was set up differently.

7   Q.  Do you see, looking at this exhibit, the beginning portion

8   with the bracket with the client's name?

9   A.  Yes.

10  Q.  The rep's name?

11  A.  Yes.

12  Q.  How would that opening go?

13  A.  You want me to just --

14  Q.  Yes.

15  A.  -- to do like I was on a call?

16  Q.  Yes.  Did you do these calls yourself for some period of

17  time?

18  A.  For the first week, to test the viability of it.

19          Hello.  Mrs. Smith, my name is Bill, and I am calling

20  from Consumer Shield and the Consumer Protection Department.

21  Q.  Please continue.

22  A.  The reason for the call today is my company works

23  specifically with individuals who may have been solicited to

24  invest into one or more of those work from home programs such

25  as a website selling products, merchant services which are

1    credit card swiping machines or government grants.  Our records

2    indicate you may have done this in the past.  Is that correct?

3          And in most cases, the consumer ends up in substantial

4    credit card debt because of this, but this happened to you as

5    well?  I am very sorry to hear that, but the good news is our

6    company now has a program that offers CPA advisory services in

7    efforts to strategically default on your debt to make it

8    uncollectible by creditors and the bank.  All we need to do is

9    set up a call to an analyst to properly assess your situation

10   and determine if you qualify for the program.

11   Q.  Who were some of the analysts who worked for you selling

12   this debt elimination service?

13   A.  Aside from myself and Michael Finocchiaro, the sales reps

14   were Derrick Larkin, Brian Pascalini, Elvin Corlion, Corey

15   Thomas, his wife for a time, Philip Howard.  Andrew Owimrin had

16   come back.  I believe Luis Jiminez for a time and Steve

17   Aladenoye.

18   Q.  How long did Mr. Owimrin work for you selling the debt

19   elimination services?

20   A.  In-between a month and two months.

21   Q.  Why did he leave?

22   A.  He wasn't productive with it.

23   Q.  I am showing you what has been marked for identification as

24   Government Exhibit 256.  Approximately how much did you charge

25   customers for this debt elimination service?

1    A.  So it was a percentage, but it was capped.

2    Q.  Capped at what?

3    A.  At $10,000.00.

4            THE COURT:  The what?

5            THE WITNESS:  Their debt, overall debt.

6    BY MS. FLETCHER:

7    Q.  Do you recognize Government Exhibit 256?

8    A.  Yes, ma'am.

9    Q.  How do you recognize it?

10   A.  This was a list that we had created to make sure that these

11   companies were not charged back on.

12           MS. FLETCHER:  The government offers Government

13   Exhibit 256.

14           MR. PAUL:  No objection.

15           MR. SCHMIDT:  No objection.

16           THE COURT:  Admitted.

17           (Government's Exhibit 256 received in evidence)

18           MS. FLETCHER:  Please publish.

19   BY MS. FLETCHER:

20   Q.  Mr. Sinclair, when you say to ensure that these companies

21   were not charged back on, what, if anything, were your

22   salespeople instructed to do with respect to charge-backs for

23   the debt elimination service?

24   A.  If needed, a lot of these customers were maxed out because

25   they had spent so much money, so there were situations where

1   them initiating charge-backs with some other companies that are

2   not listed here was permitted.

3   Q.  Was it encouraged?

4   A.  Yes.

5   Q.  Why was it encouraged?

6   A.  So we can make money.

7   Q.  So they could pay for the debt elimination service?

8        MR. SCHMIDT:  Objection, your Honor.

9        THE COURT:  Sustained as to form.

10  BY MS. FLETCHER:

11  Q.  Why was it encouraged?

12  A.  So they could pay for the debt elimination service.

13  Q.  Were there rules in place with respect to which companies

14  could and could not be charged back on?

15  A.  Yes, ma'am.

16  Q.  Is that what we're looking at here?

17  A.  We are.

18  Q.  What are the entities that are listed on this sheet,

19  generally speaking, without reading each one.

20  A.  These are companies we had gotten leads from or entities

21  that we operated as, which is essentially us.

22  Q.  Why didn't you want customers to charge back on those

23  entities?

24  A.  Because we wouldn't charge back on our own sales because

25  that would cost us thousands of dollars, and we didn't want

1    people who were giving us leads, we didn't want anyone to

2    charge back there because we wouldn't get their leads any more.

3    Q.  I want to focus your attention on conversations you had

4    with Andrew Owimrin after he came back to work for you during

5    the debt elimination service.

6         Did there ever come a time when you and Mr. Owimrin

7    discussed any customers that he had sold while he was away

8    working for Arash?

9    A.  Yes.

10   Q.  What did Andrew Owimrin say to you about those customers?

11   A.  One specifically that they sold for $150,000, who

12   apparently they had promised a percentage of a revenue sharing

13   with, like a profit sharing, rather, with A1 Business

14   Consultants.  As a part of that, $150,000.

15   Q.  You say they promised.

16        Who did Andrew tell you had promised this woman this

17   profit sharing?

18   A.  Andrew and Arash.

19   Q.  What, if any, questions did you ask Mr. Owimrin about that

20   arrangement?

21   A.  Say you're going to get in trouble.  First I asked him are

22   you giving her that profit sharing?  The answer was no.

23   Q.  What, if anything else, did he say?

24   A.  Then I asked aren't you nervous?  Aren't you going to get

25   in trouble, and his response was no, with like a giggle/laugh

1   and said that she loves him, she loves me.

2   Q.   During that conversation, did you and Mr. Owimrin discuss

3   how much, if anything, he was paid from that $150,000 sale?

4   A.   He said a percentage of it.

5   Q.   What percentage did he say?

6   A.   I can't say with absolute certainty.

7   Q.   Did he express to you any satisfaction or dissatisfaction

8   with the percentage that he received?

9   A.   Dissatisfaction.

10  Q.   What did he say?

11  A.   He had hoped for a 50-50 split with Arash.

12  Q.   Did you understand him to say he got less than that?

13  A.   Yes, ma'am.

14  Q.   What, if anything, did Mr. Owimrin propose to you that you

15  do with respect to this customer?

16  A.   Sell the debt.

17  Q.   What did you say in response to that suggestion?

18  A.   I wanted no part of it.

19  Q.   Why did you want no part of it?

20  A.   There was just red flags all over this $150,000 sale.  I

21  just didn't want to be attached to it in any way.

22  Q.   What were the red flags?

23  A.   That she was promised things that absolutely were not going

24  to be delivered on.  There is a line in the sand, and I think

25  that with varying degrees based on who you talk to in this

IAPJKET3                    Sinclair - direct

1   industry, I was on the other side of that line.

2   Q.  What do you mean by that?

3   A.  There were certain levels of fraud in this industry, and

4   that, to me, was just too much.  I did not want to be involved

5   with that woman on any level.

6   Q.  Why?

7   A.  Legal repercussions, attorneys, you name it.

8   Q.  What, if any, concerns did you have about getting caught?

9   A.  How it pertains to that particular woman?

10  Q.  Yes.

11  A.  I felt like at some point they were going to get in trouble

12  for that, and by "they," I mean Andrew and Arash.

13  Q.  Did you ever communicate with that particular woman?

14  A.  No.

15  Q.  Mr. Sinclair, I want to ask you now some questions about

16  your testimony early yesterday about your cooperation with the

17  government.

18  A.  Yes, ma'am.

19  Q.  Did there come a time after your March 2017 arrest when you

20  began meeting with the government?

21  A.  Yes, ma'am.

22  Q.  Approximately how long after your arrest was that?

23  A.  Within weeks.

24  Q.  Can you remind the jury when you were arrested?

25  A.  March 21st, 2017.

IAPJKET3                         Sinclair - direct

1    Q.   Do you recall how many meetings you had with the government

2    since you began meeting with them?

3    A.   Dozens.

4    Q.   Who was present for the meetings that you had with the

5    government in the beginning?

6    A.   My attorney, Lisa Scolari, yourself, AUSA Fletcher,

7    Detective Bastos, special Agent Figarello.  In the beginning, I

8    think that was generally the people there.

9    Q.   Focusing on the beginning -- actually, focusing on your

10   meetings with the government over time, what in general

11   happened during those meetings?

12            MR. SCHMIDT:  Objection, your Honor.

13            THE COURT:  Rephrase it.

14   BY MS. FLETCHER:

15   Q.   During the meetings you had with the government, what did

16   you do during those meetings?

17            THE COURT:  What was the purpose of those meetings,

18   from your standpoint?

19            THE WITNESS:  I was asked a lot of questions mainly

20   about myself and my business, your Honor.

21   BY MS. FLETCHER:

22   Q.   Did you answer those questions?

23   A.   Yes, ma'am.

24   Q.   Were you asked any other types of questions?

25   A.   I was asked about other people, other business dealings.

1           Are we focusing on the beginning or just overall?

2    Q.  Overall?

3    A.  I was asked if I committed any other crimes during my

4    lifetime.

5           MR. SCHMIDT:  Objection, your Honor; hearsay.

6           THE COURT:  I'll allow that.  Go ahead.

7    BY MS. FLETCHER:

8    Q.  You may continue, Mr. Sinclair.

9    A.  I was asked if I had committed any other crimes.  A lot of

10   it was about me, most of it.

11   Q.  Did you answer those questions to the best of your ability?

12   A.  Yes, ma'am.

13   Q.  Did anyone make you -- focusing specifically on the

14   crimes -- did anyone make you any promises that you would not

15   be charged for crimes that you told the government about?

16   A.  No, ma'am.

17          MR. SCHMIDT:  Objection, your Honor.

18          THE COURT:  Yes, that is quite leading.  Sustained.

19   BY MS. FLETCHER:

20   Q.  What, if any, promises were made to you with respect to

21   whether you would be charged for the crimes that you told the

22   government about?

23   A.  No promises were made.

24   Q.  Apart from your participation in this telemarketing scheme

25   that you testified about, what other crimes did you tell the

IAPJKET3                          Sinclair – direct

1    government about?

2              MR. SCHMIDT:  Objection.

3              MR. PAUL:  Objection.

4              MR. SCHMIDT:  May we approach?

5              THE COURT:  Yes, quickly.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             (At sidebar)

2             MR. SCHMIDT:  She is asking questions about what

3    statements he made back then in these meetings as opposed to

4    just asking him whether or not he committed these crimes.  She

5    is going through statements --

6             THE COURT:  You are going to be doing the same thing,

7    aren't you?

8             MR. SCHMIDT:  Judge, I deal with, you know,

9    cooperation differently than maybe some other people, but

10   having her bring out when and what he told her back then is not

11   proper.  That is all hearsay.  He can testify now.

12            If I cross-examine him in a way that allows them to

13   bring out prior consistent statements, then I opened the door.

14   I don't plan to do that.  What they're doing is basically

15   bringing out prior inconsistent statements.

16            THE COURT:  They're trying to draw the sting from your

17   cross-examination --

18            MR. SCHMIDT:  No.

19            THE COURT:  -- one of us at a time.

20            MR. SCHMIDT:  But to do that, they ask him what crimes

21   you've committed, not did you tell us about it.  That is

22   different.

23            THE COURT:  I will allow them to ask what crimes that

24   you committed and told the government about, that is all right.

25   I have no problem with that.

IAPJKET3                         Sinclair – direct

1           MR. SCHMIDT:  I think what crimes he has committed,

2    right, and if I go into did you tell the government about it,

3    she can go into it, basically what crimes he committed, not

4    what he told the government in the past meetings, which is the

5    definition of hearsay.

6           MS. FLETCHER:  I am happy to ask him what crimes he

7    committed.

8           THE COURT:  Let's move forward.

9           (Continued on next page)

1              (In open court)

2    BY MS. FLETCHER:

3    Q.  Mr. Sinclair, what other crimes have you committed in your

4    life?

5    A.  Various drug use since high school.  I sold marijuana in

6    college.  I have driven while intoxicated.  I have paid for

7    escorts.  My involvement with --

8              THE COURT:  Is that prostitutes?

9              THE WITNESS:  Yes, sir.

10             THE COURT:  Go ahead.

11             THE WITNESS:  My involvement with this industry.  I

12   believe that's it.

13   BY MS. FLETCHER:

14   Q.  How about personal drug use?

15   A.  Do you want me to list them out?

16   Q.  What drugs did you use?

17   A.  I smoked marijuana, LSD, mushrooms, cocaine, special K,

18   ecstasy, and Oxycontin.

19   Q.  Did you have a problem with any one of those drugs during

20   the time that you were operating Olive Branch Marketing?

21             MR. PAUL:  Objection to the form.

22             THE COURT:  Sustained as to form.

23   BY MS. FLETCHER:

24   Q.  What, if any, of the drugs you took were you addicted to?

25   A.  Oxycontin.

1   Q.  Approximately how many Oxycontin pills did you take at the

2   height of your addiction?

3   A.  Roughly 40 a day.

4           THE COURT:  40 Oxycontin pills of what strength?

5           THE WITNESS:  30 milligrams, your Honor.

6           THE COURT:  40 Oxycontin of 30 milligrams each?

7           THE WITNESS:  Yes, your Honor.

8   BY MS. FLETCHER:

9   Q.  What is the approximate cost of 40 30 milligram Oxycontin

10  pills a day?

11  A.  Each one at $25.00, at a thousand a day.

12  Q.  A thousand dollars a day?

13  A.  Yes, ma'am.

14  Q.  Have you used drugs since your arrest in March of 2017?

15  A.  No, ma'am.

16  Q.  Have you taken any other substances related to your

17  addiction?

18  A.  Suboxone.

19  Q.  What is suboxone?

20  A.  It is a drug that is prescribed to help you come off of

21  opiate addiction, to prevent withdrawal symptoms.

22  Q.  Did you use Oxycontin in your office at Olive Branch

23  Marketing?

24  A.  Yes, ma'am.

25  Q.  Did you discuss your oxy use with other members of the

1  sales floor?

2  A.  Just Michael Finocchiaro.

3  Q.  Why did you not discuss it with the salespeople who worked

4  for you?

5  A.  Am sorry.  Correction.  I also discussed it with Arash

6  Ketabchi.  I was embarrassed.  I am still.  I did not want

7  people to know that.

8  Q.  Did you ever sell oxycodone to people who worked for you?

9  A.  No, ma'am.

10 Q.  Did you ever share your pills with people who worked for

11 you?

12 A.  With Michael Finocchiaro.

13 Q.  Did he reciprocate?

14 A.  Yes, ma'am.

15 Q.  In connection with cooperating with the government, did you

16 enter a guilty plea and admit to committing federal crimes?

17 A.  Yes, ma'am.

18 Q.  Which crimes did you admit to committing?

19 A.  Conspiracy to commit money laundering, conspiracy to commit

20 wire fraud and wire fraud.

21 Q.  Have you been sentenced yet?

22 A.  No, ma'am.

23 Q.  The other crimes that you've committed that you discussed,

24 did the government ask you to plead guilty to those crimes?

25         MR. SCHMIDT:  Objection.

IAPJKET3                       Sinclair - direct

```
 1            THE COURT:  Just a moment.  Sustained.
 2   BY MS. FLETCHER:
 3   Q.  The other crimes that you discussed, prostitution, drug
 4   use, what is your understanding of whether the judge who
 5   sentences you will know about those crimes?
 6            MR. SCHMIDT:  Objection.
 7            THE COURT:  I'll allow that if he has an
 8   understanding.
 9            THE WITNESS:  Yes, your Honor will know about that.
10   BY MS. FLETCHER:
11   Q.  Do you know whether or not the Judge can take those crimes
12   into account when he sentences you?
13            MR. SCHMIDT:  Objection.
14            THE COURT:  I will allow that.  It is his
15   understanding.
16   A.  It is my understanding that he can and will.
17   BY MS. FLETCHER:
18   Q.  What is your understanding of the maximum sentence that you
19   face?
20   A.  60 years.
21   Q.  By "60 years," what do you mean?
22   A.  60 years in federal prison.
23   Q.  What is the lowest sentence that you could get?
24   A.  Whatever the judge decides.
25   Q.  Including no jail time?
```

1   A.  Yes, ma'am.

2   Q.  Is that the sentence you hope to get?

3   A.  Absolutely.

4   Q.  When you pled guilty, did you sign an agreement to

5   cooperate with the government?

6   A.  Yes, ma'am.

7   Q.  What is your understanding of what your responsibilities

8   are pursuant to that cooperation agreement?

9   A.  Above all else, be truthful, be honest at all times.  I am

10  basically at your disposal when you need to talk to me, when

11  you need me to come in and meet, I need to comply and just be

12  truthful.

13  Q.  What, if any, obligations do you have with respect to

14  committing additional crimes?

15  A.  I cannot.

16  Q.  What, if any, obligations do you have with respect to

17  testifying in a trial if the government asks you to?

18  A.  I need to.

19  Q.  What is your understanding of when your cooperation is

20  complete?

21  A.  Upon my sentencing.

22  Q.  Who decides when your sentencing takes place?

23  A.  The Southern District of New York.

24  Q.  What do you mean by that?

25  A.  You.

IAPJKET3                          Sinclair - direct

Q.  Is your testimony here part of your cooperation?

A.  Yes, ma'am.

Q.  Could you be asked to testify in additional cases?

A.  Yes, ma'am.

Q.  If you meet your responsibilities under the cooperation

agreement, what is your understanding of what the government

will do for you?

A.  Provide Judge Stein with the 5K letter on my behalf.

Q.  What is your understanding of what will be in the 5K

letter?

A.  Everything that I've done that is considered bad and

everything that I've given you that you deem helpful.

Q.  When you say everything you've done that is considered bad,

what do you mean by that?

A.  Previous crimes we had just discussed.

          THE COURT:  You referred to something as a 5K letter.

          Do you know what that means?  What is your

understanding of what 5K comes from or means?

          THE WITNESS:  It is a legal -- I don't know how to

explain it, but there is a 5K1.1, I believe, maybe I'm wrong, I

guess it is an article of something.

BY MS. FLETCHER:

Q.  Who is that letter sent to?

A.  Your Honor, Judge Stein.

Q.  What is your understanding of what that letter allows the

IAPJKET3                        Sinclair - direct

1   Judge to do?

2   A.  Get a full picture of me.

3   Q.  For what purpose?

4   A.  To make --

5           MR. SCHMIDT:  Objection, your Honor.

6           THE COURT:  I will allow that, whatever his

7   understanding is.

8   Q.  -- to make a fair decision on what my punishment will be.

9   BY MS. FLETCHER:

10  Q.  What do you hope the Judge does when he sees your 5K

11  letter?

12  A.  I am hoping for no prison time, first and foremost.

13  Q.  Has the government promised you you won't go to prison?

14  A.  No, ma'am.

15  Q.  Has anyone promised you that your sentence will be reduced

16  in any way?

17  A.  No, ma'am.

18  Q.  What is your understanding of who decides what your

19  sentence will be?

20  A.  Strictly Judge Stein.

21  Q.  Do you have an understanding as to whether the government

22  will make a particular sentencing recommendation to Judge Stein

23  on your behalf?

24  A.  No.  I know that you cannot.

25  Q.  Let me ask the question again.

1          Do you have an understanding as to whether the

2     government will make a particular sentencing recommendation on

3     your behalf?

4     A.   Yes.

5     Q.   What is that understanding?

6     A.   That you cannot.

7     Q.   If the government writes the 5K letter for you, and the

8     defendants on trial are acquitted, what do you expect to

9     happen?

10          MR. SCHMIDT:   Objection, your Honor.   Now we are going

11     into speculation.

12          MS. FLETCHER:   I will ask a different question your

13     Honor.   It was confusing anyway.

14          THE COURT:   Yes.

15     BY MS. FLETCHER:

16     Q.   If you get a 5K letter, even if you get the 5K letter, what

17     is your understanding of the maximum sentence the Judge can

18     impose on you?

19     A.   60 years in prison.

20     Q.   If you lie during your testimony in this trial or in any of

21     the meetings with the government, and these defendants are

22     convicted, will you get a 5K letter?

23     A.   No, ma'am.

24     Q.   If you tell the truth at this trial, and these defendants

25     are acquitted, will you get a 5K letter?

IAPJKET3                        Sinclair - direct

1    A.  You said I tell the truth?

2    Q.  Yes.

3    A.  Yes, ma'am.

4    Q.  As you understand it, does the outcome of this trial have

5    any effect on whether you get a 5K letter?

6    A.  No, ma'am.

7            MS. FLETCHER:  May I have a moment, your Honor?

8            THE COURT:  Yes.

9            (Off-the-record discussion)

10           MS. FLETCHER:  Your Honor, in an effort to cut time,

11   not show the witness these documents, the government offers

12   Government Exhibits 483, 257, 153 and 488 through 501.  The

13   government has discussed these documents with the defense.

14           THE COURT:  Is there any objection, gentlemen?

15           MR. SCHMIDT:  No, your Honor.

16           MR. PAUL:  No.

17           MR. SCHMIDT:  May I take a quick glance at them.

18           THE COURT:  The government said they were discussed

19   during the break.

20           (Off-the-record discussion)

21           MR. SCHMIDT:  No objection, your Honor.

22           THE COURT:  Admitted without objection.

23           (Government's Exhibits 483, 257, 153 and 488 through

24   501 received in evidence)

25           THE COURT:  Proceed.

IAPJKET3                          Sinclair - direct

1   BY MS. FLETCHER:

2   Q.  Mr. Sinclair, we have spent quite a bit of time today and

3   yesterday talking about Andrew Owimrin.  Do you see Andrew

4   Owimrin in the courtroom today?

5   A.  Yes, ma'am.

6   Q.  Would you describe him by an article of clothing he is

7   wearing.

8   A.  A light blue sweater.

9          MS. FLETCHER:  May the record reflect the witness has

10   identified Andrew Owimrin.

11          THE COURT:  He has and it does.

12   BY MS. FLETCHER:

13   Q.  Mr. Sinclair, do you see Mr. Steve Ketabchi in the

14   courtroom today?

15   A.  I do.

16   Q.  You can stand up if you need to, sir.

17   A.  Yes, I can see him.

18   Q.  Can you identify him by an article of clothing he is

19   wearing.

20   A.  A black jacket.

21          THE COURT:  Is he in the second row?

22          THE WITNESS:  He is.

23          THE COURT:  Is he at the far, as you look at the

24   second row, in the far right?

25          THE WITNESS:  Yes, sir.

IAPJKET3                    Sinclair – cross

1          THE COURT:  Mr. Sinclair has identified Steve

2    Ketabchi.

3          MS. FLETCHER:  No further questions, your Honor.

4          THE COURT:  Cross-examination, Mr. Schmidt.

5    CROSS EXAMINATION

6    BY MR. SCHMIDT:

7    Q.  Mr. Sinclair --

8    A.  Yes, sir.

9    Q.  -- you kept a calendar or calendars in your business

10   relating to appointments.  Is that right?

11   A.  Yes, sir.

12   Q.  And that was kept in the office, right?

13   A.  Yes, sir.

14   Q.  You had access to it, right?

15   A.  Yes, sir.

16   Q.  Now, did a person named Lisa work for you?

17   A.  Lisa?

18   Q.  Yes.

19   A.  That was the name she used on the phone.

20   Q.  Was she doing debt consolidation?

21   A.  Yes, sir.

22   Q.  The appointments that they received, they would come out of

23   the main appointment calendar, right?

24          MS. FLETCHER:  Objection to form.

25          MR. SCHMIDT:  Withdrawn.

IAPJKET3                          Sinclair - cross

1    BY MR. SCHMIDT:

2    Q.  Would the main appointment calendar reflect appointments

3    for the sales reps to speak to as long as it wasn't deleted at

4    some later date?

5    A.  Yes, sir.

6    Q.  In fact, didn't the person who used the phone name Lisa

7    contact Jane Thompson to sell her debt relief?

8    A.  I cannot say with certainty if she called a specific name.

9    I don't remember.

10   Q.  Do you know who Jane Thompson is?

11   A.  Off the top of my head, no.

12   Q.  Do you know the name Jane, don't you?

13   A.  Do I name the name Jane?

14   Q.  You used the name Jane here before, didn't you?

15           MS. FLETCHER:  Objection.

16           THE COURT:  Maybe he did.  I don't know.

17   BY MR. SCHMIDT:

18   Q.  Did you find out the name of the person that you say

19   Mr. Owimrin sold $150,000 as in the percentage of the A1

20   Business?

21   A.  He never gave me the name, so I didn't know her by name.

22           (Off-the-record discussion)

23   BY MR. SCHMIDT:

24   Q.  So if you didn't know her name, how would you know whether

25   or not you sold her or tried to sell her?

IAPJKET3                        Sinclair - cross

1   A.  We may have.  We didn't based on our conversation with

2   Andrew.

3              THE COURT:  When you said "you," you mean.

4              Mr. Sinclair, or do you mean Olive Branch or some

5   other entity?

6   BY MR. SCHMIDT:

7   Q.  Whatever entities that you controlled?  Let me rephrase the

8   question.

9              You told us that you didn't want to go near this

10  person because there were red flags and you were going to get

11  into trouble, right?

12  A.  Correct.

13  Q.  And you're telling us now that you didn't even know who

14  this person was?

15  A.  Andrew did not give me a name, correct.

16  Q.  So you're saying that you were loathe to stay away from

17  this person, but you didn't know what the name of the person

18  that you were supposed to stay away from.  Is that right?

19  A.  Correct.

20  Q.  Now, I am going to show you what has been marked as Defense

21  Exhibit CAL-34.

22             MR. SCHMIDT:  May I approach the witness?

23             THE COURT:  Yes.

24             (Pause)

25  BY MR. SCHMIDT:

IAPJKET3                        Sinclair - cross

1   Q.  Could you tell us what that is.

2   A.  This is an appointment.

3   Q.  Do you see the name at the bottom left --

4            MS. FLETCHER:  Objection.

5   Q.  -- of whose calendar it is?

6            MR. SCHMIDT:  I am not saying what it is yet.

7            THE COURT:  Yes, do you see it, yes or no?

8            THE WITNESS:  Yes.

9            THE COURT:  Do you see a name at the bottom, yes or

10  no?

11           THE WITNESS:  Yes, sir.

12           MR. SCHMIDT:  I offer that into evidence, your Honor.

13           MS. FLETCHER:  Your Honor, may I have a moment.  We

14  have a stack of these documents.  I don't see that in it.

15           THE COURT:  Mr. Schmidt, do you have another copy?

16           MR. SCHMIDT:  Do we have another copy?

17           (Off-the-record discussion)

18           THE COURT:  The government has it.

19           MS. FLETCHER:  No objection, your Honor.

20           THE COURT:  Admitted.

21           (Defendant's Exhibit CAL-34 received in evidence)

22           MR. SCHMIDT:  Can we display that to the jury, please?

23           THE COURT:  Next question, sir.

24  BY MR. SCHMIDT:

25  Q.  What is the name of the client?

1   A.  On this paper?

2   Q.  Yes.

3   A.  Jane Thompson.

4   Q.  Can you read from the paper?

5          And who is the person calling Jane Thompson, who the

6   appointment was made for?

7   A.  It looks like Lisa Corro.

8   Q.  Do you know Lisa Corro's real name?

9   A.  Elvin Corlion.

10  Q.  Now, did Mr. Owimrin tell you how the $150,000 was paid?

11  A.  Yes.

12  Q.  She put it on a credit card.  Is that correct?

13  A.  Correct.

14  Q.  But he did tell you that she had other dealings with other

15  companies that used her credit card.  Is that right?

16  A.  He may have.

17  Q.  Now, who owns A1 Business Consulting?

18  A.  Arash Ketabchi.

19  Q.  Does anybody else own it?

20  A.  Not to my knowledge.

21  Q.  Who has the right to sell a portion of the A1 Business

22  Consulting?

23          MS. FLETCHER:  Objection.

24          THE COURT:  If you know?

25          THE WITNESS:  Yeah, according to my knowledge, Arash

1    Ketabchi.

2    BY MR. SCHMIDT:

3    Q.  To your knowledge, in January or February 2006, was A1

4    Business Consulting in business?

5    A.  Not to my knowledge, no.

6    Q.  So you believe it was no longer functioning, A1 Business,

7    in January of 2016.  Is that your testimony?

8    A.  You said 2006.

9    Q.  I apologize if I said that.

10          In 2016, in January and February, was A1 Business

11   Consulting in business?

12   A.  It may have been.  Arash was not working on my floor, so I

13   don't know.

14   Q.  You didn't have conversations with Arash at that time?

15   A.  In January of '16?

16   Q.  Did you have conversations with Mr. Owimrin at that time?

17   A.  Andrew?

18   Q.  Yes.

19   A.  In January of '16, I don't know specifically if we did.

20   Q.  When was the first time that you had a conversation in 2016

21   in any form with Andrew?

22   A.  I don't have specific dates when we spoke.

23   Q.  How about approximately?

24   A.  The springtime, I would say, of 2016.

25   Q.  Now, the springtime ranges from March 21st to June 21st?

1   A.  Correct.

2   Q.  Could you give us, if possible, anything closer than just

3   springtime?

4   A.  Not with certainty, no, sir.

5   Q.  What was the first thing that you had a conversation about

6   with Mr. Owimrin?

7   A.  Lead lists he was going to be able to give us and him

8   possibly wanting to come back to sell debt for us.

9   Q.  So --

10  A.  Debt elimination services, to be clear.

11  Q.  -- so the first time that you had a real conversation with

12  Mr. Owimrin -- withdrawn.  Was it on the telephone or in

13  person?

14  A.  With me, I believe it was in person.

15  Q.  Where?

16  A.  At my office.

17  Q.  So Andrew came to speak with you and indicated that he

18  was --

19          MS. FLETCHER:  Objection.

20          THE COURT:  Yes, yes.

21  BY MR. SCHMIDT:

22  Q.  So you had a conversation, as you testified, with

23  Mr. Owimrin about coming to work for you.  Is that right?

24  A.  Yes, sir.

25  Q.  Part of that conversation included lead lists.  Is that

1    right?

2    A.  Yes.

3    Q.  Was it your idea for him to provide you with Arash

4    Ketabchi's lead lists?

5    A.  No.

6    Q.  Weren't you having problems at that point in having lead

7    lists?

8    A.  Yes, sir.

9    Q.  So notwithstanding Mr. Owimrin wanted to come back to work

10   for you, and that you were having trouble obtaining lead lists,

11   you just thought it was inappropriate to ask to get somebody

12   else's lead lists.  Is that right?

13             MS. FLETCHER:  Objection.

14             THE COURT:  It is cross.

15   A.  No, I am sorry, I didn't say that.

16   BY MR. SCHMIDT:

17   Q.  Now, you said to us, you testified here that you never

18   spoke with Andrew about the fact that the grant sales were

19   completely bogus.  Is that right?

20   A.  To my recollection, yes.

21   Q.  You said, though, that everybody knew that it was, right?

22   A.  Yes, sir.

23   Q.  I think there were a couple of other things you testified

24   to that you didn't tell Mr. Owimrin, but everybody knew, right?

25   A.  Yes, sir.

1    Q.  Now, you gave us before -- excuse me.

2            When you testified earlier, you told us about the Tier

3    I salespeople?

4    A.  Yes, sir.

5    Q.  One was Arash Ketabchi, right?

6    A.  Yes.

7    Q.  Had he worked in the industry before he ended up being your

8    sales manager?

9    A.  Yes.

10   Q.  Do you know how long he worked in the industry before that?

11   A.  To my knowledge, since -- yes, 2008, maybe.

12   Q.  Now, another person was Chris Wilson, right?

13           Did Chris Wilson work in the industry before he came

14   to you?

15   A.  I don't know offhand if Chris did.

16           THE COURT:  Mr. Schmidt asked about somebody who

17   worked in the industry.  What is your understanding of the

18   industry?

19           THE WITNESS:  The Tax Club or another sales force

20   selling similar products.

21   BY MR. SCHMIDT:

22   Q.  Now, did Pete DiQuarto work in the industry before that?

23   A.  I'm not certain.

24   Q.  Do you know what Pete did before he came to you?

25   A.  I know he was in prison.

1   Q.   Do you know for what?

2   A.   Selling drugs.

3   Q.   Do you know what Chris Wilson did before?

4   A.   No.

5   Q.   Did you have any input in whether he was being hired or

6   not?

7   A.   Yes, I did.

8   Q.   You would have interviewed him or would have been part of

9   the group that interviewed him?

10  A.   Yes.

11  Q.   Did you ask him what he was doing before?

12          MS. FLETCHER:  Objection to form.

13          THE COURT:  Change the form.

14          MR. SCHMIDT:  Withdrawn.

15  BY MR. SCHMIDT:

16  Q.   Did you ask him what he was doing or have a resume of what

17  he was doing?

18  A.   Not necessarily.

19  Q.   What was Steve's last name?

20  A.   Aladenoye.

21  Q.   Aladenoye?  Do you know where he worked before coming to

22  you?

23  A.   Yes.

24  Q.   Where was that?

25  A.   He worked at the Tax Club.

IAPJKET3                          Sinclair - cross

1   Q.   These were the people that you said were the Tier I people.

2   Is that right?

3   A.   Yes, sir.

4   Q.   Then there was Andrew and Reagan and I think Luis?

5   A.   Luis, yes.

6   Q.   Were the ones below them, right?

7   A.   Right.

8            THE COURT:   Speak a little loudly, please.

9            THE WITNESS:   Yes, sir, your Honor.

10  BY MR. SCHMIDT:

11  Q.   The Tier I group was the more savvy group, wasn't it?

12  A.   Yes, sir.

13  Q.   Now, you had lots of other people that came to work for

14  you, right?

15  A.   Yes, sir.

16  Q.   Did anybody come to work for you that you did not approve?

17  A.   As far as sales reps are concerned?

18  Q.   Yes, sales reps?

19  A.   There were a few, I'm sure, over the years so, yes.

20  Q.   Do you remember any of the people's names?

21  A.   I don't.

22  Q.   Did you hire or did you participate in hiring Ray Anilos?

23  A.   Yes.

24  Q.   Did you fire Ray Anilos?

25  A.   Technically, no.  He just disappeared.

1  Q.  Do you know where he worked before?

2  A.  Yes.

3  Q.  Where was that?

4  A.  For Carl Morris.

5  Q.  Did you hire Carl Morris?

6  A.  No.

7  Q.  Did he work in the sales floor?

8  A.  I didn't technically hire Carl Morris.  He was a sales rep

9  on my floor.

10  Q.  The answer is no?

11  A.  Yes, right.

12  Q.  What about Richard Frost?

13  A.  No, he was not an employee of mine.

14  Q.  Now, you testified that the script that was admitted into

15  evidence, the one that said Tax Club on it --

16  A.  Yes, sir.

17  Q.  Do you know that one?

18  A.  Yes, sir.

19  Q.  You said that you modified it, right?

20  A.  Yes, sir.

21  Q.  You modified it, but you left the word "Tax Club" in it.

22  Is that your testimony?

23  A.  That's what it still said, yes.

24  Q.  In what way did you modify it?

25  A.  The content.

IAPJKET3                          Sinclair - cross

1    Q.  What did you do about the content?

2    A.  I don't have the original script here to make a

3    side-by-side comparison to tell you exactly what I took out.

4           In my opinion, the changes I made made it flow better,

5    it made it more substantive and it created more value with our

6    audience.

7    Q.  Does that mean you thought it was a better way to explain

8    how to sell those things?

9    A.  Yes, sir.

10   Q.  Did you, in preparing and modifying these scripts, did you

11   make sure that there was nothing in the scripts that would

12   cause problems with the federal authorities?

13          Is that correct?

14   A.  To my knowledge --

15   Q.  I am asking you to do it, if you did it.

16          So it would be to your knowledge and nobody else's,

17   yes?

18   A.  Okay, yes, the answer is yes.

19   Q.  You repeatedly told your salespeople you can't make earning

20   promises, right?

21   A.  Yes, sir.

22   Q.  Were people fired for making earning promises?

23   A.  Yes.

24   Q.  Who was fired?

25   A.  Michael Pizarro.

IAPJKET3                          Sinclair - cross

1   Q.  Were people actually fined, for doing that.

2   A.  Yes.

3   Q.  Who were the people fined for doing that?

4   A.  I don't know specifically.

5   Q.  Was Chris Wilson one of them?

6   A.  Again I don't know specifically.

7   Q.  Who were the most aggressive salespeople on the floor

8   during that 2014 and '15 period?

9   A.  Chris Wilson, Arash Ketabchi, Steve Aladenoye, and Pete

10  DiQuarto, I would say.

11  Q.  Were they the four top sellers?

12  A.  Yes, sir.

13  Q.  Who was the least aggressive out of all of them?

14  A.  Reagan Owimrin.

15  Q.  Was he the least productive member?

16  A.  He was.

17  Q.  And Andrew was just above Reagan?

18  A.  Yes. .

19  Q.  Now, when you set out on your own company, you started

20  alone -- withdrawn.

21          You ended up being a partner with Michael Finocchiaro,

22  right?

23  A.  Yes, sir.

24  Q.  Everybody called him Fino?

25  A.  Yes, sir.

1   Q.  When you started out, Fino wasn't yet your partner.  Is

2   that right?

3   A.  That's false.

4   Q.  So from the beginning when you went out on your own, you

5   went with Fino.

6   A.  Fino was still employed at the Tax Club, but in agreement,

7   we were partners.

8   Q.  When you started it -- withdrawn.

9        At the Tax Club, did you have any legal problems with

10  the Tax Club -- withdrawn.  Did the Tax Club have any legal

11  problems when you were there?

12  A.  Yes, sir.

13  Q.  Was there a settlement with the Federal Trade Commission --

14        MS. FLETCHER:  Objection.

15  Q.  -- that you were aware of with the Tax Club?

16        THE COURT:  Just a moment.  Yes, go back a little.

17  Foundation.

18  BY MR. SCHMIDT:

19  Q.  You worked for the Tax Club for many years, right?

20  A.  Four years.

21  Q.  Now, while you were still there, did you become aware of

22  litigation with the Federal Trade Commission?

23  A.  Yes.

24  Q.  Did you become aware of the result of that litigation with

25  the Federal Trade Commission?

1   A.  To my knowledge, there was a settlement, like I said.

2   Q.  Did you actually have a copy of that settlement in your

3   computer when you left the Tax Club?

4   A.  I may have.

5   Q.  Were you aware of the substance generally of the

6   settlement?

7   A.  Generally.

8   Q.  So when you started out in your own business with Fino, did

9   you seek to avoid the same kind of problem that the Tax Club

10   had with the Federal Trade Commission?

11   A.  Can you elaborate what you mean by, "problem."

12   Q.  Did you want to not get in trouble with the Federal Trade

13   Commission?

14   A.  Yes, correct.

15   Q.  And you saw how the Tax Club got in trouble with the

16   Federal Trade Commission.  Is that correct?

17   A.  Yes, sir.

18   Q.  So you didn't want to do the same mistakes as the Federal

19   Trade Commission -- excuse me -- you didn't want to make the

20   same mistakes as the Tax Club.  Is that right?

21   A.  Yes, sir.

22   Q.  So one of the purposes of modifying the scripts and talking

23   to the salespeople were to try to avoid those problems.  Is

24   that right?

25   A.  If what you mean by "problem" is getting caught, the answer

IAPJKET3                              Sinclair - cross

1    is yes.

2    Q.  So, in other words, you were fine with everybody committing

3    all sorts of crimes as long as they didn't get caught.  Is that

4    what you're saying?

5    A.  To an extent, yes.

6    Q.  What crimes did you permit your salespeople to commit?

7    A.  Fraud, the entire thing.

8    Q.  So when you started out, it's your testimony that you went

9    into your business with the intent to commit fraud.  Is that

10   what you're saying?

11   A.  That's not a clear yes or no.  I'd have to elaborate.

12   Would that be okay?

13   Q.  Not yet.  We'll give you a chance.

14            Isn't it a fact that you sought to try to run your

15   business legally?

16            MS. FLETCHER:  Objection to "legally."

17            THE COURT:  No.  I will allow that.  Did you try to

18   run your business in compliance with the laws as you understood

19   them to be?

20            THE WITNESS:  Again I would still have to elaborate,

21   your Honor.  Can I do that?

22            THE COURT:  That is up to Mr. Schmidt.

23   BY MR. SCHMIDT:

24   Q.  Now, we do know, whether legal or illegal, you didn't want

25   to get in trouble, right?

IAPJKET3                          Sinclair - cross

1   A.  Correct.

2   Q.  Is it your testimony that the only thing that you wanted to

3   try to do when you set up your business was not to get into

4   trouble?

5   A.  Correct.

6   Q.  Would it be fair to say that during the 2014-15 period,

7   that most of the people on the sales floor came from the Tax

8   Club or on some other some other entity?

9   A.  Yes, sir.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IAP8KET4                          Sinclair - Cross

1   Q.  So those people you didn't have to train, is that right?

2   A.  Correct.

3   Q.  Now, when someone who had absolutely no background in this

4   field -- withdrawn.

5            How many people do you think you hired to come to work

6   for the firm between 2014 and '15 that had actually no

7   experience whatsoever in the telemarketing field?

8   A.  To the best of my recollection, Reagan Owimrin, Andrew

9   Owimrin -- you're just again talking about sales reps, right?

10  Q.  I am just talking about sales reps.

11  A.  I don't know if Chris Wilson did.  I can't say with

12  certainty if he did.  I don't know if Pete DiQuarto did either.

13  I can't say with certainty if he did or did not.  I believe the

14  only two I can say with certainty that did not is Andrew

15  Owimrin and Reagan Owimrin.

16  Q.  So you participated in an interview with him to make a

17  determination whether or not he was going to be hired, is that

18  right?

19  A.  You mean Andrew?

20  Q.  Andrew.

21  A.  No.

22  Q.  He just came to work?

23  A.  To my understanding, Arash said that he's bringing in two

24  people and that he would train them, and explained who they

25  were.  OK, fine, that's what I said to him.

1    Q.  So when you said just a few minutes ago that you couldn't

2    think offhand of anybody that you didn't actually speak to

3    before you hired, you were incorrect?

4    A.  Can you repeat that, please?

5    Q.  Well, you just said that you had nothing to do with Andrew

6    and Reagan coming and working for your firm, right?

7            MS. FLETCHER:  Objection.

8            THE COURT:  Sustained.

9    Q.  You said Arash said he's bringing in these two people who

10   are related to his girlfriend, and they came to work, right?

11   A.  Correct.

12   Q.  So you had nothing to say about it, except for maybe saying

13   OK to Arash?

14   A.  That's how I remember it.

15   Q.  So you didn't interview them, you didn't speak to them, you

16   didn't check them or anything, is that right?

17   A.  It wasn't a formal --

18   Q.  Did you do anything?

19           MS. FLETCHER:  Objection.

20           THE COURT:  I will allow it.

21           Did you do anything before they were hired?

22           THE WITNESS:  With regard to what specifically, like

23   background checks?

24           THE COURT:  What did you do?

25           THE WITNESS:  Nothing to my knowledge.

1            THE COURT:  They were a warm body, right?  They were

2    warm bodies?

3            THE WITNESS:  Right.

4            THE COURT:  They were recommended by Arash?

5            THE WITNESS:  Right.

6            THE COURT:  Who was your sales manager?

7            THE WITNESS:  Yes.

8            THE COURT:  You accepted that?

9            THE WITNESS:  I did.

10            THE COURT:  You didn't do anything else.  You didn't

11    care what they had done before?

12            THE WITNESS:  Right.

13            THE COURT:  Next.

14    BY MR. SCHMIDT:

15    Q.  Didn't you just tell us earlier today that you couldn't

16    think of anybody that came to work on the sales floor without

17    you speaking with them and hiring them?

18            MS. FLETCHER:  Objection.  It misstates the testimony.

19            THE COURT:  Let's see.

20            Can you answer that?

21    A.  That's not entirely accurate.  I didn't say I didn't speak

22    to them.  I am just not involved with the training process.

23    And it wasn't a formal interview.  That's what I was trying to

24    explain before.  It wasn't a formal environment.

25    Q.  Now, there has been some testimony about a phone name.  Do

IAP8KET4                         Sinclair - Cross

1  you remember that?

2  A.  Yes.

3  Q.  It's absolutely legal for someone to use -- withdrawn.

4           It is your understanding that it's absolutely legal

5  for somebody to use another name on the telephone?

6  A.  Yes.

7  Q.  Your understanding was that it was a good idea to have them

8  to sign something?

9  A.  That was my idea at the time, yes.

10  Q.  Where did you get that idea from?

11  A.  Someone else who he had worked with.

12  Q.  Now, you said that you used another name at one point.

13  That was not at Olive Branch, was it?

14  A.  Bill Porzio?

15  Q.  Yes.

16  A.  No.  That was later.

17  Q.  At Olive Branch you were known to everybody that you spoke

18  to as either William or Bill Sinclair?

19  A.  Yes, sir.

20  Q.  In fact, you were aware that because most of the people

21  that your salespeople were going to speak to, and your

22  compliance people were going to speak to, and the appointment

23  setters were going to speak to were going to be from middle

24  America, that it was good to have a simple -- to have an

25  American sounding name that was easy to pronounce, is that

1    right?

2    A.   That was the sentiment, yes.

3    Q.   That was your understanding of what would be a good idea

4    business-wise, right?

5    A.   Yes.

6    Q.   Isn't it a fact that Luis's last name was Jimenez?

7    A.   Yes.

8    Q.   Isn't it a fact at one point, when he was using his real

9    name, that somebody said, I don't deal with you people, or

10   something like that?

11   A.   I don't recall that.

12            THE COURT:  Mr. Schmidt, why don't you find a good

13   time to break.

14            MR. SCHMIDT:  Now is a good time to break.

15            THE COURT:  Ladies and gentlemen of the jury, I don't

16   think I have ever had a lawyer say anything but "now is a good

17   time to break" when asked the question.

18            Please be back at a quarter to 2, a little more than

19   an hour.  Thank you.

20            (Jury exits courtroom)

21            (Continued on next page)

22

23

24

25

1          THE COURT:  All right.  A quarter to 2.  Thank you.

2          MS. FLETCHER:  Your Honor, given that Mr. Sinclair is

3    now on cross-examination, would your Honor please instruct him

4    about the rules?

5          THE COURT:  I instruct you about the rules, which

6    means you can't talk to the government.  You can talk to the

7    agent about technical things, where you're going to meet, what

8    you're going to have lunch, but I am telling the government

9    they can't talk to you, you can't talk to them.

10         MS. FLETCHER:  Thank you, your Honor.

11         (Luncheon recess)

IAP8KET4                          Sinclair - Cross

1                              AFTERNOON SESSION

2                                   1:45 p.m.

3              (Jury present)

4        WILLIAM SINCLAIR, resumed.

5              THE COURT:  Please be seated.

6              Mr. Schmidt, you may continue.

7        BY MR. SCHMIDT:

8        Q.  Now, you testified that some people had more chargebacks --

9        some sales reps had more chargebacks than others, right?

10       A.  Yes, sir.

11       Q.  Mr. DiQuarto was one that actually had low chargebacks, is

12       that right?

13       A.  Yes.

14       Q.  He figured out a nice scheme to prevent chargebacks, didn't

15       he?

16       A.  Yes.

17       Q.  What was that scheme that he used?  What was one of the

18       schemes that he used?

19       A.  What he thought of was to have customers move the

20       investment, transfer the investment off of whatever credit card

21       they used with us to another credit card, this way if they

22       tried to charge back they couldn't.

23       Q.  He kept that a secret for a long time, didn't he?

24       A.  I believe so, yes.

25       Q.  Andrew Owimrin didn't do that, did he?

1   A.  I cannot say with certainty that he did not.

2   Q.  Let's say it the other way then.  Do you know if he did it?

3   A.  No.

4   Q.  Now, Pete also had customers take cash advances from his

5   credit card and have the check sent to the office, didn't he?

6   A.  Yes.

7   Q.  And that's another way of preventing chargebacks, isn't it?

8   A.  We believed so.  I'm not certain that that's actually the

9   case.

10   Q.  Well, if you take a cash advance, there is no product, is

11   there?

12   A.  What do you mean by "product"?

13   Q.  Well, if you went to your bank and took a cash advance on

14   your credit card, would there be a product that you were

15   purchasing?

16   A.  I guess not, no.

17   Q.  That's pretty obvious, isn't it?

18   A.  OK.

19   Q.  Am I correct?

20   A.  Yes.

21   Q.  Thank you.

22          You called Pete one of your real productive people

23   because he was really one of your scammers, wasn't he?

24          MR. SCHMIDT:  I will withdraw that question.

25   Q.  Now, Chris Wilson also had very high chargebacks, didn't

1    he?

2    A.  He did.

3    Q.  And he was somebody that you did not think highly of, is

4    that right?

5    A.  That is correct.

6    Q.  Why was that?

7    A.  Something about him, I just didn't trust him.

8    Q.  And you found out later on a good reason not to trust him,

9    isn't that right?

10   A.  I did.

11   Q.  He had a friend that obtained a merchant account, is that

12   right?

13   A.  Yes.

14   Q.  What was that merchant account?

15   A.  What was it called?

16   Q.  Do you remember what the account was?

17   A.  The name of the company?  No.

18   Q.  Because you were at times having trouble with your merchant

19   accounts, you used that merchant account, is that right?

20   A.  Yes.

21   Q.  And at some point, when Mr. Wilson left, he never gave you

22   the money out of that merchant account, did he?

23   A.  No.  Just to clarify, that was my merchant account that he

24   set up, it was under my company's name, just for the record.

25   Q.  What company?

IAP8KET4                        Sinclair - Cross

1   A.  I believe Champion Business Services.

2   Q.  But it wasn't your name as a signer on the account, because

3   at that time were you able to get an account?

4   A.  I was internationally.  I couldn't get any account set up

5   domestically because I was on the TMF list, which is why this

6   came up.

7   Q.  Now, you actually also obtained an account internationally,

8   right?

9   A.  That's the one you're referencing.

10  Q.  The one that Chris set up was international?

11  A.  Correct.

12  Q.  By the way -- withdrawn.

13          So another one of the top tier people was Chris

14  Wilson, right?

15  A.  As far as productivity?

16  Q.  Yes.

17  A.  Towards the end of his tenure with us, yes.

18  Q.  Now, you heard at some point that after Chris Wilson left

19  you -- withdrawn.

20          After Chris Wilson left you, did you understand that

21  he was working with Pete DiQuarto?

22  A.  Chris Wilson?

23  Q.  Yes.

24  A.  No, I did not.

25  Q.  Did you know that he was -- did you understand that he was

IAP8KET4                    Sinclair - Cross

1   selling grants?

2   A.  After quite sometime, yes.

3   Q.  And do you recall that he hired people who had no idea what

4   was going on?

5   A.  I don't know who he hired.

6   Q.  Did you tell the government that he hired kids who didn't

7   know what was going on in one of your many, many interviews

8   with them?

9   A.  I told them, which is what I know, that he had younger kids

10  set up processing for him, merchant accounts.  I don't know

11  their names.  I don't know any other info.

12  Q.  Now, who brought up the idea of the Youngevity account?

13  A.  Anthony Medeiros.

14  Q.  How did you know Anthony Medeiros?

15  A.  Back in, I want to say late 2013, I was introduced to him

16  through Michael Finocchiaro.

17  Q.  How did it come about this discussion with Mr. Medeiros

18  about Youngevity?

19  A.  He approached myself and Michael with it.

20  Q.  And this was in the fall of 2015?

21  A.  No.

22  Q.  When was it?

23  A.  Late 2014.

24  Q.  Was that the time that you were having problems with

25  chargebacks?

1  A.  We were having problems with chargebacks the entire time.

2  Q.  So how was it that you had your salespeople start

3  selling -- withdrawn.

4         Prior to Youngevity's existence in your office, it was

5  not common for your office to sell something like an actual

6  particular Web site selling products, is that right?

7  A.  You're asking me if we sold Web sites prior to Youngevity?

8  Q.  Let me rephrase the question.

9         Before Youngevity, your most common sales were

10  corporate setups, LLCs or S corps, right?

11  A.  Part of it, yes.

12  Q.  Business planning?

13  A.  Yes.

14  Q.  Search engine optimization?

15  A.  Yes.

16  Q.  Marketing, YouTube advertising?

17  A.  Yes.

18  Q.  Some tax?

19  A.  Very rarely.

20  Q.  But selling actual Web sites for a new company wasn't a

21  frequent occurrence at your company, was it?

22  A.  Correct.

23  Q.  So Youngevity was a pretty big change for your company and

24  the salespeople?

25  A.  It was a different business model, yes.

IAP8KET4                          Sinclair - Cross

1   Q.  Now, initially it was Mr. Medeiros who came up with the

2   model and explained it to the salespeople, is that right?

3   A.  Did Mr. Medeiros come up with the Youngevity model?  No.

4   He's not part owner of the company Youngevity.

5   Q.  Let me rephrase that.

6         The idea of your company selling Youngevity is

7   something that Mr. Medeiros came up with?

8   A.  Yes.

9   Q.  And Youngevity was an existing ongoing company, right?

10  A.  Yes, sir.

11  Q.  Something like Amway?

12  A.  I'm not too familiar with Amway, but if it's set up like a

13  pyramid, then yes.

14  Q.  When you say a pyramid, you're not necessarily saying it's

15  illegal, are you?

16  A.  No.

17  Q.  A pyramid means that the person who buys into it makes

18  money not only from selling the products, but gets a piece of

19  the products that people who he or she brought in sold, is that

20  right?

21  A.  Those are the two ways, yes.

22  Q.  So if you bring in a person who sells nothing, then even if

23  you're above that person in that pyramid, you make nothing,

24  right?

25  A.  Can you repeat that question, sir?  I'm sorry.

IAP8KET4                          Sinclair - Cross

1   Q.  If you're now in the Youngevity program, and you get

2   somebody else to join the Youngevity program, if that person

3   sells product, you get a piece of it, right?

4   A.  Which person are you referring to?

5   Q.  The person that you brought in.

6   A.  Correct.

7   Q.  If the person you brought in sells nothing, you get

8   nothing?

9   A.  From that particular person.

10  Q.  That is correct.

11  A.  Yes.

12  Q.  So for you to make money, you want the person or persons

13  you bring in to sell product, is that right?

14  A.  It is.

15  Q.  And that's part of the Youngevity model, isn't that right?

16  A.  Yes, sir.

17  Q.  And the salesmen understood that, right?

18          MS. FLETCHER:  Objection.

19          THE COURT:  Sustained.

20  Q.  You made sure that the salesmen understood that, right?

21          MS. FLETCHER:  Objection.

22          THE COURT:  I will allow that.

23  A.  I did.

24  Q.  Now, what was your understanding at the beginning, when you

25  started with the Youngevity model, of how long a Web site would

IAP8KET4                        Sinclair - Cross

```
 1    take to be, whatever they call it, put up on the Internet?
 2              MS. FLETCHER:  Objection to foundation.
 3              THE COURT:  I will allow it.
 4    A.  Your question is how long would it take for --
 5              THE COURT:  Rephrase the question.
 6    Q.  Not how long would it take.  What was your expectation of
 7    how long it would take to set up that Web site once it sold?
 8    A.  If I remember correctly, I want to say within two weeks.
 9    Q.  And what else is in the Youngevity package that was being
10    sold?
11    A.  If I remember correctly, I think there was some light
12    marketing, and then you get like a sample basket from
13    Youngevity with some of their products.
14    Q.  Now, you told the -- withdrawn.
15              The salespeople were told basically what was
16    supposed -- withdrawn.
17              Now, in the beginning, when Youngevity was being
18    sold -- withdrawn that again.
19              The salesmen had forms on their desk about the
20    products that they were going to sell when they spoke to
21    customers.  I am not talking about Youngevity.  I am talking
22    about before that.  Is that right?
23    A.  I'm sorry.  Can you repeat the question, sir?
24    Q.  Before Youngevity there were forms about what products were
25    available for the salespeople to sell to customers, is that
```

1  right?

2  A.  Yes.

3  Q.  And it included many items, including the business plan and

4  the search engine optimization and marketing, and bronze,

5  silver and gold bookkeeping, and I think some other bronze,

6  silver and gold something else, right?

7  A.  Everything that we had available to them.

8  Q.  Now, when they started selling -- withdrawn.

9          Now, who was supposed to set up the Web site for

10  Youngevity -- withdrawn.

11          What was your understanding of who was supposed to set

12  up the Web site for Youngevity when you first started selling

13  it?

14  A.  Someone I had never spoken to via Anthony Medeiros; it was

15  his guy.

16  Q.  So your understanding, and I will use the word

17  "fulfillment," was going to be taken care of by Anthony

18  Medeiros by having another entity or person do that work,

19  correct?

20  A.  Correct.

21          (Continued on next page)

22

23

24

25

1    Q.  And when you first had your salespeople sell Youngevity,

2    did you have the expectation that the websites were actually

3    going to be built?

4    A.  I did.

5    Q.  Did the salesmen have -- were the salesmen informed that

6    they expected, expected to have the websites up and running

7    within two weeks?

8    A.  Yes.

9    Q.  Was it your expectation that the marketing and the

10   advertising, though light for the product, would then take

11   place after the site was up?

12   A.  Yes.

13   Q.  Was it explained to you that for any sales that are made,

14   that it would be expected that it would take 60 or 90 days for

15   the first check to be issued?

16         MS. FLETCHER:  Objection.

17         THE COURT:  Sustained as to form.  Start again.

18   BY MR. SCHMIDT:

19   Q.  By the way, from whom were you getting the information

20   about how Youngevity was going to work?

21   A.  Anthony Medeiros.

22   Q.  Now, were you told by Mr. Medeiros that because of the

23   setup, the first check was for a customer would come from

24   Youngevity in 60 or 90 days?

25         MS. FLETCHER:  Objection.

1          MR. SCHMIDT:  Was told by Mr. Medeiros.

2          THE COURT:  Basis?

3          MS. FLETCHER:  For the objection?  It is hearsay if

4     offered by Mr. Sinclair.

5          MR. SCHMIDT:  Sorry?

6          THE COURT:  Sustained.

7          MR. SCHMIDT:  Isn't this --

8          THE COURT:  Sidebar.

9          (Continued on the next page)

10          (At sidebar)

11          THE COURT:  Put it on the record.  Go ahead.

12          MS. FLETCHER:  This is hearsay offered by Mr. Owimrin.

13     801 (d)(2)(E) only a applies for statements of an opposing

14     party's co-conspirators.  He is seeking to offer the statements

15     of his own client's co-conspirators.

16          MR. SCHMIDT:  Your Honor, I am certainly not seeking

17     it for the truth that it is going to happen.  I am offering it

18     for this is his belief, right, for his state of mind, and when

19     he tells the salespeople the same information.

20          It goes to the state of mind.  It is not for the truth

21     it will actually happen.

22          THE COURT:  Give me what the question is again.

23          MR. SCHMIDT:  Was he told that the first --

24          THE COURT:  Was he told by a co-conspirator?

25          MR. SCHMIDT:  Right, the first check was going to be

IAPJKET5                        Sinclair - cross

1   issued in 60 or 90 days?  That is was his belief whether it is

2   true or not it certainly wasn't true.

3           THE COURT:  For whose belief?

4           MR. SCHMIDT:  For his belief because he has to have a

5   belief before he passes it on to the salespeople.

6           MS. FLETCHER:  His belief is not relevant here.  If

7   what Mr. Schmidt is trying to do is establish what his client

8   understood, his client is the person to testify about that, not

9   Mr. Sinclair.

10          MR. SCHMIDT:  Of course, I can have somebody for my

11  client's state of mind bring a statement out that would affect

12  his state of mind.  We do that all the time.

13          MS. FLETCHER:  If what he is trying to do is elicit

14  what Mr. Sinclair told his client something, he can do that,

15  and depending on what that something is, the government may

16  seek a limiting instruction for the purpose for which that

17  statement is being offered, but his state of mind is not --

18          THE COURT:  Wait.  Just let me think about it for a

19  minute.  (Pause)  What is the relevance of his state of mind?

20          MR. SCHMIDT:  His state of mind is whether or not he

21  is intentionally committing a fraud when he says something on

22  the telephone because he gets the information from his boss.

23  That is his state of mind.

24          MS. FLETCHER:  That is your client's state of mind?

25          MR. SCHMIDT:  That's right.

1          THE COURT:  One at a time.

2          MR. SCHMIDT:  I can go backwards and forwards.  I can

3    go backwards where he told me client, where did he get that

4    information from.  I am trying --

5          THE COURT:  I am still trying to understand.

6          MR. SCHMIDT:  Nothing is coming in for the truth.  It

7    is just coming in for what it was said, not the truth.

8          THE COURT:  Wait.  Just a moment.

9          MR. SCHMIDT:  In the afternoon I get more excited.

10         MS. FLETCHER:  Oh, boy!

11         THE COURT:  Not the oxy, is it?

12         You're doing it for Sinclair's state of mind and that

13   is not relevant.

14         MR. SCHMIDT:  I am not doing anything for the truth.

15         None of these questions are asking or saying what was

16   said is the truth.

17         THE COURT:  What are you trying to establish?

18         MR. SCHMIDT:  It was for what was said so it was

19   passed on to the salesmen so when the salesmen are saying it,

20   it was because it was said to them.

21         THE COURT:  Why don't you ask him directly?

22         MR. SCHMIDT:  I thought I would do it progressively.

23   I can ask him the next step, yes.

24         MS. FLETCHER:  That is the government's point.  If he

25   wants to ask Mr. Sinclair what Mr. Sinclair told his client,

1    that is fine.  By seeking to introduce how Mr. Sinclair came to

2    that understanding, what he is doing is bolstering the truth of

3    the statement.  That is why that is improper.  It doesn't

4    matter.

5                (Multiple voices)

6                MR. SCHMIDT:  We all agree that it was somewhat of a

7    fraud in that it is going to happen that way.

8                THE COURT:  Do it directly.  You are better off.  It

9    will go faster that way.

10               (Continued on next page)

1              (In open court)

2      BY MR. SCHMIDT:

3      Q.  Mr. Sinclair --

4      A.  Yes.

5      Q.  -- you had your salespeople selling Youngevity packages.

6      Is that right?

7      A.  Yes.

8      Q.  Before you had them selling them Youngevity packages, you

9      told them some things about Youngevity, right?

10     A.  Yes.

11     Q.  One of the things that you told him was that the website

12     would be up and running in about two weeks.  Is that right?

13     A.  That sounds right, yes.

14     Q.  Another thing that you told them was that the money from

15     the sales of the website would start in 60 or 90 days from the

16     sale.  Is that right?

17     A.  That also sounds right, yes.

18     Q.  At the time that you told the salespeople that, you

19     believed it was true.  Is that right?

20              MS. FLETCHER:  Objection.

21              THE COURT:  I'll allow it.  Move on.

22     Q.  Is that right?

23     A.  Should I answer that?

24              THE COURT:  Yes.  If you can, yes.  Did you believe it

25     was true?

1          THE WITNESS:  I did.

2          (Off-the-record discussion)

3    BY MR. SCHMIDT:

4    Q.  Now, at the time that you started the fulfillment of the

5    Youngevity package, was to be done through Anthony Medeiros.

6    Is that right?

7    A.  To be clear, he wasn't the one fulfilling it.  It was

8    his --

9    Q.  It was through Anthony Medeiros?

10   A.  Correct.

11   Q.  Now, there came a time when you realized that websites were

12   not being set up within the time period that you believed it

13   was supposed to, right?

14   A.  Yes.

15   Q.  You took steps to try to get those websites actually set up

16   in a faster, shorter period of time.  Is that right?

17   A.  Yes.

18   Q.  You got involved with some other fulfillment people to do

19   so.  Is that right?

20   A.  Yes.

21   Q.  And who was that fulfillment person?

22   A.  Ray Quiles.

23   Q.  What was Ray Quiles' company?

24   A.  At that time I don't know if it was Prestige Worldwide at

25   that time.

IAPJKET5                        Sinclair - cross

1    Q.  What was the name it could have been that was before that?

2    A.  All Online Systems.

3    Q.  As explained to the salespeople that the website would be

4    set up by another person, would be advertised by another

5    person, would be marketed by another person.  Is that correct?

6            MS. FLETCHER:  Objection to form.

7            THE COURT:  I'll allow it.

8    A.  Yes.

9    Q.  So the person buying, the person buying the site had the

10   option of having input as to what the actual website might have

11   looked like or the name of the website.  Is that right?

12   A.  I believe so.  It is limited because you're selling

13   Youngevity's products, so it is a --

14   Q.  But we all go online and we see different -- what the first

15   page of it looks like, right, and while it obviously has to

16   include Youngevity, there are other things you can have on it,

17   right?

18   A.  That is my recollection of it, yes.

19   Q.  If the person wanted to could also receive business cards,

20   that they could pass around to friends and neighbors and

21   family, right?

22   A.  I think so, yes.

23   Q.  But for the purpose of selling through the website, the

24   customer really wasn't involved in that operation.  Isn't that

25   right?

IAPJKET5                          Sinclair - cross

1   A.  Some through the website?

2   Q.  The sales for people to go online and buy items on the

3   website, the person, the customer who purchased the Youngevity

4   package isn't going to be doing the website stuff, are they?

5   A.  Correct.

6   Q.  If the website is marketed correctly, then the person

7   basically would be getting the proceeds from the sales of the

8   products on the website without doing very much, right?

9   A.  Theoretically, yes.

10  Q.  "Theoretically," would mean if you spend a minimum amount

11  of money for the website and just get the basic advertising, it

12  is only going to go so far, right?

13  A.  That is partially true because there is not only one way

14  they can --

15          THE COURT:  Why do you say theoretically?  Why put

16  that hedge in?

17          THE WITNESS:  With specific regard to the marketing

18  aspect of it, your Honor?

19          Because our marketing was not done by a professional

20  firm.  It was done by someone who had worked at the tax level,

21  had no experience really doing that for successful business

22  owners.

23          THE COURT:  All right.  Go ahead.

24  BY MR. SCHMIDT:

25  Q.  So the people who previously worked at the Tax Club might

1    have known that.  Is that right?

2               MS. FLETCHER:  Objection.

3               THE COURT:  Sustained as to form.

4    Q.  Now, so you didn't go and tell your salespeople that we

5    have an incompetent fulfillment person as to the website, did

6    you?

7    A.  I don't know if I used those specific words to describe

8    Ray.

9               THE COURT:  In sum or substance, did you describe Ray

10   that way?

11              THE WITNESS:  Regarding Youngevity, I can't say with

12   certainty.  Did we voice complaints about Ray's overall team or

13   his company between 2014 and 15?  Yes.  Do I know for sure I

14   ever that was regarding Youngevity?  No.

15   Q.  You skipped a little bit ahead here.

16   A.  Sorry.

17   Q.  There is no question that there was problems in fulfillment

18   through Mr. Medeiros.  Is that right?

19   A.  Correct.

20   Q.  There was problems in fulfillment through Ray, right?

21   A.  Yes.

22   Q.  You also used another fulfillment company.  Is that

23   correct?

24   A.  We did.

25   Q.  Which one was that?

1  A.  I believe their name was Impact.

2  Q.  Did you use Thoth also?

3  A.  That's way before 2014.  Actually, it was in the beginning

4  of 2014, yes.

5          (Off-the-record discussion).

6  Q.  So you didn't know who Mr. Medeiros was using, right?

7  A.  I never spoke to him, no.

8  Q.  You don't know how incompetent they would be, but you

9  learned that somewhere along the line they were totally

10  incompetent?

11  A.  Yes.

12  Q.  Building a website isn't that difficult for people who have

13  built websites before.  Is that right?

14          MS. FLETCHER:  Objection.

15          THE COURT:  Sustained.

16  Q.  Now, were you aware that somebody that worked with Ray had

17  built websites before?

18  A.  Yes.

19  Q.  So while he didn't have the real experience that perhaps

20  you or I would go to if we wanted a really good website, he

21  still had the experience of building a website, right?

22  A.  Yes.

23  Q.  There was no reason to believe that Andrew Owimrin knew

24  anything other than that?

25          MS. FLETCHER:  Objection.

1              THE COURT:  Sustained.

2    Q.  Now, if we can show the witness Y, G Y 36, please.  If you

3    can look at the bottom left, do you recognize that name?

4    A.  Yes, I do.

5    Q.  Do you recognize the company that person works for?

6    A.  Yes.

7    Q.  So would it be fair to say that thought training is the

8    same thing as Impact?

9    A.  It is, yes.

10   Q.  So you were using Thoth not just early 2014, you were using

11   Thoth even 2016.  Is that right?

12   A.  To make a correction to be on the record, I got confused.

13   I thought Thoth was a company we had used earlier before 2014

14   and started.  We did not use them in early 2014.  They came

15   much later only during this time-frame.

16   Q.  Generally after a sale of a Youngevity product is made --

17   withdrawn.

18              After any sale, the next person who usually gets to

19   talk to the customer is the compliance person.  Is that right?

20   A.  After the sales rep?

21   Q.  Yes, the sales was made and the sales rep talks to the

22   person and it it goes to the compliance person?

23   A.  Yes.

24   Q.  You called the compliance person a secretary a couple of

25   times, right?

1    A.  I called our compliance officers as secretaries, yes.

2    Q.  They're actually communicating with potential clients and

3    making appointments, aren't they?

4    A.  They are.

5    Q.  Then they are making sure that the customer, after he

6    agrees to make a purchase, understands the contract that

7    they're going to sign.  Isn't that right?

8    A.  It is.

9    Q.  Part of the script that the compliance person has is to go

10   over every paragraph in the contract with the customer.  Is

11   that right?

12   A.  They summarize it.

13   Q.  Now, you used to record the compliance people, didn't you?

14   A.  We did.

15   Q.  You used to record them to make sure that they covered all

16   of the contract.  Is that right?

17   A.  We did.

18   Q.  If they didn't use every single same word as the contract,

19   they expressed every single issue in the contract with the

20   customer.  Is that right?

21   A.  They got the general point across.  They covered the

22   content of the contract.

23   Q.  Now, when you said earlier that sometimes you were called

24   in, would sometimes even before you were called in, would the

25   salesperson be called in to talk, to continue talking to the

1   customer?

2   A.   Can you be more specific so I can answer you accurately?

3   Q.   If the customer raises a question about the contract after

4   being reviewed with him or her, would the compliance person

5   automatically go to you or Mike or would they also go sometimes

6   to the salesman that sold the item?

7   A.   It would vary.

8   Q.   On a few occasions the sale would not go through, right?

9   A.   Yes.

10  Q.   On most of the occasions, the sale would go through?

11  A.   Yes.

12  Q.   And that's even not only does the sales rep have this

13  conversation, it is the compliance person going over with the

14  customer the contract, right?

15  A.   Which conversation?  About the contracts content?

16  Q.   Sales rep, if there is an agreement, goes to compliance?

17  A.   Yes.

18  Q.   Compliance makes sure that the customer knows what the

19  agreement says?

20  A.   Agreed.

21  Q.   If the customer understands, he goes through the signing

22  process?

23              MS. FLETCHER:  Objection.

24  Q.   Correct?

25              THE COURT:  I'll allow it.

IAPJKET5                        Sinclair - cross

1    A.  Yes.

2    Q.  And most of the time it is done by e-signature because that

3    is a much faster way of doing it?

4              THE COURT:  I am sorry.  Let me go back to the earlier

5    ruling.  The jury will disregard the answer to the last

6    question.  You can rephrase it.

7    BY MR. SCHMIDT:

8    Q.  It is your understanding that for the compliance person to

9    be completed with the job and the sale to go through, the

10   customer had to understand the contract?

11             MS. FLETCHER:  Objection.

12             THE COURT:  What were your instructions to the

13   compliance people about going over the contract with the

14   customer, if any?

15             THE WITNESS:  Your Honor --

16             THE COURT:  What instructions did you give them?

17             THE WITNESS:  We instructed our compliance officers to

18   go over the contract and have the customer sign and set up a

19   welcome call.

20             THE COURT:  The only thing was that you told them to

21   do with the customer was to go over the contract?

22             THE WITNESS:  Yes.

23             THE COURT:  Did you give them instructions to make

24   sure the customer understood the contract?

25             THE WITNESS:  We'd cross that bridge if they didn't,

1    your Honor.

2            THE COURT:  How did you know one way or the other what

3    their operation of mind was?

4            THE WITNESS:  If they didn't question it, then we

5    generally didn't, either.  In addition to that, your Honor --

6            THE COURT:  Wait just a moment.  I want to make sure I

7    understand you.  If when the compliance person went over the

8    contract, the customer did not ask any questions, what then?

9            THE WITNESS:  Then it is just assumed, like the sale

10   was, they just assumed it.

11           THE COURT:  What is it, assume what?

12           THE WITNESS:  The sale.  We get them to sign and I

13   believe what is said at the end is do you understand and agree

14   to the charges.  Most people just said yes because they were

15   already sold at that point.

16           THE COURT:  All right.

17   BY MR. SCHMIDT:

18   Q.  You're having a real difficult time with acknowledging --

19           MS. FLETCHER:  Objection.

20           THE COURT:  Sustained.  The government is standing.

21   The jury will disregard, as you know, any statements of the

22   lawyers.  Just ask a question.

23   BY MR. SCHMIDT:

24   Q.  Did you instruct the compliance people that I don't care if

25   they understand the contract as long as they say yes at the

1   end?

2   A.  We didn't have that conversation.  It was go over the

3   contract with them, make sure they sign it, set up a welcome

4   call.

5          MR. SCHMIDT:  One moment.

6          (Off-the-record discussion).

7   BY MR. SCHMIDT:

8   Q.  So if the compliance person is reviewing the contract with

9   the customer, if the customer asks a question that the

10  compliance person can't answer, either the sales rep, you or

11  Mike would come over to answer it, correct?

12  A.  Yes.

13  Q.  Now, after the sale was completed and acknowledged, the

14  next step would be to inform the fulfillment people that

15  there's a contract for X, Y and Z.  Is that right?

16  A.  Yes, we set up the welcome call.

17  Q.  So who would contact the compliance people?  Excuse me.

18          Who would contact -- thank you -- the fulfillment

19  people, would that be the compliance person?

20  A.  Yes.

21  Q.  Did you ever tell -- were they all women as compliance or

22  were they men and women in compliance?

23  A.  They were all females.

24  Q.  I can use women as compliance.  Thank you.

25          So the women, did you ever tell the women that the

1   fulfillment people were bogus?

2   A.  Did I use that word?  No.

3   Q.  Did you ever tell them that this is all a sham, that we

4   just are using fulfillment people just so we don't get

5   charge-backs or something like that?

6   A.  I don't believe we ever had that conversation with

7   compliance.

8          THE COURT:  Did the compliance people ever receive

9   training on the meaning of the contract?

10          THE WITNESS:  The actual contents, legalities of it?

11          THE COURT:  Not the legalities; what it said?

12          THE WITNESS:  They had to review it.  We have had

13   conversations about the contract.  It is not like a contract

14   was just given to them and read this and make sure they sign it

15   regardless if they understand it.  That is not what I am saying

16   at all.

17          It is just varying degrees of interpretation of the

18   customers, and if questions arose, we would answer them.

19          THE COURT:  Who is "we"?

20          THE WITNESS:  The company, whether it be compliance or

21   if it was elevated back to the sales rep or ownership or

22   manager.

23          THE COURT:  Thank you.

24          THE WITNESS:  Yes, sir.

25   BY MR. SCHMIDT:

1   Q.   If there were no complaints after the contract went through

2   and the call to the fulfillment, would the sales rep have

3   anything to do with that customer again?

4   A.   They shouldn't unless there was a call that came in from

5   the customer.

6   Q.   So generally on most completed contracts, the last time the

7   salesperson had contact was on the sales call that resulted in

8   the agreement, correct?

9   A.   Yes.

10  Q.   It would be sometimes fulfillment, if they had trouble

11  reaching the client, might ask the sales rep to get in contact

12  with the client so that the client can get in touch with

13  fulfillment.  Is that right?

14  A.   Yes.

15  Q.   But unless there is a complaint, that's it?  Is that right?

16  A.   Yes.

17  Q.   Now, if there is a complaint, sometimes complaints come in

18  by telephone, right?

19  A.   Mostly every time.

20  Q.   Sometimes they come by email, don't they?

21  A.   Yeah, but most of the time by phone.

22  Q.   Now, is there a main number?

23  A.   Two.

24  Q.   Of the company?

25  A.   Which company?

1   Q.  Was there ever a company you were functioning as --

2   A.  Do you mean me or fulfillment?

3   Q.  I mean you, I mean Olive Branch and its related entities?

4   A.  We had separate phone numbers.

5   Q.  For each?  For whom?

6   A.  For Olive Branch, also operating as Champion, Paramount,

7   the list of companies before.  Fulfillment has a separate

8   location so they have a separate toll free number.

9   Q.  Olive Branch has their own number?

10  A.  Correct.

11  Q.  Is there somebody answering the main number's call or does

12  it go to, you know, voice or some kind of mechanical voice that

13  tells you to push this button or that button?

14  A.  Every call should be answered.

15  Q.  Who is the person who usually answered it or what group?

16  A.  It depends on who is being called.  The main number would

17  be the compliance manager.

18  Q.  If nobody is there, the phone would go to voicemail,

19  wouldn't it?

20  A.  Yes.

21  Q.  There was a setup where Fino would get an email of the

22  voicemail, wouldn't he?

23  A.  I believe so.

24  Q.  And so it was Fino's responsibility to decide how to deal

25  with that phone call initially, right?

IAPJKET5                    Sinclair - cross

1   A.   Sure.

2   Q.   You told us that Fino was, you know, basically was the one

3   who handled complaints, right?

4   A.   Yes.

5   Q.   That doesn't mean at times a sales rep might not have been

6   brought in or asked questions by you or Fino, but generally it

7   was Fino dealing with it, right?

8   A.   He was in charge of escalated issues and charge-backs, yes.

9   Q.   So, now, if there is a call or an email -- if the email

10  came in, it would go to that main Olive Branch Marketing, LLC

11  at Gmail dot com?  If you don't know, it is okay.

12  A.   I don't recall which email it went to.  I don't know if the

13  email service was a service that lasted that long because even

14  at the end we were checking voicemails on phones.

15  Q.   You communicated with fulfillment and other sorts of people

16  by email, didn't you?

17  A.   We did.

18  Q.   So the email did work?

19  A.   It did work.

20  Q.   Now, if -- and I think it was your testimony -- correct me

21  if I am mistaken -- that Fino would then try to deal with any

22  kind of problem before it escalated into a charge-back?  Is

23  that right?

24  A.   Yes.

25  Q.   Now, if he failed to deal with the problem and it escalated

1   into a charge-back, who would be the person who handles the

2   chargeback?

3   A.   Fino.

4   Q.   If there was a contract signed, fulfillment either started

5   or completed on whatever product was purchased, how would Fino,

6   if you know, respond to the charge-back?

7   A.   From a merchant company or from a customer's end?

8   Q.   First the charge-back comes from the merchant company.  Is

9   that correct?

10  A.   Yes, sir.

11  Q.   Let's say first to the merchant company, he would he

12  respond?  Let me back up.

13          If you get a charge-back, would Fino then contact the

14  customer to see if he can persuade the customer to withdraw the

15  charge-back?

16  A.   Yes, that's the first step is to stop the bleeding.

17  Q.   Now, sometimes Fino would enlist the salesperson who made

18  the sale to try to speak with the customer, right?

19  A.   Yes, sir.

20  Q.   But that was Fino's decision, and we really don't have --

21  that was Fino's decision, correct?

22  A.   Yes.

23  Q.   Now, if it failed, if Fino failed to persuade the customer

24  to withdraw the charge-back, what would be the next step?

25  A.   If Fino failed to get ahold of the customer?

1  Q.  Either get ahold of the customer or the customer refused to

2  withdraw the charge-back?

3  A.  We'd submit whatever paperwork we had, for example, a

4  signed contract and a proof of fulfillment, and send it to the

5  merchant company so they can make a decision, hopefully in our

6  favor, to reverse the charge-back.

7  Q.  For a charge-back to be successful generally, it is your

8  understanding that it would have to be the contract, right?

9  A.  For a charge-back to be successful from whose standpoint?

10 Q.  To reverse the charge-back to be successful, there would

11 have to be a signed contract, right?

12 A.  That's certainly one prerequisite, yes.

13 Q.  If for some reason there was no signed contract, it is

14 over, right?

15 A.  Yes.

16 Q.  Correct?

17 A.  Yes.

18 Q.  The second would be that there has to be some kind of

19 fulfillment of the contract for the merchant company to see

20 that the client got either most or all of what they contracted

21 for, correct?

22 A.  That is not a yes or no answer.  Can I elaborate?

23 Q.  Let me ask you a few questions first.

24 A.  Sure.

25 Q.  If there was no fulfillment, what are the chances of

1    reversing the charge-back?

2    A.   Even without a signed contract?

3    Q.   No.  With a signed contract, we are assuming a signed

4    contract, but if there is no fulfillment, what is the chance of

5    reversing a charge-back?

6    A.   20 percent.  That is even generous.

7    Q.   Not very good?

8    A.   Correct.

9    Q.   Now some products were sold -- for example, an LLC -- the

10   fulfillment would be the production of the papers and the

11   filing of the LLC with the State Department of the state where

12   you file those things, and that would be done, correct?

13   A.   Yes.

14   Q.   Now, you told us I think it was $125 or something for an

15   LLC.  That is just the fee for the state.  Is that correct?

16   A.   The state filing fee, correct.

17   Q.   Lawyers or specialists usually charge a fee to do the work

18   to file an LLC?

19             MS. FLETCHER:  Objection.

20   Q.   Don't they?

21             MS. FLETCHER:  Objection.

22   Q.   In your experience?

23             MS. FLETCHER:  Your Honor, objection.

24             (Pause)

25             MS. FLETCHER:  There is a pending objection.

IAPJKET5                        Sinclair – cross

 1                 MR. PAUL:  May we have a sidebar just for a second,

 2     please?

 3                 THE COURT:  Sure.

 4                 (Continued on next page)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. PAUL:  Quite frankly, Judge, it has to do with

3     what transpired because you had a number of sleeping members in

4     the jury.  Juror No. 10 has been out throughout most of this

5     trial.  I just want to alert the court, and Juror No. 1 --

6          THE COURT:  We have spoken to juror -- I had my Deputy

7     speak to Juror No. 1 a couple of times.

8          MR. PAUL:  I believe Juror No. 9, though awake today,

9     was completely out yesterday.  I thought this was a good time

10    to broach the subject with the court.  We may want to keep our

11    eyes on some of the jurors.

12         THE COURT:  That is appropriate and maybe you ought to

13    have more interesting questions.  Take your places.

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Ladies and gentlemen.  Why don't everybody

3     stand and stretch just for a moment.  (Pause)

4          Let's proceed.  I read my transcript.  I made my

5     ruling.  Let's proceed.

6     BY MR. SCHMIDT:

7     Q.  You had set, generally set fees for the different products

8     that you were selling.  Is that right?

9     A.  Yes.

10    Q.  There was a recommended price?

11    A.  Correct.

12    Q.  And the salespeople had the authority to go a little bit

13    below it without seeking approval?

14    A.  For the most part, that is safe to say.  You can say that.

15    Q.  But there was another portion that they can go further down

16    but they would have to get your approval?

17    A.  Correct.

18    Q.  Or Mike's approval?

19    A.  Correct.

20    Q.  For an LLC, the lowest they can go with approval was

21    something in the nature of 650, 700?

22    A.  I think we have done it for 500.

23    Q.  The general asking price or the retail value was $1200?

24    A.  In that vicinity.

25    Q.  In point of fact, a salesman can be flexible if the

1    customer had the money and said yes to $1200, they would sell

2    it for $1200, right?

3    A.  Yes.

4    Q.  And if the customer said I can't afford -- I can only

5    afford a thousand dollars, it would be sold for a thousand

6    dollars?

7    A.  Yes.

8    Q.  Now, somebody, some fulfillment person actually did the

9    work of preparing and filing the LLC.  Is that right?

10   A.  Yes.

11   Q.  Now, you paid them a percentage of the amount that you sold

12   the LLC for.  Is that right?

13   A.  Yes.

14   Q.  Were there any companies that had at least a minimum amount

15   that you had to pay them for the LLC?  Let me rephrase this.

16          Did Thoth provide a sheet that told you how much

17   they're going to charge?

18   A.  I don't know if Thoth did.

19   Q.  Did one of the companies that you used have something like

20   that?

21   A.  I remember a sheet somewhere along the lines.

22   Q.  Was that really locked in at that amount or that was also

23   their, you know, suggested retail price?

24   A.  There was usually wiggle room.  With them, if that's what

25   you're still asking?

1  Q.  In other words, generally fulfillment got 10 percent.  Is

2  that right?

3  A.  Correct.

4  Q.  Fulfillment could go as high as 15 percent?

5  A.  It is safe to say that.

6  Q.  If the LLC was sold for $1200, they would get $120, right?

7  A.  Correct.

8  Q.  They would also not have to pay $125 for the filing costs

9  would they?

10  A.  You say you "they," you mean --

11  Q.  Fulfillment?

12  A.  No, that was not their responsibility.

13  Q.  It is safe to say that anybody who is doing that work is

14  going to get paid for it, right?

15  A.  Yes.

16  Q.  In fact, you formed a number of LLCs, didn't you?

17  A.  For myself?

18  Q.  Yes.

19  A.  I had it done for me.

20  Q.  By whom?  By the accountant?  By a lawyer?

21  A.  I think Ray did it.

22  Q.  Did he do it for free?

23  A.  For me, yes.

24  Q.  Now, you sold business plans that included coaching.  Is

25  that right?

1  A.  Business plans that included coaching?

2  Q.  Yes.

3  A.  The biz-op plan did not include coaching.

4  Q.  Prior to Youngevity, you did sell things that included

5  coaching.  Is that right?

6  A.  We sold coaching, yes.

7  Q.  You sold coaching as a separate thing or part of a product?

8  A.  The coaching model is different from what we predominantly

9  sold.

10 Q.  There are numerous emails back-and-forth that you had with

11 people at Mr. Quiles' company and at Impact about problems

12 reaching customers so they could continue their coaching

13 process, right?

14 A.  Okay, yes.

15 Q.  So what product was being sold with the coaching?

16 A.  It varies for each one.

17 Q.  So you would sell a product, but with that product you

18 could add coaching to it?

19 A.  Yes.

20 Q.  Generally for people who are starting out in a new

21 business, it would be added to whatever their package that they

22 were provided, you were selling?

23 A.  Correct.

24         MS. FLETCHER:  Objection to form.

25         THE COURT:  I'll allow it.

IAPJKET5                         Sinclair - cross

1           THE WITNESS:  Yes.

2    BY MR. SCHMIDT:

3    Q.  And, obviously, the salespeople were aware of that you can

4    sell a product alone or with coaching.  Is that right?

5           MS. FLETCHER:  Objection.

6           THE COURT:  Sustained.  Now sustained.  Stop!

7           Rephrase.

8    BY MR. SCHMIDT:

9    Q.  Were the salespeople informed that they can sell coaching

10   with some but not all of the products that you sold?

11   A.  I don't recall.

12   Q.  Do you know what products sometimes included coaching?

13   A.  I can't.  Coaching is a different product.  Can you ask me

14   the question again, please?

15   Q.  Let me rephrase it.

16          Your fulfillment people sometimes coached your

17   customers?

18   A.  Yes, sir.

19   Q.  Sometimes it was easy for them to make the appointments and

20   sometimes it was difficult for them to make the appointments,

21   right?

22   A.  Yes.

23   Q.  Usually you heard about it when it was a problem?

24   A.  Correct.

25   Q.  Now, they're fulfilling something that you sold?

1   A.  Yes, sir.

2   Q.  What is it that you sold that they're fulfilling by

3   coaching?

4   A.  In general terms?

5   Q.  In general terms?

6   A.  Between 2014 and the end of 2015?

7   Q.  That is correct.

8   A.  Any of the biz-op related products or services, including

9   an LLC or corporation setup, business plan, Corporate Credit,

10  any social media marketing, business plans, logos, as you had

11  mentioned earlier, some of them got business cards, and in a

12  very few situations we even had to billed websites.

13  Youngevity, maybe a handful of people got their taxes done.

14  That is not something that we offered.  That is really the

15  scope of those.

16  Q.  For example, for Corporate Credit, right, you told us that

17  banks really want somebody to have two years and some proof of

18  an ongoing nature of the business before they'll give Corporate

19  Credit, correct?

20  A.  Correct.  That is what I was told.

21  Q.  But preparing yourself and your business to apply for

22  Corporate Credit is helpful, isn't it?

23  A.  Agreed.

24  Q.  And the coaching by the fulfillment people would do that or

25  try to do that with the customer.  Is that right?

IAPJKET5                         Sinclair - cross

1           MS. FLETCHER:  Objection.

2           MR. SCHMIDT:  I withdraw that question and rephrase

3    it.

4    BY MR. SCHMIDT:

5    Q.  It was your understanding you're paying the fulfillment

6    people to help the customers get ready for their application

7    for Corporate Credit.  Is that right?

8    A.  Okay.  Those are two completely different questions.

9    You're asking me if it was our understanding -- can you please

10   repeat the last question, sir.  I apologize.

11   Q.  I'll try to take make it a little simpler.

12           If coaching came with the Corporate Credit product

13   sale --

14   A.  Yes.

15   Q.  -- the coaching that you understood would be done would be

16   to help the customer prepare for the application to get

17   Corporate Credit?

18   A.  One had nothing to do with the other.

19   Q.  So what kind --

20           THE COURT:  What was the purpose of the coaching?

21           THE WITNESS:  The coaching is another product, another

22   service that we offered, your Honor, to give us some type of

23   documentation to show that we did something for the customer.

24   It is not like these were, you know, successful online

25   retailers teaching people with no experience how to be

1    successful online.  It was anyone hired who knows they're

2    telling people okay, what do you want to sell, teddy bears?

3              There was no --

4              THE COURT:  There was nothing to it?

5              THE WITNESS:  Correct.

6    BY MR. SCHMIDT:

7    Q.  There is a product called Corporate Credit coaching, isn't

8    there?

9    A.  We referred to it as Corporate Credit.  I don't know what

10   you are looking at.

11   Q.  So explain to me, then, what products do you sell coaching

12   for?

13   A.  Coaching is generally a separate -- okay.  To really

14   explain this to the jury and the men and women and your Honor

15   to all understand this, we spoke about separate sales that were

16   made.  There are three sales with this online model, okay?

17             If someone is looking to start an online business,

18   they Google it, whatever case they come across, specific people

19   looking to target people like this who want to work from home,

20   and it is usually a guy dressed in a suit, standing next to a

21   Ferrari with a pile of cash.  It looks ridiculous.  That is the

22   first purchase, usually like $50.00, $100.00.  And with that

23   you get like a booklet or CD, enough to spark someone's

24   interest to investigate further into it, right?

25             The second purchase comes when these coaching

1    companies call everybody who -- because you have to leave your

2    contact numbers -- they call them, all these people who spend

3    the 50 or $100.00 to see if they can upsell them on what is

4    called a coaching program.

5         What comes with that coaching program, depending on

6    how much money you think they're willing to invest or this

7    coaching company can get out of them, they get X amount of

8    lessons with said coaching company.  They get a website.

9    Sometimes they don't even get a website built for them if their

10   budget isn't big enough.  Sometimes it is like a build-your-own

11   type of thing, and some assistance on picking out products.

12        However, from my understanding for liability issues,

13   they always make the customer pick their own product, who 99

14   percent of the time has never had any experience with any type

15   of business, specifically an internet business, okay, which is

16   why I say theoretically before because from the beginning --

17        MR. PAUL:  Judge, I object to this.

18        THE COURT:  Sustained at this point.  Proceed.  You

19   have answered the question.  I repeat it sounds like there is

20   nothing to it, the coaching.  Is that right?

21        THE WITNESS:  Correct, your Honor.

22   BY MR. SCHMIDT:

23   Q.  If I may, your Honor, I would like to show the witness an

24   exhibit marked FMT-8.

25        (Off-the-record discussion)

1          MR. SCHMIDT:  May I approach, your Honor?

2          THE COURT:  Yes.

3          (Pause)

4    BY MR. SCHMIDT:

5    Q.  Now, do you recognize that document?

6    A.  This specific document, I don't offhand.

7          MS. FLETCHER:  Your Honor, I am sorry.  I don't

8    believe the government has a copy of that document.  Could I

9    have just a moment to make sure we have one?

10         THE COURT:  Yes.

11         MS. FLETCHER:  Mr. Schmidt, do you have another copy?

12         MR. SCHMIDT:  My copy I gave to the witness.  If you

13   like, I can go onto something else and come back to that.

14         THE COURT:  Yes, please.  Take it back.

15         (Pause)

16         THE COURT:  You need to show it to the government now.

17         MR. SCHMIDT:  We'll make copies now and get back to

18   it.

19         THE COURT:  All right.

20   BY MR. SCHMIDT:

21   Q.  Now, did you receive lists from the fulfillment people as

22   to what products that would be sold?

23   A.  We did.

24   Q.  Usually when you receive those, that was an attachment to

25   an email that went into your computer?

1   A.  Yes.

2   Q.  So you at least knew what product could be sent to that

3   fulfillment company to do the fulfillment?

4   A.  Yes, sir.

5   Q.  Now, Thoth is the same thing as Impact, isn't it?

6   A.  It is a fulfillment company, yes.

7   Q.  Now, Impact is opened by whom?

8   A.  I don't remember his name offhand.  I believe it is two

9   people.

10  Q.  Impact, you get some of their lists, don't you?  You got

11  some of the lead lists from Impact, didn't you?

12  A.  I did.

13  Q.  Did Impact actually do real fulfillment?

14  A.  By real fulfillment, what do you mean?

15  Q.  That is a good question.

16       In your mind, did anybody do real fulfillment --

17  excuse me.  What do you consider real fulfillment?

18  A.  Real fulfillment?

19       THE COURT:  Objection sustained.  Ask a question.  He

20  didn't use the term.  You did.

21  BY MR. SCHMIDT:

22  Q.  Now, did you ever have any charge-backs related to LLCs?

23  A.  Can you be more specific, please.

24  Q.  Did anybody who sold an LLC seek to have the money charged

25  back from their credit card?

1    A.  Of course.

2              THE COURT:  You have to speak loudly, sir.

3              THE WITNESS:  Yes, sir.

4    Q.  Were you aware whether or not that LLC had been -- do you

5    know how many cases there were of that?

6    A.  I don't.

7    Q.  Do you know if the LLCs were actually fulfilled?

8    A.  The LLCs should have been fulfilled unless we could not

9    contact the client to select a business name generally.  When I

10   say "we," I mean whoever was fulfilling for us.

11   Q.  Now, there was different social media products that you

12   sold.  Is that correct?

13   A.  Yes, sir.

14   Q.  Now, the products that you sold, what did the social media

15   product include -- withdrawn.

16             There was probably bronze, silver and gold for social

17   media?

18   A.  I think that is safe to assume.

19   Q.  Why don't you start with the minimum and work your way up

20   to the gold.

21   A.  I don't remember offhand.

22   Q.  Now, when you applied for a merchant account using I think

23   Edge -- is that correct?

24   A.  That sounds familiar, yes.

25   Q.  When you applied for that, you needed to fill out a

1  questionnaire.  Is that right?

2  A.  Yes.

3  Q.  Did you fill out a questionnaire?

4  A.  Every single merchant account had a questionnaire.

5  Q.  Did you tell the truth in the questionnaire?

6  A.  I am not looking at it so I don't know.

7  Q.  So, in other words, what you're saying now is that without

8  looking at these questionnaires, you don't know whether you

9  lied or told the truth to the banks or the credit people.  Is

10  that what you're saying?

11  A.  I don't remember if I was completely truthful on the Edge

12  application is what I'm saying.

13  Q.  So on some applications you were not completely truthful?

14        MS. FLETCHER:  Objection.

15        THE COURT:  Sustained.

16  Q.  Were you truthful on all of your applications?

17  A.  I can't say that with certainty, sir.

18  Q.  Does that mean that you believe you lied on applications?

19        MS. FLETCHER:  Objection; asked and answered.  He said

20  he does not remember.

21        THE COURT:  Just a moment.

22        When you filled out these applications, were you

23  truthful?

24        THE WITNESS:  Generally, I was.

25        THE COURT:  Sometimes you weren't?

1            THE WITNESS:  I can't even say that, your Honor.

2            THE COURT:  I take it if you were shown one, it would

3    refresh your recollection as to that particular application.

4            Is that correct?

5            THE WITNESS:  It would, sir.

6            THE COURT:  Proceed.

7    BY MR. SCHMIDT:

8    Q.  Let me show you BS-3, which is an email.

9    A.  (Pause)

10           THE COURT:  Ask your question.

11   Q.  Do you recognize those documents?

12   A.  This is my writing.

13   Q.  Is that a questionnaire that you filled out and sent

14   related to Edge?

15   A.  Yes.

16           MR. SCHMIDT:  I offer that in evidence.

17           MS. FLETCHER:  Objection.

18           THE COURT:  Basis?

19           MS. FLETCHER:  Relevance.

20           THE COURT:  Let me see it.  Hand it up.  Let me see

21   your copy, sir.

22           (Pause)

23           THE COURT:  Mr. Schmidt, is it to follow up on the

24   question you already asked?

25           MR. SCHMIDT:  Yes.

IAPJKET5                          Sinclair - cross

1           THE COURT:  I will allow it for that limited purpose.

2           MS. FLETCHER:  Your Honor, may we have a sidebar?

3           THE COURT:  Yes.

4           (Continued on next page)

5           (At sidebar)

6           THE COURT:  This is going to his credibility?

7           MR. SCHMIDT:  Yes.

8           THE COURT:  You are going to ask him whether he lied

9   on this?

10          MR. SCHMIDT:  Yes.  If he says yes --

11          THE COURT:  That seems to me to be appropriate.

12          (Off-the-record discussion)

13          MS. FLETCHER:  I withdraw the objection.

14          THE COURT:  Let's proceed.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

IAPJKET5                          Sinclair – cross

1              (In open court)

2              THE COURT:  Next question.

3    BY MR. SCHMIDT:

4    Q.  On this particular application, did you tell the truth?

5    A.  I didn't have it long enough to --

6              THE COURT:  Take your time.  You can take that down.

7              (Pause)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   A.  OK, Mr. Schmidt.  On page 1, the second to last question

2   says, "Does your sales staff have guidelines they need to

3   adhere?"  It's checked "yes" and says "attached."  I cannot

4   give adequate answer without seeing the attachment.

5            The first question on page 2 says, "Do you have a

6   quality control process in place to review sales on a regular

7   basis?"  That's partially true, as calls were monitored

8   randomly.  So not every call was monitored.

9   Q.  You don't think that anybody believed that every single

10  phone call -- withdrawn.

11           You don't believe that that question means that every

12  single phone call should be monitored, do you?

13           MS. FLETCHER:  Objection.

14           THE COURT:  No.  I will allow it.

15  A.  I can't say what anyone else was thinking without actually

16  having that conversation with them.

17  Q.  How much would it cost to have every single sales call

18  monitored?  Do you have any idea?

19  A.  I don't remember his price points.

20  Q.  Do you remember how long it would take to monitor every

21  single phone call?

22  A.  It's not done by hand.  It's a service.

23  Q.  Somebody would have to listen to the phone calls of every

24  single individual, every single day, and you had how

25  many -- withdrawn.  You had five, six salespeople, right?

IAP8KET6                          Sinclair - Cross

1   A.  The most we had, I think, was up to seven at any given

2   time, maybe eight.

3   Q.  You know for a fact, don't you, that in the industry, that

4   when calls are monitored, that means they monitor a certain

5   number of random calls or calls per salesperson, and no one

6   monitors all the calls, isn't that right?

7   A.  No.

8   Q.  You don't know that?

9   A.  No, I didn't say that.  I said no, because I have had

10  previous jobs where every call was recorded to have it on file

11  and if an issue came up, they could always go back to review

12  it.

13  Q.  That doesn't mean they are monitored, that means they are

14  saved?

15  A.  Recorded.

16  Q.  Recorded.

17  A.  Correct.

18          THE COURT:  Move on.

19  Q.  Anything else?

20  A.  Yeah.  There was one more here.

21          On the last page, "If customer service is outsourced,

22  has anyone from your company visited customer service

23  facility?"  It says yes.  We had not.  I have never been to,

24  nor has anyone from my organization visited Utah, which is

25  where Thoth was located.

IAP8KET6                        Sinclair - Cross

1   Q.  Did you visit Ray Quiles's place?

2   A.  I did.

3   Q.  So it's partially true?

4   A.  On page 1 it specifically says "Thoth training."  So the

5   answer would be no, to be factual.  I said yes.  It was really

6   no.

7   Q.  So everything else other than what you said is true?

8   A.  It seems to be.

9   Q.  As of June of 2015, you still were being monitored by Paul

10  Curtis, is that right?

11  A.  As per this application, it seems to be.

12  Q.  Well, you said that you were being monitored on a random

13  basis, so that question was true?

14  A.  Correct.

15  Q.  Are you saying that you actually don't know now or is it

16  true?

17  A.  So I don't know the specific dates, as we discussed before.

18  I am pretty sure about Paul Curtis's monitoring.  But if I put

19  it on here, chances are we probably were.  So there is a chance

20  that that could be false as well.  I will be on the record of

21  saying that.  My apologies.

22  Q.  Now, I am going to show you FMT-8.

23  A.  Do you need these other two back?

24  Q.  Do you recognize it?

25  A.  It looks like a list of Thoth products.

1   Q.  This is something that you downloaded from Thoth in your

2   computer, isn't it?

3   A.  It doesn't say that I downloaded it.  It doesn't have my

4   e-mail on it, so I can't say that with certainty either.

5   Q.  Do you recognize it at all?

6   A.  Again, I can't say that this is the actual list that I got

7   from -- I don't mean to nitpick, but I'm under oath.

8   Q.  Of course.

9           MR. SCHMIDT:  We offer that, your Honor.

10          MS. FLETCHER:  Can I have a moment, your Honor?

11          May I have a moment to confer with counsel, your

12  Honor?

13          THE COURT:  Yes.

14          Lower, Mr. Schmidt, please.

15          MS. FLETCHER:  Your Honor, we object on 801 grounds.

16          THE COURT:  Let me see that, sir.

17          MR. SCHMIDT:  Your Honor, it's not being offered for

18  the actual truth.  It's being offered for the existence of the

19  document.

20          THE COURT:  Sustained.  You can ask it without

21  reference to the document.

22          MR. SCHMIDT:  Your Honor, may we approach?

23          THE COURT:  No.  Move on.

24  BY MR. SCHMIDT:

25  Q.  Didn't Thoth in fact sell -- withdrawn.

1    Didn't Thoth, when they were going to fulfill

2    corporate credit, was fulfilling corporate credit training or

3    corporate credit training minimal?  Isn't that what they were

4    fulfilling?

5              MS. FLETCHER:  Your Honor, if the witness is not being

6    refreshed with that document, can it be taken back from him?

7              THE COURT:  Turn it over.

8    A.  Again, I don't know if this is the actual list that I had

9    from them.

10   Q.  Isn't it a fact that when you sold corporate credit, and

11   you used Thoth as your fulfillment people, what you were

12   selling was corporate credit training?

13   A.  Again, I don't remember.  I can't say yes or no.  I'm

14   sorry.

15   Q.  So what you're saying now is that when you were selling

16   corporate credit, it may or may not have included training with

17   the corporate credit, but you just simply don't remember, is

18   that what you're saying?

19             MS. FLETCHER:  Objection.  Asked and answered now.

20             THE COURT:  I will allow it.

21   A.  What I am saying is I don't know the specifics of -- if

22   they offered corporate credit, I don't recall the specific

23   product list that Thoth offered.  And if they did offer

24   corporate credit, they weren't very good at it because we

25   didn't stay with them for a very long time at all.

```
 1   Q.  Didn't you explain to the people that you were selling what
 2   they were selling?
 3           MS. FLETCHER:  Objection.
 4           THE COURT:  You mean what they were buying.
 5   Q.  Your salespeople, you had a list of what they were selling,
 6   is that right?
 7   A.  As far as products we offered?
 8   Q.  Yes.
 9   A.  They did.
10   Q.  Did you explain to them what the product meant, you or Fino
11   or a fulfillment person, explain to the salespeople what it
12   meant that they were selling?
13   A.  Yes, sir.
14   Q.  So if your fulfillment people were selling corporate credit
15   that came with training, you would explain to your staff, the
16   salespeople, that corporate credit came with training, is that
17   correct?
18           MS. FLETCHER:  Objection to form.
19           THE COURT:  I will allow it.
20   A.  We would go over the product list or the fulfillment
21   company, whoever that was at the particular time, would explain
22   was on -- what was being offered and what that came with, yes.
23   Q.  So answered the question yes.
24           THE COURT:  He gave his answer.
25           Again, the jury is to disregard statements of the
```

1    lawyers.  The answer is what this witness just testified to.

2    Q.  Now, if social media also -- withdrawn.

3           If your fulfiller included training with their social

4    media package, you would explain that to your sales staff,

5    wouldn't you?

6    A.  Or they would, or the fulfillment team would, sure.

7    Q.  If your fulfillment people included training with the

8    business plan, you or the fulfiller would inform your

9    salespeople that it was included, isn't that correct?

10          MS. FLETCHER:  Objection.  Compound and foundation.

11          THE COURT:  Just rephrase it.  You said "it was

12   included."  Just be more specific.

13   Q.  If coaching was included -- withdrawn.

14          If the fulfillment company you were using included

15   coaching with its business plan, you would or the fulfillment

16   people inform the salespeople that coaching was included in the

17   business plan, is that correct?

18   A.  I'm not sure coaching would be offered on a business plan.

19   A business plan was just a booklet.  So again, it's two

20   separate products that you're referring to.

21   Q.  Are you now saying that you know now that your fulfillment

22   people, Thoth, did not include coaching with its business plan,

23   is that your testimony?

24   A.  I'm saying I don't know how coaching, you would be coached

25   on a business plan.  Maybe you're thinking that it's the same

1    product.  It sounds like two separate products.

2              THE COURT:  In other words -- again, I don't want to

3    put words in your mouth -- selling a business plan was one

4    product you were offering and selling coaching was the second

5    product you were offering?

6              THE WITNESS:  Yes, sir, your Honor.

7              MR. SCHMIDT:  Your Honor, I now again offer FMT-8 into

8    evidence.  And if necessary, your Honor, I would like to go to

9    the sidebar.

10             THE COURT:  We will handle the sidebar at the end of

11   the day.

12             Next.

13   Q.  Now, do you recall what you gave your salespeople, if

14   anything, as to what was included in the Youngevity pack?

15   A.  As far as a tangible for them to refer to you mean?

16   Q.  When asked what is included in this package you're selling

17   me, that the salesperson can actually give an answer based on

18   something that they were told?

19             MS. FLETCHER:  Objection.  It's not a question.

20             THE COURT:  Ask the question directly.

21             In your mind, sir, is coaching identical to training?

22             THE WITNESS:  Yes.

23             MR. SCHMIDT:  That's not the question, your Honor.

24             THE COURT:  No.  I was asking my own question.

25             MR. SCHMIDT:  OK.

1           THE COURT:  I can do that.

2           Proceed.

3    Q.  Did you give your salespeople a list of what was included

4    in the Youngevity package?

5    A.  I don't recall a list for Youngevity, as far as I can

6    remember.

7    Q.  Now, did one of your fulfillment people ask you to send

8    them a list of what was included in the Youngevity package?

9    A.  That would make more sense so they would know how to

10   fulfill it.  So I could say with a fairly reasonable degree of

11   confidence that that could be a yes, yes.

12   Q.  So if you sent the fulfillment people the list of what is

13   included in the Youngevity package, would that mean that you

14   previously provided that list to your salespeople?

15   A.  You could say that.  It was only a few things in

16   Youngevity.  It wasn't an elaborate thing.  It was a Web site

17   and maybe some social media.  It wasn't something that had to

18   be written down.  It was pretty self-explanatory.

19   Q.  Wasn't it a starter kit, with unique owner Web site,

20   including a built-in shopping cart and back office, upgraded

21   advertising Web site with links to marketing sites shopping

22   cart and catalogue, social media marketing and business network

23   services, variety sample product packages and e-mail and phone

24   customer service?  Isn't that what was sold with the Youngevity

25   package?

IAP8KET6                      Sinclair - Cross

1   A.  Yes.

2   Q.  And isn't this what your salesmen were told that they could

3   tell the customers who they were talking to about buying

4   Youngevity?

5   A.  Yes, sir.

6   Q.  Now, they were also told that they can tell their customers

7   that the Web site will take about two weeks, and their first

8   check should arrive in 60 or 90 days, isn't that right?

9   A.  Yeah.

10  Q.  And they were also told that if you don't want to do sales

11  yourself, the package would include enough that the Web site

12  would be up and running and that sales can start without you

13  doing anything?

14  A.  What they were told is that there were two ways --

15  Q.  That requires a yes or no answer.

16  A.  No.

17          MS. FLETCHER:  Objection, your Honor.

18  A.  I don't feel confident enough to give that a yes because of

19  the piece at the end, so I will say no.

20  Q.  Let me see if I understand then.

21          The salespeople were informed that the Web site

22  itself, with the products, and the marketing, and the social

23  media, and the business network service, and shopping carts and

24  catalogues were all included, and for that you don't have to do

25  a thing, is that right?

IAP8KET6                        Sinclair - Cross

1   A.  It's part of the package.

2   Q.  So the information you passed on to the salespeople about

3   the Youngevity package meant that for the Web site to be up and

4   running, to be marketed, the purchaser did not need to do

5   anything?

6   A.  Correct.

7              THE COURT:  I gather, correct me if I am overstating

8   it or incorrect, but I gather for all of the products you were

9   selling, part of the sales pitch was the customer didn't have

10  to do anything except cash checks, is that correct?

11             THE WITNESS:  To different degrees, depending on the

12  business model.

13             THE COURT:  All right.  Thank you.

14  Q.  For a business plan the customer had to have a

15  business -- withdrawn.

16             You weren't selling a business with a business plan,

17  were you?

18  A.  You mean business as far as an idea or a business as far as

19  like an LLC, a corporate setup?

20  Q.  A business plan was basically how to best run a business,

21  is that right?

22  A.  Yes.  I understand a business plan, but you said business.

23  Q.  Let me then rephrase it.

24             A business plan meant advice how to run a business?

25  A.  Yes.

IAP8KET6                          Sinclair - Cross

1   Q.   Therefore, it did require the person to do something if

2   they wanted to be successful in using the business plan?

3   A.   To that degree, yes.

4   Q.   Now, a sales engine optimization, what was the customer

5   supposed to do with sales engine optimization?

6   A.   Search engine optimization?

7   Q.   Excuse me.  You're right.  What was the customer supposed

8   to do?

9   A.   Nothing the customer could do.  That was something that was

10  supposed to be provided.  So to answer your question, there is

11  nothing that the customer could do.

12  Q.   Then the search engine optimization would be for an

13  existing business, wouldn't it?

14  A.   Yes.

15  Q.   It could also be for a --

16              THE COURT:  Did most of your customers have existing

17  businesses, if you know?

18              THE WITNESS:  It depends on where the lead came from,

19  your Honor.  If it was an Internet business, they bought into

20  an idea.  So when you say business, they had an idea for a

21  business.  What they were getting and what they thought they

22  were going are two different things.  That's the issue, your

23  Honor.

24  Q.   Didn't people have existing businesses that they were

25  looking for additional services?

IAP8KET6                        Sinclair - Cross

1   A.  So that's tough to give you a yes or no because it's open

2   to interpretation.  Can I elaborate?

3   Q.  No.  No, thank you.

4   A.  Sorry.

5   Q.  I am going to ask you to take a look -- withdrawn.

6          Did you have a customer, one customer or more that

7   wanted to get help with her search engine?

8          MS. FLETCHER:  Objection.

9          THE COURT:  No.  I will allow that.

10          If you know.

11  A.  Did we sell one person search engine optimization is your

12  question?

13  Q.  No.

14          THE COURT:  If you know, did you have any customers

15  that wanted to get help with the customer's search engine?

16          THE WITNESS:  I am sure we did.

17  Q.  Wouldn't that mean that that customer already had a Web

18  site and wanted to make it better?

19  A.  That's the definition of it, yes.

20  Q.  So those customers did exist?

21  A.  Again, this is not a yes or no.  In theory, on paper.

22  Q.  I asked you if you had customers that did ask, and you said

23  yes, isn't that right?

24  A.  Yes, but --

25  Q.  Is that --

1           THE COURT:  Allow him to answer.

2           Yes but what?

3   A.  You asked me another question.  It's more of a concept that

4   you're asking me to agree to, which I can't do that.

5   Q.  Is not really answering a question one of the things that

6   you teach your salespeople --

7           THE COURT:  Sustained.

8   Q.  -- in dealing with the customers?

9           THE COURT:  The government is standing to object.

10          Sustained.

11  Q.  Now, you told us how little percentage of the money that

12  you and Fino kept as a result of everybody that you had to pay

13  out, is that right?  Do you remember that?

14  A.  Yeah.  Much less than what people thought.

15  Q.  You said that you had to pay the people who gave you the

16  leads 40 percent of the sale price for the lead, is that right?

17  A.  Yes, sir.

18  Q.  Do you have an idea of how much you actually sold as a

19  company in 2014?

20  A.  I don't have my financials.  No, sir.

21  Q.  Well, would your financials of how much your company

22  sold -- withdrawn.

23          When you did your tax returns, the businesses that

24  were in your name was Olive Branch Marketing and Champion

25  Business Services, is that correct?

IAP8KET6                          Sinclair - Cross

1    A.  Yes, sir.

2    Q.  There was a company in the name of Fino.  What was that

3    company?

4    A.  Paramount Business Solutions.

5    Q.  So the money that Paramount got would not be included in

6    your tax return, right?

7    A.  Correct.

8    Q.  In 2014, did you have any other entity that you used for

9    merchant account?

10   A.  Under my name?

11   Q.  The company.  The company, large company.

12   A.  I don't believe so.

13   Q.  Would a review of your 2014 tax return help you in

14   remembering approximately what your gross proceeds were from

15   Olive Branch Marketing and Champion?

16   A.  Yes, of course.

17           MR. SCHMIDT:  May I approach the witness?

18           THE COURT:  Yes.

19   Q.  I bring your attention to the second page, line 1.  Why

20   don't you read that to yourself.

21           Does that refresh your recollection as to the gross

22   proceeds of those two companies?

23   A.  Line number --

24           THE COURT:  I'm sorry.  The issue is not --

25   Q.  The third page?

1              THE COURT:  The issue is not what is written there.

2        First of all, you should read the third page just to

3   yourself.  But just because a number is on a page doesn't mean

4   that it's true.  The issue is only whether you now have a

5   refreshed recollection of the gross proceeds.

6              THE WITNESS:  OK.  Thank you, your Honor.

7   A.  The answer is yes, Mr. Schmidt.

8   Q.  What was the approximate gross proceeds of the combined

9   Olive Branch and Champion firm?

10             THE COURT:  Put the document down.

11  A.  It says over --

12             THE COURT:  Not what it says.

13        Do you have a new recollection, independent of that?

14        You see, the idea of refreshing recollection is a

15  lawyer is entitled to show you anything at all that may or may

16  not refresh your recollection.  A lawyer could show you a

17  banana and say, does this refresh your recollection about the

18  gross proceeds from these companies?  It's possible it does,

19  it's possible it doesn't.  Simply because something is on the

20  page doesn't make it so.  So it's not from reading that.  But

21  reading that may give you a refreshed recollection.

22        So looking at it, do you now say, I now remember that

23  the gross proceeds were approximately or specifically or

24  whatever you now remember?

25             THE WITNESS:  I actually thought we did more in gross

1    sales.

2              THE COURT:  So tell him what your refreshed

3    recollection is in regard to gross proceeds of those two

4    companies.

5              THE WITNESS:  OK.

6              MR. SCHMIDT:  I withdraw that question.

7              THE COURT:  After all that he is withdrawing it.

8              Ladies and gentlemen, I don't know if you can feel it,

9    but the engineer has indeed lowered the temperature and

10   increased the flow here.  I certainly can feel it.

11   BY MR. SCHMIDT:

12   Q.  I ask you to take a look at page 3, line 1, and see if that

13   refreshes your recollection of the gross proceeds or sales of

14   Olive Branch Marketing LLC.

15   A.  Page 3.

16             THE COURT:  Line 1.  And again, it's not what is

17   written there.  It's whether or not what is written there gives

18   you a new recollection.

19   A.  Page 3 doesn't --

20   Q.  Profit or loss.

21   A.  Here we go.  As I just told Judge Stein, I actually

22   thought -- yes.

23   Q.  Does that refresh your recollection that you did over $3

24   million in gross sales for Olive Branch Marketing in 2014?

25   A.  Yes, sir.

IAP8KET6                              Sinclair - Cross

1   Q.  Now, I ask you to look at page 5, line 1, and ask if that

2   refreshes your recollection as to the gross sales or receipts

3   for Champion Business Services LLC in 2014?

4   A.  Yes.

5            THE COURT:  What is your refreshed recollection?

6            THE WITNESS:  These numbers are actually lower than

7   what I had in my head.

8   Q.  So what do you have in your head?

9   A.  I thought maybe combined -- it's impossible for me to tell

10  individually, but combined I thought maybe it was closer to 5

11  million.

12  Q.  So if we have six, seven, eight million dollars of gross

13  proceeds, that would be sales that you received from leads, is

14  that correct?

15  A.  Yes, sir.

16  Q.  And while 40 percent of five million would be two million,

17  does that mean you paid out at least $2 million to the lead

18  list people?

19  A.  On paper that's what it should be.

20  Q.  Now, isn't it a fact that you claimed only $43,000 in

21  deductions for payment in leads?

22  A.  I don't know what my accountant did.  I don't understand

23  all this.  I provided him with my financials.  So if that's

24  what it says, then that's what it was.

25  Q.  Did you sign it?

1          Not that piece of paper.  Did you send in your taxes?

2     A.  I don't know if I signed anything.

3     Q.  So you think your taxes went out without signing it or even

4     looking at it, is that what you're saying?

5     A.  I don't recall.  This is 2014.

6     Q.  Isn't it a fact that you sent in -- withdrawn.

7          Isn't it a fact that when you sent money to the people

8     who supplied leads, that you didn't claim all of the sales, you

9     only claimed a small portion of the sales so you could pay them

10    less?

11    A.  A small portion of the sales is false.

12    Q.  A middle portion of the sales, is that better?

13    A.  It was very difficult to underreport because they would

14    know if you ever spoke to them.  Were there situations where we

15    did underreport?  Yeah, when we got chargebacks, because they

16    wouldn't credit us for chargebacks.  So we did our best to keep

17    it even.

18    Q.  So because you knew that you were going to have

19    chargebacks, when you told the lead sources the week of April

20    12, 2014, you didn't claim all of them because you wanted to

21    hold some back just in case you had chargebacks, is that what

22    your testimony is?

23    A.  No.

24          MS. FLETCHER:  Objection.

25          THE COURT:  I will allow it.  It's cross.

IAP8KET6                        Sinclair - Cross

1              The answer is no.

2    Q.   Did you prepare 1099s for the lead sources?

3    A.   Did I personally?  No.  I'm not an accountant.

4    Q.   Did you have your accountant prepare 1099s for the lead

5    sources?

6    A.   I believe so.

7    Q.   Do you know where those 1099s might be?

8    A.   I would assume in discovery.

9    Q.   Would it have been in your computer?

10   A.   Yes, sir.

11   Q.   So the 1099s that you sent -- which computer would that be

12   in?

13   A.   The one that the government has.  You're talking about

14   e-mail or computer?

15   Q.   Which computer would the 1099s that were sent out to the

16   lead sources, which computer would it be in, the Olive Branch

17   computer, main Olive Branch one?

18   A.   Possibly.  It could also have been sent out directly from

19   the accountant, which I think makes more sense.

20   Q.   You don't think you have any 1099s in your computer?

21   A.   I may.  I may.

22   Q.   Did you pay your staff by check or by cash?  Not the

23   salespeople.  The appointment setters and the compliance

24   people.

25   A.   To my recollection, most of them got paid either by check

IAP8KET6                          Sinclair - Cross

1    or direct deposit.

2    Q.  Which account would that come from?

3    A.  The main Olive Branch account.

4    Q.  And the 1099s were prepared by, I assume your accountant,

5    and you may or may not have received them, is that right?

6    A.  I'm not saying I didn't receive them.  Yeah, I may or may

7    not have them, if that's sufficient.

8    Q.  Now, who is Jolaina Aziz?

9    A.  She was our compliance manager, I want to say from, maybe

10   like the summer of 2015 through March of '17.

11   Q.  Was she paid as an employee or as a 1099?

12   A.  I don't have those records.  I don't know, sir.

13   Q.  Did Ms. Aziz also make sales to customers for LLCs?

14   A.  Sales?  No.

15   Q.  Did any of the appointment setters or compliance make sales

16   for LLCs?

17   A.  To my recollection, it was two completely different

18   departments.  I don't remember a time where LLCs would have

19   been sold by appointment setters.

20   Q.  You communicated in Skype to a number of people, didn't

21   you?

22   A.  Yes, sir.

23   Q.  Who is Kaitlin Moscatelli?

24   A.  She was a compliance manager before Jolaina Aziz.

25   Q.  Who was Julie?

1    A.   Julie was a phone name, I believe, for someone.  I don't

2    remember who used that name.

3    Q.   Was it one of the compliance people?

4    A.   Yeah.

5    Q.   And Jen was?

6    A.   Jen Lulunaj.

7    Q.   Jen was Jen Lulunaj?

8    A.   I don't know what name she used on the phone, if any.

9    Q.   But if you said Jen to somebody, that's the person you

10   meant, is that correct?

11   A.   Correct.

12   Q.   I am going to show you what has been marked BS-7.

13            MR. SCHMIDT:  Actually, put that up.

14   Q.   I ask you to take a look at that.  Do you recognize that?

15   A.   Not offhand, no.

16   Q.   Were you bill.obm for your Skype account?

17   A.   I believe so.

18   Q.   Taking a look at that, does that refresh your recollection

19   that Jen and Julie had some sales also?

20   A.   Not at all.

21            MR. SCHMIDT:  I offer this in evidence, your Honor.

22            MS. FLETCHER:  Objection.  801.

23            THE COURT:  Just a moment.

24            Sustained.

25            THE WITNESS:  Your Honor, may I add something?  I

IAP8KET6                          Sinclair - Cross

1    think I know what this means.

2              MR. SCHMIDT:  No.  It's been sustained.

3              THE COURT:  Mr. Schmidt has answered for the Court.

4    Q.  How did you receive -- withdrawn.

5              You received reports from Paul Curtis about what he

6    said were errors made by the salespeople, is that right?

7    A.  Fines or recommendations for fines?

8    Q.  Recommendations for fines.

9    A.  Yes, sir.

10   Q.  Now, the ones that the government offered as evidence

11   indicated that -- withdrawn -- one of them indicated that there

12   was a recommended fine for making specific tax savings claims

13   and giving specific tax advice without a disclaimer.

14   A.  I remember seeing something like that.

15             MR. SCHMIDT:  Can we put up 252, government exhibit,

16   for everybody.

17             Can we go down?

18             THE COURT:  Proceed, sir.

19   Q.  Now, on page 2, the section that's highlighted is:  "The

20   first $10,000 you invest into a business like this is 100

21   percent tax deductible."

22             Do you see that?

23   A.  I do.

24   Q.  The fact is that you believed that the first $10,000 you

25   invest in a company can be tax deductible, is that right?  That

1   was your understanding?

2   A.  Not necessarily.

3   Q.  Isn't that in your script?

4   A.  It's supposed to be up to 10,000, as per the script, which

5   I don't know if that's even accurate as far as tax law, but the

6   script.

7   Q.  So what you're saying is that you gave a script to your

8   salespeople that you are now saying may not have been accurate,

9   is that right?

10  A.  That's what I am saying now.

11  Q.  At that time you thought it was accurate, is that correct?

12  A.  I did.

13  Q.  And when you gave it to Mr. Owimrin, you told him that this

14  is true, is that correct?

15  A.  I told him this is a script.

16  Q.  Did you tell him the script was made up?

17  A.  No.

18  Q.  You told him, this is correct, this is what you can say,

19  isn't that right?

20          THE COURT:  Change that.  That's compound.

21          What did you tell the salesperson when you gave the

22  salesperson the script about the script?

23          THE WITNESS:  The script was really only given to a

24  few people, Andrew being one of them.  The script was to be

25  used as a frame of reference.  It wasn't read verbatim.  As far

IAP8KET6                          Sinclair - Cross

1    as we knew, as far as the highlighted line here, the first

2    10,000, we did believe that to be accurate, as per our previous

3    company, The Tax Club.  The only difference is that the first

4    10,000 you invest, like this is 100 percent tax deductible,

5    it's supposed to say, according to our previous understanding,

6    that up to the first 10,000 you invest can be up to 100 percent

7    tax deductible.  That's why it says without a disclaimer.

8              THE COURT:  Let me ask it again.

9              If you remember, when you gave the script that's on

10   the screen to the few salespeople you say you gave it to, what

11   did you tell them about the script?

12             THE WITNESS:  Stick to this, in so many words, your

13   Honor.

14             THE COURT:  All right.

15   BY MR. SCHMIDT:

16   Q.  Didn't you receive reports from Mr. Curtis recommending

17   fines if the salesperson did not keep to the script?

18   A.  I did.

19             THE COURT:  When you gave the script to the few

20   salespeople you gave it to you, did you say anything about the

21   truthfulness or lack of truthfulness of what was set forth on

22   the script?

23             THE WITNESS:  I don't remember having conversations

24   about it being truthful.

25             THE COURT:  Is it fair to say it didn't matter whether

IAP8KET6                          Sinclair - Cross

1   it was truthful or not?

2              MR. SCHMIDT:  Objection, your Honor.

3              THE COURT:  Fair enough.  Fair enough.

4              Your next question.

5   Q.  Now, you testified that sometimes there were fines and

6   sometimes -- withdrawn -- sometimes you did not follow a

7   recommendation for a fine and sometimes you did follow a

8   recommendation for a fine, is that right?

9   A.  Correct.

10  Q.  Now, for the one that we were just talking about now, I

11  guess using "is" as opposed to "can be," was not one that would

12  likely be followed by a fine, is that correct?

13  A.  It's safe to say.

14  Q.  But there are others that certainly would be followed by a

15  fine, is that right?

16  A.  Yes.

17  Q.  Now, was there someone who got fined the most, to your

18  recollection?

19  A.  I don't remember.

20  Q.  Is there someone that you could say was fined thousands of

21  dollars?

22  A.  In one particular violation?

23  Q.  No.  Just for repeated violations.

24  A.  I don't know the numbers offhand, sir.  I'm sorry.

25  Q.  Is there somebody that sticks in your mind of who really

IAP8KET6                        Sinclair - Cross

1   was having problems in sticking to the script?

2   A.  No.  I'm sorry.

3   Q.  Isn't it a fact that you told the government in one of your

4   interviews that Brian Shalansky had thousands of dollars in

5   fines?

6   A.  That was a one-time -- that's why he left so we couldn't

7   actually assess that.

8   Q.  Isn't it a fact that Brian Shalansky received at least 17

9   of these warnings?

10  A.  That I can't confirm without looking at it.

11  Q.  How did you receive the recommendation form from

12  Mr. Curtis?

13  A.  Via e-mail.

14  Q.  Excuse me?

15  A.  Via e-mail.

16  Q.  So it would be fair to say that in your computer download

17  box there would be a lot of those?

18  A.  It would be there, yes, somewhere in my e-mail.

19  Q.  Now, Andrew worked at Olive Branch for the whole time that

20  Paul Curtis was monitoring, is that right?

21  A.  I believe so, yes, sir.

22  Q.  Reagan did also, is that correct?

23  A.  Yes, sir.  Let me take a step back.  When Andrew came back

24  and we were selling debt, Paul Curtis was not monitoring our

25  calls.

1    Q.  We are not talking about --

2    A.  The first time around.

3    Q.  We are talking about from October 2014 to sometime around

4    June or July 2015.

5    A.  Yes, sir.

6    Q.  Pete DiQuarto, did he get recommendations for fines?

7    A.  I don't know the specifics on the fines, sir.  I don't

8    remember.

9    Q.  My question was, did he get them?

10   A.  I don't remember.  I don't.

11   Q.  So it's your testimony now that you have no recollection of

12   whether Pete DiQuarto received recommendations for fines?

13   A.  As I sit here right now, I do not remember.  I apologize.

14   I don't remember.

15   Q.  Do you remember receiving fine recommendations involving

16   people making earning representations?

17   A.  Earnings claims?

18   Q.  Yes.

19   A.  I know that they came in.  I don't know when or for who or

20   how many, but I know that we had gotten them.

21   Q.  Now, you're here testifying on a case where the defendants

22   are Andrew Owimrin and Steven Ketabchi, is that right?

23   A.  Yes.

24   Q.  And for your last many meetings, the subject of your

25   conversations were frequently Andrew Owimrin and Steven

IAP8KET6                        Sinclair - Cross

1    Ketabchi, is that right?

2    A.  Yes.

3    Q.  And you were shown many documents that were seized from

4    your office or taken off of your computer, is that correct?

5    A.  Yes.

6    Q.  Were you shown any documents about Andrew Owimrin having

7    made any earning representations?

8            MS. FLETCHER:  Objection.

9            THE COURT:  Sustained.

10   Q.  Now, you talked about the number of chargebacks.

11           Now, some of the chargebacks were from people who

12   said, you know, I change my mind, I don't want to be involved

13   in Youngevity, right?

14   A.  Sure.

15   Q.  Some of them actually complained that they had a health

16   issue and they don't think they could handle it, right?

17   A.  With regard to Youngevity specifically, that I do not know.

18   Q.  Now, you told us about Ray Quiles coming in and meeting at

19   times with the staff, is that right?

20   A.  Yes.

21   Q.  And you said that he came in and said some people were

22   making earning representations, is that right?

23   A.  Yes.

24   Q.  Now, he wasn't monitoring any of the phones, is that right?

25   A.  No, he was not.

IAP8KET6

1    Q.  He said he put chargebacks in for customers, is that right?

2    A.  That Ray Quiles put chargebacks in for customers, what

3    exactly do you mean?

4    Q.  Didn't you testify that Ray Quiles put chargebacks in for

5    customers?

6    A.  I'm not sure as to what you mean.  Chargebacks were handled

7    by Michael Finocchiaro.  Ray Quiles had nothing to do with the

8    merchant accounts in that time frame.

9    Q.  Chargebacks are put in by the customers, aren't they?

10   A.  They are.

11   Q.  And at times people will tell customers to put in

12   chargebacks?

13           MS. FLETCHER:  Objection to "people."

14           THE COURT:  I will allow it.

15           MR. SCHMIDT:  Withdrawn.

16   Q.  You testified that Mr. Pizarro was telling your customers

17   to put in chargebacks?

18   A.  Yes, sir.

19   Q.  Did Ray tell you that he suggested to some customers to put

20   in chargebacks?

21           MS. FLETCHER:  Objection.

22           THE COURT:  Sustained.

23           Mr. Schmidt, I have another matter at 4:30.  Is this a

24   logical point to break?

25           MR. SCHMIDT:  Yes, it is, your Honor.

IAP8KET6

1          THE COURT:  How much longer do you have?

2          MR. SCHMIDT:  I'd say, if we are lucky, half an hour;

3     if we are unlucky, an hour.

4          THE COURT:  Ladies and gentlemen, we are going to

5     break for the evening.  Please be here tomorrow by 9:30.  We

6     will start exactly at 9:30.  You have been very prompt and

7     everyone appreciates it.  And we are going to end tomorrow at

8     4:00.  So we will go from 9:30 to 4.  Keep an open mind.  You

9     have not heard all the testimony.

10          I am going to ask the lawyers -- I already have, or

11     told the lawyers, I haven't asked them -- for both sides to

12     step up the pace of questioning so this moves more apace.  And

13     I have reduced the temperature.

14          (Jury exits courtroom)

15          THE COURT:  You may step down, sir.

16          I do have another matter so the attorneys are going to

17     have to clean up their spots just so that lawyers can be seated

18     there.

19          I am serious about both sides picking up the pace

20     here.  And part of that is get better control over your paper,

21     have better, smoother procedures.  One party has three lawyers

22     and a paralegal, one party has two lawyers and a paralegal, and

23     the other side has two lawyers.  You have enough people that

24     you can have assistance in getting the paper to the questioner

25     in adequate time.

IAP8KET6

1          MS. FLETCHER:  We do have one evidentiary issue to

2     raise with your Honor.

3          THE COURT:  Let's do it now.

4          MR. SCHMIDT:  Also, we have the Thoth issue, the

5     exhibit issue.

6          THE COURT:  FMT-8 issue.  Let's handle that first

7     since that was on the record.

8          The objection is hearsay, correct, Ms. Fletcher?

9          MS. FLETCHER:  Yes, your Honor.

10          THE COURT:  It's clearly hearsay.

11          MR. SCHMIDT:  Your Honor, first --

12          THE COURT:  I understand what you're questioning was

13     about, but I think in part it's because, I gather so far, that

14     there is no training.  It apparently has the same substance as

15     everything else here.  There is nothing there.

16          MR. SCHMIDT:  Your Honor, I object to that because --

17          THE COURT:  That's not my ultimate conclusion.  I am

18     saying what it appears so far.  And there is confusion between

19     you and the witness when you keep on asking him about training.

20          MR. SCHMIDT:  Your Honor, there are lots of e-mails to

21     him about training that we are now going to get out.  The point

22     is the government has agreed on authentication of these

23     documents coming from the Olive Branch Marketing office, which

24     include the list of products.

25          THE COURT:  You mean coming from Olive Branch.

IAP8KET6

1          MR. SCHMIDT:  Yes.  And while I am not here to say

2     that any claim made by any of the persons who testified is

3     true, or the people that he dealt with in the industry were

4     true, the fact is that existing in his computer is the

5     fulfillment list from the company he is dealing with that

6     includes training with the product.  And that shows that he is

7     not telling the truth.

8          It's not for the truth of this document because

9     whether they trained or not is not the issue.  The issue is

10    whether the product that they were selling -- and ultimately my

11    client, if he testifies, will explain -- the product that was

12    being sold was indeed, for example, corporate credit training,

13    which included the corporate credit and the training.  It's not

14    that it's truthful, but that this exists there in the office.

15          THE COURT:  He is not fighting you, I don't think, on

16    the fact that they were selling training.  The training was

17    nothing.  He just said they picked up people and didn't care

18    who they were.  He is not arguing there was no training sold.

19    He is saying the training didn't consist of anything.  They

20    were selling a lot of things that are in the miasma; they're

21    ephemeral.

22          MR. SCHMIDT:  He is saying the product sold was

23    corporate credit and did not include training.  This document

24    says that the product being sold is corporate credit, hash mark

25    training.  I am not saying that the training occurred.  I am

IAP8KET6

1   saying that the product that was being sold by the salesperson

2   included the training and not separately like he said.

3          MS. FLETCHER:  That's the hearsay purpose of this

4   document.  This document, if authenticated and the assertions

5   in the document were believed, would lead to the conclusion

6   that Thoth in fact offered a product called corporate credit

7   training.  Mr. Schmidt has had ample opportunity to impeach the

8   witness on this issue.  In fact, he has had significant

9   opportunity to impeach the witness on this issue.  There is no

10  nonhearsay purpose for this document.  And in any event, it's

11  not clear how it's relevant other than for impeachment

12  purposes, which he has already achieved.

13         MR. SCHMIDT:  This witness has repeatedly said that

14  none of the products include training, and therefore everything

15  of the product was ephemeral, while at least the product listed

16  includes training.  He is not telling the truth.  He is lying

17  to the jury about what the product is that he has been given by

18  Thoth.  Not that there really was training, but that the

19  product that is --

20         THE COURT:  It clearly is a hearsay document.  Use it

21  to refresh his recollection.  Again, I think it's a

22  definitional thing.  He says there were products involving

23  training.  The issue is there was no training.  You can use it

24  to refresh his recollection, that's all, but not to admit it.

25         MS. FLETCHER:  Mr. Schmidt did that.  He attempted to

1  refresh Mr. Sinclair's recollection with this document and Mr.

2  Sinclair still did not recall the document.

3           THE COURT:  It's a Thoth document.  It's not coming

4  in.

5           What else?

6           MS. FLETCHER:  There was another issue with respect to

7  the defense document marked BS-03.  This is the Edge

8  questionnaire.

9           THE COURT:  That he read.  Is that with the

10  handwriting that he read?

11          MS. FLETCHER:  Yes.  And he went through and indicated

12  which questions were in fact true and partially true.  He read

13  through the document.

14          THE COURT:  He did.  Not I.

15          MS. FLETCHER:  Correct, your Honor.  And you will

16  recall that the government initially objected to this document,

17  and then once your Honor said he is using it to impeach Mr.

18  Sinclair, the government withdrew its objection.  So after we

19  withdrew our objection, Mr. Schmidt did not reoffer the

20  document.  It was not admitted.  The government's understanding

21  of the record on this particular document is that it was not

22  admitted but was instead used to impeach Mr. Sinclair.

23          THE COURT:  What are you asking now?

24          MS. FLETCHER:  Nothing.  That's the state of the

25  record as it is.  So it was not offered.  It was not admitted

IAP8KET6

1    as of right now.

2         MR. SCHMIDT:  It was offered.  It was objected to.

3    The objection was withdrawn.  I guess what we are missing is

4    your Honor saying --

5         THE COURT:  I think that's right.

6         MS. FLETCHER:  If your Honor is intending to admit the

7    document now, the government has a different objection.

8         MR. SCHMIDT:  I think it's a little too late for that.

9         THE COURT:  You withdrew your objection.  What is the

10   objection at this point?

11        MS. FLETCHER:  I withdrew the objection because I took

12   your Honor's point that he was trying to use the document to

13   impeach Mr. Sinclair.  And so it wasn't being offered for its

14   truth.  It was being offered to show that Mr. Sinclair lied.

15        There are other assertions in this document that I

16   expect Mr. Schmidt will argue are true.

17        THE COURT:  Let's see.  Are you going somewhere else

18   with the document?

19        MR. SCHMIDT:  That's a good point.

20        MS. FLETCHER:  It is, isn't it?

21        MR. SCHMIDT:  Your Honor, an interesting point would

22   be that I did not go into questioning other than for his

23   honesty.  However, he read it and said certain questions are

24   true.  So if I wanted to -- and I don't need to refer to the

25   document -- I can ask him the actual question, and if he says

IAP8KET6

1    something different, then we have the impeachment of a prior

2    inconsistent statement.

3          To satisfy perhaps the government, if I do want to use

4    any of the information in there, I will ask it as a question,

5    and not a question from that document, and only if he gives an

6    answer that is different than the document will I then refer to

7    the document.

8          THE COURT:  I understand.  It's admitted.

9          What else?

10         MS. FLETCHER:  Your Honor, so now that the document is

11   admitted, depending on the questions that arise from this

12   document tomorrow, the government --

13         THE COURT:  He is not going to ask questions from the

14   document.

15         MS. FLETCHER:  No.  But I heard from Mr. Schmidt a

16   hedge.

17         THE COURT:  Mr. Schmidt, listen.

18         MR. SCHMIDT:  If the witness can hedge, then I should

19   be allowed to.

20         MS. FLETCHER:  If Mr. Schmidt is going to hedge and

21   attempt to introduce statements in this document to argue that

22   they are true, the government will seek a limiting instruction

23   with respect to those statements.

24         THE COURT:  All right.  Fine.  I don't think Mr.

25   Schmidt is going to do that.  He is going to move on.

IAP8KET6

1           What else?  That's it?

2           MS. FLETCHER:  That's it from the government.

3           (Adjourned to October 26, 2018, at 9:30 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     INDEX OF EXAMINATION

 2    Examination of:                          Page

 3    WILLIAM SINCLAIR

 4    Direct By Ms. Fletcher . . . . . . . . . . . 325

 5    Cross By Mr. Schmidt . . . . . . . . . . . . 412

 6                     GOVERNMENT EXHIBITS

 7    Exhibit No.                          Received

 8     406   . . . . . . . . . . . . . . . . . . . 342

 9     122   . . . . . . . . . . . . . . . . . . . 361

10     411   . . . . . . . . . . . . . . . . . . . 366

11     407   . . . . . . . . . . . . . . . . . . . 370

12     413   . . . . . . . . . . . . . . . . . . . 373

13     427   . . . . . . . . . . . . . . . . . . . 374

14     439   . . . . . . . . . . . . . . . . . . . 377

15     443 and 444   . . . . . . . . . . . . . . . 378

16     457   . . . . . . . . . . . . . . . . . . . 382

17     484, 485, 486 and 487   . . . . . . . . . . 384

18     260 and 261   . . . . . . . . . . . . . . . 389

19     256   . . . . . . . . . . . . . . . . . . . 392

20     483, 257, 153 and 488 through 501   . . . . . 410

21                     DEFENDANT EXHIBITS

22    Exhibit No.                          Received

23     CAL-34   . . . . . . . . . . . . . . . . . . 415

24

25
```