IAQ8KET1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------x

UNITED STATES OF AMERICA,

          v.                              17 Cr. 00243 (SHS)

ANDREW OWIMRIN, a/k/a "Andrew Owens,"
a/k/a "Jonathan Stewart," and
SHAHRAM KETABCHI, a/k/a "Steve Ketabchi,"

          Defendants.

---------------------------------------x
                             October 26, 2018
                             9:30 a.m.

Before:

                HON. SIDNEY H. STEIN,

                           District Judge
                            and a jury

                   APPEARANCES

GEOFFREY S. BERMAN
    United States Attorney for the
    Southern District of New York
KIERSTEN A. FLETCHER
ROBERT B. SOBELMAN
BENET J. KEARNEY
    Assistant United States Attorneys

SAM A. SCHMIDT
ABRAHAM J. ABEGAZ-HASSEN
    Attorneys for Defendant Owimrin

KENNETH A. PAUL
JACOB MITCHELL
    Attorneys for Defendant Ketabchi

Also Present:
    CHRISTOPHER BASTOS, Detective NYPD and HSI
    CHRISTINE LEE, Paralegal Specialist USAO
    SAMUEL TUREFF, Paralegal

1              (Trial resumed; jury not present)

2              THE COURT:  Bring the jury in.

3              Mr. Schmidt, as I recall, you said about a half hour

4    was your estimate?

5              MR. SCHMIDT:  I said half an hour to an hour.  My

6    estimate is about an hour.

7              THE COURT:  As I said, let's everybody try to strive

8    to be much more efficient.

9              Jury entering.

10             (Jury present)

11    WILLIAM SINCLAIR, resumed.

12             THE COURT:  Please be seated in the courtroom.

13             Good morning, ladies and gentlemen of the jury.  We

14    will proceed with an efficient Friday.

15             Sir, your cross-examination.

16             Mr. Sinclair, you are under oath.

17             THE WITNESS:  Yes your Honor.

18    CROSS-EXAMINATION Cont'd)

19    BY MR. SCHMIDT:

20    Q.  Mr. Sinclair, we talked yesterday about your 2014 tax

21    returns.  Do you remember that?

22    A.  Yes, sir.

23    Q.  The one thing I think we didn't ask was that the amount of

24    income that you actually paid taxes on was actually $22,000,

25    isn't that right?

IAQ8KET1                    Sinclair - Cross

1   A.  I don't recall.

2   Q.  Would looking at your 2014 tax return help you recall?

3   A.  Sure.

4           MR. SCHMIDT:  May I approach, your Honor?

5           THE COURT:  Yes.

6   Q.  Does that help refresh your recollection that the amount of

7   taxes, the income that you paid taxes on in 2014 was

8   approximately $22,000?

9   A.  That's what it says.

10  Q.  Does it help refresh your recollection that that's what you

11  paid taxes on?

12  A.  Yes.

13  Q.  Thank you.

14          Now, you didn't prepare your tax return, did you?

15  A.  No, sir.

16  Q.  You had a professional to do that, right?

17  A.  Someone associated with the business, an accountant.

18  Q.  Associated with your business?

19  A.  Yes.

20  Q.  What business was that?

21  A.  Olive Branch Marketing.

22  Q.  In other words, you had an accountant who was associated

23  with your business to assist you with any kind of tax issues,

24  is that right?

25  A.  Yes, sir.

1   Q.  And that person would have been available to any of your

2   customers that required tax advice and assistance, is that

3   correct?

4   A.  If that came up, yes.

5   Q.  The people who worked at Olive Branch were aware that you

6   had -- withdrawn.  I will rephrase that.

7            So would it be fair to say that when you signed your

8   tax return, that you relied upon the professionalism of your

9   CPA so you wouldn't get in trouble with the IRS?

10  A.  Yes.

11  Q.  Did you even bother reading through your tax return before

12  you signed it?

13  A.  To my recollection, no.

14  Q.  Did you ask your CPA whether or not what he wrote in there

15  was honest or a lie?

16  A.  To my recollection, I do not recall having that

17  conversation with him.

18  Q.  You assumed that he was doing it legally and proper, is

19  that right?

20  A.  Correct.

21  Q.  Now, could you tell us again what, was your final position

22  at the Manhattan Tax Club before you left?

23  A.  Sales manager.

24  Q.  You also described yourself as the manager of training and

25  quality assurance?

1   A.  Yes.

2   Q.  So you trained sales reps?

3   A.  I did.

4   Q.  And as you said, at Manhattan Tax Club, the salesmen's

5   conversations with potential customers were recorded, is that

6   right?

7   A.  They were, yes.

8   Q.  One of the reasons it was recorded was to ensure that their

9   pitch was clean, is that correct?

10  A.  As per my superiors, that's what I was instructed to do,

11  yes.

12  Q.  And your understanding of that it's clean was that it

13  followed the FTC guidelines, is that right?

14  A.  I believe that to be accurate.

15  Q.  And you took that training with you when you opened Olive

16  Branch Marketing, is that correct?

17  A.  Yes.

18  Q.  And that's how you began Olive Branch Marketing, with the

19  same desire to make sure that, among other things, that the

20  pitch was clean and followed the FTC rules, is that right?

21          MS. FLETCHER:  Objection.

22  Q.  There was no objection.  You can answer.

23          THE COURT:  Just a moment.  There was an objection.

24          MR. SCHMIDT:  I didn't hear objection.

25          THE COURT:  Rephrase it.

1    Q.  You took what you learned at Tax Club and put it in

2    practice when you began Olive Branch Marketing, isn't that

3    correct?

4    A.  We took, you said, practice?  I'm sorry.

5    Q.  You took what you learned at Manhattan Tax Club, as the

6    manager of sales, training, and quality assurance, and put that

7    to practice at Olive Branch Marketing?

8    A.  Correct.

9    Q.  Now, the Federal Trade Commission has actual rules that

10   deal with telemarketing for profit, doesn't it?

11   A.  That's my understanding.

12   Q.  Did you ever look at the rules?

13   A.  No.

14   Q.  So someone else told you what the rules were?

15          MS. FLETCHER:  Objection.

16          THE COURT:  I will allow that.

17          Yes or no?

18   A.  Yes.

19   Q.  And you assumed what you were told was true, is that right?

20          MS. FLETCHER:  Objection.

21          THE COURT:  I will allow it.

22          Yes or no?

23   A.  True with specific regard to FTC regulations.

24   Q.  You assumed that the person or persons who explained to you

25   what the FTC regulations were were being accurate, is that

1    correct?

2    A.  Yes.

3    Q.  And that was part of the process of you -- withdrawn.

4              And with that belief and knowledge, that's how you

5    managed and trained salespeople, is that right?

6              MS. FLETCHER:  Objection to form.

7              THE COURT:  I will allow it.

8    A.  To stay within the parameters of what could and could not

9    be said.

10   Q.  To stay within the parameters of what you understood the

11   FTC rules to be?

12   A.  Yes.

13             THE COURT:  Again, you didn't want to run into

14   trouble, right?

15             THE WITNESS:  Correct, your Honor.

16   Q.  You didn't want to break the law, right?

17   A.  Well, that's not a yes or no question, because it's just

18   not.  So if could elaborate, I am happy to do so.

19   Q.  No, thank you.

20             Getting in trouble means getting in trouble with the

21   authorities who are enforcing the law, right?

22   A.  Yes.

23   Q.  Now, you used the word "probe" on direct examination, and

24   you called it probe to find out how much money they had.  Do

25   you remember?

IAQ8KET1                    Sinclair - Cross

1    A.  Yes, sir.

2    Q.  Now, probe is not just to find out how much money they had;

3    it was also to find out what kind of business or Web site they

4    either had or wanted to have, right?

5    A.  No, sir.

6    Q.  So you're saying that probe -- did it include finding out

7    what products they had already purchased?

8    A.  A separate part of the script.

9    Q.  You say that's not the probe?

10   A.  Not the way I remember it.

11   Q.  So what you're saying is that the only thing

12   that -- withdrawn.

13          It's your testimony that the probe of a potential

14   customer did not include what they were doing, what they had,

15   and what they needed, is that your testimony?

16   A.  With all respect, sir, I cannot answer these questions with

17   yes or no.  I need to elaborate to give a full statement on

18   that to be 100 percent accurate.

19   Q.  Well, I am not asking you if that's the only thing in the

20   probe.  I am asking you if that's part of the probe.  You could

21   give us a yes or no on that I believe.

22   A.  Those are probing questions.

23   Q.  Now, you told us that the contracts that were used were

24   created by an attorney, is that right?

25   A.  Yes.

1   Q.  And during the course of running your business, you made

2   the compliance people and the salespeople aware that the

3   contracts were created by an attorney, is that right?

4   A.  Yes.

5   Q.  Now, there is also the COS, the continuation of services

6   form.  Was that created by an attorney?

7   A.  Not to my knowledge.

8   Q.  Do you know where -- withdrawn.

9           THE COURT:  Who created that?

10          THE WITNESS:  I believe Jason Sager, your Honor.

11  Q.  Who is Jason Sager?

12          THE COURT:  Jason Sager.  They have talked about him

13  before.

14  A.  He was the individual who orchestrated the debt elimination

15  program, and we used several of his merchant accounts as well.

16  Q.  Before that, he was also someone who sold leads?

17  A.  No, sir.  In a limited capacity, but he wasn't a lead

18  broker of ours.

19  Q.  What was the name of his company or companies?

20  A.  Consumer Shield.

21  Q.  Now, the contracts include language of three days'

22  cancellation, is that right?

23  A.  Yes.

24  Q.  However, it was the policy of your office that for senior

25  customers, they would have 14 days to cancel, is that right?

1   A.  At a time, I remember extending it for seniors, yes.

2           THE COURT:  What constitutes a senior?

3           THE WITNESS:  Someone who is 65 or older, your Honor,

4   I believe.

5   Q.  As you indicated, many of your -- withdrawn.

6           The lead lists that you received often contained a

7   majority of seniors?

8   A.  Safe to say, yes.

9           THE COURT:  That was your so-called demographic,

10  right?

11          THE WITNESS:  Yes.

12          THE COURT:  Your target.  You went after old people,

13  right?

14          THE WITNESS:  It's not that we went after old people,

15  your Honor.  It's that that's who signed up for these programs

16  initially, so that's who we were given.  We didn't ask for

17  older people.  That's just who generally signed up for these

18  types of things.

19          THE COURT:  Yes.  But you knew, when you went to the

20  lead brokers, that the lead list would be primarily composed of

21  old people, yes or no?

22          THE WITNESS:  Yes, your Honor.

23          THE COURT:  In fact, people who had already bought

24  things from telemarketers, right?

25          THE WITNESS:  Yes, sir.

IAQ8KET1                    Sinclair - Cross

1  BY MR. SCHMIDT:

2  Q.  Your understanding was that these people were interested in

3  starting or continuing a business from the home, is that right?

4  A.  Yes, sir.

5  Q.  And some, but not very many, people who have full-time jobs

6  outside the home are interested, in your experience, in

7  starting a home business as well, is that right?

8  A.  Some, but limited, yes.

9  Q.  But there are other people who start businesses at home,

10 for example, a spouse who is not working may be interested in

11 starting a business from a home?

12 A.  Sure.

13 Q.  And you had some customers who fit that demographic?

14 A.  Sure.

15 Q.  You had some customers --

16         THE COURT:  Speak a little louder.

17 A.  Yes, to answer your question, Mr. Schmidt.

18 Q.  You had some customers who took early retirement, so they

19 may not have been 60, they may have been -- 65, they may be

20 between 55 and 65?

21 A.  Yes, sir.

22 Q.  You even did have some people who wanted to just make extra

23 income, and were working, and were looking to expand their

24 opportunities for earning, is that right?

25 A.  Yes.

IAQ8KET1                         Sinclair - Cross

1   Q.  And you even had people who had an existing ongoing

2   Internet business who were looking to make the business better?

3   A.  That was their hope, yes.

4   Q.  Now, we know that you received a percentage of chargebacks,

5   is that right?

6   A.  Yes, sir.

7   Q.  And the percentage varied during the course of the time

8   that you were running the business, is that right?

9   A.  Yes.

10  Q.  And there were sometimes people who complained that ended

11  up not charging back, is that right?

12  A.  People who complained who ended up not charging back?  Yes.

13  Q.  And there were also people who sent in checks to pay for

14  the services?

15  A.  Yes, sir.

16  Q.  And they can't charge back?

17  A.  Correct.

18  Q.  As we know from, I think it was Pete DiQuarto, he came up

19  with a scheme of switching credit cards, or taking the credit

20  card that there was a sale on and then moving that to a new

21  credit card, and they could not charge back, is that right?

22  A.  Correct.

23  Q.  And, also, Pete DiQuarto came up with the idea of taking

24  cash advances from credit cards, and those people couldn't

25  charge back, is that right?

IAQ8KET1                    Sinclair - Cross

1   A.  Yes.

2   Q.  So dissatisfied customers did not just include -- people

3   who wanted not to be involved anymore did not just include

4   chargebacks, is that right?

5   A.  Yes.

6   Q.  And there were people who canceled within the three or 14

7   days, changed their minds and decided that they really don't

8   want to do it, for a number of reasons, and that would not be a

9   chargeback, is that right?

10  A.  Yeah.  If we just worked out a refund with them, or just

11  refunded them, then that wouldn't be considered a chargeback.

12  Q.  If someone was within the time period to cancel, you would

13  try to work out a refund so it wouldn't come back as a

14  chargeback, is that right?

15  A.  Correct.

16  Q.  So would it be fair to say that more than half of your

17  actual customers were satisfied customers?

18          MS. FLETCHER:  Objection.

19          THE COURT:  If you know.

20  A.  Satisfied is open to interpretation, so I don't know what

21  they are thinking.

22  Q.  How about happy customers?

23          MS. FLETCHER:  Same objection.

24  Q.  If you know.

25          THE COURT:  Do you know what percentage of your

IAQ8KET1                         Sinclair - Cross

1    customers were happy customers?

2              THE WITNESS:  I would say a very low percentage, your

3    Honor.

4    Q.  Do you recall when you were arrested?

5    A.  I do.

6    Q.  And you recall talking to the officers and agents about

7    your business?

8    A.  Yes.

9    Q.  And when you were talking to the agents about your

10   business, were you thinking about that you might want to

11   cooperate to see if you can help yourself and not go to jail?

12   A.  Yes, sir.

13   Q.  So were you trying to be honest to those agents when you

14   talked to them?

15   A.  The day I was arrested?

16   Q.  Yes.

17   A.  The day I was arrested I was defensive.

18   Q.  Well, did you tell the agents that "more than half happy,"

19   relating to the customers?

20   A.  I do not recall making that statement.

21   Q.  You're not saying that you didn't make that statement

22   though, is that right?

23   A.  I don't remember if I did.

24   Q.  You're not saying that you did not make that statement, is

25   that correct?

1             MS. FLETCHER:  Objection.

2             THE COURT:  Sustained.

3    Q.  Let me show you a piece of paper and just ask you to take a

4    look at it.  Just read it to yourself.

5             MR. SCHMIDT:  May I approach, your Honor?

6             THE COURT:  Counsel, you don't have to ask permission

7    to approach in my courtroom as long as you don't abuse the

8    privilege of approaching a witness.

9    Q.  Take a look at that.

10            MS. FLETCHER:  Mr. Schmidt, can we have a copy,

11   please?

12            MR. SCHMIDT:  I will give you a copy before I ask him

13   a question.

14            It's 3501-1, page 2.

15            THE COURT:  Just show the government what you're

16   showing him after he has read it.

17   Q.  Does that refresh your recollection whether you told the

18   agent and the officers that "more than half happy"?

19   A.  It does not.

20   Q.  Did you feel that not -- refusing to sell to senior

21   citizens would be a form of discrimination?

22            MS. FLETCHER:  Objection to form.

23            THE COURT:  Sustained.

24   Q.  Do you believe that selling to senior citizens would be a

25   form of discrimination?

IAQ8KET1                          Sinclair - Cross

1           THE COURT:  You may have misspoken.

2           You misspoke.  Rephrase it.

3   Q.  Do you believe that not selling to senior citizens would be

4   a form of discrimination?

5   A.  No.  Depending on the senior, but no.

6   Q.  Do you recall telling the agents when you were arrested

7   that not selling to old people could be discrimination?

8   A.  Yes, I do.

9   Q.  Now, with Youngevity, both Fino and you opened up your own

10  Youngevity accounts, is that right?

11  A.  Yes.

12  Q.  And both Fino and you actually ordered products to be

13  delivered, is that correct?

14  A.  Yeah.  I think that's part of it.  Everybody gets the

15  basket.  So yes.

16  Q.  Well, not that starter basket.  Did you order additional

17  products beyond the starter basket?

18  A.  Not that I remember.

19  Q.  Did Fino order additional products other than the starter

20  basket, if you know?

21          MS. FLETCHER:  Objection.

22  A.  I don't.

23          THE COURT:  You may answer.

24  A.  I don't know.  I'm sorry.

25  Q.  Now, we talked about not -- withdrawn.

1          You testified that making statements about earnings

2     was a no-no, is that right?

3     A.  Specific earnings claims were not allowed.

4     Q.  Now, for Youngevity, part of the rules given to the

5     salespeople were a little different, is that right?

6     A.  Correct.

7     Q.  And you informed the salespeople that they could say to a

8     customer that they would receive a check in 90 days from

9     Youngevity, is that correct?

10    A.  I don't recall the time frame, but yes, they were allowed

11    to say that they would receive checks.

12          THE COURT:  I'm sorry.  You don't recall a time frame,

13    meaning you don't know whether they said the customers would

14    receive checks within 90 days, is that what you mean?

15          THE WITNESS:  Yes.

16          THE COURT:  There may have been some other number, but

17    you remember that a number was given?

18          THE WITNESS:  A time frame was given where they could

19    say that, yes, sir.

20    Q.  Would it be fair to say a shorter time period was given in

21    the beginning, and then when you were having problems with

22    fulfillment, the time frame got longer?

23    A.  That would make sense.  I'm not positive that that's how it

24    happened.

25    Q.  Now, also, you knew that the process for Youngevity

1  was -- withdrawn.

2          Now, in most other Internet site businesses, checks,

3  if there were profits, would come in a monthly or quarterly

4  fashion, wouldn't they?

5  A.  For Youngevity?

6  Q.  Not for Youngevity.  For others.

7          Let me back up a second.  You sold some Amazon

8  affiliate sites during the course of the business, is that

9  correct?

10 A.  Yes, sir.

11 Q.  And the process for that was that if the business had a

12 profit, that the checks would be sent out to the customer in a

13 time frame that was either monthly or quarterly, is that

14 correct?

15 A.  I don't recall the time frame specifically, sir.

16 Q.  Now, for Youngevity, however, you were informed, and you

17 believed, that the Youngevity practice was for them to send out

18 checks every two weeks?

19 A.  I don't remember the time frames for Youngevity checks,

20 sir.

21 Q.  Whatever the time frame was, did you inform the sales staff

22 selling the Youngevity product that checks would come at a

23 certain period of time, whatever it was?

24 A.  All the information I got from Youngevity I passed along to

25 my sales staff.  And to answer your question, I let them know

1    that checks would come periodically, as per Anthony Medeiros.

2    Q.  But do you recall whether Anthony Medeiros informed you of

3    what the time period was?

4    A.  I'm sure he did at the time.  I just can't remember that

5    specific time frame.  I'm sorry, sir.

6    Q.  Now, in the beginning of selling the Youngevity package,

7    most of the complaints were directed towards -- given towards

8    Anthony Medeiros, is that correct?

9    A.  From who?  From customers or --

10   Q.  Customers.

11   A.  It would be probably towards his fulfillment guy in the

12   beginning, because the Web sites were taking longer than

13   expected, or not getting done at all.

14   Q.  Now, was Mr. Quiles's company being a fulfillment person in

15   January of 2016 -- '15?

16   A.  Are you asking me if Ray Quiles was doing fulfillment in

17   January of '15?

18   Q.  For Youngevity, yes.

19   A.  January of '15.  I don't remember the specific time frames

20   of when we transitioned from Anthony's fulfillment guy to Ray.

21   I know that we did, but I don't know the specific dates.  I'm

22   sorry.

23   Q.  Now, let me ask you --

24          MR. SCHMIDT:  Can we put this up for the witness.

25   Q.  Would it be fair to say that's an e-mail that you sent out?

IAQ8KET1                          Sinclair - Cross

1   A.  It looks like it's from my personal e-mail.

2   Q.  Does that mean yes?

3   A.  It looks like it.

4   Q.  Do you know who else may have sent an e-mail relating to

5   Youngevity using your personal e-mail other than you?

6   A.  It would be me.

7            MR. SCHMIDT:  I offer this into evidence, your Honor.

8            MS. FLETCHER:  No objection.

9            THE COURT:  Admitted.

10           Does it have a number.

11           MR. SCHMIDT:  YGY-9.

12           (Defendant's Exhibit YGY-9 received in evidence)

13  Q.  Now, that's an e-mail that you sent to Fino, Anthony

14  Medeiros -- excuse me.  That's an e-mail that you sent to All

15  Online Systems, is that correct?

16  A.  Yes.  And other parties were CC'd on it.

17  Q.  I was going to get to that.

18           All Online Systems was Ray Quiles's company at that

19  time?

20  A.  Yes, sir.

21  Q.  And you're complaining about why nothing has been -- some

22  things have not been done for the customers who have bought the

23  Youngevity package, is that right?

24  A.  Yes.

25  Q.  Now, based on this e-mail, it appears that it would be Mr.

1  Quiles's fulfillment team who would be getting that done, is

2  that correct?

3  A.  After reading the e-mail, yes.

4  Q.  Now, do you recall that you started selling Youngevity

5  about two to three months before?

6  A.  If I had to give an estimation, that sounds accurate.

7  Q.  Now, Mr. Arash Ketabchi is not CC'd on this, is he?

8  A.  No.

9  Q.  None of the salespeople are CC'd on this, is that correct?

10 A.  No.  That's correct.

11 Q.  Now, in January, you asked Mr. Medeiros to send you the

12 Youngevity financial model.  Do you recall that?

13 A.  I don't remember exactly saying that.

14         MR. SCHMIDT:  Can we show the witness YGY-13.

15 Q.  Now, does that refresh your recollection?

16         MR. SCHMIDT:  I will withdraw the question.

17 Q.  Were you CC'd on an e-mail that asked for the Youngevity

18 financial model?

19         MS. FLETCHER:  Objection, your Honor.  This is

20 improper refreshment.

21         THE COURT:  Sustained.

22 Q.  Do you recall whether --

23         THE COURT:  Take that down.

24         Go ahead.

25 Q.  Do you know what Mr. Quiles's fulfillment team received

1    from you, Fino, or Mr. Medeiros in relation to their role in

2    the fulfillment of the Youngevity package when they first

3    started in that role?

4    A.   What do you mean "their"?  You said "their role."  Who do

5    you mean specifically?

6    Q.   Ray Quiles's company, fulfillment company.

7    A.   So just to make sure I answer you correctly, now knowing

8    that, can you just repeat the question for me, please?

9    Q.   At some point someone involved in your business of selling

10   the Youngevity package retained the Quiles fulfillment team, is

11   that correct?

12   A.   Yes.

13   Q.   And when they were retained, what did they get to help them

14   do their job?

15   A.   I know Ray and Anthony spoke at length to discuss the

16   specifics of the different nuances between Youngevity and the

17   standard biz-op model.  A lot of those phone calls I wasn't on.

18   I know they also had e-mail communication, at least that's what

19   I was told, between them two, between those two rather.

20          Again, this was all coming from Anthony.  So I wasn't

21   the one who came up with the idea for Youngevity, Anthony was.

22   So it was up to him to explain that to Ray.

23   Q.   There were times where you were CC'd on some of these

24   e-mails going back and forth, is that correct?

25   A.   Yes.

Sinclair - Cross

1    Q.  You weren't CC'd on everything that went back and forth

2    though, is that correct?

3    A.  That's what I'm saying, yes.

4            MR. SCHMIDT:  May I have a moment, please?

5    Q.  Do you remember yesterday you talked about coaching being

6    part of the sales of some of your products?

7    A.  Yes.

8    Q.  If I use the word "training" instead of "coaching," would

9    it have made a difference?

10   A.  No.  I understand them to be synonymous.

11           THE COURT:  Was there some reason you chose the word

12   in your materials "coaching" rather than "training"?

13           THE WITNESS:  Your Honor, that was how it was referred

14   to from my days at The Tax Club.  So it was just verbiage we

15   were accustomed to using.

16           THE COURT:  All right.

17   Q.  Now, the salesmen, when they spoke to a customer, and the

18   customer decided to order some product from you, was there some

19   kind of form that they used?

20   A.  The sales reps?

21   Q.  Yes.

22   A.  Yes.

23   Q.  There wasn't always just one form, sometimes there

24   were -- withdrawn.

25           If the fulfillment team was going to be likely Mr.

1    Quiles's company, they had a form that listed the products that

2    they sold, right?

3    A.  Yes.

4          MS. FLETCHER:  Objection.

5          Withdrawn.

6    Q.  And if Thoth would be doing fulfillment, they had a form of

7    what they offered for these products, is that correct?

8    A.  Yes.

9    Q.  I am going to show you what has been marked -- should have

10   been marked BS-11.

11         I ask you to just thumb through it.  You don't have to

12   read all the information, but look at each document.  Just let

13   me know when you're done.

14   A.  OK.

15   Q.  Now, are these documents a few of the forms that the

16   salespeople filled out when they had a sale?

17   A.  Yes.

18   Q.  You recognize them?

19   A.  They look familiar.

20         MR. SCHMIDT:  I offer BS-11 into evidence.

21         MS. FLETCHER:  Objection on 801 grounds, your Honor.

22         THE COURT:  Let me see it.

23         Sustained.

24   Q.  Now, these were forms that were filled out, is that

25   correct?

IAQ8KET1                          Sinclair - Cross

1   A.  Yes.

2   Q.  It was part of the business, because otherwise there would

3   be no business, for these forms to be filled out by the

4   salespeople, is that right?

5            THE COURT:  Sustained.

6            Rephrase.

7   Q.  These forms were filled out by the salespeople while they

8   are talking to customers, is that right?

9   A.  Yes.

10  Q.  And those forms were kept in the office, in other words, it

11  went from the salespeople to you or compliance to make up a

12  contract and to ensure that you had the information about the

13  products that were being sold, the person who sold it, is that

14  correct?

15  A.  Yes.

16  Q.  And not only were these documents, these records made in

17  the regular practice of your business, it was an essential part

18  of the practice of your business, is that right?

19  A.  Essential to have these forms filled out?

20  Q.  Essential to make sales.

21  A.  I don't know if the forms were essential to do that, but we

22  wanted to keep a record of what was sold and by who.

23  Q.  And these records were kept in the Olive Branch offices, is

24  that correct?

25  A.  Yes.

1    Q.  And you were the president and owner of Olive Branch?

2    A.  Yes, sir.

3            MR. SCHMIDT:  I offer these into evidence, your Honor.

4            MS. FLETCHER:  No objection.

5            THE COURT:  Admitted.  803(6).

6            (Defendant's Exhibit BS-11 received in evidence)

7    Q.  Let's take a look --

8            THE COURT:  Needless to say, ladies and gentlemen of

9    the jury, the numbers that sometimes go back and forth are

10   legal issues and they are not for the jury.

11   Q.  Let's take a look at what is the fifth page there.

12           THE COURT:  Proceed.

13   Q.  You see that one it says Coy Kirby?

14   A.  Yes.

15   Q.  And that one would be a sale by Andrew, is that right?

16   A.  Yes.

17   Q.  I would ask you to look down where it says "corporate

18   credit."  That's the third rectangle box down that's not

19   checked off.

20   A.  Yes.

21   Q.  Could you read to me what is in that paragraph?

22   A.  "Six weeks' training detailing credit bureaus, Dun &

23   Bradstreet number, Paydex, vendor trade lines, revolving trade

24   lines, business credit cards."

25   Q.  Could you read the one below it that says "corporate credit

IAQ8KET1                          Sinclair - Cross

1    minimum"?

2    A.   "Two week training program detailing Dun & Bradstreet

3    number and vendor trade lines."

4    Q.   Could you read the one that says "business plan"?

5    A.   "Two weeks training, comprehensive business plan, 15 to 25

6    page doc."

7    Q.   Could you read the one that says "social media"?

8    A.   "Four weeks training, Facebook business page, Google and

9    Twitter."

10   Q.   I think we can stop there.  Isn't it a fact that those

11   products were sold with training?

12   A.   Yes.

13   Q.   Do you recall yesterday that you testified that these

14   products were not sold with training, that training might be

15   extra or separate?  Do you remember testifying to that

16   yesterday?

17   A.   Yeah.  I remember --

18   Q.   Do you remember testifying to that yesterday?

19            THE COURT:  Wait.  Mr. Schmidt, you asked a question.

20            MR. SCHMIDT:  I asked a yes or no question, your

21   Honor.  And if he wants to say he can't answer yes or no,

22   that's fine also.

23            THE COURT:  Just a moment.

24            Let's slow it down.  He said, "Yeah, I remember."

25            What is your next question?

1          MS. FLETCHER:  Your Honor, he was cut off.  Can Mr.

2     Schmidt please allow the witness to finish his response?

3          MR. SCHMIDT:  He was cut off because he finished

4     answering the question.

5          THE COURT:  Just a moment.

6          Do you remember testifying that these products were

7     not sold with training, that training might be extra or

8     separate?  Simply, do you remember testifying to that?

9          THE WITNESS:  Yes.

10         THE COURT:  Was that the truth when you testified to

11     that?

12         THE WITNESS:  Yeah, that's how I remembered it, your

13     Honor.

14         THE COURT:  Pardon me?

15         THE WITNESS:  That's how I remembered it, your Honor.

16         THE COURT:  You now have a different recollection?

17         THE WITNESS:  Looking at this, it says that there was

18     training involved with it.  I thought what he initially was

19     asking me was about the coaching itself, the step before it

20     even gets to us.  I thought he was getting the products mixed

21     up.

22     BY MR. SCHMIDT:

23     Q.  So, in other words, you view coaching different than

24     training?

25     A.  That's not what I am saying, no.

1  Q.  The coaching that you are referring to is the first level

2  of this marketing business, is that right?

3  A.  Technically the second, but the first large investment,

4  yes.

5  Q.  The second.  The first one is doing something that causes a

6  person who may be interested in opening or expanding an

7  Internet business to give their information to a marketing

8  company?

9  A.  A coaching company.

10  Q.  Coaching company.

11          And then that company sells coaching to those people,

12  is that right?

13  A.  Yes.

14  Q.  And part of the coaching is telling them what they need for

15  the business, is that right?

16  A.  To an extent.

17  Q.  A limited extent?

18  A.  Yes.

19  Q.  But that's where they get the leads from that you purchase?

20  A.  Yes.

21  Q.  So that's your understanding of coaching, right?

22          Now, if somebody buys an Internet through your

23  business Olive Branch, you did not really enter into it -- you

24  did not contact a customer until at least they had been

25  coached?

1   A.  Supposedly.

2   Q.  And often they started, had already made some kind of

3   arrangement with another company to do a Web site?

4   A.  The coaching company.

5   Q.  Correct?

6   A.  Yes.

7   Q.  And then your company, your model, was then to sell other

8   things that you explained were useful to the people who are

9   either starting an Internet company or considering starting an

10  Internet company or already had an Internet company, right?

11  A.  That's what was conveyed to the clients.

12  Q.  And among those things was a business plan, is that

13  correct?

14  A.  Yes.

15  Q.  And yesterday you basically said that the business plan

16  really was nothing, it was just some paper sent to the people.

17  Do you remember that?

18  A.  I remember using the words "cookie cutter."

19  Q.  But these business plans came with substantial

20  training -- withdrawn.

21          These business plans were sold with the understanding

22  that it would consist of substantial training, isn't that

23  right?

24          MS. FLETCHER:  Objection to form.

25          THE COURT:  I will allow it.

1          MS. FLETCHER:  Whose understanding, your Honor?

2          THE COURT:  Fair enough.

3          Rephrase it.

4          With the customer's understanding.  Is that what you

5     intended?

6     Q.  Your company and your salespeople would tell the customer

7     that these products, like the business plan, would come with

8     training, is that correct?

9     A.  Going back to my answer yesterday, I remember saying I

10    don't recall it coming with training.  I stand by that.  I

11    don't recall it coming with training.

12    Q.  So you're saying -- it's your testimony now that these

13    additions where it says training is completely bogus?

14          MS. FLETCHER:  Objection.

15          THE COURT:  I will allow it.  It's cross.

16          Can you answer that?

17          THE WITNESS:  Yes, sir, your Honor.

18    A.  My recollection of our business plan, corporate credit,

19    those two products that you referenced, I do not recall them

20    coming with training.  I see what is written here.  My memory

21    tells me something different.  If it's here, it's here.  I'm

22    not arguing that it was there.  All I'm simply stating is that

23    I don't remember it being a part of those two products, sir.

24    Q.  Now, when you had a chargeback from a customer who

25    purchased one of the products here that came with training, you

IAQ8KET1                    Sinclair - Cross

1   sought from the fulfillment people all the information that

2   they can give you of what they did to fulfill so you can

3   forward it to the credit card companies, is that right?

4   A.  Yes.

5   Q.  And often you received notes from the coaches with

6   conversations that they had with customers or the inability to

7   contact customers, didn't you?

8   A.  Yes.

9   Q.  And those notes included conversations of these fulfillers

10  training or coaching the customers, isn't that right?

11  A.  That was in the notes, yes.

12  Q.  So not only do we have the order forms that include

13  coaching, when you or Mike or your lawyer submitted proof of

14  fulfillment, if the people purchased a product that had

15  coaching, the records of the coach would be included, isn't

16  that right?

17  A.  Yes.

18  Q.  The only time that you saw the records of the coach would

19  be when you requested it, is that correct, or Mike requested

20  it?

21  A.  Fair to say, yes.

22            (Continued on next page)

23

24

25

Iaqdket2                    Sinclair - cross

1        THE COURT:  Do you have any knowledge one way or the

2  other whether or not the records of the coaching were accurate?

3        THE WITNESS:  I would have to take their word for

4  that, your Honor.

5        THE COURT:  All right.

6  BY MR. SCHMIDT:

7  Q.  Now, I ask you do take a look at what has been marked

8  YGY-48.

9        THE COURT:  Approximately how much time do you have,

10  sir?  We are at the hour mark.

11        MR. SCHMIDT:  I'm sorry, your Honor.  I would say a

12  half an hour.

13  Q.  Now, this is an email that you forwarded, isn't it?

14        Let me back up a second.

15        This is both an email that you received and then

16  forwarded to another person, is that correct?

17  A.  Incorrect.

18  Q.  I ask you to look at the second paragraph, where it says

19  "Forwarded."

20  A.  Yes, I am.

21  Q.  Who is it to?

22  A.  It is to olivebranchmarketing1@gmail.com, which is not what

23  I used.  It was set up under my name which was at that time

24  probably Jolaina's email.

25  Q.  So you had access to that, is that correct?

Iaqdket2                          Sinclair - cross

1    A.  I don't even think I knew the login to it.

2    Q.  So it is your testimony -- so this would be from one of the

3    compliance appointment setters using that email, is that

4    correct?

5    A.  Yes.

6    Q.  And it was her responsibility to do what you asked her to

7    do, is that correct?

8    A.  I'd like to assume so.

9    Q.  Well, if Fino asked her to do something, is that correct?

10   A.  Correct.

11   Q.  All right.  And when there was a chargeback, it was then

12   her responsibility to help put together all of the information

13   that was necessary to try to defeat the chargeback, is that

14   right?

15   A.  Yes.

16   Q.  That was part of her job?

17   A.  Yes.

18   Q.  And those emails would obviously be received or sent from

19   one of the computers in the office, is that right?

20   A.  I mean, I would think so.  I mean, could they have access

21   from outside?  Yeah.  It's just a Gmail account.

22   Q.  If it was something related to a chargeback, it would be

23   important to maintain those records that were accessible to

24   you, Fino, or your attorney, is that right?

25   A.  Yes.

Iaqdket2                         Sinclair - cross

1    Q.  And, obviously, an email is something that is made at the

2    time that it is either received or sent out, is that right?

3    A.  Sent out, yeah.  Yes.

4    Q.  And in your business, these emails relating to trying to

5    defeat chargebacks, right, and the forwarding of documents were

6    done in the regular course of your business, is that right?

7    A.  Yes, sir.

8             MR. SCHMIDT:  I offer this into evidence, your Honor.

9             MS. FLETCHER:  Objection.  801 and 901.

10            THE COURT:  Let me see it, please.

11            MR. SCHMIDT:  Your Honor, as to Rule 901, this could

12   be subject to connection.

13            MS. FLETCHER:  Your Honor, in the interest of

14   efficiency, I expect we are going to need a sidebar on this

15   document.

16            MR. PAUL:  Sorry, I can't hear you.

17            MS. FLETCHER:  I suggested a sidebar.

18            THE COURT:  Sidebar.

19            (Continued on next page)

20

21

22

23

24

25

Iaqdket2                          Sinclair - cross

1              (At the sidebar)

2              THE COURT:  All right.  This is a document where he's

3    forwarding an email received from Champion Business Services,

4    is that right?

5              MR. SCHMIDT:  He is forwarding it from Melanie at your

6    business.training, which I believe is Thoth.

7              THE COURT:  Thoth, OK.

8              MS. FLETCHER:  Your Honor, actually he has testified

9    that he is not the person who forwarded this email.  His name

10   is on the account, but that is an email account used by Jolaina

11   Aziz.  So, the first objection is the authenticity --

12             THE COURT:  Wait.  Which is the email?

13             MS. FLETCHER:  Olivebranchmarketing1@gmail.com.

14             THE COURT:  Yes.

15             MS. FLETCHER:  He has testified that his name is on it

16   because he set up the account, but he did not have access to

17   the account and it was used by one of his employees.

18             THE COURT:  He did not have access to

19   olivebranchmarketing1?

20             MS. FLETCHER:  No.  His email account, he testified

21   yesterday --

22             THE COURT:  "No" means yes?

23             MS. FLETCHER:  No, he did not have access to this

24   account.

25             THE COURT:  Yes, he did not have access to that

Iaqdket2                    Sinclair - cross

1   account, but we're on the same page.

2              MR. SCHMIDT:  That is not correct.  He got the login.

3              MS. FLETCHER:  No.  He said he never had the login,

4   that it was the account that was used by Jolaina Aziz.  He

5   testified yesterday that his account was Olive Branch Marketing

6   LLC, so this is not his email account.

7              THE COURT:  All right.  Let me just straighten that

8   out with him right now.

9              MR. SCHMIDT:  But it is a business account authorized

10  by him to be used by a member of his company.

11             THE COURT:  All right.

12             MR. SCHMIDT:  So for business purposes, whether or not

13  he is using it or not is not relevant for business records.

14  For authentication, it may be, but the government is going to

15  be able to check this out because we have the number up there

16  on the left where he'll be, you know, subject to connection, so

17  they have the right to authenticate it, and I'm sure they will

18  because I know where I got this from, and if --

19             THE COURT:  This email is from the government's

20  production.

21             MR. SCHMIDT:  Yes.

22             THE COURT:  Go ahead.

23             MR. SCHMIDT:  I mean, obviously if it is not, then I

24  am going to be sanctioned, but I am pretty confident that it

25  is.  I didn't make this up.

1          THE COURT:  I understand that.  Let me just look at

2     803(6).

3          (Pause)

4          MS. FLETCHER:  Your Honor.

5          THE COURT:  Yes.

6          MS. FLETCHER:  As you're looking at the rule, the

7     government would just direct your Honor to note where the

8     underlying notes are coming from.  They're coming from the

9     coaching company.  Mr. Sinclair has not laid a foundation that

10    this is a business record of his business.  In fact, I suspect

11    if your Honor questions him on who created it --

12         THE COURT:  It is hearsay within.

13         MS. FLETCHER:  Yes.

14         THE COURT:  -- what arguably is a business record.

15    That is your point.

16         MR. SCHMIDT:  Your Honor, first, we're not obviously

17    offering it for the truth at this point because we are not

18    calling the person who made the record.  We are talking about

19    that these are coming from the fulfillment people.

20         THE COURT:  Simply for the fact that it was said.

21         MR. SCHMIDT:  As opposed to that they exist, forwarded

22    it to the credit card company.

23         THE COURT:  There is no controversy as to whether or

24    not they exist, is there?  I mean, nobody disagrees that they

25    exist.

1            MR. SCHMIDT:  Well, Judge, he has played a game as to

2   training and coaching, and I want to unplay it.  And it is my

3   right in cross-examination to unplay the game that this witness

4   was playing.

5            MS. FLETCHER:  Your Honor --

6            THE COURT:  What game was he playing?

7            MR. SCHMIDT:  He testified that there was nothing real

8   with some of these documents -- with like the business plan,

9   when indeed it came with coaching, and he tried to back it up

10  by trying to say he misunderstood.  But this is -- you know,

11  this is substantial what the company is getting and forwarding

12  in order to try to defeat a chargeback, not just, you know, a

13  piece of junk.

14           MS. FLETCHER:  Your Honor --

15           THE COURT:  You've already gotten that from -- I mean,

16  I asked him the question, you know, did he have any reason to

17  believe that they were legitimate or not, and I forget his

18  exact words, but, yes, he accepted it.

19           MR. SCHMIDT:  Judge, I understand what you are saying.

20  I mean, I got the bare minimum out.  I have the right --

21           THE COURT:  What do you do with the hearsay point

22  within that?  Even were you able to establish 803(6), and I

23  haven't fully unpacked it, that doesn't take care of the

24  Champion Business Service aspect of YGY-48.

25           MR. SCHMIDT:  Champion Business Service is what Jeremy

Iaqdket2                          Sinclair - cross

1    Machado bought from.  The company that produced this is the

2    Your Business Training.

3              THE COURT:  That's not him.

4              MS. FLETCHER:  Exactly.

5              MR. SCHMIDT:  I can ask him a few questions about --

6    because he hired this business to do this.

7              THE COURT:  It is still not him.

8              MR. SCHMIDT:  But he hired this business to do this.

9    They are now a part of his business model to have these people

10   do that, and that is sufficient for the purposes of a business.

11             THE COURT:  How is that sufficient for 803(6)?

12             MS. FLETCHER:  Your Honor, it is not.  The witness has

13   to have personal knowledge of the procedure used to create the

14   document.  This document was not created within Mr. Sinclair's

15   company.  And if questioned on the procedure, I suspect he

16   could not say how they created this.

17             THE COURT:  You mean how Champion Business Services?

18             MS. FLETCHER:  No, your Honor.  I think there is some

19   confusion on that entity.  The company, Champion Business

20   Services, is Mr. Sinclair's company.  The notation under

21   "Client Notes" is the company that sold that particular

22   customer.  The company that is creating the notes --

23             THE COURT:  Is Your Business --

24             MS. FLETCHER:  Is Your Business Training, which is not

25   Mr. Sinclair's company, so this is a double-hearsay issue here.

1    Mr. Schmidt cannot get this document in as a business record

2    through Mr. Sinclair.  If he wants to call a witness from Thoth

3    who can explain the procedure --

4             THE COURT:  Is Thoth your business?

5             MS. FLETCHER:  Yes.  I think so.

6             If he wants to call a witness from Thoth who can

7    explain the procedures for creating this document --

8             THE COURT:  In other words, who can lay the basis

9    for --

10            MS. FLETCHER:  Yes.

11            THE COURT:  -- a business record?

12            MS. FLETCHER:  What Mr. Schmidt is trying to do,

13   frankly, your Honor, is introduce those notes for their truth,

14   to show that in fact the training center did things.  There

15   would be no other purpose.  His client isn't on this email.

16   Mr. Sinclair isn't on this email.

17            Whether these notes were taken or whether --

18            THE COURT:  The "email" being the content of YGY-48,

19   because it is the content of the email he was forwarding, is

20   that right?

21            MS. FLETCHER:  To be clear, your Honor, Mr. Sinclair

22   didn't forward this.  I realize it says his name and that is a

23   bit confusing, but that is not his email account.  He has

24   testified that that wasn't his account.

25            THE COURT:  He said that.

1          MS. FLETCHER:  It was his secretary's account, and

2     that he didn't have access to it.  So this cannot -- this

3     cannot be relevant to show either Mr. Sinclair's state of mind

4     or, more importantly, to focus on what the issues actually are

5     in this trial, that this has any connection to Mr. Owimrin.

6          THE COURT:  Go ahead.

7          MR. SCHMIDT:  Your Honor, it was set up this way so it

8     would read Bill Sinclair.  This is a document that is forwarded

9     on behalf of his company to challenge a chargeback.

10         Now, so once this comes into their possession, right,

11    it becomes a record -- maybe not the truth of the stuff in it,

12    but what they're using it for it becomes a record of their

13    company to then defeat a chargeback.

14         THE COURT:  No, it doesn't.  It is not a record of the

15    company.  It's a record of another company.

16         MR. SCHMIDT:  It is a record, but it is a record that

17    they have adopted for the purposes of --

18         THE COURT:  He can't testify that the record was made

19    at or near the time by someone with knowledge and making the

20    record was a regular practice of that activity.

21         MR. SCHMIDT:  I can question him about that the

22    document that he's forwarding for the purpose of defeating the

23    chargeback, that he believes they are accurate records,

24    otherwise he would not forward it.

25         THE COURT:  That doesn't make it a business record.

Iaqdket2                      Sinclair – cross

1    It is a record of Your Business Training.

2              I am going to exclude it.

3              MS. FLETCHER:  Thank you, your Honor.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Iaqdket2                        Sinclair - cross

1          THE COURT:  I apologize for the delay for the length

2     of that sidebar.

3          Finish up and I want to give the jury its mid-morning

4     break because I want 14 happy jurors.

5     BY MR. SCHMIDT:

6     Q.  Have you had conversations, either telephonically or by

7     email, with people from the fulfillment companies?

8     A.  Yes.

9     Q.  And when there is a chargeback, someone, either you or you

10    someone from the offices, requests all the notes of all of the

11    training coaching, is that correct?

12    A.  Yes.

13    Q.  And you have seen on a number of occasions pages of notes

14    from the person who is doing the training of the customer, is

15    that right?

16    A.  Yes.

17    Q.  And it's important for that person to have those notes

18    because those notes are used to try to defeat the chargeback,

19    isn't that right?

20    A.  Yes.

21    Q.  And had you had conversations with the people who run the

22    fulfillment companies to make sure that they make notes about

23    the training sessions that they had with the customers?

24    A.  I can't have them create notes that aren't there.  I can

25    request them, if there are notes, that they're documented.

Iaqdket2                    Sinclair - cross

1   Q.  You've seen the notes that are documented?

2   A.  Yes, sir.

3   Q.  Did you ask -- did you have a conversation with the persons

4   running the fulfillment to make sure that when their people are

5   talking to our customers and training them, that they take

6   notes for that purpose?

7            MS. FLETCHER:  Objection, your Honor.  Form.

8            THE COURT:  Well, just as to form.  Make it more

9   direct.

10           Did you have conversations with the fulfillment people

11   in regard to their taking notes on their training with your

12   customers?

13           THE WITNESS:  Yes, sir, your Honor.

14           THE COURT:  Next question.

15   BY MR. SCHMIDT:

16   Q.  And you have seen the notes that are taken, is that

17   correct?

18           THE COURT:  Asked and answered.  Next.

19   Q.  And sometimes the training notes are five, ten, even

20   fifteen pages long, is that right?

21   A.  I don't recall length.

22   Q.  Now, I'm going to show you YGY-19.

23           And do you recognize this document?  You don't have to

24   read the substance, but read the --

25   A.  It looks like it came from me or Michael to Impact.

Iaqdket2                              Sinclair - cross

1   Q.   This one, the Olive Branch Marketing LLC account, is one

2   that you regularly accessed, is that right?

3   A.   Yes.

4   Q.   And this is -- the first page has -- the second or the

5   third page are the individual emails of that email string --

6   not a string -- thread, is that right?

7   A.   I couldn't hear that.

8   Q.   The second and third page are the individual emails that

9   are found in the first page, is that right?

10  A.   It appears to be, yes.

11  Q.   And so these documents you would have access to in one of

12  the computers that you would use, is that right?

13  A.   These emails, you mean?

14  Q.   Yes, these emails.

15  A.   Yes.

16  Q.   And the emails are -- and the email is a response --

17  withdrawn.

18          One is an email to Olive Branch Marketing LLC and one

19  is a response to that email, is that right?

20  A.   It looks like -- one moment, please.

21          (Pause)

22          It looks like one is from me, and the others are --

23  the other is a response to me from Impact.

24  Q.   Do you remember this email?

25  A.   Offhand, no.

Iaqdket2                          Sinclair - cross

1   Q.  But when you responded to the email that you received, then
2   you would have obviously have been reading that email, is that
3   correct?
4   A.  If it was me who responded, yes, sir.
5   Q.  And the purpose of your response was to conduct your
6   business, or whoever responded, to conduct the business that
7   your company was involved in, is that right?
8   A.  I'm sorry, sir.  Could you repeat the question?
9   Q.  It was necessary to respond to that email for the purpose
10  of conducting your business?
11  A.  Well, I sent the email so I didn't -- it looks like I
12  initiated it.  Right?
13  Q.  No.  If you look at the --
14  A.  I am looking at the times.  4:39.
15          OK.  Right.
16  Q.  If you look at page 2, do you see the time on page 2?
17  A.  Yes, I do.  I just wanted to make sure of that.
18  Q.  So for you to function and make money, you have to deal --
19  respond to these things?
20  A.  Yes, sir.
21  Q.  You or Mike, is that right?
22  A.  Correct.
23  Q.  If you don't, you don't run your business?
24  A.  Right.
25  Q.  So --

1        THE COURT:  When you answered "respond to these

2   things," what did you understand "these things" to be?

3        THE WITNESS:  These emails.

4        THE COURT:  What type of email is this?

5        THE WITNESS:  A correspondence with fulfillment.

6        MR. SCHMIDT:  Your Honor, I offer this under 803.

7        MS. FLETCHER:  Objection.  801 --

8        THE COURT:  Sustained.  He doesn't recognize it.

9        Move on.

10  Q.  But this is from either -- the response is from either you

11  or Mike, is that right?

12        MS. FLETCHER:  Objection.  Asked and answered.

13        THE COURT:  Let's move on, sir.

14  Q.  Would it be fair to say that you had regular correspondence

15  or telephone calls with fulfillment about problems they may

16  have had?

17        MS. FLETCHER:  Objection.  Asked and answered.

18        THE COURT:  He has answered that already, but you

19  could answer it again in the interest of my keeping the jurors

20  happy.

21        THE WITNESS:  Yes, sir, your Honor.

22        (Pause)

23        THE COURT:  Get control of the paper, everybody.

24  Let's move.  Ask your question.  Show your document.

25        MS. FLETCHER:  Your Honor, the issue is Mr. Schmidt

Iaqdket2                          Sinclair - cross

1    has just handed us a document.  He does not have other copies

2    of the document.

3               MR. SCHMIDT:  Your Honor, we've just printed this out

4    from the --

5               THE COURT:  How much longer do you have on

6    cross-examination, sir?

7               MR. SCHMIDT:  15 minutes.

8               THE COURT:  Maximum.

9               Jury, take your break.  15 minutes.

10              THE COURT:  I don't want discussions like that to

11   waste the jury's time.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

Iaqdket2                          Sinclair - cross

 1                (Jury not present)

 2                THE COURT:  You may step down, sir.

 3                Mr. Paul, what is the expected length of your

 4      cross-examination, if any?

 5                MR. PAUL:  I estimate about an hour, Judge.

 6                THE COURT:  All right.

 7                MR. SCHMIDT:  Your Honor, I need to make a record to

 8      defend myself at this point.

 9                THE COURT:  You don't have to defend yourself, sir,

10      but you certainly can make a record.

11                MR. SCHMIDT:  We received an amount of data that would

12      probably be millions of pieces of paper if they were all

13      printed out.

14                THE COURT:  That is on the record multiple times in

15      the correspondence in this case.  That was the purpose of

16      having the coordinating discovery attorney and the platform set

17      up.

18                Go ahead.

19                MR. SCHMIDT:  That only solves some problems.  We

20      can't possibly know which document that we're going to need on

21      cross-examination -- withdrawn.  We can't know every document

22      that we're going to need on cross-examination because that's

23      the nature of cross-examination.  This document only became

24      necessary because of the testimony of the witness concerning

25      not having access to his email account and not having a memory

Iaqdket2                              Sinclair – cross

1    of any of this --

2              THE COURT:  You made this part of the record clear

3    several times.  I understand your position.  You understand

4    mine.  I need a more efficient presentation of proof here.

5              15 minutes -- 12 minutes.

6              (Recess)

7              THE COURT:  Bring the jury in.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Iaqdket2                           Sinclair - cross

1           THE CLERK:  All rise.

2           (Jury present)

3           THE COURT:  Please be seated in the courtroom.

4           Mr. Schmidt, continue.

5   BY MR. SCHMIDT:

6   Q.  You've heard of the app of Wickr?

7   A.  I'm sorry.  The app of?

8   Q.  Wickr.

9   A.  Yes.

10  Q.  That app that you send a message and it disappears?

11  A.  Correct.

12  Q.  Did you use it?

13  A.  I did.

14  Q.  Excuse me?

15  A.  Yes.

16  Q.  Did Bill use it?

17  A.  I am Bill.

18  Q.  Did Fino use it?

19  A.  I cannot say with certainty that he did.

20  Q.  Did Pete DiQuarto use it?

21  A.  Yes.

22  Q.  Did Chris Wilson use it?

23  A.  I have no idea if he did.

24  Q.  And you have no idea -- and you have no idea that

25  Mr. Owimrin ever used it?

Iaqdket2                        Sinclair - cross

1   A.  No.

2   Q.  Now, Mr. DiQuarto started working for you in early 2005, is

3   that right?

4   A.  No, sir.

5         THE COURT:  In this last series of questions, you've

6   said -- you responded that you have no idea.  In other words,

7   you don't know whether or not?

8         THE WITNESS:  Yes, sir.

9         THE COURT:  OK.

10  BY MR. SCHMIDT:

11  Q.  You've never ever had a Wickr communication with Andrew

12  Owimrin, is that right?

13  A.  On Wickr, not to my knowledge, no, sir.

14  Q.  Now, I made a mistake.  Mr. DiQuarto started working for

15  you in early 2015, is that right?

16  A.  I believe so.

17  Q.  I'm going to show you what's been marked PC-16.

18        Briefly, just go through them and make sure that you

19  recognize what this document is.

20  A.  I recognize them.

21  Q.  These are the forms that you got from Mr. Curtis, is that

22  right?

23  A.  It seems to be, yes.

24  Q.  And this was what you asked him -- one of the things you

25  asked him to do?

Iaqdket2                          Sinclair - cross

1    A.  Yes.

2    Q.  To listen to -- to monitor the salespeople and send them --

3    send you the information about what was going on with the

4    salespeople, is that right?

5    A.  He was instructed to and part of his service was to send us

6    any types of recommended fines for violations that he heard

7    over the phone on the calls that were recorded.

8    Q.  And as you previously testified, some of them were for the

9    language concerning the amount of money that was made or can be

10   deducted, right?

11   A.  Earnings claims, some specific tax claims, yes.

12   Q.  Some of them were much more serious than others?

13   A.  Yes.

14           MR. SCHMIDT:  Your Honor, I offer this into evidence

15   as PC-16?  No objection.

16           THE COURT:  Admitted.

17           (Defendant's Exhibit PC-16 received in evidence)

18   BY MR. SCHMIDT:

19   Q.  I want you to take a look at the last page of BS-11.

20           Do you have that?

21           (Pause)

22           Now, that's one of the sales forms that had been

23   completed by the salesperson, right?

24   A.  It looks that way.

25           MR. SCHMIDT:  Put it up.

Iaqdket2                          Sinclair - cross

1    Q.  And there is an actually sticky note on it, isn't there?

2    A.  Yes.

3    Q.  All right.  And the last two sentences of the sticky note,

4    it says, "Wants to be as hands off as possible."  Do you see

5    that?

6    A.  Yes.

7    Q.  That's because one of the choices that the salespeople were

8    allowed to express to the customers, based on your

9    instructions, were that for the Internet program, they

10   didn't -- these customers wouldn't have to do very much, is

11   that right?

12   A.  That is a gray area.  I can't answer that with a yes or no,

13   respectfully, sir.

14   Q.  It was no secret that a customer could be very hands off in

15   the Youngevity program, isn't that right?

16   A.  With specific regard to Youngevity?

17   Q.  Yes.

18   A.  I can agree to that.

19                (Continued on next page)

20

21

22

23

24

25

1   Q.  Now, I am going to show you what has been marked BS --

2          THE COURT:  I take it that was a selling point; in

3   other words, you don't have to do anything, customer?

4          THE WITNESS:  That's correct.

5   Q.  It was also a selling point that the customers wanted to do

6   stuff to make it better to do stuff, right?

7   A.  Sure.

8   Q.  A lot of the customers chose to get themselves involved in

9   it as well, is that right?

10  A.  By getting involved, what exactly do you mean?  Because

11  that can be taken several different ways.

12  Q.  Getting involved in what is getting put in the Internet,

13  what products they wanted to sell, right?

14  A.  As far as picking out products, that was up to the client

15  to make the final decision.

16  Q.  Also, because one of the ways to make money in this program

17  was actually selling the products, they can go around and put

18  things up in the neighborhood, talk to friends, talk to family,

19  promote their Internet site if they wanted to?

20  A.  Correct.

21  Q.  Or they can go around trying to get other people to join

22  and to be below them so that they can even make profits from

23  them?

24  A.  We are talking about Youngevity?

25  Q.  Only Youngevity.

IAQ8GET3                         Sinclair - Cross

1   A.  Yes.

2   Q.  In fact, you and Mike, Fino, basically got yourselves on

3   top of your group and all the people that you sold were below

4   you?

5   A.  Yes.

6   Q.  And your hope was that you guys would make a lot of money,

7   because you are going to have 10, 20, 50, 100 people selling

8   Youngevity out there and you are going to get a piece of

9   everybody's sales, right?

10  A.  Yes.

11  Q.  Now, I am going to show you BS-12.

12          Now, this is correspondence back and forth from your

13  AOL account, your personal account?

14  A.  It looks to be.

15  Q.  If you look in the back of it, the last couple of pages,

16  you see the last two pages?

17  A.  Last two pages?

18  Q.  I think it's three or four pages -- the last -- go

19  backwards just a little bit.

20  A.  It looks like customer notes.

21  Q.  Those are notes from one of the fulfillment people, is that

22  right?

23  A.  Tucker was a fulfillment person, yes.

24  Q.  So these are notes sent to you, right, in order to enable

25  you to challenge a chargeback, is that right?

1   A.  Yes, sir.

2   Q.  It's because you asked them for their notes, is that

3   correct?

4   A.  I haven't been given adequate time to read each one of

5   these pages, but just glancing at it I can agree this is

6   correspondence between me and fulfillment.

7   Q.  You would not ask fulfillment for their notes unless you

8   needed them for a chargeback, is that right?

9   A.  Not necessarily, no.

10  Q.  What other reasons would you need it for?

11  A.  It could just be to calm a customer down.  It may not

12  always be a chargeback.

13  Q.  You would not ask for the notes unless there was some kind

14  of issue going on?

15  A.  Safe to say, yes.

16  Q.  So when everything is going smoothly, you wouldn't ask for

17  notes, is that correct?

18  A.  I can agree to that, yes.

19  Q.  And if there was a chargeback, these are the kind of notes

20  that you would forward to either -- you would have Mike forward

21  or you would forward to the credit card company to try to win

22  the chargeback, is that correct?

23  A.  Correct.

24  Q.  Did you falsify documents in order to try to win

25  chargebacks?  Did you, personally?

IAQ8GET3                         Sinclair - Cross

1  A.  Not to my knowledge.

2  Q.  When you say not to your knowledge, is it a habit of

3  sometimes doing it, or do you never do it?

4  A.  What I am saying exactly is that I don't remember

5  falsifying documents to fight chargebacks.

6  Q.  Are you saying it's possible you falsified documents?

7  A.  Highly unlikely.

8  Q.  Do you know if you forwarded any document to try to defeat

9  a chargeback knowing that it was falsified?

10 A.  As I sit here right now, I cannot think of an example where

11 that would be pertinent.

12 Q.  So the documents that you have in your hand, the few pages

13 from the coach, is the type of document you would forward or

14 have forwarded to challenge the chargeback, is that right?

15 A.  Again, I just want to be clear on the record, I have not

16 reviewed this in its entirety, but at first glance,

17 correspondence between completion of training sessions or

18 coaching sessions is the type of thing we would forward to

19 fight a chargeback.

20 Q.  You can't obviously say how accurate the information is

21 that's in it because you were not present or part of the

22 coaching sessions, is that right?

23 A.  Correct.

24         MR. SCHMIDT:  Your Honor, I offer this into evidence

25 now as a business record of his business challenging

1    chargebacks.

2                MS. FLETCHER:  Objection.  801.

3                THE COURT:  It's the same reasoning that we had

4    before.  I have to exclude it.

5    Q.  The fulfillment people, when they said to you there was

6    some training, was it their routine practice to back that up

7    with the notes?

8    A.  What page are you looking at?

9    Q.  Don't look at the pages.

10               When you wanted to know what fulfillment was done, and

11   you were informed by the fulfillment people that there was some

12   coaching done, and you wanted proof of it, was it their routine

13   practice to provide you with notes of the coaching?

14   A.  Yes.

15               MR. SCHMIDT:  Your Honor, I offer that under Rule 406.

16               MS. FLETCHER:  Same objection, your Honor, but I will

17   take a look.

18               Same objection, your Honor.

19   Q.  Just to be sure, this is back and forth with your personal

20   e-mail account, is that correct?

21               MS. FLETCHER:  Your Honor, there is an objection

22   pending.

23               THE COURT:  I understand.  He was just asking to

24   clarify.  It's not in yet.

25               You can ask that question, sir.  Ask the question, Mr.

1    Schmidt.

2    Q.  This is always back and forth with your personal account

3    and not an e-mail account that you don't know whether you

4    looked at or not, is that right?

5    A.  The e-mail on page 1 is my personal AOL account.

6            THE COURT:  I am sustaining the objection.  The same

7    reasoning before as set forth at sidebar.  406 does not cure

8    it.

9    Q.  Arash Ketabchi, he actually got into fistfights with people

10   at the place of business, didn't he?

11   A.  Yes.

12   Q.  And he also was particularly nasty and argumentative to

13   some of the other staff as well, isn't that right?

14   A.  There were a handful of confrontations that we had

15   including Arash.

16   Q.  In fact, because of those, he was suspended for a period of

17   time?

18   A.  Yes.

19   Q.  Including one of the confrontations was with Andrew, wasn't

20   it?

21   A.  I don't believe so, no.

22   Q.  One certainly was with Reagan, wasn't it?

23   A.  It was with Reagan.

24   Q.  And he did have arguments with Andrew as well, didn't he?

25   A.  I don't remember one that was particularly bad with Andrew

IAQ8GET3                        Sinclair – Cross

1    offhand.

2    Q.  You agreed that your tax return said $23,000 for 2014?

3              THE COURT:  Asked and answered.  Move on.

4    Q.  In 2014 you were driving a 750Li BMW that you had to pay

5    $1450 a month for, isn't that right?

6              MS. FLETCHER:  Objection.  Relevance.

7              THE COURT:  I will allow it.

8    A.  It wasn't quite that high, but yes.

9    Q.  And you were also living in an apartment for $2500, is that

10   right?

11   A.  A little bit more than that, but yes.

12   Q.  And you were spending thousands of dollars a week on

13   oxycodone during that period of time, weren't you?

14   A.  Yes, sir.

15   Q.  When you signed your 2014 tax return that said $23,000, you

16   believed that that was accurate?

17             THE COURT:  Asked and answered.

18             Proceed.

19             MR. SCHMIDT:  I have no further questions.

20             THE COURT:  Is there any cross-examination by Mr. Paul

21   on behalf of Steve Ketabchi?

22             MR. PAUL:  Yes.

23             THE COURT:  Sir.

24   CROSS-EXAMINATION

25   BY MR. PAUL:

IAQ8GET3                    Sinclair - Cross

1    Q.  Mr. Sinclair, we have never met, have we?

2    A.  I don't believe so, no.

3    Q.  Now, how long would you estimate you have been committing

4    fraud on individuals?

5    A.  As a business owner or overall?

6    Q.  Any way you wish.

7    A.  Since 2008.

8    Q.  So if beginning in 2008 you started, was that at The Tax

9    Club?

10   A.  Yes, sir.

11   Q.  So this Tax Club was an organization similar to Olive

12   Branch?

13   A.  Yes, sir.

14   Q.  So when you were working at Tax Club, you and others were

15   participating in reaching out to customers in attempting to

16   sell them goods that really were not goods, right?

17   A.  Yes.

18   Q.  Now, how long, if at all, have you ever spent in jail?

19   A.  In jail?

20   Q.  Yes.

21   A.  March 21, 2017.

22   Q.  That's the date of your arrest for this case?

23   A.  Yes.

24   Q.  Until when?

25   A.  Later that day.

IAQ8GET3                        Sinclair - Cross

 1   Q.   Oh.  So approximately less than a day you have spent in

 2   jail, is that right?

 3   A.   Yes.

 4   Q.   Have you spent any time in jail to cover the crimes you

 5   have been committing since 2008?

 6   A.   No, sir.

 7   Q.   So other than the period of time that you spent from the

 8   time you were arrested -- I assume in the early morning hours

 9   of March 21?

10   A.   Yes.

11   Q.   -- until you were able to be released on a bond, that's the

12   actual time you have ever spent for all the years of crime you

13   have been committing, is that right?

14   A.   Yes.

15   Q.   To date?

16   A.   Yes, sir.

17   Q.   And you got released on a bond, is that right?

18   A.   Yes, sir.

19   Q.   What did the bond consist of?

20   A.   $75,000 bond.

21   Q.   You didn't have to put up $75,000 cash, did you?

22             MS. FLETCHER:  Objection, your Honor.

23   A.   No.

24             THE COURT:  Relevance, is that your objection?

25             MS. FLETCHER:  Yes.

1            THE COURT:  I will allow it.

2   Q.  Did you have to put up $75,000 cash?

3   A.  No, sir.

4   Q.  So it was secured how?

5   A.  My ex-girlfriend, my girlfriend at the time had to sign off

6   on it.  And I think the conditions of were PTI, which I go to

7   once or twice a month, depending on where the days fall.  I am

8   relegated to remaining within New Jersey, the five boroughs,

9   and a few counties in New York State.

10           THE COURT:  Do you reside in New Jersey?

11           THE WITNESS:  I do, yes, sir.

12           THE COURT:  That's why the rent was what it was.

13           THE WITNESS:  Yes.

14           MR. PAUL:  I didn't hear that.

15           THE COURT:  That's why the rent was what it was.  I

16   thought the jurors were going to ask for the address.

17   Q.  With regard to your arrest for this case, it's fair to say

18   that other than a couple of signatures, and reporting to

19   pretrial service, you were released and have been released ever

20   since?

21   A.  Yes, sir.

22   Q.  And when you were arrested for this case, what time of day

23   was that?

24   A.  I believe 6 a.m.

25   Q.  Where did that take place?

1   A.   My residence in Secaucus, New Jersey.

2   Q.   Tell me the circumstances of what occurred when you were

3   arrested that morning.

4              MS. FLETCHER:  Objection.

5              THE COURT:  Relevance?

6              MS. FLETCHER:  Yes.

7              THE COURT:  I will allow it.

8   A.   Several officers of different departments -- NYPD, homeland

9   security, U.S. marshals -- probably about 15 of them, came to

10   my door.

11              THE COURT:  Quick sidebar.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Where are you going with this?

3          MR. PAUL:  I just have a couple of questions.

4          THE COURT:  Normally I wouldn't allow it.

5          Go ahead.

6          MR. PAUL:  They are going to bring in an agent talking

7     about the circumstances of my client being arrested and what

8     transpired, and I just want to bring out through this witness

9     the similarities of what occurred, or dissimilarities of what

10    occurred, between the two.

11         THE COURT:  For what purpose?

12         MR. PAUL:  To bring out to the jury -- they are going

13    to try to bring out through a witness what occurred with regard

14    to my client and a statement he may or may not have made to the

15    agent when they busted in his door.  I am trying to find out

16    from this witness if there were similar circumstances with

17    regard to his arrest.

18         THE COURT:  Give me your questions.

19         MR. PAUL:  What he basically said -- I think he has

20    already answered my question.  There were 15 individuals.  I

21    was going to ask him whether there were guns drawn and did they

22    remove items from his apartment.

23         THE COURT:  Go ahead.  Ask.

24         Let's move on.

25         (Continued on next page)

1           (In open court)

2   BY MR. PAUL:

3   Q.  You said approximately how many law enforcement individuals

4   showed up at your door?

5   A.  About 15.

6   Q.  Did they knock on the door or bash it down?

7   A.  They knocked.

8   Q.  When they opened the door they arrested you?

9   A.  Yes.

10  Q.  Did they seize items in your residence?

11  A.  They did.

12  Q.  What kind of items did they seize?

13  A.  All electronic devices.

14  Q.  Now, you told us that you are, to your knowledge, currently

15  facing 60 years in jail for the crimes you have committed, is

16  that right?

17  A.  Yes.

18  Q.  You said you started cooperating within a short period of

19  time after your arrest, correct?

20  A.  Yes.

21  Q.  Is that because you didn't want to face the possibility of

22  going to jail for 60 years --

23  A.  Yes.

24  Q.  -- for crimes you were clearly guilty of?

25  A.  Yes.

1  Q.  Now, when you started cooperating with the government, you

2  sat down with Ms. Kiersten for the most part, is that right?

3  A.  AUSA Fletcher was there for most of our meetings.

4  Q.  I apologize.  AUSA Fletcher.  I apologize.  Ms. Fletcher.

5  A.  Yes.

6  Q.  And she has been the assistant U.S. attorney who you have

7  been debriefed with along with agents, is that right?

8  A.  Yes, sir.

9  Q.  How many times would you estimate you have had meetings

10  with the government since you were released on bond?

11  A.  Dozens.

12  Q.  Dozens.  Can you estimate approximately, was it more than

13  60?

14  A.  I don't think it was that high, no.

15  Q.  50?

16  A.  I wouldn't say 50.

17  Q.  40 times?  I am including times you met with them since you

18  signed off on your cooperation agreement.

19  A.  Since the cooperation agreement, no, it hasn't been nearly

20  that many times.

21  Q.  Including the time.  So from the time you started

22  proffering with the government to the time you were being

23  interviewed in preparation of your testimony, approximately how

24  many times would you say you have met with the government?

25  A.  If I had to put a number on it, I'd say maybe about 30

1    times.

2    Q.  30 times.

3         Now, as this trial date became closer and closer, you

4    started being interviewed by the government, Ms. Fletcher, in

5    preparation for your testimony, is that right?

6    A.  Yes.

7    Q.  So the questions she asked you on direct the other day,

8    that wasn't the first time you were hearing those questions,

9    was it?

10   A.  No.

11   Q.  In fact, she has gone over those questions with you

12   numerous times, is that not so?

13   A.  That's correct.

14   Q.  In fact, she went through with you, in preparation of your

15   testimony, a script, questions she was going to ask you, and go

16   over the answers you were going to give with regard to those

17   questions, is that not fair?

18   A.  I didn't see a script, but I have been asked most of those

19   questions repeatedly, yes.

20   Q.  And that is in preparation of your testimony here at this

21   trial, right?

22   A.  Yes, sir.

23   Q.  And you were shown exhibits that you were going to be shown

24   on the witness stand in preparation of your testimony, is that

25   right?

IAQ8GET3                          Sinclair - Cross

1    A.   Yes.

2    Q.   So when you were asked and questioned by Ms. Fletcher about

3    exhibits that were shown to you, and perhaps introduced or

4    identified, that wasn't the first time you were seeing those

5    items, is that right?

6    A.   The overwhelming majority of them I have seen before.

7    Q.   A number of times perhaps, right?

8    A.   Yes.

9    Q.   Now, you testified that you eventually entered into a

10   cooperation agreement with the government, is that right?

11   A.   Yes.

12   Q.   And this cooperation agreement that you entered into

13   basically is a contract that you have with the government with

14   regard to your helping them, is that right?

15   A.   Yes.

16   Q.   It's a contract where you have agreed to testify, be

17   debriefed, be called upon when asked to be, and testify on the

18   witness stand like you were doing yesterday, today, and so

19   forth?

20   A.   Yes, sir.

21   Q.   And in return for that, they are going to, from what you

22   have told us, write a letter to Judge Stein, who happens to be

23   your sentencing judge, is that right?

24   A.   If I continue to honor the agreement, that's my

25   expectation, yes.

1   Q.  And this letter, as you told us, is what is called a 5K1

2   letter, right?

3   A.  Yes.

4   Q.  And this letter allows Judge Stein to give you a

5   significantly less, if he chooses to, sentence than the 60

6   years you potentially are facing, is that right?

7   A.  Yes.

8   Q.  And, in fact, you told us it's your hope, understandably

9   so, your hope is that Judge Stein will give you no jail at all,

10  right?

11  A.  Yes, sir.

12  Q.  You could walk away with a probation sentence for having

13  committed these crimes since 2008 if Judge Stein deems that

14  appropriate, is that right?

15  A.  Yes, sir.

16  Q.  So you're here, hopefully, from your standpoint, to make a

17  good impression on Judge Stein, as well as to fulfill your

18  contract with the government, right?

19  A.  I am here to tell the truth.

20  Q.  OK.  You go by the name of William Sinclair and Bill

21  Sinclair, right?

22  A.  I go by Bill.

23  Q.  Bill is more commonly used.  So your initials for Bill

24  Sinclair is BS, right?

25  A.  Yes.

1    Q.  That's what I thought.

2              MS. FLETCHER:  Objection, your Honor.

3              THE COURT:  Move on.  The documents were identified

4    with the initials BS.  Move on.

5    Q.  When you took your plea and entered this cooperation

6    agreement, you took a plea that covered not only the crimes

7    since 2008, but the other crimes that you have committed, is

8    that right?

9    A.  Yes, sir.

10   Q.  And included in your agreement and your plea is crimes such

11   as solicitation of prostitutes for the period 2000 through

12   2016, including approximately once per week from 2014 through

13   2016, is that right?

14   A.  It could have been as frequently as that, yes.

15   Q.  So that was accurate, you were doing that for that time

16   period, is that right?

17   A.  Yes.

18   Q.  In addition to that, you have also covered -- in other

19   words, when Judge Stein sentences you, these crimes, just like

20   that one, is covered in that sentence, right?

21             In other words, the government can't charge you for

22   those crimes because it's included in your agreement, right?

23   A.  I have been made no promises that any of my additional

24   crimes cannot be looked at for additional sentencing.

25   Q.  I am going to show you what is 3501-09.  Forgive my notes.

IAQ8GET3                        Sinclair - Cross

```
 1            MR. PAUL:  I won't ask to approach since I understand
 2   I have permission.
 3   Q.  Take a look at that.  Look at the second page, if I could
 4   direct your attention to the bottom of the first, carried over.
 5   A.  From right here?
 6   Q.  I will give you the entire document.
 7            MS. FLETCHER:  Mr. Paul, do you want to give the
 8   witness a clean copy?
 9            MR. PAUL:  Thank you.
10   Q.  Let me replace that one with this one.  You can look at it.
11   A.  The entire document?
12   Q.  Yes.  Just review it quickly.
13            You have seen this document before, have you not?
14   A.  Yes.
15   Q.  It's a plea agreement?
16   A.  Yes.
17   Q.  It's a cooperation agreement?
18   A.  It is.
19   Q.  And you have your own signature on it?
20   A.  I do.
21   Q.  This isn't the first time you're looking at this?
22   A.  No.
23   Q.  And you have discussed this both with your lawyer and in
24   preparation for taking your plea with the government?
25   A.  Yes, sir.
```

IAQ8GET3                          Sinclair - Cross

1    Q.  If you would look at --

2            MS. FLETCHER:  Can Mr. Paul please step back?

3    Q.  If you would start at the end and then continue to the next

4    page.

5            THE COURT:  Move away from the witness.  Thank you.

6    Q.  Have you had a chance to read that paragraph?

7    A.  Almost.

8            OK.  I have read it.

9    Q.  Does that refresh your recollection that the government has

10   promised you that, as long as you continue to do what is asked

11   of you, according to the contract you have entered into with

12   them, that they will not prosecute you for the crimes you have

13   told us about, as well as the additional offenses you have told

14   us about that you have committed?

15   A.  Yes.  I misspoke.

16   Q.  So the crimes that you have told us about, in addition to

17   the fraudulent activities you have engaged in since 2008,

18   that's all covered, including solicitation of prostitutes, use

19   of drugs, a whole list of them, selling marijuana, all the

20   other things you have told the government about and you have

21   told this jury, is that right, that's all covered?

22   A.  Yes.

23   Q.  So when Judge Stein sentences you to perhaps probation,

24   it's all done, right?

25           MS. FLETCHER:  Objection to form.

IAQ8GET3                      Sinclair - Cross

1    A.  Not exactly.

2              THE COURT:  Sustained as to form.

3    Q.  Now, you told us that this Tax Club that you participated

4    in was engaged in exactly the same kind of scam that you were

5    committing at Olive Branch, is that right?

6    A.  Yes.

7    Q.  And many of the people, not Mr. Owimrin, by the way, but

8    many people came to work with you at Olive Branch who had

9    worked at Tax Club, is that right?

10   A.  Yes.

11   Q.  And these people who worked with you at Tax Club, they

12   basically learned the business, right?

13   A.  Yes.

14   Q.  It was like the minor leagues or a breeding ground or

15   preparation of what they finally engaged in at Olive Branch?

16   A.  That's where they learned the product line, the pitch.

17   Q.  The tricks of the trade?

18   A.  Yes.

19   Q.  What is your definition, sir, of a con man?

20             MS. FLETCHER:  Objection.

21             THE COURT:  I will allow it.

22   A.  Con man would be someone who deceives, misleads.

23   Q.  Would you agree with me that a man who cheats or tricks

24   someone by gaining their trust and persuading them to believe

25   something that is not true is pretty much the definition of a

1   con man, right?

2   A.   Yes.

3   Q.   Also known as a scam artist, right?

4   A.   Sure.

5   Q.   And that's you, right?

6   A.   I have been, yes.

7   Q.   You have been.  For many years, right?

8   A.   Yes.

9   Q.   Would you agree with me that it takes a certain amount of

10  talent to be a good con man?

11  A.   I don't know if it's talent.

12          THE COURT:  Certain skill.

13          THE WITNESS:  Yes.  That's fair to say, your Honor.

14  Q.   It's an unusual skill, but nevertheless it requires a

15  skill, does it not?

16  A.   Yes.

17  Q.   Because basically you have to first gain someone's

18  confidence, right?

19  A.   Yes.

20  Q.   And then once you're able to do that, you can sell them

21  hopefully just about anything and everything, right?

22  A.   Yes.

23  Q.   And that's what you did, right?

24  A.   Yes.

25  Q.   And you did this, as you said, not just for one or two or

1    three years with -- by the way, how long was Olive Branch in

2    existence?

3    A.   Officially since 2013.

4    Q.   2013.  And it ended when?

5    A.   March of '17.

6    Q.   So in addition to those three or four years that Olive

7    Branch was up and running, there are all these other years you

8    have been a con man or a scam artist, right?

9    A.   Yes.

10   Q.   Would it be fair to say that the targets you chose often

11   were people that you would learn from leads or other ways would

12   be good targets for this, right?

13   A.   Again, we did not choose our leads; they were given to us.

14   Q.   But basically, as you told us the other day, there is a

15   certain demographic, I think was the word you used, of

16   targeting individuals, right?

17   A.   To be able to answer that correctly, I don't know how they

18   go about their marketing materials.

19   Q.   Let me use your answers.  You told us that you wanted

20   people who didn't come from the metropolitan area because they

21   might be too savvy on what was going on, right?

22   A.   No, I did not.

23   Q.   You didn't tell us that?

24   A.   I didn't say I didn't want them, no.

25   Q.   You generally didn't reach out to those people, or did you?

1   A.  Because they didn't sign up initially.

2   Q.  And that would be why, because they were maybe too savvy or

3   sophisticated to know a scam from a legitimate deal?

4   A.  That would be my estimation.

5   Q.  You would reach out to the rural areas of this country,

6   right?

7   A.  We would reach out to the leads given to us, sir.

8   Q.  And they were often people who lived in rural areas of the

9   United States?

10  A.  Correct.

11  Q.  And that's the demographic that you used to sucker people

12  in to buy stuff that didn't exist, right?

13  A.  Yes.

14          MR. PAUL:  Could the witness be shown Government

15  Exhibit 714.  It's not introduced but it's been marked for

16  identification.

17          THE COURT:  Do you have a copy of it, sir?

18          MR. PAUL:  Yes.  It's their exhibit.  They have it.

19  Q.  Would you look at that, sir?

20  A.  Yes.

21  Q.  You were asked questions about this photograph, is that

22  right?

23  A.  Yes.

24  Q.  You identified people in the photograph, is that right?

25  A.  Yes.

IAQ8GET3                          Sinclair - Cross

1    Q.  And I think you identified Mona Ketabchi, right?

2    A.  Yes.

3    Q.  Do you know her?

4    A.  Never met her.  I don't know her personally.  I never spoke

5    to her.

6    Q.  How were you able to identify her photograph?

7    A.  Through pictures I have seen on Arash's social media.

8            It also says Mona right on the caption.

9    Q.  So that's a big clue, is it not?

10   A.  I know what she looks like.

11   Q.  You know what she looks like from looking at Arash's

12   Instagram?

13   A.  Prior to that.  Facebook.

14   Q.  You ever meet her?

15   A.  No.

16   Q.  Was she ever in your office?

17   A.  No.

18   Q.  She ever work for you?

19   A.  No.

20   Q.  Was she ever an employee of any kind of yours, either at

21   The Tax Club or Olive Branch?

22   A.  No, sir.

23   Q.  You also identified Steven Ketabchi in that picture, did

24   you not?

25   A.  Yes.

IAQ8GET3                        Sinclair - Cross

1   Q.  You say that -- withdrawn.

2             How many times would you say you met Steven Ketabchi?

3   A.  Once, possibly twice.

4   Q.  You remember telling the government that you met him once,

5   "I think"?

6             You're not even sure you have ever met him, are you?

7   A.  I saw him in court.

8   Q.  You saw him in court?

9   A.  Yes.

10  Q.  When he was arrested like you?

11  A.  Yes.

12  Q.  I see.  So while at Olive Branch you had never seen him,

13  right?

14  A.  Not to my knowledge.

15  Q.  You told us you spoke to him, you got e-mails.  But you

16  never physically saw him, right?

17  A.  Again, I saw him in court.

18  Q.  So that's the basis of your identifying him in this

19  photograph, is that fair?

20  A.  No.

21  Q.  What is the basis of identifying him in this photograph?

22  A.  I have known Arash since 2008 so I have seen plenty of

23  pictures.

24  Q.  Of his brother?

25  A.  Yes.  Absolutely.

1             MR. PAUL:  Can we have the witness look at Exhibit

2    715, please.  It's for identification only.

3    Q.  You see that photograph, sir?

4    A.  Yes.

5    Q.  You were asked questions about this the other day, were you

6    not?

7    A.  I was.

8    Q.  Again, you identified individuals in this photograph,

9    right?

10   A.  Yes, sir.

11   Q.  And I think you identified Mona Ketabchi?

12   A.  No, I did not.

13   Q.  You did not?

14   A.  No.

15   Q.  Who is the woman in this photograph?

16   A.  There's two women.

17   Q.  Let's start at the left, going from left to right, as I

18   think you were doing.

19   A.  The woman in the background I did not acknowledge.

20   Q.  I am talking about the five people in the photograph, not

21   someone standing in the back putting lipstick on or whatever

22   she is doing.

23   A.  It's Danielle Owimrin.

24   Q.  Who is Danielle Owimrin?

25   A.  That's Arash's, I believe, fiancee and Andrew and Reagan's

IAQ8GET3                          Sinclair - Cross

1   cousin, I believe.

2   Q.  So Arash Ketabchi is identified in this photograph, right?

3   A.  Yes.

4   Q.  With his fiancee?

5   A.  Yes.

6   Q.  And Steven Ketabchi, right?

7   A.  Yes.

8   Q.  And how did you know Danielle Owimrin?

9   A.  I met her several times.

10  Q.  It's based on those circumstances that you identified those

11  individuals, is that right?

12  A.  Yes.

13  Q.  Now, you told us already a number of times that you have

14  been committing fraud for many years.  Would it be fair to say

15  that it wasn't until you were charged and then spoke with the

16  government that you came to understand that what you were doing

17  was illegal?

18  A.  No, sir.

19  Q.  That's not fair to say?

20  A.  No.

21  Q.  I will come back to that in a minute.

22          I am going to show you 3501-04, and it's the fifth

23  page.

24          If you would look at the first paragraph, starting

25  right here.  It's two short sentences.  Have you read it?

IAQ8GET3                          Sinclair - Cross

1    A.  You're talking about these two sentences?  Yes.

2    Q.  You have had a chance to look at it?

3    A.  Yes.

4    Q.  Does that refresh your recollection that in one of the

5    proffers you had with Ms. Kiersten that you told the government

6    you always knew people weren't going to make money, should have

7    never done it, now see?

8            MS. FLETCHER:  Objection, your Honor.  The witness

9    hasn't said he doesn't remember.  Improper refreshment.

10           THE COURT:  Sustained.  He had no failure of

11   recollection.

12           MR. PAUL:  He said he did not recall that.

13   Q.  You did not say it, is that right?

14   A.  Say what?  What do you mean by "it"?

15           THE COURT:  Let's be clear.

16           MR. PAUL:  I will clarify.

17   Q.  Do you remember telling the government on April 19, 2017,

18   shortly after your arrest, like a month later, and you

19   proffered with them at a meeting where you told them that you

20   always knew people weren't going to make money -- I assume

21   meaning customers -- and should never have done it, and then

22   say to them you now see?

23   A.  I believe so, yes.

24   Q.  You did say that?

25   A.  I believe so.

1    Q.  So it's fair to say that it took you from 2008 to the date

2    you were sitting in the government's office, after being

3    charged, arrested and indicted, to finally understand that what

4    you were doing was illegal?

5    A.  Now that I come to think of it, the end part of that, I

6    don't remember saying "I now see that."

7    Q.  You don't remember that?

8    A.  Not now see that.

9    Q.  You're not certain?

10   A.  No.

11   Q.  I see.

12          THE COURT:  Are you not certain or you said you don't

13   remember saying it?

14          THE WITNESS:  I don't remember saying the end part of

15   it that he added on about now seeing that.

16   Q.  It's different than what you just said two minutes ago?

17   A.  Yes, it is.

18   Q.  So you're correcting your testimony?

19   A.  Yes.  I want it to be on the record with that.

20   Q.  We want you to be on the record.

21          Now, in listening to your testimony these last couple

22   of days, would it be fair to say that you're an individual who,

23   maybe in your own mind, was torn between the scam you were

24   participating and trying to do things the right way?

25   A.  There was no right way.

IAQ8GET3                    Sinclair - Cross

1    Q.   Yes.  But you told us that you had all these rules, right?

2    A.   To stay off the radar.

3    Q.   Only to stay off the radar?

4    A.   To make money.

5    Q.   So you knew it was a scam from day one, you knew these

6    people were getting ripped off, and you knew you were

7    participating in this, is that right?

8    A.   That's what I'm saying.

9    Q.   And that's why you had your calls monitored, right?

10   A.   When you say "that's why," what exactly do you mean?

11   Q.   Stay off the radar, I think you said.

12   A.   Yes.  Absolutely.

13   Q.   You wanted your salespeople to follow a script but not go

14   in certain areas, as I recall, right?

15   A.   Yes.

16   Q.   You didn't want them to try to overdo it, in other words,

17   right?

18   A.   Right.

19   Q.   You didn't want them to make promises that were clearly

20   going to perhaps get on the radar of law enforcement, right?

21   A.   Yes.

22   Q.   And so that's why you had rules for your salespeople, who

23   were told to follow these rules, right?

24   A.   Yes.

25   Q.   And some didn't.  I think you told us there were fines

IAQ8GET3                          Sinclair – Cross

1    involved and so forth, right?

2    A.  Yes.

3    Q.  But nevertheless, you attempted to have rules and you

4    attempted to do things within a certain framework, I suppose,

5    correct?

6    A.  We drew a line.

7    Q.  A line in the sand, I think you told us, right?

8    A.  Possibly, yeah.

9    Q.  A line that you wouldn't possibly go over, right?

10   A.  I don't remember using those words.

11   Q.  No.  Those are my words.  I am asking you, a line that you

12   wouldn't possibly go over, cross over?

13   A.  That's going to exist somewhere.

14   Q.  Really?  It didn't seem like it.  Because you have done

15   everything and anything possible to make as much money as

16   possible that Olive Branch and you could possibly make, is that

17   not correct?

18            THE COURT:  Is that a question, sir?

19            MR. PAUL:  Yes.

20            MS. FLETCHER:  Objection.

21            THE COURT:  Sustained as to form.

22   Q.  You said there has to be some limits, right?

23   A.  Yes.

24   Q.  Give us an example of some of your limits in your mind.

25   A.  Amounts that were sold.

IAQ8GET3                    Sinclair - Cross

1    Q.  What is the limit on amounts?

2    A.  I know this exceeded a few times, but generally 15,000.

3    Q.  15,000.  You thought these people who were victimized could

4    part with $15,000, is that fair?

5    A.  At that time, that was the limit.

6    Q.  But often they went over 15,000, right?

7    A.  Often, no.

8    Q.  You tried to do up-sales on people, right?

9    A.  Per transaction, sir.

10   Q.  For what?

11   A.  Per transaction, sir.

12   Q.  What does that mean, "per transaction"?

13   A.  Per transaction.  There were two sales, sometimes three.

14   Q.  So you would sell somebody, let's say, to use your number,

15   $15,000, right?

16   A.  Yes.

17   Q.  And that customer wouldn't be left alone, you would come

18   back to that customer to try to sell them more products, right?

19   A.  Depending on the circumstance.

20   Q.  Depending on the circumstances, would it be fair to say

21   often it went beyond the $15,000 that you said you can't go

22   beyond that, right?

23   A.  I said we generally did not go over 15,000 per transaction.

24   The customer limit was supposed to be at 25,000.

25   Q.  We are up to 25,000.  OK.

IAQ8GET3                        Sinclair - Cross

1    So now it's 15,000, and perhaps another 10 added on to

2    this poor person who has parted with 15, right?

3    A.  Yes.

4    Q.  I see.  And, in fact, it didn't end there, did it?  Because

5    you started something called -- what was it, a debt something,

6    as I recall?

7    A.  Debt elimination.

8    Q.  Debt elimination.  So you would reach out to a client who

9    you have now perhaps scammed for $25,000, if that person is

10   lucky, and try to sell them more, another scam deal, right, to

11   eliminate the debt caused by you?

12   A.  Yes.

13   Q.  And that didn't cross a line in your mind?

14   A.  It all did, sir.

15   Q.  It all did.  Because you're sitting here now with a

16   cooperation agreement, it all did, now it makes sense, right?

17           MS. FLETCHER:  Objection.

18           THE COURT:  Sustained.

19           MR. PAUL:  Withdrawn.

20           May the witness and jury be shown Exhibit 735.

21           THE COURT:  It's been admitted, I take it?

22           MR. PAUL:  It is.

23   Q.  Now, that's a photograph of your office you told us, is

24   that right?

25   A.  It is.

1        MR. PAUL:  Ms. Lee, could you please zero in on the

2    poster behind the desk and blow it up, please, if possible.

3    Q.  That's a poster that's behind your chair, right?

4    A.  It is.

5    Q.  And that's an office you went into every single day, right?

6    A.  It was.

7    Q.  And it's a poster, as I can see, with my bad sight,

8    "integrity," right?

9    A.  Yes.

10   Q.  And beneath that, I think it says, "If it is not right, do

11   not do it.  If it is not true, do not say it."

12        Is that a code you lived by from 2008 to 2017, '16?

13   A.  No.

14   Q.  So you had this poster behind your desk for what purpose,

15   sir?  To remind yourself of what it might be like to have some

16   integrity?

17        MS. FLETCHER:  Objection.

18        THE COURT:  Sustained.

19        Mr. Paul, I don't mind the questions.  I do mind the

20   histrionics.  So lower the level a little bit.  Straight

21   questions.

22   Q.  What was the point of having that poster behind you every

23   single day in your office?

24   A.  I didn't really think about it after a while.

25   Q.  I guess not, right?

1          MS. FLETCHER:  Objection, your Honor.

2          THE COURT:  It's not a question.

3   Q.  It obviously contradicts everything you stood for over many

4   years, is that not so?

5   A.  It does.

6   Q.  Was it perhaps a bad joke that you wanted to show your

7   people that worked for you when they came in to talk to you in

8   your office?

9          THE COURT:  Sustained.  Leading questions are OK on

10  cross-examination.  Argumentative ones are not.

11  Q.  Now, you said that --

12         MR. PAUL:  You can take that down.  Thank you.

13  Q.  Did Steven Ketabchi ever work at your office?

14  A.  No.

15  Q.  Did he ever work for you in any way?

16  A.  No.

17  Q.  Did he ever appear in your office?

18  A.  Not that I know of.

19  Q.  On direct, when Ms. Fletcher was asking you about those

20  photos, she asked you how you know Steven Ketabchi in that you

21  came to have business dealings with him at some point.  Do you

22  remember that question?

23  A.  Yes.

24  Q.  Isn't it fair, sir, that your description of business

25  dealings was not until Arash Ketabchi had left Olive Branch?

IAQ8GET3                         Sinclair - Cross

1   A.  Yes.

2   Q.  And had started his own floor at A1?

3   A.  Yes.

4   Q.  And that these business dealings, to use Ms. Fletcher's

5   term, took place from October 2015 to December 2015, is that

6   fair?

7   A.  Yes.

8   Q.  So we are talking about two, maybe three months, right?

9   A.  Yes.

10  Q.  And the business deals you're referring to with regard to

11  Steven Ketabchi was doing chargebacks for his brother, Arash

12  Ketabchi, correct?

13          MS. FLETCHER:  Objection to form.  Who was doing

14  chargebacks?

15          MR. PAUL:  I will rephrase it.

16  Q.  During that period of time, your contact with Steven

17  Ketabchi was, for the most part, if not completely, his attempt

18  in reversing chargebacks on behalf of his brother, Arash

19  Ketabchi?

20  A.  Correct.

21  Q.  And it was Steven's job, if you know, to respond to these

22  chargebacks, is that right?

23  A.  Yes.

24  Q.  And as far as you know, that's what he did, right?

25  A.  Yes.

IAQ8GET3                          Sinclair - Cross

1   Q.  So he was doing what was required by the merchants to

2   respond to these chargebacks when they came through to Arash

3   Ketabchi, is that right?

4   A.  All I know is what we discussed.  I don't know which

5   merchant he was dealing with.  I don't know anything aside from

6   what Steve asked us for.

7   Q.  And that was usually to -- always, in fact, to respond to a

8   chargeback he was working on, right?

9   A.  Correct.

10  Q.  And he would attempt to gather documents to show the

11  merchants, when there was a chargeback, as to what had

12  transpired with perhaps salespeople and the customer, right?

13  A.  Yes.

14  Q.  He would show them a contract, if it existed, right?

15  A.  Yes.

16  Q.  Let me rephrase that.

17          If someone is responding to a chargeback, the

18  procedure -- and you said Fino did this, not you, for the most

19  part, right, in terms of responding to a chargeback?

20  A.  At our own company?

21  Q.  Yes.

22  A.  Correct.

23  Q.  And Fino, who was responsible for that, would do what, he

24  would see if there was a contract for a customer who was

25  claiming they didn't get what they wanted, perhaps?

1    A.  Any type of written signed documentation, any type of proof

2    of fulfillment we would submit to the merchant.

3    Q.  So the normal procedure, as far as you are aware, was to

4    provide a contract, if it existed, signed contract hopefully,

5    and documents from the fulfillment people showing that these

6    people received what they contracted for?

7    A.  Correct.

8    Q.  That's the normal procedure?

9    A.  That's it.

10   Q.  Now, this job, as far as you know, that Steven Ketabchi

11   undertook was when Arash and yourself -- Arash Ketabchi had

12   left Olive Branch, is that right?

13   A.  Shortly after.

14   Q.  Right.  It's fair to say, sir, that your friendship with

15   Arash Ketabchi at some point thereafter deteriorated, right?

16   A.  Yes.

17   Q.  This dispute that you had was an ongoing dispute with Arash

18   Ketabchi over money, I assume, right?

19   A.  At the end of the day, yes.

20   Q.  It was a dispute over who was responsible for what

21   chargeback, I think you gave us a date, that anything past this

22   date he was responsible for, anything before the June date you

23   were responsible for, right?

24   A.  Yes.

25   Q.  So this dispute was ongoing and blew up, right?

1   A.  Yes.

2   Q.  To the point where you stopped talking?

3   A.  Yes.

4   Q.  And you were very angry with him?

5   A.  I was.

6   Q.  In fact, sir, is it fair to say you referred to him as

7   "sand nigger"?

8   A.  I did.

9   Q.  Is that a word you often use, sir, yes or no?

10  A.  Regrettably I used it.

11  Q.  Is that a word you often use?

12  A.  I have used it before.

13  Q.  So can I assume by that, sir, that you use that reference

14  to African American people?

15          MS. FLETCHER:  Objection.

16          THE COURT:  Sustained.

17  Q.  Now, you testified that because you and Arash Ketabchi got

18  to the point where you call him names and not talking, Steven

19  Ketabchi became the buffer between the two of you, right?

20  A.  Yes.

21  Q.  So you communicated to Arash Ketabchi through Steven, his

22  brother, is that right?

23  A.  Yes.

24  Q.  Because you were not on any talking terms with him?

25  A.  Yes.

1    Q.  And you would often e-mail -- sometimes e-mail Steven

2    telling him to communicate what you had to say to his brother

3    Arash, right?

4    A.  Possibly.

5    Q.  Well, I think we saw an e-mail, which I will show you

6    later, where you are spelling out your issues with Arash, and

7    it's directed at Steven, to basically pass this along to your

8    brother who is not telling you the truth?

9              THE COURT:  You mean the e-mail was going to Steven

10   and it set forth this witness's dispute with Arash?

11             MR. PAUL:  An e-mail from this witness to Steven

12   setting forth his dispute with Arash Ketabchi, yes.

13   A.  There was an e-mail.  I don't know if I asked him to

14   forward it to Arash.

15   Q.  You laid out the dispute you were having with Arash?

16   A.  I did.

17   Q.  A difference of opinion you had with regard to chargebacks?

18   A.  I did.

19   Q.  And that was Steven's job, as far as chargebacks, and you

20   hoped you would communicate this to Arash?

21             MS. FLETCHER:  Objection to form.

22             THE COURT:  Sustained.

23   Q.  That was your hope, that he would respond by communicating

24   to Arash whatever communications you gave him, right?

25   A.  I would need to see the e-mail again to be able to say that

1   definitely.

2   Q.  I will show it to you soon.

3          Now, you told us that Steven Ketabchi would e-mail you

4   or call you at times after Arash had left, is that right?

5   A.  Yes.

6   Q.  And again, was this always regarding Steven Ketabchi

7   requesting information regarding chargebacks he was responding

8   to?

9   A.  To my knowledge, the way I remember it, yes.

10  Q.  Did you ever call Steven Ketabchi?

11  A.  Did I ever initiate any calls to Steve?  I am sure I did.

12  We spoke over the phone.

13  Q.  You had his number?

14  A.  I believe so.

15  Q.  Really?

16         Is it fair to say, sir, that you handed over your

17  phone contact list to the government while you were proffering

18  and attempting to enter into a cooperation agreement?

19  A.  Yes.

20  Q.  I am going to show you what has been marked as 3501-38, I

21  believe.  I'm sorry.  It's not.

22         MR. PAUL:  Give me one second, please, Judge.

23  Q.  I am going to show you what has been previously marked

24  3501-31.  Look through it.

25  A.  OK.  I remember this.

IAQ8GET3                          Sinclair - Cross

1    Q.  Is it fair to say, sir, that during -- I want you to finish

2    going through it.

3    A.  OK.

4    Q.  Would it be fair to say, sir, that when you were proffering

5    with the government, specifically, on May 3, 2017, that you

6    provided the government with your phone contact list?

7    A.  At that time, yes, whoever was in my phone at that time,

8    yes.

9    Q.  Phone at what time?

10   A.  On that date.

11   Q.  Of May 3, 2017?

12   A.  Yes.

13   Q.  Had you modified it in any way?

14   A.  You could delete numbers.

15   Q.  Had you?

16           THE COURT:  Are you talking specifically about Steven

17   Ketabchi's number?

18   Q.  Is Steven Ketabchi on this list, sir?

19   A.  No.

20           (Continued on next page)

21

22

23

24

25

Iaqdket4                    Sinclair - cross

1   Q.  These are phone numbers of business people you know over

2   the past several years, right?

3   A.  The people on that list are, yes.

4   Q.  And, in fact, Steven Ketabchi is nowhere on this list,

5   right?

6   A.  He is not, no.

7            THE COURT:  Do you know whether or not you previously

8   had him in your phone contact list.

9            THE WITNESS:  I would had to have.

10  Q.  You would have had to?  So that means you deleted a number

11  at some point before providing the government with your contact

12  list?

13  A.  No.  Sir, what I'm saying is we spoke three years ago.  You

14  can delete numbers --

15  Q.  Why would you delete his number?

16  A.  Because I didn't talk to him anymore.  Why would I have it?

17  I didn't know Steve --

18  Q.  Why did you have it to begin with?

19            MS. FLETCHER:  Objection, your Honor.  The witness was

20  cut off again.

21  A.  The only reason Steve Ketabchi and I ever spoke was because

22  of dealings that Steve had with his brother Arash.  When that

23  communication ceased after a few months, there was no reason

24  for me to ever talk to Steve again.  So, chances are I probably

25  just deleted his number.

Iaqdket4                          Sinclair - cross

Q.  "Chances are," "probably," we don't deal with that in this
room, sir.

            MS. FLETCHER:  Objection.

            THE COURT:  Again, the jury knows to disregard the
statements of lawyers.  Just questions that are relevant, and
even the questions aren't testimony.  The testimony is what the
witness says.

            Ask a question, sir.

BY MR. PAUL:

Q.  Do you know for a fact that you deleted Steven Ketabchi's
number?

A.  No.

Q.  Thank you.  Do you remember telling the government during
one of your proffers, perhaps even the one I just asked you
about, that you found Steven to be very annoying?

A.  I do.

Q.  You do.  Even as you sit here now?

A.  Yes, I remember that.

Q.  You remember saying that?

A.  Yes.

Q.  And that's because he was asking you to do work that he was
supposed to be doing, not you, is that right?

A.  Correct.

Q.  So he was asking you questions about how do you deal with
responding to chargebacks, right?

1    A.  Correct.

2    Q.  He was particularly not very familiar -- withdrawn.

3          He was not very familiar with how to deal with these

4    chargebacks, fair?

5          MS. FLETCHER:  Objection.

6          THE COURT:  Do you know whether or not he was familiar

7    with how to deal with these chargebacks?

8          THE WITNESS:  I don't know what was explained to him.

9    It seemed like he was stepping into a new role, from my

10   perspective.

11   Q.  Thank you.

12         And so he was reaching out to you because he wanted, I

13   guess from an expert, how to respond to some of these

14   complaints that were in -- that were required chargebacks?

15         MS. FLETCHER:  Objection.

16         THE COURT:  Sustained.  It is the operation of

17   somebody else's mind you are seeking.

18   BY MR. PAUL:

19   Q.  Do you remember telling the government that -- at one of

20   your meetings, that it's your belief that Steven only came in

21   because Arash Ketabchi had left Olive Branch and you no longer

22   were there to do management for him?

23   A.  Can you repeat that, please, sir?

24   Q.  Yes.  Do you remember telling the government that you

25   believe Steven Ketabchi ever got involved in chargebacks was

1  because Arash Ketabchi had left Olive Branch?

2  A.  Yes.

3  Q.  And prior to that, you or Fino or whoever else was

4  responsible for those chargebacks, right, while Arash was with

5  you?

6  A.  At Olive Branch, yes.

7  Q.  Correct.

8       Would it be fair to say, sir, that from the calls you

9  received from Steven asking you questions about how to respond

10 to chargebacks, that you determined he was not very experienced

11 in handling these matters?

12       MS. FLETCHER:  Objection.

13       THE COURT:  Just a moment.

14       I will allow it.

15 A.  Sir, as I stated just a few moments ago, it seemed to me

16 that he was stepping into a new role, handling chargebacks.

17 Q.  And he had no role prior to that, as far as you know, with

18 regard to anything involving customers, scamming, or whatever?

19 A.  I have no idea what his previous work history was.

20 Q.  But this was the first time you had any contact with him?

21 A.  Correct.

22 Q.  Do you know if Fino helped him with regard to questioning

23 he had concerning how to respond to chargebacks?

24       MS. FLETCHER:  Objection.  Basis.

25       MR. PAUL:  I asked him if he knew --

Iaqdket4                        Sinclair - cross

1            THE COURT:  Yes or no.  You can answer yes or no.

2            THE WITNESS:  I can state with a fairly high degree

3    of --

4            MS. FLETCHER:  Your Honor -- OK.

5            THE COURT:  I am going to allow it.

6    A.  I can say with a fairly high degree of confidence that Fino

7    did as well help him with chargebacks.

8    Q.  And you told us that prior to Arash leaving, or assuming

9    even after -- well, withdrawn.

10            Prior to Arash Ketabchi leaving, Fino, one was of his

11   jobs was to deal with chargebacks, right?

12   A.  Yes.

13   Q.  Him and Jolaina I think you said?

14   A.  Yes.

15   Q.  Did Steven reach out to you sometimes to ask for documents

16   to support a challenge to a chargeback?

17   A.  Yes.

18   Q.  Now, Ray Quiles was your, you told us, was your fulfillment

19   person, right?

20   A.  Yes, one of them.

21   Q.  One of them.  He was a major participant in this operation,

22   was he not?

23   A.  Which operation?

24   Q.  Well, the operation of fulfilling sales that were made by

25   your salespeople.

1    A.  Intricate part of the process.

2    Q.  In fact, I think you told us he came to your office to tell

3    salespeople how to avoid getting chargebacks, right?

4    A.  Yes.

5    Q.  Did you know that Steven Ketabchi was in California during

6    this time that he was attempting to deal with responding to

7    chargebacks?

8    A.  That was my understanding.

9    Q.  That he was living in California?

10   A.  Yes.

11   Q.  Now, as the government -- this case became closer and

12   closer to time when we were going to begin, would it be fair to

13   say that the government had you in their office and they were

14   focusing more, for the first time perhaps, on Owimrin and

15   Steven Ketabchi who were going to trial?

16        MS. FLETCHER:  Objection to form.

17        THE COURT:  Sustained.

18   Q.  Did your proffers -- as we got closer to this trial, were

19   you asked questions about Steven Ketabchi and Owimrin?

20   A.  Yes.

21   Q.  And did you tell the government during one of these

22   meetings that in fact there was no conversation with Steven

23   Ketabchi where he was told the operation was a fraud?

24        MS. FLETCHER:  Objection to form.  No conversation

25   with whom?

1          MR. PAUL:  I just said, no conversation --

2          THE COURT:  Wait.  Wait.  Just a moment.

3          (Pause)

4          It is unclear.  The question is unclear.  So, rephrase

5     it, please.

6          MR. PAUL:  I will, your Honor.  Thank you.

7     BY MR. PAUL:

8     Q.  Do you remember telling the government that there had been

9     no conversation with Steven Ketabchi --

10         THE COURT:  No conversation that this witness has --

11    Q.  By this witness with Steven Ketabchi where he was told

12    there was a fraud involved in this?

13         MS. FLETCHER:  Your Honor, the same objection to form.

14         THE COURT:  Was there -- do you remember telling the

15    government that you never told Steven Ketabchi that there was a

16    fraud involved in this?

17         MS. FLETCHER:  Yes.

18         THE WITNESS:  I don't recall telling him that there

19    was or wasn't, yeah.  We didn't have discussions like that,

20    your Honor.

21    BY MR. PAUL:

22    Q.  That wouldn't be part of your conversation, they were

23    always dealing with chargebacks?

24    A.  Yes.

25    Q.  Do you recall telling the government that it's your belief

Iaqdket4                         Sinclair - cross

1   that Arash Ketabchi never had a conversation with Steven where

2   the whole operation was a fraud?

3            MS. FLETCHER:  Objection.

4            THE COURT:  I will allow it.  It is -- I will allow

5   it.

6            MS. FLETCHER:  Your Honor, again --

7            THE COURT:  Yes.  Do you recall telling the government

8   that you --

9            MS. FLETCHER:  Relevance and 801.

10           THE COURT:  Just a moment.

11           (Pause)

12           MS. FLETCHER:  It calls for speculation, your Honor.

13           MR. PAUL:  Anything else?

14           THE COURT:  Sustained.

15  BY MR. PAUL:

16  Q.  Do you remember telling the government in one your proffers

17  recently, as recently as September 13th, that you were not sure

18  if Steven Ketabchi knew the extent of Arash Ketabchi pitches?

19           MS. FLETCHER:  Objection, the same as --

20           THE COURT:  Allowed.

21  A.  Yes, I do.

22  Q.  Now, you testified that this Youngevity, that we've heard a

23  lot about, was one of your products after Anthony -- was it

24  Anthony Medeiros --

25  A.  Medeiros.

Iaqdket4                          Sinclair - cross

1   Q.  -- who introduced the idea to you and Olive Branch people?

2   A.  Yes.

3   Q.  And you said that Youngevity was a product sold by Olive

4   Branch where the customer could get something in return for

5   their investments, is that right?

6   A.  Yes.

7   Q.  And that's unlike some of the other things that you sold,

8   right?

9   A.  Yes.

10  Q.  So someone could buy health products and try to resell

11  them, right?

12  A.  It was an affiliate setup.  So it was people selling

13  another company's products.

14  Q.  Right.

15  A.  Youngevity's.

16  Q.  Included in that would be vitamins?

17  A.  Yes, health and wellness products.

18  Q.  Health and wellness products.

19          And I think you've already testified, again on cross,

20  that there were certain lines you wouldn't cross, one of those

21  being selling grants, right?

22  A.  We did for a short time.

23  Q.  Why would you have done it even for a short time if it was

24  a line you didn't want to cross?

25  A.  I lost my way.

Iaqdket4                              Sinclair - cross

1   Q.  You lost your way when it came to the grants?

2   A.  No, this entire business model.

3   Q.  At what point did you lose your way?

4   A.  As soon as I started up The Tax Club.

5   Q.  Oh, so you had lost your way back in 2008?

6   A.  Yes, sir.

7   Q.  And you continued to be lost until you got arrested for

8   this case?

9   A.  That's what I'm telling you.

10  Q.  So, nevertheless, as you say you lost your way, you somehow

11  managed to get back on path because you did in fact attempt to

12  sell grants, right?

13          MS. FLETCHER:  Objection to form, your Honor.

14          THE COURT:  Sustained.

15  Q.  You managed to decide to sell grants even though you knew

16  it was not the right thing to do?

17  A.  None of this was the right thing to do.

18  Q.  I'm asking you about grants.

19  A.  Yes, we did.

20  Q.  And that's because you told us that anyone who bought a

21  grant would absolutely get nothing in return for their

22  investment, right?

23  A.  Correct.

24  Q.  It was a complete sham?

25  A.  Yes.

Iaqdket4                          Sinclair - cross

1    Q.   Like many of the things you sold?

2    A.   Correct.

3    Q.   Now, in 2014 to 2015, where were you getting these grant

4    leads from?

5    A.   Some came from Carl Morris, the majority of them.  They

6    could come from various other sources I don't recall offhand.

7    Q.   Didn't you in fact -- this was out in Arizona, right?

8    A.   Yes.

9    Q.   So Carl Morris, where was Richard Frost at this time when

10   you were getting leads for grants?

11   A.   They had come to my office --

12   Q.   Oh, OK.  So they were in Arizona, right, at least Carl

13   Morris was, right?

14   A.   They are from Arizona.

15   Q.   They are from Arizona but they were operating in Arizona?

16   A.   That's where their head office is located.

17   Q.   Right.  But you brought them from Arizona to where?  New

18   Jersey?

19   A.   No.  Ryan Hope brought them from Arizona to New Jersey.

20   Q.   And where did he bring them to?

21   A.   My office.

22   Q.   Oh, so through Ryan Hope they came to you?

23   A.   Yes.

24   Q.   And, in fact, you set up an office for them, did you not?

25   A.   The office was already set up.

Iaqdket4                          Sinclair - cross

1    Q.  But it was across the hall from where Olive Branch was

2    operating, right?

3    A.  It was the same salesperson.

4    Q.  But who worked there in time to sell grants?  Was Carl

5    Morris one of the people?

6    A.  Carl Morris was not a salesman.  He was the business owner

7    out in Arizona.

8    Q.  But he's now in your office?

9    A.  He came for a day, I believe.

10   Q.  OK.  What about Richard Frost?

11   A.  He was there for I believe a week.

12   Q.  And what about Ray Quiles?

13   A.  The same, a week.

14   Q.  And Ray Quiles disappeared, I think you told us?

15   A.  That was much later on.

16   Q.  Was that because of a drug problem?

17   A.  I don't know.  He disappeared.

18   Q.  So after a week, you closed up shop with regard to the

19   grants?

20   A.  It lasted about a month, I would say.

21   Q.  Oh, it is a month.  So, after a month.  So during this

22   month, even though you lost your way, you managed to sell

23   grants even though you knew the people were getting nothing in

24   return --

25              MS. FLETCHER:  Objection.

Iaqdket4                          Sinclair - cross

1          THE COURT:  Sustained as to form.

2    Q.  During that month, your office was selling grants, right?

3    A.  Yes.

4    Q.  And you knew that people were getting absolutely nothing in

5    return for their investment?

6    A.  Yes.

7    Q.  And after a month you decided to close up this particular

8    arrangement, is that right?

9    A.  Yes.

10   Q.  And is that because that you lost your path or because it

11   wasn't making enough money for you to continue?

12   A.  Carl Morris did not pay us for what was already produced.

13   That was the reason it stopped.

14   Q.  So the reason it stopped was money-related, right?

15   A.  Yes.

16   Q.  Now, Mr. Schmidt asked you yesterday about paying the

17   40 percent of your sales to the people who supplied you leads;

18   do you remember that?

19   A.  Yes.

20   Q.  And the government asked you, as well, before that, right?

21   A.  Yes.

22   Q.  And how would these people know if you made a certain

23   number of sales from their leads, or not?

24   A.  They could call them.  They still spoke to them.

25   Q.  They could call who?

Iaqdket4                          Sinclair - cross

1    A.   The customers, sir.

2    Q.   So these people are giving you leads could check by calling

3    the customers to see if in fact they were sold products?

4    A.   Yeah, but their own customers.

5    Q.   You think they would actually reach out to customers to see

6    if in fact the sale went through -- withdrawn.

7         Wouldn't it be fair to say, sir, that these people who

8    were selling you leads and getting paid this 40 percent

9    basically had to trust you in paying you that percentage in

10   return for the sales you were making from their leads?

11   A.   Yeah.  A big part of it was trust.

12   Q.   A big part of it was trust from a scam artist, right?

13             MS. FLETCHER:  Objection.

14             THE COURT:  It was rhetorical, I assume.

15             Proceed.

16   Q.   So it would be you to determine whether or not to pay out

17   of your income this 40 percent, which was a big chunk of

18   change, right?

19   A.   Ultimately I'm the one who sent the wire, yes.

20   Q.   And you made the decision when to pay them, right?

21   A.   No.

22   Q.   That wasn't your decision.  Who was it?

23   A.   When to pay them?

24   Q.   No.  You made the decision to pay them this 40 percent?

25   A.   Oh, OK.  I thought you said on when to pay them.

1          It was set up on a weekly payout.  The arrangement was

2     the arrangement.  The only --

3     Q.  Nothing in writing, I assume, right?

4     A.  No.

5     Q.  Because you wouldn't do that.  So, it was trust.  They

6     trusted --

7     A.  Are you telling me or asking me --

8     Q.  Would you wait for the government to see if they objected

9     to that question, sir.

10          MS. FLETCHER:  Your Honor, I stood.

11          Objection.

12          THE COURT:  Rephrase it.

13    Q.  This arrangement you had was based on the people who gave

14    you these leads trusting you to pay them this 40 percent out of

15    the income your salespeople made from these leads, is that

16    fair?

17          MS. FLETCHER:  Asked and answered, your Honor.

18          THE COURT:  I will allow it.

19    A.  Yes.

20    Q.  Now, you were shown a number of emails -- Judge, I think we

21    are going to go a little over lunch.

22          THE COURT:  What is "a little"?

23          MR. PAUL:  You are pinning me down.

24          I would say a good 20 minutes -- 15/20 minutes.

25          THE COURT:  That is not a little.

Iaqdket4                          Sinclair - cross

1           Ladies and gentlemen, let's break for lunch.  Please

2      be back by 2 o'clock.  And, remember, we are going to end at 4

3      today.

4           Enjoy your lunch.  Keep an open mind.  We are moving

5      forward.

6           (Jury not present)

7           THE COURT:  You may step down, sir.

8           2 o'clock.

9           (Luncheon recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **A F T E R N O O N   S E S S I O N**

2                             2:06 p.m.

3          (Jury not present)

4          THE COURT:  Let's get the jury in.  We've got two

5     hours.  Let's make it efficient, an efficient two hours.

6          (Jury present)

7          THE COURT:  Please be seated in the courtroom.

8          Mr. Paul, please continue.

9          MR. PAUL:  Thank you, your Honor.

10    WILLIAM SINCLAIR,

11         Resumed, and testified further as follows:

12         MR. PAUL:  Judge, before we begin, I would like to put

13    on the record an apology to Ms. Fletcher.  I butchered her name

14    several times earlier today, so I want to apologize for that.

15         THE COURT:  Proceed.

16    CROSS-EXAMINATION (Continued)

17    BY MR. PAUL:

18    Q.  You were shown a number of exhibits by Ms. Fletcher

19    yesterday or the day before, and there were emails from a Heidi

20    Brownfield.  Do you remember those emails?

21    A.  Yes.

22    Q.  And those weren't the first time you were seeing those,

23    were they?

24    A.  No, sir.

25    Q.  That was -- those were some of the exhibits you had

1  reviewed in preparation of your testimony today?

2  A.  Yes, sir.

3          MR. PAUL:  Could we show Exhibit 411?  It is in

4  evidence, please.  Is there any way to make that larger?

5          Thank you.

6  Q.  Now, this is an email from Heidi to Arash Ketabchi

7  originally, correct, and Steven, I think, is also a person who

8  it was sent to?

9  A.  I can't tell who it's from originally because I'm only able

10 to see the very last of it.

11         MR. PAUL:  Could we go down on the thread of that.

12         (Pause)

13 Q.  Do you see the email from Heidi to be Arash and Steven,

14 where it says, "Good afternoon, gentlemen"?

15 A.  Yes, sir.

16 Q.  And she's asking for documents that were charged to Diane

17 Weissenberger, is that right?  Do you see that?  Is it on the

18 screen.

19         THE COURT:  No, that wasn't on the screen.

20         (Pause)

21 Q.  Where it says, "I still" -- there.  Do you see that?

22 A.  I do.

23 Q.  So she is asking for documentation -- would it be fair to

24 say that this is in response to a chargeback regarding Diane

25 Weissenberger?

Iaqdket4b                    Sinclair - cross

1    A.  It's either for a chargeback or a -- they sent out

2    retrieval requests.  That could be the second reason.  Or the

3    third is because at times they just asked for random

4    documentation.  Some merchant accounts do that.

5    Q.  OK.  If we could go to the top of the email, where it is a

6    response from Positive Faith.  That's Steven's email address?

7    A.  Yes.

8    Q.  And it's addressed to Heidi in response, saying, "As per

9    your request, attached is Diane Weissenberger's sales

10   contract," is that right?

11   A.  It looks like it, yes.

12   Q.  And with that, can you tell from this whether that's a

13   response to Heidi, the merchant, reaching out to Arash and

14   Steven asking for documentation concerning her chargeback?

15   A.  Yes.

16   Q.  And it says, "PS:  Please make sure Bill Sinclair is never

17   cc'ed again."  Do you see that?

18   A.  I do.

19   Q.  And is that because of the ongoing dispute you were having

20   with Arash Ketabchi, as far as you could tell?

21   A.  You'd have to --

22            MS. FLETCHER:  Objection.

23            THE COURT:  Sustained.  I think you are getting the

24   answer.  Move on.

25   Q.  Were you cc'ed at any time by Heidi after this date?

1   A.  I was cc'ed, yes.

2   Q.  So she was still reaching out to both you and Arash at one

3   time?

4   A.  Yes.

5          MR. PAUL:  If we could go to Exhibit 413, please.

6          Is it up?  OK.

7   Q.  Now, this is from Positive Faith, or Steven, to Olive

8   Branch.  That's your email address, right?

9   A.  Yes.

10  Q.  And he's saying, "Hi, Bill, we received a chargeback that

11  is on your timeline."  Is that right?

12  A.  That's what it says.

13  Q.  And this had to do with the date that you had arranged with

14  Arash Ketabchi, June 19, 2015, being the cutoff date concerning

15  these chargebacks?

16  A.  Yes.

17  Q.  So Steven was basically reaching out to you to say we

18  believe -- or I believe this may be your chargeback to deal

19  with, is that right?

20  A.  That's what that looks like, yes.

21  Q.  Again, dealing with chargebacks, correct?

22  A.  Yes.

23          MR. PAUL:  If we could go to Exhibit 427, please.

24  Q.  Now, this is another email, and this is Steven reaches out

25  to you in November of 2015 where he's asking you, "Hi, Bill,

Iaqdket4b                    Sinclair - cross

1    how would you rate this chargeback" --

2          I assume that's "CB"?

3    A.  Yes.

4    Q.  -- "for it's potential for a reversal?  I appreciate your

5    feedback."

6          Do you see that?

7    A.  I do.

8    Q.  And was this one of those examples where he was reaching

9    out to you to help him formulate a response to a chargeback?

10         MS. FLETCHER:  Objection.

11         THE COURT:  If you know.

12   A.  I don't know if he needed help with this.  He was simply

13   asking my opinion on whether or not I felt like they could win

14   the chargeback.

15   Q.  He was asking basically your opinion and your advice,

16   perhaps?

17   A.  Opinion.

18   Q.  OK.

19   A.  Possibly advice.

20   Q.  OK.  You don't have any independent recollection of this

21   particular email or what transpired, right?

22   A.  Not as I sit here right now, no.

23         MR. PAUL:  If we could go to the next page of this

24   exhibit, please.

25         The page after.

1    Q.  OK.  Now, can you see this exhibit, because I can't?

2            Now, this is addressed to A1 Business Consultants,

3    correct?

4    A.  Yes.

5    Q.  And is this -- if we could scroll down a little.

6            Thank you.

7            Is this a standard document that would be received by

8    Olive Branch, or anybody else, a standard form concerning a

9    complaint filed by a customer?

10           MS. FLETCHER:  Objection.

11           THE COURT:  Rephrase it.  I'm not sure what "a

12   standard form" is.

13   Q.  Have you seen this kind of form before?

14   A.  Yes.

15   Q.  And is that a form that Olive Branch would have -- similar

16   to this that Olive Branch would have received by a customer who

17   is complaining about something that he or she did not receive?

18           MS. FLETCHER:  Objection to form.

19           MR. PAUL:  I will rephrase it.

20   Q.  Looking at this document, is this a form that you and Olive

21   Branch would have received --

22           THE COURT:  Did receive.

23   Q.  -- did receive from a merchant who -- where a customer was

24   complaining about something that he or she did not receive?

25   A.  We received this form from merchant accounts after we got a

1   chargeback.

2   Q.  Right.  So there would be a chargeback.  The merchant would

3   reach out to you, and the merchant would say, can you explain

4   this by providing us with documentation or anything else to

5   support your challenge to this chargeback; is that right?

6   A.  That is the general gist of it.

7   Q.  If you would look at the bottom, it says, "Contact person

8   Steve Ketabchi," right?

9   A.  Yes.

10  Q.  And then there is a telephone number, an 800 number.  Do

11  you see that?

12  A.  I do.

13  Q.  Is that the number that goes to A1, as best you could tell?

14  A.  I don't remember.

15  Q.  Well, do people who live in a residence usually have an 800

16  number?

17          MS. FLETCHER:  Objection.

18          THE COURT:  Sustained.

19  Q.  Do you know if that's Steven Ketabchi's number at his

20  residence in California?

21  A.  I don't.

22  Q.  You said you called him.  Does that refresh your

23  recollection as to the number you may have called?

24          MS. FLETCHER:  Objection.  No failure of recollection.

25          MR. PAUL:  What?

 1              THE COURT:  Just a moment.

 2              No.  I will allow that.

 3              Does looking at that refresh your recollection as to

 4    the number you called when you called Steven at his home?

 5              THE WITNESS:  I believe we spoke on cell phones.

 6    BY MR. PAUL:

 7    Q.  So that doesn't refresh your recollection that you called

 8    an 800 number?

 9    A.  I don't believe that I did, no.  That doesn't refresh my

10    recollection.

11    Q.  It doesn't what?

12    A.  Refresh my recollection.

13              MR. PAUL:  If we can go to Exhibit 439, please.

14              Can you blow that up a little, the top half.

15    Q.  This is an email from it looks like "FYI," for your

16    information, from Steven to Arash, is that right?

17    A.  Yes.

18              MR. PAUL:  Can we scroll down a little.

19    Q.  And this is an email from you on that date to Steven

20    Ketabchi, is that right?

21    A.  Yes.

22    Q.  And in this paragraph you explain -- you say that you and

23    Arash are not on good terms, right?

24              This is when you had your falling out, correct?

25    A.  Yes.

1    Q.  And you basically say I'll keep my side of this issue to me

2    because basically I don't want to bother you, you're his

3    brother, right?

4    A.  Mm-hmm.

5    Q.  Is that correct?

6    A.  Yes.

7    Q.  And you go on to say that you your relation with Arash is

8    irreparable, and you continue to explain your position in terms

9    of the chargebacks that were posted on a particular date,

10   correct?

11   A.  Correct.

12   Q.  And do you know if Steven responded in any way to this?

13   A.  I'm pretty sure he forwarded this to Arash.

14   Q.  So he -- you sent him this email.  He forwarded it to

15   Arash, because it was basically a communication from you -- and

16   you're not talking to Arash so he's the go between -- and he

17   forwarded this to his brother, is that right?

18   A.  It sounds right.

19   Q.  And is that how it usually worked when you communicated to

20   Steven, to relay your feelings about what's going on?

21   A.  With regard to what specifically?

22   Q.  You would forward this to Arash or your communication to

23   him?

24   A.  I wouldn't know unless he responded to me.

25   Q.  OK.  But that was basically his role as the go between for

Iaqdket4b                    Sinclair - cross

1   you two, you and Arash, is that right, one of his roles?

2   A.  His role, as I understood it, was that he was helping Arash

3   fight chargebacks.

4   Q.  Right.  And he was also helping you two communicate because

5   you weren't communicating with each other, is that right?

6   A.  Yes.

7   Q.  He was, as I said before, a buffer between the two of you?

8   A.  Fair enough.

9           MR. PAUL:  I'm sorry.  What exhibit was this that's up

10  there?  439.  Thank you.

11          Could we have Exhibit 444, please?

12  Q.  Now, this is an email from Steven to Arash, it looks like

13  the subject being Arash's chargebacks since June 29, 2015.  Do

14  you see that?

15  A.  I do.

16          MR. PAUL:  Could we scroll down a little.

17  Q.  Do you see that this is -- and this is from -- who is this

18  addressed to?  This is from who?  From you to Steven?  Yes.

19          This is from you to Steven, right?

20  A.  Yes.

21  Q.  And you basically tell Steven that you're getting tired of

22  Arash and dealing with him, pretty much, is that right?

23          (Pause)

24          And the money issues concerning chargebacks, correct?

25  A.  More of the same, basically.

1   Q.  Do you know if Steven simply forwarded this on to Arash?

2   A.  I believe that he did.

3         MR. PAUL:  OK.  Will you scroll down a little, please.

4   Could you highlight that.

5         I will withdraw it.

6   Q.  This is another example of you reaching out to Steve to

7   complain about your dealings with Arash, and, as far as you

8   know, he would just forward this on to Arash with regard to

9   your communication; is that fair?

10   A.  Partially.  I don't know if I reached out to Steve to

11   complain about Arash.  At that point during the email

12   communication, that was where we were at.

13   Q.  At that point you are addressing it to Steven, and you're

14   then highlighting in your communication your complaints about

15   Arash and these chargebacks, right?

16   A.  Yes.

17   Q.  And Steven passed this along, so far as you know, to Arash?

18   A.  That's my recollection of it.

19   Q.  Now, you testified on direct -- thank you.  You can take

20   that down.

21         You testified on direct about hiring an attorney for

22   you to represent Olive Branch; do you remember that?

23   A.  Yes.

24   Q.  And this attorney and his -- was Vafa Sarmasti, I think you

25   said his name is?

1   A.  Yes.

2   Q.  And didn't Vafa Sarmasti or his firm become a big part of

3   Olive Branch?

4           MS. FLETCHER:  Objection.

5           THE COURT:  Sustained as to form.

6   Q.  What was Mr. Sarmasti's role when you retained him?

7   A.  I believe the first -- the first thing that we had him deal

8   with was a data breach of leads on the sales floor.  So, he

9   sued a few of my ex-employees.

10  Q.  And in addition to that, did he come to respond to

11  complaints filed by various customers that Olive Branch had

12  sold products to?

13  A.  Yes.

14  Q.  And do you recall --

15          THE COURT:  I'm sorry.  Let me go back.

16          You said "he sued a few of your employees."  You mean

17  as a lawyer for Olive Branch?

18          THE WITNESS:  On behalf of Olive Branch, your Honor.

19  Yes.

20          THE COURT:  It is not that he sued?

21          THE WITNESS:  Right.  On our behalf, correct.  Yes,

22  sir.

23  BY MR. PAUL:

24  Q.  And you said to file the lawsuit.  One of his jobs was to

25  dispute charges made by customers who claim that Olive Branch

1    had not done what was contracted for; is that fair?

2    A.  I don't know the specific reasoning.  It was people who

3    were unhappy.  That was the general mood.  I don't know if they

4    complained that we didn't do what was told to them.  I don't

5    remember the reasoning, just --

6    Q.  OK.  For whatever reason, he was responding to these

7    complaints?

8    A.  He was, yes.

9    Q.  It was one of his many jobs, right?

10   A.  Yes.

11   Q.  And he was responding to what's similar to chargebacks,

12   right?

13   A.  Without it being a chargeback, right.

14   Q.  OK.  I'm going to show you what I've marked as, for

15   identification only, SK-1.  And -- no, I'm sorry.

16           I will let the government look at it.

17           (Pause)

18           MS. FLETCHER:  Your Honor, may we have a sidebar?

19           MR. PAUL:  I haven't asked a question, Judge.

20           THE COURT:  Yes.

21           MS. FLETCHER:  This relates to an issue that was

22   briefed before your Honor.

23           THE COURT:  All right.  Let's go.  Sidebar.

24           (Continued on next page)

25

1           (At the sidebar)

2           THE COURT:  What is the document and what is the

3    issue?

4           Here.  Let me take a look.

5           MS. FLETCHER:  Without having seen this prior to just

6    now, this appears to be some of the documents that Mr. Paul --

7           MR. PAUL:  No.

8           MS. FLETCHER:  What is it, then?

9           MR. PAUL:  It is his retainer and his billings to

10   Olive Branch, and I am going to ask him to review it carefully

11   and discuss what he was being billed for from his law firm.

12          MS. FLETCHER:  Your Honor, this is plainly an effort

13   to get around your Honor's prior ruling.  He is essentially

14   going to get Mr. Sinclair to describe the involvement of

15   lawyers so that he can ask the jury later in the trial to draw

16   the same conclusion that your Honor has already ruled is

17   improper.

18          MR. PAUL:  That had to do with exhibits being

19   introduced.

20          THE COURT:  Wait.  Wait.

21          Don't worry about the technicality of the introduction

22   of the exhibits.  Respond to the point.

23          MR. PAUL:  I intend to ask him --

24          THE COURT:  That you are going to -- Ms. Fletcher's

25   point, I gather, is that on the basis of your questioning of

Iaqdket4b                    Sinclair - cross

1    this witness, you are going to argue to the jury that Sarmasti

2    must have thought that all of this was legitimate.

3            Is that your point?

4            MS. FLETCHER:  Yes.

5            THE COURT:  OK.

6            MS. FLETCHER:  Based on the level of his involvement,

7    which I assume is the argument to be made from his retainer and

8    his bills.

9            MR. PAUL:  The level of the lawyer's involvement,

10   among other things, was to respond not only to complains of the

11   Attorney General but to handle chargebacks.

12           THE COURT:  Are you going to be arguing to the jury

13   that these must be -- in one way or the other, that this

14   operation must be legitimate because a lawyer was acting as if

15   they were legitimate?

16           MR. PAUL:  No.  He has already said the chargebacks in

17   and of themselves are not illegal, which I intend to bring out

18   again.

19           THE COURT:  All right.

20           MR. PAUL:  And that his lawyer was simply following

21   and billing for the time he spent handling and responding to

22   customers who complained.

23           MS. FLETCHER:  So what is the proffered relevance of

24   that testimony as to your client?

25           MR. PAUL:  The proffered relevance is that the lawyer

1    was doing what everybody was doing, which was Fino, which

2    was --

3              MS. FLETCHER:  What everybody was doing?

4              MR. PAUL:  What everybody was doing in response to a

5    complaint.  It was a typical way to respond to a complaint,

6    which was fulfillment, contracts, documents.

7              MS. FLETCHER:  This is precisely why we briefed this

8    issue and why your Honor ruled the way that your Honor did,

9    because what this line of questioning invites is a trial within

10   a trial as to whether the lawyers, having reviewed the same

11   type of information that your client saw, did or did not run --

12   come to the conclusion that a crime was afoot.

13             If Mr. Paul wants to pursue this line of questioning,

14   the government will be required to redirect Mr. Sinclair on

15   what, if anything, the lawyer said to him detecting the fraud

16   and making Mr. Sinclair aware of it.

17             MR. PAUL:  That's fine.

18             MS. FLETCHER:  We also need to call additional

19   witness, including Mr. Sarmasti.

20             MR. PAUL:  I have no intention of calling

21   Mr. Sarmasti.

22             MS. FLETCHER:  This is opening the door --

23             THE COURT:  Wait.  One at a time only.

24             What did you just say?

25             MS. FLETCHER:  I said this is opening the door that

1    your Honor specifically closed.  He is cleverly doing it with

2    different document, but it is the same door.

3            MR. PAUL:  That is the first time I was referred as

4    clever.

5            THE COURT:  Yes, exactly.

6            MR. PAUL:  I do not intend to argue to the jury that

7    they should draw an inference from the fact that because a

8    lawyer was doing it and he was a lawyer, therefore they should

9    assume from that that my client was doing nothing more or less

10   than what he was doing.

11           MS. FLETCHER:  Sorry, Judge.

12           THE COURT:  What are you -- first of all, are you --

13   there are dozens and dozens of tabs here is.

14           MR. PAUL:  Oh, I'm not going to ask him that.  I just

15   did that as a convenience for him to just thumb through this

16   long document.

17           THE COURT:  What are you going to ask him about this?

18           MR. PAUL:  I intend to ask him --

19           THE COURT:  You are not going to introduce it, I take

20   it?

21           MR. PAUL:  No.  I intend to ask him was he billed on a

22   monthly basis --

23           THE COURT:  From Sarmasti?

24           MR. PAUL:  From Sarmasti, from the time he was

25   retained, which I have the date, until whenever, and those

Iaqdket4b                    Sinclair - cross

1    bills included, among other things, time he spent in responding

2    to complaints filed by customers, and that highlights in there

3    point out the specific times that he was billing for.

4               So it would take --

5               THE COURT:  And what do you intend -- it will take

6    what?

7               MR. PAUL:  Five minutes for him to thumb through this.

8    That's why I did that.

9               THE COURT:  What do you intend to do with that

10   testimony?

11              MR. PAUL:  I intend to argue that he had a lawyer

12   called in after Fino decided, I assume, he was not going to

13   handle these kind of specific matters, or for whatever reason.

14   The lawyer was called in to respond to Attorneys General

15   complaints filed with their office as well as the consumer

16   bureau, and he responded to those.  And by that, I'm saying

17   that is one of those efforts he made to do things properly.

18              MS. FLETCHER:  This is precisely the issue we raised

19   with your Honor.  He is essentially asking the jury to conclude

20   that because some third party did it -- whether he is going to

21   make an argument about the fact that that third party is a

22   lawyer is really neither here nor there.  What he is asking the

23   jury to do is conclude that because some third party did this,

24   that person is not on trial, the government didn't charge that

25   person, how can my client, who had no awareness of that

Iaqdket4b                    Sinclair - cross

1    information or of those actions, how can my client be held

2    responsible for doing effectively the same thing as that third

3    party.  It is the same argument your Honor precluded.  It is

4    just different documents.

5           MR. PAUL:  I am not introducing the document, first of

6    all, so it is not a document in terms of an exhibit.

7           THE COURT:  Go ahead.

8           MR. PAUL:  OK.  But this guy said that he wanted to

9    stay under the radar.  This was an effort on his part, I

10   assume, to stay under the radar.  He hired a lawyer to do

11   everything properly.

12          MS. FLETCHER:  Now that is a slightly different

13   argument.

14          MR. PAUL:  No.  It is the same argument.  He was

15   hiring the lawyer to respond to various complaints made by

16   customers.  He is --

17          THE COURT:  You can ask him if he hired a lawyer to

18   respond to complaints, that's all right.  What else?

19          MS. FLETCHER:  He has already asked that, Judge.

20          MR. PAUL:  That is it, Judge.  I intend to have him

21   look through this for literally three minutes.  That's why I

22   tabbed it.

23          THE COURT:  Then on the basis of that, to ask him

24   what?

25          MR. PAUL:  Did he bill out his time on a monthly basis

Iaqdket4b                          Sinclair – cross

1    for his attempts to respond to those customers.

2              MS. FLETCHER:  What is the relevance of that?

3              MR. PAUL:  Because it goes to the fact that he was in

4    fact retained and he did do --

5              THE COURT:  I am to going allow those questions.

6              MR. PAUL:  Thank you.

7              THE COURT:  Proceed.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MR. PAUL:

3    Q.  I am going to show you this.  Again, just as quickly as you

4    can, I have tabbed pages --

5              THE COURT:  Sir, what do you want him to do?

6    Q.  Take each tab, look at it carefully.  There are highlighted

7    sections.

8              THE COURT:  I am not having him look through each of

9    those tabs.  What do you want him to do?

10   Q.  Is it fair to say that you had retained Mr. Sarmasti, among

11   other things, to handle complaints filed by customers against

12   Olive Branch?

13   A.  Yes.

14   Q.  You retained him on November 5, 2014, is that right?

15   A.  I don't know the date exactly, sir.

16   Q.  If you could look at the very first page, you will see a

17   retainer.

18             MS. FLETCHER:  Objection, your Honor.

19   Q.  Turn to the fourth page and see if that refreshes your

20   recollection as to when he was retained.

21             MS. FLETCHER:  Objection is pending.

22             THE COURT:  Just a moment.

23             Move on.

24             Approximately when did you retain this person?

25             THE WITNESS:  It was most likely the end of 2014.

1          THE COURT:  Next question.

2    Q.  And he would bill you on a monthly basis?

3    A.  I don't think it worked like that.  It was a typical

4    retainer.  When he was done with the work, I believe we had to

5    give him another retainer, I believe.

6    Q.  Would it be fair to say that when he did bill you, he would

7    bill out his time that he spent, among other things, also

8    responding to these complaints filed by customers?

9          MS. FLETCHER:  Objection.

10          THE COURT:  I will allow it.

11   A.  As I sit here, that's how I remember it.

12   Q.  Would it be fair to say, sir, that you sometimes signed

13   contracts without the customer's authority or permission?

14   A.  There were times, yes.

15   Q.  That's forgery, right?

16   A.  Yes.

17   Q.  In addition to fraud, right?

18   A.  Yes.

19   Q.  Now, you have also testified, I think yesterday, that in

20   filing your taxes you showed a gross income of $8 million, or

21   approximately that amount, combining Champion and Olive Branch

22   together?

23   A.  I don't know the overall amount.

24   Q.  I think you said in your mind, after you looked at the tax

25   return, that the figure in your mind was actually higher,

1    right?

2    A.   Correct.

3    Q.   How much would you estimate in 2014 you grossed between

4    those two companies?

5    A.   I was thinking about 5 million.

6    Q.   Well, that's less than the 8 million that was reflected.

7              MS. FLETCHER:   Objection.   It misstates the document.

8    Q.   So combining the two, in your mind, you grossed

9    approximately $5 million?

10   A.   That's what I thought.

11   Q.   So let me understand something.   The $5 million that you

12   grossed, or Olive Branch and Champion grossed, that's $5

13   million of income based upon sales to customers?

14   A.   Right.   5 million in gross sales.

15   Q.   So there was $5 million in gross sales to any number of

16   customers during the course of 2014, is that your testimony?

17   A.   That's what I thought it would be.

18   Q.   So these $15,000 limit you told us about and then it moved

19   up to $25,000, that's all added in to the $5 million you're

20   telling us now?

21   A.   To clarify, the 15,000 didn't move up to 25,000.

22   Q.   It was 15,000 to sell, and then you up-sold another 10?

23   A.   Correct.

24   Q.   So, excuse the terminology, but a customer who has gotten

25   ripped off by you and your company could have already lost at

IAQ8KET5

1    least $25,000, right?

2    A.   Correct.

3    Q.   And, in fact, often, if not sometimes, those same customers

4    might have been double-dipped, meaning you went back to hit

5    them up for this debt reduction scheme you had, right?

6    A.   Yes, as I said earlier.

7    Q.   So these people, these are the victims and this is the

8    amount of money that you grossed off of their being victims, is

9    that fair?

10   A.   Yes.

11            MR. PAUL:   I have nothing further of this witness.

12            THE COURT:   Is there any redirect by the government?

13            MS. FLETCHER:   Very, very briefly.

14            If Ms. Lee could please pull up what has been marked

15   for identification as Government Exhibit 817.

16   REDIRECT EXAMINATION

17   BY MS. FLETCHER:

18   Q.   Mr. Sinclair, do you see 817 on your screen?

19   A.   I do.

20   Q.   Is that the cooperation agreement you discussed earlier?

21   A.   Yes.

22            MS. FLETCHER:   The government offers Government

23   Exhibit 817.

24            THE COURT:   Hearing no objection, admitted.

25            (Government's Exhibit 817 received in evidence)

IAQ8KET5

1          MS. FLETCHER:  No further questions, your Honor.

2          THE COURT:  Thank you.

3          MR. SCHMIDT:  I have recross-examination solely based

4     on the questions by counsel for Mr. Ketabchi, and actually for

5     that question just asked by the government.

6          MS. FLETCHER:  Your Honor, the former category would

7     be beyond the scope of redirect and the government didn't ask

8     any questions.

9          THE COURT:  What Mr. Schmidt is saying is, based on

10    Mr. Paul's examination, he wants a recross.

11         MS. FLETCHER:  Your Honor, I don't think that's

12    permitted.  He is not an adverse party.

13         MR. SCHMIDT:  I have a disagreement.

14         THE COURT:  How much is there?

15         MR. SCHMIDT:  15 minutes, maybe.  It may take a little

16    longer to get the answer, but 15 minutes.

17         MS. FLETCHER:  Your Honor.

18         THE COURT:  Sidebar.

19         (Continued on next page)

20

21

22

23

24

25

IAQ8KET5

1              (At the sidebar)

2              THE COURT:  I don't think I thought about this

3     particular issue before.  What Mr. Schmidt is saying

4     is -- well, I don't want to say more than you're saying.  You

5     tell me what you're saying.

6              MR. SCHMIDT:  Mr. Paul raised some issues concerning

7     the guidelines -- some sentencing, and I want to --

8              THE COURT:  What topics do you intend to do in

9     substantially less than 15 minutes?

10             MR. SCHMIDT:  Quickly with the guidelines.

11             THE COURT:  Just a minute.

12             You didn't ask about guidelines.

13             MS. FLETCHER:  There was nothing in the scope of

14    direct about guidelines, or redirect, or Mr. Paul's cross.

15             MR. SCHMIDT:  He went into the maximum sentences that

16    he can receive.

17             MS. FLETCHER:  That's not the guidelines.

18             THE COURT:  Are you talking about United States

19    sentencing guidelines or the guidelines of the company?

20             MR. SCHMIDT:  United States sentencing guidelines.

21             THE COURT:  There was nothing about the guidelines, to

22    my knowledge.

23             MS. FLETCHER:  If Mr. Schmidt had wanted to go into

24    it, he could have done it on his initial cross.

25             MR. SCHMIDT:  I will then eliminate that one.  That's

IAQ8KET5

1    fine.

2            His answer relating to the line that he would not go

3    over and --

4            THE COURT:  Go over the 15 and the 25?

5            MR. SCHMIDT:  No.  He lost his way.  And then he

6    responded that he lost his way when he started going in the

7    business.  I have like three questions concerning lost his way.

8            THE COURT:  Just a minute.

9            Go ahead.

10           MR. SCHMIDT:  I have about three questions regarding

11   lost his way.

12           I have a few questions, three maybe, of being under

13   the radar that was raised by Mr. Paul relating to the lawyer.

14   I have three questions relating to that.

15           THE COURT:  You went into under the radar extensively.

16           MR. SCHMIDT:  I did, indeed.  I did not go into the

17   lawyer.  I want to go into what it means by the lawyer and

18   bringing a lawsuit against other people in court, his not going

19   under the radar.  It's a couple of additional questions.

20   That's all it is.

21           And forging the name on the contracts.  First, his

22   answer to me that he didn't make fake documents.  Now he admits

23   forging the name on a contract.

24           THE COURT:  That's absolutely nothing that's different

25   than what he said to you.

IAQ8KET5

1          MR. SCHMIDT:  No.  I said, Did you submit false

2     documents?  And he said no.

3          THE COURT:  All right.  Fair enough.

4          Next.

5          MS. FLETCHER:  This was in Mr. Sinclair's 3500 and Mr.

6     Schmidt could have crossed him on this initially.  He didn't.

7     If Mr. Schmidt is permitted to recross Mr. Sinclair every time

8     he thinks of something new, this will never end.

9          MR. SCHMIDT:  This is not something new.  He raised

10    it.  If he didn't raise these questions, I wouldn't be going

11    into it.

12         THE COURT:  "He" being?

13         MR. SCHMIDT:  Mr. Paul.  I am only going into this

14    because Mr. Paul raised it partially, and I want to complete

15    it.

16         THE COURT:  Is this witness the longest witness, as it

17    were?

18         MS. FLETCHER:  It certainly is now.

19         THE COURT:  You can ask a limited number of questions

20    in regard to lost his way and in regard to forging a name on a

21    document.  That will take a few minutes.  And if you want to,

22    you can do the redirect.

23         MR. SCHMIDT:  Can I ask a couple of questions under

24    the radar?

25         THE COURT:  I don't see that because you have gone

IAQ8KET5

1    into that extensively and you haven't indicated anything that

2    Mr. Paul did that wasn't covered by you.

3                MR. PAUL:  I think he is referring to the lawyer

4    reference, Judge.

5                MR. SCHMIDT:  The lawyer reference.

6                THE COURT:  What is under the radar with regard to the

7    lawyer?

8                MR. SCHMIDT:  It seems to me, Judge, that if you're

9    bringing a lawsuit against individuals that work for you for

10   stealing the leads that you say are illegal, that you think

11   that's under the radar, I think that's inconsistent.

12               THE COURT:  That's too far afield.  That's 611.

13               MS. FLETCHER:  Your Honor, one more thing quickly.

14   The reason I jumped up at the end of our discussion in court is

15   that both counsel, but particularly Mr. Schmidt just then, have

16   been making remarks about their view of the witness's

17   credibility in front of the jury.

18               THE COURT:  What do you mean, that I haven't heard?

19               MS. FLETCHER:  I think you're hearing it, Judge.  If

20   your Honor could direct them to stop doing that.

21               THE COURT:  What do you mean?

22               MR. SCHMIDT:  How long my cross-examination would

23   take.

24               MS. FLETCHER:  His response was, it depends because

25   it's difficult to get this witness to answer a question.

IAQ8KET5

1   That's inappropriate.

2             THE COURT:  That's here.

3             MS. FLETCHER:  That was in front of the jury.

4             MR. SCHMIDT:  I didn't say all of that.

5             THE COURT:  I may have missed it.  When was that?

6             MS. FLETCHER:  Before we came to sidebar, when I stood

7   up and said "your Honor," it was in response to Mr. Schmidt

8   saying that he was going to have a bit longer with Mr. Sinclair

9   because it's difficult to get this witness to answer a

10  question.

11            THE COURT:  He said that in front of the jury?

12            MS. FLETCHER:  He did.

13            THE COURT:  That slipped my attention it.  I am going

14  to look at that, and I am going to tell the jury to disregard

15  that.

16            MS. FLETCHER:  Thank you.

17            MR. SCHMIDT:  I don't think I said all of that.  I

18  said, because of the witness, it could be longer because of the

19  witness.  If I did say anything beyond that --

20            THE COURT:  Only two of us can talk at a time.

21            I am not sure that it makes sense for me to further

22  highlight that comment --

23            MS. FLETCHER:  No.

24            THE COURT:  -- at this point.

25            MS. FLETCHER:  The government is not requesting that.

IAQ8KET5                              Sinclair - Recross

1              THE COURT:  I won't do that.  If it happened, it's

2      highly improper, and I am sorry I wasn't focusing on that.  I

3      probably was focusing on I'd rather avoid another sidebar

4      rather than listening to your response.

5              Let's proceed.  You have got those two limited areas.

6      We are not talking about 15 minutes.  We are talking about 611.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  We are talking about 611(a) and (b).

3              Proceed.

4    RECROSS-EXAMINATION

5    BY MR. SCHMIDT:

6    Q.  Mr. Sinclair, you indicated to Mr. Paul that when you lost

7    your way, you were talking about from the beginning of when you

8    got into this business.  Do you remember that?

9    A.  Yes.

10   Q.  Now, you have previously stated that -- you have told the

11   government in one of your meetings that you justified the

12   difference because at least you were giving -- withdrawn.

13              The difference between the grant program, selling the

14   grant program, to the biz-op programs or Youngevity, you

15   justified the difference because at least you were giving

16   something.  Do you remember that?

17   A.  I remember saying I justified it to myself because --

18   Q.  Yes, you justified it to yourself?

19   A.  Right.

20   Q.  So you thought there is a difference between the grant

21   program, that's completely fraudulent, and the biz-ops, that at

22   least you in the biz-op program and Youngevity are providing

23   something to the purchasers, is that right?

24   A.  At that time, when I was --

25   Q.  Is that right?

1          MS. FLETCHER:  Objection, your Honor.

2          THE COURT:  Allow him to finish.

3          Go ahead.  Did you finish?

4          THE WITNESS:  I wasn't able to.

5          THE COURT:  Go ahead.

6   A.  During the time when I owned my business is how I justified

7   it, not as I sit here now.

8   Q.  I understand that.  I understand that.

9          At that time you justified -- you felt justified as

10  long as your people did not make earnings estimates or use

11  disclaimers that it was legal or really, really close to the

12  line of being legal, is that right?

13         MS. FLETCHER:  Objection.

14         THE COURT:  I don't understand that question.

15         MS. FLETCHER:  Also beyond the scope.

16  Q.  Now, I asked you earlier whether you ever filed false

17  documents to try to win chargebacks.  Do you remember that?

18  A.  Yes.

19  Q.  And your answer was no.  Do you remember that?

20  A.  My answer was, as I sit here, I do not recall falsifying

21  documents.

22  Q.  So when Mr. Paul spoke to you a little while later and

23  asked you if you signed customer names without permission, you

24  had the ability to remember that indeed you did file false

25  documents in order to get chargebacks, is that right?

1    A.  So again, this is not as cut-and-dried as that.

2    Q.  Explain to us.

3    A.  When you initially asked me, you handed me a merchant

4    application, not relevant to a chargeback.  So that question to

5    me, when you gave me that paper and asked me did you lie about

6    any of these questions, seemed like you were asking me, have

7    you ever lied on a merchant application?  It wasn't about a

8    chargeback.

9    Q.  That was yesterday.  Today I asked you if you ever filed

10   any false documents in relation to chargebacks.

11   A.  OK.

12           THE COURT:  Sir, did you ever file any false documents

13   in relation to chargebacks, yes or no?

14           THE WITNESS:  Yeah.  I have initialed people's

15   initials before.

16           THE COURT:  Next question.

17           MR. SCHMIDT:  I am done.

18           THE COURT:  Government, anything?

19           MS. FLETCHER:  No, your Honor.

20           THE COURT:  You may step down, sir.  You are excused.

21           (Witness excused)

22           THE COURT:  Next witness for the government.

23           MR. SOBELMAN:  The government calls Anthony Giattino.

24           (Continued on next page)

25

1   ANTHONY GIATTINO,

2        called as a witness by the government,

3        having been duly sworn, testified as follows:

4            THE DEPUTY CLERK:  State your name and spell your last

5   name for the record.

6            THE WITNESS:  My name is Anthony Giattino,

7   A-N-T-H-O-N-Y, G-I-A-T-T-I-N-O.

8   DIRECT EXAMINATION

9   BY MR. SOBELMAN:

10  Q.  Goods afternoon, Special Agent Giattino.

11  A.  Good afternoon.

12            THE COURT:  Welcome, sir.

13  Q.  Where do you work?

14  A.  I work for the U.S. Attorney's Office for the Southern

15  District of New York.

16  Q.  What is your position with the U.S. Attorney's Office?

17  A.  Special agent.

18  Q.  What are your duties and responsibilities as a special

19  agent with the U.S. Attorney's Office?

20  A.  My duties are to investigate violations of federal law, and

21  I have a particular focus on financial fraud and cybercrime.

22  Q.  For approximately how long have you worked for the U.S.

23  Attorney's Office?

24  A.  Approximately one and a half years.

25  Q.  Where did you work prior to joining the U.S. Attorney's

```
 1   Office?
 2   A.  I worked for Homeland Security Investigations.
 3   Q.  Is that also known as HSI?
 4   A.  Yes.
 5   Q.  What was your position with HSI?
 6   A.  Special agent.
 7   Q.  What were your duties and responsibilities as a special
 8   agent with HSI?
 9   A.  Pretty much the exact same thing, investigating violations
10   of federal law, also with the focus on financial fraud and
11   cybercrime.
12   Q.  In total, for approximately how long have you been a law
13   enforcement agent?
14   A.  About ten years.
15   Q.  When you have investigated fraud, what types of
16   investigative techniques have you used?
17   A.  Investigating fraud typically involves the analysis of
18   financial records, conducting and executing e-mail search
19   warrants to review e-mails and correspondence relating to those
20   crimes, as well as physical search warrants at residences to
21   gather other documents.
22   Q.  When executing a search warrant, what types of items do you
23   generally look for when searching a home or office?
24   A.  Financial records, business documents, any kind of
25   documents relevant to the case showing transactions.  It
```

1    depends on the crime.

2    Q.   Approximately how many search warrants have you executed?

3    A.   Over 100.

4    Q.   Directing your attention to March 21, 2017, did you work

5    that day?

6    A.   Yes.

7    Q.   What did you do on that day?

8    A.   I executed a search warrant in Rancho Santa Margarita,

9    California.

10   Q.   What was the basis for that search?

11   A.   A search warrant that was signed by a judge the previous

12   day in Los Angeles.

13           MR. SOBELMAN:   Ms. Lee, can you please display what is

14   marked for identification as Government Exhibit 802.

15   Q.   Special Agent Giattino, do you recognize this?

16   A.   Yes, I do.

17   Q.   What is it?

18   A.   Government Exhibit 802 is a photograph of the outside of

19   the building in which the residence was located where I

20   executed the search warrant.

21   Q.   Does this photograph fairly and accurately depict that

22   building?

23   A.   Yes.

24           MR. SOBELMAN:   The government offers Government

25   Exhibit 802.

1          MR. SCHMIDT:  No objection.

2          MR. PAUL:  No objection.

3          THE COURT:  Admitted without objection.

4          (Government's Exhibit 802 received in evidence)

5     Q.  At approximately what time on March 21, 2017 did you arrive

6     at the residence to conduct the search?

7     A.  Approximately 6 a.m.

8     Q.  Why did you arrive at 6 a.m.?

9     A.  We typically execute search warrants at this time.  At 6

10    a.m., generally the person who lives there will be home,

11    probably asleep, and we do that for our own safety so that no

12    one is expecting us, and also so that we know the person will

13    be there.

14    Q.  Who, if anyone, was inside this particular residence when

15    you arrived?

16    A.  Shahram Ketabchi.

17    Q.  Do you see --

18          THE COURT:  Is this a single-family residence or

19    multifamily residence, if you know?

20          THE WITNESS:  This was a one-bedroom apartment, kind

21    of like a condo or a co-op.

22    Q.  The picture being displayed right now, is that a building

23    in which that apartment appeared?

24    A.  Yes.  There were multiple apartments within this building.

25    Q.  Thank you.

1          Special Agent Giattino, if I could ask you to look

2    around the courtroom -- and if you need to stand up to see

3    everyone, please do so -- and see if you see Shahram Ketabchi

4    in the courtroom today.

5    A.   Sure.

6    Q.   Do you?

7    A.   I do.

8    Q.   Could you please identify him by describing an item of

9    clothing and where he is located?

10          THE COURT:  Is he in the first table closest to you or

11   the second table, the one farthest from you?

12          THE WITNESS:  The one farthest.

13          THE COURT:  On that, as you face him, which side is he

14   on?

15          THE WITNESS:  He is on my right side, on the end of my

16   right-hand side.

17          THE COURT:  What is he wearing?

18          THE WITNESS:  A dark suit, a white shirt, the color of

19   the tie I can't see because of a binder.

20          THE COURT:  The witness has identified Mr. Shahram

21   Ketabchi.

22   BY MR. SOBELMAN:

23   Q.   Special Agent Giattino, when you arrived at Mr. Ketabchi's

24   apartment, what did the team do first?

25   A.   First the team knocked on the door, announced that we were

1    police and we have a search warrant.

2    Q.  What happened next?

3    A.  We repeatedly knocked on the door announcing loudly law

4    enforcement, police, with search warrant.  That happened many

5    times.  There was no answer at the door.  After this happening

6    multiple times, we forcibly entered into the apartment.

7    Q.  Why was the door forcibly opened?

8    A.  We as law enforcement do this when we are not receiving a

9    response after multiple knocks on the door and loudly

10   announcing our presence.  We do this generally for two reasons.

11   One, for our safety, because we don't know what is behind the

12   door and if somebody is preparing to fight, and, secondly, in

13   case someone is behind the door destroying evidence that we are

14   looking for.

15   Q.  Did you search the apartment alone?

16   A.  No.

17   Q.  Who else was part of the search team?

18   A.  The search team consisted of other HSI agents located in

19   HSI Orange County, as well as members of local law enforcement

20   who are a part of an HSI task force.

21   Q.  When you first entered the apartment, what did the team do?

22   A.  We conducted a protective sweep, which is law enforcement

23   speak for we quickly looked around the apartment to see if

24   there was anybody or any thing that could pose a threat to us.

25   Q.  Did you find anyone in the apartment other than Mr.

1   Ketabchi?

2   A.  No.

3         THE COURT:  Was Mr. Ketabchi there?

4         THE WITNESS:  Yes.

5   Q.  In your search of the apartment did you see any clothes

6   that did not appear to be Mr. Ketabchi's?

7   A.  No.

8   Q.  Did you see anything that indicated that someone other than

9   Mr. Ketabchi lived in the apartment?

10  A.  No.

11  Q.  How, if at all, did Mr. Ketabchi identify himself when you

12  entered the apartment?

13  A.  He identified himself as Steve.

14  Q.  Did he provide his last name at that time?

15  A.  No.  He refused to provide his full name.

16  Q.  What, if anything, did you tell him at that time about why

17  you and the other law enforcement agents were there?

18  A.  I told him that we had a search warrant signed by a judge

19  to search the apartment and that it was in relation to his

20  brother and his brother's businesses.

21  Q.  Did you provide him a copy of the warrant?

22  A.  Yes, I did.

23        MR. SOBELMAN:  Ms. Lee, could you please show the

24  witness what is marked for identification as Government Exhibit

25  801.

1   Q.  Special Agent Giattino, do you recognize this?

2   A.  Yes, I do.

3   Q.  What is it?

4   A.  This is the search warrant that I swore out on March 20,

5   2017.

6   Q.  Did you have an opportunity to review this exhibit in

7   preparation for your testimony today?

8   A.  Yes.

9   Q.  Is this a true and accurate copy of the warrant that you

10  handed to Mr. Ketabchi?

11  A.  Yes.

12          MR. SOBELMAN:  The government offers Government

13  Exhibit 801.

14          THE COURT:  Hearing no objection, admitted.

15          (Government's Exhibit 801 received in evidence)

16          MR. SOBELMAN:  Ms. Lee, please display it for the

17  jury.

18          If you could please zoom in on the top half of the

19  page.

20  Q.  Special Agent Giattino, what is the title of this document?

21  A.  The title -- well, on the top of the page it says, "United

22  States District Court for the Central District of California."

23          The caption reads, "In the matter of the search of

24  22751 El Prado, Unit 2312, Rancho Santa Margarita, California

25  92688."

1              Just below that is what I would say is the title,

2     which is "search and seizure warrant."

3     Q.  And at the bottom of the page, is it signed by a judge?

4     A.  Yes.  It is signed by the Honorable Rozella A. Oliver, a

5     U.S. magistrate judge in Los Angeles, California.

6              MR. SOBELMAN:  Ms. Lee, could you please go to page 3

7     of the document.

8              Please zoom in on the top half.

9     Q.  Special Agent Giattino, what is your understanding of the

10    purpose of this page of the warrant?

11    A.  This page describes the specific premises, the location

12    that we are going to search.  We have to be specific about what

13    we request to search before a judge.  We can't just get carte

14    blanche to search anything, so in this we are describing

15    exactly where we want to search.

16             MR. SOBELMAN:  Ms. Lee, could you please go to page 4

17    of this document.  And zoom in on the first half.

18    Q.  Special Agent Giattino, what is your understanding of the

19    purpose of this page of the warrant?

20    A.  So this page describes what exactly we are looking for

21    within the location that we are requesting to search.  So this

22    attachment B describes what we are looking for.

23    Q.  Could you please just generally describe what you were

24    looking for on this particular occasion?

25    A.  Sure.  So, specifically, "Fruits, evidence and

1    instrumentalist of violations of Title 18, United States Code,

2    Sections 1349 (conspiracy to commit wire fraud) and 1956(h

3    (conspiracy to commit money laundering), known as the financial

4    crimes.

5              "Those violations involving persons, entities and

6    properties, including Arash Ketabchi, also known as Zach

7    Peterson, Andrew Owimrin, a/k/a "Andrew Owens" and "Jonathan

8    Stewart," William Sinclair, Michael Finocchiaro, a/k/a "Michael

9    Foster," Ariele Peralta, Joseph McGowan, A1 Business

10   Consultants, Element Business Services, Elevated Business

11   Consultants, Olive Branch Marketing, Paramount Business

12   Solutions, Carlyle Management Group, and Vanguard Business

13   Solutions, from the premises identified in attachment A."

14   Q.  Was attachment A the page we looked at just before this?

15   A.  Yes.

16             MR. SOBELMAN:  Ms. Lee, can you zoom in on the second

17   half of this page.

18   Q.  You don't need to read it, but just generally what follows

19   the paragraph you just described?

20   A.  So the paragraph before describes generally the subject

21   matter.  This describes the items where we think that subject

22   matter would be located.  So electronic devices, electronic

23   documents, records generally.  That's not necessarily in A

24   through C, but that would go after that first paragraph.

25   Q.  Special Agent Giattino, you testified that you told Mr.

 1    Ketabchi the purpose of the law enforcement being there and you
 2    handed him the warrant.
 3            During that period of time, after you told him that
 4    and you handed him the warrant, how, if at all, did he react to
 5    being told that and to seeing the warrant?
 6    A.  He seemed agitated and told us to cease immediately
 7    searching his apartment and that he wanted to call an attorney.
 8    Q.  What, if anything, did he say about his brother or
 9    involvement in his brother's businesses.
10            MR. PAUL:  Objection.
11            THE COURT:  I will allow that.
12    A.  He said that he has nothing to do with his brother's
13    businesses.  He has his own businesses and drives Uber, drives
14    for Uber.
15            THE COURT:  Did you ask him about his brother's
16    businesses?
17            THE WITNESS:  I did not.
18            THE COURT:  Did anyone else?
19            THE WITNESS:  No.
20    Q.  How did you respond when he said those things?
21    A.  I told him that we have a court order to search the
22    apartment and that we would not cease searching the apartment.
23    Q.  How did you respond when he said he wanted to speak to an
24    attorney?
25    A.  I told him he's absolutely free to speak to an attorney at

1    any time.  He is not under arrest, but that we were going to

2    proceed with the court-ordered search.

3    Q.  After that interaction, what did you do next?

4    A.  We proceeded with just the protocol of what we do, which is

5    just searching -- we searched the apartment, and just kind of

6    doing that the way that we are supposed to do.

7    Q.  Where was Mr. Ketabchi while you were undertaking the

8    search of his apartment?

9    A.  He was in the living room.

10   Q.  What happened as he was sitting in the living room and you

11   were undertaking the search?

12   A.  Mr. Ketabchi was -- had a copy of the search warrant and he

13   was reviewing it.  At various times he again told us to stop

14   searching the apartment immediately.  And he also, as we

15   were -- so during the search, as we find stuff that's relevant,

16   we put the documents or whatever devices into evidence bags, we

17   bag them, we document that, and Mr. Ketabchi wanted to review

18   every item we were putting into our evidence bags.

19   Q.  When you say he wanted to review it, what in particular did

20   he say to you and the other agents?

21   A.  He said that he wanted us to stop and allow him to examine

22   each item that was being put in evidence bags.

23   Q.  What was his tone and demeanor when he said this?

24   A.  He was still agitated.  That's the word I would use.

25   Q.  Was he demanding or asking politely or something else?

1   A.  He was demanding.

2   Q.  How did you respond to him at that time?

3   A.  I told him that we are going to proceed with the search.  I

4   reminded him again, he could feel free to speak to an attorney,

5   but we are not going cease the search.

6   Q.  Did you and the other members of the team seize anything in

7   the course of your search?

8   A.  Yes.

9   Q.  Generally, what types of items did you and the other

10  members of the team seize?

11  A.  We seized documents, financial records, correspondence,

12  electronic devices, namely, a computer, phones.

13          MR. SOBELMAN:  Ms. Lee, could you please show the

14  witness what has been marked for identification as Government

15  Exhibits 803, 804, and 805.

16  Q.  Special Agent Giattino, do you recognize these?

17  A.  Yes.

18  Q.  What are they?

19  A.  These are photographs taken inside the apartment that we

20  searched that day.

21  Q.  When were these photographs taken?

22  A.  March 21, 2017, the date of the execution of the search

23  warrant.

24  Q.  Are these photographs fair and accurate depictions of the

25  portions of Mr. Ketabchi's apartment as they appeared at the

1    time of the search?

2    A.  Yes.

3          MR. SOBELMAN:  Your Honor, the government offers

4    Government Exhibits 803, 804 and 805.

5          THE COURT:  Hearing no objection, admitted.

6          (Government's Exhibits 803, 804 and 805 received in

7    evidence)

8          MR. SOBELMAN:  Ms. Lee, could you please display what

9    is in evidence as Government Exhibit 803.

10   Q.  Special Agent Giattino, could you please describe what is

11   depicted in this photograph?

12   A.  Yes.  This photograph depicts, after -- if you immediately

13   enter the apartment, if you look to your right, that's what

14   this photo depicts.  Just before you is a table with chairs.

15   To the right of that is a window facing the outside of the

16   apartment and it's covered with a dark-colored window shade.

17   Behind that is a kitchen countertop, behind which is the

18   kitchen with various appliances.  To the left you will see a

19   door, and that is the entrance to the washer/dryer room.

20         Then as you kind of come back to the source of the

21   photograph, the person taking the photograph, you can see a

22   desktop computer on top of a desk.  That's from that point of

23   view.

24         MR. SOBELMAN:  Ms. Lee, can you please display what is

25   in evidence as Government Exhibit 804.

IAQ8KET5                           Giattino - Direct

1    Q.  Special Agent Giattino, can you please describe what is

2    depicted in this photograph?

3    A.  Yes.  This photo is from the other angle.  So this is if

4    you were in the kitchen taking a photo looking forward.  You

5    could see the main entrance to the apartment.  To the farthest

6    left, that's that window that I described just before and the

7    table.  To the right you see a bit more of the desktop computer

8    and the office space.  You can see a file organizer there.

9    Behind that desk is the living room with a TV, another window,

10   a fireplace, and a door through which is a kind of little

11   outdoor sort of balcony-type thing.

12           MR. SOBELMAN:  Ms. Lee, could you please display what

13   is in evidence as Government Exhibit 805.

14   Q.  Special Agent Giattino, could you please describe what is

15   depicted in this photograph?

16   A.  Yes.  This is a close-up of the office space area.  You

17   could see more closely the desktop computer.  There is a

18   printer fax machine right there.  To the right of that are two

19   phones and then that file organizer that I described just

20   before.  And again, behind that is the rest of the living room.

21           MR. SOBELMAN:  Ms. Lee, could you please show the

22   witness what have been marked for identification as Government

23   Exhibits 806, 807, 808, 809 and 810.

24   Q.  Special Agent Giattino, do you recognize these?

25   A.  Yes.

1    Q.  What are they?

2    A.  These are photographs of some of the documents that we

3    encountered during the course of our search.

4    Q.  Were these photographs taken during the course of the

5    search?

6    A.  Yes.

7    Q.  Are these photographs fair and accurate depictions of the

8    documents and parts of the apartment as they appeared that day?

9    A.  Yes.

10         MR. SOBELMAN:  The government offers 806, 807, 808,

11   809 and 810.

12         THE COURT:  Hearing no objection, admitted.

13         (Government's Exhibits 806, 807, 808, 809 and 810

14   received in evidence)

15         MR. SOBELMAN:  Ms. Lee, could you please display

16   Government Exhibit 806.

17   Q.  Special Agent Giattino, could you please describe what is

18   depicted in this photograph?

19   A.  Yes.  This is a photograph of a document that we

20   encountered during the course of our search.  It was located in

21   that file organizer that I had described just before when I was

22   describing the office space location.  And this document on the

23   bottom there appears to be a check.

24         MR. SOBELMAN:  Ms. Lee, could you just zoom in on that

25   check.

1    Q.  Special Agent Giattino, are you able to read the name

2    that's listed on the top left of the check that's on the left

3    of the screen?

4    A.  Yes.  The first word is Elevated.  And then it gets kind of

5    blurry after that, but I can clearly see it says Elevated

6    there.

7         MR. SOBELMAN:  Ms. Lee, could you please display what

8    is in evidence as Government Exhibit 807.

9    Q.  Special Agent Giattino, could you please describe what is

10   depicted in this photograph?

11   A.  This is another photograph -- this is a photograph of

12   another document that we encountered during the search.

13        MR. SOBELMAN:  Ms. Lee, could you please zoom in on

14   the document.

15   Q.  Special Agent Giattino, could you please read what is

16   listed next to "merchant name" on the lower left-hand corner?

17   A.  Sure.  It reads "A1 Business Consultants LLC."

18   Q.  What is written on the very top right of that document?

19   A.  On the top right, it also says -- well, on the extreme top

20   right it says "chargeback debit advice."

21   Q.  In the course of your search, was this the only document

22   you found like that or were there many others?

23        MR. PAUL:  Objection.

24   A.  No, there were many.

25        THE COURT:  Be more specific.

1    Q.  Was this the only document that you found like this in the

2    course of the search?

3    A.  No.

4    Q.  In reviewing some of the documents in preparation for your

5    testimony, what, if any, others did you identify that were

6    similar to this one?

7    A.  I saw at least a dozen that were very similar to this.

8            THE COURT:  When you say "similar," what do you mean?

9    The documents you saw, did they say on the upper right

10   "chargeback debit advice"?

11           THE WITNESS:  I have seen others that say chargeback.

12           Well, when I say that they are similar, there is a

13   very similar format and they discuss chargebacks.

14           MR. SOBELMAN:  Ms. Lee, could you display what is in

15   evidence as Government Exhibit 808.

16   Q.  Special Agent Giattino, could you please describe what is

17   depicted in this photograph?

18   A.  Yes.  This is another close-up of documents found in that

19   file organizer.  And this one is focused on -- although it's

20   slightly out of focus, it is a photograph of, looks like a

21   legal document, like a court document.

22           MR. SOBELMAN:  Ms. Lee, are you able to zoom in on the

23   top left of that document; not of the photograph, but of the

24   document that's depicted in the middle.

25   Q.  It's too blurry.  I won't ask you to read it.

1          MR. SOBELMAN:  Can we move on to Government Exhibit

2      809, please.

3      Q.  Special Agent Giattino, can you please describe what is

4      depicted in this photograph?

5      A.  This photograph is a more in-focus and clearer picture of

6      the document that was in the previous photograph.

7      Q.  Could you just read the parties that are listed as

8      defendants in the top left of this document?

9      A.  Yes.  The party listed as defendants is A1 Business

10     Consultants Limited Liability Company, d/b/a A1 Business

11     Consultants, and Arash S Ketabchi.

12         MR. SOBELMAN:  Ms. Lee, could you please display what

13     is in evidence as Government Exhibit 810.

14     Q.  Special Agent Giattino, please describe what is depicted in

15     this photograph.

16     A.  Yes.  This is another document that we found during the

17     course of the search.  This was in a file organizer that was

18     not in the one that I originally described.  There was another

19     just out of the view of the photo.  And this is a document that

20     is addressed to A1 Business Consultants discussing chargebacks.

21         MR. SOBELMAN:  Ms. Lee, could you please show the

22     witness what has been marked for identification as Government

23     Exhibit 811.

24     Q.  Special Agent Giattino, do you recognize this?

25     A.  Yes.

1    Q.  What is it?

2    A.  This is a photo of one of the electronic devices that we

3    seized, that we encountered and seized in the residence.

4    Q.  Let me just stop you there.  Is this a fair and accurate

5    depiction of the item right before it was seized from Mr.

6    Ketabchi's apartment?

7    A.  Yes.

8            MR. SOBELMAN:  The government offers Government

9    Exhibit 811.

10           THE COURT:  Hearing no objection, 811 is admitted.

11           (Government's Exhibit 811 received in evidence)

12           MR. SOBELMAN:  Ms. Lee, could you display it.

13   Q.  Special Agent Giattino, please describe what is depicted in

14   this photograph?

15   A.  So the largest item is the desktop -- the tower for a

16   desktop computer, and this was underneath the desk that was

17   depicted in the photograph that I described showing the home

18   office area.  On top of that is an external hard drive, as well

19   as three smaller USB drives.

20           MR. SOBELMAN:  Ms. Lee, please show the witness what

21   have been marked for identification as Government Exhibits 812,

22   813, 814 --

23           THE COURT:  Before you go to that.

24           MR. SOBELMAN:  Yes, your Honor.

25           THE COURT:  Agent, what does that tower do?  What is

1    that tower?

2              THE WITNESS:  This contains the -- typically, this

3    will contain the hard drives for a desktop computer.  This is

4    where sort of the brain of the computer is.  The processer will

5    be found there, and generally, for a desktop computer in this

6    format, the monitor is really only the method of viewing what

7    this tower is kind of kicking out to it.

8    Q.  On top of the desk, was there a monitor, keyboard, mouse,

9    and other things that desktops often are connected to?

10   A.  Yes.  Which was also shown in those earlier photographs.

11             THE COURT:  Thank you.  I now know what this thing

12   under my desk is.

13             Proceed.

14             MR. SOBELMAN:  Ms. Lee, could you please show the

15   witness what have been marked for identification as Government

16   Exhibits 812 through 816.

17   Q.  Special Agent Giattino, do you recognize these?

18   A.  Yes, I do.

19   Q.  What are they?

20   A.  These are photographs of the bedroom in the apartment that

21   we searched on that day.

22   Q.  Are these photographs fair and accurate depictions of the

23   parts of Mr. Ketabchi's apartment at the time of the search?

24   A.  Yes.

25             MR. SOBELMAN:  Your Honor, the government offers

1    Government Exhibits 812 through 816.

2            THE COURT:  Hearing no objection, admitted.

3            (Government's Exhibits 812, 813, 814, 815 and 816

4    received in evidence)

5            MR. SOBELMAN:  Ms. Lee, could you please display

6    Government Exhibit 812.

7    Q.  Special Agent Giattino, could you please describe what is

8    depicted in this photograph?

9    A.  Yes.  This photo depicts the view of the bedroom just from

10   the doorway, the entrance to it.  So to the right is the bed,

11   to the left is a dresser, and there is a window directly

12   forward with dark drapes.  And I believe through that window is

13   that kind of outdoor patio area I described earlier.

14           MR. SOBELMAN:  Ms. Lee, could you please display what

15   is in evidence as Government Exhibit 813.

16   Q.  Special Agent Giattino, could you please describe what is

17   depicted in this photograph?

18   A.  Sure.  This is a photograph of the nightstand adjacent to

19   the bed.  On top of the nightstand are a cell phone and a

20   digital recorder that we seized on the date of the search.

21           MR. SOBELMAN:  Ms. Lee, could you please display what

22   is in evidence as Government Exhibit 814.

23   Q.  Special Agent Giattino, could you please describe what is

24   depicted in this photograph?

25   A.  Yes.  This is another photograph taken within the bedroom,

1    and in this photograph you can see the entrance to kind of a

2    walk-in closet.  To the right of that you could see the

3    entrance to the bathroom.

4    Q.  The piece of paper that's on the wall in the middle of it

5    that has a big "C" on it, was that there when the team arrived?

6    A.  No.  We put that there.

7    Q.  Why do you do that?

8    A.  Like I was saying at the beginning, we have kind of our

9    procedures when we are doing a search, and one of those is to

10   mark each room with a letter so we can say -- if we found a

11   particular piece of evidence or document, whatever, we would

12   say room C.  It's just a way for us to identify rooms without

13   having to say the master bedroom or whatever.

14        MR. SOBELMAN:  Ms. Lee, could you please display what

15   is in evidence as Government Exhibit 815.

16   Q.  Special Agent Giattino, could you please describe what is

17   depicted in this photograph?

18   A.  Sure.  This is the walk-in closet that I had described

19   previously.  And it was marked room D.

20        MR. SOBELMAN:  Ms. Lee, could you please display what

21   is in evidence as Government Exhibit 816.

22   Q.  Special Agent Giattino, could you please describe what is

23   depicted in this photograph?

24   A.  Sure.  I forgot to say in the previous photograph there was

25   a safe on the bottom, it almost looks like a mini refrigerator,

1    right down there.

2              This next photograph is the photograph of the inside

3    of that safe.

4              MR. SOBELMAN:  At this time, I am going to read a pair

5    of stipulations.

6              THE COURT:  All right.  Ladies and gentlemen, do you

7    remember way back on Tuesday morning I said there were three

8    ways evidence comes in.  First, from the witnesses on the

9    witness stand.  You certainly have seen that.  Secondly,

10   documents and other things.  So far it's only been documents to

11   my knowledge, but you have seen that.  And the third way was

12   stipulations of the parties, that is, agreements between the

13   parties that certain facts are true.  You are about to hear

14   that.  You must accept as true the facts -- if it is a fact

15   stipulation.

16             Is it a fact stipulation, sir?

17             MR. SOBELMAN:  Yes, your Honor.

18             THE COURT:  The facts set forth therein to be true.

19             MR. SOBELMAN:  There are two stipulations.  The first

20   one is a fact stipulation.  The second will be a testimonial

21   stipulation.

22             THE COURT:  In the first one, they are stipulating

23   that certain facts are true.  You must accept those facts as

24   true.

25             In the second one, they are saying, if somebody were

1    called to testify, he or she would testify as follows.  And you

2    must accept that that is the testimony that that person would

3    have given.  It's a way of saving time.

4            MR. SOBELMAN:  I am reading from what is marked as

5    Government Exhibit 302.

6            It is hereby stipulated and agreed by and between the

7    United States of America, by its attorneys -- which I will not

8    read unless the Court requires me to -- and the defendants, by

9    their attorneys, that:

10           1.  On March 21, 2017, law enforcement agents lawfully

11   seized from Andrew Owimrin an Apple iPhone, hereinafter known

12   as "Owimrin's cell phone," with telephone number 201-838-7774.

13           2.  On March 21, 2017, law enforcement agents lawfully

14   seized from Shahram Ketabchi's residence, in Rancho Santa

15   Margarita, California, the following electronic devices:

16           A.  A black Gateway computer tower;

17           B.  A black hard drive identified as WX11C62T5915;

18           C.  A black hard drive identified as WX81A2319403;

19           D.  A black hard drive identified as NA0CL3P6;

20           E.  A black 16GB thumb drive identified as number 1;

21           F.  A black 16GB thumb drive identified as number 2;

22           G.  A digital recorder; and

23           H.  A black Samsung cell phone with the telephone

24   number 949-244-8588.

25           The exhibits listed in the attached schedule A, and

IAQ8KET5                         Giattino - Direct

1    their subparts, are true and accurate copies of documents and

2    files obtained from these items as specified in schedule A.

3              I will read schedule A, which reads:

4              Government Exhibit 1001 through Government Exhibit

5    1020 are from the black Samsung cell phone, with the telephone

6    number 949-244-8588.

7              Government Exhibits 1101 through 1142 are from item D,

8    the black hard drive, identified as NA0CL3P6.

9              Government Exhibit 1201 through Government Exhibit

10   1220 are from the black Gateway computer tower.

11             Government Exhibit 1301 through Government Exhibit

12   1342 are from the black hard drive identified as WX81A2319403.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. SOBELMAN:  During the lawful search of Shahram

2   Ketabchi's residence, law enforcement agents also seized

3   certain hardcopy documents.  The exhibits listed in the

4   attached Schedule B and their subparts are true and accurate

5   copies of documents obtained from that residence during the

6   search.

7              Schedule B reads that:  This includes Government

8   Exhibits 201 through Government Exhibit 246

9              Paragraph three of the stipulation reads that:  On

10   March 21, 2017, law enforcements agents lawfully seized from

11   Olive Branch Marketing's offices in Clifton, New Jersey,

12   certain hardcopy documents.  The exhibits listed in the

13   attached Schedule C and their subparts are true and accurate

14   copies of documents obtained from those offices during the

15   search.

16              Schedule C includes Government Exhibits 250 through

17   261.

18              On March 21 -- I may not even read this part.  Skip

19   paragraph 4.

20              Reading paragraph 5:  From at least January 1, 2015,

21   until at least March 21, 2017, Andrew Owimrin used the cell

22   phone number 201-838-7774.

23              Paragraph 6:  From at least January 1, 2015, until at

24   least March 21, 2017, Shahram Ketabchi used the cell phone

25   number 949-244-8588.

1          Paragraph 7, and the final paragraph:  From at least

2     January 1, 2015, until at least March 21, 2017, Arash Ketabchi

3     used the cell phone number 917-439-1888.

4          It's further stipulated and agreed that this

5     stipulation may be received in evidence at the trial that we

6     are now having.

7          The government offers Government Exhibit 302.

8          THE COURT:  302 admitted without objection.

9          (Government's Exhibit 302 received in evidence)

10          MR. SOBELMAN:  Now I am going to read from Government

11     Exhibit 301.

12          It is hereby stipulated and agreed, by and between the

13     United States of America, by its attorneys, and the defendants,

14     by their attorneys, paragraph 1:

15          If called at trial, a custodian of records on behalf

16     of Google Inc., hereinafter known as "Google," would testify

17     that:

18          A.  He or she is familiar with the services offered by

19     and the recordkeeping practices of Google.

20          B.  Among other things, Google offers a popular free

21     Web-based email service, known as "Gmail," which can be

22     accessed via the Internet at www.gmail.com.  To obtain a Gmail

23     account, a user must visit www.gmail.com online and register an

24     account with the desired login name and password.  If the

25     desired login name is not already in use, the user will be

Iaqdket6                         Giattino - direct

assigned an email address that begins with the login name in
question and ends with @gmail.com.  Thus, a person registering
with the login name "sample" would be assigned the email
address sample@gmail.com.

Subparagraph C:  After a Gmail account is registered,
an individual may access emails sent to that account by logging
into www.gmail.com and providing the password.

Subparagraph D:  During the account registration
process, Google requests certain contact information from the
registrant of the account, but Google does not independently
verify the contact or personal information provided by the user
unless additional steps, such as phone number verification, are
taken.

2.  If called at trial, a custodian of records on
behalf of Google also would testify that Google received
various search warrants issued by a magistrate judge in the
Southern District of New York, which authorized a search and
collection of emails associated with the following Gmail
accounts:

A.   Ketabchi.rash @gmail.com.

B.   Positivefaith@gmail.com.

C.   Olivbranchmarketing1@gmail.com.

D.   OlivebranchmarketingLLC@gmail.com, and

E.   A1businessconsultations@gmail.com.

In response to the search warrants, Google conducted a

1   diligent search of records kept in the course of

2   regularly-conducted business activity and made by the

3   regularly-conducted business activity as a regular practice.

4          3.  If called at trial, a custodian of records on

5   behalf of Google also would testify that Google produced the

6   exhibits and their subparts listed in the attached Schedule A

7   in response to the receipt of search warrants and that these

8   documents are true and accurate copies of email communications

9   maintained by Google.

10          It is further stipulated and agreed that this

11  stipulation may be received in evidence at the trial in the

12  above-referenced matter.  The schedule referenced earlier

13  covers Government Exhibits 401 to 483 and Government Exhibits

14  510 to 516.

15          Your Honor, the government offers Government Exhibit

16  301.

17          THE COURT:  With no objection, 301 is admitted.

18          (Government's Exhibit 301 received in evidence)

19          MR. SOBELMAN:  Ms. Lee, could you please display --

20  I'm sorry.

21          Your Honor, the government offers, pursuant to the

22  stipulations, Government Exhibits -- I am going to list

23  several -- 246, 409, 414, 421, 514, 1001, 1002, 1011, 1013,

24  1014, 1018, 1137, 1139, 1140, 1141, and 1325.

25          THE COURT:  Admitted by stipulation and with no

1   objection.

2            MR. SCHMIDT:  May we have a moment, your Honor?

3            THE COURT:  Yes.

4            MR. SOBELMAN:  Your Honor, just to be clear, the

5   stipulation is as to authenticity.  The parties reserve any

6   other objections.

7            THE COURT:  All right.

8            MR. SCHMIDT:  We do need some time.

9            MR. SOBELMAN:  We provided a list of the exhibits

10  intended to be offered during Mr. Giattino's testimony to the

11  defense yesterday evening to try to expedite the process.

12           MR. SCHMIDT:  Yesterday night.

13           THE COURT:  Indeed, one person's evening is another

14  person's night.

15           Do you intend to use those in connection with this

16  witness?

17           MR. SOBELMAN:  Yes, your Honor.

18           THE COURT:  What are the first few that you are going

19  to use?

20           MR. SOBELMAN:  In the order that I intend to use them?

21           THE COURT:  Yes, just the first six.

22           MR. SOBELMAN:  1325, 1001, 1002, 409, and 514.

23           THE COURT:  All right.  Mr. Schmidt, do you have

24  objections to those?

25           MR. SCHMIDT:  I would have to check.

1          THE COURT:  Check those six right now and then we will

2     proceed.

3          MR. SOBELMAN:  Your Honor, the way I intend to do this

4     is there are several batches of -- all are smaller than this,

5     but three to five exhibits that I intend to go through at a

6     time and offer as we go.

7          THE COURT:  You have already given them the complete

8     list either last evening or last night?

9          MR. SOBELMAN:  Yes, that is right, your Honor.

10         MR. SCHMIDT:  Could you just read off the ones you

11    intend to offer first?

12         MR. SOBELMAN:  The first five are 1326, 1001, 1002,

13    409 and 514.

14         MR. SCHMIDT:  1326 or 5?

15         MR. SOBELMAN:  1325.  Apologies if I said 1326.

16         (Pause)

17         MR. PAUL:  No objection.

18         THE COURT:  All right.  Proceed.

19         MR. SCHMIDT:  Your Honor, we're not done yet.  Sorry.

20    We're slow.

21         THE COURT:  Oh, it was Mr. Paul that said "No

22    objection."

23         Mr. Schmidt, have you gone over the first three?

24         (Pause)

25         Mr. Schmidt, have you gone over the first three?

1          MR. SCHMIDT:  Not quite in the correct order, but we

2    are almost done, Judge.

3          THE COURT:  I think it is an imposition on this jury.

4    You had the remainder of the evening or night plus this morning

5    plus lunch.

6          MR. SCHMIDT:  We've got the ten --

7          THE COURT:  Just do it right now.

8          (Pause)

9          MR. SCHMIDT:  No objection, Judge.

10         THE COURT:  No objection.

11         MR. SOBELMAN:  Your Honor, if I may just let the

12   defense know what the next four are so that their paralegal may

13   pull them up so that when I am done with these five --

14         THE COURT:  Yes.

15         MR. SOBELMAN:  The four after this will be 515, 1128,

16   1129 and 1313.

17         THE COURT:  Now, am I correct that these have all been

18   admitted pursuant to that stipulation, or no?

19         MR. SOBELMAN:  No, your Honor.  They have been

20   authenticated pursuant to the stipulation, and we're now going

21   to offer them in groups.

22         THE COURT:  Which ones are you now offering?

23         MR. SOBELMAN:  The five that I -- I offered more than

24   five but I understand we are just talking about the first five.

25         THE COURT:  All right.  Let's talk about first five,

1   what are they?

2          MR. SOBELMAN:  The first five that the defense just

3   said they have not objection to was 1325, 1001, 1002, 409 and

4   514.

5          THE COURT:  Those five documents are admitted.

6          Start your questions.

7          (Government's Exhibits 1325, 1001, 1002, 409 and 514

8   received in evidence)

9          MR. SOBELMAN:  OK.  Ms. Lee, if you could please pull

10  up what's now in evidence as Government Exhibit 1325.  If you

11  could zoom in on the top half.

12  BY MR. SOBELMAN:

13  Q.  Special Agent Giattino, after hearing the stipulation, do

14  you recall where the 1300 series is from?

15  A.  Yes.  I believe this was from electronic devices.

16  Q.  From whose electronic devices?

17  A.  Mr. Ketabchi's.

18  Q.  Could you please read the title of this document?

19  A.  Yes.  The title reads "Business Profile."

20  Q.  What is the name of the business listed underneath that?

21  A.  "A1 Business Consultants LLC."

22          MR. SOBELMAN:  Ms. Lee, if you could please zoom in on

23  the lower half of the document.

24  Q.  Special Agent Giattino, what amount is listed next to

25  "Average Ticket"?

Iaqdket6                         Giattino - direct

1    A.   $7,000.

2    Q.   And what amount is listed next to "High Ticket"?

3    A.   $10,000.

4    Q.   What range is listed next to "Weekly Volume"?

5    A.   $30,000 to $100,000.

6    Q.   What is listed next to "Products Sold"?

7    A.   "Detailed description needed (business services such as

8    business plans, websites, corporate credit and website

9    marketing, etc.)"

10   Q.   What is listed under "Fulfillment Company Used"?

11   A.   "N/A."

12   Q.   What is your understanding of what "N/A" means?

13   A.   Not applicable.

14   Q.   And what is listed under "Chargeback rate (honest

15   evaluation needed)"?

16   A.   "N/A."

17            MR. SOBELMAN:  Ms. Lee, if you could please bring up

18   what's now in evidence as Government Exhibit 1001.

19   Q.   Special Agent Giattino, have you reviewed electronic

20   evidence from search warrants before?

21   A.   Yes.

22   Q.   And are you familiar with this type of document?

23   A.   Yes.

24   Q.   What do we see here, just generally?

25   A.   This is a text message conversation that would have been

1    taken from a seized phone.

2    Q.  And it doesn't look like it does on the phone here, is that

3    right?

4    A.  That's right.

5    Q.  So could you explain to us just generally what the process

6    is and how it gets into this format?

7    A.  OK.  So if you're forensically taking information from an

8    electronic device, in this case if there is cell phones, that

9    whatever forensic software you are using will put it in a

10   certain format.  And like you said, it doesn't look like how it

11   does on the phone.

12        So, if we should go into detail, this would show --

13   Q.  Let me just stop you.

14        MR. SOBELMAN:  Ms. Lee, could you please zoom in on

15   the left half of the document just so everyone can read it.

16   Q.  Just tell us, based on your review both of this and your

17   experience looking at these types of documents, what we see in

18   each column.

19   A.  So the first column would be just the number of the

20   column -- of the row.  Then there is the phone number, and the

21   contact's name.  And then the next column would be the date and

22   time of the message, you know, being sent or received.

23   Q.  Have you looked at this document and others similar to it

24   that were created from the report of Mr. Ketabchi's phone?

25   A.  Yes.

1   Q.   And are you familiar with the way the date is laid out in

2   this particular report?

3   A.   Yes.

4   Q.   How is the date laid out?  Is it in U.S. style or is it in

5   European style.

6   A.   It is in European style where the day comes first and then

7   the month.  So, here it wouldn't be March 10th, it would be

8   October 3rd, 2015.

9            MR. SOBELMAN:  Ms. Lee, could we please take a look at

10  the other side of the document.

11  Q.   Just orient us about what each column is.

12  A.   So for the first and second column, it will indicate

13  whether it was, you know, read or sent, basically.  The --

14  depending on the software, sometimes like they just have their

15  own language for it.  So here the third column is just

16  indicating that this is from a phone.  The fourth column is

17  indicating whether the person received the text message,

18  meaning it was incoming, or sent the text message, which means

19  it was outgoing.

20  Q.   Whose phone are this text messages from?

21  A.   Mr. Ketabchi's.

22  Q.   What contact are all of these text messages with?

23  A.   The contact name Arash.

24           THE COURT:  So when you say "Mr. Ketabchi," you mean

25  which Ketabchi?

1          THE WITNESS:  I'm sorry.  I mean Mr. Shahram Ketabchi.

2          MR. SOBELMAN:  Thank you, your Honor.

3     BY MR. SOBELMAN:

4     Q.  And just to be a hundred percent clear, if it says

5     "Incoming," that's a text message that's coming from the

6     contact that was saved as Arash?

7     A.  Yes.

8     Q.  And if it says "Outgoing," it is a text message that was

9     sent from Shahram Ketabchi's phone to the contact titled

10    "Arash"?

11    A.  Yes.

12    Q.  OK.

13          THE COURT:  The point of view is from Shahram

14    Ketabchi's phone?

15          THE WITNESS:  Correct.

16    BY MR. SOBELMAN:

17    Q.  And for clarity, I would like us to read these text

18    messages, but why don't we do this.  You can be Shahram

19    Ketabchi, so outgoing, and I will be Arash Ketabchi, which

20    means incoming, is that right?

21    A.  I think it would be if I was Shahram Ketabchi, I would be

22    receiving the message.

23    Q.  Yes.  So --

24    A.  It would be -- yeah.

25    Q.  Yes.  So you would be outgoing Shahram Ketabchi.  I'll be

Iaqdket6                          Giattino - direct

1   incoming --

2   A.   Understood.

3   Q.   -- Arash Ketabchi.   OK?

4          THE COURT:   All right.   Nobody understands that.

5   Let's do that again.

6   BY MR. SOBELMAN:

7   Q.   So there are messages both coming in and going out from

8   this phone?

9   A.   Yes.

10  Q.   And they are all in this page with between two different

11  phones, right?

12  A.   Yes.

13  Q.   Shahram Ketabchi's phone and, according to the stipulation,

14  Arash Ketabchi's phone, a number ending in 1888, is that right?

15  A.   Yes.

16  Q.   OK.   In order to make it easier to read, I think it might

17  be easier if you read one party and I read the other.

18  A.   Sure.

19  Q.   So if you could be Shahram Ketabchi, which would be the

20  outgoing texts from this phone, I will be Arash Ketabchi, which

21  are the incoming texts from Shahram Ketabchi's phone.

22          MR. SOBELMAN:   Is that clear enough, your Honor?

23          THE COURT:   Jury?

24          (Jurors indicated affirmatively)

25          THE COURT:   All right.   Proceed.

1          MR. SOBELMAN:   Thank you.   OK.

2     Q.   (Reading) We need a 1800 number.

3     A.   (Reading) Do you have an exclusive email just for A1?

4     Q.   (Reading) Yes.   And website everything.

5     A.   (Reading) What is email address?   A1 Business

6     Consultants@gmail.com.   Send cc info.

7     Q.   (Reading) I'm not sure.   I need to check on Monday, but

8     that sounds right.   Play around with names.   You will find it.

9     A.   (Reading) I tried to save it and it was taken.   I need card

10    to set up now.

11    Q.   (Reading)  Save what?   Ask me.   Because we have everything

12    already.

13    A.   (Reading) How many hours will people use 800 number per

14    month when they call -- when they call in, approximately.   Up

15    to 1,000?

16         That email address.   Check your computer and then

17    these -- these are placeholders for emojis, those four kind of

18    diamonds.

19         So, check your computer.   When home ABD verify email.

20    I will use yours right now.   Then A1 email for everything and

21    yours personal.

22    Q.   (Reading) That is just for customers calling in and website

23    to look professional minimal use.   What email did you set up?

24    A.   (Reading) Got it.

25    Q.   And just remind me what date these were?

1    A.  Here we go.  October 3, 2015.

2            MR. SOBELMAN:  Ms. Lee, if you could please pull up

3    Government Exhibit 1002.

4            And, Ms. Lee, if you could just zoom in so he could

5    read the date.

6    Q.  What date is this?

7    A.  This would be October 5, 2017.

8    Q.  Are these --

9    A.  I'm sorry.  2015.

10   Q.  Are these text messages with the same contact?

11   A.  Yes.

12           MR. SOBELMAN:  Ms. Lee, if could we could get the

13   right side.

14           Let's play the same roles.

15           THE WITNESS:  OK.

16   A.  (Reading) Have a safe --

17           THE COURT:  Repeat for the jury what the roles are.

18           MR. SOBELMAN:  Yes, your Honor.

19           The outgoing text messages --

20           THE COURT:  Who are you?

21           MR. SOBELMAN:  I'm Arash Ketabchi.

22           THE COURT:  And you are?

23           THE WITNESS:  Shahram Ketabchi.

24           THE COURT:  Let's go.

25   A.  (Reading) Have a safe flight, brosky.

1    Q.  (Reading) Thanks.  Remember, priorities website, updates

2    with Ray, merchant hard money loans and Heidi merchant

3    accounts.  We need new one.

4    A.  (Reading) I am on it.

5    Q.  (Reading) TY.

6         What is your understanding of what "TY" means?

7    A.  Thank you.

8         MR. SOBELMAN:  Ms. Lee, could you please pull up

9    Government Exhibit 409.

10        If you could zoom in on sort of the middle part of the

11   page.  Thank you.

12   Q.  Special Agent Giattino, could you please read the date on

13   this email?

14   A.  Yes.  Tuesday, October 13, 2015.

15   Q.  What is the subject line?

16   A.  "Contacts."

17   Q.  Who is it from?

18   A.  Positivefaith@gmail.com.

19   Q.  Who is it to?

20   A.  Heidi@uscardsystem.com.

21   Q.  Who is on the cc?

22   A.  Ketabchi.Arash@gmail.com.

23   Q.  Please read the email.

24   A.  (Reading) Hi, Heidi.  Going forward, please do not

25   communicate any of A1 Business Consultants' info to Bill

1  Sinclair or anyone else, as the only people involved in the

2  company are myself and Arash.  Please confirm.  Thank you.

3  Best of health.  Steve.

4          MR. SOBELMAN:  Ms. Lee, could you please pull up

5  Government Exhibits 514.

6          Go to page 2, please.

7          Would you please zoom in on the email that starts a

8  few lines into the page and ends with "Thank you, Heidi."

9  Q.  Special Agent Giattino, who is this from?

10  A.  This is from Heidi Brownfield.

11  Q.  What is the date?

12  A.  Monday, October 12, 2015.

13  Q.  Who is it to?

14  A.  Steve K.

15  Q.  Who is on the cc?

16  A.  Michael Wigdore, Alan Waddle, and Arash Ketabchi.

17  Q.  What is the subject line?

18  A.  "Document request for A1 Business Consultants LLC."

19  Q.  Please read the email.

20  A.  (Reading) Good afternoon, Steve.  My guess is that they

21  want to verify the transactions because the MID -- the MID --

22  only had two settlements for the entire month of September, and

23  prior to this batch the largest settlement was $16,189.  Also,

24  as previously explained to Arash, this account is already being

25  closely monitored because of the Charles Tosten disputes.

1    MasterCard had directed the bank to shut both accounts down,

2    but we were able to keep A1 on by pretty much putting all the

3    blame on Element.  But with the scrutiny that we knew this

4    account was under, maybe it would have been better to spread

5    these deals out over a couple days, but unfortunately that

6    didn't happen and now the bank is asking for docs.

7          I got Arash's email that you are still waiting for the

8    docs to come back.  This is never a good idea.

9          Going forward, please do not capture funds on any deal

10   that you do not have signed documentation on, specifically for

11   this reason.  Whether an account is new or not, the bank will

12   always perform random doc requests, if nothing else, to make

13   sure the merchant is operating on the up and up.

14         I will see if the bank will be willing to wait for

15   these docs till Thursday, but I can't make any guarantees

16   seeing as how this account was already flagged by MasterCard

17   for questionable activity.

18         Please let me know if you have any questions or need

19   anything further.

20         Thank you.

21         Heidi Brownfield.

22         MR. SOBELMAN:  Ms. Lee, could you please go to page 1

23   of this document and highlight the email on the bottom.

24   Q.  Who is this from?

25   A.  This is from Steve K.

1    Q.  What is the date?

2    A.  Tuesday, October 13, 2015.

3    Q.  Who is it to?

4    A.  Heidi Brownfield.

5    Q.  Who is on the cc?

6    A.  Arash Ketabchi.

7    Q.  What is subject?

8    A.  "Document request for A1 Business Consultants LLC.

9    Q.  Please read the email.

10   A.  (Reading) Hi, Heidi.  Can you please tell me if a signed

11   and faxed contract or a signed, scanned and emailed one will

12   suffice the requirements of the banks the same as a, quote, wet

13   signature, unquote.

14          Thank you.  Happy face.

15          Best of health, Steve.

16          MR. SOBELMAN:  Ms. Lee, please zoom in on the email on

17   the top of the document.

18   Q.  What is the date?

19   A.  Tuesday, October 13, 2015.

20   Q.  What is subject line?

21   A.  "Document request for A1 Business Consultants LLC."

22   Q.  Who is it from?

23   A.  Heidi@uscardsystem.com.

24   Q.  Who is it to?

25   A.  Positivefaith@gmail.com.

1    Q.   Who is on the cc?

2    A.   Ketabchi.arash@gmail.com.

3    Q.   Please read the email.

4    A.   (Reading) Yes.  That's fine.  As long as it's not any sort

5    of electronic signature.  Also, what was purchased, has any

6    fulfillment been done yet?  I just want to be prepared in case

7    that's the next thing they ask to see.

8            Thank you.  Heidi Brownfield.

9            MR. SOBELMAN:  Your Honor, the government now offers

10   the four exhibits I listed earlier -- 515, 1128, 1129, and

11   1313.

12           MR. PAUL:  No objection.

13           THE COURT:  Hearing no objection, admitted.

14           (Government's Exhibits 515, 1128, 1129, 1313 received

15   in evidence)

16           MR. SOBELMAN:  Ms. Lee, please pull up 1128.  Zoom in

17   on the top.

18   Q.   Special Agent Giattino, what is the date on the top

19   right-hand corner?

20   A.   February 4, 2016.

21   Q.   Let me just back up.

22           This is Government Exhibit 1128.  Can you remind us

23   generally where that came from, according to the stipulation I

24   read?

25   A.   From the electronic devices of Shahram Ketabchi.

1    Q.  Can you please read this document.

2              THE COURT:  It's admitted.  There is no need to read

3    from it.

4              Ladies and gentlemen of the jury, just read it on your

5    screens.

6              MR. SOBELMAN:  I'll pause.

7              (Pause)

8              THE COURT:  All right.  Next question.

9              MR. SOBELMAN:  Ms. Lee, could you please pull up

10   Government Exhibit 1129.  Please zoom in on the top half of the

11   document.

12   Q.  Is this document from the same series we just discussed?

13   A.  Yes.

14   Q.  What is the title on this document?

15   A.  "Product and Services Agreement with A1 Business

16   Consultants, LLC."

17   Q.  In the first paragraph, what is the date on the document?

18   A.  February 4, 2016.

19   Q.  And what company is listed in that paragraph?

20   A.  A1 Business Consultants, LLC.

21   Q.  And what are the products slash-- sorry.  What is the price

22   listed in paragraph that's numbered 1?

23   A.  $149,999.

24   Q.  And if you please list the services provided under the

25   headline "Services Provided"?

1          THE COURT:  That paragraph that was just yellowed, is

2     that what you are asking for?

3          MR. SOBELMAN:  Yes, your Honor.  If you want me to

4     pause for the jury to read it, I am fine with doing that.

5          THE COURT:  Jury, read the "Services Provided"

6     paragraph.  Now you have it twice.

7          (Pause)

8          Go ahead, sir.

9     BY MR. SOBELMAN:

10    Q.  What is the name of the person that this contract was with

11    in the top paragraph?

12    A.  Jane Thompson.

13    Q.  And where did she live?

14    A.  2293 Keith Street, Southwest, Supply, North Carolina.

15         MR. SOBELMAN:  Ms. Lee, can you please pull up what's

16    in evidence as Government Exhibit 515.  Can you please zoom in.

17    Q.  Special Agent Giattino, what is the date on these email --

18    on this email?

19    A.  Tuesday, March 15, 2016.

20    Q.  What is the subject line?

21    A.  "Jane Thompson."

22    Q.  Who is it from?

23    A.  A1businessconsultations@gmail.com.

24    Q.  Who is it to?

25    A.  Steve@a1businessconsultants.com.

```
 1              MR. SOBELMAN:  And, your Honor, if I may pause for the
 2    jury to read the content of the email.
 3              And, Ms. Lee, if you could just zoom in on the
 4    content?
 5              THE COURT:  All right.
 6              (Pause)
 7    BY MR. SOBELMAN:
 8    Q.  Special Agent Giattino, what is the amount that's listed
 9    here?
10    A.  $149,999.
11    Q.  What is the date right above that?
12    A.  February 4, 2016.
13              MR. SOBELMAN:  Ms. Lee, could you please pull up
14    what's in evidence as Government Exhibit 1313.
15    Q.  Special Agent Giattino, the 1300 series, is that also from
16    Mr. Ketabchi's electronic devices?
17    A.  Yes.
18    Q.  That's Shahram Ketabchi?
19    A.  Yes.
20    Q.  Ms. Lee -- you already did it.
21              Special Agent Giattino, what is the date on this
22    document?
23    A.  April 4, 2016.
24              MR. SOBELMAN:  And I'm going to pause so that the jury
25    can read it.
```

1          (Pause)

2              THE COURT:  Go ahead.  Next question.

3              MR. SOBELMAN:  Your Honor, I note that it is a couple

4      of minutes before 4.  This is a logical point at which to

5      break.

6              THE COURT:  All right.  Let's break, then.

7              Ladies and gentlemen, thank you for your attention all

8      week, Tuesday, Wednesday, Thursday, Friday.  We are going to --

9      as you can see, we are picking up the pace.  Things are coming

10     in appropriately, and next week I'm sure we'll be even more

11     efficient.

12             Enjoy the weekend.  Keep an open mind.  Don't discuss

13     this case with anyone.  And we'll see you by 9:15, please, on

14     Monday.  9:15 a.m.  We'll do a full day.  I don't have any

15     other matters as of now during that day.  Enjoy the weekend.

16             And I think everybody today stayed awake.

17             (Continued on next page)

18

19

20

21

22

23

24

25

Iaqdket6                          Giattino – direct

1            (Jury not present)

2            THE COURT:  You may step down, sir.

3            All right.  Thank you.  9:15 Monday.

4            Enjoy the weekend.

5            MR. SCHMIDT:  Your Honor, may we have a moment?

6            (Pause)

7            Thank you, your Honor.  We have no questions.  We

8    worked it out.

9            THE COURT:  All right.  Enjoy the weekend.

10           (Adjourned to 9:15 a.m., October 29, 2018)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION
 2    Examination of:                          Page
 3    WILLIAM SINCLAIR
 4    Cross By Mr. Schmidt . . . . . . . . . . . 528
 5    Cross By Mr. Paul . . . . . . . . . . . . 588
 6    Redirect By Ms. Fletcher . . . . . . . . . 664
 7    Recross By Mr. Schmidt . . . . . . . . . . 672
 8    ANTHONY GIATTINO
 9    Direct By Mr. Sobelman . . . . . . . . . . 675
10                       GOVERNMENT EXHIBITS
11    Exhibit No.                             Received
12     817   . . . . . . . . . . . . . . . . . 664
13     802   . . . . . . . . . . . . . . . . . 678
14     801   . . . . . . . . . . . . . . . . . 682
15     803, 804 and 805 . . . . . . . . . . . . 688
16     806, 807, 808, 809 and 810 . . . . . . . 690
17     811   . . . . . . . . . . . . . . . . . 694
18     812, 813, 814, 815 and 816 . . . . . . . 696
19     302   . . . . . . . . . . . . . . . . . 702
20     301   . . . . . . . . . . . . . . . . . 704
21     1325, 1001, 1002, 409 and 514  . . . . . 708
22     515, 1128, 1129, 1313  . . . . . . . . . 720
23                       DEFENDANT EXHIBITS
24    Exhibit No.                             Received
25     YGY-9  . . . . . . . . . . . . . . . . . 546
```

1    BS-11    . . . . . . . . . . . . . . . . 552

2    PC-16    . . . . . . . . . . . . . . . . 580

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25