IAT8KET1

1 | UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
2 | --------------------------------------x

3 | UNITED STATES OF AMERICA,

4 |                 v.                          17 Cr. 00243 (SHS)

5 | ANDREW OWIMRIN, a/k/a "Andrew Owens,"
a/k/a "Jonathan Stewart," and
6 | SHAHRAM KETABCHI, a/k/a "Steve Ketabchi,"

7 |                 Defendants.

8 | --------------------------------------x
                                         October 29, 2018
9 |                                       9:20 a.m.

10 | Before:

11 |                    HON. SIDNEY H. STEIN,

12 |                                        District Judge
                                            and a jury
13 |
                         APPEARANCES
14 |
GEOFFREY S. BERMAN
15 |      United States Attorney for the
         Southern District of New York
16 | KIERSTEN A. FLETCHER
ROBERT B. SOBELMAN
17 | BENET J. KEARNEY
         Assistant United States Attorneys
18 |
SAM A. SCHMIDT
19 | ABRAHAM J. ABEGAZ-HASSEN
         Attorneys for Defendant Owimrin
20 |
KENNETH A. PAUL
21 | JACOB MITCHELL
         Attorneys for Defendant Ketabchi
22 |
Also Present:
23 |      CHRISTOPHER BASTOS, Detective NYPD and HSI
         CHRISTINE LEE, Paralegal Specialist USAO
24 |      SAMUEL TUREFF, Paralegal

25 |

IAT8KET1

```
1              (Trial resumed; jury not present)

2              THE COURT:  Good morning.

3              The jury were all here in a timely fashion.

4              MR. SCHMIDT:  Your Honor, if I may, I have been in

5    contact with my client, Mr. Owimrin.  He travels by bus.  He

6    leaves very early.  The Lincoln Tunnel apparently was a mess.

7              THE COURT:  And where is he?

8              MR. SCHMIDT:  About ten minutes ago I had an e-mail

9    from him; he was on the A train.  So I assume he is going to be

10   here within ten minutes.  But in the meantime --

11             THE COURT:  Where does he come in, Port Authority?

12             MR. SCHMIDT:  Port Authority.

13             THE COURT:  So he is on the A train.  It could still

14   be 20 minutes, half an hour.  There is nothing we could do.

15             MR. SOBELMAN:  A couple of minutes ago Mr. Schmidt

16   said his client has objections to about 30 of the documents

17   that we expect to offer during Special Agent Giattino's

18   testimony.  If the Court would like to entertain them, I would

19   ask that Special Agent Giattino be excused from the courtroom.

20             THE COURT:  Thank you.

21             I hate to keep the jury waiting.  What can I do for

22   you, Mr. Schmidt?

23             MR. SCHMIDT:  Mr. Hassen is going to discuss this.

24             THE COURT:  It's Mr. Hassen.

25             MR. HASSEN:  We have communicated to the government
```

IAT8KET1

1    several objections to exhibits that they intend to offer

2    through Agent Giattino, and rather than go through them chunk

3    by chunk, as we did last week, we suggested that we go through

4    them here with your Honor.

5            THE COURT:  One by one for 30 documents, is that what

6    you want?

7            MR. HASSEN:  A large number of them the objection is

8    the same, of a broad categorical type.

9            THE COURT:  So we can do it group by group.

10           Go ahead.

11           MR. HASSEN:  If we can bring up 206A.

12           So this is a document relating to Joe Freeland.  The

13   issue is basically the terminology in the chargeback.  We don't

14   have an objection to the existence of the chargeback, but we

15   have an objection to any facts being communicated through the

16   statement.

17           THE COURT:  Who is Joe Freeland and what is this?

18           MR. HASSEN:  This is a chargeback rebuttal form that

19   is between the credit card company and Arash Ketabchi.

20           THE COURT:  Who is Joe Freeland?

21           MR. HASSEN:  Joe Freeland is potentially a government

22   witness.

23           THE COURT:  All right.

24           MR. HASSEN:  So this document is being offered to show

25   the state of mind --

IAT8KET1

1              THE COURT:  Wait.  Let me see what it is.

2              So this is a letter from, I can't see, it says

3      "sincerely."  Who is it from?

4              MR. HASSEN:  I believe it's from the processer.

5              THE COURT:  Who?  Is it from a bank?

6              MR. HASSEN:  Yeah.

7              THE COURT:  It's from the bank to A1 Business

8      Consultants, which is Arash, and it's trying to get information

9      to figure out whether services have actually been rendered to

10     A1, or whether it should, in effect, reverse the credit card

11     charge of somebody.  Is that what it is?

12             MR. HASSEN:  I think that's right.  And again, our

13     issue is not whether -- it's being offered to show the state of

14     mind of Mr. Steve Ketabchi, and we don't have a problem with

15     the document coming in -- assuming Mr. Freeland testifies, we

16     don't have a problem with the document coming in with an

17     instruction that it's only for his state of mind.  Our only

18     issue, for this type of document, is it doesn't come in without

19     the testimony and that the underlying facts that are

20     communicated are limited.

21             THE COURT:  I am not sure I understand.

22             MR. SOBELMAN:  I might be able to provide some

23     clarity.  The entire 200 series of documents are copies of

24     hard-copy documents that were seized during the search of

25     Shahram Ketabchi's apartment.  The government does not propose

IAT8KET1

```
1    that any of those documents come in for their truth.  Your

2    Honor addressed this in the in limine setting and already ruled

3    that the government can put in some amount of

4    chargeback-related documents from Mr. Ketabchi's apartment,

5    that there would be a limiting instruction if the defense

6    requested one, which it sounds like they are, and we consent to

7    that limiting instruction that the documents are not offered

8    for their truth; they are offered for the fact that they were

9    in Shahram's Ketabchi apartment, and that he might have looked

10   at them.

11          These documents that defense just pointed to --

12          THE COURT:  Just one moment.

13          MR. HASSEN:  I would object to the last part of that

14   limiting instruction.

15          THE COURT:  No.  The instruction is only going to be

16   for his state of mind.  They were found in his apartment.  It's

17   for his state of mind.

18          Go ahead, sir.

19          So far there is no issue.  What is the issue?

20          MR. SOBELMAN:  Yes, your Honor.

21          That's the government's view.  These are admissible

22   for Shahram Ketabchi's state of mind and that the objection

23   doesn't have a basis.

24          THE COURT:  I am not sure what the objection is.  It

25   sounds like everyone is agreed, or at least consistent with my
```

IAT8KET1

1    in limine ruling, the 200 series can come in with the

2    instruction to the jury by me that they are not for the truth

3    of what is set forth there, but simply for the state of mind of

4    Mr. Ketabchi.

5              Go ahead.

6              MR. HASSEN:  Our point is that it's prejudicial to our

7    client.

8              THE COURT:  For what, to have that limiting

9    instruction?

10             MR. HASSEN:  If it comes in without testimony from the

11   government witness to establish that underlying fact, that it's

12   more prejudicial to our client because his state of mind is not

13   at issue there and the jury could make the inference about the

14   actual facts.

15             THE COURT:  Well, the instruction, again -- I guess

16   you should do it again.  The instruction will be, it is only

17   for Shahram Ketabchi's state of mind.  That's what the

18   instruction will be, not your client's state of mind.

19             MR. SCHMIDT:  I would add there is no evidence that

20   Mr. Owimrin has ever seen that document.

21             THE COURT:  So that's why it's coming in solely for

22   Shahram Ketabchi's state of mind.

23             MR. SCHMIDT:  For the jury to fully understand that, I

24   think we need to include, and that there is no evidence that

25   Andrew Owimrin has ever seen that document.

1              THE COURT:  Government.

2              MR. SOBELMAN:  We disagree.  This is not no evidence

3      that Andrew Owimrin would not be aware of complaints by

4      salespeople.  To the contrary Mr. Sinclair testified that he

5      would have been aware by these types of complaints.

6              MR. SCHMIDT:  There is no evidence that he has seen

7      any of these documents, that he is aware of complaints maybe,

8      but not that he has seen any of these documents.

9              THE COURT:  I understand your point.  My instruction

10     covers that.  It's only for Shahram Ketabchi's state of mind,

11     and nothing else.

12             What is the next group?

13             That's all the 200 series, sir?

14             MR. SOBELMAN:  Yes.  They identified eight documents

15     in the 200 series, and the government's view is that the

16     argument we just had covers all eight of those documents.

17             MR. SCHMIDT:  They don't cover, I don't believe, all

18     eight of the documents.

19             THE COURT:  What is your next group?

20             Again, the parties have to get control of the paper

21     here.  You have had the whole weekend.

22             MR. SCHMIDT:  The only other one would be 208 of that

23     group, where it is indeed an e-mail that Steve Ketabchi is --

24             THE COURT:  That's what I said.  I know how to

25     pronounce Ketabchi.  Go ahead.

IAT8KET1

1          MR. SCHMIDT:  In the reason code it states "fraud,

2     card absent environment."

3          We do not know who this is about.  The prejudice,

4     therefore, is greater than, when you have a live witness who is

5     actually going to testify on the stand about what happened,

6     that takes away some of the prejudice.  The terms here, indeed,

7     again, the chargeback, whether there is a chargeback we do not

8     object, but we do object to the term "fraud."

9          MR. SOBELMAN:  Your Honor --

10          THE COURT:  Let me read it.

11          Yes, government.

12          MR. SOBELMAN:  This is another hard-copy document that

13     was seized from Shahram Ketabchi's apartment, the same limiting

14     instruction will apply.  The jury will follow that instruction.

15          THE COURT:  Mr. Schmidt, how is this document

16     different from all other documents, as it were?

17          MR. SCHMIDT:  There are a number of documents related

18     to witnesses who have testified or will testify.  So when a

19     witness testifies to the conduct, the fact that there is a

20     document that also reflects that conduct, the prejudice is

21     much, much less, and I think can be solved by a proper

22     instruction.

23          When the person who is making the hearsay statement is

24     not a witness to be called, therefore is an additional person

25     who is making a complaint of fraud, then the prejudice is

IAT8KET1

1  greater.

2           THE COURT:  But isn't that true of all of the 200

3  series?

4           MR. SCHMIDT:  No.  The 200 series are from Diane

5  Weissenberger who has testified.

6           THE COURT:  All the others are from people who have

7  testified?

8           MR. SCHMIDT:  Or are just simply chargebacks that

9  don't provide that much information.

10          THE COURT:  And your concern is that it says fraud?

11          MR. SCHMIDT:  Yes.

12          THE COURT:  Let me take a look.

13          Is this the only one that says fraud?

14          MR. SCHMIDT:  The only one that we have concern about

15  in the 200 series.

16          MR. SOBELMAN:  Your Honor, the government is unclear

17  on what the basis for the defendant's objection is.  It sounds

18  like it could be a 403 objection.

19          THE COURT:  It is a 403 objection.

20          MR. SOBELMAN:  There is no basis to rule differently

21  on an evidentiary ruling such as this, in terms of documents,

22  whether a witness is testifying or not.

23          THE COURT:  On 403, he is concerned about the word

24  "fraud."  I see this as a 403 objection.

25          MR. SOBELMAN:  This document doesn't mention Mr.

IAT8KET1

Schmidt's client, and he is not on the e-mail.  There is no

connection to him, and we are not going to make an argument

that this particular document has any connection to him.

MR. SCHMIDT:  They are not making an argument, but

they are going to be making an argument about the amount of

fraud that existed and they can point then to this.  Indeed, it

does make a difference under 403 if a witness has testified to

actions that equal fraud than a document coming in that simply

repeats or summarizes that action is obviously much less

prejudicial than of another person.

THE COURT:  I am going to make a ruling under 403 that

the probative value here is not substantially outweighed by a

danger of unfair prejudice or confusing the issues.  I am going

to allow the word "fraud" to come in.

Next.

It's simply one word on the box.  The whole case is

about wire fraud and money laundering.  It's not overly

prejudicial.

MR. SCHMIDT:  Your Honor, I believe 237 has the

same -- I am looking for that word.

THE COURT:  How long does the government have -- while

you're looking for the document after the weekend, how long

does the government have with this witness?

MR. SOBELMAN:  Probably an hour to an hour and a half.

THE COURT:  Who is the next witness?

IAT8KET1

1              MR. SOBELMAN:  Jane Thompson.

2              THE COURT:  And tell me who she is and how long she

3    will be.

4              MR. SOBELMAN:  She is a victim, and she will be

5    approximately two and a half hours on direct.  She is the

6    victim that had the $150,000 fraud amount.

7              THE COURT:  Well, that may be today.

8              What is the projection for the government to rest its

9    case?

10             MR. SOBELMAN:  We are currently evaluating what, if

11   any, witnesses we can cut that we were planning to call, both

12   in light of the way the trial has gone and also the length

13   which we did not expect.  We are hoping to rest Wednesday, but

14   that will depend on how today goes of course.

15             THE COURT:  Today will go very efficiently.

16             What other documents do we have, sir, that you're

17   concerned about?

18             MR. SCHMIDT:  238, page 2, your Honor.

19             THE COURT:  Mr. Sobelman, I didn't mean to cut you

20   off, sir.  You were talking.

21             MR. SOBELMAN:  That's fine, your Honor.

22             THE COURT:  Let me see 238.

23             This is also in the 200 series.

24             MR. SCHMIDT:  Yes.

25             MR. SOBELMAN:  The government's position is the same.

IAT8KET1

```
1          THE COURT:  Let me read it.
2          Mr. Schmidt, this does look like more of the same.
3   This is in the 200 series.  It's going to come in that it's not
4   for the truth of what is set forth.  The government is not
5   going to be reading this to the jury.  It's only for the state
6   of mind of Shahram Ketabchi.  What is the issue?
7          MR. SCHMIDT:  I understand, your Honor.  However, the
8   salespeople for the company include Mr. Owimrin.  So when there
9   is talk about what kind of false promises were made by A1, that
10  includes Mr. Owimrin.  This person is not available to
11  cross-examine.
12         THE COURT:  So this is the same objection that we have
13  been dealing with.
14         MR. SCHMIDT:  Yes.
15         THE COURT:  Same ruling under 403.
16         MR. SCHMIDT:  I can add something else important, your
17  Honor, to this.  We have found complaints made by certain
18  customers relating to promises of money coming in that deal
19  with merchant processing, which is not something that the
20  companies that Mr. Owimrin work for did, but the companies
21  before them who were involved in fraud did.
22         THE COURT:  Mr. Schmidt, juries do follow instructions
23  of the judge and this is going to come in solely for the state
24  of mind of Shahram Ketabchi.  Under 403, I am making the same
25  finding.
```

IAT8KET1

1          MR. SCHMIDT:  It's coming in for the state of mind

2    because it says salesmen at A1 are falsely giving promises of

3    return investments.

4          THE COURT:  It's coming in for the state of mind

5    because it was found in his apartment.

6          End of discussion, sir.  We are moving on.  I am

7    making a 403 ruling that its probative value is not

8    substantially outweighed by a danger of unfair prejudice.

9          MR. SCHMIDT:  We move to 401.

10         THE COURT:  How many more do we have of these?

11         MR. SOBELMAN:  We will withdraw 401.

12         THE COURT:  Withdrawn.

13         Next.

14         The government may be well put to take that position.

15   Remember, I said I don't want to scores and scores of documents

16   solely for state of mind.

17         MR. SOBELMAN:  Yes, your Honor.  We have slimmed it

18   down substantially after your Honor's ruling.

19         MR. SCHMIDT:  Your Honor, 428 and 429.  Both of those,

20   we believe that these are not only prejudicial 403, but they

21   are statements not made in furtherance of the conspiracy.

22         THE COURT:  Let me see it.

23         It's during the time period, November 2015, but you're

24   saying it's not in furtherance of.  Is that your position?

25         MR. SCHMIDT:  That is correct.

IAT8KET1

1          THE COURT:  Let me read it.

2          It's from somebody with one of the card companies, is

3   that it?

4          MR. SCHMIDT:  Yes.

5          THE COURT:  And it's to Shahram and Arash.

6          MR. SCHMIDT:  That is correct.  I don't believe that

7   Heidi from the US Card System has been found to be a member of

8   the conspiracy.

9          THE COURT:  Well, she's not.

10          MR. SOBELMAN:  That's not the government's position.

11   The government's position is that she is a member of the

12   conspiracy for these purposes.

13          THE COURT:  Wait.  I thought she is at one of the card

14   companies.

15          MR. SOBELMAN:  Yes, your Honor, and she is knowingly

16   facilitating the fraud.

17          THE COURT:  What is the evidence of that?

18          MR. SOBELMAN:  We have had several e-mails which are

19   in evidence, which I can point your Honor to, that are evidence

20   that she aware of the nature of the fraud.  There were e-mails

21   where she says, Well, We told the credit card company it was

22   company one, but really it's company two.  We have to be

23   careful to make sure we get our lies straight.  Not in those

24   words, but that's the takeaway.

25          THE COURT:  Go ahead, Mr. Schmidt.

IAT8KET1

1          MR. SCHMIDT:  It wasn't in those words because that

2    was not what was said.  What was basically said is that, if you

3    have a sale for one company, you can't process the sale using

4    two companies.  That will cause you problems.  It won't go

5    through.  If you're going to have two sales --

6          THE COURT:  Was she acting on behalf of MasterCard?

7    Who is she acting on behalf of it?

8          MR. SCHMIDT:  Apparently, there are processers who

9    have agreements with actual credit card companies.

10          THE COURT:  Processers who handle it for MasterCard.

11          Now that you say that, I do remember things from her

12    in evidence.

13          MR. SCHMIDT:  But there are warnings that you can't do

14    it this way, otherwise it will not be processed, which is not

15    sufficient to put her in the conspiracy.

16          THE COURT:  OK.  Let me take a look -- what is the

17    government's position on that?

18          MR. SOBELMAN:  We strongly disagree.  We think that

19    the e-mails, and we ask bring them back up --

20          THE COURT:  Under *Bourjaily*, there does have to be a

21    prima facie showing of participation in the conspiracy.

22          MR. SOBELMAN:  We think Mr. Sinclair's testimony about

23    her role, the e-mails that are already in evidence, as well as

24    the e-mails we intend to offer, more than surpass that prima

25    facie showing that she was a member of the conspiracy.

IAT8KET1

1        THE COURT:  Can somebody pull up easily Sinclair's

2    testimony about it?

3        MR. SOBELMAN:  We will make an effort.  I will also

4    pull up the exhibits that are already in evidence.

5        MR. SCHMIDT:  If I recall, the testimony that Mr.

6    Sinclair had concerning the processing was that these were, the

7    companies were high-risk processers.

8        Now, there are some companies, there's no question --

9        THE COURT:  High-risk processer, did he say what that

10    meant?

11        MR. SCHMIDT:  I don't know.

12        MR. SOBELMAN:  Yes, your Honor.

13        MR. SCHMIDT:  I am assuming it's because there's more

14    chargebacks.

15        THE COURT:  It's a company -- I am making this up --

16    hired by MasterCard to handle paperwork for chargebacks from

17    merchant accounts that have a lot of chargebacks?

18        MR. SOBELMAN:  Your Honor, may I try to offer some

19    clarity?  Mr. Schmidt is saying he's assuming.  I actually know

20    based on my work in this case.

21        The US Card System's company that Ms. Brownfield

22    worked for is a middleman.  It's an independent company.  It's

23    not a subsidiary or agent of MasterCard.  It's an independent

24    company.  They work in a high-risk space.  Mr. Sinclair

25    testified that the high-risk space deals with companies like

IAT8KET1

1    his that have an extraordinarily high rate of chargebacks.  And

2    the e-mails and his testimony, we think, made clear that she

3    was involved in helping them game the system in order to --

4              THE COURT:  That's what I want to take a look at.  So

5    if you can get me Sinclair's testimony on that and/or I will

6    look at your documents.  But somebody from the Owimrin team,

7    Mr. Schmidt, perhaps your paralegal, should try to contact Mr.

8    Owimrin and see what his status is.

9              Mr. Owimrin is behind the computer screen.  Welcome,

10   sir.  I apologize to you for not seeing you there.

11             MR. SCHMIDT:  Should we move on to the other ones?

12             MR. SOBELMAN:  I will actually put up the transcript.

13   We have it ready.

14             We want to put up page 372 of the transcript.

15             Your Honor, I am not sure if you have an exhibit

16   binder in front of you, but also Exhibit 407 is one of the

17   e-mails that's already in evidence.

18             THE COURT:  We don't have that binder.

19             Let me read 371.  It's up.

20             Give me the bottom of 371.

21             372.

22             Is Sinclair reading from -- is it 407 that's being

23   referenced on 372?

24             MR. SOBELMAN:  Yes, your Honor.

25             THE COURT:  I am reading Government Exhibit 407.

IAT8KET1

1          This is from Heidi to Arash and Olive Branch.

2          Mr. Schmidt, isn't the government right at least for

3     *Bourjaily* purposes?  He or she is saying, "Considering that the

4     account was ordered closed by MasterCard, it wasn't because we

5     were able to throw Element under the bus."  It certainly

6     suggests she is part of the conspiracy.

7          "It probably wasn't the best idea to settle the

8     largest batch you've ever had.  Lots of red flags going off

9     there."  She is warning, as it were, Arash and Olive Branch

10    Marketing.

11         MR. SCHMIDT:  Your Honor, the chargebacks themselves

12    have not been proven to be means that there is a fraud.

13         THE COURT:  I agree, but she says, "It wasn't because

14    we were able to throw Element under the bus."

15         I am finding, for *Bourjaily* purposes, she is a member

16    of the conspiracy and this is in furtherance and in the course

17    of the conspiracy for 801(d)(2)(E).

18         That handles what number, sir?

19         MR. SCHMIDT:  428 and 429.

20         THE COURT:  All right.

21         Next.

22         MR. SCHMIDT:  451, your Honor.

23         451 is an e-mail where I believe one of the witnesses

24    lists Arash Ketabchi.  The lists are Excel files.  This exhibit

25    has like 12 huge Excel files, with hundreds or thousands of

IAT8KET1

1    names, that is impossible for us to review to understand what

2    the purpose of that exhibit is.  If the purpose is to show that

3    Ms. Marcus is e-mailing Arash Ketabchi lead lists, the e-mail

4    is sufficient for that purpose.

5           So on due process grounds, because there is no way to

6    defend something as huge and somewhat purposeless than that, we

7    have an objection to the attachments.

8           Now, if the government comes up with a specific reason

9    why something in there is particularly important and relevant,

10   then I may have to revisit that, but as of this time, I can't

11   possibly know what the purpose is of having all of those --

12          THE COURT:  Understood.

13          Government.

14          MR. SOBELMAN:  The purpose for which we choose to use

15   an exhibit is not an objection; it's not a basis for an

16   objection.

17          THE COURT:  Correct.  What is the purpose for which

18   you intend to use this exhibit?

19          MR. SOBELMAN:  Your Honor, these are lead lists --

20          THE COURT:  Yes.

21          MR. SOBELMAN:  We can reconsider whether to offer them

22   or not.  If the defense is going to stick to their objection

23   that they are so long that they couldn't review them, they have

24   had them for months, if not years.

25          THE COURT:  No.

IAT8KET1

|    |    |
|----|----|
| 1 | MR. SOBELMAN:  These are lead lists that were passed |
| 2 | from one member of the conspiracy to another. |
| 3 | THE COURT:  Why do you need the lead lists in?  You're |
| 4 | going to get in the exhibit just without the attachments. |
| 5 | MR. SOBELMAN:  We won't offer it today.  We can |
| 6 | discuss whether they are necessary or not. |
| 7 | THE COURT:  Next. |
| 8 | MR. SCHMIDT:  Your Honor, 511 and 512. |
| 9 | THE COURT:  I think you had four exhibits.  We are now |
| 10 | up to about eight.  How many more do you have? |
| 11 | MR. SCHMIDT:  We have many more than that. |
| 12 | THE COURT:  To go? |
| 13 | MR. SCHMIDT:  I think we have four more after this. |
| 14 | THE COURT:  All right. |
| 15 | MR. SCHMIDT:  This one -- |
| 16 | THE COURT:  Ms. Blakely, tell the jury we apologize. |
| 17 | We are handling legal matters and we will be with them shortly. |
| 18 | MR. SCHMIDT:  We will skip that one.  We will not |
| 19 | oppose that one being entered. |
| 20 | 109 -- excuse me, 1009. |
| 21 | Your Honor, 1009, we believe these are statements that |
| 22 | are banter that is not in furtherance of the conspiracy. |
| 23 | MR. SOBELMAN:  They are statements of a defendant. |
| 24 | MR. SCHMIDT:  It still has to be in furtherance of the |
| 25 | conspiracy. |

IAT8KET1

1           MR. SOBELMAN:  No.  801(d)(2)(A).

2           THE COURT:  I will look at 801(d)(2)(A), but it's

3     statements of an adverse party, sir.

4           Let me look at 801(d)(2)(A).

5           MR. SCHMIDT:  Your Honor, it's apparently between

6     Arash and -- it's about Arash -- between Arash and Shahram and

7     they are talking about Andrew.  That's hearsay.

8           MR. SOBELMAN:  This is both 801 -- yes, your Honor.

9           THE COURT:  Sir, 801(d)(2)(A), a statement that meets

10    the following conditions is not hearsay:

11          (2) the statement is offered against an opposing

12    party.  The government is offering it against your client.  And

13    (A) was made by the party in an individual capacity.

14          Why isn't that the end of the inquiry?

15          MR. SCHMIDT:  Because it's hearsay against my client.

16    My client did not make the statement.

17          MR. SOBELMAN:  This also falls under 801(d)(2)(E).

18          THE COURT:  What are they saying here?

19          MR. SOBELMAN:  They are talking about sales and how

20    Andrew is happy about the amount of sales he has made.  These

21    are comments being made in furtherance and during and in

22    relation to the conspiracy.

23          MR. SCHMIDT:  It's not in furtherance.  It's not that

24    every single statement made by two conspirators are in

25    furtherance of the conspiracy.  It doesn't further anything

IAT8KET1

1    that Andrew is happy.

2              THE COURT:  Just a moment.

3              I don't know that this adds anything.  I will strike

4    this section.

5              Go ahead.

6              MR. SOBELMAN:  Your Honor, may I have a moment to

7    confer with co-counsel on this issue.

8              THE COURT:  Yes.

9              That section doesn't do anything for anybody.

10             MR. SOBELMAN:  Your Honor, this conversation is about

11   Arash Ketabchi and Shahram Ketabchi talking about Andrew making

12   sales and then later in the conversation how they are going to

13   hold on to that money through their use of the merchant

14   accounts and contracts.  These are plainly in furtherance of

15   the conspiracy.

16             If it's 801(d)(2)(E), then there is no concern about

17   which party it's being offered against because they are both

18   members of the same conspiracy.

19             MR. SCHMIDT:  Perhaps we could just take out the two

20   lines that relate to Andrew.

21             MR. SOBELMAN:  We understand that this might be

22   damaging evidence to Mr. Owimrin's case, but that's not a

23   hearsay bar.

24             THE COURT:  I don't see it much one way or the other

25   in terms of damage.

IAT8KET1

1          MR. SOBELMAN:  Mr. Schmidt can make whatever argument

2     he wants to the jury, but the fact is this is not hearsay.

3          MR. SCHMIDT:  That part of the conversation is not in

4     furtherance.  It's simply banter between two people.

5          THE COURT:  "I just hope they don't hold our money.

6     These merchant accounts can get funny."

7          MR. SOBELMAN:  What this shows is Mr. Shahram Ketabchi

8     is fighting the chargebacks that are being caused by Andrew

9     Owimrin's sales.  And this is evidence that they are indeed

10    co-conspirators.

11         THE COURT:  I think the government has changed my

12    mind, Mr. Schmidt.  Under 801(d)(2)(E) it does come in.  It's

13    central actors.

14         Move on.

15         MR. SCHMIDT:  Your Honor, 1126.

16         MR. SOBELMAN:  Your Honor, perhaps I can short-circuit

17    this.  This is the same knowledge argument we are going to have

18    with relation to the 200 series.  The 1100 series are all

19    documents that were removed from one of Shahram Ketabchi's

20    electronic devices.  We are happy to consent to the same

21    limiting instruction.

22         THE COURT:  Mr. Schmidt.

23         MR. SCHMIDT:  The same position that we have had

24    before, your Honor.

25         THE COURT:  Somebody should read this to me rather

IAT8KET1

1      than have me try to translate it on the screen.

2              "Elizabeth."

3              Go ahead.  Who wants to read it?  The Court will.

4              "I have the records of most of the contact names of

5      companies, their phone numbers and some personal cell phone

6      numbers.  I have sent $11,000 and the $180 for state licenses.

7      Now they want a total of $22,500 for more license and more

8      contacts.  I have told them no more money until I get contacts

9      before I send them any more money.  Also went to my bank,

10     closed all of my personal banking and credit card cards so they

11     have no access to my accounts.  Let me know how things stand.

12     Send me the complaint form."  And there is a signature.

13             This is found in Shahram's apartment, is that it?

14             MR. SOBELMAN:  It's on one of his electronic devices,

15     your Honor.

16             THE COURT:  Same instruction.

17             Move on.

18             MR. SCHMIDT:  The only thing we have left, just so the

19     record is clear, we also have objections to 1216, 1217, 1218,

20     1219 and 1131 for the same reasons.

21             THE COURT:  Well, have we covered the 1200 series?

22     It's the same, is that what you're saying?

23             MR. SOBELMAN:  The 1100, 1200 and 1300 series are all

24     from electronic devices that were seized from Shahram

25     Ketabchi's apartment.  The government's position is the same.

IAT8KET1

1            THE COURT:  Same ruling.

2            Bring the jury in.

3            (Continued on next page)

IAT8KET1                        Giattino - Direct

1              (Jury present)

2       ANTHONY GIATTINO, resumed.

3              THE COURT:  Please be seated in the courtroom.

4              Ladies and gentlemen, thank you all for being here.

5       You were and have been and it's appreciated.  We were actively

6       handling legal matters.  So I apologize for that time you were

7       waiting, but I assure you it has helped expedite the

8       presentation of evidence here, and we are moving forward and we

9       will have a full day of an efficient presentation of proof.

10              Government, you may continue with the direct

11       examination.

12              Mr. Giattino, sir, you understand you remain under

13       oath, correct?

14              THE WITNESS:  Yes.

15              THE COURT:  Proceed.

16              MR. SOBELMAN:  Ms. Lee, can you please pull up a copy

17       of what is in evidence as Government Exhibit 1128.

18       DIRECT EXAMINATION Cont'd)

19       BY MR. SOBELMAN:

20       Q.  Special Agent Giattino, do you recall being shown this

21       document on Friday?

22       A.  Yes.

23       Q.  A couple of questions about a couple of the documents we

24       saw on Friday and then we will move on to some new ones.

25              Did you have an opportunity to view the original

1   digital version of this document?

2   A.  Yes.

3   Q.  As it was removed from Shahram Ketabchi's electronic

4   device?

5   A.  Yes.

6   Q.  What format was this document?

7   A.  It was in Word format.

8   Q.  What is Word format?

9   A.  Microsoft Word is a program where you can create or edit

10  documents.

11          MR. SOBELMAN:  Ms. Lee, can you please put up

12  Government Exhibit 1129.

13  Q.  Same question with respect to this document.

14  A.  Yes.  I remember it, and I saw this in its native format,

15  which was a Word document as well.

16          MR. SOBELMAN:  Ms. Lee, can you please put up

17  Government Exhibit 1313.

18  Q.  Same question with respect to this document.

19  A.  Yes.  I did see this document in its Word format.

20          MR. SOBELMAN:  Ms. Lee, can you please show --

21          The government offers the next group of documents,

22  which are Government Exhibits 246, 414, 421, 1011, 1013, 1014,

23  1018, 1137, 1139, 1140, and 1141.

24          THE COURT:  You included documents in the 1000 series.

25  Is that the same as the 200 and 1100 series for purposes of

1    instructions or no?

2                 Mr. Hassen.

3                 MR. HASSEN:  I am just looking at the numbers.

4                 MR. SOBELMAN:  No, your Honor.  The 1000 series are

5    text messages that we are offering for their truth.

6                 THE COURT:  Are you offering what you have said into

7    evidence at this point?

8                 MR. SOBELMAN:  Yes, your Honor.

9                 THE COURT:  For the 200 series documents and the 1100

10   series documents, I am admitting those, ladies and gentlemen,

11   not for the truth of what is set forth there, but simply for

12   the state of mind of Shahram Ketabchi.  All right.  Only for

13   Shahram Ketabchi's state of mind.

14                The 1000 series are simply being admitted without

15   objection.

16                (Government's Exhibits 246, 414, 421, 1011, 1013,

17   1014, 1018, 1137, 1139, 1140, and 1141 received in evidence)

18                (Continued on next page)

19

20

21

22

23

24

25

1    Q.  Ms. Lee, pull up now in evidence as Government Exhibit

2    1011.

3              Special Agent Giattino, are these similar to text

4    messages we looked at on Friday?

5    A.  Yes.

6    Q.  Can we read them and please play the same roles as we did

7    before, which is if you can be Shahram Ketabchi, which are the

8    outgoing messages, and I will be Arash Ketabchi, which are the

9    incoming messages.  Before we do that, can you read the date on

10   these?

11   A.  Sure.  The date is October 20th, 2015.  Making new sales

12   guy, get 15 percent.  Okay.  Again you get email and mailing

13   address.

14   Q.  Not maybe they get 12 percent max out at 15 percent?

15   A.  Okay.

16   Q.  Send him 20 percent, 5 percent of MM Miller deal?

17   A.  So Andrew and Reagan, special family cut.

18   Q.  $14,995.00.  And they have been getting that and older in

19   business.  I'm hooking them up.

20   A.  Okay.  Tomorrow when funds ready let me know and I will

21   process $3,748.75 to come pass, the $3,748.75.

22   Q.  I barely make money after 17 percent to sales, 16 percent

23   merchant, 10 percent fulfillment, 25 percent lead source what's

24   left of 15 K?  And appointment setter and regular overhead

25   stuff.

1   A.  $4,800 your cut after those percentages on a $15,000 deal.

2   Q.  Won charge-back on debt.

3   A.  Well, we have to fight them and win.  That is where

4   computer and Youngevity come into all other protocols.

5   Charge-backs are inevitable.

6   Q.  Ms. Lee, please put up Government Exhibit 1013.  What is

7   the date on these text messages?

8   A.  October 21st, 2015.

9   Q.  Let's read the same roles.  You can be Shahram Ketabchi

10  which is outgoing, and I'll be Arash Ketabchi, which is

11  incoming.

12  A.  We need to set up two more 800 numbers for new d/b/a for

13  Ray, ring central.

14  Q.  Use same ones.  Don't waste money.

15  A.  We can do that but if they search, they will see link and

16  no go.  What do you think?

17  Q.  That's true?

18  A.  Merchant account no go then C.  Broski, we need to have $1

19  million a month merchant credit lines and they may deposit.

20  Thank you.  Once you add 10 more salesmen, better than Andrew

21  and Reagan, boom.

22  Q.  Special Agent Giattino, just remind us what these black

23  diamonds with the question marks in the middle signify?

24  A.  Yes, these are the emojis and this is like the software,

25  just like a place-holder for what were emojis in the original

IATJKET2                          Giattino – direct

1    format.

2                THE COURT:  So the jury can't see, we don't know what

3    the original emojis were.  Is that right?

4                THE WITNESS:  Yes, sir.

5    BY MR. SOBELMAN:

6    Q.  Ms. Lee, please pull up Government Exhibit 414 and if you

7    could zoom in.  Special Agent Giattino, what is the date on

8    this email?

9    A.  October 21, 2015.

10   Q.  What is the subject line?

11   A.  $4,000 retrieval for A1.

12   Q.  Who is it from?

13   A.  Positive faith at Gmail dot com.

14   Q.  Who is it to?

15   A.  ID at U.S. card system dot com.

16   Q.  Please reads these emails.

17   A.  High Heidi/Arash and Bill were working together previously,

18   any retrievals before 6-20-2015, please discuss with Bill but

19   let us know -- sorry, let us know first he can respond

20   accordingly?  Also how much of a monthly volume increase have

21   we been granted this month.  Can we use it today?  Thank you.

22   Q.  Who is it signed by?

23   A.  Steve.

24   Q.  Ms. Lee, can you please pull up Government Exhibit 1014.

25               What are the date on these text messages?

1   A.  Also October 21st, 2015.

2   Q.  Let's read the same roles.  You can be outgoing, which is

3   Shahram Ketabchi, and I'll be incoming, which is Arash

4   Ketabchi.

5   A.  Okay.  It began you give me two addresses not linked to A1

6   for d/b/a's.

7   Q.  Yours?

8   A.  In New Jersey where they are registered.

9   Q.  Hum, why would a d/b/a need separate address plus why can't

10  we use UPS address?

11  A.  For web when they check is you.  We need to show legitimacy

12  because UPS is already with A1.  We can add UPS new.  Once we

13  open accounts, we can always close them down again but

14  different UPS store not Burdan, Burdan like A1.  Once we get

15  merchant accounts open, we can.  Maybe Andrew or Reagan's

16  address.

17  Q.  Yes ask them but they opened LLC, too.

18  A.  Well for merchant.  They may get accounts for same banks,

19  so no.

20  Q.  Yes.

21       Ms. Lee, please pull up Government Exhibit 421 and

22  zoom in on the middle.  Special Agent Giattino, what is the

23  date on this email?

24  A.  October 28th, 2015.

25  Q.  What is the subject line?

IATJKET2                         Giattino - direct

1    A.  Increase of account balance limit.

2    Q.  Who is it from?

3    A.  Positive faith at Gmail dot com.

4    Q.  Who is it to?

5    A.  Admit at U.S. Card System dot com and Heidi at U.S. Card

6    System dot com.

7    Q.  Who is on the CC?

8    A.  Ketabchi dot Arash at gmail dot com.

9    Q.  Please read this email.

10   A.  Hi, Michael and Heidi.  Can you please give us the status

11   of our pending volume increase.  Thank you.

12   Q.  Who is it signed by?

13   A.  Steve.

14   Q.  Let's take a look at Page 3 of this document.  Zoom in on

15   the email.  What is the date on this email?

16   A.  October 23rd, 2015.

17   Q.  Five days before the email we just read?

18   A.  Yes.

19   Q.  Who is it to?

20   A.  Heidi Brownfield.

21   Q.  Who is it from?

22   A.  Steve K.

23   Q.  Who is on the CC?

24   A.  Arash Ketabchi and Michael Wigdore.

25   Q.  What is the subject line?

1    A.  Increase account balance limit.

2    Q.  What is the importance?

3    A.  Hi.

4    Q.  Please read this email.

5    A.  Hello, Heidi.  We just charged $7,500 and it was declined

6    due to an insufficient balance left on the account this month.

7    Can you please have our limits adjusted immediately as we

8    discussed previously with Jay to have the gateway lifted so we

9    can make ours -- make our sale and not lose business.  Please

10   confirm.  Thank you.

11   Q.  Who is it signed by?

12   A.  Steve.

13   Q.  Ms. Lee, please pull up Government Exhibit 246.  Zoom in on

14   the top half.  What is the date on this email?

15   A.  October 30, 2015.

16   Q.  Who is it from?

17   A.  Steve at A1 Business Consultants dot com.

18   Q.  Who is it to?

19   A.  IRJ 2315 at Gmail dot com.

20   Q.  What is the subject line?

21   A.  A1 email data.

22   Q.  Please read the handwriting on the right side.

23   A.  Sure.  One, My brother and mine only on our comps.  Two,

24   delete my mail from what comp it's on and then the No. 3.

25   Q.  Can you please read the sentence that is under email set up

1  and who's computer it goes on.

2  A.  Please use the actual email address as what customers will

3  see for the business emails and use the full names as the

4  header for the sales team.

5  Q.  And what is listed beneath.  Please read it.

6  A.  Their names, Zack Peterson, Connor Swanson, Jonathan

7  Stewart, Sophia Lopez, Jen Hughes.

8  Q.  Ms. Lee, please zoom in on the bottom half of the page.

9           Next to Zack at A1 Business Consultants dot com, who

10  whose name is listed?

11  A.  Arash.

12  Q.  Please lee please take a look at Page 2 of this document.

13  Please zoom in on the top half.

14           Next to Jonathan at A1 Business Consultants dot com,

15  whose name is listed?

16  A.  Andrew.

17  Q.  Ms. Lee, can you please pull up Government Exhibit 1018.

18           What is the date on these text messages?

19  A.  January 26th, 2016.

20  Q.  Let's read them with the same roles, I'll be Arash

21  Ketabchi, which is incoming, and you can be Shahram Ketabchi,

22  which is outgoing.

23  A.  Nothing in this.  He is waiting.

24  A.  No number here.  Plus waiting for new LLC to apply for new.

25  A1 on blacklist.  You're --

IATJKET2                    Giattino - direct

1   Q.  Our on blacklist?

2   A.  Galgano said his bank saw our closed in so for yes that is

3   why he couldn't open.  Best chance for A1 is international.  If

4   Graham says same, then we know again.

5   Q.  9737229342 Chris Reynolds.  Ms. Lee, please pull up

6   Government Exhibit 1139.

7           Special Agent Giattino, generally what do we see on

8   this exhibit?

9   A.  It looks like bank information, bank account information.

10  Q.  What is the entities or names listed under recipient for

11  each of these three?

12  A.  A1 Business Consultants, LLC for the first two.  The last

13  one is Arash Ketabchi.

14  Q.  Ms. Lee, please show show us the second page.  The same

15  question.

16  A.  The recipient in the first box is Arash Ketabchi.  The

17  second, in the second box, it is Dashes Salon, LLC and then in

18  the third, the recipient is Elevated Business Consultants, LLC.

19  Q.  Ms. Lee, please take a look at the last page, the third

20  page.  The same question.

21  A.  The recipient here is Arash Ketabchi.

22  Q.  Ms. Lee, please pull up Government Exhibit 1137.  Zoom in

23  on the top half.  Can you please read the title of this

24  document?

25  A.  Product and services agreement with A1 Business Consultants

1    LLC.

2    Q.  Is there a date listed on this document?

3    A.  No.

4    Q.  Is there a name of a person that is engering into a

5    contract listed?

6    A.  No. .

7    Q.  Is there an amount listed on this document?

8    A.  Sorry?

9    Q.  Is there an amount for the contract listed?

10   A.  No.

11   Q.  Ms. Lee, please go to the third page.  Is there a signature

12   here?

13   A.  No.

14   Q.  Or a date?

15   A.  No.

16   Q.  Or credit card number?

17   A.  No.

18   Q.  Ms. Lee, please put up Government Exhibit 1140.  Zoom in so

19   it can be read.  Pause for the jury to read it.

20            (Pause)

21        Are there any specifics listed in this document,

22   Special Agent Giattino?  By that I mean a name, an address,

23   credit card number?

24   A.  No.

25   Q.  Are you familiar with a template?

IATJKET2                          Giattino - direct

1    A.  Yes.

2    Q.  What is a template?

3    A.  A template is kind of a, I want to use the word go-by.  It

4    is a format for you to kind of just put in the specifics as you

5    know them.

6    Q.  Based on your review of those two documents, do they seem

7    like templates to you?

8    A.  Yes.

9    Q.  Ms. Lee, please put up Government Exhibit 1141.

10           Special agents Giattino, would you please read the

11   title on this document?

12   A.  Refund authorization form.

13   Q.  Are there any particular customer's information filled out

14   on this form?

15   A.  No.

16   Q.  Is this also a template?

17   A.  It appears to be one, yes.

18           MR. SOBELMAN:  At this time, the government offers

19   Government Exhibit 229, 243, 416, 1212 and 1213.

20           THE COURT:  Admitted subject to the sidebar.

21           (Government's Exhibits 229, 243, 416, 1212 and 1213

22   received in evidence)

23           THE COURT:  Ladies and gentlemen, these documents also

24   are being given to you not for the truth of what is set forth,

25   but for a limited purpose; namely, for the state of mind of

1    sham or Steve Ketabchi.  Proceed.

2              MR. SOBELMAN:  Just to clarify, that is with respect

3    to the 200 series and the 1200 series, but the Government

4    Exhibit 416, the government's view is that did not apply to

5    that document.

6              THE COURT:  416 is simply being admitted.

7    BY MR. SOBELMAN:

8    Q.  Ms. Lee, please put up Government Exhibit 1212.  Please

9    zoom in on the top half of the page.

10             Special Agent Giattino, what is the title of this

11   document?

12   A.  Product and Services Agreement with A1 Business Consultants

13   LLC.

14   Q.  Would you please read the date on this document.

15   A.  October 7th, 2015.

16   Q.  What is the company listed here?

17   A.  A1 Business Consultants, LLC.

18   Q.  Can you please read the amount of money listed under

19   products and services?

20   A.  $14,495.00.

21   Q.  What are the services provided listed under services

22   provided?

23   A.  Business plan, Corp. Credit.

24   Q.  Just to refresh our memories, the stipulations we looked at

25   on Friday, did they state that the 1200 series are all

1    documents taken from Mr. Ketabchi's electronic devices?

2    A.  Yes.

3    Q.  Go to Page 3 of this document.  When I say "Mr. Ketabchi,"

4    I, of course, mean Shahram Ketabchi.

5             Is there a signature on this?

6    A.  Yes.

7    Q.  Whose name is that?

8    A.  Diane Weissenberger.

9    Q.  What is the date on the document?

10   A.  The date, I am sorry, October 7th, 2015.

11   Q.  And at the bottom of the page, what amounts of money are

12   being charged?

13   A.  $7,495.00 and $7,000.

14   Q.  Ms. Lee, please put up Government Exhibit 229.

15             Special Agent Giattino, with respect to this

16   stipulation, is the 200 series are hard-copy documents that

17   were removed by your team from Shahram Ketabchi's apartment?

18   A.  Yes.

19   Q.  Can you please read the name that is listed in the shipment

20   from?

21   A.  A1 Business Consultants, LLC.

22   Q.  Can you please read the name that is listed under extremely

23   urgent delivery to?

24   A.  Diane Weissenberger.

25   Q.  What is the city and state listed for Ms. Weissenberger?

IATJKET2                    Giattino - direct

1   A.  Indianapolis, Indiana.

2   Q.  What is the date listed on the very bottom right of the

3   document under date of shipment?

4   A.  It looks like October 12th, 2015.

5   Q.  Ms. Lee, can you please put up Government Exhibit 411.

6           What is the date on this email?

7   A.  October 19th, 2015.

8   Q.  What is the subject line?

9   A.  Document request for A1 Business Consultants, LLC.

10  Q.  Who is it from?

11  A.  Positive faith at Gmail dot com.

12  Q.  Who is it to?

13  A.  Heidi at U.S. Card System dot com.

14  Q.  Who is on the CC?

15  A.  Ketabchi dot Arash at gmail dot com.

16  Q.  Please read this email.

17  A.  Dear Heidi, as per your request, attached is Diane

18  Weissenberger's sales contract.  Also we have an agreement to

19  have our commissions lowered 6 percent from 17 percent.  Can

20  you please have all the sales from this agreement date credited

21  back to our account ASAP.  Please confirm reception.  Thank

22  you.  PS:  Please make sure Bill Sinclair is never CC'd again.

23  Best of health, Steve.

24  Q.  Ms. Lee, please put up Government Exhibit 243.  Special

25  Agent Giattino, what is the date that is written on the top of

1    this document?

2    A.  October 23rd, 2015.

3    Q.  Can you please read the dates and names and amounts that

4    are listed below that.

5    A.  Sure.  October 7, Ida, $8,999.00.  October 7, Diane,

6    $14,495.00.  October 12, Patricia, $9,995.00.  October 15,

7    Linda, $7,495.00.  October 15, Emma, $14,995.00.  October 15,

8    Charlene, $19,995.00.

9    Q.  Take a look at the bottom half of the page.  Read the

10   amount listed next to Andrew.

11   A.  $5,618.29.

12   Q.  What is underneath that?  It looks like 10 slash 14 Ida.

13        What is the number to the right of that?

14   A.  $4,950.00.

15   Q.  What does it say after that?

16   A.  "Upset."

17   Q.  There is an arrow pointing to two names circled.  What are

18   those names?

19   A.  Reagan and Andrew.

20   Q.  What are the amounts next to those?

21   A.  $217.00 next to each name.

22   Q.  Take a look at Page 2.  Can you please read the names and

23   amounts listed here?

24   A.  Yes.  It says Reagan, $5,835.29; Andrew, $5,835.29.

25   Q.  Ms. Lee, please put up Government Exhibit 416.

1          Special Agent Giattino, what is the date on this

2   email?

3   A.  October 23rd, 2015.

4   Q.  What is the subject line?

5   A.  Pay out First Trend Marketing.

6   Q.  Who is it from?

7   A.  Positive faith at Gmail dot com.

8   Q.  Who is it to?

9   A.  Ketabchi dot Arash at Gmail dot com.

10  Q.  Can you please read this email.

11  A.  October 23, 2015.  Equals pay out First Trend Marketing.

12  Linda Purvis equals 7,000 $7,495.00.  Diane Weissenberger

13  equals $14,495.00.  Charlene Foster equals $19,999.00.  Total

14  sales equals $41,989.00.  Total commission equals $12,600.00.

15  Best of health, Steve.

16  Q.  Ms. Lee, please put up Government Exhibit 1213.  Zoom in on

17  the top half.

18          Special Agent Giattino, what is the company that

19  listed at the top of the document?

20  A.  A1 Business Consultants, LLC.

21  Q.  What is the date on the right side?

22  A.  July 25th, 2016.

23  Q.  Please read the letter.

24  A.  To whom it may concern.  Regarding Diane Weissenberger,

25  case No. 2016197003590.  A1 Business Consultants, LLC disputes

this charge-back.  In response to our client's claim that they

did not receive their goods or services.  The agreed upon

products/services listed below have been fully rendered and

have been delivered.  I have also attached all of the documents

and services that we have completed for our client.  Business

plan.  Corp. Credit.

Q.  I'll stop you there.  Thank you.

MR. SOBELMAN:  The government offers Government

Exhibit 204.

THE COURT:  Admitted solely for the purpose of the

state of mind of Shahram Ketabchi.  It is not for the truth of

what is set forth there.

(Government's Exhibit 204 received in evidence)

BY MR. SOBELMAN:

Q.  Please put up 204.  Special Giattino, what is the title of

this document?

A.  Product and services agreement with Elevated Business

Consultant, LLC.

Q.  What is the date on the document?

A.  June 17th, 2016.

Q.  What company is listed in the first paragraph?

A.  Elevated Business Consultants, LLC.

Q.  What individual's name is listed toward the end of that

paragraph?

A.  Sally K. Burnett.

IATJKET2                        Giattino - direct

1   Q.  What is the amount of money listed under products/services?

2   A.  $14,995.00.

3   Q.  And what is listed under product/services?

4   A.  Corp. Credit, business plan, custom website.

5          MR. SOBELMAN:  The government offers Government

6   Exhibit 230, 441, 512 and 1017.

7          THE COURT:  Is only 230 subject to the agreement?

8          MR. SOBELMAN:  Yes, your Honor.

9          THE COURT:  Subject to the same ruling.

10          Ladies and gentlemen, Exhibit 230 is similarly only

11   for the very limited purpose of Shahram Ketabchi's state of

12   mind and for no other purpose.  The other documents are for

13   your evaluation as to their truth or not.  Proceed.

14          (Government's Exhibit 230 received in evidence)

15   BY MR. SOBELMAN:

16   Q.  Ms. Lee, please put up Government Exhibit 512.  Zoom in on

17   the email at the very bottom.  What is the date on this email?

18   A.  December 4th, 2015.

19   Q.  Who is it sent by?

20   A.  Steve at A1 Business Consultants dot com.

21   Q.  Please read this email.

22   A.  Hi, Brian.  I hope you are doing well.  Can you please send

23   us the POF for Patricia Cabral today.  Thank you and have an

24   amazing day.  Best of regards, Steve K.

25   Q.  Ms. Lee, can you please zoom in on the in the email in the

IATJKET2                          Giattino - direct

1   middle of the page.  What date was this email sent?

2   A.  December 4th, 2015.

3   Q.  Who is it sent by?

4   A.  Brian C, Brian at Your business dot training.

5   Q.  Please read the email.

6   A.  I can only assume that by POF, you are referring to the

7   safe word, Patricia's safe word is Danny.

8   Q.  Ms. Lee, please zoom in on the email in the top of the

9   page.  What date was this email sent?

10  A.  December 4th, 2015.

11  Q.  Who is it sent from?

12  A.  Brian at Your Business dot training.

13  Q.  What is in the subject line?

14  A.  POF request for new CB.

15  Q.  Who is it to?

16  A.  Steve at A1 Business Consultants dot com.

17  Q.  Who is on the CC?

18  A.  Ketabchi dot Arash at Gmail dot com, Arash at A1 Business

19  Consultants dot com.

20  Q.  Please read the email.

21  A.  Just read the notes on the client and I wanted to give you

22  a heads-up.  She is a canceled pending.  Her son is claiming

23  she has dementia and is in the process of getting power of

24  attorney so she can cancel.

25  Q.  Ms. Lee, please put up Government Exhibit 230.  Please zoom

1    in on the top half.  Thank you.  What is the date on this

2    document?

3    A.  December 7th, 2015.

4    Q.  Who is it addressed to?

5    A.  A1 Business Consultants LLC, Arash Ketabchi.

6    Q.  Under transaction amount, how much is listed on the left

7    hand signed?

8    A.  $9,995.00.

9    Q.  How much is the charge-back amount?

10   A.  $9,995.00.

11   Q.  What is the transaction date on the right side?

12   A.  October 14th, 2015.

13   Q.  What is the received date?

14   A.  December 3rd, 2015.

15   Q.  Whose listed as the contact person at the bottom of the

16   page?

17   A.  Steve Ketabchi.

18   Q.  Ms. Lee, please pull up Government Exhibit 441.

19            MR. PAUL:  What exhibit number was that, please?

20            MR. SOBELMAN:  230, 2-3-0.

21   BY MR. SOBELMAN:

22   Q.  Special Agent Giattino, what is the date on this email?

23   A.  December 10, 2015.

24   Q.  What is subject line?

25   A.  New CB, POF, Patricia Cabral.

IATJKET2                      Giattino - direct

1    Q.  Who is it from?

2    A.  Steve at A1 Business Consultants dot com.

3    Q.  Who is it to.

4    A.  Info at Al at Online Systems dot com.

5    Q.  Who is on the CC?

6    A.  Ketabchi dot Arash at Gmail dot com.

7    Q.  Please read the email?

8    A.  High, Ray.  I hope you are doing well.  Can you please give

9    us detailed POF for attached contract of Patricia Cabral with

10   signature delivery confirmation tracking number.  The deadline

11   for submissions within five days.  Please confirm.  Thank you

12   and have an amazing day.  Best of regards, Steve K.

13   Q.  Ms. Lee, go back to Government Exhibit 230.  Take a look at

14   Page 2.  You can zoom in on the top half.

15          Special Agent Giattino, what is the date on this

16   document?

17   A.  December 15th, 2015.

18   Q.  Would you please read the letter through where it says

19   bookkeeping.

20   A.  To whom it may concern.  Ray, Patricia Cabral Case No.

21   2015338002836.  A1 Business Consultants, LLC disputes this

22   charge-back.  In response to our client's claim that they did

23   not receive their goods or services, the agreed upon

24   products/services listed below have been fully rendered and

25   have been delivered.  I have also attached all of the documents

IATJKET2                        Giattino - direct

1   and services that we have completed for our client.  Business

2   plan Corp. Credit bookkeeping.

3   Q.  Ms. Lee, please take a look at Page 4 of this document.

4   Zoom in on the top half.

5          Special Agent Giattino, what is the title of this

6   document?

7   A.  Product and services agreement with A1 Business

8   Consultants, LLC..

9   Q.  Who is the individual's name listed in the first paragraph?

10   A.  Patricia Cabral.

11   Q.  Under product/services, what is the amount listed?

12   A.  $9,995.00.

13   Q.  What are the services provided?

14   A.  Business plan Corp. Credit bookkeeping.

15   Q.  Look at Page 6 of this document.  Is there a signature on

16   this document?

17   A.  Yes.

18   Q.  Whose signature is it?

19   A.  Patricia Cabral.

20   Q.  What is the date?

21   A.  October 12th, 2015.

22   Q.  The bottom of the page is there credit card information?

23   A.  Yes.

24   Q.  What is the amount appears to be charged?

25   A.  $9,995.00.

IATJKET2                    Giattino - direct

1    Q.  Ms. Lee, please pull up Government Exhibit 1017.  What is

2    the date on this text messages?

3    A.  January 15th, 2016.

4    Q.  Let's read it the same way.  You can read Shahram Ketabchi

5    and read outgoing, I will be Arash Ketabchi and read incoming.

6            Patricia Cabral, what happened?

7    A.  Reversed won, they said, after I fought again after

8    reversal.

9            MR. SOBELMAN:  The government offers Government

10   Exhibit 219, 233, 1009, 1206, 1209 and 1211 and the 200 series

11   and 1200 series would be subject to your Honor's limiting

12   instruction.

13           THE COURT:  All right.  Again, ladies and gentlemen,

14   the Documents 219, 233, 1206, 1209 and 1211 are for a limited

15   reason only, the state of mind of Shahram Ketabchi.  Proceed.

16   The others are admitted without a limiting instruction.

17           (Government's Exhibits 219, 233, 1206, 1209 and 1211

18   received in evidence)

19   BY MR. SOBELMAN:

20   Q.  Please pull up Government Exhibit 1009.  What is the date

21   on these text message?

22   A.  October 15, 2015.

23   Q.  Read them the same way.  You can be outgoing, Shahram

24   Ketabchi, and I will be incoming, which is Arash Ketabchi.

25   A.  I can tell Andrew is happy.  He made sales from his texts.

1    Q.  Oh, yeah, he is pumped.  Whahoo.  I just spoke.  They hold

2    our money, these merchant accounts can get financed.  We have

3    contracts so we are good.

4    A.  Yeah, they can.  Let's.

5    Q.  Ms. Lee, please pull up Government Exhibit 219.  Please

6    zoom in on the left-hand side.

7            What is the business name listed on the shipment from?

8    A.  A1 Business Consultants.

9    Q.  And what name is listed under extremely urgent delivery to?

10   A.  Charlene Foster.

11   Q.  What is the address given for Ms. Foster?

12   A.  Wildwood, Florida.

13   Q.  On the bottom-right-hand corner, what is the date of

14   shipment provided?

15   A.  October 16th, 2015.

16   Q.  Ms. Lee, please pull up Government Exhibit 1209.  This

17   document is in reverse chronological order so let's start at

18   the end.  Sorry.  The last page of the document.  There are

19   multiple people so I am not sure if it is going to work for us

20   to each take a part.

21           MR. SOBELMAN:  It is quite lengthy, your Honor.  Would

22   you prefer that Special Agent Giattino read it or would you

23   like me to pause for the jury to read it?  It is about five

24   pages long, although the type is very large.

25           THE COURT:  The jury will have it available during its

1   deliberation.  Simply move on.

2              MR. SOBELMAN:  There are a couple of messages I will

3   highlight.

4              THE COURT:  Yes.

5   BY MR. SOBELMAN:

6   Q.  If you could read on the last page the very top message

7   along with the date of the message.

8   A.  October 16th, 2015.  3:56 pm from Melissa S. Skype sent.

9   Any other numbers for Charlene Foster.  I tried calling

10  325-399-2798 earlier and only got a busy signal and I tried

11  again now and got the same thing.

12  Q.  Let's go to the page right before that.  If you could

13  please zoom in on the top half.

14             Special Agent Giattino, please read the third message

15  on the monitor.

16  A.  October 19, 2015, Michelle Lee, follow-up call out.  2810

17  Charlene Foster, 325-399-2798, Michelle Lee, 7:38 am zero

18  minutes ago to Brian.  On her account listed in the file notes

19  it says laptop.  Are we supposed to send her a laptop?  Also

20  her number rings busy and hangs up.

21             THE COURT:  Let's move on.  You can cite to anything

22  in your summation, sir.  This is in evidence.

23             MR. SOBELMAN:  Yes, your Honor.

24  BY MR. SOBELMAN:

25  Q.  Ms. Lee, please pull up Government Exhibit 1211.

1          Special Agent Giattino, would you please read the name

2    of and business at the top left.

3    A.   Tiger direct dot com.

4    Q.   Could you please read the name after, "Dear."

5    A.   Charlene Foster.

6    Q.   At the bottom of the page, the order date?

7    A.   November 6th, 2015.

8    Q.   And what company is being billed?

9    A.   A1 Business Consultants, LLC.

10   Q.   Who is it being shipped to?

11   A.   Charlene Foster.

12   Q.   Ms. Lee, please pull up Government Exhibit 1206.  Zoom in

13   on the top half of the page.

14          What is the date on this document?

15   A.   November 9th, 2015.

16   Q.   What business is it addressed to?

17   A.   A1 Business Consultants, LLC.

18   Q.   Please read the sentence starting, "This is a

19   notification."

20   A.   "This is a notification on a first charge-back initiated by

21   the issuing bank."

22   Q.   What is listed next to reason?

23   A.   "Nonreceipt of goods or services."

24   Q.   Please read the next sentence.

25   A.   Your account has been debited by the adjustment amount

1   because -- and the merchandise/services not received.

2   Q.   What is the amount under transaction amount?

3   A.   $14,999.00.

4   Q.   What is the date listed next to transaction date?

5   A.   October 19th, 2015.

6   Q.   And who is listed as the contact person on the bottom of

7   the paragraph?

8   A.   Steve Ketabchi.

9   Q.   What is the telephone number listed for him?

10   A.   949-244-8588.

11   Q.   Ms. Lee, please put up next to this with the zoom-in on the

12   bottom of that still Government Exhibit 302.  Please go to

13   the -- I am sorry -- never mind.  Forget that.  Let's just move

14   on.

15         If you could put up Government Exhibit 233.  If you

16   can go to Page 14, please.  Zoom in on the top half.  Special

17   Agent Giattino, what is the date on this document?

18   A.   November 12th, 2015.

19   Q.   What is the name of the business addressed to?

20   A.   A1 Business Consultants, LLC.

21   Q.   Would you please read the sentence starting, "This is a

22   notification."

23   A.   "This is a notification of a first charge-back initiated by

24   the issuing bank, Capital One Bank USA National Association."

25   Q.   What is listed next to reason?

IATJKET2                    Giattino - direct

1    A.   "Cardholder dispute."

2    Q.   Please read the next sentence as well.

3    A.   Your account has been debited by the adjustment amount

4    because cardholder disputes quality/mischaracterization of

5    services/merchandise.

6    Q.   What is under transaction amount?

7    A.   $5,000.00.

8    Q.   What is the transaction date?

9    A.   October 19th, 2015.

10   Q.   This is where I wanted the reference Government Exhibit

11   302.  Please put up the second page of that next to this

12   document.  If you can zoom in on Paragraph 6 and then also zoom

13   in on the bottom of the other exhibit.

14            Special Agent Giattino, would you please read

15   Paragraph 6 in the stipulation.

16   A.   "From at least January 1, 2015 until at least March 21,

17   2017, Shahram Ketabchi used the Cell Phone No. 949-244-8588."

18   Q.   Can you please compare that number with the number listed

19   under Steve Ketabchi --

20            THE COURT:  It's the same, right?

21            THE WITNESS:  Yes.

22            THE COURT:  Move on.

23            MR. SOBELMAN:  The government offers Government

24   Exhibit 206 A, 206 B, 234 A through F, 428, 429 and 513.  The

25   200 series exhibits will be subject to your Honor's limiting

IATJKET2                          Giattino - direct

1    instruction.

2              THE COURT:  Yes, ladies and gentlemen, all of those

3    are admitted, but the 200 series are admitted solely for the

4    state of mind of Steve Ketabchi.

5              (Government's Exhibits 206A, 206B, 234A through F,

6    428, 429 and 513 received in evidence)

7    BY MR. SOBELMAN:

8    Q.  Please bring up Government Exhibit 234B, Ms Lee.  Please

9    zoom in on the top half.

10             Special Agent Giattino, what is the title of this

11   document?

12   A.  "Product and services agreement with A1 Business

13   Consultants."

14   Q.  Can you please read the date on that document.

15   A.  June 18th, 2015.

16   Q.  Whose individual's name is mentioned in this paragraph?

17   A.  Joe Freeland.

18   Q.  What is the amount listed under product services?

19   A.  $5,995.00.

20   Q.  Pause for a moment to let the jury read the paragraph

21   underneath that.  (Pause)

22             THE COURT:  Next question.

23   BY MR. SOBELMAN:

24   Q.  Please go to Page 2, Ms. Lee.  If you can zoom in on the

25   second paragraph.

1              Special Agent Giattino, could you please read the last

2    sentence in this paragraph.

3    A.  "Client is guaranteed a check within the first 90 days of

4    activation."

5    Q.  Ms. Lee, please go to the last page, the third page.  Zoom

6    in on the bottom.  Special Agent Giattino, what amount is

7    listed here?

8    A.  $5,995.00.

9    Q.  What date?

10   A.  June 18th, 2015.

11   Q.  Ms. Lee, can you please put up 234 E.

12             Special Agent Giattino, what is the date on this

13   document?

14   A.  October 23rd, 2015.

15   Q.  Who is it addressed to?

16   A.  A1 Business Consultants, LLC.

17   Q.  Please read what is on the post-it note on the top left?

18   A.  "Received, 11-4-1 marketing campaign; two, website

19   advertisement."

20   Q.  This 200 series, these are hard-copy documents your team

21   found in Shahram Ketabchi's apartment?

22   A.  Yes.

23   Q.  Under "charge-back amount," what is listed?

24   A.  $5,995.00.

25   Q.  And transaction date?

IATJKET2                      Giattino - direct

1    A.   June 24th, 2015.

2    Q.   And whose name is listed at the bottom of the page under

3    contact person?

4    A.   Steve Ketabchi.

5    Q.   Ms. Lee, please put up Government Exhibit 513.  Please zoom

6    in on email in the middle of the page.  Special Agent Giattino,

7    what is the date on email?

8    A.   October 26,2015.

9    Q.   What is subject line?

10   A.   Urgent, fulfillment DOCCS for charge-back.

11   Q.   Who is it from?

12   A.   Positive faith at Gmail dot com.

13   Q.   Who is to?

14   A.   Info at All Online Systems dot com and Ray Q at --

15   Q.   Who is on the CC?

16   A.   Ketabchi dot Arash at Gmail dot com.

17   Q.   Please read the email.

18   A.   Hi, Ray.  I hope you had a great weekend.  We received some

19   Charge-backs last Friday and I need the fulfillment

20   documentation for.  One, Jeanette Waldrup; two, Joe Freeland.

21   Q.   Who is it signed by?

22   A.   Steve.

23   Q.   Ms. Lee, please put up 234 D.

24            THE COURT:  How many more of these do you have, sir,

25   because they seem to be a bit repetitive.

1              MR. SOBELMAN:  May I consult with counsel for one

2      moment?

3              THE COURT:  Yes.

4              (Off-the-record discussion)

5              THE COURT:  The jury can refer to all of these to the

6      extent they're admitted in summations.

7              MR. SOBELMAN:  Your Honor, this is a good time for a

8      short morning break.  We can consult and try to slim down the

9      presentation even further.

10             THE COURT:  If that is the reason for the break, most

11     assuredly.  10 minutes, ladies and gentlemen.

12             MR. SOBELMAN:  Thank your Honor.

13             (Jury excused)

14             THE COURT:  Let's make it 15 minutes.

15             (Recess)

16             MR. SOBELMAN:  Your Honor, we have approximately 22 or

17     25 documents we have left.  I slimmed it down to about 8 or 9.

18             MR. PAUL:  Your Honor, I want to alert the court that

19     we sent to --

20             THE COURT:  Let's put this on the record.

21             MR. PAUL:  -- we sent to the paralegal last evening

22     the number of exhibits that we needed to be authenticated, and

23     we have been told this morning that for some reason not in our

24     control, that the paralegal did not receive the exhibits that

25     we intended to introduce and for them to authenticate so,

IATJKET2                          Giattino - direct

1   unfortunately, there may be a delay in these proceedings

2   because I think the government is now -- we turned them over

3   without even asking the paralegal, we don't care if they know

4   what our cross is going to be.  We bypassed that because of the

5   problem with them getting the email last night, and they're now

6   looking through to authenticate the various documents.

7              THE COURT:  It sounds like we are moving forward.

8   Bring the jury in.

9              MR. SOBELMAN:  Ms. Kearney will be absent in order to

10  facilitate that process.

11             THE COURT:  Bring the jury in.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

IAT8KET3                          Giattino - Direct

1          (Jury present)

2          THE COURT:  Please be seated in the courtroom.

3          You may continue.

4          MR. SOBELMAN:  Ms. Lee, can you please pull up

5    Government Exhibit 206B.  It's in evidence.

6          Your Honor, this document is a little difficult to

7    read on the screen.  If you would permit Special Agent Giattino

8    to read it.  We only have about eight or nine documents left.

9          THE COURT:  Why is it hard to read on the screen?

10          MR. SOBELMAN:  It's hard for me to read it, but if

11    your Honor can read it, perhaps the jury can read it as well.

12          THE COURT:  Your paralegal should blow it up in

13    portions.  I don't want to spend a great deal of time with

14    things being read when they are admitted, and you can summarize

15    them or say whatever you like about them on summation.

16          Jury, you can read this.

17          All right.  Next section.

18          Next section after paragraph 4.

19          Are we going to too fast, ladies and gentlemen?  I'm a

20    pretty slow reader.

21          THE JURY:  It's fine.

22          THE COURT:  Next section.

23          Next.

24          MR. SOBELMAN:  The government offers Government

25    Exhibits 220, 450 and 1126.  And 220 and 1126 would be pursuant

IAT8KET3                    Giattino - Direct

1    to your Honor's limiting instruction.

2                THE COURT:  Again, ladies and gentlemen, you know it

3    by now.

4                (Government's Exhibits 220, 450 and 1126 received in

5    evidence)

6                THE COURT:  Next question.

7                MR. SOBELMAN:  Please display Government Exhibit 1126.

8                Your Honor, I do think it is genuinely difficult to

9    read it, if Special Agent Giattino could be provided the

10   opportunity to read it.

11               THE COURT:  Yes.

12   A.   "Elizabeth.  I have the records of most of the contacts

13   names of companies, their phone number, and some personal cell

14   phone numbers.  I have sent $11,000 and the $180 for state

15   license.  Now they want a total of $22,500 for more licenses

16   and more contacts.  I have told them no more money until I get

17   contracts before I send them any more money.  Also went to my

18   bank, closed all of my personal banking and credit cards so

19   they have no access to my accounts.  Let me know how things

20   stand.  Send me the complaint form."

21   Q.   Who is it signed by?

22   A.   Chris Klevjord.

23   Q.   What is the date on this document?

24   A.   January 11, 2016.

25               MR. SOBELMAN:  Ms. Lee, please display Government

1    Exhibit 220.

2              Please zoom in.

3    Q.   What is the date on this document?

4    A.   February 22, 2016.

5              MR. SOBELMAN:   Ms. Lee, if you could just go up.

6    Q.   What organization is on the letterhead?

7    A.   A1 -- the letterhead is County of Passaic, Department of

8    Public Safety.

9    Q.   What is the subject line next to "consumer"?

10   A.   Chris Klevjord.

11   Q.   Can you just read the first two sentences of the letter?

12   A.   "Dear merchant.  This office is in the receipt of a

13   complaint filed against you from the above consumer.  Please be

14   advised that this office investigates cases evidencing fraud,

15   deceit or misrepresentation with respect to sales and

16   advertisements for the sale of merchandise between consumer and

17   a merchant."

18   Q.   Who is it signed by?

19   A.   Elizabeth Andiorio, investigator.

20             MR. SOBELMAN:   Ms. Lee, can you put up Government

21   Exhibit 450, and zoom in on the e-mail on the bottom of the

22   page.

23   Q.   What is the date of this e-mail?

24   A.   March 2, 2016.

25   Q.   Who is it sent by?

1 A. Steve@a1businessconsultants.com.

2 Q. Please read it.

3 A. "Hi Ray.  Can you please send me the complete PDF for Chris

4 Klevjord 911.  Thank you and have an amazing day.  Best of

5 records, Steve K."

6    MR. SOBELMAN:  The government offers Government

7 Exhibit 442.

8    THE COURT:  Admitted without objection.

9    (Government's Exhibit 442 received in evidence)

10    MR. SOBELMAN:  Ms. Lee, can you please put up Exhibit

11 442, and zoom in on the e-mail in the middle.

12 Q. What is the date on this e-mail?

13 A. December 15, 2015.

14 Q. What the subject line?

15 A. James A. Cooper.

16 Q. Who is it from?

17 A. Lilly@a1businessconsultants.com.

18 Q. Who is it to?

19 A. Rayq@ymail.com; steve@1Abusinessconsultants.com;

20 a1customerservicedepartment@gmail.com;

21 info@allonlinesystems.com; cs@allonlinesystems.com.

22 Q. Did this e-mail have an attachment?

23 A. Yes.

24 Q. Can you please read the first sentence?

25 A. "New client signs through fax."

IAT8KET3                          Giattino - Direct

1    Q.   What is the name of the client?

2    A.   James A. Cooper.

3    Q.   What are the services listed next to services colon?

4    A.   Corp/LLC setup, corp credit, business plan, tax prep, tax

5    plan, bookkeeping.

6    Q.   What is the amount listed?

7    A.   $49,999.

8    Q.   Who is the sales rep?

9    A.   Jonathan Stewart.

10            MR. SOBELMAN:   The government offers Government

11   Exhibit 238 and 242.

12            THE COURT:   Those are admitted for the limited purpose

13   of the state of mind of Steven or Shahram Ketabchi.

14            (Government's Exhibits 238 and 242 received in

15   evidence)

16            MR. SOBELMAN:   Ms. Lee, please put up Government

17   Exhibit 242.   If you could zoom in on the top part first.

18   Q.   Special Agent Giattino, what does it indicate after, "Did

19   the cardholder attempt to resolve with the merchant?"

20   A.   "Yes."

21   Q.   What is the date of the most recent contact?

22   A.   It looks like July 8, 2016.

23   Q.   What is the name of the contact?

24   A.   Customer service.

25   Q.   And the method?

IAT8KET3                         Giattino - Direct

1    A.   Phone.

2    Q.   What does it say under merchant's response?

3    A.   "No one available, reached voice mail."

4         MR. SOBELMAN:  Ms. Lee, could you please zoom in on

5    the part under "comments."

6         I am just going to pause for the jury to read that.

7         THE COURT:  All right.  Proceed.

8         MR. SOBELMAN:  Ms. Lee, could you please put up

9    Government Exhibit 238, page 4.

10        If you could please zoom in on the top half.

11   Q.   Special Agent Giattino, what is on the letterhead of this

12   document?

13        THE COURT:  Same thing.  County of Passaic.

14        Next.

15   Q.   Who is the consumer that is listed?

16   A.   Kaylene Zahn.

17   Q.   Are the first two sentences of this letter the same as a

18   similar letter we saw with respect to Chris Klevjord?

19   A.   Yes.

20   Q.   Is it signed by the same investigator?

21   A.   Yes.

22   Q.   What is the date on this one?

23   A.   December 4, 2015.

24        MR. SOBELMAN:  Could we please go to page 1 of this

25   document.  Zoom in on the top half.

1    Q.  What is on the letterhead?

2    A.  New Jersey Office of the Attorney General, Division of

3    Consumer Affairs.

4    Q.  What is the name listed under "complaint reported by"?

5    A.  Kaylene Zahn.

6    Q.  What city and state?

7    A.  Hutchinson, Kansas.

8    Q.  What is the business listed on the right-hand side under

9    "complaint reported against"?

10   A.  A1 Business Consultants.

11           MR. SOBELMAN:  Ms. Lee, could we zoom in on the bottom

12   half of the page.

13   Q.  Next to "statistical and informational purposes only," what

14   range is indicated?

15   A.  60 or older.

16   Q.  Under "the other," under number 1, nature of the complaint,

17   what is listed?

18   A.  "At home business opportunity."

19   Q.  Let's take a look at page 2.

20           MR. SOBELMAN:  Please zoom in on the top half.

21           I will pause so the jury can read it.

22           THE COURT:  Move on.

23           MR. SOBELMAN:  Ms. Lee, could you please zoom in on

24   the bottom half of the page.

25   Q.  Special Agent Giattino, what amount is listed next to the

1  amount of loss involved in this complaint?

2  A.  $7,000.

3  Q.  Can you please just read the sentence that's written there?

4  A.  "$7,000 for a Web site for a person with no Internet."

5  Q.  Who is it signed by?

6  A.  Kaylene Zahn.

7  Q.  What is the date?

8  A.  October 30, 2015.

9          MR. SOBELMAN:  The government offers Government

10  Exhibits 218 and 1308, both of which will be subject to the

11  Court's limiting instruction.

12          THE COURT:  They are only for state of mind of the

13  defendant Ketabchi.

14          (Government's Exhibits 218 and 1308 received in

15  evidence)

16          MR. SOBELMAN:  Ms. Lee, please put up Government

17  Exhibit 218.

18          Could you please zoom in on the very top.

19  Q.  What is the title of this document?

20  A.  "Registration of alternate name."

21          MR. SOBELMAN:  Ms. Lee, could you please zoom in on

22  the middle.

23  Q.  What is the name of the corporation listed here?

24  A.  A1 Business Consultants.

25  Q.  What is the date of incorporation?

IAT8KET3                         Giattino - Direct

1   A.  April 25, 2014.

2   Q.  And what is the alternate name to be used?

3   A.  Elevated Business Services.

4           MR. SOBELMAN:  Ms. Lee, could you please show

5   Government Exhibit 1309.  And zoom in on the top half.

6   Q.  What kind of document is this?

7   A.  This is a bank account statement.

8   Q.  From what bank?

9   A.  Wells Fargo.

10  Q.  What is the date range on the top?

11  A.  January 29, 2016 through February 5, 2016.

12  Q.  What business is it addressed to?

13  A.  Elevated Business Consultants.

14          MR. SOBELMAN:  The government offers Government

15  Exhibits 214 and 215, also subject to the same limiting

16  instruction.

17          THE COURT:  Only for the purposes of the state of mind

18  of defendant Ketabchi.

19          (Government's Exhibits 214 and 215 received in

20  evidence)

21          MR. SOBELMAN:  Ms. Lee, please put up Government

22  Exhibit 214, page 2.  If you can zoom in on the top half.

23  Q.  Special Agent Giattino, what is the date on this document?

24  A.  May 27, 2016.

25  Q.  And on the top left, who is it addressed to?

IAT8KET3                          Giattino - Direct

1   A.   Danielle Owimrin.

2   Q.   Special Agent Giattino, can you please read the first

3   sentence after "Dear Danielle Owimrin"?

4   A.   "Thanks for applying for a Capital One credit card."

5   Q.   The whole paragraph.

6   A.   "We're working on your application, and just need to finish

7   some paperwork.  We have not yet heard from you in response to

8   our previous request."

9   Q.   Please read the next sentence as well.

10  A.   "We'll be one step closer to a decision if you can verify

11  the following info within 20 days of the date of this letter."

12  Q.   What is listed underneath that?

13  A.   "Annual income for Danielle Owimrin."

14  Q.   Just read the next sentence that starts "check."

15           THE COURT:  It's not up.

16  A.   "Check the back of this letter to see the types of

17  documents you could use for this."

18           MR. SOBELMAN:  Ms. Lee, let's go to next page.

19           If you could zoom in on the section that says "total

20  annual income."

21  Q.   Special Agent Giattino, if you could just read what is

22  after the first bullet there.

23  A.   "Tax return documents (W-2, Form 1040 and/or Form 1099)

24  from the most recent tax year."

25  Q.   Then please also read the third bullet.

IAT8KET3                         Giattino - Direct

1    A.   "Letter of employment issued and signed by your employer

2    within the last three months."

3              MR. SOBELMAN:  Ms. Lee, can you go to the first page

4    of this document.

5              The first page, please.  If you can zoom in.

6    Q.   Special Agent Giattino, what date is on this document?

7    A.   June 12, 2016.

8    Q.   And what is the subject line?

9    A.   "Danielle Owimrin credit card application document."

10   Q.   Can you please read the one sentence after "Dear Capital

11   One."  I'm sorry, two sentences.

12   A.   "This letter is to confirm that Danielle Owimrin is a

13   salaried executive at Dash's Salon LLC.  She has been working

14   for our company for two years and one month and her annual base

15   salary is $280,000."

16   Q.   Approximately two years before this would be when?

17   A.   2014.

18   Q.   Let's take a look at Government Exhibit 215, second page.

19             Take a look at the top half.

20             What kind of document is this?

21   A.   This is an IRS tax document.  It's a Form 8879.

22   Q.   Whose name is after taxpayer's name?

23   A.   Danielle E. Owimrin.

24   Q.   What year is this for?

25   A.   Tax year 2014.

IAT8KET3                          Giattino - Direct

1    Q.  What is the number listed next to adjusted gross income?

2    A.  $19,748.

3    Q.  What is the date of the signature on this document, just

4    down a little further?

5    A.  May 26, 2016.

6    Q.  Just to be clear, this document, 215, and the prior one,

7    214, they were both hard-copy documents that your team found in

8    Shahram Ketabchi's apartment?

9    A.  Yes.

10              MR. SOBELMAN:  At this time, I have a list of

11   additional documents we would like to offer but not show

12   Special Agent Giattino, and otherwise his direct testimony is

13   completed.  Shall I read this list at this time?

14              THE COURT:  Yes.

15              MR. SOBELMAN:  The government offers Government 202,

16   203, 205, 207, 208, 212, 213, 217, 221, 222, 223, 224, 225,

17   232, 235, 236, 237, 244, 402, 405, 410, 417, 420, 423, 424,

18   435, 437, 440, 447, 448, 449, 453, 454, 555, 456, 458, 462,

19   463, 464, 510, 511, 516, 1003, 1004, 1005, 1006, 1008, 1010,

20   1012, 1015, 1016, 1019, 1020, 1101, 1102, 1103, 1104, 1105,

21   1112, 1115, 1116, 1117, 1118, 1131, 1134, 1135, 1136, 1142,

22   1202, 1205, 1207, 1208, 1210, 1214, 1215, 1216, 1217, 1218,

23   1219, 1220, 1310, 1311, 1312, 1314, 1315, 1316, 1317, 1318,

24   1319, 1320, 1321, 1322, 1327, and 1331.

25              THE COURT:  Ladies and gentlemen, those documents are

IAT8KET3                        Giattino - Cross

1    admitted.  And the documents in the 200 series, 1100 series,

2    1200 series, and 1300 series are admitted solely for the very

3    limited purpose of the state of mind of Shahram Ketabchi.  They

4    are not admitted for the truth of what is set forth in those

5    documents.

6              (Government's Exhibits 202, 203, 205, 207, 208, 212,

7    213, 217, 221, 222, 223, 224, 225, 232, 235, 236, 237, 244,

8    402, 405, 410, 417, 420, 423, 424, 435, 437, 440, 447, 448,

9    449, 453, 454, 555, 456, 458, 462, 463, 464, 510, 511, 516,

10   1003, 1004, 1005, 1006, 1008, 1010, 1012, 1015, 1016, 1019,

11   1020, 1101, 1102, 1103, 1104, 1105, 1112, 1115, 1116, 1117,

12   1118, 1131, 1134, 1135, 1136, 1142, 1202, 1205, 1207, 1208,

13   1210, 1214, 1215, 1216, 1217, 1218, 1219, 1220, 1310, 1311,

14   1312, 1314, 1315, 1316, 1317, 1318, 1319, 1320, 1321, 1322,

15   1327, and 1331 received in evidence)

16             THE COURT:  Does this conclude your direct?

17             MR. SOBELMAN:  Yes, your Honor.  No further questions.

18             THE COURT:  Are there any defense questions for this

19   witness?

20             MR. PAUL:  Yes, your Honor.

21             THE COURT:  Mr. Paul on behalf of Shahram Ketabchi.

22   CROSS-EXAMINATION

23   BY MR. PAUL:

24   Q.  Good morning, Agent Giattino.

25   A.  Good morning.

IAT8KET3                         Giattino - Cross

1   Q.  Let's go back to your testimony with regard to March 21,

2   2017.

3              That's the date that you, along with other agents and

4   law enforcement, arrived at my client's address, is that right?

5   A.  Yes.

6   Q.  I think you told us this was approximately 6:00 in the

7   morning?

8   A.  Yes.

9   Q.  Were you in uniform?

10  A.  We don't have a uniform, but I was wearing clothing

11  indicating that we are police.

12  Q.  Does this clothing have police across the front of it or is

13  it just a badge that you wear around your neck?

14  A.  I have to remember what I was wearing that day.  I can't

15  remember exactly what I was wearing.

16  Q.  How many other law enforcement individuals were with you

17  that day?

18  A.  I'd have to refresh my memory from the report, but there

19  were, I would say, approximately eight people.

20  Q.  What report would be able to refresh your recollection?

21  A.  There was an investigative report documenting, you know,

22  the search warrant that occurred on that day.

23  Q.  Let me show you what has been previously marked as 3507-06

24  and ask you if this is the report you are referring to.

25  A.  Yes.

IAT8KET3                    Giattino - Cross

1   Q.  By looking at that document, are you able to tell us how

2   many law enforcement individuals were with you that morning?

3          THE COURT:  The question is simply whether or not it

4   refreshes your recollection.

5          THE WITNESS:  Yes.

6   Q.  It does?

7   A.  If I read it, yes, it will refresh.

8          I am going to count in my head here.  Eight people.

9   Q.  So eight individuals, including yourself, arrived at my

10  client's door at approximately 6:00 in the morning, is that

11  right?

12  A.  Yes.

13  Q.  And you told us that you proceeded to knock on the door and

14  identify yourself as police, correct?

15  A.  Yes.

16  Q.  At some point, because you didn't have a response, you

17  forcibly entered the apartment, is that right?

18  A.  Yes, the team.

19  Q.  Describe what you say forcibly entered the apartment.

20  A.  We used a -- you know, kind of like a big hammer to open

21  the door, essentially.

22  Q.  A big what?

23  A.  Hammer.

24  Q.  Hammer?

25  A.  Yes.

IAT8KET3                    Giattino - Cross

1    Q.  Hand hammer?

2    A.  It's kind of like a ram I guess is what you would call it.

3    Q.  A battering ram type of thing?

4    A.  Yes.

5    Q.  So you knocked on the door and knocked the door down, is

6    that right?

7    A.  Yes.  Well, I personally didn't, but a member of the team

8    did.

9    Q.  You say that you do this when there is no response for a

10   number of reasons, right?

11           You told us for safety purposes?

12   A.  Yes, that's one.

13   Q.  As well as you want to make sure that no possible evidence

14   inside that location could be destroyed, right?

15   A.  That would be another reason, yes.

16   Q.  And you said you entered the apartment and you did a

17   protective sweep, right?

18   A.  Yes.

19   Q.  And you identified yourself to -- you finally saw Mr.

20   Ketabchi, correct?

21   A.  Yes.

22   Q.  And when you first saw him, was he in sleepwear?

23   A.  I can't remember what he was wearing, but it was early in

24   the morning so it's possible.

25   Q.  Did you not tell him when you came in, after you identified

1  yourself, that you were doing a search regarding his brother's

2  business, in relation to Arash Ketabchi's business?

3  A.  Yes.

4  Q.  So that's one of the first things you told him, right?

5  A.  I think that's right, yes.  Yeah, that's correct.

6  Q.  Then you handed him the warrant, I believe, because he

7  wanted to see it, or I assume you just wanted to show it to

8  him?

9  A.  Yeah.  I gave him a copy of the warrant.

10  Q.  So let me understand the sequence of events.  You come in,

11  you battered down the door, bashed down the door, 6:00 in the

12  morning, Mr. Ketabchi is standing there.  And where did you

13  fist see him when you first confronted him?

14  A.  I saw him in the living room or in that sort of immediate

15  area after entering, but I wasn't the first person in, so I

16  don't know where exactly he was when members of the team

17  entered.

18  Q.  So at some point, at least almost immediately, you tell him

19  that you're there to conduct a search regarding Arash

20  Ketabchi's business, is that right?

21  A.  Yes.  Though I don't think that was the first sentence out

22  of my mouth.  It was just we have a search warrant.

23  Q.  We have a search warrant?

24  A.  And I'm pretty sure what happened next is I gave him a copy

25  of the warrant because, if I remember correctly, he was

1   basically saying, what's this about?

2   Q.  And you said we are doing a search with regard to your

3   brother's business?

4   A.  Yeah, and some of his associates.

5   Q.  At that point, or shortly thereafter, he told you, I don't

6   have anything to do with my brother's business, for the most

7   part, I have my own business and I drive an Uber, is that fair?

8   A.  Yes.

9   Q.  Did you handcuff him?

10  A.  I don't remember handcuffing him.

11  Q.  Wouldn't it be accurate, sir, that in fact you and/or your

12  team handcuffed him and marched him outside while you conducted

13  either your protective sweep or the beginning of your search?

14  A.  I personally can't remember that because I don't think

15  I -- again, I was not the first person in.  It's very possible

16  that he was handcuffed.  That's something we might do because,

17  again, we have to make sure that we are in control of the place

18  where we have the court authorization to search.  So it is very

19  possible that he would have been handcuffed, but I just can't

20  remember.

21  Q.  Did he put up any physical restraint in trying to stop you

22  and your team?

23  A.  I don't remember him being physical.

24  Q.  You told us he was agitated, right?

25  A.  Yes.

1  Q.  And this was 6:00 in the morning, perhaps at a moment you

2  had just woken him up by bashing down his door, right?

3  A.  I'm sorry.  What's the question?

4  Q.  This was 6:00 in the morning.  You told us he was agitated,

5  right.

6  A.  Yes.

7  Q.  And perhaps this was right after you had bashed down his

8  door and woken him up, is that not fair?

9  A.  Yes.  We encountered him after we entered the apartment,

10 yeah.

11 Q.  So you believe he was handcuffed because that might be the

12 normal procedure, and it's also possible you took him outside

13 of the apartment itself as you conducted your search, or at

14 least initially, is that right?

15 A.  Again, I can't recall exactly, but it's possible, yes.

16 Q.  So it's possible he was handcuffed standing outside, you

17 and your team are conducting a search inside, and eventually he

18 gets brought back into the apartment I assume, is that fair?

19 A.  Yes.

20 Q.  And at some point he is sitting on the couch and he is

21 looking through the search warrant that you had handed him, is

22 that right?

23 A.  Yes.

24 Q.  And you didn't have an arrest warrant for him, did you?

25 A.  No.

IAT8KET3                    Giattino – Cross

1    Q.  He wasn't under arrest at all, was he?

2    A.  No.

3    Q.  And the warrant you had listed a number of individuals who

4    were being arrested that day, right?

5            MR. SOBELMAN:  Objection.

6            THE COURT:  I will allow him to answer if he knows the

7    answer.

8    A.  I do know that at least one person listed on the warrant

9    had been arrested, or was going to be arrested.

10   Q.  Well, the warrant itself, I think you handed him the

11   attachments that came with the warrant, right?

12   A.  Yes.

13   Q.  And he is sitting on the couch looking through this at some

14   point, right?

15   A.  Yes.

16   Q.  And attachment B talks about items to be seized in relation

17   to financial crimes, correct?

18   A.  Yes.

19   Q.  Included in those financial crimes were persons, entities,

20   and properties, including Arash Ketabchi, Andrew Owimrin,

21   William Sinclair, Michael Finocchiaro, Ariele Peralta, and

22   Joseph McGowan, right?

23   A.  That sounds right.

24   Q.  His name was not on that, meaning Steven Ketabchi's name

25   was not on there?

IAT8KET3                          Giattino - Cross

1   A.  Correct.

2   Q.  Now, were you armed that morning?

3   A.  Yes.

4   Q.  With a gun, I assume?

5   A.  Yes.

6   Q.  Were your fellow law enforcement officers and/or agents

7   also armed?

8   A.  Yes.

9   Q.  When you and your fellow agents entered the apartment, did

10  you have your guns drawn?

11  A.  I did not have mine drawn.

12  Q.  Did you notice if your brother agents had theirs drawn?

13  A.  I can't remember.

14  Q.  Do you recall if in fact they entered with guns drawn

15  pointing at Mr. Ketabchi.

16          MR. SOBELMAN:  Objection.  Asked and answered.

17          THE COURT:  I will allow it.

18          Do you remember that?

19          THE WITNESS:  No.

20  Q.  You talked about normal procedure.  Would that have been

21  the normal procedure to be entering a place that you had just

22  bashed down a door with guns drawn?

23  A.  There is not necessarily a written procedure dictating

24  whether you have your weapon drawn or not.  It's really up to

25  the law enforcement officer and his comfort level.

1  Q.  So your comfort level, I assume, was fine because you

2  didn't have a gun drawn, right?

3  A.  I was at the back of the line so --

4  Q.  So there were 14 -- seven or so fellow agents ahead of you?

5  A.  Yes.

6  Q.  So you couldn't tell if those in the front coming through

7  the door had their guns drawn, is that fair?

8  A.  That's right.

9  Q.  So you can't testify whether someone had their gun drawn

10  and was pointing at Mr. Ketabchi as well, right?

11  A.  Right.  I didn't see that.

12  Q.  Now, you testified that -- I believe it was Exhibit 427.

13          MR. PAUL:  Could we have that shown to the witness,

14  please.

15          My mistake.  I will get back to that.

16          Exhibit 807 -- 806.  My mistake.  806.

17  Q.  Now, this was an exhibit you testified, it's in evidence,

18  and this were a number of documents that you described as --

19          MR. PAUL:  Could we show 807 now?

20  Q.  These were a number of documents that you pulled out from

21  Mr. Ketabchi or a desk or whatever that was located in that

22  apartment, is that right?

23  A.  Yes.

24  Q.  And I think you described these as chargeback documents,

25  right?

1  A.  Yes.

2  Q.  And this is the format of a chargeback where a merchant has

3  reached out claiming that a complaint has been filed, or a

4  chargeback request has been made, is that right?

5         MR. SOBELMAN:  Objection.  Foundation.

6         MR. PAUL:  I will withdraw it, Judge.

7  Q.  You're the investigator in this case, right, one of them?

8  A.  No.  I had the limited role of going to California for this

9  search warrant.

10  Q.  But you're familiar with the facts and circumstances

11  surrounding this investigation, are you not?

12  A.  Yes.

13  Q.  You have reviewed some of the documents that have been

14  introduced, I think you have testified to many?

15  A.  Yes.

16  Q.  So many I couldn't keep up with them as the government was

17  reading them.

18         THE COURT:  The jury will disregard the comments of

19  the lawyer, of any lawyer.

20  Q.  You have testified that you have reviewed many documents

21  with regard to this case, is that right?

22  A.  Yes.

23  Q.  And what appears in 807 is a form, is it not, where a

24  merchant has reached out to the party where a sale has been

25  made and the customer is complaining, is that correct?

```
 1              MR. SOBELMAN:  Objection.  Foundation.

 2              Simply because the agent has seen the document doesn't

 3    mean --

 4              THE COURT:  Just a moment.

 5              Do you know if it's a form?

 6              THE WITNESS:  Yeah.  I mean, I would call it a

 7    notification.

 8              THE COURT:  All right.

 9    Q.  So you would say you have seen this kind of document many

10    times in this case, right?

11    A.  Yes.

12    Q.  And as you said, it's like a form that the merchant reaches

13    out to the party that made the sale because there has been a

14    complaint filed, is that right?

15    A.  Yes.

16    Q.  By the way, you said that one of the reasons you go into a

17    location where you're conducting a search after the party has

18    not responded is to avoid destruction of evidence, potential

19    evidence, right?

20    A.  Yes.

21    Q.  Did you see any proof of any attempt of documents being

22    ripped up or destroyed?

23    A.  I didn't see that.

24    Q.  Did you find any kind of shredding machine in the

25    apartment?
```

IAT8KET3                          Giattino - Cross

1    A.  I don't remember seeing a shedder.

2    Q.  So it would be fair to say, would it not, agent, you found

3    no evidence of any destruction of any documents when you

4    entered that apartment, right?

5             MR. SOBELMAN:  Objection.  Asked and answered.

6             THE COURT:  I will allow it.

7    A.  I didn't see evidence of that, no.

8    Q.  Are you aware, in the course of your investigation of this

9    case, that A1 Business had closed down six months prior to this

10   search?

11            THE COURT:  Do you know whether or not that's true?

12            THE WITNESS:  I don't.

13            THE COURT:  Next.

14   Q.  Now, you said that -- in fact, we saw a picture, I believe,

15   in the bedroom of a safe, is that right?

16   A.  Yes.

17   Q.  Inside of that safe I think you said you recovered hard

18   drives, is that right?

19   A.  Yes.

20   Q.  These were what, external hard drives that one could use as

21   a backup to any computer?

22   A.  Yes.

23   Q.  Standard external hard drive?

24   A.  Yes.  I have seen their type before.

25   Q.  Was there a key to this safe?

IAT8KET3                          Giattino - Cross

1    A.  I can't remember whether it was open or if we obtained a

2    key.

3    Q.  Is it possible, agent, that in fact, when you came upon the

4    safe, Mr. Ketabchi gave you the combination to that safe so you

5    could open it?

6              THE COURT:  Sustained as to form.

7              Do you know?  Did he give you the combination to the

8    safe?

9              THE WITNESS:  I can't remember exactly.

10   Q.  Certainly you didn't have to forcibly open it, right?

11   A.  I personally didn't have to.

12   Q.  Do you know if any of your fellow agents did?

13   A.  I don't remember getting any sort of outside equipment to

14   open a safe.

15   Q.  By the way, were you the first agent to approach Steven

16   Ketabchi or you said there were other agents ahead of you,

17   right?

18   A.  There were other agents ahead of me.

19   Q.  Did you notice, at least when you came upon him, that he

20   had earplugs in his ears?

21   A.  I don't remember.

22             MR. PAUL:  Could we show Exhibit 813, please.

23   Q.  Now, this is a photograph that you have identified, and

24   it's in evidence, of -- this is in his bedroom, is that right?

25   A.  Yes.

1   Q.  This is next to his bed?

2   A.  Yes.  It's the nightstand next to the bed.

3   Q.  And there are three, what look like containers.  You see

4   that?

5   A.  Yes.

6   Q.  And the one on the left, do you know if in fact that is a

7   container to hold earplugs?

8   A.  I don't know.

9   Q.  The one in the middle, is that a container to hold

10  medication, like Lunesta for sleeping?

11  A.  I don't know.

12  Q.  The one on the right, did you investigate to see if in fact

13  that was a container for a mouth guard?

14  A.  It looks like a mouth guard container.

15          MR. PAUL:  You can take that down.

16  Q.  Now, how long did this search take, by the way?

17  A.  I can't remember exactly how long it took.  I'm not sure if

18  it's in the report.

19  Q.  Would that report again help you?

20  A.  Yes.

21          MR. PAUL:  I am showing the witness 3507-06 again.

22          THE COURT:  Does that refresh your recollection with

23  regard to how long the search took?

24          THE WITNESS:  Not immediately, no.

25  Q.  Do you need more time to look?

IAT8KET3                          Giattino - Cross

1    A.  If I may have another moment.

2    Q.  Sure.

3    A.  I don't think a time is indicated.  I'm sorry.  I don't

4    know how long it took.

5    Q.  Could you estimate?

6            THE COURT:  The jury does not want a guess, but if you

7    have an estimate, please give the jury the estimate.

8    A.  I would give an estimate based on these types of warrants

9    in the past.  Probably, let's say, two hours.

10   Q.  And that's so you could remove all the documents and the

11   devices that you were recovering as you proceeded throughout

12   the apartment, is that right?

13   A.  Yes.

14           MR. PAUL:  If we could pull up Exhibit 236, what has

15   been introduced.

16   Q.  Now, again, this is one of those -- I'm sorry.  Withdrawn.

17           This is a letter addressed to the merchant and it

18   says, where it's circled -- by the way, did you circle that?

19   A.  No.

20   Q.  This is how you found the document?

21   A.  Yes.

22   Q.  This was found on Mr. Ketabchi's computer or a separate

23   item?

24   A.  This was a physical item found at the location.

25   Q.  And it says, "Thank you for your recent rebuttal to the

1    chargeback.  Unfortunately, we are denying your request because

2    indicated delivery date is prior to the" -- what is CH's, do

3    you know?

4    A.  Just in the context, I would say it's cardholder.

5    Q.  -- "prior to the cardholder's claimed date of expected

6    receipt/resolve attempt and no proof services were received.

7    No further reversal rights exist."

8            Do you see that?

9    A.  Yes.

10   Q.  Can we go to the next page of that exhibit.

11           And this is -- it says, "Contact person Steve K."

12   Correct?

13   A.  Yes.

14   Q.  And it has an 800 number, correct?

15   A.  Yes.

16   Q.  And it says "check attachment."  Is that right?

17   A.  Yes.

18           MR. PAUL:  And if we can now go to the next page.

19   Q.  This is in response to the rebuttal to the chargeback,

20   correct?

21           It says, "Dear Merchant.  Thank you for your recent

22   rebuttal to the chargeback."

23   A.  Yes.

24   Q.  It goes on to say we are denying it, right?

25   A.  Yes, I see that there.

1          MR. PAUL:  Can we go to the next page, please.

2          Next page.

3    Q.  Now, this has the heading of "A1 Business," correct?

4    A.  Yes.

5    Q.  And it has an 800 number, 914-4135, is that right?

6    A.  Yes.

7          MR. PAUL:  Can we go to the following page.

8    Q.  This letter that was sent to the merchant is signed by who?

9    A.  Arash Ketabchi.

10   Q.  So the cover page or the contact person is Steve Ketabchi,

11   but inside the actual letter is signed by Arash Ketabchi, is

12   that right?

13   A.  Yes.  I would have to go back to that first page, but it's

14   signed by Arash Ketabchi, yes.

15         MR. PAUL:  Then can we go on to the next page.

16         Next page, please.

17   Q.  And this is the service or contract that was entered into,

18   or at least signed by DW.  And I think the last page was Diane

19   Weissenberger, right?

20   A.  Yes.

21   Q.  So what we have, you would agree, agent, wouldn't you, is a

22   response to the merchant with regard to this complaint that was

23   filed by Diane Weissenberger, where Steven Ketabchi, in the

24   cover letter or the front page, is the contact person, but the

25   letter in response is from Arash Ketabchi, is that right?

1    A.   It was signed by Arash Ketabchi, yes.

2              MR. PAUL:   Can we go to Exhibit 230, please.

3              If we could go to the top part, highlight that.

4    Q.   Again, this is a letter, correct, addressed to A1 Business,

5    where it's talking about a notification of a first chargeback

6    initiated by the issuing bank, Hanscom Federal Credit Union, is

7    that right?

8    A.   Yes.

9    Q.   And the reason is services were not provided or merchandise

10   not received, correct?

11   A.   Yes.

12   Q.   It then says, "Cardholder claims nonreceipt of merchandise

13   services.  Valid proof of delivery/receipt is required along

14   with the sale invoice/order form."  Is that right?

15   A.   Yes.

16   Q.   The bottom is again signed by Steven Ketabchi as the

17   contact person, right?

18   A.   Yes.

19   Q.   And he is providing an 800 number, 800-914-4135, correct?

20   A.   Yes.

21   Q.   Then it says "reversal reason."  And then it says

22   "attached."

23              MR. PAUL:   If we could go to the next page.

24   Q.   If we could see, the 800 number is the same as the contact

25   person, Steve Ketabchi, wrote on the first page, 800-914-4135,

1   is that right?

2   A.  Yes.

3          MR. PAUL:  And if we could scroll down.

4          Go to the next page of this.

5   Q.  Again, this is a letter signed by who, Steven Ketabchi or

6   Arash Ketabchi?

7   A.  Arash Ketabchi.

8          MR. PAUL:  If we can go to the next page.

9   Q.  Again, this is product and services agreement with A1

10  Business Consultants.

11         This appears to be, correct, a contract with Patricia

12  Cabral?

13         MR. PAUL:  If you could go to the next page.

14  Q.  Is that right?

15  A.  Yes.

16  Q.  Signed by Patricia Cabral?

17  A.  Yes.

18         MR. PAUL:  If we could go to the next page.

19  Q.  And included with the attachment, besides the contract --

20         MR. PAUL:  If we could just scroll through those

21  documents.

22  Q.  That last letter is a letter addressed to Ms. Cabral from

23  A1 Business, is that right?

24  A.  Yes.

25  Q.  And it says, the second paragraph, "Enclosed is your

business plan draft.  We are going to call you to go over some

business financials," and so forth, is that right?

A.  Yes.

Q.  And that was all part of the attachment that was forwarded

back to the merchant, correct?

A.  Yes.

          MR. PAUL:  Thank you.  You can take that down.

Q.  Now, you have looked at many documents that were recovered,

whether it be on Mr. Ketabchi's, Steven Ketabchi's computer or

actual hard-copy documents, you have examined many, if not all

of those, is that right?

A.  Yes, I would say many.

Q.  So what we have just looked at is just one of many similar

documents that you have examined, is that fair?

A.  Yes.

Q.  So there were perhaps many, or several at least, documents

from the merchant reaching out to A1 in this case, and there

was a response to the merchant, where the contact person often

was Steven Ketabchi, but the letter inside was signed by Arash

Ketabchi, along with additional attachments, is that not fair?

A.  Yes.  Yes.

          MR. PAUL:  Your Honor, we have a number of exhibits

that I am not sure whether this is requiring a sidebar or not,

but there are a number of exhibits we intend to introduce

through this witness, and I will use the elmo, the

IAT8KET3                          Giattino – Cross

1    old-fashioned way.

2              THE COURT:  Go ahead.

3              MR. PAUL:  We have some that have been OK'd.  I am not

4    sure which ones those are.

5              MR. SOBELMAN:  Your Honor, regrettably, I think we

6    will need a sidebar.

7              THE COURT:  Sidebar.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (At the sidebar)

 2                MS. KEARNEY:  This relates to the wall paralegal

 3    authentication issue we have been dealing with throughout the

 4    trial.  My understanding is last night Mr. Mitchell at least

 5    attempted to e-mail all of these documents ahead of time.

 6                THE COURT:  We talked about this briefly.

 7                MS. KEARNEY:  We never received it.

 8                THE COURT:  I know.  This morning you were working on

 9    that to check the authentication of the documents that were Mr.

10    Paul wishes to introduce now.

11                MS. KEARNEY:  Correct.  So we are doing that in

12    realtime.  We have been able to confirm a subset of what I

13    think Mr. Paul wants to introduce.

14                THE COURT:  Good.

15                MS. KEARNEY:  However, the marked copies are with the

16    wall paralegal right now.  So we are not going to be able to

17    match up exhibit numbers.

18                THE COURT:  It's 12:00.  Why don't we take our lunch

19    break.  Can you handle that over our lunch break?

20                MR. SOBELMAN:  Apologies, your Honor.

21                (Continued on next page)

22

23

24

25
```

IAT8KET3                        Giattino - Cross

1          (In open court)

2          THE COURT:  Ladies and gentlemen, I have some legal

3     matters.  Rather than have you wait around, let's take our

4     lunch now.

5          Again, everybody is trying to make this as efficient

6     as possible for you.  It's 12:10.  Be back at 1:15.  I do want

7     to tell you tomorrow, in order to accommodate one of you, we

8     are going to take the lunch break at 2:00.  So when we have the

9     mid-morning break I suggest, although obviously you don't have

10    to, you can bring an apple, a sandwich, something like that.

11    Apples are delicious this time of year, crisp, cold.  Do

12    something like that and we will break for lunch at 2.  To

13    compensate for that we are breaking for lunch today at 12.

14          See you back here at a quarter after 1.

15          (Jury exits courtroom)

16          THE COURT:  You may step down.  Quarter after 1.

17          MR. SOBELMAN:  Because Special Agent Giattino is on

18    cross, would you please instruct him that he should not speak

19    to the government attorneys, but only with the agents on

20    logistical matters?

21          THE COURT:  Do not speak with the government

22    attorneys, but only with the agents.  Speak with yourself.

23          (Luncheon recess)

24

25

IATJKET4                    Giattino - cross

1          AFTERNOON SESSION

2          1:15 pm

3          (Trial resumes)

4          (In open court; jury not present)

5          THE COURT:  All right.  I understand there are

6     document issues?

7          MR. SOBELMAN:  Yes, your Honor.  There are two buckets

8     that our objections fall into.  The first bucket is a 401-403

9     issue with respect to the documents that are labeled SK-7

10    through 22.  Many of these documents significantly predate the

11    time period that Shahram Ketabchi is alleged to have been a

12    member of the conspiracy.

13         There are documents in here that include a letter

14    years ago of Shahram Ketabchi emailing or sending a letter,

15    drafting a letter to a judge to try to get Arash Ketabchi out

16    of a traffic ticket.  I could go document-by-document, but our

17    essential argument is none of them have any relevance to this

18    case, and that to the extent they were deemed to have some type

19    of relevance, the likelihood of confusion would far outweigh

20    any probative value they could offer.

21         MR. PAUL:  Judge, I don't see the confusion.

22         Most, if not all, of these documents are tasks that he

23    was doing for his brother just like he was doing charge-back

24    tasks.  In his mind, this was just an additional list of items

25    that his brother was asking him to do.  It shows that this was

a continuation of his activity on behalf of his brother

starting before this conspiracy that is alleged to have

occurred, including through the time period of the conspiracy

itself.  So that is the purpose of introducing these.

THE COURT:  If it is before the conspiracy, what is

the relevance?  It is that his work during the conspiracy was

of a piece from before the conspiracy?

MR. PAUL:  Correct.

THE COURT:  What is the relevance of that?

MR. PAUL:  Because they're trying to argue his state

of mind through all of these various exhibits they've

introduced, hundreds or so.  We're simply arguing that his

state of mind was such that these charge-backs, which was what

they're alleging -- the government will argue he did many more

things besides charge-backs, obviously, by their introduction

of exhibits.

We're offering these charge-backs was just

incorporated into the many tasks he has been doing in an

ongoing basis for several years on behalf of his brother, and

it goes to his state of mind that, in fact, he did not think

these charge-backs was any more than what he had been doing

previously for the many tasks his brother was asking him to do.

MR. SOBELMAN:  Perhaps we can focus on a couple of

examples, and that might help frame the issue on to the floor.

THE COURT:  Sure.

1            MR. SOBELMAN:  For example, looking at the first one

2       in the series, SK-7, it is a mortgage document.

3            THE COURT:  Yes.  Where are the years?

4            MR. PAUL:  The date is April 14, 2014.

5            THE COURT:  What is the years of the conspiracy?  Let

6       me get the indictment out.

7            MR. SOBELMAN:  It is included in that range, but the

8       government's theory is that Shahram Ketabchi did not join the

9       conspiracy until more than a year after that.  We will not

10      argue to the jury otherwise.

11           MR. PAUL:  That is nice, but I think it is part of the

12      conspiracy time-frame.  I think it just incorporates what he

13      had been doing previously up and through the time the

14      government is alleging he participated.

15           MR. SOBELMAN:  Your Honor, the indictment is broader

16      because it was initially brought against multiple defendants

17      and the conspiracy existed before Shahram Ketabchi joined the

18      conspiracy.  The fact he filed a mortgage document for his

19      brother or may have done so a year and a half before the joined

20      the conspiracy is of no moment for this jury.

21           THE COURT:  Is it SK-7 you want me to look at?

22           MR. SOBELMAN:  That is the first one in a series, but

23      I am happy to look at any of them in this bucket.

24           THE COURT:  What is SK-7, Mr. Paul?

25           MR. PAUL:  SK-7 is a mortgage application that my

1   client was doing on behalf of his brother, Shahram Ketabchi,

2   dated April 18, 2014.

3          MR. SOBELMAN:  It is unclear to the government -- not

4   that we are going to make an argument -- Mr. Steve Ketabchi was

5   the one that filled this out.  It doesn't appear to the

6   government it is his writing, for example, compared to other

7   items seized from his apartment.

8          THE COURT:  Fair enough.  Mr. Paul?

9          MR. PAUL:  I didn't hear.

10         THE COURT:  There is nothing in this document that the

11  government says this has anything to do with Shahram.

12         MR. PAUL:  Except it was taken off of his device just

13  like they're arguing all these other items were taken off his

14  device and they're going to as a basis, well, if it was taken

15  off his device, it must have been had something to do with it.

16         Either he read it to show his knowledge or his intent

17  as well for the many documents that went through his device.

18  We are trying to show his state of mind was such the

19  charge-backs were one of many things that went through this

20  device from his brother.  Whether he actually filled this in or

21  not --

22         THE COURT:  I understand.  What is in this so-called

23  bucket, SK-7?  What else?

24         MR. SOBELMAN:  7 through 22.  Another good example is

25  SK-11.

IATJKET4                     Giattino - cross

1            MR. PAUL:  SK what?

2            MR. SOBELMAN:  11.

3            THE COURT:  What is SK-8?

4            MR. PAUL:  These are bank records that my client had

5     on his computer that had to do with Arash Ketabchi's personal

6     bank as another task.  My client, quite frankly, Judge was a

7     file cabinet for his brother.  His brother asked him to do

8     anything and everything for him.  Included in that, he had

9     access to or was provided by Arash Ketabchi's and his checking

10    account and his banking account.  It is one of many things.

11           THE COURT:  SK-9?  I understand, Mr. Paul.  What is

12    SK-9?

13           MR. PAUL:  I think Arash was under foreclosure, and I

14    think my client was trying to help him get out from under the

15    foreclosure.

16           THE COURT:  I take it that he doesn't -- what can you

17    ask this witness about -- he doesn't know what --

18           MR. PAUL:  I don't intend to ask the witness anything

19    other than these were taken off his device so I can introduce

20    them.  I have no questions with regard to this witness and

21    these exhibits, Judge.  I am simply using this witness to

22    introduce these exhibits because he is the one who has been the

23    vehicle of the government introducing all the many exhibits

24    taken off my client's device.

25           MR. SOBELMAN:  The witness will not be able to

1    authenticate any of these documents.  We agree they're

2    authentic.  This witness has never seen these documents before.

3    I am not sure why we're dealing with this now while the witness

4    and jury is waiting.  We can revisit this at a different time?

5             MR. PAUL:  My goal is to introduce these exhibits

6    through this witness.  That is it.  I intend to --

7             THE COURT:  Well, but the government has just said

8    this witness can't say they came from Shahram Ketabchi.

9             MR. PAUL:  But they authenticated it has.  I don't

10   need this witness to authenticate.  That is why I went through

11   this rigamarole.  They authenticated these came off his

12   devices.

13            THE COURT:  So how are you getting them admitted?

14            MR. PAUL:  Are these some of the documents -- he was

15   the one who gathered all of these documents, whether they be

16   hard copy or taken from the device, so all I am trying to do

17   through this witness is introduce the exhibits themselves.  I

18   am not asking him any questions about the content of the

19   exhibits themselves because he probably has no recollection of

20   them.

21            THE COURT:  I am confused.  The government, apparently

22   they have agreed to the authenticity of these documents?

23            MR. SOBELMAN:  Correct, your Honor, there is no

24   dispute as to authenticity of these documents.

25            THE COURT:  What is the witness going to do for you in

1  addition to saying yes, these came from Shahram Ketabchi, that

2  is authenticated?

3          MR. SOBELMAN:  This witness can't even do that.  That

4  is my point.  The witness, as far as I know, has never seen

5  this stack of documents, and as we discussed in this case,

6  there are many, many items on these devices and he has not

7  reviewed all of them.

8          MR. PAUL:  Fine.  I will recall this witness on my

9  case, have this witness review these documents so that he can,

10 in fact, recall these were documents taken from my client's

11 devices and introduce them on my case.

12         THE COURT:  Can he do that?

13         MR. PAUL:  Why not?

14         THE COURT:  How can he recall they came from the --

15         MR. PAUL:  He can go back and do what they just did,

16 authenticate it and say these came from my client's computer

17 and/or --

18         MR. SOBELMAN:  There is an easy way to shortcut this.

19         We are happy to enter into a stipulation saying these

20 are authentic documents came from where they came from.

21         THE COURT:  That doesn't get them admitted, does it?

22         MR. SOBELMAN:  No.  They can offer them pursuant to

23 the stipulation at any time, and your Honor will rule on the

24 objections we are raising now just as they have objections to

25 our documents we offered a stipulation.  I didn't ask Special

1  Agent Giattino whether each of those came from the devices.

2              MR. PAUL:  That is fine.  I am assuming the government

3  will enter such a stipulation that it has been authenticated,

4  and then they can raise individual objections like they're

5  starting to do now, and either your Honor will rule admitted or

6  not admitted.

7              THE COURT:  When the jury is not here?

8              MR. PAUL:  Yes, your Honor.

9              THE COURT:  Do that!

10             MR. SOBELMAN:  Are any of these documents you plan on

11 trying to admit through this witness?

12             MR. PAUL:  Not with this understanding.

13             THE COURT:  Bring this jury in.

14             MR. SOBELMAN:  Thank your Honor.

15             MR. PAUL:  In that case, Judge, I have no further

16 questions, but I'll wait to say it in front of the jury.

17             THE COURT:  Mr. Schmidt, do you have any questions?

18             MR. SCHMIDT:  If I may, your Honor.

19             (Off-the-record discussion)

20             (Jury present)

21             THE COURT:  Please be seated in the courtroom.  Mr.

22 Paul, you may continue the cross-examination.

23             MR. PAUL:  Your Honor, I have no further questions of

24 this witness.

25             THE COURT:  Thank you.  Mr. Schmidt, any questions?

1    CROSS EXAMINATION

2    BY MR. ABEGAZ-HASSEN:

3    Q.  Good afternoon, Judge.  Good afternoon, Agent.  I have one

4    question.

5            You testified earlier that you reviewed some of the

6    documents from Mr. Ketabchi's computer, correct?

7    A.  Yes.

8    Q.  You didn't review all of the documents from his computer.

9    Is that right?

10   A.  That's right.

11   Q.  You reviewed just the ones that the government provided to

12   you for review in anticipation of your testimony?

13   A.  Well, on the date of the search warrant?  Are you talking

14   specifically about electronic devices?  I missed the -- I.

15   Q.  I am talking about all of the documents.

16   A.  Yes, on the date of the search warrant I was examining

17   documents to see if they were relevant to the search, so I

18   wouldn't say that the only documents I reviewed were chosen by

19   the government.

20   Q.  On the day of the search, you did kind of a cursory glance

21   to see if something might be relevant, but you didn't look at

22   the documents?

23   A.  I would say that's right.

24   Q.  And later on you did a more in-depth search of just the

25   ones provided to you for your testimony?

1    A.   That's right.

2              MR. ABEGAZ-HASSEN:   Thank you.   No further questions.

3              THE COURT:   Ladies and gentlemen, you can now see what

4    a lawyer means by just one question.   Any redirect?

5              MR. SOBELMAN:   Briefly, your Honor.

6              THE COURT:   Yes.

7    REDIRECT EXAMINATION

8    BY MR. SOBELMAN:

9    Q.   Agent Giattino, do you recall Mr. Paul asking you about

10   signatures on a few different letters?

11   A.   Yes.

12   Q.   Do you recall being asked who signed those letters?

13   A.   Yes.

14             MR. SOBELMAN:   I am going to show you what are marked

15   as 234 D-1, 235-2 and 235-1, and these, I will show them to

16   defense counsel.

17             (Off-the-record discussion)

18   BY MR. SOBELMAN:

19   Q.   Ms. Lee, would you please put up what is in evidence as

20   Government Exhibit 234 D.   Would you please compare Government

21   Exhibit 234 D to 234 D-1, which is before you in that plastic

22   sleeve.   Does it appear to be the same document?

23   A.   Yes.

24             MR. SOBELMAN:   The government offers 234 D-1.

25             THE COURT:   Hearing no objection, admitted.

1           (Government's Exhibit 234 D-1 received in evidence)

2   BY MR. SOBELMAN:

3   Q.  Would you please remove it from the plastic sleeve.

4           Would you please take your time, run your finger over

5   where the signature is at the bottom of the page and see if you

6   can determine whether it appears to be what I would call a wet

7   ink signature or an original signed version or whether it is

8   some kind of printout or copy.  If you turn it over and feel

9   the back, that may help.

10  A.  Yes, that's what I just did and it appeared to be a wet

11  signature, meaning signed with pen.

12  Q.  Now let's take a look at Government Exhibit 235, Page 2.

13          Special Agent Giattino, could you compare this to --

14  sorry, I don't have the originals in front of me -- it is 235-2

15  in the sleeve.

16          MR. PAUL:  Objection, your Honor.  It is beyond the

17  scope of cross.

18          THE COURT:  I will allow it.

19  BY MR. SOBELMAN:

20  Q.  Could you please compare what is in the sleeve as 235-2 to

21  the portion of Government Exhibit 235 that is on our screen.

22  Is it the same document?

23  A.  Yes.

24  Q.  Can you please pull that document out of the sleeve.

25          MR. SOBELMAN:  The government offers 235-2.

1              THE COURT:  Hearing no objection, admitted.

2              (Government's Exhibit 235-2 received in evidence)

3    BY MR. SOBELMAN:

4    Q.  Could you please do the same analysis, move your finger

5    over the signature block and look closely at it and see if you

6    can determine whether it appears to be the wet ink signature or

7    it is some kind of copy or printout?

8    A.  Based on hearing and touching the back, it appears to be a

9    wet ink signature.

10   Q.  Ms. Lee, let's take a look at Government Exhibit 235, Page

11   11.  Special Agent Giattino, could you pull 235-1 in the sleeve

12   in front of you.  Would you compare the first page of 235-1 to

13   the page that is up now which is Page 11 of 235.  Does that

14   appear to be the same document?

15   A.  Yes.

16   Q.  Ms. Lee, go to the last page of Exhibit 235.

17              Special Agent Giattino, if you could please compare

18   the second page of 235-1 to what is on your screen, which is

19   Page 18 of 235.  Does that appear to be the same document?

20   Sorry.  The very last page of this document, Ms. Lee.  There it

21   is.  Yes, Page 29.  Thank you.  Please compare Page 2 of 235-1

22   to Page 29 of 235.  Does that appear to be the same page?

23   A.  Yes.

24              MR. SOBELMAN:  The government offers 235-1.

25              THE COURT:  Hearing no objection, admitted.

IATJKET4

1              (Government's Exhibit 235-1 received in evidence)

2     BY MR. SOBELMAN:

3     Q.  Can you please do the same analysis or move the second page

4     of 235-1 from the sleeve and see whether it is a wet ink

5     signature?

6     A.  Yes, it appears to be a wet ink signature.

7              MR. SOBELMAN:  One moment, your Honor.  No further

8     questions.

9              MR. PAUL:  No questions.

10             THE COURT:  Mr. Schmidt, anything?

11             MR. ABEGAZ-HASSEN:  No questions.

12             THE COURT:  You may step down, sir.  You're excused.

13             (Witness excused)

14             MS. KEARNEY:  Before we call our next witness, I would

15     like to read a stipulation.

16             THE COURT:  Yes, ma'am.  Is it a stipulation of fact

17     or testimony?

18             MS. KEARNEY:  It is a testimonial stipulation.

19             THE COURT:  All right.

20             MS. KEARNEY:  It is hereby stipulated and agreed by

21     and between the United States of America, by Geoffrey S.

22     Berman, United States Attorney, Kiersten A. Fletcher, Benet J.

23     Kearney, and Robert Sobelman, Assistant United States

24     Attorneys, and Andrew Owimrin, by and his attorneys, Sam A.

25     Schmidt, Esquire and Abraham Jabir Abegaz-Hassen, Esquire, and

IATJKET4

Shahram Ketabchi, by and through his attorneys, Kenneth A.

Paul, Esquire and Jacob Mitchell Esquire that:

    1.  If called as a witness at trial, a custodian of

records from Discover would testify that Government Exhibit

901, including all parts and subdivisions thereof, contains

true and correct copies of records obtained from Discover

regarding an account opened and maintained at Discover and

bearing account number ending 0568, that the original records

were all made at or near the time by or from information

transmitted by a person with knowledge of the matters set forth

in the records, that they were kept in the ordinary course of

Discover's regularly conducted business activity and it is the

regular practice of that business activity to make the records.

    2.  If called as a witness at trial, a custodian of

records from Founder Federal Credit Union would testify that

Government Exhibits 902 and 903, including all parts and

subdivisions thereof, contain true and correct copies of

records obtained from Founders Federal Credit Union regarding

accounts opened and maintained at Founders Federal Credit Union

and bearing account numbers ending in 6065 and 6744

respectively, that the original records were all made at or

near the time by or from information transmitted by a person

with knowledge of matters set forth in records, that they were

kept in the ordinary course of Founders Federal Credit Union's

regularly conducted business activity and it is the regular

IATJKET4

practice of that business activity to make the records.

   3. That if called as a witness at trial, a custodian of records from Capital One would testify that Government Exhibits 904 A, 908 A, 909 A and 910, including all parts and subdivisions thereof, contain true and correct copies of records obtained from Capital One regarding accounts opened and maintained at Capital One and bearing account numbers ending in 1253, 0445, 6752, 1715, 6969, 8897, 1420, 5521, and 6190, that the original records were all made at or near the time by or from information transmitted by a person with knowledge of the matters set forth in the records, that they were kept in the ordinary course of Capital One's regularly conducted business activity and that it is the regular practice of that business activity to make the records.

   4. If called as a witness at trial, a custodian of records from Bank of America would testify that Government Exhibits 906 A and 909 A, including all parts and subdivisions thereof, contain true and correct copies of records obtained from Bank of America regarding accounts opened and maintained at Bank of America bearing account numbers ending in 3770, 6913, 4639 and 6534, that the original records were all maintained at or near the time by or from information transmitted by a person with knowledge of the matters set forth in the records, that they were kept in the ordinary course of Bank of America's regularly conducted business activity and it

IATJKET4

1    is the regular practice of that business activity to make the

2    records.

3              It is further stipulated and agreed that this

4    stipulation and Government Exhibits 901, 902, 903, 904 A, 906

5    A, 908 A, 909 A, and 910 may be received in evidence at the

6    trial in the above-referenced matter and signed by the parties.

7              Pursuant to that stipulation, your Honor, the

8    government now offers Exhibits 902, 902 A through D, 903, 903 A

9    through F.

10              THE COURT:  Are you introducing the stipulation

11   itself?

12              MS. KEARNEY:  The government does.  It is marked

13   Government Exhibit 303, and we offer it into evidence as well.

14              THE COURT:  What about 901?

15              MS. KEARNEY:  One moment, your Honor.  Your Honor, the

16   government offers all of the records as Exhibits 901, 902, 903,

17   904 A, 906 A, 908 A, 909 A, and 910.

18              THE COURT:  Admitted without objection.

19              (Government's Exhibits 901, 902, 903, 904 A, 906 A,

20   908 A, 909 A and 910 received in evidence)

21              THE COURT:  The next witness for the government?

22              MS. KEARNEY:  The government calls Jane Thompson.

23   JANE THOMPSON,

24        called as a witness by the Government,

25        having been duly sworn, testified as follows:

1   DIRECT EXAMINATION

2   BY MS. KEARNEY:

3   Q.  Good afternoon, Ms. Thompson.

4          How old are you?

5   A.  I'm 55.

6   Q.  Where do you currently live?

7   A.  In North Carolina.

8   Q.  Where did you live in 2015 and 2016?

9   A.  South Carolina.

10  Q.  What do you currently do for work?

11  A.  I'm a nurse, a registered nurse.

12  Q.  What kinds of services do you perform currently as a

13  registered nurse?

14  A.  I do supervisory visits for AIDS in the homes.

15  Q.  How long have you been doing supervisory visits for AIDS?

16  A.  Since 2015.

17  Q.  Is that full-time work or part-time work?

18  A.  It is part-time work.

19  Q.  Prior to doing supervisory visits, what did you do for

20  work?

21  A.  I was a nurse in Springs Hospital in Lancaster, South

22  Carolina.

23  Q.  How long did you work at that hospital?

24  A.  Since 1987.

25  Q.  What kinds of things did you do there?

A.   A variety of things.  I was started out in the emergency

room.  I also worked, did home health nursing.  I was a hospice

nurse for a while.  I also did transitional care nursing on the

Transitional Care unit, and I did ER mental health.

Q.   Were those responsibilities full-time or part-time?

A.   Mostly full-time.

Q.   What kinds of hours were you working when you were working

full-time?

A.   A little bit at that time, but most of it was nights, 7:00

pm to 7:00 am.

Q.   When did you stop working full-time?

A.   In 2015.

Q.   Why did you stop working full-time?

A.   Because of family illnesses.  My mother was on, she was on

hospice, and she passed away in 2013, November of 2013 after a

long illness, and then in 2016, around that

mid-October-November, it was October of 2016, my oldest brother

passed away suddenly.

        At that time my dad was also in hospice, and so I,

around that time, that was the time I, like I said, I stopped

working to spend more time with them because as I did with my

mom and my other brother, my only other sibling was very ill

also and has since passed away.

Q.   What time period, I am sorry, was your father in the

hospice?

1  A.  He went into hospice right after my mom passed away, and he

2  ended up passing away in 2015 of November, I believe it was.

3  Q.  He was in hospice a little bit before that?

4  A.  Yes, almost two years.

5  Q.  Now, are you familiar with a company called A1 Business

6  Consultants?

7  A.  Unfortunately, I am.

8  Q.  In general terms, how are you familiar with them?

9  A.  Well, they're the company that has been able to take every

10  bit of my 401 (k) money.  I don't know what else.

11  Q.  Were you in touch with people from A1 Business Consulting?

12  A.  Yes, I was.

13  Q.  When were you in touch with them, approximately?

14  A.  It started in -- (pause) --

15          THE COURT:  Take your time.  There is water there if

16  you would like.

17          THE WITNESS:  Okay.

18          THE COURT:  Take your time.

19  BY MS. KEARNEY:

20  Q.  Do you remember when you were in touch with them?

21  A.  I don't know.  I may have to look.  I have written

22  everything, I took notes.

23  Q.  Do those notes refresh your recollection about when you

24  were in touch with A1?

25  A.  Yes.

1          THE COURT:  Do you know what year it was --

2          THE WITNESS:  Yes.

3          THE COURT:  -- when you first had contact with them?

4          THE WITNESS:  2015.

5          THE COURT:  2015.  Next question.

6     BY MS. KEARNEY:

7     Q.  Now, you said you paid some money to A1 Business

8     Consultants?

9     A.  Yes.

10    Q.  Approximately how much money did you pay to A1?

11    A.  Over 200,000.

12    Q.  To date, have you been able to get any of it back?

13    A.  No.

14    Q.  You told us about several things that were going on in your

15    life in 2015.  Have you been diagnosed with any medical

16    conditions as a result of that?

17    A.  Yes, anxiety, stress.

18    Q.  Could you describe it.

19    A.  Yes.  Anxiety, stress, and because of that, I have trouble

20    getting my words out.  I have seen several doctors, and the

21    neurologist has told me that the reason for that is because of

22    being under so much stress.  Can I just explain how it works?

23    Q.  Sure.

24    A.  When you're under stress and you get this fight-or-flight

25    response, and your eyes dilate and all the same things happen

1   and you get nor epinephrine and all the hormones happen, and

2   you get all that feelings and all those things happen, when it

3   happens and you're doing that for so long and sending you -- in

4   so many months and weeks, and that happens on and on, it builds

5   up in your body.

6           Because I have had that go on for such -- had that go

7   on for such a long time, it has caused this to happen.  I am

8   much better than I was, but especially when I'm nervous like

9   this, it is hard to get my words out.

10  Q.  You said it is hard to get your words to come out.  Does it

11  affect your memory in any way?

12  A.  No.

13  Q.  Does it affect your ability to process information?

14  A.  No.

15  Q.  Do you have any children, Ms. Thompson?

16  A.  I do.

17  Q.  Where do they live?

18  A.  He lives in South Carolina.

19  Q.  So we talked about A1 Business Consultants.

20          Prior to when you were in touch with A1 Business

21  Consultants, had you ever attempted to start a home business or

22  be contacted about a home business opportunity?

23  A.  Yes.

24  Q.  Approximately when was that?

25  A.  That was a few years before that, I had -- I don't remember

1     the impact year, but a few years before that I tried with a

2     couple of companies.

3     Q.   What kinds of home businesses were those?

4     A.   One of them was a drop ship company and the other one was

5     if you open, and I have a website you're on where you try to

6     sell your own products from other companies.

7     Q.   Do you remember the name or names of any of those companies

8     that?

9     A.   One was Dream Success to Reality and the other one was

10    Network Solutions.

11    Q.   Did you ever make any money from those home business

12    opportunities?

13    A.   I did from one.

14    Q.   How much?

15    A.   I got a check for 26 or $36.

16    Q.   So let me direct your attention to approximately the fall

17    of 2015.

18    A.   Okay.

19    Q.   Did there come a time when you were contacted about a

20    business opportunity involving merchant terminals?

21    A.   Yes.

22    Q.   Do you remember approximately when that was?

23    A.   Yes, it was, I believe, in the spring.  I don't remember

24    the exact date, but I remember how it started out.

25    Q.   We'll get to that.

1   A.   Okay.

2   Q.   First tell me, what is a merchant terminal?

3   A.   A merchant terminal is the device that you see in a

4   business that you swipe your card and pay for your purchase or

5   your dinner or your bill.

6   Q.   How were you contacted about that opportunity?

7   A.   I just got a cold call at my home in South Carolina, and on

8   my landline that I never answer, and I just happened to pick up

9   that phone that time.  And do you want me to tell you what they

10  asked?

11  Q.   Who contacted you?

12  A.   I don't know what their name, I don't remember their name.

13  It was a young guy, and --

14  Q.   What was the opportunity that was presented to you?

15  A.   That you can just make a little bit of money by getting

16  business cards at any establishment as long as it wasn't a

17  chain like a Chili's or Appleby's or that type of thing.

18          You get their business cards and send it into them.

19  If you have at least three a month, that would give you 10 or

20  $15.00 for each one, and they would contact them and see if

21  they could put their terminals into their businesses.

22  Q.   Did you do that?

23  A.   I collected a few cards.

24  Q.   Would you --

25  A.   No.

1    Q.  Why not?

2    A.  Because before you send them in, they had other people

3    contact me.

4    Q.  Who contacted you?

5    A.  I don't remember the name of the next person that contacted

6    me, but --

7    Q.  What were they calling about?

8    A.  Just other opportunities to make even more money.

9    Q.  What kind of opportunities?

10   A.  Well, I don't know the in-between things, but they were

11   also telling me how they could help me out with, I had a long,

12   one son in college and just all of the stuff they could help me

13   with, and then, of course, they talked about what I was going

14   through with my family and how sorry they were and everything,

15   and then this other person might could help me, so somebody

16   else called me and then they had --

17   Q.  Did they present you with any business opportunities?

18   A.  Yes.  Then Michael Goldman called about me putting my all

19   merchant terminal in a business with him.

20   Q.  Who called you?

21   A.  Michael Goldman.

22   Q.  Did Michael Goldman tell you what company he worked for?

23   A.  He probably did and I would have written it in my notes,

24   but I don't remember off the top of my head.

25   Q.  I am going to show you what has been marked as Government

1    Exhibit 165.

2              Would you take a look at Page 2 of that document and

3    just read it to yourself and let me know if that refreshes your

4    recollection about what company Michael Goldman told you he

5    worked for.

6    A.  (Pause)  Yes.

7    Q.  What company was that?

8    A.  Tristar.

9    Q.  Sorry?

10   A.  Tristar.

11   Q.  You said Michael Goldman presented you with an opportunity

12   about your own terminals?

13   A.  Yes.

14   Q.  What was your understanding how, if at all, you could make

15   money from your own terminals?

16   A.  If I bought a terminal with him, then when the merchant

17   purchases a terminal, they have to pay so much -- can I back up

18   just a second.

19             Most people say you have -- they don't want you to use

20   your card unless it is $10.00 or more or $20.00 or more and

21   that is because they have to pay a fee when they use that.

22             So for that fee, depending on how risky the business

23   was, they might have to pay 4 percent or 2 percent or whatever.

24   So whatever that was, he and I would split that amount, and

25   that's how I made money.  Also putting a terminal in,

1    supposedly I would give $500.00 for each terminal they placed

2    in a business, and then I didn't quite understand, but if they

3    borrowed money against that terminal or someone borrowed money,

4    there would be revenue coming from that.

5    Q.   Did Michael say how much money you would need to pay for

6    this opportunity?

7    A.   Yes.  Well, he threw out numbers that costs up to $150,000,

8    100,000, but, of course, he would give me a much better deal.

9    Q.   Did he give you a sense of how much money you would have to

10   pay?

11   A.   Around 50,000, he was saying.

12   Q.   Did he give you any sense of a time-frame in which you

13   would make money?

14   A.   Yes, within six weeks I would start making money.

15   Q.   At that point did you agree to make a payment to Michael

16   Goldman's Company?

17   A.   No.

18   Q.   Did you tell him that?

19   A.   Yes.

20   Q.   How did he respond?

21   A.   Not very happily.  He used very fishy like used car

22   salesman kind of fishy, he was excited, he called lots and

23   often, and he would call and say he was in L.A., he would say

24   he was here and there and he wanted to make a movie about my

25   story, and how wonderful it would be when I made all of this

1  money.

2  Q.  Did he introduce you to anyone else at his company?

3  A.  Yes.

4  Q.  Who did he introduce you to?

5  A.  He said he had his assistant he wanted me to talk with,

6  Emily Miller.

7  Q.  Do you know if Emily Miller was her real name?

8  A.  I am pretty sure not now, but at the time I thought it was.

9  Q.  Have you ever met Emily in person?

10 A.  No.

11 Q.  Do you know what Emily looks like?

12 A.  Yes.

13 Q.  How do you know?

14 A.  Well, we talked a lot on the phone and in texts, and she

15 had sent me a picture of her by text, and then we were Facebook

16 friends.

17 Q.  Ms. Lee, can you please pull up Government Exhibit 705.

18      Do you recognize the person in that picture?

19 A.  Yes.

20 Q.  Who is it?

21 A.  That's Emily Miller.

22 Q.  You can take that down.

23      You said you would call and text with Emily?

24 A.  That's not who I knew her as when I knew her.  I mean

25 that's not the photo that she sent me when we were talking.

1   Q.  That is not the specific photo she sent you?

2   A.  She didn't look like that in the photo that she sent me

3   when we were talking to each other.

4   Q.  Why do you think those are the same people?

5   A.  Well, after when she friended me on Facebook, and I looked

6   at her pictures, they looked kind of like that, but that was

7   later on.

8   Q.  Understood.  When you spoke with Emily, did you document

9   your conversations in any way?

10  A.  I did.

11  Q.  How did you do that?

12  A.  I did that in my notes because this was my business, so I

13  kept, tried to keep accurate notes.  As a nurse I was taught we

14  had to write it down.  If it is not written down, it is not

15  done, and so I write down the date and time, but something

16  wasn't -- when I say we're meeting, I meant meeting by phone,

17  and so I would write the date and the time, her phone number

18  she was going to meet with, that type of thing.

19  Q.  Would you take down everything that was said on a

20  particular call?

21  A.  Not word-for-word, no.

22  Q.  Did you take notes of every conversation you had with

23  Emily?

24  A.  Not every conversation.  We talked three times a day or

25  more sometimes.

1   Q.  You said you called and texted with Emily.  Did you do that

2   using a cell phone?

3   A.  Yes.

4   Q.  Ms. Lee, could you show the witness for identification

5   Government Exhibit 170 A.

6           Do you recognize that exhibit?

7   A.  Yes.

8   Q.  What is it?

9   A.  That is a copy of our picture of my contact information

10  from my cell phone of Emily Miller.

11  Q.  Is it a fair and accurate representation of that

12  information?

13  A.  Yes, it is.

14  Q.  How did you get the information that is listed here?

15  A.  I would have gotten one of the first phone numbers from

16  Michael Goldman because I wouldn't answer the phone if I didn't

17  know who it was hopefully, and then she would have given me the

18  additional numbers.

19          MS. KEARNEY:  The government offers Government Exhibit

20  170 A.

21          THE COURT:  Hearing no objection, admitted.

22          (Government's Exhibit 170 A received in evidence)

23  BY MS. KEARNEY:

24  Q.  Ms. Lee, would you please publish this.  Would you be able

25  to zoom in a bit on the content.  You can take that down.

1          When you first spoke to Emily, Ms. Thompson, what, if

2   any, companies did she tell you she was calling on behalf of?

3   A.  I don't remember off the top of my head.  There were so

4   many companies I don't know.

5   Q.  That is all right.

6   A.  I have it in my notes, I am sure.

7   Q.  You said initially that you didn't agree to make any

8   payments to Michael Goldman when he talked to you.  Did there

9   come a time when that changed?

10  A.  Yes.

11         THE COURT:  Go back to the exhibit you just put up.

12         MS. KEARNEY:  170 A.

13         THE COURT:  Ms. Thompson, does looking at that exhibit

14  refresh your recollection with regard to what company Emily

15  Miller first said she was affiliated with?

16         THE WITNESS:  Well --

17         THE COURT:  It may or may not?

18         THE WITNESS:  It does not.  I will tell you I have A1

19  Business Consultants on there, but I would have changed it as

20  she changed companies.

21         THE COURT:  Thank you.

22         THE WITNESS:  You're welcome.

23  BY MS. KEARNEY:

24  Q.  Ms. Lee, could you please put up Government Exhibit 903 A

25  which should be in evidence.

1              Ms. Thompson, do you recognize this?

2     A.   I do.  It is a check I wrote.

3     Q.   Ms. Lee, could you focus just on the face of the check

4     rather than on the back.  Thanks.

5              What is the date on this check?

6     A.   December 11th, 2015.

7     Q.   How much is it for?

8     A.   $50,000.

9     Q.   Who is it made out to?

10    A.   KB Consulting.

11    Q.   What is KB Consulting?

12    A.   I have no idea.

13    Q.   Why did you make this check out to them?

14    A.   Because Emily told me to.

15    Q.   Was this the investment for the merchant terminals?

16    A.   Yes, I think so.  Actually, I don't know.  I don't know.  I

17    have to look at my notes and see.  Honestly, I don't know.

18    Q.   Would you mind taking a look at Government Exhibit 165, on

19    Page 6, and read it to yourself and put it down.

20    A.   (Pause)

21    Q.   Does that refresh your recollection about what this check

22    was for?

23    A.   No, not really.  Only that it was -- I was sending it to

24    first them, and they told me First Trend then.

25    Q.   What is First Trend?

1    A.  That was the company that Emily was working with at the

2    time, Emily and Michael Goldman.

3    Q.  So between your first conversation with Emily and when you

4    wrote this $50,000 check, how many times a day did you speak

5    with Emily?

6    A.  I was speaking to her many times a day, two, three, four,

7    maybe at least.

8    Q.  After you wrote this check, who, if anyone, contacted you?

9    A.  At that time that is when Emily, Michael was kind of fading

10   out of the picture for various, I don't know what reasons, but

11   and she introduced me to what she said was going to be -- was

12   her partner, Jonathan Stewart.

13   Q.  Before we talk about Jonathan, are you familiar with

14   someone called Steve Blake?

15   A.  Yes.

16   Q.  Who is Steve Blake?

17   A.  That was someone that was -- I can't remember what she

18   called him, but he was going to be the person that would get

19   the leads for the terminals.

20   Q.  Did you ever speak with Mr. Blake?

21   A.  I did once a week.

22   Q.  And what did he talk to you about?

23   A.  He would tell me like I have six leads, for instance, I

24   have six leads, one of them is pending or one of them sent

25   their paperwork in, two of them have gotten their stuff

1  together but they haven't gotten it to me yet, one of them

2  doesn't look good, things like that.

3          The next week he might say we have got this much, this

4  is looking different, this is that, I don't think one is going

5  to work out and those kind of things.

6  Q.  How often did you speak to Steve Blake?

7  A.  Once a week usually.

8  Q.  You testified earlier you took notes when you spoke with

9  Emily.  Did you take notes when you spoke with Steve as well?

10  A.  Yes, I did.

11  Q.  How long were you in communication with Steve?

12  A.  I would guess, I would estimate that maybe six weeks.

13  Q.  Approximately?

14  A.  Maybe a couple of months.

15  Q.  Do you remember approximately the first time Steve Blake

16  contacted you?

17  A.  I don't, but if I could look at my notes, I could tell you.

18  Q.  Sure.  Could you look at Government Exhibit 165, on Page 7,

19  and read it to yourself and let me know if that refreshes your

20  recollection about the date that Steve Blake contacted you.

21  A.  (Pause)  December 14th, 2015.

22  Q.  You mentioned someone named Jonathan earlier.  Who is

23  Jonathan?

24  A.  I don't know really, but Jonathan Stewart that I knew of

25  was, like I said, that was Emily's partner, she said.  They had

1  worked together before and they would be working together

2  closely, and that is all I knew.

3  Q.  Did you ever speak with Jonathan Stewart?

4  A.  Many times.

5  Q.  What was your understanding of what company Jonathan

6  Stewart works for?

7  A.  Just a minute.  (Pause)  I think at that time maybe this,

8  when she was saying they were going with another company, but

9  I'd have to look and see if it said something in different in

10 my notes or not.  I can't remember for sure because it was

11 getting pretty confusing at the time.

12 Q.  We'll go with what you remember right now?

13 A.  Okay.

14 Q.  Do you remember the first time you spoke with Jonathan

15 Stewart?

16 A.  I don't remember the first date, no.

17 Q.  Would looking at your notes refresh your recollection?

18 A.  Yes, it would.

19 Q.  Would you look at Government Exhibit 165, Page 8, and read

20 it to yourself and let me know if it refreshes your

21 recollection.

22 A.  (Pause)  Yes.

23 Q.  What date did you first speak with Jonathan Stewart?

24 A.  Wednesday, December the 16th, 2015.

25 Q.  Do you know if Jonathan Stewart was his real name?

1  A.  I know now it was not.

2  Q.  At the time did you think it was his real name?

3  A.  Yes, of course.

4  Q.  How did you speak with Jonathan?

5  A.  By telephone.

6  Q.  Ms. Lee, could you please put up Government Exhibit 172 A.

7  If you could zoom in on the contact information there.

8         Ms. Thompson, do you recognize this exhibit?

9  A.  Yes.

10  Q.  What is it?

11  A.  That is a copy of my contact information on my telephone

12  with Jonathan Stewart.

13  Q.  It is a fair and accurate representation of that

14  information?

15  A.  Yes, it is.

16  Q.  How did you learn the phone numbers for Jonathan Stewart?

17  A.  Again Emily would have given me an original number, and

18  then he gave me the other numbers.  That 0 would have been his

19  cell phone or what he told me about, and --

20  Q.  The government offers Government Exhibit 172 A.

21         THE COURT:  Hearing no objection, admitted.

22         (Government's Exhibit 172 A received in evidence)

23  BY MS. KEARNEY:

24  Q.  Ms. Lee, could you publish it, please.

25  A.  I am sorry.  I said the other word.  It is on mobile,

1    actually.

2    Q.   What is the entry under mobile?

3    A.   201-838-7774.

4    Q.   You can take that down, Ms. Lee.

5          Ms. Thompson, did you take notes of your conversations

6    with Jonathan as well?

7    A.   I did of some of them, yes, the ones involving me writing

8    checks, I would think I did.

9    Q.   During the call with Jonathan on December 16th, 2015, what

10   did Jonathan speak with you about?

11   A.   About setting up an LLC, limited liability company.

12   Q.   Why would you need an LLC?

13   A.   Because I wanted my company to be legitimate and legal.

14   Q.   Did Jonathan offer you any services in connection with

15   making your company legitimate and legal?

16   A.   He did.

17   Q.   What kind of services?

18   A.   Tax services that were going to be for my personal taxes

19   and my business taxes, and help getting my family -- settling

20   my family affairs as far as getting my parents' things

21   completed.  And also setting up a business line of credit,

22   opening a bank account, business bank account, checking and a

23   line of credit for that.  I might have said that, all of those

24   things I needed them to do.

25          (Continued on next page)

1              MS. KEARNEY:  Ms. Lee, could you pull up what has been

2    marked for identification as Government Exhibit 160.

3              If you could zoom in on the body.

4    Q.  Ms. Thompson, do you recognize this?

5              Did you review this document in preparation for your

6    testimony today?

7    A.  I did, yes.

8    Q.  What is it?

9    A.  It's an e-mail that I found in my e-mails.

10   Q.  Do you remember receiving this e-mail on the date that it

11   was sent?

12   A.  No.

13   Q.  In preparation for testifying today, did the government ask

14   you to look through your e-mails and see if you could find

15   anything relating to A1?

16   A.  Yes.

17   Q.  Did you do that?

18   A.  I did.

19   Q.  In connection with that, did you find this e-mail?

20   A.  Yes, I did.

21             MS. KEARNEY:  The government offers Exhibit 160.

22             THE COURT:  Admitted without objection.

23             (Government's Exhibit 160 received in evidence)

24             MS. KEARNEY:  Ms. Lee, could you publish it, please.

25   Q.  Ms. Thompson, what is the date on this e-mail?

1   A.  December 17, 2015.

2   Q.  Who is it from?

3   A.  It's from Arash Ketabchi or something.

4   Q.  At what e-mail address?

5   A.  Atechosign@echosign.

6   Q.  Who is it to?

7   A.  It's to jthompson13.

8   Q.  Who is that?

9   A.  That's me.

10  Q.  At the time, did you know who Arash Ketabchi was?

11  A.  Never heard of him.

12  Q.  Let's look at the right-hand side of what is in the body

13  there.

14          It says, "Arash Ketabchi, positivefaith@gmail.com."

15          It says, "Please review and sign, Jane Thompson."

16          Do you know who positivefaith@gmail.com is?

17  A.  No.

18  Q.  What is your understanding of what the sender of this

19  e-mail wanted you to do?

20  A.  They wanted me to click on it and sign it and send it back

21  to them.

22  Q.  Could you look at the left-hand side of the body there.

23          MS. KEARNEY:  Ms. Lee, is it possible to blow it up so

24  it's readable?

25          It looks like not.  We will move on then.

1    Q.  Do you know what that is a picture of?

2    A.  It's some type of document, but I can't really read it.

3    Q.  At the bottom on the right-hand side it says, "All parties

4    will receive a final PDF copy by e-mail."

5            Did you receive that PDF?

6    A.  No, I couldn't find anything else, and I certainly didn't

7    sign it and send it back.

8            MS. KEARNEY:  Ms. Lee would, could you publish

9    Government Exhibit 903B, which should be in evidence.

10           THE COURT:  Prior to that time, that is, prior to

11   December 17, 2015, when you received that e-mail, to your

12   knowledge, had you had any dealings or any knowledge of Arash

13   Ketabchi?

14           THE WITNESS:  Never.

15           MS. KEARNEY:  Could you blow up the face of that

16   check, Ms. Lee?

17           Thank you.

18   Q.  Ms. Thompson, what is this?

19   A.  This is another check that I have written.

20   Q.  What is the check number?

21   A.  8570.

22   Q.  What is the date on the check?

23   A.  December 18, 2015.

24   Q.  How much is it for?

25   A.  $18,999.

1   Q.  Who is it made out to?

2   A.  A1 Business Consultant, LLC.

3   Q.  Can you make out the memo line?

4   A.  Tax business services.

5   Q.  How many days after your December 16 conversation with

6   Jonathan Stewart did you write this check?

7   A.  Two days.

8   Q.  Where did you get the money for this check?

9   A.  From my 401(k).

10  Q.  You said the memo line says "tax business services."  What

11  did you understand that to mean?

12  A.  That they were going to have somebody take care of all my

13  tax services.

14  Q.  Why did you purchase that?

15  A.  So someone would take care of all of my tax services.

16  Q.  What business would those tax services be in connection

17  with?

18  A.  With my business, my personal, and all of my family

19  business that I am still responsible for.

20  Q.  What business was that?  Let's put aside your personal and

21  your family for a second.  What business were those tax

22  services in connection with?

23  A.  With these terminals, is that what you're asking?

24          With the terminals, with the business I was setting up

25  and they were helping me set up; that they were supposed to be

1   setting up for me for the business that I was establishing.

2   Q.  So in addition to paying this money, what was your

3   understanding of what, if anything, you would have to do to

4   make that terminal business successful?

5   A.  That was very clear.  I was not going to have to do

6   anything, as far as no selling.  I was not going to have to

7   do -- I wouldn't have to learn Webinars or go through lessons

8   or whatever.  Because I asked them very, very clearly, I said,

9   I'm not a seller.  If somebody wants to buy something, I'm

10  like, if you want to buy it, buy it, if you don't, it's OK with

11  me.  That's not a business for me, to sell something to

12  somebody.

13  Q.  Who did you say that to?

14  A.  I said that to Jonathan Stewart, or the person I knew as

15  Jonathan Stewart.  I said that to Emily Miller.  I said that to

16  Michael Goldman.  I said that to their fulfillment team.  I

17  said that to everybody I spoke to, every time, very, very

18  often.  So I made that extremely clear.

19  Q.  When you spoke to Jonathan about it, did he respond?

20  A.  Yes.  He said, Don't worry about that.  You won't have to

21  do anything.  You don't have to sell anything.  There is

22  nothing you have to do except keep up with the amount of money

23  that's coming in to you so that you can let our tax people that

24  are working for you know how much you made to do your taxes.

25  He made that extremely clear, and I made it extremely clear.

We went back and forth about that on several, many occasions,

because that was really important to me.

      In fact, when it came to the point, they said, you

know, we are going to send you a computer so that you can just

keep up with that, and all you have to do is print it out and

send it to us, or just send it through an e-mail or whatever,

just how much you have made, that's all you have to let us

know, how much money you have made, that's all you have to do.

Don't worry about all this other stuff, there is nothing else

for you to do.

Q.  You said you were sent a computer?

A.  Yes.

Q.  What was the computer for?

A.  Just so I can keep up with the money that I was making.

      MS. KEARNEY:  Ms. Lee, could you show the witness what

has been marked for identification as Government Exhibit 161.

Q.  We talked earlier about how the government asked you to

search your e-mails, Ms. Thompson.  Is this another e-mail you

found?

      MS. KEARNEY:  Could you zoom in a little bit?

A.  Yes, it is.

Q.  Who is it to?

A.  It's to me.

Q.  Who is it from?

A.  From customer service at A1 customer service department.

1                MS. KEARNEY:  The government offers Government Exhibit

2     161.

3                THE COURT:  Hearing no objection, admitted.

4                (Government's Exhibit 161 received in evidence)

5     Q.  Ms. Thompson, you said this was from the customer service.

6     Who signed the e-mail?

7     A.  Samantha M. at the fulfillment department.

8     Q.  Samantha M. writes, "Our next scheduled appointment has

9     been set."

10               Before that she wrote "Thank you so much for your time

11    today."

12               Had you spoken to Samantha on December 18?

13    A.  I had, yes.

14    Q.  Generally, what did you and Samantha discuss?

15    A.  Generally, it was Samantha and Stephanie that were in that

16    department, and one or the other one would call me once a week

17    and they would discuss how they wanted me to fill out some tax

18    forms.  And I would discuss how I wasn't filling out tax forms,

19    I needed to talk to a CPA, that I was promised a CPA to take

20    care of these things, and I paid a lot of money to have that

21    busy work done.

22               They would say, Well, that needs to be done.  And I

23    said, No, it's not going to be done.  We would go back and

24    forth about that.  And they'd say, Well, I will call you next

25    week and I'll see if I can't get you a CPA to call you.  And

1    I'd say, Well, I'm going to talk to Jonathan about that.

2    They'd say, OK.  And I would talk to Jonathan about that and

3    he'd, I'm going to take care of it and get somebody to call

4    you, and nobody called me.  Excuse me.

5    Q.  Samantha writes, "We will go over your enrollments listed

6    below."  And then she lists "corporate setup, business plan,

7    corporate credit, tax prep, and tax plan."

8           What are those items?

9    A.  Those are the items that Jonathan discussed with me the

10   first time we spoke, I think.  It looks like the same thing.  I

11   mean, it doesn't look like it is the same thing.

12   Q.  Your understanding is it was the same thing?

13   A.  Yes.

14   Q.  Samantha signs her e-mail from the fulfillment department.

15   How frequently did you speak to the fulfillment department?

16   A.  Once a week.  Sometimes she would call on -- Wednesdays

17   seemed like it was our day.  Well, that says Monday.  Sometimes

18   she'd say, Well, I will call you back Wednesday or Friday and

19   see if you have things together.  I'd say, You can call back,

20   but I'm not going to have them together because I'm not going

21   to do those packets or something she sent.  I wasn't doing

22   that.  I paid $18,000 to get this done.  I'm not doing that.

23   I'm not doing it.  I'm not going to do it.

24   Q.  I am going to bring you up a binder.  I think it will make

25   it more quick to review the documents.

1  A.  I mean, I was going to get my information together, don't

2  get me wrong, but I am not going to fill out -- I am not going

3  to do their secretarial work for them.

4  Q.  Ms. Thompson, could you take a look in your binder at what

5  has been marked as Government Exhibit 175.

6  A.  Can I say something?  May I say something?

7          THE COURT:  Wait until there is a question.

8          THE WITNESS:  I'm so sorry.

9          THE COURT:  That's all right.

10 Q.  Can you take a look at Government Exhibit 181?

11          Do you recognize those documents?

12 A.  I do.

13 Q.  What are they?

14 A.  Those are documents that they sent me to sign.

15 Q.  Who is "they"?

16 A.  A1.

17 Q.  Are these the actual documents or are these pictures of the

18 documents?

19 A.  Those are pictures of the documents.

20 Q.  How can you tell that?

21 A.  Because the cover on -- the screen cover on my phone is

22 broken and you can tell it's a photocopy here.

23          MS. KEARNEY:  The government offers Exhibits 175 and

24 181.

25          THE COURT:  Hearing no objection, 175 -- pardon me?

1                MR. HASSEN:  We haven't seen the documents.

2                MS. KEARNEY:  Yes, you have.

3                MR. MITCHELL:  No objection.

4                MR. SCHMIDT:  May I have a moment?

5                No objection.

6                THE COURT:  Hearing no objection, both of those

7       exhibits are admitted.

8                (Government's Exhibits 175 and 181 received in

9       evidence)

10               MS. KEARNEY:  Ms. Lee, could you put up Government

11      Exhibit 175.  And it's two pages, so if it's possible to put

12      them side-by-side, that would be good.

13      BY MS. KEARNEY:

14      Q.  Ms. Thompson, what is your understanding of what this

15      document was for?

16      A.  This document was to prepare taxes for 2014.

17      Q.  When did you receive this document?

18      A.  I received this document at the end of, I guess in 2016.

19               MS. KEARNEY:  Ms. Lee, could you please, on page 2,

20      blow up the section below "please be aware of the following

21      deadlines."

22      Q.  This says, "Your individual tax return for 2014 is due to

23      the IRS by April 15, 2015."

24               Did you receive this before or after April 15, 2015?

25      A.  After.

1   Q.  Number 2 says, "If you have a corporation, your business

2   tax return for 2014 is due to the IRS by March 16, 2015."

3           Did you receive this before or after March 16, 2015?

4   A.  After.

5   Q.  Did you speak with anyone at A1 about that?

6   A.  Yes.  I called them and told them I thought they sent me

7   the wrong information.  And they said it was a clerical error.

8   They just sent the wrong packet -- they just forgot to change

9   the date.

10  Q.  Take a look at Government Exhibit 181.

11          MS. KEARNEY:  Ms. Lee, could you just zoom in on the

12  first half.

13  Q.  Ms. Thompson, what is the title of this document?

14  A.  "General engagement letter for individual tax return

15  preparation."

16          MS. KEARNEY:  Ms. Lee, could you scroll down a little

17  bit.

18  Q.  Ms. Thompson, there is a red arrow here.  It says "sign

19  here."  Did you sign this document?

20  A.  No, I don't believe I did.

21  Q.  Why not?

22  A.  Because I didn't want individual tax services done.  I

23  needed business and individual tax services done.

24  Q.  At the top there is a name here, Leo Gordon.  Do you know

25  who that is?

1   A.  I know who that was supposed to be.  He was supposed to be

2   my CPA.  I spoke to him one time I think on the phone, and that

3   was it.

4           THE COURT:  Do you know who "EA" stands for after the

5   name Leo Gordon?

6           THE WITNESS:  I have no clue.

7   Q.  Ms. Thompson, I am going to bring you what has been marked

8   as Government Exhibit 176, 178 and 180.  If you could turn in

9   your binder, or maybe Ms. Lee could put up on the screen for

10  identification 185.

11          Do you recognize those four documents?

12  A.  Yes, I do.

13  Q.  What are they?

14  A.  These are packets that were sent to me by A1.

15  Q.  Three of those that I just brought to you, those are in

16  plastic sleeves.  Were they like that when you got them from

17  A1?

18  A.  No, they weren't.

19          MS. KEARNEY:  The government offers Exhibits 176, 178,

20  180 and 185.

21          THE COURT:  Hearing no objection, admitted.

22          (Government's Exhibits 176, 178, 180 and 185 received

23  in evidence)

24          MS. KEARNEY:  Your Honor, I was wondering if perhaps

25  we could publish the originals of 176, 178 and 180 to the jury

1   and I continue the questioning while we do it.

2            THE COURT:  Yes.

3            In other words, the government is asking that you see

4   the original of the documents.  Listen to the questions and the

5   answers, but you can pass those amongst you.

6   Q.  Let's start with 185.

7            MS. KEARNEY:  Ms. Lee, could you publish that for the

8   jury, please.

9   Q.  Ms. Thompson, what is this document?

10  A.  It looks like just the welcome letter to their business.

11  Q.  What is the date on it?

12  A.  December 2015.

13  Q.  Take a look at the second paragraph, the second sentence.

14  It says, "We are going to call you to go over some business

15  financials," and it lists a couple of things.

16           Did you someone call you to discuss that?

17  A.  No.  There was no talk about any month-to-month expenses,

18  startup costs, investment portfolio.  There was no talk of any

19  of that.

20           MS. KEARNEY:  Ms. Lee, could you please put up

21  Government Exhibit 180.

22  Q.  Ms. Thompson, can you turn to the copy that's in your

23  binder, please.

24  A.  I'm sorry.  180?

25  Q.  Yes.  180.

1              What is the title of this document?

2    A.  "JRT Enterprises, LLC."

3    Q.  What is JRT Enterprises LLC?

4    A.  That was my business name.

5              MS. KEARNEY:  Ms. Lee, could you just flip through the

6    pages in that document, please.

7              Could you put up Government Exhibit 178, please.

8    Q.  Ms. Thompson, could you please turn to it in your binder.

9              What is the title of this document, Ms. Thompson?

10   A.  "Income tax planning and strategy guide."

11   Q.  You said this was another document you got from A1?

12   A.  Yes.

13   Q.  Did you read this document?

14   A.  Where is it in here?

15   Q.  I'm sorry.  It's 178.

16             I read through this.  Yes, I did.

17   Q.  Let's look at Government Exhibit 176.

18             What is the title of this document, Ms. Thompson?

19   A.  The title is "daily bookkeeping log."

20   Q.  You have a copy there in your binder, right?

21   A.  I do.

22   Q.  Approximately how many pages is it?

23   A.  Maybe 50, 75, maybe 100.

24   Q.  Can you just quickly flip through the pages there?

25   A.  Sure.

1    Q.  Other than the cover, are the pages the same or different?

2    A.  They are the same.  Well, you have got this page and that

3    page, and then they are all copies of that.

4    Q.  Copies of two pages?

5    A.  Copies of two pages.

6    Q.  Did you fill out this document?

7    A.  Absolutely not.  There was nothing for me to fill in.  I

8    don't have any of those expenses.

9    Q.  Did you discuss these documents with anyone at A1?

10   A.  I did.

11   Q.  Who did you discuss them with?

12   A.  With the fulfillment department.

13   Q.  And you're making air quotes.  Why is that?

14   A.  Because the fulfillment department is nothing but busy

15   work.  That was the biggest joke I ever heard of it.  There was

16   nothing but stalling, that's all they did was stall.

17   Q.  Did you discuss these documents with Jonathan Stewart?

18   A.  I did.

19   Q.  What did you say to him and how did he respond?

20   A.  I told him that this was a bunch of bull and that it's

21   crazy.  There is nothing to this but busy work, and I wasn't

22   paying to do busy work.  And he knew that.  And he was, Oh, no,

23   don't worry about that, you know, you're a special client, you

24   know, we don't need you to do all that stuff.  Of course, you

25   paid money for somebody to do that.  I said, You're darn right

1    I have, in other words.  And it was just on and on.  We went

2    back and forth and back and forth and back and forth about

3    that.  As you guys see, that looks as clean as it was when I

4    got it, and it stayed that way.  I don't know how else to say

5    that politely.

6    Q.  Let's take a look at what has been marked for

7    identification as Government Exhibit 163.

8            Ms. Thompson, could you please take a look at pages 3

9    through 5.

10           MS. KEARNEY:  Ms. Lee, could you blow up page 3

11   through 5?

12   Q.  Do you recognize pages 3 through 5?

13   A.  Yes, I do.

14   Q.  What are they?

15   A.  I did e-sign this.

16   Q.  What is "this"?

17   A.  Where I paid another check.

18   Q.  Could you look at page 1 of 163?

19           What is page 1?

20   A.  This is an e-mail to me -- I mean, I don't recognize this.

21   Q.  Do you remember receiving it on the date that's in that

22   e-mail?

23   A.  I don't remember receiving it on the date that's in the

24   e-mail.

25   Q.  When the government asked you to go search through your

1    e-mails, is this a document that you found?

2    A.  Yes, it is.

3          MS. KEARNEY:  The government offers Government Exhibit

4    163.

5          THE COURT:  Admitted without objection.

6          (Government's Exhibit 163 received in evidence)

7          MS. KEARNEY:  Ms. Lee, would you please publish, and

8    we will start with page 1.

9    Q.  Ms. Thompson, who is this e-mail from?

10   A.  It's from Zach Peterson at Echo Sign to Zach Peterson at

11   Positive Faith.

12   Q.  Who else is it to?

13   A.  To me.

14   Q.  What is its date?

15   A.  December 29, 2015.

16   Q.  At the time, did you know who Zach Peterson was?

17   A.  At that time, I don't know that I knew who Zach Peterson

18   was yet.  I'd have to check my notes.

19   Q.  Did you eventually learn who Zach Peterson was?

20   A.  I did eventually learn who he was.

21   Q.  And we talked about positivefaith@gmail.com.  Do you know

22   whose e-mail address that is?

23   A.  Not until just recently, a week or so ago.  I just found

24   out -- I just heard that name.  I still don't know who that is.

25   Q.  At the time you didn't know?

1    A.  I had no idea, no.

2    Q.  Let's take a look at page 3.

3              MS. KEARNEY:  Ms. Lee, if you could zoom in on the top

4    half.

5    Q.  What is the title of this document?

6    A.  "Product and Services Agreement with A1 Business

7    Consultants, LLC."

8    Q.  Who is this agreement between, who are the parties?

9    A.  Between A1 Business Consultants and myself.

10   Q.  What is the date on this agreement?

11   A.  The 29th of December, 2015.

12             MS. KEARNEY:  Ms. Lee, could you zoom in on the

13   products and services.  Thank you.

14   Q.  How much money is this agreement for?

15   A.  $9,995.

16             MS. KEARNEY:  Ms. Lee, let's go to page 5.

17   Q.  Ms. Thompson, did you sign this contract?

18   A.  I did.  I e-signed that.

19   Q.  Did you speak to anyone at A1 about this contract before

20   you signed it?

21   A.  While I was signing that, I did.  I spoke with Emily

22   Miller.

23   Q.  How about prior to signing it, were you surprised when you

24   received this, or were you expecting it?

25             MR. HASSEN:  Objection.

1              THE COURT:  Sustained as to form.

2              Rephrase it.

3   Q.  Were you surprised when you received this contract?

4              MR. HASSEN:  Same objection, your Honor.

5              THE COURT:  I will allow it.

6   A.  Yes, I was surprised, but I did sign it.

7   Q.  Did you know what this contract was for before you received

8   it?

9   A.  I didn't know what all of this meant.  I didn't know

10  what -- I was just going along with what -- I was just going

11  along, I will be honest with you.

12  Q.  Let's take a look at, under products and services, page 3?

13  A.  Yes.

14  Q.  It lists, YouTube, social media package, SEO/SEM, and

15  custom merchant Web site.

16             Do you know what those services or products were?

17  A.  I don't know what SEM and SEO are, no.

18  Q.  These services that you purchased for $9,995, were those

19  included in the $18,999 that we talked about earlier, or was

20  this a separate charge?

21  A.  They should have been included, but obviously I paid a

22  separate charge for them.

23  Q.  Let's take a look at page 5 again, the bottom of the page.

24             How did you pay?

25  A.  By check.

1  Q.  What is the check number?

2  A.  8571.

3  Q.  Again, what is the date on this contract?

4  A.  December 29, 2015.

5          MS. KEARNEY:  Ms. Lee, could you put up Government

6  Exhibit 903C, please.

7          Thank you.

8  Q.  Ms. Thompson, what is 903C?  What is this exhibit?

9  A.  That's a check to A1 Business Consultants.

10  Q.  How much is it for?

11  A.  $9,995.

12  Q.  What is the check number?

13  A.  8571.

14  Q.  What is in the memo line?

15  A.  Front end web services.

16  Q.  Now, this check is dated January 30, 2015.  Is that the

17  date you wrote the check?

18  A.  Yes, it would have been the date I wrote the check.

19  Q.  How does this check number compare to 903B, which is the

20  check we previously looked at?

21          MS. KEARNEY:  Ms. Lee, could you put them

22  side-by-side.

23          THE COURT:  Blow that up, please.

24  Q.  How does the check number on 903C compare to the check

25  number on 903B?

1        THE COURT:  What is the check number on each of those

2    exhibits, Ms. Thompson?

3        THE WITNESS:  The one on the bottom is 8570.

4        THE COURT:  And the other one?

5        THE WITNESS:  The other one is 8571.

6        THE COURT:  Thank you.

7        Next question.

8    Q.  On page 5 of Government Exhibit 163, what is the check

9    number that you used to pay for that contract?

10   A.  For the contract, it's 8571.

11   Q.  Ms. Thompson, did you ever see your Web site?

12   A.  No.  I was told that -- as far as I know, there wasn't a

13   Web site.

14   Q.  Did you ever see a YouTube video?

15   A.  No, no YouTube video.

16   Q.  Did there come a time when you spoke to someone in the

17   fulfillment department at A1 about your Web site?

18   A.  Yes, there was.

19   Q.  Who did you talk to?

20   A.  I don't know if it was Stephanie or Samantha, but one of

21   those.

22   Q.  What did they tell you about your Web site?

23   A.  They told me that, as far as they knew, they didn't do any

24   Web site work at their company; they didn't provide that at

25   all.

1     Q.  How did you react to that?

2     A.  Very angrily and upset, since I had already paid quite a

3     few thousands and thousands of dollars for it already.

4     Q.  Did you talk to Jonathan Stewart about it?

5     A.  Yes.

6     Q.  What did he tell you?

7     A.  They must be mistaken.  Again, another mistake.  Just

8     mistake after mistake after mistake.

9     Q.  Now, this whole time that you have been speaking with

10    people from A1 Business Consultants, are you still in touch

11    with Steve Blake or has that stopped?

12    A.  I'd have to check my notes on that.

13    Q.  You don't remember?

14    A.  I don't remember.  I think probably still kind of in touch

15    with him, but I pretty much -- I kind of wasn't answering all

16    those calls.  I think I still was hearing from him, but I

17    thought he was kind of a joke too.

18            Of course, I was the one that was a joke.  I was the

19    one writing the checks.

20            MS. KEARNEY:  Ms. Lee, could you pull up Exhibit 903D.

21            Can you zoom in on the face of the check.

22    Q.  Ms. Thompson, what is this?

23    A.  That's a check for $20,000 that I wrote on January 21,

24    2016.

25    Q.  What is in the memo line?

1    A.  Merchant account something services.

2    Q.  Let me direct your attention to two days before the date on

3    this check, so to January 19, 2016.

4           What, if any, conversation did you have regarding

5    merchant terminals or merchant accounts on that day?

6    A.  I'd have to guess.  Maybe that's when I talked with

7    Jonathan and Emily about --

8    Q.  Do you remember if you talked to Jonathan or Emily?

9    A.  Can I look at my notes, please?

10   Q.  Ms. Thompson, could you please take a look at Government

11   Exhibit 165, page 19.

12          THE COURT:  She is moving on.

13          MS. KEARNEY:  I'm actually not.  I am going to attempt

14   to refresh her recollection.

15          THE COURT:  All right.

16          MS. KEARNEY:  May I proceed?

17          THE COURT:  Yes.

18   Q.  Can you take a look at page 19 of Government Exhibit 165,

19   read it to yourself, and let me know if that refreshes your

20   recollection about whether you talked to Jonathan or Emily that

21   day.

22          THE COURT:  Ms. Thompson, when you asked to look at

23   your notes, I gather that's because you could not remember

24   whether or not you talked to Jonathan or Emily, is that

25   correct?

1        THE WITNESS:  When I said I wrote that check, I'm

2   thinking it was about a conversation that I am remembering, but

3   I would have to see my notes to know that that was the

4   conversation.

5        THE COURT:  That's perfectly all right.

6   Q.  Does that refresh your recollection, Ms. Thompson?

7   A.  Yes.  Can I read it?

8   Q.  I'm sorry.

9   A.  Yes, it does.

10  Q.  What, if any, conversation did you have about merchant

11  terminals or merchant accounts on that day?

12  A.  I talked with Jonathan and Emily on the telephone.

13  Q.  Did you talk to them separately or together?

14  A.  Together.

15  Q.  What did you discuss?

16  A.  We discussed starting up two or three terminals at that

17  time.  Jonathan wanted me to go ahead and start with three

18  terminals, and he was really encouraging me to go ahead and do

19  the three.  And Emily -- as I said, all three of us were on the

20  line, and she knew at the time that my money was getting lower.

21  Anyway, I don't remember exactly why or how that was, but I

22  remember specifically that conversation because -- I can

23  remember where I was sitting in my house at the time anyway,

24  but that's not important.  He was wanting me to -- really

25  pitching for me to do the three terminals.  And she was texting

1   me separately.  I mean we were talking, but she was texting,

2   and she said, just do one for now, just do one more now and get

3   off the phone, just get him off the phone and we will talk

4   later.

5   Q.  Did you agree to purchase any terminals?

6   A.  I did.  I agreed to do one terminal.  And I said that's

7   where the $20,000 came in.

8   Q.  What was your understanding as to whether or not you would

9   make money from that terminal?

10  A.  That I would make money from it, yes.

11  Q.  How would you be able to make money from that terminal?

12  A.  The way that I had discussed before with the one with

13  Michael Goldman, that I would get -- if it was 4 percent that

14  we were making off that terminal, he would get 2 percent, I

15  would get 2 percent.

16  Q.  When you say he would get 2 percent, I would get 2 percent,

17  who is the "he"?

18  A.  He, as in Jonathan Stewart.

19  Q.  What, if any, understanding did you have about when you

20  would start making money from that terminal?

21  A.  Within the 30 days.

22  Q.  How did you come to that understanding?

23  A.  Jonathan Stewart told me that.

24  Q.  I am going to show you what has been marked for

25  identification as Government Exhibit 172.  You can turn to it

1   in your binder.

2           MS. KEARNEY:  Ms. Lee, could you also pull it up.

3   Q.  Do you recognize this exhibit?

4   A.  Yes.

5   Q.  What is it?

6   A.  That's the contact information off my telephone of

7   Jonathan's phone numbers.

8   Q.  Could you flip through the pages?

9           Are there things here other than his contact

10  information?

11  A.  These are text messages between he and I.

12          MS. KEARNEY:  The government offers Government Exhibit

13  172.

14          THE COURT:  Admitted without objection.

15          (Government's Exhibit 172 received in evidence)

16  Q.  Ms. Thompson, let's start on page 4 of this exhibit.

17          What is the date on these messages?

18  A.  January 20, 2016.

19  Q.  Can you now read the messages that you sent, and then I

20  will read Jonathan's messages.  OK?

21  A.  "Hi, Jonathan.  I sent the check.  It will be there before

22  noon tomorrow.  Tracking number EL190577358US.  Have a great

23  day and let me know if I need to do anything else at this time.

24  Thanks, Jane Thompson."

25  Q.  "OK.  Thank you so much for the tracking information.  We

1   are all set for now.  I will be giving you a call tomorrow

2   afternoon.  I'm excited for you.  Hope to speak to you often.

3   Remember your password and don't hesitate to call.  Have a

4   great day Jane.  Jonathan Stewart."

5            So when you told Jonathan "I sent the check," what

6   were you referring to?

7   A.  The check for $20,000.

8   Q.  Then further down Jonathan tells you to remember your

9   password.  What did you understand him to mean by that?

10  A.  They had asked me to start using a password, to make up a

11  password that he and Emily and I would know, and Steve Blake,

12  that we would all just know.  I assumed that was because they

13  didn't want anybody else to skip me up because they were

14  changing companies at that time.

15  Q.  So let's look at pages 5 through 8 now.

16           What is the date on these messages?

17  A.  January 22, 2016.

18  Q.  Let's do the same thing.  You read you, I'll read Jonathan,

19  and we will go from "Hi, Jonathan" to "take care."

20  A.  "Hi, Jonathan.  Hope you had a good day.  Wanted to let you

21  know that the money was in my account for the check that I

22  sent.  I apologize for not letting you know yesterday.  That

23  was my intention.  I have been so busy trying to get my house

24  here packed, emptied, dealing with realtor to get it rented.  I

25  could go on but I'm sure you understand.  Let me know if you

1    need anything from me at this point.  I plan to be completely

2    packed and moving van loaded and leaving here early Monday

3    morning if the weather lets us.  Have a great weekend, Jane."

4    Q.  "Hello, Jane.  Thank you so much.  My day went well, busy

5    as always, but finally heading home now.  Please don't

6    apologize for anything.  All is well here on our end, making

7    progress just as expected.  And thank you for the notice.  I

8    will definitely contact you if we need anything.  Good luck

9    with the move.  Yes, hopefully the weather holds up for you.

10   Enjoy your weekend as well.  I will speak to you Tuesday.

11   Please please please contact me if you need anything at all."

12   A.  "OK.  I will definitely text or call you if I need anything

13   from here on out.  Glad your workday is finally coming to an

14   end.  And thanks, I will need some luck to make this happen on

15   time, but my aunt and uncle have been a huge help and I have a

16   couple of cousins and friends coming to load moving truck.

17   Just hope I can get it all packed or trashed by then.  LOL.

18   Talk to you soon, Jane."

19   Q.  "You will be in my prayers tonight.  I think with the help

20   of friends and family you will be OK, but it doesn't hurt to

21   have a little luck on your side as well.  Try to find some time

22   to relax along the way too.  Have a great weekend, Jane.

23   Jonathan Stewart."

24   A.  "Thanks so much.  Great advice and I definitely agree.

25   Just so happy to be getting this done.  Take care."

1  Q.  On page 57, you referenced that you were trying to pack up.

2  Were you moving?

3  A.  Well, yeah, I was moving out of my house so I could rent it

4  because I didn't have any money coming in and I was broke.

5  Q.  On page 6, when Jonathan tells you, "All is well here on

6  our end, making progress just as expected," what did you

7  understand him to mean?

8  A.  That they were making progress on getting the merchant

9  terminal up and running so I would be getting some money coming

10 to me.

11 Q.  Let's go to pages 8 and 9.  We will do the same thing.

12 Let's start with "Hey, Jane," and we will go to "I will call

13 you right back."  So you be you and I will be Jonathan.

14         "Hey, Jane.  Just checking in, seeing how everything

15 is going.  Please don't forget to give me a call when you're

16 free today so we can move forward with our next step.  Thank

17 you.  Speak to you soon."

18 A.  "OK.  Thanks, Jonathan.  I'm at the store checking on the

19 phone right now."

20 Q.  "OK.  Great.  I will call you right back."

21 A.  "Hi, Jonathan."

22 Q.  We can stop there.

23         On page 7 you said you were at the store checking on

24 the phone?  What were you referring to?

25 A.  I was getting a business phone for my business.

1    Q.  Why were you doing that?

2    A.  Because Jonathan and Emily insisted that I needed to have a

3    separate phone for my business, and that they were going to

4    reimburse me for that.

5    Q.  OK.  Now, in addition to a business phone, did you obtain

6    anything else to help with your business?

7    A.  Besides a business phone?  I obtained so many things.

8    Q.  Did you ever open a checking account?

9    A.  Oh, yeah, a checking account, that cost me money too, not

10   as much as the business phone.  Yeah, I opened a checking

11   account, and I had to open that, I had to put an amount of

12   money in there to open it, and then if I didn't have so much

13   money in it by -- I don't remember if it was 30 or 90 days, but

14   if I didn't have the $1500 in there by that time, then they

15   would charge me on it.  And of course I didn't so I ended up

16   having to pay money to close the account.

17   Q.  When you opened the account, did you expect to have the

18   required amount of money within the time period you needed to?

19   A.  Absolutely.

20            MR. HASSEN:  Objection.

21            THE COURT:  I will allow that.

22            It's been answered.

23            Next.

24   Q.  Why did you think that?

25   A.  Because Jonathan Stewart and Emily Miller both assured me

1  that I would definitely have that money by the end.

2  Q.  Now, we spoke earlier about your business phone.  Were you

3  ever reimbursed for those costs?

4  A.  No.

5  Q.  Let's go back to Government Exhibit 172, where we left off

6  on pages 9 and 10.

7         Let's start with "Hi, Jonathan," and we will go to

8  "speak to you soon."  So you be you and I will be Jonathan.

9  A.  "Hi, Jonathan.  If you have already gone to bed, just wait

10  until morning to respond to this, please.  I just wanted to go

11  ahead and text you about it so I would not forget.  I went to

12  sign form for LLC and the form asked for street address and

13  they have typed in my mailing address, and as for my mailing

14  address the form is blank.  I just wasn't sure if I needed to

15  change this before mailing it in.  Thanks so much, Jane."

16  Q.  "Hey, Jane.  Can I call you in about an hour?"

17  A.  "Sure.  That will be great."

18  Q.  "OK.  Perfect.  Speak to you soon."

19         You refer here to signing a form for the LLC.  What

20  were you talking about?

21  A.  The fulfillment department sent me the forms for me to fill

22  out for my LLC.  So after so long I went ahead and did it

23  myself.

24  Q.  Can you take a look, and Ms. Lee, could you pull up for

25  identification Government Exhibit 179.

1          Do you recognize this document, Ms. Thompson?

2     A.   Yes, I do.

3     Q.   What is it?

4     A.   That's the North Carolina -- it's my LLC license.

5          MS. KEARNEY:  The government offers Government Exhibit

6     179.

7          MR. HASSEN:  No objection.

8          THE COURT:  Admitted.

9          (Government's Exhibit 179 received in evidence)

10         MS. KEARNEY:  Ms. Lee, could you please publish, and

11    let's look at page 3 of the document, which is actually

12    numbered page 1.

13    Q.   Ms. Thompson, do you know who filled out the typewritten

14    portion of this document?

15    A.   I don't know exactly who, but it came from A1.

16    Q.   Whose handwriting is on this document?

17    A.   It's my handwriting.

18         MS. KEARNEY:  Let's look at page 2, Ms. Lee.

19    Q.   Is that your signature, Ms. Thompson?

20    A.   Yes, it is.

21    Q.   The date up here above your signature is December 24, 2015.

22    Is that the date you signed the document?

23    A.   No, it's not.

24    Q.   Do you remember what date you signed it?

25    A.   I don't remember the date I signed it, but it would be

1    close to the date I wrote the check.

2    Q.  Let's look at the bottom of page 1 of this document first.

3          What date was this filed?

4    A.  February the 8th, 2016.

5          MS. KEARNEY:  Ms. Lee, let's turn to the bottom of

6    page 2 in the notes.  It says filing fee is $125.  Was that fee

7    included in the $18,999 that you paid to A1 Business

8    Consultants?

9    A.  It was supposed to be, but I had to pay it anyway.

10         MS. KEARNEY:  Ms. Lee, could you please put up

11   Government Exhibit 903E?

12         THE COURT:  Before we go to another document, is this

13   a good time for a mid-afternoon break?

14         MS. KEARNEY:  It would be.

15         THE COURT:  Ladies and gentlemen, let's take 15

16   minutes.

17         (Jury exits courtroom)

18         THE COURT:  You may step down, ma'am.

19         We will take a 15-minute break.

20         Ms. Kearney, are you on track to conclude at about

21   4:30?  That would be the time frame you gave me originally.

22         MS. KEARNEY:  Is it 3:15 now?

23         THE COURT:  It says 3:09.  Let's call it 3:15.

24         MS. KEARNEY:  I think I will.

25         (Recess)

1           (In open court; jury not present).

2           THE COURT:  Bring the jury.

3           (Jury present)

4           THE COURT:  Please be seated in the courtroom.  You

5    may continue with the direct examination of Ms. Thompson.

6           MS. KEARNEY:  Thank you, your Honor.  Would you remind

7    Ms. Thompson she is under oath?

8           THE COURT:  You remain under oath.  You understand

9    that?

10          THE WITNESS:  Yes.

11   BY MS. KEARNEY:

12   Q.  Ms. Thompson, when we left off, we were looking at

13   Government Exhibit 903 E.  Ms. Lee, would you pull that up,

14   please.

15          Ms. Thompson, what is this check for?

16   A.  That is for my LLC.

17   Q.  What is the date on the check?

18   A.  January 27th, 2016.

19   Q.  Is it made out?

20   A.  Secretary of State.

21   Q.  What is the amount?

22   A.  $125.

23   Q.  What is in the memo line?

24   A.  State LLC.  I can't read my handwriting right there, but --

25   Q.  We'll let the jury tussle it out.  Can we take a look at

1    Government Exhibit 903 F, Ms. Lee.

2              Ms. Thompson, what is the date on this check?

3    A.  January 28, 2016.

4    Q.  Who is it to?

5    A.  A1 Business Consultants.

6    Q.  What is the amount?

7    A.  $30,000.

8    Q.  Is there anything in the memo line?

9    A.  No, there is not.

10   Q.  Do you remember what this payment was for?

11   A.  I don't remember off the top of my head.  I have to look at

12   my notes.

13   Q.  Would something refresh your recollection?

14   A.  My notes would.

15   Q.  Take a look at Government Exhibit 165, Page 27.  Read it to

16   yourself and let me know if that refreshes your recollection

17   what this check was for.

18   A.  (Pause)

19   Q.  Does that refresh your recollection, Ms. Thompson?

20   A.  Yes, it does.

21   Q.  What was this check for?

22   A.  For the second and third terminals.

23   Q.  When you say the "second and third terminals," what kind of

24   terminals?

25   A.  The merchant terminals.

1    Q.  Did you talk to anyone at A1 about those terminals before

2    you wrote that check?

3    A.  Jonathan Stewart.

4    Q.  Let's take a look at Government Exhibit 172 again and start

5    on Page 10.  Just like last time, you read your messages, I'll

6    read Jonathan Stewart's message.  Start with have a missed call

7    and go through okay, great.  Have a missed call in my office

8    line.  Just wanted to see if everything was okay.

9    A.  Yes, it is, Emily is going to call you or she may have

10   already.

11   Q.  Okay, great.  I just got off the phone with Corp. Credit

12   Coach.  Everything is looking great for 30 business days from

13   today.  I'll speak to you soon.  Until then, enjoy your day.

14   A.  Okay, thanks.  I am working on transferring the funds right

15   now and then I'll get to UPS again.  Before 5:00.

16   Q.  Okay, great.

17           So Jonathan Stewart writes to you I just got off the

18   phone with Corp. Credit Coach and everything is looking great

19   for 30 business days from today.

20           Do you know who the Corp. Credit Coach was?

21   A.  Not without checking my notes.

22   Q.  What were they supposed to do?

23   A.  Corporate Credit Coach?

24   Q.  Yes?

25   A.  I don't know, but 30 days from now is when I was supposed

1   to have money back in my account, I know that.

2   Q.  When he says everything is looking great for 30 business

3   days from today, what does that mean?

4   A.  I was supposed to have money back in my account to replace

5   that, what I was taking out.

6   Q.  You saw the name Zack Peterson earlier.

7   A.  Yes.

8   Q.  Did there come a time when you spoke to Zack Peterson?

9   A.  Yes.

10  Q.  How did that come about?

11  A.  Jonathan Stewart and Emily told me that Zack Peterson went

12  to A1 Business Consultants.  I don't know if he was the owner

13  or one of the owners, but he had a great, wonderful, they had

14  something inside of him he had to tell me and that he had an

15  opportunity for me, great opportunity for me and couldn't wait

16  for me to talk to him.

17  Q.  At the time did they tell you what the opportunity was?

18  A.  They didn't tell me exactly what the opportunity was, just

19  he wanted to talk with me.

20  Q.  Did you eventually come to learn what the opportunity was?

21  A.  I did.

22  Q.  How did you learn that?

23  A.  From talking with him on the telephone.

24  Q.  When did that call take place?

25  A.  I don't know the date, but I wrote it in my notes.

1    Q.  Could you take a look at Government Exhibit 165, at Page

2    22.  Read it to yourself and let me know if that refreshes your

3    recollection about when the call took place.

4    A.  (Pause)  Yes.

5    Q.  When did the call take place?

6    A.  January the 20th, 2016.

7    Q.  Was anyone else on the line?

8    A.  Yes, it was myself, Zack Peterson, Jonathan Stewart and

9    Emily Miller.

10   Q.  Zack Peterson, do you know if that was his real name or

11   not?

12   A.  I know now it was not, but at the time I thought it was.

13   Q.  Now, what was the opportunity that Zack Peterson offered

14   you?

15   A.  To be a 20 percent owner in a business.  He was going to

16   pay -- it was for $300,000 -- he would pay half of that.  I

17   would pay half.  Why he would pay half, don't ask me why right

18   now because I don't know.

19        I guess to complete my insanity, I don't know, but

20   anyhow he would pay half of that and I would pay half, and then

21   I would get that 20 percent residual from their business, and

22   if only everybody would pay like I did, I would be rich right

23   now, right?  Sorry.

24   Q.  So did you agree to that proposal on that call?

25   A.  Not right on that call, no.

1   Q.   You said Mr. Peterson offered you 20 percent of a business.

2   Do you know what business that was?

3   A.   A1 Business Consultants.

4   Q.   Why did you not agree to the proposal on that call?

5   A.   Because that was a lot of money.

6   Q.   Did you speak with anyone at A1 before you made a decision

7   about whether to agree or not?

8   A.   Yes.

9   Q.   Who did you talk to?

10  A.   Jonathan Stewart.

11  Q.   What date did you talk to Jonathan?

12  A.   I'm sure later that day and the next day, I guess.  I'd

13  have to just refer.

14  Q.   Do you remember what date you talked to Jonathan?

15  A.   I know within a day or so I made a decision, so --

16  Q.   Was Zack Peterson on the line when you spoke with Jonathan?

17  A.   Yeah, we continued to talk then.  I made a decision pretty

18  quickly, so it was probably right away.

19  Q.   Do you remember what you discussed with Jonathan?

20  A.   How I would get paid.

21  Q.   From what?

22  A.   From how I would get paid from the company.

23  Q.   What, if anything, did he tell you?

24  A.   How those checks would come in.  I know I wrote something

25  in my notes about that, how often I would get paid.

1   Q.   Do you remember how frequently you would get paid?

2   A.   I don't remember exactly.  I know I took notes on it, but I

3   don't remember it.

4   Q.   Would you take a look at Government Exhibit 165, on Page

5   31, and read it to yourself and let me know if that refreshes

6   your recollection about how frequently you would get paid.

7   A.   (Pause)

8   Q.   Ms. Lee, would you keep it on the left-hand page, please.

9   A.   (Pause)

10          THE COURT:  Looking at that, do you remember now how

11   frequently you were paid?

12          THE WITNESS:  I do remember.  It keeps moving.  I

13   don't remember without reading it.  I know there would be three

14   extra checks, and something would be coming for this and that,

15   but off the top of my head, without reading my notes --

16          THE COURT:  Take a look at your notes and see if it

17   refreshes your recollection.

18          THE WITNESS:  Okay.  (Pause)

19   BY MS. KEARNEY:

20   Q.   Does that refresh your recollection how frequently you

21   would get paid?

22   A.   It does as far as I would get a check from each terminal.

23   Q.   Was there a price range of the check that you would

24   receive?

25   A.   Yes.

IATJKET6                         Thompson - direct

1    Q.  What was it?

2    A.  For what I remembered, it would be eventually plateau about

3    $6,000 for each one.

4    Q.  How frequently would that be?

5    A.  Every two weeks.

6    Q.  Where did you get that understanding?

7    A.  Zack Peterson told me that and Jonathan Stewart reinforced

8    all of my things.

9    Q.  Ms. Lee, could you pull up for identification what has been

10   marked as Government Exhibit 182.  Ms. Thompson, do you

11   recognize that document?

12   A.  Yes, I do.

13   Q.  What is it?

14   A.  That's the first document that I received from A1 for me to

15   sign for the contract.

16           MS. KEARNEY:  The government offers Government Exhibit

17   182.

18           THE COURT:  Admitted without objection.

19           (Government's Exhibit 182 received in evidence)

20   BY MS. KEARNEY:

21   Q.  Ms. Lee, could you publish it, please.  Thank you.

22           Now, Ms. Thompson, is this a paper copy of the

23   contract or are these photographs of the contract?

24   A.  That is a photograph.

25   Q.  How can you tell?

1   A.  Because of the thing on the side of the screen.

2   Q.  Let's start with Page 2.  What is the title of this

3   contract?

4   A.  "Product and services agreement with A1 Business

5   Consultants LLC."

6   Q.  Who is the user or one of the parties to the contract?

7   A.  Myself.

8   Q.  What is the date on the contract?

9   A.  February 4th, 2016.

10  Q.  Who is it with?

11  A.  With A1 Business Consultants.

12  Q.  Ms. Lee, could you zoom in on the products and services

13  section and services provided.  Thank you.

14          What is the amount of this contract?

15  A.  $149,999.00.

16  Q.  What services were to be provided?  You don't have to read

17  all of them.  Can you describe in general terms what they are.

18  A.  LLC, business plan, credit coaching, tax planning.

19  Q.  What are those?

20  A.  Everything I already paid for.

21  Q.  Does this include the partnership interest you had been

22  offered?

23  A.  No, it does not.

24  Q.  Let's take a look at Page 4.  Did you sign this contract?

25  A.  No, I did not.

1   Q.  Why not?

2   A.  Because it didn't include the partnership, the main thing

3   that I thought I was paying for.

4   Q.  Did you speak with anyone from A1 about that?

5   A.  Yes, I did.

6   Q.  Who did you talk to?

7   A.  Jonathan Stewart.

8   Q.  What did he tell you?

9   A.  He told me there must be some mistake, another mistake.

10  Q.  Did you talk to Zack Peterson about it?

11  A.  I tried to, but I couldn't get in touch with him.

12  Q.  Did you eventually get in touch with Zack?

13  A.  No, but Zack eventually got in touch with me.

14  Q.  How did he do that?

15  A.  By message.  He left me a message, I believe.

16  Q.  Phone or email?

17  A.  By voice-mail.

18  Q.  Did you make the payment that this contract calls for?

19  A.  Yes, I did.

20  Q.  Ms. Lee, could you put up Government Exhibit 902 A.

21          Ms. Thompson, what is this?

22  A.  That's the copy of the check that I sent them.

23  Q.  What is the date on it?

24  A.  February 4th, 2016.

25  Q.  Who is it to?

1    A.   A1 Business Consultants.

2    Q.   The amount?

3    A.   $149,999.00.

4    Q.   What is in the memo line?

5    A.   "Final investment."

6    Q.   Now, did you send this check before or after you received

7    the contract that is Government Exhibit 182?

8    A.   Before.

9    Q.   Ms. Lee, could you show her for identification Government

10   Exhibit 184.  Ms. Thompson, do you recognize this document?

11   A.   Yes, that's the second contract that they sent me after I

12   received the message from Zack apologizing for the clerical

13   error that his secretary, his clerical staff must have made an

14   error and just forgot to put in the part about the partnership.

15   He was so, so, so, so, so, so sorry about, and would I please

16   just sign this and send it back.

17            MS. KEARNEY:  The government offers Government Exhibit

18   184?

19            THE COURT:  Admitted without objection.

20            (Government's Exhibit 184 received in evidence)

21   BY MS. KEARNEY:

22   Q.   Ms. Lee, could you publish that and let's start with Page

23   1.  Can you read that second paragraph starting with sorry in

24   the initial agreement.

25   A.   Sorry that the initial agreement -- sorry that in the

1   initial agreement the ownership stipulation was missing due to

2   a clerical error.  It has now been updated.

3   Q.  Ms. Lee, let's look at Page 2.  Ms. Thompson, what is the

4   title of this document?

5   A.  "Product and services agreement with A1 Business

6   Consultants."

7   Q.  What is the entity referred to in it?

8   A.  A1 Business Consultants.

9   Q.  Who is the user?

10  A.  Myself.

11  Q.  Ms. Lee, could you go to Paragraph 1, product services

12  shareholder.  How much money is this contract for?

13  A.  $149,999.00.

14  Q.  What are the services provided?

15  A.  The same things, LLC setup, Corporate Credit Coaching,

16  business plan, tax planning, web service, logo.

17  Q.  What is the shareholder ownership?

18  A.  20 percent of A1 Business Consultants.

19  Q.  Let's look at the last page.  Did you sign this contract?

20  A.  No, I did not.

21  Q.  Ms. Lee, could you put up Government Exhibit 902 A again.

22  Ms. Thompson, was this check negotiated?

23  A.  Yes, it was.

24  Q.  Ms. Lee, could you put up Government Exhibit 902 B.  What

25  is this, Ms. Thompson?

1  A.  That's a check, another check I wrote to A1 Business

2  Consultants.

3  Q.  What is the date on it?

4  A.  February 19, 2016.

5  Q.  What is the amount?

6  A.  $10,000.00.

7  Q.  What is in the memo line?

8  A.  A loan to CPA services, personal and business for 2015,

9  2016 and 2017.

10 Q.  Did you talk with anyone at A1 before writing this check?

11 A.  I did.

12 Q.  Who did you talk to?

13 A.  I talked to Jonathan Stewart.

14 Q.  What did he tell you?

15 A.  He told me -- I was extremely frustrated and I wanted to

16 get my taxes done because I have never been late getting my

17 taxes done, and I canceled my appointment with my personal CPA

18 that year that I had been dealing with and I was freaking out

19 because I wanted to get them done, and I talked with the CPA,

20 and --

21 Q.  Did you express that to Jonathan?

22 A.  Yes.

23 Q.  How did he respond?

24 A.  I had to pay again to get them done and this would have --

25 Jonathan thought I needed to pay some more money, but this

IATJKET6                          Thompson - direct

1    would take care of it.

2    Q.  Did anyone from A1 ever assist you in filing your taxes?

3    A.  No.  In fact, I still am behind on getting my taxes done.

4    Sorry, Judge.

5             THE COURT:  It is not my area.

6             THE WITNESS:  Thank God!

7             MS. KEARNEY:  Let's take a look at Government Exhibit

8    184?

9             THE WITNESS:  I am still freaking out, too.

10   BY MS. KEARNEY:

11   Q.  What is the date on this contract, Ms. Thompson?

12   A.  April the 4th, 2016.

13   Q.  After that date, did you continue to speak with Jonathan

14   Stewart?

15            MR. SCHMIDT:  Objection.

16            THE COURT:  I'll allow that.

17   A.  I can't remember if I had any conversations with him after

18   that point.  I would have to check my notes.

19   Q.  Did there come a time you stopped speaking with Jonathan

20   Stewart?

21   A.  Yes, because I could not get him on the telephone any more.

22   He stopped speaking with me, to be more exact to say.

23            THE COURT:  Is that an objection?

24            MR. ABEGAZ-HASSEN:  Yes, your Honor.

25            THE COURT:  Ill allow it.

1    BY MS. KEARNEY:

2    Q.  After April 4th, 2016, did you continue to speak with

3    Emily?

4    A.  I did.

5    Q.  Ms. Lee, could you put up Government Exhibit 902 C.  What

6    is this, Ms. Thompson?

7    A.  That is a check that I wrote to KB Consulting.

8    Q.  Who is KB Consulting?

9    A.  I have no idea.

10   Q.  Why did you make a check out to them?

11   A.  Because they were going to help me get my money back.

12   Q.  What is the date on this check?

13   A.  March the 21st, 2016.

14   Q.  How much is it for?

15   A.  $5,000.00.

16   Q.  What is in the memo line?

17   A.  "For charge-back services."

18   Q.  What is charge-back services?

19   A.  That was what was my understanding it was called if you had

20   written anything by credit card, had anything by credit card,

21   they might get your money back.

22   Q.  So why did you write this check?

23   A.  Because I had also paid some money in credit card, by

24   credit card also, and she was saying she was going to try to

25   get money back from me.

1    Q.   Who said that?

2    A.   Emily was going to try to get money back I paid Jonathan

3    Stewart and A1 Business Consultants.

4              She said also I could, that even that I had written

5    checks, that they could also get charge-back services, use

6    charge-back services to do that.  I didn't know if that was

7    true or not, but with all the money I spent, what is 5,000 more

8    dollars at that point.  I thought anything to get my money

9    back.

10   Q.   Could you put up Government Exhibit 902 D.  What is this

11   check, Ms. Thompson?

12   A.   Another check to KB Consulting.

13   Q.   The date?

14   A.   March the 25th,.

15   Q.   What is the amount?

16   A.   $2,000.

17   Q.   What is in the memo line?

18   A.   "Final for recovery services."

19   Q.   What is recovery services?

20   A.   The same thing basically except for checks instead of

21   credit cards.

22   Q.   Were you able to recover any of that money?

23   A.   No, I was not.  I don't believe that was really true,

24   actually, now.

25   Q.   Ms. Thompson, did you ever make any money from the

IATJKET6                    Thompson - direct

1    investments you made with A1 Business Consultants?

2    A.  No, I did not.  I didn't even get paid money for wiring the

3    money to them I was supposed to get back.

4             MS. KEARNEY:  Just one moment, your Honor.

5             (Off-the-record discussion)

6    BY MS. KEARNEY:

7    Q.  Ms. Thompson, in total how much money did you pay the A1

8    Business Consultants?

9    A.  Close to $300,000.

10   Q.  Have you gotten any of that money back?

11   A.  No, I have not.

12            MS. KEARNEY:  No further questions.

13            THE COURT:  All right.  Thank you.  Mr. Schmidt, any

14   cross-examination of this witness?

15            MR. MITCHELL:  Your Honor, in the interests of time,

16   since I have a shorter amount of questions, I'll go first.

17            THE COURT:  Whatever you'd like, sir.

18            This is mr. Mitchell, on behalf of Shahram Ketabchi.

19            Mr. Schmidt, how long do you think cross is, if any?

20            MR. ABEGAZ-HASSEN:  About two hours, your Honor.

21            THE COURT:  Mr. Abegaz-Hassen, two hours, is that what

22   you said?

23            MR. ABEGAZ-HASSEN:  An estimation.

24            THE COURT:  Go ahead, Mr. Mitchell.

25   CROSS-EXAMINATION

1   BY MR. MITCHELL:

2   Q.  Good afternoon, Ms. Thompson.

3   A.  Good afternoon.

4   Q.  I will try to make this as easy as possible.  If I ask a

5   question that is confusing, let me know and I'll clarify, or if

6   you can't hear me, ask me to speak up, okay?

7   A.  Okay.

8   Q.  At some point you said that a woman named Emily contacted

9   you?

10  A.  That's correct.

11  Q.  You later came to find out Emily was Brooke Marcus?

12          MS. KEARNEY:  Objection.

13          THE COURT:  Did you later come to find out Emily's

14  true name?

15          THE WITNESS:  No, I did not.  I still don't know her

16  true name, actually.

17  BY MR. MITCHELL:

18  Q.  So Emily sent you a contract?

19  A.  No.

20  Q.  Emily never sent you any contracts?

21  A.  No.

22  Q.  You spoke a lot on the phone with Emily?

23  A.  Yes.

24  Q.  And you texted with Emily?

25  A.  Yes.

1   Q.  You even became Facebook friends with Emily?

2   A.  I didn't become Facebook friends with Emily.  She somehow

3   became a Facebook friend with me.

4   Q.  She became a confidant of sorts?

5   A.  Yes, she did.

6   Q.  You all spoke about things other than business?

7   A.  Yes.

8   Q.  Personal things?

9   A.  Yes.

10  Q.  You told her about your family?

11  A.  Yes.

12  Q.  She told you about her family?

13  A.  I'm not sure if she did or not, but she told me about

14  people that she made up family, and I don't know if they're

15  real or not.

16  Q.  You said at some point you were speaking to her on the

17  phone two or three times a day?

18  A.  Yes.

19  Q.  Whenou consulted with her along the way throughout this

20  process?  Throughout the different products that you purchased,

21  you would consult with her regularly?

22  A.  Yes.

23  Q.  Did you consider her your friend?

24  A.  I did.

25  Q.  Even after you had lost over a hundred thousand dollars,

1    you confided still in Emily?

2    A.  Is that a question?

3    Q.  Yes.  Did you still confide with in Emily even though you

4    lost over a thousand dollars?

5    A.  Sorry?

6    Q.  Even after you had lost a hundred thousand dollars or more,

7    did you still confide in Emily?

8    A.  I didn't know I had lost a hundred thousand dollars at that

9    point.

10   Q.  She was going to try to help you get that money back at

11   that point, so you were still trusting Emily at that point?

12   A.  I was hoping I was trusting her.  I wasn't sure.  I was

13   doing the best I could at the time.

14   Q.  She kept you on the hook?

15   A.  Absolutely, you got it there, yes, good statement there.  I

16   like that one.

17   Q.  Did she ever apologize to you?

18   A.  She did.

19   Q.  When did she apologize?

20   A.  Quite a few times along with that man over there.

21          THE COURT:  Point to the who you're referring to.

22          THE WITNESS:  I am assuming it is him, that one in the

23   sweater.

24          THE COURT:  In the second row?

25          THE WITNESS:  The second row, the third one from the

1    left.

2            THE COURT:  The witness has identified Mr. Owimrin.

3    BY MR. MITCHELL:

4    Q.  And they apologized along the way because they were still

5    trying to -- withdrawn, your Honor.

6            Emily apologized along the way, but she continued to

7    take your money?

8    A.  Yes.

9    Q.  So since you realized that you felt you had been conned --

10   A.  No, I didn't legalize I felt I had been conned.

11   Q.  Today do you feel that way, that Emily conned you?

12   A.  I feel that a lot of people conned me.

13   Q.  Emily being one of them?

14   A.  Jonathan Stewart and your other person over there I am sure

15   must have been one of them or he wouldn't be here on trial.

16           MR. PAUL:  Objection.

17           MR. ABEGAZ-HASSEN:  Objection.

18           THE COURT:  Sustained.  The jury will disregard the

19   statement, "The other one over there I am sure is one of them

20   or he wouldn't be on trial."  The jury will disregard that

21   statement.

22           A VOICE:  I move to strike that.

23           THE COURT:  I instructed the jury to disregard it.  Do

24   you want some underlying objection on that, sir?

25           MR. PAUL:  No.

1              THE COURT:  Let's move on.

2      BY MR. MITCHELL:

3      Q.  You spoke with someone named Zack Peterson?

4      A.  I did.

5      Q.  Did you ever come to find out Zack Peterson had another

6      name?

7      A.  I did.

8      Q.  Was that name Arash?

9      A.  I guess that is how you say it.

10     Q.  And he offered you 20 percent of his company, A1 Business

11     Consultants?

12     A.  Is that a question?

13     Q.  Did he offer you 20 percent of his company, A1 Business

14     Consultants?

15     A.  Yes, he did.

16     Q.  Then he sent you a contract that didn't include that 20

17     percent, right?

18     A.  Right.

19     Q.  And then he told you it was a clerical error?

20     A.  Yes.

21     Q.  And then he sent you another contract that included the 20

22     percent.  Is that right?

23     A.  That's right.

24     Q.  And he cashed your check even though you hadn't signed that

25     contract?  Arash, he cashed the check that you sent even though

1  you had not signed the contract?

2  A.  (Pause)

3            THE COURT:  Was it that check?

4            THE WITNESS:  Yes, he cashed the check.  I didn't know

5  if you were asking me.  I thought you were stating a fact.

6  BY MR. MITCHELL:

7  Q.  I am sorry.  I am asking the questions.

8            Arash, you feel, conned you?

9            By cashing your check, did Arash con you?

10 A.  That is up to you.  Yeah, I think that was a con mostly.

11 Q.  So you believe Arash conned you.  Do you think Arash would

12 con anybody?

13 A.  I have no idea.  I don't know Arash.

14 Q.  You spoke with him with Zack Peterson?

15 A.  I spoke with him one time, not unlike your clients.

16           MR. PAUL:  Objection.

17           THE COURT:  Sustained.

18           MR. MITCHELL:  Could I show the witness Government

19 Exhibit 163?

20           THE WITNESS:  Your Honor, may I ask a question?

21           THE COURT:  Wait.  Let him ask the questions.  Is

22 there something that confuses you?

23           THE WITNESS:  I do have a confused question.  Who is

24 he representing?

25           THE COURT:  Who do you represent, sir?

1           MR. MITCHELL:  I represent Steve, Steve Ketabchi.

2           THE WITNESS:  Okay.  That is interesting.

3           THE COURT:  Proceed.

4           MR. MITCHELL:  Can we get to Page 6 on Government

5    Exhibit 163.

6           (Off-the-record discussion)

7           THE COURT:  There is your exhibit, sir.

8    BY MR. MITCHELL:

9    Q.  Can the jury see it as well?

10          THE COURT:  It is admitted.  They should be able to

11   see it.

12   Q.  Do you see where it says IP address on this document just

13   under Jane R. Thompson upsell history.  Document uploaded by

14   Zack Peterson.  IP address.  December 29th, 2015, IP address 69

15   dot 117 dot 174 dot 32?

16          THE COURT:  Do you see that line?

17          THE WITNESS:  Yes, I do.

18   BY MR. MITCHELL:

19   Q.  Are you familiar with what an IP address is?

20   A.  Only from hearing it on TV.

21   Q.  You know that it has to do with the internet?

22   A.  Yes.

23   Q.  And it identifies where someone is connecting to the

24   internet?

25          MS. KEARNEY:  Objection.

1              THE COURT:  Let's see what she knows.  Do you know

2     that?

3              THE WITNESS:  I only know from hearing it on

4     television that it has to do with tracking down internet

5     addresses, that is all I know.

6              THE COURT:  Next question.

7     BY MR. MITCHELL:

8     Q.  So you mentioned a bunch of names today, people, the names

9     you knew of people you had spoken to who said they were from

10    A1.  You mentioned Emily --

11             THE COURT:  Is there a question?

12    Q.  Other than the names that you've mentioned today, did you

13    speak to anyone else who said they were from A1?  Do you

14    remember the name of anyone else who you spoke to said they

15    were from A1?

16             THE COURT:  Apart from who you've told us about

17    already, Ms. Thompson, was there anyone else from A1 to whom

18    you spoke?

19             THE WITNESS:  There was a Steve Blake.

20    BY MR. MITCHELL:

21    Q.  Mr. Blake?

22    A.  Yes.

23             THE COURT:  Anybody else?

24             THE WITNESS:  There may have been a few others, but I

25    don't remember them off the top of my head.  They may be in my

1    notes.

2              THE COURT:  Next question.

3              MR. MITCHELL:  One moment, your Honor.

4              (Off-the-record discussion)

5              MR. MITCHELL:  No further questions, your Honor.

6              THE COURT:  All right.  Thank you.  Is there any

7    cross-examination?  Mr. Abegaz-Hassen, you said you had a bit

8    of cross-examination?  Why don't you start, sir.

9              MR. ABEGAZ-HASSEN:  Thank you, your Honor.

10             THE COURT:  And begin by explaining to Ms. Thompson

11   who you represent.

12   CROSS EXAMINATION

13   BY MR. ABEGAZ-HASSEN:

14   Q.  Good afternoon, ladies and gentlemen.  Good afternoon, Ms.

15   Thompson.  My name is Abraham Hassen?

16   A.  I can barely hear you.

17   Q.  My name is Abraham Hassen.  Is that right?

18   A.  I don't know if that was right or not.  I was only guessing

19   on your client.

20   Q.  I represent Mr. Owimrin over here.

21   A.  Who?

22   Q.  Mr. Owimrin.

23   A.  Never heard of him.

24   Q.  So you testified that Emily Miller became a confidant of

25   yours.  Is that right?

1    A.  Somewhat.

2    Q.  Someone you talked to regularly?

3         You mentioned you talked to her three or four times a

4    day or more.  Is that right?

5    A.  Yes.

6    Q.  Now, you called her -- I'll move on for a minute.

7         You mentioned earlier also that you had been investing

8    in these companies for I believe you said several years.  Is

9    that right?

10        MS. KEARNEY:  Objection.

11        THE COURT:  Were you investing in these companies for

12   several years?

13        MS. KEARNEY:  Which companies, your Honor?

14        THE COURT:  Fair enough.  Rephrase.

15   BY MR. ABEGAZ-HASSEN:

16   Q.  Before A1, you testified on your direct that you had

17   invested in online companies for a few years, you had been

18   investing for a few years?

19   A.  I think I can clarify that a little better than you just

20   stated it.

21   Q.  Okay.

22   A.  I had invested in a couple of companies on a few occasions.

23   I hadn't invested in companies for a few years.  You're making

24   it sound a lot more broader than it is.

25   Q.  My apologies.  It was a few years back that you started, is

1   that right, a few years before 2015?

2   A.  Shall I be specific for you?

3   Q.  If you can.

4   A.  I can.  I had started invested, I had some money in Network

5   Solutions, and with that company I had talked with them about

6   doing a drop ship business, and with that I had invested about

7   $6,000, I believe, and with that company what you would do is

8   you would --

9            THE COURT:  You said you invested with Network

10  Solutions for drop ship.  What else?  Anything else?

11           THE WITNESS:  And one other company where I would open

12  a website and try to sell from like an Amazon or something

13  through that, nothing near like this.

14  BY MR. ABEGAZ-HASSEN:

15  Q.  How did you get involved with Network Solutions?

16  A.  I got a call or I may have seen it on the internet.

17  Honestly, I can't remember exactly where I found that out from.

18           THE COURT:  What was the name of the other company you

19  just mentioned?

20           THE WITNESS:  Dream Success to Reality.

21           THE COURT:  Yes, you testified to that.  Thank you.

22           THE WITNESS:  You're welcome.

23  BY MR. ABEGAZ-HASSEN:

24  Q.  Can you explain what a drop ship business is.

25  A.  I sure can.  It is where you have a wholesaler, you buy

1    from a wholesaler and you put it on your website and sell it as

2    if people, people buy it as if they're buying it from you.

3              When you buy it from a lot of websites and they get it

4    and say Jane Thompson bought, they have a middleman and then

5    they get it from them, but you actually pay the drop shipper a

6    portion and then you get the amount in-between.

7    Q.  What were you selling on that?

8    A.  I didn't ever sell anything.  I did sell one pocketbook

9    just to get my eBay things started.  I sold a pocketbook from

10   my own house.

11   Q.  You mentioned Network Solutions where you did drop

12   shipping?

13   A.  I didn't do it.  I said that's what you would have done.  I

14   never got it started.  That was filing to be specific.  There

15   was never a business.

16   Q.  My apologies.  Then you also mentioned eBay just now.

17             Was that part of Network Solutions or was that a

18   different company?

19   A.  That was how you could use eBay or Amazon, you can get

20   stuff off there where you could pick stuff out.  If I wanted to

21   sell bags, I could sell any bags they had on eBay, but I could

22   put them on my website.

23   Q.  So you had your own website?

24   A.  No, I did not have a website.  I never built a website.  I

25   never got that far.  I never actually did it, you see?

1   Q.  I understand.  So you started the process of a drop ship

2   company, but it never materialized?

3   A.  I never hardly even started it.  You're making it sound

4   like I went all into this business.  I didn't.  I just kind

5   of -- I was working full time and my parents got sick so I

6   never even got into it.

7          What you have to do with all these things, you have to

8   figure it all out, you have to figure out which one's going to

9   be the business and best thing somebody wants to find, who is

10  going to want to buy it, is there a lot of competition for it.

11  If there is too much competition, you don't want to pick that

12  one.  That is when I talked so much with Jonathan Stewart about

13  I didn't have time to do this kind of stuff.  I want something

14  where I don't have to do all that stuff.  He said you don't

15  have to do anything for this, you don't have to do anything.  I

16  don't want to do anything or sell anything.  This is just

17  something where you're investing into it.  That is where the

18  terminals are that work for you.

19  Q.  So for the Network Solutions, you started a company, you

20  technically started a company, but you never really did

21  anything with it?

22  A.  Technically, I never even started.  I just talked about it

23  and got the coaching.  I did pay for the coaching on that one.

24  That is why I needed coaching there, but I didn't want coaching

25  for this business that we are talking about now, A1.

IATJKET6                              Thompson - cross

1              I didn't need coaching because there was nothing to

2      coach me to do because they didn't want me to do anything.

3      Q.  So you just mentioned the coaching that Network Solutions

4      did.  Was that how you learned about all this markets and

5      niches you just mentioned?

6      A.  How I what?

7      Q.  You learned how that sometime works, how that drop shipping

8      works?

9      A.  Yes.

10     Q.  Do you remember any of the coaches or people that you spoke

11     with from Network Solutions?

12     A.  I remember a name Mark, maybe Mark Murray or something.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Do you remember a Michael Thorp?

2    A.  I've heard that name before, yes.

3    Q.  Do you remember --

4    A.  I don't know if I heard it in this -- it might have been

5    with this company.  I can't remember which company.  I've heard

6    that name though.  And I see you have got my notes.  You got it

7    out of my notes.

8    Q.  Would that help you remember the Network Solutions?

9    A.  It probably would, yes.

10   Q.  Do you still have the government exhibits that were handed

11   to you before?

12           THE COURT:  Do you have your notes?

13   Q.  If I could refer you to Government Exhibit 167, page 4, and

14   just read that to yourself.

15   A.  OK.

16   Q.  Does that refresh your recollection of your interaction

17   with Network Solutions?

18   A.  Yes, it does.

19   Q.  So what were you doing with Network Solutions?  Does that

20   help you remember a little more?

21   A.  Yes, it does.  That's just what I was saying.

22           THE COURT:  That what?

23           THE WITNESS:  I told you I had heard the name Michael

24   Thorp and that I was starting to look up those things trying to

25   figure out how to start that type of business.

1          THE COURT:  I think you testified -- I don't want to

2     put words in your mouth -- that you received coaching from

3     Network Solutions, is that correct?

4          THE WITNESS:  That's correct.

5          THE COURT:  What did that coaching consist of?

6          THE WITNESS:  Talking about trying to figure out what

7     type of business I wanted to do.  I can't remember all the

8     details of it, your Honor.  I know it was -- I know I was

9     interested in two types of things and the coaching was

10    about -- without looking at my notes I can't remember, that's

11    why I write everything down.  But it was about trying to, like

12    I said, figure out what type of niche, what was the best things

13    to try to sell and which things -- seeing what the market was

14    more saturated with.

15         THE COURT:  Did someone from Network Solutions assist

16    you in that?

17         THE WITNESS:  Yes.

18         THE COURT:  Next question, sir.

19    BY MR. HASSEN:

20    Q.  You also mentioned Amazon.  Was that part of this or is

21    that a separate business, or a separate concept?

22    A.  Well, I don't remember if it was separate or with that

23    but -- I don't know if they were saying that, or it was with

24    the other company, because they all kind of run together to me.

25    When I said the other company, I mean the Dream Success to

Reality.  But with a lot of these companies you can sell off of

Amazon or eBay, you can sell products off of those companies on

your Web site.  So that's all I know to answer you on that.

            THE COURT:  Next question.

Q.  So do you remember doing any kind of similar business that

involved debt settlement or student loans?

A.  I know they were talking about that, but no, I didn't do

any of those.

Q.  When they were talking about that, was that something that

you were going to invest in or was that just talk?

A.  That was things they told me that I could do, but I didn't

have any -- I wasn't going to settle anybody's debts.

Q.  Do you remember having a conversation around the same

period of time with Targeted Lead Systems?

A.  Targeted Lead Systems?  I didn't -- ask that again.

Q.  Do you remember having a conversation with someone named

Melissa about Targeted Lead Systems?

A.  I'm sure you're reading from my notes so obviously there

was.

            THE COURT:  I don't want you to assume what he is

reading from.

            THE WITNESS:  I know what he's talking about.

            THE COURT:  Just answer the question.  If you can't

answer the question, then he will ask another one.

A.  No.

1    Q.  You don't remember.  Would it help to look at your notes

2    from that period of time?

3    A.  Sure.

4    Q.  If I could refer you to Government Exhibit 167, page 6.

5           THE COURT:  Just take a look at it on the screen.

6    Read it to yourself and see if that refreshes your

7    recollection.

8    A.  OK.

9    Q.  Can you tell us about what that conversation with Melissa

10   was about, what kind of business that was about?

11   A.  I don't remember that conversation, but I do remember that

12   that was to do with that Dream Success to Reality company, and

13   they would have -- they were selling leads, and I can't

14   remember what that was -- what exactly that was supposed to

15   have to do with.  Honestly, I don't remember.

16   Q.  The idea was selling leads of some sort?

17   A.  Yes.

18   Q.  Do you remember having a conversation with someone named

19   Trevia Davis?

20   A.  I remember that name, yes.

21   Q.  Who is that?

22   A.  Someone at that same company.

23   Q.  What was their role?

24   A.  I'm not sure.

25   Q.  How about someone named Leona?

IAT8KET7                          Thompson - Cross

1    A.  Leona was the owner of the company.

2    Q.  If I could ask you to speak into the mic.

3    A.  Leona was the owner of the company.

4    Q.  Leona was the owner of Dream Success to Reality?

5    A.  The head of the company, if not the owner.

6    Q.  How often did you talk to Leona or Trevia Davis, if you

7    remember?

8    A.  I don't know about Trevia Davis, but I know I spoke with

9    Leona Davis several times, and then that company closed down

10   and then they opened back up.

11   Q.  They closed down?  How did you find that out?

12   A.  I found that out because I saw that they were unavailable

13   on the Internet.  Then all of a sudden they were available

14   again.

15   Q.  Did you ever call them on the phone or was it just on the

16   Internet that you interacted?

17   A.  Called them on the phone.

18   Q.  What happened when you called them, did they stop

19   answering?

20   A.  Yes.

21   Q.  Do you remember setting up a Web site of your own through

22   them?

23   A.  No, I did not set up a Web site of my own.  They told me

24   they would set up a Web site for me, but I did not ever see it.

25   Q.  You never saw a Web site.  OK.

1  A.  Only a thing that came up, but nothing on it.  They were

2  going to do it for me, but that didn't happen either.

3  Q.  This goes back to that same concept of the Drop Shipping?

4  A.  Yes, you can do that through Drop Shipping, or you can sell

5  anything you wanted to through their company.

6  Q.  And they set you up with some sort of portal to look into

7  it?

8  A.  Yes.

9  Q.  But you never put the things in it that would be necessary

10  to do it?

11  A.  Correct.

12  Q.  Do you remember someone named Terri?

13  A.  Not off the top of my head.

14  Q.  Would it help to look at the notes?

15  A.  Yes.

16  Q.  If I could refer you to Government Exhibit 167, page 9.

17          There are a few names mentioned.  Do you remember

18  Terri now?

19  A.  Terri was supposed to be the Web site designer.

20  Q.  Did you ever talk to Terri about your Web site?

21  A.  I did.

22  Q.  What was supposed to happen?  What were those

23  conversations?

24  A.  Terri was supposed to be able to help me design a Web site,

25  but Terri was just like, What color do you want it to be?  What

IAT8KET7                         Thompson - Cross

1   do you want on it?  Instead of designing it for me she was, you

2   want black or white, you want the lettering to be green or

3   what?  That was about all the designing I got from there.

4   Q.  What about Steven Abrams?  A cool name.

5   A.  What?

6   Q.  I apologize.

7   A.  Cool name, is that what you said?

8            THE COURT:  Proceed.

9            Do you know that person?

10  A.  I remember that name, and I think he was the one that I was

11  talking to as sort of the representative after Leona, but

12  that's pretty much it.

13  Q.  Was he a mentor, was that his role?  Was that another

14  coaching situation?

15  A.  I think that was pretty much it.  He was supposed to lead

16  me along and take my money.

17           A handler, so to speak.  I think he was to be my

18  handler, so to speak, the best name I could call it.

19  Q.  Did you speak with him regularly then?

20  A.  Did he handle me regularly?  For a while, till I knew that

21  they were conning me, and I moved on and let A1 do it for

22  awhile.

23           Yeah, I was pretty gullible.  Not anymore.  I don't

24  have any money to be gullible anymore.  You all got it all.

25           THE COURT:  Next question.

1   Q.   So they had set you up with a different kind of program, is

2   that right, Steven Abrams?

3   A.   If you say so.

4   Q.   Tell me about the program.

5   A.   I think we have already covered that pretty well, sir.

6   Q.   Are you saying that the Steven Abrams program was the same

7   as the Network Solutions, or was it something different?

8   A.   It's a little different.  I mean, I am not understanding

9   your question.

10         THE COURT:  Ask another question, sir.

11  Q.   I was just trying to understand what the program was.

12  A.   I don't understand your question.

13  Q.   Did you end up doing a GoDaddy program?

14  A.   No.  GoDaddy is how you set up a Web site.  That's

15  something that they said I could buy one from.  I'm sure you

16  know what that is.

17  Q.   And they introduced it as something different than it

18  actually was, right?

19  A.   No, they didn't.

20  Q.   They didn't?

21  A.   No, they didn't.

22  Q.   OK.  So moving on, do you remember setting up

23  ds2rjhelp.com?

24  A.   I didn't set it up.  They set it up as to how to log into

25  my Web site they were fixing for me.

1    Q.  And that was for Dream Success to Reality?

2    A.  There you go, that's it.

3    Q.  When these people were talking to you, when you were

4    talking to them regularly, you bought a business plan from

5    them, is that right?

6    A.  No, that's not correct.

7    Q.  That's not correct?  Did they ask you to buy a business

8    plan?

9    A.  I don't think that's correct.  I think I just bought the

10   leads from them, best I could remember.  If you want to show me

11   in my notes, I could be wrong, and I could refresh my memory if

12   you need me to.

13   Q.  Do you remember having a conversation around August of 2015

14   with Michael Jeffries?

15   A.  Not off the top of my head.

16   Q.  If I could refer you to Government Exhibit 167, page 14.

17           Who is Michael Jeffries?

18   A.  I have no idea.  Just because I was going to get a welcome

19   call from him doesn't always mean I'm going to take the call.

20   Q.  So that was just -- can you explain that?

21   A.  May I see that one more time?

22   Q.  You would like to see it again?

23   A.  Please.

24           THE COURT:  Ask a question, sir.

25   Q.  Who was Michael Jeffries?

1    A.  I don't know.

2    Q.  Do you remember what you discussed?  Do you remember the

3    company he said he was representing?

4              THE COURT:  The witness is shaking her head negatively

5    to those two questions.

6              THE WITNESS:  Sorry, sir.

7    Q.  Do you remember the name Business Development Center?

8    A.  I do not.

9    Q.  A few days later, around the same time in August, do you

10   remember having a conversation with Michelle?

11   A.  I do not.

12   Q.  If I could refer you to Government Exhibit 167, page 15.

13   A.  OK.

14   Q.  So do you remember Michelle being your main point of

15   contact?

16   A.  I don't remember Michelle being a main point of contact,

17   but I do remember something about this now after reading a

18   couple of those.  They did send me something as a welcome -- I

19   got a gift from them.  I got some hot chocolate and some stuff

20   like that.  That was the best thing I got from them.  And a

21   business plan, they wrote up all this stuff for me, but it had

22   nothing -- I mean, it was a joke, really.

23              THE COURT:  Why do you believe it was a joke?

24              THE WITNESS:  I'm sorry, sir.  Because they had my

25   name on it like it was my business plan, but it was

1    nothing -- it was just a basic thing pulled up off the

2    Internet, a generic plan.

3            THE COURT:  Thank you.

4            THE WITNESS:  Yes, sir.

5    Q.  And Michelle, was she another handler, as you said?

6    A.  I guess, yes.  She was not -- she was just somebody from

7    the company, just a person on the phone, not somebody that I

8    remember talking to regularly.

9    Q.  So you didn't --

10   A.  I didn't pursue that.

11   Q.  You didn't really pursue that?

12   A.  Past that point of getting that thing in the mail, that

13   packet.

14   Q.  So going to September of 2015, do you remember having

15   conversations with Interactive Business Solutions?

16   A.  No.

17   Q.  Does the name Brady walker, does that ring a bell?

18   A.  No, it does not.

19   Q.  If I could refer you to page Government Exhibit 167, page

20   16.

21   A.  This is when I was trying to get some type of company

22   started, so I was getting phone calls from everyone and his

23   brother.  Once you put something on the Internet, they are all

24   going to call, from everywhere.  That's why when I said I got

25   the numbers on my contact information and she said was this

1   fair and accurate, I said yes because I would have gotten that

2   number from Emily about Jonathan, or that number from them

3   about them, and then the rest of them.  This is why.  Because I

4   was getting them constantly.

5          And I was researching trying to find something else,

6   because this is when my mom was really, really sick and I was

7   working 12 hours a night, and then leaving there and going to

8   spend time with them and not getting hardly any sleep.  So

9   that's why I don't remember all these people that I spoke to.

10  I know you're trying to say, if I don't remember that, how did

11  I remember this other stuff?  This is why.  This is why I don't

12  remember all these things.  This is why I wrote it all down.

13  But I was trying to find something else that I could do while

14  spending time with my parents.  My dad had dementia.  My mom

15  had a form of Parkinson's and she was losing the use of her

16  hand and eventually her leg.  So I wanted to try to find a way

17  that I could stay with them all the time.

18          THE COURT:  Let's have another question.

19          MR. HASSEN:  Thank you.

20  BY MR. HASSEN:

21  Q.  So you didn't go forward with them?

22  A.  No, I did not.

23  Q.  But they were offering you some kind of add-on to your

24  existing business, right?

25  A.  Well, they were, I think -- the way I felt it was, they

were seeing where I had spent some money with someone else and

they were like, you know, let's do this, you want to do it with

our company, you want to do this, you know.  And yeah, add-ons

trying to get me to work further into that business.  And I

just didn't have the time or the energy or the concentration to

pursue what I needed to do to get any kind of business to run,

but now I know none of them were really businesses.

Q.  But at the time, one of the ones you invested in prior to

September 2015 was a real business that you owned, right?

A.  I was hoping they were all real businesses, of course.

Q.  And this company with Brady Walker was trying to sell you

something to add to your existing business, right?

A.  I don't have any idea.  I don't even know which one we are

talking about at the moment, sir.

Q.  Well, do you remember that the idea was you didn't want to

do business with them, right, because it wouldn't be beneficial

to your company at the time?

A.  Oh, I have no idea about that.  I don't know how you're

thinking I didn't want to because it wouldn't be beneficial to

my company, when I wasn't even starting a company, and you

don't even know that.  It doesn't make sense to me.  Boy,

you're thinking outside the box is all I could think.  Wow, you

in my head?  How did you get that?  Where in the world did you

get that from?  You just said that I was thinking it wouldn't

be beneficial to my company?  How in the world could you think

1    that?

2            THE COURT:  Let's now have another question.

3            MR. HASSEN:  Can I show the witness Government Exhibit

4    167, page 16.

5    Q.  Read to yourself the middle section.

6            MS. KEARNEY:  Objection, your Honor.  The witness has

7    not had a failure of recollection.

8            THE COURT:  That's correct.

9            Ask a question, please.

10   Q.  Is it your testimony today that you did not have -- you did

11   not believe you had any businesses in September of 2015?

12   A.  Excuse me?

13   Q.  In September of 2015, did you believe you had a business?

14   A.  I didn't have an active business that was selling anything.

15   I might have had something on the Internet that came up and

16   said I was a business, but that's because these companies put

17   it up there.  There was something that you could punch in and a

18   Web site came up, but it didn't sell anything, unless it sold

19   more people coming to that company for them to buy, put money

20   in to buy something from that same company.  But they weren't

21   buying anything to make money for me, that's for darn sure.

22   Q.  I understand.  My question really was just what you were

23   thinking at the time.

24   A.  That's exactly what I was thinking at the time, the same

25   thing I just said.

1   Q.  At this time you were getting a lot of calls from Leona?

2   A.  No.  I wasn't getting a lot of calls from Leona.  I spoke

3   with her maybe two or three times, three or four at the very

4   most, ever.  No lots of calls from Leona, no, sir.

5   Q.  So you just got a few calls from Leona?

6   A.  Several of those I made myself.

7   Q.  And you called her to get updates on --

8   A.  Find out what the heck was going on.

9   Q.  With this company, this Dream Success to Reality, do you

10  know -- when you gave the money, how did you pay them?

11  A.  Best I could remember I transferred money from my 401(k)

12  and wired it to them.

13  Q.  Do you remember how much?

14  A.  I don't remember exactly.  $50,000 at a time I know, at one

15  time.  You could probably tell me.  You're probably reading it

16  there.

17  Q.  Who is Bonnie?

18  A.  I'm sorry?

19  Q.  Bonnie.

20  A.  I don't remember that right off.  I try not to read through

21  these any more than I had to for this thing because it's really

22  just heartbreaking and disgusting, and I can't change it right

23  now.  I am not getting my money back so what am I going to do.

24  I am just trying to move on so once I get through this I can

25  have a life.  This is really disturbing and taking up all of my

IAT8KET7

1    time, all of my life, and all of my money trying to come up

2    here and live in this little city for a few weeks here, this

3    huge city.

4              THE COURT:  Let's have another question, please.

5              It's a quarter of 5.  Why don't we break for the

6    evening.  It's been a long day of testimony.  We will pick it

7    up tomorrow at 9:30.

8              Is this an all right time to break, sir?

9              MR. HASSEN:  Perfect, your Honor.

10             THE COURT:  Ladies and gentlemen, we will break now

11   for the evening.  Keep an open mind.  The testimony is coming

12   in apace and we are moving forward.  Be here at 9:30 tomorrow.

13   Remember to bring a nice healthy snack for our first break,

14   apples, yogurt, almonds, or candy, it's Halloween, whatever you

15   like, and then we will break for lunch at 2:00.

16             Thank you.

17             (Jury exits courtroom)

18             (Continued on next page)

19

20

21

22

23

24

25

IAT8KET7

1          THE COURT:  Ms. Thompson, you may step down.  Because

2    you are under cross-examination, you are not permitted to talk

3    with the government attorneys about this, and they are not

4    permitted to ask you questions.  So don't think they are being

5    impolite and they won't think you're being impolite.  You can,

6    of course, talk with the government agents about the mechanics

7    of where you should be and so forth, but not the lawyers.

8    Thank you.  Enjoy your evening.

9          All right.  I will see everybody at 9:30.  Try to make

10   whatever is left of the cross-examination as efficient as

11   possible.

12         I am going to remind the government attorneys not to

13   react in their facial expressions to the answers.  That goes

14   for the defense attorneys as well.

15         MS. KEARNEY:  Your Honor, before we go I just want to

16   apprise the Court that we on the government side, in conferring

17   with defense counsel, are actively trying to see if we can

18   eliminate or pare down some witnesses.  We just wanted to flag

19   that on the record in case people who are on our list are not

20   appearing.

21         THE COURT:  9:30 tomorrow.

22         (Adjourned to October 30, 2018, at 9:30 a.m.)

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                            Page

 3    ANTHONY GIATTINO

 4    Direct By Mr. Sobelman . . . . . . . . . . . 753

 5    Cross By Mr. Paul  . . . . . . . . . . . . . 800

 6    Cross By Mr. Abegaz-Hassen . . . . . . . . . 832

 7    Redirect By Mr. Sobelman . . . . . . . . . . 833

 8    JANE THOMPSON

 9    Direct By Ms. Kearney  . . . . . . . . . . . 840

10    Cross By Mr. Mitchell  . . . . . . . . . . . 910

11    Cross By Mr. Abegaz-Hassen . . . . . . . . . 918

12                      GOVERNMENT EXHIBITS

13    Exhibit No.                             Received

14     246, 414, 421, 1011, 1013, 1014, 1018, . . . 755

15          1137, 1139, 1140, and 1141

16     229, 243, 416, 1212 and 1213   . . . . . . 765

17     204  . . . . . . . . . . . . . . . . . . . 771

18     230  . . . . . . . . . . . . . . . . . . . 772

19     219, 233, 1206, 1209 and 1211  . . . . . . 777

20     206A, 206B, 234A through F, 428, 429 and 513  783

21     220, 450 and 1126  . . . . . . . . . . . . 789

22     442  . . . . . . . . . . . . . . . . . . . 791

23     238 and 242  . . . . . . . . . . . . . . . 792

24     218 and 1308 . . . . . . . . . . . . . . . 795

25     214 and 215  . . . . . . . . . . . . . . . 796
```

```
 1    202, 203, 205, 207, 208, 212, 213, 217, . . . 800
 2              221, 222, 223, 224, 225, 232,
 3              235, 236, 237, 244, 402, 405,
 4              410, 417, 420, 423, 424, 435,
 5              437, 440, 447, 448, 449, 453,
 6              454, 555, 456, 458, 462, 463,
 7              464, 510, 511, 516, 1003,
 8              1004, 1005, 1006, 1008, 1010,
 9              1012, 1015, 1016, 1019, 1020,
10              1101, 1102, 1103, 1104, 1105,
11              1112, 1115, 1116, 1117, 1118,
12              1131, 1134, 1135, 1136, 1142,
13              1202, 1205, 1207, 1208, 1210,
14              1214, 1215, 1216, 1217, 1218,
15              1219, 1220, 1310, 1311, 1312,
16              1314, 1315, 1316, 1317, 1318,
17              1319, 1320, 1321, 1322, 1327,
18              and 1331
19    234 D-1 . . . . . . . . . . . . . . . . 834
20    235-2 . . . . . . . . . . . . . . . . . 835
21    235-1 . . . . . . . . . . . . . . . . . 836
22    901, 902, 903, 904 A, 906 A, 908 A, 909 A and 910 839
23    170 A . . . . . . . . . . . . . . . . . 852
24    172 A . . . . . . . . . . . . . . . . . 858
25    160 . . . . . . . . . . . . . . . . . . 860
```

1    161    . . . . . . . . . . . . . . . . . . 866

2    175 and 181   . . . . . . . . . . . . . . 869

3    176, 178, 180 and 185   . . . . . . . . . . 871

4    163    . . . . . . . . . . . . . . . . . . 876

5    172    . . . . . . . . . . . . . . . . . . 885

6    179    . . . . . . . . . . . . . . . . . . 891

7    182    . . . . . . . . . . . . . . . . . . 900

8    184    . . . . . . . . . . . . . . . . . . 903

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25