IAUJKET1                    Thompson - cross

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        17 Cr. 00243 SHS

5   ANDREW OWIMRIN, a/k/a "Andrew Owens,"
    a/k/a "Jonathan Stewart," and
6   SHAHRAM KETABCHI, a/k/a "Steve Ketabchi,"

7                   Defendants.

8   ------------------------------x
                                         October 30, 2018
9                                        9:30 a.m.

10  Before:

11                  HON. SIDNEY H. STEIN,

12                                       District Judge
                                          and a jury
13
                           APPEARANCES
14
    GEOFFREY S. BERMAN,
15       United States Attorney for the
         Southern District of New York
16  KIERSTEN ANN FLETCHER,
    ROBERT BENJAMIN SOBELMAN,
17  BENET JEANNE KEARNEY,
         Assistant United States Attorneys
18
    SAM A. SCHMIDT,
19  ABRAHAM JABIR ABEGAZ-HASSEN,
         Attorneys for defendant Owimrin
20
    KENNETH A. PAUL,
21  JACOB MITCHELL,
         Attorneys for defendant Ketabchi
22
    Also Present:
23       CHRISTOPHER BASTOS, Detective NYPD and HSI
         CHRISTINE LEE, Paralegal USAO
24       SAMUEL TUREFF, Paralegal

25

IAUJKET1                    Thompson - cross

1              (Trial resumes)

2              (In open court; jury not present)

3              THE COURT:  Good morning.  The last juror has just

4    arrived.  I understand the parties have issues.  Please be

5    seated in the courtroom.

6              I do wish to remind the parties to agree upon, if you

7    can, a verdict form.  It should be fairly straightforward and

8    to present it to me tomorrow, the verdict form.

9              Yes, who has issues?

10             MS. KEARNEY:  Your Honor, after the conclusion of Ms.

11   Thompson's testimony, the government intends to introduce the

12   deposition of Charlene Foster along with the transcript as an

13   aid to the jury.

14             THE COURT:  We have been over that, yes.  How long is

15   that?

16             MS. KEARNEY:  An hour and 15 minutes inclusive.

17             THE COURT:  All right.

18             MS. KEARNEY:  Mr. Schmidt raised last night and again

19   this morning that he wishes to introduce extrinsic evidence of

20   a prior inconsistent statement of Ms. Foster that she made to

21   her daughter-in-law, Blake Foster.  The government believes

22   that is inappropriate under Rule 613.

23             THE COURT:  Mr. Schmidt.

24             MR. SCHMIDT:  Your Honor, there are two separate

25   issues involving this.  The first one involves a statement made

1    by Charlene Foster.

2              THE COURT:  Wait.  First of all, you cited Rule 615?

3              MS. KEARNEY:  13, your Honor.

4              THE COURT:  613?  All right.  Let me look at it.

5    (Pause)  Yes, sir.  First of all, let me get the timing on

6    this.  Mr. Abegaz-Hassen, how much longer do you envisage being

7    with this witness on cross?

8              MR. ABEGAZ-HASSEN:  I would estimate an hour to an

9    hour and a half.

10             THE COURT:  Really?

11             MR. ABEGAZ-HASSEN:  I will try to make it quicker.

12             THE COURT:  I would think you'd want to.  All right.

13             Mr. Schmidt, so it is 10:00, 11:30, and then how long

14   is the tape again?

15             MS. KEARNEY:  An hour and 15 minutes.

16             THE COURT:  That would bring us to noon.  Tell me what

17   the issue is, Mr. Schmidt.

18             MR. SCHMIDT:  There are two inconsistent statements.

19             One of them, I had the 3500 material, the

20   daughter-in-law at the time of the deposition, and I asked the

21   witness if she told her daughter-in-law --

22             THE COURT:  So this is you at the deposition?

23             MR. SCHMIDT:  That's correct.  I asked her if she told

24   her daughter-in-law the specific issue, and she said no, all

25   right?

1          THE COURT:  Just to help me, what is the issue?

2          MR. SCHMIDT:  I asked her if she told her

3   daughter-in-law that they tried to do all of her tax filings.

4          THE COURT:  Who is "they"?

5          MR. SCHMIDT:  Well, in the context of the deposition

6   was the A1 or the people of A1.

7          THE COURT:  Okay.  So did you tell your

8   daughter-in-law that A1 was really doing work?

9          MR. SCHMIDT:  They tried, that they tried to do her

10  tax filings.

11         MS. KEARNEY:  This is on Page 50 of the deposition, if

12  that is helpful.

13         THE COURT:  Do I have that here?

14         MS. KEARNEY:  You should.  It is Government Exhibit

15  116 FT.

16         THE COURT:  Hold on.  (Pause)

17         MR. SCHMIDT:  Line 12, your Honor.

18         MS. KEARNEY:  If I may, your Honor, while you're doing

19  that, the reason this is coming up is an effort to streamline

20  the case, we decided we are not going to call Blake Foster.

21         THE COURT:  That is the daughter-in-law, I take it?

22         MS. KEARNEY:  That is the daughter-in-law.  We were

23  hoping to do a stipulation what her testimony would be.  We

24  were not able to agree.  Our decision at this point is not to

25  call her at all.

1          THE COURT:  You said it is Government Exhibit 115?

2          MS. KEARNEY:  116.

3          MS. KEARNEY:  FT.

4          THE COURT:  Just a moment.  116 FT.  Because the jury

5     is here -- no.  You know what?  Let me hear what the is issue.

6          MR. SCHMIDT:  So I asked Charlene Foster did you tell

7     Blake that they tried to do your tax filings for you?

8          THE COURT:  What page are we on?

9          MS. KEARNEY:  The second page of the exhibit, it is

10    numbered Page 50.

11         THE COURT:  Did you tell Blake that they tried to do

12    your tax filings for you?  No, I never told her that.  I said

13    they would do my taxes for me and that was nothing to do with

14    A1.  They were going to do it all.  I am not sure I understand

15    it.

16         MR. SCHMIDT:  The difference is that, your Honor, that

17    saying they're going to do it and trying to do it are two

18    different things.

19         THE COURT:  All right.  Did you tell Blake that they

20    tried to do your tax filings?  No, I never told her that.  I

21    said they would do my taxes.

22         Is that the emphasis you want?  Not that they tried,

23    but they they would do it?

24         MR. SCHMIDT:  No, no.  What I want to bring out was

25    that they tried to do it.  What she told Blake was they tried

1    to do it because she did not answer her phone calls, so

2    obviously they were unable to complete that process as opposed

3    to no one making an effort to do it after they said they would

4    do it.  That is the distinction.

5          MS. KEARNEY:  The part about the phone calls and

6    Charlene Foster not keeping her supposed appointments with the

7    company is elsewhere in the transcript.  That will be clear.

8    That will be included when presented to the jury.

9          THE COURT:  You lost me on that.  I am trying to

10   follow it bit-by-bit.

11         MS. KEARNEY:  It seems to me the point Mr. Schmidt

12   wants to make through wanting to introduce this statement that

13   Charlene made to Blake is that --

14         THE COURT:  What is it, Mr. Schmidt, what is the

15   statement you have that Charlene made to Blake?

16         That is the allegedly prior inconsistent statement.

17   Is that correct?

18         MR. SCHMIDT:  Yes, yes.

19         THE COURT:  What is that statement, and where do I

20   find it?

21         MR. SCHMIDT:  It is the 3500 material, 3505-09.  I

22   will read it verbatim to you.

23         THE COURT:  Yes.

24         MR. SCHMIDT:  CF, which means Charlene Foster, told

25   BF, which you know is Blake Foster, that they tried to do all

1    of her tax filings.

2              THE COURT:  Just a moment because this is new to me.

3              (Pause) So if I follow your point, sir, Charlene said

4    she never told Blake that they tried to do her tax filings, and

5    here you have a 3500 report that says Charlene did tell Blake

6    they tried to do her tax filings.  Is that your point?

7              MR. SCHMIDT:  Yes.

8              THE COURT:  Now let me look at 16 (b).

9              Extrinsic evidence of a witness's prior inconsistent

10   statement is admissible only if the witness is given an

11   opportunity to explain or deny the statement and an adverse

12   party is given the opportunity to examine the witness about it

13   or if justice so requires.

14             All right.  Government?

15             MS. KEARNEY:  First off, I don't think it is a prior

16   inconsistent statement.  Ms. Foster's answer is ambiguous at

17   best, and that will be clearer in the video as well.

18             THE COURT:  What is ambiguous about, "I never told her

19   that"?

20             MS. KEARNEY:  She said they said they would do my

21   taxes and that has nothing to do with A1.  It seems to me there

22   is just a miscommunication between Mr. Schmidt and Ms. Foster.

23             THE COURT:  Go ahead.  Assuming it is a prior

24   inconsistent statement, what then?

25             MS. KEARNEY:  Well, your Honor, Ms. Foster is

1   obviously not here in person.  We cannot follow up with her

2   about it.

3            THE COURT:  Charlene, you mean?

4            MS. KEARNEY:  Yes, Charlene is not here in person.  We

5   can't follow up with her about it and she was never actually

6   presented with this statement.

7            THE COURT:  Extrinsic evidence of a witness's prior

8   inconsistent statement is admissible only if Charlene is given

9   an opportunity to explain her statement that, "I never told

10  Blake they tried to do my tax filings," and an adverse party --

11  I don't know who would be adverse -- is it adverse to the party

12  seeking the introduction of the prior inconsistent statement?

13           MS. KEARNEY:  I think the government would be the

14  adverse party.

15           THE COURT:  All right.  And the government is given an

16  opportunity to question Charlene about it, or if justice so

17  requires.

18           Mr. Schmidt, she is not here.  There doesn't seem to

19  be an opportunity.  There was only an opportunity during the

20  deposition, but there was nothing -- we didn't know about

21  inconsistencies during the deposition.

22           MS. KEARNEY:  To be fair, your Honor, we did.  The

23  notes that Mr. Schmidt is referring to --

24           THE COURT:  He didn't have that note then.

25           MS. KEARNEY:  Yes, he did.  These notes, 3505-9, are

1    dated September 10th.  They were produced a week ahead of the

2    October 1st deposition.  We produced 3500 for both Charlene and

3    Blake ahead of the deposition.

4              THE COURT:  Now I understand that, Mr. Schmidt.

5              MR. SCHMIDT:  I did confront her with the prior

6    inconsistent statement, giving her the opportunity.

7              THE COURT:  Where?

8              MR. SCHMIDT:  When I asked her did you tell Blake,

9    that's the opportunity she has to explain it.  That is the

10   opportunity.

11             THE COURT:  I understand what you're saying.  (Pause)

12             so let's give you the benefit of the doubt here.  You

13   looked at the 3500 material a week prior to the deposition.

14   You saw that in the 3500 material it said Charlene told Blake

15   they tried to do her tax filings.

16             MR. SCHMIDT:  And I confronted her with it.  If I

17   didn't ask her --

18             THE COURT:  No.  You say only if the witness is given

19   an opportunity to explain or deny the statement.  That would be

20   Charlene.  You told --

21             MR. SCHMIDT:  Charlene --

22             THE COURT:  Just a second.  You told Blake they tried

23   to do your tax filings.  Explain the fact that now you say I

24   never told Blake that, right?  That would be confronting him

25   with the prior inconsistent statement.

1        MR. SCHMIDT:  No.  Confronting her is asking her if

2   she did.  What that section means is that I could not ask her

3   about that prior inconsistent statement, and then at a later

4   time try to bring out the prior inconsistent statement without

5   asking her about it.  I asked her about it.  That is the

6   confronting.  So she had the opportunity to say yes, yes --

7        THE COURT:  I understand what you're saying.  It says

8   opportunity to explain or deny the statement.  At least --

9        MR. SCHMIDT:  She denied it.

10        THE COURT:  -- at least in the excerpt I read here

11   aloud, there is no telling her you earlier told Blake that they

12   tried to do your tax filings.  Explain or deny that.

13        In other words, it looks, again on the limited reading

14   I just did, that you never gave Charlene an opportunity to

15   explain or deny the statement.  Indeed, you never told Charlene

16   that she had made a prior statement to Blake that they tried to

17   do her tax filings.

18        MR. SCHMIDT:  I did.  I said didn't you tell Blake,

19   and then she denied it.

20        THE COURT:  Ah, ah, I see now.  Did you tell Blake?

21   All right.  Let me think.

22        MR. SCHMIDT:  And then she denied it.

23        THE COURT:  Extrinsic evidence of a witness's prior

24   inconsistent statement is admissible only if Charlene is given

25   an opportunity to explain or deny the statement.  Going back to

1    the transcript:  Did you tell Blake that they tried to do your

2    tax filings?  Answer:  No.

3            And an adverse party, the government, is given an

4    opportunity to examine the witness about it.

5            MR. SCHMIDT:  And they were there.  They had redirect

6    examination.

7            THE COURT:  All right.  Ms. Kearney.

8            MS. KEARNEY:  Your Honor, Mr. Schmidt never gave Ms.

9    Foster any indication of the context of that statement.

10           THE COURT:  He doesn't have to do context.  What he

11   has to do, did you tell Blake that they tried to do your tax

12   filings.

13           MS. KEARNEY:  I think, your Honor, the way the

14   question is phrased, there is no indication there that she did

15   tell Blake.  It is an open-ended question.  It is not didn't

16   you tell Blake that.

17           THE COURT:  I am sorry.  Say that again.

18           MS. KEARNEY:  It is an open-ended question.  It is not

19   didn't you tell Blake that, implying she had.

20           THE COURT:  I see.  Does the nicety, does 613 (b) turn

21   on the nicety of that contraction?

22           MS. KEARNEY:  I don't think there is a civility

23   requirement of 613 (b), your Honor, but confronting a witness

24   with a statement is more than --

25           THE COURT:  I understand.  Let's get testimony in

1    here.  I will consult with Weinstein on this at least on paper.

2           MR. SCHMIDT:  The second point is that after the

3    deposition, we received 3500 material of Blake Foster, that

4    Blake Foster said that Charlene Foster initiated the dispute,

5    and clearly meaning the dispute with the Discover credit card

6    company, right?  We did not know that.

7           THE COURT:  Wait.  Charlene initiated the dispute?

8           MR. SCHMIDT:  Yes.  That is why Blake Foster told the

9    government, as reflected in the 3500 material, of --

10          THE COURT:  Go ahead.

11          MS. KEARNEY:  And --

12          THE COURT:  Let him finish.  Remember, just two at a

13   time.

14          MR. SCHMIDT:  And during the deposition, Ms. Charlene

15   Foster said that she didn't not know anything about

16   Charge-backs being initiated, and I assumed at the time based

17   on what we had there, that we knew at some point, based on the

18   material that we had, that Blake Foster was dealing with the

19   credit card companies.

20          We assumed that it was Blake Foster who initiated the

21   Charge-backs, and it turns out, obviously, it wasn't.  It was

22   Charlene.  We did not have that.  Normally we did not confront

23   Charlene Foster with it, and that is one of the usual things

24   that must be done.

25          However, because it is a deposition, because it is not

IAUJKET1                     Thompson - cross

```
 1   clear, the second section of B says "or if justice so
 2   requires," so it would seem to me that justice would so require
 3   because we did have that deposition, that it is now confusing
 4   as to who initiated the charge-back; and, therefore, under that
 5   section, that simple prior inconsistent statement, that --
 6            THE COURT:  All right.  Show me in the deposition
 7   transcript where the testimony is.
 8            MR. SCHMIDT:  Page 30.
 9            THE COURT:  Government, what exhibit?
10            MS. KEARNEY:  This is going to be -- I don't have the
11   page number.  I am sorry, your Honor.
12            THE COURT:  That's all right.  Read it to me, sir.
13            MR. SCHMIDT:  Page 30, Line 7:
14            At the time you said you stopped answering the phone
15   with these people, were you aware whether anybody took steps to
16   recover the money from the credit card companies that you paid
17   out?  Answer:  I'm not aware.
18            Obviously, you have to be aware --
19            THE COURT:  Just a moment.  Just a moment.
20            MR. SCHMIDT:  30.
21            THE COURT:  All right.  So Charlene says I'm not aware
22   of any efforts to recover money from the credit card companies,
23   and after the deposition you find out in 3500 material, I take
24   it, of an interview of Blake, Blake says Charlene initiated the
25   dispute with Discover.
```

1          And extrinsic evidence of a witness's prior

2     inconsistent statement; that is, Blake's statement to the

3     government that Charlene initiated the dispute with Discover,

4     is admissible if the witness is given an opportunity to explain

5     or deny the statement, and you say never mind that because you

6     didn't even know about it until you got the 3500 material

7     later, and an adverse party is given an opportunity to examine

8     the witness about it.  That doesn't matter because of the

9     timing, or if justice so requires.

10          Why does justice so require this?

11          MR. SCHMIDT:  Your Honor --

12          THE COURT:  Because we know, according to you, what

13     she said is not true.

14          MR. SCHMIDT:  That is correct, and also what she did

15     say was going to be part of this, is that she only told her

16     children recently, very recently about these charges, right?

17          And that was October 1, 2018 she said it, and Ms.

18     Blake Foster said that they found out about this either in

19     February or April of 2016.  So we have a woman, and I don't

20     know if you watched, read the transcript or watched her, a

21     woman who had a hard time remembering things, who got this

22     basic important information incorrect, and now we have somebody

23     who does not have any memory problems, who has told us what the

24     correct --

25          THE COURT:  Well, you're going far afield now.  I take

1    it what you would be doing on this, we'll call it the second

2    one, is simply reading to the jury the prior inconsistent

3    statement; that is, the statement from the 3500 material of

4    Blake, right?

5              MR. SCHMIDT:  Yes, your Honor.

6              THE COURT:  Because, because the other statement of

7    Charlene is already in the deposition that they're going to

8    see.  I take it all you do is after the deposition, read the

9    Blake statement from the 3500 material?

10             MR. SCHMIDT:  That statement and the time that Blake

11   found out about it, just so the record --

12             THE COURT:  I understand.  What is the position of the

13   government?

14             MR. SCHMIDT:  -- the jury is not misled by obvious

15   incorrect testimony.

16             THE COURT:  I understand, sir.  What is the position

17   of the government here apart from the fact that she is not

18   being given an opportunity to explain or deny.

19             MS. KEARNEY:  Correct.  This is no different from when

20   a witness testifies early in the trial, and then the defense

21   receives 3500 material for a different witness that the

22   government took after the first witness testifies that is

23   inconsistent.  So what happens here is --

24             THE COURT:  Well, Mr. Schmidt may take the position

25   so, too, in that case he should have had the opportunity to

1    introduce a prior inconsistent statement.

2              MS. KEARNEY:  But she would not have the opportunity

3    to explain or deny.  Ms. Foster was deposed on October 1st.

4    The government met with Blake Foster after that, and at one of

5    those subsequent meetings Blake said that Charlene initiated

6    the dispute.  We produced that in 3500.

7              But at the time of the October 1 deposition,

8    Mr. Schmidt had ample materials to question Charlene regarding

9    the initiated of the dispute.  So, for example, he had the

10   dispute from Capital One that is dated December 2015, which is

11   only a few weeks after she signed the contract with A1 Business

12   Consultants, which was in October 2015.  And now she testified

13   at her deposition that she didn't tell her children about these

14   fraudulent charges until recently, so a Capital One document

15   dated December 2015 would suggest that someone other than her

16   children initiated that dispute.

17             THE COURT:  All right.  This is what I am going to

18   do --

19             MR. SCHMIDT:  May I just, your Honor?

20             What I am concerned about now, if the government was

21   aware at the time of the deposition that the testimony that

22   Ms. Charlene Foster was giving was incorrect, they would have

23   an obligation to correct it in some manner.  So the idea this

24   is the same thing of them having 3500 material given to me

25   later on during the course of the trial, if they were aware of

1   that material, they would have the obligation to correct it.

2           THE COURT:  This is what I am going to do.  I want to

3   do a little research, as I say, on the issue, but I want to get

4   the testimony in front of this jury.  Bring the jury in.  Bring

5   the witness in.  I really think, Mr. Abegaz-Hassen, you should

6   try to expedite your cross as much as you can consistent with

7   your client's rights.  I think you actually have gotten some

8   material you can use from this witness already.

9           MR. ABEGAZ-HASSEN:  Thank your Honor.

10          THE COURT:  I say that in the interests of having you

11  expedite matters.  Come forward, ma'am.  The witness is now in

12  the courtroom.  Good morning, Ms. Thompson.

13          THE WITNESS:  Good morning.

14          (Jury present)

15          THE COURT:  Good morning, ladies and gentlemen.

16  Please be seated in the courtroom.  Again we were handling

17  legal matters.  Please be seated.

18          MR. ABEGAZ-HASSEN:  May I proceed, your Honor?

19          THE COURT:  No, not yet.  Ladies and gentlemen, we'll

20  take our mid-morning break around 11:45 or so and remember

21  we're going to have lunch at 2:00.  Ms. Thompson, welcome, and

22  I remind you that you remain under oath.  You understand that?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  Please speak loudly, slowly and clearly.

25  CROSS EXAMINATION (Continued)

IAUJKET1                    Thompson - cross

1   BY MR. ABEGAZ-HASSEN:

2   Q.  Good morning, Ms. Thompson.

3        Yesterday we spoke about some of the companies and

4   things that happened before December of 2013.

5        THE COURT:  You, too, sir, speak into the mike and

6   speak loudly, please.

7   Q.  Do you remember that?

8   A.  I remember you discussing that, yes.

9   Q.  Now I want to move on and go, start talking about the

10  things that started happening in December of 2015.  Yesterday

11  you testified about First Trend, and First Trend is also known

12  as Tri-star or KB Consulting.  Is that right?

13  A.  I don't know.

14  Q.  Are you familiar with First Trend, the name?

15  A.  I'm familiar with the name of First Trend, yes, but I don't

16  know if they're the same company.

17  Q.  Okay.  So would it help if you looked at your notes?

18        MS. KEARNEY:  Objection, your Honor.  She just

19  testified she doesn't know, not that she doesn't recall.

20        THE COURT:  Sustained.

21  BY MR. ABEGAZ-HASSEN:

22  Q.  Do you remember writing a check on December 11th to KB

23  Consulting?

24  A.  I don't remember off the top of my head, no.

25  Q.  Would it help to have your notes?

IAUJKET1                    Thompson - cross

1   A.  Sure.

2   Q.  Could I refer you to 3506-02.  That is also Government

3   Exhibit 165, Page 6.  Read to yourself just the top of that

4   page there.

5   A.  (Pause)

6           THE COURT:  What is the question?

7   BY MR. ABEGAZ-HASSEN:

8   Q.  Does that refresh your recollection that you wrote a check

9   on December 11th to KB Consulting and sent it to that address,

10  First Trend Marketing, attention Emily Miller?

11          MS. KEARNEY:  Objection, your Honor.  He is reading

12  from a document not in evidence.

13          THE COURT:  Does that refresh your recollection in

14  regard to whether you wrote a check on December 11 to KB

15  Consulting?

16          THE WITNESS:  No, it does not.

17          MR. ABEGAZ-HASSEN:  I'll come back to that in one

18  minute.

19          (Off-the-record discussion)

20  BY MR. ABEGAZ-HASSEN:

21  Q.  You remember testifying yesterday that you did send several

22  checks to KB Consulting.  Is that right?

23  A.  Yes, I do.

24  Q.  Do you remember on the check on December 11th?

25  A.  I don't remember it off the top of my head, no.

1   Q.  Can we get, I believe it is Government Exhibit 902 A.

2           The first person you spoke to from Tri-star was Mr.

3   Goldman, right?

4   A.  I'm not sure.  I'd have to check my notes.

5           MS. KEARNEY:  Is there a question about 902 A?

6           THE COURT:  No.  Let him ask his questions.

7   BY MR. ABEGAZ-HASSEN:

8   Q.  May I refer you to Government Exhibit 165, Page 2.

9   A.  What is the question?

10  Q.  Do you remember speaking with Mr. Goldman from Tri-star?

11  A.  Yes.  I don't remember it off the top of my head.  I

12  remember speaking with Michael Goldman, and after looking at my

13  notes, I know that he was from Tri-star.

14  Q.  What you were buying from them, what you thought you were

15  buying from Mr. Goldman was merchant processing.  Is that

16  right?

17  A.  Can I look at my notes again?

18          THE COURT:  Forget the notes for the moment.

19          What did you believe you were buying from Mr. Goldman?

20  Don't worry about your notes.  What did you think you were

21  buying from him?

22          THE WITNESS:  If at that time I had written a check to

23  him, then I believed I was buying merchant processing, I call

24  it --

25          THE COURT:  Terminal?

1              THE WITNESS:  Terminal.  Thank you.

2    BY MR. ABEGAZ-HASSEN:

3    Q.  So at that time they led you to believe that you were

4    buying a merchant processing business for yourself, right?

5    A.  A merchant processing terminal.

6    Q.  You were going to use that to start a business for

7    yourself?

8    A.  Well, that would be what I would be getting, not a

9    business, but, yes.

10   Q.  He explained to you, and you had conversations about the

11   financials and the details of how much money you would be

12   earning from that merchant processing?

13   A.  I'm not sure what you mean by the financials and the

14   details.

15   Q.  He gave you figures, percentages you would earn?

16   A.  Yes.

17   Q.  Do you remember the details of that?

18   A.  I remember some of the details of that.

19   Q.  What were you supposed to be earning?

20   A.  We would split the percentage that would be earned on the

21   merchant terminal and I would get a set amount which was

22   $500.00 for each terminal that was placed, and then as I

23   testified yesterday, if they borrowed against that terminal or

24   with that, then there would be some residual from it also.

25   Q.  It was through those conversations with Mr. Goldman that

1    you were introduced to Emily Miller.  Is that right?

2    A.  After I did not agree -- this was before I wrote the check,

3    before I agreed to do that, he introduced me to Emily Miller

4    because I wasn't agreeing to do it before I wrote that check.

5    Q.  He introduced you to Emily Miller before you wrote the

6    check, and did Emily convince you to work with Mr. Goldman and

7    write that check?

8    A.  In conjunction with both of them, yes.

9    Q.  You regularly talked to Emily Miller on her cell phone.  Is

10   that right?

11   A.  I did.

12   Q.  You would text and talk quite regularly, at least three or

13   four times a day?

14   A.  Yes.

15   Q.  Sometimes more?

16   A.  Sometimes.

17   Q.  It was through this business opportunity that you learned

18   that you were introduced to Steve Blake.  Is that right?

19   A.  Yes.

20   Q.  And he was introduced as your campaign manager?

21   A.  Yes.

22   Q.  He called you once a week, right?

23   A.  Yes.

24   Q.  Were you supposed to do anything else with him?  Did he

25   give you tasks or other things to do?

IAUJKET1                         Thompson - cross

1   A.  No, he did not.

2   Q.  As you talked to Steve, you also would check in with Emily.

3   Is that right?

4            MR. PAUL:  Could you clarify what Steve you're talking

5   about.

6            MR. ABEGAZ-HASSEN:  My apologies.

7   BY MR. ABEGAZ-HASSEN:

8   Q.  When you would speak to Steve Blake, you would check in

9   with Emily from time to time about what Steve Blake was telling

10   you.  Is that right?

11   A.  She would ask me what he was telling me, and I would tell

12   her.

13   Q.  And she would sometimes disagree with Steve and sometimes

14   agree.  Is that right?

15   A.  I'm not sure what you mean by that.

16   Q.  But at the time you developed a trust with Emily.  Is that

17   right?

18   A.  Yes, that's true.

19   Q.  If you had problems or questions about the things that

20   Steve or Steve Blake or Mr. Goldman were telling you, you would

21   ask those questions of her.  Is that right?

22   A.  To her, and then along with that time I had been introduced

23   to --

24   Q.  I'm just talking about the time with Tri-star the first

25   time.  You would talk to Emily and you would talk to other

1    people as well?

2    A.  Yes, but that only went on for about a week or so, and by

3    that time I had been introduced to your defendant, but I knew

4    him as another name and I would ask him about it also.

5    Q.  I haven't gotten there yet.  I am just talking about this

6    initial contact --

7              THE COURT:  Next question.

8    Q.  She told you she was in Delaware.  Is that right?

9    A.  Sometimes she said she was there and sometimes she said she

10   was in another state, in Nevada.  But then the time zones,

11   times started getting mixed up.  Sometimes, yeah, that's true.

12   Q.  It was Emily who came up with the idea to get more add-ons

13   to your existing merchant accounts, right, your merchant

14   processing?

15   A.  No, I don't think so.

16   Q.  It was Emily who said you went with A1.  Isn't that right?

17   A.  I believe it was A1 next.  I don't think it came next.  I

18   don't believe so.  It went before another company before that

19   one.

20   Q.  What was the other company?

21   A.  I'd have to refer to my notes, but I believe there was

22   First Trend, and then there was something else before A1.  Off

23   the top of my head, I thought there were three, I thought there

24   was another one in-between there.

25   Q.  Around what date?

1   A.  It would have to be in December.

2   Q.  Would it help to look at your notes from December?  Would

3   that help you remember?

4   A.  Probably, yes.

5   Q.  Could we show the witness Government Exhibit 165, Page 7.

6   A.  (Pause)

7   Q.  Does that help you remember?

8   A.  That helps me remember First Trend that Steve Blake talked

9   about and how I would make money from them and how he would

10  collect the fees.  That is not money I would pay; that is money

11  I would receive.

12  Q.  So yesterday on your direct testimony you testified that

13  you would have gotten a number for A1 from Emily?  Is that

14  right?

15  A.  Number from A1 from Emily?

16  Q.  That you got the number for A1 from Emily Miller?

17  A.  I don't know there was a direct number for A1.  I got the

18  number that she had and she was working at eventually for A1,

19  so that is why I put A1 under her name.

20          Before that if you could back up in my phone, it would

21  have said she worked for whatever the first company she had and

22  the next company and the next company, so each time in my

23  contact numbers, I would have changed the title under her name.

24  So I don't know if A1 had an original number for them or not.

25  What I am saying is I put the title of where they were under

1    the name just like I did for everyone else.

2    Q.  That makes sense.

3        On your testimony yesterday you said that the original

4    number that you got to talk to Jonathan Stewart from A1 was

5    from Emily.  Is that correct?

6    A.  That's correct.

7    Q.  Now, why did Emily give you that number?

8    A.  Because she wanted to introduce me to her partner, that

9    they would be working closely together and she wanted me to

10   work with the two of them, and she, as I testified yesterday,

11   after going through, after talking with -- once my name was out

12   on the internet, after I had looked into different companies

13   and was trying to find something that I wanted, that I could do

14   at home, once my name was out there, I was bombarded with calls

15   constantly, multiple times a day.

16       So I wasn't answering these calls any more, so then if

17   I found somebody I was going to talk to like I thought I had

18   found somebody I could trust, then I would tell them.  If

19   somebody is going to call me, I need their number because if I

20   don't have their number and their name plugged in my phone, I

21   am not going to answer the phone.

22       So Emily, just like Michael Goldman, gave me Emily's

23   name and number they would call me from.  I put it in my phone.

24   When they called, I would answer, and Emily did the same.  I

25   said tell me his name and number, and I put it in my phone so

1    when they call, I'll answer.  When they called, they say okay,

2    here is my cell number or my office number and this and that,

3    and I put that in my phone, and they would say they were

4    calling, for instance, from First Trend or whatever.

5            Well, they would say, at that point point they would

6    say we are working for A1 now, A1 Business Consultants, and

7    that is why I changed the contacts to say A1.

8    Q.  So you didn't want to talk to anyone unless Emily told you

9    that you could talk to them first or they were trustworthy?

10   A.  No, I am not saying only Emily.  I am just saying only if I

11   felt like it was somebody I felt was legitimate at the time.  I

12   am not saying Emily was the be all and end all, the only person

13   I trust in.  I am not that --

14   Q.  In this particular case, you got the number for A1 from

15   Jonathan Stewart from Emily?

16   A.  I did.  Then once I started talking to him --

17           (Continued on next page)

18

19

20

21

22

23

24

25

1    A.  (Continuing) Then once I started talking to him -- I will

2    let you ask the questions.  It's your job.

3    Q.  So when you first had that first conversation with A1, the

4    idea was to add things on to your business, right?

5    A.  No.

6    Q.  What were the things that you bought in that first -- what

7    were the things you discussed in that first conversation with

8    A1?

9    A.  I don't remember.  I would have to look at my notes to tell

10   you that.

11   Q.  Could I refer you to Government Exhibit 165, page 8.

12           Have you had a chance to read it?

13   A.  Yes.

14   Q.  So isn't it true that in that first conversation with A1,

15   the main thing you were buying was an LLC, is that right?

16   A.  No.  The main thing that we talked about doing was the need

17   to set up an LLC and what went along with that.

18   Q.  OK.  There were some reasons that you wanted to do that

19   that you expressed.  You wanted to do it to add professionalism

20   to your existing business?

21   A.  No.  There were reasons that he expressed I needed to do

22   that, not that I expressed, and I wrote those down.

23   Q.  That you were to add professionalism?

24   A.  He said I needed to add professionalism.

25   Q.  And legitimacy?

1    A.   And legitimacy he said.

2    Q.   And the protection, tax deductions, business checking,

3    things like that, right?

4    A.   That's what he told me, yes.  Those were the bullet points

5    that he was telling me, and that's why I wrote them down that

6    way.

7    Q.   And on your direct testimony yesterday, you said you did it

8    because you wanted your company to be legitimate and legal, is

9    that right?

10   A.   I said I took notes accurately and precisely because I

11   wanted my company to be legal and accurate.  I didn't say I did

12   all that for that reason.

13   Q.   On your direct testimony yesterday, when you were asked why

14   you needed an LLC, didn't you say that you wanted your company

15   to be legitimate and legal?  Do you remember saying that?

16   A.   I don't remember saying it in those words, but if I did,

17   then I must have.  What I'm saying is --

18   Q.   So that first conversation, what came out of that was a

19   decision to purchase an LLC, and you got some follow-up from A1

20   shortly thereafter, is that right?

21   A.   I'm not sure what you mean by follow-up.

22   Q.   Well, you were on the call, right?  You had a call with

23   Jonathan?

24   A.   According to the note you showed me and I just read, we had

25   another appointment a few days later at 11 a.m.  Is that the

1  follow-up you're speaking of?

2  Q.  Yeah.  And you spoke with the people from fulfillment,

3  right?

4  A.  Not that 11 a.m. call.  That 11 a.m. call was supposed to

5  be with Jonathan Stewart.  There was a time when I spoke with

6  fulfillment.

7  Q.  And the people with fulfillment --

8  A.  You are getting kind of confused a little bit.

9  Q.  Thank you for correcting me.

10  A.  You're welcome.

11          THE COURT:  The jury will disregard the badinage.

12          THE WITNESS:  I'm sorry, your Honor.

13          THE COURT:  It's all right.

14  Q.  So when you talked to fulfillment, they were supposed to do

15  the LLC work for you, is that right?

16  A.  That's what I was told, yes.

17  Q.  And they were supposed to search names and help figure that

18  out, right, the names for the LLC, right?

19  A.  That's what I was told, yes.

20  Q.  And they would follow up and set future calls so that you

21  maintained contact and kept things moving, right?

22          After every call, you would set up another appointment

23  with them?

24  A.  They would set up another appointment with me, yes.

25  Q.  Do you remember on December 18 you spoke with Stephanie and

1    Samantha?

2    A.  I can't say I remember that exact date, but I would have

3    kept it in my notes.

4    Q.  Can I refer you to Government Exhibit 165, page 10.

5              So in that appointment, they were supposed to do some

6    things for you?

7              MS. KEARNEY:  Your Honor, I think he is refreshing the

8    witness's recollection.  We haven't had an answer.

9              MR. HASSEN:  Withdrawn.

10             THE COURT:  Take a look at page 10.

11             Does that refresh your recollection of the exact date?

12             THE WITNESS:  Only because I see it written there.  So

13   it doesn't refresh my recollection of the exact day.

14             THE COURT:  Next question then.

15   Q.  When you wrote that, that was -- when you made these notes,

16   you made them when they were fresh in your mind?

17   A.  Absolutely.

18   Q.  And they were accurate at the time you wrote them?

19   A.  Yes.

20             MR. HASSEN:  I offer page 10 of Government Exhibit

21   165.

22             MS. KEARNEY:  Your Honor, she can read from the

23   document.  But if Mr. Hassen is going to offer a page, we

24   request that the whole document be admitted.

25             THE COURT:  He is not going to want that.

1                I shouldn't speak.

2                MR. HASSEN:  I don't need the whole document.

3                THE COURT:  Read from the item you're referring her

4      to.

5      Q.  Just that middle paragraph there and the star where it says

6      "next appointment."

7      A.  "Receive paperwork for corporate setup and I sign and send

8      on to state.  She will get with accountant and see which state

9      we should use -- South Carolina, North Carolina -- and call me

10     back with that.  Then they will need to get documents going and

11     search for available name for LLC.  Then send out documents for

12     my PO.  I will then need to sign and date and forward to

13     appropriate state for approval.  Next call later today after

14     her conference with accountant.  Next appointment Monday 12/28

15     at 2 p.m."

16               THE COURT:  Next question.

17     Q.  And you had that next appointment on 12/28, isn't that

18     right?

19     A.  I don't know without looking at my notes.

20     Q.  Could I refer you to the same document, page 12.

21               THE COURT:  Did you have that appointment on 12/28?

22               THE WITNESS:  Yes, sir, I did.

23               THE COURT:  Next.

24     Q.  And they basically told you that they had messed up with

25     the shipping, is that right?

1           THE COURT:  Don't worry about your notes.  Can you

2   answer the question?  On that 12/28 telephone conference, did

3   they basically tell you that they had messed up on the

4   shipping?

5           THE WITNESS:  I have no recollection of that.

6           THE COURT:  All right.

7   Q.  Would it help to read the notes?

8           THE COURT:  It's not that she doesn't remember.  She

9   has no recollection.

10  Q.  But these are the same notes and same process for taking

11  these notes, and you believe them to be accurate at the time

12  you wrote them, is that right?

13  A.  That's right.

14  Q.  Could I ask you to read on page 12 from -- just read page

15  12.

16  A.  OK.  "A1 Business -- Monday, December 28, 2015 at 2:00.  A1

17  Business Consultants fulfillment department.  Samantha.  Spoke

18  with her instead of Stephanie this time.  They work together.

19  Corporate document, business plan, etc., includes my LLC,

20  business license to sign and send to state.

21          "Two packages were sent out to me with tracking

22  numbers, but it was sent to Kershaw, South Carolina.  She will

23  track down it, reroute to me at my box in Shallotte."

24  Q.  They messed up with the shipping?

25  A.  It looks like it, yes.

1    Q.   Did you discuss that with Emily Miller afterwards?

2    A.   I don't remember if I did or not.  I may have.  I can't

3    remember that off the top of my head.

4    Q.   When things would happen with your businesses, did you

5    generally update Emily on them?

6    A.   Jonathan Stewart and Emily.

7    Q.   Then there came a time where you made another purchase with

8    A1, is that right, on December 29?

9    A.   I think so.

10   Q.   And that was more of these kind of add-on services, is that

11   right?

12   A.   I think it was only adding on trying to get my taxes done.

13   Q.   Isn't it the case on the 29th you did a contract for

14   YouTube and social media and SEO?

15   A.   And taxes.  Taxes.

16   Q.   And that second contract, that wasn't with Jonathan, that

17   was with someone else at A1, right?

18   A.   I discussed it with Jonathan.

19   Q.   Do you remember if it was someone else that you talked to

20   at A1 about that particular sale?

21   A.   Not off the top of my head.  I would have to confer with my

22   notes.

23   Q.   Page 13.

24   A.   OK.

25   Q.   Isn't it right that you spoke with Connor on that day?

IAU8KET2                    Thompson - Cross

1   A.  Yes, it is.

2   Q.  He gave you a different number, an 800 number to call,

3   right?

4   A.  Yes, he did.

5   Q.  And the things that you discussed were a Web site, right?

6   A.  Without looking at my note there, I think that's what I

7   read, yes.  But I got his number from Jonathan Stewart,

8   Connor's number.

9   Q.  OK.  Going back to Jonathan Stewart, the first time you met

10  him, he gave you a telephone number, right?  The first time you

11  talked to him on the phone he gave you his cell phone number,

12  right?

13  A.  Yes.

14  Q.  And you testified yesterday that you texted with him a few

15  times and you called him, right?

16  A.  Yes.

17  Q.  You would call him on his cell phone, is that right?

18  A.  I don't remember which lines I would call him on the most,

19  but I would call him on different lines.

20  Q.  He gave you a 7774 number?

21  A.  I would have to look back at that contact information.  I

22  don't memorize numbers.  I just pull them up on my phone and

23  have it.  I'm not trying to be flippant.  I don't even know any

24  family numbers.

25  Q.  So after that second sale, you did not sign the contract

IAU8KET2                        Thompson - Cross

1    immediately, isn't that right?

2    A.  Which contract?

3    Q.  The contract from 12/29 with A1.

4    A.  I need for you to show me which contract you're referring

5    to.  I only signed one contract ever, and that was the e-sign

6    contract.

7    Q.  But before you signed it, you spoke with Emily about it,

8    right?

9    A.  Yes.

10   Q.  You wanted to make sure that it was the right thing to do

11   before you signed it, right?

12   A.  Not just Emily, but yes.  Emily wasn't my guide or my god

13   in this, if that's what you mean.

14   Q.  But you spoke with her multiple times a day?

15   A.  Sure I did.

16   Q.  And you spoke with her about the contracts?

17   A.  But I didn't do everything Emily told me to do.

18   Q.  I am not asking if she told you.  I am asking did you

19   consult with her before making that decision?

20   A.  Yeah.  I talked to her about it, yes.  I think consulting

21   with her about it and talking to her about it are kind of two

22   different things.

23   Q.  Could you explain the difference?

24   A.  I think it's common sense.  Consulting means getting all

25   her advice and taking it, sort of.  And talking with her about

1  it means hearing her out and making my own decision.

2  Q.  I understand.

3          So talk to her about it is a better term.

4  A.  But she is not the only one I talked with about it.

5          In other words, I also talked with Jonathan Stewart

6  about it, Connor Swanson, and these other people about it.  She

7  wasn't the only one who influenced me is what I'm trying to

8  say.

9  Q.  So do you remember on January 8 you were supposed to have a

10 call at 4 p.m.?

11 A.  No, I don't remember that.  My notes could refresh me

12 though.

13 Q.  Can we look at page 16.

14         Does that refresh your recollection of that day?

15 A.  It refreshes my recollection that when I see it I remember,

16 but I can't recall it without reading it to you, if that makes

17 sense.

18 Q.  OK.

19 A.  I don't remember it, but when I read it I can describe to

20 you what I meant by those notes.

21 Q.  OK.  So let's go -- can you read that page?

22 A.  Yes.  I don't think it will make sense to you unless I

23 explain it though.

24         At the top it says, "A1 - New Jersey check, 201."

25         Then to the right it says, "Delaware, arrow, First

```
 1   Trend not answer."
 2             Then under there I have got an arrow from there "302."
 3             Under there, "Friday, January 8.  A1, Jonathan
 4   Stewart.  Ask about LLC, what girls should I work with?"
 5             Under that, "Connor Swanson, 1-800-914-4135."
 6             And then I have something marked out and 201 area
 7   code.
 8             Under there, "Michael Goldman, Emily Miller."
 9             Then under that, "4 p.m. today fulfillment, no call
10   received??  Waited until after 5:30 p.m. Eastern."
11             May I explain?
12   Q.  So fulfillment didn't call you that day, right?
13   A.  They did not.  And all the other stuff meant that, what's
14   going on?  These area codes are from different places and I'm
15   saying something's not right here; people are calling from area
16   codes they are not supposed to be, at least that's what I
17   figured.  I don't know all these area codes, but I'm finding
18   out -- I'm thinking something's not right.
19   Q.  Did you talk to Emily about that?
20   A.  I talked to Jonathan about that.
21   Q.  Let me refer you to January 4th.
22             You had a conversation with someone named Mattie?
23   A.  Who?
24   Q.  Mattie, M-A-T-T-I-E.
25   A.  I don't remember that.
```

IAU8KET2                        Thompson - Cross

1    Q.  I will show you page 14.

2    A.  OK.

3            MS. KEARNEY:  Your Honor, she testified she doesn't

4    remember it, not that she doesn't remember whether it happened.

5            THE COURT:  I will allow it.

6            Take a look at page 14.

7    A.  OK.

8            THE COURT:  Next question.

9    Q.  Who is Mattie?

10   A.  I have no idea.

11   Q.  You also mentioned Steve and Louis, is that right?

12   A.  Did I?

13           MS. KEARNEY:  He is reading from a document that's not

14   in evidence.

15           THE COURT:  Exactly.

16           MR. HASSEN:  I will move on.

17   Q.  Moving forward to January 19th.

18   A.  OK.

19   Q.  You got a call from Mr. Goldman, is that right?

20   A.  I'm not sure.

21   Q.  I refer you to page 18.

22           THE COURT:  Does that refresh your recollection on

23   whether or not you received a call from Mr. Goldman on January

24   19?

25           THE WITNESS:  Yes.

1        THE COURT:  Next question.

2   Q.  What was that phone call about with Mr. Goldman?

3   A.  Off the top of my head, him wanting me to invest in a

4   terminal again.

5   Q.  So he wanted you to invest more money, right?

6   A.  Yeah.  He wanted me to invest in a terminal, a merchant

7   terminal.

8   Q.  He gave you a bunch of numbers again, right?

9   A.  Correct.

10  Q.  And he told you about how much money you can make if you

11  invested more money, right?

12  A.  Yes.

13  Q.  But you decided not to do that, right?

14  A.  As far as I can remember.  I'm a little confused with the

15  timelines now.  Are we going backwards or forwards?

16  Q.  We are on January 19th.

17  A.  OK.  Yeah.  I know at that moment I was going for a

18  doctor's appointment, and they were calling me back when that

19  call was made and I told them I couldn't talk anymore right

20  then.  So he called me back after I got out of there.

21  Q.  And he made you some guarantees about how much money you

22  would make if you gave him more money, right?

23  A.  He told me how much I could make.

24  Q.  Did he guarantee that?

25  A.  Michael Goldman?

1   Q.  Mr. Goldman.

2   A.  He didn't guarantee anything about the amounts.  He told

3   me -- yeah, he told me there were lower amounts and higher

4   amounts that could be made.

5   Q.  But he guaranteed that you would make money, right?

6   A.  What do you mean guaranteed?  He didn't give me anything in

7   writing.

8   Q.  In his words.

9           THE COURT:  Did he say, I guarantee you are going to

10  make money, Ms. Thompson?

11          THE WITNESS:  I can't remember if he used those words,

12  sir.

13          THE COURT:  Next question.

14  Q.  But when you wrote these notes, your recollection was

15  fresher, right?

16  A.  Yes.

17  Q.  And they would be accurate, right?

18  A.  Yes.

19  Q.  Could I ask you to read from Government Exhibit 165, page

20  18.  You can skip that first paragraph.

21          THE COURT:  What bullet point do you want?

22          MR. HASSEN:  The second bullet point.  "This would

23  be."

24          THE COURT:  Read that paragraph.  "This would be."

25  A.  "This would be more guaranteed, very strict, depends on

IAU8KET2                          Thompson - Cross

1    what you get approved for."  Ants?

2              THE COURT:  Is that amounts?

3              THE WITNESS:  Amounts.

4    A.  "Should have three merchant accounts, a chargeback."

5    Q.  And the next one as well.

6    A.  "You need collateral.  25,000 per account for collateral.

7    75,000.  100,000 to 250,000 for first three months.

8    Neutropseudo company.  1 million."

9    Q.  And the last one.

10   A.  "Michael charges high-risk owners 15 percent.  100,000."

11   Q.  And the last one.

12   A.  "Also talked with Emily multiple times."

13   Q.  This was Michael Goldman, the original call, from Tri-Star,

14   right?

15   A.  Yes.

16   Q.  Ultimately you decided not to go with him, right?

17   A.  Yes, in the beginning.

18              He didn't guarantee.  He said more guaranteed.

19   Q.  So you're not going to invest anymore with Goldman, but at

20   this time you decide to do more merchant processing with A1, is

21   that right?

22   A.  I believe I did.

23   Q.  And you have a conference call with Jonathan Stewart and

24   Emily Miller, right?

25   A.  Yes, that's true.

1   Q.  And you decided to buy one merchant account, right?

2   A.  Yes.

3   Q.  And this was different than what you had done with A1

4   before, right?

5   A.  I don't understand the question.

6   Q.  You never bought merchant accounts, merchant processing

7   with A1 before January 19, is that right?

8   A.  If that was the first one I bought, then I had not before.

9   Q.  You were buying the merchant stuff with Tri-Star, KB, First

10  Trend, right?

11  A.  I don't think so.

12  Q.  With Mr. Goldman?

13  A.  No.

14  Q.  Are you saying you didn't buy merchant processing with

15  Mr. Goldman?

16  A.  The first one I bought was with Jonathan and Emily.  If I'm

17  not mistaken, I believe the first one I bought was with

18  Jonathan and Emily.  And then I bought two more.

19  Q.  Let me refer you to Government Exhibit 902A.

20          903A.

21          Isn't this the check you wrote to KB Consulting and

22  sent to First Trend on December 11?

23  A.  It's a check that I wrote to KB Consulting on December 11.

24  Q.  And you sent it to First Trend, care of Emily Miller?

25          THE COURT:  Did you send it to First Trend, care of

1   Emily Miller?

2                THE WITNESS:  Sir, I don't remember it.

3                THE COURT:  Next question.

4   Q.  Let me also refer you to 902C.

5                THE COURT:  Question.

6   Q.  Was this the first check you sent to KB?

7   A.  I don't remember.

8   Q.  OK.  Never mind.  Withdrawn.

9   A.  I'm quite sure it was not the first check I sent.

10  Q.  But on December 11, you had not yet ever talked to Jonathan

11  Stewart or A1?

12  A.  I don't know.

13  Q.  Because you testified yesterday that the first call with

14  Jonathan Stewart -- do you remember testifying about your first

15  call with Jonathan Stewart yesterday?

16  A.  I remember testifying when it was by checking with my

17  notes.  Without looking through those I couldn't tell you.

18  That's why I kept notes.

19               THE COURT:  Next question, please.

20  Q.  Do you remember yesterday on your testimony you were asked:

21          "What date did you first speak with Jonathan Stewart?"

22          And you said, "Wednesday, December 16."

23  A.  I said that after referring to my notes.  I can't go by

24  what you're saying.  I can only go by --

25  Q.  Would it help if I showed you the transcript from

1    yesterday?

2    A.  No.

3         THE COURT:  Next question.

4    Q.  So going back to, we are now at January 19, you had a

5    conference call with Jonathan and Emily, right?

6    A.  I'm not sure if that was the date, but I did have a

7    conference call at a point with Jonathan and Emily.

8    Q.  Would it help you to remember that conversation to look at

9    your notes from that day?

10   A.  Would it help to look at my notes?  Sure.

11        MR. HASSEN:  Can we show page 19 of GX 165.

12        THE COURT:  Does that refresh your recollection with

13   regard to whether or not you had a conference call with

14   Jonathan and Emily on January 19, yes or no?

15        THE WITNESS:  Yes, it does.

16        THE COURT:  What is that refreshed recollection?

17        THE WITNESS:  That it was on January 19 that I had a

18   conference call.

19        THE COURT:  Next question.

20   Q.  It was on that conference call that you decided to invest

21   in one more merchant terminal?

22   A.  It was at that time that I decided to invest in a merchant

23   terminal, yes.

24   Q.  But Mr. Goldman didn't stop calling you, isn't that right?

25   A.  He did stop for a while, yes.

IAU8KET2                        Thompson - Cross

1   Q.  But the next day, on the 20th, he called you again, right?

2   A.  Yes, he had just started back.  He had stopped for a while.

3   Q.  After you told him no he stopped, but then he started up

4   again?

5   A.  Yes.

6   Q.  Whose idea was it to have this call with the merchant

7   account with A1?

8   A.  Whose idea?

9   Q.  Do you remember?

10  A.  Yeah.  Jonathan Stewart and Emily Miller, they decided that

11  they wanted to do it and not have Michael involved.  He was

12  having some personal issues.

13  Q.  And you kept getting calls from Steve Blake during this

14  period, right?

15  A.  Well, yes, because he was supposed to be getting the leads

16  for places to put the terminals.

17  Q.  And he left you a voice mail on the 20th?

18  A.  I don't remember.

19  Q.  Would it help to look at the notes?

20  A.  Of course.

21          MR. HASSEN:  Can we refer the witness to page 20.

22          THE COURT:  How much longer do you have with this

23  witness, sir?

24          MR. HASSEN:  Homestretch here, but I'm guessing

25  another half hour.

1           THE COURT:  Pick it up and proceed.

2           MR. HASSEN:  Around a half hour.

3           THE COURT:  What is your question?

4   Q.  Do you remember that voice mail from Mr. Blake?

5           Does that refresh your recollection of the voice mail

6   and the conversations you had on that day?

7   A.  Only that I would get them from him quite a bit.  Just

8   vaguely.  I don't remember that specific one though.

9   Q.  You don't remember that?

10          But these notes were accurate when you wrote them,

11  right?

12  A.  Absolutely.

13  Q.  Can I have you read page 20?

14  A.  "1/20/16, 1:15 on Wednesday.  Sent check and texted

15  confirmation of tracking number to Emily and to Jonathan.

16  Received update voice mail from Steve Blake and texted Emily

17  regarding this.  He stated I had four confirmed and a fifth

18  business that just sent info in and that would make it five for

19  cash advances, and they had a sixth business lead, and as soon

20  as they get their info that could make six, but should be five

21  confirmed before he gives my next update on Wednesday.

22          "This is different from what Emily said yesterday.

23  She is going to check on this, but for now accurate info is

24  four confirmed and hope to get a check going out Friday or

25  Monday, but not for definite yet."

IAU8KET2                        Thompson - Cross

1   Q.  So there was some miscommunication between Steve and Emily,

2   is that right?

3   A.  Yes.

4   Q.  They were saying different things from each other?

5   A.  Is that a question?  Yeah.

6   Q.  But you trusted Emily more than Steve, right, Steve Blake?

7            THE COURT:  Did you trust Emily more than Steve?

8            THE WITNESS:  Yes.

9            THE COURT:  Next question.

10  Q.  In the same period of time, you got another call from

11  Mr. Goldman about merchant accounts, right?

12  A.  From who?

13  Q.  Mr. Goldman.

14  A.  I'm not sure.

15  Q.  He explained something about five points and $100,000?

16  A.  I'd have to see my notes.

17  Q.  I refer you to page 21.

18  A.  You're asking if I got a call from him at that point?  I'm

19  not sure if I did or not, or if I just wrote a note there.  I

20  don't know if that was a telephone call.  I don't have a time

21  or a date by that.

22  Q.  What does 100,000 five points mean?

23  A.  I have no idea.

24            MS. KEARNEY:  Your Honor, again reading from a

25  document that is not in evidence.

1           THE COURT:  Next question.

2    Q.  And you had yet another phone call on January 20th, isn't

3    that right?

4    A.  I don't know.

5    Q.  Let me refer you to page 22.

6    A.  Yes, I did.

7    Q.  And this was the first time you talked to Zach Peterson, is

8    that right?

9    A.  That's correct.

10   Q.  And they were trying to do more of these merchant

11   businesses, right?

12          MS. KEARNEY:  Objection.

13   A.  No.

14          MS. KEARNEY:  Who is "they"?

15          THE COURT:  Next question.

16          Overruled.

17   Q.  Zach explained to you he wanted to have a new relationship

18   going forward, is that right?

19   A.  That's correct.

20   Q.  And around this same period of time, you took down an

21   e-mail address for Emily Miller, isn't that right?

22   A.  I don't remember.

23   Q.  Let me refer you to page 23.

24          THE COURT:  Does that refresh your recollection in

25   regard to whether around the same period of time you took down

1    an e-mail address for Emily Miller?

2              THE WITNESS:  I don't remember it, but I see it on the

3    page.

4              THE COURT:  Next question.

5    Q.  So that doesn't refresh your recollection, but this was

6    accurate when you wrote it at the time, right?

7    A.  Yes, it was.

8    Q.  I will have you read the first two lines there on the left

9    side.

10   A.  "Bcm67az@gmail.com, foreword."

11   Q.  And above and below that, what names are there?

12   A.  "Emily e-mail."

13             THE COURT:  And below it.

14   A.  "Carol Marcus."

15             THE COURT:  Next question.

16   Q.  You had a lot of questions that you wanted answered about

17   all these things, right, during this period of time?

18   A.  I had a lot of questions all the time, yes.

19   Q.  And you were maybe frustrated that you weren't getting

20   answers to all your questions, is that right?

21   A.  Yes.

22   Q.  And Goldman from Tri-Star was calling you on one hand, and

23   A1 was calling you on another hand, both trying to get you to

24   buy more merchant business, right?

25   A.  Mostly they were just calling and stalling about the money

1     they were supposed to send me.

2     Q.  Tri-Star, they were supposed to be sending you money, and

3     every few weeks they would say it's going to be another few

4     weeks, right?

5     A.  I don't know if it was Tri-Star, but it was Jonathan

6     Stewart saying they had a check ready for me that was on his

7     desk, or it's coming to his desk and didn't get there.  And

8     Emily said she was going to be checking with Jonathan and see

9     why it hadn't been sent.  And Steve must be mixed up, he must

10    not have all the information up-to-date what he has, but she

11    would check on that.

12          I just wanted my taxes done.  At that point I was just

13    stressed about getting that done.  And Jonathan kept promising

14    me that they'd have the CPA call me.  But mostly they just kept

15    changing the subject and stalling.

16    Q.  You just mentioned that Jonathan told you you were to get a

17    check.  What agreement would that have been for?

18    A.  For the money that I had invested for the merchant

19    terminals.

20    Q.  But you hadn't yet invested with the merchant terminals up

21    to this point, right?  You had just started with --

22    A.  I had invested for the first one.  When I had the

23    conference call with me, Jonathan and Emily, that's where I

24    paid the money for the first one with them.

25    Q.  That was the date --

1    A.   That was before I did the partnership with Zach.  If you

2    read back, you'll see.

3    Q.   Is it your understanding that the merchant terminal that

4    you purchased on December 11 was from Jonathan Stewart?

5    A.   It's not my understanding; that was what I was told.  I

6    know it wasn't real now, but that's what it was.

7    Q.   But it was what you were told on the 11th before you had

8    ever talked to Jonathan Stewart?

9    A.   No.  When I talked to Jonathan Stewart, we had a conference

10   call.  Me, Jonathan Stewart and Emily, we were all three on the

11   phone together.  And he wanted me to buy three merchant

12   terminals, but I only bought one, and that was with a

13   partnership with him.

14   Q.   On the 11th?

15   A.   I don't know the date.  You can look it up on whatever that

16   conference call -- I can't look at my notes, I'm not allowed

17   to, but whatever that date was that the three of us had that

18   call, the check that I sent for that call was for the terminal

19   to have with him, Jonathan Stewart, or I don't know his name,

20   the guy sitting there in the tan shirt.

21   Q.   So on the 19th, January 19, was the first conversation you

22   had with Jonathan Stewart about merchant terminals?

23              MS. KEARNEY:  Objection.

24              THE COURT:  Sustained.

25   A.   I told you I don't know the date.

1     THE COURT:  There is no question pending.

2     MR. HASSEN:  One moment, your Honor.

3  Q.  So let me refer you to January 27th.  Would it help to look

4  at your notes?

5     MS. KEARNEY:  Your Honor, there has not been a

6  question yet.

7     THE COURT:  Sustained.

8     Just ask a question.

9  Q.  Do you remember conversations on January 27?

10  A.  I do not.  No, sir, I do not.  It's been quite a time ago.

11  Q.  No problem.  I refer you to page 25.

12     THE COURT:  Take a look at what is up on the screen

13  and just say whether that refreshes your recollection in regard

14  to whether or not you had conversations on January 27, 2016,

15  yes or no?

16  A.  No, it does not.

17     THE COURT:  Next question.

18  Q.  But these were accurate when you wrote them, right?

19  A.  Yes.

20  Q.  Let me have you read page 25, the top part, on the right.

21  A.  "Wednesday, January 27, 2016, 11:30.  Received call from

22  Martin, from first USA Business Development, 813-603-4293.

23  Wants to talk to me about what they can do to help me with my

24  business, referred by First Trend, and to go over a progress

25  report.

1          "12:30 received call from Steve Blake at First Trend,

2    spoke with him.  Stated eight businesses in processing, one is

3    a 50/50 shot.  Asked him when I might see a check.  He stated,

4    'No way to know, maybe a week, maybe two weeks.'  The

5    accounting department will call when they have a check ready

6    and they will ask how I want to get paid."

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IAUJKET3                    Thompson - cross

Q.  So this is again you're getting calls from all kinds of

companies trying to sell you more of these merchant accounts,

right?

A.  No.

Q.  Who is Martin from First USA Business Development?

A.  I don't think I had any idea at the time.  That is why I

wrote it down.  I didn't know if they were involved with these

people or not.

        They said they were referred by that First Trend, but

I don't know if they were or if they weren't.  I just jotted it

down.  As far as I know, off the top of my head, I didn't ever

do anything with them.  They wanted to, as I read this, they

wanted to talk to me about what they could do to help me with

my business.

        Everybody wanted to help me with my business.  They

wanted to sell me more and more and more.  I didn't want to buy

any more.  I wanted to get money from what I had in merchant

accounts, and Jonathan said I didn't need to do anything.  I

just had it already done.

        I needed the money.  I didn't want more money.  I

didn't want to get rich.  I wanted to make the salary I was

making.  I wanted to do it where I could spend time with my

family.

Q.  You had a conversation -- there came a point where you

talked with Jonathan Stewart and Mr. Peterson, where he

1   elaborated on that earlier, Mr. Peterson elaborated on that

2   earlier conversation you had.  Isn't that right?

3   A.  No, I don't think so.

4   Q.  Do you remember --

5           (Multiple voices)

6   Q.  -- February 3 with Mr. Peterson?

7   A.  I am not sure.  I'd have to check the date.

8   Q.  I refer you to Page 31.

9   A.  Yes, that was my first conversation with Mr. Peterson.

10  Q.  Excuse me.  Do you remember that conversation?

11  A.  Yes, I do.

12  Q.  In this conversation, this was a conference call with

13  Peterson, Stewart and Emily Miller, right?

14  A.  Yes.

15  Q.  And Peterson made you an offer?

16  A.  Yes.

17  Q.  He was going to sell you part of his business.  Is that

18  right?

19  A.  Yes.

20  Q.  And at that time did you know how much money he was making

21  at his business?

22  A.  No.

23  Q.  Did he tell you?

24  A.  No.  He gave me an idea of how much that would be I would

25  make from that.

1   Q.  Did he say how much he was making?

2   A.  No.

3   Q.  Did he say how much you would get?  Do you remember?

4   A.  He gave me an idea.  I don't remember the exact figures,

5   though.

6   Q.  You were going to buy 20 percent of his company.  Is that

7   right?

8   A.  Yes.

9   Q.  He gave you a contract that didn't include that 20 percent,

10  right?

11  A.  Yes.  Sometime later he mailed that contract.

12  Q.  And then he gave you one with it, right?

13  A.  Sort of, you can say that.  Mostly it said that when they

14  went under, that I would go under with them.  So it was really

15  a joke.

16  Q.  But he led you to believe that that company was making

17  money?

18  A.  Not in the contract.

19  Q.  No.  On the phone call?

20  A.  Oh, yes, ah-huh, yes, he did.

21  Q.  Let me refer you to -- do you remember having, sketching

22  out some of the financials for what that deal might look like?

23          Do you remember doing that in your notebook?

24  A.  Do I remember, yes.

25  Q.  May I refer you to --

IAUJKET3                          Thompson - cross

1          MS. KEARNEY:  Your Honor, she testified she remembers.

2     Q.  -- what kind of revenue do you think you would be seeing

3     from that A1 deal?

4     A.  I would be getting 20 percent -- I mean, yeah, 20 percent

5     of the revenue that they had coming in every month.

6     Q.  Did you ever go through any numbers of what that actually

7     looked like in terms of his actual revenue?

8     A.  They gave me an idea, and I think I wrote it down, but I

9     don't remember that off the top of my head.

10    Q.  Would it help to look at your notes?

11    A.  Sure.

12    Q.  May I refer you to Government Exhibit 164, Page 3.

13    A.  (Pause)

14    Q.  Does that --

15    A.  That has nothing to do with it.

16    Q.  It has nothing to do with?

17    A.  With what you're asking me.

18    Q.  If I refer you to the top right side, top-left side of that

19    page, you have some figures there.

20         MS. KEARNEY:  Objection, your Honor.

21         THE COURT:  Yes, sustained.  In other words, did you

22    ever go through any numbers on what that actually would look

23    like in terms of the actual revenue?  Looking at that did not

24    refresh your recollection.  She said that has nothing to do

25    with it.  Move on.

IAUJKET3                         Thompson - cross

1              (Off-the-record discussion)

2    BY MR. ABEGAZ-HASSEN:

3    Q.  So you'd spoken with Zack one time prior to the time where

4    he tried to convince you to invest in his business, right?

5    A.  Correct.

6    Q.  Do you remember the date that that conversation happened?

7    A.  You said it a couple of times and had me refer to it, but

8    now I can't remember.  I am guessing.  I have no idea,

9    actually.

10   Q.  On the 20th, you had a conversation with Zack?

11   A.  That's right.

12             THE COURT:  No.  He can't tell you things.  He can

13   only ask you things.

14             THE WITNESS:  I don't know.  I don't remember.

15   BY MR. ABEGAZ-HASSEN:

16   Q.  Would you go back quickly to Page 22 of 165.

17   A.  (Pause)  Yes, January the 20th.

18   Q.  Zack Peterson told you he was an attorney.  Is that right?

19             THE COURT:  Did Zack Peterson tell you he was an

20   attorney?

21             THE WITNESS:  Yes, he did tell me he was an attorney.

22             THE COURT:  All right.

23             MR. ABEGAZ-HASSEN:  One moment.  (Pause)

24             Your Honor, if we can take our break now, I can wrap

25   up in 10 minutes.

1       THE COURT:  I would like to conclude this before the

2   break.

3       MR. ABEGAZ-HASSEN:  All right.

4       THE COURT:  And, in fact, any redirect before the

5   break.

6       MR. ABEGAZ-HASSEN:  All right.  I'll keep going.

7   BY MR. ABEGAZ-HASSEN:

8   Q.  All right.  So you'd invested with A1 and then you decided

9   to join?

10  A.  Yes, I did.

11  Q.  Join with them?

12  A.  Yes.

13  Q.  Do you remember on February 3rd, you got a long voice-mail

14  from Steve Blake?

15  A.  I don't remember, no.

16  Q.  May I refer you to Page 30.

17  A.  Do you want me to read it to myself?

18  Q.  Does that refresh your recollection of that voice-mail that

19  you got?

20  A.  (Pause)  It does vaguely.  I remember after reading it, but

21  I wouldn't remember --

22  Q.  What was Steve Blake telling you?

23  A.  I'd have to read it back.  It is too long.  He was telling

24  me a bunch of more junk about this and that and just a lot of

25  made-up stuff why I wasn't getting any money.

1    Q.  And you reported that to --

2    A.  Well, it says I reported it to Emily, yeah.  I also was

3    calling Jonathan with these problems, too, though.

4    Q.  You didn't stop getting calls from all these companies, did

5    you?

6    A.  I didn't answer any calls from all these other companies

7    that were calling.  Is that what we're talking about?

8    Q.  You were getting a lot of calls is what I am asking you?

9    A.  I would get 20 or 40 or more calls a day.  I just didn't

10   answer them from other people, other companies, I am assuming.

11   I just didn't answer them unless I knew it was from Jonathan or

12   Emily or one of these people that were supposed to be calling

13   me.

14   Q.  There came a time where you stoped talking to everybody

15   except Emily, right?

16   A.  No.  I was still trying to talk to Jonathan for a long

17   time.  I called him, I called him, I called him, but he stopped

18   talking to me.

19        He was praying for me.  I thought he was going to be

20   my friend.

21   Q.  Do you remember?

22   A.  I thought he was a good guy.

23   Q.  Let me ask the questions, please.  Thank you.

24        Do you remember a conversation that you had a couple

25   of days ago where you told the government that a woman kept

IAUJKET3                         Thompson - cross

 1   calling you about her husband?

 2                MS. KEARNEY:  Objection.

 3                THE COURT:  Just a moment.

 4                MR. ABEGAZ-HASSEN:  Withdrawn.

 5                THE COURT:  All right.

 6   BY MR. ABEGAZ-HASSEN:

 7   Q.  Do you remember a woman who kept calling you about debt

 8   consolidation or debt relief?

 9   A.  I've had a lot of people call me about debt and debt

10   consolidation.  I can't tell you how many companies have called

11   me over the years for debt relief and debt consolidation.  In

12   fact, I have probably got a few this week.

13   Q.  You mentioned some of those when you were talking with the

14   government, right?

15                MS. KEARNEY:  Objection.

16                THE COURT:  Basis?

17                MS. KEARNEY:  It is hearsay.

18                THE COURT:  Sustained.

19   BY MR. ABEGAZ-HASSEN:

20   Q.  Did you ever get a call from someone named Lisa Corro?

21   A.  I don't remember that name.

22   Q.  Now, you told us here today about how many times -- one

23   moment.

24                (Off-the-record discussion)

25   BY MR. ABEGAZ-HASSEN:

IAUJKET3                    Thompson - cross

1   Q.  Just back to this document that is in front of you, just to

2   be clear, when it says you reported calls to Emily, it doesn't

3   say reported calls to Jonathan, right?

4           THE COURT:  Sustained.  The government is rising to

5   object.

6           (Off-the-record discussion)

7   BY MR. ABEGAZ-HASSEN:

8   Q.  You wrote down you reported calls to Emily --

9           MS. KEARNEY:  Objection.

10          THE COURT:  Just a minute.

11  Q.  You reported calls to Emily?

12          THE COURT:  I will allow that.  Did you write down you

13  reported calls to Emily?

14          THE WITNESS:  I reported calls to Emily.

15          THE COURT:  Did you also report calls to Jonathan?

16          THE WITNESS:  I also reported calls to Jonathan.

17          THE COURT:  Did you write down you reported calls to

18  Jonathan?

19          THE WITNESS:  No, sir, but there were lots of things.

20          THE COURT:  No is no.  Next.

21  BY MR. ABEGAZ-HASSEN:

22  Q.  Isn't it true, do you remember talking to the government,

23  and do you remember having interviews with the government

24  months and months ago?

25  A.  Months, yes, I talked to them several times to prepare for

1    this, yes.

2    Q.  When you were preparing with them, you told them how many

3    times you had spoken with Jonathan, right?

4    A.  I told them I had spoken to him multiple times.

5    Q.  Didn't you tell them that -- would it help -- didn't you

6    tell them that you --

7              MS. KEARNEY:  Objection.

8    Q.  -- with him five or six times in your early interview?

9              MS. KEARNEY:  Objection.

10             THE COURT:  I'll allow that.  Did you tell them you

11   spoke to Jonathan five or six times?

12             THE WITNESS:  No.  Maybe five or six times on some

13   days, but I spoke to him many, many, many times, more than

14   that.

15             (Off-the-record discussion)

16   BY MR. ABEGAZ-HASSEN:

17   Q.  Isn't it a fact --

18   A.  I don't think he would pray for me if I was speaking to him

19   only five or six times.

20   Q.  -- isn't it a fact that you told the government you spoke

21   with Emily multiple times a day, but in the same --

22             MS. KEARNEY:  Objection.

23   Q.  -- in the same interview you told them you spoke with

24   Jonathan Stewart five or six times, maybe more?

25             THE COURT:  Sustained.

1   A.  No.

2              THE COURT:  The jury will disregard the answer.

3              THE COURT:  Wrap it up, please.

4   BY MR. ABEGAZ-HASSEN:

5   Q.  Did you tell the government that?

6   A.  No, I did not.

7              MR. ABEGAZ-HASSEN:  One moment.

8              (Off-the-record discussion)

9   BY MR. ABEGAZ-HASSEN:

10  Q.  About a month ago, September 18th?

11  A.  What year are we talking about?  2016 now?

12  Q.  This year, did you meet with the government?

13  A.  I don't know the dates, but --

14  Q.  On September 18th did you meet with -- was Detective Bastos

15  and AUSA Fletcher here?  Do you remember talking to them before

16  meeting with them?

17             MS. KEARNEY:  Objection.

18             THE COURT:  I'll allow that.

19  A.  I don't remember the dates.

20             THE COURT:  If you don't know, you don't know.  Next.

21             (Off-the-record discussion)

22  BY MR. ABEGAZ-HASSEN:

23  Q.  Just around that time do you remember having --

24  A.  Yes.

25  Q.  -- a conversation?

1    A.  Yes.

2    Q.  Do you remember the subject matter of that conversation?

3    A.  Yes.

4    Q.  Did you tell them on that date that you spoke to Jonathan

5    Stewart five or six times a day?

6           MS. KEARNEY:  Objection.

7    A.  No.

8           THE COURT:  Sustained.  Anything else, sir?

9           MR. ABEGAZ-HASSEN:  No further questions.

10          THE COURT:  Is there any redirect by the government?

11          MS. KEARNEY:  Yes, your Honor.

12          THE COURT:  How long?

13          MS. KEARNEY:  I don't want to hazard a guess.  I may

14   have a better idea in a few minutes.

15          THE COURT:  All right.

16   REDIRECT EXAMINATION

17   BY MS. KEARNEY:

18   Q.  Ms. Thompson, we've discussed Government Exhibit 165 a lot.

19   What is Government Exhibit 165?

20   A.  My notes.

21   Q.  What kind of notes?

22   A.  Lots of notes that I took during this time.

23   Q.  Could you describe --

24   A.  During that time.

25   Q.  -- the process of taking them?

IAUJKET3                    Thompson - redirect

A.   Like I said, I would just keep notes.  I would write down
the date and the time that I was -- when I say meeting with, on
the phone with someone and the subject matter we were going to
speak about or that we spoke about, and I wouldn't write down
everything that we talked about, yeah, small talk or anything,
but just what I call the bullet points of what the conversation
was we were discussing.

Q.   When you were doing that, were you trying to do that --

A.   Absolutely.

Q.   You were doing that at or near the time that this meeting
that you called was taking place?

A.   Yes.

          MS. KEARNEY:  Your Honor, pursuant to Rules 801
(d)(1)(B) and 106, the government offers Pages 1 through 37 of
Government Exhibit 165, which are Ms. Thompson's notes from
December 2015 through April 6, 2016.

          MR. ABEGAZ-HASSEN:  Objection, your Honor.  May we
approach?

          THE COURT:  First let me find the rules.  (Pause)

          Sidebar quickly.

          (Continued on next page)

1          (At sidebar)

2          THE COURT:  A statement under 801 (d), a statement

3    that meets the following conditions is not hearsay:

4          2.  Is consistent with the declarant's testimony and

5    is offered, and what are you offering it under?

6          MS. KEARNEY:  First to rebut the implied charge of the

7    thrust of Mr. Abegaz-Hassen's cross-examination that the

8    defendant has recently fabricated.

9          THE COURT:  You mean the witness?

10         MS. KEARNEY:  Yes, the witness has recently fabricated

11   or acted with improper influence and also rehabilitate her

12   credibility as a witness.

13         The thrust of Mr. Abegaz-Hassen's cross-examination

14   has been to suggest that Ms. Thompson is confusing

15   representations that were made to her by Jonathan Stewart with

16   representations that were made to her by other individuals.  He

17   has had her read from a significant amount of those notes

18   verbatim into the transcript, under 801 and also 106, and it is

19   not proper to offer the entire notes.

20         MR. SCHMIDT:  If I may.  There is a difference between

21   failure of recollection and recent fabrication.  There is no

22   issue of recent fabrication here.

23         THE COURT:  All right.  Just a moment.  Just a moment.

24         Is consistent with the declarant's testimony and is

25   offered to rebut an express or implied charge that the

IAUJKET3                    Thompson - redirect

1    declarant -- you say it is not fabrication -- acted from a

2    recent improper influence or motive in so testifying.  That is

3    not an issue here?

4          MS. KEARNEY:  It is in that Mr. Abegaz-Hassen, in

5    questioning Ms. Thompson about fabricating how many times she

6    spoke to Jonathan Stewart, differences between what she

7    allegedly said to the government and what she testified to

8    today.

9          MR. SCHMIDT:  Judge, it is in the 3500 material that

10   she said --

11         THE COURT:  All right.  I am denying the request to

12   put in all of the notes.  Let's move forward.

13         MS. KEARNEY:  Your Honor, then I am going to question

14   the witness significantly about the various notations she made

15   regarding her conversations with Jonathan Stewart.

16         MR. SCHMIDT:  That is hearsay.  It is not a proper

17   basis of putting in those conversations with Jonathan Stewart.

18   There is no basis to put in that hearsay.

19         MS. KEARNEY:  Mr. Abegaz-Hassen has laid the

20   foundation for past recollection recorded.  I have laid the

21   foundation for past recollection recorded.

22         THE COURT:  Just a moment.  What do you intend to do?

23   It seems to me that --

24         MS. KEARNEY:  Mr. Abegaz-Hassen has walked through

25   specific conversations Ms. Thompson had with individuals other

1   than Jonathan Stewart and representations made to her during

2   those conversations.

3            THE COURT:  Yes.

4            MS. KEARNEY:  I would like to ask her about specific

5   representations Jonathan Stewart made to her.

6            THE COURT:  You can do that.  I don't see any problem

7   with doing that.

8            MR. SCHMIDT:  Your Honor --

9            THE COURT:  I don't see any problem with what did

10  Stewart say to you.

11           MS. KEARNEY:  On particular dates and particular

12  times.

13           MR. SCHMIDT:  One, they can't be leading just because

14  it is redirect, admonition.  I have no problem with that.

15           THE COURT:  Thank you.

16           MR. SCHMIDT:  Second, that she has the absolute right

17  on redirect examination to go into things that we went into on

18  cross-examination, but not the things that we did not go into

19  on cross-examination.

20           THE COURT:  But you went into it on cross.  On

21  redirect, she can go into the subject matters of the cross.

22           THE COURT:  And that is what she is doing.  He has

23  been asking her about conversation with with Stewart.

24           MR. SCHMIDT:  I don't think we are disagreeing.

25           THE COURT:  You can do that, and it is up to you, but

IAUJKET3                        Thompson - redirect

1    I am not quite sure it is worth a significant amount of time.

2    I think the jury understands the witness.

3            MS. KEARNEY:  That is why it would be more efficient

4    to offer the notes, your Honor.

5            THE COURT:  I am not going to allow that wholesale.

6            MS. KEARNEY:  All right.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2    BY MS. KEARNEY:

3    Q.  Ms. Thompson, on cross-examination Mr. Abegaz-Hassen asked

4    you about Emily telling you she was in Nevada.  Do you remember

5    that?

6    A.  I do.

7    Q.  Where did you send the check to First Trend, that $50,000

8    check, what state?

9    A.  I believe it was sent to Nevada.

10   Q.  Do you remember the address you sent it to?

11   A.  I don't remember.

12   Q.  Could you please take a look at Government Exhibit 165,

13   Page 6.  Did you write down an address to send that check to?

14   A.  I did.

15   Q.  Could you read that address, please.

16          THE COURT:  Does looking at Page 6 refresh your

17   recollection with regard to what state you sent that first

18   check to?

19          THE WITNESS:  Yes, it does.

20          THE COURT:  What is your refreshed recollection, what

21   state?

22          THE WITNESS:  Arizona.

23          THE COURT:  Next question.

24          MS. KEARNEY:  Thank your Honor.

25   BY MS. KEARNEY:

IAUJKET3                        Thompson - redirect

1    Q.  Mr. Abegaz-Hassen also asked you about your conversations

2    with Zack Peterson regarding your partnership?

3    A.  Yes.

4    Q.  I believe we established that that took place on January

5    20th, 2016?

6    A.  I believe so, yes.

7    Q.  Do you remember who was on the call at that time?

8    A.  Yes, I do.  Do you want me to name them?

9    Q.  Yes, please.

10   A.  Myself, Zack Peterson, Jonathan Stewart and Emily Miller.

11   Q.  Mr. Abegaz-Hassen also asked you about another call on

12   February the 3rd that you had.  Do you remember that?

13   A.  I don't remember exactly.

14   Q.  But you know the call I'm referring to?

15   A.  I think you're referring to the three of us.  I am not

16   sure, actually, honestly.

17   Q.  Do you remember a call on February 3rd?

18   A.  I don't know which one you're talking about.  I am confused

19   about all the dates.  I am sorry.

20   Q.  Could I direct your attention to Government Exhibit 165,

21   Page 31.

22   A.  Okay.

23   Q.  Does that refresh your recollection about whether you had a

24   call on February 3rd?

25   A.  Yes, it does.

IAUJKET3                          Thompson - redirect

1    Q.  What time did that call take place?

2    A.  At 4:00 pm.

3    Q.  Who was that call with?

4    A.  With Jonathan Stewart.

5    Q.  Now, on that call did Mr. Stewart make any specific

6    representations to you about how frequently you would receive

7    checks or how much those checks would be?

8           THE COURT:  Don't refer to your notes.  Do you have a

9    recollection?

10          THE WITNESS:  He did, and that is, I do have a

11   recollection about the times.  That is where I mean the amounts

12   and how frequent it would be and that is where that came in.

13          I can't recall the exact amounts in those things, but

14   they're like three different times I would get checks for

15   different amounts, and some had to do with the revenue coming

16   from the company, I believe, and some had to do with the

17   revenue coming from the terminals that he and I invested in,

18   but I would have to read it to tell you exactly.

19   Q.  You don't remember the specific amount that Jonathan

20   Stewart told you?

21   A.  No, I do not.

22   Q.  Is that reflected in your notes?

23   A.  Yes, it is.

24   Q.  Could you please read starting at the top of the left-hand

25   side of Page 31.

IAUJKET3                    Thompson - recross

1   A.  Yes.

2   Q.  Would you start above that.

3   A.  Wednesday, February 3rd, Jonathan Stewart, 4:00 pm.

4   Terminals, three contracts, $149,999.00 payable to A1 Business

5   Consultants.  Final investments in limbo.  Discuss Mr.

6   Peterson's offer to take me on as a partner in A1 with a 20

7   percent stake in the company for 300,000, and Mr. Peterson

8   would match my funding one-to-one, I would pay 149,999 and he

9   would pay the other half.

10          I would receive a check from A1 every month for 20

11  percent of their residual and what they made.  I would receive

12  three separate checks, one for each contract, for terminal

13  accounts every two weeks.  These should eventually grow and

14  plateau at around 6 to 7,000 each.

15          MS. KEARNEY:  No further questions.

16          THE COURT:  All right.  Thank you.

17          MR. SCHMIDT:  Your Honor, may we?

18          THE COURT:  Yes.

19          (Off-the-record discussion)

20  RECROSS EXAMINATION

21  BY MR. ABEGAZ-HASSEN:

22  Q.  One more question.  On that same page, on February 3rd on

23  Page 31 that you just read --

24          THE COURT:  Just ask a question.  Don't worry about

25  your notes right now.  Just ask a question.

IAUJKET3                         Thompson - recross

1   Q.  -- doesn't what you just read indicate that it was Zack

2   Peterson that you talked to about --

3   A.  No, it does not.  It indicates I talked with Jonathan

4   Stewart.  If you look at the top of the page, I put the date,

5   who I talked to and the time.

6   Q.  But doesn't it indicate --

7   A.  No.  It indicates I talked with Jonathan Stewart.

8   Q.  Let me ask the question.

9           Doesn't it indicate that it was Zack Peterson who made

10  that offer to you?

11  A.  It indicates that --

12          THE WITNESS:  May I answer the question, sir?

13          THE COURT:  Yes, of course.

14          THE WITNESS:  It indicates that Jonathan Stewart was

15  explaining the offer in full to me of what Zack Peterson was

16  offering and how I would get revenue from him and from their

17  company.

18          MR. ABEGAZ-HASSEN:  Thank you.

19          THE COURT:  Thank you.  Sir, anything?  You may step

20  down.  You are excused, Ms. Thompson.

21          (Witness excused)

22          THE COURT:  Ladies and gentlemen, it is noon.  Why

23  don't we take our 15-minute break.  Thank you.

24          (Jury excused)

25          (Recess)

IAUJKET3

1          THE COURT:  Bring the jury in.  Has the government

2     teed-up the deposition?

3          MS. KEARNEY:  We also have copies of the transcript

4     for the jury as an aid.

5          THE COURT:  All right.  What are you calling the

6     transcripts?  Do you have a number on them?

7          MS. KEARNEY:  They are 116 A through J.

8          THE COURT:  Why A through J?

9          MS. KEARNEY:  Because when we cut the extraneous

10     cropping, we made -- we'll just play them all in a row.

11          THE COURT:  All right.

12          MR. PAUL:  Do you have copies for us?

13          (Off-the-record discussion)

14          THE COURT:  So I am going to let the government call

15     the witness.  That is how we'll do it.

16          MR. SCHMIDT:  Just for the record, we seem to have

17     reached a stipulation as to Blake Foster, and we are going to

18     be preparing it at the -- the government will prepare it at the

19     end of the day and we should have it tomorrow morning.

20          THE COURT:  All right.  Well, perhaps the government

21     will have rested by then.

22          MS. FLETCHER:  Just discussing some scheduling issues,

23     we may want to make your Honor aware of where we are in terms

24     of timing at the beginning of the lunch break, but the jury is

25     about to come in.

IAUJKET3

1          THE COURT:  Yes.

2          MS. KEARNEY:  Since we are calling a witness, would

3    you like me to stand at the podium?

4          THE COURT:  Wherever you want.

5          MS. KEARNEY:  Since I am not actually doing anything

6    live.

7          THE COURT:  Whatever you want.

8          MS. KEARNEY:  Okay.

9          (Pause)

10         THE COURT:  Jury entering.

11         (Jury present)

12         THE COURT:  Please be seated in the courtroom.

13         Government, call your next witness.

14         MS. KEARNEY:  The government calls Charlene Foster.

15         THE COURT:  Proceed.

16         MS. KEARNEY:  In connection with that, your Honor, the

17   government offers Government Exhibits 116 A through J as a

18   corresponding transcript as aids to the jury.

19         (Government's Exhibits 116 A through J received in

20   evidence)

21         (Continued on next page)

22

23

24

25

IAU8KET4

1           MR. SCHMIDT:  If I may, other than the objections that

2     were made previously, we have no other objections.

3           THE COURT:  All right.  Thank you.

4           MR. PAUL:  No objection.

5           THE COURT:  Ladies and gentlemen, you are going to

6     hear the testimony of this witness by deposition.  She is not

7     going to be live.  The government is going to show you her

8     deposition, for which the attorneys for the parties were all

9     present and had an opportunity to examine and cross-examine Ms.

10    Foster.

11          MS. KEARNEY:  With that, your Honor, I ask that we be

12    permitted to publish the transcript as an aid to the jury.

13          THE COURT:  And the tapes are being admitted as

14    evidence.

15          Just as before, the parties have prepared transcripts

16    of what is on the tape to help you.  So the 116T series are the

17    transcripts.  Those are just aids.  They are not evidence.  If

18    you think you hear something on the tape that's different from

19    what is on the transcript, it's the tape that is the evidence.

20          MS. KEARNEY:  To be clear, your Honor, the letters

21    proceed in order.  So A, comes before B, comes before C.

22          THE COURT:  That's just to help you if you didn't know

23    A came before B.

24          Pass out the transcripts.

25          Let's proceed, government.

IAU8KET4

1    　　　　MS. KEARNEY:  Ms. Lee, could you please publish to the

2    jury Government Exhibit 116A, and then proceed to play them in

3    order.

4    　　　　　(Videotape played)

5    　　　　　(Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IAUJKET5

1          (Videotape played)

2          MS. KEARNEY:  Your Honor, that concludes Government

3     Exhibit 116 A.

4          THE COURT:  All right.  Sidebar.

5          (At sidebar)

6          THE COURT:  In regard to the two prior inconsistent

7     statements with this witness, I am going to allow the first

8     allegedly inconsistent statement to come in under 613 (b), but

9     I'm not going to allow the second inconsistent statement to

10    come in.  I don't find that the justice so requires it.

11          In looking at the factors in Weinstein, the

12    significance of the issue with which the statement reads is not

13    a major issue here and the probative value of the statement for

14    impeachment purposes is also low.  So I don't find that justice

15    requires the prior inconsistent statement on the second one.

16    Again the first one comes in; the second one does not.

17          MS. KEARNEY:  The first one is did the taxes versus

18    trying to do the taxes or would do the taxes.

19          THE COURT:  The first one is did you tell Blake that

20    they tried to do your tax filings for you?  No, I never told

21    him that.  And the prior inconsistent statement is on the 3500

22    material Charlene told Blake they tried to do her tax filings.

23          MR. PAUL:  What was the second one?

24          THE COURT:  The second one is the initiation of the

25    dispute with discovery.  That is the one I am not allowing in.

IAUJKET5

1          Where do we go from here?

2          MR. SOBELMAN:  Our next witness is Jo Ann La Morte.

3    She should be 30 to 40 minutes on direct examination.  If your

4    Honor wants to do the first 10 minutes, we could --

5          THE COURT:  No.  Everybody is starving.  I am about to

6    eat my sleeve, so it is 10 to 2:00.  We'll do it at 3:00

7    o'clock.  And then the next witness?

8          MR. SOBELMAN:  After that, we have Ms. Casanova, who

9    is the forensic accountant.

10          THE COURT:  How long will Casanova be?

11          MS. FLETCHER:  30 minutes, maybe 40.

12          THE COURT:  And Thomas?

13          MR. SOBELMAN:  15 minutes, 20 manipulates.

14          THE COURT:  That will be the end of the day by then

15    and we'lllook at the situation at that time.  I will excuse the

16    jury now.

17          (Continued on next page)

18

19

20

21

22

23

24

25

IAUJKET5

1      (In open court)

2      THE COURT:  Ladies and gentlemen, it is 10 to 2:00.

3  Before we put another witness on, let me give that lunch break

4  and come back at 3:00 o'clock.  Thank you.  Enjoy your lunch.

5  Keep an open mind.  The evidence is coming in and we will have

6  other witnesses this afternoon.  The government will take those

7  transcripts.  Leave them there and the government will pick

8  them up.

9      (Jury excused)

10      THE COURT:  I will see everyone at 3:00 o'clock.

11      MS. FLETCHER:  I don't want to make your Honor eat

12  your sleeve, but there are some scheduling issues.

13      THE COURT:  My sleeve will wait.  Just a moment.

14      (Pause)  Go ahead.

15      MS. FLETCHER:  In addition to the witnesses that we

16  just --

17      THE COURT:  La Morte, Casanova and Thomas?

18      MS. FLETCHER:  Yes, Bolus is Thomas' last name.  We

19  will also call one of the paralegals on our team to

20  authenticate a couple of Instagram posts, and then we expect to

21  call David Kandar, who is the son of a victim, and we

22  anticipate that direct testimony will be 45 minutes.  The

23  paralegal's testimony will be 15 minutes maybe.  Then the

24  government anticipates that we will rest, which depending on

25  the length of any cross-examination, it appears will be early

IAUJKET5

1    in the day tomorrow.

2              THE COURT:  How do you see that if we have three to

3    five that probably will be La Morte and Casanova.  That works

4    out Bolus will be sometime in the mid to late morning?

5              MS. FLETCHER:  I expect that will happen, your Honor.

6              As we previewed yesterday, this is a result of us

7    significantly trimming back our case.  There were two

8    additional potential cooperating witnesses on our witness list

9    we advised counsel this morning after Ms. Thompson concluded we

10   no longer intended to call.

11             THE COURT:  All right.  Thank you.

12             At this point, Mr. Schmidt, do you have a case?

13             MR. SCHMIDT:  Yes, we do, your Honor, and the case is

14   revolving mostly around Mr. Owimrin's testimony.  The problem

15   that we now have is that because of the significance of the two

16   witnesses that the government is now not calling, we have spent

17   so much of our time trying to deal with those witnesses, the

18   documents related to them and all of that matters, that we do

19   not have our documents in any kind of sense for the defense

20   case.  So we need at least a half a day to, besides tonight, to

21   get everything in order so we can actually present a rational,

22   reasonable presentation for the defense.

23             THE COURT:  You have tonight.  What else?

24             MR. SCHMIDT:  Your Honor, it is going to delay things

25   so much.  We are trying to get the documents and the things

IAUJKET5

1    that we need together to have a decent flowing case.   The

2    government has overwhelmed us with new material, with the

3    number of witnesses that they were going to call, and we had --

4         THE COURT:  When did you tell the defense the

5    witnesses you were not going to call?

6         MS. FLETCHER:  We let them know yesterday in court

7    that we were working to cut witnesses and that we would tell

8    them as soon as we knew.  Candidly, the decision not to call

9    Brooke Marcus and the decision not to call Michael Finocchiaro

10   is a result of Ms. Thompson's testimony.  Ms. Thompson's

11   testimony made it clear to the government we didn't need either

12   of those witnesses.  Once her testimony concluded, we made

13   clear that we were not going to call those two witnesses.

14        THE COURT:  You told, I gather from that, you told the

15   defense you were not calling Finocchiaro and you are basically

16   at the end of the day yesterday?

17        MS. FLETCHER:  No, your Honor.  At the end of the day

18   yesterday, Mr. Schmidt asked if we intended to call

19   Finocchiaro.  I said if we do call him, he will very likely be

20   our last witness because we wanted Mr. Schmidt to have notice

21   of the witnesses he needed to prepare for the witnesses we're

22   calling today.  Once Ms. Thompson's testimony concluded, we

23   informed both Mr. Schmidt and Mr. Paul we were, in fact, not

24   going to call Ms. Marcus and not going to call Mr. Finocchiaro.

25        THE COURT:  Today, you told them today?

IAUJKET5

1        MS. FLETCHER:  Yes.

2        THE COURT:  In court?

3        MS. FLETCHER:  Yes, your Honor.

4        We also made clear, as we have throughout the trial,

5   to the extent Mr. Schmidt can provide documents to us for the

6   purposes of our authentication of those documents, especially

7   if he expected them to come in through Ms. Marcus, we're happy

8   to agree to the authenticity of those documents and discuss any

9   objections that we may have substantively to those documents.

10       THE COURT:  Mr. Schmidt, if Finocchiaro and Marcus

11  were going to testify, you'd be in court for that testimony, so

12  when did you intend to get your ducks in a row for the defense

13  case?

14       MR. SCHMIDT:  We would have at least two nights,

15  additional nights, your Honor, to get that done.

16       THE COURT:  How is that?  You would have tonight.  You

17  are factoring in tonight?

18       MR. SCHMIDT:  Because Mr. Finocchiaro is a witness,

19  like Mr. Sinclair, the primary witness of Olive Branch, and we

20  assumed the direct for him would have taken somewhere between

21  two and four hours, and we would have had at least that much --

22       THE COURT:  You would have had tonight and tomorrow

23  night --

24       MR. SCHMIDT:  We did.

25       THE COURT:  -- to prepare the documents.  Certainly I

IAUJKET5

1   know where you're going in the defense case.  You're just

2   talking about ordering the documents, which has given you a bit

3   of a problem throughout the trial, but that's what you're

4   talking about, right?

5           MR. SCHMIDT:  That is right, your Honor.

6           THE COURT:  Getting the documents in some order?

7           MR. SCHMIDT:  Getting the documents in order, now

8   getting the documents that would have come in under Ms. Marcus

9   or Mr. Finocchiaro to see if we can get those documents in

10  otherwise.  So, indeed, it is a huge undertaking, your Honor.

11  Especially with, for example --

12          THE COURT:  You have two lawyers and a paralegal.

13          MR. SCHMIDT:  I understand that, your Honor.  I am

14  lead counsel.  We found out about Ms. Marcus at the beginning

15  of this case and we have received a tremendous amount of 3500

16  material, I think like 163 numbers, not individual documents,

17  some of them are multiple documents, of Ms. Marcus.

18          I have spent every moment until usually around 10:00

19  sometimes to 11:00 pm trying to get everything ready for the

20  next day.

21          THE COURT:  That late, 11:00 pm during trial?  That

22  late, sir?

23          MR. SCHMIDT:  Judge, I am human.  If I can't get six

24  or seven hours of of sleep, I can't function the next day.  I

25  think I am entitled to have six or seven hours of sleep a day,

IAUJKET5

1    and this is the product of how this case went.  I think it is

2    just unfair to have us -- obviously, were going to be rushing

3    it another half a day, but it would be impossible to have any

4    kind of organized defense.

5         THE COURT:  As of now, to the extent you feel you can

6    tell me what does your defense case consist of in terms of

7    witnesses and time?

8         MR. SCHMIDT:  The witnesses would be Mr. Owimrin, and

9    depending on his cross-examination, we might call our expert

10   witness, and obviously he would be very brief.

11        THE COURT:  There has been discussion about the

12   expert.  Please tell me about the expert.  I thought it was

13   very brief, if I recall correctly?

14        MR. SCHMIDT:  He would be testifying about --

15        THE COURT:  The names?

16        MR. SCHMIDT:  Right.

17        THE COURT:  That Porzio is a better name than

18   Sinclair, that sort of thing.

19        MR. SCHMIDT:  Or theory, perhaps reversed.

20        THE COURT:  Yes.

21        MR. SCHMIDT:  Mr. Owimrin worked from Olive Branch

22   from March, April of 2014, left Olive Branch, worked with Arash

23   Ketabchi until June 2016, so we're talking about that whole

24   length of time from the beginning basically to the end where

25   he's going to have to testify about what he did, all of the

 1    information, documents, the witnesses who testified, the

 2    customers whose names have gone in in evidence based on

 3    charge-backs and complaints.

 4             THE COURT:  I can't hold you to it.  I don't intend to

 5    hold you precisely to it.  Do you have a sense of how long the

 6    direct would be?

 7             MR. SCHMIDT:  Yes, I would say somewhere between three

 8    and four hours if we are running smoothly with the documents.

 9    It would double --

10             THE COURT:  That is probably almost a day then for

11    cross-examination, probably a day.  All right.

12             So Mr. Owimrin -- again I am not binding you to

13    this -- Owimrin and, if need be, the named expert?

14             MR. SCHMIDT:  That's correct.

15             THE COURT:  That is your case?  Mr. Paul?

16             MR. PAUL:  Your Honor, I would simply join in Mr.

17    Schmidt's application that we get some extension of time in

18    preparation.  The government gave us a list this morning that

19    Ms. Marcus was going to be called to the stand, and as I

20    indicated, we didn't learn until we had our break, I believe,

21    that they were not going to call Ms. Marcus.

22             Now they've told us also they're not calling

23    Finocchiaro.  I anticipate, and a lot of my time, even though I

24    have not had to concentrate like Mr. Schmidt on victims,

25    obviously, but I have had to concentrate on preparing for

1    Mr. Sinclair, Finocchiaro, Ms. Marcus and others, so a lot of

2    my time has been focused on preparing for cross-examinations

3    for those witnesses.

4         Be that as it may, as your Honor is asking my defense,

5    I have not made a final decision as to whether or not my client

6    will be testifying.

7         THE COURT:  Nor am I asking for that from either of

8    you.  You understand that, Mr. Schmidt?

9         MR. SCHMIDT:  Yes, I understand that.  Obviously, I

10   have a lot less work to do if Mr. Owimrin was not going to

11   testify.

12        THE COURT:  I understand.  I just want the record to

13   be clear I am not asking for counsels' determination whether or

14   not their client is going to testify prior to the close of the

15   government's case.  Mr. Paul?

16        MR. PAUL:  I intend to recall Agent Giattino to the

17   stand for a very short direct having to do with some exhibits

18   that were introduced through Ms. Thompson, I believe, not

19   through him, but there are a few questions I have concerning a

20   few of those exhibits.

21        In addition to that --

22        THE COURT:  Are you pressing the other exhibits; that

23   is, the other things, the other documents that were found?

24        MR. PAUL:  If my client is not going to testify, then,

25   yes; if he is going to testify, I don't think that will be an

1    issue with regard to those exhibits.  We will decide that this

2    evening with regard to the exhibits.

3            We were going to enter into a stipulation in advance

4    of your Honor's ruling concerning those exhibits, but if, in

5    fact, I choose to call -- I think we'll still go ahead with the

6    stip to make sure we're covered with regard to that, and then

7    if we decide to call my client to the stand, there is no need

8    for your Honor's ruling because I think they will be admitted.

9            MR. SCHMIDT:  I neglected to mention, I think there

10   are two or three other prior inconsistent statements that were

11   made, but hopefully we'll have a stipulation.  If not, a

12   very --

13           THE COURT:  In regard to what witness?

14           MR. SCHMIDT:  Offhand, I am not sure.  I think it

15   might be the detective, it might be one of them.  I think he

16   took the prior inconsistent statement, and I am going to try to

17   deal with the government on the prior inconsistent statement.

18   I am assuming that if the government has an objection, it will

19   be for the admission of the statement; but if your Honor rules

20   that the statement is admitted, that the government will

21   probably stipulate to what the statement would be if the

22   witness was called.

23           THE COURT:  I am not sure I understand that, but we

24   don't need to worry about it now since you don't know the

25   witness.  Let me just do some calculations here.

1            MR. PAUL:  Judge, to add to the list, now that the

2   government is not calling Fino or Mr. Finocchiaro, I may be

3   calling him as my own witness.

4            THE COURT:  Finocchiaro?

5            MR. PAUL:  Yes.

6            THE COURT:  Does the government want to reconsider not

7   calling?

8            MR. SOBELMAN:  We'll discuss it, but I think that is

9   unlikely.  With respect to Special Agent Giattino, this is the

10  first we are hearing of this.

11           THE COURT:  No, it is not because I was handed at a

12  sidebar Mr. Paul said in connection with the documents.

13           MR. SOBELMAN:  We hadn't heard anything about him

14  calling Special Agent Giattino since that time and we had

15  agreed in principle on a stipulation that we're understanding

16  they will present us with a draft of with respect to

17  authenticity.

18           Special Agent Giattino, in any event, wouldn't be able

19  to authenticate documents on the fly as we discussed before.

20  My understanding is Mr. Paul would have to submit a Touhy

21  request to the Department of Justice in order to call Special

22  Agent Giattino.  I suggest if he intends to call him, he do so

23  immediately because it takes some time for those requests to

24  work their way through the system.  It is unclear the purpose

25  for which he would be calling him in his own case and he would

IAUJKET5

1    have to articulate that under the applicable regulations.

2           MR. PAUL:  I thought Giattino works for the U.S.

3    Attorney's Office.

4           MR. SOBELMAN:  He is a special agent with the U.S.

5    Attorney's Office for the Southern District of New York, which

6    is a component of U.S. Department of Justice.

7           I had this in --

8           THE COURT:  I haven't looked at it recently, but I do

9    think you have to make a so-called Touhy request, but you can

10   work that out.

11          MR. SOBELMAN:  I am happy to provide him with whatever

12   information he needs to make that possible.

13          MR. PAUL:  With regard to the agent's testimony, it

14   would be a few questions regarding an exhibit the government

15   has reintroduced.

16          THE COURT:  That may assist in your Touhy request.

17          MR. PAUL:  There is no authenticity requirement for

18   this agent to produce them.

19          THE COURT:  Perhaps the parties can stipulate to

20   whatever you're seeking.  I don't think there is a surprise at

21   this point, so you discuss it with the government.  That may

22   obviate any of these issues.

23          Let me just do some -- anything else, sir?

24          MR. SOBELMAN:  With respect to the prior inconsistent

25   statements that Mr. Schmidt raised, we are not sure what

IAUJKET5

1    witnesses or what statements he is talking about.

2              THE COURT:  Nor is he.  I don't mean that negatively,

3    but he has to check it out.

4              MR. SOBELMAN:  Are there any other witnesses, we ask

5    you to inquire of Mr. Paul, that the defendant Shahram Ketabchi

6    is planning on calling himself, Special Agent Giattino and

7    Michael Finocchiaro?

8              MR. PAUL:  I provided two additional names that may or

9    may not called that are character witnesses.

10             MR. SOBELMAN:  One other item for the record.

11             With respect to the extra witness Mr. Schmidt spoke

12   about, we inquired earlier on the record for 26.2 material for

13   that witness, and we still received none.

14             THE COURT:  We dealt with that at a hearing a couple

15   of days ago.  I said you should be more specific.

16             MR. SCHMIDT:  We forwarded an email with the

17   information.

18             MR. SOBELMAN:  We received an email of a list of

19   sources that apparently the expert had relied on, including a

20   book from 1929, but we did not receive any 26.2 material.

21             THE COURT:  The bases?

22             MR. SOBELMAN:  No, your Honor, we didn't receive any

23   additional explanation of bases of his opinion.

24             We received a list of sources we then had to find a

25   librarian to pull for us.  At this time we are not raising that

IAUJKET5

1   as an issue.  The issue I am raising, there are no 26.2

2   material, meaning written statements in the possession of

3   defense counsel, often referred to as reverse 3500 for this

4   witness.

5         MR. SCHMIDT:  He may not be called, one.

6         THE COURT:  That doesn't obviate the need for the

7   26.2.

8         MR. SCHMIDT:  I understand that.

9         Your Honor, presently I have three lines of my

10   conversation with him, and if he is going to be called, I can

11   give him the three sets, but at this point it depends on the

12   cross-examination of my c lient and whether or not he could be.

13   Called.

14         THE COURT:  Give him the three sentences because if he

15   is not called, it is not an issue.

16         MR. SCHMIDT:  I will give it to them.

17         THE COURT:  Let me do some time calculations here.

18   (Pause)  Because I am trying to see if we can get this case to

19   this jury before Friday, and today is Wednesday.

20         My Deputy informs me today is Tuesday.

21         (Off-the-record discussion)

22         THE COURT:  Just a moment, everybody.  If today is

23   Tuesday, that changes things.  I think this is what we can do.

24   Mr. Schmidt is asking for half a day.  Let's get the

25   government's -- no.  I forgot about this afternoon.  Sorry.

IAUJKET5

1   (Pause)  The government, do you think you'll be able -- it

2   depends on the cross, obviously, get La Morte and Casanova on

3   and off tonight?  That may be hard.

4           MS. FLETCHER:  It does really, your Honor, depend on

5   the length of the cross.

6           THE COURT:  Okay.

7           MS. FLETCHER:  If there is not a lengthy cross, then

8   yes.

9           THE COURT:  This is what I am going to do.  I may

10  regret it.  I'll tell the jury to come in like at 12:30

11  tomorrow.  Mr. Schmidt, that way you have your morning, all

12  right, Mr. Schmidt?

13          MR. SCHMIDT:  Yes.

14          THE COURT:  That is how it now stands.  Let's see.

15          I'll know better at the end of the day and try to

16  think about this timing as well.  If we can get this case to

17  the jury this week, it would be good, all right?

18          Do the parties have some sense -- I will not ask about

19  the closings until we get further along.  3:00 o'clock.  Thank

20  you.

21          (Luncheon recess)

22          (Continued on next page)

23

24

25

IAU8KET6

                    AFTERNOON SESSION

                        3:10 p.m.

1

2

3          (Jury not present)

4          THE COURT:  Bring the jury in.

5          Let's be as efficient as we can.  What I may do is

6    bring the jury in at regular time tomorrow, and then when the

7    government's case is over, let them go rather than starting in

8    the afternoon, because maybe the government case won't finish

9    up tomorrow if I do that.  It just may be more efficient to

10   start regular time.  But let's get as much evidence in as we

11   can this afternoon.

12         Jury entering.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

IAU8KET6                          LaMorte - Direct

1          (Jury present)

2          THE COURT:  Please be seated.

3          Next witness for the government.

4          MR. SOBELMAN:  The government calls Jo Anne LaMorte.

5   JO ANNE LaMORTE,

6        called as a witness by the government,

7        having been duly sworn, testified as follows:

8          THE DEPUTY CLERK:  State your name and spell your last

9   name for the record.

10          THE WITNESS:  Jo Anne LaMorte, L-A-M-O-R-T-E.

11          THE COURT:  Good afternoon, Ms. LaMorte.

12          Please be seated.  Speak loudly, slowly and clearly.

13          Your witness.

14   DIRECT EXAMINATION

15   BY MR. SOBELMAN:

16   Q.  Good afternoon, Ms. LaMorte.

17   A.  Good afternoon.

18   Q.  Where do you live?

19   A.  In Manhattan.

20   Q.  For approximately how long have you lived in Manhattan?

21   A.  22 years.

22   Q.  What is your educational background?

23   A.  I have a bachelor's degree.

24   Q.  Where do you work?

25   A.  At NBC Universal.

1  Q.  What is your title with NBC Universal?

2  A.  I'm a legal e-billing coordinator.

3  Q.  What is e-billing?

4  A.  It's electronic invoicing for law firms that send us their

5  invoices to NBC.

6  Q.  Where did you work prior to joining NBC Universal?

7  A.  At Mount Sinai School of Medicine.

8  Q.  Where did you work before Mount Sinai?

9  A.  General Electric.

10  Q.  When did you join General Electric?

11  A.  In November of 2013.

12  Q.  What was your title with General Electric?

13  A.  I was a legal e-billing coordinator.

14  Q.  Was that a similar role to the one that you have now?

15  A.  Yes.

16  Q.  Were you working that job in the fall of 2014?

17  A.  Yes.

18  Q.  Were you satisfied with your level of income at that time?

19  A.  Yes.  But I wanted to earn more money for retirement

20  savings.

21  Q.  Why?

22  A.  Because I didn't have any retirement savings.

23  Q.  What, if anything, did you do at that time to try to

24  increase your income?

25  A.  I answered an e-mail about filling out surveys online.

1    Q.  What, if anything, happened after you filled out those

2    surveys?

3    A.  After that I got a call from someone.

4    Q.  Who did you get a call from?

5    A.  A woman, her name was Deborah, she said.

6    Q.  Do you know Deborah's last name?

7    A.  No, I don't remember it.

8    Q.  Approximately when did you receive that call?

9    A.  December of 2014.

10   Q.  What, if anything, did Deborah say about why she was

11   calling you?

12   A.  She said she worked for a company that helped people work

13   from home with their own Web sites, and that her company would

14   build me a Web site and also teach me to build a Web site.

15   Q.  Do you recall whether Deborah said she was calling from a

16   particular company?

17   A.  She didn't say the name at that point.  She did eventually

18   I think afterwards.

19   Q.  What, if anything, did she say about the product or service

20   she was selling?

21   A.  She said that -- she called it an educational program, and

22   she said that they had different tiers and each tier offered a

23   different service.

24   Q.  Just generally, what was your understanding of what she

25   called the program at that time?

1  A.  She said it was -- it was a program to help people to build

2  a Web site, to work from home, and also to teach you to build a

3  Web site and maintain a Web site yourself.

4  Q.  Were you interested in what Deborah was offering at that

5  time?

6  A.  It sounded interesting, but I told her that I would think

7  about it.

8  Q.  How did that call end?

9  A.  She said that her director would call me like in a day or

10 two after that.

11 Q.  Did there come a time when Deborah's director did call you?

12 A.  Yes.

13 Q.  Approximately how long after Deborah's call did that

14 happen?

15 A.  About a day or two later.

16 Q.  What was that person's name, the director?

17 A.  Al Stroud.

18 Q.  What, if anything, did Mr. Stroud say about why he was

19 calling you?

20 A.  He said that he worked for a company that built Web sites

21 and that taught people to build Web sites and to maintain a Web

22 site so that you can work from home.

23 Q.  Do you recall whether Mr. Stroud said he was calling from a

24 particular company?

25 A.  I don't think he did the first time, but maybe afterwards.

IAU8KET6                        LaMorte - Direct

1    Q.   What company did he eventually say he was calling from?

2    A.   EDU Consulting.

3    Q.   What, if anything, did he say about the timing of a

4    potential purchase from him?

5    A.   He said at the beginning of the next year that the prices

6    were going to go up, and so I should -- if I was going to buy

7    it, I should buy it by the end of that year.

8    Q.   Can you remind us, approximately when was this?

9    A.   It was in December of 2014.

10   Q.   What, if any, questions did Mr. Stroud ask you on that

11   call?

12   A.   Well, he had asked me -- also, Deborah had asked me about

13   my credit, if I had good credit.  And I said, yes, that I did.

14   I thought that was kind of weird because they kept calling it

15   an educational program.  So he asked me too about my credit,

16   and I told him that I had good credit.  And she said that the

17   company only accepted credit cards, which I thought was kind of

18   strange.

19   Q.   What else, if anything, did Mr. Stroud tell you about the

20   educational program?

21   A.   Well, he said a lot, but he said that -- he finally said at

22   the end, he told me the prices of what they charged for each

23   tier.

24   Q.   What were those prices?

25   A.   I think that one started at maybe 5,000 or 7500.   Then

1   there was another one at 10,000 and another one at 15,000.

2   Q.  How did you respond to Mr. Stroud's sales pitch?

3   A.  I gasped.

4   Q.  Why?

5   A.  Because it was so much money.  I think I even said that.  I

6   said that's a lot of money.

7   Q.  How did that call end?

8   A.  Again, I told him I would think about it.

9   Q.  Did there come a time when you heard from Mr. Stroud again?

10  A.  Yes.

11  Q.  How many times did you hear from him after the first call?

12  A.  Maybe two or three.

13  Q.  What, if anything, did he say to you during those two or

14  three other calls?

15  A.  He was talking about the program, and he was telling me

16  that I should, if I was going to buy it, to buy it by the end

17  of the year.  And he said that they had videos on their Web

18  site and to look at them because there were other people on

19  there that they had successful Web site companies through his

20  company.

21  Q.  What did he say about why you should sign up by the end of

22  the year?

23  A.  Because he said that at the beginning of next year, that

24  the prices were going to go up, so I should buy it then.

25  Q.  What, if anything, did Mr. Stroud say about how much money

1   you would make if you joined his program?

2   A.  He didn't really say.  He said it depended on my effort and

3   how much I put into it.

4   Q.  Moving to the last of those calls, what was your

5   understanding of why he called you that last time?

6   A.  The last time, because he wanted me to buy it before the

7   end of the year.

8   Q.  What, if anything, did he say on that call about whether

9   other people made money in the program?

10  A.  Well, he had told me to see the Web site, the videos, and I

11  did.  And the videos had one man that he made $14,000 a month,

12  like selling some kind of car parts, or motorcycle parts.  And

13  there was another couple, they made thousands of dollars a

14  month they said.  Then there was another man, too, that he said

15  that he worked from home, and he said all he did was he turned

16  on his computer in the morning and that was his work.

17  Q.  How did that call end?

18  A.  Well, he said to me, he said to me -- he kept calling it an

19  educational program.  So then I asked him, well, if I do this,

20  could I get a deduction on my taxes for the whole 15,000?

21  Because at that point I had planned, if I was going to do this,

22  to get the top tier because the top tier was the one where they

23  taught you to build a Web site, you know.  So he said yes; he

24  said that I could deduct the whole thing.  I said, all of it?

25  He said, all of it.  So then I decided to do it.  So I said

1    yes, that I would do.

2    Q.  Why did you agree to sign up?

3    A.  Because I figured, well, I am not really losing anything

4    because I could get the money back when I do my taxes in a few

5    months, and I could earn some extra money at home.

6    Q.  Which tier did you sign up for?

7    A.  The top tier.

8    Q.  Why did you sign up for the top tier?

9    A.  Because the top one taught you to build a Web site, he

10   said.

11   Q.  How much did you agree to pay?

12   A.  $14,999.

13   Q.  What, if anything, happened after that call ended?

14   A.  After that, I started getting all these other calls from

15   all these other companies that were trying to sell me Web sites

16   and similar programs.  And I was getting calls -- one day I got

17   seven calls in one day.  I was getting calls every day, like

18   two or three calls, from all different places in the country.

19   Q.  Focusing on Mr. Stroud's program, did you proceed with that

20   program or at some point did something else happen within a few

21   days?

22   A.  What happened was I called my accountant and I spoke to him

23   the next day, and I asked him about the whole tax deduction

24   thing because I wasn't sure if that was really true.  So my

25   accountant said, no, that it wasn't true, that I couldn't

1     deduct the whole thing in one year.  He said he could split it

2     up like into threes, like a third each year going forward.

3          So then I decided, well, I can't do this.  I don't

4     want to do this.  I can't do it.

5     Q.  Why?

6     A.  Because it was $15,000, and I didn't have that kind of

7     money, and I was putting it on American Express.  So I decided

8     not to do it.  So I wrote an e-mail to his company, and I said

9     that, you know, I was canceling out.

10    Q.  What, if any, response did you get from that e-mail?

11    A.  He called me a few days later and I was at work, and I

12    called him back on my break.  Then he said -- I said to him, I

13    think, did you get the e-mail that I am canceling out from your

14    program?  And he said, yes, but there has been some confusion.

15    And I was, like, there is no confusion, I am canceling out.  I

16    am canceling out of the whole deal I think I said, something

17    like that.  And then he said that I missed the deadline to

18    cancel.

19    Q.  Let me stop you there.  How soon after you signed the

20    contract with that guy and paid him money did you send your

21    cancellation e-mail?

22    A.  It was within three business days.

23    Q.  OK.  Please continue.  What happened next?

24    A.  So then I said -- he said to me that I missed the deadline.

25    I said, I didn't miss the deadline because in the contract that

1    I signed it says you have three business days to cancel, I

2    said.  And I sent the e-mail on the third business day, which I

3    remember it was Christmas Eve, which is a business day.

4    Q.  How did he respond?

5    A.  And he said that their company worked with Internet

6    business days and that that included Saturday.  And since that

7    included Saturday, that I was a day late because Saturday was

8    like the last day, in other words.

9    Q.  What, if anything, did he say about contacting your credit

10   card company, American Express?

11   A.  Well, after I wrote the e-mail, I called American Express

12   and I opened up a dispute so that they wouldn't pay it, so they

13   wouldn't pay his company, you know.  So then he told me that

14   calling up American Express and opening up a dispute wasn't the

15   way to resolve the issue.

16   Q.  What, if anything, did he say about how the issue or

17   dispute should be resolved?

18   A.  Well, he called me at least several times, like on the

19   weekends at different times, because I wasn't undoing the

20   dispute.  Then he said to me, one day he said, he said that he

21   could get after me, he said, like if I didn't pay, you know.

22   Q.  Did he say who would get after you?

23   A.  No, he didn't say.

24   Q.  What, if anything, did he say about suing you?

25   A.  Well, he didn't say.  That's what he said, that -- that he

1  had lawyers to get after me.  He said, I have lawyers to get

2  after you.  So I understood that to mean that he would sue me

3  for the money if I didn't, you know, dissolve the dispute with

4  American Express.

5  Q.  What did you do next?

6  A.  Then I decided, well, I have to pay him, I guess, because I

7  don't want to go into a suit.  Hiring a lawyer would cost me

8  more than $15,000 I figured.  So then I called American Express

9  and I told them to put the payment through, and they did.

10 Q.  What, if anything, did Mr. Stroud tell you about spending

11 money with other telemarketing companies?

12 A.  He told me that to have the Web site work well I would have

13 to hire other companies for, like, other services for the Web

14 site to work.

15 Q.  After your purchase with Mr. Stroud, did you receive other

16 similar telemarketing calls?

17 A.  Yes.  I received many, many.

18 Q.  Do you recall the names of any of the companies from which

19 you received calls?

20 A.  One was Business Development Center.

21 Q.  Do you recall the name of the person who called you from

22 Business Development Center?

23 A.  Andrew Owens.

24 Q.  Approximately how long after you paid Mr. Stroud did

25 Mr. Owens call you?

1   A.  Seven months later.

2   Q.  Do you know if Andrew Owens is his real name?

3   A.  I don't know.

4   Q.  Do you recall how old he sounded on the phone?

5   A.  He sounded young.

6   Q.  Approximately how many times did you speak with Mr. Owens?

7   A.  About two or three.

8   Q.  What phone did he reach you on?

9   A.  On my cell phone.

10  Q.  Where were you when you spoke to him?

11  A.  At home.

12  Q.  In Manhattan?

13  A.  In Manhattan.

14  Q.  Did he call you or did you call him?

15  A.  He called me.

16  Q.  What did Mr. Owens say about why he was calling you?

17  A.  He said he worked for a company that had -- I could work

18  from home with a Web site and, also, they had a Web site too.

19  Q.  What, if anything, did Mr. Owens say about the money you

20  would make from that Web site?

21  A.  He said that from theirs I would get a check every two

22  weeks after 90 days, he said.  He said that the amounts would

23  vary depending on how much they sold on their Web site.

24  Q.  Were you interested in purchasing his services at that

25  time?

IAU8KET6                          LaMorte - Direct

1   A.   I thought about it because I thought maybe those hundreds

2   of dollars could help me to pay the debt that I had already

3   incurred with Al Stroud's company.

4   Q.   What, if anything, did Mr. Owens say about how much money

5   his other customers were making?

6   A.   He said one man --

7           MR. SCHMIDT:  Objection, your Honor.  Leading.

8           THE COURT:  Just a moment.

9           Rephrase.

10  Q.   What else did Mr. Owens tell you on the call?

11  A.   What else did he tell me?  He told me that one man earned

12  $800, someone else earned $200.

13  Q.   What, if anything, did Mr. Owens say about how you could

14  pay for the Web site that he was trying to sell you?

15          MR. SCHMIDT:  Objection, your Honor.

16          THE COURT:  I will allow it.

17  Q.   You may answer, Ms. LaMorte.

18  A.   He said that they only accepted credit cards.

19  Q.   Were you able to pay him with a credit card?

20  A.   No, I couldn't.

21  Q.   Why not?

22  A.   I didn't have any room left on my cards.  They were all

23  maxed out by that point.

24  Q.   What happened next?

25  A.   Then he said that he could help me to get a credit card.

1  Q.  What happened next?

2  A.  He called Discover, and we had a three-way conference call.

3  Q.  What happened during that part of the call?

4  A.  He introduced me to whoever at Discover, and then I applied

5  for a Discover card, like he got off the phone and I applied

6  for a Discover card.

7  Q.  How did that call with Discover end?

8  A.  I was approved for a card.

9  Q.  How much credit did that card have on it?

10 A.  $8500.

11 Q.  Had Mr. Owens mentioned to you any prices in the first part

12 of the call?

13 A.  He said that they charge $10,000 for their service.

14 Q.  What happened after you were approved for the Discover card

15 that Mr. Owens helped you set up?

16 A.  He called me back right away, and I told him I was approved

17 for $8500.

18 Q.  What happened next?

19 A.  Then he said that their program was $10,000, he said, but

20 he would ask his manager if they would accept 8500 instead of

21 10,000.

22 Q.  What happened next?

23 A.  He put me on hold.  I said OK.  He put me on hold.  Then he

24 came back and he said, yes, that he spoke to his manager and

25 his manager said, yes, that 8500 was fine, that they would

1    accept that.  I even told him how convenient that your company

2    will accept $8500, you know, instead of 10,000.

3    Q.  Were you provided with a contract?

4    A.  Yes, I was.

5    Q.  Did you sign that contract?

6    A.  Yes, electronically.

7    Q.  Was that during the call with Mr. Owens?

8    A.  Yes.

9              MR. SOBELMAN:  Ms. Lee, can you please show the

10   witness what is marked for identification as Government Exhibit

11   140.

12   Q.  Ms. LaMorte, do you recognize this?

13   A.  Yes.

14   Q.  What is it?

15   A.  This is the contract that I signed electronically.

16   Q.  Is this a true and accurate copy of this document?

17   A.  Yes.

18             MR. SOBELMAN:  The government offers Government

19   Exhibit 140.

20             MR. SCHMIDT:  No objection, your Honor.

21             THE COURT:  Hearing no objection, admitted.

22             (Government's Exhibit 140 received in evidence)

23             MR. SOBELMAN:  Ms. Lee, can you please display it for

24   the jury.

25   Q.  Ms. LaMorte, can you please read us the title at the top of

1   the document?

2   A.  "Service agreement."

3   Q.  What is the date in the first paragraph?

4   A.  July 17, 2015.

5   Q.  What is the company listed in the first paragraph?

6   A.  Business Development Center.

7   Q.  Whose name is listed after that?

8   A.  Jo Anne LaMorte.

9   Q.  Is that you?

10  A.  Yes.

11  Q.  What is the price listed?

12  A.  8499.

13         MR. SOBELMAN:  I am just going to pause so the jury

14  can read what is listed in italics underneath "products and/or

15  services."

16  Q.  Ms. LaMorte, based on what Mr. Owens said during your call,

17  what was your understanding of what this site would do?

18  A.  Well, he told me that I would have a site built for me, and

19  also, I was supposed to get money every two weeks from their

20  site.

21         MR. SOBELMAN:  If we could go to page 3 of this

22  document.

23  Q.  Ms. LaMorte, it says credit card ending 7050.  Was that the

24  Discover card that Mr. Owens helped you set up?

25  A.  Yes.

1  Q.  Did you e-sign this document?

2  A.  Yeah.  Electronically, yes.

3          MR. SOBELMAN:  Ms. Lee, we can take it down.

4  Q.  Ms. LaMorte, what happened after you opened the new

5  Discover card with Mr. Owens and you signed this contract?

6  A.  Well, that night I read the contract, I read through it,

7  and I saw that it didn't say anything in it about getting a

8  check every two weeks, the way he told me over the phone.

9  Q.  What did you do next?

10  A.  I decided to cancel out of that because the contract wasn't

11  right.

12  Q.  Did you try to cancel?

13  A.  Yes.

14  Q.  How did you go about doing it?

15  A.  I wrote an e-mail the next morning, early in the morning,

16  to his company.

17          MR. SOBELMAN:  Ms. Lee, can you please pull up

18  Government Exhibit 464 in evidence.

19          If we can zoom in on the bottom half.

20  Q.  Ms. LaMorte, is this the e-mail you wrote?

21  A.  Yes.

22  Q.  Could you please read what it says under "from"?

23  A.  The date?

24  Q.  Just the name.

25  A.  From Jo Anne LaMorte.

1  Q.  What is the date?

2  A.  Sunday, July 19, 2015.

3  Q.  What time was it sent out?

4  A.  5:51 a.m.

5  Q.  Did you send it at 5:51 a.m.?

6  A.  Yes, I did.

7  Q.  Why?

8  A.  Because I was very upset.  It really bothered me that it

9  wasn't on there, you know, nothing about getting a check every

10 two weeks.  So I couldn't sleep that night.  So I woke up at

11 like 4 in the morning.  I got up out of my bed, got my laptop,

12 and I wrote this whole e-mail out, and I sent it.

13 Q.  Could you please read the subject line?

14 A.  The subject line, "Canceling out of service agreement with

15 Business Development Center."

16 Q.  Who did you send the e-mail to?

17 A.  I sent it to info@bdcenter.net.

18 Q.  Who did you understand you were sending it to?

19 A.  Andrew Owens, his company.

20 Q.  After "dear sirs," can you please read the first sentence

21 of this e-mail?

22 A.  "Please be advised that I am canceling out of our agreement

23 to obtain services and/or products from your company."

24 Q.  Can you please read just the next two sentences?

25 A.  "I have reviewed the contract which I signed late Friday

1   afternoon on July 17, 2015, and it does not state anything

2   about receiving checks every two weeks after 90 days as your

3   representative Andrew Owens stated in my telephone conversation

4   with him on Friday, July 17, 2015, and also in a previous

5   telephone conversation.  Since it is now 5:00 in the morning on

6   Sunday, July 19, 2015, I am well within your three business day

7   right of cancellation."

8   Q.  We are going to skip over the next paragraph in which you

9   quote the contract.

10          MR. SOBELMAN:  Can you please go to page 2, Ms. Lee?

11  Q.  How does this e-mail end, Ms. LaMorte?

12  A.  "Thank you, Jo Anne LaMorte," and a phone number.

13          MR. SOBELMAN:  Ms. Lee, you can take it down.

14  Q.  Ms. LaMorte, what happened after you sent this e-mail?

15  A.  I don't know if I called him or he called me, I think a few

16  days after, and I asked him if they had received the e-mail

17  that I sent.

18  Q.  Who is "him"?

19  A.  Andrew Owens.

20  Q.  What do you recall about that conversation?

21  A.  He said, yes, that they did, and that everything was

22  canceled, everything was done and over with.

23  Q.  Earlier you testified that you paid approximately $15,000

24  to Mr. Stroud, is that right?

25  A.  Yes.

1    Q.  In addition to that, did you also make similar purchases

2    with other telemarketing companies?

3    A.  Yes, because I thought I had to for this Web site.

4    Q.  In total, approximately how much did you spend?

5    A.  $25,000, approximately.

6    Q.  Were you able to make that money back?

7    A.  No.

8    Q.  Were you able to make any money?

9    A.  No.

10   Q.  Were you able to pay the credit card debt from those

11   charges?

12   A.  No.

13           MR. SOBELMAN:  No further questions.

14           THE COURT:  Any cross?

15           MR. SCHMIDT:  Yes.

16   CROSS-EXAMINATION

17   BY MR. SCHMIDT:

18   Q.  Good afternoon, Ms. LaMorte.

19   A.  Good afternoon.

20   Q.  You told us that Mr. Stroud called you repeatedly?

21   A.  Yes.

22   Q.  Now, with Andrew, you had a conversation within that first

23   time when he sold you the product?

24   A.  No.  I spoke to him maybe two or three times, I think.  It

25   wasn't once, maybe twice.

1  Q.  Do you recall how many days apart -- not the last time you

2  spoke to him after you canceled, but the one or two other

3  times, could you tell us how many days apart they would have

4  been?

5  A.  I'm not sure.  Maybe a day or two apart.

6  Q.  Would it have been possible that you spoke to a young woman

7  who set an appointment up to speak to Mr. Owens at that time?

8  A.  I don't remember.  I don't think so.

9  Q.  The first time that you spoke to him, did you talk

10 about -- what did you talk about the first time that you spoke

11 with him?

12 A.  He said that he worked for a company that had a Web site

13 and that would also build a Web site for me.

14 Q.  What else was part of that conversation?

15 A.  I think I told him that I was interested in starting a Web

16 site to sell cosmetics, like organic and natural cosmetics.

17 And he seemed to think that that was a good idea, and he said

18 they could build a Web site for me for that.

19 Q.  When did the discussion concerning --

20         MR. SCHMIDT:  Can we put up the contract, please.

21 It's 140.

22         Can we highlight just below "products and/or

23 services."

24 Q.  Now, did you have a discussion with him about what that Web

25 site would be about?

1  A.  Yes.

2  Q.  Did he use the word "Youngevity" with you?

3  A.  I don't understand what you mean by Youngevity.

4  Q.  Youngevity, did he use that term, did you hear him say

5  Youngevity?

6  A.  I don't remember him saying that, no.

7  Q.  So it was your idea of what type of product that was going

8  to be sold?

9  A.  Yes.

10  Q.  You realized that if you were going to sell something over

11  the Internet, that you were going to have to do some -- there

12  would have to be some marketing on the Internet to be

13  successful, right?

14  A.  Yes.

15  Q.  Did you have a discussion with him about how long it would

16  take a Web site to get up and running?

17  A.  I don't remember talking about a time.

18  Q.  You said that you would start receiving checks

19  approximately 90 days?

20  A.  That's what he told me, right.

21  Q.  Was it 90 days after the Web site was up and running?

22  A.  I believe it was like 90 days after I signed the contract,

23  because it was supposed to be money from his Web site, from

24  their company.  According to him, it was already going, it was

25  already, you know, up and running.

IAU8KET6                        LaMorte - Cross

1   Q.   Now, it says here that you were to receive variety sample

2   product packages.  Do you know what that meant?

3   A.   I see that.

4   Q.   What did that mean to you?

5   A.   I don't know what he told me at that time.  It was like

6   four years ago or whatever.  I don't really remember what he

7   said exactly about that.

8   Q.   It's clear that he did not tell you that -- withdrawn.

9             It was your understanding that you would be earning

10  money from the sales of whatever the product was going to be,

11  is that right?

12  A.   Yes.  Right.

13  Q.   And he didn't tell you that there was going to be a

14  specific amount of return on that product because it was going

15  to depend on how much was sold, is that right?

16  A.   No, not really, no.

17  Q.   So he told you that there was going to be a specific amount

18  of return no matter whether you sold it or not?

19  A.   From the Web site that his company had, he said every two

20  weeks I would get a check for varying amounts, depending on how

21  much they sold.

22  Q.   You're telling us you didn't know what the item was being

23  sold?

24  A.   No, I don't remember what he said about it.  It was their

25  Web site, and I don't know what they were selling on it, or I

1  don't remember if he told me.

2  Q.  On this, though, it says a starter kit with unique owner

3  Web site, is that right?

4  A.  Yeah.  Right.  I see that.

5  Q.  It does not say anything about their own company's Web

6  site, does it?

7  A.  No.  That's why I canceled with them because it doesn't say

8  anything about that.

9  Q.  Now, when you entered into a contract with Mr. Stroud, what

10 were you supposed to receive from him?

11 A.  I was supposed to receive coaching every week, and they

12 were supposed to build a Web site for me, and they were also

13 supposed to teach me to build a Web site.

14 Q.  They agreed to help build a Web site for you, right, where

15 you would be selling products, is that right?

16 A.  Right.

17 Q.  And did you have a discussion with him about what the

18 products were?

19 A.  Yes.

20 Q.  What were the products that you had a discussion with

21 Mr. Stroud about?

22 A.  He told me that they had coaching sessions every week, and

23 that someone would call me every week and go over what the best

24 products would be to sell, what would sell the most, depending

25 on statistics and -- like statistics online, and they could

1   help me to figure out what would be the best thing to sell,

2   that would sell the most.

3   Q.   You said that you continued with Mr. Stroud because you

4   were afraid of going into a lawsuit?

5   A.   Right.

6   Q.   Did you get coaching from him?

7   A.   Yes, I did; not him, but from his company.

8   Q.   You said that you purchased other things from other

9   companies?

10  A.   Yes, I did.

11  Q.   What kind of things did you purchase?

12  A.   I purchased a social media program from another company.  I

13  also purchased -- from another company, they incorporated me,

14  they made an LLC for me.  Those were two companies.  I think

15  there was maybe a third or fourth company; they had some

16  services.

17  Q.   Now, when you spoke with Mr. Owens, were you still dealing

18  with Mr. Stroud's company?

19  A.   By that point I had pretty much -- I still had the Web

20  site, I understood, from Mr. Stroud's company, but I really

21  wasn't dealing with his company at that point by then.

22  Q.   Now, you said that you sent an e-mail to cancel?

23  A.   Right.

24  Q.   You were very careful because what happened to you

25  previously, you wanted to make sure that you sent it in within

1  what you understood at that time was a three-day Internet

2  period of time?

3  A.  No, three business days.  That's what it said on the

4  contract.

5  Q.  So you wanted to make sure that there wasn't going to be a

6  problem?

7  A.  Right.

8  Q.  So either you called up Mr. Owens or Mr. Owens called up

9  you because of the cancellation?

10  A.  Right.

11  Q.  You don't remember which way it was?

12  A.  No, I don't really.

13  Q.  Would it be fair to say that Mr. Owens did not try to stop

14  you from canceling?

15  A.  That would be fair to say.

16  Q.  He didn't try to?

17  A.  He didn't try to stop me, no.

18  Q.  He didn't try to put the hard sell on and get you to back

19  out of it?

20  A.  No.

21  Q.  Would it be fair to say that he was a gentleman, very nice

22  when you spoke with him?

23  A.  He was, he was nice about it.

24  Q.  Even though he knew that his company was going to lose the

25  sale that he made to you, right?

IAU8KET6                          LaMorte - Cross

1   A.  Right.

2                MR. SOBELMAN:  Objection.  Speculation.

3                THE COURT:  Sustained.

4                The jury will disregard the answer.

5   Q.  At the time that you entered the contract with Mr. Owens

6   and his company, did you have ready access to $10,000?

7   A.  No.

8   Q.  So if you were able to pay by not a credit card, but by

9   check, you didn't have the money to do so?

10  A.  No.

11  Q.  So would it be fair to say that it was you explaining to

12  Mr. Owens that it sounded interesting, but I don't have the

13  money to pay for it?

14  A.  Right.  He also said that they only took credit cards.

15  Q.  Are you certain about that?

16  A.  I'm not sure about that, but I think he said that.  I'm not

17  sure.

18  Q.  It may have been that you said you didn't have the money

19  for it, and then you had a discussion of whether or not you had

20  sufficient credit worthiness to get a credit card so you can

21  actually enter into this business?

22  A.  Right.

23  Q.  So he was being helpful to you?

24  A.  Yes.

25  Q.  He didn't harass you or harangue you, he was having a nice

IAU8KET6                              Casanova - Direct

1   conversation with you and you entered into an agreement?

2   A.   Right.

3            MR. SCHMIDT:  I have no further questions, your Honor.

4            MR. PAUL:  No questions, your Honor.

5            THE COURT:  Redirect.

6            MR. SOBELMAN:  No further questions, your Honor.

7            THE COURT:  Thank you, Ms. LaMorte.  You may step

8   down.  You're excused.

9            (Witness excused)

10           THE COURT:  Next witness for the government.

11           MS. FLETCHER:  Your Honor, the government calls Jenna

12  Casanova.

13    JENNA HUFFMAN CASANOVA,

14       called as a witness by the government,

15       having been duly sworn, testified as follows:

16           THE DEPUTY CLERK:  State your full name and spell your

17  name for the record.

18           THE WITNESS:  Jenna Huffman Casanova, J-E-N-N-A,

19  H-U-F-F-M-A-N, C-A-S-A-N-O-V-A.

20           THE COURT:  Good afternoon.

21           Please be seated, Ms. Casanova.  Welcome.

22           Your witness.

23  DIRECT EXAMINATION

24  BY MS. FLETCHER:

25  Q.   Good afternoon, Ms. Casanova.

1   A.  Hi.

2   Q.  What do you do for a living?

3   A.  I'm a forensic accountant with Deloitte.

4   Q.  What is Deloitte?

5   A.  Deloitte is a financial advisory company.  We offer audit,

6   tax, and consulting in financial matters.

7   Q.  How long have you been with Deloitte?

8   A.  A little over a year and a half.

9   Q.  Are you currently assigned to work with a law enforcement

10  agency?

11  A.  I am.  Deloitte is contracted through Treasury, and I am

12  detailed from Treasury to Homeland Security Investigations.

13  The group I work with involves NYPD police officers, agents

14  from various agencies.

15  Q.  Is there a name for the task force that you're assigned to?

16  A.  Yes.

17  Q.  What is that?

18  A.  El Dorado Task Force.

19  Q.  Where geographically do you work?

20  A.  New York.

21  Q.  Prior to joining Deloitte, where did you work?

22  A.  KPMG.

23  Q.  What is KPMG?

24  A.  Also a financial advisory company, specializing in audit,

25  tax, and financial advisory.

1  Q.  Focusing on your work now, on the El Dorado Task Force,

2  what are some of your duties and responsibilities as a forensic

3  accountant?

4  A.  I provide financial analysis for cases.  I can assist with

5  subpoena and affidavits.

6  Q.  Did there come a time when you were asked to provide

7  assistance in this case?

8  A.  Yes.

9  Q.  Who asked you to provide assistance in this case?

10  A.  My colleague, Ms. Pickman.

11  Q.  What is Ms. Pickman's first name?

12  A.  Sydney.

13  Q.  What is Sydney Pickman's role?

14  A.  Sydney Pickman also works with Deloitte as a forensic

15  accountant, and provides similar services to what I do, the

16  same services.

17  Q.  Approximately when did Ms. Pickman ask you to review or to

18  participate in this particular case?

19  A.  In September of this year.

20  Q.  Prior to your conversation with Ms. Pickman, had you had

21  any role in performing any of the financial analysis in this

22  case?

23  A.  No.

24  Q.  What, if any, documents or spreadsheets did you review in

25  connection with your analysis in this case?

1  A.  I reviewed the analysis Ms. Pickman had performed and the

2  underlying support for that analysis.

3  Q.  Can you describe generally what types of documents that

4  included?

5  A.  Bank statements and images of the checks or deposits that

6  can accompany the bank statements.

7  Q.  Did you also review spreadsheets?

8  A.  Yes.  Sorry.  The bank statements were converted into Excel

9  using a program called SSIS, and once it's put into that

10  program, we are able to export it into Excel and do analysis in

11  the Excel.

12       MR. SOBELMAN:  Ms. Lee, can we please pull up what has

13  been marked for identification as Government Exhibit 905.

14  Q.  Ms. Casanova, do you see Government Exhibit 905 on your

15  screen?

16  A.  I do, yes.

17  Q.  Do you recognize Government Exhibit 905?

18  A.  Yes.

19  Q.  What is Government Exhibit 905?

20  A.  It's the summary of accounts that Ms. Pickman used in

21  putting together her analysis.

22  Q.  Did you prepare this summary chart?

23  A.  I did not.

24  Q.  Who prepared it?

25  A.  Ms. Pickman.

IAU8KET6                          Casanova - Direct

1    Q.  Did you review the data for the accounts that are listed in

2    Government Exhibit 905?

3    A.  No.

4    Q.  I should ask a different question.  Did you review all the

5    data for the accounts listed in Government Exhibit 905?

6    A.  No.

7    Q.  What, if any, subset of the data did you review?

8    A.  I reviewed the accounts and the information that Ms.

9    Pickman provided her analysis on.  It varied.  It was off of

10   this list.

11              MS. FLETCHER:  The government offers Government

12   Exhibit 905.

13              THE COURT:  Hearing no objection, admitted.

14              MR. SCHMIDT:  If I may?

15              THE COURT:  Yes.

16   VOIR DIRE EXAMINATION

17   BY MR. SCHMIDT:

18   Q.  What we are looking at now, this exhibit, is just a list of

19   different bank accounts, with the name of the account holder,

20   signatories, when it was opened and when it was closed, the

21   account number and the bank, and that's the only information

22   here?

23   A.  Yes.

24              MR. SCHMIDT:  I have no objection.

25              THE COURT:  Admitted without objection.

IAU8KET6                          Casanova - Direct

1              (Government's Exhibit 905 received in evidence)

2              MS. FLETCHER:  May I publish?

3              THE COURT:  Yes.

4              MS. FLETCHER:  Thank you for the preview, Mr. Schmidt.

5              THE COURT:  The jury will disregard the statements of

6     the lawyers.  You know that.

7     BY MS. FLETCHER:

8     Q.  Ms. Casanova, do you still see that document on your

9     screen?

10    A.  Yes.

11    Q.  We talked just a moment ago about what you reviewed and

12    what you didn't review.

13             Are you familiar with the volume of documentation that

14    makes up the different accounts listed in Government Exhibit

15    905?

16    A.  Yes.

17             (Continued on next page)

18

19

20

21

22

23

24

25

IAUJKET7                    Casanova - direct

1    BY MS. FLETCHER:

2    Q.   How voluminous is that documentation?

3    A.   Thousands of pages.

4    Q.   Generally when you review financial records, do you review

5    those thousands of pages or do you review them in another

6    format?

7    A.   We generally review them in Excel.

8    Q.   Let's talk a through this particular Excel.  Can you give

9    an explanation of what is reflected in each column for the

10   first account listed here.

11   A.   Sure.  The first account, the first column is the bank, the

12   second column is the account number of that bank, the third

13   would be the account holder at the bank, and the fourth under

14   signatories is the person authorized to sign for that account.

15          Then the last two columns are the date that we have

16   the records, the beginning date and the account closed is the

17   ending date.

18   Q.   Do you see in the column on the far right how certain

19   accounts say either "unknown" or "not applicable"?

20   A.   Yes.

21   Q.   What does that signify?

22   A.   It indicates in the records we had that the account was not

23   closed or we don't know its current status.

24   Q.   Let's go ahead and take that down.  I'll show you what has

25   been marked for identification as Government Exhibit 904.  Do

1   you recognize Government Exhibit 904?

2   A.  I do.

3   Q.  What is it?

4   A.  It is a listing of the payments Jane Thompson made to the

5   business A1 Business Consultants.

6   Q.  Did you prepare this chart?

7   A.  No.

8   Q.  What, if any, steps did you take to review it for accuracy?

9   A.  I reviewed the accompanying checks that Ms. Pickman used to

10  build this chart.

11  Q.  Ms. Casanova, I will hand you a binder.  It is a multipage

12  document.  If you could please turn to what is behind Tab 904

13  You can publish 904 A in evidence.

14          Did you review the documents at 904 A?

15  A.  Yes.

16  Q.  What are the documents behind 904 A?

17  A.  It's the check images, the front and back images from Ms.

18  Jane Thompson to the business A1 Business Consultants.

19  Q.  How, if at all, do these documents compare to the documents

20  you reviewed to prepare Government Exhibit 904, to verify the

21  accuracy of Government Exhibit 904?

22  A.  These were the documents reviewed so they were the check

23  images.

24          MS. FLETCHER:  The government offers Government

25  Exhibit 904.

1        MR. SCHMIDT:  No objection.

2        MR. PAUL:  No objection.

3        THE COURT:  904 admitted.

4        (Government's Exhibit 904 received in evidence)

5        MS. FLETCHER:  Can we please publish.

6   BY MS. FLETCHER:

7   Q.  Ms. Casanova, can you please walk us through what the

8   different pieces of information are in the first row with

9   reference to the column headings?

10  A.  Sure.  The first column is the bank account.  The second

11  would be the date of deposit.  The third would be the amount

12  the check was written for.  The next was the source of deposit

13  is the person who wrote the check, which the next column was

14  who received the check, and that column is the name written

15  actually on the check, and the memo also comes directly from

16  the check memo section.

17  Q.  Let me make sure I understand what is reflected in the

18  payee column.  You say it is who received the check?

19  A.  It is the name that was written on the check under the,

20  "pay to the order line."

21  Q.  Did you total up the checks that were paid to the entity in

22  the payee column from Jane Thompson?

23  A.  I did.

24  Q.  What is the total amount of money that Jane Thompson wrote

25  in checks to A1 Business Consultants?

IAUJKET7                        Casanova - direct

1   A.   $238,993.00.

2   Q.   Ms. Casanova, why did you add up the checks from this

3   individual Jane Thompson?

4   A.   You asked me to.

5   Q.   Do you have any idea who Ms. Thompson is?

6   A.   No.

7   Q.   Can you pull up what is marked for identification as

8   Government Exhibit 906.  Do you recognize Government Exhibit

9   906?

10  A.   I do.

11  Q.   What is it?

12  A.   It's a summary of the account activity in Element Business

13  Services.

14  Q.   Who prepared Government Exhibit 906?

15  A.   Ms. Pickman.

16  Q.   What, if any, steps did you take to confirm the accuracy of

17  the data in Government Exhibit 906?

18  A.   I reviewed the bank statements for the business Element

19  Business Services.

20  Q.   Can I ask you to turn to the information behind 906 A in

21  your binder.

22  A.   Yes.

23  Q.   What is behind 906 A?

24  A.   The actual statements from the business Element Business

25  Sources at Bank of America.

1          MS. FLETCHER:  The government offers Government

2     Exhibit 906.

3          MR. SCHMIDT:  No objection.

4          MR. PAUL:  No objection.

5          THE COURT:  Admitted without objection.

6          (Government's Exhibit 906 received in evidence)

7     BY MS. FLETCHER:

8     Q.  Ms. Lee, can we please blow up just the top third or so of

9     that sheet.  Perfect.

10         Ms. Casanova, do you see the date 6-5-2015?

11    A.  I do.

12    Q.  What date does that signify with respect to this account?

13    A.  It is the date the account was opened.

14    Q.  What is the source of the opening funds for that account?

15    A.  A check from the business A1 Business Consultants.

16    Q.  Do you see the three transactions just below that?

17    A.  I do.

18    Q.  For 7-23 and 7-24 of 2015?

19    A.  Yes.

20    Q.  Can you describe what is reflected in those three

21    transactions.

22    A.  Sure.  It's two deposits, one on July 23, 2015, and one on

23    July 24, 2015, from the credit card processer APS and

24    immediately that is followed by a withdrawal on 7-24 through a

25    check to Olive Branch Marketing.

1   Q.  Did you review all of the account statements for this

2   particular account?

3   A.  Yes.

4   Q.  Can you describe generally what type of account activity

5   you saw in that account?

6   A.  Yes, we're seeing deposits quickly followed by withdrawals.

7   The deposits vary between the credit card processor or cash.

8   Q.  How about the withdrawals?

9   A.  They were being paid to two main businesses, Olive Branch

10  Marketing or A1 Business Consultants -- sorry -- of the

11  withdrawals were back to the credit card processer APS.

12  Q.  Is there a term in forensic accountant speak for what type

13  of account this seems to be?

14  A.  It shows characteristics of a funnel account.  The money

15  is -- we are seeing deposits and withdrawals quickly in a short

16  time-frame, the account is appearing to be a pass-through to

17  another business.

18          MR. SCHMIDT:  Objection.

19          THE COURT:  I'll allow it.

20  BY MS. FLETCHER:

21  Q.  Just focusing on those two transactions on July 23rd and

22  July 24th we were just talking about, do you see where it says

23  ACHN/CC?

24  A.  Yes.

25  Q.  What does that mean?

1  A.  ACH stands for Automatic Clearinghouse.  It is a type of

2  payment or processing that happens between banks.  It is

3  similar to a wire, but it is a little bit quicker and happens

4  in batch statements between the banks.

5  Q.  Ms. Lee, if we could please go back to the main document

6  and blow up the transactions on September 15th and September

7  17th.

8          Ms. Casanova, can you take a look at the three

9  transactions that are at the bottom of the blowup on your

10  screen and explain to the jury what is happening on September

11  15th and September 17th of 2015 in this account.

12  A.  Sure.  On the 15th of September 2015, we see a cash deposit

13  for $13,300.00.  And two days later, we immediately see a

14  withdrawal by the credit card processor APS for roughly the

15  same amount.

16  Q.  Do you see a single withdrawal or do you see multiple

17  withdrawals?

18  A.  We are seeing two withdrawals on the September 17.

19  Q.  What is the total of those two withdrawals?

20  A.  $134,995.00.

21  Q.  Are you able to see, based on your review of the underlying

22  bank statements, what the purpose of these two ACH out

23  transactions are on 9-17-2015?

24  A.  Yes.  I believe the description on the bank account states

25  a charge-back.

1    Q.  Ms. Lee, if we could please take that down and blow up

2    instead the transaction on October 22nd.  Ms. Casanova, can you

3    please describe -- do you need a moment?

4    A.  No.

5    Q.  Can you please describe what transactions are reflected for

6    October 22, 2015, the Element account?

7    A.  Yes, we're seeing a deposit from the credit card processer

8    APS for $6,995.26 followed by a check out the same day to A1

9    Business Consultants for $7,000.

10   Q.  We can take that down, Ms. Lee, and just leave up the full

11   screen of the document.

12        You saw the check to A1 Business Consultants.  Had you

13   seen any checks made payable to A1 Business Consultants prior

14   to that check in this account?

15   A.  No.

16   Q.  Let's take a look at the last transaction on 12-3-2015.

17        Ms. Casanova, what is that transaction?

18   A.  It's a withdrawal from the Element Business Service

19   accounts for $11,950.79.

20   Q.  What, if anything, are you able to tell about the purpose

21   of that transaction, based on your review of the account

22   records?

23   A.  It was the final withdrawal from the account.

24   Q.  What does that mean?

25        Was the account subsequently closed?

1    A.  Based on the dates provided by the bank, yes, the account

2    was no longer open after that.

3    Q.  When you say the "dates provided by the bank," what are you

4    referring to?

5    A.  The statement dates.  There was no further information.

6    Q.  There were no statements after December of 2015?

7    A.  No.

8    Q.  Ms. Lee, can we please pull up what is -- sorry.  Let's go

9    to what is in evidence as Government Exhibit 906 A.  If we can

10   go to the very last page of that document which is I believe

11   Page 42.

12           Ms. Casanova, do you see Government Exhibit 906 A

13   there in your binder?

14   A.  I do.

15   Q.  Do you see the very last page of Government Exhibit 906 A?

16   A.  I do.

17   Q.  What is the document that is the very last page of

18   Government Exhibit 906 A?

19   A.  It is the signature page for the bank account.

20   Q.  Is that also called the signature card?

21   A.  Yes, the signature card.

22   Q.  What is the purpose of a signature card, as you understand

23   it?

24   A.  Basically for business accounts related to a personal

25   account gives the bank authorization for who can sign and make

1    withdrawals on behalf of that account.

2    Q.  Do you see names listed on the signature card for the

3    Element Business Services account?

4    A.  I do.

5    Q.  What are the names listed?

6    A.  Masoud Kouchekmanesh and Andrew Owimrin.

7    Q.  Do you see the dates next to their signatures on the

8    signature card?

9    A.  Yes.

10   Q.  What is the date?

11   A.  June 5, 2015.

12   Q.  Ms. Lee, can you please show Ms. Casanova what's been

13   marked for identification as Government Exhibit 908.

14          Can you take a look at 908 in your binder now on your

15   screen?

16   A.  Yes.

17   Q.  Do you recognize Government Exhibit 908?

18   A.  Yes.

19   Q.  What is it?

20   A.  It is a summary of payments to Shahram Ketabchi which

21   includes payments by the business A1 Business Consultants and

22   cash deposits into his account.

23   Q.  Did you and Ms. Pickman prepare this?

24   A.  Ms. Pickman prepared this.

25   Q.  What, if any, steps did you take to review it for accuracy?

1   A.  I reviewed the underlying transactions she provided.

2   Q.  Can you take a look at what is in your binder and in

3   evidence as 908 A.

4   A.  Yes.

5   Q.  What is 908 A?

6   A.  It is the wire and cash deposit information used to prepare

7   the summary.

8           MS. FLETCHER:  The government offers Government

9   Exhibit 908.

10          MR. SCHMIDT:  No objection.

11          THE COURT:  Admitted without objection.

12          (Government's Exhibit 908 received in evidence)

13          MS. FLETCHER:  Ms. Lee, please publish.

14          THE COURT:  Mr. Paul, no objection, correct?

15          MR. PAUL:  I was the first to say that, yes.

16          THE COURT:  All right.

17  BY MS. FLETCHER:

18  Q.  Ms. Casanova, do you see Government Exhibit 908 on your

19  screen?

20  A.  Yes.

21  Q.  Can you describe what information or what data is reflected

22  in each of the columns here on Government Exhibit 908?

23  A.  Sure.  The first column is the date of the deposit, the

24  second is the amount, the third is who paid Mr. Shahram, and

25  the last is the location of the deposit if it was a cash

1   deposit.

2   Q.   Where did the information in the summary chart come from?

3   A.   The bank statements in support for Mr. Shahram Ketabchi's

4   accounts.

5   Q.   What is the date of the first transaction listed on this

6   summary chart?

7   A.   December 8th, 2015.

8   Q.   Are you aware of whether there were cash deposits into

9   Shahram Ketabchi's accounts prior to that date?

10  A.   There were.

11  Q.   Why does the chart begin on that date?

12  A.   It was requested for us to review the payments to

13  Mr. Shahram Ketabchi from the A1 Business Consultants, and we

14  started with the date, the first date of that payment.

15  Q.   What type of transaction is the transaction on 12-8-2015?

16  A.   It is a wire from the business A1 Business Consultants.

17  Q.   Did you include any cash deposits into Shahram Ketabchi's

18  accounts prior to that first A1 Business Consultants wire?

19  A.   No.

20  Q.   Taking a look at the various cash deposits that follow that

21  between January of 2016 and March of 2016, can you explain what

22  the location column means for those particular transactions.

23  A.   It indicates, where known, the actual location of the

24  deposit.

25  Q.   Were some of them unknown?

1    A.  Yes.

2    Q.  Can we please show the whole document again, Ms. Lee.

3        Did you total up the wires from A1 Business

4    Consultants to Shahram Ketabchi and the cash deposits into

5    Shahram Ketabchi's account?

6    A.  I did.

7    Q.  What was the total of those transactions?

8    A.  $30,825.00.

9    Q.  To be clear, based on your review of Shahram Ketabchi's

10   accounts, did he receive deposits from other sources besides,

11   for example, A1 Business Consultants and besides cash deposits?

12   A.  He did.

13   Q.  What type of deposits did he receive?

14   A.  Payments from Lyft and a company called Razor LSE, a

15   subsidiary of Uber.

16   Q.  How about cash transfers from other accounts?

17   A.  I don't recall that.

18   Q.  What, if any, transactions did you see that indicated to

19   you that Shahram Ketabchi may have had other bank accounts?

20   A.  He made a check payment from an account with a check title

21   that had his name at U.S. Bank.

22   Q.  Can you explain what you mean by that, he made a --

23   A.  Sorry.  The image of the check provided in the backup to

24   the financial statements showed in the upper left similar to

25   your personal checks the name Shahram Ketabchi with the same

1   address, and it was at a bank called U.S. Bank.

2   Q.  Just to clarify one point about the deposit location column

3   on Government Exhibit 908, are those branch locations or are

4   they ATMs?  How did you determine the information for that

5   particular column?

6   A.  So on the support from Bank of America, they put the name

7   of the branch.  Where it had a New York City address, we put,

8   "New York."

9   Q.  What if the address was an address in Franklin Lakes, New

10  Jersey, for example?

11  A.  The bank would only put, "Franklin Lakes."

12  Q.  We can take that down and pull up what has been marked for

13  identification as Government Exhibit 909.  Do you recognize

14  Government Exhibit 909?

15  A.  I do.

16  Q.  What is it?

17  A.  It's a summary of the payments into Andrew Owimrin's

18  account, half of the business Olive Branch Marketing and A1

19  Business Consultants and also includes cash deposits.

20  Q.  Did you prepare this?

21  A.  No.

22  Q.  Who prepared it?

23  A.  Ms. Pickman.

24  Q.  What, if any, steps did you take to verify the accuracy of

25  the summary chart?

IAUJKET7                          Casanova - direct

1   A.  I reviewed the image, information she used to build this

2   chart, so it was images of the checks and the bank statements.

3   Q.  Are those the checks and bank statements that are in

4   evidence as Government Exhibit 909 A?

5   A.  Yes.

6           MS. FLETCHER:  The government offers Government

7   Exhibit 909.

8           THE COURT:  Hearing no objection, admitted.

9           (Government's Exhibit 909 received in evidence)

10  BY MS. FLETCHER:

11  Q.  The same question, Ms. Casanova, the same question with

12  respect to the prior exhibit.  Can you explain what is

13  reflected in each of the columns here on the Andrew Owimrin

14  payments summary.

15  A.  The first column is the date of deposit.  The second column

16  is the amount that was deposited, and the third column is the

17  entity that wrote the check that was for deposit or if it was a

18  cash deposit.

19  Q.  Now, what is the time-frame that is captured in this

20  particular exhibit?

21  A.  It was from May 30th of 2014 until April 27, 2016.

22  Q.  Why did you confine the summary to that date range?

23  A.  You requested it.

24  Q.  Taking a look at the first entry for cash deposit, do you

25  see that on June 30th, 2014?

1    A.  I do.

2    Q.  Can you explain how you were able to determine, based on

3    the review of the bank records, there was a cash deposit on

4    that date?

5    A.  There was an accompanying deposit slip that had "cash"

6    written on it.

7    Q.  Were there other cash deposits that were not included on

8    this summary chart?

9    A.  Yes.

10   Q.  Why did you not include those cash deposits?

11   A.  We had checks from the entity written to Mr. Owimrin that

12   reflected the exact same amount of the cash deposited into his

13   account.

14   Q.  In those instances, is it fair to say that you had both the

15   check paid to Mr. Owimrin and a separate cash deposit in the

16   same amount?

17   A.  Yes.

18   Q.  Why did you not include both?

19   A.  We were requested to show the payments from the entities to

20   Mr. Owimrin.

21   Q.  As opposed to showing the cash deposits?

22   A.  Are correct.

23   Q.  What, if anything, would including both the check and the

24   cash deposit do with respect to the total here?

25   A.  It would have double-counted the amounts that were actually

IAUJKET7                          Casanova - direct

1  deposited into his account.

2  Q.  In those instances, where you had an entity making a check

3  payable to Mr. Owimrin and a corresponding identical amount

4  cash deposit, which of the two did you leave off of this chart?

5  A.  We left off the cash deposit.

6  Q.  In those instances when you had an entity making a check to

7  Mr. Owimrin and a corresponding cash deposit, what, if

8  anything, would those transactions in the back update tell you

9  about what the person negotiating the check did with the check?

10 A.  It indicates he cashed the check and deposited the amount

11 in his account.

12 Q.  When you say "the amount," do you mean the cash or the

13 check?

14 A.  The check amount, the amount written on the check would

15 have been cashed and that amount deposited into his account.

16 Q.  Can we blow up that -- sorry -- the other way, zoom out.

17 Show the whole page.  Thank you.

18         Did you total up the checks made payable to

19 Mr. Owimrin from the Olive Branch and A1 Business Consultants

20 entities and the cash deposits for which you could not find a

21 corresponding check amount?

22 A.  Yes.

23 Q.  What was the total of that, of those two pieces data?

24 A.  $112,6487.12.

25         MS. FLETCHER:  May I have a moment, your Honor?

1        THE COURT:  Yes.

2        (Off-the-record discussion)

3    BY MS. FLETCHER:

4    Q.  Ms. Casanova, just a couple of clarifying questions.

5        Going back to the example we just discussed where an

6    entity wrote a check to Mr. Owimrin, and you separately had a

7    cash deposit into Mr. Owimrin's accounts --

8    A.  Yes.

9    Q.  -- how were you able to see both pieces of those two types

10   of transactions?

11   A.  We had the account statements for the entities Olive Branch

12   Marketing and A1 Business Consultants and we were able to

13   identify in their banking information checks written to

14   Mr. Owimrin.

15   Q.  You didn't see those checks in Mr. Owimrin's accounts.  Is

16   that fair?

17   A.  Correct.

18   Q.  What did you see in Mr. Owimrin's accounts?

19   A.  We saw deposit slips for cash in amounts that matched the

20   checks deposited within a short time-frame of the check having

21   been written.

22        MS. FLETCHER:  No further questions, your Honor.

23        THE COURT:  Is there any cross-examination?

24        MR. SCHMIDT:  Just a few, your Honor.

25   CROSS EXAMINATION

IAUJKET7                         Casanova - cross

1   BY MR. SCHMIDT:

2   Q.  Cashing a check and then depositing it as cash doesn't make

3   the check disappear from the banking system, does it?

4   A.  No.

5   Q.  Cashing a check and then depositing the cash makes the

6   money that you deposited in the bank account immediately

7   available.  Is that right?

8   A.  It can be.  It depends on the bank.

9   Q.  If you put cash into a bank, that money is immediately

10  available.  Is that right?

11  A.  I would think, yes.

12  Q.  If you put a check into the bank, it may not be immediately

13  available.  Is that right?

14  A.  Yes.

15  Q.  Now, you said that you went up to I think April of

16  something on the accounts and just went through those checks

17  being cashed and deposited?

18  A.  Correct.

19  Q.  And you did that because you were told just to go up to

20  that point.  Is that right?

21  A.  It was requested by Ms. Fletcher, correct.

22  Q.  But the account was closed in June of 2016.  Is that

23  correct?

24  A.  Correct.

25  Q.  Did you look at the statements of the account in May and

1    June of 2016?

2    A.  Ms. Pickman was the one who reviewed this, so I did not.

3    Q.  You don't know what the status of those accounts were after

4    that last check in April.  Is that right?

5    A.  No.

6    Q.  Am I correct?

7    A.  You're correct.

8              MR. SCHMIDT:  No other questions.

9              MR. PAUL:  I have a few, Judge.

10   CROSS EXAMINATION

11   BY MR. PAUL:

12   Q.  Ms. Casanova, could you look at Exhibit 908 again, please.

13   A.  Sure.

14   Q.  Would you put it up on the screen.  Can we blow that up.

15             Now, let me understand something.  This is from

16   December 2015 to January of 2017, so this incorporates

17   approximately a year, a little more than a year.  Is that

18   right?

19   A.  Yes.

20   Q.  It shows the payer, an amount for first line, December 8th,

21   $3,000, A1 business, and it has other A1 Business Consultants,

22   Capital One from different accounts, it looks like, or at least

23   two different accounts for A1 Business.  Is that so?

24   A.  Yes.

25   Q.  Now, if you count those up, I believe there are 10 entries

1  with regard to payments made to Mr. Ketabchi from A1 Business?

2  A.  Yes.

3  Q.  It shows cash deposits.

4           Now, were these other cash deposits, which are most of

5  the items in this chart, were they matched up with any entities

6  at all?

7  A.  No.

8  Q.  So it just showed that there was a cash entry into his

9  account, right, that he deposited cash?

10          There was cash deposited into his account.  Is that

11  right?

12 A.  Correct.

13 Q.  Prior to December 8th, 2015, did you investigate any money

14 that was deposited into Mr. Ketabchi's account or accounts?

15 A.  No.

16 Q.  So we don't know, based on your information, whether or not

17 any other amounts were cashed or sent by A1, or is this the

18 first entry you were able to locate from A1, December 8th,

19 2015?

20 A.  This was the first entry from A1 in the statements in my

21 review.  There were other cash deposits.

22 Q.  From A1?

23 A.  I can't identify that.

24 Q.  You had other cash deposits, but you weren't able to tie

25 them into an entity, is that what you're saying?

IAUJKET7                    Casanova - cross

1    A.  Correct.

2    Q.  Prior to December 8th, 2015?

3    A.  Correct.

4    Q.  So December 8th, 2015 is the first entry of any money going

5    into Mr. Ketabchi's account of $3,000.  Is that right?

6    A.  The first identifiable deposit, correct.

7    Q.  You told us that the total for this entire year came to,

8    including all the cash deposits, $30,825.00.  Is that right?

9    A.  On this chart, yes.

10   Q.  Well, you said that he had received deposits from other

11   entities other than A1.  Is that right?

12   A.  Yes.

13   Q.  I think you told us he received monies from Lyft and Uber?

14   A.  Correct.

15   Q.  And do you know how much money he received from those

16   entities?

17   A.  I don't have the actual numbers.

18            (Off-the-record discussion)

19   Q.  I know you're an accountant and you may be able to be good

20   with numbers in your head, probably better than me, but would

21   you agree off the top of your head if you were to subtract the

22   cash deposits of Mr. Ketabchi's payments into his account

23   rather than $30,325.00, the sum total from A1 would be 19,000

24   and some-odd dollars?

25            THE COURT:  Is there a question?

IAUJKET7

1    Q.  Yes, that is the question.

2              If you were to subtract the total of deposits from A1

3    that was sent into this account, there would be a total of

4    $19,025.00.  Is that right?

5              THE COURT:  Can you say that is correct?

6              THE WITNESS:  Without cash?

7    BY MR. PAUL:

8    Q.  Let me rephrase it, Judge.

9              If you were to remove the cash deposits and just focus

10   on the A1 deposits into Mr. Ketabchi's account, it would come

11   to approximately $19,000.  Is that fair?

12   A.  That's fair.  Closer to 20,000.

13   Q.  Right.  I knew you could do it.  Thank you.

14             MR. PAUL:  I have no further questions, Judge -- wait.

15   I am sorry.  One second, please.

16             (Off-the-record discussion)

17             MR. PAUL:  Thank you.  Nothing further.

18             THE COURT:  The government?

19             MS. FLETCHER:  No further questions.

20             THE COURT:  Thank you, Ms. Casanova.  You may step

21   down.  You're excused.

22             (Witness excused)

23             THE COURT:  Ladies and gentlemen, it is 4:30.  I think

24   we should break for the day today.  Now, I think I'm able

25   tomorrow to give you a short day.  I don't want to promise it,

IAUJKET7

1    but because of the way for witness convenience and legal

2    matters, we may be able to give you a short day tomorrow.  Come

3    in at 9:30 and we'll see how it goes.  Thank you.  Keep an open

4    mind.

5            (Jury excused).

6            THE COURT:  All right.  If everything is still the

7    same, tomorrow morning at 9:30 we'll have Mr. Bolus and then

8    the paralegal and David Kandar and the government will rest.

9    We'll have motions -- I'll excuse the jury.  We'll have

10   motions, and we will pick it up again if there are going to be

11   defense cases on Thursday.  We'll see how that goes.

12           Is there anything I can deal with now?  I think the

13   parties have to discuss stipulations and a variety of things.

14           MR. SCHMIDT:  May we have a moment, your Honor?

15           MR. PAUL:  Just so your Honor knows where we're coming

16   from, the defense would ideally like to sum up on Monday, which

17   is where I think we are heading anyway, so we can do summations

18   and charge on Monday rather than try to squeeze it in on

19   Friday.

20           THE COURT:  I think that makes sense.  I didn't

21   promise anything to the jury so I am not promising anything to

22   you.

23           MR. PAUL:  Fair enough.

24           THE COURT:  That all makes sense, and although I must

25   say -- no, I won't say.  All right.

IAUJKET7

<table>
<tr><td>1</td><td>MR. SCHMIDT:  We do have one issue.  There is at least</td></tr>
<tr><td>2</td><td>one issue we can resolve one way or the other now.</td></tr>
<tr><td>3</td><td>The government is intending -- yes -- intending to put</td></tr>
<tr><td>4</td><td>this exhibit into evidence.  It is a Instagram photograph.  It</td></tr>
<tr><td>5</td><td>is an Instagram photograph that from I think Arash Ketabchi's</td></tr>
<tr><td>6</td><td>account.  We have no objection to the photograph.  We have</td></tr>
<tr><td>7</td><td>objection to the writing on the side.  The writing on the side</td></tr>
<tr><td>8</td><td>is hearsay.  It is not in furtherance of the conspiracy.  It is</td></tr>
<tr><td>9</td><td>simply banter.</td></tr>
<tr><td>10</td><td>THE COURT:  Are these words of Arash Ketabchi, is that</td></tr>
<tr><td>11</td><td>what it is?</td></tr>
<tr><td>12</td><td>MS. FLETCHER:  They are.  The government anticipates</td></tr>
<tr><td>13</td><td>arguing that in response hash tag, I hash tag pay attention is</td></tr>
<tr><td>14</td><td>a statement of Mr. Owimrin.</td></tr>
<tr><td>15</td><td>THE COURT:  What is the relevance of all of these</td></tr>
<tr><td>16</td><td>statements?</td></tr>
<tr><td>17</td><td>MS. FLETCHER:  The first statement, the statement from</td></tr>
<tr><td>18</td><td>Arash Ketabchi to Mr. Owimrin is --</td></tr>
<tr><td>19</td><td>THE COURT:  Because I am not familiar with this</td></tr>
<tr><td>20</td><td>layout, either.  Instagram is a means of exchanging</td></tr>
<tr><td>21</td><td>communications, correct, between people?</td></tr>
<tr><td>22</td><td>MS. FLETCHER:  Your Honor, I expect that Ms. Kronthal,</td></tr>
<tr><td>23</td><td>who is significantly more knowledgeable than me, will testify</td></tr>
<tr><td>24</td><td>Instagram is a social media website where people post</td></tr>
<tr><td>25</td><td>photographs of things they're doing or things they just did to</td></tr>
</table>

IAUJKET7

share with their friends, and sometimes when people post

photos, they write a comment about what the photo is about.

Then if you tag someone in the photograph or if you

tag some of their friends, then they can respond and comment

about the same photograph.

THE COURT:  Do I have to be concerned with what

tagging is because it is adequate for me to know that this goes

out?

MS. FLETCHER:  It does.  The paralegal who we intend

to introduce this through will testify she went on Instagram,

on Arash Ketabchi's public Instagram page and saw this

particular post.

THE COURT:  And then this is a statement of Arash

Ketabchi is known to Instagram as superstar ALK, is that it?

MS. FLETCHER:  Yes.

THE COURT:  He then says the killer 50 K a week is a

light week for him.

MS. FLETCHER:  Yes.

THE COURT:  Presumably himself.  Is that the idea?

MS. FLETCHER:  No.  I think it the comment is meant to

refer to the person in the photograph which Mr. Sinclair has

already identified as Andrew Owimrin.

THE COURT:  I see.

MS. FLETCHER:  To put it in the government's terms, in

the government's view, this is Arash Ketabchi commending his

IAUJKET7

1    subordinate for being a killer and making 50 K a week in sales.

2    It is a photograph of Mr. Owimrin in his office at Olive

3    Branch.

4             THE COURT:  So the killer 50 K a week is a light week

5    for him?

6             MS. FLETCHER:  Yes.

7             THE COURT:  In other words, again I only looked at it,

8    the government is arguing for others making 50 K a week would

9    be a killer, but for Owimrin, it is a light week?

10            MS. FLETCHER:  Yes.

11            THE COURT:  What is hash tag pay attention hash tag

12   stay focused, et cetera, et cetera?  What is all of that?

13            MS. FLETCHER:  I am embarrassed on my inability to

14   explain hash tags, but as I understand it, if your Honor were

15   to, for example, look at Mr. Ketabchi's Instagram, you would

16   see a lot of photos that say hash tag pay attention.

17            The government does not intend to elicit what that

18   means other than it is something, as we understand it, that is

19   commonly on Instagram posts by him.

20            THE COURT:  And then you're saying Mr. Owimrin

21   responds I hash tag pay attention?

22            MS. FLETCHER:  Correct.  In terms of evidentiary

23   rules, the government would submit that Owimrin's statement

24   comes in under 801 (d)(2)(A) and superstar ALK statement comes

25   in under 801 (a)(2)(E).  He is essentially encouraging his

IAUJKET7

1    salesperson, commending him for being a killer and making more

2    than 50 K a week in sales.

3           THE COURT:  Just a moment.  (Pause)

4           The statement is offered against an opposing party and

5    was made by the party in an individual capacity, is that what

6    you're referring to?

7           MS. FLETCHER:  Yes, your Honor.

8           THE COURT:  And then 801 (d)(2)(E) is the other?

9           MS. FLETCHER:  Yes.

10          THE COURT:  Mr. Schmidt.

11          MR. SCHMIDT:  First, your Honor, of course, there is

12    an obvious way to actually prove that Mr. Owimrin --

13          THE COURT:  Speak into the microphone, please, and

14    face the Reporter.

15          MR. SCHMIDT:  There is an actual way to prove whether

16    he made $50,000 in sales that week is the records that are in

17    the possession of the government instead of using what is

18    banter on the part of Mr. Arash Ketabchi.  Obviously, the hash

19    tag pay attention for Mr. Owimrin is saying nothing as the hash

20    tag pay attention is for Arash Ketabchi, so that doesn't have

21    any really significance.

22          The real significance is the statement by Arash

23    Ketabchi that is not true.  The government produced the sales,

24    but it is hearsay, it is not in furtherance of the conspiracy.

25          THE COURT:  How is it hearsay?

IAUJKET7

1          MR. SCHMIDT:  It is a statement outside of the

2     courtroom made by another person.

3          THE COURT:  Statements that are not hearsay, 801 (d),

4     statement that meets the following conditions is not hearsay:

5          2.  A statement is offered against an opposing party

6     that was made by the party in an individual capacity.

7          MR. SCHMIDT:  Well --

8          THE COURT:  That says it is not hearsay.

9          MR. SCHMIDT:  -- the individual capacity would be hash

10    tag pay attention, right?

11         THE COURT:  No.  The individual capacity is what

12    Superstar ALK, that is what Arash Ketabchi is saying.  It is

13    proved by the government against an opposing party.

14         MR. SCHMIDT:  Arash Ketabchi is not an opposing party

15    here, your Honor.  He is not on trial.

16         MS. FLETCHER:  The first statement is 801 (d)(2)(E).

17         Also just to correct something Mr. Schmidt said,

18    Mr. Owimrin's statement is not the same nothing hash tag pay

19    attention.  It is, "I pay attention."  He is adopting the

20    statement in the earlier post.  So even were that not to be

21    admissible under 801 (d)(2)(E), it would be admissible under

22    Rule 106 to complete Mr. Owimrin's statement he is paying

23    attention.

24         THE COURT:  What does Owimrin's statement, "I pay

25    attention" mean?

1          MS. FLETCHER:  The government would argue it is an

2     acknowledgment of what Superstar ALK is saying.  He is

3     agreeing -- assuming arguendo -- the government's argument is

4     that he is saying well, the reason I made 50 K a week in sales

5     is because I pay attention.

6          MR. SCHMIDT:  As the government had actually said a

7     little bit before, that Mr. Arash Ketabchi almost in all of his

8     Instagram posts says hash tag pay attention, hash tag stay

9     focused, right?

10          THE COURT:  Doesn't that support the government's

11     statement that here he is being Joe Torre for his baseball

12     team?

13          MR. SCHMIDT:  Who is being Joe Torre?

14          THE COURT:  That Superstar ALK.  In other words, he is

15     revving up the sales force?

16          MR. SCHMIDT:  Judge, I guess there are statements that

17     actually are in furtherance of the conspiracy, and there are

18     statements that if you want to look at it in a particular kind

19     of way, it is between two people who are part of the conspiracy

20     must be part of it.

21          THE COURT:  I don't understand.  Sorry, I don't

22     understand.

23          MR. SCHMIDT:  Mr. Ketabchi's statement is banter and

24     not part of --

25          THE COURT:  I understand that argument.  Isn't the

IAUJKET7

1    government entitled to argue that, but to argue this is in

2    furtherance of the conspiracy, that it, it is revving up the

3    sales force?  What is the date on this, by the way?  Does

4    anyone know that?

5              MS. FLETCHER:  May 26, 2014.  That is the date the

6    photograph is posted.

7              THE COURT:  Isn't the government entitled to argue

8    that, and you can argue whatever you wish to argue?

9              MR. SCHMIDT:  Your Honor --

10             THE COURT:  The statement is offered against an

11   opposing party, it is offered by the government against

12   Owimrin, and it is made by the party's co-conspirator Arash

13   Ketabchi during and in furtherance of the conspiracy.

14             It seems to me, now that I've focused in on it, that

15   is 801 (d)(2)(E).  I am admitting it, all right?  Anything

16   else?  Just one request.  Mr. Paul, will you speak to

17   Mr. Schmidt about pronunciation?

18             MR. PAUL:  I will work on it before he goes to sleep.

19             THE COURT:  Thank you.  That is now.  Thank you.

20             (Court adjourned until Wednesday, October 31, 2018,

21   9:30 am)

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

Cross By Mr. Abegaz-Hassen . . . . . . . . . . 961

Redirect By Ms. Kearney . . . . . . . . . . .1009

Recross By Mr. Abegaz-Hassen . . . . . . . .1018

JO ANNE LaMORTE

Direct By Mr. Sobelman . . . . . . . . . . .1041

Cross By Mr. Schmidt . . . . . . . . . . . .1060

JENNA HUFFMAN CASANOVA

Direct By Ms. Fletcher . . . . . . . . . . .1068

Cross By Mr. Schmidt . . . . . . . . . . . .1092

Cross By Mr. Paul  . . . . . . . . . . . . .1093

                  GOVERNMENT EXHIBITS

Exhibit No.                               Received

 116 A through J  . . . . . . . . . . . . .1021

 140   . . . . . . . . . . . . . . . . . . .1055

 905   . . . . . . . . . . . . . . . . . . .1073

 904   . . . . . . . . . . . . . . . . . . .1076

 906   . . . . . . . . . . . . . . . . . . .1078

 908   . . . . . . . . . . . . . . . . . . .1084

 909   . . . . . . . . . . . . . . . . . . .1088