IAV8KET1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA,

         v.                          17 Cr. 00243 (SHS)

ANDREW OWIMRIN, a/k/a "Andrew Owens,"
a/k/a "Jonathan Stewart," and
SHAHRAM KETABCHI, a/k/a "Steve Ketabchi,"

        Defendants.

------------------------------------x
                       October 31, 2018
                       9:40 a.m.

Before:

               HON. SIDNEY H. STEIN,

                           District Judge
                            and a jury

                  APPEARANCES

GEOFFREY S. BERMAN
    United States Attorney for the
    Southern District of New York
KIERSTEN A. FLETCHER
ROBERT B. SOBELMAN
BENET J. KEARNEY
    Assistant United States Attorneys

SAM A. SCHMIDT
ABRAHAM J. ABEGAZ-HASSEN
    Attorneys for Defendant Owimrin

KENNETH A. PAUL
JACOB MITCHELL
    Attorneys for Defendant Ketabchi

Also Present:
    CHRISTOPHER BASTOS, Detective NYPD and HSI
    CHRISTINE LEE, Paralegal Specialist USAO
    SAMUEL TUREFF, Paralegal

IAV8KET1

1           (Trial resumed; jury not present)

2           THE COURT:  The jury is here.  Bring the jury in.

3           Mr. Bolus will be called, is that correct?

4           MR. SOBELMAN:  Yes, your Honor.

5           THE COURT:  15 to 20 minutes?

6           MR. SOBELMAN:  Yes, your Honor.

7           (Jury present)

8           THE COURT:  Please be seated.

9           Good morning, ladies and gentlemen.  Thank you for

10   being here in a timely fashion.  It looks like I am the only

11   one in a costume today.

12          Let's proceed.  Call your next witness, government.

13          MR. SOBELMAN:  The government calls Thomas Bolus.

14          THE COURT:  Sir, if you would raise your right hand

15   and speak to my deputy.

16    THOMAS BOLUS,

17        called as a witness by the government,

18        having been duly sworn, testified as follows:

19          THE DEPUTY CLERK:  State your full name and spell your

20   last name for the record.

21          THE WITNESS:  Thomas Bolus, B-O-L-U-S.

22          THE COURT:  Good morning.  Welcome.  Please be seated.

23          Your witness.

24          (Continued on next page)

25

IAV8KET1                    Bolus - Direct

1  DIRECT EXAMINATION

2  BY MR. SOBELMAN:

3  Q.  Good morning, Mr. Bolus.

4  A.  Good morning.

5  Q.  Where do you work?

6  A.  I work at the Internal Revenue Service in Scranton,

7  Pennsylvania.

8  Q.  Is the Internal Revenue Service also known as the IRS?

9  A.  Yes, it is.

10  Q.  What is your title at the IRS?

11  A.  I am a court witness coordinator with the Internal Revenue

12  Service.

13  Q.  How long have you worked at the IRS?

14  A.  For over 13 years.

15  Q.  What are your duties and responsibilities with the IRS?

16  A.  As a court witness coordinator, I represent the

17  commissioner of the Internal Revenue Service in the

18  commissioner's custodial duties, I gather and retrieve

19  documents, both electronic and paper, and I prepare those

20  documents for presentation in federal criminal trials.

21  Q.  In general terms, what are the activities of the IRS?

22  A.  The activities of the IRS is to provide America's taxpayers

23  with top quality service by helping them understand and meet

24  their tax responsibilities and apply the law with fairness.

25  Q.  Are you familiar with the names Andrew Owimrin and Shahram

1    Ketabchi?

2    A.   Yes, I am.

3    Q.   How are you familiar with them?

4    A.   I am familiar with their names as being assigned to assist

5    on this trial just a couple of weeks ago.

6    Q.   Generally, are individuals required to report their income

7    to the IRS on an annual basis?

8    A.   Yes, they are.

9    Q.   How does income get reported to the IRS?

10   A.   The income comes in and is reported to the IRS by payers,

11   such as banks, financial institutions, mortgage and lending

12   companies, and then the persons that receive that money, the

13   taxpayers, then have to reconcile that income annually on the

14   Form 1040 every year.

15   Q.   If someone has income that isn't reported by an employer,

16   are they required to report that income themself to the IRS?

17   A.   Yes, they would be.

18           MR. SCHMIDT:  Leading.

19           THE COURT:  Sustained.  Move on.

20   Q.   Mr. Bolus, are there requirements that apply to individuals

21   in the event that an employer does not report income for an

22   individual?

23   A.   Yes, there are.

24   Q.   What types of requirements?

25   A.   Well, any income that a person receives, no matter the

IAV8KET1                              Bolus – Direct

1   source, is reportable to the IRS.

2   Q.   When you say reportable, does that mean required to be

3   reportable?

4   A.   Required on the Form 1040.

5   Q.   Are individuals required to file taxes with the IRS on an

6   annual basis?

7   A.   Yes, they are.

8   Q.   Approximately what is the amount of income one must have

9   for an individual person to be required to file taxes in a

10  given year?

11  A.   Well, it goes by their filing status, whether single,

12  married, head of household, but most single filers, for

13  instance under the age of 65, are required to file if they have

14  earnings of about $10,000.

15          MR. SOBELMAN:   Ms. Lee, could you please show the

16  witness what have been marked for identification as Government

17  Exhibits 823, 824, 825 and 826.

18  Q.   Mr. Bolus, did you have an opportunity to review these

19  exhibits in preparation for your testimony today?

20  A.   Yes, I did.

21  Q.   What are these?

22  A.   These documents are forms 1040 and information returns

23  provided to this court by the Internal Revenue Service's

24  disclosure office for Andrew Owimrin and Shahram Ketabchi.

25  Q.   Are these four exhibits true and accurate copies of records

IAV8KET1                         Bolus - Direct

1    from the IRS?

2    A.  Yes, they are.

3    Q.  Were these documents made at or near the time by or from

4    information transmitted by someone with knowledge of the

5    information contained in the documents?

6    A.  Yes, they were.

7    Q.  Were these documents kept in the course of a regularly

8    conducted activity of the IRS?

9    A.  Yes, they are.

10   Q.  Is keeping and maintaining these types of records a regular

11   practice of the IRS?

12   A.  Yes, it is.

13            MR. SOBELMAN:  Your Honor, the government offers

14   Government Exhibits 823, 824, 825 and 826.

15            THE COURT:  Hearing no objection, admitted.

16            Those are admitted pursuant to 803(6).

17            (Government's Exhibits 823, 824, 825 and 826 received

18   in evidence)

19            MR. SOBELMAN:  Ms. Lee, please show the witness what

20   have been marked as Government Exhibits 821 and 822.

21   Q.  Mr. Bolus, did you have an opportunity to review these

22   exhibits in preparation for your testimony today?

23   A.  Yes, I did.

24   Q.  What are these?

25   A.  These are certification of lack of record; they are IRS

IAV8KET1                          Bolus – Direct

1    forms 3050.  These forms are used when we are asked to conduct

2    a search of any tax information that may be reported or exist

3    on persons; and then if there is no information, we provide

4    this form and list that information that we searched for but

5    could not find.

6    Q.  Are Government Exhibits 821 and 822 true and accurate

7    copies of documents created by the IRS?

8    A.  Yes, they are.

9              MR. SOBELMAN:  The government offers Government

10   Exhibits 821 and 822.

11             THE COURT:  Hearing no objection, admitted.

12             (Government's Exhibits 821 and 822 received in

13   evidence)

14             MR. SOBELMAN:  Ms. Lee, please show the witness what

15   is marked for identification as Government Exhibit 827.

16   Q.  Mr. Bolus, do you recognize this?

17   A.  Yes, I do.

18   Q.  What is it?

19   A.  This document is a spreadsheet that's a summarization of

20   Shahram Ketabchi's tax filings for the years 2013 through 2017.

21             The second column lists the IRS income thresholds for

22   persons that are 65 years or younger that are single.

23             And then the third column is any income that the IRS

24   was informed about by employers, financial institutions and

25   banks on the information return processing program.

IAV8KET1                        Bolus - Direct

1   Q.  Let me just stop you there.  Does the information contained
2   on this chart come from what are now in evidence as Government
3   Exhibits 822, 824 and 826?
4   A.  Yes.
5   Q.  Did you also include the income threshold for filing taxes
6   in the relevant years?
7   A.  Yes, I did.
8   Q.  Where did you get that information?
9   A.  From IRS -- actually, from the IRS Web site, and then
10  through publications that are produced annually by the IRS to
11  inform the public.
12  Q.  Does this chart accurately reflect the information that is
13  summarized?
14  A.  Yes, it does.
15          MR. SOBELMAN:  The government offers Government
16  Exhibit 827.
17          THE COURT:  Admitted without objection.
18          (Government's Exhibit 827 received in evidence)
19          MR. SOBELMAN:  Ms. Lee, can you please display what is
20  now in evidence as Government Exhibit 827.
21  Q.  Mr. Bolus, can you just explain what we see in this chart?
22  A.  So Exhibit 827 is a summarization for Shahram Ketabchi for
23  the tax years 2013 through 2017, as listed in column one.
24          The second column indicates the threshold filing or
25  the filing requirement amount for those particular tax years.

1              Then the third column indicates any reported income

2       that the IRS received from financial institutions, banks,

3       mortgages lending companies, employers, etc.

4              And the fourth column just indicates whether Mr.

5       Ketabchi filed a tax return for those particular years or not.

6       Q.  Let's just focus on 2015 and 2016 for the moment.

7              For the year 2015, how much was the threshold of

8       income for someone that they are required to pay taxes as an

9       individual under 65 years of age?

10      A.  $10,300.

11      Q.  And how much income was reported for Shahram Ketabchi to

12      the IRS by his employers for the tax year 2015?

13      A.  $21,954.

14      Q.  Was he therefore required to file taxes that year?

15      A.  Yes.

16      Q.  Moving to the last column, did he file taxes that year?

17      A.  He, did not.

18      Q.  Let's look at 2016.  How much was the income threshold for

19      that year?

20      A.  $10,340.

21      Q.  How much income was reported to the IRS by his employers

22      that year?

23      A.  $13,538.

24      Q.  And did he file taxes that year?

25      A.  No, he did not.

IAV8KET1                          Bolus – Direct

1   Q.  Was he required to do so?

2   A.  Yes.

3   Q.  Based on your review of the tax documents that you

4   discussed and that are now in evidence, did Shahram Ketabchi

5   disclose any income in addition to that disclosed by his

6   employers for any of these five years?

7   A.  No, he did not.

8   Q.  Based on your review of the tax documents now in evidence,

9   did A1 Business Consultants report any income for Shahram

10  Ketabchi for any of these five years?

11  A.  No, they did not.

12  Q.  Based on your review of the tax documents now in evidence,

13  did a company named Element Business Services report any income

14  for Shahram Ketabchi for any of these five years?

15  A.  No, they did not.

16  Q.  Based on your review of the tax documents now in evidence,

17  did a company named Elevated Business Consultants report any

18  income for Shahram Ketabchi for any of these five years?

19  A.  No, they did not.

20  Q.  Do be clear, did Shahram Ketabchi himself report any income

21  to the IRS for any of those three businesses for any of these

22  five years?

23  A.  No, he did not.

24  Q.  Now, if Shahram Ketabchi had been paid by one of those

25  businesses by check or wire transfer or in cash, would the IRS

IAV8KET1                          Bolus - Direct

1   automatically know about that?

2              MR. PAUL:  Objection.

3              THE COURT:  Sustained.

4   Q.  In general, is the IRS notified when someone is paid by

5   cash or check or wire transfer automatically?

6              MR. PAUL:  Objection.

7              THE COURT:  I will allow it.

8   Q.  You may answer.

9   A.  Not all the time, sir.

10  Q.  How might they learn -- you explained earlier, how do they

11  learn about people's income?

12  A.  Well, the IRS information return processing program by law

13  requires employers, financial institutions, mortgage lending

14  companies to report to the IRS annually any wages, income or

15  extra money that a person would have received during that tax

16  year.

17  Q.  If an individual receives a wire transfer of funds from an

18  employer, from their employer, and the employer does not report

19  it and the individual does not report it to the IRS, does the

20  IRS automatically somehow learn of that wire transfer?

21             MR. SCHMIDT:  Objection.

22  A.  No.

23             THE COURT:  Just a moment.

24             I will allow it.

25  Q.  Same question with respect to a cash deposit.  Would the

IAV8KET1                          Bolus - Direct

1   IRS automatically learn about it in that situation?

2   A.   It would depend on the amount of the cash deposit.  Then

3   the bank or the financial institution may be required to report

4   that information to the IRS.

5   Q.   If it's under $10,000, would they be required to report it?

6   A.   No.

7   Q.   When I say under $10,000, meaning per transaction, not in

8   aggregate?

9   A.   That's correct.  That would be pertaining to those banks or

10  financial institutions where that money may have been

11  deposited.

12  Q.   Same question with respect to a check.  If an employer

13  wrote a check to an employee and the employee deposited it or

14  cashed that check, would the IRS automatically know about that

15  check if the employer and the employee did not report it to the

16  IRS?

17  A.   No.

18  Q.   Do you know whether Shahram Ketabchi had additional income

19  for 2015 or 2016 that was not reported to the IRS?

20          MR. PAUL:  Objection.

21  A.   No, I don't.

22          THE COURT:  I will allow it.

23  Q.   Why don't you know that?

24  A.   Because I only know what was reported to the IRS through

25  the information return processing program.

IAV8KET1                        Bolus - Direct

1          MR. SOBELMAN:  Ms. Lee, could you please show the

2     witness what is marked as Government Exhibit 828.

3     Q.  Do you recognize this?

4     A.  Yes, I do.

5     Q.  What is it?

6     A.  So this document Exhibit 828, again, similar to the last

7     exhibit that we looked at, is a summarization for Andrew

8     Owimrin for the tax years 2013 through 2017.

9     Q.  Does this chart contain information from Government

10    Exhibits 821, 823 and 825 that are now in evidence?

11    A.  Yes, it does.

12    Q.  Does this chart accurately reflect the information that's

13    summarized?

14    A.  Yes, it does.

15          MR. SOBELMAN:  The government offers Government

16    Exhibit 827.

17          MR. SCHMIDT:  No objection.

18          MR. SOBELMAN:  Sorry.  828.

19          THE COURT:  828 is admitted.

20          (Government's Exhibit 828 received in evidence)

21          MR. SOBELMAN:  Ms. Lee, could you please display 828.

22    Q.  Mr. Bolus, let's just focus on 2014 through 2016 for a

23    moment.

24          For 2014, what was the IRS income threshold for filing

25    taxes?

IAV8KET1                          Bolus - Direct

1   A.  $10,150.

2   Q.  How much income was reported to the IRS by employers for

3   that year for Andrew Owimrin?

4   A.  $56,299.

5   Q.  Was Mr. Owimrin required to file taxes that year?

6   A.  Yes.

7   Q.  Did he?

8   A.  No.

9   Q.  For the tax year 2015, what was the IRS income threshold

10  for filing taxes?

11  A.  $10,300.

12  Q.  And how much income was reported to the IRS by Mr.

13  Owimrin's employers for that year?

14  A.  $72,549.

15  Q.  Was he required to file taxes that year?

16  A.  Yes.

17  Q.  Did he?

18  A.  No.

19  Q.  For 2016, what was the IRS income threshold for filing

20  taxes?

21  A.  $10,340.

22  Q.  How much income was reported to the IRS for Mr. Owimrin's

23  employers?

24  A.  $20,212.

25  Q.  Was he required to file taxes?

IAV8KET1                        Bolus - Direct

1  A.  Yes.

2  Q.  Did he?

3  A.  No.

4  Q.  Based on your review of the tax documents now in evidence,

5  was most of the income that Mr. Owimrin reported from one

6  source, or was it from many different sources, or somewhere in

7  between?

8  A.  A few sources, sir.

9  Q.  What were the principal sources of his income?

10 A.  A1 Business Consultants, I believe was the title, and Olive

11 Branch Marketing LLC.

12 Q.  If he had been paid by one of those businesses by check or

13 wire transfer or cash and they hadn't reported it to the IRS,

14 would the IRS somehow automatically become aware of those

15 payments?

16 A.  No, they wouldn't.

17 Q.  If he had been paid that way and his employer did not

18 report some of that income, would he himself have been required

19 to report that part of that income?

20 A.  Yes, he would.

21 Q.  Do you know whether Mr. Owimrin had any additional income

22 for 2014, 2015 or 2016 that was not reported to the IRS?

23 A.  The IRS is not aware of any other income, sir.

24 Q.  Why don't you know about it?

25 A.  Because it was not reported to the IRS by either financial

IAV8KET1                         Bolus - Cross

1    institutions or by Mr. Owimrin himself.

2    Q.  Aside from reviewing the tax documents that I have asked

3    you about, did you have any other involvement in the

4    investigation of this case?

5    A.  No, I did not.

6              MR. SOBELMAN:  No further questions.

7              THE COURT:  Any cross-examination of this witness?

8              Mr. Schmidt.

9    CROSS-EXAMINATION

10   BY MR. SCHMIDT:

11   Q.  Now, the column on 828 that says income reported to the IRS

12   by employers, I assume that would come from -- withdrawn.

13             What form would the employers file for the income to

14   be reported?

15   A.  So that column could derive from, and did derive from,

16   multiple documents, such as wage documents, W-2 forms, also

17   1099 forms for contractor payments made to Mr. Owimrin.

18   Q.  When it's paid in a W-2 form, taxes are withheld, is that

19   right?

20   A.  Yes, sir.

21   Q.  When it's paid --

22             THE COURT:  They are withheld by the employer?

23             THE WITNESS:  That's correct, sir.

24             MR. SCHMIDT:  Thank you, your Honor.

25   Q.  And when income is received as a contractor by way of a

IAV8KET1                          Bolus - Cross

1    1099, the employer does not withhold any money, is that

2    correct?

3    A.  That's correct.

4              THE COURT:  Would you tell the jury what a 1099 form

5    is.

6              THE WITNESS:  A form 1099 is a miscellaneous payment

7    by institutions, or it could by a person that pays someone for

8    contracted work other than a regular full-time employee.

9    Q.  It's also sometimes done by employers to avoid paying

10   payroll taxes and calling somebody not an employee but an

11   independent contractor?

12   A.  I don't know that, sir.

13   Q.  Do you know offhand how much of the income in 2014, '15 and

14   '16 were by W-2?

15   A.  Not without looking at it, but I if could see the exhibit I

16   could tell you exactly.

17   Q.  The other exhibit it shows that?

18   A.  Yes, sir.

19   Q.  Do you know if the form filed by the employer on the 1099

20   is accurate?

21   A.  It's as accurate as is reported to the IRS, sir.

22   Q.  All it is is that the employer reports the amount, right,

23   and the IRS accepts that for the purposes of the tax returns

24   unless they get other information, right?

25   A.  Yes, sir.

IAV8KET1                       Bolus - Cross

1   Q.  So the government asked you questions whether or not Mr.

2   Owimrin received other income other than what is stated on this

3   form.  Do you remember that?

4   A.  Yes, sir.

5   Q.  Also, you don't know whether Mr. Owimrin was required to

6   pay back some of the income received from his employer, do you?

7   A.  I do not know that.

8            MR. SCHMIDT:  I have no further questions.

9            THE COURT:  Mr. Paul.

10           MR. PAUL:  Just a couple, sir.

11  CROSS-EXAMINATION

12  BY MR. PAUL:

13           MR. PAUL:  Can we pull up Exhibit 827, please.

14  Q.  Sir, so I understand, looking at 2014, there is a threshold

15  of $10,150, is that right?

16  A.  Yes, sir.

17  Q.  So there was no requirement on the part of Mr. Ketabchi to

18  file taxes on that year, correct?

19  A.  No requirement based on the income that the IRS received by

20  payors.

21  Q.  Then 2015 there is a $10,300 threshold, correct?

22  A.  That's correct, sir.

23  Q.  And he is approximately what, 11,000 plus over that

24  threshold?

25  A.  Yes, sir.

IAV8KET1                        Bolus - Cross

1    Q.  So that's the difference of what he should have been -- he

2    should have been reporting, in other words, because of that

3    threshold amount?

4    A.  Yes, sir.

5              THE COURT:  Just a moment.

6              THE WITNESS:  If I could reanswer the question.

7              THE COURT:  Is $11,000, that is, the difference

8    between the threshold and the income reported by employers,

9    what he is liable for?

10             THE WITNESS:  The full amount $21,954 he is liable

11   for.

12   Q.  But he is over that threshold by approximately $11,000 in

13   order to have to file a tax return, right?

14   A.  Yes, sir.

15   Q.  The same with 2016, he is about $3,000 over the threshold?

16   A.  Yes.

17   Q.  As a consequence, he was supposed to file his return and

18   did not, is that your testimony?

19   A.  Yes, sir.

20   Q.  Now, do you know what employers specifically notified the

21   IRS about, for example, 2015 where there was income of 21,954?

22   A.  Yes.

23   Q.  What employers were they?

24   A.  If I could see the exhibits, they would be in 822 through

25   826.

1        MR. PAUL:  Can we put up 822?

2    Q.  Does that help you?

3    A.  No, sir.  The next one.

4    Q.  Go to the next one.

5    A.  And the next.

6        This document will help me if --

7    Q.  If we can see it, right?

8    A.  Yes.

9    Q.  Does help you?

10   A.  Yes, sir.

11   Q.  What employers were filing with the IRS for payments that

12   were sent to Mr. Ketabchi?

13   A.  So this document reflects the information returns

14   processing transcript for Shahram Ketabchi, and it was received

15   from Lyft, Inc. in the amount of $8,525.

16   Q.  So we still have a balance to go, right?

17   A.  Yes, sir.  And this was submitted by Form 1099Ks which are

18   third-party payor documents.

19   Q.  And that was, you said from Lyft, correct?

20   A.  Yes, sir.

21   Q.  And the balance of reporting to the IRS from employers, we

22   have to go to the next document?

23   A.  Yes, sir.

24   Q.  Tell us when.

25        I don't think that answers it.

IAV8KET1                          Bolus - Cross

1    A.  No, sir.

2    Q.  Can we go to the next one.

3            The next page, I think.

4            The next page, correct?

5    A.  Correct.

6    Q.  The next page.

7    A.  I would be looking for the information return processing

8    transcript, sir.  It's the computer printout, the first form we

9    were just talking about.

10   Q.  So that's what we are looking for?

11   A.  Yes, sir.

12   Q.  Go to the next page.

13           Tell us when we get there.

14   A.  You may have to start from the beginning.

15   Q.  I apologize.

16   A.  It might be early on.

17           MR. PAUL:  Can we go to the earlier exhibits.

18           MR. MITCHELL:  Can we go back to 824 and then go to

19   page 3.

20           MR. PAUL:  Thank you.

21           THE COURT:  Is that the page we just saw?

22           MR. MITCHELL:  No.

23           THE COURT:  I am asking the witness that.

24           MR. MITCHELL:  Sorry, your Honor.

25           THE WITNESS:  No, it's not, sir.

IAV8KET1                           Bolus - Cross

1    Q.   What does this exhibit show?

2    A.   This is also an information return processing transcript

3    for Shahram Ketabchi, and this shows income from Lyft, Inc. of

4    $3,136.

5    Q.   Are we at the total yet of 29,954?

6    A.   Not yet, sir.

7    Q.   Do you know as you sit here what the balance consisted of,

8    where it came from, what employer?

9    A.   Multiple, sir.

10   Q.   Sorry?

11   A.   There were multiple employers.

12   Q.   Were they all regarding taxi driving, as best as you can

13   recall?

14   A.   No, sir, they didn't.  I'd have to see them again to verify

15   that.

16   Q.   Let me show you 824.  Why don't you look through this

17   exhibit.

18   A.   Thank you, sir.

19            Sir, what tax year are you talking about in

20   particular?

21   Q.   I am talking about 2015.  Do you have those documents?

22   A.   Yes.

23   Q.   That's the first one we were talking about.

24            THE COURT:  Is your question what employers reported

25   giving Shahram Ketabchi income in 2015?

IAV8KET1                     Bolus - Cross

1          MR. PAUL:  Correct.

2          THE COURT:  So we know Lyft already.

3          MR. PAUL:  Correct.

4    A.  Rasier LLC at $19,734.

5          Then Rasier again had $2,220.

6    Q.  This is in 2015?

7    A.  Yes, sir.

8    Q.  What is Rasier, do you know?

9    A.  It says Rasier Lyft.  I don't know exactly without looking

10   up the merchant category code on it.

11         THE COURT:  Is Lyft spelled L-Y-F-T?

12         THE WITNESS:  Yes.

13         THE COURT:  So it's Rasier Lyft?

14         THE WITNESS:  Yes, sir.

15   Q.  Is that, as far as you know, a cab service?

16   A.  I do not.

17   Q.  Can we turn to 2016?  Do you have those documents in front

18   of you?  Is that part of that exhibit?

19   A.  Yes, it is.

20   Q.  And there was $13,538 reported by employers.  Do you know

21   which employers reported that?

22   A.  $750 by Lyft, Inc.  $896 by Rasier, Inc.

23         THE COURT:  Is that different?  Is that Rasier Lyft,

24   Inc. or Rasier, Inc.?

25         THE WITNESS:  They are listed -- one is an LLC and one

IAV8KET1                        Bolus - Cross

1    says Inc., your Honor.

2              THE COURT:  All right.

3    A.  Then there is Lyft, Inc. has $3,136.

4              Uber Technology, it says $360.

5              Then Rasier, LLC has 8,396.

6    Q.  You have heard of Uber, have you not?

7    A.  Yes, I have.

8    Q.  That's a taxi service?

9    A.  Yes.

10   Q.  You're not sure what Lyft is?

11   A.  I do not know what Lyft is, sir.

12   Q.  Do you know if Rasier is connected to Uber at all?

13   A.  I do not know, sir.

14             MR. PAUL:  I have nothing further.

15             THE COURT:  Government, anything?

16             MR. SOBELMAN:  No further questions, your Honor.

17             THE COURT:  Thank you, Mr. Bolus.  You may step down.

18   You are excused.

19             (Witness excused)

20             THE COURT:  Next witness for the government.

21             MS. KEARNEY:  The government calls Hayley Kronthal.

22    HAYLEY KRONTHAL,

23         called as a witness by the government,

24         having been duly sworn, testified as follows:

25             THE DEPUTY CLERK:  State your full name and spell your

IAV8KET1                        Kronthal - Direct

1    name for the record.

2              THE WITNESS:  Hayley Kronthal, H-A-Y-L-E-Y,

3    K-R-O-N-T-H-A-L.

4              THE COURT:  Good morning, Ms. Kronthal.  Welcome.

5              Your witness.

6    DIRECT EXAMINATION

7    BY MS. KEARNEY:

8    Q.  Good morning, Ms. Kronthal.

9    A.  Good morning.

10   Q.  Where do you work?

11   A.  I work at the U.S. Attorney's Office for the Southern

12   District of New York.

13   Q.  What do you do there, what is your job title?

14   A.  A paralegal specialist there.

15             THE COURT:  Could you put the microphone closer to

16   you.

17   Q.  What unit are you in?

18   A.  Money laundering and asset forfeiture.

19   Q.  In general, what are your duties and responsibilities as a

20   paralegal specialist in that unit?

21   A.  I draft a lot of orders, for example, substitute asset

22   orders, final orders of forfeiture, subpoenas, nondisclosure

23   orders, and I also help in pretrial investigations and pretrial

24   duties.

25   Q.  Have you done any work in connection with this

1   investigation and case?

2   A.  Yeah.

3   Q.  Have you worked with the folks at this front table here?

4   A.  Yes.

5   Q.  And with me?

6   A.  Yes.

7   Q.  Have you been present in the courtroom for portions of the

8   testimony of this case?

9   A.  Yes.

10  Q.  Ms. Kronthal, how old are you?

11  A.  I'm 23.

12  Q.  Are you familiar with something called Instagram?

13  A.  Yes.

14  Q.  What is Instagram?

15  A.  Instagram is a social media platform where you can post

16  pictures of your daily life and share them with friends and

17  followers.

18  Q.  Do you just post pictures or can you post other things as

19  well?

20  A.  You can post other things, like videos and comments.

21  Q.  Do you have an Instagram account?

22  A.  Yeah.

23  Q.  If someone wants to open an Instagram account, what do they

24  have to do?

25  A.  You can download the app on -- you go on your phone on the

1   app store and you download the Instagram app, and you log in

2   and create a user name and a password, and then you can start

3   posting.

4   Q.  Do you have to use a phone or can you also use a computer?

5   A.  You can use a computer.  You can use both.

6   Q.  You said you create a user name and a password?

7   A.  Yes.

8   Q.  Is there a particular term for a user's user name?

9   A.  Yes.  It's called a handle.

10  Q.  Does your handle have to be your real name or can it be

11  something different?

12  A.  It can be anything you want.

13  Q.  Is there a term for the information that's put on

14  Instagram?

15  A.  Yeah.  It's called posting, post a picture.

16  Q.  Based on your use and review of Instagram, when are

17  Instagram posts generally made in relation to the picture being

18  taken?

19  A.  It's usually instantaneous.  So if you take a picture, then

20  you post it within a couple of hours or right then and there.

21  Q.  Now, in connection with this case, have you been asked to

22  review the postings for two Instagram accounts?

23  A.  Yes.

24  Q.  What specifically were you asked to do with respect to

25  those accounts?

IAV8KET1                    Kronthal - Direct

1   A.  I was asked to look at the pictures and then go on and

2   check to see if those pictures were on those two particular

3   accounts.

4   Q.  Ms. Kronthal, could you please take a look at what I have

5   just handed you, specifically, Government Exhibits 713 through

6   716, 723 and 724.

7   A.  OK.

8   Q.  Do you recognize those?

9   A.  Yeah.

10  Q.  What are they?

11  A.  They are screenshots of an Instagram post.

12  Q.  Is that one of the posts that you were asked to review?

13  A.  Yes.

14          THE COURT:  What is a screenshot?

15          THE WITNESS:  A screenshot is a picture taken on the

16  computer where you can -- you see the image on the computer and

17  there is like a snipper tool and you can screenshot the

18  picture.

19  Q.  So it's an image of what was on the computer screen?

20  A.  Yes.

21  Q.  From what account or handle are the exhibits that we just

22  looked at?

23  A.  This one is from superstar_al_k.

24  Q.  Based on your review of that account, were you able to

25  determine the name of the user of that account?

IAV8KET1                          Kronthal - Direct

1   A.  Yes.

2   Q.  How were you able to do that?

3   A.  If you go to their profile, it says their name under their

4   handle.

5   Q.  What was the name listed under superstar_al_k?

6   A.  Arash Ketabchi.

7           MS. KEARNEY:  The government offers Government Exhibit

8   713 through 716, 723 and 724.

9           MR. SCHMIDT:  Your Honor, other than the previously

10  made objection, we have no further objection.

11          THE COURT:  It's admitted.  The sidebar is on the

12  record.

13          (Government's Exhibits 713, 714, 715, 716, 723 and 724

14  received in evidence)

15  Q.  Ms. Kronthal, could you please look at Government Exhibits

16  725 through 730.

17          Do you recognize those exhibits?

18  A.  Yeah.

19  Q.  What are they?

20  A.  They are also screenshots of an Instagram account, but this

21  time it's a different Instagram account.

22  Q.  Is it one of the accounts you were asked to review?

23  A.  Yes.

24  Q.  What is the account or handle?

25  A.  The handle for this one is Owimrin, but the O is spelled

1   with a zero, so it's 0wimrin.

2   Q.  Based on your review of that account, were you able to

3   determine the name of the user of 0wimrin?

4   A.  Yes.

5   Q.  How were you able to do that?

6   A.  The same thing.  You just click on Owimrin's handle and it

7   brings you to a profile and his name is underneath.

8   Q.  What was that name?

9   A.  Andrew Owimrin.

10          MS. KEARNEY:  The government offers Government Exhibit

11  725 through 730.

12          MR. SCHMIDT:  No objection.

13          THE COURT:  Hearing no objection, admitted.

14          (Government's Exhibits 725, 726, 727, 728, 729 and 730

15  received in evidence)

16          MS. KEARNEY:  Ms. Lee, can we please publish 713.

17          Could you zoom in as much as possible.

18  BY MS. KEARNEY:

19  Q.  Ms. Kronthal, can you describe what this image is?

20  A.  Sure.  It's a post from super_al_k and there is a picture

21  and comments.

22  Q.  Was the superstar_al_k account public or private?

23  A.  It was public.

24  Q.  What does it mean to have a public account?

25  A.  It means that anyone can go on and type in your handle and

IAV8KET1                    Kronthal - Direct

1    then look at all of your posts.

2    Q.  If you have a private account, what does that mean?

3    A.  That means that you have to accept follower request.  So if

4    someone wants to see your posts, they have to request to follow

5    you, and then you as that user have to accept them back and

6    then they can see it.

7    Q.  Kind of like a friend request?

8    A.  Yeah.

9    Q.  Let's look at the bottom.  It says "log in to like or

10   comment."  What does it mean to like an Instagram post?

11   A.  You see the heart right there.  If you like it, then it

12   likes the picture.  So it's kind of like in real life when you

13   like something, and you can do the same thing on a picture.

14   Q.  What does it mean to comment on an Instagram post?

15   A.  That means that you can add your comment.  It looks like

16   there is one comment here.  So you can just write something

17   about the post.

18   Q.  You say it looks like there is one comment.  Can you point

19   out where that is?

20   A.  Yes.  Right under the post -- on the right side it's the

21   last word.

22   Q.  Can you read the comment?

23   A.  The comment, sure.  It says "I hashtag pay attention."

24   Q.  Are you familiar with the term "hashtag"?

25   A.  Yes.

IAV8KET1                    Kronthal - Direct

1   Q.   What is a hashtag?

2   A.   A hashtag is a way to categorize and describe the picture.

3   Q.   What does a hashtag look like?

4   A.   The pound sign.

5   Q.   What is a hashtag used for?

6   A.   It's a way to categorize a picture and describe what is

7   going on.

8   Q.   So could you give us an example of a common hashtag?

9   A.   So, for example, it's Halloween today, and so a lot of

10  people will post hashtag Halloween, and it's a way to see

11  that -- let's say you're in a costume and you hash tag

12  Halloween.  It's a way to describe that you're not in a costume

13  for no reason, but you're celebrating the holiday Halloween.

14  Q.   Are there some hash tags that are in general used, and by

15  that I mean that most Instagram users know what they mean?

16  A.   Yes.

17  Q.   What is an example of a hashtag that's in general use?

18  A.   Hashtag TBT.

19  Q.   What would that mean?

20  A.   Throwback Thursday.

21  Q.   What would you be trying to indicate with that?

22  A.   That the picture that you're posting is of you when you

23  were younger or of an event when you were younger.  So you're

24  throwing it back to a time that isn't the present.

25  Q.   What about hashtag latergram?

1  A.  Yeah.  That's a hashtag too.

2  Q.  What does that indicate?

3  A.  That's when you take a picture, but you're not posting it

4  right then, you might be posting it a couple of days later or a

5  week later, a couple of weeks later.

6  Q.  You talked about hashtags that are in general use.  Are

7  there some hashtags that are not in general use?

8  A.  Yeah.

9  Q.  What would be an example of when you use a hashtag that is

10  not understood by everyone?

11  A.  If it's an inside joke with a friend.

12  Q.  Let's look back at the full picture of 713.

13          THE COURT:  Is there any use for a hashtag apart from

14  making whatever statement is being made by use of the hashtag?

15  Does that make sense?

16          THE WITNESS:  Would someone use a hashtag if they

17  weren't --

18          THE COURT:  No.  For example, hashtag Halloween, you

19  said people will do that today.

20          THE WITNESS:  Yeah.

21          THE COURT:  Can I, for example, click on that hashtag

22  Halloween and see all of the public Instagram posts where

23  somebody has put hashtag Halloween?

24          THE WITNESS:  Yes.  Exactly.

25          THE COURT:  So if you're making a political statement,

1   you're pro the environment or anti the environment, or whatever

2   it might be, somebody could, if they see that hashtag, click on

3   it and see everybody who has written, again, either hashtag pro

4   environment or hashtag anti environment, is that the idea?

5            THE WITNESS:  Yes.

6            THE COURT:  Are there hashtags used that way?

7            THE WITNESS:  Yes, there are.  Sometimes, yeah.

8            THE COURT:  What is the primary use of a hashtag, just

9   for people to look at it and to see Owimrin says I pay

10  attention?

11           THE WITNESS:  For this, if you click on hashtag pay

12  attention, that will populate other people who have used

13  hashtag pay attention.

14           (Continued on next page)

IAVJKET2                          Kronthal - direct

1    Q.  When you say "other people," you mean their profiles or the

2    post hash tag pay attention?

3    A.  Post hash tag pay attention.

4    Q.  You'll see a bunch of other pictures?

5    A.  Yes.

6            THE COURT:  Thank you.

7    Q.  Looking at Government Exhibit 713, who is the user who

8    posted this photograph?

9    A.  Superstar underscore A underscore K.

10   Q.  Underneath that name, there is some text.  Could you read

11   it.

12   A.  Yeah.  It says the killer 50 K a week is a light week for

13   him, exclamation points, hash tag pay attention, hash tag stay

14   focused, hash tag light work, hash tag look up.

15   Q.  There is something with an "at" sign.

16           What does that mean?

17   A.  He tagged another user.

18   Q.  What does that do to tag another user?

19   A.  That means it will tell that user, that it will give that

20   user a notification about this picture, that he was mentioned

21   in it or his handle is mentioned in the picture.

22           THE COURT:  So the person whose handle is Drew

23   underscore steady 456 will automatically receive Government

24   Exhibit 713 in that person's Instagram account?

25           THE WITNESS:  They'll get notified of that picture.

1    It might not be on Drew's Instagram, but he will be notified

2    that he was talked about in a different person's profile.

3            THE COURT:  In this instance, do you know what that

4    notification would say?

5            THE WITNESS:  I would say that Drew was tagged and

6    Superstar ALK's post of this photo so he can go click on it and

7    he can look at it right away.

8            THE COURT:  It is not sent to the tagged; simply the

9    tagged person is notified that he was tagged in Superstar

10   underscore A L Superstar K's Instagram account.  Is that right?

11           THE WITNESS:  Yes.

12           THE COURT:  Thank you.

13   BY MS. KEARNEY:

14   Q.  And then you talked about the comments from zero Owimrin.

15   What is the comment?

16   A.  I hash tag pay attention.

17   Q.  Ms. Lee, could we see the whole thing again.  Thank you.

18           THE COURT:  Now, before you move on, how does one

19   decide what hash tags to put on a post?

20           MR. SCHMIDT:  Objection, your Honor.  I assume that

21   lots of people have different reasons.

22           THE COURT:  Is that true, lots of people have

23   different reasons?

24           THE WITNESS:  Yes.

25           THE COURT:  Fair enough.  But, for example, if

1   somebody writes hash tag stay focused and misspells "focused,"

2   I assume there is no reason -- it is unlikely that there are

3   other posts out there that say hash tag stay focused with a

4   misspelling of "focused," right?

5        THE WITNESS:  It is possible that someone misspelled

6   it like that, and if you click on it, it will populate other

7   posts.

8        THE COURT:  All right.

9   BY MS. KEARNEY:

10  Q.  Let's take a look at the bottom on the right-hand side

11  underneath 24 likes.  There is a date?

12  A.  Yes.

13  Q.  Ms. Lee, could you zoom in on that.  Thank you.  What is

14  that date?

15  A.  May 26, 2015.

16  Q.  What does that tell you about this post?

17  A.  That means that it was posted on May 26, 2015.

18  Q.  Ms. Lee, we look at Government Exhibit 714.

19       THE COURT:  So on 713 it says 24 likes.  24 people

20  clicked on the heart when they got 713?

21       THE WITNESS:  Yes, 24 people.

22       THE COURT:  Is there some way for the Superstar

23  underscore A L underscore K to determine who those likers are?

24       THE WITNESS:  Yeah.  You click on the 24 likes, it

25  will show you what users like your picture.

IAVJKET2                        Kronthal - direct

1          THE COURT:  That is available to Superstar underscore

2     A underscore K?

3          THE WITNESS:  Yeah, but I can also Superstar ALK,

4     underscore the person.  I can also look at who liked that

5     picture.

6          THE COURT:  I can click on 24 likes and I will get a

7     list of the labels of those people of the likers?

8          THE WITNESS:  Yeah.

9          THE COURT:  Thank you.

10    BY MS. KEARNEY:

11    Q.  Let's look at 714.  Ms. Kronthal, who is the account who

12    made this post?

13    A.  Under superstar ALK?

14    Q.  Underneath that user name, it says the Westin Las Vegas,

15    Las Vegas hotel and Spa.  What is that?  Not what is the

16    Westin, but what does that indicate?

17    A.  That indicates a location tag.

18    Q.  How do you put a location tag on an Instagram post?

19    A.  It is an option when you're posting the picture, you can

20    add a location.  That means that you're there, that's where the

21    picture is taken.

22         THE COURT:  Is that something you type in or does a

23    GPS automatically put that in if you want it to?

24         THE WITNESS:  The GPS can put it in.

25    BY MS. KEARNEY:

1   Q.  Ms. Lee, could you zoom out again and zoom in at the

2   bottom-right-hand side.  What is the date on this post?

3   A.  May 3, 2015.

4   Q.  Look at Government Exhibit 715.  Who is the user who made

5   this post?

6   A.  Superstar ALK.

7   Q.  What is the location tag?

8   A.  The Encore, Las Vegas.

9   Q.  What is the date of this posting?

10  A.  May 2, 2015.

11  Q.  Look at Government Exhibit 716.  Who is the user who made

12  this post?

13  A.  Superstar ALK.

14  Q.  What is the date on this post?

15  A.  April 17, 2015.

16  Q.  Is there a location tag on this one?

17  A.  No.

18  Q.  Let's look at Government Exhibit 723.  Who is the user who

19  made this post?

20  A.  Superstar ALK.

21  Q.  What is the location tag on it?

22  A.  The Bank VIP at Bellagio.

23  Q.  What is the date on this post?

24  A.  April 23rd, 2016.

25  Q.  Let's look at Government Exhibit 724.  Who is the user who

IAVJKET2                         Kronthal - direct

1    made this post?

2    A.   Superstar ALK.

3    Q.   What is the date on this post?

4    A.   May 17th, 2014.

5    Q.   Now, could you flip through Government Exhibit 725 through

6    730 and remind us who is the user who posted these posts?

7    A.   0 Owimrin.

8    Q.   Was the 0 Owimrin account public or private?

9    A.   That was also public.

10   Q.   Let's look at 725.  Who is the user for this post?

11   A.   0 Owimrin.

12   Q.   What date was it posted?

13   A.   April 23rd, 2016.

14   Q.   What is the location tag?

15   A.   The Bank Nightclub at Bellagio.

16   Q.   Let's look at 726.  Who is the user who posted this?

17   A.   0 Owimrin.

18   Q.   The location tag?

19   A.   Lakeside at Wynn, Las Vegas.

20   Q.   Ms. Lee, could you stay on that comment.  In addition to

21   the text, there is a picture there.  What are those?

22   A.   Those are emojis.

23   Q.   What are they used for?

24   A.   To express your feelings.

25   Q.   What is the date on this post?

IAVJKET2                         Kronthal - direct

1   A.   April 22, 2016.

2   Q.   Look at 727.   Who is the user who made this post?

3   A.   0 Owimrin.

4   Q.   What is the location tag?

5   A.   The Encore in Las Vegas.

6   Q.   What is the date?

7   A.   The date is April 21, 2016.

8   Q.   Look at Government Exhibit 728.   Who is the user who made

9   this post?

10  A.   0 Owimrin.

11  Q.   Is there a location tag?

12  A.   No.

13  Q.   Ms. Lee, could you look at the comments for a second.   What

14  is that?

15  A.   It is a device you can put your phone in and take a picture

16  of yourself and take picture of yourself and friends without

17  having someone take one of you.

18  Q.   Here the message or the comment says hash tag selfie stick.

19  Is that an example of a hash tag?

20  A.   Yeah.

21  Q.   There is some smiley faces?

22  A.   Yeah.

23  Q.   What are those?

24  A.   Emojis.

25  Q.   What is the date on this post?

IAVJKET2                        Kronthal - direct

1   A.  June 2, 2015.

2   Q.  Look at Government Exhibit 729.  Who is the user made this

3   post?

4   A.  O Owimrin.

5   Q.  What is the date on this post?

6   A.  June 2, 2015.

7   Q.  Look back at the comments on this one.  Here in addition to

8   hash tag selfie stick, it says at Superstar ALK.  Would you

9   describe to us what is happening there.

10  A.  Sure.  So O Owimrin, that user tagged Superstar, that other

11  user tagged Supperstar A underscore K, so that Superstar would

12  get a notification about this picture or this post.

13  Q.  Did I ask you the date on this post?

14  A.  It is June 2, 2015.

15  Q.  Let's look at Government Exhibit 730.  Who is the user that

16  made this post?

17  A.  O Owimrin.

18  Q.  What is the date on the post?

19  A.  June 2, 2015.

20  Q.  Just one moment.

21          (Off-the-record discussion)

22          MS. KEARNEY:  No further questions.

23          THE COURT:  Is there any cross-examination of this

24  witness?

25          MR. SCHMIDT:  Yes, your Honor.

IAVJKET2                          Kronthal - cross

1    CROSS EXAMINATION

2    BY MR. SCHMIDT:

3    Q.   Good morning.

4    A.   Good morning.

5    Q.   Now, we looked at a number of photographs that Mr. Arash

6    Ketabchi put in where he misspelled "focus" in in stay focused,

7    all right?

8    A.   Yes.

9    Q.   Now, you looked through more photographs than the ones that

10   were actually put into evidence.  Is that correct?

11   A.   Yes.

12   Q.   In fact, there are Government Exhibits 717 through 722 that

13   were not entered into evidence, are also photographs put up by

14   Arash Ketabchi.  Is that correct?  You just looked at them?

15   A.   Yes.

16   Q.   Those are all family-type photographs.  Is that right?

17   A.   I don't know who he is or his family is.  I don't know the

18   people in the picture.

19   Q.   717 is a photograph of doctor --

20            MS. KEARNEY:  Objection, your Honor.

21            THE COURT:  Just a moment.

22            THE COURT:  I don't see 717 up here, sir.

23            MR. SCHMIDT:  It is not in evidence.

24            THE COURT:  So what are you doing?

25            MR. SCHMIDT:  Trying to complete the picture of --

IAVJKET2                         Kronthal - cross

1              THE COURT:  Do you want to put it in evidence?

2              MR. SCHMIDT:  I'll put that in evidence, yes.  I will

3    put in 717 to 722 into evidence.

4              THE COURT:  Any objection?

5              MS. KEARNEY:  No objection.

6              THE COURT:  717 to 722 admitted.

7              (Government's Exhibits 717 through 722 received in

8    evidence)

9              MR. SCHMIDT:  Now, can we just go through those, the

10   six of them every second or so.

11             (Pause)

12   BY MR. SCHMIDT:

13   Q.  Now, on each of those photographs, Mr. Arash Ketabchi also

14   does hash tag pay attention, hash tag stay focused and hash tag

15   light work.  Is that right?

16   A.  Yeah, in Government Exhibit 717.

17   Q.  Actually, in 721 it is spelled correctly, isn't it?

18             THE COURT:  Please put 721 up.

19             (Pause)

20   BY MR. SCHMIDT:

21   Q.  Stay "focused" is actually spelled correctly?

22   A.  Yes.

23   Q.  But on the other ones, stay focused is spelled with two Cs?

24   A.  Yes.

25   Q.  So on all of -- now, the correct spelling of stay focused,

IAVJKET2                        Kronthal - cross

1   did you check on how many, is it called users?

2           What is it actually called, people who would get

3   access to that hash tag?

4   A.  Who could see it?

5   Q.  Yes, the people who joined this --

6   A.  Yeah, it would be users could see it.

7   Q.  Stay focused has 2 million 800 users, don't they?

8   A.  I don't know.

9   Q.  You haven't checked?

10  A.  No.

11  Q.  Pay attention, you know, has almost 849,000, or have you

12  not checked?

13  A.  I don't know.

14  Q.  You haven't checked the amount of users on any of these

15  hash tags to see if it is a small group or it's a huge group of

16  people?

17  A.  Who used that hash tag?

18  Q.  Yes.

19  A.  Yeah, I don't know who uses that.

20  Q.  So if a hash tag is used by -- (Pause)

21          (Off-the-record discussion).

22  BY MR. SCHMIDT:

23  Q.  You didn't check the results of any of the hash tags used

24  either by Arash Ketabchi or Andrew Owimrin.  Is that correct?

25  A.  I didn't click on hash tag.

IAVJKET2                    Kronthal - cross

1   Q.  Before there was some question about using a hash tag could

2   be used as an inside joke, unquote.  Do you remember saying

3   that?

4   A.  Yeah.

5   Q.  Now, if the hash tag has 2 million 800,000 members, it is a

6   pretty large inside joke.  Wouldn't you say so?

7            MS. KEARNEY:  Objection.

8            MR. SCHMIDT:  I'll withdraw the question.

9   BY MR. SCHMIDT:

10  Q.  It doesn't have to be an inside joke; it could just be

11  something that lots of people follow, right?

12  A.  I don't know.

13           THE COURT:  Now, look at 721.  Do you see 721?

14           THE WITNESS:  Yes.

15           THE COURT:  It is a post by Superstar ALK, correct?

16           THE WITNESS:  Yes.

17           THE COURT:  So did he post four different posts using

18  that same picture?  Is that what that indicates?

19           THE WITNESS:  No.  It is one picture.  I think he only

20  posted it once, but he hash tagged different phrases.

21           THE COURT:  No, not hash tag.  There are "at," there

22  is the "at" sign?

23           THE WITNESS:  I see.  He commented on it four

24  different times, but he only posted it once.

25           THE COURT:  Are the four different comments different

IAVJKET2                        Kronthal - cross

1    times or at the time of the posting?

2              THE WITNESS:  It doesn't give me a time, so I don't

3    know when he commented on the post, but if he posted

4    instantaneously and people commented on it, then he can comment

5    back whenever he feels like it.

6              THE COURT:  So at a later time?

7              THE WITNESS:  Yes, or whenever, yeah, or that date or

8    later.

9              THE COURT:  Okay.  And this, you can't tell when those

10   comments were put on it from what you have here?

11             THE WITNESS:  From what I have here, no.

12             THE COURT:  Now, look at the second comment.  I am

13   just trying to understand this.  Superstar ALK, at meeeskiki.

14   That is another user?

15             THE WITNESS:  Yes.

16             THE COURT:  And by putting that on there, he is

17   sending the fact that meeeskiki was noted in 721.  Is that

18   right?

19             THE WITNESS:  Yes.

20             THE COURT:  And then he says oh, hey, yeah, just got

21   here with my girl for a mini vaca.  That one I know.

22             And so that's not only going to meeeskiki, right?

23   That is going to who?

24             THE WITNESS:  That is for the public to see because

25   his account is public.

1    THE COURT:  So if I had an account, I could see this?

2    THE WITNESS:  Yes.

3    THE COURT:  If I were a user of Instagram, I could see

4  this?

5    THE WITNESS:  Yes.

6    THE COURT:  Okay.  Thank you.

7  BY MR. SCHMIDT:

8  Q.  Those are all, though, written by Superstar, right?

9  A.  Yes.

10 Q.  Do we not see the other comments, if there are any, would

11 they be there?

12 A.  Not necessarily.  Someone can delete their comment, but it

13 looks like these are only comments from Superstar.

14 Q.  So like one his Honor was talking about meeeskiki, that

15 would be just sent to notification, would just be sent to

16 meeeskiki?

17 A.  The notification would be.

18 Q.  Right.  As opposed to if you have a hash tag, everybody

19 under the hash tag would actually get it?

20 A.  Well, no.  So if you have a hash tag, people that use that

21 hash tag don't get a notification every time it is used.  There

22 is no notification there.

23 Q.  But they can access it?

24 A.  If you click on it.

25 Q.  This one, no one would -- it is not being sent to a group,

IAVJKET2                        Kandar – direct

1   but it is open, so anybody could go and look at it if they

2   wanted to click on Superstar AK?

3   A.  Yes.

4           MR. SCHMIDT:  I have nothing further.

5           MR. PAUL:  No questions, your Honor.

6           THE COURT:  Any redirect?

7           MS. KEARNEY:  No.  Thank your Honor.

8           THE COURT:  Thank you, Ms. Kronthal.  You may step

9   down.  Thank you for the education.

10          (Witness excused)

11          THE COURT:  Next witness for the government, please.

12          MR. SOBELMAN:  The government calls David Kandar.

13   DAVID KANDAR,

14       called as a witness by the Government,

15       having been duly sworn, testified as follows:

16   DIRECT EXAMINATION

17   BY MR. SOBELMAN:

18   Q.  Good morning, Mr. Kandar.

19   A.  Good morning.

20   Q.  Where do you live?

21   A.  Bel Canto, Massachusetts.

22   Q.  What is your educational background?

23   A.  I have a masters degree in English.

24   Q.  Are you employed?

25   A.  Yes.

IAVJKET2                          Kandar – direct

1   Q.  Where do you work?

2   A.  Avalon High School.

3   Q.  Where is Avalon?

4   A.  That is in Massachusetts, not too far from Springfield.

5   Q.  What is your job at Avalon High School?

6   A.  I teach high school English.

7   Q.  I would like to ask you some questions about your mother.

8   What is her name?

9   A.  Patricia A. Cabral.

10  Q.  Who --

11          THE COURT:  How do you spell her last name, sir?

12          THE WITNESS:  C A B R A L.

13          THE COURT:  Thank you.

14  BY MR. SOBELMAN:

15  Q.  How old is she?

16  A.  86.

17  Q.  Where does she live?

18  A.  Waltham Crossing Nursing Home, Waltham, Massachusetts.

19  Q.  Has your mother ever run her own business?

20  A.  No.

21  Q.  Has she ever expressed an interest you to you in starting

22  her own business?

23  A.  No.

24  Q.  Did there come a time when you learned she might have paid

25  money to telemarketing companies?

IAVJKET2                      Kandar - direct

1    A.   Yes.

2    Q.   Approximately when did you learn about it?

3    A.   November of 2015.

4    Q.   Do you recall the names of any of those companies?

5         MR. SCHMIDT:  Objection, your Honor.

6    A.   I do.

7         THE COURT:  Just a moment.  When there is an

8    objection, if you would pause and I have to make a

9    determination about a legal issue.

10        THE WITNESS:  Okay.

11        THE COURT:  I will allow that.  You may answer sir.

12   A.   I do.

13   Q.   What are the names you recall?

14        MR. SCHMIDT:  Objection.

15        THE COURT:  Basis?

16        MR. SCHMIDT:  Hearsay.

17        THE COURT:  I will allow that.  You may answer.

18   A.   A1 Business Consultants, Morning Break, Vibrant Solutions,

19   something called CRF, and off the top of my head I can't

20   remember any more.

21   Q.   I am going to ask you some questions about the first one

22   you mentioned, A1 Business Consultants.

23        How did you first learn that your mother might have

24   paid money to A1?

25   A.   There was a family friend visiting my mother when she was

IAVJKET2                          Kandar - direct

1   still living at the house, and he overheard her arguing with

2   someone over the phone about money specifically, and he didn't

3   like what he heard, so he called me and told me I should call

4   my mother and try to find out what is going on.

5   Q.  What, if anything, did you do next?

6   A.  I called my mother and told her I would be down the next

7   day to talk to her about everything that was going on.

8   Q.  What did you do next?

9   A.  When I went down and talk to her, I interviewed her at

10  length about what it was she had done, who she was talking to

11  and what sort of paperwork she had.

12  Q.  Why did you go visit her that day?

13  A.  I was concerned that she was being taken advantage of and

14  paying monies to supposed businesses that didn't exist.

15  Q.  What, if anything, did you do when you arrived to visit

16  her?

17  A.  When I first got there, I just talked to her about what she

18  was doing and then we started looking at a lot of paperwork

19  that she had been given by A1 and we also looked at her credit

20  card statements.

21  Q.  Ms. Lee, would you please display for the witness what is

22  marked for identification as Government Exhibit 120.

23          Mr. Kandar, do you recognize this?

24  A.  Yes.

25  Q.  What is it?

IAVJKET2                          Kandar - direct

```
 1    A.   It is a Product and Services Agreement with A1 Business
 2    Consultants.  I remember looking at this with my mother.
 3    Q.   Is this one of the documents you received from your mother
 4    that day?
 5    A.   Yes.
 6    Q.   Is it a fair and accurate copy of that document?
 7    A.   Yes.
 8            MR. SOBELMAN:  The government offers Government
 9    Exhibit 120.
10            MR. SCHMIDT:  No objection.
11            THE COURT:  Admitted without objection.
12            (Government's Exhibit 120 received in evidence)
13    BY MR. SOBELMAN:
14    Q.   Ms. Lee, could you please display it for the jury.
15            Mr. Kandar, can you read the title of this document?
16    A.   "Product and Services Agreement with A1 Business
17    Consultants, LLC."
18    Q.   Whose name is listed in the first paragraph?
19    A.   My mother's, Patricia Cabral.
20    Q.   What is the date on this document?
21    A.   The 12th day of October, 2015.
22    Q.   What is the cost listed under products/services?
23    A.   $9,995.00.
24    Q.   Could you please read the services provided under services
25    provided?
```

IAVJKET2                          Kandar - direct

1    A.   Business plan, Corp. Credit, and bookkeeping.

2    Q.   Do you know what "business plan" means in this context?

3    A.   No.

4    Q.   Do you know what "Corp. Credit" means in this context?

5    A.   No.

6    Q.   As far as you know, was your mother in need of bookkeeping

7    services at that time?

8               MR. SCHMIDT:  Objection.

9               THE COURT:  Sustained.

10   BY MR. SOBELMAN:

11   Q.   Let's take a look at Page 3.  Mr. Kandar, do you recognize

12   the handwriting on this page?

13   A.   Yes.

14   Q.   Whose handwriting is it?

15   A.   It is my mother's.

16   Q.   Ms. Lee, can you please show the witness what is marked for

17   identification as Government Exhibit 121.

18               Ms. Lee, please show the witness -- sorry.

19   Mr. Kandar, do you recognize this?

20   A.   Yes.

21   Q.   What is it?

22   A.   It is a Hanscom Federal Credit Union Visa credit card

23   statement.

24   Q.   Is this another one of the documents your mother provided

25   to you at the time you went to visit her?

IAVJKET2                          Kandar - direct

1   A.  Yes.

2   Q.  Is it a fair and accurate copy of that document as it was

3   provided to you by your mother?

4   A.  Yes.

5            MR. SOBELMAN:  Your Honor, the government offers

6   Government Exhibit 121?

7            MR. SCHMIDT:  No objection.

8            THE COURT:  Admitted.

9            (Government's Exhibit 121 received in evidence)

10           MR. SOBELMAN:  Ms. Lee, please display it for the

11  jury.

12  BY MR. SOBELMAN:

13  Q.  Mr. Kandar, please read where this is from in the

14  upper-left-hand corner?

15  A.  Hanscom Federal Credit Union.

16  Q.  What type of credit card is this for.

17  A.  Visa platinum credit card.

18  Q.  Whose name appears in the address field?

19  A.  Patricia A. Cabral, my mother.

20  Q.  Whose handwriting do we see on this document?

21  A.  My mother's.

22  Q.  What is the date in the upper-right-hand corner?

23  A.  The --

24  Q.  The statement date?

25  A.  10-31-15.

IAVJKET2                         Kandar - direct

1   Q.  What is the credit limit listed underneath that?

2   A.  $14,500.

3   Q.  What is the unused credit available listed beneath that?

4   A.  Zero.

5   Q.  In the top middle of the page, how much is the amount over

6   credit limit?

7   A.  $7,552.43.

8   Q.  Looking to a list of transactions, if you could focus on

9   the one that lists A1 Business Consultants.

10          Can you please read us the charge date, postdate and

11  the amount?

12  A.  The charge date is 10-14, postdate is 10-16, and the amount

13  is $9,995.00.

14  Q.  Is that the same amount listed on the contract we looked

15  at?

16  A.  Yes.

17  Q.  What, if anything, did you do after receiving the contract

18  and this credit card Bill?

19  A.  I talked to my mother about them.  I asked her for any

20  information she had on these supposed businesses, and I started

21  trying to contact them about getting a refund.

22          THE COURT:  Who is "them"?

23          THE WITNESS:  A1 Business Consultants in this instance

24  right here.

25  BY MR. SOBELMAN:

IAVJKET2                       Kandar - direct

1   Q.  Did you contact the other companies that have circled

2   amounts on the bill as well?

3   A.  Yes.

4   Q.  I am going to ask you just about A1 for the moment.  Who,

5   if anyone, did you speak with at A1?

6   A.  The two names that I recall are Connor Wasson, as I wrote

7   it down and Zack Peterson.

8   Q.  Do you know whether those were their real names?

9   A.  I have no idea.

10  Q.  Approximately how many times did you speak with Connor

11  Wasson?

12  A.  I believe around three times.

13  Q.  What do you recall from your conversations with him?

14  A.  He acted very sympathetic towards the information I was

15  telling him about my mother's physical and mental condition,

16  and he suggested ultimately that I talked to Zack Peterson.

17  Q.  Did there come a time when you did speak with Zack

18  Peterson?

19  A.  Yes.

20          THE COURT:  What was her physical and mental condition

21  at that time, which was October 2015.  Is that right?  Was that

22  in October 2015?

23          THE WITNESS:  Yeah, at that time my mother was using a

24  walker.  She had seven back operations.  She was frequently

25  dehydrated.  She has been in and out of the emergency room a

IAVJKET2                    Kandar - direct

1    number of times over the last seven years, truthfully, and she

2    is now in a nursing home.

3              THE COURT:  What was her mental condition in October

4    of 2015?

5              THE WITNESS:  The dehydration that she frequently

6    endured because she is also incontinent, and so she would be

7    afraid to drink too much, made her mind cloudy, made her not

8    understand things, and she frequently would get confused.

9              THE COURT:  Next question.

10   BY MR. SOBELMAN:

11   Q.  Let's take a look at Government Exhibit 512 in evidence.

12   If you could zoom in.  Is that possible?  We can go to the

13   bottom email on the page of the three.  Mr. Kandar, have you

14   ever seen this before?

15   A.  No.

16   Q.  Did I show this to you before right now?

17   A.  No.

18   Q.  Can you please read the date on the top of the email.

19   A.  Friday, December 4th, 2015, at 11:15 am.

20   Q.  What is the email address listed next to it?

21   A.  Steve at A1 Business Consultants dot com.

22   Q.  Is that an email address you're familiar with?

23   A.  No.

24   Q.  Can you please read the email.

25   A.  High, Brian.  I hope you are doing well.  Can you please

1    send us the POF for Patricia Cabral today.  Thank you and have

2    an amazing day.  Best of regards, Steve K.

3    Q.  Do you know what POF means in this context?

4    A.  No.

5    Q.  Ms. Lee, can you please look at the email right above that

6    in the middle of the page.  Mr. Kandar, is there a date and

7    time on this e-mail?

8    A.  On Friday, December 4th, 2015, at 12:39 pm.

9    Q.  What email address is it from?

10   A.  Brian at your business dot training.

11   Q.  Is that an email address you're familiar with?

12   A.  No.

13   Q.  Would you please read the email.

14   A.  I can only assume by POF you're referring to the safe word.

15   Patricia's safe word is Danny.

16   Q.  Ms. lee, please go to the top email on the page.

17          Mr. Kandar, what is the date on this email?

18   A.  Friday, 4 December 2015.

19   Q.  What is the subject line?

20   A.  POF request for new CB.

21   Q.  Do you know what CB means in this context?

22   A.  No.

23   Q.  What is the email address it is from?

24   A.  Brian at your business dot training.

25   Q.  Who is it to?

IAVJKET2                        Kandar - direct

1   A.   Steve at A1 Business Consultants dot com.

2   Q.   What email addresses are on the CC?

3   A.   Ketabchi dot Arash at Gmail dot com, Arash at A1 Business

4   Consultants dot com.

5   Q.   Are you familiar with these names or email addresses?

6   A.   No.

7   Q.   Would you please read the email.

8   A.   Just read the notes on client and I wanted to give you a

9   heads-up.  She has cancel pending.  Her son is claiming she has

10  dementia and is in the process of getting power of attorney so

11  she can cancel.

12  Q.   Did there come a time when you spoke to Zack Peterson?

13  A.   Yes.

14  Q.   Approximately how many times did you speak to Zack

15  Peterson?

16  A.   I don't remember exactly, probably around a dozen or so.

17  Q.   When you first spoke with Mr. Peterson, what, if anything,

18  did you tell him?

19  A.   I explained to him my mother's physical condition and

20  mental condition, and he acted very concerned.

21  Q.   What, if anything, did you ask Mr. Peterson for at that

22  time?

23  A.   I asked her for a refund based on my mother's physical and

24  mental condition.

25  Q.   How did Mr. Peterson respond to that request?

IAVJKET2                          Kandar - direct

1   A.  He did not want to give a refund.  He told me that she -- I

2   can't remember the exact words, but he showed me her driver's

3   license and said she looked fine, and he was not going to rule

4   right then and there whether she was eligible to create her own

5   business.

6   Q.  You said he showed you her driver's license?

7   A.  Yes, he did.

8   Q.  Did you speak with him over the phone or was it in person?

9   A.  I spoke to him over the phone, and he showed me her

10  driver's license over the email.

11  Q.  When you say "her driver's license," you mean a photograph

12  of it?

13  A.  Photograph of her driver's license, yes.

14  Q.  What did he say about that photograph?

15          MR. SCHMIDT:  Asked and answered, your Honor.

16          THE COURT:  I'll allow it.  Apart from she looked

17  fine, did he say anything else?

18          THE WITNESS:  About the photograph?

19          THE COURT:  Yes.

20          THE WITNESS:  No.

21          THE COURT:  Next question.

22  BY MR. SOBELMAN:

23  Q.  Did there come a time when you contacted Hanscom Federal

24  Credit Union about A1's charge your mother's credit card?

25  A.  Yes.

IAVJKET2                          Kandar - direct

1   Q.  Why did you contact them?

2   A.  I contacted them because I was afraid she was being taken

3   advantage of.

4   Q.  What, if anything, happened during your conversations with

5   them?

6           MR. SCHMIDT:  Objection, your Honor.  I think the

7   attempt to -- hearsay.  I object to some other things.

8           THE COURT:  Just a moment.  Sidebar quickly.

9           MR. SOBELMAN:  I can ask it in a different way.  I am

10  not looking to elicit hearsay.

11  BY MR. SOBELMAN:

12  Q.  What, if anything, did you ask them to do during your

13  conversations with them?.

14  A.  I asked them for advice regarding what had happened, and

15  they suggested --

16          MR. SCHMIDT:  Objection, your Honor.

17          THE COURT:  The question is what did you say to them.

18          THE WITNESS:  What did I say to them?  I asked them

19  for advice.

20  BY MR. SOBELMAN:

21  Q.  What, if any, steps did you take with them with respect to

22  those charges?

23  A.  I asked them to charge back the money and dispute it that

24  way.

25  Q.  Why?

IAVJKET2                         Kandar - direct

1    A.   Because I felt she was being subjected to fraud.

2    Q.   After contacting Hanscom, did you speak with Mr. Peterson

3    again?

4    A.   Yes.

5    Q.   What, if anything, did Mr. Peterson say about a refund at

6    that time?

7    A.   He talked about specifically he had to talk to their people

8    there, their attorneys and others who were decision-makers

9    about the possibility of a refund.  He eventually told me that

10   he would give us a $3,000 refund if we pulled back the

11   Charge-backs with Hanscom.

12   Q.   How did you respond to Mr. Peterson's suggestion?

13   A.   I told him we wanted a full refund.

14   Q.   Why?

15           MR. SCHMIDT:  Objection, your Honor.

16           THE COURT:  No.  I will allow that.  Why did you

17   request a full refund?

18           THE WITNESS:  Because my mother deserved a full refund

19   based on the fact that she didn't really know what she was

20   doing.

21   BY MR. SOBELMAN:

22   Q.   Did you talk to Mr. Peterson again after that?

23   A.   Yes.

24   Q.   What, if any, suggestions did me make at that time

25   regarding a refund?

1    A.  The last time that I spoke with him, he suggested that my

2    mother declare bankruptcy and they would give us a $3,000

3    refund still and we would both win.

4    Q.  How did you respond to Mr. Peterson's suggestion?

5    A.  I didn't know what to say.

6    Q.  Why?

7    A.  Because I felt I was being asked to commit fraud.

8    Q.  In total, approximately how much did your mother pay to A1

9    and the other telemarketing companies?

10   A.  You see, this is the frustrating thing because I don't know

11   that I can come up with an exact figure.  I believe it is

12   around $30,000.

13   Q.  Did she make that money back --

14           THE COURT:  Did she receive that money back?

15           THE WITNESS:  Not all of it.

16   Q.  The question specifically is did she make any of that money

17   back in profits from the --

18           THE COURT:  I am sorry.  I didn't realize.

19           MR. SOBELMAN:  That is okay, your Honor.

20           THE COURT:  Yes, it is.

21           THE WITNESS:  Would you mind saying that?

22   BY MR. SOBELMAN:

23   Q.  Let me rephrase.

24           Did your mother make any of the money that she spent,

25   the approximately $30,000 back in profits or revenue from any

IAVJKET2                          Kandar – direct

1   of the supposed businesses that she invested in?

2   A.  No.

3   Q.  Did she make any money?

4   A.  No.

5   Q.  Ultimately, did A1 give you or her any of the money back

6   that she paid to them?

7   A.  No.

8   Q.  Did Hanscom make your mother pay the charge to A1?

9   A.  No.

10  Q.  Throughout your communications with Zack Peterson, did he

11  read you any voice-mails?

12  A.  Yes.

13  Q.  Mr. Kandar, I am going to hand you what are marked as

14  Government Exhibits 122, 123, 124 and 125.  Do you recognize

15  these?

16  A.  Yes.

17  Q.  What are they?

18  A.  They're recordings of the voice-mail messages left on my

19  phone.

20  Q.  Did you have an opportunity to listen to the audio files on

21  these four desks in preparation for your testimony today?

22  A.  Yes.

23  Q.  How do you know that you reviewed these particular discs?

24  A.  My initials are on the disks.

25  Q.  Who wrote those initials?

IAVJKET2                        Kandar - direct

1   A.  Me.

2   Q.  Are the audio files on these disks fair and accurate copies

3   of voice mails you received from Zack Peterson?

4   A.  Yes.

5             MR. SOBELMAN:  Your Honor, the government offers

6   Government Exhibit 122, which was previously offered subject to

7   connection, and Government Exhibits 123, 124 and 125.

8             MR. SCHMIDT:  No objection.

9             MR. PAUL:  No objection.

10            THE COURT:  Admitted without objection.

11            (Government's Exhibits 122, 123, 124 and 125 received

12  in evidence)

13            MR. SOBELMAN:  Can you please hand out copies of

14  122-T, which was previously offered.

15            THE COURT:  Is that the only T you're offering at this

16  point?

17            MR. SOBELMAN:  There are going to be three others in a

18  moment.  This was was previously offered.  There are three

19  Mr. Kandar viewed we will offer in a few minutes.

20            THE COURT:  Was it admitted as an aid already?

21            MR. SOBELMAN:  122-T was admitted as an aid previously

22  in this trial.

23            THE COURT:  Fine.

24            THE COURT:  You understand, ladies and gentlemen of

25  the jury, right, this is simply to assist you in listening to

IAVJKET2                          Kandar - direct

1    the audio file.  The transcripts in your hands are not evidence

2    themselves.

3              MR. SOBELMAN:  Ms. Lee, please display what is already

4    offered as 122-T.

5    BY MR. SOBELMAN:

6    Q.  Mr. Kandar, on what date did you receive the the voice-mail

7    transcribed here?

8    A.  November 3rd, 2015.

9              MR. SOBELMAN:  Ms. Lee, can you please play the first

10   minute and two seconds of Government Exhibit 122.

11             (Audio played)

12   BY MR. SOBELMAN:

13   Q.  What was your understanding of the message left on this

14   voice-mail?

15   A.  My understanding was that he was going to work on trying to

16   get us at least a partial refund.

17   Q.  Did that come to fruition?

18   A.  No.

19             MR. SOBELMAN:  Ms. Lee, please play the remainder of

20   Government Exhibit 122.

21             (Audio played)

22   BY MR. SOBELMAN:

23   Q.  Mr. Kandar, what is your understanding of whether that

24   portion of the voice-mail was intentionally left for you?

25   A.  It was not intentionally left, I believe.

IAVJKET2                         Kandar – direct

1  Q.  Are you able to identify all of the voices on that

2  recording?

3  A.  No.

4  Q.  Ms. Lee, can you please display -- let me ask this first.

5          In preparation for your testimony today, did you have

6  an opportunity to review draft transcripts of recordings that

7  are in evidence as 123, 124 and 125?

8  A.  Yes.

9  Q.  Ms. Lee, just display the first pages of those transcripts

10  for Mr. Kandar, just for Mr. Kandar.  Those were marked as

11  Government Exhibits 123-T, 124-T and 125-T?

12  A.  There is nothing there yet.

13  Q.  Perhaps you can display the substantive pages in the

14  transcripts for the witness.

15          Can you see that on your screen?

16  A.  Yes.

17  Q.  Are these the three transcripts you reviewed?

18  A.  Yes.

19  Q.  Did you have the opportunity to compare the accuracy of

20  these transcripts to the audio recordings that they correspond

21  to?

22  A.  Yes.

23  Q.  Were they accurate?

24  A.  Yes.

25          MR. SOBELMAN:  The government offers Government

IAVJKET2                          Kandar - direct

1  Exhibits 123-T, 124-T and 125-T as aids to the jury.

2          THE COURT:  Hearing no objection, I am going to admit

3  them for that purpose as aids to you.  Again what you hear is

4  the evidence, not what is on the transcript.

5          (Government's Exhibits 123-T, 124-T and 125-T received

6  in evidence)

7          MR. SOBELMAN:  May I have permission to distribute

8  copies to the jury?

9          THE COURT:  Yes.

10          MR. SOBELMAN:  Ms. Lee, please display Government

11  Exhibit 123-T.

12  Q.  On what date did you receive the voice-mail that is

13  transcribed here?

14  A.  November 11th, 2015.

15  Q.  Who is it left by?

16  A.  Zack Peterson.

17  Q.  Ms. Lee, please --

18          THE COURT:  Approximately how long after the

19  conversation that was just played was this, the conversation

20  reflected in 123?  That is not --

21          MR. SOBELMAN:  Perhaps I can help answer the question,

22  your Honor, by putting up the exhibit.

23          THE COURT:  Can you answer my question?  How long

24  after the tape that we just heard was the tape in this

25  transcript, if you know?

IAVJKET2                         Kandar – direct

1            THE WITNESS:  You mean how many --

2            THE COURT:  Months, years, days?

3            THE WITNESS:  I never arranged any of the voice-mail

4    messages I got in 2015.  It wasn't until, I don't know,

5    September, until this all started.

6            THE COURT:  How soon after the first conversation did

7    the second conversation take place?

8            THE WITNESS:  You mean on my voice-mail messages or on

9    the conversations I actually had?

10           THE COURT:  The conversations?

11           THE WITNESS:  I don't remember.

12           THE COURT:  Fine.  Go ahead, sir.

13           MR. SOBELMAN:  Thank your Honor.

14   BY MR. SOBELMAN:

15   Q.  Just to make it clear, Ms. Lee, put up the first page of

16   the transcript 122-T.  Mr. Kandar, this is from the recording

17   we just listened to.  What was the date on this voice-mail?

18   A.  November 3rd, 2015.

19   Q.  Ms. Lee, please put up the first page of 123-T.  What is

20   the date on this voice-mail?

21   A.  November 11th, 2015.

22   Q.  Approximately how long between these voice mails was there?

23   A.  Eight days.

24           MR. SOBELMAN:  Ms. Lee, please play Government Exhibit

25   123.

IAVJKET2                          Kandar - direct

1            (Audio played)

2    BY MR. SOBELMAN:

3    Q.  Mr. Kandar, what was your reaction to receiving this

4    voice-mail?

5    A.  I was incensed.

6    Q.  Why?

7    A.  Because I had explained how infirm my mother was and how

8    physically and mentally debilitated she was, and the idea of

9    her actually doing and starting some kind of business at that

10   point was infuriating to me.

11   Q.  Ms. Lee, can you please display Government Exhibit 124-T.

12            What was the date on this voice-mail?

13   A.  December 8th, 2015.

14   Q.  Who was it left by?

15   A.  Zack Peterson.

16            MR. SOBELMAN:  Ms. Lee, please play Government Exhibit

17   124.  Thank you.

18            (Audio played)

19   BY MR. SOBELMAN:

20   Q.  Did you ever receive a check from Zack Peterson?

21   A.  No.

22   Q.  Did you ever receive a check from A1?

23   A.  No.

24   Q.  Did your mother ever receive a check like that?

25   A.  No.

IAVJKET2                      Kandar - cross

1   Q.  Ms. Lee, please display Government Exhibit 125-T.  On what

2   date did you receive the voice mails transcribed here?

3   A.  December 10th, 2015.

4   Q.  Who was it left by?

5   A.  Zack Peterson.

6        MR. SOBELMAN:  Ms. Lee, please play Government Exhibit

7   125.

8        (Audio played)

9   BY MR. SOBELMAN:

10  Q.  Did you or your mother receive any legal paperwork from

11  Mr. Peterson or A1?

12  A.  No.

13  Q.  What was your reaction to that?

14  A.  I was angry, but I also wanted to see these people in court

15  and hire my own lawyer to discuss any potential lawsuit over

16  the $10,000.00.

17        MR. SOBELMAN:  No further questions.

18        THE COURT:  Any cross?

19        (Off-the-record discussion)

20  CROSS EXAMINATION

21  BY MR. SCHMIDT:

22  Q.  Mr. Kandar, I understand that you're very very upset, so

23  I'll try to be as brief as possible.

24        Now, you collected all the paperwork related to the

25  charges against your mother's credit cards, right?

IAVJKET2                    Kandar - cross

1    A.  I looked at her credit card statements and other things

2    that were sent to her by A1, yes.

3    Q.  You told us about A1.

4            Did you collect the other papers from the other

5    companies that your mother paid?

6    A.  There were no other papers from those companies, just my

7    mother's notes that she had from those companies.

8    Q.  Well, there was credit card charges in April of 2015

9    against your mother's credit card.  Isn't that right?

10   A.  I don't remember that.

11   Q.  You don't remember challenging the charges by Net Zero?

12   A.  No.

13           THE COURT:  Mr. Schmidt, how long do you think your

14   cross is?  I don't want to rush you.  It is 11:30, and I

15   haven't given the jury its mid-morning break.

16           MR. SCHMIDT:  Your Honor, probably about 15 minutes.

17           THE COURT:  Let's take a 15-minute break, ladies and

18   gentlemen.  That was not to rush you, sir.

19           MR. SCHMIDT:  I understand.

20           (Jury excused)

21           THE COURT:  You may step down, sir.  Because you're on

22   cross-examination, you should not talk with any of the

23   government lawyers.  You can talk with the agent who you have

24   been dealing with in terms of where to go and whatever, but

25   don't talk with the government lawyers.  Thank you.  We're

IAVJKET2                         Kandar – cross

1    going to take a rest break.

2                   (Recess)

3                   (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IAV8KET3

```
1              (Jury not present)
2              THE COURT:  I am told the lawyers have issues.
3              MS. KEARNEY:  Yes, your Honor.  We wanted to visit the
4    issue of Ms. Thompson's notes, Government Exhibit 165.  We
5    realized in reviewing the transcript yesterday that there was
6    no ruling on the exception under 801(d)(1)(B)(ii), which is
7    that --
8              THE COURT:  Just a moment.
9              801?
10             MS. KEARNEY:  (d)(1)(B)(ii).
11             And, also, under Rule 106, and I can explain further.
12             THE COURT:  Yes.  Go ahead.
13             MS. KEARNEY:  Essentially, what has happened here is
14   on cross Mr. Hassen had Ms. Thompson read selected excerpts of
15   her notes.  And what that does is it creates an incredibly
16   confusing picture of what those notes are.
17             So, for example, if you go through his
18   cross-examination, she reads from page 6, then she reads from
19   page 9, then she reads from page 7.
20             The thrust of that cross-examination, by having her
21   read statements made by people who are not defendants here, is
22   that she is somehow confusing statements that unknown or
23   non-defendant folks made to her with statements that Jonathan
24   Stewart made to her.  I think that creates an incredibly
25   confusing picture for the jury, and I think that the implied
```

IAV8KET3

1    charge of Mr. Hassen's cross-examination is that she is somehow

2    confused and therefore lacks credibility.

3        Now, in permitting her to read the selected portions

4    of those notes, it creates a misleading picture for the jury of

5    what exactly her notes were.  So basically selected excerpts of

6    notes through her reading them have been introduced to the

7    jury, and so under 106 we would like to submit the entirety of

8    her notes.

9        THE COURT:  OK.  Thank you.

10        Mr. Hassen or Mr. Schmidt.

11        MR. SCHMIDT:  Your Honor, as the Court indicated --

12        THE COURT:  I take it you are going to argue that she

13    was confused and is mixing up people.

14        MR. SCHMIDT:  Well --

15        THE COURT:  No, you're not?

16        MR. SCHMIDT:  Your Honor, we are going to make an

17    argument of some nature relating to that.  However, it is --

18        THE COURT:  I am not sure what that means.

19        MR. SCHMIDT:  I want to explain.  The witness's

20    testimony on direct was mostly her recollection based on her

21    preparation to testify, which included reviewing her notes.

22    That's reasonable and logical.

23        Because we did not prepare her of certain other time

24    frames or things that happened, we were asking her questions,

25    and because she didn't review everything that we were going to

IAV8KET3

ask her, we had to go back to her notes as to the questions

that we were asking.  And because her memory was fairly normal

of a person in trying to break everything down, she required

looking at her notes.  Sometimes it refreshed her recollection,

sometimes it didn't, and when it didn't, we brought it in as a

prior recorded statement.

So the government then had the right, as your Honor

indicated, they could go back to specific selected ones that

they wanted to.  If she didn't remember it, she would be able

to review the notes.  And if that didn't cause her to refresh

her recollection, then she would be able to read from her notes

as a prior recorded statement.  They chose to do it at one

paragraph and not to do it for others that they could have done

for redirect.

It's not a substitute to put everything in en masse

for their failure to take advantage of their ability to do it

the right way on redirect examination.

THE COURT:  What are you going to argue based on her

notes?

MR. SCHMIDT:  I am not going to argue based on her

notes.  I am going to argue based on her testimony which

include the notes.

THE COURT:  It's a better way to say it.  What is your

argument going to be?

MR. SCHMIDT:  She is certainly mixing up some things

IAV8KET3

1    with others and some things she is absolutely right on.

2            MS. KEARNEY:  I think that's the point here, your

3    Honor.

4            THE COURT:  Yes.  That's exactly the government's

5    argument.

6            MR. SCHMIDT:  I understand, your Honor.  The remedy

7    was for them to do this on cross-examination and not just to

8    put all of her notes en masse in evidence.

9            THE COURT:  Ms. Kearney, the 801(d) -- I'm sorry.

10   801(d)(1)(B)(ii) says "is offered to rehabilitate the

11   declarant's credibility as a witness when attacked on another

12   ground."  What is the "when attacked on another ground"?

13           MS. KEARNEY:  Lack of memory, your Honor.  Confusion.

14   It's precisely what Mr. Schmidt is laying out here, that their

15   intention is to argue that certain representations that she

16   testified were made to her were not in fact made by Jonathan

17   Stewart, but were made by the other people, and then she

18   verbatim read selected pages of those notes.

19           So to have the jury have a oral recitation of random

20   out-of-order pages of Ms. Thompson's notes is really not the

21   best way to introduce --

22           THE COURT:  You were able -- go ahead.

23           MS. KEARNEY:  Mr. Schmidt also said that the way she

24   testified was based on her preparation with the government, and

25   the fact that she had reviewed --

IAV8KET3

```
1              THE COURT:  I don't care about that.

2              Go ahead.

3              MS. KEARNEY:  The point there, your Honor, is that

4    under (i) of that section, that charge is that because she has

5    developed some motive to overemphasize or underemphasize.

6              THE COURT:  The jury will get a charge that it will be

7    unusual for the witnesses not to have talked to the lawyers

8    beforehand.

9              MS. KEARNEY:  The larger point I am making, your

10   Honor, is this is 37 pages of documents.  They are in

11   notebooks.  They are in chronological order.  Unlike myself and

12   some other witnesses we have had, her handwriting is legible.

13   So I don't think it will cause any confusion to the jury.

14   These pages are in order and it's very clear what they are.

15   Indeed, it will remedy the confusion created by having her read

16   out-of-order excerpts of certain pages jumping back and forth.

17             THE COURT:  Mr. Paul, you said you may call her.

18             MR. PAUL:  Sorry, Judge?

19             THE COURT:  Didn't you say you may call her?

20             MR. PAUL:  Are you talking about Ms. Thompson?

21             THE COURT:  Yes.

22             MR. PAUL:  No.

23             MR. SCHMIDT:  We withdraw our objection.

24             THE COURT:  All right.

25             MS. KEARNEY:  Problem solved.
```

IAV8KET3

1    THE COURT:  What is the exhibit number?

2    MS. KEARNEY:  It will pages 1 through 37 of Government

3    Exhibit 165.  We will create a 165A.

4    MR. SCHMIDT:  If I may, I may want to add from I think

5    167, if I could take a look at that.

6    THE COURT:  Let's do that -- we are going to bring the

7    jury back.

8    MS. KEARNEY:  Your Honor, just to flag, 167 has not

9    been authenticated.

10    THE COURT:  Take the time to authenticate it.

11    MS. KEARNEY:  It's her notes.

12    THE COURT:  It didn't come from the government

13    production?

14    MS. KEARNEY:  It's in the government production, yes.

15    THE COURT:  Isn't that the authentication issue?

16    MS. KEARNEY:  Ms. Thompson testified on both direct --

17    THE COURT:  What is 167?

18    MS. KEARNEY:  167 is a different notebook.

19    THE COURT:  Mr. Schmidt, did you hear that?

20    MR. SCHMIDT:  I heard that, your Honor.

21    THE COURT:  We don't have the witness now.  So let's

22    get this jury in.

23    Mr. Schmidt, you will do your cross.  How long do you

24    think it is now?

25    MR. SCHMIDT:  15, 20 minutes.

IAV8KET3

```
1            THE COURT:  Mr. Paul, are you going to have any?

2            MR. PAUL:  No, your Honor.

3            THE COURT:  Then, I take it, the government is going

4   to rest, subject to the issue of Thompson's exhibits.

5            MS. FLETCHER:  Yes, your Honor, and a handful of other

6   documents we intend to offer without a witness.

7            THE COURT:  And then you will rest.

8            MS. FLETCHER:  Yes.

9            THE COURT:  Then I think I will let the jury go, but

10  with this crew -- that is, all the lawyers -- let's button up

11  the 165/167 issue before I adjourn them for the day.

12            Mr. Schmidt.

13            MR. SCHMIDT:  We found actually on the transcript of

14  doing that on at least one of the pages of Exhibit 167.

15            THE COURT:  Speak into the microphone or at least

16  louder.

17            MR. SCHMIDT:  We found where we did lay the foundation

18  for at least one of the pages in 167.

19            THE COURT:  Share that with the government.

20            Let's bring in jury in.

21            (Continued on next page)

22

23

24

25
```

IAV8KET3

1          THE COURT:  Jury entering.

2          (Jury present)

3    DAVID KANDAR, resumed.

4          THE COURT:  Please be seated in the courtroom.

5          I remind you, sir, you remain under oath.

6          You may continue and conclude your cross-examination,

7    Mr. Schmidt.

8    BY MR. SCHMIDT:

9    Q.  Mr. Kandar, you provided the government with a number of

10   documents, is that correct?

11   A.  Yes.

12   Q.  One of the documents was admitted as Government Exhibit

13   121, is that correct?

14          MR. SCHMIDT:  Can we put up 121?

15   A.  Yes.

16   Q.  In that document, which is a credit card statement, it

17   includes a payment to A1 Business Consultants, is that right?

18   A.  Yes.

19   Q.  It also includes a payment to a company named Morning

20   Break, is that right?

21   A.  Yes.

22   Q.  And a company named Great Western Tax, is that correct?

23   A.  Yes.

24   Q.  And a company named CRF Enterprises, is that correct?

25   A.  Yes.

IAV8KET3

1   Q.   These are other companies that you learned that your mother

2   had dealings with, is that right?

3   A.   Yes.

4   Q.   And you contacted them as well?

5   A.   I did.

6   Q.   Now, another document that you provided the government with

7   is 3508-3, page 12.

8          Can you see that?

9   A.   Yes.

10  Q.   Is that a document that you provided to the government?

11  A.   Yes.

12  Q.   Is that a document related to the moneys that your mother

13  paid out to these entities?

14  A.   Yes.

15          MR. SCHMIDT:   I offer that into evidence, your Honor.

16          MR. SOBELMAN:   As long as the offer is just page 12,

17  there is no objection.

18          MR. SCHMIDT:   Right now it's just page 12.

19          THE COURT:   Is that your offer?

20          MR. SCHMIDT:   Yes.   Page 12 is what I am offering,

21  yes.

22          THE COURT:   Admitted without objection.

23          (Government's Exhibit 3508-3, page 12 received in

24  evidence)

25          THE COURT:   Continue.

IAV8KET3

1            MR. SCHMIDT:  I am trying to publish it, your Honor.

2            THE COURT:  Can the jury see it?

3            We will get it up.

4            THE JURY:  It's up.

5    BY MR. SCHMIDT:

6    Q.  In that bill there is a payment to Net Systems for $5,000,

7    is that correct?

8    A.  Yes.

9    Q.  And that's one of the companies that your mother dealt

10   with, is that right?

11   A.  It's hard for me to remember all the names, but yes.

12   Q.  This is a company that your mother dealt with many months

13   prior to A1, is that right?

14   A.  I don't know exactly the timeline.

15   Q.  This statement date is May 31, 2015, is that correct?

16   A.  I am looking for the statement.  May 31, 2015, yes.

17   Q.  If we can take a look again at 121, that statement date is

18   October 31, 2015, is that right?

19   A.  Yes.

20   Q.  Now, I am going to ask you to take a look at 3508-3, page

21   13.

22            Now, can you see that?

23            That's another document that you gave to the

24   government, is that right?

25   A.  I believe so, yes.

IAV8KET3

```
 1   Q.  It's another credit card statement similar to the credit
 2   card statement of the previous document, is that right?
 3   A.  Yes.
 4            MR. SCHMIDT:  I offer that into evidence, your Honor.
 5            MR. SOBELMAN:  That particular page, no objection.
 6            THE COURT:  Admitted.
 7            (Government's Exhibit 3508-3, page 13 received in
 8   evidence)
 9   Q.  That one has a statement date of April 30, 2015?
10   A.  Yes.
11   Q.  This has two charges from Net Systems, is that correct?
12   A.  Yes.
13   Q.  $750 and $5,000, is that correct?
14   A.  Yes.
15   Q.  There was also a Target credit card charge for another
16   company, wasn't there?  Do you remember that?
17   A.  Yes.
18   Q.  Is this one of the pages?  Is that up there?
19   A.  It's not on my screen.
20            MR. SOBELMAN:  Could counsel please identify what he
21   is showing the witness.
22            MR. SCHMIDT:  3508-3, page 6.
23   Q.  Is that another document you gave the government?
24   A.  I believe so.
25   Q.  Do you need to see the front?
```

IAV8KET3

1          MR. SCHMIDT:  Could you go to page 5.

2    Q.  Is that another credit card statement to your mother?

3    A.  Again, I believe so.

4          MR. SCHMIDT:  We offer page 6 into evidence.

5          MR. SOBELMAN:  That particular page, no objection.

6          THE COURT:  That page admitted.

7          (Government's Exhibit 3508-3, page 6 received in

8    evidence)

9    Q.  Now, that reflects payments to Impact Rankings for a total

10   of $7,800, is that right?

11   A.  It looks like 9,800.

12   Q.  It says total purchases.

13          Yes, on the other side.

14          MR. SCHMIDT:  Page 5 is also offered.

15          MR. SOBELMAN:  No objection to that page.

16          THE COURT:  Page 5 admitted.

17          (Government's Exhibit 3508-3, page 5 received in

18   evidence)

19   Q.  Now, when you first talked with your mother about her

20   getting involved with these businesses, you took notes, is that

21   right?

22   A.  I did.

23   Q.  And when you talked with your mother, she was able to

24   explain to you what she believed was the business that she

25   bought into, didn't she?

IAV8KET3

1    A.  Yes.

2    Q.  And she was actually able to provide great detail of the

3    businesses that she thought she bought into?

4    A.  Yes.

5    Q.  So when you had a conversation with her about the

6    businesses, she was -- withdrawn.

7            As to her understanding of what she thought she bought

8    into, she was not confused, is that correct?

9            MR. SOBELMAN:  Objection.

10           THE COURT:  Sustained as to form.

11   Q.  When you talked to her and she explained to you what

12   businesses she thought that she bought into, she was not

13   confused, is that correct?

14   A.  She couldn't explain it well.  So she probably didn't think

15   she was confused.

16           THE COURT:  Did you believe she was confused?

17           THE WITNESS:  I believed she was confused, yes.

18   Q.  Did she tell you what kind of business that she bought

19   into?

20   A.  Yes.

21   Q.  It was merchant processing, wasn't it?

22   A.  I have never heard that term before.

23   Q.  It was merchant business commissions, that she would be

24   making money based on the use of, for example, credit

25   terminals?

IAV8KET3

```
1    A.  I have never heard of any of that terminology before.

2    Q.  Did she explain to you that she would get $500 per

3    terminal?

4    A.  I have never heard that explained that way before.

5    Q.  I am going to show you what is marked 3508-1, page 2.

6             Can you see that document?

7    A.  I can.

8    Q.  Is that your handwriting?

9    A.  That is my handwriting.

10   Q.  Is that notes that you took during the conversation with

11   your mother?

12   A.  Those are notes that I took during my conversation with my

13   mother.

14   Q.  Now, does that refresh your recollection whether your

15   mother talked to you about, for example, that she would get

16   $500 per terminal?

17            MR. SOBELMAN:  Objection, your Honor.  The witness

18   didn't say that he had a failure of recollection.

19            MR. SCHMIDT:  I will do it differently.

20            THE COURT:  Sustained.

21   Q.  Does that change your mind whether or not your mother

22   explained to you about profiting $500 per terminal?

23            MR. SOBELMAN:  Objection.

24            THE COURT:  Ask it directly.

25            Go ahead.
```

IAV8KET3

1   Q.  Did your mother tell you that she expected to get $500 per
2   terminal?
3           MR. SOBELMAN:  Objection.
4           THE COURT:  I see now.
5           I will allow that not for the truth of the matter
6   asserted, but simply for the fact of whether or not it was
7   said.
8           MR. SCHMIDT:  That's what I am asking, your Honor.
9   Q.  Did your mother say that?
10  A.  Much of what I have here is from my mother's notes that she
11  wrote down that she got from talking to these supposed
12  companies, OK.
13          MR. SOBELMAN:  Your Honor --
14  A.  She would never use --
15          THE COURT:  Go ahead.
16  A.  She would never use these terms.  I got this from her
17  notes.
18  Q.  Did she tell you that she made those notes when she had the
19  conversations with the people that she bought into the business
20  with?
21  A.  I'm sorry.  Would you repeat, please?
22          THE COURT:  Is it your understanding that these notes
23  were written by her during her conversations with the people
24  who were calling her?
25          THE WITNESS:  Yes.

IAV8KET3

1          MR. SOBELMAN:  Your Honor, I think the record is

2    confused.  I believe Mr. Kandar testified that these are his

3    notes that were based on her notes.  There are multiple levels

4    of hearsay.

5          THE COURT:  You're quite right.

6          Clean it up, sir.

7    Q.  Your notes are based on conversations with your mother and

8    a review of the notes that she told you she took when she had

9    the conversations with these people, is that correct?

10   A.  I actually saw her notes and wrote down my own notes based

11   on her notes.  She verbally could never say any of this at the

12   time, and did not, to the best of my recollection.

13   Q.  Did she tell you, though, that she wrote those notes?

14   A.  She wrote those notes, yes.

15         THE COURT:  Wait.  Not the notes in the document

16   that's before you.

17         THE WITNESS:  These are mine.

18         THE COURT:  The notes from which you were writing this

19   down.

20         THE WITNESS:  Correct.

21         THE COURT:  And those notes, that is her notes, your

22   understanding was were written when?

23         THE WITNESS:  When she talked to all of these supposed

24   businesses.

25         THE COURT:  All right.  I now understand.

IAV8KET3

```
1           If I understand you -- I don't want to put words in
2   your mouth -- your understanding was that, at the time she
3   wrote the notes of which these are your notes, she did not have
4   the capability of using the terms set forth in these notes, is
5   that it?
6           THE WITNESS:  Correct.
7   BY MR. SCHMIDT:
8   Q.  The terms that are reflected in your notes, did you make
9   those up or did they come from terms that were in her notes?
10  A.  They were terms that were in her notes.
11  Q.  So she was able to write down what she was told by the
12  people that she was talking to?
13          MR. SOBELMAN:  Objection.
14          THE COURT:  If you have an understanding in that
15  regard, you may answer.
16  A.  She wrote down exactly what they told her.
17  Q.  Now, you said that because of her incontinence, she becomes
18  dehydrated frequently?
19  A.  Yes.
20  Q.  But clearly she is not dehydrated all of the time at that
21  time, correct?
22  A.  Correct.
23  Q.  And when --
24          THE COURT:  Why do you say that?  What is that based
25  on?
```

IAV8KET3

1     THE WITNESS:  I mean, she would have good days and bad

2     days, I guess.

3     THE COURT:  In terms of hydration or in terms of

4     mental ability?

5     THE WITNESS:  In terms of mental ability more than

6     hydration, I guess.

7     Q.  You first talked to her in November or December 2015 about

8     all of this stuff?

9     A.  It was in November I think.

10    Q.  When you talked to her she was very upset?

11    MR. SCHMIDT:  I will withdraw that question.

12    Q.  When you started talking about this, was she upset?

13    A.  It's hard to explain.

14    Q.  Let me ask you another question.

15    Did she say that the people that she talked to were

16    nice to her?

17    A.  Yes.

18    Q.  That's one of the reasons that you believed that she was

19    being taken advantage of?

20    A.  Yes.

21    Q.  I understand.

22    Was it clear when you were talking to your mother that

23    you were upset?

24    A.  Yes.

25    Q.  Did your mother become upset because of that?

IAV8KET3

1    A.  Yes.

2                MR. SCHMIDT:  I have no further questions, your Honor.

3                MR. PAUL:  I have no questions, your Honor.

4                THE COURT:  Government.

5                MR. SOBELMAN:  Nothing further, your Honor.

6                THE COURT:  You may step down, Mr. Kandar.  Thank you.

7    You are excused.

8                (Witness excused)

9                THE COURT:  Let's give the jury a short break and you

10   will straighten out the matters that you were talking about.

11               Very short break, ladies and gentlemen.  We will call

12   you back in a few minutes.

13               (Jury exits courtroom)

14               THE COURT:  Straighten out the 165/167 issue.

15               MS. KEARNEY:  Your Honor, I have some further argument

16   to make on that point.

17               THE COURT:  The objection to 165 was withdrawn.

18               MS. KEARNEY:  Correct.

19               167 I don't believe they have any grounds to offer

20   that.  It's in a separate notebook.  There is no hearsay

21   exception that applies to that notebook.

22               And under Rule 106 --

23               THE COURT:  Mr. Schmidt, are you listening?

24               MR. SCHMIDT:  Yes, I am.

25               MS. KEARNEY:  -- it is only adverse parties that may

IAV8KET3

1    request that the full writing be admitted.  It is Mr. Schmidt

2    and Mr. Hassen who made the reference to Government Exhibit

3    167.

4              THE COURT:  It's Mr. Schmidt and Mr. Hassen?

5              MS. KEARNEY:  Who introduced portions of Government

6    Exhibit 167 by having Ms. Thompson read them.  And it is only

7    the adverse party that may require the full writings to be

8    admitted.

9              THE COURT:  Just a moment.  Let me take a look and

10   then I want to look at 167, shocking as that may be.

11             MS. KEARNEY:  Rule 106.  Exhibit 167.

12             THE COURT:  I know.

13             MS. KEARNEY:  Too many numbers.

14             MR. SCHMIDT:  Your Honor, the government is the one

15   that offered 165.

16             THE COURT:  Yes.

17             MR. SCHMIDT:  I am now the adverse party to what the

18   government is offering.  So, therefore, I have a right to have

19   the complete part to be introduced.

20             THE COURT:  I understand what you are saying.  Let me

21   look at 167.

22             MS. KEARNEY:  Your Honor, you will see, if you look at

23   167, this is a separate notebook.  It's titled "Mostly Dream

24   Success to Reality," which Ms. Thompson testified --

25             THE COURT:  Wait a minute.  I am looking at 167, a

IAV8KET3

1    multicolored sheet on the cover.

2          Where are you saying Success Dream to Reality?

3          MS. KEARNEY:  The cover of the notebook.  So the

4    right-hand side of the multicolored page, page 1, is titled

5    "Mostly Dream Success to Reality."  Ms. Thompson testified that

6    Dream Success to Reality was a separate business that she

7    conducted prior to her dealings of A1.  It is a separate

8    notebook from Government 165, which contains her notes of her

9    conversations with A1.  If you look at the dates in each

10   notebook, 167, the Dream Success to Reality notebook, predates

11   Government Exhibit 165.

12         MR. SCHMIDT:  Your Honor --

13         THE COURT:  Let me just look at this exhibit and then

14   I will give you a full opportunity.

15         All right.  I have looked at it.

16         Mr. Schmidt, these are individual diary entries

17   involving different potential investments.  Tell me why, in

18   fairness, they ought to be considered at the same time as 165?

19         Just a moment.  I'm sorry.  I want to take another

20   look at 165.  There was extensive examination by both parties

21   on 165.

22         Yes, sir.  Why 167, in fairness, ought to be

23   considered at the same time?

24         MR. SCHMIDT:  Your Honor, first of all, 167 was cited

25   six times during her cross-examination.  The people mentioned

IAV8KET3

1    in 167 were testified to during cross-examination and are

2    mentioned numerous times in 165.  165 is a continuation of 167,

3    including her business of merchant processing.  Merchant

4    processing, as 167 shows, began months before any contact with

5    our client.  So to just have the names and the issues that are

6    continued in 165, and not the beginning where those names and

7    those issues arose months earlier that are in 167, would then

8    leave an incomplete view of what just went in in 165.

9              For example, July 28, 6 p.m. --

10             THE COURT:  Just a moment.

11             Yes, sir.  July 28, 2015, 6 p.m.

12             MR. SCHMIDT:  Steven Abrams is mentioned there with a

13   referral program and the units that are part of her business

14   that caused her to purchase business services from A1.  Her

15   purchases from A1 initially were for business services to

16   assist her in the businesses that she was already involved in.

17   This is one of the businesses she was already involved in.

18             THE COURT:  I remember a reference to GoDaddy.

19             MS. KEARNEY:  Actually, Ms. Thompson testified that

20   the purchases she made from A1 were for the purchases she had

21   made from what she called Tri-Star and First Trend, which are

22   contained in Government Exhibit 165.

23             MR. SCHMIDT:  That's exactly right.  We tried to

24   question her about that.  That's why we questioned her six

25   times referring to 167, and having her look at 167, and even

IAV8KET3

1    read from 167, is because it wasn't services just purchased

2    from Tri-Star; it was also the business that had existed before

3    that includes the names of people, the kind of business that

4    she was involved in.

5            THE COURT:  There are a variety of dates here in 167.

6    Are the dates, at least some of the dates the same time period

7    as in 165?

8            MS. KEARNEY:  There is one page that is the same time

9    period as 165.  The rest predate by several months.

10           MR. SCHMIDT:  One is on January 27, which she is

11   talking about the same businesses that are referred to earlier

12   in this document.

13           THE COURT:  Where is the January 27?  Is that the same

14   overlapping date?

15           MS. KEARNEY:  Yes.  Page 20.  It ends in the Bates

16   stamp with 400.  It's the second to last page.

17           If Mr. Schmidt really believes that this belongs with

18   Government Exhibit 165, we will consent to the entry of page 20

19   of 167 along with Government Exhibit 165.

20           MR. SCHMIDT:  Your Honor, the government has gotten up

21   here and argued to your Honor that, because we only read some

22   of the things, that's why all of 165 should come in, to show

23   everything, so there is no confusion.

24           167 shows how it all started, including the businesses

25   she had when she started talking to A1.  To now get up here and

IAV8KET3

1    say that is not part of it, including the names of the people

2    that Mr. Hassen --

3              THE COURT:  The names here are different, sir.

4              MR. SCHMIDT:  They are not all different.  Many of

5    them are the same.  There is Leona who is the owner of a

6    company.  There is Mr. Abrams that was talked about.  I could

7    match a number of times where these same people are mentioned

8    in 165.

9              THE COURT:  I am going to allow 167 in under 106.

10             What is the next issue?

11             MS. KEARNEY:  Along with 165?

12             THE COURT:  Yes.  165 the objection was withdrawn.

13             Let's make the record clear.  165 and 167 are

14   admitted.

15             MS. KEARNEY:  Just to be clear, your Honor, we had

16   originally moved pages 1 through, I think, 37.  165 is a

17   50-page document.  The latter pages actually contain notes

18   regarding Ms. Thompson's dealings with our office, and so we

19   don't think those should come in.

20             THE COURT:  Mr. Schmidt, did you hear that?

21             MR. SCHMIDT:  I hear that, except for there are some

22   that do not relate solely to law enforcement.  I have no

23   objection to redacting the conversations with law enforcement

24   and leaving the rest in.

25             THE COURT:  Ms. Kearney.

IAV8KET3

1      MS. KEARNEY:  We will come up with a redacted version

2  and run it by Mr. Schmidt and hopefully we can resolve it.

3      THE COURT:  165 comes in subject to an agreement or a

4  ruling by the Court on redactions.

5      167 comes in under 106.  165 comes in because Mr.

6  Schmidt has withdrawn his objection to the admission of 165.

7      (Government's Exhibits 165 and 167 received in

8  evidence)

9      THE COURT:  Wasn't there another issue?  No, I think

10  that's it.

11      What I propose we do is we bring the jury back.  The

12  government will rest.  I will excuse the jury until tomorrow.

13  And then I will hear if there are any motions.

14      Let's bring this jury back.

15      I will have them in at 9:00 on Thursday, and we will

16  put on -- if you're going to put your case on, Mr. Schmidt, I

17  take it you will start with Mr. Owimrin and presumably will be

18  able to finish your case tomorrow.

19      MR. SCHMIDT:  Other than Mr. Owimrin, we have a

20  few --

21      THE COURT:  You said you had the Mr. Porzio expert.

22      MR. SCHMIDT:  A summary witness on a few issues will

23  be testifying.

24      THE COURT:  What does that mean?  What is the summary

25  witness on?

IAV8KET3

1        MR. SCHMIDT:  Some things, telephone records and some

2   other things, that should take about 15 minutes.

3        MS. FLETCHER:  After the jury departs, the government

4   actually has a number of issues to raise with the Court.

5        THE COURT:  You said you were going to put documents

6   in before you rest.

7        MS. FLETCHER:  Yes.

8        THE COURT:  I will say, any other witness, and you

9   will put those documents in.

10        MS. FLETCHER:  Yes.

11        THE COURT:  So we will handle whatever you have to

12   handle.  Does it involve when you rest whatever issues you

13   have?

14        MS. FLETCHER:  No, your Honor.  We have resolved all

15   issues that need to be resolved before the government can rest.

16        THE COURT:  Bring the jury in.

17        (Continued on next page)

18

19

20

21

22

23

24

25

IAVJKET4

1            (In open court; jury present)

2            THE COURT:  Please be seated in the courtroom.  Next

3     witness for the government?

4            MS. KEARNEY:  The government offers the following

5     exhibits:  465, 467 through 469, 471, 475 through 477, 165 A as

6     discussed amongst the parties, and 167.

7            MR. SCHMIDT:  If I may have a moment, your Honor.

8            (Pause)

9            MS. KEARNEY:  I am also going to read a stipulation,

10    so perhaps as Mr. Schmidt is looking, I can read it.

11           THE COURT:  Go ahead.

12           MS. KEARNEY:  It is hereby stipulated and agreed by

13    and between the United States of America, by Geoffrey S.

14    berman, United States Attorney, Kiersten A. Fletcher, Benet J.

15    Kearney, and Robert Sobelman, Assistant United States

16    Attorneys; Andrew Owimrin, by and through his attorneys, Sam A.

17    Schmidt, Esquire and Abraham Abegaz-Hassen, Esquire; and

18    Shahram Ketabchi, by and through his attorneys, Kenneth A.

19    Paul, Esquire and Jacob Mitchell, Esquire that:

20               1.  If called at trial, Blake Foster would testify as

21    follows:

22           A.  Charlene Foster is her mother-in-law.

23           B.  Charlene Foster currently lives in a senior living

24    facility in Minnesota, and, from approximately September 25,

25    2015 through October 2016, Charlene Foster lived in a senior

1    living facility in Wildwood, Florida.

2            C.   Sometime between February 2016 and May 2016, Blake

3    Foster found the documents that are marked Government Exhibits

4    101, 102, 103, 104, 105, 106, 107A, 108, 109, 111, 113, and 115

5    in Charlene Foster's apartment in Wildwood Florida.

6            D.   After finding the documents that are marked as

7    Government Exhibits 101 through 106, 107A, 108, 109, 111, 113,

8    and 115 in Charlene Foster's apartment, Blake Foster contacted

9    Discover in approximately May 2016 and asked for a copy of

10   Charlene Foster's dispute paperwork to be sent to Blake Foster.

11   In response, Blake Foster received the document marked as

12   Government Exhibit 112.

13           E.   When Blake Foster spoke to Charlene Foster about

14   A1 Business Consultants, Charlene Foster told Blake Foster that

15   A1 Business Consultants tried to do Charlene Foster's taxes.

16           It is further stipulated and agreed that this

17   stipulation may be received in evidence at the trial in the

18   above-referenced matter.

19           The government offers that stipulation, which is

20   Government Exhibit 304.

21           THE COURT:  Admitted without objection.

22           MS. KEARNEY:  And also Government Exhibits 102 through

23   106, 107 A, 108, 109, 111, 113 and 115.

24           THE COURT:  Admitted without objection.

25           (Government's Exhibits 304, 102-106, 107A, 108, 109,

IAVJKET4

1   111, 113 and 115 received in evidence)

2              MR. SCHMIDT:  Your Honor, as to the other exhibits,

3   the only objection I have is to 467.  That is based on the

4   objections that we discussed I think prior to trial or just at

5   the beginning.

6              THE COURT:  I don't know what 467 is, sir.

7              MR. SCHMIDT:  May we have a sidebar just briefly, your

8   Honor?

9              THE COURT:  The government, can it be done after the

10  next witness?

11             MS. KEARNEY:  I think so.  I also neglected to offer

12  112.

13             THE COURT:  All right.  So all of those are admitted.

14             (Government's Exhibit 112 received in evidence)

15             THE COURT:  I'll hear Mr. Schmidt's issue on 467 after

16  the jury is excused.

17             MS. FLETCHER:  Your Honor may we have just a moment on

18  this issue?

19             THE COURT:  Yes.

20             (Off-the-record discussion)

21             MR. SCHMIDT:  Your Honor, I withdraw that objection.

22             THE COURT:  Is the record clear now all of those

23  exhibits are admitted.

24             (Government's Exhibits 465, 467-469, 471, 475-477

25  received in evidence)

IAVJKET4

```
 1            THE COURT:  The next witness for the government?
 2            MS. FLETCHER:  The government rests.
 3            THE COURT:  All right.  Ladies and gentlemen, you've
 4   heard the government rest.  As I told you, the evidence is
 5   coming in apace.  We have some legal matters to handle now.
 6   Between the legal matters and lunch, I didn't want you to be
 7   sitting around so I am going to excuse you for the day.  Please
 8   be here by 9:15 tomorrow.  Tomorrow we will see if there is
 9   going to be a defense case presented by either of the two
10   defendants.
11            As you know, because I told you when we started back a
12   week ago Tuesday, the defendants are never under an obligation
13   to prove anything.  The burden is always on the government to
14   prove each defendant's guilt beyond a reasonable doubt, so the
15   defendants don't have to prove anything.  It is the government
16   that has to prove the guilt of each defendant beyond a
17   reasonable doubt.  So we will see if there is going to be a
18   defense case for either or both of the defendants.
19            Be here tomorrow and make it 9:15.  Enjoy the day.  It
20   is a beautiful day.  Thank you.  Keep an open mind.
21            (Jury excused)
22            THE COURT:  Please be seated.
23            Are there any motions?
24            MR. SCHMIDT:  Your Honor, at this time we move under
25   Rule 29 for a dismissal of the charges against Mr. Owimrin.
```

IAVJKET4

1          THE COURT:  What is the basis?  There is enough

2     evidence for a reasonable juror to conclude there is guilt

3     beyond a reasonable doubt.  I think are two counts against

4     Mr. Owimrin, correct?  That is the standard, correct?

5          MR. SCHMIDT:  That's correct.

6          THE COURT:  Do you have an argument?

7          MR. SCHMIDT:  I rest on the record.

8          THE COURT:  I am going to deny the motion.

9          MR. PAUL:  On behalf of Mr. Ketabchi, I, too, will

10    move for a Rule 29 judgment of acquittal with regard to both

11    counts against him for the failure of the government to

12    establish a case that is beyond a reasonable doubt as presented

13    to the jury.

14         THE COURT:  Before I rule on that, and I shouldn't

15    have ruled so quickly on Mr. Owimrin's.  Does the government

16    want to respond?

17         MS. FLETCHER:  Your Honor, only to respond that there

18    is more than sufficient evidence in the record to sustain a

19    conviction with respect to Mr. Owimrin on both Counts 1 and 2

20    and with respect to Mr. Ketabchi on both Counts 1 and 2.

21         THE COURT:  All right.  Having had a full airing of

22    the issues, I deny the motion both by Mr. Owimrin and

23    Mr. Shahram Ketabchi.  I have, indeed, been listening to the

24    evidence, and I believe a denial is appropriate.  I'll see

25    everybody at 9:15 tomorrow.

1          MS. FLETCHER:  When I spoke just before you dismissed

2     the jury about there being several issues to raise with the

3     court, I was hoping to raise them before we all depart for

4     today.

5          THE COURT:  Go ahead.

6          MS. FLETCHER:  If your Honor would allow that.  If

7     your Honor prefers, the government could do that after the

8     lunch break.

9          THE COURT:  Let's do it now.

10         MS. FLETCHER:  One of the issues raised yesterday with

11    respect to Mr. Shahram Ketabchi is that Mr. Paul now intends to

12    call Michael Finocchiaro in the defense's case in chief.  We

13    have had some ability to discuss the issues amongst ourselves,

14    and the government wants to just raise a couple of issues we

15    think will likely percolate up to the court now.

16         The first is that Mr. Paul has indicated that he

17    intends to cross-examine Mr. Finocchiaro based on his

18    presumption that Mr. Finocchiaro is either a hostile witness or

19    identified with an adverse party.

20         Your Honor, the government has determined not to call

21    Mr. Finocchiaro.  Mr. Paul is evidently calling him because he

22    believes that Mr. Finocchiaro has some relevant helpful

23    testimony for his case, and so he should not be permitted to

24    lead Mr. Finocchiaro.  It is Mr. Paul's witness now.

25         THE COURT:  Who is Mr. Finocchiaro?

1          MS. FLETCHER:  He was a defendant in this case.  The

2     government --

3          THE COURT:  He is a defendant in the case.

4          MS. FLETCHER:  Yes, your Honor.  He entered a guilty

5     plea pursuant to a cooperation agreement.  He was on the

6     government's witness list.  In an effort, as we made your Honor

7     aware of, in an effort to cut down the time of the government's

8     case, the government elected not to call him.  Now I understand

9     Mr. Paul would like to call him.

10         MR. PAUL:  He is a cooperating witness, Judge.

11         THE COURT:  Go ahead.

12         MS. FLETCHER:  Your Honor, the issue arises under 611

13    (c).  Once I became aware Mr. Finocchiaro, the defense intends

14    to call Mr. Finocchiaro, I spoke with his counsel.  His counsel

15    indicated that Mr. Finocchiaro is willing to testify.  I have

16    no reason to think that he is going to be a hostile witness to

17    Mr. Paul and every reason to think that he will cooperate

18    fully.  The fact he is a cooperating witness does not render

19    him a witness identified with an adverse party.  That would be,

20    for example, if there was a federal agent who they wished to

21    call.  That person might, for example, be identified with an

22    adverse party because they would be essentially an agent of the

23    government.

24         Mr. Finocchiaro is not our agent.  He was a defendant

25    in this case.  He pled guilty pursuant to a cooperation

IAVJKET4

1    agreement, but he is not testifying pursuant to that

2    cooperation agreement.

3          THE COURT:  I understand that.  Surely this issue has

4    come up before.  It sounds like everyone knew about this.  My

5    notes indicate that Mr. Paul yesterday said that maybe he would

6    call Finocchiaro, and it sounds like he now has decided to.

7          So the parties had some time to think about this.  Do

8    you have a case?  This would not be the first time this

9    occurred.  Does anyone want to give me a case?

10          MS. FLETCHER:  I don't have a case.  I conferred with

11    a supervisor in our office about this issue.  He is looking

12    into it.  His view is the same as I just articulated to the

13    court.

14          THE COURT:  Under the cooperation agreement, doesn't

15    it say he has to cooperate with the government?

16          MS. FLETCHER:  It says he has --

17          THE COURT:  And --

18          MS. FLETCHER:  -- pursuant to the cooperation

19    agreement, he has to testify in any proceeding at which the

20    government asks him to testify.  We are not asking him to

21    testify.

22          THE COURT:  I understand.  All right.  The parties

23    should do some research, as I will, and see if this has been

24    decided before.  Mr. Paul, what do you want to say?

25          MR. PAUL:  What your Honor raised, he is under a

1    cooperation agreement.

2              THE COURT:  No, but I think what Ms. Fletcher has said

3    is the words of the agreement say, "when called by the

4    government."  Apparently that's correct.  Is that right?

5              MS. FLETCHER:  I don't know that those are the exact

6    words, your Honor, but --

7              THE COURT:  You'll get them for me?

8              MS. FLETCHER:  Substantively, he is required to

9    testify if he government asks him to.

10             THE COURT:  Okay.

11             MR. PAUL:  He is coming in under subpoena, which will

12   be served on his lawyer.  I have spoken to the lawyer.

13             With regard to his being called as my witness instead

14   of the government calling him as a witness, he is still a

15   witness for the government in the sense he is under a contract

16   with the government as cooperating witness.  He is certainly

17   not a defense witness in that sense.  He is a cooperating

18   witness signed on by the government.  They have chosen not to

19   call him for whatever reason.  My questioning of him will be

20   limited in certain regards.  I certainly think they will then

21   have a right to cross-examine him, obviously, because I am

22   calling him first.

23             The fact I am calling him and not them, I don't think

24   that that eliminates the fact he should be declared a hostile

25   witness in the sense that given the background of this witness

1    being called to the stand --

2             THE COURT:  Do you have a case for me?

3             MR. PAUL:  I will try to find one, your Honor.

4             THE COURT:  Let me look at 611.

5             Leading questions should not be used on direct

6    examination except as necessary to develop the witness's

7    testimony.  Ordinarily, the court should allow leading

8    questions on cross-examination and, two, when a party calls a

9    hostile witness, an adverse party or a witness identified with

10   an adverse party --

11            MR. PAUL:  Correct.

12            THE COURT:  Well, he is a defendant.  Because he pled

13   guilty doesn't make him not a defendant, in my view.

14            MR. PAUL:  I submit, your Honor --

15            THE COURT:  He is not an adverse party to that extent.

16            He is an adverse party to the extent he is signed up

17   as a cooperator with the government.  I will look and see if I

18   can find cases.  The parties should do the same.  We'll take a

19   look at some of the 611 (c) cases.  My instinct says it is

20   direct.  He has been subpoenaed, that is the only way you can

21   get him in here.  I don't think that goes one way or the other

22   and he should be treated as any other witness.

23            If it appears he is hostile upon your asking direct

24   questions, I can always declare him a hostile witness.  My

25   instinct says direct questions only, not leading, unless it

IAVJKET4

1    appears to the court that his answers reflect a hostility to

2    the questioner, but I suggest if there are other judges of

3    higher courts who have taken a look at this, I'll take a look

4    at it, or for that matter coordinate courts.

5             What else?

6             MS. FLETCHER:  Just a --

7             THE COURT:  If the parties can get me whatever

8    citations they want, I will probably be going to sleep after

9    Mr. Schmidt.  Go ahead.

10            MS. FLETCHER:  As well as the rest of this table.  We

11   will, your Honor.

12            Another issue that is likely to arise just by virtue

13   of this same issue, Mr. Schmidt and I spoke before the court

14   today.  I think we're all in agreement that if Mr. Paul calls

15   Mr. Finocchiaro, the government crosses Mr. Finocchiaro.  In

16   other words, we get to lead Mr. Finocchiaro.

17            There is some dispute as to whether Mr. Schmidt also

18   gets to cross and lead Mr. Finocchiaro.  My reading of 611

19   suggests that Mr. Finocchiaro, consistent with your Honor's

20   gut, is going to be subject to direct questions.

21            THE COURT:  Again, the gut test says yes.  There has

22   been no conflict between the defendants here at any time.

23            MS. FLETCHER:  Exactly, your Honor.  The government's

24   position is that like Mr. Paul, Mr. Schmidt should be required

25   to direct examine Mr. Finocchiaro.

1           THE COURT:  I agree with you until now unless I think

2     he is hostile.  Mr. Schmidt.

3           MR. SCHMIDT:  Your Honor, he is not my witness.  If

4     you're saying that --

5           THE COURT:  No, but he is not adverse, either.

6           MR. SCHMIDT:  He very well may be adverse.  That is

7     why I would not be calling him as a witness.

8           THE COURT:  Sorry.  You are not calling him?

9           MR. SCHMIDT:  I am not calling him as a witness.  He

10    has adverse things to say about my client.  If you're saying

11    that because counsel for co-defendant is calling a witness,

12    then I am restricted to direct, you're basically saying we are

13    trying this case together.

14          We are not.  We are separate individuals.  We have

15    separate issues and essentially in this case completely

16    separate issues because probably the total amount of time that

17    my client had contact with the co-defendant in this case prior

18    to his arrest I think is one.  So we have separate cases,

19    completely separate cases --

20          THE COURT:  Yes, but --

21          (Multiple voices)

22          MR. SCHMIDT:  -- I don't want him as a witness.  His

23    testimony, that witness' testimony is going to be adverse to my

24    client.  So I don't know how am I supposed to ask questions to

25    this witness when the government is going to be able to direct

1    them to the things that they want him to testify to that is

2    adverse to my client, and I can't cross-examine him?

3             That is crazy!

4             MR. PAUL:  I agree with Mr. Schmidt.  I think he

5    should -- in fact, I think he the order should be after Mr.

6    Fino sits down, is done with my testimony, direct or cross,

7    whatever your Honor rules, Mr. Schmidt has an absolute right to

8    cross him.  It is as if Mr. Owimrin is called to the stand, I

9    have a right to cross him.  I don't want to limit my discussion

10   with regard --

11            THE COURT:  I understand.  Ms. Fletcher.

12            MS. FLETCHER:  Just to point out that I think

13   Mr. Schmidt appears to be confusing the meaning of the word

14   "adverse" with "has unhelpful things to say about."

15            Just because a witness has unhelpful things to say

16   about a client does not mean he is an adverse party.  "Adverse"

17   refers to which side of the "v" you're on.  He and Mr. Ketabchi

18   are on the same side of the v in this particular case.

19            For example, on direct examination -- I don't presume

20   to know what Mr. Paul's direct examination of Mr. Finocchiaro

21   will be but, in any event, the government on cross will be

22   confined to the scope of direct.  So presuming that Mr. Paul

23   does not intend to elicit on direct unhelpful information from

24   Mr. Finocchiaro about Mr. Owimrin, the government will not be

25   permitted to cross Mr. Finocchiaro on the unhelpful information

IAVJKET4

1   that Mr. Schmidt fears the government will elicit about his

2   client.

3            THE COURT:  All right.  You lost me.

4            MS. FLETCHER:  It is procedurally complicated, your

5   Honor.

6            THE COURT:  Just a moment.  (Pause)

7            I agree with your presumption; that is, Mr. Paul will

8   presumably not elicit on his questioning of Mr. Finocchiaro bad

9   stuff about Mr. Owimrin; and, therefore, presuming there is no

10  such bad stuff about Mr. Owimrin adduced by Mr. Paul in the

11  questioning of Mr. Finocchiaro, the government will not be

12  crossing Finocchiaro on the stuff that doesn't exist; that is,

13  the unhelpful information about Mr. Owimrin.  I agree with you

14  on that.  So where does that take you?

15           MS. FLETCHER:  The point I was making, your Honor, is

16  that contradicts the underlying assumption made by Mr. Schmidt

17  that he should be permitted to cross Mr. Finocchiaro.  I think

18  I heard him say he should be permitted to cross Mr. Finocchiaro

19  because Mr. Finocchiaro is going to have unhelpful information

20  about his client.

21           THE COURT:  Right.

22           MS. FLETCHER:  But based on the sequence as I

23  understand it will transpire, when Mr. Paul directs Mr.

24  Finocchiaro --

25           THE COURT:  No, no.  I don't think Mr. Schmidt was

IAVJKET4

1    saying there will be unhelpful information about Owimrin in the

2    record after Mr. Paul's direct examination.  I think what

3    Mr. Schmidt was saying is he doesn't think Finocchiaro is going

4    to be helping his client.

5              MS. FLETCHER:  I suspect he won't.

6              THE COURT:  That is Mr. Schmidt's point.

7              MS. FLETCHER:  I don't think Mr. Finocchiaro will help

8    either defendant, but that is for Mr. Paul to determine.

9              THE COURT:  No, but that is what Mr. Schmidt, that is

10   why he is saying he is adverse because he won't like what

11   Finocchiaro has to say about Owimrin.

12             And your point is it is the v that counts?

13             MS. FLETCHER:  Yes, your Honor.

14             THE COURT:  Not helpful or unhelpful?

15             MS. FLETCHER:  Yes.

16             THE COURT:  The parties should get me what they can.

17             What else?  And you have my instinct and you also have

18   611 (a).  The court should exercise reasonable control over the

19   mode and order of examining witnesses in presenting evidence so

20   as to make these procedures effective for determining the

21   truth, avoid wasting time and to protect witnesses from

22   harassment and undue embarrassment, and I intend to fully

23   exercise those powers.  Next?

24             MS. FLETCHER:  Your Honor had requested yesterday that

25   the parties jointly prepare a verdict form --

IAVJKET4

1          THE COURT:  Yes, ma'am.

2          MS. FLETCHER:  -- for the court.  I have conferred

3    with Appeals in our office and with the supervisors handling

4    this case about the verdict form here, and we would just ask

5    for your Honor's indulgence to give us another day --

6          THE COURT:  Of course.

7          MS. FLETCHER:  -- for the verdict form?

8          THE COURT:  Of course.

9          MS. FLETCHER:  Count 2 in particular is a conspiracy

10   with two separate objects, and we want to be sure that the form

11   reflects what it needs to reflect.

12         THE COURT:  And before you give it to me, run it by

13   the defense.

14         MS. FLETCHER:  Of course, we will.

15         THE COURT:  What else?

16         MS. FLETCHER:  May I have a moment, your Honor?

17         THE COURT:  Yes.

18         (Off-the-record discussion)

19         MS. FLETCHER:  Your Honor, I am reminded that in

20   reevaluating Mr. FInocchiaro's proposed testimony, and I

21   candidly reviewed my notes for the purposes of preparing my

22   cross-examination of that witness, it is clear there are

23   certain what I would call opinion statements by Mr. Finocchiaro

24   that Mr. Paul may seek to elicit from him in direct

25   examination.  Again I am guessing here because I don't know

1    exactly why he is calling this witness.

2            But, for example, Mr. Finocchiaro told the government

3    during one of his meetings that he was surprised to see Shahram

4    Ketabchi on the indictment in this case because he only had two

5    or three months of involvement with him.  The government would,

6    of course, agree that Mr. Finocchiaro can describe his

7    involvement with Mr. Ketabchi, but that his opinion as to

8    whether Mr. Ketabchi should or should not be in the indictment

9    and/or his surprise upon seeing him in the indictment is not

10   testimony that is admissible or should be put before the jury.

11           There are several other statements like that by Mr.

12   Finocchiaro; in particular, statements about the involvement of

13   lawyers and his understanding of what the lawyers were doing.

14           THE COURT:  You mean defense lawyers in this

15   indictment?

16           MS. FLETCHER:  No, your Honor.  Your Honor will recall

17   that in connection with pretrial motions, we moved in limine to

18   exclude certain exhibits?

19           THE COURT:  I do remember.

20           MS. FLETCHER:  Mr. Paul sought to offer --

21           THE COURT:  Right.

22           MS. FLETCHER:  There was an effort during

23   Mr. Sinclair's cross-examination to further question

24   Mr. Sinclair about the retainer that Olive Branch had with

25   their law firm Sarmasti, PLLC and with the extent of his

1    involvement in their company.

2          The issue here is while your Honor has precluded the

3    communications between Mr. Sinclair and the outside attorneys,

4    the government suspects Mr. Paul is again going to seek to

5    elicit this from Mr. Finocchiaro, you communicated with

6    lawyers, you came to some conclusion whether you were breaking

7    the law; and, therefore, how could my client have come to a

8    different conclusion?

9          THE COURT:  Mr. Paul is shaking his head vigorously,

10   "negative" now.  Mr. Paul?

11         MS. FLETCHER:  That is helpful.

12         THE COURT:  Let me hear the litany of issues.

13         MS. FLETCHER:  Your Honor, those are essentially the

14   categories.  The government is trying to ascertain what

15   relevant testimony the defense intends to elicit from Mr.

16   Finocchiaro that is not just to impeach him, and these are the

17   categories of things that the government can conceive of, all

18   of which raise serious red flags for the government in terms of

19   their admissibility.

20         THE COURT:  Mr. Paul.

21         MR. PAUL:  It is my understanding the government on

22   direct examination of Mr. Sinclair opened the door with regard

23   to attorneys being hired, specifically Mr. Vafa Sarmasti.  That

24   is why I attempted to question Mr. Sinclair beyond that opening

25   of the door by the government.

IAVJKET4

1          With regard to exhibits --

2          THE COURT:  Which I believe I stopped.

3          MR. PAUL:  You didn't completely because I think you

4     allowed a limited numbers of questions of Mr. Sinclair dealing

5     with Mr. Sarmasti handling complaints filed by customers or

6     victims, and that I showed him the exhibit, but we didn't go

7     through all the tabs for obvious reason that your Honor pointed

8     out, it would be too time consuming.  I limited my questions.

9     I don't expect to go beyond that with Mr. Finocchiaro.

10          So I intend to ask him similar questions of which were

11     permitted with Mr. Sinclair.

12          THE COURT:  We'll take a look when it comings.  I

13     certainly don't care about Finocchiaro's opinions of surprise

14     that somebody is indicted or not.  The issue is not for Mr.

15     Finocchiaro.

16          MR. PAUL:  I was surprised, too, so we're in the same

17     boat when my client was indicted.

18          THE COURT:  I don't understand that comment.  What I

19     am saying is I don't care -- it would not be admissible

20     evidence for this jury to hear whether Finocchiaro was

21     surprised that somebody was indicted.

22          MR. PAUL:  I don't intend to ask him.

23          THE COURT:  All right.  Fine.

24          MS. FLETCHER:  Relatedly, your Honor, the government's

25     position is Mr. Finocchiaro would also not be permitted to

1    testify about what his internal conclusions were about whether

2    he was breaking the law or whether he was relying on counsel in

3    ensuring they were not breaking the law.

4           As the government understands it, Mr. Finocchiaro, to

5    the extent he had those internal musings, did not communicate

6    those musings to Mr. Ketabchi.  There should be no inquiry into

7    his opinions as to whether he was following the advice of

8    lawyers.

9           THE COURT:  Mr. Paul.

10          MR. PAUL:  I am not presenting an advice of counsel

11   defense here, Judge, so I don't know why the government is

12   going crazy here.  I am simply going to be asking Mr.

13   Finocchiaro questions about how he responded in certain

14   proffers.

15          THE COURT:  How he responded to?

16          MR. PAUL:  In certain proffers provided to the

17   government when he was attempting to cooperate as well as after

18   he was signed on as a cooperating witness.  I am not presenting

19   a defense of advice of counsel.  There is no, as we admitted,

20   there is no connection between my client and Mr. Sarmasti.  So

21   clearly I am not relying on that as a defense.  So I don't know

22   what the government's -- excuse my expression --

23          MS. FLETCHER:  Your Honor, without, and I don't expect

24   Mr. Paul to preview this, but if he is going to be questioning

25   Mr. Finocchiaro about statements he made during Mr.

IAVJKET4

1    FInocchiaro's proffers with the government, he can only do that

2    if he is seeking to impeach Mr. Finocchiaro in some way.  As I

3    am sure Mr. Paul knows, he is not permitted to call a witness

4    solely for the purpose of impeaching him.

5            MR. PAUL:  I intend to call Mr. Finocchiaro so that he

6    can testify as to what his role was at Olive Branch, how he was

7    partners with Mr. Sinclair, how he was involved with

8    charge-backs, how he communicated with my client in advising

9    him to conduct himself with regard to charge-backs, very

10   similar questions of what I've asked Mr. Sinclair.  That is

11   pretty much the scope of my questions.

12           Does he have a cooperation agreement with the

13   government?  Is he expecting X number of jails as a consequence

14   of his taking the plea?

15           Those kind of questions I think are permissible.  The

16   fact the government chose not to call him, that is their

17   choice.  I don't think I should be restricted by that, and I

18   intend to ask him the questions on the direct examination, if

19   that is what your Honor rules, bringing out that kind,

20   eliciting that kind of testimony.

21           MS. FLETCHER:  Your Honor, the government sees no

22   problem with that outline of questioning.  That is perfectly

23   permissible.  I don't know how it is helpful, but it is

24   perfectly permissible.

25           MR. PAUL:  That is for me to decide.

1          THE COURT:  Obviously.  You didn't have to say it.

2          MS. FLETCHER:  The one thing I heard Mr. Paul say, and

3    I don't understand him to be saying that he is going to elicit

4    this testimony from Mr. Finocchiaro, but obviously the

5    government has decided not to call Mr. Finocchiaro.  Presumably

6    that is something that will be known amongst the parties and

7    not known to the jury.  I don't want the jury --

8          THE COURT:  What, what will not be known?

9          MS. FLETCHER:  The fact the government decided not to

10   call him.

11         THE COURT:  That is not irrelevant.

12         MS. FLETCHER:  That is the government's position, your

13   Honor.

14         THE COURT:  However, it is clear that he is a witness

15   for the defense and the government has not called him.

16         MS. FLETCHER:  Understood, your Honor.

17         THE COURT:  But the issue of the government cogitating

18   over whether or not to call Finocchiaro, deciding not to is not

19   for this jury, assuming there was cogitation.

20         MR. SCHMIDT:  The government, unless I misheard,

21   seemed to indicate that Mr. Finocchiaro believes that when he

22   was conducting the business at Olive Branch, did not think he

23   was breaking the law.

24         Indeed, if he said that to the government, that would

25   be Brady material, not obviously admissible, but it would be

1    Brady material for the defense to receive to further explore

2    that issue.  I have not seen that, I think, in the 3500

3    material unless I missed it.

4              MS. FLETCHER:  It is in the 3500 material.  He says,

5    in sum and substance, we thought we had a legal tussle.  We

6    know what we were doing was wrong, but we had lawyers in

7    involved so we thought we had a legal tussle.

8              MR. PAUL:  Why is that not permissible to be asked?

9              MS. FLETCHER:  He asks the witness, who is not a

10   lawyer, to draw a legal conclusion.

11             MR. PAUL:  I thought he was skirting, like

12   Mr. Sinclair was testifying, following these rules, somewhat

13   going over the line, sometimes not going over the line.  By

14   them hiring a lawyer, they thought, in their minds, they were

15   skirting any criminal activity or the law enforcement would not

16   come back to haunt them.

17             THE COURT:  That isn't an advice of counsel argument.

18             MR. PAUL:  I am not relaying that to my client.  That

19   has to do with the witness testifying.  I am not claiming my

20   client acted under any advice or feeling because they had a

21   lawyer, he was necessarily doing something -- it is this

22   witness.

23             MS. FLETCHER:  What Mr. Paul just said is precisely

24   why the government is in a stink about this issue because it

25   appears Mr. Paul is trying to do with Mr. Finocchiaro exactly

IAVJKET4

1    what your Honor precluded him from doing with respect to the

2    lawyers retained by Mr. Sinclair and Mr. Finocchiaro.

3        Whether Mr. Finocchiaro believed he was following the

4    law or not is of no moment to Mr. Ketabchi's state of mind

5    because, as the government understands, there is no evidence

6    that Mr. Finocchiaro ever communicated that to Mr. Ketabchi.

7        It is essentially putting before the jury that putting

8    aside what Mr. Ketabchi thought, that Mr. Finocchiaro at one

9    point thought he had an advice of counsel defense, or at the

10   minimum a mistake of law, both of which the court, the

11   government expects, would instruct the jury are not to be

12   considered by them.  There is no advice of counsel defense for

13   Mr. Ketabchi and mistake of law is not a defense.

14       So whether Mr. Finocchiaro was confused about what the

15   law was or believed he had a legal hustle is confusing for the

16   jury, is not relevant to Mr. Ketabchi's state of mind, and

17   presents exactly the same type of issues that the government

18   raised --

19       THE COURT:  No.  I intend to agree.

20       Mr. Paul, I don't want the jury to be cogitating on

21   whether or not this whole thing may be legal in the view of

22   some other lawyer and that they acted, Finocchiaro acted in

23   reliance on some other lawyer's view of the legality.  That is

24   not for this jury.  I don't want a scent of that in here.

25       MR. PAUL:  I won't be arguing that.  I will be arguing

IAVJKET4

1    this was just one of the many rules, quote-unquote, that

2    Sinclair and Finocchiaro thought they had basically to cover

3    their tracks.

4              THE COURT:  What do you mean, "rules"?

5              MR. PAUL:  Well, Sinclair told us that they had these

6    so-called rules in place that basically no one followed,

7    certainly not Mr. Sinclair.

8              THE COURT:  Yes.

9              MR. PAUL:  And that was, in essence, kind of keeping

10   it within a certain framework of what they were doing, not to

11   cross the line, of which Mr. Sinclair bounded it many times.

12             Nevertheless, there was some line drawn, some boundary

13   in their minds.

14             THE COURT:  You can ask him about what rules governed

15   their conduct.

16             MR. PAUL:  Yes, and in addition to that, they hired a

17   lawyer to handle these complaints, and in Finocchiaro's mind at

18   least, and I think Mr. Sinclair even testified to this, they

19   thought this was a way to get around law enforcement asking any

20   questions.  Oh, well, you have a lawyer handling these matters.

21             THE COURT:  I don't think Sinclair testified to that.

22             MS. FLETCHER:  He didn't, Judge.

23             MR. PAUL:  Sinclair testified many times that they did

24   not want --

25             THE COURT:  Do you have the transcript pages so I can

1  get into the area?

2           MR. PAUL:  No, but he testified, I am sure your Honor

3  will recall, staying off the radar in terms of law enforcement.

4           THE COURT:  Right.

5           MR. PAUL:  This was one of the ways, in his mind, in

6  Finocchiaro's mind, they were staying off the radar.

7           THE COURT:  Okay.

8           MR. PAUL:  And that I think is appropriate to elicit

9  from the witness.

10           THE COURT:  They wanted to stay off the radar?

11           MR. PAUL:  Correct.

12           THE COURT:  You can do that.

13           MR. PAUL:  That is all I am intending to do.

14           THE COURT:  I am no so sure.  I'll see everybody

15  tomorrow.  I think you have a sense of the court's rules, sir,

16  and I think you'll stay off the radar, correct?

17           MR. PAUL:  I will make every effort.

18           THE COURT:  Thank you.

19           MR. SCHMIDT:  Get a good night's sleep, your Honor.

20           THE COURT:  Let's try to be here, I told them 9:15.

21  Really seriously, this whole thing is serious, Mr. Schmidt, try

22  to be as efficient as possible.  I am giving you truly fulsome

23  time here.  You have a paralegal and two lawyers.  You have

24  fulsome time.  I expect the result to be an efficient use of

25  your time with Mr. Owimrin.

IAVJKET4

1              MR. SCHMIDT:  My goal is to be very efficient, but

2    that does not mean it won't take a long time.  I have a lot to

3    talk about.

4              THE COURT:  Your estimate I think to the court was

5    four to five hours -- no.  I am sorry -- three to four hours.

6              Efficiency!

7              MR. SCHMIDT:  Absolutely.

8              (court adjourned until Thursday, November 1, 2018, at

9    9:15 am)

```
 1                        INDEX OF EXAMINATION
 2    Examination of:                              Page
 3    THOMAS BOLUS
 4    Direct By Mr. Sobelman . . . . . . . . . . .1108
 5    Cross By Mr. Schmidt . . . . . . . . . . . .1121
 6    Cross By Mr. Paul  . . . . . . . . . . . . .1123
 7    HAYLEY KRONTHAL
 8    Direct By Ms. Kearney  . . . . . . . . . . .1130
 9    Cross By Mr. Schmidt . . . . . . . . . . . .1148
10    DAVID KANDAR
11    Direct By Mr. Sobelman . . . . . . . . . . .1154
12    Cross By Mr. Schmidt . . . . . . . . . . . .1177
13                        GOVERNMENT EXHIBITS
14    Exhibit No.                              Received
15     823, 824, 825 and 826   . . . . . . . . . .1111
16     821 and 822   . . . . . . . . . . . . . . .1112
17     827   . . . . . . . . . . . . . . . . . . .1113
18     828   . . . . . . . . . . . . . . . . . . .1118
19     713, 714, 715, 716, 723 and 724   . . . . .1134
20     725, 726, 727, 728, 729 and 730   . . . . .1135
21     717 through 722   . . . . . . . . . . . . .1149
22     120   . . . . . . . . . . . . . . . . . . .1158
23     121   . . . . . . . . . . . . . . . . . . .1160
24     122, 123, 124 and 125   . . . . . . . . . .1171
25     123-T, 124-T and 125-T   . . . . . . . . .1174
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1234

3508-3, page 12   . . . . . . . . . . . . .1188

3508-3, page 13   . . . . . . . . . . . . .1190

3508-3, page 6   . . . . . . . . . . . . .1191

3508-3, page 5   . . . . . . . . . . . . .1191

165 and 167   . . . . . . . . . . . . . . .1204

304, 102-106, 107A, 108, 109, 111, 113 and 115207

112   . . . . . . . . . . . . . . . . . . .1208

465, 467-469, 471, 475-477   . . . . . . .1208