IB1JKET1                    Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        17 Cr. 00243 SHS

5   ANDREW OWIMRIN, a/k/a "Andrew Owens,"
    a/k/a "Jonathan Stewart," and
6   SHAHRAM KETABCHI, a/k/a "Steve Ketabchi,"

7              Defendants.

8   ------------------------------x
                                         November 1, 2018
9                                        9:15 a.m.

10  Before:

11                 HON. SIDNEY H. STEIN,

12                                       District Judge
                                           and a jury
13
                        APPEARANCES
14
    GEOFFREY S. BERMAN,
15       United States Attorney for the
         Southern District of New York
16  KIERSTEN ANN FLETCHER,
    ROBERT BENJAMIN SOBELMAN,
17  BENET JEANNE KEARNEY,
         Assistant United States Attorneys
18
    SAM A. SCHMIDT,
19  ABRAHAM JABIR ABEGAZ-HASSEN,
         Attorneys for defendant Owimrin
20
    KENNETH A. PAUL,
21  JACOB MITCHELL,
         Attorneys for defendant Ketabchi
22
    Also Present:
23       CHRISTOPHER BASTOS, Detective NYPD and HSI
         CHRISTINE LEE, Paralegal USAO
24       SAMUEL TUREFF, Paralegal

25

1              (Trial resumes)

2              (In open court; jury not present)

3              THE COURT:  Good morning.  Please be seated.  The

4    jurors are here.  The government has rested.  Mr. Schmidt, is

5    it your intention today to put on a case and to have

6    Mr. Owimrin to testify?

7              MR. SCHMIDT:  Yes, your Honor, but before Mr. Owimrin

8    testifies, our paralegal is going to testify as to summary

9    charts.

10             THE COURT:  Have you shown them to the government?

11             MR. SCHMIDT:  Yes, the government has them.

12             THE COURT:  I want to talk to your client now about

13   his testifying, Mr. Schmidt.  I want to talk to your client now

14   about his decision to testify.

15             Mr. Owimrin, if you would stand, sir.

16             There are certain decisions that in the course of the

17   trial that are for the attorney to make, Mr. Schmidt to make;

18   for example, what witnesses to call, if any, what questions to

19   ask the government's witnesses, what questions to ask the

20   defense witnesses if there is a defense case, what motions to

21   make pretrial.  Those decisions and others like them are really

22   decisions for the lawyer to make.

23             There are certain important decisions, though, that

24   are for you, the client, the defendant, to make.  One of those

25   important decisions that are for the client, not the lawyer to

1    make is whether or not you, the client, the defendant in this

2    case, wishes to testify on your own behalf.  Do you understand

3    that, sir?

4                 DEFENDANT OWIMRIN:  Yes.

5                 THE COURT:  So have you spoken with Mr. Schmidt about

6    whether or not you're going to take the stand and testify here?

7                 DEFENDANT OWIMRIN:  Yes, your Honor.

8                 THE COURT:  If you had questions, did he answer any

9    questions you had about that issue?

10                DEFENDANT OWIMRIN:  Yes.

11                THE COURT:  Okay.  Don't tell me what his advice was.

12    That's attorney-client, that is privileged, that is between you

13    and Mr. Schmidt.

14                What I want to tell you is I want you to have listened

15    to that advice.  That doesn't mean you have to follow it, but

16    he is your lawyer, his sole interest is you, so listen to him,

17    but ultimately whether or not you are going to testify is your

18    decision.  Do you understand that?

19                DEFENDANT OWIMRIN:  Yes, sir.

20                THE COURT:  Do you have any questions of me about that

21    issue?

22                DEFENDANT OWIMRIN:  No, sir.

23                THE COURT:  What is your decision, sir, do you wish to

24    testify in your own defense or not?

25                And, by the way, if you don't testify, I am going to

IB1JKET1                    Trial

1   instruct the jury that a defendant is under no obligation to

2   put on any evidence because the burden of proof is always on

3   the government, and if you do not testify, the jury cannot draw

4   any inference from the fact that you've decided not to testify.

5           Do you understand that?

6           DEFENDANT OWIMRIN:  I understand.

7           THE COURT:  What is your decision, sir?

8           DEFENDANT OWIMRIN:  I will testify today, sir.

9           THE COURT:  You do want to testify?

10          DEFENDANT OWIMRIN:  Yes.

11          THE COURT:  Thank you very much.  Let's bring the jury

12  in.

13          MS. FLETCHER:  Your Honor, there is one additional

14  issue before the jury comes in.

15          MS. FLETCHER:  I notice AUSA Sobelman is no longer

16  sitting at the table.  We expect he will not be for remainder

17  of the trial, which may prompt some curiosity or questions

18  among the jurors.  We request your Honor tell the jurors that

19  he is attending to another matter and to not speculate and to

20  move on.

21          THE COURT:  If that is what you want.  You want me to

22  tell them he is not going to be here, he is working on another

23  matter, and they can draw no inference from the fact he is not

24  here?

25          MS. FLETCHER:  Yes, that would be our request.

IB1JKET1                          Trial

1          THE COURT:  Fine.  Defense, I take it you have no

2   objection?

3          MR. PAUL:  No.  Judge, I know the jury is lined up,

4   but there is an issue that has to be brought to your Honor's

5   attention immediately.

6          First of all, I think as your Honor may or may not

7   know, we put in a request for authorization of an expert.  The

8   problem is he is coming from the other side of this country,

9   from Washington.  The government is --

10         THE COURT:  Washington State?

11         MR. PAUL:  Correct.  I wish it was Washington, D.C.

12         The government is unwilling to stipulate.  It has to

13   do with an IP address concerning Jane Thompson.  The jury has

14   been shown an email and follow up to that email that has Arash

15   Ketabchi with positive faith, my client's email address.

16         What we wanted, because the government obviously

17   objects to save everybody time and expense and everything, that

18   IP address, if located, would not be located in California.

19   That is what our expert is always going to be testifying to, so

20   we asked for a stipulation from the government.  They refuse.

21   So, consequently, we are asking for an authorization for this

22   expert to come in for that limited purpose.

23         THE COURT:  That sounds a bit absurd.  Let me see if I

24   can understand it.  I didn't think IP addresses are located

25   anywhere physically.  I thought they're kind of located up

1    there somewhere along with Instagram posts.

2              MR. PAUL:  I am like you, your Honor.  Maybe

3    Mr. Mitchell can explain just briefly.

4              MR. MITCHELL:  Well, your Honor, an IP address, it

5    shows where an internet connection is occurring.  So it is

6    similar, you can think of it almost as a zip code in a sense.

7    It is going to give you a general location.

8              From an IP address, you can tell if someone is doing

9    something from a particular computer, they might be doing

10   anything from a particular computer.  So in this case, the IP

11   address would show that the contract that was sent to a victim

12   was sent from the metropolitan area, not California where our

13   client was located.  So it is significant --

14             THE COURT:  Wait just a minute.  The computer on my

15   desk --

16             MR. MITCHELL:  Yes, your Honor.

17             THE COURT:  -- that is the tower I am told that is

18   under my desk, it has a specific IP number.

19             MR. MITCHELL:  Yes, your Honor.

20             THE COURT:  And presumably there is some record now

21   that this IP address is being used.  Is that right?

22             MR. MITCHELL:  Yes, your Honor, okay.

23             THE COURT:  If I take this tower and bring it to

24   California and plug it in there, the IP address will show as

25   being used in California?

1       MR. MITCHELL:  A different IP address, your Honor.

2       THE COURT:  The same computer.

3       MR. MITCHELL:  Yes.

4       THE COURT:  Doesn't the IP address go with the

5  hardware?

6       MR. MITCHELL:  The IP address goes with the router.

7       MS. FLETCHER:  Your Honor --

8       MR. MITCHELL:  The internet connection.

9       THE COURT:  The internet connection?

10      So you say the IP address on an email would show where

11  the internet connection is taking place.  Is that the idea?

12      MR. MITCHELL:  Right.  The IP address would show where

13  that communication occurred from and it connects to a specific

14  geographic location.

15      THE COURT:  All right.  The government?

16      MS. FLETCHER:  Your Honor, that may be the case, but

17  it is not always the case.  So, for example, if I use my phone

18  and connect to the internet by using Dectective Bastos' hot

19  spot, it will show one particular IP address.

20      By searching on a website called, "What is my IP

21  address," you can determine the geographic location of that

22  particular internet location.  However, to use a DOJ phone, for

23  example, if I connect to the internet using this phone, my

24  communications are actually routed through the DOJ server in

25  Washington.  If you search the IP address for my particular

1    phone, the geographic location that will come up for my IP

2    address is actually in Washington, D.C.

3              THE COURT:  So if you connect right now, if you

4    connect through a hot spot, put aside the IP here in Manhattan,

5    your IP address will show up as being located in Washington?

6              MS. FLETCHER:  Yes.

7              THE COURT:  Because you have --

8              MS. FLETCHER:  On the Department of Justice phone, it

9    routes through a non-New York IP address.

10             THE COURT:  I understand.

11             MS. FLETCHER:  What Mr. Paul and Mr. Mitchell have

12   asked us to do is to stipulate that that IP address is located

13   in New York.  The government, to the extent they want to call a

14   witness to testify to that fact, would like to cross-examine

15   that witness to make clear, for example, that --

16             THE COURT:  You have the right to cross-examine any

17   witness, yes, I understand.  You want to make clear, for

18   example, what you said about your phone?

19             MS. FLETCHER:  Yes.

20             MR. MITCHELL:  The expert would testify what Ms.

21   Fletcher is referring to is a proxy, and you have to take

22   additional steps to create a proxy, and there are tests and

23   diagnostics to be run to determine whether or not a proxy was

24   used, and we expect this expert to testify that all of the

25   tests that he had run indicate a proxy was, in fact, not used,

IB1JKET1                    Trial

1   meaning it was not rerouted.

2           THE COURT:  I understand.

3           MS. FLETCHER:  We would like to cross-examine their

4   expert.

5           THE COURT:  Bring him in.

6           MR. MITCHELL:  We need to know whether or not we have

7   authorization to bring in this expert because I have to go call

8   him right now and get him on a plane.

9           THE COURT:  Yes.

10          MR. MITCHELL:  Thank your Honor.

11          MS. FLETCHER:  The government has, apart from what

12  Mr. Mitchell just informed us this morning --

13          THE COURT:  Wait.

14          MS. FLETCHER:  -- has not received any notice of their

15  intention to call an expert.  The government would -- this

16  issue first became aware to the government when Ms. Thompson

17  was cross-examined about the IP address on her particular

18  document.  I suspect this issue was known to Mr. Paul and

19  Mr. Mitchell long before that.  This is an untimely expert

20  notice.  The government is going to try to get our hands around

21  whatever materials Mr. Mitchell and Mr. Paul can provide to us.

22          THE COURT:  Are you providing materials?

23          MR. MITCHELL:  Yes, your Honor.

24          THE COURT:  Now?

25          MR. MITCHELL:  Right now I can provide the CV of the

IB1JKET1                          Trial

expert and I can also explain, it is fairly clear, a summary of
what his testimony will be based on what we are discussing now,
and I will have the expert send everything over, everything he
is basing his opinions on.

THE COURT:  Right now, this morning?

MR. MITCHELL:  I will tell him right now, this morning
to send it.

MS. FLETCHER:  Presumably this witness will testify
tomorrow?

MR. PAUL:  Yes.  He is flying in tonight if your Honor
authorizes it?

THE COURT:  When Mr. Owimrin gets off, I would like to
give the jury, which I assume will be today, I would like to
give the jury Friday afternoon off.  Let's get him in here
right now.  Bring the jury in.

(Jury present)

THE COURT:  Please be seated in the courtroom.

All right, ladies and gentlemen, yesterday you saw the
government rest.  The issue now is whether Mr. Schmidt, on
behalf of Mr. Owimrin, is going to put a defense case on.  I
told you the defense is under no obligation to prove anything
because the burden is always on the government to prove its
case beyond a reasonable doubt.

Mr. Schmidt, is there a defense case on behalf of
Mr. Owimrin that you wish to present?

1            MR. SCHMIDT:  Yes, your Honor.

2            THE COURT:  Call your first witness.

3            MR. SCHMIDT:  The first witness is Samuel Tureff.

4    SAMUEL TUREFF,

5         called as a witness by the Defendant Owimrin,

6         having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MR. SCHMIDT:

9    Q.  Mr. Tureff, what do you do for a living?

10   A.  I'm an independent paralegal consultant, typically within

11   the Eastern and Southern District of New York.

12   Q.  How old are you?

13   A.  28.

14   Q.  What is your educational background?

15   A.  I have a BA in psychology from Wesleyan University.

16   Q.  How long have you been a paralegal?

17   A.  Since I graduated college, about six and a half years.

18   Q.  As a paralegal, what are your duties generally?

19   A.  For the most part, I assist the attorney in the matter at

20   hand.  I review discovery evidence, whether it is phone

21   records, medical records, bank records, financial records and

22   put together review memos, I help assist in drafting legal

23   memorandum for the court, visit with the clients, whether they

24   be incarcerated at the various prisons around New York or at

25   meetings such like that.

IB1JKET1                         Tureff - direct

1    Q.  You're retained to be a paralegal --

2              THE COURT:  Well, at prisons only if the defendant is

3    incarcerated?

4              THE WITNESS:  Of course, yes, or meetings.

5              THE COURT:  Meetings outside?

6              THE WITNESS:  Yes.

7              THE COURT:  All right.

8    BY MR. SCHMIDT:

9    Q.  Were you retained as a paralegal in this matter?

10   A.  Retained by the defense?

11   Q.  Yes.

12   A.  No, I was not.

13   Q.  How did you end up working for the defense in this case?

14   A.  I was appointed as a paralegal expert pursuant to the CJA

15   qualifications, appointed by the court.

16   Q.  What does CJA mean?

17   A.  The Criminal Justice Act.

18   Q.  Does that mean that ultimately you're paid by the court?

19   A.  Yes.

20             THE COURT:  When you say "paralegal expert," that is a

21   fancy way of saying you were appointed as a paralegal, right?

22             THE WITNESS:  Yes.  I was going for the terms in the

23   materials I submit.

24             THE COURT:  All right.

25   BY MR. SCHMIDT:

IB1JKET1                        Tureff - direct

1   Q.  Now, in relation to your testimony here, what did you do?

2   A.  I reviewed Mr. Owimrin's --

3          THE COURT:  Ladies and gentlemen, just so you're

4   aware, the Criminal Justice Act provides under certain

5   circumstances federal funds from the Criminal Justice Act,

6   provided from the Criminal Justice Act can be used to pay

7   various attorneys and their assistants.  That is what is

8   happening here.  Proceed.

9   BY MR. SCHMIDT:

10  Q.  Did you examine any particular records for the purpose of

11  testifying here today?

12  A.  Yes, I did.  We had reviewed Mr. Owimrin's cell phone

13  records from January 2015 through March 2016, and those were

14  primarily the records I reviewed. .

15  Q.  I am going to show you what is marked as SP-1.

16         MR. SCHMIDT:  May I approach.

17  Q.  I want you to take a look at these records.  What are those

18  records?

19  A.  These are the cell phone records I was looking through.

20  They're for Mr. Owimrin's cell phone.

21  Q.  What period of time do they cover?

22  A.  They span from January 1st of 2015 to March 3rd of 2016.

23  Q.  Now, were there any other -- did you have access to any

24  other cell phone records beyond that period of time for

25  Mr. Owimrin?

IB1JKET1                    Tureff - direct

1    A.  No, I did not.

2              MR. SCHMIDT:  I offer that in evidence as Defense

3    Exhibit SP-1.

4              MS. FLETCHER:  No objection, your Honor.  I understand

5    there is also a stipulation that covers these records.

6              THE COURT:  No objection to the admission of SP-1.

7              (Defendant's Exhibit SP-1 received in evidence)

8              THE COURT:  Ladies and gentlemen, I meant to point out

9    to you simply that you may notice that Mr. Sobelman is no

10   longer here.  Now he is working on another case and you should

11   draw no inference from the fact he is not here.  We now know he

12   is working on another case.  Is there a stipulation?

13             MR. SCHMIDT:  Yes, there is, your Honor.

14             (Off-the-record discussion)

15             MR. SCHMIDT:  Your Honor, the stipulation reads:

16             It is hereby stipulated and agreed by and between

17   Andrew Owimrin, by and through his attorney, Sam A. Schmidt and

18   Abraham J. Abegaz-Hassen, Esquire, and United States of

19   American by Geoffrey S. Berman, United States Attorney,

20   Kiersten A. Fletcher, Benet J. Kearney and Robert Sobelman,

21   United States Attorney's, and Shahram Ketabchi, by and through

22   his attorneys, Kenneth A. Paul and David Mitchell, Esquire,

23   that:

24             One, if called as a witness at trial, a custodian of

25   records from Sprint would testify that Defense Exhibit SP-1,

IB1JKET1                          Tureff - direct

including all parts and subdivisions thereof, contains true and

correct copies of records obtained from Sprint regarding the

account opened and maintained at Sprint bearing telephone

numbers 201-838-7774, and from January 1, 2015 through March 3,

2016, the original records while made at or near the time by or

from the information transmitted by a person with knowledge of

the matters set forth in the records, that they were kept in

the ordinary course of Sprint's regularly conducted business

activity, that it was a regular practice of that business

activity to make such records.

          The custodian of records from Sprint would further

testify that the Defense SP-1 only records of voice calls are

included, records of text messages sent to or from 7774 are not

included.  The column date and "at" reflects the month and date

on which the call was placed or received.  The columns time and

"at" reflect the time at which the calls were placed or

received.

          D.  The columns phone number and to and from reflect

the number of the party to the call that is not the 7774

number.  If the call is an outgoing call, to and from column

reflects the number that received the calm from the 7774

number.  If the call is an incoming call, the phone number the

to and from column reflects the number placed the call to the

7774 number.  The columns destination and call destination

reflect outgoing calls, the city and state associated with the

IB1JKET1                          Tureff - direct

1    number called by the 7774 number.  The column minutes used and

2    min, M I N, reflected duration of the call rounded up to the

3    nearest minute.

4            It is further stipulated and agreed that this

5    stipulation may be received in evidence at a trial of the

6    above-referenced matter, dated November 1, and signed by the

7    attorneys for all parties, and I offer that stipulation in

8    evidence as SP-5.

9            THE COURT:  SP-5 admitted.

10           MR. SCHMIDT:  Excuse me, your Honor, SP-6.

11           THE COURT:  SP-6 admitted without objection.

12           (Defendant's Exhibit SP-6 received in evidence)

13           THE COURT:  Proceed.  Next question.

14   BY MR. SCHMIDT:

15   Q.  Now, in the examination of all of the telephone records in

16   SP-1, what was the purpose of the examination of all of the

17   telephone records in SP-1?

18   A.  There were two purposes for which I examined the records.

19           The first was to review the phone numbers associated

20   with sales that Mr. Owimrin made while at Olive Branch and to

21   compare those telephone numbers to his records to see if there

22   are any matches; and the second, I reviewed telephone records

23   pertaining to his calls with a Brooke Marcus and Jane Thompson,

24   I reviewed them, if there are any matches between his records

25   and that phone number.

1    Q.  Do you know another name used by Brooke Marcus?

2    A.  Yes, Emily Miller.

3    Q.  Now, when you reviewed the records for the time that

4    Mr. Owimrin was working at Olive Branch, did you review the

5    whole period of time they worked there or only the period of

6    time that the records that you had reflected?

7    A.  Right, so we, the records we had reflect only part of his

8    time at Olive Branch spanning from the beginning of January

9    2015 when our phone records begin until the end of September

10   2015 when he no longer worked there.

11   Q.  How long did you obtain the telephone numbers of the people

12   who Andrew Owimrin sold to?

13   A.  There were a couple of places where I found these phone

14   numbers.  Primarily they were within the Google calendar

15   documents that we received.  Their phone numbers were

16   associated, listed in with the calendar appointments.  The

17   remaining phone numbers that I could not find on the calendars

18   I found primarily in the WEE lists that were also provided on

19   the WEE lists or in discovery.  I apologize.

20   Q.  Did you search many other documents to assure yourself that

21   you had at least a fair --

22            THE COURT:  Sustained.

23   BY MR. SCHMIDT:

24   Q.  Do you know whether you were able to locate all of the

25   sales made by Mr. Owimrin during that period of time?

IB1JKET1                              Tureff - direct

1   A.   No, I do not.

2   Q.   Are you confident that you obtained a substantial or most

3   of those calls --

4             MS. FLETCHER:   Objection.

5   Q.   -- of those sales?

6             THE COURT:   Sustained.

7   BY MR. SCHMIDT:

8   Q.   How did you actually physically obtain that information

9   from the documents that you saw?

10  A.   To compile Mr. Owimrin's sales, there were a couple of

11  charts, sales charts within the discovery, primarily found on

12  the Olive Branch marketing one at Gmail dot com account.  They

13  were Excel charts attached to emails.

14            There is a shared reporting chart.  There was a

15  Youngevity sales chart and I also found sales through coded

16  sales forms as well as the calendar entries.

17  Q.   Did you actually physically search through all of these

18  documents or did you use any technology to help you?

19  A.   I used the primarily the search and find function on Excel

20  a lot of times as well as -- that is the main technology I used

21  to help find and isolate his sales.

22  Q.   The search technology for Excel would only find documents

23  in Excel?

24  A.   In that document that I pulled up, yes.

25  Q.   What about other documents?

IB1JKET1                         Tureff - direct

1   A.  I searched our database with that provided all the

2   discovery evidence as well as the other discovery materials

3   with a similar search and find function.

4   Q.  Were you aware of what the database included?

5         MS. FLETCHER:  Objection, your Honor.

6         MR. SCHMIDT:  I'll rephrase the question.

7   BY MR. SCHMIDT:

8   Q.  Do you know from what devices the data, in the database

9   came from?

10  A.  Yes, there were --

11        MS. FLETCHER:  Objection, your Honor.

12        THE COURT:  If he knows.

13        MS. FLETCHER:  Your Honor, may we be heard at sidebar?

14        THE COURT:  Yes.

15        (Continued on next page)

16

17

18

19

20

21

22

23

24

25

IB1JKET1                         Tureff - direct

1          (At sidebar)

2          THE COURT:  The question is from what devices the

3   database came.

4          MS. FLETCHER:  Your Honor, my concern is that this

5   line of questioning is going to make it appear to the jury

6   there is a bunch of evidence they haven't seen.  What I think

7   Mr. Schmidt is doing is trying to establish he conducted a

8   diligent search for phone numbers.  The government won't

9   challenge that.  We ask he not create the impression there is a

10  whole bunch of stuff the jury is not being shown.

11         MR. SCHMIDT:  How about I use the word search through

12  all the material received on this case from the government?

13         MS. FLETCHER:  Sure.

14         THE COURT:  Let's go.

15         (Continued on next page)

IB1JKET1                          Tureff - direct

1              (In open court)

2     BY MR. SCHMIDT:

3     Q.  Mr. Tureff, would it be fair to say that your examination

4     included all of the material and documents provided by the

5     government in discovery?

6     A.  Yes.

7     Q.  Did you prepare a chart of the telephone numbers and names

8     of the people that you found to be purchasers from Andrew

9     Owimrin during the time-frame?

10    A.  Yes, I did.

11    Q.  I ask you to take a look at SP-5.  There are how many pages

12    in SP-5?

13             THE COURT:  Purchases from Andrew Owimrin based on his

14    phone records.  Is that right?

15             THE WITNESS:  Purchases, your Honor?

16             THE COURT:  The sales.  I am sorry.  Sales of Andrew

17    Owimrin based on his phone records, is that what we're talking

18    about?

19             THE WITNESS:  This is a comparison of Andrew Owimrin's

20    phone records --

21             THE COURT:  No.  I am sorry.  The question was --

22             MR. SCHMIDT:  Let me back up a second, your Honor.

23             I'll make it clearer.

24    BY MR. SCHMIDT:

25    Q.  After you found the names of the people that Andrew Owimrin

IB1JKET1                          Tureff - direct

1    sold to, how did you obtain the telephone numbers of those

2    people?

3              MS. FLETCHER:  Objection to foundation.

4              THE COURT:  How did you find the names of the people

5    that Andrew Owimrin sold to?

6              MS. FLETCHER:  Your Honor, apologies, but objection to

7    foundation on your Honor's question as well.

8              MR. SCHMIDT:  That testimony is already in evidence.

9              THE COURT:  Your objection to my question is

10   overruled.

11             MS. FLETCHER:  Expectedly, your Honor.

12             THE COURT:  Let's go.  Sir?

13             THE WITNESS:  To answer your question, I reviewed

14   sales documents within the discovery.  There were a number of

15   larger sales documents for certain time periods as well as

16   weekly sales reports and as well calendar entries that I use.

17             THE COURT:  That you just testified to?

18             THE WITNESS:  Yes.

19             THE COURT:  Proceed.

20   BY MR. SCHMIDT:

21   Q.  How did you obtain the telephone numbers of the purchasers?

22   A.  As I said, I mostly found those phone numbers within the

23   calendar entries that related to this appointment for that

24   sale.  I also found the couple of phone numbers I couldn't find

25   in the calendar entries were located on lead lists also in the

IB1JKET1                          Tureff - direct

1    discovery.

2    Q.  Lead lists of the same names?

3    A.  Yes, sorry, lead lists associated with that customer

4    itself.

5    Q.  Were you able to obtain the telephone numbers of everybody

6    single person that you had on that list?

7    A.  I believe I did, yes.

8    Q.  When you prepared the document SP-5 that shows the

9    telephone number, the name and the result of your review --

10            MS. FLETCHER:  Objection to form.

11            THE COURT:  Sustained.

12   BY MR. SCHMIDT:

13   Q.  I am going to give you what is marked SP-5 so you

14   physically have it in front of you.  What did you do with the

15   result of your searches?

16   A.  I drafted a summary chart.

17   Q.  What does the summary chart include?

18   A.  The summary chart includes the date of the sale, the

19   telephone number or on occasion plural numbers that I found

20   associated with those customers as well as the result of

21   comparing those telephone numbers to Mr. Owimrin's cell phone

22   records.

23   Q.  Now, did you also include a date relating to each of the

24   sales?

25   A.  Yes, the date of the sales, the first column on the left.

IB1JKET1                         Tureff - direct

1   Q.   How did you find or locate the date of the sales?

2   A.   Those again were listed on service agreements on the

3   calendar entries, and those were the two sources as well as,

4   sorry, as well as the sales spreadsheets.

5   Q.   Did SP-5 correctly and accurately reflect the result of

6   your searches?

7   A.   Yes, it does.

8              MR. SCHMIDT:  I offer SP-5 into evidence.

9              MS. FLETCHER:  May I have a moment, your Honor?

10              THE COURT:  Yes.

11              (Off-the-record discussion).

12              MS. FLETCHER:  No objection.

13              THE COURT:  Admitted without objection, SP-5.

14              (Defendant's Exhibit SP-5 received in evidence)

15              MR. SCHMIDT:  Would you publish SP-5.

16              THE COURT:  Next question.

17              MR. SCHMIDT:  Can we just publish it.

18              THE COURT:  Next question.

19   BY MR. SCHMIDT:

20   Q.   Now, were there any merchants of Mr. Owimrin having

21   telephone contact with the names on the list on his cell phone?

22   A.   Of the, I believe, 87 customers that matches I reviewed for

23   the time period, I believe there was one customer, yes, where

24   Mr. Owimrin had contact with on his telephone.

25   Q.   Who was that customer?

IB1JKET1                         Tureff - direct

1    A.   Diane Weissenberger.

2    Q.   The contact that Mr. Owimrin had with Ms. Weissenberger,

3    did it match the date of the sale that he made while at Olive

4    Branch?

5              MS. FLETCHER:  Objection to foundation.

6              THE COURT:  I will allow that.

7              MS. FLETCHER:  Your Honor, it assumes facts not in

8    evidence.

9              THE COURT:  He has testified --

10             MR. SCHMIDT:  It is in evidence.

11             THE COURT:  -- he testified of his view of when he was

12   at Olive Branch.  You may answer.  Restate the question so the

13   witness has it.

14             MR. SCHMIDT:  I forgot the question.

15             THE COURT:  Did the contact that Mr. Owimrin had on

16   his cell phone with Ms. Weissenberger reflected in your chart

17   match the date of sale of D0S that he made while at Olive

18   Branch?

19             THE WITNESS:  No.  The phone calls occurred after,

20   after the sale.

21             THE COURT:  The sales were in the contract.

22             What is the date of sale, when the contract was

23   signed, if you know?

24             THE WITNESS:  The date of sale I believe for Ms.

25   Weissenberger was the date entered for the sale on the

1  Youngevity sales chart when the sale was completed.

2          THE COURT:  One contact you found was on Owimrin's

3  cell phone was after the sale?

4          THE WITNESS:  Yes, it was.

5          THE COURT:  Next.

6          THE WITNESS:  Yes, your Honor, it did not match the

7  sales.

8  BY MR. SCHMIDT:

9  Q.  You indicated on the chart the actual date of the contact?

10  A.  I did.

11  Q.  Now, what was the purpose of -- now, did you make charts

12  related to the second purpose of your examination?

13  A.  Yes, I did.

14  Q.  Where did you obtain the telephone number or telephone

15  numbers of Brooke Marcus?

16  A.  They were located within Jane Thompson's 3500 material, a

17  screen-shot of her contact, of Emily Miller in her contacts and

18  the two associated cell phones.

19  Q.  You said Emily Miller.

20          Is that because you, in your review of the records,

21  you believe Emily Miller and Brooke Marcus are one and the same

22  people?

23  A.  Yes.  Emily Miller is the name Brooke Marcus used.

24  Q.  Now, in the examination of -- was that time-frame more

25  limited?

IB1JKET1                          Tureff - direct

1    A.  Yes.

2    Q.  Than the --

3            THE COURT:  The time-frame of that search?

4            THE WITNESS:  I would have to see my chart to provide

5    the specific dates, but I believe it ranged from the end of

6    December 2015 through the beginning of March 2016.

7    BY MR. SCHMIDT:

8    Q.  I am going to show you what is marked as SP-2.

9            Is that a chart that you made as a result of your

10   search efforts?

11   A.  Yes, SP-2 is the contact between Brooke Marcus' cell phone

12   we have on your records and Mr. Owimrin's cell phone.

13   Q.  Is there more than one cell phone that you were aware that

14   Brooke Marcus had communications with?

15   A.  Yes, I was aware of two cell phones.

16   Q.  How did you do the searches to make a determination of the

17   communications?

18   A.  Again so in Andrew Owimrin's cell phone records I did a

19   search and did find function for those two telephone numbers.

20   Q.  Page 1 and Page 2 the result of you those searches?

21   A.  SP-2 and SP-3, yes, those are the results of my searches

22   with the two cell phone records associated with Brooke Marcus.

23   Q.  What does the information of those documents -- what

24   information is supplied in those documents?

25   A.  It is the date of a cell phone record, date of a call

IB1JKET1                         Tureff - direct

between Ms. Marcus and Mr. Owimrin, the time the call occurred,

whether the call came in, meaning it went from Brooke Marcus to

Andrew Owimrin or out from Mr. Owimrin to Ms. Marcus as well as

the duration in minutes.

Q.   When you say from and to Mr. Owimrin or Ms. Marcus, you

mean from their telephones, not necessarily, you know, they

actually had a conversation?

A.   Correct, correct, to and from those associated phone

numbers.

Q.   SP-4 is a separate chart.  What does that chart show?

A.   SP-4 is a comparison between the phone records for

Mr. Owimrin and Jane Thompson.

Q.   When you say the "phone records," you mean all of the phone

records that he made, all the phones he used or a particular

phone?

A.   The phone records that we have in discovery for

Mr. Owimrin's cell phone ending in 7774.

Q.   Did you have access to any other telephones that

Mr. Owimrin did or did not use?

A.   No.  These are the records I had where did you get

Ms. Thompson's telephone number, Ms. Thompson's telephone

number again I found in her 3500 material.

Q.   Did you locate more than one cell phone for Ms. Thompson?

A.   I cannot say whether the other phone number was a cell

phone.  I did find another phone number associated with Ms.

1    Thompson in her notes.

2    Q.  Did you do the same kind of search in these Sprint records

3    for the numbers you had for Ms. Thompson?

4    A.  I did.

5    Q.  Does SP-4 accurately show the results of that search?

6    A.  Yes, it does.

7              MR. SCHMIDT:  I offer SP-2, 3 and 4 into evidence.

8              MS. FLETCHER:  No objection.

9              THE COURT:  Admitted.

10             (Defendant's Exhibits SP-2, SP-3 and SP-4 received in

11   evidence)

12             MR. SCHMIDT:  Would you show the jury.

13             (Pause)

14   BY MR. SCHMIDT:

15   Q.  That one is of Brooke Marcus' phone ending in 3998.  May we

16   have the next one?

17             THE COURT:  Speak into the Mike, please.

18   Q.  May we have the next one, please.  (Pause)

19   A.  Jane Thompson's telephone number that there were calls and

20   I guess there is one other page.  (Pause) Mr. Owimrin and Ms.

21   Marcus in phone number ending in 9446.

22             (Pause)

23   Q.  Let's go back a second for the Diane Weissenberger.

24             What was the date that you found that she made the

25   agreement to purchase products from Andrew Owimrin while he was

IB1JKET1                          Tureff - cross

1    at Olive Branch?

2    A.   The date I have is September 17th, 2015.

3              MR. SCHMIDT:   I have no further questions.

4              THE COURT:   Is there any cross-examination?

5              MS. FLETCHER:   There is, your Honor.

6              THE COURT:   Mr. Paul, do you have any questions?

7              MR. PAUL:   I do not, your Honor.   Thank you.

8    CROSS EXAMINATION

9    BY MS. FLETCHER:

10   Q.   Good morning, Mr. Tureff.

11   A.   Good morning.

12   Q.   Ms. Lee, can we please pull up what is now in evidence as

13   Defense Exhibit SP-5.

14             Mr. Tureff, you testified on direct that you only

15   included on SP-5 the sales made while Mr. Owimrin was working

16   for Olive Branch.   Is that correct?

17   A.   That is not entirely correct.   The SP-5 is the sales that

18   Mr. Owimrin made at Olive Branch that fit the time range that

19   we have for his phone records.

20   Q.   So you did not include any sales that Mr. Owimrin made

21   after September 29th of 2015?

22   A.   Correct.

23   Q.   Why did you not include any sales after September 29, 2015?

24   A.   Those were the records I was asked to review as pertaining

25   his sales at Olive Branch.

1    THE COURT:  In other words, you did what you were

2   told, and you weren't told to add any sales for any other time

3   period.  Is that correct?

4    THE WITNESS:  Yes, that was the task.

5    MS. FLETCHER:  Ms. Lee, can you please go to the last

6   page of SP-5 and blow up 9-17-15 entry for Diane Weissenberger.

7   BY MS. FLETCHER:

8   Q.  Mr. Tureff, you said that, you testified on direct the sale

9   you understood Mr. Owimrin made to Ms. Weissenberger was on

10  September 17th of 2015.  Is that correct?

11  A.  I believe so.  That was the date listed on the sales chart.

12  Q.  When you looked at Mr. Owimrin's cell phone records, you

13  didn't see any calls from his cell phone to Ms. Weissenberger

14  on that date?

15  A.  Correct.

16  Q.  But you did see, it looks like, 9 calls that Mr. Owimrin

17  made to Ms. Weissenberger on the dates listed in the right-hand

18  column of your chart.  Is that right?

19  A.  There were 9 phone calls, I believe they included both

20  ingoing and outgoing calls, so they were not necessarily 9

21  calls made by Mr. Owimrin.

22  Q.  9 calls between Mr. Owimrin and Ms. Weissenberger on the

23  dates reflected in the far-right column of your chart at SP-5?

24  A.  Yes.

25  Q.  Is that right?

IB1JKET1                     Tureff - cross

1    A.   Yes.

2    Q.   One of those dates is October 7th of 2015?

3    A.   Yes.

4    Q.   Correct?  Ms. Lee, can we please pull up what is in

5    evidence as government exhibit -- I believe it is 503.  Do you

6    see that on your screen, Mr. Tureff?

7    A.   I do.

8    Q.   This is one of the appointments that you testified about,

9    right, the appointments in Mr. Owimrin's calendar?

10   A.   This is an appointment.  I have no way of seeing whether

11   this was in Mr. Owimrin's calendar or not.

12   Q.   Fair enough.

13          Taking a look at Government Exhibit 503, do you see

14   where it says upsell Diane Weissenberger?

15   A.   I do.

16   Q.   And the date of that appointment is September 25, 2015?

17   A.   Yes.

18   Q.   That appointment indicates Ms. Weissenberger had signed a

19   COS?

20   A.   I see that note, yes.

21   Q.   And based on your review of the discovery in this case, you

22   know a COS means a Continuation of Services Agreement?

23   A.   Yes.

24   Q.   Is that fair?

25          And individuals at Olive Branch, customers of Olive

IB1JKET1                         Tureff - cross

1    Branch were asked to sign Continuation of Services Agreements

2    when they had initiated charge-backs?

3              MR. SCHMIDT:  Objection, your Honor.

4              THE COURT:  Yes, sustained.

5    BY MS. FLETCHER:

6    Q.  The date of this appointment is 9-25-2015?

7    A.  Yes.

8    Q.  Is that correct?  Okay.  Ms. Lee, can we please pull up

9    what is in evidence as Government Exhibit 1103.  If we can blow

10   up just the top half of that.

11             Do you see that on your screen, Mr. Tureff?

12   A.  I do.

13   Q.  This is a Product and Services Agreement with A1 Business

14   Consultants?

15   A.  Yes.

16   Q.  And it is an agreement between A1 Business Consultants and

17   Diane Weissenberger?

18   A.  Yes.

19   Q.  Do you see that just to the right of where it says Diane

20   Weissenberger, there are initials that say DW?

21   A.  Yes.

22   Q.  It says 10/7/15?

23   A.  Yes.

24   Q.  That is October 7th of 2015, correct?

25   A.  Yes.

IB1JKET1                        Tureff – cross

1    Q.  If we please can go to the last page of that exhibit, I

2    believe it is Page 3, this is the signature page of the Product

3    and Services Agreement, correct?

4    A.  Yes.

5    Q.  Signed by Diane Weissenberger?

6    A.  Yes.

7    Q.  Dated October 7th, 2015?

8    A.  Yes.

9    Q.  And she authorizes two credit card charges on that day --

10            MR. SCHMIDT:  I am objecting.  This is far beyond the

11   scope.

12            THE COURT:  Sustained.

13   BY MS. FLETCHER:

14   Q.  Is it fair to say Ms. Weissenberger made additional

15   purchases on October 7th of 2015?

16            MR. SCHMIDT:  Objection, your Honor.

17            THE COURT:  Sustained.

18   BY MS. FLETCHER:

19   Q.  Can you please go back to SP-5.  The data of this in SP-5,

20   Mr. Tureff, is culled from the 7774 phone records, right?

21   A.  The date?

22   Q.  The data?

23   A.  The data?  This chart is --

24            MR. SCHMIDT:  Objection, your Honor.

25            THE COURT:  No.  I will allow that.

IB1JKET1                         Tureff - cross

1    A.  -- which section of data is pulled from -- I don't

2    understand your question.  I am sorry.

3    Q.  The dates and the phone numbers -- let me make sure I

4    understand exactly what you did.

5    A.  Okay.

6    Q.  Once you reviewed the appointment calendars and the sales

7    sheets and got an idea of the sales made by Mr. Owimrin, do I

8    understand that what you did was you looked for the phone

9    numbers of those particular victims in --

10                  MR. SCHMIDT:  Objection.

11   Q.  -- in Mr. Owimrin's phone records?

12                  THE COURT:  No.  I will allow that.

13   A.  Yes, I tried to match up the phone number to see whether

14   the phone numbers for the customers of those sales appeared in

15   Mr. Owimrin's cell phone records.

16   Q.  And to be clear, you only reviewed his cell phone records?

17                  You didn't review, for example, the landline records

18   from Olive Branch?

19   A.  Correct.

20   Q.  You reviewed only voice records?  You didn't review whether

21   he had any text message communications with these customers?

22   A.  I reviewed the records we were provided from Sprint.

23                  THE COURT:  Did you review the records of the cell

24   phones of other employees?

25                  THE WITNESS:  No.  I reviewed --

IB1JKET1                          Tureff - cross

1          THE COURT:  Next question.  I am sorry.  You reviewed
2     7774?
3          THE WITNESS:  Yes, your Honor.
4          THE COURT:  That's it?
5          THE WITNESS:  Yes.
6          THE COURT:  All right.
7     BY MS. FLETCHER:
8     Q.  You didn't review any communications that Mr. Owimrin may
9     have had on his cell phone after September 29th of 2015?
10    A.  For this particular exhibit, no.
11    Q.  Would you please please pull up Page 104 of what is now in
12    evidence as Defense Exhibit SP-1.
13    A.  What was that page?
14         THE COURT:  She is just putting up an exhibit.
15         THE WITNESS:  Okay.
16    Q.  Mr. Tureff, I am hoping you'll be able to see Page 1 of 4
17    on your screen.
18    A.  (Pause)  If we could blow it up.
19    Q.  Ms. Lee, can you please blow up the bottom half of that,
20    the calls on October 14th.  Mr. Tureff, do you see that on your
21    screen?
22    A.  I do.
23    Q.  Do you see the call on October 14th at 5:00 pm to an area
24    code 352 in Wildwood, Florida?
25         MR. SCHMIDT:  Your Honor, I object.  This is beyond

IB1JKET1                         Tureff - cross

1    the scope of this witness' testimony.  The testimony was the

2    telephone calls while Mr. Owimrin was at Olive Branch, period.

3            THE COURT:  Overruled.

4    A.  I see that entry.

5    BY MS. FLETCHER:

6    Q.  Do you see the area code 352?

7    A.  I do.

8    Q.  That is Charlene Foster's phone number, isn't it?

9    A.  I don't know that answer.

10   Q.  Take a look at the next page.  Page 105, the very bottom of

11   the page, October 16th, several calls on October 16th.

12           Do you see the third one from the bottom, area code

13   352 in Wildwood, Florida?

14   A.  I see that entry.

15   Q.  Those are Charlene Foster's phone records?

16           MR. SCHMIDT:  Objection again.

17           THE COURT:  I don't know that he would know that.

18           Do you know that?

19           THE WITNESS:  I don't know who that phone number is

20   associated with.

21   BY MS. FLETCHER:

22   Q.  So in preparing Government Exhibit SP-5, you looked at

23   sales --

24           THE COURT:  No, no.  Defense exhibit.

25           MS. FLETCHER:  Sorry, your Honor.

IB1JKET1                    Tureff – cross

1   Q.  Defense Exhibit SP-5, in preparing Defense Exhibit SP-5,

2   you looked at sales sheets from Olive Branch Marketing?

3   A.  I did.

4   Q.  Is that right?

5   A.  Yes.

6   Q.  In those sales sheets, you didn't see Charlene Foster's

7   phone number?

8   A.  No, I don't believe so.  I wasn't attempting to find it.

9   It wasn't one of the sales -- wasn't one of the customers for

10  most of the sales I found I was searching, attempting to locate

11  the telephone.

12  Q.  Ms. Lee, please pull up Page 120 of that same exhibit, the

13  calls on November 12th.

14      Now, we'll look at the exhibits you created with

15  respect to the calls of Brooke Marcus.  You were asked to

16  collect phone calls between Andrew Owimrin and Brooke Marcus on

17  Andrew Owimrin's cell phone.  Isn't that right?

18  A.  Yes.

19  Q.  Take a look at the entry three lines from the bottom on

20  government exhibit -- sorry -- Defense Exhibit SP-1, Page 120,

21  do you see that entry there, 3:57 pm on November 12th?

22  A.  I do.

23  Q.  And that phone number beginning in 949?

24  A.  Yes.

25  Q.  That is Shahram Ketabchi's phone number?

IB1JKET1                          Tureff - cross

1    A.  I don't know that.

2    Q.  You weren't looking to collect phone calls from Shahram

3    Ketabchi and Andrew Owimrin for the purposes of preparing your

4    exhibit?

5    A.  I was not.  That was not the scope of the search.

6    Q.  Can we please pull up what is now in evidence as Government

7    Exhibit 165, Page 8.

8            MR. SCHMIDT:  Your Honor, again this is beyond the

9    scope.

10           THE COURT:  I think so, but I want to hear a question.

11   I shouldn't say, "I think so."  I want to hear a question.

12   BY MS. FLETCHER:

13   Q.  Can you see that on your screen, Mr. Tureff?

14   A.  I see that entry, yes.

15   Q.  This is Jane Thompson's notebook, right?

16           THE COURT:  Do you know that, sir?

17           THE WITNESS:  I believe so, yes.

18           THE COURT:  Fine.

19   BY MS. FLETCHER:

20   Q.  You testified on direct that you reviewed certain entries

21   in Jane Thompson's notebook for the purposes of conducting your

22   analysis?

23   A.  I found her cell phone records, I found her cell phone

24   number amongst the 3500 material.

25   Q.  That included review of Government Exhibit 165, Jane

1    Thompson's notebook?

2    A.  I didn't particularly look through Government Exhibit 165

3    closely.  I found her cell phone number in her 3500 material.

4    Q.  Taking a look at that particular page, do you see the two

5    phone numbers?

6    A.  I do.

7    Q.  What is the first phone number there listed next to the

8    name Jonathan Stewart?

9    A.  Do you want me to read you the telephone number?

10          201-448-9788.

11   Q.  Are you familiar with that phone number?

12   A.  Not particularly.

13   Q.  You didn't include any calls to or from that phone number

14   in conducting your analysis of what calls there were between

15   Andrew Owimrin and Jane Thompson.  Is that right?

16   A.  I compared Ms. Thompson's phone number which I found in the

17   materials to Andrew Owimrin's cell phone, 7774 number for which

18   we have records.

19   Q.  So your summary charts would not reflect, for example,

20   calls between Ms. Thompson and this phone number, 201-448-9788?

21   A.  I do not have the records for either of those phone

22   numbers.

23          THE COURT:  The answer to the question is that's

24   correct, your search did not include those?

25          THE WITNESS:  Correct, I did not search for trying to

1   find a link between those two phone numbers because I don't

2   have the records to do so.

3   BY MS. FLETCHER:

4   Q.  If we can pull up what is now in evidence as Defense

5   Exhibit SP-2 and SP-3.  If we can put those side-by-side, Ms.

6   Lee.  Do you have those documents in front of you, Mr. Tureff?

7   A.  I do.

8   Q.  SP-2 and SP-3?

9   A.  Yes.

10  Q.  The date range on those two documents combined is December

11  28, 2015 through March 1st of 2016.  Is that right?

12  A.  Yes.

13  Q.  I understand you don't have records after March 1st of

14  2016.  Were there any phone calls between Brooke Marcus and

15  Andrew Owimrin's cell phone before December 28th of 2015?

16  A.  I did not find any between that cell phone for Ms. Marcus,

17  either cell phone for Ms. Marcus and the 7774 number in the

18  rest of 2015 that was included in Mr. Owimrin's cell phone

19  records.

20  Q.  How about text messages?

21  A.  I believe those records that I have only include voice

22  calls.

23  Q.  How about phone calls between one of Brooke Marcus' two

24  cell phones and any other number used by Andrew Owimrin?

25  A.  Again the records that we have are for Andrew Owimrin's

IB1JKET1                      Tureff – cross

1    cell phone, the number ending in 7774.

2    Q.  Can we pull up what is now in evidence as Defense Exhibit

3    SP-4.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IB18KET2                        Tureff - Cross

1    Q.  Do you see that up on the screen?

2    A.  I do.

3    Q.  These are the calls, you testified on direct, between Mr.

4    Owimrin's 7774 number and the phone number that you had for

5    Ms. Jane Thompson, is that right?

6    A.  For one of the two phone numbers I had for Ms. Thompson,

7    yes.

8    Q.  You testified that the other Jane Thompson phone number did

9    not have any calls with this cell phone number, right?

10   A.  To Mr. Owimrin's cell phone number, correct.

11   Q.  Understood.

12        Now, this chart doesn't include any calls that Ms.

13   Thompson may have had with Mr. Owimrin on any other phone

14   number, is that correct?

15   A.  This chart includes the records for Mr. Owimrin at 7774 and

16   Ms. Thompson at 2059, the number I found.

17        THE COURT:  I gather, although I don't want to put

18   words in your mouth, the answer to Ms. Fletcher's question is

19   yes.

20        MR. SCHMIDT:  Your Honor, the exhibit actually speaks

21   for itself.  The question is somewhat redundant.

22        THE COURT:  Can you answer my question or have you

23   lost --

24        THE WITNESS:  Can she repeat the question?

25        THE COURT:  Sure.

IB18KET2                         Tureff - Cross

1  Q.  I have lost the thread of it.

2          I think what I asked, Mr. Tureff, is this exhibit

3  doesn't include any phone calls that Ms. Thompson may have made

4  to any other phone number that Andrew Owimrin used, including

5  the one in her notebook?

6  A.  Correct.

7  Q.  It doesn't include text messages?

8  A.  Yes.

9  Q.  If Jane Thompson --

10  A.  Correct.

11          THE COURT:  None of the records you have looked at

12  included texts?

13          THE WITNESS:  Correct.  The cell phone records I have

14  for Mr. Owimrin only includes calls.

15          MR. SCHMIDT:  Your Honor, that is indicated in the

16  stipulation as well.

17          THE COURT:  Thank you.

18          Next question.

19  Q.  Mr. Tureff, if Andrew Owimrin was on the phone with Brooke

20  Marcus and she patched in Jane Thompson, she meaning Brooke

21  Marcus initiated a three-way call to include Jane Thompson in

22  the call, that wouldn't be reflected on Andrew Owimrin's phone

23  records, would it?

24  A.  I cannot say yes or no to that.  I don't know that answer.

25  Q.  Did you see any indication on Andrew Owimrin's phone

1   records that he was participating in three-way calls with Jane

2   Thompson?

3   A.  I don't believe there was a designation for a three-way

4   call in the records.

5          THE COURT:  Based on the records and that's all you

6   have to go on.

7          THE WITNESS:  I have no way of knowing.  As far as I'm

8   aware, I have no way of knowing.

9   Q.  Similar question.  If Jane Thompson was on the phone with

10  Brooke Marcus and Brooke Marcus used one of her two cell phones

11  to patch in Andrew Owimrin on his cell phone, that wouldn't be

12  reflected on Andrew Owimrin's records as a call between Andrew

13  Owimrin and Jane Thompson, would it?

14  A.  I don't know the answer to that.

15  Q.  Wouldn't it be reflected as a call between Brooke Marcus

16  and Andrew Owimrin if Ms. Marcus is the one who patched in Mr.

17  Owimrin to speak to Jane Thompson?

18         MR. SCHMIDT:  Objection.

19         THE COURT:  Sustained.  He is not a telephone expert.

20  He is a paralegal.

21         MS. FLETCHER:  May I have a moment, your Honor?

22         THE COURT:  He did what he was told, and didn't do

23  what he wasn't told.

24         MS. FLETCHER:  No further questions, your Honor.

25         THE COURT:  Anything?

IB18KET2                          Tureff - Redirect

1          MR. SCHMIDT:  Very briefly.

2     REDIRECT EXAMINATION

3     BY MR. SCHMIDT:

4     Q.  Mr. Tureff, did you have access working this case to every

5     bit of discovery that was received by the defense from the

6     government?

7     A.  I believe so.

8     Q.  Was your search -- withdrawn.

9          Now, do you recall the testimony of Mr. Sinclair that

10    salespeople may have used cell phones to make sales calls?

11         MS. FLETCHER:  Objection.  Beyond the scope of cross.

12         MR. SCHMIDT:  It certainly explains --

13         MS. FLETCHER:  And direct.

14         THE COURT:  Just a moment.

15         MS. FLETCHER:  Also 801.

16         MR. SCHMIDT:  Your Honor, if you want me to lay a

17    better foundation I can.

18         THE COURT:  It does seem to be beyond the scope, sir.

19    Ask another question.

20    BY MR. SCHMIDT:

21    Q.  You answered all of the questions that the government asked

22    limiting the time frame of the calls up to the point that he

23    left Olive Branch Marketing, is that right?

24         MS. FLETCHER:  Objection to form.

25         THE COURT:  Up to the date he was given.

1          You searched the phone records within the dates you

2    were provided, correct?

3          THE WITNESS:  The date range, yes, was up until Mr.

4    Owimrin left Olive Branch Marketing.

5    Q.  The dates that you had was from the beginning of the date

6    that you had telephone records to the date that was relevant to

7    when Mr. Owimrin left Olive Branch Marketing, is that correct?

8          MS. FLETCHER:  Objection to form.

9          THE COURT:  I will allow it.

10   A.  Yes.  That's the date range for the records in SP5 for the

11   review.

12   Q.  Do you recall Mr. Sinclair's testimony as to the use of

13   cell phones by salespeople?

14         MS. FLETCHER:  Objection.  Scope.  801.

15         THE COURT:  Sustained.  Beyond the scope.

16   Q.  Do you know what the purpose of your limited search was in

17   relation to cell phone calls with customers?

18         THE COURT:  Sustained.  Just rephrase it.

19         I didn't understand it.  That's why I am asking.

20   Q.  Did you understand the purpose, the limited purpose of your

21   examination of the records limiting it to that time frame?

22   A.  Yes, I did.

23   Q.  What was that purpose?

24         MS. FLETCHER:  Objection.  801.

25         THE COURT:  Sustained.

1                    MR. SCHMIDT:  May we approach, your Honor?

2                    THE COURT:  Not on this.  Let's close it.

3                    801 is the appropriate objection.  Proceed.

4                    MR. SCHMIDT:  I have no further questions.

5                    THE COURT:  All right.  You may step down, sir.

6                    (Witness excused)

7                    THE COURT:  Next witness for the defense.

8                    MR. SCHMIDT:  The defense calls the defendant, Mr.

9       Owimrin.

10                   THE COURT:  Mr. Owimrin, please step up.

11       ANDREW OWIMRIN,

12           called as a witness by the defendant,

13           having been duly sworn, testified as follows:

14                   THE DEPUTY CLERK:  State your full name and spell your

15       last name for the record.

16                   THE WITNESS:  Andrew Owimrin, last name is

17       O-W-I-M-R-I-N.

18                   THE COURT:  Good morning, sir.  Welcome.

19                   Please be seated.  You know the drill by now.  Keep

20       the microphone close to your mouth.

21       DIRECT EXAMINATION

22       BY MR. SCHMIDT:

23       Q.  Before you get to the beginning, I have a few questions.

24                   Did you ever use your cell phone when you worked in

25       Olive Branch to make a sale?

IB18KET2                    Owimrin - Direct

1   A.   Maybe once or twice.

2   Q.   Now, was it for a nefarious purpose using your cell phone

3   once or twice to make a sale?

4             MS. KEARNEY:  Objection.

5             THE COURT:  Sustained as to form.

6   Q.   Did you use your cell phone when you left Olive Branch and

7   moved with Mr. Ketabchi to A1 in the beginning?

8             MS. KEARNEY:  Objection.  Form.

9             THE COURT:  I will allow it.

10  A.   Yes.

11  Q.   Why?

12  A.   We were in the processing of starting A1.  We didn't have a

13  phone system.  We were just getting started.  We were moving

14  from Olive Branch to work for Arash.

15  Q.   Once you had -- withdrawn.

16            Now, Andrew, where did you grow up?

17  A.   I grew in Hillsdale, New Jersey, Bergen County.

18  Q.   Who did you grow up with?

19  A.   I grew up with my family, my brothers.

20  Q.   How many brothers do you have?

21  A.   Three brothers.

22  Q.   What are the ages of your brothers?

23  A.   The one closest in age to me is 35 -- excuse me, 34, he

24  will be 35 in January.  The next one is 36 and 39.

25            THE COURT:  How old are you, sir?

1        THE WITNESS:  I just turned 29.

2    Q.  Were you raised with your parents?

3    A.  Yes.

4    Q.  Now, are your parents from the United States?

5    A.  No, they are not.

6    Q.  Where are your parents from?

7    A.  My father was born in Jordan, raised in Lebanon, Beirut,

8    and my mother was born in Greece.

9    Q.  Do you know if your father reads and writes English?

10   A.  He does not; he does not read and write English.

11   Q.  Now, when you were growing up, what kind of work was your

12   father doing?

13   A.  Flooring, primarily flooring work.

14   Q.  Now, what high school did you go to?

15   A.  I went to Pascack Valley High School.

16   Q.  Did you graduate from Pascack Valley?

17   A.  I did not.

18   Q.  When did you leave Pascack Valley High School?

19   A.  When I was 15 years old, 10th grade.

20   Q.  Why did you leave high school?

21   A.  I had dropped out to help my father with the family

22   business.

23   Q.  Had you worked with your father before that?

24   A.  I did, pretty much my entire childhood I would help.

25   Q.  Did there come a time that you stopped working for your

1  father?

2  A.  I did.

3  Q.  How long did you work for your father, about?

4  A.  About, I would say about five, six years -- five, six years

5  after I had dropped out, worked full time.

6  Q.  Why you stop working for your father?

7  A.  Health reasons.  My father's health was deteriorating and

8  the business just kind of slowed down and stopped.

9  Q.  What kind of work did you do after that?

10 A.  I have done everything.  Construction, landscaping,

11 maintenance work, handyman work, busboy, barback, which is

12 basically a busboy for a bartender, pizza delivery.

13 Q.  What was your last job that you had before you went to work

14 at Olive Branch?

15 A.  I was a busboy at a restaurant and they had promoted me to

16 a barback.

17 Q.  Andrew, are you nervous?

18 A.  Yes, I am.

19 Q.  I notice that you smile a lot when you're answering your

20 questions.

21 A.  Yes.

22 Q.  Why is that?

23 A.  When I get nervous I tend to smile or laugh or chuckle, but

24 I do smile when I get nervous.

25          THE COURT:  I hope you also smile when you're enjoying

IB18KET2                        Owimrin - Direct

1   something.

2            THE WITNESS:  I do, but I believe they are different

3   smiles.  You know when I'm nervous or when I am happy.

4   Q.  Now, while you were working at that last job as a back

5   busboy?

6   A.  A busboy.

7            THE COURT:  A barback.  A barback supplies the

8   bartender with clean glasses, takes dirty glasses away, sets

9   up, helps out the bartender?

10           THE WITNESS:  Yes, your Honor.

11  Q.  While you were doing that, did you apply for another job?

12  A.  Yes.  Our neighbor that -- when we were living in Cliffside

13  Park, our neighbor was the mayor's of Cliffside Park brother,

14  and he wanted to offer me the opportunity to apply for the

15  Cliffside Park police department, so I did.

16  Q.  What process did you go through?

17  A.  I went in for an -- I went in for two interviews, and then

18  I would have to wait for the police academy, which I believe

19  was every six months or every three months.  I'm not sure

20  exactly how long.

21  Q.  Did you have an idea about how long you were going to have

22  to wait until you could start the academy?

23  A.  I would say six months.

24  Q.  Now --

25  A.  Before I had the academy interview.  I wouldn't have just

1    started.  I would have to go through a test.

2    Q.  Your brothers, are they all employed?

3    A.  Yes.

4    Q.  What do they do?

5    A.  My oldest brother Alex is a stagehand here in New York

6    City, in Manhattan.  My brother Rich works for PSEG.  And my

7    brother Steve works as pretty much a coach; he runs a company

8    in South Jersey doing sports, coaching, training, private

9    parties.

10   Q.  While you were bar busing and waiting to be interviewed or

11   take a test at the academy, did there come a time that you were

12   offered an opportunity to apply for another job?

13   A.  Yes.

14   Q.  What was that?

15   A.  My cousin Reagan told me he was working for this company

16   with his sister's boyfriend at the time, it's a good

17   opportunity, it could be something that we could do as a

18   career, you know.

19   Q.  What were you told to do?

20   A.  I was told to come in for an interview.

21   Q.  Had you known your cousin's -- had you met your cousin's

22   boyfriend before that time?

23   A.  I did not meet my cousin's boyfriend before.

24   Q.  Who is your cousin's boyfriend?

25   A.  Arash Ketabchi.

IB18KET2                        Owimrin - Direct

1   Q.  Now, did you go to that office?

2   A.  Yes.

3   Q.  What happened when you got to the office?

4   A.  Well, I went there in a suit and tie.  I met my cousin

5   Reagan in the hallway.  He had called Arash Ketabchi out into

6   the hallway, that was the first time I met Arash Ketabchi.

7   Then we introduced ourselves there in the hallway.  He walked

8   me in the office, led me to Bill Sinclair's office where Bill

9   conducted the interview.

10          THE COURT:  When was this?

11          THE WITNESS:  This was, I believe, in March or April

12  of 2014.

13  Q.  Now, you have heard testimony about different offices for

14  Olive Branch.  Do you remember what town that this office was

15  located in?

16  A.  Yes.  It was in Hoboken.

17  Q.  Now, you saw a photograph that Mr. Sinclair described the

18  rooms and everything.  Was it at that office or another office?

19  A.  That was another office.

20  Q.  Could you tell us about what the interview consisted of?

21  A.  It consisted of Bill Sinclair giving me the details about

22  what the job entailed, that it was a telemarketing sales job.

23  But he kind of described it as a business development type job.

24  He told me that --

25          MS. KEARNEY:  Objection.

IB18KET2                         Owimrin - Direct

1              MR. SCHMIDT:  This is for background and his state of

2    mind.

3              THE COURT:  Just a moment.

4              Sustained.

5              MR. SCHMIDT:  Your Honor, may we approach?

6              THE COURT:  Yes.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         (At the sidebar)

2         THE COURT:  I understand it's just background, but I

3    would like you to get to the core of what this is about.

4         MR. SCHMIDT:  The government has asked for a conscious

5    avoidance charge.  They are going to say in some way or the

6    other that he made improper statements, and he had the

7    knowledge of these things, and ultimately -- or at least that

8    he was aware of all the things going on, and therefore he knew

9    this was a whole scam.

10        The only way for him to defend himself is for him to

11   be able to testify what occurred that caused his state of mind

12   to believe that this was a legitimate business that he was

13   doing.  If he can't do that, he can't defend himself.

14        So whether Bill Sinclair told him the truth or not is

15   not relevant.  What is relevant is what he heard from Bill

16   Sinclair, what he heard from other people, what he thought

17   about that, how it impacted his knowledge and intent.

18        MS. KEARNEY:  Perhaps the more appropriate question

19   is, What is your understanding of what the business would be

20   based on what Bill told you?

21        THE COURT:  I think that's the same thing.

22        Go ahead.  Do it.  I just don't want a whole lot of

23   hearsay coming in here because it's not an adverse party.

24        MS. KEARNEY:  I will add, your Honor --

25        MR. SCHMIDT:  I need to develop why he trusted Bill

1    Sinclair and why he continued to work there.  If I can't bring

2    out what Bill Sinclair was saying to him to impact his state of

3    mind, then we can't do it, we can't present our defense.

4              THE COURT:  There is something called hearsay.

5              MR. SCHMIDT:  There is hearsay when it's coming out

6    for the truth, not for impacting his state of mind.  If you

7    like, you could give a charge that it's not being offered for

8    the truth of anything that Bill Sinclair has ever said.  I am

9    perfectly happy with that.  It's not what he said.  It's for

10   the effect on his state of mind.

11             THE COURT:  All right.

12             MS. KEARNEY:  I understand that, your Honor, but Mr.

13   Schmidt's question was what did he say to you.  There is no

14   indication of what the topic is going to be.  So at that point

15   I have to object because --

16             MR. SCHMIDT:  I will be perfectly happy to lead him.

17             MS. KEARNEY:  I think you can cabin your question on

18   the topic or instructions.

19             MR. SCHMIDT:  I can do this.

20             THE COURT:  Do that, but again, state of mind only

21   goes so far.

22             MR. SCHMIDT:  In this case it's the only way, Judge.

23             THE COURT:  What I mean is in terms of your running

24   with lots and lots and lots of questions that you want an

25   exception for state of mind.  Make it succinct.  Make it a few

IB18KET2                          Owimrin – Direct

1    questions.  Let's move on.  And I will give that limiting

2    instruction.  I am giving you some leeway here.

3               (Continued on next page)

IB18KET2                        Owimrin - Direct

1              (In open court)

2              THE COURT:  Rephrase.

3    BY MR. SCHMIDT:

4    Q.  What was the tone of the interview?

5    A.  It was professional, enthusiastic, the best way I can

6    describe how Bill was.

7    Q.  Was it done in a way to try to persuade you to come to

8    work?

9              MS. KEARNEY:  Objection.

10             THE COURT:  Sustained as to leading.

11   Q.  Had you ever worked in a telephone marketing company?

12   A.  Never.

13   Q.  Other than perhaps receiving some telephone calls, did you

14   have any idea what how a telephone marketing company worked?

15   A.  No.

16   Q.  In your interview with Mr. Sinclair, was he just seeking

17   information from you about your background or was he giving you

18   information about the business?

19   A.  It was more of him explaining to me what the business was.

20   Q.  You said he was professional and -- what was the word you

21   used?

22   A.  Enthusiastic.

23   Q.  Enthusiastic, what do you mean by that?

24   A.  It's just the way -- his demeanor, the way he carried

25   himself, the way he dressed, the way he described everything.

                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

IB18KET2                          Owimrin - Direct

1   He seemed to know what he was talking about and seemed to want

2   me to be there, or at least try.

3              THE COURT:  You think he was selling you on the job?

4              THE WITNESS:  Looking back on it, yes, sir.

5              MR. SCHMIDT:  Thank you, your Honor.

6   Q.  Was he successful --

7   A.  Yes.

8   Q.  -- in selling you the job?

9              Did he talk to you at all about what this job can mean

10  to you as an occupation, as earnings, did he talk to you about

11  that?

12             MS. KEARNEY:  Objection.

13             THE COURT:  Sustained as to form.

14             Did you try to sell him on yourself?

15             THE WITNESS:  No.  I let him know that I'm completely

16  new to this.  I had no idea what it was, but I was willing to

17  learn.  Because of the fact that he explained it was a career,

18  it could be a career, they were just starting, they were going

19  to be growing, they were going to be getting 401-k, health

20  benefits, he led me to believe this was something that I could

21  do for the rest of my life if I succeeded at it.

22  Q.  Did he inform you about the earning potential?

23  A.  Yes, he did.

24  Q.  What did he tell you?

25  A.  He said, if I'm not making $80,000 a year just to start,

IB18KET2                        Owimrin - Direct

1    then there is no reason for me to be working there; he wouldn't

2    want me working there.

3    Q.  How did that make you feel?

4    A.  Nervous but excited.

5    Q.  Did he talk at all about the kind of products that you were

6    going to be selling?

7    A.  Yes.  He briefly did talk about everything.  He gave me a

8    pamphlet that described what these products that we would be

9    selling were, as well as brief descriptions of them, almost

10   like a script.  If it had an LLC, it would tell you what the

11   LLC was about and you could read that off to a customer.

12   Q.  Did you have any understanding of the products they were

13   selling prior to taking a look at the documents that he gave

14   you?

15   A.  No, not at all.

16   Q.  Were you offered a job?

17   A.  Yes, I was offered an opportunity.

18   Q.  When did you start work?

19   A.  March or April of 2014.  I started the next -- literally

20   that day, actually, not the next day, that day I started

21   listening to people in the office.

22   Q.  So what did you do -- withdrawn.

23            Was there a formal training there?

24   A.  I wouldn't call it formal, but there was a training.

25   Q.  What did you do initially for the first couple of weeks?

1  A.  I started off listening to appointments being set, and then

2  I had started getting on the phones to set appointments and

3  just get comfortable talking to people on the phone.

4  Q.  Now, did you receive any training about how to set

5  appointments?

6  A.  Yes.

7  Q.  Who trained you to do that?

8  A.  Bill had pretty much trained me, but also he wanted me to

9  listen to other people setting appointments, everybody in the

10  office, nobody specific.  But Bill taught me, Arash taught me a

11  few things, everybody really did.  But primarily Bill because

12  everybody else was working so he was the only one who had time

13  to explain things to me.

14  Q.  Now, when you set appointments, how did you reflect the

15  appointments so people knew that there were going to be

16  appointments?

17  A.  I would set the appointment, and then in the description on

18  the calendar I would put set by Andrew.

19  Q.  You said a calendar.  What kind of a calendar was it?

20  A.  It was a Gmail Google calendar.

21  Q.  Had you worked a Gmail Google calendar before then?

22  A.  Never.

23  Q.  Who trained you to work a Gmail Google calendar?

24  A.  Bill and coworkers.

25  Q.  What was your understanding, once you put an appointment on

IB18KET2                        Owimrin - Direct

1    the Gmail Google calendar, who would be able to see it?

2    A.   Everybody would be able to see it.  Everybody that had a

3    name on the calendar, everybody that had access to the

4    calendar, which is basically everybody in the office.  Not

5    basically, it was everybody in the office.

6    Q.   Now, when you were doing the appointment setting, did you

7    talk to the people you were setting appointments with about the

8    products that the company had?

9    A.   No.

10   Q.   Who was the person who talked about that?

11   A.   The sales rep.

12   Q.   Now, do you recall the first time that you made a sales

13   call?

14   A.   Yes.

15   Q.   Could you tell us about it?

16   A.   Arash had -- I was setting appointments that day, and he

17   just randomly stood me up and said, you're going to take this

18   appointment, made me call it in front of the entire office.  It

19   was the only appointment; he made me do it in front of

20   everybody.  It didn't go so well.

21   Q.   What do you mean by it didn't go so well?

22   A.   I couldn't really get my words out.  It got really hot in

23   there, and I kind of just crumbled, ended up hanging on the

24   client without even saying anything at all.

25              THE COURT:  When was this?

IB18KET2                          Owimrin - Direct

1           THE WITNESS:  March or April.  It was after two weeks,

2    because I did appointments for about two weeks, so it had to be

3    after about two weeks of me working there.

4    Q.  Now, when you were making the sales call, did you have a

5    script to follow?

6    A.  I did have a script that I should have followed but I

7    didn't.

8    Q.  What happened?

9    A.  I just got nervous.  I just froze.

10   Q.  Now, eventually you made -- would it be fair to say you

11   made more and more sales calls?

12   A.  Yes.

13   Q.  Do you recall about how long it was before you were first

14   successful?

15   A.  Almost a month or two months -- it was actually almost two

16   months into it, because the first month I was pretty much

17   training, and then the second month I was actually trying to

18   make sales calls, and it took me about two and a half, three

19   weeks to get a sale.

20   Q.  Now, when you started making these telephone calls, did you

21   receive -- you said you received a script, is that right?

22   A.  I did.

23   Q.  Now, I am going to show you Government Exhibit 254.

24           MR. SCHMIDT:  Can we put that up?

25   Q.  You had a chance to previously read this?

1   A.  Yes.

2   Q.  This document, right?

3   A.  Yes.

4   Q.  Is this a document -- is this one that you actually have

5   seen before?

6   A.  This exact one I did not see when I was still working at

7   Olive Branch.

8   Q.  Did you see something that was very similar to this script?

9   A.  The words Tax Club were just replaced with Olive Branch,

10  but it was pretty much the exact same contract, other than the

11  business name, and there were a little tweaks here and there.

12  Q.  Is it fair to say this is similar to one of the scripts

13  that you worked off of?

14  A.  It's fair, yes.

15          THE COURT:  It sounds like -- go ahead.

16          Next question.

17  Q.  Now, when there were other products to sell, did you

18  receive either a script or information that you would use in

19  describing those products?

20  A.  Yes.

21  Q.  Now, besides this script, did anyone there inform you that

22  when you're making these sales there's some things you can do

23  and some things you can't do?

24          MS. KEARNEY:  Objection.

25          THE COURT:  Rephrase it.

IB18KET2                         Owimrin - Direct

1  Q.  Besides just given the script, were you given other

2  instructions by senior people?

3  A.  Yes.

4  Q.  Who were the people who gave you instructions?

5  A.  The ownership, Bill Sinclair, Michael Finocchiaro, Arash.

6  Q.  Was some of the instructions -- were you told -- what were

7  some of the instructions that you were given?

8  A.  There was just certain things that we could not say on the

9  phone, earnings claims specifically was a big one that I could

10 remember, tax -- I can't recall the exact word right now, but

11 pretty much no earnings claims and no leading people to believe

12 that they have to take these products.  We are offering them,

13 but they don't have to do it.  You can't force somebody to do

14 it.

15 Q.  Now, other than Youngevity, which we will discuss later on,

16 do you recall the products --

17          THE COURT:  I'm sorry.  Before you do that, I am not

18 sure I quite understand what you just said.

19          You said you could not lead people to believe that

20 they had to take the products you were offering.  Is that

21 right?

22          THE WITNESS:  Yes.

23          THE COURT:  What did you mean?  That you could not

24 tell them they were under a legal obligation to take the

25 products, or rather it's not a must-have item?

1     THE WITNESS:  That first part was not specifically

2  told to us.  But yes, we couldn't lead them to believe that in

3  order to be successful you need to take our products.  They

4  could go to anybody they want.  They could go to any company

5  they want to get whatever services they want.

6     THE COURT:  I take it you didn't say that though,

7  right?

8     THE WITNESS:  Occasionally you could say that.  If

9  people said, are you the company we invested with previously,

10  we would say, no, we are not; we are a separate company.  We

11  couldn't act as we were the company that had initially spoke to

12  these clients.  If Elite called, we couldn't say I am calling

13  from Elite.  We would have to separate ourselves and let them

14  know that they could work with anybody; they are not

15  specifically directed to work with us.

16  Q.  Were you able, though, to indicate in some way that you're

17  aware of their relationship with that prior company?

18  A.  Yes.

19  Q.  Now, what was your understanding of -- withdrawn.

20     Were you told what leads were?

21  A.  Yes.

22  Q.  What were leads?

23  A.  Leads were potential clients.

24  Q.  Did you know where leads came from?

25  A.  No.  A lead source, that's the word they would say, but I

1    didn't know where they came from.  It came from a list.

2    Q.  When you were at Olive Branch, did you ever see a lead list

3    in the entirety?

4    A.  Not in its entirety.  Bill Sinclair would specifically give

5    me a certain number of lists.  So I wouldn't see every lead

6    that he had, but they would give me a list to cull through.

7    Q.  Now, what was your understanding of the nature of the

8    product that you were selling to the people where you had got

9    the list from?

10   A.  The nature of the products we were selling?

11   Q.  Yes.  At the time you were at Olive Branch, before

12   Youngevity.

13   A.  They would be products that can potentially help these

14   businesses succeed, or make them more complete.

15   Q.  So your understanding was the people had already invested

16   in a business?

17   A.  Yes.

18   Q.  Other than Youngevity, generally, did you at Olive Branch

19   sell businesses or sell products that would help the business?

20   A.  Products that were supposed to help the business.

21   Q.  Do you have some examples?

22   A.  An LLC, search engine optimization, marketing and

23   advertising, business plans, things like that.

24   Q.  What was your understanding -- withdrawn.

25             Was your understanding that some of these items also

1    came with assistance, like coaching or training?

2              MS. KEARNEY:  Objection.

3              THE COURT:  Sustained as to form.

4              It's your witness, sir.

5    Q.  Did you understand whether all of the products that you

6    were selling stood alone or had other elements involved in

7    them?

8              MS. KEARNEY:  Objection.

9              MR. SCHMIDT:  I will withdraw that question.

10             Can we put up BS 11, please.

11   Q.  What is BS 11?

12   A.  This looks like a sales sheet.

13   Q.  Is this the only sales sheet that you ever saw when you

14   were at Olive Branch?

15   A.  No.

16   Q.  Were there more than one sales sheet?

17   A.  Yes.

18   Q.  They changed at times?

19   A.  Yes, depending on the fulfillment company that would be

20   actually doing the work.

21   Q.  Now, what was your understanding of what a fulfillment

22   company was?

23   A.  That was a company that actually did the work.  I was told

24   or led to believe that these people in the fulfillment

25   companies went to school for marketing, online marketing or

IB18KET2                         Owimrin - Direct

1    business, had business degrees.  I was led to believe that

2    these fulfillment people specialized in completing these

3    services.

4    Q.  Who led you to believe that?

5    A.  Bill Sinclair, Michael Finocchiaro, Arash, the ownership

6    and the management of the company.

7    Q.  Now, who were the actual owners?

8    A.  Bill Sinclair, Michael Finocchiaro.

9    Q.  Was there one more active as an owner than the other?

10   A.  Yes.

11   Q.  Who was that?

12   A.  That was Bill Sinclair.

13   Q.  Now, looking at Defense Exhibit BS 11, if you look down,

14   for example, at business plan, it says "two week training" and

15   some other words after that.

16           What was your understanding about what that meant?

17   A.  They got a two week training, they got a business plan,

18   business plan booklet, a certain amount of revisions on the

19   business plan, depending on how much they invested or what tier

20   or package of business plan they purchased.

21   Q.  And the amount of training, did that depend on how much

22   they are willing to spend for that particular product?

23   A.  Yes.

24   Q.  Did you believe that it was a real product?

25           MS. KEARNEY:  Objection.

1            THE COURT:  Sustained.

2            What was your understanding of what you were selling?

3            THE WITNESS:  A business plan.  They showed us an

4    example of a business plan.  They explained it as like -- I

5    don't want to sound like a sales guy, but they explained it

6    like it's a road map for your business, it shows how to get

7    from A to B as quickly and safely as possible.  It breaks down

8    the market they are in and things like that.  That's what my

9    understanding of what business plan is.  I don't really know

10   very well what a business plan is.

11   Q.  Now, if a customer asked you a question that you did not

12   know the answer to, what did you do?

13   A.  I specifically told clients, if there is an answer I don't

14   know, I'm not going to sit here and pretend that I do, but I

15   will either lead you to somebody that will answer it or try my

16   best to.

17   Q.  Did you ask anybody who you were working with to help you?

18   A.  Yes.

19   Q.  As a salesperson, the first person that would contact -- do

20   you know the first person who would contact a prospective

21   customer?

22   A.  Yes.

23   Q.  Who would that be?

24   A.  That would be an appointment setter.

25   Q.  And where would that appointment -- if it was successful

1  and an appointment was set up, what would the appointment

2  setter do?

3  A.  They would put it on the Google calendar.

4  Q.  Under whose name?

5  A.  Zach Peterson, which is Arash Ketabchi.

6  Q.  What was his position at the time you worked there?

7  A.  He was a sales floor manager.

8  Q.  At some point what would happen to that appointment?

9  A.  About five minutes before the hour he would delegate those

10 appointments to whoever was available.  We each had a color, we

11 each had a name on the calendar.  Let's say it was me.  He

12 would put it in Andrew Owens' name.  My color was purple.  So

13 that appointment on the calendar would show up as purple and I

14 would know that that's my appointment.  And he would also tell

15 us you have an appointment, check your calendar.

16 Q.  You told us the appointment calendar was under Andrew

17 Owens?

18 A.  Yes.

19 Q.  Your name is Andrew Owimrin?

20 A.  It is.

21 Q.  Why were you using Andrew Owens?

22 A.  We were told to use more American names.  It's something

23 that telemarketing people do.  If you ever heard or spoke to a

24 telemarketer, it's probably not their real name, even if it's

25 from, I don't know --

IB18KET2                          Owimrin - Direct

1   Q.  Did anyone tell you of an example of what happened when

2   they didn't use an Americanized name?

3   A.  Yes, one of my coworkers.

4   Q.  What did he tell you?

5          MS. KEARNEY:  Objection.

6          THE COURT:  Sustained.

7          MR. SCHMIDT:  It's for state of mind.  It's not for

8   the truth.  It's for the state of mind of my client.

9          THE COURT:  All right.  I will allow it.  Ladies and

10  gentlemen, not for the truth of what this person supposedly

11  told him, but simply for its impact, if any, on the state of

12  mind of Mr. Owimrin.

13          I will allow it.

14  A.  A coworker, his name is Louis Jimenez, he worked for The

15  Tax Club.  He was closer in age to me so we kind of connected,

16  and he told me, you know, how he used to use Louis Jimenez as

17  his phone name, or he did for a short period of time.  And when

18  he would introduce himself, people would say some nasty things

19  and hang up on him because of his ethnicity.  So he changed it

20  to Louis Anderson and didn't have that problem again.

21  Q.  Were you trying to hide your real name?

22  A.  No.  I have actually --

23  Q.  Now, if the appointment was put in your color, what would

24  you do?

25  A.  I would call it.

IB18KET2                        Owimrin - Direct

1    Q.  Would you look at the appointment?

2    A.  Yeah.  I would look at the appointment -- I would look at

3    the description.  I would open up the appointment and it would

4    have a description.  It would tell you the name of the client,

5    their phone number, what lead list it came from.  And then if

6    the appointment setter got any type of information or a feel

7    for the client, they would say simple things like sweet lady or

8    not in a good mood, just things so you'd know going into it a

9    little bit, you have some type of feel for it, as well as if

10   the client told you if there's any products, sometimes they

11   would tell them if there's products that they already had.

12   Whatever information the customer told them they would write

13   down for us to see so we knew something going in.

14   Q.  Now, if the conversation you had -- how long would some of

15   these conversations, how long would these be?

16   A.  They usually would typically last 30 minutes to an hour and

17   a half or half hour to an hour and a half.

18   Q.  If the conversation that you had with the customer was

19   successful, what would happen, or what would you do?

20   A.  First thing I would do would be bring a sales sheet into

21   Bill Sinclair's office.

22   Q.  Who would have filled out that sales sheet?

23   A.  I would have filled out the sales sheet while on the phone

24   with the client.

25   Q.  What would happen when it was brought to Bill Sinclair's

1   office?

2   A.  He would do what is called a preauthorization on a credit

3   card.  If it wasn't being put on a credit card, we would just

4   take it directly to our appointment setters which also did

5   compliance.

6   Q.  Now, was there any restriction of taking only credit cards

7   from customers at Olive Branch?

8           MS. KEARNEY:  Objection.

9           THE COURT:  Sustained.

10  Q.  Was there any restrictions on the manner that you accept

11  payment at Olive Branch?

12          MS. KEARNEY:  Objection.

13  A.  No.

14          THE COURT:  I will allow it.

15          You could accept a check, I take it, then?

16          THE WITNESS:  You could accept any form.

17          THE COURT:  You could accept a check?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  And cash?

20          THE WITNESS:  Nobody sent cash, but you could accept a

21  check, a wire.

22          THE COURT:  A credit card.

23          THE WITNESS:  Debit card, credit card.

24          THE COURT:  Anything.

25          THE WITNESS:  Any form of payment, except for a point

IB18KET2                        Owimrin - Direct

1   in time we didn't accept American Express, but sometimes we

2   did, depending on the merchant.

3   BY MR. SCHMIDT:

4   Q.  Now, you have heard the testimony about merchant accounts

5   taking certain percentages of sales.  Were you aware at that

6   time of what percentage the merchant accounts that Olive Branch

7   worked with was getting per sale?

8   A.  No, I did not.

9   Q.  Did you have any knowledge of what a merchant account would

10  get from a sale from your local grocery store?

11  A.  No.

12  Q.  You were aware though that they were going to get

13  something?

14              MS. KEARNEY:  Objection.

15              MR. SCHMIDT:  Withdrawn.

16  Q.  In fact, was a form of payment other than credit card

17  preferred?

18              MS. KEARNEY:  Objection.

19              THE COURT:  I will allow it, if he knows.

20  A.  Yes.

21  Q.  Why?

22  A.  Because if you got a check or a wire, a form of cash rather

23  than a credit card, they don't have to pay merchant fees, so

24  they prefer a credit card -- they prefer a check or cash wire.

25  That was actually their preference, not credit cards.

1          THE COURT:  And within that check, cash, wire, did

2     they have a preference?

3          THE WITNESS:  No.

4          THE COURT:  It didn't matter whether it was a check or

5     instant cash through a wire?

6          THE WITNESS:  It didn't matter.

7     Q.  The limitation of their preference that was made known to

8     you was noncredit cards are better than credit cards?

9     A.  Yes.

10         MS. KEARNEY:  Objection.

11         THE COURT:  Sustained as to form.

12    Q.  Now, if it was a credit card and it went to Bill for

13    preauthorization, what did preauthorization mean?

14    A.  As it was explained to me, a preauthorization, it just kind

15    of puts a hold on a portion of the funds or the funds; whatever

16    charge you are planning on putting through later, it just holds

17    that amount, and it also sees if the client actually has it.

18    If it's declined, they wouldn't be able to make that purchase.

19    If they would preauthorize it and the preauthorization went

20    through, you would know that it will be successful after

21    contracts are signed and things like that.

22    Q.  Now, if it was preauthorized, then what would happen?

23    A.  Then I would take the same paper I just handed to Bill, I

24    would walk from his office into the compliance room.  I would

25    hand whichever compliance rep was available that sheet of

1    paper.  I would walk back to my phone.  I would congratulate

2    them for joining the team.  Then I would transfer them over to

3    compliance to go through the contracts.

4    Q.  Now, if they were going to send a wire or a check or a

5    money order, was there any part that you skipped?

6              MS. KEARNEY:  Objection.

7    A.  I would have to --

8              THE COURT:  Just a minute.

9              Sustained.

10   Q.  What would happen if they were going to be paid by check,

11   money order, wire, not a credit card?

12             MS. KEARNEY:  Objection.

13             THE COURT:  What was the procedure used if a credit

14   card was not the method of payment?

15             THE WITNESS:  It depended.  If it was a wire, we would

16   have to go and ask Bill which account he wanted to put it to.

17   So we would have to get the account information, wire

18   information, routing number, the address of the bank from Bill,

19   so we could give that information to the client so they could

20   actually conduct the wire transfer.

21             With a check, we just gave them our address to send

22   the check to our office.  And then instead of it going to Bill

23   for preauthorization, it would just go directly to compliance.

24   Q.  Now, after it goes to compliance and there were no problems

25   concerning the customer, would you ever have contact with that

1  customer again?

2  A.  No.

3  Q.  Did there come a time that there were some times problems

4  with the customers?

5  A.  Yes.

6  Q.  Generally, were you the one dealing with the problems?

7  A.  No.

8  Q.  What was your understanding of who was dealing with the

9  problems?

10  A.  Michael Finocchiaro was in charge of that.

11  Q.  Now, did there come a time during the time that you were at

12  Olive Branch where you did actually speak to customers after

13  you finished what you understood to be your role?

14  A.  Yes.

15          MS. KEARNEY:  Objection.

16          THE COURT:  I will allow that.

17  A.  Typically it would be right after the preauthorization or

18  the completion, when they would be reading through the

19  contract, they would have questions.  So I would go and try to

20  answer those questions.  If I was not available, if I was on

21  another call already, Bill would come and answer those

22  questions.

23  Q.  How often did that happen?

24  A.  A handful of times, maybe two handfuls, maybe ten times.

25  Q.  Now, were there other occasions that you would be asked to

IB18KET2                        Owimrin – Direct

1   contact a client that you sold a product to?

2   A.  Yes.

3   Q.  What would that be?

4   A.  That would be when a client was trying to cancel or charge

5   back and Michael Finocchiaro was either not in the office or

6   just didn't feel like doing it.

7   Q.  What would you do?

8           THE COURT:  Let me go back a little bit.  When you

9   said that there were a handful of times, maybe two handfuls,

10  maybe ten times, during what period of time was that?  Was that

11  both at Olive Branch and at A1?

12          THE WITNESS:  No.  That would just be from the Hoboken

13  office where I started to when I ended in Clifton, all at Olive

14  Branch.

15          THE COURT:  All at Olive Branch.

16          THE WITNESS:  Yeah.  That's what I was speaking about.

17  I wasn't talking about A1 as well.

18  Q.  Now, did you ever receive any requests from fulfillment

19  people?

20  A.  Yes.  If they were having trouble contacting a client that

21  purchased a product, they would either reach out to myself or

22  Fino or appointment setters.  They would notify us that they

23  are having trouble reaching the client.  So we would call them

24  to get them to answer the phone for their fulfillment

25  appointments.

IB18KET2                          Owimrin - Direct

1   Q.  What is your understanding -- withdrawn.

2              How often did you deal with fulfillment people?

3   A.  Not often.

4   Q.  Were you told what company or people were involved in the

5   fulfillment?

6              MS. KEARNEY:  Objection.

7              THE COURT:  I will allow it for his state of mind.

8   Again, not for the truth of what was said.

9   A.  I was told names and I was also given a printed out list of

10   the company names and the fulfillment members for those

11   companies.

12   Q.  Now, I am going to show you Exhibit A02.

13              Do you see that exhibit?

14   A.  Yes, I do see it.

15   Q.  Is this a document that was given to you by anyone?

16   A.  Yes.

17   Q.  Do you recall who gave it to you?

18   A.  Bill Sinclair.

19   Q.  Do you recall what was the purpose of it?

20   A.  To know the names of the fulfillment members.  If a client

21   called one of us to say who's Christina, I would know that

22   Christina is part of our fulfillment team, so I would let that

23   client know that's part of our fulfillment team.  Or I could

24   notify them that you will be speaking with Sally.  She will be

25   the one on your account.  She is the one that takes care of

IB18KET2                              Owimrin - Direct

1   LLCs.  So things of that nature.  Just so I could know who they

2   are and let the customer know who will be speaking to them

3   next.

4          MR. SCHMIDT:  I offer this as Exhibit AO2.

5          MS. KEARNEY:  We object on 801 grounds.

6          MR. SCHMIDT:  It's being offered for his state of

7   mind, your Honor, not for whether these people are real names.

8          THE COURT:  I am going to sustain the objection.

9   Q.  Were you given other lists concerning fulfillment people

10  who worked for other companies?

11  A.  Yes.

12  Q.  Did you have any reason to believe that these fulfillment

13  people were not doing their jobs?

14         MS. KEARNEY:  Objection.

15  A.  No.

16         THE COURT:  I will allow that.

17  A.  No, I did not.  Actually, in fact, one of the --

18         THE COURT:  You have answered the question.

19         Next question.

20  Q.  I want to go back to the calendar.  I am going to give you

21  a hard copy of AOC01 to 35.

22         Look through briefly the documents.

23  A.  I see it.

24  Q.  Now, could you describe generally what these documents are?

25  A.  This is an appointment -- these are all appointments from a

1    Google calendar.  It's not the exact format, but I could tell

2    that it's from my Google calendar, which I will see on my

3    calendar.  When I click on it, this is what would show up.

4    Q.  In other words, this is not what you would actually see on

5    the screen at your desk, but this is from the calendar if you

6    printed it out?

7    A.  If I opened up the bullet point on the screen, this would

8    pop up.

9    Q.  Now, you told us that some of the information when you were

10   setting appointments, that you made appointments with leads, is

11   that correct?

12   A.  Yes.

13   Q.  Now, the information concerning the name and/or telephone

14   number or address of the leads, that would come from some other

15   source, is that right?

16            MS. KEARNEY:  Objection.

17            THE COURT:  Rephrase it.

18   Q.  The original information about the lead came from some

19   other source, didn't it?

20            MS. KEARNEY:  Objection.

21   Q.  Where did the original information of the lead come from?

22            THE COURT:  I will allow it.

23   A.  In the calendar, it would come from the appointment setter,

24   as it shows here.  And it's set up --

25            MS. KEARNEY:  Objection, your Honor.  This document is

IB18KET2                          Owimrin - Direct

1   not in evidence.

2            THE COURT:  This is not in evidence?

3            MS. KEARNEY:  No.

4            MR. SCHMIDT:  It's not in evidence.

5            THE COURT:  All right.

6   A.  Yes, it would be from the appointment setter.

7   Q.  Where would the appointment setter -- you were an

8   appointment setter.  Where would you get the name and telephone

9   number from?

10  A.  They would get it from a list, the lead list.

11  Q.  Would it be fair to say that you did not know that

12  information was accurate when you saw it on a lead list?

13           MS. KEARNEY:  Objection.

14           THE COURT:  I will allow that.

15           Did you have any understanding as to the accuracy of

16  the information on the lead list?

17           THE WITNESS:  I believed it to be accurate.  I had

18  nothing to tell me otherwise.

19  Q.  Now, what would the appointment setter do with the

20  information of the name and telephone number of the lead?

21  A.  She would copy and paste it and put it into the subject;

22  she would copy and paste the name, the number, the lead source.

23  Q.  What was the first thing that an appointment setter would

24  do with the lead?

25  A.  She would call it, set up the appointment, or try to set up

1    the appointment, attempt to set up an appointment, and then put

2    it on a Google calendar under that person's name.

3             THE COURT:  Is the appointment setter personnel the

4    same as the compliance personnel?

5             THE WITNESS:  Yes.

6             THE COURT:  I take it you were here when you heard

7    testimony that those people were, quote, essentially

8    secretaries.  Do you remember that testimony?

9             THE WITNESS:  Yes.

10            THE COURT:  Do you agree with that?

11            THE WITNESS:  I do agree.

12   Q.  Were the appointment setters required at work to put that

13   information in the Google calendar?

14   A.  Yes, they were.

15   Q.  And it was necessary for the running of the business to

16   have that information put in the calendar, otherwise there

17   wouldn't be a business?

18            MS. KEARNEY:  Objection.

19            THE COURT:  Sustained as to form.  This is direct

20   examination, not summation.

21   Q.  Now, the record that was made in the calendar, was that

22   made by the appointment setter at about the time that she was

23   setting the appointment with the lead?

24   A.  Yes.

25   Q.  Were those records put in and kept in the calendar in the

IB18KET2                          Owimrin - Direct

1   course of the business of Olive Branch?

2   A.  Yes.

3   Q.  Was the entry made by the appointment setter made as a

4   normal part and a regular part of the business?

5   A.  Yes, to my understanding.

6   Q.  Now, there's other information that is generally put into

7   the calendar at some point, is that right?

8            MS. KEARNEY:  Objection.

9            MR. SCHMIDT:  I am trying to lay a foundation, Judge.

10  That's all I am doing.

11           THE COURT:  I will allow it.

12           MS. KEARNEY:  Just so you know, I think we are going

13  to have a total objection if Mr. Schmidt moves this document

14  into evidence.  It may need to be discussed at sidebar for

15  planning purposes.

16           THE COURT:  You can answer that question, sir.

17  A.  Yes.

18  Q.  Now, if the appointment was put -- withdrawn.

19           Who decided who got the appointment?

20  A.  Arash.

21  Q.  How was it shown that he made a decision?

22  A.  He made it seem like it was whoever was available at the

23  time, but we kind of knew he was getting into who he favored.

24  Q.  How was it indicated on the calendar that somebody --

25  A.  They would put it in their name.

IB18KET2                        Owimrin - Direct

1   Q.  What does that mean when you were looking at your calendar?

2   A.  I would see if it was in my name or in somebody else's

3   name.

4   Q.  Was there any other way of seeing whose name it was under?

5            MS. KEARNEY:  Objection.

6            THE COURT:  I will allow it.

7   A.  You would see whose name it was under at first, you could

8   see it's under Zach, and then he would change it.

9   Q.  When you looked at the calendar --

10  A.  You would see the customer names up there.

11  Q.  How were each individual salesman divided up on the Google

12  calendar, by what?

13  A.  By colors.

14  Q.  So it was easy to see who it was because of the color?

15           MS. KEARNEY:  Objection.

16  A.  Yes.

17           THE COURT:  I will allow it.

18  Q.  Now, if it was your color, your appointment, what would you

19  do?

20  A.  I would call the appointment.

21  Q.  What was your responsibility in relation to the calendar

22  while you were talking to the person or immediately thereof?

23  A.  I would have to take notes on the client.  When I was

24  talking to them, if I didn't do it while I was speaking, I

25  would have to update it and put notes in there after.

IB18KET2                        Owimrin - Direct

1   Q.  Was that a requirement for you to do it?

2   A.  Yes.

3   Q.  When you did it, did you do it at the time that you were

4   talking to the person or immediately thereof?

5   A.  Either/or.  I wasn't very good at taking notes.

6   Q.  Was the calendar kept in the ordinary course of business?

7   A.  Yes, it was.

8   Q.  Was it required in the regular practice for the salesperson

9   to make those entries in the calendar?

10  A.  Yes.

11          MR. SCHMIDT:  Now, your Honor, I move Defense Exhibit

12  AOC01 to AOC35 into evidence.

13          MS. KEARNEY:  We object, your Honor.

14          THE COURT:  Sidebar.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Yes, ma'am.

3          MS. KEARNEY:  There are multiple layers of hearsay in

4     this document.  Even assuming arguendo that Mr. Schmidt has

5     laid a business records foundation, which based on Mr.

6     Owimrin's statement that he didn't take very good notes I don't

7     think he has, these notes contain statements of the victims he

8     spoke to on the phone.  Those statements are not business

9     records.

10         MS. FLETCHER:  Your Honor, I don't want to interrupt,

11    but might this be a good time for the jury to take the morning

12    break?  It's almost noon.

13         THE COURT:  I didn't even realize that.  Yes.

14         (In open court)

15         THE COURT:  Ladies and gentlemen, I didn't realize how

16    late it was.  The attorneys just brought that to my attention.

17    I apologize.

18         (Jury exits courtroom)

19         (Recess)

20         (Continued on next page)

21

22

23

24

25

1         (In open court; jury not present)

2         THE COURT:  Counsel, sidebar -- we don't have to do

3    sidebar.  The jury is not here.  Government?

4         MS. KEARNEY:  Yes, your Honor, these are calendar

5    entries.  The defendant, first off, has testified that he

6    didn't actually take very good notes --

7         THE COURT:  Yes, I did notice that.

8         MS. KEARNEY:  -- in making these entries.

9         Second, there is no indication he was, no indication

10   he was the one made these entries.  Sometimes he testified the

11   appointment person would make it, sometimes he would make it

12   when they were on the calls.  To the extent Mr. Schmidt is

13   attempting some sort of recorded recollection, there is no

14   indication these are --

15        THE COURT:  It doesn't work under recorded

16   recollection.  Deal with it under business records.

17        MS. KEARNEY:  Since Mr. Owimrin testified he didn't

18   take very good notes, there is actually no duty to accurately

19   record and report any of this information in this document.

20        Putting that aside, your Honor, these are statements

21   by third parties, the victims in this case, who are not --

22        THE COURT:  There are a lot of entries here by the

23   appointments people just saying when they were setting up

24   appointments.

25        MS. KEARNEY:  Most of these entries are recounting

1    things that were told by the appointment setter on the phone,

2    so just on the first page, "has used all personal funds" --

3              THE COURT:  Yes, the first page is the weirdest one.

4              MS. KEARNEY:  Page 3, invested $7,000 in LLC, was

5    given additional traffic.  Page 4, still can't squeeze even a

6    thousand bucks out of --

7              THE COURT:  Wait, wait.  When you say Page 4?

8              MS. KEARNEY:  I am sorry.  Page 5.

9              THE COURT:  Just a moment.  So you're saying that it's

10   hearsay, it is the statements of who the government calls the

11   victims?

12             MS. KEARNEY:  Correct.

13             THE COURT:  Mr. Schmidt.

14             MR. SCHMIDT:  Your Honor, first of all, it is

15   admissible under both business records and 803 (6).

16             THE COURT:  It is business records.

17             (Off-the-record discussion).

18             THE COURT:  Let's take it first under 803 (6), and you

19   can -- under 803 (6), the problem is that it would be hearsay

20   within 803 (6) documents and a lot of this does seem to be

21   hearsay.  It is the statements of who the government calls the

22   victims.

23             MR. SCHMIDT:  There is no question that some of the

24   information was obviously obtained from the person that, the

25   salesperson, whether Mr. Owimrin or otherwise, got from the

1    customer.  One of the problems --

2                THE COURT:  It is hearsay.

3                MR. SCHMIDT:  -- one of the problems we have here,

4    Judge, is that you have started calling the customer the

5    victim.

6                THE COURT:  No.  I didn't before the jury, absolutely

7    not.

8                MR. SCHMIDT:  Here is the problem.

9                If this was a case where the government was saying

10   that Mr. Owimrin lied on these three occasions and committed

11   fraud on those three occasions, and that's why he is guilty,

12   the defense would be much more limited by choice and by law to

13   deal with that issue.

14               The government has not taken that position.  The

15   government has taken the position that this whole business is a

16   scam, and our client is part of the whole business scam, and so

17   that his knowledge and understanding and belief are now

18   completely in issue.

19               So when my client is working in this business that the

20   government says is a scam, we are trying to show that how he is

21   dealing with it, how he sees others are dealing with it, right,

22   impacts on his belief on whether or not this is a lawful

23   endeavor, a belief it is a lawful endeavor he is involved in or

24   that it is a scam.

25               You cannot separate that.  The statements of the

IB1JKET3                          Owimrin - direct

1    witnesses, the customers here, right, whether they're accurate

2    or not, right, is not significant.  It's how the salesperson,

3    especially Mr. Owimrin, acts because he is now looking or have

4    read that information.  He accepts it as true; and, therefore,

5    it impacts on how he is conducting himself, the knowledge that

6    he has and his intent and motive.

7             THE COURT:  Just a moment.  I am not quite sure what

8    all of that was about, but I can say I very much agree with you

9    that whether or not your client intentionally committed a

10   crime, his state of mind is important, obviously, that I agree

11   with.  I am not quite sure what all the other stuff was.

12            MR. SCHMIDT:  Judge, they've asked for a conscious

13   avoidance charge.

14            THE COURT:  I understand that.

15            MR. SCHMIDT:  Now, conscious avoidance charge

16   acknowledgment means that somebody is confronted with certain

17   facts that they should have been gone forward to check on

18   things.

19            THE COURT:  Right.

20            MR. SCHMIDT:  Right, and if they didn't --

21            THE COURT:  They put their head in the sand and they

22   saw all of the warning flags flying.  I understand that.

23            MR. SCHMIDT:  What the government is trying to do is

24   only put in the quote warning flags and prevent us from putting

25   in everything else that is going on around him for two and a

1   half years and why these were not red flags that should cause

2   him to seek further knowledge.

3          It seems to be fundamentally unfair for the government

4   to take the position, right, that there are red flags, but

5   prevent us from showing those red flags in context.

6          THE COURT:  Why don't you deal with the evidentiary

7   issue we have at the moment, which is the hearsay statements

8   within what's arguably a business record because the hearsay

9   statements should not be coming in.

10         For example, on the first page, all of that is, I

11  would think, what the customer, the client is telling

12  Mr. Owimrin.

13         MR. SCHMIDT:  So it is coming in for his state of mind

14  for a number of reasons.  It is, one, how he conducted himself

15  when he obviously heard --

16         THE COURT:  But your state of mind, the way you assert

17  the state of mind exception, it lets everything come in because

18  by your very verbiage, anything that is happening in the

19  business affects his state of mind.  You just said that.

20         MR. SCHMIDT:  Absolutely.

21         THE COURT:  So anything involved in this business

22  comes into this trial under that theory?

23         MR. SCHMIDT:  No, no.  If he doesn't know about it, it

24  doesn't affect his state of mind.  He has to know about it.

25  That is why we have these from his calendar, so these are the

IB1JKET3                        Owimrin - direct

1    ones that he knows about.

2             For example, Judge, the government puts in their

3    witnesses some clearly people who are victims and who look like

4    they're taken a advantage of, and is arguing that this is the

5    nature of the business, while trying to avoid having my client

6    explain why he dealt with those particular people the way he

7    did because this is how he dealt with everybody else, and

8    during the course of his work over there he saw people who

9    wanted to go forward, wanted to do something, some people who

10   didn't want to do something, some people who sought his advice,

11   some people said thank you but we are not interested, and he

12   didn't push it any more.

13             So the government is just trying to take this

14   microcosm of the life of Andrew Owimrin for two and a half

15   years and condense it only for the things that they want to

16   come in.

17             THE COURT:  All right.  Government, I understand what

18   you're saying.  There is no limiting principle to what you're

19   arguing, sir, and that is the problem.

20             MR. SCHMIDT:  But we are not trying to prove that

21   these people did this, this and this.  All we're trying to

22   prove is that my client believed these people did this, this

23   and this, and you can instruct the jury to that.  I don't care.

24             MS. KEARNEY:  Mr. Owimrin is free to testify that

25   based on information that he was provided, he believed these

IB1JKET3                    Owimrin - direct

1   people had gotten XYZ or wanted to purchase ABC, but putting in

2   statements that have gone through an appointment setter to

3   Mr. Owimrin, when it is not clear who made the statements, who

4   wrote down the statements, in what context they were recorded

5   has no indicia of reliability here.

6          To the extent this is a business record, Mr. Owimrin's

7   statement that his notes weren't very good, and we don't know

8   about the practice of other appointment setters, I would argue,

9   your Honor, 806 (e) is implicated.  -

10         THE COURT:  Let me read this about the opponent.

11         MR. SCHMIDT:  May I address that one point, your

12  Honor?

13         THE COURT:  Not until I read this.

14         (Pause)

15         THE COURT:  Yes.

16         MR. SCHMIDT:  Two things:

17         One, what Mr. Owimrin meant and would be able to

18  testify is when they say take down good notes, they complained

19  he didn't take down enough notes, so later on he started making

20  better notes.  That is what we meant by that.  It wasn't that

21  he put down wrong stuff, he wasn't caring about what he wrote

22  down, it was just he hadn't done enough.  It is irrelevant to

23  that point.

24         Whether or not the source of the information or the

25  method and circumstance of the preparation indicate a lack of

1    trustworthiness is ridiculous because if the information that

2    the note the appointment setter was given was not correct, then

3    they wouldn't be able to contact the people to make an

4    appointment.

5             THE COURT:  All right, Ms. Kearney, what is your

6    point?

7             MS. KEARNEY:  That is incorrect.  The only information

8    you need to contact the victim is the name and number.

9             THE COURT:  I already discarded that last phrase.

10            Go ahead.

11            MS. KEARNEY:  The majority of these records are from

12   2014, which is the beginning of the phase where Mr. Schmidt now

13   says his notes weren't very good and they got better over time.

14            THE COURT:  All right.  I am going to allow this in,

15   but with a limiting instruction.  Bring the jury in.  I am

16   trying to make sure that --

17            MS. KEARNEY:  If it is coming in, your Honor, the

18   government does not request a limiting instruction.  We prefer

19   your Honor not give one.

20            THE COURT:  All right.  Fine.

21            MR. SCHMIDT:  Your Honor, if I understand correctly,

22   is the government saying they want to use the hearsay --

23            THE COURT:  The government is saying given my ruling,

24   they don't want a limiting instruction.  Obviously, that lets

25   them cross him on these documents.

1           MS. KEARNEY:  Given your Honor's ruling, we withdraw

2    our objection to the admission of this document.

3           THE COURT:  All right.  So given the gamesmanship,

4    Mr. Smith, are you still proffering it?

5           MR. SCHMIDT:  Yes.

6           THE COURT:  Bring the jury in.  How much longer do you

7    have, sir?

8           MR. SCHMIDT:  Obviously, with all of the objections --

9           THE COURT:  It is no different than anything we have

10   been doing so far.  It doesn't add any time.

11          MR. SCHMIDT:  If I have to do this the way to avoid

12   objections, your Honor, we probably have like two or three more

13   hours to go.

14          THE COURT:  Jury entering.

15          (Jury present)

16          THE COURT:  Mr. Owimrin, if you would take the stand

17   again, you may.  You may be seated in the courtroom.

18   Mr. Schmidt, you may continue with your examination.

19          What do you want this document to be marked?

20          MR. SCHMIDT:  80C 01 through 80C 35.

21          (Defendant's Exhibits 80C 01 through 80C 35 received

22   in evidence)

23   BY MR. SCHMIDT:

24   Q.  I ask you to look at 80C 01 in evidence.

25          THE COURT:  Mr. Owimrin has reminding me he is still

1    under oath.  Sir, next question.

2    BY MR. SCHMIDT:

3    Q.  Andrew, the information on the top that says William

4    Frederick Ryan and the phone name.  Where did that come from?

5    A.  That came from the appointment setter.

6    Q.  What does Paramount mean after that?

7    A.  At that time we were using Paramount and Olive Branch.  It

8    was directed by Bill Sinclair depending on which lead it was to

9    call, either Paramount or Olive Branch, they were appointments

10   I would put in the subject.

11   Q.  So the name Paramount or Olive Branch, did that determine

12   what merchant account any credit card was put under?

13   A.  Yes.

14   Q.  So if the word "Paramount" is on there, what does that mean

15   to you when you speak to the customer?

16   A.  It just means that's the merchant account that they would

17   be using if they were to be a purchaser or charge.

18              THE COURT:  Why is that relevant to you?

19              THE WITNESS:  Just because we have to let the

20   potential client know how it would show up on their statements

21   if there was a charge or what the contract would look like.  If

22   it was going through the Paramount merchant account, it would

23   say Paramount.  If it was Olive Branch, it would be the Olive

24   Branch contract.

25   BY MR. SCHMIDT:

IB1JKET3                          Owimrin - direct

1   Q.   During the time you were at Olive Branch, did they use

2   other merchant accounts, other company names?

3   A.   Yes.

4   Q.   Can you tell us some of them.

5   A.   Paramount, Olive Branch Marketing, A1 Business Consultants,

6   A1, there is a second A1.  I forget what it is called now.

7   Business Development Center was one that we use as a merchant

8   account, and Sunset, those are the ones I remember off the top

9   of my head.

10  Q.   Now, did you have any understanding of what those other

11  ones, what kind of companies they were?

12          MS. KEARNEY:  Objection.

13  A.   No.

14          THE COURT:  Sustained.

15  BY MR. SCHMIDT:

16  Q.   Were you responsible in any way in determining the merchant

17  account used or company name used?

18          THE COURT:  Did you determine which merchant account

19  or company name was to be used?

20          THE WITNESS:  No.

21          THE COURT:  Next.

22  BY MR. SCHMIDT:

23  Q.   Looking at this, the information after the date, where does

24  that information come from?

25  A.   That comes from me or the sales rep usually.  This one

1    right here came from me.

2    Q.  Now, look at 2.

3    A.  Okay.

4    Q.  Now, there is up on the top subject line says, "Bill

5    no-show."  What does that mean?

6    A.  That means they were a no-show, somebody tried calling them

7    and they no-showed, they didn't pick up the first time they

8    tried calling.

9    Q.  The information under the date --

10              THE COURT:  Why Bill no-show?

11              THE WITNESS:  I think that Bill portion has to do with

12   Yahoo.

13              THE COURT:  You don't think Bill is Sinclair?

14              THE WITNESS:  No.

15              THE COURT:  Next.

16   BY MR. SCHMIDT:

17   Q.  So the information below was something that you would have

18   put in or somebody else had to put in?

19   A.  That would be what I put in.

20   Q.  Does that mean at some point you were able to talk with

21   him?

22   A.  Yes.

23   Q.  When there was a no-show for the specific appointment,

24   would you or the salesperson immediately give up?

25   A.  No.  Either myself or the appointment center would try to

IB1JKET3                          Owimrin - direct

1    call back.

2    Q.  I'd ask you --

3            THE COURT:  When it says CC were maxed, what is CC?

4            THE WITNESS:  Their credit cards were maxed.

5            THE COURT:  What is maxed?

6            THE WITNESS:  Maxed out, that means they were at their

7    limit, they had no more available credit.

8            THE COURT:  All right.

9    BY MR. SCHMIDT:

10   Q.  Did you attempt to open a credit card for them?

11   A.  No.

12           MS. KEARNEY:  Objection.

13           THE COURT:  If he remembers, I will allow it.

14           THE WITNESS:  I remember at this time --

15           THE COURT:  Sir?

16           THE WITNESS:  No.

17           THE COURT:  Next.

18   BY MR. SCHMIDT:

19   Q.  Did there come a time that you did help customers to open

20   credit cards?

21   A.  Yes.

22   Q.  How long were you at Olive Branch before that happened,

23   approximately?

24   A.  From about, I'd say, almost a year.

25   Q.  How often did you do that?

IB1JKET3                        Owimrin - direct

1   A.  I didn't do it very often.

2   Q.  Was there anybody you were aware of on the sales floor who

3   did that very often?

4   A.  Yes.

5   Q.  Who was that?

6   A.  Peter DiQuarto.

7   Q.  Now, on this one, did these people -- what was the result

8   of your conversation with this person?

9   A.  The result of this was it wasn't a sale.  We just, they had

10  investment.

11          THE COURT:  How do you know that?  Do you know that

12  from this document or you remember this particular couple and

13  know it from your experience?

14          THE WITNESS:  We're talking about three now, AC or --

15          THE COURT:  Three, I am sorry, turning to three now,

16  the same question, how do you know that there was no sale?

17          THE WITNESS:  If there was typically a sale, I would

18  put in the description sold or sale and the amount.

19          THE COURT:  Thank you.  Next question.

20  BY MR. SCHMIDT:

21  Q.  Let's skip to 80C 06.  Now, you see the words under the

22  date.  Is that something that you put there?

23  A.  Yes.

24  Q.  Now, what is an Amazon affiliate site?

25  A.  It would be an affiliate website, affiliate website with

IB1JKET3                         Owimrin - direct

1    Amazon.com.  You could have your own personal website and sell

2    Amazon products on there.  Amazon would be acting a as job

3    share.

4    Q.  You testified earlier you would be selling basically

5    products for people who already had an open company.  What were

6    you told?  What type of companies would have been opened on

7    behalf before you spoke to them?

8              MS. KEARNEY:  Objection.

9              THE COURT:  Sustained.

10   BY MR. SCHMIDT:

11   Q.  What type of company?  Were you trained when you are

12   selling the product to learn what the company you were selling

13   the products for?

14   A.  Yes.

15   Q.  What kind of company did you come in contact with?

16             What kind of company, to your knowledge, while you

17   were at Olive Branch you were selling products for?

18   A.  It was three at that time, typically three, merchant,

19   businesses processing businesses, Amazon affiliate websites and

20   drop ship websites businesses.

21   Q.  Now, let's skip to 08.  Below Amy set appointment and found

22   in premier choice richy, there is --

23             THE COURT:  Put 08 up, please.

24   Q.  -- did you put some of the information down on this?

25   A.  Yeah, I put the sale amount and the LLC, potential LLC

1  names that she would have and obviously her account number or

2  the payment.

3  Q.  So what kind of funds were used to make a sale?

4  A.  This was either a direct wire or a check.  It looks like it

5  was a direct wire.  I didn't have a check number on there so

6  direct wire or wire transfer.

7  Q.  Now, I ask you to take a look at 9.  Did this document tell

8  you who made the sale?

9  A.  Yes.

10  Q.  Why was this document be on your website?

11         MS. KEARNEY:  Objection.  Objection.  I am confused by

12  the question.

13         THE COURT:  Why was this document on your web --

14         MR. SCHMIDT:  I'll rephrase the question.

15         THE COURT:  Rephrase it.

16  BY MR. SCHMIDT:

17  Q.  Why would a sale by Louis Anderson be on your calendar?

18  A.  For an upsell, to try to sell more product.

19  Q.  So you say the first sale, it was the -- was the

20  information that says sales -- withdrawn.

21         What were you supposed to do with this information?

22  A.  I was supposed to figure out what type of products she had

23  bought with Louis, trying to figure out what she bought

24  previously and I would see what she would need or potentially

25  need.

IB1JKET3                        Owimrin - direct

1   Q.  What is an upsell?

2   A.  It is a second sell.

3          THE COURT:  Selling more product?

4          THE WITNESS:  Selling more product.

5          THE COURT:  Getting more business?

6          THE WITNESS:  Getting more business.

7          THE COURT:  You were a salesman?

8          THE WITNESS:  Yes.

9          THE COURT:  That was your job?

10         THE WITNESS:  It was, yes.

11  BY MR. SCHMIDT:

12  Q.  Does this indicate whether or not that upsell was

13  successful?

14  A.  Yes.

15  Q.  Was it successful?

16  A.  No.

17         THE COURT:  And again if I understand your testimony,

18  you know it wasn't successful because there was no statement on

19  this that you sold her anything more, is that it?

20         THE WITNESS:  No.  This one in the subject bar, it

21  says broke.

22         THE COURT:  It says broke?  What does that mean?

23         THE WITNESS:  We just used simple words to notify if

24  it was broke are or broken leads.  She had no funds or she just

25  didn't want to move forward.  She just could have --

```
 1                THE COURT:  You say broke?

 2                THE WITNESS:  Yeah.  It could have been broke, like

 3      physically broke or it could have been mean a broken lead in

 4      the sense of they do not wish to purchase any more products

 5      until they see some results.

 6      BY MR. SCHMIDT:

 7      Q.  I ask you to take a look at 11.  Did you make a sale here?

 8                THE COURT:  How many more of these do you have, sir?

 9      There were 35 separate pages here?

10                MR. SCHMIDT:  I going to probably do another 10 or so,

11      your Honor.

12                THE COURT:  Move on.

13                MR. SCHMIDT:  I am trying to do as best I can.

14                THE COURT:  These are in evidence.  You can make

15      whatever argument you want.

16                MR. SCHMIDT:  There are explanations in here.

17                THE COURT:  Your time!

18      BY MR. SCHMIDT:

19      Q.  I ask you to look at No. 11.

20      A.  Yes.

21      Q.  Did you make the sale there?

22      A.  I did.

23      Q.  Why there?  What do the names under usual sale name?

24      A.  On 11?

25      Q.  11?
```

IB1JKET3                          Owimrin - direct

1   A.  The three business names.

2   Q.  Yes.?

3   A.  That was for potential LLC names.

4   Q.  Did you sell a lot of LLCs during your time at Olive

5   Branch?

6   A.  Yes.

7   Q.  You have heard the testimony of the witnesses who purchased

8   LLCs about what the pitch was to them about the LLC or the LLC

9   was used for.  Do you remember those things?

10  A.  Yes, I do.

11  Q.  Was that accurate?

12  A.  Yes, to my knowledge.

13  Q.  Now, when it says don't, don't call for a reminder, what

14  does that mean?

15  A.  This client just did not wish -- if she had an appointment

16  set, we didn't need to call them to remind them the day before.

17  This particular client did not want the call to -- (inaudible).

18  Q.  I ask you to take a look at 12.  Underneath found on JF

19  marketing, right, other than happy.  Is that something that you

20  wrote?)

21  A.  At 12?

22  Q.  12, yes?

23  A.  I was on 10.  Sorry.  Do you want me to read it?

24  Q.  No.  Is that something that you wrote, if you remember?

25  A.  It looks like something that I wrote, right.

1    THE COURT:  Why do you say that?  It is typed.  Why do

2    you say it looks like something you would write?

3    THE WITNESS:  Just because I was fairly broad with my

4    notes.  It looks like something I was writing as I was speaking

5    to the client.

6    THE COURT:  Next question.

7    BY MR. SCHMIDT:

8    Q.  Now, were there customers that you spoke to that expressed

9    their both either happiness or unhappiness with the companies

10   that they had?

11   A.  Yes.

12   Q.  Do you have an idea of the percentage that expressed

13   happiness, neutral and unhappiness?

14   A.  I don't, I don't have a percentage.  It was fairly even

15   throughout.

16   THE COURT:  If you don't have a percentage, you don't

17   have a percentage.  Next.

18   BY MR. SCHMIDT:

19   Q.  I ask you to look at 13.  Now, it has Andrew a thousand and

20   Steve 997 at the bottom.  Do you see that?

21   A.  Yes, I do.

22   Q.  How did that come about?

23   A.  On this particular pitch, I didn't know how to pitch a

24   logo, so we split.  I got him on the phone to do the logo

25   portion of it because I didn't know, I never sold a logo, I

IB1JKET3                        Owimrin - direct

1    didn't know how to describe or explain it.  I got him on after

2    I pitched the LLC, and we split the sale.

3    Q.  Now, I ask you to look at 14.

4            Now, do you know what this person meant when saying

5    supposed that 10,000 customers a site, not there yet?

6    A.  Traffic.

7            MS. KEARNEY:  Objection.

8            THE COURT:  Pardon me?

9            MS. KEARNEY:  Testifying about --

10           MR. SCHMIDT:  Withdrawn.

11   BY MR. SCHMIDT:

12   Q.  What is your understanding of what that person meant?

13           MS. KEARNEY:  The same objection.

14           THE COURT:  No.  I will allow his understanding.

15   A.  You're supposed to get a thousand customers or 10,000

16   customers to a site, but the number is not there yet, starting

17   to get direct traffic to his website clicks basically.

18   Q.  Did your company do that?

19   A.  We did.

20   Q.  Is that one of the products that --

21   A.  That was one of our products, yes.

22   Q.  I ask you to take a look at 15.

23   A.  Right.

24   Q.  Did you attempt to make any kind of pitch to this woman?

25   A.  I did not.  I did -- (inaudible) -- sorry.

IB1JKET3                          Owimrin - direct

1  Q.  Look at No. 17.  What is pitched by Andrew Owimrin on the
2  spot mean?
3  A.  That means the appointment center called to set up an
4  appointment, and the client wanted to speak right then and
5  there and didn't want to set an appointment, so they were
6  transferred to whoever was available.
7  Q.  Does the "going for surgery Monday" help you understand
8  what happened?
9  A.  Yes, they were going for surgery Monday, so we just kind of
10  let go.  We said we would call back at a later date after --
11  Q.  Look at 18, please.  What did you sell there?
12  A.  I sold an LLC.
13  Q.  Did you sell a lot of LLCs?
14  A.  Yes.
15  Q.  Why?
16  A.  That was the product that I was able to learn.  That was
17  the one I was most familiar with.  That was the easiest for me
18  to pitch, and it was what I felt comfortable pitching.
19  Q.  Let's look at 21.  What kind of funds were used for this
20  sale?
21  A.  It was a check, cash.
22  Q.  I ask you to take a look at 22.  This one has Youngevity on
23  it.  Now, you talked before about the products that you and
24  your company sold that would help distant companies.  How was
25  Youngevity doing?

1    MS. KEARNEY:  Objection.

2    THE COURT:  Rephrase it.

3  BY MR. SCHMIDT:

4  Q.  How was Youngevity as a product different than the product

5  that you were selling prior to Youngevity?

6  A.  It was sold as a complete business, a complete website.

7  Q.  Now, taking a look at this, do you think you sold any

8  Youngevity packages prior to this?

9  A.  Prior to this, no.

10  Q.  How did the idea of Youngevity, selling Youngevity at Olive

11  Branch, how were you informed that this was something that was

12  going to happen?

13  A.  I was informed by Bill Sinclair, Mr. Finocchiaro and Arash

14  they would be bringing in Anthony Medeiros, who would be

15  explaining and introducing this new product that we could sell,

16  that we will be selling.

17  Q.  Did they give you any information that would inform you as

18  to what the basic package contained?

19  A.  Yes.

20  Q.  Would you put up Government Exhibit 234 A, Page 6.  Do you

21  see the highlighted portion?

22  A.  Yes.

23  Q.  Is this what information they gave you?  Is this some of

24  the information they gave you?

25  A.  Yes, that's Youngevity.

1    Q.  Do you know if anything else could be sold with that?

2    A.  Yes, they told me what products to sell with it.

3    Q.  What kind of products could be sold or upgraded products

4    could be sold?

5    A.  There is different levels of Youngevity that come with

6    higher levels of marketing, but add-ons would be YouTube, Press

7    Release, LLC, Corporate Credit Tax.

8    Q.  Now, you have testified that one of the things that was

9    made very clear to you at the beginning, that they were going

10   to -- there must be no earning claims when you sold the

11   products that you sold prior to Youngevity, right?

12   A.  Yes.

13   Q.  Was there anything a little different?

14          Was anything explained to you a little differently as

15   it related to Youngevity?

16   A.  Yes.

17   Q.  What was that?

18   A.  With Youngevity, we could tell these clients that after 60

19   to 90 days, they could potentially receive a check or they will

20   receive a check, no specific amount, but a check.

21   Q.  Payments, was there anything discuss about after that first

22   check?

23   A.  Yes, unlike the other businesses they had, we get paid on a

24   monthly basis or quarterly basis with Youngevity, you would get

25   paid out on a biweekly basis.

IB1JKET3                        Owimrin - direct

1    Q.   Who told you that?  Who gave you this information?

2    A.   Anthony Medeiros.

3    Q.   Was anyone, was any of your employers with Mr. Medeiros

4    when this occurred?

5    A.   Yes.

6    Q.   What was your understanding of how the process would take

7    place when somebody bought your deal on Youngevity?

8    A.   When they purchased the Youngevity program, they would get

9    a website that would take up to 10 to 14 business days.  They

10   would get a variety, a sample of products they could choose to

11   sell on their website during that same time period, 10 to 14

12   business days, then the marketing and the advertising would

13   take 60 to 90 days to kick in and actually start generating

14   traffic for these clients or potential clients.

15   Q.   Were you familiar with Youngevity prior to this?

16   A.   No.

17   Q.   Now, did anybody in the business, to your knowledge, also

18   buy Youngevity package?

19   A.   Yes.

20   Q.   Who?

21   A.   Bill Sinclair, Michael Finocchiaro, Arash Ketabchi.

22   Q.   Now, who were the people who were supposed to build a

23   website and provide the marketing and the social media, et

24   cetera?

25   A.   Anthony Medeiros and his fulfillment team.

IB1JKET3                          Owimrin - direct

1    Q.  What was your expectation that would happen if you sold a

2    Youngevity package to a customer?

3    A.  That they would get everything that was promised to them,

4    they would get their website, their marketing and they would

5    make money.

6    Q.  Now, we talked about previously people making either

7    charge-back requests or complaints.  Did you see any

8    charge-back requests related to Youngevity while you were at

9    Olive Branch?

10   A.  Not, not, not till later.

11   Q.  Now, were you told to change your statement about

12   Youngevity at any point while you were selling it?

13   A.  Yes.

14   Q.  Could you tell us about that.

15   A.  Yes.  Bill Sinclair had called a meeting with the office,

16   and he told us that Anthony Medeiros and his fulfillment team

17   was having trouble keeping up with the volume of sales and

18   getting the websites built, so instead of saying 60 to 90 days,

19   we would have to stick with 90 days, it would take 90 days just

20   because they were backed up in actually getting the products

21   completed or services completed.

22   Q.  Were you involved in any way of payments to the Youngevity

23   owners of the money that they were supposed to get for selling

24   the product?

25   A.  No.

IB1JKET3                         Owimrin - direct

1    Q.  What was your understanding about what a person who

2    purchased a Youngevity package needed to do to get their

3    website up and running and the marketing and social media done?

4    A.  Nothing.

5    Q.  Who told you that?

6    A.  Anthony Medeiros and Bill Sinclair, Michael Finocchiaro,

7    Arash Ketabchi.

8    Q.  When you were selling media, social media and marketing

9    packages for other companies, all right, to people --

10   withdrawn.

11           Prior to Youngevity and after Youngevity, when you

12   sold things such as YouTube or marketing or SEO, search -- or

13   social media packages to people, were those people required to

14   do anything to get those products?

15   A.  No.

16   Q.  Who was supposed to do all of those things?

17   A.  Our fulfillment team.

18   Q.  Now, could a person purchase a Youngevity package

19   participate in ways that might increase their chances of

20   earning more money?

21   A.  Yes.

22   Q.  How would that be?

23   A.  They would be able to direct people to their website, they

24   could advertise on their website, they could physically go

25   door-to-door and sell products, or they could have people sign

1    up and get a Youngevity website themselves.  There are three

2    ways basically.

3    Q.  I ask you to take a look at 23.  Do you see the bottom line

4    of 23, is that something that you wrote in?

5    A.  Yes.

6    Q.  What did you mean by that?

7    A.  I told to reach out to coach for answers.  He was asking me

8    questions, but I didn't have answer for him so I told him to

9    reach out to his coaches or whoever he spoke to prior.

10   Q.  Were there times when you actually spoke to customers that

11   you sold to to help get them to start communicating with their

12   coaches?

13   A.  Yes.

14   Q.  How would that happen?

15   A.  I would get either a notification from Bill, Fino, one of

16   the secretaries, or I could get a notification on our

17   messenger, we used Skype at the time, the fulfillment team

18   would each out and ask us to try to call them so they could get

19   them on their fulfillment call and get them on their

20   appointments.

21   Q.  I ask you to take a look at 25.  Do you see how the pitch

22   of $9,997.00 dropped to $7,997.00?

23   A.  Yes.

24   Q.  How would that have occurred?

25   A.  That would have occurred because he didn't want to go with

1      that highest package or that high package, so we would have

2      lowered some of the weeks, a size of the SEO, social media

3      marketing, and we would lower that product, approximately

4      throwing a complimentary or free press release it says here, so

5      we would drop the price to get the sale.

6      Q.  Did many of the products have different levels?

7      A.  Yes.

8              THE COURT:  Was it your decision when to reduce the

9      price, drop products and reduce the price?

10             THE WITNESS:  If it was just dropping the tier of the

11     product, it was a business plan, and for me to drop it from

12     gold tear to a silver tier, I could make that decision, but if

13     I was just changing the price in general, let's say LLC, which

14     is 1200, if I wanted to sell it for 600, I had to ask for

15     permission to do that.

16     Q.  Was there some flexibility that you were allowed to have

17     before you had to ask permission, say, for an LLC, for example?

18     A.  Yeah, we were allowed to go down to it was either 700 or

19     $900.00 before we had to ask.  I think it was dependent on the

20     state.

21             THE COURT:  Next question.

22     BY MR. SCHMIDT:

23     Q.  Now, I ask you to take a look at 31.

24             THE COURT:  How many more of these do you have because

25     you're over your estimate already and I want to move forward

IB1JKET3                          Owimrin - direct

1    here.

2              MR. SCHMIDT:  I apologize, your Honor.  I am moving as

3    fast as I can.

4              THE COURT:  How many more of these do you have?

5              MR. SCHMIDT:  I have three more, including this one.

6              THE COURT:  That is essentially every one.  Let's go.

7              Next question.

8    BY MR. SCHMIDT:

9    Q.  I ask you to look at 31.

10   A.  Yes.

11   Q.  Now, did you make a sale here?

12   A.  No.

13   Q.  Did you have a number of people that you spoke with that

14   were having problems with their fulfillment of the companies

15   that they purchased from?

16   A.  Yes.

17   Q.  How would you deal with that?

18   A.  Either, let's say, here can't get a website, part of the

19   website they get it, we were able to get permission from Bill

20   to give them a free website and obviously sell them other

21   products with that free website.

22             Also what I would do, I would tell them to reach out

23   to the company that they spoke to or purchased with previously

24   and figure out what that issue is.

25   Q.  I ask you to take a look at 33.  Do you recognize the name

1    of it, don't you?

2    A.  I do.

3    Q.  Did you sell her the Youngevity, the Corporate Credit and

4    the Silver Bookkeeping on September 17th, 2014?

5    A.  I don't recall when I sold her on that September 17th.  I

6    did do the upsell.

7    Q.  You did sell, you did sell Diane Weissenberger?

8    A.  Yes, I did.

9    Q.  Now, when you went to work with Arash, you went to work for

10   the company called A1.  Is that right?

11   A.  Yes.

12   Q.  But A1 was used before while you were at Olive Branch

13   wasn't?

14            MS. KEARNEY:  Objection.

15   A.  Yes.

16            THE COURT:  Just a moment.

17            MS. KEARNEY:  To form, your Honor.

18            THE COURT:  Rephrase it.  It is unclear what you're

19   asking, sir.

20   BY MR. SCHMIDT:

21   Q.  Now, were you familiar with A1 prior to moving with Arash

22   to another sales?

23   A.  Yes.

24   Q.  What was your understanding how -- what was your

25   understanding about the existence of A1?

IB1JKET3                          Owimrin - direct

1   A.  It is my understanding that was Arash's LLC merchant

2   account, his merchant account was through A1.

3   Q.  How come it was used while you were on the Olive Branch

4   floor?

5   A.  Because Arash was basically partners with Bill, and

6   although he was the manager, he, you know, he got merchants to

7   help us conduct business.

8   Q.  Were you ever asked to open up a merchant account?

9   A.  I was.

10  Q.  How did that come about?

11  A.  Bill had confronted me and told me that they were having

12  issues with processing.  He said we have processing, but he

13  always wants to have more, his businesses runs by processing,

14  lives by processing.  He always wanted to have backup

15  processing and have more, and he asked me to apply and asked me

16  if I wanted now to apply.  I could use a few extra dollars a

17  month if could I do it.

18          THE COURT:  What is a few extra dollars?

19          THE WITNESS:  It would vary depending on how much I

20  got approved for or how much the merchant account was left to

21  put through for each month and actually how much they used it,

22  so he said I can make anywhere from 500 to up to $3,000 a

23  month.

24          THE COURT:  Depending on how much was sold?

25          THE WITNESS:  Yes.

1     THE COURT:  To use that merchant account?

2     THE WITNESS:  Yes.

3     THE COURT:  Sell more and make more?

4     THE WITNESS:  Exactly.

5  BY MR. SCHMIDT:

6  Q.  So what did you have to do first to open up a merchant

7  account?

8  A.  I had to get an LLC.

9  Q.  Did you do it?

10  A.  I did not.

11  Q.  Who did it?

12  A.  I paid for it, but our fulfillment team.

13  Q.  What happened after forming an LLC?

14  A.  You go down to the bank with your EIN number, employer

15  identification number, and open up a business bank account, a

16  business checking, business savings, and then apply for -- I

17  assume apply for a merchant account.  I don't know.  Bill had

18  me fill out a bunch of papers.

19     MS. KEARNEY:  He testified he doesn't know how it

20  worked.

21     THE COURT:  Let's move on.

22  BY MR. SCHMIDT:

23  Q.  Let's back up.  What was the name of the LLC?

24  A.  It was Core Business Services.

25  Q.  So after you opened up the account, bank account, what was

1    supposed to be done to apply for a merchant account?

2    A.  I gave all that information to Bill.  He filled out, had me

3    fill it out, and he filled out himself a booklet for a merchant

4    account, for an application for a merchant account.

5              THE COURT:  In your name?

6              THE WITNESS:  In my name, yes.

7    BY MR. SCHMIDT:

8    Q.  Was it in your name or your company's name?

9    A.  The business name, Core Business, Core Business was in my

10   name.

11   Q.  Did you ask anyone else that you knew to open up a merchant

12   account?

13   A.  I did.

14   Q.  Who did you ask?

15   A.  I asked my girlfriend at the time if she wanted to do it.

16   Q.  Anybody else?

17   A.  Ah --

18   Q.  I withdraw that.

19              Now, did you think there was anything wrong or illegal

20   or bad in opening up a merchant account in your name to help

21   basically Olive Branch Marketing?

22   A.  No.

23   Q.  Would you have asked your girlfriend to do it if you

24   thought there was anything wrong?

25              MS. KEARNEY:  Objection.

1    THE COURT:  Sustained as to form.

2  BY MR. SCHMIDT:

3  Q.  Did anyone else, to your knowledge, open up a merchant

4  account to assist in the processing for Olive Branch?

5  A.  Yes.

6  Q.  Who?

7  A.  There were several co-workers, my cousin, they asked my

8  aunt to open up a merchant account.  I do know people that had

9  applied and actually had been approved and used their merchant

10  accounts.

11  Q.  Now, were you aware of the issue of Charge-backs at some

12  point at Olive Branch?

13  A.  Yes.

14  Q.  What was your understanding of what the charge-back was.

15  A.  It was somebody that called their credit card companies up

16  and charged-back, initiated a dispute.

17  Q.  Did you ever see any papers relating to what the customer

18  said was a dispute?

19  A.  No.

20    THE COURT:  Mr. Schmidt, before we get into the

21  subject of charge-backs, it is 5 of 1:00.  It this a logical

22  point to give the jury its lunch break?

23    MR. SCHMIDT:  Yes, it is.

24    THE COURT:  Be back by 2:00 o'clock.  Keep an open

25  mind.  Enjoy the beautiful day.

IB1JKET3                          Owimrin – direct

1              (Jury excused)

2              THE COURT:  You may step down, sir.  2:00 o'clock.

3              (Luncheon recess)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IB18KET4

                              AFTERNOON SESSION

                                   2:00 p.m.

1

2

3           (Jury not present)

4           THE COURT:  Mr. Schmidt, there is an issue?

5           MR. SCHMIDT:  Yes, your Honor.  One of the exhibits

6    that I am going to be offering into evidence is the arrest

7    photo of Mr. Owimrin to show what he looked like when he was

8    arrested, and it has on top supervision.uscourts.gov.  He is

9    going to testify that this was a photo taken when he was

10   arrested on this case.

11          THE COURT:  And the purpose?

12          MR. SCHMIDT:  The purpose is to show this is what he

13   looked like when he was arrested.

14          THE COURT:  And the purpose?

15          MR. SCHMIDT:  As opposed to the photograph that the

16   government put in and what he looked like.

17          THE COURT:  Government.

18          MS. KEARNEY:  The government sees no relevance of

19   putting in a photograph of Mr. Owimrin.  They have been looking

20   at him for a week and a half.

21          THE COURT:  I think that's right.  Explain a little

22   more, sir.  You're showing me a photograph of Mr. Owimrin.  I

23   see it.  Surprisingly, it looks very much like Mr. Owimrin.

24   What is the purpose?  I don't mean to be flip.

25          MR. SCHMIDT:  I understand, your Honor.  The

IB18KET4

 1    government chose to put in a photograph of my client when he

 2    looks really, really bad.

 3          THE COURT:  Let me see the photograph that you have.

 4          MS. KEARNEY:  We also object on 403 grounds, and I can

 5    lay that out after you have had a chance to take a look.

 6          THE COURT:  I have two photos in my hand.  Which one

 7    is the one that's in evidence?

 8          MS. KEARNEY:  The one with a blue back.

 9          THE COURT:  The one that says Government Exhibit 706.

10          MS. KEARNEY:  That's the DMV photograph.

11          THE COURT:  That's on his license?

12          MS. KEARNEY:  Correct.  It's my understanding that was

13    taken after his arrest.

14          MR. SCHMIDT:  It was not taken after his arrest.  It

15    was taken before his arrest, and the photograph from the

16    previous license was put onto the newer one after the arrest.

17          THE COURT:  Government Exhibit 706 is in evidence put

18    in by the government.  What do you want to show, Mr. Schmidt?

19    Do you want them to see this picture?

20          MR. SCHMIDT:  That is correct.

21          THE COURT:  Let me look at it.  It says on it AOL.2.

22    On top it says supervision.uscourts.gov.

23          MR. SCHMIDT:  Your Honor, he is going to be testifying

24    shortly about his drug use, and he is going to be testifying

25    that at the time of the arrest he was no longer using drugs.

IB18KET4

1    They have a photo of him over there where there is no

2    indication when that photo was taken.

3            THE COURT:  Are you talking about Government Exhibit

4    706?

5            MR. SCHMIDT:  Yes.  I want the photograph of him taken

6    when he was arrested.

7            THE COURT:  AOL.2.

8            MR. SCHMIDT:  Yes.

9            To confirm his testimony when he says that he was not

10   on drugs when he was arrested.

11           THE COURT:  How does this confirm one way or the other

12   whether he was on drugs?

13           MR. SCHMIDT:  It certainly distinguishes what he

14   looked like in the government exhibit at an unknown date.

15           THE COURT:  I understand.

16           Government, what difference does it make?

17           MS. KEARNEY:  I see no relevance to this.

18           Based on Mr. Schmidt's opening, in which he referenced

19   the government trying to put his client away -- I think your

20   Honor at sidebar said he was drawing bars across him -- putting

21   in this picture, which is clearly a mugshot, bolsters that

22   argument for Mr. Schmidt that the government is somehow bearing

23   down on his client and trying to put someone away.

24           In addition, Mr. Schmidt indicated to me when we took

25   our lunch break that he wants that superscript at the top to

IB18KET4

1    prove that his client is telling the truth when he says that
2    that was taken while he was on supervision.  He is trying to
3    bolster his client's testimony here.

4            MR. SCHMIDT:  Judge, I want that to come in to show
5    and to confirm that when he testifies he was not on drugs when
6    he was arrested, his life had changed, that they don't have any
7    kind of doubt that the photograph in the government exhibit is
8    what he looked like at the time of his arrest.  This is what he
9    looked like.  It confirms that when he was arrested his life
10   has changed.

11           THE COURT:  I don't think it makes much difference one
12   way or the other.  I am not going to exclude it under 403.
13   This is the picture, AOL.2.

14           MS. KEARNEY:  If they would like to take a picture of
15   Mr. Owimrin in his current state, in which I assume he is not
16   using drugs, we would be happy to have them offer it.  I don't
17   know for what reason.  But to offer something that is clearly a
18   mugshot with a government Web site on the top implies that the
19   government is using its resources to basically crush Mr.
20   Schmidt's client.

21           MR. SCHMIDT:  I don't know what you are talking about.
22   He was arrested.

23           THE COURT:  Bring this jury in.  I will allow it.  I
24   will give the jury all the pictures of Mr. Owimrin they want.

25           What is your estimate now that you have had lunch to

IB18KET4                        Owimrin - Direct

1    whittle it down, sir?

2           MR. SCHMIDT:  It's a long and difficult process

3    because my client has a lot of witnesses that he has to testify

4    about.

5           THE COURT:  What is your estimate now that you had

6    lunch to whittle it down, sir?

7           MR. SCHMIDT:  An hour and a half.

8           THE COURT:  Let's move.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2      ANDREW OWIMRIN, resumed.

3           THE COURT:  Please be seated in the courtroom.

4           Mr. Schmidt, you may continue with your direct

5      examination of Mr. Owimrin.

6      BY MR. SCHMIDT:

7      Q.  Mr. Owimrin, I am going to show you a photograph marked

8      AOL1-2.

9           THE COURT:  Show it to him.  Walk up here and give it

10     to him.

11          Next question.

12          There it is.  It's up.

13     Q.  Is that you?

14     A.  Yes, sir.

15     Q.  When was that photograph taken?

16     A.  This is when I was arrested.

17          THE COURT:  In this case?

18          THE WITNESS:  In this case.

19          THE COURT:  Next question.

20          MR. SCHMIDT:  Could you show 706, government 706.

21          THE COURT:  Is that a picture of you, sir?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  When was that taken?

24          THE WITNESS:  A few years prior.

25          THE COURT:  Next question.

1   Q.  Were you using drugs when that picture was taken?

2              THE COURT:  When what picture was taken, 706?

3   Q.  706.

4   A.  Yes.

5   Q.  Before you started working at Olive Branch, had you

6   experimented with any drugs?

7   A.  Yes.

8   Q.  What drugs?

9   A.  Marijuana.  I tried mushrooms before, and Ecstasy a couple

10  of times as well.

11  Q.  Had you stopped using -- were you still using marijuana

12  when you first went to work at Olive Branch?

13  A.  No.

14  Q.  Now, did there come a time at Olive Branch when you were

15  introduced to oxycodone?

16  A.  Correct.

17  Q.  How did that happen?

18  A.  Michael Finocchiaro had invited me to go to a Giants game

19  with him.  I went with him to a New York Giants game.  We were

20  tailgating.  He offered me a pill and I took it.

21  Q.  Had you known that Fino had been using drugs before then?

22  A.  No.

23  Q.  What happened after that first time you used drugs with

24  Fino?

25  A.  He became more comfortable showing his drug use, I guess

IB18KET4                        Owimrin - Direct

1    his addiction or his habit.  I saw him doing it in the office,

2    and I would join him and do it with him.

3    Q.  Where did you obtain these drugs?

4    A.  From Michael Finocchiaro, as well as his friend Anthony

5    Medeiros, who also introduced Youngevity to us.

6    Q.  Now, did you become addicted to them?

7    A.  Yes.

8    Q.  How many were the most that you were taking a day?

9    A.  15.

10            THE COURT:  15 what?

11            THE WITNESS:  30 milligram Roxicet, which is like a

12   oxycodone.

13            THE COURT:  30 milligram what?

14            THE WITNESS:  Oxycodone, Roxicet.

15   Q.  Where were you obtaining those from?

16   A.  Anthony Medeiros and Michael Finocchiaro.

17   Q.  How much were you paying either Anthony Medeiros or Mike

18   Finocchiaro?

19   A.  18 to 22 dollars each, depending on how many I got at once.

20   Q.  Did there come a time that you tried to stop using it?

21   A.  Yes.

22   Q.  What did you do to try to stop using it?

23   A.  I went to a detox, Bergen Regional Medical Center detox.

24            THE COURT:  When was this?

25            THE WITNESS:  This was in the end of winter, beginning

1   of spring 2015, I believe.

2                 THE COURT:  Next.

3   Q.  How long were you in detox?

4   A.  About a week.

5   Q.  What did you do afterwards?

6   A.  I went right back to work the day I got out.

7   Q.  Was Mr. Finocchiaro still working there?

8   A.  Yes.

9   Q.  Was he still doing oxycodone?

10  A.  Yes.

11  Q.  What happened after -- did you start doing oxycodone

12  immediately?

13  A.  No.

14  Q.  Did there come a point where you started doing it again?

15  A.  Yes.

16  Q.  Was there an event that led to it?

17  A.  Yes.

18  Q.  What happened?

19  A.  A close friend of mine got into an accident and he became

20  paralyzed, and it was just something that I leaned on as a

21  crutch.

22  Q.  When you started using it again, how much were you paying

23  for it?

24  A.  $22 each.

25  Q.  Where were you getting it from?

IB18KET4                       Owimrin - Direct

1   A.  Michael Finocchiaro and Anthony Medeiros.

2              THE COURT:  Approximately when was this?

3              THE WITNESS:  This was, I want to say --

4              THE COURT:  How long was it after the detox?

5              THE WITNESS:  About six months.

6              THE COURT:  So you were clean for about six months?

7              THE WITNESS:  Yes.

8              THE COURT:  Next.

9   Q.  How were you paying for it?

10  A.  Cash.

11  Q.  Where were you getting the money?

12  A.  From work.

13             THE COURT:  You mean your earnings?

14             THE WITNESS:  My earnings, yes, my earnings from work.

15  Q.  Did the purchase and the use of oxycodone pills put a

16  financial strain on you?

17  A.  Yes.

18  Q.  What did you do to continue paying for your drugs?

19  A.  I got a loan.  I asked a friend if he knew anybody that

20  could give me a loan.  He referred me to a loan shark, the

21  guy's name was John, I don't know his last name.

22  Q.  Who is the friend?

23  A.  Brian Shalansky.

24  Q.  Where did you know him from?

25  A.  From work.  He worked at The Tax Club and then he worked

1   with us.

2   Q.   That loan, how much were you paying off on that loan?

3   A.   It was about a $10,000 loan or $8,000 loan, and I was

4   paying $1,000 a week.  They call it seven points were going to

5   interest and the -- I had to give him $1,000.  $700 would go

6   into his pocket and $300 would actually go the principal debt.

7   Q.   Did there come a point that you were paying money for the

8   loan to a person other than who you borrowed it from?

9   A.   Yes.

10  Q.   Who was that?  Who did you pay that money to?

11  A.   To Arash.

12  Q.   How did that happen?

13  A.   It became a little bit too much for me to -- I couldn't

14  obviously afford my drug habit and $1,000 a week loan.  So I

15  had asked Arash -- I actually started working for him, and I

16  asked if I could get a loan from him.  He said no, but he said

17  that his uncle would be able to do it.  So I got a loan from

18  his uncle to pay off the loan shark.  Then I had to pay off his

19  uncle with an agreed upon $1500 a month rather than a $1,000 a

20  week.

21  Q.   At what interest rate?

22  A.   What interest rate for his uncle?

23  Q.   Yes.

24  A.   Like I said, it was $1500 a month.

25  Q.   For how long?

1    A.  12 months.

2    Q.  How much money was borrowed?

3    A.  $10,000.

4    Q.  How was the money collected?

5    A.  Arash.

6    Q.  How did he collect that money?

7    A.  He took it out of my pay; he took it out of my earnings.

8    Q.  How were you paid when you worked there, was it salary or

9    commission?

10   A.  Commission.

11   Q.  At that time, did you have any kind of arrangements with

12   any of the workers about how you would split the commissions?

13   A.  Yes.

14   Q.  What was that?

15   A.  Me and my cousin Reagan were the only two sales reps on the

16   floor at that time, so we came up with an agreement that

17   whatever he sold we would split, and whatever I sold we would

18   also split our commission.

19   Q.  Now, did there come a time that you no longer could afford

20   to use Oxycontin?

21   A.  Correct.

22   Q.  What did you start doing?

23   A.  Heroin.

24   Q.  How long did you do that?

25   A.  It seems like a long time, but it was -- obviously I

IB18KET4                         Owimrin - Direct

1    couldn't even give you -- maybe three, four months.

2              THE COURT:  When did you start that?

3              THE WITNESS:  Pretty much right when we moved from

4    Clifton to work for Arash.

5              THE COURT:  When was that?

6              THE WITNESS:  This was in late 2015.

7              THE COURT:  All right.  Next.

8    Q.  Did there come a time you went into detox again?

9    A.  Yes.

10   Q.  Approximately when was that?

11   A.  That was in, I want to say spring of 2016.

12   Q.  Now, after you came out of detox there, did you go back to

13   work for Arash?

14   A.  No.

15   Q.  Where did you go?

16   A.  I went to work for Bill Sinclair at Consumer Shield.

17   Q.  When you went back to Bill Sinclair, what happened in

18   regards to drug use?

19   A.  I started using again.

20   Q.  Where did you get it from?

21   A.  Michael Finocchiaro and Anthony Medeiros.

22   Q.  Did there come a point when you left them?

23   A.  Yes.

24   Q.  After you left them, did you continue using drugs?

25   A.  For a short period of time.

1    Q.  When you were arrested were you using drugs?

2    A.  No.

3    Q.  Have you used drugs since that time?

4    A.  I was smoking marijuana at that time, but I was not doing

5    opiates or heroin.

6    Q.  After you were arrested, have you been using any kind of

7    drug?

8    A.  No, sir.

9    Q.  I want to ask you to take a look at Exhibit 140.

10          You see that exhibit?

11   A.  Yes, sir.

12   Q.  Now, you see what was sold to Ms. LaMorte?

13   A.  Yes.  It looks like Youngevity.

14   Q.  Did you sell any other product that had that paragraph?

15   A.  Yes.  I added corporate credit.

16   Q.  The part that has starter kit, etc., up to corporate

17   credit, is that paragraph unique to the Youngevity sales?

18   A.  Yes.  That's the Youngevity products.

19   Q.  Now, when you sold Youngevity, did the customer, the

20   potential customer -- withdrawn.

21          You explained what was the difference between selling

22   the Youngevity package with the other items in relation to

23   statements concerning earnings.  Do you remember that?

24   A.  Yes.

25   Q.  Did some of the potential customers ask you to give them an

1  estimate of how much they were going to make?

2  A.  Yes.

3  Q.  How would they do that?

4  A.  They would just ask me, how much am I going to make, give

5  me a number.  They would push for me to give them an amount of

6  how much they would make.

7  Q.  What was your response to that?

8  A.  My response was, I can't.  I would literally tell them it's

9  illegal for me to make earnings claims.  I can't promise you.

10  There are so many different variables that come into play.  I

11  couldn't predict how much they would make.

12  Q.  If the potential customers were persistent, what would you

13  say?

14  A.  I would give them examples of how much clients have made

15  previously with us using Youngevity.

16  Q.  What kind of amounts would you talk about?

17  A.  A couple hundred dollars, $200, $300, $800.  We had one

18  client, to my knowledge, that earned $3,000.  It varied.

19  Q.  So how did it come to your attention that the customer made

20  $3,000?

21  A.  Management -- Arash Ketabchi, Bill Sinclair, Michael

22  Finocchiaro -- would notify us when a check would come in for

23  whatever client that had Youngevity.

24  Q.  As to that one person who made that large amount of money,

25  how did you hear of that?

1  A.  They announced it to the office.  They showed

2  us -- actually, Arash Ketabchi lifted up the check at his desk

3  and showed us.  They got the guy on a conference call, and he

4  was speaking about how he made money.

5          THE COURT:  This was a check made out to the purchaser

6  of Youngevity?

7          THE WITNESS:  Yes.

8          THE COURT:  Why did Arash have a check made out to

9  somebody else?

10          THE WITNESS:  Basically, the checks would go to the

11  office first and they would distribute it.  Because they were,

12  I guess, the top of the --

13          THE COURT:  Pyramid?

14          THE WITNESS:  Pyramid.

15  Q.  Did you hear anything about whether Mike, Arash or Bill

16  invested in Youngevity?

17  A.  Yes.

18  Q.  What did you hear?

19  A.  They all had -- they all invested in Youngevity.

20  Q.  Did you have a conversation with Arash about investing in

21  Youngevity?

22  A.  Yes.  I asked him if I could invest in Youngevity myself.

23  Q.  Why did you ask him that?

24  A.  To try and make some extra money.

25  Q.  What did he say?

IB18KET4                          Owimrin - Direct

1   A.  He said no.

2   Q.  At that time, did you have any reason to disbelieve what

3   Bill, Mike or Arash were saying about Youngevity?

4              MS. KEARNEY:  Objection.

5              THE COURT:  Sustained.

6   Q.  Did you believe them?

7   A.  Yes.

8              MS. KEARNEY:  Objection.  What time period?

9              THE COURT:  Pardon me?

10             MS. KEARNEY:  What time period are we talking about?

11             THE COURT:  What time period?

12             THE WITNESS:  When Youngevity pretty much first

13  started.

14  Q.  How many times did you hear about money going to customers

15  who purchased Youngevity during the first eight months of

16  Youngevity being sold?

17             THE COURT:  What were the first eight months, what

18  time period are we talking about?  When was Youngevity being

19  sold early on?

20             THE WITNESS:  From when Youngevity started or when we

21  got it?

22             THE COURT:  From when you were selling it.

23             THE WITNESS:  Right when we first got Youngevity, or

24  was introduced to Youngevity, about two weeks after being

25  introduced to it we were selling it.

1        THE COURT:  On the calendar, when was that?

2        THE WITNESS:  That was probably late or early 2015

3   to -- probably early 2015, to my knowledge.

4        MR. SCHMIDT:  Your Honor, I would like to show Mr.

5   Owimrin Defense Exhibit AOC 22.

6        THE COURT:  Next question.

7   Q.  Now, do you have a better memory of when actually a sale of

8   Youngevity first took place at Olive Branch?

9   A.  September, end of September 2014.  So late 2014, early

10  2015.

11  Q.  You heard the testimony in the video of Charlene Foster.

12  Did you sell Charlene Foster?

13  A.  Yes.

14       MR. SCHMIDT:  Would you put up Exhibit No. 102.

15  Q.  What did you sell Charlene Foster?

16  A.  An LLC, a business plan, corporate credit, tax prep, and we

17  gave her a free laptop.

18  Q.  What would that mean as to what she had already owned if

19  you sold her those products?

20  A.  She would have a business already, that's what it would

21  mean, a running business.

22  Q.  Now, would these items here necessarily provide a regular

23  earnings from these products?

24  A.  These products wouldn't generate you an income, no.  You

25  wouldn't make money off of these products.  The LLC could help

IB18KET4                         Owimrin - Direct

1   with legitimacy, but it wouldn't make you money.

2   Q.  Now, at the time that you were selling these products, were

3   you aware of other products that were being sold that would

4   provide earnings to a customer?

5           MS. KEARNEY:  Objection.

6           THE COURT:  Sustained as to form.

7   Q.  Would you sell products like these to someone who did not

8   have an actual -- withdrawn.

9           Would you sell these products to somebody if you

10  didn't believe they had an actual business?

11  A.  No.

12  Q.  Why not?

13  A.  There is no point in having them if you don't have a

14  business.

15  Q.  And when you sold this to Ms. Foster on or about the 15th

16  day of October 2015, what was your belief or understanding of

17  whether she had a business at that time?

18  A.  She had a business at that time.

19  Q.  Do you know what the business was?

20  A.  Yes.

21  Q.  What was it?

22  A.  Youngevity.

23  Q.  Did you sell her Youngevity?

24  A.  I did.

25  Q.  When did you sell her Youngevity?

IB18KET4                          Owimrin - Direct

1    A.  At Olive Branch, maybe a month prior.

2    Q.  When you talked with her --

3            THE COURT:  So your testimony is, if I understand you

4    correctly, that by selling her Youngevity, she was engaged in

5    conducting a business of her own, is that right?

6            THE WITNESS:  Correct.

7            THE COURT:  All right.

8    Q.  So when you talked with her, did you have any trouble in

9    communications?

10   A.  No.

11   Q.  Now, after this sale, did you receive your commission for

12   it?

13   A.  I did.

14   Q.  What happened to that commission?

15   A.  I had to give it back.

16   Q.  Why?

17   A.  Because she charged back; she canceled.

18   Q.  How did you know that?

19   A.  Arash Ketabchi informed me that she charged back.

20   Q.  How were you paid for your commission?

21   A.  By check.

22   Q.  How did you pay back Mr. Ketabchi?

23   A.  By cash.

24           THE COURT:  What was the amount of your commission on

25   the sale of Youngevity to Ms. Foster?

1    THE WITNESS:  It would have been 10 percent.

2    THE COURT:  And what was that?

3    THE WITNESS:  That was a $15,000 sale or 10,000.  It

4    would have been 10 percent.  So it would have been either

5    $1,000 or $1500.

6    Q.  Did you ever learn whether or not the chargeback for

7    Ms. Foster was reversed?

8    A.  No.

9    Q.  Did you ever receive any money back from Mr. Ketabchi?

10   A.  No.

11   Q.  Did you ever speak to Ms. Foster after that?

12   A.  No, I did not.

13   Q.  Were the products that you sold her, did that include

14   coaching and training?

15   A.  Yes.

16   Q.  Who would be involved in that activity, the coaching and

17   training?

18   A.  The fulfillment center, the fulfillment team.

19   Q.  Now, do you have any idea of how much the fulfillment team

20   is paid to fulfill contracts that you or other salesmen entered

21   into with customers?

22   A.  No.

23   Q.  Did you know how much, either at Olive Branch when you were

24   there or with Mr. Ketabchi when you were there, how much they

25   were paying for leads to customers?

1    A.  No.

2    Q.  Did you know how much they were paying, the percentage, for

3    their merchant accounts?

4    A.  No.

5    Q.  Now, you have heard the testimony of Diane Weissenberger,

6    correct?

7    A.  Yes.

8    Q.  Did you sell her?

9    A.  Yes.

10   Q.  Did you up-sell her?

11   A.  Yes.

12   Q.  Now, Diane Weissenberger testified that you or someone said

13   that the goal for the first year in earnings was six figures.

14   Do you remember her testifying to that?

15   A.  I do remember.

16   Q.  Did you say that?

17   A.  No.

18   Q.  Would you ever say anything like that for a Youngevity

19   product?

20   A.  No.

21   Q.  Did you ever say anything like that for any product?

22   A.  No, sir.

23   Q.  Now, who was the first person who caused you to know the

24   name of Jane Thompson?

25   A.  Emily Miller and Arash.

1    Q.  Now, did you sell to Jane Thompson?

2    A.  Yes.

3         MR. SCHMIDT:  Can you put up the first contract,

4    please.

5    Q.  Do you recall the products that you sold Jane Thompson?

6    A.  Yes.

7    Q.  What were the products that you sold Jane Thompson?

8    A.  It was the normal products I usually sold:  LLC, business

9    plan, corporate credit, tax services.

10   Q.  Now, what would that mean to you that you sold those

11   products?

12   A.  That would mean that she already had a business.

13   Q.  Do you remember the conversation that you had with Ms.

14   Thompson when you were trying to sell her some of the products?

15   A.  I do.

16   Q.  Would you tell us about the conversation you had with her?

17   A.  From what I remember, she had a merchant processing

18   business and another business, I believe it was an affiliate

19   market Web site, and she was excited.  She was excited about

20   having the opportunity to work from home and she was excited

21   about these endeavors that she was pursuing.

22   Q.  Would you have made any earnings claims --

23        MS. KEARNEY:  Objection.

24   Q.  Did you make any earning claims to --

25        THE COURT:  Sustained as to form.

Q. -- Ms. Thompson relating to that sale?
A. No.
Q. Now, after you made that sale, did you become aware of another sale to her from A1?
A. After I made that sale? Repeat the question. I'm sorry.
Q. This is Government Exhibit 163.
You see that the date of this sale is the 29th of December?
A. Yes.
Q. And you see the products that are being sold?
A. Yes.
Q. Do you recall if you or another salesperson made this sale?
A. Yes.
Q. Who made this sale?
A. Connor Swanson.
Q. Who was Connor Swanson?
A. That was my cousin, Reagan Owimrin.
Q. Was Connor Swanson his phone name?
A. Yes.
Q. Did you adopt a different phone name when you left Olive Branch and went to A1?
A. Yes.
Q. What name did you adopt?
A. Jonathan Stewart.
Q. Why did you adopt a different name?

1    A.  Because we switched companies, just Arash told us to change

2    names.  We were working for different companies.  It was a

3    different ownership, different people, so he told us that we

4    need to switch our names.

5    Q.  Now, during the time that you were at Olive Branch, did you

6    use any other name other than Andrew Owens when you were

7    selling?

8    A.  Not when I was selling, no.

9    Q.  When you were at A1, did you use Jonathan Stewart when you

10   were selling?

11   A.  Yes.

12   Q.  Did you give out your cell phone number to people while you

13   were at Olive Branch?

14   A.  Yes.

15   Q.  What was the name on the cell phone?

16   A.  Andrew Owimrin.

17   Q.  When you gave out your cell phone to people while you were

18   working at A1, what was the name on the cell phone?

19   A.  I actually might have switched over to my mother's name,

20   Daphney Owimrin.

21   Q.  Did you try to make your, I guess your identification

22   restricted on your phone?

23   A.  No.

24   Q.  So that telephone number that came up, unless somebody put

25   in a different name, the first time it would come up with

1   Daphney Owimrin while you were at A1, is that right?

2   A.   If they had caller ID, yes.

3   Q.   When you were at Olive Branch, the name that would have

4   came up, if they called that number, would have been Andrew

5   Owimrin?

6   A.   Correct, if they had caller ID.

7   Q.   Now, why did you go with Arash to the other company?

8   A.   For two reasons.  One, the business was kind of slowing

9   down at Olive Branch; we were struggling to get leads,

10  processing.  Arash and Bill had gotten into some type of

11  disagreements that I didn't know about, didn't know what they

12  were about, but they got into a disagreement.  Arash decided he

13  was going to start his own company, and he asked me and my

14  cousin Reagan to go him.  He was my cousin's fiance so I really

15  didn't have a choice.

16  Q.   Where was it located?

17  A.   In his basement in their home, my cousin at his home.

18  Q.   Was there an expectation that you were going to stay there

19  or move?

20  A.   We were going to move.  He had plans on getting an office.

21  It was just an in-between place that we were going to be until

22  we got our feet on the ground.

23  Q.   By the way, by the time that you left Olive Branch, did

24  Olive Branch have more space than that one area that was

25  discussed by Mr. Sinclair?

1    A.  Yes, much more.

2    Q.  What else did they have?

3    A.  They had an office across the hall that had two rooms in

4    it, and they had a whole office space downstairs that had an

5    office that was the size of basically the two offices upstairs,

6    and then a basement that was a part of that.

7    Q.  Do you know what was going on in the other offices?

8    A.  Yes.

9    Q.  What?

10   A.  In the office upstairs that was across the hall was where

11   we put the appointment setters because we had hired more sales

12   reps, or they had hired more sales reps, so they put the

13   appointment setters separate.

14          Then downstairs he opened up strictly an SEO floor,

15   search engine optimization floor.  It's like a Google floor;

16   they were just selling people Google, SEL.

17   Q.  Now, that sale, again, what was necessary for Connor to

18   make a sale of those items?

19          MS. KEARNEY:  Objection.

20          THE COURT:  Sustained.

21   Q.  What does the sale of the YouTube, social media package,

22   SEO/SEM, and custom merchant Web site mean to you?

23   A.  That means that she had a merchant processing business.

24   Q.  Now, when you talked to customers, other than the first

25   couple of weeks when you didn't have a phone, when you went for

1    a sale initially, did you speak to them on an office phone or

2    your cell phone?

3    A.  My cell phone.

4    Q.  When was that?

5    A.  That was when we first moved from Olive Branch to Arash's

6    basement.

7    Q.  Why was that?

8    A.  We didn't have phone systems set up yet.

9    Q.  When the phone systems were set up, what did you do?

10   A.  We used the office phones.

11   Q.  Did you use your cell phone at some point?

12   A.  Occasionally, yes.

13   Q.  Did you give out your cell phone number to customers you

14   thought that it would be helpful to have it?

15   A.  If they asked for it, I would give them my cell phone

16   number.  I wouldn't just offer it, but if they asked, I would

17   give it to them.

18   Q.  Now, I ask you to take a look at 165, on page 8.

19        Do you remember talking to Ms. Thompson on that date?

20   A.  Yes.

21   Q.  Now, looking at these notes there, can you tell us what you

22   talked to her about?

23        MS. KEARNEY:  Objection.

24        MR. SCHMIDT:  I will withdraw that question.

25   Q.  Could you tell us what you talked to her about?

1    A.  I spoke about the products I sold her -- the LLC, business

2    plan, corporate credit -- the first initial sale.

3    Q.  Based on Exhibit SP4, which is the telephone chart, would

4    it be fair to say that --

5            MS. KEARNEY:  Objection.

6            THE COURT:  Change the phrasing.

7            Go ahead.

8    Q.  Do you remember if you talked to her with your cell phone

9    or the office phone?

10   A.  My cell phone.

11   Q.  I ask you to look at SP4.

12           MS. KEARNEY:  Objection.  The witness has answered.

13           MR. SCHMIDT:  He answered that question, but I have

14   another question.

15           THE COURT:  He can show him whatever he wants.

16           Go ahead.

17   Q.  Do you see the chart of the telephone calls made with your

18   cell phone?

19   A.  Yes.

20   Q.  Could you tell us if you spoke with Ms. Thompson on your

21   cell phone or on your office phone?

22   A.  My cell phone.

23   Q.  Where is it listed there?

24   A.  The first three 1/5/16 --

25   Q.  We are talking about now --

1            MR. SCHMIDT:  Could we show page 9 of 165.

2    Q.  You see the date on there?

3    A.  December 17.

4    Q.  On that date, do you recall whether you spoke to her on

5    your cell phone or on your landline?

6    A.  Landline.

7    Q.  Were there times that you spoke with Ms. Thompson on your

8    cell phone?

9    A.  Yes.

10   Q.  After that?

11   A.  Yes.

12   Q.  Now, you said you had communication with a person named

13   Emily Miller, is that right?

14   A.  Yes.

15   Q.  Prior to going to A1, were you familiar with that name at

16   all?

17   A.  I was familiar with the name, yes.

18   Q.  How were you familiar with that name?

19   A.  We would see it in lead lists, in appointments; an

20   appointment setter would just copy and paste whatever was in

21   the lead list, and you would see the previous sales rep and

22   previous company and you would see her name a lot.

23   Q.  Did there come a time that you communicated with her on the

24   telephone?

25   A.  Yes.

1   Q.  How did that occur?

2   A.  That happened through Arash when we moved into his basement

3   to work for A1.  She sent him over some leads and she had, I

4   believe, either texted or called me to explain to me what those

5   leads were, what they had purchased, and things of that nature.

6   Q.  Now, after the sale that you made and the sale that Connor

7   made to Jane Thompson, was there any other products that you

8   knew of that was available to be sold to Jane Thompson?

9   A.  No, sir.

10  Q.  The products that you sold, at the time that you sold them

11  to Jane Thompson, did you think that they were real?

12  A.  Yes.

13  Q.  Did you think they were fulfilled and being serviced?

14  A.  Yes.

15  Q.  The products that Connor sold to Ms. Thompson, did you

16  think that they were real?

17  A.  Yes.

18  Q.  Did you think that they were being serviced?

19  A.  Yes.

20  Q.  Now, you did participate in other sales with Ms. Thompson,

21  didn't you?

22  A.  Correct.

23  Q.  How did it come about, after the sales by you and Connor,

24  that other sales happened?

25  A.  Could you repeat that?

IB18KET4                        Owimrin - Direct

1    Q.  You previously just testified that you sold the products

2    that you had to Ms. Thompson.  But you also testified that you

3    also were involved in later sales with Ms. Thompson?

4    A.  Yes.

5    Q.  So how did it come about, after you and Connor made those

6    first two sales, that other sales occurred?

7    A.  It was initiated by Arash Ketabchi and Emily Miller, they

8    notified -- Emily basically notified that there were other

9    products that we could sell.

10   Q.  What was the product that Emily told you that was available

11   to be sold?

12   A.  A merchant processing business.  I think it was a little

13   different than merchants that I was aware of.  That was the one

14   that KB sold for $50,000 prior to us getting her lead.  But a

15   merchant terminal.

16   Q.  Had you sold anything like that before?

17   A.  Never.

18   Q.  Did you know much about that?

19   A.  No.

20   Q.  Did anyone explain that to you?

21   A.  Yes.

22   Q.  Who?

23   A.  Emily Miller.

24   Q.  Whose idea was it to sell Jane Thompson these merchant

25   processing things?

IB18KET4                          Owimrin - Direct

1    A.  It was both Emily and Arash.

2    Q.  Did you have an adequate understanding at the time that you

3    participated --

4               MS. KEARNEY:  Objection.

5               THE COURT:  Sustained as to form.

6    Q.  Did you believe that the merchant processing program, as

7    explained to you by Emily and Shahram, was lawful?

8               MS. KEARNEY:  Objection.

9               THE COURT:  Just a moment.

10              MR. SCHMIDT:  I apologize.  Emily and Arash.  I

11   apologize.

12              MS. KEARNEY:  Same objection.

13              THE COURT:  Sustained as to form.

14   Q.  What was your understanding about the legitimacy of the

15   merchant processing program as explained to you by Arash and

16   Emily?

17   A.  I thought it was a legitimate business.

18   Q.  Did you have any idea really how it ran?

19   A.  No.

20   Q.  Did you know how much the program would be sold for?

21   A.  Not at that time, no.

22   Q.  Did you learn what the prices were?

23   A.  Yes.

24   Q.  How did you learn about it?

25   A.  They told me.

IB18KET4                          Owimrin - Direct

1    Q.   When you say "they," who do you mean?

2    A.   Emily told me the prices.  Arash didn't tell me that.

3            THE COURT:  Your job was to sell what the company was

4    selling, right?

5            THE WITNESS:  Yes, sir.

6            THE COURT:  I take it you never refused to sell a

7    product of either Olive Branch or A1, did you?

8            THE WITNESS:  No, sir.  Unless I wasn't knowledgeable

9    about it, then I would get assistance to do so.

10   Q.   Now, I ask you to look at -- one moment.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Ladies and gentlemen, why don't we stand

2    up and stretch and take a break.  We're doing that primarily

3    because I felt the need to stretch.

4         (Pause)

5         THE COURT:  All right.  Thank you.  Next question.

6    BY MR. SCHMIDT:

7    Q.  You testified that you did speak with Ms. Thompson on your

8    cell phone on January 5th.  Is that right?

9    A.  Yes.

10   Q.  Now, do you remember who you spoke to before you had that

11   conversation?

12   A.  Yes.

13   Q.  With Jane Thompson on the 5th?

14   A.  Yes, I remember.

15   Q.  Who was the person that you talked to?

16   A.  Emily Miller.

17   Q.  What was the conversation about that you talked to Emily

18   Miller?

19   A.  She was giving me a brief summary, a rundown of what

20   products to talk about and things like that.

21   Q.  So were you planning on then, after speaking to Ms. Miller,

22   to speak to Ms. Thompson?

23        MS. KEARNEY:  Objection.

24        MR. SCHMIDT:  I'll withdraw that question.

25   BY MR. SCHMIDT:

IB1JKET5                          Owimrin - direct

1   Q.   Now, did you call Ms. Thompson and try to sell a product to

2   her?

3               MS. KEARNEY:  Objection.

4               THE COURT:  I'll allow it.

5   A.   Yes.

6   Q.   Do you remember what the product was?

7   A.   Yes.

8   Q.   What was it?

9   A.   It was a merchant terminal.

10  Q.   How did that conversation go?

11  A.   Pretty bad.

12  Q.   Can we put up 474, please.

13              (Off-the-record discussion)

14              MR. SCHMIDT:  475.

15  Q.   Now, do you see that email?

16  A.   Yes.

17  Q.   Did you have a conversation after your not so good attempt

18  with Jane Thompson with Emily Miller?

19  A.   Not right away, no.

20  Q.   Now, I ask you to take a look at the marked SP-2.  I am

21  handing this to you.

22  A.   Thank you.

23  Q.   Did you have a number of conversations with Emily Miller on

24  the 5th, 6th, and 7th of January?

25  A.   Yes.

1  Q.  Do you recall what those conversations were about?

2  A.  They were about other leads, they were about Jane Thompson,

3  about merchant processing, things like that.

4  Q.  Now, did you have other conversations with Jane Thompson

5  after that?

6  A.  Yes.

7  Q.  Now, I ask you to take a look at 165, Page 19.

8  A.  Okay.

9  Q.  Did you have a conversation with Ms. Thompson about that

10  time?

11  A.  Yes.

12  Q.  What was the conversation about?

13  A.  It was about getting a merchant terminal up and running.

14  Q.  Were you a little bit -- how were you at that time in

15  discussing the merchant processing?

16         THE COURT:  Sustained.

17  Q.  How comfortable were you discussing merchant processing

18  with Ms. Thompson at that time?

19  A.  Not very comfortable.

20  Q.  Was this a conversation in which Emily participated in?

21  A.  Yes, sir.

22  Q.  Who did most of the talking about the actual merchant

23  processing?

24  A.  Emily.

25  Q.  Now, between you, Jane Thompson and Emily Miller, who

IB1JKET5                          Owimrin - direct

1    seemed to be the least informed about merchant process?

2              MS. KEARNEY:  Objection.

3              THE COURT:  Sustained.

4    Q.  Do you recall who talked the least about the merchant

5    processing in that conversation?

6    A.  Me.

7    Q.  Now I ask you to take a look at Page 22.

8              THE COURT:  I take it that is because Emily was doing

9    the sale, right?

10             THE WITNESS:  Yes.

11   Q.  Did Jane Thompson seem knowledgeable about merchant

12   processing?

13   A.  Yes, she did.

14             THE COURT:  Jane Thompson appeared to be knowledgeable

15   to you about the merchant processing process.  Is that your

16   testimony?

17             THE WITNESS:  Yes.

18             THE COURT:  All right.

19   BY MR. SCHMIDT:

20   Q.  Actually, have you reviewed with us --

21   A.  I should say more knowledgeable than myself.

22             THE COURT:  No, that is not what I was asking.

23   Q.  Did she seem more knowledgeable than Emily?

24   A.  No.

25   Q.  I ask you to look at --

IB1JKET5                        Owimrin - direct

1              THE COURT:  Let me ask you another way because I want

2      to make sure your testimony is clear to the jury.

3              Is it your testimony that in that conversation you

4      came to the conclusion that Jane Thompson understood what

5      merchant processing was about?

6              THE WITNESS:  Yes.

7              THE COURT:  Did you believe -- next.

8      BY MR. SCHMIDT:

9      Q.  Did you come to the conclusion that Jane Thompson

10     understood what merchant processing was from earlier

11     conversations?

12     A.  Yes.

13     Q.  Now I show you Page 22 of Government Exhibit 165.  Now,

14     were you a participant in that conversation?

15     A.  Yes.

16     Q.  Where would you rank yourself in the frequency of you

17     talking in that conversation among those four people -- excuse

18     me -- yes, the four people?

19     A.  Three other than myself, at the bottom.

20     Q.  Now, by the end of this conversation what was your

21     understanding as to the next product that would be sold or

22     attempted to be sold to Jane Thompson?

23     A.  Merchant, more merchant processors.

24     Q.  How many?

25     A.  Three of them.

IB1JKET5                          Owimrin - direct

1    Q.  By this time, did you have an idea of what the costs would

2    be for the merchant processing program?

3    A.  $50,000, judging by the initial $50,000 sale from KB.

4    Q.  You understand whether she -- was it your understanding at

5    some point she was offered a merchant processing site for less

6    than $50,000?

7    A.  The site itself is different than the actual -- the site

8    would be a separate entity.

9    Q.  I ask you to take a look at Page 31 of the same exhibit.

10   Did you speak with Ms. Thompson on that day?

11   A.  Yes.

12   Q.  What was your conversation with Ms. Thompson about?

13   A.  The terminals were beginning to write the check out of, you

14   know, things like that.

15   Q.  After you had a conversation about the terminals, did you

16   give the phone to someone?

17   A.  Yes.

18   Q.  Who did it give it to?

19   A.  To Zack Peterson.

20   Q.  Did you participate in the conversation that appears to be

21   reflected in the paragraph with the asterisk?

22   A.  No, sir.

23   Q.  Did you learn about that conversation?

24   A.  I did.

25   Q.  Who did you learn about that conversation from?

1    A.  From Arash.

2    Q.  At the time were you getting paid the commissions for sales

3    at A1?

4    A.  Yes.

5    Q.  Was Reagan getting paid?

6    A.  Yes.

7    Q.  Do you recall if someone else, any other salespeople were

8    working at that time?

9    A.  Yes.

10   Q.  Who else was working there?

11   A.  There was another sales rep, Louis, had other business

12   partners and there was two, a private centers compliance

13   rep/secretaries that worked there also.

14   Q.  At that point did you have, did you have an understanding

15   about the costs related to a sale, including the lead,

16   fulfillment and the merchant account?

17   A.  No.

18   Q.  To your knowledge, did you understand that A1 was making

19   money?

20   A.  Yes.

21   Q.  Were you making money?

22   A.  I was.

23   Q.  Did you know what 20 percent of the residuals after

24   everything was paid from A1 would be?

25   A.  No.

1   Q.  Why is that?

2   A.  Because I don't know, that wasn't my -- I didn't keep track

3   of all the finances.  It wasn't my business.

4   Q.  Now, did you have conversations with Ms. Thompson other

5   than conversations specifically about the things that you sold?

6   A.  Yes.

7   Q.  What kind of conversations did you have?

8   A.  Things about life, just talking about regular, everyday

9   life issues, you know, she was going through, issues I was

10  going through in my personal life, things like that.  We

11  talked.

12  Q.  What did you think about Jane Thompson as a person?

13  A.  I thought she was a sweetheart.

14  Q.  How do you feel now what you've seen what has happened to

15  Jane Thompson?

16  A.  I feel like, I feel horrible, honestly.  I can't really put

17  it into words, honestly.

18  Q.  Were you aware that Jane Thompson continued to give money

19  to Emily Miller after these last deals?

20  A.  No.

21  Q.  Did you learn Emily Miller's real name at some point?

22  A.  Yes.

23  Q.  What is her real name?

24  A.  Brooke Marcus.

25  Q.  Did there come a point while you were still working for

1    Arash Ketabchi that you were forwarding leads to Bill Sinclair?

2    A.  Yes.

3    Q.  During the time that you were working for Arash, had you

4    seen Bill or other people work there on and off?

5    A.  I used to go up to Bill's offices, yes.

6    Q.  Was there any kind of reason that what you were doing in

7    Bill's office?

8    A.  I would go get drugs from him, Mike Finocchiaro and I would

9    meet Anthony Medeiros sometimes, too.

10   Q.  Did there come a time where you had a conversation with

11   either Bill or Mike about going back to work with them?

12   A.  Yes.

13   Q.  Did you have a conversation with them about helping them

14   with leads?

15   A.  Yes, I did.

16   Q.  What was your understanding at that time, when you had that

17   conversation with them, what they were selling at that time?

18   A.  They were selling debt consolidation basically.

19   Q.  Did there come a time you forwarded debt leads to them?

20   A.  Yes.

21   Q.  Did you get paid at any time?

22   A.  Yes.

23   Q.  What did you get paid?

24   A.  It is hard for me getting my job back for that or beginning

25   a job.  He gave me a thousand dollars.  I wasn't making money

IB1JKET5                        Owimrin - direct

1    at the time at Arash's.  He gave me a thousand dollars cash

2    spending money until to live until I got on my feet and started

3    making sales.

4    Q.  When you first started working at Olive Branch, where did

5    you live?

6    A.  I lived in Cliffside Park.

7    Q.  Did you live with anybody?

8    A.  I lived with my parents.

9    Q.  At some point while you you were working at Olive Branch,

10   did you get your own apartment?

11   A.  Well before.

12   Q.  Did you share your own apartment?

13   A.  Before that, I moved in with my brother.  We ended up

14   getting -- having to move.  I moved in with my brother.  I

15   stayed there for a little bit while was working with Olive

16   Branch.  I did eventually get my own apartment.

17   Q.  What happened to that apartment?

18   A.  I got evicted.

19   Q.  Why did you get evicted?

20   A.  I was not paying my rent.

21   Q.  How much before going into rehab in 2000, spring-summer of

22   2016 did you get evicted from your apartment?

23   A.  Can you repeat that?  I am sorry.

24   Q.  How much before you went into rehab the second time did you

25   get evicted from your apartment?

IB1JKET5                        Owimrin - direct

1   A.   Again.

2   Q.   You saw the evidence, put in evidence of your bank accounts

3   through March, if I am not mistaken of 2016.  What happened to

4   your bank account?

5   A.   They were all delinquent.  They were in the negative and

6   they all pretty much got checked out, but if they weren't being

7   checked out, they just weren't being used.

8   Q.   When you went back to Olive Branch, what were you selling

9   at that time?

10  A.   It was Consumer Shield at that time when I went back and we

11  were selling debt consolidation.

12          MR. SCHMIDT:  I would like to play some audio.

13          MS. KEARNEY:  What exhibit is this?

14          MR. SCHMIDT:  122.

15          (Audio played)

16  BY MR. SCHMIDT:

17  Q.   Now, would you tell us what that conversation was about.

18  A.   Yes.

19  Q.   What was it about?

20  A.   We had gotten $40,000 in sales the week prior, but we

21  didn't have processing at that time to actually run the

22  charges.  Arash had found, he had found a merchant processing

23  company.  He had told that merchant processor that following

24  week that we have signed contracts with these clients already,

25  we are expecting to put through the $40,000 in sales that week

1   we got the week before.

2           We were having trouble contacting some of these

3   clients, so he was passing whatever I could tell him, he said

4   we have $40,000, we have signed contracts and we don't.  I

5   basically told him we don't have control over these people.  If

6   they spoke to somebody else, they may not want to work with us,

7   work with somebody else.  That is basically what I was telling

8   him.

9           (Audio played)

10  BY MR. SCHMIDT:

11  Q.  Now, you had a conversation with Charlene about selling her

12  private debt?

13  A.  Yes.

14  Q.  What did you understand Arash Ketabchi meaning was

15  dangerous?

16  A.  Because putting one charge on one card on one account

17  merchant account, if they decided to charge-back or cancel

18  even, it could ruin the merchant account with a charge that

19  high.

20  Q.  How did you respond to that?

21  A.  I told them that we could break it up into separate

22  charges.

23  Q.  What did you tell him about the conversation that you had

24  with Charlene?

25  A.  I told her that -- I spoke to her.  She initially thought

1    that she had invested $25,000 with Elite for the services.  I

2    actually ended upselling her.

3          She was under the impression that she did, but they

4    never charged her.  They actually refunded her for some reason.

5    I explained to her that we're going to be the same services

6    except it would be for $5,000.00 less.  Instead of 25,000, we

7    would do it for 20,000.

8    Q.  You heard Bill Sinclair testify about what he claims you

9    said to him about what happened with Jane Thompson.

10         Now, at the time that you ended all your relationship

11   with Jane Thompson, did you believe that she was a victim of a

12   scam?

13   A.  No, not at that time.

14   Q.  Now, part of the contract that she had, she was supposed to

15   get money from A1, 20 percent?

16   A.  Correct.

17   Q.  Did you learn whether she ever got any money from A1?

18   A.  No.

19   Q.  Did you learn whether A1, indeed, was using its own

20   merchant account by the time that you went back to Bill

21   Sinclair?

22   A.  They weren't using their own merchant account.

23   Q.  By the time that you went back to Bill Sinclair, did you

24   think that Arash and Emily Miller did, indeed, rip her off at

25   least for that part about being a partner?

IB1JKET5                         Owimrin - cross

1   A.  With that part, I was questioning it.

2   Q.  Did you get paid from Arash for a commission for the sales

3   to Ms. Thompson?

4   A.  Yes.

5   Q.  Did you laugh about what happened to Ms. Thompson?

6   A.  No.

7   Q.  Have you learned anything in this past year and a half in

8   this case by going through documents?

9              MS. KEARNEY:  Objection.

10             MR. SCHMIDT:  I have no further questions.

11             THE COURT:  Thank you.  Is there cross-examination?

12             MS. KEARNEY:  Yes.  Thank you.

13             THE COURT:  All right.  I am sorry.  Is there anything

14   from --

15             MR. PAUL:  We'll go afterwards, but I will go now

16   because I only have a few questions.

17             THE COURT:  Let's do that.

18             MS. KEARNEY:  That is fine.

19   CROSS EXAMINATION

20   BY MR. PAUL:

21   Q.  Good afternoon, Mr. Owimrin.

22   A.  Good afternoon.

23   Q.  You were asked some questions with regard to at least one

24   phone conversation that popped up on one of the charts that was

25   connected to Steven Ketabchi's phone.  Do you remember that?

1    A.  Yes.

2    Q.  Approximately, if you can estimate, how many times did you

3    communicate with Steven Ketabchi during the time of your

4    employment at either Olive Branch or A1?

5    A.  None at Olive Branch, and maybe at most 10 times at A1 at

6    most.

7    Q.  If you can tell us, what would be the purpose of any of

8    those conversations or what did those conversations pertain to

9    when you spoke to Steven Ketabchi?

10   A.  Primarily they're about me Fed Ex-ing personal documents of

11   Arash's to Shahram.

12   Q.  What kind of personal documents?

13   A.  Tax stuff, tax information, also I know he, from what I

14   understand, was sending gift baskets out to clients.

15   Q.  Did you have any understanding with regard to Steven

16   Ketabchi's role concerning charge-backs?

17   A.  No.

18   Q.  What was the role that, as best you can tell us, the role

19   that Mike Finocchiaro had at the office at Olive Branch?

20   A.  He was in charge of charge-backs.

21   Q.  What about Sinclair?

22   A.  To an extent, he was also in charge of charge-backs.  He

23   was the owner of the company.  They both were.

24   Q.  You testified that you reached out to a number of customers

25   during the course of your selling both at Olive Branch and A1.

1       During the time you were employed at A1, did you reach

2  out to customers who were happy with their purchases?

3  A.  Yes.

4  Q.  How would they portray that to you in terms of your

5  conversations with them?

6       MS. KEARNEY:  Objection.

7       THE COURT:  Sustained as to form.

8  BY MR. PAUL:

9  Q.  How did you come to conclude that customers you spoke to

10  were happy with their purchases?

11  A.  They were excited.  They were thanking for the gift basket

12  and they were excited to be a part of the company.

13  Q.  You told us that -- could you estimate, if possible, the

14  percentage of customers you spoke to who were happy with the

15  products they were purchasing?

16  A.  I would say like 50 percent.

17       THE COURT:  I take it that the gift baskets were given

18  shortly after the sale was made?

19       THE WITNESS:  Yes, it was part of the welcoming call.

20       THE COURT:  So they're indicating -- I don't want to

21  put words in your mouth -- were they indicating their

22  excitement about joining the team and thanking you for the gift

23  basket?

24       THE WITNESS:  Yes.

25       THE COURT:  Shortly after joining the team and

IB1JKET5                          Owimrin - cross

1    receiving the goodies?

2              THE WITNESS:  Yes.

3              THE COURT:  All right.

4    BY MR. PAUL:

5    Q.  You testified you spoke to Steven Ketabchi with regard to

6    his tasks on behalf of his brother, Arash Ketabchi's personal

7    effects and things like that.  Is that right?

8    A.  Correct.

9    Q.  Had you ever met Steven Ketabchi?

10   A.  No, sir.

11   Q.  Had you ever met his sister, Mona Ketabchi?

12   A.  Yes, I did.

13   Q.  What would be the circumstances of your having met Mona

14   Ketabchi?

15   A.  Me and Arash and Reagan were in Las Vegas, and she ended up

16   showing up to surprise Arash.  She was in Las Vegas as well.

17   Q.  Was Steven in Las Vegas at that time as well?

18   A.  No, sir.

19             MR. PAUL:  Nothing further.

20             THE COURT:  Thank you.  Cross-examination.

21             MS. KEARNEY:  Thank you.

22             THE COURT:  Do you have an estimate of the length of

23   your cross-examination?

24             MS. KEARNEY:  I don't, your Honor.

25             THE COURT:  All right.

IB1JKET5                          Owimrin - cross

1   CROSS EXAMINATION

2   BY MS. KEARNEY:

3   Q.  Mr. Owimrin, you testified about your time at Olive Branch

4   and then at A1 Business Consultants.  Do you remember that?

5   A.  Yes.

6   Q.  And you were at Olive Branch, you said, from maybe March or

7   April 2014 through September 2015.  Is that right?

8   A.  Correct.

9   Q.  So that's 18 months, maybe?

10  A.  Yes.

11  Q.  When you started out, you were pretty new, right?  You

12  didn't know what you were doing?

13  A.  Yes.

14  Q.  You listened to some people make some calls, right?

15  A.  Correct.

16  Q.  You listened to Arash, right?

17  A.  Occasionally.

18  Q.  That was one of the people that Bill suggested you listen

19  to, right?

20  A.  It was one of the six.

21  Q.  He was your manager, right?

22  A.  He was the manager, yes.

23  Q.  Your manager?

24  A.  Yes.

25  Q.  Right, and so he presumably he had been there for a long

IB1JKET5                          Owimrin – cross

1   time, right?

2   A.   Yes, and some of the other reps.

3   Q.   And Arash knew what he was doing, right?

4   A.   As most people on the floor, yes.

5   Q.   And Arash made a lot of sales, right?

6   A.   He was the sales manager, so, yes.

7   Q.   Where would you rank him?

8   A.   Like as a sales rep?

9   Q.   You were here when Mr. Sinclair testified about the tiers.

10        Where would you rank Arash?

11  A.   In terms of production, he was up there.

12  Q.   So that means he made a lot of sales, right?

13  A.   Correct.

14  Q.   Okay.  So you listened to some other folks at Olive Branch,

15  right?

16  A.   Yes.

17  Q.   And you learned about the various products that they were

18  offering?

19  A.   Correct.

20  Q.   And that was the LLCs, right?

21  A.   Yes.

22  Q.   And the business plans?

23  A.   Correct.

24  Q.   Corp. Credit?

25  A.   Corp. Credit Coaching, yes.

1    Q.   Would you explain to us what Corporate Credit coaching is.

2    A.   Not in great detail, but basically corporate coaching to me

3    would be a Corporate Credit coach would work on helping you

4    establish business lines of credit.

5    Q.   A Corporate Credit coach coaches you in corporate credit.

6    Is that right?

7    A.   They help you establish corporate lines of credit.  They

8    don't coach you.  It is like a training.

9    Q.   Is that the description you would give to a customer on the

10   phone who asked you what Corporate Credit was?

11   A.   No.  I had a description in front of me I could read from.

12   Q.   But you don't remember that now?

13   A.   No.

14   Q.   Some other products that you offered were tax services,

15   that's right?

16   A.   Yes.

17   Q.   You talked about Youngevity, right?

18   A.   Correct.

19   Q.   And that was just kind of the buffet of options you could

20   offer to people that you called on the phone?

21   A.   It was one of the options.

22   Q.   Now, when you called people when you were working at Olive

23   Branch, you told them your name was Andrew Owens.  Is that

24   right?

25   A.   Correct.

IB1JKET5                          Owimrin - cross

1    Q.  Who is Zack Peterson?

2    A.  Arash Ketabchi.

3    Q.  You told us that Connor Swanson, that was your cousin

4    Reagan Owimrin?

5    A.  Yes, that was Reagan.

6    Q.  Who is Sophia?

7    A.  She was an appointment setter.

8    Q.  What was her real name?

9    A.  Lissette, I think.

10             THE COURT:  Lissette?

11             THE WITNESS:  L I S S E T T E, I believe.

12   BY MS. KEARNEY:

13   Q.  And Emily Miller, you told us her real name was Brooke

14   Marcus, right?

15   A.  Correct.

16   Q.  How did you learn that?

17   A.  From when she started giving Arash leads when we were

18   working for A1.  I actually didn't even learn it right away,

19   but I learned it through Arash, Arash told me what her name

20   was.

21   Q.  Brooke Marcus went by Emily Miller.  Is that right?

22   A.  As I know it, yes.

23   Q.  And now when you were at Olive Branch, you eventually

24   figured out what you were doing, right?

25   A.  Somewhat.

IB1JKET5                          Owimrin - cross

1   Q.  You were able to make some sales?

2   A.  I was.

3   Q.  And the bulk of the sales, I think you told us, were LLCs,

4   right?

5   A.  LLC, business plan, corporate credit, correct.

6   Q.  Primarily LLCs because that is what you felt comfortable

7   pitching on the phone, right?

8             MR. SCHMIDT:  Objection, your Honor; misstates his

9   testimony.

10            THE COURT:  It is cross.  I'll allow it.

11  BY MS. KEARNEY:

12  Q.  Mr. Owimrin, do you remember telling us you primarily sold

13  LLCs because you were most comfortable with that product?

14  A.  I was most comfortable with that product, yes.

15  Q.  You primarily sold LLCs because that is what you were most

16  comfortable pitching on the phone, correct?

17  A.  It was part of the packages I was selling, yes.

18  Q.  Was it primarily the product you sold or just a part of the

19  package?

20  A.  I would sell the LLCs along with business plan, Corporate

21  Credit typically.

22  Q.  When you told us primarily you sold LLCs because that is

23  what you were most comfortable with, did you just --

24            MR. SCHMIDT:  Objection, your Honor.

25            THE COURT:  Just a moment.  Let her finish.

IB1JKET5                        Owimrin - cross

1        Did you just sell the LLCs, or when you sold the LLCs,
2   were they part of a package?
3        THE WITNESS:  Both, they were both.  I would sell both
4   on their own and as well as part of a package, yeah.
5   BY MS. KEARNEY:
6   Q.  So you eventually were able to make some sales, right?
7   A.  Yes.
8   Q.  After that first disastrous call you told us about?
9   A.  Correct.
10  Q.  And you called Jo Ann La Morte, right?
11  A.  I did.
12  Q.  You heard her testify at this trial?
13  A.  Yes.
14  Q.  And you sold her in July 2015 a $8500.00 starter kit,
15  right?
16  A.  Youngevity.
17  Q.  And when you called her, you told her your name was Andrew
18  Owens, right?
19  A.  Correct.
20  Q.  You also sold products to Diane Weissenberger, right?
21  A.  Correct.
22  Q.  Multiple times?
23  A.  Correct.
24  Q.  So you sold products to her on September 17, 2015, right?
25  A.  Yes.

IB1JKET5                          Owimrin - cross

1    Q.  Do you remember seeing that phone chart where there was no

2    entry for September 17th, 2015 for your cell phone?

3    A.  I don't remember off the top of my head, no.

4    Q.  I think it was Defense Exhibit SP-5.  Could you go to the

5    last page, please.

6            So there is a sale on September 17th, 2015, but there

7    is no call from your cell phone.  Is that right?

8    A.  Correct.

9    Q.  Was that because you called her from your office phone?

10   A.  Yes, I think that would be.

11   Q.  You also spoke to her on September 25th, right, 2015?

12   A.  I can't remember off the top of my head.

13   Q.  Ms. Lee, could you please put up Government Exhibit 503.

14   A.  Yes.

15   Q.  That is an appointment with Diane Weissenberger, right?

16   A.  Correct.

17   Q.  As you spoke to her on September 25th, 2015, right?

18   A.  Ah-huh.

19   Q.  At 11:00 am?

20   A.  Yes.

21   Q.  Right there it says signed COS.  That means Continuation of

22   Service, right?

23   A.  Yes.

24   Q.  At that point she had already tried to charge back the

25   previous sale that you made just a week earlier?

IB1JKET5                         Owimrin - cross

1   A.  Correct.

2   Q.  And someone had talked her into not doing that?

3   A.  To not signing the COS?

4   Q.  Not charging back that sale?

5   A.  Yes.

6   Q.  You called her again on October 7th, right?

7   A.  Also September 25.

8   Q.  Also October 7th, right?

9   A.  Yes.  That is what is listed here.

10  Q.  Ms. Lee, could you put up Government Exhibit 154.

11          So this is a refund authorization form for Diane

12  Weissenberger, right?

13  A.  Yes.

14  Q.  That is dated September 18th, 2015.  That is one day after

15  you had sold her on September 17th, right?

16  A.  Correct.

17  Q.  So she tried to refund one day after you sold to her?

18  A.  Yes.

19  Q.  Then you called her again on September 25th, 2015?

20  A.  I did.

21  Q.  And again on October 7th, 2015?

22  A.  Yes.

23  Q.  And on October 7th, you entered a $15,000 contract with

24  her, right?

25  A.  Correct.

IB1JKET5                            Owimrin - cross

1   Q.  When you first spoke to her on September 17th, you told her

2   your name was Andrew Owens, right?

3   A.  When I was at Olive Branch, yes.

4   Q.  Who is Doug Nielsen?

5   A.  That is Reagan.

6   Q.  He used a couple of different names?

7   A.  When we switched companies, he switched names, as I stated.

8   Q.  He is Connor Swanson of A1, but Doug Nielsen of Olive

9   Branch?

10  A.  Correct.

11  Q.  You said on direct testimony that you only used Andrew

12  Owens and Jonathan Stewart when you were making sales.

13          Did you use other names when you were doing other

14  things?

15  A.  No.

16  Q.  So then on October 7th, 2015, you're at A1 now working for

17  the Arash, right?

18  A.  Yes.

19  Q.  You called Diane Weissenberger again?

20  A.  What was that date?

21  Q.  October 7th, 2015?

22  A.  Yes.

23  Q.  This time you tell her your name is Jonathan Stewart,

24  right?

25  A.  Correct.

IB1JKET5                        Owimrin - cross

1   Q.  Do you tell her she was talking to the same person?

2   A.  No.

3   Q.  You also testified about your calls to Charlene Foster.  Do

4   you remember that?

5   A.  Yes.

6   Q.  You said that you sold Charlene Foster the Youngevity

7   contracts, right?

8   A.  Yes, as per contract.

9   Q.  You looked at one of those long contracts?

10  A.  Yes.

11  Q.  That includes like the starter website and --

12  A.  Yes, ma'am.

13  Q.  And after that, you called her again, right, from A1?

14  A.  I really don't remember off the top of my head right now.

15  Q.  Let's look at Government Exhibit 1205.  Ms. Lee, can you

16  please zoom in on the top.  This is a contract with Charlene

17  Foster, right?

18  A.  Ah-huh.

19  Q.  With A1 Business Consultants, right?

20  A.  Correct.

21  Q.  It is dated October 15th, 2015?

22  A.  Correct.

23  Q.  And look at the products and services, are those the

24  Youngevity products?

25  A.  No those are LLCs, Business Plan, Corporate Credit, tax

1   preparation as well as a --

2   Q.  You sold her Corp. Credit, LLC?

3   A.  Yes.

4   Q.  You sold her a business plan?

5   A.  Correct.

6   Q.  You sold her Corp. Credit again?

7   A.  Correct.

8   Q.  You sold her Corporate tax prep?

9   A.  I don't know if I sold her Corporate Credit previously.

10  Q.  You gave her a laptop?

11  A.  Yes.

12  Q.  And that is because she had told you she didn't have one,

13  right?

14  A.  She said she didn't have a laptop, and we asked if she

15  wanted one, and she said sure.

16  Q.  That contract is for $20,000, right?

17  A.  That's what it says, yes.

18  Q.  When you talked to Charlene Foster on October 15th, you

19  told her your name was Jonathan Stewart?

20  A.  Correct.

21  Q.  What name did you give her when you spoke to her about

22  Youngevity?

23  A.  When I was working at Olive Branch, it was a different

24  company, I gave her Andrew Owens.

25  Q.  When you spoke with Charlene Foster, is it your impression

1  that she understood the Youngevity business?

2  A.  Yes, she understood what we were talking about.

3  Q.  She understood it involved marketing, right?

4  A.  She understood that fulfillment team would do the marketing

5  for her.

6  Q.  Help making sales?  You can't make money from Youngevity

7  unless there is some sales, right?

8  A.  She didn't have to physically make the sales.

9  Q.  If she didn't make sales to make money, people would have

10  to come in under her, right?

11  A.  Or her, she could have been selling perhaps on her website.

12  Q.  On her website?  Got it!

13  A.  Yes.

14  Q.  So when you spoke to her about it, you felt she understood

15  the mechanics of this pyramid, as you described it?

16  A.  Bill described it that way and, yes.

17  Q.  Bill described it to you or to her?

18  A.  He described it in this courtroom.

19  Q.  You sold Youngevity, right?  It is a pyramid?

20  A.  I didn't look at it like that at the time.  Now I see it

21  was a pyramid, but at the time I was selling her Youngevity.

22  Q.  And Youngevity involves marketing things to other people

23  and selling things through a website and bringing other people

24  in under you, right?

25  A.  Correct.

1   Q.  So when you spoke with Ms. Foster, it is your sense she

2   understood all of that prior to this upsell?

3   A.  Yes.  Well, technically this isn't an upsell.  It is a

4   different company.

5   Q.  You can upsell from one company to another, right?  That is

6   what A1 does with a lead, right?

7   A.  That is not the way I looked at it, but I guess, yes, you

8   are right.

9   Q.  So you're taking a sale made by one company, right?

10  A.  Yes.

11  Q.  And you are adding on products on top of that sale, right?

12  A.  Correct.  Sorry.

13  Q.  Mr. Owimrin, were you in this courtroom when you saw the

14  video of Charlene Foster?

15  A.  Yes.

16  Q.  Do you think she understood what the Youngevity program

17  was?

18          MR. SCHMIDT:  Objection, your Honor.  We are talking

19  about almost four-year difference.

20          THE COURT:  It is cross.  You can redirect.

21  A.  In that video, it seems like she didn't know.

22  BY MS. KEARNEY:

23  Q.  You testified a lot about Jane Thompson.

24          You testified that you initially spoke to her about

25  $19,000, right?

IB1JKET5                          Owimrin – cross

```
 1   A.  Yes.

 2   Q.  And that was the corporate setup?

 3   A.  Yes.

 4   Q.  And the business plan?

 5   A.  Yes, the same thing.

 6   Q.  Corporate tax, right?  Tax prep?

 7   A.  Yes.

 8   Q.  Tax plan?

 9   A.  Yes, I believe so.

10   Q.  And that was to help her with the $50,000 that you knew she

11   had spent with First Trend or Elite, right?

12   A.  With the emerging processing business she invested into, as

13   I thought at that time.

14   Q.  Right, as you thought, okay.

15           And then a week or so later you and Reagan sold her

16   this search engine optimization, right?

17   A.  Reagan did.

18   Q.  Reagan did that?

19   A.  And --

20   Q.  And you split the profit with him, right?

21   A.  We split everything in A1.

22   Q.  What was your commission at A1?

23   A.  10 percent.

24   Q.  So the two of you would each get 5 percent of everything?

25   A.  No.  It was 20 percent of the split would be 10 percent, so
```

1    I would receive my commission off that would be 10 percent.

2    Q.  So off that $19,000 sale, you got $1900?

3           You're smiling?

4    A.  I am trying to do the math in my head, that's why.  Yes, I

5    believe so.  Sorry.

6    Q.  Off Reagan's $9,995.00 sale, you got --

7           THE COURT:  No.

8    Q.  I am sorry.  You got 900 -- now I am smiling.

9           You got $9995.00?

10   A.  No.  I got $500.00, I believe.  10 percent of 10,000 would

11   be a thousand, right?

12   Q.  Right, but you got 10 percent of a thousand?

13   A.  Yes, you're right.  Sorry.  Now I see.

14   Q.  But, in fact, Ms. Thompson spent more than $99,995.00 on

15   that sale --

16          THE COURT:  No.  You are --

17          MS. KEARNEY:  It is numbers, your Honor.

18   BY MS. KEARNEY:

19   Q.  $9,995.00, she spent more than that, right?

20   A.  Not on that initial sale, but previously, yes.

21   Q.  Didn't she spend $149,995.00 and put part of it on a credit

22   card?

23   A.  Not that I can remember.  I don't recall.

24   Q.  You didn't ask her to split up the two?

25   A.  I don't remember.  I don't think so, not -- you're talking

1    about Jane?

2    Q.  Ms. Thompson, yes.

3    A.  No, I don't believe so.  I don't remember.  I believe I

4    don't.  Sorry.

5    Q.  You talked to Jane frequently, right?

6    A.  Later on, yes.

7    Q.  You were on a first-name basis with her?

8    A.  I would say so.

9    Q.  That is why you're calling her "Jane" now?

10   A.  It is just what came out now.  There is no special reason.

11   Q.  And she was an eager customer, right?

12   A.  I wouldn't say, "eager."

13   Q.  She had a lot of questions, though, right?

14   A.  I didn't hear a lot of questions from her.

15   Q.  You didn't ask her a lot of questions?

16   A.  Not a lot.

17   Q.  She seemed very interested in her business?

18   A.  She was excited.

19   Q.  And she talked to you about it a lot?

20   A.  Alongside a lot of things, yes.

21   Q.  So when it came time to sell her $20,000 in these merchant

22   processing terminals that you talked about, you thought that

23   would be a good opportunity for her, right?

24   A.  Yeah, I did, I did.

25   Q.  You thought she really understood what these terminals

IB1JKET5                          Owimrin - cross

1   were, right?

2   A.  I said she had a better idea what they were than I did.  I

3   don't know about how much she understood, but she seemed pretty

4   knowledgeable.

5   Q.  But you yourself, you weren't really that comfortable

6   pitching them, right?

7   A.  I tried and I didn't --

8   Q.  You didn't really understand what it was?

9   A.  I had no idea what it was.  I don't know the details.

10  Q.  You were on the phone with Ms. Thompson, right, and you

11  were trying to explain some of the details to her, right?

12  A.  I was trying to.

13  Q.  Then again, she made a second purchase, right, a $30,000

14  purchase?

15  A.  With Brook Marcus.  I am sorry.

16          THE COURT:  Brook Marcus ended up pitching her?

17          THE WITNESS:  Pitching her, yes.

18  BY MS. KEARNEY:

19  Q.  Were you on the call?

20  A.  I was on the call.

21  Q.  Did you participate?

22  A.  No.  I listened.

23  Q.  You sat there silently?

24  A.  Pretty much, yes.

25  Q.  You sat there silently while Brooke Marcus pitched Jane

IB1JKET5                          Owimrin - cross

1   Thompson?

2   A.   Yes.

3   Q.   Did you talk to Arash about that?

4   A.   (Inaudible).

5   Q.   What?

6   A.   Could I could learn the merchant processing pitch.

7   Q.   You heard some testimony earlier, and I think you testified

8   as well that when you get a lead from a lead source, there is a

9   payment to that lead source, right?  It is not for free?

10  A.   Correct.

11  Q.   So when you received Jane Thompson from First Trend, from

12  Emily Miller, First Trend got paid for that, right?

13  A.   I would assume so.  I wouldn't know.

14  Q.   In fact, you yourself paid Emily Miller for that lead,

15  right?

16  A.   No.

17  Q.   You didn't deposit a thousand dollars into her bank

18  account?

19  A.   No.

20  Q.   Isn't that how you learned what her real name was?

21  A.   No.

22  Q.   Did you get commission on the merchant terminal sales?

23  A.   Yes.

24  Q.   How much?

25  A.   10 percent.

IB1JKET5                          Owimrin - cross

1    Q.   10 percent of each?

2    A.   From what she signed up with us, yes, not the prior ones.

3    The prior one --

4    Q.   The 10 percent of 20,000, right?

5    A.   Yes.

6    Q.   10 percent of 30,000, right?

7    A.   Correct, 5,000.

8    Q.   You talked about this partnership interest when you were on

9    the phone and Jane Thompson learned about that, right?

10   A.   Yes.

11   Q.   Your testimony was you were not on the phone when Jane

12   Thompson learned about the partnership interest?

13   A.   Yes.

14   Q.   How did you find out about it?

15   A.   Arash had told me.

16   Q.   Just in passing?

17   A.   Later on that evening after he did it.

18   Q.   But you got a commission on that, right?

19   A.   Yes, because we sold merchant processing terminals.

20   Q.   You got a commission on the 20,000 from the merchant

21   processing terminal, right?

22   A.   Yes.

23   Q.   You got a commission on the $30,000 from the merchant

24   processing terminal, right?

25   A.   Yes.

IB1JKET5                              Owimrin - cross

1    Q.  You got a mission on $150,000 in partnership that you sold

2    to Jane Thompson, right?

3    A.  That wasn't what I thought that was for at first.  It was

4    for merchant terminals.

5    Q.  You thought she got $50,000 in merchant terminals?

6    A.  Yes, three merchant terminals --

7              MR. SCHMIDT:  Your Honor --

8              THE COURT:  You should allow him to finish.  Go ahead.

9    A.  -- I thought that she was purchasing three merchant

10   terminals at $50,000 each.  The 20,000 and the 30,000 prior

11   were for merchant terminals.

12   Q.  So she had the first one from First Trend, right, that was

13   $50,000?

14   A.  Yes.

15   Q.  And there was the second one for $20,000 that you were on

16   the call for when you were learning about the merchant

17   processing, right?

18   A.  Ah-huh.

19   Q.  And then --

20             THE COURT:  You have to say, "yes."

21             THE WITNESS:  Yes.

22   BY MS. KEARNEY:

23   Q.  There was the third one for $30,000, and that was actually

24   a third and fourth, right, for two?

25   A.  I don't recall if it was for two or for one.

1   Q.  You were on the call, though, right?

2   A.  Yes.

3   Q.  Was there something different about the third and fourth

4   from the second merchant terminal, that it costs something

5   different?

6   A.  I think that the 50, those two -- can we see the contracts?

7   Is that possible?

8   Q.  I am asking you a question.  What do you remember?

9   A.  I don't recall.

10  Q.  And she bought three more for $150,000, and that is your

11  testimony?

12  A.  My testimony is yes, I thought that she was purchasing

13  three merchant terminals for $50,000 each.

14          THE COURT:  Did you get a commission from that

15  $150,000 sale?

16          THE WITNESS:  I did.

17  BY MS. KEARNEY:

18  Q.  And you got a commission for that $150,000 even though you

19  weren't even on the phone?

20  A.  I was on the phone for the merchant terminals pitch.  I

21  wasn't on the phone for the partnership part of it.

22  Q.  You didn't know about the partnership, right?

23  A.  I knew about it after.

24  Q.  But you got a commission on that, right?

25  A.  Yes, that was part of it.  It was all wound-up into one.

1   There was three merchant terminals as well as the partnership.

2   I didn't know the partnership was even going to be there until

3   after.

4           (Off-the-record discussion)

5           THE COURT:  Ms. Kearney, I need to give the jury a

6   break at some point.

7           MS. KEARNEY:  This is great.

8           THE COURT:  Ladies and gentlemen, I am sorry to have

9   kept you so long.

10          (Jury excused)

11          THE COURT:  You may step down, sir.  Approximately how

12  much longer do you think you have, Ms. Kearney?

13          MS. KEARNEY:  I am really not sure.

14          THE COURT:  Are we talking an hour.

15          MS. KEARNEY:  What time is it now?

16          THE COURT:  4:00 o'clock.

17          MR. SCHMIDT:  I want to let my client know, because he

18  is on cross-examination, that I can't talk to him about his

19  examination.

20          THE COURT:  Yes.

21          MR. SCHMIDT:  I can talk to him about timing, but not

22  about his examination.

23          THE COURT:  Right, that is correct.

24          (Recess)

25          (Continued on next page)

1          THE COURT:  Bring in the jury in, please.

2          Let's try to complete the cross if you can this

3     afternoon, maybe even redirect.

4          Do you have a sense of redirect, Mr. Schmidt, how

5     long, if any, on redirect?

6          MR. SCHMIDT:  Very brief so far.

7          THE COURT:  We may be able to finish that this

8     afternoon then.

9          Would that mean you would be resting?

10         MR. SCHMIDT:  Your Honor, we have a stipulation that

11    we need --

12         THE COURT:  You will have a stipulation.

13         MR. SCHMIDT:  That's not quite ready.  And then I have

14    to make a determination based on the cross-examination whether

15    or not I am going to call my expert.

16         THE COURT:  The name person, the Americanization of

17    Emily person.

18         MR. SCHMIDT:  That's correct.

19         THE COURT:  The jury wants to know about next week.

20    So we will talk when this afternoon is over.  I will talk to

21    the lawyers on the record about what it looks like, and then I

22    will be able to tell this jury.  They would like to know today

23    so they can make plans.

24              (Continued on next page)

25

1    (Jury present)

2              THE COURT:  Please be seated.

3              Ms. Kearney, the continuation and conclusion of your

4    cross-examination.

5              MS. KEARNEY:  Thank you.

6    BY MS. KEARNEY:

7    Q.  Mr. Owimrin, when we left off we were discussing Jane

8    Thompson.  Do you remember that?

9    A.  Yes.

10   Q.  We were discussing the merchant terminals and the

11   partnership offer that she invested in, right?

12   A.  Yes.

13   Q.  We were talking about the call, I believe it was Government

14   Exhibit 165, page 31, on February 3, 2015.  And it was your

15   testimony, I believe, that you were initially on that call

16   because you were talking about the merchant terminals, right?

17   A.  Correct.

18   Q.  And then at some point you handed off that phone to Zach

19   Peterson, right?

20   A.  Correct.

21   Q.  And you handed it off to Zach, and that was Arash, right?

22   A.  That was Arash?  Is that what you said?

23   Q.  Zach is Arash?

24   A.  Yes.

25   Q.  So you hand the phone to Arash, right, and you left the

1    room?

2    A.  No, I got on another call.

3    Q.  So you stuck around.  You were in the room.  And Arash --

4    sorry?

5    A.  No.

6    Q.  You were not in the room?

7    A.  No.

8    Q.  You left the room?

9    A.  I could have walked upstairs with my headset on.

10   Q.  You left Arash alone on the phone with Jane Thompson?

11   A.  Correct.

12   Q.  You had no idea what he was saying?

13   A.  He was supposed to be welcoming her, because we had already

14   previously made the sale for the merchant processing.  I was

15   getting the billing information basically set.  Then I gave him

16   the phone to welcome her.  He wanted to speak to her to welcome

17   her, you know, congratulate her, whatever he wanted to say.

18   Q.  This is a welcome call to Jane Thompson?

19   A.  Not a welcome call, but he was congratulating her

20   on -- obviously, it's a big investment, it's a big step, so he

21   wanted to speak to her.

22   Q.  So you hand off the phone so that Arash can welcome Jane

23   Thompson to the merchant terminal world, right?

24   A.  To congratulate her for making a big decision and to talk

25   to her, just to talk to her in general.

IB18KET6                         Owimrin - Cross

1   Q.  Then you leave the room?

2   A.  I get on another appointment.

3   Q.  In another room, right?  You just told us that.

4   A.  Yes, upstairs.

5   Q.  So you left the room?

6   A.  Correct.

7   Q.  OK.  And it's your testimony that you didn't know what Zach

8   said to her, you didn't know what Arash said to her?

9   A.  No, not at that time.

10  Q.  And yet you got paid commission on that, right?

11          MR. SCHMIDT:  Objection.  Asked and answered.

12          THE COURT:  I will allow it.  It's cross.

13  Q.  You got paid commission on that?

14  A.  Yes.

15          MS. KEARNEY:  Can we look at Government Exhibit 909.

16          Ms. Lee, can you zoom in on the February 8, 2016

17  entries.

18  Q.  On February 8, 2016, $12,500 was deposited into your

19  account, isn't that right?

20  A.  Correct.

21  Q.  Now, Mr. Owimrin, you testified about your use of oxycodone

22  while you were working at Olive Branch?

23  A.  Correct.

24  Q.  And while you were working at A1 too, and again when you

25  were at Consumer Shield, right?

IB18KET6                          Owimrin - Cross

1    A.  Correct.

2    Q.  You testified that sometimes you bought oxycodone from

3    Michael Finocchiaro, right?

4    A.  Correct.

5    Q.  And I think you said Anthony Medeiros?

6    A.  He was the primary person I did, yes.

7    Q.  When you were at Olive Branch and A1, was Arash Ketabchi

8    selling oxycodone?

9    A.  Not to my knowledge at that time.

10   Q.  So Arash Ketabchi -- I just want to back up.

11          So when you get a legal prescription for oxycodone,

12   you get that from a doctor, right?

13   A.  Yes.

14   Q.  Part of the process of maintaining that prescription is you

15   have to submit urine tests, right?

16   A.  Correct.

17   Q.  When you submit a urine test, the doctor is looking for

18   verification that the patient is the one taking the pain

19   medication, right?

20   A.  Correct.

21   Q.  Because if the patient isn't taking it, maybe he is selling

22   it to someone else, right?

23   A.  Correct.

24   Q.  And you at the time were using oxycodone, right?

25   A.  Correct.

IB18KET6                         Owimrin - Cross

1    Q.  So there came a time then when Arash Ketabchi asked you for

2    your urine, right?

3    A.  This was at Olive Branch?

4    Q.  At Olive Branch or at A1, you tell me.

5    A.  At A1 Arash asked me, but at Olive Branch Mike Finocchiaro

6    asked me.

7    Q.  So you were asked on a couple of occasions for your urine?

8    A.  Four or five.

9    Q.  And you gave it to Michael Finocchiaro, right?

10   A.  I did.

11   Q.  And you gave it to Arash, right?

12   A.  Later on at A1 I did.

13   Q.  Your understanding of why Arash needed that was so that he

14   could obtain oxycodone prescriptions, correct?

15   A.  Correct.

16   Q.  And your understanding was that he himself was not using

17   oxycodone, right?

18   A.  Correct.

19   Q.  Otherwise he wouldn't need your urine, right?

20   A.  Not necessarily, but that is correct with Arash.

21   Q.  So he wasn't using oxycodone?

22   A.  He was not.

23   Q.  But he was obtaining prescriptions for oxycodone?

24   A.  I came to find out at that time he was.

25   Q.  But it's your testimony that he wasn't selling oxycodone?

1  A.  No.  You were talking about Olive Branch first.

2  Q.  I said at Olive Branch and at A1, was Arash Ketabchi

3  selling oxycodone?

4        MR. SCHMIDT:  Objection, your Honor.  It's a compound

5  question.

6        THE COURT:  Thank you.

7        You may answer.

8  A.  From what I understood of your question, you were asking me

9  about Olive Branch first, and at that time I wasn't aware that

10  Arash was selling Oxycontin.  But when I had left to A1, later

11  on I did find out that he was.

12  Q.  How did you find out?

13  A.  Through Fino.

14  Q.  Then there came a time when Arash asked you if he could use

15  your dirty urine to obtain a prescription for oxycodone, is

16  that right?

17  A.  That is correct.

18  Q.  So it's your testimony now that he was selling oxycodone?

19  A.  Correct.

20  Q.  And he asked you on several occasions to do that, right?

21  A.  He asked me once.

22  Q.  It was an understanding between the two of you of what he

23  was using that for, right?

24  A.  Yes, because he would give me a couple of them if I did it.

25        THE COURT:  You mean in exchange for your providing

1    your dirty urine, that is, one that showed evidence of drug

2    use, to Arash, you would receive oxycodone pills in return?

3              THE WITNESS:  Yeah.  He would give me -- he gave me

4    five of them in return.

5    Q.  So that's like a hundred bucks?

6    A.  Around there.

7    Q.  Now, we talked earlier about some of the rules that were in

8    place at Olive Branch when you worked there.  Do you remember

9    that?

10   A.  I do.

11   Q.  And you testified that you weren't allowed to make earnings

12   representations, right?

13   A.  Correct.

14   Q.  And you weren't allowed to make representations about

15   people's taxes, right?

16   A.  Specific tax claims, yes.

17   Q.  There were also some rules about the kinds of customers you

18   could sell to, right?

19   A.  Yes.

20   Q.  You weren't supposed to sell to people over 80 without

21   approval?

22   A.  It was anyone over 65 you had to get approval.

23   Q.  You had to get approval from Bill Sinclair for that, right?

24   A.  Correct.

25   Q.  There were also caps on the amount of money per transaction

IB18KET6                         Owimrin - Cross

1    you could process, right?

2    A.   That varied, but yes.

3    Q.   But there was a cap, whether or not the amount varied,

4    right?

5    A.   There was a cap that they had in place, but it was

6    flexible.   It depended on if Bill Sinclair approved you or not.

7    Q.   So to go over the cap, you had to get Bill's approval?

8    A.   Correct.

9    Q.   And that cap at various times was $10,000 or $15,000?

10   A.   Per transaction.   Per sale.   Excuse me.

11   Q.   You testified about you moving from Olive Branch to A1.   Do

12   you remember that?

13   A.   I do.

14   Q.   Part of that decision were these rules were getting in the

15   way, right?

16   A.   No.

17   Q.   Well, the cap on the transactions, that's limiting the

18   amount of commission you could get, right?

19   A.   The cap was always there.

20   Q.   And it limits the amount of commission you could get,

21   right?

22   A.   The cap was always there.

23   Q.   And it limits the amount of commission you could get,

24   right?

25   A.   I guess, yes.

1  Q.  If you can't charge more than $10,000, you can't make more

2  than $1,000 if you're getting a 10 percent commission, right?

3  A.  That statement that you're making is true, yes.

4  Q.  And around the time that you were leaving Olive Branch,

5  Olive Branch instituted what we have heard talked about as a

6  retention policy, right?

7  A.  It was about three months, four months before I left.

8  Q.  That's because they were experiencing a lot of chargebacks,

9  right?

10  A.  Yes.

11  Q.  So they started holding money in reserve from each of the

12  salespeople to cover those chargebacks, right?

13  A.  A small percentage, yes.

14  Q.  You weren't making as much commission because of that

15  either, right?

16  A.  It wasn't that much less, but yes, it wasn't as much.

17          MS. KEARNEY:  Ms. Lee, could you please put up

18  Government Exhibit 909 again.

19          Could you please zoom in on the September 2015

20  entries.

21  Q.  So in July 2015, you're getting more than $8,000 from Olive

22  Branch, right?

23  A.  Yes.

24  Q.  Then for all of September 2015, a little more than $1,000,

25  is that right?

IB18KET6                          Owimrin - Cross

1    A.  Correct.

2    Q.  And after that you left?

3    A.  Correct.

4    Q.  So when you were at Olive Branch during those final few

5    months, you were aware of the volume of chargebacks that were

6    happening, right?

7    A.  Not a specific number, but I was aware chargebacks were

8    happening.

9    Q.  Well, you were aware when your commissions would be held up

10   because there might be a chargeback, right?

11   A.  My commissions were never really held up because of that.

12   Q.  You didn't get any chargebacks?

13   A.  I did, but my commissions weren't really held up because of

14   that.  They would usually come in later on after I had already

15   gotten paid, and I really wasn't aware of when they came in.

16   Q.  Wasn't that the point of the retention policy, is that you

17   were getting paid before the chargeback was being settled, and

18   so therefore Olive Branch would have to hold onto something?

19   A.  That was the point of the retention.

20   Q.  Mr. Owimrin, you're familiar with the term "whale," right?

21   A.  Yes.

22   Q.  That's a term that's used to refer to a biz-op customer

23   with a lot of cash, right?

24   A.  And specifically willing to spend it.

25   Q.  So whale is someone with access to a lot of cash and is

1    willing to spend that cash?

2    A.   A lot of cash, available credit.

3    Q.   Liquidity?

4    A.   I don't know what that means.

5    Q.   You're also familiar with the term "laydown," right?

6    A.   Say that again.

7    Q.   A laydown?

8    A.   Yes.

9    Q.   A laydown is someone who is an easy sale, right?

10   A.   Somebody that is excited to get things going and is an

11   easier sale.

12   Q.   Someone like Jane Thompson?

13   A.   I guess, yes, you could say that, yes.

14   Q.   She was a whale too, right, she had a lot of cash?

15   A.   Yes.

16   Q.   And she was willing to and eager to spend it, right?

17   A.   Correct.

18   Q.   And you know what it means to "save a sale," right?

19   A.   I do.

20   Q.   You save a sale when the customer is trying to get a refund

21   or trying to withdraw their contract, right?

22   A.   Or if they get nervous and want to cancel immediately, or

23   don't want to sign the contract.  There's a bunch of different

24   ways you can save a sale.

25   Q.   Or when they file a chargeback and you want to talk them

1    out of it, right?

2    A.   That wouldn't be up to me.

3    Q.   That's also part of saving a sale, right?

4    A.   That would be saving the owner's deal.  It wouldn't be

5    considered saving a sale.  Saving a sale to me would be trying

6    to save the actual sale, her trying to cancel, not charging

7    back.

8    Q.   You were involved in saving sales during your time at Olive

9    Branch, right?

10   A.   Yes.

11   Q.   You had talked to the customers and you would hear the

12   kinds of things that made them want to cancel, right?

13   A.   If they had questions about their contracts, I would answer

14   them.

15   Q.   And if they had doubts about their contracts, you would

16   address them, right?

17   A.   To the best of my knowledge, I would.

18   Q.   I think you testified that that was primarily Michael

19   Finocchiaro's job, right?

20   A.   Not to go through the contract with them if they had

21   questions.  Finocchiaro's job was, if they had initiated a

22   chargeback or wanted to cancel past their 14 days or three to

23   14 days right to rescind, then they would be on him.  If they

24   did it in between those days, first the sales rep would talk to

25   them, try to answer questions, try to get them to stay on.  If

1  we couldn't, we would have to send it to Michael Finocchiaro to

2  initiate the refund or try to save it himself.

3  Q.  So sometimes you would talk to customers when they were

4  your own sales, right?

5  A.  Yes.

6  Q.  And sometimes Michael Finocchiaro would ask you to do saves

7  for him if he wasn't around, right?

8  A.  No.

9  Q.  Did you ever listen to Michael Finocchiaro save a sale?

10 A.  Not that I could remember.  I may have overheard it, but I

11 never sat down to actually listen to him save a sale.

12 Q.  There are some kind of stock phrases that salespeople use

13 when they are trying to save a sale, right?

14 A.  Not that I'm aware of.

15 Q.  Things like "Rome wasn't built in a day," right?

16 A.  I never used that or heard of that.

17 Q.  Never heard anyone --

18 A.  I heard that saying, but not in sales.

19 Q.  You never heard Pete DiQuarto use that at Olive Branch?

20 A.  No.

21 Q.  But you heard the reasons why the customers were backing

22 out of these contracts, right?

23 A.  Some of the verbiage in the contracts that worried them.

24 Q.  Sometimes they would just tell you they were out of money?

25 A.  Or they were nervous.

1   Q.  Or they were out of money, right?

2   A.  Sometimes.

3   Q.  Or they were broke, like on your calendars, right?

4   A.  Correct.  They wouldn't say broke.

5   Q.  No.  You said broke?

6   A.  I said broke.

7   Q.  Which means they have got nothing?

8   A.  Or they don't want to move forward.

9   Q.  But some of these people were colloquially broke; they had

10  no money, right?

11  A.  Yeah.

12  Q.  Or some people just wanted to see some results before they

13  spent any more money, correct?

14  A.  Correct.

15  Q.  Mr. Schmidt asked you about trying to open a merchant

16  processing account, right?  Do you remember that?

17  A.  Yeah.  He brought that up.

18  Q.  You testified that you weren't able to, but you had asked

19  some other people if perhaps they could?

20  A.  I asked.

21  Q.  You weren't able to open a merchant processing account?

22  A.  I was not.  I got declined.

23  Q.  But you did open a bank account, Mr. Owimrin, right?

24  A.  I was a cosigner on an account.

25  Q.  That was the Element bank account?

1   A.  I actually don't recall the name of it.

2   Q.  You were a cosigner on the account though, right?

3   A.  Yeah.  I did cosign on one of -- the account that Bill had

4   asked me to cosign on, I did cosign the account.

5   Q.  And your other cosigner was Masoud Kouchek Manesh?

6   A.  Correct.

7   Q.  But you don't remember what the name on that account was?

8   A.  I don't off the top of my head.

9   Q.  But the purpose of that bank account was to receive the

10  funds from the merchant account that Mr. Kouchek Manesh was

11  able to set up, right?

12  A.  I have no idea.

13  Q.  You just opened up a bank account?

14  A.  I didn't open it up.  They asked me to be a cosigner.

15  Q.  And you put your name on it?

16  A.  I did.

17  Q.  Without knowing what it was for?

18  A.  I did.  Well, they explained that it was just a bank

19  account, and if they needed to access the bank account, they

20  wanted somebody that was in the office to be able to do it,

21  because that gentleman named Masoud, the primary account

22  holder, was not -- they didn't live close by, so if they needed

23  access to it, they wanted somebody close by to be able to

24  access it, which I never had to do.

25  Q.  So they just needed you to access Mr. Kouchek Manesh's

IB18KET6                          Owimrin - Cross

1   account?

2   A.   Yeah.  He was their partner, I guess, in a sense.

3   Q.   And that account, it was your understanding, was used to

4   process transactions for Olive Branch and for A1, right?

5   A.   I thought it was just a business checking account that I

6   signed.

7   Q.   You didn't know it was connected to a merchant account?

8   A.   I didn't.  I found out later, but at the time I had no

9   idea.

10  Q.   Do you remember testifying about Government Exhibit 122,

11  that's that voice mail recording?

12  A.   Yes, I do.

13  Q.   Do you remember it well or do you want me to play it again?

14  A.   I remember it.  You could play it if you want, but I

15  remember it.

16  Q.   I have just a couple of questions about it.

17       I think it was your testimony that -- that was you on

18  that recording?

19  A.   It was me, Arash, Reagan and Jenn.

20  Q.   So when you said "so they went and bought with someone

21  else, you can't control them," you were talking about customers

22  who went to other companies for their purchases, right?

23  A.   I was talking about customers that we had pitched and sold

24  or came to agreements with the previous week, and who might

25  have gone and purchased products from other companies.

IB18KET6                          Owimrin - Cross

1   Q.  So they went and bought with someone else, so they hadn't

2   done that yet?

3   A.  I had no idea.  I was basically just explaining to Arash if

4   you want to tell the merchant we can't get in touch with them,

5   maybe they went and bought with another company.  There is

6   nothing we could do to control them.  We sold them, we had a

7   signed contract, but we never actually were able to charge the

8   funds.  So if they decided that they didn't want to do it, they

9   could have went with another company.  So that's what I was

10  explaining to him.

11  Q.  So you were hoping Arash would come up with an excuse to

12  give to the merchant processer, is that what I understand?

13  A.  No.

14  Q.  In any event, if they went and bought with someone else,

15  that's actually totally possible, those customers could have

16  bought with other companies, right?

17          MR. SCHMIDT:  Objection to the form of that question.

18          THE COURT:  Sustained.

19  Q.  There are a lot of biz-op companies out there, right?

20  A.  Yes.

21  Q.  And customers get calls from a lot of different companies,

22  right?

23  A.  Yes.

24  Q.  In fact, sometimes when you talk to customers they would

25  tell you about the other companies that had called them?

1    A.   Correct.

2    Q.   And so biz-op is a competitive business, right?

3    A.   It's a fair statement.

4    Q.   So there is incentive to lock down the sale, get that

5    signed contract, as soon as you get a yes on the phone, right?

6    A.   I mean -- can you repeat that?

7    Q.   Let me ask it a different way.

8              As soon as you get a credit card number, you want to

9    run that, right?

10   A.   You want to preauthorize the charge.

11   Q.   And that's so no one else can get to that customer between

12   when those charges go through and you calling them, right?

13   A.   That's so we secure the deal.

14   Q.   Then we talked a little bit about Charlene Foster.  You

15   said "I will get Charlene today"?

16   A.   Yes, ma'am.

17   Q.   And that you were referencing you were going to try to sell

18   her again?

19   A.   No.  I had already had her verbally commit and sign

20   contracts.  I was going to actually run the charges that day,

21   after I had contacted her.

22   Q.   So she had already agreed to a sale?

23   A.   Yes.

24   Q.   That's your testimony?

25   A.   Yes.

IB18KET6                         Owimrin - Cross

1    Q.  But you hadn't run her card?

2    A.  No.

3    Q.  What was the amount of the sale she agreed to?

4    A.  $20,000.

5    Q.  But you said you are going to put at least 20 grand on that

6    card, right?

7    A.  Yeah, that was just the verbiage I was using with Arash.  I

8    wouldn't have put more.

9    Q.  Because she didn't agree to that, right?

10           MR. SCHMIDT:  Objection, your Honor.

11           THE COURT:  Sustained.

12           Next question.

13   Q.  Did you tell Arash, I am going to put at least 20 grand on

14   that card?

15   A.  I meant out of the 40,000 in sales that we had the previous

16   week, I would get at least 20,000 of that done today for us as

17   a company -- as a company.

18   Q.  From Ms. Foster?

19   A.  Yes, ma'am.

20   Q.  At least 20 grand from Ms. Foster?

21   A.  At least, yes.

22   Q.  Arash told you that was actually risky, right?

23   A.  To put that amount through, yes.

24   Q.  On one card, right?

25   A.  Yes, ma'am.

1    Q.  But it's only risky to put that amount on a card if there

2    is a chargeback, right?

3    A.  Or even a cancel, even if we had to refund it, to my

4    knowledge, that would put a red flag on a merchant account.  So

5    even if you have to refund it, it's like a negative hit on that

6    account and could cause it to be shut down.

7    Q.  That $20,000 charge on its own would not have been a

8    problem at A1, right?

9    A.  Yes.

10   Q.  But you also told Arash that Charlene Foster thought that

11   25 was going through already?

12   A.  Yes.

13   Q.  And that was from a sale that Elite had made to her?

14   A.  Yes.

15   Q.  And Elite canceled that sale?

16   A.  She canceled that sale with Elite.

17   Q.  So Elite refunded Charlene Foster her money?

18   A.  She canceled with them.

19   Q.  Then you were going to run it through as yours because she

20   didn't understand that they had canceled?

21   A.  That's not what I said.

22   Q.  Well, you said, "They never charged her the 20,000, the

23   initial sale of the 20,000, but she thinks she did it.  So I

24   told her, I was like, no, we just have to rerun it."

25              So is it your testimony that you did not mean that you

1   were going to rerun the Elite sale as an A1 sale?

2   A.  Yes.

3   Q.  Then you were just going to send out the initial contract,

4   that is the A1 contract, to cover the amount of the Elite sale,

5   right?

6   A.  Correct.  That's not what I was going to do.

7   Q.  In fact, you did try to sell to Charlene Foster on November

8   3, right?

9   A.  I did.

10  Q.  Did you call her before you did that?

11  A.  Yes.

12  Q.  Use your cell phone?

13  A.  I can't remember off the top of my head.

14  Q.  Did you tell her that Elite had canceled?

15  A.  I told her, yes -- she told me that she canceled with

16  Elite.

17  Q.  Did you tell her that, no, that was going to be a charge

18  with A1 now?

19  A.  I said, no, we could do it for $20,000 instead.  She was

20  uncomfortable with the amount.  I said we could do it for

21  20,000 instead of 25,000.

22  Q.  Remind me, Elite is a lead source for A1, right?

23  A.  Yes, ma'am.

24  Q.  So A1 bills out the business that Elite sets up, correct?

25  A.  Correct.

1    Q.  Let's talk about some other kinds of leads.

2              You testified earlier about the various business lines

3    that A1 had going, I think you called it an Amazon affiliate

4    business?

5    A.  I was speaking about Olive Branch at the beginning.

6    Q.  I'm sorry.  Olive Branch.  Did A1 have a similar line of

7    business?

8    A.  Yes.  But there was a fourth one that got introduced at

9    Olive Branch later on and then continued in A1.

10   Q.  Was that grants?

11   A.  We would seek grant leads, yes.

12   Q.  And a grant lead are people who have been told they have

13   got a government grant, right?

14   A.  Correct.

15   Q.  So they are going to have money coming in, right?

16   A.  They would be getting a grant and then they would also get

17   like a business sold with that grant.

18   Q.  They would use the grant to buy their business?

19   A.  No.  When they initially sold them the grant, they would

20   sell them a business too, a Web site as well.

21   Q.  You're using air quotes.  Is that because the grant doesn't

22   exist?

23   A.  Yes, because the grant doesn't exist.

24   Q.  But Olive Branch used grant leads for a period of time,

25   right?

1    A.  Yes.

2    Q.  And A1 used grant leads for a period of time, right?

3    A.  I believe every biz-op floor uses those leads.

4    Q.  In fact, you sold grant leads back to Bill Sinclair, right?

5    A.  I brought them with me.  I wouldn't say sold them.

6    Q.  Did you paid for them?

7    A.  I got a job opportunity.

8    Q.  Nevertheless, you gave grant leads to Bill Sinclair to use

9    for Consumer Shield, right?

10   A.  Correct.

11   Q.  And that was his debt consolidation pitch?

12   A.  Yes.

13   Q.  And part of the pitch, when you're selling a grant lead, is

14   that you need to run this business or take advantage of this

15   opportunity because that grant might never come, right?

16   A.  I don't know.  I never pitched a grant.

17   Q.  You just sold grant leads?

18   A.  Well, they had a business too, so I didn't sell the grant.

19   Q.  You sold the grant lead?

20   A.  I guess, yes.  It was still a biz-op lead at the same time.

21   It was labeled as a grant lead, but it was a biz-op lead as

22   well.

23   Q.  At a certain point you realized no money ever came from

24   grants, right?

25   A.  Pretty quickly.

1  Q.  That's why these leads are a good candidate for debt

2  consolidation, right?

3  A.  Correct.

4  Q.  Because these are people who sunk a lot of money, and that

5  money never came back, right?

6  A.  Yeah.  Yes.

7  Q.  In fact, one candidate for debt consolidation was Ms.

8  Thompson, right?

9  A.  I did bring her to Bill's attention, right.

10  Q.  Because she had spent $19,000 with you, right?  And then

11  other --

12           THE COURT:  You're shaking your head.

13  A.  Yes.

14  Q.  Another 10 with Reagan, right?

15  A.  I believe those were cash deals, but --

16  Q.  Cash?

17  A.  I believe those were cash deals.  I believe she wrote us a

18  check for those.

19  Q.  So she wrote checks for those?

20  A.  That wouldn't be considered debt consolidation.

21  Q.  Then she wrote another check for 20,000?

22  A.  Correct.

23  Q.  Then another one for $30,000, right?

24  A.  Correct.

25  Q.  And then there is that 149, right?

IB18KET6                        Owimrin - Redirect

1    A.   Correct.

2    Q.   Then after that --

3             THE COURT:  149?

4    Q.   $149,000 check, right?

5    A.   Correct.

6    Q.   Then after that she wrote another check, right?

7    A.   Yes, ma'am.

8    Q.   $10,000?

9    A.   Yes.

10   Q.   That was for her CPA tax services?

11   A.   Correct.

12   Q.   And those were all checks?

13   A.   I believe so, if I am not mistaken.

14   Q.   But when you came back to Consumer Shield, you thought she

15   might be a good candidate for this new product that Bill

16   Sinclair was working on?

17   A.   I learned from talking to her, I knew that she did also

18   have credit card debt, so yes.

19            MS. KEARNEY:  No further questions.

20            MR. SCHMIDT:  Briefly, your Honor.

21            THE COURT:  Yes, sir.  Redirect.

22   REDIRECT EXAMINATION

23   BY MR. SCHMIDT:

24   Q.   Andrew, you learned about Olive Branch selling -- did Olive

25   Branch sell grant leads at the same floor that you were on?

IB18KET6                          Owimrin - Redirect

1  A.  For a time.  They introduced it.  I was not there for it,

2  but from what I have heard, yes.

3  Q.  When you came back, it was no longer there?

4  A.  It was no longer there.

5  Q.  Was the floor used for something else?

6  A.  Yes.  We put our appointment setters in there.

7  Q.  You never sold a grant, is that correct?

8  A.  No, never.

9  Q.  But when you forwarded leads to Mr. Sinclair that you

10  received, you forwarded every single lead that Arash received,

11  is that right?

12  A.  Yeah, I forwarded a bunch of list of leads, grants being

13  one of them.

14  Q.  But for debt consolidation -- withdrawn.

15       The purpose of debt consolidation for grants was to

16  help people who now have credit card debt as a result of

17  grants?

18  A.  Not just grants, just credit card debt in general.

19  Q.  But people who were sold grants, that would be an

20  indication that they would probably have credit card debt?

21  A.  Yes, sir.

22  Q.  Did you think that the credit card consolidation relief was

23  a real thing?

24  A.  I did.

25  Q.  Who explained it to you?

1   A.  Mr. Sinclair.

2   Q.  Did you believe Mr. Sinclair?

3   A.  I did.

4   Q.  Now, you understood what the term "whale" was?

5   A.  Correct.

6   Q.  Did you ever use it?

7   A.  No.

8   Q.  Now, when you peed in the cup for Fino, you knew he was

9   using Oxycontin, didn't you?

10  A.  He was, yes.

11  Q.  Did he explain to you why he needed your urine as opposed

12  to his own if he also was using oxycodone?

13  A.  Yes.

14  Q.  What did he tell you?

15  A.  Because the urine couldn't contain any other drug but that

16  drug.

17  Q.  Were you using any other drug?

18  A.  No, sir.

19  Q.  Was Fino any other drug?

20  A.  Yes.

21  Q.  What was he using?

22  A.  Cocaine, marijuana, the list goes on.

23  Q.  Now, we saw some of the checks that you received as a

24  result of the sales to Ms. Thompson.  Not the full 10 percent

25  was there.  How come?

1    A.  Because I had to pay Arash's uncle the loan off.  He would

2    just take the money out of my paychecks, or I would cash it and

3    give him the cash, but sometimes he would just take it directly

4    out of my pay before I even received the check.

5    Q.  Have you knowingly ever tried to defraud anybody?

6    A.  No.

7             MR. SCHMIDT:  No other questions.

8             THE COURT:  Thank you.  You may step down.

9             MS. KEARNEY:  I have recross.

10            THE COURT:  Go ahead.

11            Mr. Paul, I take it nothing?

12            MR. PAUL:  I have no questions.

13   RECROSS EXAMINATION

14   BY MS. KEARNEY:

15   Q.  Mr. Schmidt asked you about the grant leads that you were

16   selling.  I just want to make sure we are clear on this.

17            There are companies that sell people grants, right?

18   A.  There are companies that sell people grants, correct.

19   Q.  Those grants are fiction, those grants don't exist?

20   A.  Yes.

21   Q.  And when you get a grant lead, you are selling biz-op to

22   people who have previously bought grants, is that right?

23   A.  Well, when they bought the grant, they also bought a Web

24   site with it; that company, whatever company that was, also

25   gave them a Web site along with it.  Whether it be a merchant

1    processing, Amazon affiliate, they would get a Web site with

2    it, and we would add on to that.

3    Q.  And that Web site was for something in connection with

4    their grant?

5    A.  I don't know.  I know it was a Web site.

6           MS. KEARNEY:  No further questions.

7           THE COURT:  Anything sir?

8           MR. SCHMIDT:  Very briefly.

9    REDIRECT EXAMINATION

10   BY MR. SCHMIDT:

11   Q.  The Web site that you understood that these people

12   purchased was one of the three that you understood could make

13   money:  Merchant processing, affiliate and --

14   A.  Drop shipping.

15   Q.  -- drop shipping.  Is that correct?

16          MS. KEARNEY:  Objection.

17          THE COURT:  Sustained as to form.

18   Q.  The Web site that you understood that people also wasted

19   their money on grants received were what kind of Web sites?

20   A.  The three I stated earlier:  The merchant, affiliate, or

21   drop ship.

22   Q.  So while you understood that people spent money for grants

23   that they were not going to get, they also had a Web site that

24   can make them money -- withdrawn.

25          MS. KEARNEY:  Objection.

IB18KET6

1          THE COURT:  I will allow it.

2    Q.  You understood that the people who purchased grants also

3    had a Web site that had the ability to make money?

4    A.  Correct.

5          MR. SCHMIDT:  No other questions.

6          THE COURT:  Thank you.  You may step down.  You are

7    excused.

8          Next witness for the defense.

9          MR. SCHMIDT:  May we have a moment, your Honor?

10          THE COURT:  A moment, yes.

11          MR. SCHMIDT:  May we approach, your Honor?

12          THE COURT:  Sidebar.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

IB18KET6

1          (At the sidebar)

2          MR. SCHMIDT:  The good news is that I am saving the

3     courts $3,000 by not calling the expert.

4          THE COURT:  Not the courts.  But go ahead.  The CJA

5     fund.

6          MR. SCHMIDT:  It comes from the administrative office

7     by the way.

8          The bad news is we are working on a very brief

9     stipulation for a prior inconsistent statement that the

10    government, because they have been very busy, hasn't finished.

11    And we are perfectly willing to rest with the idea that we

12    could put the stipulation in tomorrow, or we could not rest now

13    and rest after we put the stipulation in, whichever way your

14    Honor wishes.

15         THE COURT:  Can you do the stipulation right here and

16    now?

17         MS. FLETCHER:  It's in a Word document, your Honor.

18    Defense sent us a version of the Word document last night.  We

19    have changes to it.  In order for us to agree, we would need to

20    go to a computer and make the changes.

21         THE COURT:  Is that something you can do now?

22         MS. FLETCHER:  I could.  But the jury would be

23    waiting.

24         THE COURT:  How long will that take?

25         MS. FLETCHER:  A few minutes.  I am happy to do it,

IB18KET6

1    your Honor, if your Honor wants the jury to wait.

2              (Counsel conferred)

3              THE COURT:  The parties are going to work on a

4    stipulation now.  That was the off-the-record discussion, but

5    just between the lawyers, not with the Court.

6              Then Mr. Schmidt will read the stipulation into

7    evidence and rest.

8              Now, let's turn to you, sir.  What is your case?

9              MR. PAUL:  We have our expert flying in as we speak,

10   unfortunately, to the expense of our tax dollars.

11             We have Mr. Fino, who is supposed to be here at 9:15

12   tomorrow morning, by subpoena.  His attorney has assured me he

13   will be here.

14             We have a character witness, my client's sister, that

15   I have informed the government about.

16             The only issue remaining, and I told the government I

17   would let them know by this evening, before Mr. Schmidt's

18   bedtime, whether my client is testifying or not.  That's the

19   only issue remaining.  If he does testify, we are going to be

20   taking up a good part of tomorrow.

21             THE COURT:  How long is your West Coast expert?

22             MR. MITCHELL:  No more than 30 minutes.

23             THE COURT:  How long is your direct on Mr. Fino?

24             MR. PAUL:  Your Honor hadn't ruled.  I intend to

25   submit a response to Ms. Kearney's letter motion that she

IB18KET6

1  submitted last night that I didn't see until I woke up.

2          MR. MITCHELL:  Rule 611 issue.

3          THE COURT:  Let's assume it's direct, because I think

4  that's what it's going to be, how long?

5          I want to see your paper.

6          MR. PAUL:  I wouldn't think it would be more than an

7  hour.

8          THE COURT:  All right.  So an hour plus on Fino.  45

9  minutes on the expert.

10          Character witness.

11          MR. PAUL:  15 minutes.

12          THE COURT:  Then you will decide whether or not you

13  are going to put on your client tomorrow.

14          MR. PAUL:  Correct.

15          THE COURT:  I would like to be able to give this jury

16  the afternoon off.  They have been really very good.  They also

17  want to know what about next week.  We are going to go into

18  next week regardless of whether we work tomorrow afternoon or

19  not.  In large part, it depends on whether or not your client

20  is going to testify.  I guess between summations, charge, and

21  deliberations, we are talking probably Monday and Tuesday for

22  this jury, it seems to me.

23          MR. PAUL:  I agree to me.

24          THE COURT:  And if they don't decide on Tuesday, it

25  will go on.

IB18KET6

1              MS. KEARNEY:  I think Tuesday is Election Day.

2              THE COURT:  It's not a federal holiday.  I need to

3    give them time to vote and there are some who are from Rockland

4    or Westchester.

5              (In open court)

6              THE COURT:  Ladies and gentlemen, there is no need for

7    you to be here while we are talking.  It will just be a few

8    moments.  Why don't you go into your deliberation room and rest

9    and I will get back to you certainly within 15 minutes at the

10   latest.  Then we will be able to excuse you for the evening

11   after you come back in.

12             (At the sidebar)

13             THE COURT:  Yes, sir.

14             MR. PAUL:  Your Honor wants to give the jury tomorrow

15   afternoon off.  Will that still happen with or without my

16   client testifying?  That's my question.  If he testifies, there

17   is no way this jury is going to be excused for the afternoon.

18   It's going to be into the afternoon.

19             THE COURT:  There is no way he is not going to have to

20   continue his testimony on Monday.

21             MR. PAUL:  So that's my question.

22             MR. SCHMIDT:  If I may, based on the timing, it seems

23   to me, I think I understand their case, if Mr. Ketabchi

24   testifies, because his case is so different than my client's, I

25   think we will be done with all testimony on Friday, and then we

IB18KET6

1    can sum up and charge on Monday.  If he is not testifying, then

2    they will have the afternoon off.

3        THE COURT:  Let me think about this for a second.  If

4    he is not testifying, that's easy, the case is over.  Then it's

5    for the lawyers.  If he is testifying, what?

6        MR. SCHMIDT:  I think the nature of his case, that his

7    testimony will not take more than the afternoon.  So if they

8    are sitting in the afternoon, I think we will be finished with

9    the testimony, at least the defense testimony, on Friday

10   afternoon, and we can sum up and charge on Monday.

11       THE COURT:  But you will be able to do that anyway.

12       MR. SCHMIDT:  I understand.  But I think that under

13   any circumstance, whether he testifies or not, we will be able

14   to sum up and charge on Monday.

15       THE COURT:  I agree.

16       MR. SCHMIDT:  The only question is the afternoon

17   tomorrow.

18       MR. PAUL:  You're not going to tell the jury that

19   you're tentatively thinking of giving them the afternoon off

20   tomorrow, because I don't want to be blamed for them not having

21   it off.

22       MS. FLETCHER:  There is another variable, your Honor.

23       THE COURT:  Under this theory, whether they have the

24   afternoon off or not tomorrow, it sounds like we will be

25   summing up on Monday.

IB18KET6

1      MS. FLETCHER:  Barring a government rebuttal case,

2  which is possible based on Mr. Owimrin's testimony and as yet

3  undetermined testimony from Mr. Finocchiaro.

4      MR. PAUL:  Can we inquire as to how long you would

5  estimate that?

6      MS. FLETCHER:  I think it depends on the scope of your

7  direct, and what therefore is the scope of my cross.  I may ask

8  at some point during Mr. Finocchiaro's testimony to make him my

9  witness rather than have to have a separate rebuttal case,

10  primarily to have him testify about things that are

11  inconsistent with Mr. Owimrin's testimony, but that testimony

12  has just happened so we haven't worked that out yet.  But I

13  didn't want your Honor to promise summations on Monday.

14      THE COURT:  I am not telling the jury any of this.

15      MR. PAUL:  You're going to be telling them we are

16  going to be working into next week, Monday, possibly Tuesday?

17      THE COURT:  No.  I am going to tell them they should

18  plan for Monday and Tuesday.

19      Do the stip.

20      MS. FLETCHER:  If your Honor dismisses the jury

21  tomorrow, is it the Court's intention to have a charge

22  conference tomorrow afternoon?

23      THE COURT:  No.  You don't have the charge yet.  I

24  haven't given you the proposed charge.

25      MS. FLETCHER:  I understand.

IB18KET6

1          THE COURT:  I would give it to you probably sometime

2     tomorrow.  And the charge conference, which I don't think is

3     going to be very long, Monday morning.  I don't think there is

4     that much at issue.

5          (Recess)

6          THE COURT:  Apparently the stipulation is agreed to?

7          MS. FLETCHER:  Yes, your Honor.

8          THE COURT:  So Mr. Schmidt I will ask for your next

9     witness.  And Mr. Schmidt, you are going to read the

10    stipulation into the record and then rest, is that correct?

11         MR. SCHMIDT:  I am going to read it, correctly

12    pronounce the names, and then rest.

13         THE COURT:  I think, so that we don't run into the

14    problem of the jury blaming Mr. Paul and to give the jury a

15    heads-up, I am going to tell them that we are going to work

16    through tomorrow until 2:00, so they should bring food for the

17    mid-morning break.  We will adjourn at 2.  And I am going to

18    tell them they should assume they will get their case for

19    deliberation about Tuesday.  Is that fair?

20         MR. PAUL:  If your Honor is telling them they are

21    breaking at 2, and my client chooses to testify, that means we

22    will do that on Monday.

23         THE COURT:  No. he will start the testimony and

24    continue on Monday.

25         MR. PAUL:  Ideally, if he is going to testify, I would

IB18KET6

1       like to get his testimony in and the cross.  I don't think

2       having a weekend for the government to prepare their cross is

3       really appropriate.  That's my concern.  If he is going to

4       testify, I don't think the jury should be told that they are

5       going to be excused in advance.  If he is not going to testify,

6       then you can tell them tomorrow.  But I think to give them an

7       advance notice that they are going to be excused at 2:00, and

8       then my client testifies for an hour of his three or four

9       hours --

10              THE COURT:  I am trying to understand that.  What is

11      wrong with that?

12              MR. PAUL:  Depending on the timing, it's breaking up

13      his testimony, which I would rather not do.

14              THE COURT:  I understand that.

15              MR. PAUL:  And it allows the government an entire

16      weekend to prepare their cross with regard to his testimony,

17      and I think that's unfair.  Not that I don't think the

18      government has been preparing their cross in any case assuming

19      that he may or may not testify.

20              THE COURT:  Is it similarly unfair if he begins his

21      testimony on Monday?

22              MR. PAUL:  No.

23              MS. FLETCHER:  It's unfair the other way, your Honor.

24              THE COURT:  Why?

25              MS. FLETCHER:  It would essentially require the

IB18KET6

1    government to prepare a cross and its closing this weekend

2    without having heard any of the testimony.  The government is

3    always prepared and we will be prepared whenever your Honor

4    calls on us to sum up or to cross Mr. Ketabchi.  But if we are

5    talking about fairness of requiring parties to prepare or not

6    prepare tasks, it's equally unfair the other way.

7            THE COURT:  I am not going to tell the jury about

8    tomorrow.  We will see if your client testifies and we will

9    take it from there.  I will tell them that everyone's

10   expectation is that they will get this case for their

11   deliberation on Tuesday.  Fair?

12           Bring the jury in.

13           (Jury present)

14           THE COURT:  Please be seated.

15           Next witness for Mr. Owimrin.

16           MR. SCHMIDT:  Your Honor, we have a stipulation to be

17   entered.  It's a testimonial stipulation.

18           THE COURT:  Go ahead, sir.

19           MR. SCHMIDT:  The United States of America v. Andrew

20   Owimrin and Shahram Ketabchi.

21           It is hereby stipulated and agreed by and between

22   Andrew Owimrin, by and through his attorneys, Sam A. Schmidt

23   and Abraham Abegaz-Hassen, and United States of America, by

24   Geoffrey S. Berman, United States Attorney, Kiersten A.

25   Fletcher, Benet J. Kearney, and Robert B. Sobelman, Assistant

IB18KET6

1   United States Attorneys, and Shahram Ketabchi, by and through

2   his attorneys, Kenneth A. Paul and Jacob Mitchell, that:

3        1.  If called at trial, Detective Chris Bastos would

4   testify that, while conducting a post-arrest interview with

5   Bill Sinclair on March 21, 2017, Detective Bastos took notes.

6   The notes of that interview indicate that Mr. Sinclair said to

7   Detective Bastos that "more than half" were "happy."  Detective

8   Bastos interpreted Mr. Sinclair to be referring to his

9   customers.

10       It is further stipulated and agreed that this

11  stipulation may be received in evidence at the trial in the

12  above-referenced matter.

13       It's dated today.  It's Exhibit AO3.

14       Your Honor, I offer that into evidence, and Andrew

15  Owimrin rests his defense.

16       THE COURT:  AO3 admitted.

17       (Defendant's Exhibit AO3 received in evidence)

18       THE COURT:  Ladies and gentlemen, you have heard Mr.

19  Owimrin rest.  Tomorrow when you come in we will see if

20  Mr. Shahram Ketabchi wishes to put on a defense because, as I

21  have told you, defendants are never under any obligation to

22  present any case whatsoever because the burden is always on the

23  government to prove its case beyond a reasonable doubt.

24       For planning purposes, you should assume that you will

25  receive this case for your deliberation on Tuesday.  So we will

IB18KET6

1    sit tomorrow.  We will sit Monday.  We will sit Tuesday.  I

2    can't promise that's the end of the case because obviously you

3    need to deliberate.  That's everyone's best estimate at this

4    time.

5              Thank you.  We will see you tomorrow at 9:15.

6              MR. SCHMIDT:  Your Honor, if I may, Tuesday is

7    Election Day.

8              THE COURT:  Tuesday is Election Day.  It is not a

9    federal holiday.  We will make sure you have time to vote.  We

10   will work that out.  So you will tell us when your polling

11   places are open.

12             (Jury exits courtroom)

13             THE COURT:  All right.  9:15 tomorrow.  I thank

14   everyone for their cooperation.

15             MR. PAUL:  Your Honor, I know it's late in the day,

16   but rather than put in a submission, I would just like for ten

17   minutes to argue the issue of cross-examination versus direct

18   of Mr. Fino.

19             THE COURT:  Yes, of course.  Go ahead.

20             I do have a sentencing that's been waiting outside.

21             MR. PAUL:  I will be very brief.

22             The only thing I would point out to the Court, in

23   addition to what we argued the other day, is that basically the

24   cases show -- that I have been able to find anyway -- with

25   regard to one case specific, *Ellis v. City of Chicago*, which is

IB18KET6

1      cited at 667 F.2d 606, from the Seventh Circuit, where it talks

2      about Rule 611(c), it says:  The drafters of Rule 611(c),

3      however, determined that these limitations -- that were

4      apparently present before 611(C) -- represented an unduly

5      narrow concept of those who may safely be regarded as hostile

6      without further demonstration.

7              THE COURT:  That's why there was a change in 611(c).

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IB1JKET7

1          MR. PAUL:  Correct.  It says the --

2          THE COURT:  That is why they added adverse party or

3    witness identified with an adverse party.

4          MR. PAUL:  Correct.  My point to the court is quite

5    frankly that I don't see how Finocchiaro is anything but a

6    witness associated or with the adverse party being the

7    government.  Simply by looking at his cooperation agreement, it

8    specifies a number of things he must do that require his

9    cooperation in return for the government providing a letter to

10   the sentencing court, your Honor being that Judge.

11         THE COURT:  Let me see his agreement.

12         MR. PAUL:  Sure.

13         THE COURT:  Somebody should let me see it.

14         (Off-the-record discussion)

15         THE COURT:  May I have a clean copy from the

16   government.  Go ahead, sir.

17         MR. PAUL:  The issue is that Ellis in particular said

18   it is not necessary for there to be actual hostility.  I think

19   the government is relying on the fact he is voluntarily coming

20   forward and he is going to be testifying voluntarily and

21   answering my questions.

22         THE COURT:  You subpoenaed him, correct?

23         MR. PAUL:  Yes.  As you said, witnesses are subpoenaed

24   every day.  I don't know if that necessarily means anything

25   other than he is required to be in court.  I don't see how he

IB1JKET7

1   is not a party affiliated and associated with the government,

2   given the nature of his cooperation agreement, being that he

3   had proffered even without an attorney being present, being

4   that he is under this cooperation agreement.

5           I will cite a few other cases.  U.S. v. Bryant, 461

6   F.2d 912, which is a 2006 case in the U.S. Court of Appeals

7   from the Sixth Circuit, where it talks about where the witness

8   was closely identified with the interest of the government.

9           Another case is Clinigan, C L I N I G A N, versus USA,

10  400 Fed.2d 849, a Fifth Circuit case, 1968.

11          U.S. v. Freeman, 302 F.2d 347 (1962).

12          All of these cases state that it is not necessary to

13  show the hostility of the witness for your Honor to determine

14  that he is, in fact, affiliated or associated with the

15  government in this case.  I can't see how a cooperating witness

16  who is signed on as a cooperating witness, who is going to

17  testify before the government decided not to call him as their

18  own witness and, in fact, was proffered three days before in

19  preparation for his testifying, the fact that they have chosen

20  not to call him as their witness should limit me with regard to

21  my calling him as a witness and not being able to present his

22  testimony by cross instead of direct.

23          THE COURT:  I understand.

24          MS. FLETCHER:  Your Honor, the government endeavored

25  to find a case addressing exactly the question that your Honor

IB1JKET7

1    had posed; in other words, whether someone who is a signed up

2    cooperating witness is de facto identified with an adverse

3    party for the purposes of Rule 611 (c).  We didn't find any

4    cases under that particular fact pattern.  I don't understand

5    Mr. Paul to be saying that any of his cases are along that

6    factual pattern.

7              The case the government did find and cited in its

8    letter is an 11th Circuit case, United States v. Diaz.  In that

9    case, the government didn't offer the witness a cooperation

10   agreement, but instead provided the witness with immunity.  The

11   witness testified for the government, and the Court, the

12   District Court, still declined to rule that that witness was

13   identified with an adverse party once defense counsel in that

14   case sought to make the witness his own.

15             There is simply no basis here, your Honor, for what

16   Mr. Paul has argued is the law, i.e., the cooperator is

17   identified with the government.  In fact, the factual

18   circumstances here make clear that that is not the case.  The

19   government determined not to call Mr. Finocchiaro, and now Mr.

20   Paul, ostensibly because he believed Mr. Finocchiaro has

21   relevant and helpful testimony for his client, has decided to

22   call that witness.

23             There is simply no reason to let Mr. Paul begin his

24   questioning of Mr. Finocchiaro by treating him as a hostile

25   witness.  I expect Mr. Finocchiaro will answer his questions in

IB1JKET7

1    precisely the same way he would have answered the government's

2    questions on cross.

3           While Mr. Finocchiaro had limited interaction with

4    Mr. Paul's client, Mr. Finocchiaro was friendly with the other

5    defendants in this case even after the breakdown of the

6    relationship between Bill Sinclair and Arash Ketabchi.  Michael

7    Finocchiaro remained friends with Arash Ketabchi.  He has years

8    of interaction with these people preceding his months of

9    proffering with the government.

10          If anything, he remains adverse to the government.  He

11   still is on the opposite side of the "V" to the government.  To

12   the extent he may have been willing to testify on behalf of the

13   government in this case, the government has told him we do not

14   want his testimony.

15          MR. PAUL:  That is interesting.  He may have been

16   willing to testify.  He is under a cooperation agreement with

17   the government.  That is --

18          THE COURT:  I understand everybody's point.  I am

19   looking at the cooperation agreement.  "Shall truthfully

20   testify before the grand jury and at any trial and other court

21   proceeding with respect to any matters about which this office

22   may request his testimony."

23          I am going to look at these cases, okay?  We found a

24   couple which are not, also not directly on point, but it

25   suggests to me that he is not hostile unless and until he shows

IB1JKET7

1    his hostility.  The language of 611 suggests that as well.

2              Leading questions should not be used on direct exam

3    except as necessary to develop the witness's testimony if he is

4    not being hostile and is testifying truthfully as he is

5    obligated to do, not only because it will be under oath, but

6    because of his cooperation agreement.

7              Then one would think any questions are not necessary

8    to develop his testimony.  It then limits the area in which the

9    court should allow leading questions.  Of course,

10   cross-examination and what we're talking about, a hostile

11   witness, an adverse party or a witness identified with an

12   adverse party is on the same side of the "V."  Again there is

13   no hostility that has come to mind so far.  So my preliminary

14   research suggests that Mr. Paul is not allowed to ask the

15   leading questions, but I will look at these cases.

16             9:15 tomorrow.  Thank you.

17             MS. FLETCHER:  Your Honor, I apologize.  How does the

18   court intend to make the parties aware of its ruling on this

19   issue?

20             THE COURT:  Of what?

21             MS. FLETCHER:  Of its ruling on this issue?

22             THE COURT:  Why should the jury be aware of the ruling

23   on the issue?  He is going to ask whatever questions, type of

24   questions are permitted.  I should also say that Rule 611

25   provides that my obligation is to exercise reasonable control,

IB1JKET7

1    so I have the ability to decide what is appropriate under the

2    law and under 611.

3              MS. FLETCHER:  We would agree, your Honor.  The

4    government was inquiring as to how the court intended to advise

5    the parties of its ruling with respect to this issue.

6              THE COURT:  At 9:14 I'll give you my ruling.  I assume

7    you don't want it after examination begins, okay?

8              MS. FLETCHER:  Thank you.

9              MR. SCHMIDT:  I do have actually a question, Judge,

10   that if the government is going to be using or adopting him as

11   its witness, just even the expression that they could adopt him

12   as their witness does I think somewhat change the dynamic.

13   Obviously, if they adopt him as their witness, then there is no

14   question that we can cross-examine him.

15             The fact is that they are discussing adopting him as

16   their witness seems to me as evidence that that witness is

17   identifiable with the government.  We'll wait and see.

18             THE COURT:  All right.

19             MS. FLETCHER:  It means only the government

20   anticipates the possibility that it may wish to question him

21   beyond the scope.

22             THE COURT:  I understand.  I am not in the habit of

23   determining things that don't need determination.  See

24   everybody tomorrow.

25             (Court adjourned until Friday, November 2, 2018)

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   SAMUEL TUREFF

 4   Direct By Mr. Schmidt . . . . . . . . . . .1245

 5   Cross By Ms. Fletcher . . . . . . . . . . .1264

 6   Redirect By Mr. Schmidt . . . . . . . . . .1280

 7   ANDREW OWIMRIN

 8   Direct By Mr. Schmidt . . . . . . . . . . .1282

 9   Cross By Mr. Paul . . . . . . . . . . . . .1407

10   Cross By Ms. Kearney . . . . . . . . . . . .1411

11   Redirect By Mr. Schmidt . . . . . . . . . .1458

12   Recross By Ms. Kearney . . . . . . . . . . .1461

13   Redirect By Mr. Schmidt . . . . . . . . . .1462

14                      DEFENDANT EXHIBITS

15   Exhibit No.                          Received

16    SP-1   . . . . . . . . . . . . . . . . . .1248

17    SP-6   . . . . . . . . . . . . . . . . . .1250

18    SP-5   . . . . . . . . . . . . . . . . . .1258

19    SP-2, SP-3 and SP-4 . . . . . . . . . . .1263

20    80C 01 through 80C 35  . . . . . . . . . .1332

21    AO3  . . . . . . . . . . . . . . . . . . .1473

22

23

24

25
```