IB28KET1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------x

UNITED STATES OF AMERICA,

                    v.                          17 Cr. 00243 (SHS)

ANDREW OWIMRIN, a/k/a "Andrew Owens,"
a/k/a "Jonathan Stewart," and
SHAHRAM KETABCHI, a/k/a "Steve Ketabchi,"

                    Defendants.

--------------------------------------x
                                            November 2, 2018
                                            9:30 a.m.

Before:

                    HON. SIDNEY H. STEIN,

                                            District Judge
                                              and a jury

                              APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
KIERSTEN A. FLETCHER
ROBERT B. SOBELMAN
BENET J. KEARNEY
     Assistant United States Attorneys

SAM A. SCHMIDT
ABRAHAM J. ABEGAZ-HASSEN
     Attorneys for Defendant Owimrin

KENNETH A. PAUL
JACOB MITCHELL
     Attorneys for Defendant Ketabchi

Also Present:
     CHRISTOPHER BASTOS, Detective NYPD and HSI
     CHRISTINE LEE, Paralegal Specialist USAO
     SAMUEL TUREFF, Paralegal

IB28KET1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  Please be seated in the

3     courtroom.

4          Everyone is present.

5          In an effort to get my decision in regard to how

6     Mr. Paul could question Mr. Finocchiaro, rather than have you

7     wait until 9:14 this morning, I had my clerk e-mail to all the

8     attorneys who are listed on the ECF system, because it was so

9     late that we couldn't get it filed on ECF, I had my clerk

10    e-mail the following:

11         "Good evening.  Judge Stein has asked me to inform the

12    parties that, after reading the cases cited by the parties in

13    court today" -- meaning yesterday.  This was sent at 7:10 p.m.

14    on November 1 -- "and for the reasons he set forth on the

15    record, Mr. Paul will be limited to asking direct questions of

16    Mr. Finocchiaro."

17         It says, "Sincerely, Rebecca.  Law clerk to the

18    Honorable Sidney H. Stein."

19         Government, I assume you received it.

20         MS. FLETCHER:  We did.  We appreciate it.  Thank you,

21    your Honor.

22         THE COURT:  Mr. Paul.

23         MR. PAUL:  Yes.

24         THE COURT:  Mr. Schmidt.

25         MR. SCHMIDT:  Yes, your Honor.

IB28KET1

1          THE COURT:  Why don't we bring the jury in.

2          What is going to happen this morning, Mr. Paul, from

3    the standpoint of whether or not you are presenting a case and

4    what it will consist of.

5          MR. PAUL:  Yes, your Honor.  First we are calling our

6    expert to the stand.

7          THE COURT:  He made it.

8          MR. PAUL:  He made it last night.  He came to our

9    office; it was very nice of him to come right to our office

10   from the airport.  So yes, he is here.

11         THE COURT:  And his name is?

12         MR. PAUL:  It's Mr. Mitchell's witness.

13         MR. MITCHELL:  Brandon Jelinek.  I imagine I will be

14   about 30 minutes, your Honor.

15         THE COURT:  And then who do you think your second

16   witness is going to be?

17         MR. PAUL:  A character witness, Mona Ketabchi.  I

18   don't think she will be very long at all, maybe 15, 20 minutes.

19         THE COURT:  And then?

20         MR. PAUL:  Steven Ketabchi, the defendant.

21         THE COURT:  How long will that be?

22         MR. PAUL:  It's hard to say, your Honor.  On direct, I

23   don't want to limit myself, but he will obviously be a fairly

24   long witness.  I don't want to lock myself in, but I wouldn't

25   think more than two to three hours.

IB28KET1

1           THE COURT:  Really?

2           MR. PAUL:  Yes.

3           THE COURT:  All right.  Well, that changes what I

4    thought the timing would be.

5           MR. PAUL:  Mr. Finocchiaro is last, Judge.

6           THE COURT:  And how long is that?

7           MR. PAUL:  On direct, I would say maybe an hour, tops.

8           THE COURT:  All right.  Well, it looks like probably a

9    very full day.

10          All right.  I am going to address your client at this

11   point, Mr. Paul.

12          Mr. Ketabchi, if you would stand, please.

13          You were here yesterday when I spoke to Mr. Owimrin

14   about his decision to testify.  Do you remember?

15          DEFENDANT KETABCHI:  Yes.

16          THE COURT:  Well, the same thing applies to you.

17   Specifically, sir, the decision of whether or not you wish to

18   testify is entirely in your hands.  As I told Mr. Owimrin,

19   there are many decisions that essentially are for the lawyer to

20   make, including what witnesses to call, what motions to make,

21   what questions to ask, that type of thing.  But certain major

22   decisions are for the client to make, and that's you.  And one

23   of them is whether or not you wish to testify.

24          I think you know, because I have told this jury a

25   number of times, the burden is always on the government to

IB28KET1

prove its case beyond a reasonable doubt.  A defendant,
specifically you, have no obligation whatsoever to prove
anything or to put on a case at all, but you do have the right
to put on a case, and that includes that you have the right to
testify.

I assume you have spoken with your lawyer about
whether or not you should testify, and because he is your
lawyer, and Mr. Paul has only your interests in mind, that's
his professional obligation, I want you to listen to him, but
that doesn't mean you have to follow what he says.  And just as
I told Mr. Owimrin, I don't want to know what his advice was to
you.  That's completely private between you and Mr. Paul.

My main point here is that it's going to be your
decision.  I also should tell you anything you say could be
used against you.  But it's your decision as to whether or not
you want to testify.  Have you made a decision in that regard?

DEFENDANT KETABCHI:  Yes.

THE COURT:  What is your decision?

DEFENDANT KETABCHI:  I will testify.

THE COURT:  That's fine.  You certainly will testify.

You can decide right up until the moment when Mr. Paul
says he is calling you as a witness.  But you're telling me you
have decided to testify.  I appreciate your speaking directly
with me.

Let's bring in jury in.

IB28KET1

1           (Jury present)

2                THE COURT:  Please be seated in the courtroom.

3                Good morning, ladies and gentlemen.  Thank you for

4      being here as always in a timely manner.  This jury has been

5      wonderful in terms of its paying attention and in terms of your

6      timeliness in the mornings.

7                As I told you yesterday, we now are going to see

8      whether Mr. Steven Ketabchi wishes to put a case on.

9                Mr. Paul, does the defense wish to put a case on?

10               MR. PAUL:  Yes, your Honor.

11               THE COURT:  Call your first witness, sir.

12               MR. MITCHELL:  The defense calls Brandon Jelinek.

13               THE COURT:  Let's have Mr. Jelinek come forward if he

14     is in the courtroom.

15      BRANDON JELINEK,

16          called as a witness by the defendant,

17          having been duly sworn, testified as follows:

18               THE DEPUTY CLERK:  Please state your full name and

19     spell your last name for the record.

20               THE WITNESS:  Brandon Jelinek, J-E-L-I-N-E-K.

21               THE COURT:  Welcome, Mr. Jelinek.  If you would move

22     your chair forward and keep that microphone in front of your

23     face, I would appreciate it.

24               Your witness, Mr. Mitchell.

25               MR. MITCHELL:  Thank you, your Honor.

IB28KET1                    Jelinek – Direct

1  DIRECT EXAMINATION

2  BY MR. MITCHELL:

3  Q.  Good morning, Mr. Jelinek.

4  A.  Good morning.

5  Q.  What type of work do you do?

6  A.  I'm a computer forensic examiner.

7  Q.  What is forensic examination?

8  A.  Forensic examination, when doing digital evidence, is the

9  process of looking at digital evidence on laptops, cell phones,

10  computers, and finding things such as documents, e-mails,

11  browser history, other networking settings.

12  Q.  Do you have to be certified to do that?

13  A.  We definitely have a certification process.  It also helps

14  to be trained and have lots of experience.

15  Q.  Are you certified to do that?

16  A.  Yes.  I have a certification as an Encase forensic

17  examiner.  I also have certifications from Microsoft as a

18  Microsoft certified professional server and a Microsoft

19  certified professional in Windows Professional.

20  Q.  What kind of jobs have you held with those certifications?

21  A.  For the past few years I have been working as an

22  independent contractor, primarily as a subcontractor to two

23  larger forensic companies, in the Spokane area.

24          Prior to that I have been --

25          THE COURT:  Spokane in the state of Washington?

1           THE WITNESS:  Yes, in Washington state.

2     A.  Prior to that, I worked with one of those companies full

3     time as the director of e-discovery where my primary

4     responsibilities were to work for more civic courts and namely

5     larger entities, such as hospitals, school districts, etc.

6     Q.  What computer languages are you literate in?

7     A.  Currently I am programming in C#, Java, Perl, and SQL.

8     Q.  Have you consulted on any state or federal cases in the

9     past?

10    A.  I have consulted on many state and federal and military

11    cases.

12          MR. MITCHELL:  Your Honor, at this time, pursuant to

13    Rule 702 of the federal rules, I move to qualify Mr. Jelinek as

14    an IP and forensic expert.

15          MS. KEARNEY:  Your Honor, there is no objection,

16    except I think the topic should be more precisely defined.

17          THE COURT:  An expert in what regard to computers and

18    forensics?

19          MR. MITCHELL:  Forensic analysis and IP addresses.

20          MS. KEARNEY:  No objection.

21          THE COURT:  Ladies and gentlemen, what this is about

22    is, if I grant the motion of Mr. Mitchell, that means that he

23    will be permitted to ask questions as to this witness's opinion

24    in areas of his expertise.  And I am going to grant that

25    motion.  So he may ask opinion questions.

IB28KET1                          Jelinek - Direct

1           Proceed.

2                MR. MITCHELL:  Thank you, your Honor.

3                Please show the expert Government Exhibit 161.

4                Can we go to 162.

5     BY MR. MITCHELL:

6     Q.  Do you see the exhibit in front of you?

7     A.  Yes, I do.

8                MR. MITCHELL:  Can we show that to the jury, please.

9                Can we look at 163?

10               THE JURY:  We can't see it.

11               MR. MITCHELL:  Sorry.  One moment.

12               Is it up now?

13               THE JURY:  Yes.

14               MR. MITCHELL:  And 163 is up.

15               Can we go to page 6.

16    BY MR. MITCHELL:

17    Q.  Were you asked to review these documents?

18    A.  Yes, I was.

19    Q.  What were you asked to review these documents for?

20    A.  I was asked to help determine if any geolocation can be

21    assessed from the IP addresses on the page.

22    Q.  What do you mean by geolocation?

23    A.  Geolocation, much like we would have in Google Maps, is the

24    process of taking these IP addresses and trying to find

25    geographically on a system like Google Maps where those

1  addresses may come from.

2  Q.  How would you do that?

3       THE COURT:  Did you say where the addresses may come

4  from, is that what you said?

5       THE WITNESS:  I don't recall if I used the word "may."

6       THE COURT:  Let me ask Mr. Mitchell's question then.

7       What do you mean by geolocation?

8       THE WITNESS:  Geolocation is the process by which I am

9  going to take these addresses and try to locate where they come

10 from on a geological map such as Google.

11 Q.  When you say addresses, what kind of address?

12 A.  These are Internet protocol addresses.  In this version of

13 the Internet protocol, there are four clusters of digits.

14 Q.  Is there an abbreviation for Internet protocol?

15 A.  Yeah.  It is abbreviated as IP.

16 Q.  How did you do this?

17 A.  To first identify who the addresses belong to, and thereby

18 determine where the addresses are geographically located,

19 typically we query the ARIN database.

20 Q.  Just taking a step back for a second, do you see the first

21 IP address on this document that you were asked to examine?

22 A.  Yes, I do.

23 Q.  Could you just read that address?

24 A.  69.117.174.32.

25 Q.  Were you able to locate that IP address?

A.  Yes.  The ARIN database did have a reported hit on that IP
address.

Q.  Where is that IP address located?

A.  It is located in and around the New York area.

Q.  Did you use tools or how did you locate this IP address
location?

A.  There are lots of tools on the Internet, which will query
the ARIN database for you.  I happened to use one of them.  I
believe it was called WhatIsMyIP.

          THE COURT:  What exhibit number is up now, sir?

          MR. MITCHELL:  163, your Honor.

          THE COURT:  Thank you.

Q.  What, if anything, did you do to determine if someone was
using this IP address to disguise their location?

A.  After finding the general geolocation of the IP address, I
went ahead and plugged it into another system by which to see
if it was blacklisted anywhere.

Q.  What do you mean by blacklisted?

A.  Due to the high volumes of spam and problems on the
Internet, several organizations have created these long lists
of IP addresses that are easily misused, or have been misused
in the past, and those blacklists will typically identify
troublesome IP addresses.

Q.  What tests did you run to determine if this address was on
a blacklist?

1    A.  I went to one of the blacklist check sites.  I don't recall

2    offhand.  I know that I provided the name of the Web site.  But

3    it queried 70 different blacklist sites against these IPs.

4              THE COURT:  What does it mean to misuse an IP address?

5              You said these sites list IP addresses that have been

6    misused.  What does that mean?

7              THE WITNESS:  Different blacklist sources will have

8    different purposes to them.  Some of them are to identify sites

9    that are commonly known for spam, fraud; some of them are there

10   to identify sites that would have proxy servers, known open

11   relays, where people can connect that shouldn't be connecting.

12             MR. MITCHELL:  Can we show the witness SK-25, please.

13   Q.  Is this one of the sites that you used to do your research?

14   A.  Yes.  This was the site I used in order to query the ARIN

15   database to find the geolocation and the customer that owns

16   that specific IP address.

17             MR. MITCHELL:  At this point, I would like to offer

18   SK-25 into evidence.

19             MR. SCHMIDT:  No objection.

20             MS. KEARNEY:  No objection.

21             THE COURT:  Admitted.

22             (Defendant's Exhibit SK-25 received in evidence)

23             MR. MITCHELL:  Can we show that to the jury?

24   Q.  Can you walk us through what you did with this site to

25   conduct your research?

IB28KET1                          Jelinek - Direct

1    A.  There are quite a number of tools that will query the ARIN

2    database.  You can see that under the source, the

3    whois.arin.net.  I entered the IP address and initiated the

4    query.

5    Q.  What did these results tell you?

6    A.  These results tell me that that specific IP address belongs

7    to a customer titled Optimum Online.  It's a Cablevision

8    system.  And that Optimum Online is located in Hicksville, New

9    York.

10               MR. MITCHELL:  We can take down that exhibit?

11   Q.  You mentioned blacklists.  You said you used a site to

12   determine which blacklists there were, if any.

13               MR. MITCHELL:  Can we put up Exhibit SK-26, please.

14   Q.  Is this what you used to conduct your research involving

15   blacklists?

16   A.  Yes.  This came from the whatismyip.net Web site.  This is

17   the query results against that specific address.

18               MR. MITCHELL:  At this point, I would like to offer

19   Defense Exhibit SK-26 into evidence.

20               MR. SCHMIDT:  No objection.

21               MS. KEARNEY:  No objection.

22               THE COURT:  Admitted without objection.

23               (Defendant's Exhibit SK-26 received in evidence)

24               MR. MITCHELL:  Can we show that to the jury?

25   Q.  Using this site, what did you do to determine if there were

IB28KET1                    Jelinek - Direct

1   any blacklists?

2   A.  This specific site shows you the results of the blacklist

3   test by indicating whether there is a green check mark or a red

4   exclamation mark.  The green check marks mean that there was no

5   record of that specific IP address in that blacklist,

6   essentially meaning that it was cleared and clean of being

7   known to be misused in a specific way.

8            Again, each one of those blacklist sites has different

9   purposes to it, and some of them are more aggressive and some

10  are less aggressive.

11  Q.  What were the results of the test that you ran?

12  A.  The results of this test were that 67 out of the 70 of the

13  blacklist sites did not list this IP address as known to be

14  troublesome or misused.  There were three positive hits.

15  Q.  What do positive hits mean?

16  A.  Positive hits basically just mean that the IP address is in

17  their database, and for various reasons each different one will

18  have a reason why it reports that site.

19  Q.  In this case, in plain language, what are those reasons?

20  A.  Starting from the top most on the right, the

21  dnsbl.spfbl.net site, the reason why it hit on that one looks

22  to be because of how that server is configured for sending

23  e-mails.  It doesn't really have to do with IP addressing

24  nearly as much as it does about e-mail serving.

25            The second hit that you see on the top most of the

1   left side of the page, the dnsbl.sorbs.net, that is a catch-all

2   hit, which means that the reason why that one shows as a hit is

3   because the one below it, the dul.dnsbl.sorbs.net, is the

4   actual hit.  The one up above it was simply, if any of the

5   sorbs.net results hit, then it was going to show that one as

6   well.

7   Q.  In plain language, what does that mean?

8   A.  That means that this IP address is relatively clear of

9   being misused or known to have any issues with people utilizing

10  it other than the way it was intended by the company.

11        MR. MITCHELL:  Can we take that down and show 163,

12  Government Exhibit 163, page 6 again.

13        Show that to the jury as well.

14  Q.  What is the name associated with the first IP address you

15  were asked to look up?

16  A.  The name that is associated with it, from Adobe standpoint,

17  the Zach Peterson, and the e-mail used to log into the Adobe

18  system appears to be positivefaith@gmail.com.

19  Q.  So in setting up Adobe, the e-mail is like the user name?

20        MS. KEARNEY:  Objection.

21        THE COURT:  Sustained.

22  Q.  What would the e-mail be when setting up Adobe?

23        MS. KEARNEY:  Objection.

24        THE COURT:  No.  I will allow it, if he can answer it.

25        MS. KEARNEY:  May I voir dire then, your Honor?

IB28KET1                        Jelinek – Direct

1              THE COURT:  Yes.

2    VOIR DIRE EXAMINATION

3    BY MS. KEARNEY:

4    Q.  Mr. Jelinek, have you ever used EchoSign?

5    A.  No, I have not.

6              MS. KEARNEY:  My objection stands.

7              THE COURT:  Sidebar.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IB28KET1                          Jelinek - Direct

1            (At the sidebar)

2            THE COURT:  EchoStar has not been involved in this

3    question.

4            MS. KEARNEY:  EchoSign.  If you look at the first

5    page, it was sent from EchoSign, which is part of Adobe, and

6    Mr. Mitchell is asking the witness to testify about the process

7    of how Adobe or EchoSign gets that information.  This witness

8    has never used EchoSign and therefore has no basis to testify

9    to that.

10           MR. MITCHELL:  I can remedy it with one question:

11   Have you ever used Adobe?

12           MS. KEARNEY:  But he just testified he has never used

13   EchoSign.

14           MR. MITCHELL:  With is part of Adobe.

15           MS. KEARNEY:  This is a specific product under Adobe.

16   So Adobe has things like Acrobat or Reader or things like that,

17   which perhaps this witness has used, but this particular

18   product EchoSign he has already testified he has not.

19           THE COURT:  What difference does that make?

20           MS. KEARNEY:  Because the process of using EchoSign,

21   either creating a user account or creating a log-in, what

22   information is provided and how the company assigns that

23   information is different from how you use Reader or Acrobat or

24   something else like that.

25           MR. MITCHELL:  My understanding is it's done through

IB28KET1                          Jelinek – Direct

1    Adobe.

2              THE COURT:  Let's clear it up.  Ask the questions you

3    need to.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IB28KET1                     Jelinek - Direct

1              (In open court)

2              THE COURT:  Ask a question, Mr. Mitchell.

3    BY MR. MITCHELL:

4    Q.  Was this document sent using Adobe?

5    A.  Yes, it was sent using Adobe acrobat.

6              THE COURT:  Ask another question.

7    Q.  What would the e-mail signify here using Adobe?

8              MS. KEARNEY:  Objection.

9              THE COURT:  Just as to form.  Rephrase it.  I don't

10   know what that question is.

11   Q.  Why is the e-mail on this document?

12             MS. KEARNEY:  Objection.

13             THE COURT:  I will allow that.

14   A.  The e-mail is there because when you sign up for the Adobe

15   Cloud account, you will give it a name that you want attributed

16   to that Adobe account and an e-mail address.

17             THE COURT:  What is EchoStar, sir?

18             MS. KEARNEY:  EchoSign.

19             THE COURT:  EchoSign.

20             THE WITNESS:  EchoSign, the process of signing the two

21   documents within Adobe.  Or a document with both signatures

22   from one person to another.  Sorry.  I misspoke.

23             THE COURT:  Go ahead, sir.  Mr. Mitchell, ask a

24   question.

25   Q.  What does that e-mail signify about the user?

1   A.   Just that that was the e-mail address that was given to

2   Adobe.  It doesn't necessarily mean much about the user other

3   than somebody used it to log in.

4   Q.   So what is the name associated with the second IP address

5   that you were asked to examine?

6   A.   That user name was Jane R. Thompson, and the e-mail address

7   used was the jthompson13@ymail.com.

8   Q.   And were you used to run similar tests with regard to this

9   IP address?

10  A.   Yes, I did run similar tests.

11  Q.   In plain language, could you just summarize what those

12  tests revealed?

13  A.   Yes.  Similar to the first IP address that I reviewed, I

14  queried first against the ARIN database.  It showed that this

15  address came from North Carolina, in and around Shallotte, I

16  believe is the way it's said.  And then I also queried the

17  blacklists against it and it only had one hit, which was that

18  e-mail hit in the blacklist.  So 69 out of the 70 blacklists

19  labeled this address as clean.

20  Q.   How does that compare to the first IP address that you

21  examined?

22  A.   They are very similar in the result sets.  There is a only

23  a difference between one -- basically one hit in the blacklists

24  were different.

25  Q.   In the simplest terms possible, what were the results on

1    your investigation into these two IP addresses?

2    A.  Basically that the IP addresses seemed to be relatively

3    simply located geographically.  They didn't seem to have any

4    major flags that would indicate that anybody had ability or

5    would have been using them from remote locations in order to

6    disguise their own location.  The first address appears that it

7    was right around the New York area, and the second address was

8    right around North Carolina.

9    Q.  What does that mean in regards to sending this contract?

10   A.  It means that it is very highly likely that it came from

11   the North Carolina area -- sorry, the 69, that it was uploaded

12   in and around New York and that it was signed in North

13   Carolina.

14              MR. MITCHELL:  No further questions, your Honor.

15              THE COURT:  Is there any cross?

16              MS. KEARNEY:  No cross.

17              THE COURT:  No cross.

18              MR. SCHMIDT:  Nor from me, your Honor.

19              THE COURT:  All right.  You are excused, sir.  Thank

20   you.

21              (Witness excused)

22              THE COURT:  Next witness for Mr. Shahram Ketabchi.

23              MR. MITCHELL:  I call Mona Ketabchi to the stand.

24              (Continued on next page)

25

1      MONA KETABCHI,

2           called as a witness by the defendant,

3           having been duly sworn, testified as follows:

4                THE DEPUTY CLERK:  Please state your full name and

5      spell your last name for the record.

6                THE WITNESS:  My name is Mona Ketabchi, and it's

7      M-O-N-A, K-E-T-A-B-C-H-I.

8                THE COURT:  Good morning.  Welcome.  Please be seated.

9      DIRECT EXAMINATION

10     BY MR. PAUL:

11     Q.  You have told us your name.  Where do you reside?

12     A.  I reside in Orange County, California.

13     Q.  How long have you lived there?

14     A.  I have lived there for approximately the past nine years.

15     Q.  What do you do for a living?

16     A.  I have my doctorate in psychology.  I am a licensed

17     clinical psychologist.

18     Q.  What is your educational background?

19     A.  I have my doctorate in psychology and two masters.  After

20     high school I completed approximately 12 years of education,

21     including my pre- and post-doctoral hours and my experience

22     with patients, as well as passing my licensing and national

23     exams.

24     Q.  Now, you told us you're a licensed clinical psychologist,

25     is that right?

IB28KET1                          M. Ketabchi - Direct

1   A.  Correct.

2   Q.  Do you have your own practice or do you work for somebody

3   else?

4   A.  I am currently working full time as a licensed clinical

5   psychologist at Kaiser Permanente.  It's a hospital system on

6   the West Coast.  And I work in the department of psychology and

7   behavioral health.

8   Q.  Do you know an individual by the name of Shahram Ketabchi?

9   A.  Yes.

10  Q.  Who is he?

11  A.  He is my older brother.

12  Q.  Do you have any other siblings?

13  A.  I do.  I have another brother, his name is Arash Ketabchi.

14  Q.  What is the order in terms of age with regard to you and

15  your siblings?

16  A.  Shahram Ketabchi is my older brother, Arash Ketabchi is the

17  middle child, and I am the youngest and only girl.

18  Q.  You're the baby?

19  A.  Yes.

20  Q.  And the only girl?

21  A.  Yes.  Not spoiled at all.

22  Q.  With regard to your relationship with your brothers, can

23  you describe, if you can, how you would characterize Arash

24  Ketabchi and Steven Ketabchi?

25  A.  Sure.  Of course I love both my brothers and they have

1  always been generous and loving to me as a younger sister, but

2  it's always been an ongoing joke in our family that they are

3  polar opposites and I fall somewhere in between.  Arash has

4  always been more loud and friendly, overt with a lot of his

5  behaviors, and Shahram has always been more quiet and reserved

6  and covert with a lot of his behaviors.

7       Shahram has always been much more humble, and he has

8  always been the person in our family who has been an advocate.

9  For example, when my mother was diagnosed with cancer, he was

10 like behind the scenes trying to advocate for her and get her

11 treatment and the best care.  And Mr. Arash was more of the

12 person who would kind of try and make my mom laugh through

13 chemo and radiation.  So they vary in their personalities and

14 their life choices.

15      So, for example, unfortunately my brother Arash has

16 been diagnosed with mental illness, such as bipolar disorder,

17 and he has a long-standing history of drug and alcohol use, and

18 so that has affected a lot of his judgment and behaviors and

19 life choices.

20 Q.  You're talking about Arash?

21 A.  Yes.  On the other hand, Shahram has never picked up drug

22 or alcohol or a cigarette a day in his life.  He just lives a

23 very moral and ethical life.

24 Q.  Have you over the years with Steven, Shahram, as your

25 brother, been able to form an opinion with regard to his

IB28KET1                          M. Ketabchi - Cross

1   character when it comes to truthfulness and honesty?

2   A.  Yes.

3   Q.  What would that opinion be?

4   A.  He is the most -- one of the most moral and ethical people

5   I have ever met in my entire life, and he has taught me what

6   morals and values are.  He has been a father figure for me.

7   He's taught me how to be good to others and what it means to

8   provide acts of service, how to help the homeless and the

9   hungry.  He's motivated me to pursue my educational career, and

10  he has always given me truthful opinions about my life choices

11  and try to make sure I am guided in the right direction to make

12  the right decisions.  He is just -- he has taught me what

13  character really is.

14  Q.  So would it be fair to say that when it comes to at least

15  truthfulness and honesty your opinion of him would be

16  characterized as excellent?

17  A.  Absolutely.

18          MR. PAUL:  Thank you.  I have no further questions.

19          MR. SCHMIDT:  I have no questions.

20          THE COURT:  Government, is there any cross here?

21          MS. KEARNEY:  Yes, briefly, your Honor.

22  CROSS EXAMINATION

23  BY MS. KEARNEY:

24  Q.  Good morning.

25  A.  Good morning.

IB28KET1                         M. Ketabchi - Cross

1    Q.  You testified on direct that Arash is the bold character in

2    the family, right?

3    A.  Correct.

4    Q.  I think you said Steve is more of the behind-the-scenes

5    person?

6    A.  Um-hmm.

7              MR. PAUL:  Objection.

8              THE COURT:  What did you mean by "um-hmm"?

9              THE WITNESS:  I was just confirming that I said that.

10   Q.  Steve was the behind-of-scenes personality?

11             THE COURT:  Objection is overruled.

12   Q.  Is that right?

13             I am just trying to clarify after all that back and

14   forth.  You testified that Steve was the behind-of-scenes

15   personality?

16   A.  Yes, I did.  What I mean by that he is more covert and

17   subtle with his giving behaviors.  So when it came to

18   advocating for my mom, he would just take it upon himself to do

19   research and find the best hospitals, where Arash is more

20   verbal, making her laugh.  That's what I meant by that.

21   Q.  Would it be fair to say that Arash is like the front man?

22             MR. PAUL:  Objection to the term "front man."

23             THE COURT:  No.  Based on the testimony, objection

24   overruled.

25   A.  What do you mean by front man?

IB28KET1                          M. Ketabchi - Cross

1    Q.  He is the face of things, he is the person you put out

2    front, right, he is gregarious?

3    A.  He is definitely friendly, yes.

4    Q.  So he is the person who would interact with the public,

5    like with your mom?

6            THE COURT:  Well, could you rephrase that?  I don't

7    think mom is the public.

8    Q.  In your mother's situation, you said when she was getting

9    treatment, Arash would be the person who would interact with

10   others?

11   A.  Yes.  He was the one that would make my mom laugh.

12   Q.  And then Steve would be the one who would be doing the

13   paperwork, things like that?

14   A.  No.  More like advocating for her, for her treatment.

15   Q.  Now, you said you live out in California?

16   A.  Yes.

17   Q.  Were you aware that your brother Arash was operating a

18   fraudulent telemarketing ring?

19   A.  No, I was not aware of that.

20   Q.  Were you filing your brother Arash's documents?

21   A.  No.

22   Q.  Were you taking care of his taxes?

23   A.  No.

24   Q.  Were you doing his mortgage paperwork?

25   A.  No.

IB28KET1                          M. Ketabchi - Redirect

1    Q.  Were you applying for credit cards on his behalf?

2    A.  No.

3    Q.  Do you have any dealings with A1 Business Consultants?

4    A.  No.

5    Q.  Do you have any dealings with Element?

6    A.  I don't know what that is.

7    Q.  What about Olive Branch?

8    A.  No.

9    Q.  Did you ever make any legal filings on behalf of Mr. Arash?

10   A.  No.

11   Q.  Were you aware that Arash recruited your brother to

12   participate in a telemarketing ring?

13   A.  Can you repeat that?

14   Q.  Were you aware that Arash had recruited your brother to

15   participate in a telemarketing ring?

16            MR. PAUL:  Objection.

17            THE COURT:  Sustained.

18            MS. KEARNEY:  No further questions.

19            MR. PAUL:  I have a few, your Honor.

20   REDIRECT EXAMINATION

21   BY MR. PAUL:

22   Q.  What, if any, understanding did you have with regard to

23   Arash Ketabchi's business?

24   A.  I just thought he was doing sales, which is what he has

25   done his whole life.  I wasn't sure what they were selling or

1   what he was doing really.

2   Q.  You were asked some questions with regard to Arash

3   Ketabchi -- Steven Ketabchi's relationship in terms of his

4   assisting or working with his brother.  What is your

5   understanding with regard to Steven's relationship with his

6   brother Arash over the years in terms of what, if anything, he

7   was doing for him?

8   A.  So Shahram in my eyes has always been like Arash's personal

9   assistant, because Arash tends to delegate a lot of things in

10  his life and he isn't very computer or text savvy.  So Shahram

11  would always do things like -- hey, can you book my ticket?

12  Can you apply for my insurance?  Can you do those type of

13  things for me?  So he would always do those type of things for

14  Arash.

15  Q.  And do you know whether or not there was any financial

16  relationship between Steven Ketabchi and his brother Arash

17  Ketabchi?

18  A.  Nothing formally, but I know Arash helped Shahram over the

19  years with loans or helping out with his rent or things like

20  that.

21  Q.  Did your father as well do that?

22  A.  Yes.

23  Q.  Did you have any understanding as to what Steven Ketabchi

24  did for a living?

25  A.  Yes.  Over the years he has been driving with Uber and

IB28KET1                    Ketabchi – Direct

1   Lyft, but I know in the past he has held other jobs.

2           MR. PAUL:  Thank you.  I have nothing further

3   Ms. Ketabchi.

4           THE COURT:  Thank you.  You are excused.  You may step

5   down.

6           THE WITNESS:  Thank you, Honorable Judge Stein.  Thank

7   you, everyone.

8           (Witness excused)

9           THE COURT:  Next witness for Shahram Ketabchi.

10          MR. PAUL:  May the witness remain in the courtroom now

11  that she has completed her testimony?

12          THE COURT:  You may remain if you wish.

13          MR. PAUL:  The defense calls Steven Ketabchi to the

14  stand.

15   STEVEN KETABCHI,

16       called as a witness by the defendant,

17       having been duly sworn, testified as follows:

18          THE DEPUTY CLERK:  State your and spell your name for

19  the record.

20          THE WITNESS:  Shahram Ketabchi, S-H-A-H-R-A-M,

21  K-E-T-A-B-C-H-I.  I also use Steve, S-T-E-V-E.

22          THE COURT:  Good morning, sir.  Please be seated.  You

23  know the drill.  If you would keep the microphone close to your

24  face and speak loudly, slowly and clearly.

25          MR. PAUL:  Before we begin the testimony, I have two

1   stipulations to enter into the record.

2                THE COURT:  Yes, sir.

3                MR. PAUL:  This is a stipulation between the parties.

4                It is hereby stipulated and agreed by and between the

5   United States of America, by Geoffrey S. Berman, United States

6   Attorney, Kiersten A. Fletcher, Benet J. Kearney, and Robert B.

7   Sobelman, Assistants U.S. Attorneys, Andrew Owimrin, by and

8   through his attorney --

9                THE COURT:  Would you would slow down, sir?  This is

10  being recorded.

11               MR. PAUL:  By and through his attorney, Sam A. Schmidt

12  Esq. and Abraham Abegaz-Hassen, Esq., and Shahram Ketabchi, by

13  and through his attorneys, Kenneth A. Paul, Esq. and Jacob

14  Mitchell, Esq. that:

15               1.  On March 21, 2017, law enforcement agents lawfully

16  seized from Shahram Ketabchi's residence, in Rancho Santa

17  Margarita, California, a black Gateway computer tower.

18  Exhibits SK-6 through SK-22 and their subsets are true and

19  accurate copies of documents and files obtained from that

20  device.

21               It is further stipulated and agreed that this

22  stipulation may be received in evidence at the trial in the

23  above-referenced matter.

24               It's dated November 1, signed by the parties.

25               This would be SK-28 that I would also move into

1   evidence.

2           THE COURT:  Admitted without objection.

3           (Defendant's Exhibit SK-28 received in evidence)

4           MR. PAUL:  The second stipulation.

5           It is hereby stipulated and agreed by and between the

6   United States of America, by Geoffrey S. Berman, United States

7   Attorney, Kiersten A. Fletcher, Benet J. Kearney, and Robert B.

8   Sobelman, Assistant US Attorneys, Andrew Owimrin, by and

9   through his attorneys, Sam A. Schmidt, Esq. and Abraham

10  Abegaz-Hassen, Esq., and Shahram Ketabchi, by and through his

11  attorneys, Kenneth A. Paul, Esq. and Jacob Mitchell, Esq. that:

12          1.  If called at trial, a custodian of records on

13  behalf of Google, Inc., referred to as Google, would testify

14  that Google received various search warrants issued by a

15  federal judge in the Southern District of New York which

16  authorized the search and collection of e-mails associated with

17  the following accounts:

18          A.  Positivefaith@gmail.com; and

19          B.  A1businessconsultations@gmail.com.

20          In response to the search warrants, Google conducted a

21  diligent search of records kept in the course of regularly

22  conducted business activity and made by the regularly conducted

23  business activity as a regular practice.

24          2.  If called at trial, a custodian of records on

25  behalf of Google also would testify that Google provided the

1   exhibits marked as SK-2 through SK-5 and SK-23 and SK-24 in

2   response to the receipt of search warrants, and that these

3   documents are true and accurate copies of e-mail communications

4   maintained by Google.

5          It is further stipulated and agreed that this

6   stipulation may be received in evidence at the trial in the

7   above-referenced matter.

8          This stipulation is marked as SK-29 and I move it into

9   evidence as well.

10         THE COURT:  You're moving into evidence each of the

11  exhibits as well as the stipulation?

12         MR. PAUL:  That's correct, your Honor.

13         THE COURT:  Admitted.

14         (Defendant's Exhibit SK-29 received in evidence)

15         MS. KEARNEY:  Your Honor, we have an objection.

16         THE COURT:  To the stipulation?

17         MS. KEARNEY:  Not to the stipulation, but to the

18  exhibits named in the stipulation.  Mr. Paul told me before

19  this morning he would not be moving them in today.

20         THE COURT:  Just talk to each other right now and

21  then we will take a sidebar.  Talk quietly.

22         MR. PAUL:  We need a sidebar, Judge.

23         (Continued on next page)

24

25

1          (At the sidebar)

2          MS. KEARNEY:  Your Honor, these are the same exhibits

3    that we were discussing with respect to the cross of Special

4    Agent Giattino.

5          THE COURT:  These I take it?

6          MS. KEARNEY:  Yes.

7          THE COURT:  And the parties have informed me that was

8    all handled.

9          MS. KEARNEY:  The authentication was handled.  The

10   objections were not.

11         MR. PAUL:  If they have an objection, I would like to

12   hear what the objection is.

13         MS. KEARNEY:  First, with respect to SK-5, we have a

14   hearsay objection.

15         THE COURT:  How many are there?

16         MS. KEARNEY:  20.  Mr. Paul informed me he wouldn't be

17   offering these.

18         MR. PAUL:  I said it had been offered from Giattino.

19   It had been withdrawn with regard to that offer.  I intended to

20   offer them through this witness.

21         THE COURT:  If you knew there was going to be an

22   objection, I really would have appreciated being able to handle

23   those objections -- there are 20 objections -- before the jury

24   is sitting here at 10:30 on a Friday.

25         MR. PAUL:  Obviously, Judge, I apologize.

1            MS. KEARNEY:  There must have been a miscommunication.

2            MR. PAUL:  All of these exhibits go to his state of

3    mind.  This entire case --

4            THE COURT:  If I recall what these exhibits are, these

5    are documents that were taken from Shahram Ketabchi's computers

6    and uploaded to the coordinating discovery attorney's platform

7    and available to the defense, and you want to introduce these

8    to show that Shahram was a filing cabinet for Arash.

9            MR. PAUL:  Thank you.  Yes.

10           THE COURT:  I do listen.

11           MR. PAUL:  Good.

12           THE COURT:  So your argument is exactly what, because

13   he was doing these other things, he had no idea as to what he

14   was doing with the chargebacks?

15           MR. PAUL:  No.  It has to do with him receiving these

16   documents and it goes to his state of mind.

17           THE COURT:  How does it go to his state of mind?

18           MR. PAUL:  It goes to the fact that he would either

19   pass these along as documents that he received and reviewed or

20   passed them along to his brother.  They are going to argue that

21   he had knowledge and intent to be a participant in this

22   conspiracy, and I am going to argue that his state of mind was

23   such that he did not have knowledge.

24           THE COURT:  I understand.  How are these documents

25   relevant to that inquiry?

1          MR. SCHMIDT:  May I have one moment.

2          MS. KEARNEY:  I also just remind --

3          THE COURT:  Wait.

4          MR. PAUL:  Judge, I was going to say the exhibits that

5     I am offering, certainly the ones --

6          THE COURT:  It's this whole big pile that I have, the

7     ones you gave me during trial a few days ago?

8          MR. PAUL:  Exactly.  These exhibits, certainly the

9     ones that have to do with chargebacks and his communications

10    with either Heidi and his brother and Bill --

11         THE COURT:  Aren't those already in?

12         MR. PAUL:  These are additional ones.  Just like the

13    government introduced them to show his state of mind, I am

14    introducing them to show his state of mind.

15         MS. KEARNEY:  Specifically for SK-5, he is not even on

16    this e-mail.

17         MR. PAUL:  Let me see what you are referring to.

18         MR. SCHMIDT:  There seems to be two different kinds

19    e-mails there.  Ones that specifically relate to the case and

20    ones that relate to errands and things he is doing for his

21    brother.  There are actually two different issues.

22         THE COURT:  Mr. Paul, it's now 10:20.  Can you do an

23    hour of questioning not involving these documents so that when

24    I give the jury a break we can handle these objections?

25         MR. PAUL:  Sure.

IB28KET1                          Ketabchi - Direct

1              (In open court)

2              THE COURT:  I am not ruling on the application at this

3       time.  I will handle that when the jury takes a break so that I

4       am using their time as efficiently as possible.

5       BY MR. PAUL:

6       Q.  Mr. Ketabchi, how old are you?

7       A.  I am 47, sir.

8       Q.  Where are you currently living?

9       A.  I live in California.

10      Q.  How long have you lived in California?

11      A.  I have lived there approximately 12 years now.

12      Q.  What, if anything, do you do for a living in California?

13      A.  Currently I am a driver for Lyft and Uber, and I recently

14      obtained my real estate license.

15      Q.  Have you been able to utilize that real estate license?

16      A.  No.  I don't have the marketing budget at this time,

17      unfortunately.

18      Q.  Would you talk into the mic so we could hear you.  Move the

19      mic closer to you.  Thank you.

20              Are you a United States citizen?

21      A.  Yes, sir.

22      Q.  Who, if anyone, do you live with?

23      A.  I don't live with anybody currently.

24      Q.  Were you ever married?

25      A.  I was.

IB28KET1                          Ketabchi - Direct

1    Q.   When was that?

2    A.   I got married approximately, I think it was around 2008 or

3    so, 2009.

4                 (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IB2JKET2                        Ketabchi - direct

1   Q.  Are you since divorced?

2   A.  Yeah, I've been divorced for about like 11 or 12 years or

3   so.

4   Q.  What is your employment history?  What have you done in the

5   past in terms of employment?

6   A.  Going back, my first real job, I started working at a Dairy

7   Queen at 16, and I kept --

8   Q.  How long did you do that for?

9   A.  Approximately 8 years.

10  Q.  And then?

11  A.  And then I was working there all through high school and

12  college, and then --

13  Q.  How far did you go in school?

14  A.  I earned a bachelor degree in business management.

15  Q.  Where was that?

16  A.  That was Ramapo College, Mahwah, New Jersey.

17  Q.  This was in high school.  In college you were living in New

18  Jersey?

19  A.  I was living in New Jersey, yes.

20  Q.  After the Dairy Queen job, where did you move on to?  What

21  did you do?

22  A.  After that, I actually did a couple of waiter jobs while I

23  was also working at Dairy Queen, just from more hours I could

24  have a higher income while going to school.  After college I

25  actually started working on Wall Street at Gruntal & Company.

1    I was training to be a stock broker.

2    Q.  How long did you work at Gruntal & Company?

3    A.  Approximately six months.

4    Q.  What did you do after the six months?

5    A.  After the six months, I went into the family business.  I

6    was working with my dad.

7    Q.  What is that family business?

8    A.  It is an ice cream, chocolate candy store, gifts.

9    Q.  How long did you do that for?

10   A.  I did that for approximately, I am estimating the next five

11   or six years.

12   Q.  In what capacity did you work?  What was your employment at

13   the store or stores?

14   A.  I helped with general management of the stores,

15   systemizing, you know, all the details of the business in terms

16   of marketing and hiring, staff and making sure everything is

17   being run properly.

18   Q.  What did you do after your employment in your father's

19   business?

20   A.  Around that time I got married legally, but we didn't have

21   a ceremony.  Unfortunately, my mother, God bless her soul, she

22   passed away due to cancer at that time, and yeah, me and my

23   wife, we moved to Florida, and --

24   Q.  What did do, if anything, in Florida?

25   A.  I launched a restaurant.

IB2JKET2                         Ketabchi - direct

1    Q.   What kind of restaurant?

2    A.   A burger place called Bambini's Burgers.

3    Q.   How did you have funds to launch such an endeavor?

4    A.   I got a loan from my dad, and I also had some resources on

5    my own in terms of credit cards and things, so I also was able

6    to use that as well back, back then.  The majority of it was a

7    loan from my father.

8    Q.   What happened with that business?

9    A.   Unfortunately, it took us approximately 9 months to get

10   open and we had a lot of issues with the start-up process with

11   the city and getting licensing, and I just don't know -- there

12   was four hurricanes in the Orlando area in that timeline, and

13   we were really, unfortunately, because we didn't have the

14   finances to continue because it took us all to get started and

15   we took a really big hit with the hurricanes.  Unfortunately, I

16   had to close that business.

17   Q.   What, if anything, did you do after that business?

18   A.   After that business, I was in a major financial challenging

19   time in my life, and I decided to get a real estate license in

20   Florida, and I started practicing real estate in Florida, and I

21   think it was about a year or so later there was a major turn in

22   the market, and right around that time me and my wife actually

23   started a separation, and she moved back to the tristate area,

24   and then a few months later I also moved back, and I went

25   through a divorce.  Then that was like about year back up here,

IB2JKET2                          Ketabchi - direct

1    and then --

2    Q.   Were you working during that year you were back up here?

3    A.   I was helping my dad with the stores and helping with

4    everyday things.

5    Q.   What happened after that year?

6    A.   After that I had made a final decision that I cannot live

7    in the North East because I have chronic body pain, and it just

8    gets too cold and I just couldn't live here, so I moved to

9    California.

10   Q.   What, if any, employment when you moved to California did

11   you engage in?

12   A.   When I first arrived to California, I was hired by the

13   vitamin shop as a general manager at their store in La Mesa,

14   and I was working there for three years.

15   Q.   After the three years, what, if anything, did you do?

16   A.   After the three years, I have always, in my heart I have

17   always been an entrepreneur since I can remember from my dad

18   and everything, and I just know I couldn't continue working for

19   another business like longer term, so I launched a Vitamin Pros

20   dot com which was an online retailer of vitamins and

21   supplements.

22   Q.   How long did that business continue for?

23   A.   I was in that business for about five years or so.

24   Q.   Tell us about what that business entails.

25   A.   Basically we were an online retailer and we focused on

1   vitamin supplements, proteins, pre-workout drinks, all those

2   type of things.

3   Q.  Other than the Vitamin Pros business, over the last several

4   years have you been engaged in any other employment?

5   A.  No.  I mainly focused on Vitamin Pros, and then we were

6   doing okay in the first couple of years or so because we were

7   selling a lot internationally, and then whenever a big source

8   of customer base was Brazil, and they went through a downturn

9   in their economy, and it started the orders getting lower and

10  lower, and during the whole time I was really, it was so, so

11  hard I was struggling to make ends meet, buying food, getting

12  gas, trying to keep Vitamin Pros going.

13  Q.  Did you supplement your income by doing any other jobs?

14  A.  Yeah, and I also then started about four years ago,

15  approximately, or so I started driving for Uber and then left.

16  Q.  Are you still doing that?

17  A.  Yes, sir.

18  Q.  Are you a United States Citizen?

19          THE COURT:  Asked and answered.

20  A.  I am, sir, yes.

21          MR. PAUL:  I apologize.

22  BY MR. PAUL:

23  Q.  You have a sibling.  You have two siblings, correct?

24  A.  Yes, sir.

25  Q.  And we heard from your sister, right?

IB2JKET2                          Ketabchi - direct

```
 1    A.  Yes, that is my sister.

 2    Q.  And usual brother is Arash Ketabchi?

 3    A.  He is my younger brother, yes, sir.

 4    Q.  How would you describe your relationship with your brother

 5    Arash Ketabchi.

 6    A.  Me and my brother, we are not the type of brothers who talk

 7    every day or anything like that.  We're just two different

 8    people like in almost every way.

 9    Q.  Describe that, please.

10    A.  He's very outgoing, he likes to, you know, like go out and

11    do fun things, and like I work out consistently, I have been an

12    athlete all my life, and my brother usually doesn't work out.

13    He has in the past, but not like consistently.  That would be a

14    big difference between us.

15             I am always looking to strive to get better and grow

16    and evolve as a person and be kind and see what I can do to

17    make the world a better place, and I am working on certain

18    business projects right now and also a book on that.

19    Q.  What is your relationship in terms of doing tasks perhaps

20    for your brother?

21    A.  So I've been helping my brother in like everyday type of

22    tasks from like booking flights for him, going to Broadway

23    shows, filing applications.

24             Recently I've done his mortgage application.  I have

25    applied for credit cards for him, anything you can name that is
```

1    done like in an office like you need a computer for online or
2    otherwise, I've helped him with.
3    Q.  Why would he ask you, if you know, to do these tasks for
4    him?
5    A.  Most of the time it was just basically he just doesn't
6    really engage in a lot of the computer type of tasks and online
7    based on like filling out applications and things.  He is more
8    of like, you know, get out there and just do other things, and
9    I am more of like, you know, working on projects and business
10   projects and putting paperwork together and filing things and
11   organizing that way.
12   Q.  Did there come times when he would send you documents just
13   to store or hold for him?
14   A.  Oh, yeah, basically my whole desktop on my hard drive, I
15   have all of his files.  My computer is his computer.  So like I
16   have docs from going 25 years or so even.
17   Q.  Did you store these documents that he would send you or
18   tasks that you were doing for him on your computer or did you
19   have backups?  How did this work?
20   A.  Yes.  It might be a little hard to understand for
21   everybody, but I basically had my desktop like the Honorable
22   Judge has mentioned has, and what I used to do is I have a lot
23   of very important data, I have a couple of business plans on
24   there that are very important that I am looking to launch, and
25   all my files I have searched on all these years.

1          Anyway, I have the desktop that I always use and I

2    keep one hard drive, backup hard drive on top of that.

3    Depending on what file I worked on that day, I back that up

4    usually daily.  Then I have another one that I kept in a safe,

5    and then I also kept another one in the bank just in case, you

6    know, something, a fire or something occurred where I was

7    living.  So I always have a lot of backups.

8    Q.  These are external hard drives that you would keep?

9    A.  Yes, sir.

10   Q.  And back up your documents?

11   A.  I would back up just to be safe, yes.

12   Q.  Did you have any kind of financial arrangement with your

13   brother in terms of financing he would provide for you in

14   return for doing these tasks or other things you were doing for

15   him?

16   A.  Going back many, many years when I launched the Bambini's,

17   my brother actually had loaned me several, several thousand

18   dollars for the business, especially when we had the hurricanes

19   and we ran into major financial challenges, and all through

20   that time on throughout the years he's always helped me

21   financially, I couldn't make rent, I couldn't make my car

22   payment, so he was always there to help me, and I always helped

23   him with certain things he needed help with and a lot of the

24   office work and things of that nature.

25   Q.  What was your understanding of what your brother Arash's

IB2JKET2                          Ketabchi - direct

1   business was?

2   A.   The A1?

3   Q.   Well, over the years.  What did you understand he was

4   doing?

5   A.   Well, a long time ago when I was also in the family

6   business, he was also in the business for a while, so he was in

7   that business.  Then after that I think he just got tired of

8   retail and everyay customer service and everything, and I

9   believe around that time, I think he may have started working

10  for the Tax Club, I think he mentioned.

11  Q.   What was your understanding of his work at the Tax Club?

12  A.   I never had the intricate details or anything on that

13  business because I never went into his office or anything like

14  that, but he told me they were basically selling telemarketing

15  business like selling financial services, I think maybe

16  annuities and insurance and those type of things for their

17  customers.

18  Q.   Did there come a time when he left the Tax Club as far as

19  your knowledge is concerned and went to another employer, Olive

20  Branch?

21  A.   Yeah, I believe that was his next job.

22  Q.   What was your understanding of what he did at Olive Branch?

23  A.   From what he told me, it was basically the same line of

24  business, telemarketing, and I think their product line made

25  them a little different.

IB2JKET2                         Ketabchi - direct

1    Q.  They were selling products by telemarketing?

2    A.  Yeah, like services and certain products like training

3    people and customer service and things like that and that type

4    of field.

5    Q.  Did there come a time that he left, to your knowledge,

6    Olive Branch and started his own floor or telemarketing

7    business?

8    A.  Yeah, there was a time I guess a few years or so, yeah, he

9    decided to go out on his own and he launched the same type of

10   similarly industrial sales and telemarketing on his own.

11   Q.  And that was A1?

12   A.  Yes.

13   Q.  Did you have a conversation with him during this period of

14   time where he told you he was starting this A1 business and was

15   trying to bring you on board somehow?

16   A.  Yes, I remember speaking to him.  I believe he may have

17   initially sent a message, but I know we also talked about it on

18   the phone.

19   Q.  What was that conversation about with regard to his talking

20   to you about A1?

21   A.  Yeah, basically to my recollection, and it was so long ago,

22   he basically called me and he saw I was just so burnt out from

23   like driving and trying to work on my business every day and

24   with all the financial challenges and stuff, and I was so

25   exhausted, and so he called me and said listen, instead of

1  driving so many hours with Uber, like you can take some of

2  those hours away and maybe, and I launch a new business, the

3  same type of business I was in, and you can help me do maybe

4  some of my office work.  Some of the money you were making for

5  Uber, I can always help you out and pay of the bills and stuff.

6  Q.  Did you have any kind of financial arrangement with him

7  with regard to what you would be doing for him?

8  A.  No.  There was no like I was being hired for the business.

9  It was like we always had done in the past, he would help me

10 out and I'd help him and it was a family type of thing.

11 Q.  Did you have an understanding that he would send you a

12 certain amount of money periodically?

13 A.  In the beginning since I really didn't know like how much

14 he wanted me to do or needed me to do because he always had

15 staff, it was in his home office back then, it wasn't any set

16 amount or anything like that.

17        As he grew and he had more clients and he needed more

18 time, I said well, if I am going to take so many hours away

19 from driving, I can't work on Vitamin Pros, for me to be able

20 to pay certain bills, it would nice to get a certain amount,

21 and that amount I think was around $500.00 or something.

22 Q.  Did you have any arrangement of how often he would send you

23 this $500.00?

24 A.  I think yeah, I think it was every week, yeah, I remember

25 it was weekly.

IB2JKET2                        Ketabchi - direct

1   Q.  Do you remember what time period this was where he told you

2   he was starting this business at A1?

3   A.  When we had that conversation, it was -- I think it may

4   have been around the fall of 2015 or something, but then I grew

5   to learn it was actually, he launched it or incorporated before

6   then.

7   Q.  Did you help him incorporate or set up this business in any

8   way?

9   A.  No.  He did all those things before he asked me to help him

10  with everyday office stuff or whatever he needed, if needed.

11  Q.  Did there come a time where he discussed with you handling

12  charge-backs?

13  A.  Yeah, I recall he asked me, he said, you know, charge-backs

14  are like a part of my industry that we're in and we get them

15  periodically.  That would be one of the tasks you can help me

16  with.

17  Q.  Was that one of the tasks you did help him with?

18  A.  Yeah, I did help him with a few charge-backs on a very

19  limited occasion, yes.

20  Q.  Do you recall over this period of time that we're talking

21  about approximately how many charge-backs you helped in any

22  way?

23  A.  Actually, after I reviewed the documents, it looks like I

24  helped him with seven of them.

25            THE COURT:  What is a chargeback?

1           THE WITNESS:  A chargeback, to my experience and

2    understanding, is basically it happens in every industry, it

3    can be Amazon.com or it could be your supermarket or retail

4    store, and it is basically if a customer calls the credit card

5    processor and requests that the funds be reversed for whatever

6    reason.

7           It could be because they didn't get what they thought

8    they were supposed to get.  It could be, and this happens on a

9    lot of occasions, they claim it is a fraud or they lose their

10   card.  That is actually an easier way to get the chargeback

11   process.

12          So it is basically, you know, the main reason why a

13   charge-back happens is because the customer wants their money

14   back.

15   Q.  Now, was it your understanding at all during this period of

16   time that you were assisting your brother that he was, or

17   anybody working with him was engaged in any illegal activity?

18          MS. FLETCHER:  Objection.

19          THE COURT:  Sustained.

20   BY MR. PAUL:

21   Q.  Did he ever talk to you -- other than the fact that he told

22   you that he was continuing his telemarketing business -- did he

23   ever tell you that they were involved in promising things to

24   customers that they were not satisfying?

25   A.  Absolutely not, never.  In fact, he told me the exact

1   opposite, that they were servicing them, they were taking care

2   of clients, they were happy, and that is what was communicated

3   to me.

Q.  Did you, during the time you were working and doing these

5   tasks for your brother, did you learn as to what a fulfillment

6   person or company is?

7   A.  Yes.

8   Q.  What are they?

9   A.  Basically the way his business worked was they had their

10  salespeople and they did the selling.  Then the fulfillment

11  company was hired on to service the customers in terms of

12  training or coaching and given the products that they bought or

13  whatever they purchased, so that was what the fulfillment

14  company was responsible for.

15  Q.  Now, prior to your brother asking you to do this for him,

16  had you ever been involved in dealing with charge-backs before?

17  A.  No, I never, I never was involved in responding to

18  charge-backs or anything because especially in his line of

19  business, I was never in the telemarketing business or anything

20  like that.

21  Q.  How, if at all, did you learn or come to learn as to how to

22  deal with charge-backs?

23  A.  Well, there were a couple of people that he was associated

24  with that knew what charge-backs were like in his industry, and

25  what would be an effective way to respond to them.

1           And also more importantly, from my viewpoint, it was

2   always how to prevent your charge-backs because you want your

3   customers to be happy and get everything they're supposed to

4   get.

5   Q.  Who were these couple of people, if you know, he told you

6   were involved in dealing with charge-backs?

7   A.  Yeah, I believe one of them, I think it was a lady called

8   Heidi, and she worked with one of the merchants, I believe,

9   merchants, I believe, and I recall I think Bill also guided me.

10  Q.  Bill?

11  A.  Bill Sinclair.

12  Q.  Had you ever spoken to a Michael Finocchiaro?

13  A.  I recall, I am trying to think back.  I think I may have

14  talked to him.

15  Q.  Would that be regarding the subject of charge-backs?

16  A.  Yeah, I think there may have been an interaction or two,

17  but I don't have a very good memory of Michael Finocchiaro as

18  much as what I remember.  I remember I talked to Bill a couple

19  of times about charge-backs, but I don't remember Mike as much.

20  Q.  What about a woman called Jolaina?

21  A.  Jolaina, I believe she was Bill Sinclair's secretary.

22  Q.  Did you deal with her in any way with regard to responding

23  to charge-backs?

24  A.  I remember requesting information from her for I think

25  sales contracts for the business that Bill and my brother were

IB2JKET2                          Ketabchi - direct

1  in before A1 because I believe they shared a merchant account,

2  and she was the go-to person, I believe.

3  Q.  What did you come to learn with regard to how to deal with

4  charge-backs?  What was your understanding as to what your role

5  would be in responding to charge-backs?

6  A.  In terms of my role, it was basically if a charge-back was

7  sent out, basically what I would do is get the document number

8  of the charge-back, like any information, and see who sold that

9  customer to get the sales contract.  Then after I got the sales

10 contract, I was advised to contact the fulfillment company.

11 Q.  For what purpose?

12 A.  To get their proof of fulfillment, to see what they're

13 doing or what the status is of the customer and what was

14 service and what level of training they're at and coaching and

15 status.

16 Q.  What would you do after you were notified there was a

17 charge-back existing and receive a contract and reach out to

18 the fulfillment, what was your job at that point?

19 A.  I was basically just a filer.  All I did was gather the

20 documents together and just send them to the credit card

21 processor to review under the authorization of my brother.  So

22 whatever my brother -- because I am not -- I am nowhere.

23 Obviously, I am in another state.  I am not a salesperson.  I

24 have no knowledge of what they're selling, what they're doing

25 or what their relation is with the customer.

IB2JKET2                         Ketabchi - direct

1   Q.  Did you ever reach out to salespeople to find out what, if

2   anything, they had discussed with the customer who signed the

3   contract?

4   A.  I don't recall ever contacting them to see any specifics

5   about sales.  I was just a filer.  That was my brother's job

6   because he is the owner.  I was to make sure his customers and

7   clients are being taken care of and everything is done --

8   Q.  Did you come to learn of an individual named Ray Quiles?

9   A.  Yes.

10  Q.  Who was that?

11  A.  Ray Quiles was the owner of one of the fulfillment

12  companies.

13  Q.  Did you have contact with him?

14  A.  I did.

15  Q.  For what purpose?

16  A.  The purpose of my contact with Ray was mainly on different

17  occasions I was checking the status of my brother's clients to

18  make sure they were getting serviced and getting their goods

19  and receiving their coaching and training, and also he was

20  servicing my brother's sales, maybe three or four of the seven

21  or so charge-backs I responded to, Ray had the fulfillment.

22          That was my contact with Ray, the purpose of it.

23  Q.  We have observed and looked at a number of exhibits where

24  there is a form debit advice.  You have seen those documents?

25  A.  Yes, I recall those, yes.

1  Q.  What exactly is that where it says debit advice to

2  charge-backs in a complaint?

3  A.  Basically not to get too detailed about it, but basically

4  when a customer calls their credit card company and they have a

5  dispute of any kind, that goes to the processor, and the

6  processor sends that to the vendor, and that is called a debit

7  advice.

8          That basically has information of, if I recall, I

9  think part of the credit card number is on there and it has why

10  it was charged back and that's like the basic information and

11  then you have to go and find the sales contract that it

12  belonged to.

13  Q.  Would you receive this notice of a debit advice?

14  A.  I didn't always receive them directly, no.

15  Q.  If you did receive them, how would you receive them?

16  A.  They would usually come by email.

17  Q.  From who?

18  A.  Usually I remember I think I got some from Heidi, and

19  because she worked with one of the processors, and I think I

20  may have gotten a couple or so from the company directly.  I

21  don't remember exactly, though.

22  Q.  When you would receive a contact, let's say Heidi who would

23  tell you there has been a complaint filed by a customer, what

24  specifically, if you can recall, was she reaching out to you to

25  do at that point?

1          THE COURT:  Pardon me?

2          MS. FLETCHER:  Objection to form.

3          THE COURT:  Sustained.

4    BY MR. PAUL:

5    Q.  Do you recall what, if anything, after you received a

6    communication from Heidi, you would do with regard to that

7    communication in response to that communication?

8    A.  In terms of a charge-back, if there was one?

9    Q.  Yes.

10   A.  It was basically find the customer, get the sales contract

11   and send that document to the fulfillment company to gather the

12   data and information and then send it directly to the credit

13   card processor for review to see why, if the charge-back should

14   have happened in the first place as if did they receive what

15   they were supposed to get in terms of their agreement between

16   the company and the salesperson and the customer.

17   Q.  Were those fulfillment documents and contract sent back to

18   Heidi in that example?

19   A.  I think she may have gotten one of them.  I don't really

20   remember.  I remember sending them more directly to the credit

21   card processor because they had a department that dealt with

22   charge-backs because it is very prevalent especially in the

23   telemarketing industry, there is a higher level of

24   charge-backs.

25   Q.  Could we have Exhibit 113 displayed, please.

1          Would you look at this document, and this is from

2    Capital One, is it not?

3    A.  Yes, sir.

4    Q.  Have you seen this before?

5    A.  I think I recall this now in the review of the discovery,

6    yes.

7    Q.  This is a letter addressed to Charlene Foster, is it not?

8    A.  Yes, sir.

9    Q.  Regarding a dispute with A1 business.  Is that right?

10   A.  Yes.

11   Q.  Is this the kind of notification that you would receive

12   with regard to a dispute?

13   A.  Actually, no, this isn't the initial document that is sent

14   with the dispute.  This is actually, it looks like it has been

15   reviewed and the credit card company has made some type of

16   determination.

17   Q.  According to this letter, they reached out to Ms. Foster

18   and credited her account for $5,000.00.  Is that right?

19   A.  Let's see.  But then it says since then the merchant

20   supplied information to support the transaction, so for now

21   they actually reapplied the charge-back to her card.

22          So fulfillment, they reviewed the agreement and the

23   service and the fulfillment and Capital One decided to reverse

24   the charge, and that's what that letter is telling me, I

25   believe, after their review.

1    Q.   The charge-backs that you handled, you said that you would

2    not reach out to the salesperson, that wasn't part of --

3    A.   No, no.  I was just a simple file processor, just gather

4    the documents and just send it out.

5    Q.   Did you ever communicate with any of the customers?

6    A.   Regarding their charge-back?

7    Q.   Yes.

8    A.   No.

9    Q.   Regarding anything?

10   A.   No, I never talked to any customer.  That is just nothing,

11   nothing I did was with customers.  I just did simple tasks that

12   my brother requested like for his A1.  I mean not only did I

13   not have the time, it wasn't my position.

14   Q.   Do you have an independent recollection of Charlene

15   Foster's charge-back?

16   A.   I have a better recollection because I actually recently

17   reviewed it for this case, so I do remember her charge-back

18   like the amount, I believe.

19   Q.   What, if anything, did you do with regard to Ms. Foster's

20   case?

21   A.   Just the same process.  If I recall, I think my brother,

22   his office said if there is a new charge-back or we got it, and

23   I sent the documents to the sales contract and the fulfillment

24   company to get the information on what they have done and I

25   forwarded it to the bank.

IB2JKET2                          Ketabchi - direct

1    Q.   What would you describe is the ultimate goal in responding

2    to a charge-back when it comes to the merchant, the person who

3    sold --

4    A.   Based on my understanding, obviously a charge-back is a

5    dispute between whoever bought the product and the business, so

6    something needs to be rectified there, whether the salesperson

7    selling something over-promised, maybe the fulfillment company

8    underdelivered, maybe the salesman, do they exaggerating

9    certain things so the customer who may have not known, you

10   know, all of the details of what they're supposed to get.

11          Ideally, you want to avoid charge-backs, so --

12   Q.   Why is that?

13   A.   Because it is not good for business because, number one,

14   you have an unsatisfied customer, and it doesn't look good on

15   the merchant account because you can only have so many

16   charge-backs per account.

17          THE COURT:  Or what?

18          THE WITNESS:  Or what can happen is if you go over a

19   certain percentage, depending on the different merchant

20   account, they could actually refuse to do business with you.

21   BY MR. PAUL:

22   Q.   Were you ever asked or did participate in opening up a

23   merchant account?

24   A.   The only thing I did in terms of merchant accounts, I just

25   helped my brother fill out the application.  I think --

IB2JKET2                         Ketabchi - direct

1   Q.  For who?

2   A.  For my brother.

3   Q.  Did you ever open a merchant account?

4   A.  Of course not, no.

5   Q.  Did you ever open a bank account that would allow a

6   merchant account to be opened?

7   A.  No, absolutely not.  I was not involved in any of that.

8   This is solely my brother's business.  I was just helping him

9   with some taxes.

10  Q.  We heard a lot of testimony about drugs and so forth.  Did

11  you ever use drugs?

12  A.  No.

13  Q.  Do you drink?

14  A.  I don't drink.  I don't smoke.

15  Q.  I think we saw a photograph introduced in evidence of you

16  and your brother at some restaurant where there is a white

17  liquid in a glass.  Do you recall that photo?

18  A.  Yes, I do.

19  Q.  What was that?

20  A.  That was a glass of milk.

21  Q.  Is that what you drink?

22  A.  When I have dessert  It is like standard, cookies or cake

23  or something else, I have milk.

24  Q.  On that occasion or any occasion, you didn't participate in

25  drinking alcohol?

IB2JKET2                        Ketabchi - direct

1          THE COURT:  Move on.

2     A.  No, I don't drink, no.  I don't drink.

3     Q.  Now, could we bring up Exhibit 206 B, please.

4          Do you see the exhibit, sir?

5     A.  Yeah, I see it better.

6     Q.  Can we go to the next page.  Do you see it is signed by Joe

7     Freeland?

8     A.  Yes, I see that, sir.

9     Q.  Do you have an independent recollection with regard to

10    charge-back that he filed?

11    A.  Yes, I recall that was one of the seven that I responded

12    to.

13    Q.  Can we go back to the first page and blow that up please.

14    Do you see in this letter -- well, what is your understanding

15    of what this letter is?

16    A.  I actually never looked at this letter like in terms of

17    analyzing any of the information on it.  I glanced at it when I

18    got the charge-back debit advice because out of the few I did,

19    I recall this was the only one that had any kind of info on it.

20          Since I am not in the business and it is just not my

21    position to read what happened between sales, the salesman and

22    the customer and my brother's business, I just didn't have time

23    to read this, so I just took the debit advice, got the sales

24    contract and did the same process.

25    Q.  The same process you would normally follow?

IB2JKET2                          Ketabchi - direct

1   A.  The other charge-backs I had done didn't have any

2   descriptions.

3   Q.  You can take that down.

4          Now, you've seen, as I said, a number of these debit

5   advice forms, correct?

6   A.  Yes.

7   Q.  In response to that form, there would be -- let's bring up

8   239, please.  Now, what is this document, sir?

9   A.  This one, this actually looks similar to a charge-back

10  debit advice, but this one looks like it has the same type of

11  information you would see on a debit advice, but this one looks

12  like it was reversal acceptance.  We are reversing this

13  charge-back.

14  Q.  Did you have anything to do with this particular

15  charge-back, as best you can recall?

16  A.  I would not be able to answer that question because I can't

17  locate any names, just the numbers.

18  Q.  Can we go to the next page.

19  A.  So I can't verify it.  That is actually good for me to

20  point out that when a charge-back debit advice does come in,

21  one of those numbers, like you'd have to find which sales

22  contract, like the office, my brother's office would have to

23  locate that based on the information that's there.

24  Q.  Would you go to the next page.

25          Now, do you recognize this document?

1   A.  Yes, this is an actual charge-back debit advice, yes.

2   Q.  What we have been talking about is a debit advice letter

3   that was sent to you?

4   A.  Yes.

5   Q.  Correct?

6   A.  Yes, sir.

7   Q.  You have at the bottom, if you blow that up, the bottom

8   part of this exhibit, thank you, this has contact person.

9   That's you, right?

10  A.  That is me, sir.

11  Q.  Did you fill that in?

12  A.  I did.

13  Q.  What's the 800 number, as best you can recall?

14  A.  That is my brother's main office number.

15  Q.  Now can we go to the next page, and the next page.  Keep

16  going.

17          Now, this is a letter to whom it may concern.  Do you

18  now recognize which charge-back this was for?

19  A.  Yes, this is for John Ford.

20  Q.  Is he one of the individuals whose charge-back you handled?

21  A.  Yes, I recall that, yes.

22  Q.  This is a letter sent from A1's letterhead where it is in

23  response to the customer claiming they did not receive goods or

24  services.  Is that right?

25  A.  Yes.

IB2JKET2                         Ketabchi - direct

1    Q.  It goes on to say that you or someone has attached

2    documents and services that we have completed for our client,

3    and it lists tax prep, Credit, trust and wills.  Is that right?

4    A.  Yes.

5    Q.  Below that there are a string of numbers.  What are those

6    numbers, sir?

7    A.  That's a tracking number for the USPS.

8    Q.  Would you enter that number?

9    A.  Yes, that number was received from the fulfillment company

10   for the delivery confirmation.

11   Q.  The fulfillment company would respond to your request for

12   documents showing these people or this person in particular

13   received this?

14   A.  Yes.

15   Q.  And give you the UPS number or tracking number showing it

16   was sent out?

17   A.  If it was a physical product, yes, and that would be part

18   of the verification process.

19   Q.  Go to the next page, please.

20          Now, this is signed over printout of Arash Ketabchi,

21   CEO of A1 Business Consultants.  Is that right?

22   A.  Yes, sir.

23   Q.  It has what looks like a signature.  Whose signature is

24   that, sir?

25   A.  That is signed by myself with the authorization of my

1   brother since he was in another state.

2   Q.  This was a form letter, for the most part?

3   A.  Yeah, just the standard protocol like everything is the

4   same in any charge-back I was corresponding.

5   Q.  It is responding on A1 stationery, with your brother listed

6   as the CEO, and you as the contact person, and you would write

7   this signature in with your brother's authorization.

8          Is that right?

9   A.  Yes, sir.

10  Q.  You can take that down.  Did you do that on the

11  charge-backs that you handled for the most part?

12  A.  Yes, sir.

13  Q.  Can we bring up Exhibit 240, please.

14         Now, Exhibit 240 is what, sir?

15  A.  Let's see.  To my recollection, it looks like I was sent

16  this by my brother or someone in his office.

17  Q.  There is a post-it on it that says, "update this"?

18  A.  Yes.

19  Q.  Is that your handwriting?

20  A.  That is my handwriting, yes.

21  Q.  What does that mean, update this?

22  A.  I believe they requested me to modify the words so it was

23  more company-specific.  As you can see in the highlight in

24  yellow, it says by company name.  They basically wanted me to

25  make sure it was for A1 business so they could start using that

1    file.

2              MS. FLETCHER:  Your Honor, I believe we are talking

3    about a document that is not in evidence.

4              MR. PAUL:  I will move it into evidence.

5              THE WITNESS:  It was Exhibit 240.

6              MR. PAUL:  That is what it says.

7              THE COURT:  Take it down from the jury.

8              MR. PAUL:  I thought it was introduced.  At this time,

9    I would offer it.

10             MS. FLETCHER:  No objection.

11             THE COURT:  Admitted without objection.

12             (Government's Exhibit 240 received in evidence)

13             THE COURT:  240 as a government exhibit.

14             MR. PAUL:  Either way, as long as it is in evidence.

15   BY MR. PAUL:

16   Q.  Why were you asked, if you know, to revise and update this

17   script?

18   A.  Well, obviously my brother knows I have a background in

19   business and I've worked on documentation in the past, so he

20   thought that it would be easy for them for me to just revise

21   this because I use Microsoft Word and all the office documents.

22   Q.  Can we bring up Exhibit 243, please.

23             MR. PAUL:  Is that in evidence?

24             MS. FLETCHER:  Yes.

25             MR. PAUL:  Thank you.

IB2JKET2                        Ketabchi - direct

BY MR. PAUL:

Q.   Would you describe -- by the way, do you remember this document, receiving or looking at this document?

A.   I recall this document, yes.

Q.   What exactly is it, sir?

A.   This I believe it was my brother sending me his sales with certain customers and the commissions for his salesman were supposed to get and I believe he asked me to check the numbers, the calculations to make sure they're right.

Q.   Was that your handwriting on there?

A.   No, this is not -- no, actually, the numbers like all the details are not my handwriting, but I just noticed the 20-22-15, I believe, is my handwriting, yes.

Q.   Is there another page to this exhibit.  What do those numbers, as best you can recall, represent?

A.   I think those totals are what the salespeople are supposed to get in commission.  I am not sure of the timeline because it says total.

Q.   Why were you sent this breakdown in math?

           MS. FLETCHER:  Objection.

           MR. PAUL:  Withdrawn.

BY MR. PAUL:

Q.   You testified that you were asked to check the math.  Is that right?

A.   Yeah, from what I recall, yes.

IB2JKET2                          Ketabchi - direct

1   Q.  Did you respond in any way to your brother when you

2   received this?

3   A.  I think I must have, yeah.

4   Q.  Do you know what that response was?

5   A.  I think when I checked the numbers, I verified the

6   calculations were correct.

7          MR. PAUL:  Is this a good time?

8          THE COURT:  If you can continue, let's continue.

9          MR. PAUL:  Okay.

10  BY MR. PAUL:

11  Q.  Can we bring up Exhibit 246, assuming it is in evidence.

12         THE COURT:  You'll let me know when the sidebar issue

13  arises, but for now proceed.

14  BY MR. PAUL:

15  Q.  Do you see this, sir?

16  A.  Yes.

17  Q.  Do you know what this document is claiming?

18  A.  Yeah, I understand this document, yes.

19  Q.  This is from you to IRG2315 and Gmail dot com.  Is that

20  right?

21  A.  Yes.

22  Q.  It starts off by highlights, right?

23  A.  Yes.

24  Q.  And you say below, "I hope you do well?"

25         MS. FLETCHER:  Objection to form.

1    THE COURT:  Sustained.

2  BY MR. PAUL:

3  Q.  What is your understanding of what this document is?

4  A.  This was my brother asked me to set up their salesperson

5  names and print them out and email to Lance because he was

6  their tech guy and he was going to set up their extensions like

7  so they have their own personalized emails on their email

8  server and their website host.

9  Q.  It lists a number, some five names in a box.  Do you see

10  that?

11  A.  Yes, sir.

12  Q.  Zack Peterson, who is that, as best you know?

13  A.  Well, from what I've learned here, that is my brother.

14  Q.  You said these are salespeople's names?

15  A.  Now that I look at them carefully, I believe the first

16  three were definitely sales, but I don't recall him ever

17  telling me they had a lady in sales, so I believed the last two

18  I think were secretarial help.

19  Q.  What is your understanding when you say "salespeople's

20  names," names of salespeople used?

21  A.  To my understanding, and especially in the telemarketing

22  industry, many times they don't use their real names because,

23  number one, for privacy reasons; another reason is if something

24  is simpler, it is just easier to pronounce and people can

25  relate to it later.  I have actually had that problem when I

1    was a lot younger because my name, Shahram, is not easy to

2    pronounce.  In the beginning of college, I said everybody to

3    call me Steve.

4    Q.  Was it your understanding it was not an unusual practice

5    for salespeople to use a different name?

6    A.  No.  It is actually common.  I've even been on tech support

7    or like a call to Amazon and it is not their customer rep's

8    real name, they Americanized it.

9    Q.  Some of these are not Americanized.  These are just

10   different names, correct?

11            MS. FLETCHER:  Objection.

12            THE COURT:  Yes.

13   Q.  And Lance, what was his role, did you say, as best you can

14   recall?

15   A.  Yeah, Lance.

16   Q.  What was his role, if any?

17   A.  He helped with some of the IT stuff.  I spoke to him maybe

18   once or something.

19   Q.  Can we bring up Exhibit 408.

20            MS. KEARNEY:  It is not in evidence.

21            MR. PAUL:  I introduce it into evidence.  I will lay

22   the foundation.  Can the witness be shown 408, please.

23   BY MR. PAUL:

24   Q.  Do you see that, sir?

25   A.  Yes.

1    Q.  What is this document, as best you can tell?

2              THE COURT:  Speak louder, sir.

3    Q.  What is this document, as best you can tell?

4    A.  It looks like my brother sent me this and I think he is

5    telling me here, tell Heidi --

6              MS. FLETCHER:  Objection.

7    Q.  Don't read it.  Just look at it.

8    A.  I am looking at it.  (Pause)

9              THE COURT:  Do you have a question.

10   BY MR. PAUL:

11   Q.  Do you recognize this document, sir?

12   A.  I've seen this document.

13   Q.  Was this received by you by email?

14   A.  Yes, to my personal email, yes.

15             MR. PAUL:  I move it into evidence.

16             MS. FLETCHER:  No objection.

17             THE COURT:  Admitted without objection.  What is it,

18   408?

19             MR. PAUL:  408.

20             THE COURT:  Government Exhibit 408 admitted on the

21   defense case.

22             (Government's Exhibit 408 received in evidence)

23             MR. PAUL:  The jury can be shown this.

24   BY MR. PAUL:

25   Q.  Do you see, sir, this is a subject Heidi, and it is from

IB2JKET2                        Ketabchi - direct

1    Arash to you, and it says tell Heidi only to CC me and you and

2    then Bill is no longer involved in our business, not to contact

3    him, everything is in my name and also tell her the way her

4    boss made it sound, we were all good and we can charge up to

5    300 K just --

6                THE COURT:  The jury can see it.  What is your

7    question?

8    BY MR. PAUL:

9    Q.  Sir, what is your understanding of what Arash is

10   communicating here?

11   A.  He's basically saying Bill, which that is the Bill Sinclair

12   I used to work with, and he is saying Heidi, who is servicing

13   the account, the merchant account, not to copy Bill Sinclair

14   any more because Arash is working on his own and he doesn't

15   want Bill to see his information.

16   Q.  What was your understanding, if any, of the relationship

17   between Bill and your brother Arash at this time?

18               THE COURT:  You mean in the fall of 2015?

19               MR. PAUL:  Yes, dated October 13, 2015.

20               THE WITNESS:  Yeah, I was informed they were not on

21   good terms and they were not working with each other, something

22   bad happened in the relationship or they were just not

23   communicating.

24   BY MR. PAUL:

25   Q.  Was this rather usual that your brother had gone and set up

1     A1?

2     A.  This was afterwards, I believe, yes.

3     Q.  Did you have an understanding as to a time-frame with

4     regard to whether Bill would be responsible for charge-backs or

5     your brother would be responsible for charge-backs?

6     A.  Yes.  As I was helping my brother with certain things, I

7     came on an email.  I think that Bill may have sent me something

8     which said the responsibility of who pays for our charge-back

9     room, according to an agreement they had, I believe.

10    Q.  Do you recall whether that was a June 2015 date?

11    A.  Yeah, I think it was June, now that you mention it.

12    Q.  What, if any, role did you have with regard to

13    communications between, that continued between Bill Sinclair

14    and your brother?

15    A.  Well, there came a time for a certain amount of time where

16    I was basically an intermediary, where they couldn't contact

17    each other or wouldn't, and they were sending some emails to

18    me, and I recall even speaking to Bill once on the phone for a

19    few minutes about what do you want to say to my brother and

20    things of that nature.

21    Q.  When there were communications, some communications between

22    from Bill to your brother, were they sometimes directed to you?

23    A.  Yeah, I think I remember seeing some of them where he

24    would -- because he knew I was getting the email, he would say

25    Steve, and then I would just forward it right to my brother.

IB2JKET2                          Ketabchi - direct

1    They were basically just talking amongst themselves.  I wasn't
2    even really paying attention because I was just like a
3    messenger-boy.
4    Q.  You were a go-between between Bill and --
5    A.  Yeah, because I could tell you, I just had so many things
6    to do like, you know, during that time, it is just crazy.
7    Q.  Can we bring up 409.
8             MR. PAUL:  Is this in evidence?
9             MS. KEARNEY:  Yes.
10            MR. PAUL:  May the jury have it.
11   BY MR. PAUL:
12   Q.  Do you see, sir, this is the exhibit subject contacts and
13   it is from you to Heidi Brown, and your brother Arash is CC'd.
14   Do you see that?
15   A.  Yes, I see that.
16   Q.  It says words to the effect you're saying well, tell me
17   what is being communicated.  This is from you to Heidi?
18            MS. FLETCHER:  Objection to form.
19            THE COURT:  Ask him questions.
20   BY MR. PAUL:
21   Q.  What is your understanding as to what you were telling
22   Heidi here?
23   A.  I think this kind of was an email where my brother had told
24   me, communicate with Heidi that Bill is not part of my business
25   or we don't work with each other on any level, so make sure she

1    doesn't communicate any of A1 stuff with Bill.

2    Q.  It says, the last part of the sentence says as the only

3    people involved in the company and Arash.  Was that true?

4    A.  No, that is not an accurate comment because they had

5    secretarial staff and the salespeople, and what I really meant

6    by that was since he was sending me emails sometimes, me being

7    involved was just basically for the limited amount of tasks

8    that I may have had to do because my brother is obviously the

9    sole owner of this business and he makes all of the decisions.

10   Q.  Can we bring up Exhibit 414, please, in evidence, I

11   believe.  Do you see this document, sir?

12   A.  Yes.

13   Q.  What is this document?  This is from you to Heidi again,

14   correct?

15   A.  Yeah.

16   Q.  What exactly are you trying to convey in this letter or

17   this communication to Heidi?

18   A.  This actually I think goes back to what you touched upon

19   about the June timeline, and I think it has to do with the

20   agreement Bill had with my brother, and I am simply letting him

21   know that my brother wants anything in terms of charge-back

22   retrievals before 6-20-2015 to send a Bill, but let him know

23   before so he can respond.

24          I believe in the following sentence, she was looking

25   on a merchant account volume increase for my brother so they

1    could have a higher credit line.

2    Q.  When you say also how much of the monthly volume increase

3    have we been preempted this month, that was for what purpose?

4    A.  Every merchant account like credit card processor grants a

5    business a certain credit line they can charge, and they had a

6    certain limit, and I believe Heidi was looking to get that

7    increased with the company.

8    Q.  Can we bring up Exhibit 163, please.

9              Now, we saw this earlier today.  Do you see this

10   document, sir?

11   A.  Yes, sir.

12   Q.  Zack Peterson is who?

13   A.  That is my brother, his salesman.

14   Q.  It says, "subject:  Jane R Thompson," correct?

15   A.  Yes.

16   Q.  It goes on to say Jane R. Thompson upsell between Zack

17   Peterson and Jane R. Thompson is signed and filed.  Do you see

18   that?

19   A.  Yes, I do.

20   Q.  And it says from Zack Peterson, positive faith at Gmail dot

21   com.  Do you see that?

22   A.  Yes.

23   Q.  Whose email address is that?

24   A.  That is my personal email.

25   Q.  Did you send this document?

1   A.  No, sir.

2   Q.  Would you go to the next page, the next page.  Keep going.

3          Now, this was part of the same exhibit, and it says,

4   if we can blow that up, Jane R. Thompson, upsell history.

5   Thank you.  Document uploaded by Zack Peterson, and it gives

6   your email address, correct?

7   A.  That is correct.

8   Q.  And then we have heard testimony about that IP address.  Is

9   that right?

10  A.  Yes.

11         MS. FLETCHER:  Objection form of the questions, your

12  Honor.

13         THE COURT:  I think we are way beyond that, but

14  sustained.

15  BY MR. PAUL:

16  Q.  Did you at any time send this document to Ms. Thompson?

17  A.  I never sent this document to Ms. Thompson.

18  Q.  Did you have anything to do with setting up an electronic

19  signature through Adobe?

20  A.  Yes, I set up the account for my brother's business.

21  Q.  When you set up the account for your brothers business of

22  this electronic signature, what information was provided?

23  A.  Email and the name of the account, like who it belongs to

24  and the name of the business.

25  Q.  And the email address that you gave in the application for

IB2JKET2                        Ketabchi – direct

1    your brother for electronic signature, that was your email

2    address, correct?

3    A.   That was my personal email, yes.

4    Q.   On behalf of your brother?

5              MS. FLETCHER:  Objection.

6    A.   Yes.

7              THE COURT:  Sustained.  It is your witness.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IB28KET3                           Ketabchi - Direct

1   Q.  How, if at all, can you explain, sir, that it says

2   "document uploaded by Zach Peterson" with your e-mail address?

3   A.  Well, that's just simply -- I actually used Adobe myself in

4   the past, for graphic software and things like illustrator and

5   stuff, and my brother said, Hey, we need to get electronic

6   signature software.

7   Q.  Is this one of the tasks that you were asked to do for him?

8   A.  Yeah.

9              MS. FLETCHER:  Objection.

10             THE COURT:  I will allow it.

11  Q.  Go ahead.

12  A.  At that time I don't think I had any e-mails from his

13  business, like any ones they used, and it was just simpler for

14  me to use my personal e-mail to set up that account.  But I

15  also used his contact info, Arash Ketabchi and A1 Business and

16  everything.  So my e-mail was just for initial set-up purposes.

17  Q.  In December 29, 2015, where were you, as best you can

18  recall?

19  A.  I recall being in California.  And actually, I went on an

20  Uber ride January 2nd.

21  Q.  How do you recall that?

22  A.  Because I looked at my driving history.

23             MR. PAUL:  Your Honor, I think this might be a good

24  time.

25             THE COURT:  Ladies and gentlemen, 15 minutes.

IB28KET3                          Ketabchi - Direct

```
 1              Thank you.
 2              (Jury exits courtroom)
 3              THE COURT:  Counsel, you can refresh yourselves as
 4    well for a few minutes and then come back.
 5              You may step down, sir.
 6              (Recess)
 7              THE COURT:  Where do the parties stand?
 8              MS. KEARNEY:  We have been able to resolve several of
 9    the objections, but the government still has some.
10              THE COURT:  What are they?
11              MS. KEARNEY:  They fall into two buckets, your Honor.
12    The largest one is a 401 objection as to the relevance of these
13    documents.
14              THE COURT:  When you say certain ones have -- you have
15    handled some.  So are there certain of these that everyone has
16    agreed are in and certain of these that everyone has agreed are
17    out?
18              MS. KEARNEY:  There are certain of these that I
19    understand Mr. Paul is no longer.
20              MR. PAUL:  Correct.
21              MR. MITCHELL:  Let me interrupt really quickly because
22    it's matter of another attorney's time.  The attorney for Mr.
23    Finocchiaro is here and he has been here since 9:15 a.m.  It's
24    looking like Mr. Finocchiaro may not go on today, according to
25    conversations we have had with the government.  So we would
```

1     like to sort that out so he does not have to sit here for no

2     reason; he can go do other things, your Honor.

3             MR. PAUL:  Your Honor, I had subpoenaed him, after

4     talking to his attorney, for 9:15 this morning.  In fact, in

5     fairness, I actually subpoenaed him to be here yesterday

6     because I didn't know the scheduling and I didn't want your

7     Honor to turn to me and say where is your first witness.  So I

8     had reached out to Mr. Cibella, the attorney.  I originally

9     told him Friday, which is what it is as it turns out.  And I

10    thought he was going to be in a different order of witnesses.

11    We didn't decide until this morning that we were going to call

12    my client before Mr. Finocchiaro, for a number of reasons, but

13    that's not important to put on the record.

14            In any case, it seems that we are not going to get to

15    Mr. Finocchiaro today.

16            THE COURT:  No, it doesn't.  You have Mr. Steven

17    Ketabchi for two to three hours.  You're more than two hours

18    into it.

19            Government, what do you think the cross will be?

20            MS. FLETCHER:  Your Honor, I think it depends on what

21    happens in the remainder of Mr. Ketabchi's testimony, but I

22    expect at least two to three hours of cross.  I didn't expect

23    what has transpired.  So the cross is lengthy.

24            MR. PAUL:  That's why I raise it now, Judge.

25            THE COURT:  So you have what, less than an hour to go?

1    What is your estimate?

2              MR. PAUL:  Probably about an hour.

3              MS. FLETCHER:  That would mean the government wouldn't

4    be starting until probably after the lunch break.

5              THE COURT:  That would be 2:00.  And you think you

6    have two hours?

7              MS. FLETCHER:  I would say I have at least two hours,

8    your Honor.

9              THE COURT:  This jury is going to be here at least

10   through Wednesday then.

11             MR. PAUL:  Mr. Finocchiaro's testimony is going to be

12   certainly not as long as Mr. Ketabchi's testimony.  It's going

13   to be within an hour I think I estimate.

14             THE COURT:  So where does that go?

15             MR. PAUL:  It goes into Monday.  If the government's

16   estimate is accurate, it goes into Monday.

17             THE COURT:  We are going to let Mr. Finocchiaro go.

18             You are his attorney, sir?

19             MR. CIBELLA:  Yes, your Honor.

20             THE COURT:  I take it he'd rather not sit here, is

21   that right?

22             MR. CIBELLA:  That's what we were hoping to avoid.

23             MR. PAUL:  I have apologized to Mr. Cibella.  I think

24   he as a defense attorney can understand things change on the

25   fly.

1    THE COURT:  I am more concerned about the jury.

2        Mr. Cibella, I am going to excuse your client.  Have

3  him here at 9:30 on Monday.  Understood?  9:30 Monday.

4        MR. CIBELLA:  Absolutely, your Honor.

5        THE COURT:  Government, I urge you to be as efficient

6  as you can in your cross of Mr. Ketabchi.  Don't elongate it in

7  order to have a full day.  Quite the opposite.  Try to be as

8  short as you can be.

9        MS. FLETCHER:  That is not at all the government's

10 intention, your Honor.

11        THE COURT:  Now, let's do these documents.  I express

12 again my frustration that it wasn't handled when this jury

13 wasn't here.

14        Go ahead.

15        MS. KEARNEY:  My understanding is that Mr. Paul is no

16 longer offering SK-5, 9, 10, 13 through 18, and 22.

17        The remainder --

18        THE COURT:  Wait.  Just a minute.

19        Is that correct?

20        MR. PAUL:  It is.

21        THE COURT:  Go ahead.

22        MS. KEARNEY:  The remainder, there are 401 objections

23 to the vast majority of them, and then a more limited amount of

24 801 objections.

25        I think with respect to SK-2 and SK-3, the government

1  simply requests that a limiting instruction be given that these

2  documents are being offered only for Mr. Ketabchi's state of

3  mind.

4            THE COURT:  Just a moment.

5            SK-2 and SK-3, the government has no objection but

6  want a limiting instruction.

7            MS. KEARNEY:  That's correct.

8            THE COURT:  Just a second.

9            What else?

10            MS. KEARNEY:  With respect to SK-4 and SK-19, the

11  government objects to --

12            THE COURT:  Just a moment.

13            MS. KEARNEY:  I'm sorry.  Just SK-4, your Honor.

14            THE COURT:  Yes, ma'am.

15            MS. KEARNEY:  The government objects to this on 801

16  grounds.  The way this has been explained to me by Mr. Mitchell

17  is that this is intended to demonstrate that Mr. Ketabchi in

18  fact ordered his own Youngevity products, and therefore this is

19  being offered for the truth of the placement --

20            THE COURT:  Mr. Steven Ketabchi ordered his own

21  Youngevity products?

22            MR. PAUL:  Correct.

23            MS. KEARNEY:  Therefore, this is being offered for the

24  truth of that order, that that order was placed.

25            MR. PAUL:  It's not being offered for the truth, your

1    Honor.  It's being offered for his state of mind that he didn't

2    think there was anything illegal going on with regard to

3    Youngevity.  In fact, he is ordering the products.

4            THE COURT:  If he is ordering the products, how does

5    that speak to whether or not he thinks it was legal or not?

6    Why can't he be ordering the products and think it's illegal?

7            MR. PAUL:  It goes to the fact that he thought this

8    operation of Youngevity was an ongoing operation that they were

9    selling out of A1, of which he was going to be one of many

10   customers, I assume, and he was going to order it for his own

11   business, Vitamin Pros, that he has testified about.

12           It also, I think, relates to payments that his brother

13   paid on his behalf.  Because I believe, though he was ordering

14   this, when there was money received from Arash Ketabchi to

15   Steven Ketabchi, some of that money was as a payment for him to

16   order these products.

17           THE COURT:  I am excluding it, SK-4.  It's an

18   out-of-court statement and it is for the truth.  It's not for

19   the state of mind.  SK-4 excluded.

20           Next.

21           MS. KEARNEY:  SK, I believe it's 6.  It's a chargeback

22   document.

23           MR. PAUL:  Your Honor, if I may, this simply goes --

24           THE COURT:  I need to find it.

25           MS. KEARNEY:  It was the one you were just looking at.

1    THE COURT:  All right.  What is the government's

2    objection?

3    MS. KEARNEY:  The objection here is two-fold, your

4    Honor.  First, it's a hearsay objection.

5    THE COURT:  Clearly it's hearsay.

6    Go ahead.

7    MS. KEARNEY:  For the truth of the information

8    contained in this packet about the proper way to fight a

9    chargeback.

10   Second, it's a 403 objection, your Honor.  I think

11   putting in a brochure on how to fight a chargeback invites the

12   jury to try and figure out whether chargebacks were fought

13   properly or not, which is not point of this trial.  The point

14   is whether they facilitated a fraud, not whether the paperwork

15   was properly filed.

16   THE COURT:  Mr. Paul.

17   MR. PAUL:  This goes to my client's testimony with

18   regard to he was trying to do things the right way, which is

19   respond to chargebacks.  This is an example of what he did in

20   terms of formulating in his mind how to respond to chargebacks.

21   And it goes to basically his state of mind, that this is an

22   example of him not thinking he -- he was trying to follow the

23   rules and doing what at least he was either told or what he

24   researched.

25   MS. KEARNEY:  Again, your Honor, the point is not

IB28KET3                          Ketabchi – Direct

1    whether Mr. Ketabchi checked all the boxes in filing these

2    chargebacks.  The point is what he knew he was facilitating

3    when he filed them.

4              THE COURT:  This is not relevant.  It is clearly a

5    hearsay document.  I also think there is a likelihood of

6    confusion under 403.  This is excluded.  It's simply a manual

7    found on his computer, I assume, or in his home.

8              Next.

9              MS. KEARNEY:  The remaining objections are simply

10   relevance objections.  These are 7, 8, 11, 12.

11             THE COURT:  Just a moment.

12             MR. PAUL:  Just quickly, with regard to the last

13   exhibit, I would introduce just the first sheet as to the fact

14   that he was trying to gather a guide to chargebacks and leave

15   out the rest so it's not, as the government claims, confusing

16   to the jury.

17             THE COURT:  Government.

18             MS. KEARNEY:  Your Honor, I think the argument here is

19   the same.  Having this guide and whether or not he complied

20   with how to file a chargeback is not the issue here.  The issue

21   is whether the chargebacks with which he was helping were

22   facilitating a fraudulent scheme and whether he knew that.

23             THE COURT:  It's hearsay.  I am going to exclude it.

24             Now, 7, what is the next one?

25             MS. KEARNEY:  7, 8, 11, 12 --

1                  THE COURT:  Just a moment.

2                  I have 7.  I have 8.

3                  Next.  11, 12.

4                  MS. KEARNEY:  Yes.

5                  MR. PAUL:  We will withdraw 11, Judge.

6                  THE COURT:  11 withdrawn.  Just when I had found it.

7                  All right.  12.  What else?

8                  MS. KEARNEY:  19 through 21.

9                  THE COURT:  I have them.  Let's go through them.

10                 Is this a single objection to all of them?

11                 MS. KEARNEY:  These are all relevance applications,

12       your Honor.

13                 THE COURT:  Well, this is Mr. Paul's theory to show

14       that he was doing lots of things for his brother.  Is that

15       right?

16                 MR. PAUL:  It is, your Honor.

17                 THE COURT:  So it's state of mind.

18                 MS. KEARNEY:  Several of these documents, your Honor,

19       are outside of the time period that's at issue in this case.

20       For example, 12 is from 2012.

21                 THE COURT:  I am going to do each one.

22                 SK-7 I am going to allow in.  It involves work for

23       Arash.  It is hearsay so they will get a limiting instruction

24       on it.

25                 MS. KEARNEY:  Fine.

IB28KET3                        Ketabchi - Direct

1           THE COURT:  8.

2           MR. PAUL:  The same thing, your Honor.

3           THE COURT:  What does it show?  What is he doing?  It

4     looks like bank information.

5           MR. PAUL:  Correct.  He is handling his brother's bank

6     information.  As he said, he was a storage, or a cabinet file

7     as your Honor pointed out.

8           THE COURT:  No.  I was quoting you.

9           MR. PAUL:  In any case, it's a sample of that, as well

10    as the others being tasks that he was ongoing for many years.

11          THE COURT:  Government.  It's October 2015.  What is

12    your position?

13          MS. KEARNEY:  That's correct.  I think Mr. Paul is

14    offering these simply to bolster his client's credibility that

15    he was performing these tasks.

16          THE COURT:  There is no question about it.  The

17    evidentiary issue is whether it can be admitted as a hearsay

18    document limited to state of mind.

19          MS. KEARNEY:  The objection to SK-8 is not hearsay.  I

20    think the banking documents are not hearsay, your Honor.  I

21    think it's a relevance argument.

22          THE COURT:  No.  I will allow it.  He only wants it in

23    for state of mind.  I will allow it in for state of mind.

24          MS. KEARNEY:  State of mind as to what?

25          THE COURT:  I see.  There is nothing arguably illegal

1    about these banking documents.

2              Make the state of mind argument more pointed, sir.

3              MR. PAUL:  The state of mind argument is that he is

4    continuing to do tasks for his brother.

5              THE COURT:  You had plenty of testimony about that.

6              MR. PAUL:  He has testified to that.  These documents

7    support that testimony and show -- I could have taken out

8    hundreds of documents to show what I have been attempting to

9    show.  I have tried to narrow it down to just a sampling to

10   show what his state of mind was with regard to doing tasks and

11   how, when he was given the task of A1, in his mind it was one

12   of the many tasks he has always been doing for his brother.

13             MS. KEARNEY:  With respect to this charged conspiracy,

14   your Honor, I don't think it's relevant whether he performed

15   other legal tasks.  The government does not allege there is

16   anything illegal about him having his brother's Capital One

17   bank record or filing DMV paperwork for him.  But the fact that

18   he performed some legal tasks for his brother has no bearing on

19   whether he performed illegal tasks for his brother.

20             MR. PAUL:  Judge, I find it a little hard to respond

21   when the government has selected in an attempt to show through

22   conscious avoidance all of these various documents that my

23   client received on his devices, and then they are going to

24   argue either he read them and knew or he looked the other way

25   and should have known.  And that does not present the full

1    picture of his state of mind.  His state of mind was such, as

2    we brought out in his testimony, that his brother was sending

3    him documents to do tasks, just like he has been doing in many

4    subjects.

5            I think this is highly relevant to show that in

6    fact -- unlike what the government has done, which is basically

7    cherry pick and show that all of these various e-mails and

8    documents that he was looking at or receiving shows his

9    knowledge and intent, I am showing quite the opposite.  And it

10   goes to his state of mind.

11           THE COURT:  SK-8 I am going to keep out on 611

12   grounds.  You have plenty in here for the same point.  SK-8 is

13   out.

14           Next.  We have got SK-12.

15           MS. KEARNEY:  12, again, this is Arash Ketabchi's --

16           THE COURT:  This is too early.  This is 2012.  Out.

17   SK-12.

18           Next.

19           MS. KEARNEY:  19, your Honor.

20           THE COURT:  19 is within the relevant time period.

21           MS. KEARNEY:  Yes.

22           THE COURT:  And he is signing something -- I don't

23   know if he is signing it.  It's in his computer.  From Arash.

24           MR. PAUL:  Created by Mr. Ketabchi.

25           THE COURT:  Created by Ketabchi.  What is the

1  government's issue with this?

2          MS. KEARNEY:  It's the same objection, your Honor.

3  It's a 401 objection.  Whatever is going on with Arash

4  Ketabchi's medical records, whether this submission is legal or

5  not, it's entirely separate --

6          THE COURT:  No.  But you're not confronting Mr. Paul's

7  point that he is showing that he is doing lots of other things

8  for Arash to strengthen his "filing cabinet" argument.

9          MS. KEARNEY:  If Mr. Paul intends to argue that his

10 client never read any of these documents, is that my

11 understanding?

12         THE COURT:  No.  I don't think that's what Mr. Paul is

13 arguing.

14         MS. KEARNEY:  Is your argument that your client never

15 read any of the documents?

16         MR. PAUL:  Any of the documents that you have

17 presented?

18         MS. KEARNEY:  Correct.

19         MR. PAUL:  I am saying he read some and some he did

20 not read.  He testified to that.

21         MS. KEARNEY:  So this relates in no way to any

22 business endeavor.  This is a personal document relating to

23 Arash Ketabchi, so it has nothing to do with whether what A1

24 Business Consultants was doing was legal or not, or Shahram

25 Ketabchi's understanding of that.

1           MR. PAUL:  It was one of many tasks that he was doing

2      and testified to.

3           THE COURT:  How is that relevant?

4           MR. PAUL:  Because when he was given the task to do

5      chargebacks, in his mind -- all he was told to do was A, B, C,

6      get the contract, get the fulfillment, pass it along.  That's

7      all he did, just like he handled all of the tasks for his

8      brother.  His brother would send him his bank account.  File

9      this, do this, send flowers for my girlfriend.  It's just one

10     of the many things he did for his brother.  I have tried to

11     narrow it down as a sampling.  I understand some of them go

12     back a ways, and your Honor has ruled, and some I have

13     withdrawn because of the time frame.  I honestly think, your

14     Honor, this is just one of the many tasks he was doing.

15          THE COURT:  I am going to let in SK-19.  It seems to

16     me it's a state of mind issue.

17          MR. PAUL:  Exactly.

18          THE COURT:  I am going to allow in SK-19, which is

19     from October '16.  And I am going to exclude SK-20, which

20     is -- I was doing it the European way.  This also is a 2016.

21     Let me take a look at it.

22          MR. PAUL:  It is.  I think it's similar.

23          THE COURT:  I think it is.  19 and 20 I am allowing in

24     with a limiting instruction.

25          What else?

IB28KET3                    Ketabchi - Direct

1          MS. KEARNEY:  21.

2          MR. PAUL:  It's also February 2016, your Honor, where

3    he has been asked to gather together insurance on behalf of his

4    brother and his brother's fiancee for the diamond ring.  Again,

5    one of the many things that were thrown his way.

6          THE COURT:  I will allow 21 in.

7          Now, you also have a fair amount of bank account

8    numbers and Social Security numbers.  You may want to redact

9    that.  I think you're supposed to redact that.  But I am

10   certainly not going to hold this jury when one of the many

11   lawyers here could be doing that.

12         MS. KEARNEY:  There is one more document, SK-23.  It's

13   an e-mail.

14         THE COURT:  I have a document where 23 is crossed out

15   and 22 is written.  What is 23?

16         MS. KEARNEY:  It is a December 22, 2015 e-mail at

17   4:45.

18         THE COURT:  Let me see it.

19         Line the jury up, please.

20         MR. PAUL:  What are we talking about now, 23?

21         THE COURT:  What is it, government?

22         MS. KEARNEY:  It's an e-mail -- your Honor has my

23   copy, but my understanding is it's an e-mail between Arash

24   Ketabchi and Steve Ketabchi regarding an e-mail from Bill

25   Sinclair.

1            MR. PAUL:  This has to go to his state of mind.  As

2    you recall, he is go-between between Bill and his brother.  And

3    if you look at the very top of this exhibit, where it says

4    "he's a loser drug addict, don't waste your time with him,"

5    that is one of the reasons why Steve, when he got any

6    communication from Bill, would just simply pass it along to

7    Arash and ignore any communication or reference to his brother.

8            THE COURT:  I not going to allow this.  I can't allow

9    all these hearsay documents in.

10           MR. PAUL:  They introduced this exhibit.

11           MS. KEARNEY:  This exhibit I don't think the

12   government introduced.  What number is it?

13           THE COURT:  Is this in evidence?

14           MS. KEARNEY:  I don't believe so.

15           MR. PAUL:  I think everything but the top.

16           MS. KEARNEY:  It was marked as a proposed exhibit, but

17   it was not introduced.

18           MR. PAUL:  I think they introduced the thread

19   including the very top.

20           THE COURT:  What does the government believe its

21   exhibit number was on this?

22           MS. KEARNEY:  What is the subject line, your Honor?

23           THE COURT:  Re Arash's chargebacks since 6/29/15.

24           MS. KEARNEY:  It's 4:45.  It is my understanding it

25   has not been admitted.

IB28KET3                         Ketabchi - Direct

1           THE COURT:  I am excluding it.  It's a rank hearsay

2    document and it's not an adversary party that's proposing it.

3    I am excluding SK-23.

4           Bring this jury in.

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1             (Jury present)

 2             THE COURT:  Mr. Ketabchi, if you would take the stand

 3   again.

 4   STEVEN KETABCHI, resumed.

 5             THE COURT:  Ladies and gentlemen, I apologize for the

 6   length of that break.  Please be seated in the courtroom.  But

 7   I do assure you that the entire purpose of the break is to try

 8   to resolve legal matters in a way that will make the

 9   presentation efficient for the jury.  That's really the goal in

10   what we have been doing.

11             Continue your direct examination of Shahram Ketabchi.

12             MR. PAUL:  Thank you, your Honor.

13   BY MR. PAUL:

14   Q.  Sir, what is your understanding as to why chargebacks would

15   ever come or exist?  What is the reasoning behind chargebacks,

16   as far as you could tell, in general?

17             MS. FLETCHER:  Objection to form.

18             THE COURT:  Sustained.

19   Q.  If you know, how would chargebacks come into existence?

20             MS. FLETCHER:  Objection to form.

21   Q.  What are, as far as you know, the reasons behind

22   chargebacks that are filed?

23             THE COURT:  He has testified to what a chargeback is.

24   What more are you seeking here?

25   A.  From my --

1          THE COURT:  Just a moment.

2          MR. PAUL:  The reasons why there would be complaints

3    by customers.

4          THE COURT:  Do you know why customers complained?

5          MS. FLETCHER:  Objection, your Honor.  I'm sorry.

6    That's asking him to speculate as to what is in the mind of the

7    customer.

8          THE COURT:  He may know.

9          Do you know why customers complain?

10          THE WITNESS:  I do.

11          THE COURT:  Why do customers complain?

12          THE WITNESS:  Because I am one of them.

13          To my scope of knowledge, sir, I would say there's

14    several reasons why a customer would initiate a chargeback.

15    Off the top of my head --

16          MS. FLETCHER:  Your Honor, objection.

17          THE COURT:  Sustained.  It's not why customers would

18    initiate a chargeback.

19          Mr. Paul, ask again.  Let's see if we can get there.

20    BY MR. PAUL:

21    Q.  In your experience in dealing with chargebacks, or

22    responding to chargebacks, what have you come to learn are the

23    bases for the complaints filed, the reasons for the complaints

24    filed?

25          THE COURT:  The asserted reasons.

1           MR. PAUL:  Yes, of course.

2           THE COURT:  Do you understand the question?  What are

3     the asserted reasons behind chargebacks, the seven that you

4     have been involved with?

5           THE WITNESS:  I believe I understand the question.

6     A.  I believe the reason why a chargeback occurs could be that,

7     when the salesperson is talking to the customer on the phone in

8     a telemarketing business, there could be certain things that

9     are either promised or not promised that could be not

10    understood by the customer and what they believed --

11          MS. FLETCHER:  Objection, your Honor.

12          THE COURT:  You don't know what the customer is

13    understanding or not.

14          Go ahead.

15    A.  When you're doing phone sales --

16          MR. SCHMIDT:  I am going to object to this.

17          MR. PAUL:  I will withdraw the question.

18          THE COURT:  All right.  We will move forward.

19          MR. PAUL:  Can we pull up 426, please.

20          MR. MITCHELL:  It's not in evidence yet.

21          MR. PAUL:  Show it to the witness, please.

22    BY MR. PAUL:

23    Q.  Sir, would you look at this document?

24    A.  OK.

25    Q.  Do you have an understanding of what is contained in this

1    document?

2    A.  Yes, I do.

3    Q.  You have seen this document before?

4    A.  I have.

5    Q.  Was this received by you on one of your devices?

6    A.  Yes, it was.

7    Q.  What is your understanding -- withdrawn.

8              MR. PAUL:  I will move at this time to introduce this

9    exhibit, 426.

10             MS. FLETCHER:  Your Honor, this is, as we understand

11   it, the same as SK-2 which your Honor has already ruled on.

12   And I think we discussed a limiting instruction with respect to

13   this document.

14             THE COURT:  Keep that up.  Let me see it.  Unless the

15   defense agrees it is SK-2 --

16             MR. PAUL:  I don't think she is saying it's SK-2.

17             THE COURT:  Is there a Bates number on the bottom of

18   the government one?

19             Come on, folks.

20             MR. PAUL:  Withdrawn.

21             Can we show the witness SK-2, please.

22   BY MR. PAUL:

23   Q.  Are you looking at this document, sir?

24   A.  Yes, I am.

25   Q.  Have you seen this document before?

1   A.  Yes.  I recall this document.

2   Q.  Is this a document that was received by you on one of your

3   devices?

4   A.  Yes, sir.

5          MR. PAUL:  I move it into evidence.

6          MS. FLETCHER:  No objection, subject to the limiting

7   instruction.

8          THE COURT:  Yes.

9          (Defendant's Exhibit SK-2 received in evidence)

10          THE COURT:  Ladies and gentlemen, this is being given

11   to you not for the truth of what is set forth, but only on a

12   very limited issue, that is, as to Mr. Shahram Ketabchi's state

13   of mind.  That's all.  But not for the truth of what is

14   contained within this.

15          Proceed.

16   BY MR. PAUL:

17   Q.  Sir, this is an e-mail from Arash to you, is that not so?

18   The top part.

19   A.  Yeah.  I am actually sending it to Arash.

20   Q.  What is the document -- below that, there is from Michelle

21   to -- you are CC'd.

22   A.  Right.  And the chain below was also sent to me.

23   Q.  What is this document saying, as far as you can tell?

24   A.  This document, basically, I had requested on behalf of my

25   brother to check the status of their customers.

IB28KET3                          Ketabchi - Direct

1    Q.   Why would you be doing that?

2    A.   Because I am trying to make sure that, at the request of my

3    brother, that the fulfillment company is doing their job to

4    make sure that the customers are being serviced properly and

5    getting the right coaching or training if that was part of

6    their package.

7    Q.   Now, this is from Michelle.  Who is Michelle?

8    A.   Michelle, looks like she is from -- I believe she worked at

9    yourbusiness.training.  And she has responded with a status of

10   the client and who she has called and what amount of sessions

11   are left.

12   Q.   When it says Ida Williams, is it your understanding that

13   that is a customer?

14   A.   Yes, that is a customer.

15   Q.   Has one more session left, November 10.  Final session on

16   November 5.  And then you see a number of other names.  Are

17   those customers?

18   A.   Yes, I believe those are their customers.

19   Q.   So this is a status report with regard to sessions, at

20   least as far as Michelle is concerned, as to whether or not

21   these customers are getting fulfillment or not, is that right?

22   A.   Exactly.

23   Q.   You were asked to do this by your brother to find out the

24   status of these people?

25            MS. FLETCHER:  Objection.

1    A.  Yes.

2              THE COURT:  Sustained.

3              Keep in mind this is your witness.

4              MR. PAUL:  I understand.

5              THE COURT:  No, you don't.

6              Proceed.

7    Q.  Is it your understanding, sir, from reading this -- what

8    was your understanding from reading this document?

9    A.  This document basically communicates to me that the

10   fulfillment company is making progress and doing what they are

11   supposed to be doing to fulfill the customers that A1 Business

12   Consultants had contract with.

13   Q.  Thank you.

14             MR. PAUL:  Take that down.

15             Exhibit 429, please.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

IB2JKET4                          Ketabchi - direct

1    Q.  This is from Heidi to a number of individuals, including

2    you.  Is that right?

3            MS. FLETCHER:  Objection.

4    Q.  What is this document, sir?

5    A.  Just give me one moment.  I want to be sure.  (Pause)

6            Based on my understanding of reading this email, Heidi

7    from U.S. Card Systems is communicating to a number of people

8    that they have to sell services and products of their merchant

9    company that they signed up with is already agreed upon in

10   their contract, so if they go out of the scope of what's being

11   offered, then it could be an issue with their merchant company

12   because they didn't have prior permission.

13           In the second part, I believe she is communicating

14   that you're not supposed to intermingle two different merchant

15   accounts.

16   Q.  If you would --

17   A.  They're not supposed to be affiliated, so if A1 has their

18   own merchant account, they cannot be intermingled with Element,

19   which is another merchant account, and that is part of standard

20   protocol in that industry, in the merchant industry.

21   Q.  You're CC'd on this, right?

22           It is addressed to Arash?

23   A.  Yeah, I was CC'd on this and it looks like a couple of

24   other people at U.S. Card Systems, and it was mainly sent to my

25   brother.

IB2JKET4                      Ketabchi - direct

1   Q.  Can we pull up -- one second.  (Pause) -- 448.  Do you

2   recognize this document, sir?

3   A.  I only see who it has been sent to.  I see an attachment,

4   but I never opened this attachment.

5   Q.  Can we go to the attachment next.

6          Do you see this list?

7   A.  Yes, I see a list of names and phone numbers and some

8   amounts.

9   Q.  Looking at this list, what is your understanding of what

10  that is?  And it says -- excuse me -- go back to the first

11  page.  It says, "Emily leads."  Do you see that?

12  A.  I see that, sir.

13  Q.  What does this involve?

14  A.  I couldn't say exactly what that involves.  I can make an

15  assumption based on the wording, but if you can go back to the

16  actual file and go to the top, I can see if there is any

17  descriptions of the columns.

18  Q.  That is the first page, I believe.

19  A.  So there is nothing on top of Michael Elliott, like --

20  Q.  No.  So basically when I look at this, it looks like it is

21  a client list of leads that they have from, it is like Elite

22  Generation Company.

23  Q.  What was your understanding about leads?

24  A.  Leads are basically like in any industry, if it is a sales

25  industry, they need to get leads so they have potential clients

IB2JKET4                        Ketabchi - direct

1    that they could possibly sell their products with.

2              So, for example, a health product business, let's say

3    if they're selling like --

4              MS. FLETCHER:  Objection, your Honor.

5              THE COURT:  Sustained.  Next question.

6    BY MR. PAUL:

7    Q.  Did you, when you received this, do you recall looking at

8    the attachment at all?

9    A.  I did not open this attachment.  I believe how I even got

10   this was my brother had contacted one of his people he gets

11   leads with, one of the companies, and I think he said send it

12   to my brother so I can get it because I am his depository of

13   everything, so he can save time.

14   Q.  You can take that down.

15             You said you handled about seven or so charge-backs is

16   your recollection.  Is that right?

17   A.  Yes.

18   Q.  Do you remember the actual names of the individuals who

19   were customers who were filing charge-backs?

20   A.  I only remember some of them based on the court proceedings

21   recently.

22   Q.  What is your recollection, as you sit here now, of those

23   individuals, their names?

24   A.  I recall Joe Freeland, I believe we actually saw that

25   today.  I believe one of them was Charlene Foster.  I believe

IB2JKET4                          Ketabchi - direct

1    Jeanette Waldrup, I believe.  I think Diane Weissenberger may

2    have been one.  I think that's all that is coming to my mind

3    right at the moment.

4    Q.  Do you recall handling a chargeback of Patricia Cabral?

5    A.  Oh, yeah, yeah, Patricia.

6    Q.  What about John Ford?

7    A.  I recall John Ford.

8    Q.  What about Rita Redding?

9    A.  Rita Redding, yeah, that was one.

10   Q.  That is your recollection of the charge-backs you handled?

11   A.  Yes, based on my September review.

12              THE COURT:  You said you believe one of them was

13   Charlene Foster.  Is that correct?

14              THE WITNESS:  Yes.

15              THE COURT:  You've been sitting here throughout this

16   trial, correct?

17              THE WITNESS:  Yes.

18              THE COURT:  You heard Ms. Weissenberger's testimony,

19   correct?

20              THE WITNESS:  I did.

21              THE COURT:  You just simply believe that --

22              MR. PAUL:  He misspoke.  He said Charlene Foster and

23   Ms. Weissenberger.

24              THE COURT:  I am sorry.  You said you believe one of

25   them was Charlene Foster?

IB2JKET4                          Ketabchi - direct

1          THE WITNESS:  Yes.

2          THE COURT:  And you have been here throughout the

3     trial, correct?

4          THE WITNESS:  Yes.

5          THE COURT:  Did you watch the video of Charlene

6     Foster's testimony?

7          THE WITNESS:  I did.

8          THE COURT:  Are you unsure as to whether you handled

9     the chargeback of Charlene Foster?

10         THE WITNESS:  I am.

11         THE COURT:  The reason I ask is because you said you

12    believe --

13         THE WITNESS:  I am pretty certain, but usually,

14    unfortunately, my memory isn't what it used to be because I

15    have so much stress and PTSD from what happened to me that last

16    year with my arrest and everything and also going to the

17    issues --

18         THE COURT:  Sir, the issue is, do you have any doubt

19    in your mind -- and if you do, tell me -- that you were

20    involved in the chargeback of Charlene Foster?  If you have a

21    doubt, I want to know that.  If you don't, I want to know that

22    also.

23         THE WITNESS:  I believe I don't have any doubt of that

24    one.  That was definitely of the ones I responded to.

25         THE COURT:  Next question.

IB2JKET4                        Ketabchi - direct

1   BY MR. PAUL:

2   Q.  His Honor asked you about watching the video of Ms. Foster.

3   You remember that, right?

4   A.  Yes.

5   Q.  Have you ever seen Ms. Foster?

6   A.  No.

7   Q.  Have you ever spoken to Ms. Foster?

8   A.  No.

9   Q.  Had you ever had any communication with Ms. Foster?

10  A.  No.

11  Q.  Other than handling the documentations and the contract,

12  did you have any other involvement with the case of Ms. Foster?

13          MS. FLETCHER:  Objection to form.

14          THE COURT:  I'll allow it.

15  A.  No, sir.

16  BY MR. PAUL:

17  Q.  Now, you told us that your brother was the owner of A1.  Is

18  that right?

19  A.  Yes, sir.

20  Q.  Is that right?

21  A.  Yes, sir.

22          THE COURT:  Move the mike closer to you, sir, and

23  speak up.

24  A.  Yes, sir.

25  Q.  Were you a partner of his in any way with regard to A1?

1    A.  No, sir.

2    Q.  Were you involved in the business in any way other than

3    what you have told us about, consumer charge-backs?

4    A.  No, sir.

5    Q.  Can we pull up --

6              (Off-the-record discussion)

7    BY MR. PAUL:

8    Q.  I want to make sure.  Is SK-3 in evidence?  Can we pull up

9    SK-3, please.  Do you recognize that document, sir?

10   A.  Yes.

11   Q.  The subject is, "Client status."  Do you see that?

12   A.  Yes.

13   Q.  You have already testified with regard to the list of

14   names, I believe, and what was happening with regard to

15   sessions?

16   A.  Yes.

17             MR. PAUL:  I move this into evidence.

18             MS. FLETCHER:  No objection, subject to the exception.

19             THE COURT:  Yes, ladies and gentlemen, this document

20   also is being given to you not for the truth of what it

21   contains.  That is not your concern.  It is being given to you

22   for a much more limited purpose; that is, it goes, if you so

23   desire, so believe it does, to this witness' state of mind.

24   That is the only purpose it is being given to you for.

25   Proceed.

1          (Defendant's Exhibit SK-3 received in evidence)

2          MR. PAUL:  We can move on.

3          MR. PAUL:  Could it be displayed to the jury.

4          THE JURY:  We have it.

5          MR. PAUL:  I am sorry.  I misunderstood.  Okay.

6   BY MR. PAUL:

7   Q.  Sir, these are individuals' names as we talked about and

8   sessions they received.  What is your understanding of what is

9   going on here?

10  A.  This is the same document as before, and it is basically a

11  status update from the fulfillment company that is fulfilling

12  the products and services that were sold from A1 Business

13  Consultants, and my brother wants to make sure that they're

14  being serviced properly and getting their agreed-upon products

15  and services.

16  Q.  In this case, these are training sessions you're talking

17  about?

18  A.  Yeah, there are some training statuses here, yes, sir.

19  Q.  You can take that down.  Can we pull up SK-7, please, for

20  the witness.  Take a look at this document, sir.  If we could

21  go to the next page, and the next page.

22          Do you see this document, sir?

23  A.  Yes, I do.

24  Q.  What is your understanding -- by the way, was this document

25  received, downloaded onto your device?

1  A.  Yes, it was sent to me.

2  Q.  What is your understanding of what this is?

3  A.  This is a mortgage document that my brother filled out and

4  executed, so it was also sent to me.

5  Q.  Is this an example of one of the tasks that you described

6  that your brother would send you?

7  A.  Yes, one of the hundreds.

8  Q.  Is that your handwriting that exists on this document?

9  A.  Not that particular document, no.

10  Q.  But you assisted in filing this for him?

11  A.  Yes, I think one of the mortgage bankers sent that to me to

12  get it together and make sure everything is accurate and

13  everything so I was verifying the information on that

14  particular one.

15  Q.  Can we pull up SK-19.

16          THE COURT:  Are you offering SK-7?

17          MR. PAUL:  Yes.

18          THE COURT:  Ladies and gentlemen, again this, too, is

19  being given to you not for what is contained in it, but solely

20  for this witness' state of mind.  I am admitting it for that

21  limited purpose only.

22          (Defendant's Exhibit SK-7 received in evidence)

23          THE COURT:  Next.

24          MR. PAUL:  Can the jury be shown this, please.

25          THE COURT:  Move on.

1        MR. PAUL:  I am asking it to be projected to the jury.

2        THE COURT:  Now it is projected.  Now you can move on.

3    BY MR. PAUL:

4    Q.  Would you quickly go through the document, please.  (Pause)

5    Thank you.  Would you pull up SK-19, please, for the witness.

6        Do you see this document?

7    A.  Yes, I do.

8    Q.  Do you remember receiving this document or downloading it?

9    A.  Yes.

10   Q.  What is this document?

11       MR. PAUL:  I offer SK-19.

12       THE COURT:  Admitted, but only for a limited purpose.

13   Ladies and gentlemen, you know what that limited purpose is,

14   only for his state of mind.

15       (Defendant's Exhibit SK-19 received in evidence)

16       MR. PAUL:  Would you show the jury SK-19, please.

17   BY MR. PAUL:

18   Q.  What is is this document, sir?

19   A.  It looks like my brother, it looks like when he went to

20   rehab at some point, he had a major medical issue and he had

21   some major challenges financially and he is looking for an

22   abatement.  I think it was something to do with taxes in terms

23   of business taxes or something, sales tax.

24   Q.  Did you draw up this document?

25   A.  I did, sir.

IB2JKET4                          Ketabchi - direct

1   Q.  It says, "created."  That is you, Steve K.?

2           THE COURT:  Talk into the microphone.

3           THE WITNESS:  Yes.

4           THE COURT:  I am sorry.  That was the tone of voice

5   that was addressed to Mr. Paul, not to you, sir.

6           THE WITNESS:  Yes, I wrote this out for my brother.

7           MR. PAUL:  I move this.  SK-20, please.  Show it to

8   the witness.

9   BY MR. PAUL:

10  Q.  Would you look at this document, sir.

11  A.  Yes.

12  Q.  Is this one of the documents that was downloaded on your

13  computer?

14  A.  I drafted this document for him, for a DMV request.

15          MR. PAUL:  I move SK-20 into evidence.

16          THE COURT:  The same thing, ladies and gentlemen, only

17  for state of mind not for the truth of what is set forth in it.

18          When you say DMV, I take it you mean Department of

19  Motor Vehicles?

20          THE WITNESS:  Yes, your Honor.

21          (Defendant's Exhibit SK-20 received in evidence)

22          THE COURT:  Next question.

23          MR. PAUL:  Show it to the jury.

24          THE COURT:  Go ahead.

25  BY MR. PAUL:

1   Q.  This was created by you?

2              THE COURT:  He said, "yes."

3   Q.  What was this document for?

4   A.  Change of --

5              THE COURT:  Next.

6   Q.  This was on behalf of your brother?

7   A.  Yes, sir.

8   Q.  This is an example of one of the tasks you conducted for

9   him?

10  A.  One of the many.

11  Q.  Can we pull up SK-21.  Show it to the witness.  Have you

12  seen this document before, sir?

13  A.  Yes.

14  Q.  Is this downloaded on one of your devices?

15  A.  Yes.  I filed it for him.

16             MR. PAUL:  I move SK-21.

17             THE COURT:  The same, ladies and gentlemen.  I am

18  admitting it, but for the very limited purpose of this witness'

19  state of mind.

20             (Defendant's Exhibit 21 received in evidence)

21             THE COURT:  Next.

22             MR. PAUL:  Display it to the jury.

23  BY MR. PAUL:

24  Q.  Sir, what is this?

25  A.  The document on the screen looks like it is an insurance

1    contract, an agreement for a piece of jewelry, it looks like.

2    Q.  A schedule of property.  It lists a three karat diamond.

3    Is that right?

4    A.  Yes.

5    Q.  And this was an insurance policy that you were doing on

6    behalf of your brother?

7    A.  Yes, to ensure that piece of property, yes.

8    Q.  Was this one of the many tasks you were asked to do by your

9    brother?

10   A.  Yes, sir.

11   Q.  You can take that down.

12           You heard testimony with regard to tax returns.  Do

13   you remember that?

14   A.  Yes, I did, sir.

15   Q.  Did you file tax returns for 2015?

16   A.  2015, I don't believe I did.

17   Q.  Why would that be?

18           MS. FLETCHER:  Objection.

19           THE COURT:  Yes, sustained.  Why did you not file tax

20   returns?

21           THE WITNESS:  I couldn't afford to, sir.

22   BY MR. PAUL:

23   Q.  So you chose not to?

24   A.  I had no choice.

25           THE COURT:  You chose not to?  You decided not to file

1    your returns.  Is that correct?

2              THE WITNESS:  I did not have the budget to.  I did not

3    have --

4              THE COURT:  You didn't have any money to pay your

5    taxes?

6              THE WITNESS:  I didn't have money to file for the

7    taxes, just filing.

8    BY MR. PAUL:

9    Q.  Was it your understanding that you had not met the

10   threshold requiring --

11             THE COURT:  Sustained.

12   Q.  What was your understanding with regard to filing taxes

13   that year?

14   A.  I believed that my income did not meet the threshold

15   because it was a very, very low income.

16   Q.  Can we pull up 908 A.  Before I ask you about 908 A,

17   getting back to taxes, did Arash, your brother, send you money

18   during the period of 2015?

19   A.  Yes, he did.

20   Q.  Did you declare the money he sent to you as income?

21   A.  No, I did not.

22   Q.  Why is that?

23   A.  Because it was family, him helping me out to pay bills, and

24   it was more of like, you know, a gift type of thing.  He was

25   just helping his brother to get by, pay for food, pay for rent.

1  Q.  Did you not think that it was to be considered as income?

2  A.  I didn't consider that as income because it was just -- it

3  wasn't like I was working, you know, for a company and I was

4  getting a, you know, a pay stub or anything.  I didn't think

5  that was any type of income.

6  Q.  Can we pull up 908 A.  Could we thumb through that, roll

7  through that.  (Pause)

8          This is your account, is it not, with checks where

9  money or cash is going into your account?

10  A.  Yes, I believe so.

11  Q.  The dates on this looks like March of 2016 for the most

12  part.  Do you see that?

13  A.  Yes, the month I just looked at.

14  Q.  For example, there is a $500.00 and another $600.00.  Do

15  you see that?

16  A.  Yes, I do.

17  Q.  Do you know what the source of that income is?

18  A.  Yes, those I remember my brother had given me.

19  Q.  What was the purpose of him send you those funds?

20  A.  That goes back to the agreement I had with him, if I drive

21  less with Uber and I do some of his office work and help him

22  out, he would help me pay some of my bills because of the time

23  differences.

24          THE COURT:  What do you mean, because of the time

25  differences?

1           THE WITNESS:  Basically I was going to do some of his

2      office tasks that he requested.  I couldn't spend as much time

3      on the road to drive to make that --

4           THE COURT:  The difference in time between driving for

5      Uber and doing his work?

6           THE WITNESS:  Yes, sir.  I still had to drive, but I

7      just couldn't drive as much.

8           MR. PAUL:  I am nearing the end, your Honor.

9           THE COURT:  You are, that's correct!

10          MR. PAUL:  I know.  That is why I said that.

11     BY MR. PAUL:

12     Q.  Can we pull up Exhibit 512.  Now, tell me what this is,

13     sir.  It is from Brian and it is to you, is it not?

14     A.  Yes.

15     Q.  Who is Brian?

16     A.  Brian, I recall he's the -- I believe he was the owner of

17     the Thoth Fulfillment Company, training.  I don't remember the

18     exact name.

19     Q.  He is one of of the people involved in fulfilling

20     contracts?

21     A.  Yes, for A1 Business for my brother.

22     Q.  It says just read the notes on the client and wanted to

23     give you a heads-up.  Do you see that?

24     A.  Yes.

25     Q.  This is dated December 4th, 2015.  Do you see that?

IB2JKET4                         Ketabchi - direct

1   A.  Yes, I see that.

2   Q.  Did you respond to this email?

3   A.  I don't see any response to it, no.  I don't recall

4   responding.  I have no verification of that.

5   Q.  It says she is a cancel pending, her son is claiming she

6   has dementia and is in the process of getting power of attorney

7   so she can cancel.

8            Did you respond in any way to that notation?

9   A.  I don't recall a response to this particular email.

10  Q.  Can we go down to the next page.  Is that the extent of the

11  email thread?

12  A.  (No response)

13  Q.  Let me take you back to the date when your apartment was

14  searched.  Do you remember that date?

15  A.  Yeah, it was a very, very traumatic experience.

16            MS. FLETCHER:  Objection, your Honor.

17            THE COURT:  Sustained.  The question -- and the jury

18  will disregard -- the question is do you remember that date?  I

19  would think the answer is either yes or no or I don't know.

20            THE WITNESS:  Yes, sir.

21  BY MR. PAUL:

22  Q.  Before I ask you that, there was testimony earlier from

23  Mr. Owimrin having to do with him forwarding you documents from

24  Arash to you.  Do you remember that?

25  A.  Yes, sir.

IB2JKET4                          Ketabchi - direct

1   Q.  Did you, in fact, receive documents from Mr. Owimrin on

2   behalf of your brother concerning items from your brother?

3   A.  Yes, I recall that.

4   Q.  What did those documents, for the most part, consist of?

5   A.  I believe the ones he sent at the time were tax-related.

6   Q.  He said that you were also involved in setting up gift

7   baskets.  Do you remember that testimony?

8   A.  Yeah, I recall sending like a gift basket or two.  I don't

9   know exactly how many, but my brother requested that --

10           MS. FLETCHER:  Objection to form in these questions

11   and to narrative answers.

12   Q.  Did there come a time that you --

13           THE COURT:  Sustained.  Go ahead.

14   Q.  -- did there come a time you were involved with gift

15   baskets?

16   A.  Yes.

17   Q.  What was that involvement consist of?  What did it consist

18   of?

19   A.  My brother requested that their new clients, their new

20   customers get a gift basket to welcome them.

21           THE COURT:  What time?

22   A.  To thank them.

23           THE COURT:  What did you do?

24           THE WITNESS:  I recall I sent them on Amazon.com from

25   him to their customer.  There might have been two or three.  I

1    don't remember exactly.

2    BY MR. PAUL:

3    Q.  Let me take you back to March 21, 2016.  Do you remember

4    that date?

5              THE COURT:  Yes or no, do you remember that date?

6              THE WITNESS:  March 21?  I think that maybe that's the

7    date that they broke into my apartment, I think.

8    BY MR. PAUL:

9    Q.  Do you remember that event?

10   A.  Yes.

11   Q.  Tell us what happened on that date when they came to your

12   apartment.  When you say "they," who do you mean?

13   A.  I found out they were from Homeland Security, and I was

14   sleeping that morning, and I usually almost always wear my ear

15   puffs because I am very sensitive to noise.  I heard like

16   knocking, and I thought maybe I was having like a dream or

17   something, so I like paused like a second or two.

18             Then it got a little louder, and then I am like, yeah,

19   this, this has to be real because it doesn't sound like a

20   neighbor, like you know a neighbor banging on the wall or

21   something anything like that or moving upstairs or anything, so

22   then I started to walk out of my bedroom.  As I was just -- it

23   is a very small apartment.  I was walking towards like the

24   living room, and like there was noise like on the door, and the

25   next thing I know they broke into my door and then they pulled

1    their gun on me and --

2              THE COURT:  Take your time, sir.  Take your time.

3    Relax.  You don't have to hurry up.  You may want to take

4    water.  Do you want to take some water?  Just relax.

5              THE WITNESS:  I was in total shock because I just

6    couldn't imagine why they would do that.  I had never done

7    anything wrong.  Then I think when they brought me out to the

8    side of the door, and he handcuffed me and he said -- I think

9    he said we have like a search and seizure order on you or

10   something.

11             Then there was so many of them, and a few of them went

12   in to search my apartment.  I think there were like a clearance

13   or something to see if it was safe, and then I think it was

14   about 10 minutes or so, 15 minutes later he brought me into my

15   apartment and he sat me on my couch.  Then I think he asked me

16   like -- I asked him why are you guys here?  What are you doing?

17             I need to contact my attorney, and you guys have to

18   stop, and then he goes, I think he was like do you know, do you

19   know A1 Business Consultants, and I was like yes, that is my

20   brother's business.

21             THE COURT:  Take your time.  Just relax.

22             THE WITNESS:  It was a very traumatic experience.

23             THE COURT:  That is why I want you to relax.

24             THE WITNESS:  And I said yeah, that is my brother's

25   business, and he said well, you know, have you done anything

1   for him and stuff?  Yeah, I have done some of his office work.

2   He said well, that's why we're here.  I said why?  What did I

3   do?  I don't understand.

4          Then he said, you know, he went back with the order

5   and stuff and then all the agents were just ransacking my

6   apartment.  They went into my files, and because I keep all

7   physical files, I have like all like business stuff and I had

8   like my brother's things on there as well because I was storing

9   his documents, too.  They went into the bedroom and they were

10  just searching all over.  They must have been there for like

11  two to three hours.

12  Q.  Did you have a safe in your apartment?

13  A.  Yes.

14  Q.  Did anything occur with regard to that safe?

15  A.  Yeah, they wanted to go into it and they said give us the

16  combo or we're going to break it.

17  Q.  Did you give them the combination?

18  A.  Yeah, of course I complied.

19  Q.  What, if anything, was kept in that safe?

20  A.  I remember I had backup hard drives.  I think I had some

21  like important documents in there, if I remember.

22  Q.  Now, on March 21, 2017 when they came to your apartment,

23  had you prior to that --

24          THE COURT:  I am sorry.  This was March 21 of what

25  year, sir?

1        THE WITNESS:  I think it was 2017.

2        THE COURT:  All right.  Thank you.

3   BY MR. PAUL:

4   Q.  I misspoke.  March 21, 2017 is when they conducted the

5   search you just told us about?

6   A.  Yes, sir.

7   Q.  Were you arrested on that date?

8   A.  No, sir.

9   Q.  When, if at all, were you arrested in this case?

10  A.  I don't remember the exact date right now, but I believe it

11  was about 30 days later.

12  Q.  By the way, did you have a shredder machine in your

13  apartment?

14  A.  No, sir.

15  Q.  Did you ever attempt at any time to destroy or shred or

16  throw away documents?

17  A.  No, sir.

18  Q.  Would it be fair to say, if anything, you saved just about

19  anything --

20        THE COURT:  Sustained.  Your witness.

21  Q.  Do you know when A1 closed up shop, approximately?

22  A.  I believe it was about like five or six months my brother

23  stopped selling and stuff.

24  Q.  Five or six months when?

25  A.  Before they broke into my apartment.

IB2JKET4                          Ketabchi - direct

1   Q.  So approximately five or six months before the search of

2   your apartment on March 21, 2017 is your understanding A1 had

3   already closed their doors?

4   A.  Yes, sir.

5   Q.  Now, Mr. Ketabchi, you've been listening, as we all have,

6   for two weeks with regard to this case.  What, if anything,

7   after listening to this testimony, is your response to what you

8   have heard?

9   A.  It is just when I hear the witness testimonies, it is

10  horrific and it saddens me and it is very upsetting of what the

11  owners of these businesses were doing.

12  Q.  That includes your brother?

13  A.  It does.

14  Q.  What are your feelings about your brother now?

15  A.  I think he did something wrong, very wrong.  He should have

16  not done that.

17  Q.  Did you at any time in your mind do anything wrong?

18  A.  No, sir.  I was just helping him like I always did before

19  with tasks.

20  Q.  Did you at any time knowingly and intentionally participate

21  with anyone to commit any kind of fraud, sir?

22  A.  No, sir.  I am an honest person.  I believe in compassion

23  and helping others, not taking away from them.

24          MR. PAUL:  I have nothing further.

25          THE COURT:  Thank you.  Ladies and gentlemen, let's

IB2JKET4                         Ketabchi – direct

1   take our lunch break.  10 after 2:00.  Be back at 10 after

2   2:00.  Keep an open mind.  You have not heard all of the

3   testimony.

4              (Jury excused)

5              THE COURT:  10 after 2:00.  Mr. Paul, I know you know

6   the difference between direct questions and leading questions,

7   and I don't appreciate what I consider to be your purposeful

8   continuation of leading questions.

9              MR. PAUL:  I apologize to the court.

10             THE COURT:  Well, that is not adequate.  Let's

11  proceed.  10 after 2:00.

12             (Luncheon recess)

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          AFTERNOON SESSION

2          2:10 pm

3          (Trial resumes)

4          (In open court; jury not present)

5          THE COURT:  Be seated.  I understand the parties have

6    issues to bring to the court's attention.

7          MR. SCHMIDT:  I have two.  One is I will ask your

8    Honor to instruct the jury just because our paralegal, Mr.

9    Tureff, was helping the Ketabchi defense with the electronics

10   and that that does not indicate that --

11         THE COURT:  You want me to bring that to their

12   attention?  It is up to you.  I certainly will.  Is that what

13   you want?

14         MR. SCHMIDT:  Yes.

15         THE COURT:  So that Mr. Tureff was assisting the

16   attorneys for Mr. Ketabchi, in what?  I want them to do what?

17         Ladies and gentlemen of the jury, you may have noticed

18   Mr. Tureff, paralegal on behalf for Mr. Owimrin, was assisting

19   the attorneys for Mr. Ketabchi during the direct examination of

20   Mr. Ketabchi by Mr. Paul.  You?

21         MR. SCHMIDT:  Basically talk about --

22         THE COURT:  What do you want me to tell them?  What do

23   you want me to tell them, sir?

24         MR. SCHMIDT:  That does not mean he is part of the

25   same defense team.

1          THE COURT:  I can do better for you.  "He was simply

2     assisting Mr. Paul as a matter of courtesy."

3          MR. SCHMIDT:  Thank your Honor.

4          Your Honor, the only other point is that my

5     examination of Mr. Ketabchi, I have three, actually three

6     questions only for him, but because of the nature of the

7     subjects, at least one of them is going to be a leading

8     question because it is the only way to get the point out.

9          If you want, I can make a record at sidebar what my

10    questions are so we can get through it without any kind of

11    objections.

12         THE COURT:  Absolutely.

13         MS. FLETCHER:  I have an issue to raise at sidebar as

14    well.

15         THE COURT:  Let's go to sidebar.

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

IB2JKET4                        Ketabchi - direct

1              (At sidebar)

2              MR. SCHMIDT:  Your Honor, I am assuming I am next?

3              THE COURT:  Yes, you are.

4              MR. SCHMIDT:  Obviously, my cross-examination right

5    now is very limited to what he testified on direct examination.

6    On direct examination, he testified that maybe salesmen

7    exaggerated something, all right?  There is a reason for the

8    charge-backs, all right?

9              THE COURT:  I actually don't remember that.

10             MS. FLETCHER:  I do.

11             MR. SCHMIDT:  I so I am going to be asking him, did

12   you speak to the customers?  He will say no.  Did you speak to

13   the salesmen?

14             THE COURT:  You're talking about the charge-backs?

15             MR. SCHMIDT:  Yes.

16             THE COURT:  Did you speak to the customers?  No.

17             MR. SCHMIDT:  About the charge-backs?  Did you speak

18   to any salesmen about what was said to the customers?  I am

19   assuming he will say no.

20             THE COURT:  Right.

21             MR. SCHMIDT:  When you said maybe salesmen exaggerated

22   something, you were talking generally about salesmen in

23   general?  That is it.

24             MS. FLETCHER:  That is a leading question.

25             THE COURT:  It is very leading.  What is the position

IB2JKET4                    Ketabchi - direct

1    of the government?  You certainly allowed massive amounts of

2    leading by Mr. Paul.

3            MS. FLETCHER:  I did.  I was trying to get through it,

4    your Honor.

5            THE COURT:  Because it was so obvious.

6            MR. PAUL:  Oh, my God!

7            THE COURT:  I assumed it was a strategic decision by

8    the government; and, therefore, I did not interject.

9            MS. FLETCHER:  I have no problem with the first two

10   questions.  The third one is pretty objectionable.

11           Can you say it again?

12           THE COURT:  Try to focus it more.

13           MR. SCHMIDT:  "When you testified on direct

14   examination that maybe salesmen exaggerated something, right,

15   that you were talking about salesmen in general and not in this

16   case?"

17           THE COURT:  Were you talking about specific salesmen

18   at A1?

19           MS. FLETCHER:  Right, or what salesmen were you

20   talking about?  I am sure he doesn't want to ask that.

21           MR. SCHMIDT:  So what is happening here is I have a

22   witness that I have never talked to and by law I wasn't even

23   able to talk to, right?

24           And so I have no control over him.  I haven't asked

25   him questions to prepare, right?  And he said something that

1     could be used --

2             THE COURT:  Just give me the question.  I understand

3     your position.  Why don't you focus it.  It seems to me it is

4     in your interest to have him say no, he didn't talk to any of

5     the salesmen, he wasn't referring to the salesmen at A1.

6             MR. SCHMIDT:  Because?

7             THE COURT:  Because he may not say that.

8             MR. SCHMIDT:  I don't trust this witness since I

9     haven't talked to him.  So I --

10            THE COURT:  Take a minute and focus it as narrowly as

11    you can.  (Pause)

12            Do you want to ask him were you referring to any

13    specific salesmen?  Answer:  No.

14            MR. SCHMIDT:  Okay.

15            THE COURT:  Does that do it for you?  I am not trying

16    to hinder you.  I am trying to be efficient in terms of

17    questioning.

18            MR. SCHMIDT:  The problem is "any specific salesman"

19    does not explain enough that he was not talking about any

20    salesmen in this case, all right?

21            THE COURT:  Well, do you want that to be the question?

22            MR. SCHMIDT:  I want, "Were you talking about salesmen

23    in general when you said that?"

24            MS. FLETCHER:  If he wants to ask that question, were

25    you talking about salesmen in general.

1          THE COURT:  Okay, fine.  How long do you think you're

2     going to go?

3          MS. FLETCHER:  I am sorry, your Honor, but I think it

4     will be quite lengthy.  I anticipate at least two hours, maybe

5     three.  I have one issue.

6          I anticipate questioning this defendant about certain

7     events that the government has a good-faith basis to believe he

8     may have been aware of, in particular interactions his brother

9     had with law enforcement in California, also interactions that

10    other names and email communications that he has seen have had

11    with law enforcement.

12         THE COURT:  You have a basis to believe he is aware

13    of?

14         MS. FLETCHER:  Yes.

15         THE COURT:  Go ahead.

16         MS. FLETCHER:  Obviously, I don't want to preview what

17    those are for obvious reasons, but I want to flag I will be

18    asking him questions about whether he is aware certain people

19    were arrested for certain things.

20         MR. PAUL:  I think that is beyond direct, so I object

21    to it.

22         MS. FLETCHER:  His entire direct examination is he was

23    only doing these tiny little things for his brother and he had

24    no idea his brother was running this telemarketing scheme.

25         The government has reason to believe he was aware of

1    other crimes his brother was committing and other crimes that

2    other members of the telemarketing scheme were committing.  We

3    are entitled to impeach him with that information.  He may say

4    he didn't know about it.

5         MR. PAUL:  All what is your basis for that?  You said

6    you have a good-faith basis?

7         MS. FLETCHER:  There are two different issues.

8         One relates to interactions that he had with his

9    brother in California.  He has omitted from the timeline that

10   for a significant period of time he was living near his brother

11   in California.  There was significant interaction with law

12   enforcement between his brother, his brother's girlfriend and

13   law enforcement which, in the government's view, is what

14   precipitated his brother's departure in California and return

15   to the New York area.

16        MR. PAUL:  And he had knowledge of this involvement

17   with his brother and law enforcement?

18        MS. FLETCHER:  The government believes he did.

19        (Multiple voices)

20        THE COURT:  Just a moment.  What does that do for you?

21        I don't want to know what the wrongful acts were of

22   Arash that he was aware of.  How does that relate?  How does

23   that impeach this witness?

24        MS. FLETCHER:  Two reasons, your Honor:

25        First, as I said, he omitted from his timeline of

1   where Arash was working and Arash was doing.  The time period

2   Arash was living very near to him in California, it was just

3   missing from the timeline.

4           THE COURT:  I don't know what you mean.  I don't care

5   about that, do I?

6           MS. FLETCHER:  I think you do, your Honor, I expect

7   one of the arguments --

8           THE COURT:  When I say "I don't care," I mean what is

9   the relevance?

10          MS. FLETCHER:  I understand.  One of the arguments I

11  understand Mr. Paul will make in summations here is that his

12  brother Arash was in California the entire time and he had no

13  idea what his brother was up to, he was just doing simple tasks

14  for his brother.  It is relevant he lived near his brother

15  in --

16          (Multiple voices)

17          THE COURT:  I have no objection to your establishing

18  when Arash lived in California and next to him.

19          MS. FLETCHER:  The government also should be permitted

20  to establish that the reason his brother left California and

21  came back to the New York City area was because of legal

22  issues, because his brother was suspected of committing other

23  crimes.

24          THE COURT:  What does that have to do with Shahram?

25          MS. FLETCHER:  The government intends to argue that

1      Shahram was aware of that.  Now, I can't know --

2              THE COURT:  What is the relevance of his awareness of

3      other wrongdoing by Arash?

4              MS. FLETCHER:  One, it cuts against the statements he

5      has made on direct that he had no idea his brother was involved

6      in these crimes.

7              THE COURT:  In the telemarketing scheme?

8              MS. FLETCHER:  Yes, the fact his brother was involved

9      in other crimes is relevant both to impeach his testimony that

10     he believed his brother to be operating a legitimate

11     telemarketing company, and it is also relevant to impeach the

12     declarant, which is Arash Ketabchi, who is the person who told

13     Shahram Ketabchi everything he knows about this business.

14             So if the government has impeachment information about

15     Arash, and we do, we're entitled to question him about it to

16     put in the appropriate light what his state of mind was when

17     Arash is telling him this is all legitimate if, in fact, that

18     is what he was telling him.

19             MR. PAUL:  There has been no timeline by this witness

20     with regard to Arash and his business.  He testified that he

21     was at Tax Club.  He testified he was at Olive Branch.

22             THE COURT:  He, Arash?

23             MR. PAUL:  Correct, and he started A1.  I didn't go

24     through with this witness his knowledge of where Arash was at

25     any particular time beyond his understanding of working at Tax

1   Club and being in the telemarketing business.

2              MS. FLETCHER:  My first questions were to clear up the

3   timeline.

4              MR. PAUL:  There was no timeline.  He didn't establish

5   any timeline.  He didn't discuss Arash.

6              MS. FLETCHER:  I will look at my notes.  He, of

7   course, discussed Arash.

8              MS. FLETCHER:  He talked about him working for Tax

9   Club, never went to his office.

10             THE COURT:  Just one conversation.

11             MS. FLETCHER:  Shahram testified his brother left the

12  Tax Club and went to Olive Branch Marketing.  There is a

13  twelve-month period between there when Arash was living in

14  California, engaged in a number of illegal activities in

15  California with his girlfriend.  Shahram has just skipped that.

16             THE COURT:  I don't have any problem with your

17  questioning him about that.  The issue is whether or not you

18  can bring in Arash's wrongdoing, that is the issue.

19             MR. PAUL:  I agree.  I object to that.

20             THE COURT:  No, no, no.  You have to establish a

21  basis.

22             MR. PAUL:  First of all, think I what they're trying

23  to do is what they should have done pretrial and I assume by

24  inference they're tying my client in with Arash, with Arash's

25  wrongful acts.  This is like 404 (b) information.

1        THE COURT:  In a way, it is.

2        MR. PAUL:  Exactly.

3        THE COURT:  That can be subject to a limiting

4   instruction if need be.  No, that wouldn't make sense because

5   they're not being asked anything about Arash's propensity.

6        MS. FLETCHER:  It is not wrongfulness by Shahram.  It

7   would not have been subject to a 404 (b) notice.

8        THE COURT:  As I understand what the government is

9   doing is trying to rebut Mr. Paul's position of the state of

10   mind, he had no idea about the wrongdoing, wrongfulness of the

11   charge-backs.  He is so astonished now that he cries when he

12   realizes that Arash has done wrong, wrongfulness, wrong things,

13   so the government is impeaching him --

14        MS. FLETCHER:  Yes.

15        THE COURT:  -- with the fact that he knew his brother

16   was a no-good-nick.  Is that the idea?

17        MS. FLETCHER:  Yes.

18        THE COURT:  Sir?

19        MR. PAUL:  First of all, I don't think the direct

20   examination of this witness --

21        THE COURT:  No, not insofar as you really drilled down

22   on state of mind.  Your position is his state of mind was as

23   pure as the driven snow, and her position is that his state of

24   mind was he knew his brother had a lot of run-ins with law

25   enforcement, so it wasn't pure as driven snow.

1    MR. PAUL:  Is the run-ins with law enforcement dealing

2  with telemarketing companies?

3    MS. FLETCHER:  No.

4    MR. PAUL:  That is what this case is about.

5    MS. FLETCHER:  There is a fraud, but not telemarketing

6  fraud.

7    MR. PAUL:  All he testified to is his understanding

8  his brother was dealing with telemarketing.

9    MS. FLETCHER:  Based on statements made to him by his

10  brother, the government is entitled do to impeach the declarant

11  of the statements.

12    THE COURT:  Since the issue is state of mind, I will

13  allow a limited number of questions in that regard and I will

14  be telling the jury that it is simply for his state of mind

15  and --

16    MR. PAUL:  I have a standing objection to that.

17    THE COURT:  Yes, of course.

18    MR. PAUL:  Not during the course of the testimony, but

19  the record should show I am objecting to --

20    THE COURT:  I want a limiting number of questions.  I

21  don't want this to be a trial of Arash.

22    MR. PAUL:  I failed to introduce one last exhibit

23  which I have asked permission of the court to allow me to ask

24  this of the witness to introduce one exhibit which the

25  government is not objecting to.  It has to do with the Adobe

IB2JKET4                          Ketabchi – direct

1    account that we have had to bring expert in.

2              THE COURT:  If the government is not objecting to it,

3    then you can ask the question.

4              MR. PAUL:  Thank you.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (In open court)

2    THE COURT:  Bring the jury in, please.

3    (Jury present)

4    THE COURT:  Please be seated in the courtroom.

5    Mr. Paul.

6    MR. PAUL:  Yes, your Honor, with permission, I only

7    have a few more questions, a couple of more questions.

8    THE COURT:  Yes.  You heard, ladies and gentlemen of

9    the jury, you heard Mr. Paul say before lunch no further

10   questions.  I have given him permission to ask a few more.

11   You remain under oath, Mr. Ketabchi, you understand

12   that, correct?

13   THE WITNESS:  Yes, your Honor.

14   THE COURT:  All right.  Be seated.

15   BY MR. PAUL:

16   Q.  Mr. Ketabchi, can we pull up SK-24 for the witness, please.

17   Mr. Ketabchi, could you look at this document.

18   A.  Yes, your Honor.

19   Q.  No, I am not.

20   A.  Yes, sir.

21   Q.  Is this a document that appeared on one of your devices?

22   A.  Yes.

23   Q.  Are you familiar with this document?

24   A.  Yes.

25   MR. PAUL:  Your Honor, I offer it into evidence.

1           THE COURT:  Admitted without objection.

2               (Defendant's Exhibit SK-24 received in evidence)

3           MR. PAUL:  Could the jury be shown this?

4           THE COURT:  Yes.

5   BY MR. PAUL:

6   Q.  Mr. Ketabchi, this is an email from your email address --

7   to your email address, excuse me -- from Adobe Systems

8   Incorporated.  Do you see that?

9   A.  Yes.

10  Q.  It is addressed to Dear Arash Ketabchi.  Is that right?

11  A.  Yes.

12  Q.  It talks about thanking him for subscribing to an Acrobat

13  Standard PC.  Do you see that?

14          MS. FLETCHER:  Objection to form.

15          MR. PAUL:  I withdraw it.

16  BY MR. PAUL:

17  Q.  Could you tell us what this exhibit, in your mind, shows?

18  A.  This is basically a confirmation of a software purchase

19  that is per monthly charged for Arash Ketabchi's Adobe software

20  that they're using for A1 Business Consultants to do electronic

21  signatures for their customers.

22  Q.  Why, if you know, why is this addressed to your email

23  account?

24  A.  Because I used my personal email for some facility to

25  process this order.

IB2JKET4                         Ketabchi - cross

1   Q.  When you processed this order, in whose name was the order?

2   A.  My brother, Arash Ketabchi.

3            MR. PAUL:  I have no furthers questions, Judge.

4            THE COURT:  Mr. Schmidt, cross-examination, sir.

5            MR. SCHMIDT:  Yes, your Honor.  I have only a few

6   questions.

7   CROSS EXAMINATION

8   BY MR. SCHMIDT:

9   Q.  Mr. Ketabchi, do you remember testifying earlier today and

10  saying that maybe salesmen exaggerated something?

11  A.  I recall.

12  Q.  Now, you also remember testifying today that you did not

13  speak to any of the customers relating to the charge-backs?

14  A.  I recall.

15  Q.  Do you remember testifying today that you didn't speak to

16  any of the salespeople about charge-backs?

17  A.  Yes, I remember that.

18  Q.  When you said maybe salesmen exaggerated something, were

19  you talking about salespeople in general?

20  A.  In general.

21           MR. SCHMIDT:  No further questions.

22           THE COURT:  Thank you.

23           Ladies and gentlemen, I do wish to inform you that you

24  may have noticed that Mr. Tureff, the paralegal for

25  Mr. Schmidt, representing Mr. Owimrin, was assisting Mr. Paul

1   in his direct examination of this witness.  He was simply

2   assisting Mr. Paul as a matter of courtesy.  He is still a

3   certified member of the Owimrin team.

4             MR. SCHMIDT:  Thank your Honor.

5             THE COURT:  All right.  The government,

6   cross-examination of this witness.

7   CROSS EXAMINATION

8   BY MS. FLETCHER:

9   Q.  Good afternoon, Mr. Ketabchi.

10  A.  Good afternoon, ma'am.

11  Q.  You began your testimony on direct talking about your

12  personal history.  Do you remember that?

13  A.  I recall that, yes.

14  Q.  You testified that you lived in California for

15  approximately twelve years, correct?

16  A.  Approximately, yes.

17  Q.  Where in California geographically have you lived for those

18  twelve years?

19  A.  I remember when I first moved there, I lived in San Diego

20  County.  I lived there for about three years.

21             I think the name of the town, if I recall correctly,

22  was Winter Crest.  I am not sure.  I don't remember exactly.

23  Then after three years, I moved to Orange County.

24  Q.  The last 9 years or so you've lived in Orange County.  Is

25  that right?

1   A.   Well, I've lived in San Bernadino County in the last year

2   and month or so.

3   Q.   All in Southern California?

4   A.   All in Southern California, yes.

5   Q.   During that time-frame, you said you operated your business

6   Vitamin Pros for about five years?

7   A.   Approximately, yes.

8   Q.   When you stop operating Vitamin Pros?

9   A.   I'd say maybe -- I am trying to think when the last sale

10   was.  I am estimating.  I would have to see my documents, but I

11   am estimating maybe like three years or so, give or take.

12   Q.   Three years ago?

13   A.   Yeah, two or three years, something like that.

14   Q.   You stopped operating vitamin Pros in about 2015.  Is that

15   fair?

16   A.   No.  I think it was a little before -- no, not 2015.  I

17   think right around that time, like I was still getting some

18   sales, but I wasn't getting a lot of business at all.

19        I can't really verify that information.  I would have

20   to go back and look at my records.  Whatever I say is going to

21   be inaccurate.

22   Q.   You also mentioned your brother gave you a loan at some

23   point?

24   A.   He has given me several loans.

25   Q.   What was the most recent loan that he gave you?

IB2JKET4                    Ketabchi - cross

1    A.  It was one of the ones on the chart from A1 business.

2    Q.  Are you talking about the summary chart that was shown in

3    evidence during this trial?

4    A.  Yeah, that was one of them.  We designated it as a loan,

5    but I will give it back to him when I am able to at sometime in

6    the future.

7    Q.  You talked through your understanding of your brother

8    Arash's employment history.  Do you remember that?

9    A.  Yeah, I remember some of that.

10   Q.  You testified he worked at the Tax Club?

11   A.  I recall that.

12   Q.  For some period of time?

13   A.  Yes, ma'am.

14   Q.  Your understanding was that he sold some type of financial

15   services at the Tax Club?

16   A.  Yes, from my understanding and what I was told.

17   Q.  What you were told by your brother, I assume?

18   A.  Correct.

19   Q.  At some point he left the Tax Club and started working at

20   Olive Branch Marketing?

21   A.  From what I was told, yes.

22   Q.  Mr. Ketabchi, isn't it true that, in fact, there is a time

23   between when he worked at the Tax Club and when he worked at

24   Olive Branch Marketing?

25   A.  I there may be.  I know at some point he lived in

1  California for a couple of years, or so I recall I think he

2  worked for the name of the company may have been Unleashed

3  Solar, I believe.

4          THE COURT:  Can you spell it.

5          THE WITNESS:  U N L E A S H E D, Solar.

6          THE COURT:  Unleashed Solar?

7          THE WITNESS:  That was when he was living in

8  California.

9          THE COURT:  It is Unleashed Solar?

10         THE WITNESS:  Yeah, he was a salesman for that.

11 BY MS. FLETCHER:

12 Q.  Now, it is your testimony that there was a couple-year

13 period where he was living in California between when he worked

14 at the Tax Club and when he worked at Olive Branch?

15 A.  I don't recall exactly the dates when he was employed at

16 Tax Club and Olive Branch, but I can definitely verify he lived

17 in California for approximately a couple of years.

18 Q.  And he lived in Orange County?

19 A.  He lived in Orange County, yes.

20 Q.  He lived near you?

21 A.  Near me.

22 Q.  During at least some of that time period he lived with a

23 woman named Kerri Simmons, didn't he?

24 A.  Kerri Simmons, I believe, yes.

25 Q.  That was his girlfriend at the time?

IB2JKET4                         Ketabchi - cross

1    A.  Yes.

2    Q.  And in addition to working at the solar company, he and Ms.

3    Simmons also worked for a foreclosure company or a company

4    helping to renegotiate mortgages on homes that were in

5    foreclosure, didn't he?

6    A.  I don't have knowledge of that information.

7    Q.  You weren't aware of that?

8    A.  I wasn't aware of that.  I was only aware of Unleashed

9    Solar that I know my brother worked for for some time.

10   Q.  Are you aware that he moved back to the tristate area from

11   California in late 2013?

12   A.  I know he definitely moved back for a fact.  I just, for

13   the record, my dates are, unfortunately, not accurate.  I can't

14   rely on my memory because I am under extreme stress and I

15   have -- there is a lot of issues with PTSD and everything.

16   Q.  I understand.

17   A.  That is a fact he did move back.

18   Q.  Isn't it also a fact that the reason he moved back was

19   because he and Ms. Simmons were in various types of legal

20   trouble during that time?

21   A.  I don't have knowledge of legal trouble.

22   Q.  You're not aware, for example, that Homeland Security

23   executed a search warrant at their joint apartment and seized

24   evidence of narcotics trafficking?

25   A.  No, I was never made aware of that.

IB2JKET4                         Ketabchi - cross

1   Q.  You're not aware the mortgage company that he worked for

2   was being investigated for fraud and that several members of

3   that company were arrested in connection with their role?

4   A.  No, I was never informed of that information.

5   Q.  You're not aware he and Ms. Simmons were questioned by law

6   enforcement about that fraud taking place at that mortgage

7   company?

8   A.  No.

9           MR. PAUL:  I object to this.

10          THE COURT:  I understand.  Go ahead.  Next question.

11          It is noted, sir.

12  BY MS. FLETCHER:

13  Q.  Was your brother married during the time period he was

14  living in California?

15          THE COURT:  Ladies and gentlemen, before that is

16  answered, I want you to understand that the series of questions

17  that were just asked in regard to Arash are given to you solely

18  for the impact, if any, of the -- that is not the way to phrase

19  it -- were given to you solely as, relevant or not, as you

20  decide on this defendant's state of mind, all right?

21          It is only the impact on his state of mind, for no

22  other purpose.  The two defendants here are Mr. Owimrin and

23  Mr. Shahram Ketabchi.  Mr. Arash Ketabchi is not before you.

24  That has nothing to do with what you're supposed to be doing

25  here.  It is only his state of mind alone.  Go ahead.

1              You were asking something about marriage?

2    BY MS. FLETCHER:

3    Q.  Was your brother, Arash, married when he was living in

4    California?

5    A.  I cannot answer that question accurately because I am not

6    sure at that time if he was legally divorced.

7    Q.  Did there come a time when he got a divorce?

8    A.  I still don't know if he is legally divorced actually

9    because his marriage was initially consummated with someone

10   that lived in another country, so I think there is a

11   complication in the legality of how they went about any kind of

12   divorce, but I don't have that information.

13   Q.  Were he and his wife separated when he was living in

14   California?

15   A.  If he was still legally married, then they were obviously

16   separated, correct.

17   Q.  Now, were you aware that during the time period that Arash

18   was living in California, he and Ms. Simmons and others were

19   packaging and shipping large quantities of marijuana from

20   California to the tristate area?

21           MR. PAUL:  Objection; asked and answered.

22           THE COURT:  I'll allow it, but again it is state of

23   mind only.

24   BY MS. FLETCHER:

25   Q.  The last question, were you aware that after he departed

1   living in California, your brother Arash was shipping oxycodone

2   to the tristate area from California?

3   A.  I have no knowledge of that, no.

4           THE COURT:  The similar limitation, his state of mind

5   only, not for the truth of what Arash was doing or wasn't

6   doing.

7   BY MS. FLETCHER:

8   Q.  You testified on direct about the day that the --

9           THE COURT:  And just so the record is clear for the

10  lawyers, I have made a 403 calculation and permitted those

11  questions.  Proceed.

12  Q.  -- you testified on direct about March 21, 2017, the day

13  that your apartment was searched.  Do you recall testifying

14  about that?

15  A.  Yes, ma'am.

16  Q.  At that time you lived alone in your apartment, right?

17  A.  Yes, ma'am.

18  Q.  Let's pull up Government Exhibit 803 in evidence.

19          Mr. Ketabchi, this is your apartment, isn't it?

20  A.  This is my old apartment, yes, ma'am.

21  Q.  The apartment you lived in in March of 2017?

22  A.  The one that they broke into, yes, ma'am.

23  Q.  This is the kitchen in that apartment?

24  A.  Yes, ma'am.

25  Q.  Can you pull up 805, please.

1          Mr. Ketabchi, this is your work space or office space

2     in your apartment you were living in in March of 2017?

3     A.  Yes, that is the joint living room and the space I used to

4     work in the office.

5     Q.  Can you describe what some of the items are on this desk?

6          There is a big black item in the foreground.  Is that

7     a speaker?

8     A.  Can you put the -- that is a speaker, yes.

9     Q.  And then how about on the other side of the computer

10    monitor, is that a copy machine, fax machine, scanner?

11    A.  Yes.

12    Q.  It looks like there is an office telephone, a

13    conference-type phone?

14    A.  Yes.

15    Q.  Then a separate landline phone?

16    A.  Right.

17    Q.  To the right of that there is a filing tray.  Do you see

18    that?

19    A.  Yes.

20    Q.  It has multiple levels of paperwork on it?

21    A.  Yes, I see that.

22    Q.  That was essentially your filing cabinet, right?

23    A.  That was one of them.

24    Q.  Let's pull up Government Exhibit 806.  This is a zoomed-in

25    picture of some of that filing cabinet, right?

1    A.  Yes.

2    Q.  So there are some papers here?

3    A.  That is correct.

4    Q.  If you look closely at the second rung down, you can see

5    there are checks made payable to A1 Business Consultants?

6    A.  I see that.

7    Q.  Do you see that?

8    A.  Yeah, I think that says A1 on the top there.  That was

9    seized into evidence.

10   Q.  Let's look at Government Exhibit 807.

11          These are stacks of some of the charge-back debit

12   advice documents that you testified about on direct?

13   A.  I would say that's inaccurate information.  It looks like

14   on this picture the first maybe one of them is a charge-back

15   debit device.  It is hard to tell what is underneath of that.

16   Q.  If we can get the image back up.

17   A.  Those were just printed from my computer, so there is no --

18   it is not anything that is not into evidence.

19   Q.  I understand that.

20          THE COURT:  Just a moment.  Let's get that image back

21   up so you can see it again.  (Pause)

22          MS. KEARNEY:  I think the signal went down.

23          THE COURT:  And, therefore?

24          MS. KEARNEY:  Therefore, none of the monitors are

25   connected now.

1             THE COURT:  And, therefore?

2             MS. KEARNEY:  Therefore, no one can see anything.

3             THE COURT:  If you have a hard copy, give him a hard

4   copy if you're proceeding with this.  How do we get the feed

5   back up?  Is that for our IT people?

6             MS. KEARNEY:  It's for the IT people.

7             THE COURT:  Ms. Blakely.

8             MS. FLETCHER:  Ms. Blakely is on it already.

9             THE COURT:  Back in the day, this was a lot easier.

10            MR. SCHMIDT:  I agree.

11            THE COURT:  Can you use the Elmo there?

12            MS. FLETCHER:  I have never been so relieved in my

13  life.

14  BY MR. PAUL:

15  Q.  Do you see that on your screen, Mr. Ketabchi?

16  A.  I do.

17  Q.  These are charge-back documents, charge-back debit advice

18  documents?

19  A.  Yes, the first one shows a charge-back debit advice.

20  Q.  The first one and two, do you see that?

21  A.  Where?

22  Q.  Just show the first one.  You can see the bottom, the

23  second page, more charge-back debit advice documents?

24            THE COURT:  I am not sure.

25  A.  I can see, I can only -- I am sorry.

1          THE COURT:  Go ahead.

2     A.  If I am analyzing this, I can verify that the top document

3     is 100 percent a charge-back debit advice.  I cannot assume the

4     other one underneath it is because I don't have enough

5     information.

6     Q.  So when the agents, the HSI agents, came to your apartment,

7     they showed you the search warrant?

8     A.  Yes.

9     Q.  Right?  The search warrant listed a number of companies

10    including A1 Business Consultants?  Did you see that on the

11    search warrant?

12    A.  I was in shock and I did not read the search warrant or

13    look at it or analyze it.  All I know IS he mentioned to me

14    there was A1 business they were coming to search for in my

15    apartment.

16    Q.  He said, "We're here to search for documents related to A1

17    Business Consultants"?

18    A.  I don't remember that verbatim.  This was a long time ago

19    and I was in shock.

20    Q.  You made that clear.

21          Once the agents came and began the search, you told

22    them to stop searching, didn't you?

23    A.  I recall in my state that I was -- I don't even know what

24    words I used, like what are these agents doing in my apartment

25    with a gun to my head.

IB2JKET4                        Ketabchi - cross

1   Q.  Mr. Ketabchi --

2           MS. FLETCHER:  Your Honor, we move to strike.

3           THE COURT:  The jury will disregard the answer.  Go

4   ahead.

5   BY MS. FLETCHER:

6   Q.  Did you tell them to stop searching?

7   A.  I recall I most likely did.

8   Q.  Did you tell them I have nothing to do with my brother's

9   business, I just drive Uber?

10  A.  That's false information.

11          THE COURT:  No, no, no, not whether it is false or

12  not.  The question was:

13          Did you tell the men who entered your apartment on the

14  morning of March 21, 2017 that you had nothing to do with your

15  brother's business, I just drive Uber?  The answer is either

16  yes or no, did you say that to them?

17          THE WITNESS:  I can't verify 100 percent.  I do not

18  recall making that statement.  In fact, I made the opposite

19  statement, that I am aware of A1 Business, and I helped them

20  with some office work.  I may have also said I do Uber, driving

21  and stuff.

22  Q.  Okay.

23  A.  The question you're asking is just something that is so

24  long ago and when a person is in a state of shock --

25  Q.  Yes.

```
 1            THE COURT:  Do you believe you still are in a state of
 2   shock, sir --
 3            THE WITNESS:  Well --
 4            THE COURT:  -- from that event?
 5            THE WITNESS:  I don't want to say I am in a state of
 6   shock, but I definitely had symptoms of PTSD.
 7            THE COURT:  Thank you.  Next question.
 8   BY MS. FLETCHER:
 9   Q.  You testified on direct Mr. Ketabchi that you did office
10   work for your brother.  I think used the phrase, "simple
11   tasks."  Do you remember that?
12   A.  I most likely did, yes.
13   Q.  Do you remember saying that you did simple tasks for your
14   brother?
15   A.  Okay.  Ma'am?  Your Honor, if I can make a statement?
16            THE COURT:  No, no.  It is a pretty straightforward
17   question.  Do you remember saying today from this witness stand
18   that you did simple tasks for your brother?
19            It seems to me, unless I am wrong, that question can
20   be answered either yes, no, or I don't remember.  What is the
21   answer to that question?
22            THE WITNESS:  I understand my options.  The answer is
23   yes.
24   BY MS. FLETCHER:
25   Q.  You also testified that you helped with a limited number of
```

1    charge-backs -- excuse me -- seven charge-backs over a limited

2    occasion.  Do you remember that?

3    A.  I don't remember saying limited occasion, but I remember

4    seven.

5    Q.  Seven?  And that was Rita Redding, Patricia Cabral,

6    Charlene Foster, Joe Freeland Jeanette Waldrup, Diane

7    Weissenberger and John Ford.  Do you remember that list of

8    seven?

9    A.  Yes.

10   Q.  Can we please pull up what is in evidence as Government

11   Exhibit 423.  Do you see this email on your screen,

12   Mr. Ketabchi?

13   A.  I do.

14   Q.  This is an email from you to your brother, Arash.  Isn't

15   it?

16   A.  Yes.

17   Q.  The email has an attachment, yes?

18   A.  Ah-huh.

19   Q.  Did you say to your brother this is the letter prototype I

20   set up, also read the note to Heidi below, look at the POF doc.

21            POF, that is proof of fulfillment, right?

22   A.  Correct.

23   Q.  The letter prototype you're talking about -- please go to

24   the next page -- go to the attachment -- back one -- that is

25   this document, right, the document here that is dated

IB2JKET4                          Ketabchi - cross

1  10-29-2015?

2  A.  If that was the attachment, I guess that is what it was.

3  Q.  This is the letter prototype you set up?

4  A.  From what I recall, yes, if that is attached to that email.

5  Q.  Yes.  At least this version of it looks like it has an

6  electronic signature for Arash Ketabchi?

7  A.  That is correct.

8  Q.  And you testified on direct that this is basically the

9  template that you used, right, for responding to the

10  charge-back disputes that you responded to?

11  A.  No.

12  Q.  This isn't your template?

13  A.  This is an initial version.  The template that was used for

14  the following charge-backs is different than this.

15  Q.  How is it different?

16  A.  Well --

17  Q.  It has more information, right?

18  A.  There is more information.  Is this the complete page?  I

19  don't know.

20  Q.  Is there --

21  A.  Is there another?  I recall there is a couple of

22  stipulations and their contract that was added to this

23  prototype.  I also believe there was a tracking section that

24  was added, and also I remember, instead of doing a digital

25  signature, it was a written signature.  Those are the changes I

IB2JKET4                          Ketabchi - cross

1   recall.

2   Q.  So you listed a few changes, the written signature,

3   tracking number section, and then I think what you're referring

4   to is the indemnification provision, right?

5        You included that information in the later drafts of

6   this template?

7   A.  Yeah, based on my guidance from people who worked with my

8   brother, they recommended to update those things.

9   Q.  To include the indemnification provision in the --

10  A.  Yeah, the clause because it was in the contract so I

11  followed directions.

12       (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  So once you followed directions and modified this prototype
2   that you created, you used that version, right, to respond to
3   all of these seven chargebacks?
4   A.  Yes.  From what I remember, yes.
5   Q.  And you said you didn't modify it, it was just a standard
6   form that you used and attached the fulfillment data to the
7   back of it?
8   A.  Describe modify.  What changes are you exactly talking
9   about?
10  Q.  Presumably you changed the date and the name of the
11  customer, right?
12  A.  Yeah.  That would be standard because they wouldn't be able
13  to connect the information at the merchant company.
14  Q.  Otherwise the substance of the notice was essentially a
15  template?
16  A.  Yeah.  It would just be a standard copy and paste, besides,
17  you know, key information I would say.
18  Q.  OK.  Let's go to Government Exhibit 512 in evidence.
19          You testified about this document on direct.  Do you
20  remember that?
21  A.  Let me read it.
22          MS. FLETCHER:  Ms. Lee, why don't we blow up the
23  bottom half of that.
24  A.  Yeah.  I recall seeing this.  Patricia Cabral.
25  Q.  So this is an e-mail dated December 4, 2015, 11:15 a.m.

1    And it's from you to Brian.  Brian is at fulfillment, right?

2    A.  One of the companies, yes.

3    Q.  And you're asking him for POF for Patricia Cabral today;

4    POF, proof of fulfillment, right?

5    A.  That is correct.

6    Q.  So this means you have received a chargeback for Patricia

7    Cabral and you're in the process that you described of

8    gathering documents to dispute the chargeback?

9    A.  Most likely, yes.

10        MS. FLETCHER:  Please scroll up, please.

11   Q.  Brian responds, "I can only assume by POF you're referring

12   to the safe word."  Her safe word is "Danny."

13        Is it fair to say he doesn't understand your question

14   here?

15   A.  It seems that way.

16        MS. FLETCHER:  Can we scroll up to the top e-mail on

17   that chain.

18   Q.  This is another e-mail, just a couple of hours later, from

19   Brian to you, right, copying Arash?

20   A.  Yeah.  It's another e-mail.

21   Q.  It says he read the notes on the client.  Those are the

22   fulfillment notes, right, notes of the training sessions with

23   the client?

24   A.  Um-hum.

25   Q.  And he is saying he wants to give you a heads-up.

IB28KET5                          Ketabchi - Cross

1        THE COURT:  You can't just say "um-hum."

2   A.  I understand.  I am reading that, yes.

3   Q.  And he says, "Her son is claiming that she has dementia and

4   is in the process of getting a power of attorney for her."

5   A.  I see that.

6   Q.  And you testified on direct that you don't remember

7   responding to this or whether there was a response to this?

8   A.  I don't recall responding to this e-mail.

9   Q.  Do you recall seeing this?

10  A.  I saw this.

11  Q.  So you saw at the time that Patricia Cabral was trying to

12  cancel or her son was trying to cancel for her because she had

13  dementia?

14  A.  I recall reading it.  I didn't really analyze the

15  information in it.  Because that's not my decision to make.

16  It's my brother's.  It's his business.  So whatever he tells me

17  I do.  But I do remember this particular e-mail, in terms of I

18  did contact my brother and I asked him, I said, what's going on

19  with Patricia?  You need to make sure you take care of this

20  client.

21  Q.  You were telling your brother to take care of this client?

22  A.  Yes, because I had information that there was a problem

23  with the client and they needed to address this.

24  Q.  OK.  Let's move on to Government Exhibit 510 in evidence.

25        I'm sorry.  Let's go to 511, please.

1          You see the top of the e-mail from Lilly?

2     A.  Yeah, I see that.

3     Q.  To you and Arash?

4     A.  Yes, I see that.

5     Q.  Attaching Patricia Cabral's proof of fulfillment.

6     A.  I see that.

7     Q.  Let's go to 441, please.

8          So those e-mails we just looked at, those are dated

9     December 4, right?  This is now December 10, so six days later?

10    A.  Yes.

11    Q.  This is an e-mail from you to Ray.  That's Ray Quiles, the

12    other fulfillment company?

13    A.  Yes.

14    Q.  And you're asking him for detailed proof of fulfillment for

15    the attached contract of Patricia Cabral?

16    A.  Yes.

17         MS. FLETCHER:  Can we pull up Government Exhibit 230

18    in evidence.

19         If we could go to page 2, please.

20    Q.  It's fair to say Government Exhibit 230 is five days later,

21    December 15, 2015?

22    A.  From what date?

23    Q.  From the last e-mail we looked at.

24    A.  I didn't check the last e-mail date.  But if you say that's

25    accurate, then that's the date.

1   Q.  So we just looked at the December 10 e-mail.  This is

2   December 15.

3           And this is the document, this is your template, for

4   attaching proof of fulfillment to dispute Patricia Cabral's

5   chargeback?

6   A.  Yes.

7   Q.  Let's look at some of the attachments here.

8           I'm sorry.  Let's look at the three items she

9   purchased:  Business plan, corp credit, bookkeeping.

10          Now, those were services for Ms. Cabral's online

11  business, right?

12  A.  To my knowledge, I believe business plan is actually a

13  document, and I believe so is corporate credit, but I believe

14  bookkeeping was a service from what they informed me of.

15  Q.  And these items were products that are sold to someone who

16  has an online business?

17  A.  I'm not sure about that.  I don't know.  That's dependent

18  on the salesperson and the customer in their office.  I don't

19  have information on that.

20  Q.  You're not familiar with the purpose that these services

21  were being sold?

22  A.  I have never been on any sales call.  I don't have

23  knowledge of that information.

24  Q.  Your brother didn't tell you what his business was selling?

25  A.  They are selling business plan, corporate credit,

1   bookkeeping, and some other services and products, but they

2   don't tell me what they are communicating with their customers

3   and what the deals are.

4   Q.  Did they tell you what type of customers they have?

5   A.  They tell me they have people who need these type of

6   services.  So if someone is either, maybe, looking for a

7   business plan to launch a new business, that would be a

8   customer that is interested in these services, and so on and so

9   forth with the other services.

10  Q.  You said the business plan and corporate credit are

11  documents.  Let's look at those.

12          What is this document?

13  A.  I am not sure.  Maybe I can look at it further with the

14  other parts.

15          This actually -- let's see.  Are there other pages, I

16  believe?

17          This looks like a business plan, actually.

18  Q.  This is the business plan?

19  A.  I believe so, yes.

20          MS. FLETCHER:  Let's scroll forward.

21          Let's stop there.

22  Q.  Isn't this the bookkeeping service, this document?

23  A.  I am not sure.  I can't answer that question because I'm

24  not the fulfillment company.

25  Q.  But you're attaching this and sending it to the credit card

1    company, so what was your understanding of what you were

2    attaching?

3    A.  I don't have an understanding.  I am just doing a simple

4    task that my brother asked me to do to put the files together

5    and send it to the merchant.  I'm not analyzing the data, what

6    customers were sold, what the fulfillment agreement is with my

7    brother's company and what the products are, and at what level

8    of quality or extensiveness there is supposed to be.  That is

9    not my knowledge whatsoever in this.

10   Q.  Let's go to the next page.

11               This is corporate credit, right?

12   A.  It says BizCredit.  So I would think that would be their

13   corporate credit.  They named it BizCredit.  Yes.

14   Q.  OK.  Let's go to Government Exhibit 221 in evidence.

15               It's fair to say this is another chargeback?

16   A.  This looks like another chargeback.

17   Q.  Let's go to page 2.

18               This is Rita Redding's chargeback?

19   A.  Yes.  It's Rita Redding.

20   Q.  And the date on this is May of 2016?

21   A.  Yes.

22   Q.  And her services are slightly different, right, corp/LLC,

23   corp credit, trust and will?

24   A.  Yes.

25   Q.  In your job, responding to these chargebacks for your

brother, it was important to you to be sure that you had the

documents to fight the chargebacks?

A.   In terms of proof of delivery?  What is exactly the

question?  I don't understand.

Q.   Was it important to you to be sure that you had the

necessary documents to be able to fight the chargeback?  You

wanted to be sure that you proved fulfillment?

A.   I wanted to make sure that the fulfillment company had the

information or the services of the products or the training or

coaching that was agreed upon with my brother's company and the

customer.  So therefore we can send that to the merchant, to

the credit card company, so they can review it, and then they

can resolve it, either the company, A1 Business, can fix the

problem with the customer, if they didn't get something, or

something was missing, or there was a miscommunication with

salesperson and customer, and the merchant company, the bank

would have to evaluate the information and analyze that data.

         So that was the process that I was asked to do, to

just gather the documentation and forward it to the correct

department.  And the other parts of the puzzle, salesperson to

customers and fulfillment to A1 Business, that's for them to

determine what is supposed to be done.

Q.   You had nothing to do with that.  I understand.

         But going back to your particular role, in order to

submit the proper documentation to the merchant company, you

1   had to obtain the contract, right?

2   A.  Yeah.  Initially you have to get the contract so you can

3   match the information to the sales.

4   Q.  When you say the information, you need to match the

5   customer name, the date of the sale, the method of payment, you

6   need to figure out whether you have a contract to support a

7   particular chargeback that you're fighting?

8   A.  Yeah.  To be more exact in my response, the chargeback

9   debit advice doesn't have customer names on it.

10  Q.  I understand.  You testified on direct you need to pull the

11  contract to be sure that you have the appropriate contract to

12  go --

13  A.  I don't pull the contract.  I don't have any contracts.  A1

14  Business Consultants or whoever the sales floor is, they store

15  the contracts, because once they sell it they store it.

16  Q.  And you request the contract from them so that you can

17  include it in your response to the merchant company?

18  A.  Exactly.  We need -- without the contract --

19  Q.  Mr. Ketabchi, if you could please just answer my question,

20  I will ask you the next question if I need more information.

21  OK?

22  A.  Yes.

23  Q.  So you obtained the contract so that you can include that

24  in the documentation that you submit to the merchant company.

25  And when you did that, you looked at the contract to see what

IB28KET5                              Ketabchi - Cross

1    services the customer had purchased, correct?

2    A.  I don't analyze what they purchased.  I send that to the

3    fulfillment company.  It's their job to see what was purchased

4    and send me the information.

5    Q.  You just collect the documents?

6    A.  I'm just a document collector and a faxer.  That's all I am

7    doing.

8             THE COURT:  You're basically -- I don't mean to demean

9    it any way -- you're a low-level transferor of documents from

10   one person to -- sir, let me ask the question.

11            THE WITNESS:  Yes, sir.

12            THE COURT:  Are you saying that, in essence -- and

13   again, I don't mean this in any demeaning way, but I am trying

14   to understand what you're saying -- that you, in essence, are a

15   low-level transferor of information from one entity to another?

16            THE WITNESS:  With this task, yes, your Honor.

17            THE COURT:  And what you do is completely mechanical?

18            THE WITNESS:  It's mechanical.  And anyone can do it

19   with basic knowledge.

20            MS. FLETCHER:  Let's go to page 4, please.

21   BY MS. FLETCHER:

22   Q.  You also included copies of the customer's driver's license

23   to dispute the chargebacks, didn't you?

24   A.  That is correct for one or two I think, maybe, of the

25   transactions that I was given, but a lot of them didn't.

1        THE COURT:  Let's do it this way.

2            Ms. Fletcher is entitled to an answer of yes, no, or I

3    don't know.  So if you can answer a question yes, no, or I

4    don't know, you should say that, either yes, no, or I don't

5    know.  If you can't answer it that way, tell Ms. Fletcher that,

6    and then she will decide what to do.

7    A.  I am not able to answer that without an explanation, in

8    terms of a yes or no.

9    Q.  In responding to Ms. Redding's chargeback complaint, you

10   attached to your letter a copy of her driver's license, isn't

11   that right?

12   A.  Ms. Redding's license was attached, correct.

13            THE COURT:  So the answer then is yes?

14            THE WITNESS:  For this specific one, yes.

15            THE COURT:  That is what you were being asked.

16           What I am trying to do is make things go a little

17   faster for everybody.  The most important thing is to be

18   telling the truth here.  So if you can answer it yes, no, or I

19   don't know, do so.

20   Q.  And this is Ms. Redding driver's license photo on your

21   screen?

22   A.  Yes.

23            THE COURT:  Now you have it.

24   Q.  Let's move to page 7 of that document.

25           You also included this document in your response.

1   This is the continuation of services agreement document.

2   A.   I was -- well, whatever they give me from their office is

3   what was included.  That's what I was given.  So yes.

4   Q.   Yes, you included this document in the response to Ms.

5   Redding's chargeback?

6   A.   Yes.

7   Q.   And it's called a continuation of services agreement?

8   A.   That's how it's labeled, yes.

9   Q.   It was explained to you what the purpose of this agreement

10  is, wasn't it?

11  A.   No.  I never recall getting an explanation on what that

12  form is for.

13  Q.   Your testimony is that you did not understand the purpose

14  of this document?

15  A.   I did not understand the purpose of this document when I

16  was doing these.  When I found out was, I think, if I remember

17  correctly, Bill Sinclair may have mentioned what it was for.

18  Q.   Let's go to page 10.

19          This is the business plan again, right?

20  A.   The next page -- yes, that seems to be their business plan.

21          MS. FLETCHER:  Can you pull up Government Exhibit

22  206B.

23  Q.   Do you see 206B up on your screen, Mr. Ketabchi?

24  A.   Yes.

25  Q.   This is the letter from Joe Freeland.  Do you remember

IB28KET5                         Ketabchi - Cross

1    testifying about that on direct?

2    A.   I have seen this letter when they asked me about it, yes.

3    Q.   When you say "they," when your attorney, Mr. Paul, asked

4    you about it during your direct examination?

5    A.   Correct.

6    Q.   And when you saw this document on your direct examination,

7    you said you just glanced at it before, you didn't review it.

8    Do you remember saying that?

9    A.   I do, yes.

10            MS. FLETCHER:   Could we just, please, blow up the top

11   half of that.

12   Q.   You see bullet number 1 there, right in the center of the

13   page?

14   A.   I see that.

15   Q.   It says, "They promised me a commission check within 90

16   days in writing of which I never received.  They kept putting

17   me off saying it was on the way and sales were going to start

18   to process after that 90 days."

19            Your testimony is that you don't remember that part of

20   that letter?

21   A.   Absolutely not.

22   Q.   This is a letter that was printed out in your apartment,

23   wasn't it?

24   A.   I don't recall.

25   Q.   Let's go to Government Exhibit 234 in evidence.

IB28KET5                          Ketabchi - Cross

1          I'm sorry.  Before we move on, do you see the date on

2     this letter, December 18, 2015?

3     A.  I see the date.

4     Q.  And this letter was attached to Joseph Freeland's

5     chargeback dispute.  Do you recall that?

6     A.  I don't recall looking at the letter in terms of a glance.

7     I didn't read it.  I didn't analyze it.  It was just another

8     part of the main document, and I am just processing the file.

9     So I am not reading what they are trying to communicate with

10    the salesforce at A1 Business.  That's not my job.  And I have

11    no time to waste.

12    Q.  Understood.

13         So with Patricia Cabral, you received the notification

14    that she had dementia and you raised that with your brother,

15    right?

16    A.  That was a simple e-mail.  I looked it through, and it was

17    alarming to me, and I needed to in good faith notify my brother

18    so he could address it accordingly and do what was supposed to

19    be done.

20    Q.  You didn't have time to read this document?

21    A.  This is --

22    Q.  Mr. Ketabchi, let me finish my question.

23         You didn't have time to read this document because it

24    was a full page long?

25    A.  I assess what I spend time on --

1    THE COURT:  Can you answer her question?

2    A.  I can answer with an explanation.  I can't answer yes or

3    no.

4              THE COURT:  Do you want the explanation, Ms. Fletcher?

5              MS. FLETCHER:  No, thank you.

6              THE COURT:  All right.

7              MS. FLETCHER:  234A, please.

8              If we could, actually -- this is multi-part.  Can we

9    put it up next to 234B, please.

10   Q.  You see the document on the left-hand side of your screen?

11   A.  Yes, ma'am.

12   Q.  That's Joe Freeland's chargeback dispute.  It's attached to

13   234B.  Do you see that?

14   A.  Yes, I see that, yes.

15             MS. FLETCHER:  Could you pull up 234C.

16   Q.  This is the chargeback dispute that you prepared?

17   A.  That is the prototype letter response, yes.

18   Q.  In this letter you say, "The customer's claim is 100

19   percent false."

20   A.  That is what I was told to write with that response from my

21   brother.

22   Q.  You're also told to sign the letter for him?

23   A.  I have authorization to sign the letter, upon his

24   authorization, that is correct, yes.

25             MS. FLETCHER:  Let's pull up Government Exhibit 235 in

IB28KET5                        Ketabchi - Cross

1   evidence.

2           Can we blow up the whole sheet.

3   Q.  Mr. Ketabchi, these Post-its that are on here, that say

4   "sent denied 11/25," "credit back," those are your handwriting,

5   right?

6   A.  Yes.

7   Q.  Keeping track of the status of the different chargeback

8   disputes?

9   A.  It seems that way, yes.  What's going on with it so I can

10  be better organized.

11  Q.  Then if you go to the top of the page, you have numbered

12  the pages.  Is that your handwriting there, "page 1 of 9"?

13  A.  Yes.  That's for the fax so that the company getting it can

14  make sure they received all the pages.

15  Q.  Let's go to page 2, please.

16          This is the chargeback dispute letter for Jeanette

17  Waldrup.  Do you see that?

18  A.  I do.

19  Q.  This is not an A1 Business Consultants chargeback, this is

20  an Element Business Service, LLC?

21  A.  That is correct.

22  Q.  And that's another merchant account that your brother used?

23  A.  That is correct.

24  Q.  And if you scroll down, this letter is signed Masoud

25  Kouchek Manesh?

IB28KET5                        Ketabchi - Cross

1   A.  That is correct.

2   Q.  That's actually your signature, isn't it, you have signed

3   for Mr. Kouchek Manesh?

4   A.  Under authorization, that is correct.

5   Q.  Under authorization from what Mr. Kouchek Manesh?

6   A.  From Kouchek Manesh through my brother.  It was authorized.

7   I only do what my brother requests and his agreements with the

8   parties.

9   Q.  If your brother told you to jump off a bridge, would you?

10  A.  I would not.

11  Q.  Let's go to the top of that, please.

12          You see the paragraph just below where it says Element

13  Business Services, LLC?

14  A.  I'm sorry.  Which paragraph again?

15  Q.  Just below that.  You prepared this letter?

16  A.  In response -- yes, I believe so.

17  Q.  This letter is slightly different than some of the other

18  letters we have looked at, isn't it?

19          You say "Our representatives never made any of the

20  comments that the client is stating about the 2 percent

21  residual income and the 1 percent profit from credit card

22  purchases monthly."

23          Is it your testimony, Mr. Ketabchi, that you only

24  included that because your brother told you to?

25  A.  Absolutely.

IB28KET5                        Ketabchi - Cross

1   Q.  Let's go to Government Exhibit 428 in evidence.

2             This is an e-mail from Heidi at US Card System to you

3   and Arash.

4   A.  Yes.

5             MS. FLETCHER:  If we can blow up the substance, the

6   first paragraph of that e-mail.

7   Q.  So what has happened here is you have put some of Jeanette

8   Waldrup's chargeback documentation on the wrong company's

9   letterhead, isn't that right?

10  A.  This was a simple clerical error.  The chargeback was

11  responded from one client to the wrong merchant.  That's all

12  that was.

13  Q.  OK.  And what she tells you is that this is a huge problem

14  because you have told the bank --

15  A.  She is telling Arash, if you note the name on top.

16  Q.  Mr. Ketabchi, would you please let me finish my question?

17  A.  You said a statement that wasn't --

18  Q.  This e-mail is to you and your brother?

19  A.  That's what the e-mail that it was sent to, but it's

20  addressed to Arash.

21  Q.  And in the e-mail to you and your brother she says, "This

22  is a huge problem considering that we told the bank that A1 and

23  Element are completely separate companies and have nothing to

24  do with each other."

25  A.  That makes sense.  That's standard protocol.  You can't

IB28KET5                          Ketabchi - Cross

1   respond from one company to another with another merchant.

2   Q.  It was your understanding --

3   A.  That's like Amazon --

4            THE COURT:  Sir, I don't believe there is a pending

5   question.  I may be wrong.

6            THE WITNESS:  I'm sorry.

7   Q.  It was your understanding that Ms. Brownfield had told the

8   bank that A1 and Element were completely separate companies

9   that had nothing to do with each other?

10  A.  That's what she had stated, I believe, yes.

11  Q.  Let's go to 429 in evidence.

12           THE COURT:  Could we go back one exhibit, please, the

13  exhibit that you put on before.

14           MS. FLETCHER:  235?

15           THE COURT:  Highlight the sentence that was

16  highlighted last time.

17           "Our representatives," do you see that, sir?

18           THE WITNESS:  I see that.

19           THE COURT:  You did what Arash told you to do,

20  correct, you said what Arash told you to say?

21           THE WITNESS:  Yes.

22           THE COURT:  My question is, did he, over the phone or

23  in person, dictate those words to you?

24           THE WITNESS:  From my recollection, he stipulated to

25  me this is what you need to respond in this particular response

1    letter that I had, and I just put it into writing for them.

2              THE COURT:  That's what I don't understand.  Did

3    he -- if you remember, did he dictate those words to you or did

4    he say something else?

5              In other words, did he say, Shahram, I want you to

6    say, "The client's claim is 100 percent false.  Our

7    representatives never made," and so forth, did he say those

8    words and you typed it out?

9              THE WITNESS:  From my recollection, it wasn't

10   verbatim, but that is what he wanted me to communicate in the

11   response, because I have no way of knowing or knowledge of what

12   their transaction was.  So I just do what they had set up with

13   their customers and clients.

14             THE COURT:  Am I wrong -- I may be wrong because I

15   haven't been involved in this -- doesn't it require some

16   understanding of the process to write a sentence that says,

17   "Our representatives never made any of the comments that the

18   client is stating about the 2 percent residual income and the 1

19   percent profit from credit card purchases monthly"?

20             THE WITNESS:  No.  Not only is it not necessary, it's

21   impossible for me to know because I am not on the sales call or

22   the sales floor.  So I can only go by what I am being told

23   based on what they have done.

24             THE COURT:  Thank you.

25             THE WITNESS:  Yes, sir.

IB28KET5                         Ketabchi - Cross

1    BY MS. FLETCHER:

2    Q.  You could have spoken to the salesperson, right?

3    A.  I could have spoken to a lot of people, yes.

4    Q.  But you didn't?

5    A.  That wasn't my job description for this task.

6    Q.  Let's go to Government Exhibit 434 in evidence.

7            You see this e-mail from Heidi to you and your

8    brother?

9    A.  Yes, I see that.

10   Q.  This is actually from Ray to you --

11   A.  To Heidi, copied my brother.  I see that.

12   Q.  The e-mail below that is an e-mail from Heidi to you and

13   your brother?

14   A.  I see that.

15   Q.  And the date on this is November 19, 2015.  She says, "The

16   A1 and Element chargeback reversals for Jeanette Waldrup were

17   both denied."

18           What does that mean?

19   A.  I believe that means that there was a chargeback response

20   and the merchant bank denied those.

21   Q.  Denied what?

22   A.  Denied that they should be reversed and given back to the

23   company.

24   Q.  So it means you won the chargeback?

25   A.  No, it means the opposite.

IB28KET5                          Ketabchi - Cross

1    Q.  It means you lost the chargeback?

2    A.  A1 Business Consultants, not me, I don't get anything from

3    them, they lost the chargebacks.

4    Q.  You don't get anything from A1 Business Consultants?

5    A.  No, not for their sales.

6    Q.  Let's go to Government Exhibit 437 in evidence.

7           So this is an e-mail from you to Heidi, dated December

8    3rd of 2015?

9    A.  I see that.

10   Q.  You ask her, "Can you please send us the final account

11   closure letter for Element?"

12          Do you see that?

13   A.  I see that, ma'am.

14   Q.  The Element merchant account at this point in time was

15   being closed, wasn't it?

16   A.  I believe, based on this information, I can't say it was in

17   the process of being closed, or it may have been closed in the

18   past.  There is insufficient data there.

19          MS. FLETCHER:  Could we pull up Government Exhibit 204

20   in evidence.

21   Q.  See this product services agreement on your screen?

22   A.  Yes.

23   Q.  This is an agreement between a customer Sally K. Burnett

24   and Elevated Business Consultants LLC?

25   A.  I see that.

1  Q.  Elevated Business Consultants, this is another name for A1

2  Business Consultants, isn't it?

3  A.  I'm not aware of that.  It couldn't be another name,

4  because if they are both LLCs, they are independent companies,

5  just from my business information.

6  Q.  Isn't it a fact that the A1 Business Consultants LLC name

7  actually filed to have an alternate LLC name, the name of

8  Elevated Business Consultants?

9  A.  I don't recall that.  I don't have information on that.

10  Q.  Let's take a look at -- in one of the e-mails we just

11  looked at, Heidi was offering you and Arash consulting services

12  on chargebacks.  Do you remember seeing?

13  A.  She is not offering me anything.  I'm not the owner of the

14  business.  I don't run it.  I'm not involved in the business.

15  I don't make anything from the business.  She is addressing it

16  to my brother.

17  Q.  Are you reading from something?

18  A.  No, I have nothing here.

19  Q.  I thought you had a script.

20  A.  No, it's not a script.

21      THE COURT:  The jury will disregard the comment of the

22  attorney.

23  Q.  Did she offer you and your brother in the e-mail consulting

24  services?

25  A.  No.

IB28KET5                          Ketabchi - Cross

Q.  Did she offer to work for Arash for a fee to respond to
certain of his chargebacks?

A.  For Arash at A1 Business Consultants, yes.

Q.  Didn't you tell her, in fact, that you would speak to Arash
about potentially hiring her to do these consulting services?

A.  At Arash's request.

Q.  Was she actually hired to do these consulting services for
your company?

A.  I do not recall what she did with my brother.  I don't have
that information.

Q.  OK.  So you responded to the seven chargebacks that we
discussed earlier?

A.  Upon the request of my brother.

Q.  Yes or no?

A.  Yes.

Q.  Let's take a look at Government Exhibit 242 in evidence.

         In addition to the seven chargebacks that you worked
on, you also received other complaints, didn't you, including
Government Exhibit 242?

         If you'd like, we can blow that up.

A.  I can respond to that with an explanation.  I can't respond
yes or no.

Q.  Did you receive other complaints from A1 Business
Consultants' customers apart from the seven chargebacks that
you worked on?

IB28KET5                        Ketabchi - Cross

1   A.  I can respond to that, if I can explain.  It's not a yes or

2   a no.

3              MS. FLETCHER:  Your Honor, would the Court please

4   direct the witness to answer the question?

5              THE COURT:  Sir, did you receive other complaints from

6   A1 Business Consultants' customers in addition to the seven

7   chargebacks that you have testified you worked on?  Yes, no, or

8   I don't know?

9              THE WITNESS:  If you could kindly define complaints.

10             THE COURT:  You want a definition of complaint?

11             THE WITNESS:  Yes.  Because there's chargebacks,

12  there's customer complaints.  I can't respond accurately.

13             THE COURT:  Well, what is the universe?

14             THE WITNESS:  What is the universe?

15             THE COURT:  You said there's chargebacks.

16             THE WITNESS:  I'm not an astronomer, but there's stars

17  and planets.

18             THE COURT:  Next question.

19  BY MS. FLETCHER:

20  Q.  Were you made aware of other instances in which A1 Business

21  Consultants' customers had claimed that they did not receive

22  the services that they paid for, apart from the seven

23  chargeback disputes that you worked on?

24  A.  I recall one.

25  Q.  Which one do you recall?

1   A.  I believe, if I remember correctly, it was a local

2   jurisdiction complaint, I believe Passaic, because my brother

3   sent me that information.  It was a complaint.

4   Q.  Take a look at 242 on your screen.

5           Is this another format --

6           THE COURT:  I now realize what you were saying.

7           When I was asking what is the universe, I meant what

8   is the universe of complaints that you worked on.

9           THE WITNESS:  I'm sorry.

10          THE COURT:  That's all right.  I'm sorry.  My Star

11  Trek mind.

12          Let Ms. Fletcher ask her questions.  I am sorry I

13  confused you.

14          Ms. Fletcher, proceed.

15  BY MS. FLETCHER:

16  Q.  Do you see this document on your screen, Mr. Ketabchi?

17  A.  Yes, ma'am.

18  Q.  This is another one of the documents that was seized from

19  your apartment?

20  A.  I have never looked at this document until now.

21  Q.  Never looked at it?

22  A.  I have never seen this one, to my recollection.

23  Q.  So this is another format of a chargeback complaint, isn't

24  it?

25  A.  I have never seen one like this.  I cannot answer that

1    question.

2    Q.  So it reads, "Merchant also promised a six month time frame

3    for services to be completed, but when customer followed up

4    merchant said there was delay with server and still nothing was

5    done."

6         Further down, "Customer contacted merchant and

7    canceled, requested refund, because none of the services

8    promised were provided."

9         Your testimony is that you do not recall seeing this

10   ever?

11   A.  I do not recall seeing this document, ma'am.

12   Q.  Take a look at the next page of that document.

13        You see that contract?

14   A.  I see the contract.

15   Q.  Isn't it a fact that you requested this contract and

16   attached this contract to the customer complaint and maintained

17   this contract with the customer complaint in your apartment?

18   A.  I don't recall that.

19   Q.  Let's go to Government Exhibit 1126.

20        You see that up on your screen, Mr. Ketabchi?

21   A.  I do.

22   Q.  This is a letter, a handwritten letter from Chris Klevjord

23   based in Newport, Washington?

24   A.  Yes.

25   Q.  You see this letter is dated 1/11/16?

1   A.   I do.

2   Q.   And this was on one of your electronic devices in your

3   apartment?

4   A.   Yes, ma'am.   I believe, if my memory serves me correctly,

5   this was the one from the County of Passaic.

6   Q.   This is a complaint that was submitted to the Passaic

7   County Department of Public Safety?

8   A.   Yes.   And my brother forwarded that to me to respond.

9   Q.   Did you review this letter?

10  A.   No.   I can barely read the handwriting.   I don't have time

11  to read stuff like that.

12  Q.   In this letter, Ms. Klevjord says, "Now they want a total

13  of $22,500 for more license and more contracts.   I have told

14  them no more money until I get contracts before I send them any

15  more money.   Also went to my bank, closed all my personal

16  banking and credit cards so they have no access to my

17  accounts."

18          It's your testimony you don't remember reading this?

19  A.   I have never read this.

20  Q.   But you responded to the Passaic County inquiry with

21  respect to Ms. Klevjord's complaint, didn't you?

22  A.   Yeah, because I'm a file processer, yes.

23  Q.   Did you or did you not respond to the complaint?

24  A.   I responded, but I didn't analyze the information, yes.

25  Q.   Let's pull up Government Exhibit 1131 in evidence.

1        This was the investigative complaint?

2   A.   That's the one I was referring to.  I remember this and I

3   recall it.

4   Q.   Dated February 22, 2016?

5   A.   Yes.  And my brother had updated me on this.

6   Q.   So you responded again at his direction?

7   A.   I responded, and he also -- well, I'm not going to say

8   until you ask me.

9   Q.   Let's pull up what is in evidence as Government Exhibit

10  450.

11       You see the e-mail at the bottom, dated March 2, 2016,

12  from you to Ray?

13  A.   Absolutely.

14  Q.   You asked him, "Can you please send me the complete proof

15  of fulfillment for Chris Klevjord 911?"

16  A.   As I said, I responded.  This is just evidence that I

17  responded because I am getting POF.

18  Q.   You're requesting proof of fulfillment for Chris Klevjord

19  911, right?

20  A.   That is correct.

21  Q.   911 means emergency, doesn't it?

22  A.   In most terminology, yes.

23  Q.   It's your word.  It means emergency, doesn't it?

24  A.   Yes.

25       THE COURT:  What did you intend to signify by writing

IB28KET5                           Ketabchi - Cross

1   911?

2           THE WITNESS:  Well, my brother, if I recall, he had

3   informed me that we got a complaint --

4           MS. FLETCHER:  Objection.

5           THE COURT:  Answer it narrowly.  What did you mean by

6   writing 911?

7           THE WITNESS:  I meant you need to expedite this as

8   fast as possible.

9           THE COURT:  Thank you.

10          Next question.

11  BY MS. FLETCHER:

12  Q.  Showing you what is in evidence as Government Exhibit 238.

13          MS. FLETCHER:  If we could blow up the top half of

14  that.

15  Q.  Mr. Ketabchi, did you see this during the course of this

16  trial, the complaint from Kaylene Zahn to the New Jersey Office

17  of the Attorney General?

18  A.  The only time I have seen this, I believe, is when I saw

19  some discovery material, if I remember correctly.

20  Q.  You didn't see this at the time that it was received?

21  A.  Not that I recall, no.

22  Q.  You didn't see it?

23  A.  I did not see this.

24          MS. FLETCHER:  If we could go to the second page and

25  blow up the bottom of it.

1  Q.  You see the date on that, October 30, 2015?

2  A.  I do.

3  Q.  Signed by Kaylene Zahn?

4  A.  I do.

5  Q.  And you see the amount of loss that she identifies as being

6  involved in this complaint?

7  A.  I see that.

8  Q.  "$7,000 for a Web site for a person with no Internet."

9  A.  I see that.

10 Q.  Your testimony is you didn't see this when it came in?

11 A.  I never saw this document.

12 Q.  Do you know how this came to be printed out in your file

13 cabinet in your apartment?

14 A.  I don't recall.

15       MS. FLETCHER:  Scroll up to the top of that page.

16 Q.  She says, "They promised me that I would be successful and

17 would make a lot of money even though I do not have a computer

18 or Internet service."

19       You never saw that?

20 A.  I never read that.

21       THE COURT:  How did you decide what documents to print

22 out and what documents not to print out?

23       THE WITNESS:  I don't recall exactly which ones I

24 printed back then.

25       THE COURT:  That's not what I am asking.  What I am

1    asking is how did you decide which documents to print out?

2           THE WITNESS:  I am trying to think back what my

3    process was.  I think I may have printed something that needed

4    to be stored, like physically.  That's the only thing I could

5    think of.

6           THE COURT:  Why would something need to be stored

7    physically as opposed to in your computer?

8           THE WITNESS:  I kind of use the hybrid system.  If I

9    need to look at a document at sometime in the future, I may

10   just print and store it so I can just access it quicker.  So it

11   just depends.  And my brother's stuff --

12          THE COURT:  Is it fair to say that you would print out

13   the documents that you wanted to look at and/or thought were

14   important?

15          THE WITNESS:  Maybe some of them, but not all of them.

16   I think it was more of what needed to be addressed in terms of

17   maybe timelines.

18          THE COURT:  In terms of what?

19          THE WITNESS:  Timelines.

20          THE COURT:  What needed attention?

21          THE WITNESS:  Yeah, depending on what I was asked to

22   do.

23          THE COURT:  All right.

24          MS. FLETCHER:  May I have a moment, your Honor?

25          THE COURT:  Yes.

1   BY MS. FLETCHER:

2   Q.  Mr. Ketabchi, I am going to have you take a look at what

3   has been marked for identification as Government Exhibit 517.

4   A.  OK.

5           MS. FLETCHER:  Ms. Lee, if we could, please, blow up

6   the top portion of that screen.

7           If you could scroll up, Ms. Lee, so we could see the

8   addresses on the e-mail.

9   Q.  Mr. Ketabchi, do you see that on your screen?

10  A.  I do.

11  Q.  You see this is an e-mail from you to Arash Ketabchi and

12  elizabetha@passaiccountynj.org?

13  A.  I do.  And I see Kaylene Zahn there.

14  Q.  You see the attachment to this e-mail is Kaylene Zahn?

15  A.  I see that.

16          MS. FLETCHER:  The government offers Government

17  Exhibit 517.

18          THE COURT:  Why did you volunteer that you saw Kaylene

19  Zahn on that?

20          THE WITNESS:  Because she's attempting to say that I

21  knew of this, but the truth is I never recalled this.  And now

22  that I see it, it's obvious that I attached it, but that

23  doesn't mean I read it or looked it over or analyzed it.  It

24  kind of goes back to chargebacks.  And what I have been trying

25  to tell the Court is --

IB28KET5                         Ketabchi - Cross

1          THE COURT:  Sir, I think you have answered my

2     question.

3          Next question.

4          MR. SCHMIDT:  Your Honor, I think they offered it into

5     evidence.

6          MS. FLETCHER:  We did.

7          MR. SCHMIDT:  I object to it.  I know your Honor made

8     some rulings relating to this so I think it comes in with a

9     limiting instruction.

10         MS. FLETCHER:  Your Honor, I don't think a limiting

11    instruction is appropriate with respect to this document.

12         THE COURT:  Sidebar.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

IB28KET5                           Ketabchi - Cross

 1            (At the sidebar)

 2            MR. SCHMIDT:  The Court previously allowed the

 3   government to put in complaints relating to --

 4            THE COURT:  Just a moment.  This is a document written

 5   by an adverse party.  It's a statement of a party opponent.

 6   What is the issue?

 7            MR. SCHMIDT:  It's not the top sheet, your Honor.

 8            The government offered a number of complaints that

 9   they were going to use for the state of mind of Mr. Ketabchi.

10   And when they were entered into evidence, your Honor gave a

11   limiting instruction.

12            Now, this is a new document --

13            THE COURT:  Just a moment.  Let me recall it.

14            Go ahead.

15            MR. SCHMIDT:  We objected because we said that even a

16   limiting instruction would not be sufficient for the jury to be

17   able to use this just for the state of mind of Mr. Ketabchi,

18   and they would be using it against my client because it's

19   similar to the complaints testified to by the witnesses that

20   the government called.  And your Honor disagreed and put a

21   limiting instruction.

22            Now, this is a new document that relates to one of

23   those documents.

24            THE COURT:  To one of the chargebacks?

25            MR. SCHMIDT:  No, one of the complaints that were

1    previously admitted.  That was the handwritten letter.

2            Now what has happened --

3            THE COURT:  Again, let me just think back.

4            OK.

5            MR. SCHMIDT:  Now, they had that letter that really

6    didn't identify a lot, but it was a complaint and it was for

7    the state of mind of Mr. Ketabchi.

8            Now they are putting in a document that specifically

9    relates to that complaint that identifies one of the company

10   names that was used by I think Olive Branch at the time.

11           Now, if this was offered versus the handwritten

12   complaint, this would have a lot less information in it that

13   was prejudicial to my client.  But now they have been able to

14   put the prejudicial information that's related to my client --

15           THE COURT:  Show me.  It's 517.

16           MR. SCHMIDT:  It's in the other exhibit with Kaylene

17   Zahn's name on it.

18           THE COURT:  The handwritten one.

19           MR. SCHMIDT:  It did not relate to my client.  So when

20   they are looking at it for the state of mind of Mr. Ketabchi,

21   it might have worked, the limiting instruction.  Now we have

22   this document which relates back to that, which we did not have

23   before, that does link it to my client.

24           THE COURT:  Show me.

25           MR. SCHMIDT:  The contract is from Sunset.  There has

1   been testimony about Sunset.

2              THE COURT:  Show me.

3              MR. PAUL:  At the top of service agreement.

4              THE COURT:  Sunset Interactive, and what is the

5   testimony in the record about Sunset Interactive?

6              MR. SCHMIDT:  It was one of the merchant accounts that

7   Olive Branch used.

8              MS. FLETCHER:  Your Honor, I am very confused as to

9   why Mr. Schmidt is arguing about this document.  The

10  relationship between this document and Mr. Schmidt's client is

11  not apparent to the government.

12             THE COURT:  I am more concerned about Mr. Schmidt

13  saying that -- and I do of course remember -- that in terms of

14  the complaint, it was only for his state of mind, because I was

15  concerned with Mr. Paul's argument that the issue was, he saw

16  these things, but he had lots of other things to do.  It's

17  simply whether he knew what was happening or not, state of

18  mind.  So that made sense to me.

19             MS. FLETCHER:  That was the purpose of the complaint.

20  That is absolutely the reason for which it was offered, and any

21  argument the government has with respect to that document will

22  be about what it shows for Mr. Ketabchi's state of mind, and

23  there will be no argument related to Mr. Owimrin.

24             This document the government pulled over the lunch

25  break, because it became clear from Mr. Ketabchi's direct

1    testimony that he was going to insist he was only aware of

2    seven complaints, and while the complaint was in his apartment,

3    we wanted to find evidence that he in fact responded to the

4    complaint.  And we found it.  So the only import of this

5    document is that, contrary to his testimony, he did review that

6    document and he submitted a response to the AG's office related

7    to Ms. Zahn.

8            The government is not going to make any argument about

9    this document with respect to Mr. Owimrin.  And to the extent

10   that I understand this to be a hearsay objection, as your Honor

11   had noted, it's the statement, if any, by a party opponent.

12   It's nonhearsay as offered by the government.

13           MR. SCHMIDT:  This isn't hearsay.  It basically

14   undercuts the previously admitted document that the government

15   has put in.  It would be completely different if this was in

16   existence and we knew about this at that time, linking it to my

17   client now.

18           THE COURT:  I understand the objection.  I am going to

19   permit in Government Exhibit 517.

20           How much longer do you have?

21           MR. SCHMIDT:  Would it be with an instruction that

22   this has been offered only against --

23           THE COURT:  No.  It's a statement of an adverse party.

24           MS. FLETCHER:  I neglected to say 517A.  I now

25   understand this has been marked as a separate exhibit.  So we

1   will offer both.

2          THE COURT:  How much longer do you have?

3          MS. FLETCHER:  I have quite a bit still, your Honor.

4          THE COURT:  We will go about 15, 20 minutes, and then

5   I will excuse them until Monday morning.

6          (In open court)

7          THE COURT:  Was the motion for admission made?

8          MS. FLETCHER:  Yes, your Honor.  With respect to

9   Government Exhibit 517 and its attachment 517A.

10          THE COURT:  I am admitting 517 and 517A.

11          (Government's Exhibits 517 and 517A received in

12   evidence)

13          MS. FLETCHER:  Can we please publish the top half of

14   that page.

15   BY MS. FLETCHER:

16   Q.  Mr. Ketabchi, this is an e-mail from you to your brother

17   and to elizabetha@passaiccountynewjersey.org, is it not?

18   A.  It is.

19   Q.  It's dated December 10, 2015, isn't it?

20   A.  That is correct.

21   Q.  The attachment -- there's two attachments.  The first one

22   is titled "kaylenezahn.pdf."  And you say, "Hi, Elizabeth.  The

23   sales contract is attached."  Don't you?

24   A.  That is correct.

25          MS. FLETCHER:  Let's go to the next page, please.  I

1    guess it's 517A.

2    Q.   This is a service agreement between Sunset Interactive,

3    Inc. and Ms. Kaylene Zahn, isn't it?

4    A.   That's what it states, yes.

5    Q.   To be clear, the recipient of the e-mail, if we could go

6    back a page, Elizabeth A.  That's the Passaic County

7    investigator, isn't it?

8    A.   To my recollection, I believe that was her, but I can't

9    verify without seeing her documentation.

10           MS. FLETCHER:  Can we show Mr. Ketabchi what is in

11   evidence as Government Exhibit 236.

12           Go to page 2, please.

13           Sorry.  Page 3.

14   Q.   You see just above the word "type," it says "merchant

15   notification of denial" here?

16   A.   I see that.

17   Q.   And that means that, in response to receiving documentation

18   disputing a chargeback, the merchant has decided to grant the

19   chargeback, to give the customer their money back, isn't that

20   right?

21   A.   That is correct.

22           MS. FLETCHER:  Go to the next page.

23           I am looking for the template letter.  Can you click

24   forward a couple of pages?

25   Q.   This is one of the other chargebacks you worked on, isn't

IB28KET5                         Ketabchi - Cross

1    it, Mr. Ketabchi?

2    A.  That is correct.

3    Q.  Dated July 25, 2016, related to Ms. Diane Weissenberger?

4    A.  That is correct.

5         MS. FLETCHER:  Can we go forward one more page.

6    Q.  You sent another letter with respect to Ms. Weissenberger

7    on August 25th of 2016, right?

8    A.  Is that a different date than the one you just showed me?

9    Q.  It appears to be, doesn't it?  The last one was July 25.

10   A.  I didn't look at the date of the other one.

11        MS. FLETCHER:  Please go back two pages.

12   A.  Yes.  You're correct.  They are different dates.

13   Q.  You testified on direct that the only work you did for A1

14   related to these chargebacks.  Do you remember that?

15   A.  I can answer with an explanation.

16   Q.  Did you testify on direct that the only work you did for A1

17   related to these chargebacks?

18   A.  I don't recall.

19             (Continued on next page)

20

21

22

23

24

25

IB2JKET6                      Ketabchi - cross

1    Q.  You don't recall whether you testified on direct that the
2    only thing you did was related to charge-backs?
3    A.  Not at the moment, but I believe it wasn't just
4    charge-backs.  It was other tasks as well, yes.  It wasn't just
5    charge-backs, to my recollection, on my testimony.
6    Q.  I believe you referred to those as simple tasks, that you
7    were essentially your brother's paper-pusher?
8    A.  Some of that.
9    Q.  Is that fair?
10   A.  Some of them, yes.
11   Q.  Let's take a look at Government Exhibit 448 in evidence.
12        Do you remember looking at this during your direct
13   testimony?
14   A.  I do.
15   Q.  It is an email, dated January 24, 2016, from you at your
16   personal email to Arash at his personal email, attaching the
17   spreadsheet that is titled, "Emily leads."
18   A.  I see that.
19   Q.  This is a lead list, isn't it?
20   A.  I would assume so.
21   Q.  Isn't it a fact that Emily refers to Emily Miller, an
22   individual also known as Brooke Marcus?
23   A.  I was only made aware of that when the trial started and it
24   started to come out with information.  I never had information
25   of that previously.

1   Q.  In this email, you are sending this lead list to your

2   brother.  Isn't that right?

3   A.  That is correct.

4   Q.  So someone sent it to you before you sent it to your

5   brother?

6   A.  Yes, I recall, I believe I explained that it is somewhat I

7   am remembering my brother had contacted one of his lead

8   companies and guided them to send it to me so I could forward

9   it to him.

10  Q.  Let's take a look at Government Exhibit 463 in evidence.

11          Do you see this email on your screen?

12  A.  I see it.

13  Q.  September 13, 2016, subject Carl Morris wire info.

14  A.  I see that.

15  Q.  Carl Morris, the email is from you to your brother, isn't

16  it?

17  A.  It is.

18  Q.  And reflected in the email is Carl Morris' wire info.  So

19  you're sending your brother information so he can send wire

20  payments to Carl Morris.  Isn't that right?

21  A.  Yes.

22  Q.  And Carl Morris is based in -- cut off -- Glendale,

23  Arizona, is he not?

24  A.  It looks that his bank is, yes.

25  Q.  Carl Morris is another lead source, isn't he?

IB2JKET6                          Ketabchi - cross

1   A.  I am not fully aware of that.  I can't verify.  Only my

2   brother knows.

3   Q.  Did you ever meet any of your brother's lead sources?

4   A.  No, not that I recall.

5   Q.  Did you ever meet Carl Morris?

6   A.  No, not that I recall.

7   Q.  Did you ever travel to Phoenix with your brother?

8   A.  I never traveled with him, no.

9   Q.  Did you ever meet him in Phoenix?

10  A.  I did.

11  Q.  Let's show you what in evidence as Government Exhibit 714.

12          Do you see this photograph on your screen?

13  A.  I do.

14  Q.  This is an Instagram post by your brother, right?

15  A.  Yes.

16  Q.  The location here is at the Westin in Las Vegas?

17  A.  Yes, that's what it says.

18  Q.  There are four people in that photo.  The person in the

19  foreground, that is your sister, Mona, right?

20  A.  Yes, it is.

21  Q.  And then you?

22  A.  That is me.

23  Q.  The person next to you is an individual Ryan Hult?

24  A.  From the testimony previously, yes, it seems to be my

25  brother's friend or whatever he was.

1         THE COURT:  Do you not know that is Ryan Hult?

2         THE WITNESS:  I know him from the testimony

3    previously, but I don't recall him.

4         THE COURT:  You don't remember?  You just said the

5    gentleman in blue is yourself?

6         THE WITNESS:  That is me.

7         THE COURT:  You don't remember him from the fact he

8    was sitting next to you in the Westin Las Vegas hotel & Spa?

9         THE WITNESS:  I don't remember him and that name

10   because he was an acquaintance of my brother's and he showed up

11   at our table and spent a few minutes with us.  That is my

12   brother's crowd or whatever you want to call it.

13        THE COURT:  That is you, right?

14        THE WITNESS:  That is me, yes.

15        THE COURT:  Next question.

16        THE WITNESS:  That seems to be Ryan Hult.

17   BY MS. FLETCHER:

18   Q.  It is dated May 3, 2015?

19   A.  I see that.

20   Q.  You're sitting down having brunch?

21        THE COURT:  That's correct?

22        THE WITNESS:  It seems that way, yes,.

23   BY MS. FLETCHER:

24   Q.  Ryan Hult is sitting next to you.  He has his own

25   place-setting?

IB2JKET6                          Ketabchi - cross

1   A.  I see that.

2   Q.  Your testimony is that you did not know he was your

3   brother's lead source?

4   A.  I did not know, no.

5   Q.  Let's go to Government Exhibit 243 in evidence, please.

6   A.  I know he was my brother's friend.

7   Q.  Pull up the top half of that.

8           You testified on direct that your brother sent you

9   this document and asked you to check the math, essentially.  Is

10  that right?

11  A.  I recall that, yes.

12  Q.  So what we're looking at on the left, those are dates of

13  sales, right?

14  A.  I believe so, yes.

15  Q.  And to the right names of customers?

16  A.  It seems that way, yes.

17  Q.  Ida, Diane, Patricia, Linda, Emma, Charlene?

18  A.  Yes.

19  Q.  Have you ever met anyone under the age of 80 named Ida?

20  A.  Have I ever met anyone?

21  Q.  Yes.

22  A.  Not that I recall.

23           THE COURT:  Does having an aunt Ida count?

24           THE WITNESS:  It is possible.  It is possible, but I

25  don't recall.

IB2JKET6                        Ketabchi - cross

1   BY MS. FLETCHER:

2   Q.  Have you looked to the right of their names, Mr. Ketabchi,

3   you see the same amounts, right, Ida spent --

4            THE COURT:  Slow down.

5   Q.  -- is it fair to say that what we're looking at here is the

6   amount of the sales made by your brother's company to these

7   customers?

8   A.  It seems like a good assumption, yes.

9   Q.  You checked the math here, right?

10  A.  If I recall correctly, yes.

11  Q.  What were you checking?

12  A.  To see if the numbers added up for him.

13  Q.  So if you add up those numbers, $75,974?

14  A.  Ah-huh.

15  Q.  What does the "at 17" percent mean?

16  A.  I think that's what he had written down for some commission

17  of some kind, so I think his salespeople, but I am not a

18  hundred percent certain because it is not identified as what it

19  is really into.

20  Q.  17 percent, that is the merchant fee, isn't it?

21  A.  That, it could be that, too, I think possible, yes.

22  Q.  Then he subtracts 13 percent.  What is that for?

23  A.  I can't answer that question because there is no -- like a

24  total, I don't know exactly what it he meant, but I would

25  assume maybe it is the sales commission for the sales force,

IB2JKET6                          Ketabchi - cross

1   but I can't verify that.

2   Q.  Scroll down, Please, Ms. Lee.

3       So the numbers next to Reagan and Andrew, what do

4   those numbers reflect?

5   A.  I would assume it is their sales commission.

6   Q.  Did you check the accuracy of those numbers?

7   A.  I think I may have, but a lot of the things you're asking

8   me were so long ago, my memory is not as good as you may think,

9   what happened with Kyle Lawson.

10  Q.  "At pay," what does that mean?

11  A.  It is possible I may have registered this on an Excel sheet

12  or something.  I don't remember, but that is the only thing I

13  can think of when I am looking at it right now.

14  Q.  Mr. Ketabchi, looking at this document, isn't it a fact

15  what you're doing here is trying to be sure that Arash is

16  paying his salespeople the appropriate amount after deducting

17  merchant fees and fees for lead sources?

18  A.  Can you repeat that question, please?

19  Q.  I don't think, I can.

20      (Record read)

21  A.  That is not a fact.

22  Q.  Let's look at Government Exhibit 414 in evidence.

23      THE COURT:  Ms. Fletcher, why don't you find a logical

24  point to break -- not to break, but actually I want to be able

25  to give this jury, be able to excuse this jury late on Friday

IB2JKET6                          Ketabchi - cross

1    afternoon.

2              MS. FLETCHER:  You know what the government's response

3    to that question always is:  Now is a good time!

4              THE COURT:  I do and I phrased it to get that answer.

5              Ladies and gentlemen, you have been hearing testimony

6    for a long day.  I did not want to keep you till 5:00 o'clock

7    on Friday afternoon.  The evidence is coming in apace.  My

8    staff and the parties and the attorneys very much appreciate

9    your hard work.  I can tell you things are moving forward.

10             Keep an open mind.  Enjoy the weekend.  Please be

11   here.  We have some legal things to do, and I don't want you

12   just to be waiting around, so on Monday come in at 10:00.  I

13   will meet with the parties at 9:00 or maybe even earlier, and

14   be here by 10:00.  Again, we need all 14 of you here.  Thank

15   you very much.  Enjoy the weekend.  Keep an open mind.  You

16   have not heard all the testimony.

17             (Jury excused)

18             THE COURT:  Please be seated in the courtroom.

19             You may step down, sir.  You are on cross-examination,

20   sir, and you have heard me tell the other witnesses you can't

21   talk to your lawyers, okay?

22             You're in the middle of cross-examination.  You're not

23   allowed to talk to your lawyers.

24             THE WITNESS:  Thank you.

25             THE COURT:  We're going to have a charging conference

1  starting at 9:15 am on Monday.  I think it should be relatively

2  short.  My Deputy will pass out to each of the parties the

3  charge as I intend to give it with one exception and, of

4  course, I'll hear whatever arguments you want.

5      The one exception is this was printed out before

6  Shahram Ketabchi took the stand, so it had the open issue of

7  whether or not he would take the stand.  You'll see that there,

8  and obviously there will be one charge now that deals with the

9  defendants have each taken the stand and it is the standard

10 charge on that.

11     If you have any substantive changes, and something

12 tells me you won't because I think it is pretty solid, it has

13 been given in large part before, but if you do, I would

14 appreciate your either faxing it to us or if you can, filing it

15 on ECF so I can take a look.  So you have the charge.  The

16 charging conference is at 9:15 am.  You heard me tell the jury

17 to be here at 10:00.  Mr. Finocchiaro, I take it, will be here

18 at 9:15 or 9:00.  So he will wait outside of the courtroom.

19     How much longer do you think you have, Ms. Fletcher?

20     MS. FLETCHER:  My best guess, your Honor, is about 45

21 minutes.

22     THE COURT:  All right, fine.

23     MS. FLETCHER:  But I --

24     THE COURT:  I am not holding you to that.  That is

25 your good faith estimate, I take it.  Then Mr. Fino, Mr.

IB2JKET6                          Ketabchi - cross

1    Finocchiaro, and that is it, Mr. Paul, you believe, for your

2    case?

3              MR. PAUL:  That will be the end of our case, Judge.

4              THE COURT:  Thank you.  Enjoy the weekend.

5              MR. PAUL:  Because my client takes everything very

6    literally, would your Honor please advise him that he can talk

7    to us about other matters other than his testimony.

8              THE COURT:  Yes, certainly.

9              Do you understand that, Mr. Ketabchi?  You can talk

10   about scheduling and such things, but you can't talk about the

11   case, you can't talk about your testimony or others' testimony.

12   Don't talk to them about the case.  Talk about the weather,

13   talk about when you're supposed to be here, things of that

14   nature.  Do you understand that, sir?

15             THE WITNESS:  I understand.

16             THE COURT:  Anything else?

17             MS. FLETCHER:  Just for scheduling purposes, is it

18   your Honor's intention that if we finish before 2:00 or so on

19   Monday, that the parties will sum up?

20             THE COURT:  Yes.

21             MS. FLETCHER:  Is that so even though the government

22   may sum up and there would be a break overnight for the defense

23   summations?

24             THE COURT:  Yes, because you will have the ability to

25   have a rebuttal summation.

IB2JKET6                        Ketabchi - cross

 1            MS. FLETCHER:  I have no problem with that schedule,

 2    your Honor, but just for planning purposes.

 3            THE COURT:  For planning purposes, I intend to have

 4    have this jury's time used as efficiently as possible, and that

 5    includes, to the extent possible, not letting them go after

 6    half a day on Monday.

 7            MS. FLETCHER:  Understood.

 8            THE COURT:  The basic theory is I want this jury's

 9    time to be used efficiently, all right?

10            MS. FLETCHER:  Understood.

11            THE COURT:  If you're done with your summation and

12    there is time for one defense summation, there will be one

13    defense summation, all right?  Thank you, all.  Enjoy the

14    weekend.  Monday at 9:00 for the lawyers at least.

15            (Adjourned until Monday, November 5, 2018, at 9:00

16    a.m.)

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                            Page

 3   BRANDON JELINEK

 4   Direct By Mr. Mitchell . . . . . . . . . . .1489

 5   MONA KETABCHI

 6   Direct By Mr. Paul . . . . . . . . . . . . .1504

 7   Cross By Ms. Kearney . . . . . . . . . . . .1507

 8   Redirect By Mr. Paul . . . . . . . . . . . .1510

 9   STEVEN KETABCHI

10   Cross By Mr. Schmidt . . . . . . . . . . . .1626

11   Cross By Ms. Fletcher . . . . . . . . . . .1627

12                      GOVERNMENT EXHIBITS

13   Exhibit No.                             Received

14    240   . . . . . . . . . . . . . . . . . .1549

15    408   . . . . . . . . . . . . . . . . . .1554

16    517 and 517A . . . . . . . . . . . . . . .1682

17                      DEFENDANT EXHIBITS

18   Exhibit No.                             Received

19    SK-25  . . . . . . . . . . . . . . . . . .1494

20    SK-26  . . . . . . . . . . . . . . . . . .1495

21    SK-28  . . . . . . . . . . . . . . . . . .1514

22    SK-29  . . . . . . . . . . . . . . . . . .1515

23    SK-2   . . . . . . . . . . . . . . . . . .1584

24    SK-3   . . . . . . . . . . . . . . . . . .1594

25    SK-7   . . . . . . . . . . . . . . . . . .1595
```

1    SK-19    . . . . . . . . . . . . . . . . .1596

2    SK-20    . . . . . . . . . . . . . . . . .1597

3    21    . . . . . . . . . . . . . . . . .1598

4    SK-24    . . . . . . . . . . . . . . . . .1625

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25