IB5JKET1                          Charge Conference

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                 v.                          17 Cr. 00243 SHS

5    ANDREW OWIMRIN, a/k/a "Andrew Owens,"
     a/k/a "Jonathan Stewart," and
6    SHAHRAM KETABCHI, a/k/a "Steve Ketabchi,"

7                 Defendants.

8    ------------------------------x
                                          November 5, 2018
9                                         9:20 a.m.

10   Before:

11                  HON. SIDNEY H. STEIN,

12                                        District Judge
                                           and a jury
13
                          APPEARANCES
14
     GEOFFREY S. BERMAN,
15        United States Attorney for the
          Southern District of New York
16   KIERSTEN ANN FLETCHER,
     ROBERT BENJAMIN SOBELMAN,
17   BENET JEANNE KEARNEY,
          Assistant United States Attorneys
18
     SAM A. SCHMIDT,
19   ABRAHAM JABIR ABEGAZ-HASSEN,
          Attorneys for defendant Owimrin
20
     KENNETH A. PAUL,
21   JACOB MITCHELL,
          Attorneys for defendant Ketabchi
22
     Also Present:
23        CHRISTOPHER BASTOS, Detective NYPD and HSI
          CHRISTINE LEE, Paralegal USAO
24        SAMUEL TUREFF, Paralegal

25

IB5JKET1                          Charge Conference

1            (Trial resumes)

2            (In open court; jury not present)

3            THE COURT:  All right.  Good morning.  Everyone is

4    here including the clients.  Your clients do not have to be

5    here, but welcome to everybody.  All the lawyers are here.

6    Please be seated.  We're on the record for the charging

7    conference.

8            The parties received on Friday afternoon the hard copy

9    of the court's proposed charge.  Since then, the only change

10   I've made relates to the fact that both defendants have decided

11   to testify, so that we took out the option charge if a

12   defendant does not testify, then pluralized the charge that

13   said the defendants have testified.  Everything else is the

14   same.

15           Let's be very efficient in this.  I am going to take

16   the hard copy that was given to the parties and we'll just see

17   if there are any objections whatsoever.

18           So first let's take if there are any objections in

19   Roman Numeral I; that is, Pages 1 through and including 34.

20           Anyone have any objections?

21           MS. KEARNEY:  Not an objection, but a proposed

22   addition, your Honor.

23           THE COURT:  All right.

24           MS. KEARNEY:  Charge 12, charts and summaries admitted

25   in evidence.

1            THE COURT:  Just a moment.  (Pause)

2            Anyone have anything before Charge 12?  Let's go to

3      Charge 12.  Yes, ma'am.

4            MS. KEARNEY:  That charge, the government is fine with

5      it as-is.  In our proposed request to charge, we also included

6      charts and summaries not admitted in evidence.

7            THE COURT:  As far as my recollection and notes went,

8      every chart and summary was admitted.

9            MS. KEARNEY:  I think 711, which is the flow chart of

10     the processing, was not admitted as an exhibit, just as an aid

11     to the jury in understanding the testimony.

12           MR. PAUL:  I think that is true.

13           THE COURT:  Let me look at the government's charge.

14           MS. KEARNEY:  It is on Page 50 of the government's

15     request to charge.

16           (Pause)

17           THE COURT:  I have no objection to adding right behind

18     my Charge 12, which is entitled, "Charts and summaries admitted

19     in evidence," the government's proposed charge which is its

20     Request No. 36, "charts and summaries not admitted as

21     evidence."  Any objection to that?

22           MR. PAUL:  No.

23           THE COURT:  I will make one change, though, there for

24     correct parallelism.  The penultimate sentence in Government

25     Request No. 36 says:  "To the extent the charge conforms to

1    what you determine the underlying facts to be, you should

2    accept them, and then to the extent that the charge differs,

3    you may reject them.  So I am just going to make both of those,

4    "may."  Any objection?

5              MR. SCHMIDT:  No objection.

6              MR. PAUL:  No.

7              THE COURT:  So we now have a new Charge 13.  All

8    right.  Thank you for that, Government.

9              Anything else?

10             MR. SCHMIDT:  Yes, I have objections to No. 23,

11   conscious avoidance.

12             THE COURT:  Yes, I understand that.

13             MS. KEARNEY:  I have 17 first if we want to go in

14   order?

15             THE COURT:  I do want to go in order.

16             MR. SCHMIDT:  17 goes first.

17             THE COURT:  Are we going Page 17 or Charge 17?

18             MS. KEARNEY:  Charge 17, Page 26.

19             THE COURT:  All right.  Yes, ma'am.

20             MS. KEARNEY:  The objection is to the first sentence

21   of the third paragraph, "Where a cooperating witness testifies,

22   that testimony must be examined with greater scrutiny than the

23   testimony an ordinary witness."

24             MR. SCHMIDT:  Sorry?  You say the first sentence?

25             MS. KEARNEY:  The first sentence of the third

1    paragraph.

2              THE COURT:  Yes, go ahead.

3              MS. KEARNEY:  I think the "must" there is not

4    appropriate.  I think the government's proposed charge on this

5    issue would be more appropriate, and the issue is this:  The

6    jury may --

7              THE COURT:  What is the government's proposed charge?

8              MS. KEARNEY:  It is on Page 37, Request No. 26, and

9    the specific language is the --

10             THE COURT:  Just a moment.  (Pause)

11             MS. KEARNEY:  The first sentence of the 5th paragraph,

12   which is because of the possible interest the cooperating

13   witness may have in testifying, the cooperating witness

14   testimony should be scrutinized with care and caution.

15             The issue here is there are many witnesses who have

16   potential biases and motives for testifying, and cooperating

17   witnesses certainly do, but that doesn't mean this particular

18   motive must be scrutinized more carefully than any other

19   particular motive a witness may have.

20             THE COURT:  Any objection to that change?

21             MR. SCHMIDT:  Yes.

22             MR. PAUL:  Yes.

23             THE COURT:  I think I get it from Sand.  Let me take a

24   look.

25             MR. PAUL:  That is how I always recall hearing it.

1       MR. SCHMIDT:  Simply the reason is that cooperating

2   witnesses have, by definition, need to be scrutinized more.

3   Similarly, a defendant, you know, has an interest, and there it

4   is more scrutinized.  I think it works in everybody's interests

5   to be much more subtle and different.

6       MS. KEARNEY:  To take that to its logical

7   conclusion -- and I am not requesting this -- you should say

8   like the defendants have an interesting in testifying.

9       THE COURT:  No, that is not what the Second Circuit

10  says.

11      MS. KEARNEY:  I am not requesting that.  That is why I

12  think the "must" is the issue here.

13      THE COURT:  I am just going to take a look at Sand.  I

14  think this is from Sand.  (Pause)  I want to take a look at

15  Sand.  I am pretty sure "must" is the traditional method.  It

16  certainly is with me.

17      Let's go on.  What is the next one?

18      MR. SCHMIDT:  23.

19      MS. KEARNEY:  19.

20      THE COURT:  Yes, ma'am.

21      MS. KEARNEY:  Just to propose instead of "the

22  defendant," it say "Shahram Ketabchi," since there are two

23  defendants.

24      THE COURT:  I think that's fine.

25      MR. SCHMIDT:  I am sorry.  Where are you reading?

1      THE COURT:  19, it says the defendant has called a

2  witness, and the government is requesting instead it read,

3  "Shahram Ketabchi has called a witness."

4      MR. PAUL:  That is fine.

5      THE COURT:  Yes, it is.  The next one.

6      MR. SCHMIDT:  23, your Honor, as conscious avoidance,

7  first note my general objection to conscious avoidance.

8      THE COURT:  In 22?

9      MR. SCHMIDT:  23, Page 33.

10      THE COURT:  That is the change?  We took one out

11  because both defendants have now testified.

12      Conscious avoidance.  Go ahead.

13      MR. SCHMIDT:  Note my general objection.

14      I think conscious avoidance generally changes the

15  burden from the government to the defense and lessens the

16  burden on the government.  So that is my general objection to

17  conscious avoidance.  If your Honor disagrees and is going to

18  have this charge, on the last paragraph, the second to the last

19  sentence that starts, "However," the problem --

20      THE COURT:  Just let me find it.  Yes, "However, if

21  you find that the defendant actually believed"?

22      MR. SCHMIDT:  Yes.

23      THE COURT:  Yes.

24      MR. SCHMIDT:  Yes.  The problem that I have there is

25  that without some other language, it, indeed, shifts the

1    burden.  I suggest that it read:

2           "The government must also prove beyond a reasonable

3    doubt that the defendant did not actually believe the fact was

4    not so.  If the government did not find that he acted knowingly

5    with respect to the fact, you must find the defendant not

6    guilty."  That simply means --

7           THE COURT:  Let me read it on the screen. (Pause)

8           If the government did not prove that he acted

9    knowingly?  Go ahead, sir.

10          MR. SCHMIDT:  It is basically because being phrased

11   the way it is there, it seems like it is almost an affirmative

12   defense that the defendant, you know, needs to prove that he

13   did not actually believe the fact is not so, as opposed to the

14   burden is on the government to prove that the defendant did not

15   actually believe the fact was so.

16          THE COURT:  The government.

17          MS. KEARNEY:  First, I believe this is straight Sand.

18          Second, the way it works is it is the government's

19   burden to show the high probability, in which case if the

20   defendant demonstrates the actual belief, then the high

21   probability is not sufficient.

22          THE COURT:  I actually think this states the law just

23   as it is.  All right.  I am going to keep it the way it is

24   except it says "she acted," that is because this is from my

25   charge -- is really from Sand.  I am going to make that "he."

1          MR. PAUL:  Your Honor, I join in the objections.

2          THE COURT:  Both of your objections are noted and you

3     have them for the record.

4          MR. SCHMIDT:  The next one I have is 31, Page 46.

5          MS. KEARNEY:  I have a proposed revision for No. 27,

6     Page 40, just to make the wording clearer.

7          THE COURT:  Give me the title as well, "Existence of

8     the conspiracy"?

9          MS. KEARNEY:  Existence of the conspiracy, the third

10    to last paragraph, the last sentence, I just propose it say:

11         "To violate the law in the manner charged in Counts 1

12    and/or 2."  Otherwise it implies they have to find both.

13         MR. PAUL:  Where are you?

14         MS. KEARNEY:  Page 40.

15         THE COURT:  The government is proposing the third from

16    the last paragraph, "In short, as far as the first element of

17    the conspiracy is concerned, the government must prove beyond a

18    reasonable doubt that at least two alleged conspirators came to

19    a mutual understanding, either spoken or unspoken, to violate

20    the law in the manner charged in Counts 1 and/or 2."

21         MR. SCHMIDT:  I have no objection, your Honor.

22         THE COURT:  Mr. Paul?

23         MR. PAUL:  I have no objection.

24         THE COURT:  We'll make that change and/or.  A

25    formulation I hate, but I will put it in.

1           MS. KEARNEY:  I apologize.

2           THE COURT:  I understand the concern.  The next one.

3           MR. SCHMIDT:  Your Honor, No. 31 on Page 46.

4           THE COURT:  Just a moment.  Yes, sir, Count 1,

5    conspiracy to commit wire fraud?

6           MR. SCHMIDT:  That's correct, object of the

7    conspiracy.

8           THE COURT:  Yes.

9           MR. SCHMIDT:  The last sentence reads:

10          "You may also find the existence of such a scheme if

11   could find the defendant conducted himself in a manner that

12   departed from the" --

13          THE COURT:  Speak into the microphone.

14          MR. SCHMIDT:  "You may also find the existence of such

15   a scheme if you find that the defendant conducted himself in a

16   manner that departed from traditional notions of fundamental

17   honesty and fair play in the general business life of society."

18          I would ask your Honor that it read:

19          "You may also find the existence of such a scheme if

20   you find that the defendant knowingly and intentionally

21   conducted himself in a manner," et cetera.

22          THE COURT:  The government?  I think that's what the

23   law is.  They have to have a knowing element.

24          MS. KEARNEY:  Yes, I think that is covered in 32, the

25   first paragraph.

1          THE COURT:  It is, but there is no harm in putting it

2     in again.

3          MS. KEARNEY:  No.

4          THE COURT:  I will make that change.

5          "You may also find the existence of such a scheme if

6     you find that the defendant knowingly and intentionally

7     conducted himself in a manner that departed from traditional

8     notions of fundamental honesty and fair play in the general

9     business life of society."

10         Let me go back to Sand here.  (Pause).

11         (Off-the-record discussion)

12         Does anyone have the Sand reference charge on

13    cooperating witness testimony that we were talking about

14    earlier because I can't seem to find it and I was pretty sure

15    this is from Sand.

16         MS. KEARNEY:  I don't have it handy, your Honor.  I am

17    sorry.

18         MR. SCHMIDT:  Your Honor, it is not going to impact on

19    my summation.

20         THE COURT:  You have to speak into the microphone,

21    sir.

22         MR. SCHMIDT:  If your Honor can't make a decision now

23    on that issue, it is not going to impact on my summation.

24         THE COURT:  I know.  You're entitled to a charge,

25    knowing what the charge is.  That is all right.  I want to keep

1   it clean.  (Pause)  What I am going to do, I am going to make,

2   "must" "should," and I think that handles the more troubling

3   language.

4           MR. PAUL:  May I ask how Sand —

5           THE COURT:  I don't see Sand in front of me, but I

6   will grant the request.  Hold on.  (Pause)

7           I am going to make it "should," softening it a little

8   bit.  So on Charge 17, cooperating witness testimony, Page 26,

9   the paragraph that begins, "where a cooperating witness

10  testifies," will read, "that testimony should be examined with

11  greater scrutiny than the testimony of an ordinary witness.

12  You should consider," and so on and so forth.

13          I think the key part really is in Sand.  You should

14  look at all the evidence and decide what credence and what

15  weight, if any, you will want to give to the cooperating

16  witness.  That takes care of Mr. Schmidt's concern.  Let's go

17  back now to where we were.

18          I just handled the request on Count 1, conspiracy to

19  commit wire fraud, and granted the request to add, "knowingly

20  and intentionally."

21          What is the next number anyone has?

22          MS. KEARNEY:  36, Page 55, it is just for clarity.

23          THE COURT:  Count 2, conspiracy to commit money

24  laundering, object of the conspiracy?

25          MS. KEARNEY:  Correct.

IB5JKET1                          Charge Conference

1              THE COURT:  Yes, ma'am.

2              MS. KEARNEY:  I propose the third sentence of the

3      third paragraph start with but --

4              THE COURT:  Instead of?

5              MS. KEARNEY:  Instead of, "just for example."

6              THE COURT:  All right.  Let me read it.  (Pause)

7              MR. SCHMIDT:  I think "for example" is better because

8      that's just an example of a problem as opposed to the only

9      problem.

10             THE COURT:  Let me read it.

11             MS. KEARNEY:  My proposal is it start "but, for

12     example."

13             THE COURT:  Ah, Mr. Schmidt?

14             MR. SCHMIDT:  Then I have no objections.

15             MR. PAUL:  No objections.

16             THE COURT:  Without reading it then, I am going to

17     add, "but, for example."  Now I'll read it.

18             That's fine.  I think that is a minor improvement.

19             All right.  Next one.

20             MS. KEARNEY:  Charge 38, Count 2, conspiracy to commit

21     money laundering, Object 1, the first element.

22             THE COURT:  Yes, ma'am.  1956 money laundering?

23             MS. KEARNEY:  Correct.  The last paragraph, Page 59.

24             THE COURT:  Yes, ma'am.

25             MS. KEARNEY:  We haven't had any testimony to date,

1    and I don't expect there will be, regarding the FDIC, so I

2    think including the second sentence may be confusing to the

3    jury.

4              THE COURT:  That's from my --

5              MS. KEARNEY:  Right.  I propose we take out that

6    sentence and renumber the other two ways so it is between the

7    United States and a foreign country.

8              If you find the source of funds used in the

9    transaction affected interstate commerce, that is sufficient,

10   or if you find the transaction itself involved interstate

11   transfer of funds, that would also be sufficient.

12             THE COURT:  Any objection?

13             MR. SCHMIDT:  Your Honor, I have no objection.

14             However, there was some mention of international

15   merchant processing.

16             THE COURT:  That is in there by saying the first one,

17   between the United States and a foreign country.

18             MR. SCHMIDT:  Then I have no objection.

19             THE COURT:  Let me just get that.  (Pause)  Mr. Paul,

20   any problems?

21             MR. PAUL:  No, no objection.

22             THE COURT:  All right.  This is how I am going to have

23   that paragraph read:

24             "The term interstate or foreign commerce means

25   commerce between any combination of states, territories or

possessions of the United States or between the United States

and a foreign country.  Thus, if you find that the source of

the funds used in the transaction affected interstate commerce,

that is sufficient as well.  Or, if you find that the

transaction itself involved an interstate transfer of funds,

that would also be sufficient."

          Any objection, government?

          MS. KEARNEY:  No.

          THE COURT:  Mr. Schmidt?

          MR. SCHMIDT:  No.

          THE COURT:  Mr. Paul?

          MR. PAUL:  No, your Honor.

          THE COURT:  Next.

          MR. SCHMIDT:  On No. 41, Page 62.

          THE COURT:  Yes, sir.

          MR. SCHMIDT:  You have the second sentence starting

with, "whether."  You have:

          "Whether each defendant intended to promote the

carrying on of the telemarketing fraud may be established by

proof of the defendant's actual knowledge by circumstantial

evidence or by the defendant's conscious avoidance."

          Now, what is happening here is that conscious

avoidance is used for knowledge and cannot be used in

determining intent.  I think that this would confuse the use of

conscious avoidance, your Honor, having using the word,

1    "intended" in the same sentence.

2              THE COURT:  Just a moment.  (Pause)

3              MS. KEARNEY:  If I may, your Honor?

4              THE COURT:  Hold on.  (Pause)

5              MR. SCHMIDT:  I note the last two words, the

6    defendant's knowledge at the bottom of the paragraph, and as

7    your Honor is aware --

8              THE COURT:  Just a moment.

9              (Pause)  Let me hear the argument, Mr. Schmidt.

10              MR. SCHMIDT:  Your Honor --

11              THE COURT:  I know you're concerned about conscious

12    avoidance.  What are you proposing?

13              MR. SCHMIDT:  And that section does talk about the

14    intent to promote.  My suggestion is that this paragraph read:

15              "The fourth element that the government must prove

16    beyond a reasonable doubt is that the conspirators agreed to

17    engage in the financial transactions knowingly and

18    intentionally, that the purpose of the transaction was to

19    promote the carrying on of specified unlawful activity; namely,

20    telemarketing fraud."

21              I suggest that your Honor eliminate the next sentence

22    because it is --

23              THE COURT:  And then?

24              MR. SCHMIDT:  And substitute what I previously

25    discussed with you, the terms "knowingly and intentionally,"

1    all right?

2              And then go to leave out, "In other words, you are

3    entitled to find from the circumstances surrounding the

4    financial transactions or attempted financial transactions, the

5    purpose of that activity and the defendant's knowledge and

6    intent."

7              THE COURT:  The government?

8              MS. KEARNEY:  I didn't quite follow.  I am sorry.

9              THE COURT:  What he is doing, he hates conscious

10   avoidance.

11             MS. KEARNEY:  I understand that.

12             THE COURT:  So what he's doing is taking out the

13   middle sentence that has the words "conscious avoidance" in it,

14   keeping the first sentence which talks about intent and the

15   last sentence which allows an inferential conclusion of intent;

16   that is, you are entitled to find from the circumstances

17   surrounding the financial transactions that the defendant's

18   knowledge.  I think that gets you where you want to go without

19   the hated phrase, "conscious avoidance."

20             MS. KEARNEY:  If I understand it correctly, I think we

21   are okay with it.

22             MR. SCHMIDT:  Your Honor --

23             THE COURT:  Don't mess it up, Mr. Schmidt.

24             MR. SCHMIDT:  -- it is not just conscious avoidance in

25   this.

 1              THE COURT:  I am cutting out the second sentence.

 2              MR. SCHMIDT:  It is conflating knowledge.  So I ask

 3    that after, on the first sentence afterward financial

 4    transactions, that knowingly and intentionally is put in, not

 5    just knowledge because it also requires intent, or knowledge

 6    and intent with the knowledge and with the knowledge of just

 7    adding and intent.

 8              THE COURT:  It says with the knowledge that the

 9    purpose of the transaction, and it is entitled, "intent."  They

10    understand intent.  Just a moment.  I am going to look at your

11    words here.  (Pause)

12              MR. SCHMIDT:  I have a slight modification, your

13    Honor.

14              THE COURT:  Just a moment.  (Pause)

15              MR. SCHMIDT:  My suggestion will actually be keep

16    everything there other than --

17              THE COURT:  What is your current proposal?

18              MR. SCHMIDT:  On the first sentence, before the word

19    "agreed" would be "intentionally agreed," and at the end of the

20    last sentence after the defendant's knowledge, adding the words

21    "and intent," and, of course, taking out the "whether"

22    sentence.  This way only three words need to be added and that

23    one sentence taken out.

24              MS. KEARNEY:  Knowledge and intent the government is

25    fine with.  Intentionally --

IB5JKET1                          Charge Conference

 1           THE COURT:  Wait, wait, wait.  You mean at the end?

 2           MS. KEARNEY:  Correct, with the knowledge and intent

 3  of the purpose of the transaction, the conspirators

 4  intentionally agreed.

 5           THE COURT:  I am not putting that in.  So let's see if

 6  we have it.

 7           "The fourth element that the government must prove

 8  beyond a reasonable doubt is that the conspirators agreed to

 9  engage in these financial transactions with the knowledge that

10  the purpose of the transaction was to promote the carrying on

11  of specified unlawful activity; namely, the telemarketing

12  fraud."  Well, "In other words" doesn't work there.

13           MR. SCHMIDT:  You start the sentence with "you."

14           THE COURT:  Just a minute.  (Pause)  The government?

15           MS. KEARNEY:  We are taking out the entire second

16  sentence and just beginning the last sentence, "you are

17  entitled" --

18           THE COURT:  And ending the word, "You are entitled to

19  find from the circumstances surrounding the financial

20  transactions or attempted financial transactions the purpose of

21  that activity and the defendant's knowledge and intent."

22           MS. KEARNEY:  That is fine.

23           THE COURT:  Fine.  That is what we'll do.  Just a

24  moment.

25           MR. PAUL:  Is your Honor putting in "and intent" in

1    that first sentence after "knowledge"?

2            THE COURT:  You mean intentionally agreed?  The first

3    sentence will read as it now is, as it is typed in front of

4    you.  I will read it again.  I will read that charge again.

5            "The fourth element that the government must prove

6    beyond a reasonable doubt is that the conspirators agreed to

7    engage in these financial transactions with the knowledge that

8    the purpose of the transaction was to promote the carrying on

9    of specified unlawful activity; namely, the telemarketing

10   fraud.  You are entitled to find from the circumstances

11   surrounding the financial transactions or attempted financial

12   transactions the purpose of that activity and the defendant's

13   knowledge and intent."

14           Mr. Paul?

15           MR. PAUL:  That is fine.

16           THE COURT:  Mr. Schmidt?

17           MR. SCHMIDT:  That is fine.

18           THE COURT:  The government?

19           MS. KEARNEY:  That is fine.

20           THE COURT:  Anything else?

21           MS. KEARNEY:  My next one, your Honor, is No. 43,

22   conspiracy to commit money laundering, the 1957 object, the

23   first element.

24           THE COURT:  Yes.

25           MS. KEARNEY:  Just to conform it to match the FDIC

IB5JKET1                          Charge Conference

1   provision.

2                THE COURT:  Yes, all right.  Where was that earlier

3   change, what number?

4                MS. KEARNEY:  38, Page 59.

5                THE COURT:  All right.  Thank you.  The last paragraph

6   on Count 2, a conspiracy to commit money laundering, Object 2,

7   the conspiracy to commit money laundering, the first element

8   will read the same as when we deleted JP Morgan Chase Bank and

9   the FDIC language.  Next.

10               MS. KEARNEY:  48, venue.

11               THE COURT:  Yes, ma'am.

12               MS. KEARNEY:  I am requesting the court add a sentence

13   specifying that the defendant need not be the person who

14   performed or caused the action that occurred in the Southern

15   District of New York.

16               THE COURT:  Where?

17               MS. KEARNEY:  Between the second paragraph and the

18   third paragraph.

19               THE COURT:  What is the language?

20               MS. KEARNEY:  Whatever your Honor would like it to be,

21   but I propose:

22               "I also note that the defendant need not be the

23   individual who committed or caused the act in furtherance of

24   the conspiracy and the act may have been committed by a

25   co-conspirator even if that co-conspirator is not a defendant

1    in this case."  (Pause)

2              THE COURT:  All right.  Defendants, any objection?

3              MR. PAUL:  No objection.

4              MR. SCHMIDT:  No objection.

5              THE COURT:  All right.  "I also note that the

6    defendant need not be the individual who committed or caused

7    the act in furtherance of the conspiracy and the act may have

8    been committed by a co-conspirator even if that co-conspirator

9    is not a defendant in this trial."  All right, all agreed upon

10   by everyone.

11             Any other changes?

12             MS. KEARNEY:  Yes, your Honor, there are two charges

13   that were not in the proposed charge.  The first is the

14   question of punishment is not to be considered by the jury.

15             THE COURT:  That should be in my closing --

16             MS. KEARNEY:  Okay.

17             THE COURT:  -- instructions.  Let me look.

18             MR. PAUL:  Yes, it is.

19             MS. KEARNEY:  Never mind then.

20             THE COURT:  All right.  What else?

21             MS. KEARNEY:  An uncalled witness charge.

22             THE COURT:  Defense, do you have have objection to

23   putting in an uncalled witness charge?

24             MR. PAUL:  I have to see the charge before I comment

25   on it.  As I recall, I don't have objections.

1     MR. SCHMIDT:  Your Honor, I probably would, simply

2  because notwithstanding the ability for us to subpoena

3  witnesses, even cooperators like Mr. Paul is doing, it is clear

4  that the government's ability to call witnesses is not the same

5  as the defense.  However, I will not be arguing anything

6  relating to the fact that the government did not call any

7  particular witness.

8     THE COURT:  The government, if there is no argument in

9  summation, I am not going to put it in.

10     MS. KEARNEY:  All right.

11     THE COURT:  I think that does it for you.  Anything

12  else?  The charge then, except for the exceptions noted on the

13  record this morning, is complete.  This is the charge I will be

14  giving.  I don't know if the entire jury is here.  I'll find

15  out in a moment.

16     We are in the midst of the cross-examination of

17  Mr. Shahram Ketabchi.  What is your estimate, Ms. Fletcher?

18     MS. FLETCHER:  About 30 to 40 minutes.

19     THE COURT:  And then I believe Mr. Paul, you said that

20  the final witness will be Mr. Finocchiaro?

21     MR. PAUL:  That's correct.

22     THE COURT:  Let's see if the jury is here.  I will

23  step off the Bench.

24     (Recess)

25     (Continued on next page)

IB58KET2                          Ketabchi – Cross

1                  (Jury not present)

2                  THE COURT:  Your client, Mr. Paul.

3                  MR. PAUL:  I think he went to the men's room.

4                  THE COURT:  Is your estimate on Mr. Finocchiaro still

5      about an hour?

6                  MR. PAUL:  I think so.

7                  THE COURT:  That was an efficient charging conference.

8      I appreciate it.

9                  Mr. Ketabchi, if you would take the stand again, sir.

10                 (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IB58KET2                         Ketabchi - Cross

1           (Jury present)

2      SHAHRAM KETABCHI, resumed.

3           THE COURT:  Please be seated in the courtroom.

4           Good morning, ladies and gentlemen.  Welcome.  I hope

5    you had a pleasant weekend.  We handled legal matters that we

6    had to take care of and there will now be the continuation of

7    the cross-examination of Shahram Ketabchi by Ms. Fletcher.

8           Mr. Ketabchi, I remind you that you remain under oath.

9    You understand that?

10          THE WITNESS:  I understand.

11          THE COURT:  Proceed.

12   CROSS-EXAMINATION (Cont'd)

13   BY MS. FLETCHER:

14   Q.  Good morning, Mr. Ketabchi.

15   A.  Good morning, ma'am.

16          MS. FLETCHER:  Ms. Lee, can we start by pulling up

17   Government Exhibit 431 for identification.

18   Q.  Mr. Ketabchi, I am going to show you a couple more e-mails

19   in addition to the ones we looked at on Friday.

20          MS. FLETCHER:  Can we blow up the top portion of that,

21   Ms. Lee, so Mr. Ketabchi can read it on his screen.

22   Q.  Mr. Ketabchi, this is an e-mail chain, isn't it, e-mail

23   from you to your brother Arash?

24   A.  Yes.

25   Q.  Dated November 11, 2015?

IB58KET2                          Ketabchi - Cross

1    A.  Yes.

2    Q.  And it relates to a chargeback, doesn't it?

3    A.  I am reading the document, if you just give me one moment

4    to verify.

5            I think it's trying to determine if it's a chargeback

6    from a certain customer that they are having.

7            MS. FLETCHER:  The government offers Government

8    Exhibit 431.

9            THE COURT:  Hearing no objection, admitted.

10           (Government's Exhibit 431 received in evidence)

11           MS. FLETCHER:  Please publish, Ms. Lee.

12   BY MS. FLETCHER:

13   Q.  Mr. Ketabchi, do you see the bottom e-mail on the chain is

14   an e-mail from Bill Sinclair?

15   A.  Where it says, "OK, so apparently"?

16   Q.  Yes.  He mentioned that Arash sold Geraldine on August 12,

17   and then Arash sold her again on August 20?

18   A.  Yes, I see that.

19   Q.  And Mr. Sinclair explains that Andrew came to the office

20   one day a few weeks ago to follow up with her because they

21   don't have her contract.

22           Do you see that?

23   A.  Yes, I see that.

24   Q.  Then you respond to Arash, "I don't even think that

25   chargeback is from her anyway but just to cover all of your

1    bases."

2            What does that mean?

3    A.  I actually didn't write that.  That's from Olive Branch

4    Marketing, if you look at on Wednesday, November 11, 2015.

5    That's right above.  That's in that chain.

6    Q.  You don't think "just to cover all your bases" is from you?

7    A.  No, it's not.  It's from Olive Branch Marketing.

8    Q.  Let's pull up what has been marked for identification as

9    Government Exhibit 433.

10           THE COURT:  Your e-mail is not Positive Faith?

11           THE WITNESS:  It is, but in that chain that response

12   was from Olive Branch, your Honor.

13           THE COURT:  All right.

14           MS. FLETCHER:  Can we blow up the top half of that

15   page, Ms. Lee, including the heading.

16   Q.  Mr. Ketabchi, this is another e-mail chain, isn't it, from

17   you to your brother Arash on November 19, 2015?

18   A.  Yes.

19   Q.  And it relates to chargebacks for Jeanette Waldrup

20   and -- just Jeanette Waldrup, doesn't it?

21   A.  I'm just reviewing the document.  One moment, please.

22           Yes, it's Jeanette.

23           MS. FLETCHER:  The government offers Government

24   Exhibit 433.

25           MR. SCHMIDT:  Your Honor, may I have a moment because

1    these are new exhibits so I haven't gone through them yet.

2              THE COURT:  Yes.

3              MR. SCHMIDT:  Thank you.

4              Your Honor, I object.

5              THE COURT:  Basis?  It's from this witness to Arash

6    Ketabchi.

7              MR. SCHMIDT:  I think, though, within the e-mails

8    there are hearsay that are not from them.

9              THE COURT:  Scroll up, please.

10             MR. SCHMIDT:  Your Honor, I withdraw the objection.

11             MR. PAUL:  I have no objection.

12             THE COURT:  Admitted.

13             (Government's Exhibit 433 received in evidence)

14             MS. FLETCHER:  Please publish, Ms. Lee.

15   BY MS. FLETCHER:

16   Q.  Mr. Ketabchi, do you recall on Friday we discussed the

17   chargeback that you responded to related to Jeanette Waldrup?

18   It was an Element chargeback and the initial draft of your

19   response was on A1 letterhead.

20             Do you recall that?

21   A.  I recall that, yes.

22   Q.  Taking a look at this, you're explaining to your brother

23   Arash that this is not the reason why the merchant is denying

24   the chargeback.  It's because proof of fulfillment is no good.

25   Is that accurate?

1  A.  I wrote that, yes.

2  Q.  And you tell your brother after that that he told you that

3  Fino was winning chargebacks?

4  A.  I see that.

5  Q.  You see that here?

6  A.  Yes.

7  Q.  So you tell him, "The reality is Bill and Fino are out of

8  the business because of the things we talked about.  We need to

9  revise the model.  Now let's get it fixed."

10         Do you see that?

11  A.  I see that.

12  Q.  You're telling your brother that the two of you need to fix

13  the business model of A1.

14  A.  What I am telling my brother is that what he needs to do is

15  to make sure that the clients are 100 percent satisfied with

16  the services they are getting and fulfillment has to be on the

17  same page, the fulfillment company he is using, and they need

18  to make sure whatever the salespeople are selling, the

19  fulfillment company has to make sure that the customers are

20  getting exactly that.  Otherwise what is going to happen is

21  what happened to Bill and Fino, they are going to go out of

22  business because they are not taking care of the customers and

23  delivering what they promised.

24         So it's a very critical business matter being in the

25  telemarketing business that my brother was.  So based on my

1    business experience, that's what I shared with him because I

2    wanted him to have a successful business.  That's what that

3    e-mail implies.

4    Q.  OK.  Let's pull up what has been marked for identification

5    as Government Exhibit 438.

6              MS. FLETCHER:  If we can blow up just the top half of

7    that.

8    Q.  Mr. Ketabchi, this is an e-mail between Heidi Brownfield,

9    you, and your brother related to Element and A1 Business

10   chargebacks, isn't it?

11   A.  If you give me a moment, I am going to read the letter.

12             Yeah.  I believe this e-mail is in regards to Element

13   business merchant account.

14             MS. FLETCHER:  The government offers Government

15   Exhibit 438.

16             THE COURT:  Hearing no objection, admitted.

17             (Government's Exhibit 438 received in evidence)

18   BY MS. FLETCHER:

19   Q.  Mr. Ketabchi, let's pull up -- take a look at what has been

20   marked for identification as Government Exhibit 454.

21             Do you see that on your screen, sir?

22   A.  Yes, I see that.

23   Q.  This is an e-mail from you to your brother Arash on April

24   25, 2016, isn't it?

25   A.  It is.

IB58KET2                          Ketabchi - Cross

1  Q.  The e-mail lays out a number of transactions that indicate

2  that there is a strategic block claim.

3          Do you see that?

4  A.  Yes.

5          MS. FLETCHER:  The government offers Government

6  Exhibit 454.

7          MR. SCHMIDT:  May I have a moment, your Honor?

8          THE COURT:  Yes.

9          THE WITNESS:  Can I explain what that is?

10         THE COURT:  Just wait for a question, sir.

11         MS. FLETCHER:  I am informed that this is already in

12 evidence.

13         THE COURT:  All right.  Proceed.

14 Q.  Do you see these transactions on your screen, Mr. Ketabchi,

15 the transactions that you are e-mailing to your brother?

16 A.  Yes.

17 Q.  A strategic block claim, those are transactions where the

18 credit card processer has identified that a chargeback is

19 likely to occur, isn't it?

20 A.  From my recollection -- I would have to look into this

21 further -- but I recall this being a line of credit that my

22 brother had borrowed from one of the fintech companies and that

23 there was a block on the payment.  This has no link to merchant

24 accounts.  So that is inaccurate.

25         MS. FLETCHER:  You can take that down.

1    Q.  Mr. Ketabchi, do you remember last week we discussed the

2    continuation of services agreement, abbreviated COS?

3    A.  I recall.

4    Q.  Sometimes you included in your responses to chargebacks the

5    COS that was signed by the customer?

6    A.  That I received from POF, that is correct.

7    Q.  When we talked last week, you testified that you didn't

8    have an understanding as to how or when that document was

9    created, is that correct?

10   A.  I believe that was my recollection, yes.

11   Q.  Is that your recollection today, you don't know how or why

12   the continuation of services agreement is created?

13   A.  Well, based on what happened last week I actually went and

14   looked into that.  So I have a better understanding of what it

15   is and was.

16   Q.  You went and looked into what a continuation of service

17   agreement is?

18   A.  Yes, I looked into.

19   Q.  Since Friday?

20   A.  I looked over the weekend to see what it was exactly.

21   Q.  In fact, isn't the continuation of services agreement a

22   document that customers are asked to sign so that you can use

23   that document to prevent the chargeback?

24   A.  That would be based on the sales office and the decision

25   they make per each individual customer.  That's not something

1   that I would do.  It has nothing to do with me.  All I do is

2   get it and just send it to whoever it needs to go to.

3   Q.  Whether you did it or not, you have an understanding of the

4   purpose of the continuation of services agreement, do you not?

5   A.  I do at this time.

6   Q.  Your testimony is that when you were actually responding to

7   chargebacks you didn't have that understanding?

8   A.  I may have, but I may have not recalled it last week.

9   Because this happened so long ago and I'm not in the business

10  and it's hard to remember every single file, every

11  single -- because I have done just so many things and

12  unfortunately my memory isn't as good as I would like.

13  Q.  You requested continuation of services agreements for

14  purposes of collecting paperwork and responding to chargebacks,

15  did you not?

16  A.  I'm sorry.  Can you repeat that, please?

17  Q.  Did you collect continuation of services agreements for

18  purposes of responding to chargebacks?

19  A.  I collected them in terms of requesting them from whoever

20  had them and in whatever office.  It was part of the sales

21  contract.  I would get that and send it to the merchant if it

22  was applicable, but I never did anything else with them.

23  Q.  So yes, you collected them for purposes of sending them in

24  response to chargebacks?

25  A.  From what I recall, yes.

1  Q.  And your testimony is that when you did that, you didn't

2  understand the purpose of the continuation of services

3  agreement?

4  A.  From what I recall.

5  Q.  OK.  Let's take a look at Government Exhibit 234A in

6  evidence.

7          You see 234 on your screen?

8  A.  Yes, ma'am.

9  Q.  You see the Post-it there?

10 A.  I do.

11 Q.  That's your handwriting, isn't it?

12 A.  That is correct.

13 Q.  You wrote down, "denial response sent 11/24/2015."

14         Is it fair to say these Post-its is how you track the

15 progress of your response to chargebacks?

16 A.  I believe from what I remember, I actually had another

17 setup where I would keep track of dates of all projects, not

18 just chargebacks or anything I did for my brother but just

19 across the board with anything I did in life.  And I think when

20 I printed some of these, I think I just put a note on so I

21 don't forget what the status is, I believe.

22 Q.  You used Post-its on the chargeback documents to track the

23 status or the progress of your response or the merchant

24 accounts reversal or denial of the chargeback?

25 A.  It could have been other things too.  It could have been

IB58KET2                          Ketabchi - Cross

1    just to remind me of anything.

2    Q.  Let's look at 234B.

3         This is Government Exhibit 234 with different

4    subparts.  These are documents related to the Joseph Freeland

5    chargeback, correct?

6    A.  That is correct.

7    Q.  You see Joseph Freeland on this contract?

8    A.  I see that, yes.

9    Q.  Let's go to 234C.

10        If we could go -- that's fine.

11        So this is your first response dated 11/21/2015.

12        Do you see that?

13   A.  Yes.

14   Q.  Let's go to 234D.

15        This is another response dated October 29, 2015.

16        Do you see that?

17   A.  Yes, I see.

18        MS. FLETCHER:  Can we go to the next page, Ms. Lee.

19   Or 234E, if it's separated.

20   Q.  You see the Post-it here at the top of Government Exhibit

21   234E?

22   A.  Yes.

23   Q.  "Received 11/4."  Then you star two bullets.

24        What do the bullets say?

25   A.  Those, I believe, were just a couple of notes.

1   Q.  Your notes, right?

2   A.  That's my handwriting.

3   Q.  What do those notes say?

4   A.  "Marketing, and I think CAM.  I can't even read my own

5   handwriting.

6   Q.  Company?

7   A.  Marketing company, yes.  And then web site advertisement is

8   number two.

9   Q.  Those were the products that Mr. Freeland purchased,

10  correct?

11  A.  I don't recall, but I have to see a sales contract to

12  verify what that pertained to.

13  Q.  That's in evidence.  Let's take a look at 234B -- 234F, the

14  next page.

15          You see your Post-it here?

16  A.  I do.

17  Q.  "Credited back."

18          Do you see that?

19  A.  I do.

20  Q.  So that means that you have successfully reversed the

21  chargeback, correct?

22  A.  If you give me a moment, let me read the letter to make

23  sure.

24          Yes, that seems to be the case.

25  Q.  Is it fair to say your Post-it again, you're tracking the

1    status of your chargeback response?

2    A.  Yes.  This is to inform me of what the status is, that is

3    correct.

4    Q.  You're noting that you have won the chargeback, it's been

5    credited back?

6    A.  It has been credited back to A1 Business Consultants, that

7    is correct.

8    Q.  Let's go to the very last page of that document.

9         I see the last Post-it there, again, in your

10   handwriting?

11   A.  Yes.

12   Q.  You're writing you need to call to get the status on the

13   Freeland chargeback?

14   A.  Yes.

15   Q.  And you have some dates there.

16        What do those dates reflect?

17   A.  Let me see.  I believe, if I remember correctly, those were

18   dates regarding what the deadlines were to respond to the

19   merchant company.

20   Q.  Again, you're tracking the status of your response to the

21   chargeback?

22   A.  Yeah.  I need to be organized to make sure that I'm getting

23   everything done properly; otherwise, I won't be effective.

24   Q.  Let's pull up what is in evidence as Government Exhibit

25   242.

IB58KET2                    Ketabchi - Cross

1          Mr. Ketabchi, do you remember looking at this document

2    on Friday?

3    A.  I do recall this, yes.

4    Q.  This is the complaint, if we look at page 2, this is the

5    complaint from Michael Deuter.

6          Do you recall that?

7    A.  I think I have a recollection, yes.

8    Q.  If we can go back to page 1.

9          You testified on Friday, Mr. Ketabchi, that you had

10   never seen this document before.

11         Do you recall that?

12   A.  I do.

13   Q.  Is it your testimony that you have never seen this document

14   before?

15   A.  Yeah.  I don't recall reading it or analyzing the

16   information in it.  It's possible I may have looked at it, like

17   glanced at it, but if anything was more than a couple of

18   sentences in these chargeback things, I just don't read them

19   because they don't pertain to anything I have done or sold.

20         As I stated, I was just filing.  It was just a simple

21   file processing for me.  So it's kind of like if you're in the

22   office, you're doing secretarial work and your boss says, file

23   something for me, you just don't have time to read the data

24   because that's their job, especially when I am in California

25   and I'm not anywhere in the office, that's just not anything I

1  did.

2           THE COURT:  You were just a filer.

3           THE WITNESS:  I was either a filer or a responder.

4  Just assessing the data.  Because I had my whole -- I had so

5  much stuff I had to do everyday.

6           THE COURT:  It's your testimony that you didn't really

7  put any thinking into what you were doing, you would just file

8  things?

9           THE WITNESS:  Yes.  Especially in terms of this

10 document, yes.

11          THE COURT:  No, in general.

12          THE WITNESS:  In general, of course, yeah.  But she

13 was asking specifically.

14          THE COURT:  I am asking you in general, you simply

15 filed things?

16          THE WITNESS:  Filed or responded.  That was my main.

17          THE COURT:  Correct.

18 Q.  Let's pull up what has been marked as Government Exhibit

19 519.

20          You see this e-mail on your screen, Mr. Ketabchi?

21 A.  I do.

22 Q.  It's an October 28, 2015 e-mail communication between you

23 and Mr. Bill Sinclair, correct?

24 A.  I believe that's correct, yes.

25 Q.  Subject, Deuter.

IB58KET2                    Ketabchi - Cross

1    A.  That is correct.

2    Q.  The last name of the individual who made the complaint in

3    the last document we looked at?

4    A.  Yes.

5         MS. FLETCHER:  The government offers Government

6    Exhibit 519.

7              THE WITNESS:  Can I explain?

8              THE COURT:  Wait for a question, sir.

9              Hearing no objection, admitted.

10             MR. SCHMIDT:  If I may, your Honor, review this.

11             THE COURT:  Yes, of course.

12             MR. SCHMIDT:  No objection.

13             THE COURT:  Admitted.

14             (Government's Exhibit 519 received in evidence)

15   BY MS. FLETCHER:

16   Q.  Mr. Ketabchi, in this e-mail chain Mr. Sinclair has sent

17   you the contract for Michael Deuter.  Isn't that correct?

18             MS. FLETCHER:  Would you scroll down, Ms. Lee, so we

19   can see the bottom e-mail.

20             Can you see that at the very bottom, Ms. Lee?

21   Q.  All the way at the bottom it starts with an e-mail from Mr.

22   Sinclair to you.

23             You respond, "Thanks, Bill."

24             It looks like he says to you, "Whenever you need a

25   contract, we will send it to you."

1      You say, "Thanks Bill.  If you could have a file with

2 all of the contracts that you can e-mail me, then I can keep

3 them and not have to keep asking you."

4      You see that?

5 A.  I see that.

6      What was the previous question you asked me about the

7 contract being attached to this?  I don't see a contract

8 attached to this because there is no attachment.

9 Q.  No attachment in this chain, but do you see the e-mail from

10 Mr. Sinclair to you, subject Deuter, and he says "whenever you

11 need a contract, we will send it to you?"

12 A.  Yes.  That was for the deals they had between him and his

13 brother, so they have to determine who responds.

14      This one seems to reference Deuter.  But there is no

15 information on this contract or anything.

16 Q.  Mr. Ketabchi, I would like you to take a look at what has

17 been marked for identification as Government Exhibit 520.

18      You see that on your screen?

19      MS. FLETCHER:  If we can blow up just the e-mail

20 that's on the first page, Ms. Lee.

21 Q.  Mr. Ketabchi, this is an e-mail from you to HIT Marketing

22 2677 copying your brother Arash.

23      Do you see that?

24 A.  Yeah, I see that.

25 Q.  It's dated May 10 of 2016?

IB58KET2                          Ketabchi - Cross

1    A.  I see that.

2              MS. FLETCHER:  Government offers Government Exhibit

3    520.

4              MR. SCHMIDT:  We just received it.  May I look at it?

5              THE COURT:  Yes.

6              MR. PAUL:  No objection.

7              THE COURT:  Admitted without objection.

8              MR. SCHMIDT:  I am not as fast.

9              No objection.

10             (Government's Exhibit 520 received in evidence)

11             MS. FLETCHER:  May we please publish the first page of

12   520.

13   BY MS. FLETCHER:

14   Q.  Mr. Ketabchi, this is an e-mail from you to HIT Marketing

15   2677.  It looks like you addressed the e-mail to Jacob and

16   Robert.

17             Who are Jacob and Robert?

18   A.  Is this the same e-mail you just showed me?

19   Q.  It is.

20   A.  I have no recollection of Jacob and Robert, but I would

21   assume it was probably the reps that head marketing for

22   whatever my brother -- it looks like they sent us an agreement

23   or something and I think he wanted to revise some of the

24   verbiage or whatever it was, but that's all I can think of at

25   the moment of what that was.

IB58KET2                          Ketabchi - Cross

1    Q.  You sent the proposed revised verbiage, didn't you?  You

2    request that the transaction per client be increased to $10,000

3    per client instead of 5,000, and you ask for the chargeback

4    payback period to be extended to 20 days?

5    A.  I believe they had sent an agreement to my brother and then

6    my brother requested to inform them they need to be revised.

7    So it was nothing that I executed.  This is under my brother's

8    instruction.

9    Q.  You sent this e-mail, did you not?

10   A.  I sent it, but it's not my information because I'm not the

11   owner of the business.  I'm just doing secretarial tasks.

12   Q.  Showing you what has been marked for identification as

13   Government Exhibit 533.

14   A.  If I could expand what I am trying to say.  Just because I

15   am typing something --

16            THE COURT:  Sir, just wait for a question.  Your

17   lawyer will have an opportunity to question you.  So just

18   again, let's go back to what we were talking about on Friday.

19            THE WITNESS:  I understand.

20            THE COURT:  If you can answer a question yes, no, or I

21   don't know, that's the best way.

22            THE WITNESS:  I understand.

23            THE COURT:  But if you can't, then you should tell Ms.

24   Fletcher that.

25            THE WITNESS:  I understand.

IB58KET2                        Ketabchi - Cross

```
1          THE COURT:  Then she will decide what the next

2   question will be or whether she wants an explanation from you.

3          THE WITNESS:  I understand.

4          THE COURT:  Proceed.

5   BY MS. FLETCHER:

6   Q.  Do you see 533 up on your screen, Mr. Ketabchi?

7   A.  I do.

8   Q.  This is an e-mail from you to admin at US Card System

9   copying your brother, ketabchi.arash?

10  A.  I see that.

11  Q.  Dated October 20, 2015?

12  A.  I see that.

13         MS. FLETCHER:  Government offers Government Exhibit

14  533.

15         MR. SCHMIDT:  No objection.

16         MR. PAUL:  No objection.

17         THE COURT:  Admitted without objection.

18         (Government's Exhibit 533 received in evidence)

19  BY MS. FLETCHER:

20  Q.  You see the subject on this e-mail, Mr. Ketabchi, "new

21  merchant account?"

22  A.  I see that.

23  Q.  This is from you to Michael -- Michael is Michael Wigdore

24  at US Card System, isn't that right?

25  A.  I believe he works for that company, yes.
```

IB58KET2                        Ketabchi - Cross

```
 1   Q.  You ask him, "Can you please call me when you get this at
 2   your cell phone number, 949-244-8588, so we can set up another
 3   merchant account for A1 Business Consultants."
 4            Do you see that?
 5   A.  Yes I do.
 6   Q.  Mr. Ketabchi, we talked on Friday about Elevated Business
 7   Consultants.
 8            Do you recall that?
 9   A.  I do.
10   Q.  If I asked you if you were aware that Elevated was just
11   another name for A1 Business Consultants.
12            Do you remember that?
13   A.  I think I remember that, yeah.
14   Q.  You said it wasn't, as far as you were concerned.
15   A.  From what I remembered, yes.
16   Q.  They were different companies?
17   A.  From what I remembered.
18   Q.  I want to show you what is in evidence as Government
19   Exhibit 218.
20            You see the title of this document is registration of
21   an alternate name?
22   A.  Yes.
23            MS. FLETCHER:  Ms. Lee, if you can blow up the center
24   portion of that document.
25   Q.  This is a document that purports to change the name of A1
```

IB58KET2                          Ketabchi - Cross

```
 1   Business Consultants, LLC to an alternate name, Elevated
 2   Business Services.  Isn't that correct?
 3   A.  Yes.  I believe that may be a d/b/a.  So they are actually
 4   separately independent when they file for any type of things.
 5   Q.  So by d/b/a, you mean Elevated Business Consultants is what
 6   A1 Business Consultants is now doing business as?
 7   A.  Well, A1 Business Consultants, LLC and then Elevated
 8   Business Services, I believe this registration creates two
 9   different names for the businesses.
10   Q.  For the same company?
11   A.  I'm not sure if my brother ever filed an Elevated Business
12   corporation like separately.  I don't recall.
13   Q.  Wouldn't that have been your responsibility?
14   A.  No.  I never set up the A1 Business or any of the startup
15   documentation for him.
16   Q.  But this was in your apartment, was it not, printed out?
17   A.  It may have been.  But when A1 Business Consultants was
18   launched, I never did any of the startup documents.  He did
19   that in 2014, and a number of months later he asked me if I
20   could help him with some tasks.
21   Q.  Look at the date on this document at the very bottom.  It's
22   dated 10/13/15.  This was during the time period that you were
23   helping your brother?
24   A.  I believe it is, yes.  What I am trying to communicate is
25   that A1 Business Consultants was registered in 2014 and we can
```

IB58KET2                         Ketabchi - Cross

1   submit the documents to verify that.  And I did not submit

2   them.

3   Q.  OK.  Mr. Ketabchi, are you familiar with the Dash's Salon,

4   LLC?

5   A.  I believe that was a corporation that my brother's fiancee

6   and him set up, from --

7   Q.  Your brother's fiance is --

8   A.  -- from my recollection.

9   Q.  -- Danielle Owimrin?

10  A.  Yes, ma'am.

11  Q.  Did there come a time when you assisted Ms. Owimrin in

12  obtaining a credit card related to her employment at Dash's

13  Salon?

14  A.  I believe, if I remember correctly, I think she asked me to

15  help her set up like a credit application on a card or

16  something, like to fill out the form.  But I don't remember

17  fully.

18  Q.  Showing you what is in evidence as Government Exhibit 214.

19          MS. FLETCHER:  If we can blow up the whole top portion

20  of that, please.

21  Q.  You created this document, didn't you, Mr. Ketabchi?

22  A.  Yes.  I believe Danielle or my brother or both of them, I

23  don't remember at this time exactly it was so long ago, but

24  they told me to draft this letter for Danielle.

25  Q.  And the purpose of the letter is to get Ms. Owimrin a

1    credit card, is it not?

2    A.  I don't remember exactly what she wanted to use it for, but

3    I was just told to draft this letter.

4    Q.  Let's go to page 2 of that same document.

5            This is a letter from Capital One to Danielle Owimrin

6    dated May 27 of 2016, isn't it?

7    A.  Yes.  I think my memory is refreshed now.  I think it was

8    for an application for Capital One.

9    Q.  Capital One is asking her in this letter for a verification

10   of her annual income so she can get a credit card, isn't that

11   correct?

12   A.  I see that, yes.

13   Q.  So if you go back to page 1, this is the letter you

14   prepared in response dated June 12, 2016?

15   A.  Yes, based on her instruction.

16   Q.  And in that letter you indicate that she has been working

17   for Dash's Salon for two years and one month and her annual

18   base salary is $280,000.

19           Do you see that?

20   A.  I typed that for her, but it's not my knowledge or

21   understanding.  It's just simple secretarial typing, drafting

22   of the letter.  I have no information of what her salary is,

23   what she does, what any of that is.

24   Q.  You see the signature on that, it says Danielle Owimrin.

25   But that's actually Arash's signature, isn't it?

IB58KET2                        Ketabchi - Cross

1    A.  It looks like it may be.

2    Q.  It's the signature you applied to this document?

3    A.  I applied that for Danielle, yes.

4    Q.  And it is your testimony that when you applied this, you

5    did not have any information about what Ms. Owimrin's salary or

6    financial situation was, is that correct?

7    A.  I believe she -- for this application I believe she sent me

8    a, I think I filed it with her taxes, if I remember correctly.

9    But I didn't review anything.  I just processed the file.

10   Q.  Let's take a look at what is in evidence as Government

11   Exhibit 215.

12              THE COURT:  Lets me see if I understand.

13              Put that up again.

14              Go to the top.  Is that the top?

15              You prepared this document, is that correct?

16              THE WITNESS:  Yes, I typed this out.

17              THE COURT:  It's as if it came from Dash's Salon, LLC,

18   is that correct?  Because Dash's Salon with its address is on

19   the upper left.

20              THE WITNESS:  Yes.  That's what they requested me to

21   do.

22              THE COURT:  Who requested you again?

23              THE WITNESS:  Danielle.

24              THE COURT:  So Danielle asked you to type this out and

25   the words are yours, I take it?

1             THE WITNESS:  No, these aren't my words.  She told me

2        to type this out for her.

3             THE COURT:  And she dictated it?

4             THE WITNESS:  Yes.

5             THE COURT:  And she told you that her annual salary,

6        base salary is $280,000, correct?

7             THE WITNESS:  That is correct.

8             THE COURT:  Then you applied an electronic signature

9        of Arash, is that correct?

10            THE WITNESS:  Yeah.  It looks to be an error on my

11       end.  I guess I had so much going on and I made a mistake.

12            THE COURT:  Did you have an electronic signature for

13       Danielle?  I assume not, but I don't know.  I don't mean to

14       suggest it.

15            Did you have an electronic signature for Danielle?

16            THE WITNESS:  This is actually done with a pen so it's

17       not really electronic.

18   Q.  Is it fair to say, Mr. Ketabchi, you signed Mr. Arash's

19   name?

20   A.  It seems to be his signature, yeah.

21   Q.  And you testified a moment ago that when you prepared this

22   letter, you believe you had in your possession tax documents

23   related to Danielle Owimrin, isn't that correct?

24   A.  I recall her sending me documents to forward to whatever

25   the application was for.  That's what I can remember, I

IB58KET2                         Ketabchi - Cross

1    believe.  I don't know for sure.  I would have to verify.

2    Q.  Let's take a look at what is in evidence as Government

3    Exhibit 214.

4            This is Ms. Owimrin's tax return, isn't it, sir, for

5    2014.

6    A.  It looks to be a tax return, yes.

7            MS. FLETCHER:  If we can go to page 3 and blow up the

8    top half of the page.

9    Q.  Mr. Ketabchi, isn't it a fact that Ms. Owimrin's 2014 tax

10   return lists her taxable income as $18,748?

11   A.  That looks to be correct.

12   Q.  It is your testimony that you wrote the letter that we just

13   looked at in Government Exhibit 214, that you had these tax

14   documents, and that you just didn't look at them?

15   A.  No, I wasn't verifying her income or anyone's income.  She

16   just said, this is what I want on the letter, here's the

17   document, and send it to wherever I was supposed to send it to,

18   if I sent it anywhere.

19           I'm not an accountant doing her taxes.  I am doing a

20   simple task for her, just helping out my brother because she is

21   the fiance.

22   Q.  It is your testimony that Ms. Owimrin told you that her

23   annual income was $280,000 and she simultaneously provided you

24   with a 2014 tax return showing that her income was just over

25   $18,000 and you did not notice the discrepancy?

IB58KET2                          Ketabchi - Cross

1   A.   That is clearly evident, yes.

2            MS. FLETCHER:  We can take that down.

3   Q.   Mr. Ketabchi, in your role working for your brother, you

4   testified on Friday that you helped him to fill out

5   applications of sorts.

6            Do you recall that?

7   A.   Yeah, countless of them.

8   Q.   I'm sorry?

9   A.   Countless.

10  Q.   Some of those applications included applications for

11  additional merchant accounts, isn't that correct?

12  A.   That is correct.

13  Q.   Let's pull up what is in evidence as Government Exhibit

14  217.

15           Is this one of the merchant accounts that you helped

16  fill out, the merchant account applications?

17  A.   Let's see.  I recall this APS, but actually -- I know that

18  company, but I don't believe I filled this one out.  This one

19  is actually a Masoud Manesh one.  I didn't fill this one out.

20  It's for Element Business Services.

21           And I think, if I could comment, this was the mix-up

22  with the d/b/a because Element Business Services is part of

23  Element Business Services, LLC, which is Manesh, and it wasn't

24  a link to my brother's A1 Business Consultants.  So I think

25  that is a discrepancy with all of that.  But this is nothing I

1    signed or set up.

2    Q.  Let's take a look at what is in evidence as Government

3    Exhibit 222.

4            This is a merchant account application that you filled

5    out, is it not?

6    A.  No, that isn't correct.  This is a line of credit from Fox

7    Funding.  This is not a merchant application.  And also, my

8    brother had requested me to see if he could acquire a loan.

9    And if you notice it says $499 and the percentage of banking

10   deposits, so it's clearly a line of credit, like a fintech

11   company.

12   Q.  You filled out an application for your brother.

13   A.  Yeah, it was loan application.

14   Q.  Let's take a look at Government Exhibit 223 in evidence.

15           How about this one?

16   A.  Excuse me.  This one is the same as Fox, same type of

17   company.  It's requesting a line of credit, basically a loan.

18   It's a fintech company.  That actually goes back to the

19   strategic block.  I believe it was this company that you showed

20   before.

21   Q.  Let's look at Exhibit 224 in evidence.

22           How about this?

23   A.  Same as the last one.  I remember Yellowstone.  It was a

24   fintech company.

25   Q.  A Manhattan-based company?

IB58KET2                          Ketabchi - Cross

 1   A.  Yeah.

 2          If you see in the purchase price $40,000, that was the

 3   amount of the loan, at 15 percent, for a total payback of

 4   $58,000 when he was trying to grow the business and market and

 5   everything.

 6   Q.  Let's take a look at 1105 in evidence.

 7          How about this one, sir?

 8   A.  Could you be so kind if you could -- if I could see if I

 9   remember.

10          BMO?  Can you kindly, if you could just scroll down a

11   little bit.

12          This looks like it's most likely a merchant account

13   application from what I am gathering.

14   Q.  Again, filled out by you, sir?

15   A.  I filled this out, yes, ma'am.

16   Q.  Let's go to Government Exhibit 202 in evidence.

17          Another business loan application?

18   A.  Yeah.  This was a loan application.

19   Q.  Filled out by you, sir?

20   A.  I filled this out, yes.

21          MS. FLETCHER:  Ms. Lee, please pull up what is in

22   evidence as Government Exhibit 163.

23   Q.  Mr. Ketabchi, I want to talk about Ms. Jane Thompson.

24   A.  Sure.

25   Q.  You testified on Friday that you never sent this document

IB58KET2                          Ketabchi - Cross

1   to Ms. Jane Thompson, is that correct?

2   A.  Yes.

3   Q.  You recall you have a specific recollection that you did

4   not send this document to Jane Thompson?

5   A.  I have no recollection that I sent this document to Jane

6   Thompson, because I never did those electronic signatures from

7   my memory.  They did that in their office.

8   Q.  OK.  So the electronic signatures was not something that

9   your brother asked you to do?

10  A.  I never recall him asking me to do that.

11  Q.  You set up the Adobe account, though, didn't you?

12  A.  I did.

13  Q.  Let's take a look at Government Exhibit 515 in evidence.

14          You see this March 15, 2016 e-mail from

15  a1businessconsultations@gmail.com to you?

16  A.  I see that.

17  Q.  Who used the a1businessconsultations@gmail.com e-mail?

18  A.  I believe that was used by their office.

19  Q.  By whom in the office?

20  A.  Whoever he had help from.  I think one of the ladies, one

21  of the secretarial staff.  I think it was Lizette.  I think

22  there was another lady there at some point.

23  Q.  This e-mail sets forth the contact information for Ms. Jane

24  Thompson, correct?

25  A.  It seems that way, yes.

IB58KET2                          Ketabchi - Cross

1    Q.  And the information on her check, correct?

2    A.  Yeah, it looks like that way.

3    Q.  That check is dated February 4th of 2016 for $149,000.  You

     see that?

4

5    A.  I see that, yes.

6    Q.  This is information that's being sent to you for purposes

7    of preparing her contract, is it not?

8    A.  I don't recall if that was the case of why they sent me

9    this.  It's been so long I really don't remember.

10   Q.  The number $149,999 is not something that stands out to

11   you, sir?

12   A.  It's a big sale of theirs, yeah.

13   Q.  Is it not the biggest sale that came through A1 Business

14   Consultants during the entire time that you were assisting your

15   brother?

16   A.  I am not sure because my brother didn't share his sales

17   with me in terms of what was the biggest, what was the

18   smallest, and all those things.

19   Q.  Did you see any that was bigger than this one?

20   A.  I didn't have access to his sales.  I only got the limited

21   amount of chargebacks.  I can't really comment on that because

22   I'm not in the office and I don't know what their sales are.

23   Q.  Let's take a look at Government Exhibit 1128 in evidence.

24           You prepared this document, did you not, Mr. Ketabchi?

25   A.  I typed this up for them, yes.

IB58KET2                        Ketabchi - Cross

1   Q.  Dated February 4, 2016?

2   A.  That is correct.

3   Q.  Let's go to 1129, please.

4           You prepared this document, too, didn't you, sir, the

5   $149,999 contract for Ms. Jane Thompson?

6   A.  I don't remember exactly if I set this up for him and the

7   office, but I would have to verify the files, look at my files,

8   to see if I did.  I just don't remember.

9   Q.  This was a Word document on one of your electronic devices,

10  correct, sir?

11  A.  I have to check and verify that.

12  Q.  Let's take a look at Government Exhibit 1313 in evidence.

13          After the first letter that you typed up you prepared

14  a second letter, didn't you, and that's what you are looking at

15  here, dated April 4 of 2016?

16  A.  Yeah, I did that for my brother under his direction.

17  Q.  You prepared this document, correct?

18  A.  I typed this document with what my brother asked me to

19  type.

20  Q.  And you included in this document an apology that the

21  initial agreement, the ownership stipulation was missing due to

22  a clerical error.

23          You typed those words, sir?

24  A.  I did type those words.

25  Q.  April 4, 2016.  And you attached to in letter an updated

IB58KET2                        Ketabchi - Cross

1  contract for Ms. Thompson, didn't you, sir?

2  A.  I don't recall exactly.  I'd have to check my records.

3  Q.  Let's take a look at what is in evidence as 1214.

4          This is a shipping label, isn't it, sir?

5  A.  It is.

6  Q.  Taken, again, from one of your electronic devices,

7  purporting to ship something to Ms. Jane Thompson.

8          Do you see that?

9  A.  I see the shipping label, yes.

10  Q.  You see the date on it, April 5, 2016?

11  A.  I see that.

12          MS. FLETCHER:  May I have a moment, your Honor?

13          THE COURT:  Yes.

14          MS. FLETCHER:  No further questions.

15          THE WITNESS:  It's from A1 Business Consultants.

16          THE COURT:  Thank you.

17          Mr. Paul.

18          MR. PAUL:  I have a few.

19          THE COURT:  Mr. Schmidt, do you have anything?

20          MR. SCHMIDT:  I don't have anything.

21          MR. PAUL:  Just a few questions.

22          MR. SCHMIDT:  If I may, I think it would be more

23  appropriate for Mr. Paul to go first because based on his

24  questions I may have a couple of questions.

25          THE COURT:  Mr. Paul.

IB58KET2                         Ketabchi - Redirect

1    REDIRECT EXAMINATION

2    BY MR. PAUL:

3    Q.  Mr. Ketabchi, during the time in assisting your brother

4    Arash Ketabchi at A1, did you personally purchase any of his

5    products, and if so, what products were they?

6    A.  Let me think here.  Yeah.  I actually -- I remember -- I

7    was actually in the vitamin supplement business and they had

8    launched, I believe it was called Youngevity, and they sold the

9    same line of products that my company was selling online.

10   Q.  That was for Vitamin Pros?

11   A.  Yeah.

12   Q.  What if anything did you purchase from Youngevity?

13   A.  Different supplementation, multi-vitamins.  They had a fish

14   oil that was popular on the market.  So I would get those and

15   then resell them on the Web site.

16   Q.  You testified on cross-examination that there was an e-mail

17   shown between you and Bill Sinclair -- withdrawn.

18           There was an e-mail where you indicated that you did

19   not want what happened at Olive Branch management to happen at

20   A1.

21           Do you remember that?

22   A.  Yes, I remember that.

23   Q.  What if anything was your understanding as to what had

24   actually happened at Olive Branch?

25           MS. FLETCHER:  Objection.  Basis.

IB58KET2                    Ketabchi - Redirect

```
 1              THE COURT:  I will allow it, if you believe you know.
 2   A.   Just thinking back, I believe my brother at one point
 3   communicated --
 4              MS. FLETCHER:  Objection.
 5              MR. PAUL:  What his brother communicated?
 6              MS. FLETCHER:  801.
 7              THE COURT:  I will allow it.
 8   Q.   You can continue.
 9   A.   So from my recollection, my brother had communicated that
10   Bill and Fino weren't managing their business properly, and I'm
11   all about, you know, customer service, you know, kind of like
12   Amazon, very customer centric, and my brother launched this and
13   I wanted his business to be successful.  So when he
14   communicated with me that Bill and Fino's company weren't
15   executing proper customer service protocols and weren't on top
16   of fulfillment and weren't following up with customers and they
17   were no longer being able to service the customers, and I was
18   very passionate with my brother with communicating with them
19   that this is the core competency, you must make sure your
20   customers are getting what they are supposed to be getting,
21   they are happy, the salespeople are following up.  You can't
22   just sell somebody something and disappear from the face of
23   earth when it's pretty easy to do in telemarketing and that
24   would lead to failure.
25   Q.   Is that what you meant in your e-mail, if you can recall,
```

1    when you said "we have to revise this model?"

2    A.  That is precisely what I meant because I always saw him

3    operating a business services telemarketing company.

4    Q.  Now, there was a document shown to you with regard -- I

5    think it was Exhibit 533 -- where there was a merchant account

6    being set up.

7         Do you recall that?

8    A.  Is it possible I can see it again to make sure because

9    there were a few of them?

10   Q.  Sure.

11   A.  Oh, I see that.  I think that was with US Card Systems or

12   something.

13   Q.  What if anything, as best you can recall, are you saying

14   here?

15   A.  Just basically my brother had informed me that I need to

16   get ahold of Michael to see if he could set up a new,

17   additional merchant account it seems like for his business, and

18   that is just one of the many tasks he requested me to do.

19   Q.  Did you ever set up a merchant account?

20   A.  I never personally applied or did anything with A1 Business

21   Consultants on my name at all.  It was all my brother's

22   business.  The only thing I did was just fill out an

23   application for him and things like that.

24   Q.  You were shown exhibits regarding Danielle Owimrin.

25        Do you remember those?

IB58KET2                        Ketabchi - Redirect

1    A.   Yes.

2    Q.   Dash's Salon?

3    A.   Yes.  I remember those.

4    Q.   Who, if anyone, requested that you draw up that letter on

5    behalf of Danielle Owimrin?

6    A.   It was Danielle Owimrin.

7    Q.   What exactly -- withdrawn.

8         So the letter you typed up and the information you

9    placed in that letter, who provided you that information?

10   A.   Danielle and my brother.

11   Q.   Who provided you, if you could recall, her tax return?

12   A.   I believe Danielle sent me those, if I remember.

13   Q.   What instructions, if any, did Danielle Owimrin give you

14   with regard to what she was requesting?

15   A.   She just said send the documents to the applicable party.

16   So that's exactly what I did for her.

17   Q.   When the government asked you, Ms. Fletcher asked you about

18   the tax showing X number, certainly not matching up with the

19   number that you put in the letter, did you at all read these

20   documents or interpret these documents before passing them on?

21        MS. FLETCHER:  Objection to form.

22        THE COURT:  Sustained as to form.

23   Q.   What, if anything, did you do with these documents when you

24   received them from Danielle Owimrin?

25   A.   I didn't analyze anything.

1          THE COURT:  No.  What did you do, not what did you not

2     do.

3          What you did you do, if anything, before passing them

4     on?

5     A.  I didn't do anything because all I needed to do is, I think

6     may have scanned it if it was going to an e-mail address and

7     just sent it out.  I'm not an accountant.

8          MR. PAUL:  I have no further questions, your Honor.

9          MS. FLETCHER:  Very brief recross.

10          THE COURT:  Very brief.

11          MR. SCHMIDT:  I have no questions.

12          THE COURT:  Thank you, sir.

13    RECROSS-EXAMINATION

14    BY MS. FLETCHER:

15    Q.  Mr. Ketabchi, you just testified that you are passionate

16    about customer service.  Is that right, sir?

17    A.  Yes.

18    Q.  You wanted to be sure that your brother's business was

19    running smoothly and he was doing everything properly, is that

20    correct?

21    A.  As his brother, I wanted him to do his best to do that

22    best.

23    Q.  Isn't it your testimony, sir, when you were fighting or

24    responding to these chargebacks that you didn't care whether

25    you won or lost them, you just wanted to be sure that the

IB58KET2                        Ketabchi - Recross

1    customer was happy?

2    A.   Can you repeat that question?

3              (Continued on next page)

1   Q.  Is it your testimony, sir, that when you were responding to

2   these charge-backs, that you didn't care whether you won or you

3   lost, that you just wanted the customer to be satisfied and

4   happy?

5   A.  Well, in terms of charge-backs, the end goal is always to

6   try to resolve the dispute to make sure that whatever happened

7   in that sales transaction in their office is corrected and

8   rectified so at the end of the day the client, the customer is

9   happy and satisfied.  That's the main purpose of a charge-back.

10  Q.  So you wanted the customers to be satisfied.  Is that your

11  testimony?

12  A.  Yeah, that is always the case in any business.

13  Q.  You didn't want to just win the charge-back?

14  A.  Well, when you -- it is kind of -- I am trying to see how

15  to explain this.  When you're given a task --

16  Q.  Mr. Ketabchi, did you or did you not want to win the

17  charge-back?

18  A.  I am not able to answer that question unless I have an

19  explanation.  It is not a yes or no because it can lead to a

20  false conclusion.

21  Q.  Can we please pull up, Ms. Lee, what is in evidence as

22  Government Exhibit 1011.  This is a text message conversation

23  between you and your brother, isn't it, Mr. Ketabchi?

24  A.  Can I see the left more so I can make sure I can answer

25  that properly.

IB5JKET3                          Ketabchi - redirect

1    Q.  Ms. Lee, just pull up the bottom three lines.

2              Arash tells you one charge-back I'm dead, correct?

3    That is the message from Arash to you?

4    A.  I see that, yes.

5    Q.  And you respond, well, we have to fight them and win.

6    Didn't you say that, sir?

7    A.  I can answer that with an explanation.

8              THE COURT:  Well, did you say that, yes or no?

9              THE WITNESS:  I obviously wrote that, yes.

10             THE COURT:  Next question.

11             MS. FLETCHER:  No further questions.

12   REDIRECT EXAMINATION

13   BY MR. PAUL:

14   Q.  What is your explanation with regard to this text, please?

15   A.  Basically when there is a charge-back dispute, the most

16   important goal of any business is to make sure you're taking

17   care of your customers.  That is just number one.

18             Anybody who goes to any business school and has been

19   in business knows that.  If don't do that, you're not going to

20   make it.  When you get a charge-back from a customer, sometimes

21   the sales and the company may have given everything they were

22   supposed to to the client, and some people just dispute them

23   because they want to get their money back, they don't believe

24   they got everything they were supposed to.

25             So when they file a charge-back, the goal of the

IB5JKET3                        Ketabchi - redirect

1   company is also to resolve the problem, and the only way to do

2   that is to win them.  So winning them doesn't mean you don't

3   want the customer to be happy as a general goal of a business.

4   You can take this out of context and think oh, we're not -- I'm

5   not thinking about the customers or my brother doesn't care

6   about customers, but that is 100 percent absolutely not true.

7   It is like if you're playing football, you know, your goal is

8   to win the charge challenge.  It is the same thing when you

9   have a dispute in a charge-back.

10          So there is a lot of variables of why charge-backs

11  occur in the first place.  It could be because the customer

12  doesn't have accurate information.

13          MS. FLETCHER:  Objection, your Honor.

14          THE COURT:  Go ahead.

15          THE WITNESS:  Also the sales office didn't execute the

16  fulfillment.  There are too many variables to make a

17  determination on the word, "win."

18          MR. PAUL:  No further questions.

19          THE COURT:  Anything?

20          MS. FLETCHER:  No, your Honor.

21          THE COURT:  Mr. Ketabchi, you may step down, sir.

22          (Witness excused)

23          THE WITNESS:  Thank you, your Honor.  Thank you for

24  the opportunity.

25          THE COURT:  Next witness for Shahram Ketabchi, Mr.

IB5JKET3                        Finocchiaro - direct

1    Paul.

2              MR. PAUL:  Yes, your Honor.  The defendant calls

3    Michael Finocchiaro.

4     MICHAEL FINOCCHIARO,

5          called as a witness by the Defendant,

6          having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    Q.  Mr. Finocchiaro, good morning.

9    A.  Good morning.

10   Q.  Have we ever met before?

11   A.  The other day briefly outside.

12   Q.  Was that when you refused to talk to me?

13   A.  That's what I was directed by my lawyer.

14   Q.  But you have talked to the government, I assume?

15   A.  Yes, that's correct.

16   Q.  Could you tell us what is your employment history?

17   A.  I've worked for telemarketing companies for over the last

18   decade at the Tax Club as well as Olive Branch, and currently I

19   am in medical device sales.

20   Q.  Where was Tax Club located?

21   A.  That was in the Empire State Building, 460.

22   Q.  How long did you work there?

23   A.  I don't know the exact years I was, three to four years.

24   Q.  What was your role, if any, while you were working there

25   for three or four years?

IB5JKET3                          Finocchiaro - direct

1    A.   I was a representative, just salesman at the time.

2    Q.   A salesperson?

3    A.   Yes.

4    Q.   What was the business of Tax Club specifically?  What was

5    the business that they engaged in?

6    A.   It was called biz-op.

7    Q.   Was this another telemarketing company, I assume?

8    A.   Yes, that's correct.

9    Q.   After you left Tax Club -- by the way, did you know an

10   individual by the name of Bill Sinclair?

11   A.   Yes, sir.

12   Q.   Was he also working at Tax Club while you were working

13   there?

14   A.   That's correct, yes.

15   Q.   What, if any, legal problems, if you know, did the Tax Club

16   face while you were working there?

17   A.   While I was working there?

18   Q.   Yes.

19   A.   I know there was one of the vice presidents I believe of

20   the company had some legal issues with a car wreck involving

21   his father.  When I left, they were having issues.

22   Q.   What kind of issues did you learn of after you left?

23   A.   FTC issues for just certain type of sales practices.

24           MS. FLETCHER:  Is there any way to ask Mr. Finocchiaro

25   to move the mike a little bit away from his mouth.  I think it

IB5JKET3                          Finocchiaro - direct

1    is creating this hissing feature.

2              THE COURT:  I wondered what that was.

3              MS. FLETCHER:  Every time he gets close.

4              THE COURT:  Mr. Finocchiaro, now that I've asked you

5    to bring the Mike close to your face, I am going to ask you to

6    move it away.

7              THE WITNESS:  Yes your Honor.

8              MR. PAUL:  You can't win.

9              THE COURT:  I thought that was somebody's assisted

10   hearing device.  Thank you.

11   BY MR. PAUL:

12   Q.  You said they had FTC issues?

13   A.  Yes, that's right

14   Q.  After you left Tax Club, where did you go to work?

15   A.  At that point, we were down the Wall Street area.  We tried

16   to start a coaching company.

17   Q.  Who is we?

18   A.  My partner at the time, Bill Sinclair, and there were two

19   other gentlemen, Jeff Fisher and Preston -- I forget last --

20   Preston Clark.

21   Q.  What does a coaching company do?

22   A.  A coaching company is where you are taking an inexpensive

23   lead that can be anywhere from 50 cents, 10 cents, 50 cents, a

24   dollar, really up to about a couple of dollars that you're

25   going to thousands of these leads and trying to find which

1  clients have money to invest into the biz-op venture and

2  ultimately are sold services.

3  Q.  So you were selling services involving coaching for the

4  biz-op?

5  A.  Yeah, coaching, explaining what they needed to do

6  step-by-step to make money, and to my knowledge, it was a while

7  ago, I believe that we might have done like a website,

8  something of that nature.  I don't recall offhand.

9  Q.  Do you recall if those customers made any money?

10  A.  No, they did not.

11  Q.  Where did you go after you left this coaching company with

12  Bill Sinclair?

13  A.  At that point we started our own venture which actually we

14  went to my old manager, Brian Hult had a company in Clifton, we

15  made a brief stop there and ultimately tried to get the

16  coaching off the ground.

17  Q.  This was at Olive Branch?

18  A.  It wasn't Olive Branch yet.

19  Q.  When did you set up Olive Branch?

20  A.  Olive Branch was right after that.  I am not a hundred

21  percent on the date, 2012 or 13, give or take.

22  Q.  Who did you set Olive Branch up with?  Who was your

23  partner?

24  A.  Bill Sinclair.

25  Q.  So Bill Sinclair remained as your partner since you left

IB5JKET3                          Finocchiaro - direct

1    Tax Club.  Is that fair?

2    A.  That is correct.

3    Q.  Primarily what was your job when you worked at Olive Branch

4    Management?

5    A.  At Olive Branch, I was in charge of doing saves, which is

6    keeping customer retentions as well as charge-backs.

7    Q.  Keeping customers what?

8    A.  Keeping customers on board if they tried to cancel.

9    Q.  When you say "saves," it was your job to save that

10   customer, to keep him on board and to continue to invest?

11   A.  Ultimately, I morphed into that position because there

12   would be an excessive amount that I would have to help because

13   the employees were supposed to, but it just got overwhelming

14   that I had to handle it.

15   Q.  So it fell upon you to handle these what you call saves.

16   Is that right?

17   A.  Most of the time.

18   Q.  You said you also handled charge-backs?

19   A.  That's correct.

20   Q.  Can you explain in your mind what a charge-back is.

21   A.  A charge-back is when a client who is initially sold

22   services decides to cancel, and there is many different reasons

23   they could cancel.

24   Q.  Such as?

25   A.  "I never signed up for this, I don't recall giving this, I

1    was promised I was going to make money, I can't do this any

2    more, I don't have funds."  Those were the main three that I

3    remember.

4    Q.  Now, was there a certain demographic of customers or

5    clients that were reached out to, and if so, how would you

6    describe that demographic?

7    A.  The demographic was middle America, elderly most of the

8    time.  That's the leads we would get.

9    Q.  Why would they be good customers for you to reach out to?

10        MS. FLETCHER:  Objection to form.

11        THE COURT:  I'll allow it.

12   A.  Just because the thought process was people in bigger

13   cities are more in tune with these kind of -- they weren't as

14   gullible.

15        THE COURT:  I am not sure who you're casting as the

16   gullible people.  Say it again so I understand it.

17        THE WITNESS:  They felt that people in bigger cities

18   were not as gullible as some of the clients in middle America.

19   BY MR. PAUL:

20   Q.  So middle America, in your view, were easier targets.  Is

21   that fair?

22   A.  That's correct.

23   Q.  Now, given the legal problems that the Tax Club faced as

24   you told us you learned, what, if any, roles were set up at

25   Olive Branch Management to avoid similar legal problems?

IB5JKET3                        Finocchiaro - direct

A.  What we did was we had call monitoring for a brief period
of time.  We also had specific rules like earnings claims.  You
could not make a blatant earnings claim, and also just to make
sure that someone was of sound mind and could make a decision
for themselves.

Q.  What was the purpose of these rules?

A.  To maintain some sort of a structure as opposed to just a
free-for-all.

Q.  What would be your concern if you were in a free-for-all?

A.  That we would get the authorities to look into what was
going on.

Q.  So these rules that you set up were really to, in essence,
keep you off the radar of law enforcement.  Is that fair?

A.  Yes, that's fair.

Q.  How, if at all, were these rules implemented at Olive
Branch so everyone working there could follow them?

A.  It was difficult to listen to everyone's calls, but my
partner Bill, as myself, we would always try to keep our ears
open.  If we heard anything, we would yell out and correct the
salesperson, but we also had a call monitoring system in place
that there would be random calls that were monitored, and then
finding the issue.

Q.  You told us you were partners with Bill Sinclair at Olive
Branch.  Were you and Bill the owners of this company?

A.  Yes, that's correct.

IB5JKET3                         Finocchiaro - direct

1    Q.  Who was the sales manager at Olive Branch?

2    A.  Arash Ketabchi.

3    Q.  How did you know Arash Ketabchi?

4    A.  I met him while I was at the Tax Club going back to 2008 or

5    9, in that time-frame.

6    Q.  You brought him with you to Olive Branch, you and Bill?

7    A.  We didn't bring him initially.  I guess he was living out

8    West, and he came back, so then Bill called me and said I have

9    a surprise for you today, and then he showed up.

10   Q.  You said one of your jobs at Olive Branch was to deal with

11   charge-backs in addition to these saves you described.

12            What, if anything, would you do to combat

13   charge-backs?

14   A.  What I would first do is call the client initially to try

15   and put out any fires or any issues that were occurring.  We

16   would also have to gather whatever was sold, we would have to

17   show sufficient proof that we could send in to the merchant

18   account, the credit card company so we could show proof to get

19   the charge-back overturned.

20   Q.  Where would you get this proof from?

21   A.  We had a fulfillment company.

22   Q.  So you would reach out to the fulfillment people to send

23   you documents to show proof of these customers getting what

24   they contracted for.  Is that fair?

25   A.  That's fair.

1  Q.  What about contracts, would you attempt to locate the

2  contract?

3  A.  That's correct as well.  I didn't add that.  I should added

4  that.

5  Q.  That is a pretty crucial part of what you had to do with

6  regard to responding to charge-backs.  Is that not fair?

7         MS. FLETCHER:  Objection to form.

8         THE COURT:  Sustained as to form.

9  BY MR. PAUL:

10  Q.  Would it be fair to say that reaching out to the

11  fulfillment people to get hold of the signed contract was one

12  of the many things you had to do with regard to fighting the

13  charge-backs?

14  A.  That's not what the contract is for.

15  Q.  Where were the contracts?

16  A.  They were on the floor with us.

17  Q.  The contracts were physically at your office.  Is that

18  right?

19  A.  That's correct.

20  Q.  The fulfillment people were those who sent documents --

21  withdrawn -- sent proof to you that these customers received

22  what they contracted for?

23         MS. FLETCHER:  Objection to form.

24         THE COURT:  I'll allow it.

25  Q.  Is that fair?

1           THE COURT:  I am sorry.  I am sorry.  Given the

2      sidebar, sustained.

3      BY MR. PAUL:

4      Q.  With regard to the contract, what would you do to locate

5      the contract?

6      A.  I would ask a secretary.  She was in charge of all that.

7      She would pull it up on the computer.

8      Q.  She would pull it up?

9      A.  Yes.

10     Q.  What would you do after receiving or locating the contract

11     in your office with regard to the fulfillment people?

12     A.  I am sorry?

13          THE COURT:  What would you next do after locating the

14     contract in your sales floor?

15          THE WITNESS:  After the contract, we would reach out

16     to fulfillment to make sure that whatever was sold, that we can

17     show some sort of proof that the customer received what it was

18     that they paid for.

19     BY MR. PAUL:

20     Q.  What would you do after you've gathered the contract and

21     the documents you received from the fulfillment, what, if

22     anything, would you do with that?

23     A.  At first we would try to put out the fire, use that as

24     ammunition.  If the client was saying hey, I never did this or

25     whatever the reason is you can show me look, you signed this

1   or -- you always try to put the fire out at first if you could.

2           If not, then you have to send it into the credit card

3   company.

4   Q.  That would be the contract and the fulfillment documents

5   you received.  Is that right?

6   A.  That's correct.

7   Q.  Now, if there was no contract to be located, what, if

8   anything, would you do with regard to the charge-back?

9   A.  In that situation, I would call, I would still make the

10  call to the client and try and reason with them to keep them on

11  board however, whatever needed to be said to put them at ease.

12  Q.  Even without a contract?

13  A.  Yes, that's correct.

14  Q.  Who was Ray Quiles?

15  A.  He was a fulfillment manager in charge of providing

16  services that we sold.

17          THE COURT:  Is he with Olive Branch?

18          THE WITNESS:  He actually was a separate entity, but

19  he worked with us.

20  BY MR. PAUL:

21  Q.  If you know, what was the grant program?

22  A.  The grant program is a program that you are basically

23  making promises, you're making promises to a client that you're

24  going to get some sort of government grant, whether it be

25  ex-military or senior citizen, there was a list of different

IB5JKET3                        Finocchiaro - direct

1   reasons, and you promise them they're going to make X amount of

2   money, but they would have to pay X amount of money.

3   Q.  So they would have to pay X amount of money to get into

4   this grant program, you promise them in return for their

5   investment they would receive X amount of money.  Is that fair?

6   A.  That's fair.

7   Q.  Did you have such a program at Olive Branch?

8   A.  Yes, we did.

9   Q.  Would it be fair to say, sir, that the -- what was your

10  understanding as to what the customer would end up with if they

11  invested in this grant program?

12  A.  Pretty much nothing, maybe a piece of -- a grant packet

13  that I have personally never seen, but that is what I was told

14  they would get from people in fulfillment.

15  Q.  So how long did you have this grant program in existence at

16  Olive Branch?

17  A.  There are two separate occasions.

18  Q.  Let's take the first occasion.

19  A.  Okay.  We had a floor, a group, another company from

20  Arizona come out to show us how to do the process.  It was

21  short-lived, I want to say two weeks, maybe three weeks, but I

22  remember there were issues with money, where we never got paid,

23  so that it abruptly ended.

24  Q.  It ended as a result of a money issue.  Is that fair?

25  A.  Yes, that is fair.

Q.  How is selling customers grants any different than the

other products you were selling to them from Olive Branch?

A.  The grant program was, I felt, a quicker way to get

authority's attention because it was to blatant.

THE COURT:  So blatant what?

THE WITNESS:  Just that there was nothing they

received, the clients.

BY MR. PAUL:

Q.  With regard to the other products you were selling, was

there something that the clients were receiving?

A.  They would receive depending on what they bought.

Q.  So the products you were selling, other than the grant

program where they got nothing, they would receive something

with regard to the other products you were selling.  Is that

fair?

A.  That's fair, yes.

Q.  The people who were working and selling the grants, you

said these were the people you brought over from Arizona.  Is

that right?

A.  That's correct.

Q.  Do you know the names of those individuals?

A.  The head of the company was Carl Morris, from what I

remember, and there was Richard Frost and Ray Abelos.  I don't

know if I am pronouncing that correctly.  Those are the three I

remember

1    Q.  When you were at Tax Club, did you have an understanding

2    whether grants were being sold and, if so, what was your

3    understanding as to how successful the selling of grants were

4    at Tax Club?

5    A.  Grant leads always were problematic for the fact that they

6    would cancel eventually, so they're easy to sell, but they come

7    with major headaches, so everyone kind of -- no one really

8    wanted them to start.

9    Q.  But did they sell them at Tax Club?

10   A.  When they came in, there would be different batches of

11   leads that would come in, and if you received them, you had no

12   choice but to sell them.

13   Q.  Now, knowing that selling grants was a fraud, and you told

14   us that, what, if anything, did you think would happen to Olive

15   Branch if you got caught by the authorities?

16           MS. FLETCHER:  Objection to form.

17           THE COURT:  Sustained.

18   BY MR. PAUL:

19   Q.  What was your understanding that potentially could happen

20   at Olive Branch by selling these grants?

21   A.  That we would get in trouble, have legal issues with

22   potentially getting arrested.

23   Q.  Was FTC also on your mind?

24   A.  Absolutely.

25           THE COURT:  FTC is the Federal Trade Commission.  Is

1    that correct?

2              THE WITNESS:  Yes, your Honor.

3    Q.  Did you know a Brooke Marcus?  And, if so, who was she?

4    A.  I can't say for certain, but I do remember the name.  I

5    believe she was a lead, one of the lead, like in between like

6    from a lead company.

7    Q.  Did you know a Heidi?  And if so, who was she?

8    A.  Again, I remember the name and I believe she was another

9    lead in-between, like a contact.

10   Q.  Are you aware of complaints against Olive Branch Management

11   that went to the attorney general offices and, if so, how did

12   you respond to them?

13   A.  Yes, I have, and for the AG complaints, I originally would

14   try and handle it myself by sending in, fighting them as a --

15   show proof if it was like a charge-back, and I remember I was

16   uncomfortable, so we hired an attorney to handle these kind of

17   issues.

18   Q.  Who was that attorney?

19   A.  His name was Vafa Sarmasti.

20   Q.  What is your understanding as to how the lawyer that you

21   retained would respond to these complaints?

22              MS. FLETCHER:  Objection.

23              THE COURT:  Sustained.  You hired him to respond to

24   the complaints.  Is that correct?

25              THE WITNESS:  That wasn't the only reason, but I was

1   out of my comfort zone, where I just felt uncomfortable

2   speaking to any AG, so he would handle them and write whatever

3   he needed to write to resolve the issue.

4   BY MR. PAUL:

5   Q.  Was part of the job of the retained lawyer also to respond

6   to charge-backs, if you know?

7   A.  For the most part, no, but I am sure there has been issues.

8   I just can't recall specifically where he would have helped.

9   Q.  And you paid this lawyer on a retainer.  Is that right?

10   A.  That's correct.

11   Q.  Were you billed on a monthly basis?

12         MS. FLETCHER:  Objection.

13         THE COURT:  How were you billed?

14         THE WITNESS:  My partner, Bill, handled most of that,

15   but I believe it was monthly sometimes.

16         THE COURT:  Don't guess.  The jury isn't interested in

17   guessing.  On the other hand, if you have reason to believe,

18   sir, something is true, you should let the jury know that.

19         My question was how were you billed?  Do you know?  Do

20   you have a belief as to how Olive Branch was billed by

21   Sarmasti?

22         THE WITNESS:  Yes, your Honor.  He would be sent an

23   invoice through the email.

24   BY MR. PAUL:

25   Q.  Would this invoice lay out the hours of the lawyer, what he

IB5JKET3                         Finocchiaro - direct

1   was doing with regard to --

2          THE COURT:  What did the invoice contain, if you know?

3          THE WITNESS:  That was something that my partner,

4   handled.  I don't recall specifically what the breakdown was.

5   BY MR. PAUL:

6   Q.  Do you recall communicating with the lawyer at any time as

7   the retained attorney while you were at Olive Branch and, if

8   so, what would those communications have been?

9          MS. FLETCHER:  Objection, your Honor.

10          THE COURT:  Sustained.

11   Q.  Did you communicate with the lawyer at any time?

12   A.  I am sorry.  Can you be more clear.

13          THE COURT:  Did you talk or email with Sarmasti?

14          THE WITNESS:  Yes, I did.

15   BY MR. PAUL:

16   Q.  What would the subject matter, if at all, as you can

17   recall, pertain to?

18          MS. FLETCHER:  Objection, your Honor.

19          THE COURT:  I will allow that.  Do you know, was it

20   charge-backs?  Saves?  What was it?

21          THE WITNESS:  It was at one point we had a lawsuit

22   that we were filing against ex-employees, your Honor.

23          THE COURT:  Olive Branch was suing employees?

24          THE WITNESS:  Yes, your Honor.

25          THE COURT:  Go ahead.

IB5JKET3                      Finocchiaro - direct

1           THE WITNESS:  That was a reason that we would use him

2    and mainly for AG complaints or I remember we fired someone and

3    we just wanted counsel on how to do it properly.

4    BY MR. PAUL:

5    Q.  Do you recall whether you had communications with him

6    concerning charge-backs and, if so, what were they?

7           MS. FLETCHER:  Objection.

8           THE COURT:  I will allow the first part of that.

9    Q.  Did you have communications with the lawyer regarding

10   charge-backs?

11          MS. FLETCHER:  Asked and answered, your Honor.

12          THE COURT:  Yes or no?

13          THE WITNESS:  I don't recall specifically.

14          THE COURT:  All right.  Next.

15   BY MR. PAUL:

16   Q.  May I show you what has been previously marked as SK-1 for

17   identification purposes and see if you could just look at the

18   highlight and see if that refreshes your recollection?

19          THE COURT:  Now, sir, it is not what is written there.

20   What is written there in a way doesn't matter.  The only issue

21   is does looking at that refresh your recollection, because you

22   just said you don't recall whether you had communications with

23   Sarmasti regarding charge-backs.  Do you have your refreshed

24   recollection now?

25          THE WITNESS:  If I may have a minute, please?

IB5JKET3                          Finocchiaro - direct

1              THE COURT:  Oh, yes, of course.

2              (Pause)

3              THE WITNESS:  Yes, that seems accurate, your Honor.

4              THE COURT:  No, not that seems accurate.

5              Now that looking at that has refreshed your

6    recollection, do you recall speaking with Sarmasti in regard to

7    charge-backs?

8              THE WITNESS:  I don't recall, but if it is on there --

9              THE COURT:  No, no, no.  If you don't recall, you

10   don't recall.  Next.

11   BY MR. PAUL:

12   Q.  So reading that does not refresh your recollection?

13             THE COURT:  Asked and answered.  Next.

14   Q.  Do you know whether or not Mr. Sarmasti, the attorney, was

15   made aware about the charge-back complaints at Olive Branch

16   and, if so, how?

17             MS. FLETCHER:  Objection.

18             THE COURT:  Sustained.

19   BY MR. PAUL:

20   Q.  Would you agree that Mr. Sarmasti was practically on the

21   payroll at Olive Branch and, if so, why would you come to that

22   conclusion?

23             THE COURT:  Sustained, sustained, sustained, without

24   the government rising.

25             MR. PAUL:  I don't believe that is a leading question,

IB5JKET3                          Finocchiaro - direct

 1   your Honor.

 2              MS. FLETCHER:  That wasn't the basis for the

 3   non-standing objection.

 4              THE COURT:  The government has objected.  The court

 5   has sustained the objection.

 6              MR. PAUL:  Because of leading?

 7              THE COURT:  Sustained, sir.  Move on.  Do you want a

 8   sidebar?  Let's have a sidebar.

 9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At sidebar)

2           THE COURT:  I have given you plenty of leeway here.

3           Your specific representation to the Court, sir, when

4    we had an extended sidebar on this, or it may have been in open

5    court without the jury, is that your questions to Mr.

6    Finocchiaro in regard to Sarmasti would be limited to the

7    questions that you asked Sinclair on 658, 659.  You are way

8    beyond that at this point.

9           MR. PAUL:  Okay.  Judge, can I just put something on

10   the record also I was meaning to?

11          THE COURT:  Of course.

12          MR. PAUL:  I realize I was in the doghouse on Friday

13   with your Honor, but I think having seen my client up close and

14   personal, I think your Honor might have a better understanding

15   why often I had to lead my witness rather than use direct

16   because we would still be here on direct examination otherwise.

17          THE COURT:  I do have a better sense of that.

18          MR. PAUL:  Thank you.

19          THE COURT:  I won't make any comment about the

20   doghouse.  I must say that when I asked what was the universe,

21   and he looked at me and said I am not an astrophysicist --

22          MR. PAUL:  He talked about the stars and moon.

23          THE COURT:  I thought he may have been joshing.

24          MR. PAUL:  I remember.

25          THE COURT:  I was astonished.  In the course of the

IB5JKET3                         Finocchiaro – direct

1    afternoon, I realized there was a substantial chance he was not

2    joshing, he takes things very literally.

3              MR. PAUL:  Correct.

4              THE COURT:  And that did change my perception of this

5    answers.

6              MR. PAUL:  Thank your Honor.  I hope your perception

7    of my examination of him as well?

8              THE COURT:  In order to have you expedite this, I

9    won't comment on that.

10              MR. PAUL:  Okay.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2      BY MR. PAUL:

3      Q.  You testified about these attorneys general complaints.

4           What, if anything, would you do when there was such a

5      complaint filed?

6      A.  At first I attempted to resolve it myself by calling, and I

7      was uncomfortable from my initial reaction, that we had our

8      attorney handle them after we received a couple.

9      Q.  Was there an effort at Olive Branch to convince customers

10     to pay by check and, if so, why?

11     A.  It happened, but it wasn't common practice.

12     Q.  I am sorry.  It happened but what?

13     A.  It wasn't the norm, the normal procedure to do so.

14     Q.  Why would you do so?

15     A.  In the event that -- for one, if there was no credit card,

16     they can write a check, but it also depends on what time of the

17     business we were doing this at because at certain points we

18     were trying to have clients write what is called a balance

19     transfer check, where they would get it from the credit card

20     and write it because those type of transactions, you weren't

21     able to charge-back on or it was very difficult to do so.

22     Q.  So it was an effort to avoid charge-backs.  Is that fair?

23     A.  That's fair.

24     Q.  If there was no charge-back possible because Olive Branch

25     perhaps was paid by check, how would the customer in that

1    circumstance be able to get their money back, if at all?

2    A.  It would be very difficult.

3    Q.  Would one of the ways perhaps be by filing a complaint with

4    the attorneys general office?

5    A.  It is a possibility, yes.

6    Q.  By the way, sir, what, if anything, happened to you in

7    March of 2017?

8    A.  I was arrested.

9    Q.  What were you arrested for?

10   A.  For committing wire fraud, money laundering as well as

11   narcotics distribution.

12   Q.  Distribution of what?

13   A.  Oxycodone.

14   Q.  Did you shortly thereafter your arrest meet with the

15   government and, if so, what was the purpose of such a meeting?

16   A.  It was, I don't know the exact time, but a month, a couple

17   of months maybe, and it was to admit to what I was in trouble

18   for and to ultimately cooperate.

19   Q.  To ultimately get a cooperation agreement?

20   A.  I am sorry?

21   Q.  To ultimately get a cooperation agreement from the

22   government?

23   A.  I wasn't promised anything, but ultimately if I was

24   truthful, it could potentially lead to that if I was truthful.

25   Q.  If you were truthful based on whose determination, the

1    government?

2    A.  No, just telling the truth.

3    Q.  Who would offer you the cooperation agreement?

4    A.  It --

5              MS. FLETCHER:  Objection to form.

6              THE COURT:  I'll allow that if you understand it.

7    A.  Can you say that again?

8    Q.  Did you eventually sign a cooperation agreement?

9              THE COURT:  Did you sign an agreement with the

10   government?

11             THE WITNESS:  Yes, I did.

12             THE COURT:  Do you remember what that agreement said

13   in general terms?

14             THE WITNESS:  Yes, your Honor.  To my knowledge, I had

15   to tell the truth about what transpired over the last years of

16   operating the telemarketing business, all my business dealings,

17   and I also had to admit to past transgressions, crimes that

18   I've done, and I was not promised anything except for the fact

19   that the Southern District would not prosecute me for some of

20   the crimes that I did admit to.

21             THE COURT:  Mr. Paul, you said, sir, you had to tell

22   the truth about what transpired, correct?

23             MR. PAUL:  You misspoke.  Mr. Finocchiaro.

24             THE COURT:  I am sorry.  Mr. Finocchiaro.  I

25   apologize.  Mr. Paul asked you owe -- sorry.  Let's start

IB5JKET3                          Finocchiaro - direct

1    again.  You said you had to tell the truth, that was in your

2    agreement, correct?

3                THE WITNESS:  Yes, your Honor.

4                THE COURT:  Mr. Paul asked you before who decides

5    whether or not you tell the truth?

6                THE COURT:  If you know?

7                THE WITNESS:  The Judge, I believe,.

8                THE COURT:  All right.

9    BY MR. PAUL:

10   Q.  According to your cooperation agreement with the

11   government, in return for cooperating with them, what is your

12   understanding as to what will happen?

13   A.  If I live up to my end and give a truthful account of what

14   transpired, I could potentially receive what is called a 5K1

15   letter.

16   Q.  What is your understanding of what a 5K1 letter is?

17   A.  That gives the judge the ability to sentence under the

18   guidelines for the crimes.

19   Q.  How much time, as best you -- withdrawn.

20               THE COURT:  When you say "under the guidelines," do

21   you mean below the guidelines?  Is that what you mean?

22               THE WITNESS:  Yes, sir, that's correct.

23               THE COURT:  All right.

24   BY MR. PAUL:

25   Q.  I started asking you before about your meetings with the

1    government.  Approximately how many times, if you can recall,

2    did you meet with the government before you agreed to a

3    cooperation agreement?

4    A.  I want to say about four to five times.

5    Q.  How many times did you meet with the government after

6    signing the cooperation agreement?

7    A.  Maybe about seven times.

8    Q.  When was the most recent time you met with the government?

9    A.  It was last week.

10   Q.  About a week ago?

11   A.  Yes, sir.

12   Q.  What was the purpose of that meeting?

13   A.  Just to --

14           THE COURT:  From your standpoint, sir, from your view?

15           MS. FLETCHER:  Objection, your Honor.  I think we are

16   going to need a sidebar on this.

17           THE COURT:  Move on and we'll come back to it.

18           MR. PAUL:  Okay, Judge.

19   BY MR. PAUL:

20   Q.  What is your understanding, sir, of how many years you are

21   potentially facing for the crimes you pled guilty to?

22   A.  80 years.

23   Q.  As you sit here today, is it your expectation that you're

24   going to be sentenced to 80 years?

25   A.  I would certainly hope not.

IB5JKET3                        Finocchiaro - direct

1  Q.  Is it your understanding that if and when the government

2  files this 5K1 letter, that the judge could sentence you to

3  whatever he thinks is appropriate.  Is that right?

4          MS. FLETCHER:  Objection to form.

5          THE COURT:  I'll allow it.

6  A.  That is correct.

7  Q.  In your mind, is it possible the Judge who sentences you

8  could sentence you to as little as no jail at all?

9  A.  If that's the Judge's decision, then yes.

10  Q.  So he's not restricted in any way, but once he receives the

11  5K1 letter, is it your understanding that in return for that

12  letter, he can sentence you to as little as probation?

13  A.  To my knowledge, yes.

14  Q.  In addition to your admitting to fraudulent telemarketing

15  activities and money laundering from 2012 to 2017, you told us

16  that you also pled guilty to a conspiracy to distribute

17  oxycodone.  Is that right?

18  A.  That's correct.

19  Q.  And you know the period of time that you were selling

20  oxycodone?

21  A.  It was -- I can't put an exact year, but it was five to

22  seven years possibly.  I don't know exactly.

23  Q.  Would it be fair to say, sir, that according to your plea

24  and the charges, you were selling oxycodone from 2008 through

25  March of 2017?

IB5JKET3                      Finocchiaro - direct

1            MS. FLETCHER:  Objection to form.

2            THE COURT:  I'll allow it.

3            MS. FLETCHER:  Your Honor, the witness said he doesn't

4     recall.

5            THE COURT:  Sidebar quickly.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At sidebar)

2           THE COURT:  Is the government going to fight on having

3   this witness say the bad stuff he has done and pled to?

4           MS. FLETCHER:  Not at all.  My concern is Mr. Paul is

5   throwing dates at him.  The way Mr. Paul was throwing dates at

6   him was basically impeaching him when he says --

7           MR. PAUL:  Fine.

8           THE COURT:  That will be a lot easier.

9           MR. PAUL:  I will do that.

10          THE COURT:  What about this issue of what was the

11  purpose of meeting with the government, to prepare?

12          MS. FLETCHER:  The reason I objected, your Honor, is

13  because I don't think the jury should know that the government

14  was preparing him to testify, and then decided not to call him

15  because it suggests that the government was --

16          THE COURT:  I see.  So you think his answer may be

17  they were preparing me for my testimony when they were going to

18  call me on their case, is that the idea?

19          MS. FLETCHER:  Yes.

20          MR. PAUL:  You can give them a charge on that.

21          THE COURT:  This is a little more subtle.  It is Ms.

22  Fletcher saying that if he suggests, and the jury picks up the

23  fact that he was being prepared for his testimony on the

24  government's direct case, and then the jury --

25          MS. FLETCHER:  The jurors are listening to you.

1           THE COURT:  It is almost impossible.

2           MS. FLETCHER:  I can see them staring at you.

3           THE COURT:  That they will then realize that he is

4    testifying on the defense case and make some improper

5    inferences from that.

6           MR. SCHMIDT:  I have a question.  I don't disagree

7    with what your Honor just said.  What I am interested in

8    knowing is that once the defense decided to call him as a

9    witness, their witness, and the government was not, whether he

10   actually spoke to the government in preparation of his

11   cross-examination by them?

12          MS. FLETCHER:  I am happy to address that.

13          THE COURT:  I assume not.

14          MS. FLETCHER:  We did not.

15          MR. PAUL:  I assume not, either, but I should be

16   permitted to ask this witness that as part of his cooperation

17   agreement which he has testified to, he is to be made available

18   to the government for the purposes of testimony.

19          THE COURT:  That is fine.

20          MR. PAUL:  And that, in fact, during many of these

21   meetings, certainly a week ago that he was being prepared to

22   testify.  I don't see what is wrong with that.

23          MS. FLETCHER:  That is completely improper.

24          What they're trying to do is give the jury the

25   impression that we prepared him to testify and then tried to

1    hide his testimony or decided he was in some way being

2    untruthful or unhelpful.

3           THE COURT:  I understand.  You can ask the standard

4    questions.  He said how many times he has met with the

5    government.  You can ask him --

6           MR. PAUL:  How long those sessions were, I assume, is

7    permissible?

8           THE COURT:  Yes.  You can ask him did the

9    government -- I see the issue.

10          MS. FLETCHER:  Yes.

11          THE COURT:  You can't ask the standard did the

12   government go over the questions they were going to ask.

13          MR. PAUL:  I won't ask him that.  I will ask him how

14   many times he met.  He testified he met them as recently as a

15   week ago.  I will ask him how long did those sessions take when

16   he met with them and was that the last time he spoke to the

17   government.

18          THE COURT:  That is fine.

19          MS. FLETCHER:  To be clear, so the record is clear, I

20   did not prepare him for his cross-examination.

21          MR. PAUL:  I didn't think you had.

22          MS. FLETCHER:  I didn't prepare him for his

23   questioning of you, but I have spoken to him and told him that

24   you're going to call him and he should answer your questions

25   just as he would my own.

IB5JKET3                          Finocchiaro - direct

1              MR. PAUL:  Okay.

2              MS. FLETCHER:  So I don't know that that is proper to

3     elicit that.  The purpose of that was so he would calm down and

4     not to prepare him.  I still think this line of questioning is

5     veering towards suggesting the government has hidden him in

6     some way.

7              THE COURT:  No.

8              MR. PAUL:  I intend to ask him just what I indicated

9     to the court.

10             THE COURT:  Say it.

11             MR. PAUL:  I will limit my questioning with regard to

12    that.

13             THE COURT:  How many times and how long?

14             MR. PAUL:  Yes.

15             THE COURT:  Fine.  Let's do it.

16             MS. FLETCHER:  Your Honor, not to manage the court's

17    schedule, but it is almost noon.  I think the jury is standing

18    up and --

19             THE COURT:  Once again, I have been so fascinated by

20    what is going on.

21             (Continued on next page)

22

23

24

25

1             (In open court)

2             THE COURT:  Ladies and gentlemen, it has been pointed

3    out to me it is noon and I haven't given you a morning break.

4    I apologize.  Please do so.  No?  People are saying no?  I

5    think it makes sense.

6             (Jury excused)

7             (At sidebar)

8             THE COURT:  No break for the weary.  How long low

9    longer do you have, do you think?

10            MR. PAUL:  I don't have my notes with me.  I think I

11   have done about half an hour, so I think I have another half an

12   hour to go hopefully.

13            THE COURT:  Let's try to, if we can, finish up by

14   lunch with cross, too, we are fine.  Do you have anything?

15            MR. SCHMIDT:  Yes.

16            THE COURT:  How long?

17            MR. SCHMIDT:  20 minutes to half an hour.

18            THE COURT:  Really?

19            MS. FLETCHER:  What is the order?

20            MR. SCHMIDT:  This is a good question.

21            MS. FLETCHER:  Thank you.

22            MR. SCHMIDT:  Because we discussed this actually.  I

23   have 20 minutes to half an hour.

24            THE COURT:  I am very surprised.

25            MR. SCHMIDT:  Based on some of the questions of Mr.

IB5JKET3                          Finocchiaro – direct

1   Paul.  Obviously, if I go next, I will not have be able to deal

2   with the questions elicited by the government, and I am

3   assuming they're going to try to elicit things I would probably

4   have to respond to.  If the government goes next on

5   cross-examination, and then my cross-examination could

6   include --

7            THE COURT:  I understand.  Ms. Fletcher?

8            MS. FLETCHER:  I currently don't anticipate asking him

9   very much.  So I am not sure I will trigger any additional

10  questions.

11           THE COURT:  I think it is a straightforward 611, so it

12  is fine you do it after Ms. Fletcher.

13           MR. SCHMIDT:  Thank your Honor.

14           (Recess)

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Please be seated in the courtroom.

3           We will break for lunch at 1:00 today, ladies and

4    gentlemen.

5           You may continue with your direct examination of Mr.

6    Finocchiaro, Mr. Paul.

7           MR. PAUL:  Thank you, your Honor.

8    BY MR. PAUL:

9    Q.  Sir, before we broke for our last respite, I asked you

10   questions about the time periods for which you pleaded guilty

11   concerning the oxycodone.  Do you remember that?

12   A.  That's correct, yes.

13   Q.  And you said you didn't recall the actual time period, is

14   that right?

15   A.  I am not 100 percent certain.

16   Q.  You entered into a cooperation agreement with the

17   government, correct?  You told us that.

18           THE COURT:  Next question.

19   Q.  I am going to show you Government Exhibit 817.

20           Would you look through that document?

21           You have seen this document before, is that fair?

22   A.  Yes, I have.

23   Q.  That's your cooperation agreement, isn't it?

24   A.  That's correct.

25   Q.  If you would look down at the bottom of the first page and

 1    read that to yourself.

 2              THE COURT:  Read it to yourself, sir.

 3    A.  The last paragraph?

 4    Q.  Yes.  At the very bottom of page 1, beginning with Count

 5    Four.

 6              Does that refresh your recollection of the time period

 7    that you admitted to engaging in a conspiracy to distribute

 8    oxycodone?

 9    A.  I'm sorry.  I don't see count -- you said Count Four on the

10    bottom of the first page?

11              MR. PAUL:  Excuse me, Judge.

12    Q.  May I have that document back.

13              Let me show you 818.  Look at the very bottom of that

14    page, the first page.

15    A.  Yes, I recall.

16    Q.  Does that refresh your recollection, sir, that you pleaded

17    guilty in Count Four to engaging in a conspiracy to distribute

18    oxycodone from 2008 through in or about March of 2017?

19    A.  Yes, sir.

20    Q.  With regard to this agreement, what is your understanding

21    concerning other crimes that you have admitted to in your past

22    to the government?

23    A.  My understanding is as long as I give a truthful account

24    and I live up to my part, that I cannot be prosecuted by the

25    Southern District for the crimes that I admitted.  However, I

1   am open to other agencies.

2   Q.  Does that include the crimes you have admitted to, which is

3   the telemarketing activities from 2012 through 2017, correct?

4   A.  That is not correct.

5   Q.  The fraudulent telemarketing activities for the period in

6   or about 2012 through in or about March 2017 as charged in

7   Counts One and Two of the information?

8           MS. FLETCHER:  Objection to form.

9           MR. PAUL:  I will rephrase it.

10  Q.  Would you look at page 3, sir?

11          Look at the second paragraph beginning with "it is."

12  A.  OK.

13  Q.  You see that?

14  A.  Yes.

15  Q.  Is it fair to say, sir, as part of your agreement, the

16  government has agreed not to prosecute you further for the

17  fraudulent telemarketing activities from 2012 through March of

18  2017, is that correct?

19          The middle of that paragraph beginning with "A."

20  A.  I don't understand the question.

21  Q.  You entered into a cooperation agreement with the

22  government, right?

23  A.  Yes.

24  Q.  You told us that your past criminal activity, as part of

25  your agreement with the government, they have agreed not to

1    prosecute for some of those offenses, if not all of them, is

2    that correct?

3    A.   That's correct, for the past crimes.

4    Q.   And included in those past crimes is what you have told us

5    about that you have admitted to, correct?

6    A.   That's correct.

7    Q.   And also included in your past crimes is your personal use

8    of steroids and cocaine, is that so?

9    A.   That's correct.

10   Q.   As well as your personal use of oxycodone and other

11   prescription opiates from '08 to 2017 is that true?

12   A.   That's correct.

13   Q.   As well as solicitation of prostitution approximately five

14   times per year from 2000 through June 2017, is that true?

15   A.   That sounds accurate.

16   Q.   Driving while intoxicated on several occasions from '08

17   through March 2017, is that true?

18   A.   That's correct.

19   Q.   And the operation of a sports gambling book from

20   approximately 2008 to 2016, is that correct?

21   A.   That's correct.

22   Q.   The sale of marijuana between '03 and '05 and in late 2016

23   through early 2017, is that fair?

24   A.   That's accurate.

25   Q.   When you were selling oxycodone, where were you selling it?

IB58KET4                    Finocchiaro - Direct

1    A.  It was just to my group of friends; we all had problems and

2    it would kind of go back and forth.

3    Q.  Were you selling it at Olive Branch?

4    A.  Yes, at times.

5    Q.  You told us before we took our break that you met with the

6    government as recently as approximately a week ago, is that

7    right?

8    A.  Yes, sir.

9    Q.  You told us before your cooperation agreement you had met

10   with them approximately four or five times, is that right?

11   A.  Give or take, yes.

12   Q.  After your cooperation agreement, you met with them again

13   on several occasions, is that fair?

14   A.  About six, seven times, give or take.

15   Q.  Six or seven times in addition to the four or five times

16   before you signed the cooperation agreement, is that right?

17   A.  That's correct.

18   Q.  When you met with them, let's take the last time you met

19   with them which was a week ago, how long was that meeting,

20   approximately?

21   A.  I don't have my phone or anything -- two hours, give or

22   take.  I don't recall the exact time frame.

23   Q.  Have you met again with the government since then?

24   A.  Since last week?

25   Q.  Yes.

1   A.  No, I have not.

2   Q.  In the one or two hours, I think you said two hours or so

3   that you met with them a week ago, was that similar in time

4   frame as to all the other meetings you met with them prior to

5   that date?

6           THE COURT:  In other words, did each meeting last

7   approximately two hours, is that what you're asking?

8           MR. PAUL:  Yes.

9           THE COURT:  Sir, did each of your meetings with the

10  government that you testified to last approximately two hours?

11          THE WITNESS:  I can't say for sure.

12  Q.  Were some longer, some shorter?

13  A.  That sounds accurate.

14  Q.  Getting back to your working with Olive Branch, did there

15  come a time when Arash Ketabchi and Bill Sinclair had a

16  falling-out, and if so, could you tell us what happened after

17  that?

18          MS. FLETCHER:  Objection to the compound questions.

19          THE COURT:  Yes.  Sustained as to form.

20  Q.  Is it your understanding that -- what is understanding as

21  to what transpired between Arash Ketabchi and Bill Sinclair at

22  Olive Branch?

23  A.  There was a major dispute that ultimately just tore them

24  apart.

25  Q.  Did this dispute involve you or was this between Bill

IB58KET4                          Finocchiaro - Direct

1    Sinclair and Arash?

2    A.  It was Bill and Arash, that was the real problem there.

3    Q.  What, if anything, did Arash Ketabchi do after this dispute

4    arose?

5    A.  It was an ongoing thing.  Can you be more specific?

6    Q.  Did he leave Olive Branch?

7    A.  As a result, ultimately, I want to say it was an agreed

8    upon suspension or ultimately where he left.

9    Q.  Where, if you know, did he go?  What did he do?

10   A.  He started his own floor from his house.

11   Q.  Was that A1?

12   A.  Yes, sir.

13   Q.  That was from his house?

14   A.  Yes.

15           THE COURT:  When was this, approximately?

16           MR. PAUL:  I didn't hear the question.

17           THE COURT:  I am asking the witness, when did Arash

18   leave and start A1 from his house, approximately?

19           THE WITNESS:  I would say late -- it was the last

20   year, 2015 to '16, roughly.

21           THE COURT:  Thank you.

22   Q.  Do you know Steven Ketabchi?

23   A.  Yes, I do.

24   Q.  How do you know him?

25   A.  I know him as the brother of Arash.

1  Q.  Had you ever met him?

2          THE COURT:  Have you ever met him?

3  Q.  Have you ever met him?

4  A.  I can't pinpoint the time, but I feel like I have before.

5  But I just don't recall when because I have known Arash for so

6  long that I feel like I remember seeing him.  I just can't

7  recall the specific time.

8  Q.  You can't recall when or where you met him, but you believe

9  you have because you have known Arash Ketabchi for so long?

10  A.  Family barbecues, I was close with Arash so I have been

11  around the family, and I am sure I would have ran into him at

12  some point.  I just can't pinpoint an exact time.

13  Q.  Did he ever work for you?

14  A.  No.

15  Q.  Did he ever work on your floor?

16  A.  No, sir.

17  Q.  Was he ever on the payroll?

18  A.  No, sir.

19  Q.  As far as you know, was he a salesperson of any kind?

20  A.  Not to my knowledge.

21  Q.  When Arash Ketabchi left Olive Branch, did he have a

22  conversation with you regarding his brother, Steven Ketabchi?

23  A.  Can you be more specific?

24  Q.  Did he discuss with you what role, if any, Steven Ketabchi

25  was going to play for him when he left Olive Branch?

1    A.  He was -- from what I was told, he was handling all their

2    chargebacks and I believe saves.

3    Q.  You believe he was involved in saves?

4    A.  I know his chargebacks.

5            MS. FLETCHER:  Objection.

6    Q.  So you're able to say that Arash Ketabchi told you that,

7    upon leaving Olive Branch, that Steven Ketabchi was going to be

8    handling his chargebacks, is that fair?

9            MS. FLETCHER:  Objection to form, your Honor.

10           THE COURT:  Sustained.

11           You may answer.

12   A.  He wanted me to explain the process of how I did

13   chargebacks.

14   Q.  Your primary role, you told us, was chargebacks, is that

15   right, as well as saving customers?

16   A.  They tend to go hand in hand.

17   Q.  And Arash Ketabchi told you that Steven was going to do his

18   chargebacks and he asked you to do what?

19   A.  He just wanted me to explain how to do it so he had the

20   know-how of how to go through the process.

21   Q.  Was it your understanding from that conversation that

22   Steven Ketabchi did not know how to do the process of dealing

23   with chargebacks?

24   A.  That was my assumption, being that he wanted me to teach

25   him.

1          THE COURT:  Approximately when was this conversation?

2          THE WITNESS:  It would have been between the last year

3   before we got in trouble.  My dates are a little off, but it

4   was towards the end.

5   Q.  Did you, in fact, have any conversation with Steven

6   concerning chargebacks after that?

7   A.  A brief conversation.

8   Q.  What, if anything, did you tell Steven concerning

9   chargebacks?

10  A.  Just -- specifically?

11  Q.  If you can recall.

12  A.  I would have explained that you have to call the client,

13  try to put the fire out before -- if you could stop it before

14  it gets started, meaning the chargeback or the retrieval

15  request.

16  Q.  But you don't know if he ever did that, do you?

17          MS. FLETCHER:  Objection.

18  Q.  Do you know if he ever did that?

19  A.  Do I know if he did what?

20  Q.  Do you know if Steven Ketabchi ever reached out to any

21  customers?

22  A.  To my knowledge, it's very difficult to fight a chargeback

23  if you're not calling the client.

24          THE COURT:  Do you know if Steven Ketabchi ever

25  contacted any customers?

1    THE WITNESS:  That I can't say for sure.

2    Q.  That is something you would have done, right?

3    A.  Absolutely.

4    Q.  But you don't know if he did that?

5        MS. FLETCHER:  Objection.  Asked and answered.

6        THE COURT:  Sustained.

7    Q.  So what else did you tell Mr. Steven Ketabchi with regard

8    to how he was supposed to respond to chargebacks?

9    A.  Providing him with the appropriate documentation.

10   Q.  From where?

11   A.  We had that at the time in our office.

12   Q.  Meaning the contracts?

13   A.  I believe they had contracts, but there was a form called

14   the COS, continuation of service agreement, that would

15   ultimately, if there was a deal that was worked out between the

16   client and the company, sign it, and puts the chargeback to

17   rest.

18   Q.  So you advised him that if there was a COS, include that in

19   your documentation, is that fair?

20   A.  That's fair, yes.

21   Q.  But there wasn't always a COS, correct?

22   A.  You have to agree with the client.  If they are not willing

23   to talk, then no.

24   Q.  But there might be a contract without a COS, right?

25       MS. FLETCHER:  Objection to form.

IB58KET4                          Finocchiaro - Direct

1     THE COURT:  Sustained.

2     Q.  Is it your understanding that a customer -- what is your

3     understanding with regard to a customer when he signs a

4     contract?

5           MS. FLETCHER:  Objection to form.

6           THE COURT:  I don't understand.

7           MR. PAUL:  I will withdraw it.

8     Q.  Is it fair to say, sir, when you had this conversation with

9     Steven Ketabchi, you explained to him what you had done with

10    regard to responding to chargebacks?

11    A.  That's correct.

12    Q.  What, if any, impression did you have about Steven Ketabchi

13    when you spoke to him?

14          MS. FLETCHER:  Objection.

15          THE COURT:  Sustained.

16    Q.  How many times would you say you spoke to Steven Ketabchi

17    about his role as dealing with chargebacks?

18    A.  Once, maybe twice.

19    Q.  Did you delegate any further conversations with him to deal

20    with Steven concerning chargebacks, did you delegate that job

21    to anybody else?

22    A.  Yes, I did.

23    Q.  Who did you delegate that to?

24    A.  Jolaina Aziz.

25    Q.  Do you know whether Jolaina then spoke to him about how he

1     is supposed to deal with chargebacks?

2     A.   That was her duty.  I didn't hear the conversation, but she

3     would have done what I asked her to, or via e-mail.

4     Q.   Did you feel that Steven Ketabchi was left to deal with

5     this task of chargebacks on his own?

6            THE COURT:  Sustained.

7     Q.   Did you come to any conclusion as to why Arash Ketabchi

8     would have asked Steven Ketabchi to handle his chargebacks?

9            MS. FLETCHER:  Objection.

10           THE COURT:  Sustained.

11    Q.   Are you aware of a company called Chargeback 911?

12    A.   Yes, I am.

13    Q.   What is it?

14    A.   Chargeback 911 is a company that -- the service they

15    provide is instead of having a chargeback hit your merchant

16    account, you get like a 24- to 48-hour window to correct the

17    problem with the client before it hits on the merchant account.

18    Q.   So this is a company that holds itself out as to dealing

19    with customers who are filing chargebacks?

20           MS. FLETCHER:  Objection.

21           THE COURT:  Sustained as to form.

22    Q.   Was this a company that you utilized at Olive Branch, and

23    if so, how?

24    A.   We did use the company at one point, and it was used to

25    help prevent chargebacks.

1    Q.  Are you aware that Chargeback 911 advertises their

2    services?

3              MS. FLETCHER:  Objection, your Honor.

4              THE COURT:  Does Chargeback 911 advertise its

5    services?

6              THE WITNESS:  It was more of a referral.  I can't

7    recall.  I don't know.

8    Q.  So you went to it through a referral?

9    A.  Someone mentioned it to us.

10   Q.  I see.

11             Is it fair to say, sir, that during the time both at

12   Tax Club and at Olive Branch you were knowingly and

13   intentionally committing crimes?

14   A.  That's a fair statement.

15             MR. PAUL:  I have nothing further of this witness,

16   Judge.

17             THE COURT:  Thank you.

18             Is there any cross-examination of this defense

19   witness?

20             Government.

21             MS. FLETCHER:  Yes, your Honor, very briefly.

22   CROSS-EXAMINATION

23   BY MS. FLETCHER:

24   Q.  Good afternoon, Mr. Finocchiaro.

25   A.  Good afternoon.

1  Q.  You testified on direct examination about how you and Mr.

2  Sinclair started a coaching floor.  Do you remember that?

3  A.  Yes.

4  Q.  Can you just describe briefly what the coaching pitch is

5  like?

6  A.  The coaching pitch is, it's based off of a client signing

7  up to -- could have been a variety of different things.  Let's

8  just say they saw an infomercial on how to make money from home

9  on a computer.  The coaching pitch would explain, hey, welcome,

10  this is so and so calling from ABC Coaching Company, and it

11  looks like you signed up for, whatever they signed up for, and

12  congratulations.  So tell me a little bit about, what are your

13  financial goals, and start talking about what it is they want

14  to do.  And then you go through, it's called a probe to find

15  out how much money they are working with.  Because if there is

16  no money, you don't want to waste your time, you want to move

17  on to the next call, because there is a lot of volume in these

18  calls, you went through a lot of leads.

19          So it's a long pitch, but ultimately if they have

20  money you go to the next step and you just explain:  If you're

21  doing this business, you are going to need to have a Web site.

22  You are going to want to have an LLC set up.  You are going to

23  explain certain things and point them in the direction of what

24  they need to do to be successful.  That's ultimately what the

25  coaching pitch is.  That's how it's set up.

1    Q.  Is it fair to say, Mr. Finocchiaro, that the coaching pitch

2    is designed to prime the customer for the ultimate biz-op sale?

3    A.  Absolutely.

4    Q.  And the idea being that the coach tells the customer, in

5    order for your business to be successful and profitable, you

6    are going to need X, Y, Z products, is that fair?

7    A.  That is fair.

8    Q.  So when the customer gets a phone call from the biz-op

9    floor saying, I am calling on behalf of the coaching company

10   about X product, the customer knows what the biz-op pitch is

11   talking about?

12   A.  That's how it's supposed to go, yes.

13   Q.  You talked a bit about how your job was handling saves and

14   chargebacks, and you mentioned that employees were supposed to

15   save their customers.  Can you explain what you meant by that?

16   A.  As I stated earlier, I kind of morphed into the saves role,

17   because originally I was doing chargebacks but there is so many

18   cancellations that led to a lot of my reps would -- they feel

19   overwhelmed, because they don't want to worry about last week,

20   you want to move on and make your money for this week.  So in

21   circumstances they would pawn it off on me, but at first they

22   were supposed to save their own clients, until it became a

23   little bit too much for them to handle.

24   Q.  Were there times when you were overwhelmed with the number

25   of saves that you were required to handle?

1    A.  Yes.

2    Q.  Who, if anyone, did you enlist to assist you in handling

3    those saves?

4    A.  I had some of workers that worked for me.  Are you asking

5    specifically?

6    Q.  Who specifically?

7    A.  I remember Andrew Owimrin helping me.  I also remember

8    Chris Wilson.

9    Q.  Why did you enlist Andrew Owimrin to help you with saves?

10   A.  Because I knew -- he was helpful, he was always someone who

11   was -- he was a company guy, where he wanted to help out, and

12   he was good at what he did and he would help keep the client on

13   board.

14   Q.  Fair to say he was good at it?

15   A.  He was very good at it.

16   Q.  You mentioned on your direct testimony certain reasons that

17   customers gave you for wanting to cancel.  I think you said

18   they don't remember doing the transaction.  Was that one of

19   them?

20   A.  That's correct.

21   Q.  You also mentioned they didn't have the money.  That was a

22   reason why they might want to cancel, is that correct?

23   A.  That is correct.

24   Q.  Did the customers also say things like that, I want to make

25   money before I invest any more money?

1   A.  That would come out.

2   Q.  Did you in your practice talking to these customers have a

3   standard response for that sort of pushback from the customer?

4   A.  Yeah.  You just say whatever you -- are you saying

5   specifically?

6   Q.  If a customer said to you, I don't want to invest any more

7   money until I make back the money I made from the coaching

8   sale, what did you say in response?

9         MR. SCHMIDT:  Objection.  Relevance.

10        THE COURT:  Pardon me?

11        MR. SCHMIDT:  Relevance.

12        THE COURT:  Just a moment.

13        I will allow it.

14        You may answer, sir.

15  A.  I'm sorry.  Can you please say that again?

16        THE COURT:  When a customer said to you they didn't

17  want to invest any more money until they made some money, what

18  did you do.

19  A.  In a situation like that, you would tell them, listen, sir,

20  ma'am, you spent X amount of money, OK.  How are you going to

21  expect to, you know, try and make money when you don't have

22  certain things in place?  How are you going to try to make

23  money when you don't even have a business, meaning the LLC that

24  would have in essence been set up.  You would go over specifics

25  and tell them -- it's like having a storefront with no

1    advertising on the front.  It's just a building that has

2    nothing on there so no one is going to walk into your store.

3    How are you going to make money with an online business if you

4    don't have a Web site?  So those are some examples.

5    Q.  You testified on direct that salespeople were not permitted

6    to make blatant earnings claims.  Do you remember that?

7    A.  That is correct.

8    Q.  It's fair to say salespeople were not permitted to say, you

9    will make $5,000 by the end of the month, is that correct?

10   A.  They couldn't say that.

11   Q.  But they were permitted to say things like, how are you

12   going to make money if you don't invest more money?  Is that

13   right?

14   A.  There was always a spin on the wording of it where you are

15   going to look to make money.  You ask them their financial

16   goals.  If someone says, sir, ma'am, why are you doing this?

17   How much are you looking to make?  Please don't give me a crazy

18   number like 20,000 a month, ha, ha, ha.  You create the

19   conversation.  Then ultimately they will say, two, three, four

20   thousand dollars.  Then you use that number that they said, you

21   plug it in.

22   Q.  What is the purpose of doing that?

23   A.  To try and keep ourself where we are not having clients

24   complain that these guys are making straight earnings claims.

25   And we also had recordings to try and keep these things.

1   Q.  Mr. Finocchiaro, wasn't the purpose of that statement that

2   you just made for the customer to understand that they would

3   make two or three or four thousand dollars if they just

4   invested a little more money?

5             MR. SCHMIDT:  Objection.

6             THE COURT:  I will allow it.

7   A.  Absolutely.

8   Q.  Now, you talked a bit with Mr. Paul about the grant

9   program.  I want to just clarify a couple of points about the

10  grant program.

11            You described how there was a period of time where

12  Carl Morris and Richard Frost came to your floor to start the

13  grant program.  Do you remember that?

14  A.  Yes, I do.

15  Q.  Is it fair to say that during that time, what you and the

16  other salespeople at Olive Branch were doing was actually

17  selling grants themselves?

18  A.  For that time period.

19  Q.  Is that accurate?

20  A.  When they were there, yes; after they were there, not

21  before.

22  Q.  By that, you were actually calling the customers and

23  pitching them on the initial grant itself, is that correct?

24  A.  Yes, that is correct.

25  Q.  Now, if you can, what, if any, difference is there between

1   that model and the practice on your floor of selling to grant

2   leads?

3   A.   The consensus is everyone understood that grant lead, it's

4   complete, it's nothing, it's a complete sham, where there is

5   literally nothing behind it, and everyone had a full

6   understanding of what it was that we were doing at that point.

7   And it was a decision that, are we going down this road,

8   everyone?  And it was kind of a group discussion about it.

9   Q.   Mr. Finocchiaro, I am not sure that you have clarified the

10   point.  What I am trying to ascertain is the difference between

11   selling grants and selling a biz-op product to a grant lead.

12          Starting with the first, selling grants, there was a

13   period of time that you did that on your floor, correct?

14   A.   That's correct.

15   Q.   And that was a short period of time when Carl Morris came

16   and worked for you, is that right?

17   A.   That is correct.

18   Q.   Separate and apart from that, there was a longer period of

19   time where your floor sold biz-op products to people who had

20   previously purchased grants, is that correct?

21   A.   For a grant lead.

22   Q.   Yes.

23   A.   Yes.  I misspoke.  I didn't realize that's what you were

24   asking.

25   Q.   This is why I am clarifying.

1      So focusing on your sales floor's efforts to pitch

2   biz-op products to people who had previously purchased grants,

3   what, if anything, did you instruct your salespeople to say to

4   prospective customers about the grant that they had previously

5   applied for?

6   A.  It was a feel-out process.  They would tell them sometimes,

7   this is bogus, chances are you are never going to get what you

8   paid for.  In other circumstances, if you didn't want to scare

9   away the client by saying it was a straight-up sham, you would

10  just say, from my experience, I know it takes a long time if

11  you're ever going to get the money from whatever grant you

12  supposedly signed up with.

13      Then, based upon that, then say, we have a program

14  that we can put in place to expedite that process, to at least

15  put you in a position to try and hit whatever financial goals

16  for the time being until that grant, if it ever comes.

17  Q.  That would be through selling them biz-op products for some

18  other online business?

19  A.  That is correct.

20      THE COURT:  Ms. Fletcher, is this a logical time to

21  break for lunch?

22      MS. FLETCHER:  Yes.

23      THE COURT:  10 after 2, ladies and gentlemen.

24  Remember to keep an open mind.  Be back by 10 after 2.

25      (Jury exits courtroom)

IB58KET4                        Finocchiaro – Cross

1              THE COURT:  You may step down, sir.

2              10 after 2.

3              (Luncheon recess)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              AFTERNOON SESSION

2              2:10 pm

3              (Trial resumes)

4              (In open court; jury not present)

5              THE COURT:  Bring the jury in.  How much longer do you

6    have?

7              MS. FLETCHER:  I'm finished, your Honor.

8              THE COURT:  Pardon me?

9              MS. FLETCHER:  I'm finished.

10             THE COURT:  All right.

11             (Jury present)

12             THE COURT:  Please be seated in the courtroom.

13             Ms. Fletcher, you may continue with your

14   cross-examination of this witness.

15             MS. FLETCHER:  No further questions, your Honor.

16             THE COURT:  Thank you.  Mr. Schmidt, do you have

17   questions for this witness?

18             MR. SCHMIDT:  Yes, I do, your Honor.  Thank you.

19             THE COURT:  Approximately how long, sir?

20             MR. SCHMIDT:  I am not good at this.

21             THE COURT:  I know!

22             MR. SCHMIDT:  An hour.

23             THE COURT:  Proceed.

24   CROSS EXAMINATION

25   BY MR. SCHMIDT:

IB5JKET5                        Finocchiaro - cross

1   Q.  Mr. Finocchiaro, am I pronouncing your name correctly?

2   A.  Yes, sir.

3   Q.  Mr. Finocchiaro, you testified earlier that you thought the

4   Judge would make a determination if you told the truth.  Do you

5   remember that?

6   A.  I am sorry.  Can you say that again?

7   Q.  Do you remember testifying that you thought the Judge made

8   the determination whether you were telling the truth?

9   A.  I don't recall that.  I don't recall that specifically.

10  Q.  Now, if everything goes well, you will receive some type of

11  letter.  Is that right?

12  A.  If I was truthful.

13  Q.  You would get some kind of letter.  Is that right?

14  A.  That is correct.

15  Q.  What is that letter called?  Do you know what that letter

16  is called?

17          THE COURT:  Asked and answered.  Move on.

18  Q.  Now, isn't it a fact that it is the government and only the

19  government that makes the determination whether you fulfilled

20  your obligations under the agreement.  Is that right?

21  A.  To my knowledge, yes.

22  Q.  Now, you told us that salespeople were not to make

23  statements about earnings, earning claims.  Is that right?

24  A.  That's correct.

25  Q.  Now, there was, though, an exception to one of the products

IB5JKET5                         Finocchiaro - cross

1    that you were selling.  Is that right?

2    A.  That is correct.

3    Q.  What was that product?

4    A.  Youngevity.

5    Q.  Do you know if the salespeople were instructed as to what

6    they could say when they were selling the Youngevity product?

7    A.  Every time there is a new product that we role out, we

8    indicate different rules and what you can and can't say or

9    parts to focus in on.

10   Q.  Now, from April 2014 to October 2015, what were the new

11   products that were rolled out other than Youngevity?

12   A.  I don't recall any new products as opposed to just the

13   Youngevity.  Can you be more specific?

14   Q.  You said whenever there were new products rolled out, that

15   you would meet with the salespeople and have a conversation,

16   and basically you're talking about now that during the period

17   of time that Andrew Owimrin is working at Olive Branch, there

18   was one new product that you remember?

19   A.  It is hard to say.  I don't recall offhand.  We always had

20   different -- we would switch gears every now and again

21   depending on -- I can't recall exactly -- there are certain

22   parts I can't put an exact date on it.

23   Q.  Now, let's talk -- I understand it is difficult.

24           Do you recall what products that you were selling from

25   the time Andrew Owimrin appeared till the time he left?

1    A.  We did biz-op services.  Do you want me to specifically

2    name them?

3    Q.  Yes.

4    A.  LLC setups, business plan, for a short time Corporate

5    Credit, SCO, SCM, there would be customer service, Youngevity

6    which was basically the same thing as biz-op, except it was a

7    service where you can actually make an earnings claim with

8    money attached to it and a time-frame, and then there was debt

9    for a little while and then there was grant programs as well.

10   Q.  The debt came later, after Mr. Owimrin left, is that right,

11   or you don't remember the timing of it?

12   A.  I know it was later on.  I don't recall whether he was

13   there for that or not.

14   Q.  What is customer service?

15   A.  Customer service is if you have an idea that a client is

16   going to need a lot of handholding, meaning instruction, we

17   rolled this out when our fulfillment realized it is taking a

18   lot of time, so it was just extra handholding to explain what

19   they needed for the client.

20   Q.  Something like extra training sessions?

21   A.  That sounds right, I guess.

22   Q.  Many of the products that you did sell came with training

23   sessions.  Is that right?

24   A.  Not all products specifically were trained.  LLC is pretty

25   straightforward.  Not all of them.  Some, some they're

1    explained.  There is a welcome call.

2    Q.  Obviously in a search engine optimization thee is going to

3    be somebody who knows what to do with computers, who is going

4    to handle that and not training the customer, right?

5    A.  That is accurate.

6    Q.  And most of the marketing kinds of things would be things

7    that fulfillment would do and not the customers, right?

8    A.  Most of it.

9    Q.  There are things that did come with training like the

10   business plan, the Corporate Credit and bookkeeping and even to

11   some extent a little bit of tax stuff, right?

12   A.  That's correct.

13   Q.  Now, with the Youngevity, the salespeople were told they --

14   when were the salespeople told that they can make, I guess it

15   could be considered a modified earnings claim?

16            MS. FLETCHER:  Objection to form.

17            THE COURT:  Sustained.

18   BY MR. SCHMIDT:

19   Q.  What were the salesmen told that they can make --

20            THE COURT:  What type of earnings claims were the

21   salesmen permitted to make in regard to the Youngevity?

22            THE WITNESS:  It wasn't supposed to be a specific

23   dollar amount, but the idea was while everything is getting set

24   up within the first two to three months, you can expect to get

25   some checks coming in.

1   BY MR. SCHMIDT:

2   Q.   Then subsequent to that, was there a frequency of when to

3   expect the next check?

4   A.   After the 60 to 90 days, you mean?

5   Q.   Yes.

6   A.   That was not so much after, assuming they did their part,

7   it was up to them, that was the training wheels for showing

8   them for 60 to 90 days.

9   Q.   Weren't they told that the Youngevity program then would

10  provide checks every two weeks?

11  A.   That was the idea.  Not every two weeks, but normally we

12  would go monthly.

13  Q.   You say bill monthly?

14  A.   No.  Generally, if anything, you would expect to get one

15  check a month.

16  Q.   So that is your understanding, as you sit here now, it was

17  once a month?

18  A.   That's how I remembered it.

19  Q.   Now, would it be fair to say that you actually heard one of

20  the salesmen making a specific earning claim, amounts of money

21  to a customer?  Do you remember that?

22  A.   Yeah, there has been instances where we would hear things

23  like that.

24  Q.   And the people you remember was Chris Wilson?

25  A.   That sounds accurate.

IB5JKET5                          Finocchiaro - cross

1    Q.  Chris Wilson was generally a person that your office had

2    problems with with him making promises including earning

3    promises, right?

4    A.  Absolutely.

5    Q.  Now, do you know how you would rank the salespeople during

6    the 2014-15 in relation of the amount of sales that they made?

7    A.  It is not that cut and dried because it is what stays on

8    board, so it is tough to say without seeing something in front

9    of me at this point, but everyone was for the most part pretty

10   decent.

11   Q.  Do you think you maybe could put them in tiers, like who

12   was the most productive salesmen and who was the least

13   productive salesman?

14           MS. FLETCHER:  Objection; asked and answered.

15           THE COURT:  I'll allow it.

16   A.  My memory, I'm not remembering specifically what workers

17   were in at the time frame we set.

18           2014 to 15?

19   Q.  Yes, when Andrew Owimrin was working there?

20   A.  I understand that, but I don't know if there is some other

21   people that might have been with us at that time.  I am not

22   sure now if they were there during that time.

23   Q.  Just the people that you remember.

24   A.  Okay.  Arash was one of the managers, he would pitch with

25   Chris Wilson for a while, so they were kind of -- you can claim

1    it was one person in essence.  Pete DiQuarto, Andrew, Reagan.

2    Q.  You're saying Andrew and Reagan were in the top tier of

3    salespeople.  Is that your testimony?

4    A.  No, I am not saying that.

5    Q.  Let's talk about the people who were the most productive,

6    the top tier.

7    A.  There is different times where other people were better

8    than others because depending on who was there, so that is why

9    it is hard to answer that specifically.

10   Q.  The next question, now you have testified to saves and

11   charge-backs, correct?

12   A.  Correct.

13   Q.  Now, would it be fair to say that saves are what occurs

14   before a charge-back is made?

15   A.  Yes, that's correct.

16   Q.  Is there a time-frame generally when people would call up

17   prior to a charge-back, where you or anyone else would speak to

18   them about a save?

19   A.  We had a recision period.

20   Q.  The recision period was three days for people basically

21   under 65 and 14 days for people over 65.  Is that right?

22   A.  That's accurate, right.

23   Q.  So we're talking about the save period being within that

24   recision period.  Is that right?

25   A.  Yes, sir.

IB5JKET5                        Finocchiaro - cross

1   Q.  So the times that you asked Andrew to help you with the

2   saves, we're talking about the people who contacted Olive

3   Branch and indicated in some way that they may want to back

4   out.  Is that right?

5   A.  Yes, sir.

6   Q.  So subsequent to the 14-day period for over 65 and

7   three-day period for the under 65 customers, you basically took

8   over and were trying to prevent the charge-backs or get --

9   there is an initial for the stopping the charge-backs.  What is

10  that called, the document?

11  A.  COS.

12  Q.  COS?  And you were in charge of that, right?

13  A.  That's correct.

14  Q.  Now, the way the office was set up, there was a main

15  telephone number for Olive Branch for people to reach out.  Is

16  that right?

17  A.  A customer service line.

18  Q.  Was there a separate line for each of the entities?

19          Was there a separate telephone number that would say

20  Olive Branch or Champion or Paramount?

21  A.  I believe so.  I cannot say for certain.  I don't believe

22  that.

23  Q.  Now, if the office was open and if it went to the main

24  line, it would be answered by the women who were working as

25  compliance or account-makers, right?

IB5JKET5                          Finocchiaro - cross

1   A.   That's accurate.

2   Q.   If a complaint -- if somebody came on while you were there,

3   you would be the first person generally to be contacted by your

4   employee about the problem, is that right, unless the people

5   asked for a specific person?

6   A.   It would get forwarded to me, yeah, depending on the

7   situation.

8   Q.   Now, you often came in late to the office, didn't you?

9   A.   That's correct.

10  Q.   That was often a result of your drug use.  Is that correct?

11  A.   That was part of it, but that was an agreement I had with

12  my partner.

13          THE COURT:  That was the agreement you had with your

14  partner?

15          THE WITNESS:  That he would be the early guy and I was

16  the late guy because we would stay late hours at the office.

17          THE COURT:  All right.

18  BY MR. SCHMIDT:

19  Q.   Now, if there was nobody to answer the phone, the calls

20  from the customers would go into voice-mail.  Is that right?

21  A.   That's correct.

22  Q.   Now, there was a setup with voice-mail that you would

23  actually get the printout, you would have to get an email with

24  what was left on the voice-mail.  Is that right?

25  A.   The service had something along those lines, with like a

1    transcript that you can read.

2    Q.  When you were in the office and somebody called, it would

3    be you that would first be dealing with the customer that had a

4    problem.  Is that right?

5    A.  I would be notified hey, call this person or when I was

6    able to get to it, I got to it.

7    Q.  When the office was closed, you would be the person who

8    would actually get an email for every voice-mail that came into

9    the office.  Is that right?

10   A.  I can't say every one, but the idea was to get as many as

11   possible.

12   Q.  Was there anybody else set up the same way that got the

13   voice-mails?

14   A.  I don't think every, I don't think every sales rep had that

15   feature.  They had their own voice-mails, but I believe like

16   our compliance department would have had access to that as

17   would myself, as would Bill Sinclair and myself.

18   Q.  Now, you would also, in the process that the

19   appointment-setters compliance were women, they took a message

20   from somebody who needs to be spoken to and you were not

21   around, they would put -- withdrawn.

22          There were times where the appointment-setters put

23   information in the Olive Branch calendar that was directed to

24   you.  Is that right?

25   A.  Not necessarily me.

1   Q.  Were there times where they would put in messages basically

2   saying cancellation for female, please call as soon as

3   possible, or cancellation call for Fino, or cancellation call

4   for Fino?  Didn't you get a lot of those emails?

5   A.  Yes, I did.

6   Q.  Because, as you said, you were the person in charge of

7   charge-backs and complaints.  Is that right?

8   A.  That's correct.

9   Q.  Would it be fair to say -- withdrawn.

10          Now, in the complaints or the cancellation information

11  ranged -- there was a great range of reasons why people were

12  calling up to cancel.  Is that right?

13  A.  Yes, sir.

14  Q.  There were reasons where people just simply decided that

15  they didn't want to go through with it?

16  A.  That's accurate.

17  Q.  People who said that they misunderstood what was supposed

18  to happen?

19  A.  That's accurate.

20  Q.  People who said they were promised something that they

21  didn't get?

22  A.  That's accurate.

23  Q.  People who were waiting on what they were supposed to get

24  and it hadn't been fulfilled?

25  A.  Sometimes.

1    Q.  Well, you did have fulfillment problems that led to many,

2    many complaints.  Is that right?

3    A.  Sometimes.

4    Q.  Let's talk about Youngevity.

5         Did you have fulfillment problems in actually getting

6    the website up and getting ready to go for many clients?

7    A.  Towards the end, yes.

8    Q.  You had to change fulfillment people to actually get the

9    websites going?

10   A.  Sorry, who?

11   Q.  You had to change the people who were actually making the

12   websites and putting them up?

13   A.  Yes, that's correct.

14   Q.  But would it be fair to say that you and Bill were quite

15   excited about the prospect of making money from this Youngevity

16   model?

17   A.  Yeah, that's accurate.

18   Q.  How were you going to make money from the Youngevity model?

19        What were your expectations to make money from the

20   Youngevity model?

21   A.  It was explained to me that by putting specific placements

22   in a hierarchy of different clients that signed up, if you're

23   on an upper echelon, you will get bigger checks.  The idea is

24   to keep building underneath, and that is how it was described

25   to us and it also made sense to do because we were told that

1   the clients would make some money.

2   Q.  What you described, that only makes sense if the people

3   that you were bringing in -- in other words, the customers --

4   were actually going to make money selling the product.  Is that

5   right?

6   A.  That's accurate, yes.

7   Q.  Indeed, to some extent -- withdrawn.

8        It was also clear that part of this program was that

9   the product was going to be selling on the internet.  Is that

10  right?

11  A.  That's correct.

12  Q.  The customers generally would not be involved in the actual

13  internet sales; it would be run by your company or the

14  fulfillment people who set it up?

15  A.  For a period of time.

16  Q.  And including it would be, for example, not only setting up

17  the website, but providing marketing, search engine

18  optimization, YouTube or other things that either was included

19  in the package or could be added to the package.  Is that

20  right?

21  A.  That's accurate.

22  Q.  So if a salesperson told -- withdrawn.

23        So you or Bill, or the combination of you and

24  Mr. Medeiros, informed the salespeople that this program would

25  be run by the company or fulfillment people and not run by the

1    customers.  Is that right?

2    A.  It was explained exactly how it was explained to us, and we

3    would get our point across to our workers that --

4    Q.  So it was appropriate based on --

5         MS. FLETCHER:  Your Honor, I don't believe the witness

6    finished answering.

7         THE COURT:  Did you finish?

8    Q.  Is there anything else you wanted to add?

9    A.  I was saying we were explained for the first six -- I am

10   sorry -- two to three months, 60 to 90 days, it was like

11   training wheels where they would look to get checks, okay, and

12   then after that it was explained that it was sink or swim, you

13   needed to learn during that process.

14   Q.  What did they have to learn?

15   A.  What did they learn?

16   Q.  What did they have to learn?

17   A.  How to manage the business.

18   Q.  Well, if they're making sales on the website, right, who is

19   the one who is sending out the product for a sale on the

20   website?

21   A.  Youngevity.

22   Q.  If they wanted to get more hits, more people to come to

23   their website, was there something that they could purchase to

24   get more hits on their website?

25   A.  That was the idea for some of the services that we offered,

```
1    we would have said that.
2    Q.  So is there another way that somebody who has a website
3    selling another product that has been shipped automatically is
4    suppose to do to run their website?
5            MS. FLETCHER:  Objection to form.
6            THE COURT:  Sustained.
7            MR. SCHMIDT:  I'll withdraw it.
8    BY MR. SCHMIDT:
9    Q.  Now, you signed up for Youngevity, didn't you?
10   A.  That's correct.
11   Q.  And Bill signed up for Youngevity, didn't he?
12   A.  Yes, sir.
13   Q.  And you got checks from Youngevity, didn't you?
14   A.  Yes, I did.
15   Q.  What did you do to make your website that much better?
16   A.  I actually didn't do anything.
17   Q.  And Bill didn't do anything, either, did he?
18   A.  That's correct.
19   Q.  And you both got checks?
20           You both got checks from Youngevity even though you
21   didn't do anything, right?
22   A.  That's correct.
23   Q.  Now, when Andrew started working at Olive Branch, he wasn't
24   using drugs, was he?
25   A.  Not to my knowledge.
```

IB5JKET5                          Finocchiaro - cross

1    Q.  He started using drugs when you went out to a Giants

2    football game with him, didn't he?

3    A.  That I have no idea.

4    Q.  It was you that gave him pills, right?

5    A.  There have been times, but I don't believe that was the

6    first time.

7    Q.  You sold him pills, didn't you?

8    A.  At times.

9    Q.  You actually told him that you needed him to pee in a cup

10   because you needed it for the doctor that you were going to,

11   but you actually gave that cup to Arash.  Isn't that right?

12   A.  Well, that is true.

13   Q.  When he came back to Olive Branch after leaving Arash's

14   basement, right, you gave him pills again, didn't you?

15   A.  If he asked for them.

16   Q.  And you sold them to him, didn't you?

17   A.  That's correct.

18   Q.  Now, you talked a little bit about grant leads.  We had a

19   little confusion between selling grants and leads from the

20   previous company that sold grants.  Do you remember that?

21   A.  Yes, that's accurate.

22   Q.  Now, generally Olive Branch and whatever the company was

23   called would get leads from companies that sold something

24   first.  Is that right?

25   A.  Yes, sir.

1  Q.  And the reason that was necessary was because generally

2  Olive Branch wasn't selling any businesses that made money,

3  they were selling product that would help the business.  Would

4  that be fair to say?

5  A.  That's accurate.

6  Q.  Until Youngevity came?

7  A.  Yes, it was.

8  Q.  It was clear to -- when I say "you," I take it back.

9           You and Bill made it clear, based on the products that

10  you were selling, you can't make any kind of earnings claims to

11  the customers that they were talking to.  Is that right?

12           MS. FLETCHER:  Objection to, "making it clear."

13           THE COURT:  Rephrase it.

14  BY MR. SCHMIDT:

15  Q.  You told the salespeople --

16           THE COURT:  Didn't you tell the salespeople not to

17  make specific earnings claims?

18           THE WITNESS:  That's correct.

19           THE COURT:  Next.

20  BY MR. SCHMIDT:

21  Q.  And you told them many times?

22  A.  That was one of the rules.

23  Q.  And if somebody was caught doing that, right, not only

24  would that person be talked to, you would probably talk to

25  everybody else?

1          MS. FLETCHER:  Objection.

2          THE COURT:  Sustained.  What was the result if

3     somebody was caught making a specific earnings claim on the

4     telephone?

5          THE WITNESS:  We would talk to them first.  If it was

6     a repeated offense, they would get fired.

7     BY MR. SCHMIDT:

8     Q.  You told us about the recordings that were being done at

9     some point.  Do you remember?  Do you remember testifying to

10    that?

11    A.  Yes, sir.

12    Q.  Now, in fact, you or Bill deleted the recordings, didn't

13    you?

14    A.  It wasn't specifically us that deleted it, but we were

15    told --

16    Q.  You caused it to be deleted?

17         MS. FLETCHER:  Objection.

18    Q.  Would that be a fair statement?

19         MS. FLETCHER:  The witness did not finish the answer.

20    Q.  Did you finish?

21         THE COURT:  Did you finish your answer?

22         THE WITNESS:  I was still answering that one.

23         THE COURT:  Go.

24         THE WITNESS:  It was recommended we don't have to have

25    the recording any more.  So we were also trying to save money,

1    and that was something we eliminated.

2    BY MR. SCHMIDT:

3    Q.  Other people in the business who were experienced at this

4    biz-op business told you it wasn't particularly a good idea to

5    keep recordings.  Isn't that correct?

6    A.  Yeah, that's correct.

7    Q.  Now, your office got communications from Paul Curtis during

8    the period of time that he was monitoring the telephone calls,

9    right?

10   A.  Yes, for a period of time, he did, yeah.

11   Q.  Do you recall what period of time that was or how long of a

12   period of time that was?

13   A.  Again my dates are a little out of whack.  I would say he

14   used them for a year and a half, two years.  I could be a

15   little off there.

16   Q.  Now, did you get to see the correspondence from Mr. Curtis

17   related to his monitoring?

18   A.  We would get notified in an email.

19   Q.  And you would get -- both you or Bill would get the email,

20   if you know, or the main -- withdrawn.

21          Where would the email come to?

22   A.  I believe it was our main Olive Branch account or one of

23   the main emails.

24   Q.  Now, were there some of the complaints made by Mr. Curtis

25   in the forms that were not treated particularly serious?

1              MS. FLETCHER:  Objection.  By whom?

2    BY MR. SCHMIDT:

3    Q.  By you and Bill?

4    A.  Can you be more specific.  I don't know what --

5    Q.  If the person didn't read the closing script, would

6    somebody get fined for not reading the closing script?

7              MS. FLETCHER:  Objection to form.

8              THE COURT:  Yes, sustained.

9    BY MR. SCHMIDT:

10   Q.  Did you or Bill fine people for not reading the closing

11   script?

12   A.  Everybody got warned.  There very well could have been.  I

13   can't say for certain.

14   Q.  Did people get fined for not mentioning the specific entity

15   that was going to be the billing entity?

16   A.  That's something that we would have, we would have

17   explained, and if it was happening excessively, we would have

18   issued a fine.

19   Q.  Were there some things you really didn't have to happen

20   excessively before fines or issues, right?

21   A.  From what I remember, we would at least give a warning at

22   first.

23   Q.  For people who had earning statements, at most they would

24   get one warning before they would get fired.  Is that fair?

25   A.  It would have to be on a case-by-case, depending on the

IB5JKET5                        Finocchiaro - cross

1  certainty of how it sounded.

2  Q.  If somebody would say that well, this is a product that in

3  your industry you need, you really need to have to be

4  successful, would that cause a fine to be issued by you or Bill

5  with one warning or maybe more than one warning?

6            MS. FLETCHER:  Objection to form.

7            THE COURT:  Sustained as to form.

8  BY MR. SCHMIDT:

9  Q.  What were the ones that you considered the most serious

10  violations of policy in the warnings that you received from Mr.

11  Curtis?

12  A.  An earnings claim as well as if a customer had no idea what

13  was going on in the call, they were taking the credit card and

14  processing it.

15  Q.  In fact, some of the complaints or charge-backs were where

16  the customer had no idea that he was getting charged money for

17  something --

18            MS. FLETCHER:  Objection.

19  Q.  -- is that correct?

20            THE COURT:  Just a moment.  Can you answer that

21  question, sir?  Overruled.

22  A.  In this situation -- can you repeat that.  I am sorry.

23            (Continued on next page)

24

25

1    Q.  You said one of the more serious offenses was basically

2    charging somebody's credit card when it was clear that the

3    customer had no idea that that was going to happen?

4    A.  That and earnings claim.

5    Q.  I know the earnings claim.  But another one was -- the

6    second one was charging somebody's credit card when it was

7    clear that the customer didn't understand that that was going

8    to be done?

9    A.  Not of sound mind, meaning --

10              THE COURT:  Meaning what?

11   A.  Meaning that the potential client literally was almost to

12   the point where they weren't of their right mind; they didn't

13   know what was going on, to the point where they are not well.

14   They could have been sickly or some sort of mental issue or

15   whatever it may have been.

16   Q.  But you did have rules, both at some age, and if there was

17   any indication that a client may be confused and not

18   sufficiently aware of what is going on, that before anything

19   could be done, you or Bill would have to speak to that person,

20   is that correct?

21              THE COURT:  "That person" meaning that salesperson?

22   Q.  The customer.  To make sure what was going on.

23              THE COURT:  Is that true, yes or no?

24   A.  Yes, it is.

25   Q.  So the violation would be somebody basically not bringing

1   you or Bill over to speak to the potential customer and just

2   going through with the charge?

3   A.   That's true.

4   Q.   What was the result or reaction of you and Bill for reports

5   that a salesman was excessively aggressive?

6            MS. FLETCHER:   Objection to form.

7            THE COURT:   Sustained.

8   Q.   Did you receive complaints, or whatever those forms are

9   called, from Mr. Curtis that a salesman in an instant was

10  excessively aggressive to a potential customer?

11  A.   I can't recall one offhand, but I'm sure that would have

12  been part of the process.

13  Q.   Would it be fair to say at times Arash Ketabchi was

14  excessively aggressive?

15  A.   Arash, yes.

16  Q.   Would it be fair to say that Chris Wilson was excessively

17  aggressive at times?

18  A.   That's correct.

19  Q.   And would it be fair to say that Pete DiQuarto was

20  excessively aggressive at times?

21  A.   At times, yes.

22  Q.   And would it be fair to say that you have never heard

23  Andrew Owimrin be excessively aggressive?

24  A.   I can't say that I have.

25  Q.   Now, back to grant leads.

1           Now, the leads that came from the people who sold

2   grants included not only the grants, but also the Web site or

3   business that was going to be accompanying the grant, is that

4   right?

5   A.  Yes, that sounds correct.

6   Q.  Now, do you have any idea of what the -- withdrawn.

7           You said for a week or two you had some salespeople

8   selling from grants lists, is that right?

9   A.  That's correct.

10  Q.  What was the price to sell a grant to some sucker?

11  A.  From what I recall with the grant, there was no set price.

12          I'm sorry.  Are you talking about when we were selling

13  the grants or grant leads?

14  Q.  When you were -- the week or two that you brought in those

15  guys from out west, sat them down and had them sell grants.

16  How much were the grants?  How much did it cost for a grant?

17  A.  It was open-ended, from what I remember.

18  Q.  Could you give us a general idea of the low cost, medium

19  cost and a high cost?

20  A.  I can't say for certain, but I would assume $1,000, maybe

21  up to 20,000.

22          THE COURT:  Was it up to each salesman to set the

23  price of the grant that he was attempting to sell?

24          THE WITNESS:  Yes, your Honor.  It was based on how

25  much money was available.

IB58KET6                        Finocchiaro - Cross

1            THE COURT:  You mean how much money the customer said
2     they had to spend?
3            THE WITNESS:  Yeah, available.  That's accurate, your
4     Honor.
5            THE COURT:  All right.
6     BY MR. SCHMIDT:
7     Q.  Depending on how much the customer got to spend also
8     depended on what they received or thought they were going to
9     receive in the nature of a Web site and a business, is that
10    right?
11           MS. FLETCHER:  Objection to what they thought.
12           THE COURT:  Sustained.
13    Q.  Depending on how much a customer was going to spend, it was
14    your understanding the salespeople would then include certain
15    items, including a Web site and a business?
16    A.  I don't recall.
17    Q.  So how did the Web site and the business get associated
18    with the grant?
19    A.  The grant was such a short time, I don't recall the full
20    services that went along with that.
21    Q.  You had a disagreement with your partner about this attempt
22    to sell grants, is that right?
23    A.  Yes, I did.
24    Q.  Now, you were against it, would that be fair to say?
25    A.  Yes, I was.

IB58KET6                         Finocchiaro - Cross

1    Q.  And Mr. Sinclair was less against it than you?

2    A.  That's fair, yes.

3    Q.  But the guys who came -- within a very short period of time

4    there were numerous arguments, disagreements between the people

5    who came from out west, who were the grant people, and you and

6    Bill, would that be fair to say?

7    A.  Not so much myself.  He spoke to the head of their grant

8    company.  That was more of an argument.  I never talked to the

9    guy really.

10   Q.  You really backed out and tried not to be involved in that

11   at all, would that be fair?

12   A.  To an extent.

13   Q.  Now, you have talked about doing what you could to stay in

14   the gray area.  Remember testifying about that?

15   A.  Yes, sir.

16   Q.  One of the things that you testified about to try to help

17   to stay in the gray area was having Paul Curtis monitor the

18   telephone calls, is that right?

19   A.  That's accurate.

20   Q.  And that would include the warnings, additional training,

21   and fines to the salespeople, is that right?

22   A.  Yes, sir.

23   Q.  So when you say trying to stay in the gray area, you are

24   basically saying that you were making efforts to try to prevent

25   your salespeople from saying things that they weren't supposed

IB58KET6                          Finocchiaro - Cross

1    to say, is that right?

2    A.  It's a little more to it than that.

3    Q.  Go for it.

4    A.  We had things in place to avoid being blatant where we

5    would have trouble with, whether it be the FTC or legal issues

6    with authorities.

7    Q.  And most of the people there in sales, over the course of

8    the time that you were at Olive Branch, not all but most, they

9    came from places like The Tax Club and other biz-op marketing

10   places, is that right?

11   A.  At times, yes.

12   Q.  You're aware that Andrew and Reagan Owimrin had no

13   background whatsoever in biz-op marketing, is that right?

14   A.  That is correct.

15   Q.  And you and Bill made it clear to Andrew and Reagan what

16   they should not be doing when they are making sales calls, is

17   that fair?

18           MS. FLETCHER:  Objection to making it clear.

19           MR. SCHMIDT:  I will withdraw that question, Judge.

20   Q.  Did you or Bill inform Andrew and Reagan what should not be

21   done in these telephone calls to customers?

22   A.  Absolutely.

23   Q.  When it was explained to Andrew and Reagan, did you tell

24   them, Oh, the reason we don't want you to do this is because we

25   want to stay in the gray area?  Did you say something like

IB58KET6                         Finocchiaro - Cross

1   that?

2   A.  We didn't really talk like that.

3   Q.  So you didn't say that, right?

4   A.  Not that I recall.

5   Q.  You said, basically, this is the right way to do it, that's

6   the wrong way to do it; is that fair to say?

7              MS. FLETCHER:  Objection.

8              THE COURT:  I will allow that.

9   A.  Yeah.  We would tell them, this is how you say it and don't

10  say it this way because you're making a blatant earnings claim.

11  That's what we would have explained.

12  Q.  When you say you're making a blatant earnings claim, did

13  you say that it was wrong, it was unethical, it was illegal,

14  you will get into trouble, or something of that nature?

15  A.  Just say it's going to cause cancellations and problems.

16  Q.  So you didn't use anything that would make it seem like it

17  was unethical or illegal, it was just problematic; is that what

18  your testimony is?

19             MS. FLETCHER:  Objection.

20             THE COURT:  I will allow it.

21             Can you answer it?

22  A.  That's what would have been explained to the sales manager,

23  and it was his job to do the hands-on training.

24             THE COURT:  I think you said you were interested in

25  stopping the most blatant violations, is that correct?

1           THE WITNESS:  Yes.

2           THE COURT:  But ones that were closer to the line did

3    you allow?

4           THE WITNESS:  We didn't allow anything that was on our

5    list.  Blatant earnings claims, there were certain ways to go

6    about saying it.

7           THE COURT:  All right.

8    Q.  His Honor asked you, basically, did you permit, when you

9    were talking to someone who had no experience in biz-ops, did

10   you tell them that they are allowed to do something that you

11   believed was near the line?

12   A.  Conversations like that, it wasn't specific in that nature.

13   It was, here's the script, learn it, follow it, done.

14   Q.  It was your intention for them to believe that that was the

15   proper way of doing it versus the other way, which was the

16   wrong way of doing it, is that correct?

17          MS. FLETCHER:  Objection.

18          THE COURT:  Sustained.

19          Did you tell them following the script was the proper

20   way?

21          THE WITNESS:  That's what we explained to them, just

22   follow it word for word.

23          THE COURT:  Did you tell them not following the script

24   was not the proper way?

25          THE WITNESS:  We said as long as they don't break the

1   rules, they can put it into their own words over time as they

2   felt more comfortable, your Honor.

3          THE COURT:  Next question.

4   Q.  Now, you described that the wrong way was making blatant

5   earning statements, but that it was OK to do a certain spin on

6   it so maybe the customers would think that they are getting

7   promises of earnings, is that right?

8   A.  That's accurate.

9   Q.  Now, when you told people who had never worked in the

10  biz-op field before that you can say this, that's OK, but not

11  that, did you explain to them that that was just a spin that

12  you were putting on it?

13  A.  Not that I recall.  We explained --

14  Q.  This is the right way, that's the wrong way, is that

15  correct?

16         MS. FLETCHER:  Objection.  He keeps cutting the

17  witness off.

18         THE COURT:  Had you finished?  You started to say "we

19  explained."

20  A.  We just explained that you can't make a blatant earnings

21  claim.  This is how you have to say it.

22         THE COURT:  Move on.  You have been over the blatant

23  earnings claim issue, back and forth.

24         Next.

25  Q.  You said during that period of time, from 3 to 14 days to

1    save a sale, that you often had Andrew make calls as well as

2    you making calls, is that right?

3    A.   At times, if he would help me out, yes.

4    Q.   Maybe I shouldn't use the word often.  It was when you were

5    getting overloaded with the calls, you would sometimes seek

6    Andrew to make a few calls for you?

7    A.   That's fair, yes.

8    Q.   The reason why you chose Andrew was because of the way he

9    talked to people, is that right?

10   A.   He was good at what he did.

11            THE COURT:  He was a good salesman?

12            MR. SCHMIDT:  That was not my question, your Honor.

13            THE COURT:  That was mine.

14   Q.   He was a nice-sounding person on the phone and in person?

15   A.   Yes.  He understood what --

16   Q.   I am not asking about understanding.  I am just asking you

17   what he sounded like to you.

18   A.   He was good.

19   Q.   Did he sound nice?

20            THE COURT:  Sir, I think part of the problem is I

21   don't understand "nice."  Do you mean somebody spoke with

22   dulcet tones?  Do you mean that they spoke correct English?  Do

23   you mean they engaged in the other person to think favorably of

24   them?  So rephrase it in a way that even I can answer it.

25   Q.   When he talked, he sounded sincere?

1   A.  That's accurate.

2   Q.  Now, did you ask Arash to make these phone calls?

3   A.  He has, if it was his client.

4   Q.  Is he the choice to make the phone calls because he also

5   sounds so sincere?

6   A.  He was more of a steamroller in terms of more aggressive.

7   Q.  And so was Chris Wilson?

8   A.  They were --

9   Q.  He was more of a steamroller also, wasn't he?

10              MS. FLETCHER:  Objection.

11              THE COURT:  You have to let him answer.

12              MR. SCHMIDT:  He wasn't answering my question, Judge.

13              THE COURT:  Just ask the next question.

14   Q.  He was more of a steamroller, wasn't he, Chris Wilson?

15   A.  Yes.

16   Q.  And Pete DiQuarto was pretty much an aggressive

17   steamroller, wasn't he?

18   A.  Not so much.

19   Q.  A little bit less than the other two?

20   A.  He was actually a very good salesman, had low retention.

21   Q.  Low?

22   A.  His cancellations weren't as bad from what I remember.

23   Q.  And that's because he --

24              THE COURT:  What was the reason for his cancellations

25   not being as bad?

1          THE WITNESS:  He had a very good rapport with all of

2     his clients.  He was very thorough.  He would always make

3     himself available.  He put time and effort in, took that extra

4     step.  So if there were questions, he wanted to speak to his

5     clients so they knew it's the same voice; they are not hearing

6     another person come in.  He was very hands-on.

7     Q.  You testified here about the maximum sentence you could

8     receive?

9     A.  Yes, I recall.

10    Q.  You also testified about the guidelines.  Do you remember?

11    A.  That's correct.

12    Q.  What are the guidelines?  What does that mean to you?

13    A.  The guideline, it's the sentencing guidelines, where you

14    could potentially -- if you're found guilty, what you could be

15    put in jail for.

16    Q.  Do you have an understanding now of approximately what your

17    sentencing guidelines would be?

18    A.  I have an idea, yes.

19    Q.  What is that?

20          MS. FLETCHER:  Objection.

21          THE COURT:  If he believes he has an idea, I will hear

22    that idea.

23          MS. FLETCHER:  Your Honor, I am concerned about the

24    basis for the idea.

25          THE COURT:  Let's see if he has an idea, and we can

1    establish the basis.

2                Do you have an idea, sir, as to what approximately

3    your sentencing guidelines will be?

4                THE WITNESS:  I am just looking off the -- what's it

5    called --

6    Q.  The cooperation agreement?

7                THE WITNESS:  -- the agreement, sir.  Your Honor,

8    that's what I am referring to, just what I read off of that.

9                THE COURT:  What is that understanding?

10               THE WITNESS:  It could be anywhere from, depending on

11   the decision, I guess probation to potentially 80 years in

12   prison.

13   Q.  That's your understanding of the sentencing guidelines for

14   your case?

15   A.  That's what is on the paper and that's what I gathered.

16               MR. SCHMIDT:  May I have one moment, your Honor?

17   Q.  Now, I am going to show you what has been previously

18   entered into evidence as PC 21 and 22 -- PC 16, pages 21 and

19   22.

20               MR. SCHMIDT:  It would be faster if I approach the

21   witness, your Honor.

22               THE COURT:  It's in evidence?

23               MR. SCHMIDT:  Yes.

24               THE COURT:  How much longer do you have?

25               MR. SCHMIDT:  Five minutes.

1   Q.  Can you see that monitoring form?

2           THE COURT:  Take a look at the screen.

3           Do you see that document?

4   Q.  Do you see that?

5   A.  Yes, I do.

6   Q.  You see the first one, the violation of company policy

7   calling credit card without the client on the phone?

8   A.  Yes, sir.

9   Q.  And the second one?

10  A.  Yes.  You want me to read it?

11  Q.  No.  Everybody can see it.

12          And the third one?

13          THE COURT:  Do you see it?

14          THE WITNESS:  Yes, I do.

15          THE COURT:  Next.

16  Q.  Is this consistent with what you said about how nice and

17  sweet Pete DiQuarto is to his customers?

18          MS. FLETCHER:  Objection.

19          MR. SCHMIDT:  Withdrawn.

20  Q.  Is this consistent with your testimony of Pete DiQuarto's

21  relationship with his customers and potential customers?

22  A.  Can I explain?

23  Q.  Yes, of course.

24  A.  He would sell a lot more clients.  So, of course, there is

25  going to be cancellations, but his retention, from what I

1  remember, was very low, which made us happier because we didn't

2  have to clean up a lot of his deals.

3  Q.  And when he spoke to his clients to try to save a sale, was

4  he also still overly aggressive when he tried to save a sale?

5  A.  Again, I can't recall a specific time.  I just remember

6  that he had low retention compared to some of our other

7  salesmen.

8        MR. SCHMIDT:  I am finished, your Honor.  Thank you

9  very much.

10        THE COURT:  Is there any redirect?

11        MR. PAUL:  Just a question or two.

12 REDIRECT EXAMINATION

13 BY MR. PAUL:

14 Q.  Mr. Finocchiaro, you were asked questions about saves,

15 correct?

16 A.  Yes, sir.

17 Q.  This was one of the things you did among others, such as

18 chargebacks, correct?

19 A.  That's correct.

20 Q.  You told us that you had a conversation with Steve Ketabchi

21 about how he can deal with chargebacks, right?

22 A.  Yes.

23 Q.  As you sit here now, do you remember whether you actually

24 talked to Steven Ketabchi about doing saves?

25 A.  I don't recall saves.

IB58KET6

1    Q.  You don't recall talking to him about that aspect about the

2    chargebacks that you did?

3    A.  We spoke about the chargebacks.

4    Q.  But you don't recall talking to him about the saves that

5    you conducted before any chargeback response, right?

6    A.  Well, the idea is if you save the client before it gets to

7    that point, then it could be viewed that way, but --

8    Q.  My question is, do you know or remember talking to Steven

9    Ketabchi about doing saves before he conducted any response

10   with regard to chargebacks?

11   A.  Not that I recall.

12              MR. PAUL:  Thank you.

13              Nothing further.

14              THE COURT:  Thank you.

15              Next witness.

16              MS. FLETCHER:  The government doesn't have any

17   questions for this witness, but we would offer Government

18   Exhibit 818 into evidence.

19              MR. SCHMIDT:  May we have a moment, your Honor?

20              THE COURT:  It's the cooperation agreement.  It seems

21   to me appropriate.  Any objection?

22              MR. PAUL:  No.

23              MR. SCHMIDT:  No.

24              THE COURT:  818 admitted.

25              (Government's Exhibit 818 received in evidence)

IB58KET6

1      THE COURT:  You may step down, sir.  You are excused.

2           (Witness excused)

3      THE COURT:  Next witness for Mr. Shahram Ketabchi.

4      MR. PAUL:  The defense rests, your Honor.

5      THE COURT:  Let's have a sidebar quickly.

6           (At the sidebar)

7      THE COURT:  I take it no rebuttal case?

8      MS. FLETCHER:  No.

9      THE COURT:  All we have to do is the summations.

10     How long is the opening summation?

11     MS. FLETCHER:  Probably 90 minutes, maybe less.

12     THE COURT:  Who goes first on the defense?

13     Mr. Schmidt, how long is your closing?

14     MR. SCHMIDT:  Probably 90 minutes.

15     THE COURT:  Are you going to join the crowd?

16     MR. PAUL:  Why not.

17     THE COURT:  So that's about four and a half hours.

18     Well, let's try to do everything we can to move it

19 forward.  We will have your summation now.  We should be able

20 to get it in.

21     MS. FLETCHER:  Can we give the jury a short break?

22     THE COURT:  Yes.

23          (In open court)

24     THE COURT:  Ladies and gentlemen, let's take simply

25 ten minutes.  I take it the temperature is also getting a

IB58KET6

1    little warm.

2              (Jury exits courtroom)

3              THE COURT:  Ten minutes.

4              (Recess)

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Please be seated in the courtroom.

3          I hope that was a refreshing break, ladies and

4    gentlemen.

5          We are now going to move on to the next phase of the

6    trial.  You have seen all three of the parties rest, so there

7    is no more testimony.  But I don't want you to make up your

8    minds yet because we have three more phases -- the summations

9    of the lawyers, my charge to you on the law, and your

10   deliberations.

11         Now, the order of summations is set by law.  The

12   parties have no role in the order.  The government goes first,

13   then the defendants, and then the government gets a rebuttal

14   summation.  It gets to talk to you last because, as you know,

15   it bears the burden of proof here.

16         I want you to listen to what the lawyers say.  As I

17   told you at the beginning of this case, my strong assumption is

18   that the lawyers will tell you what the evidence showed and the

19   conclusions that they want you to draw from that evidence.  As

20   I say, I want you to listen to it.

21         But remember, you decide what the evidence showed,

22   they don't.  And you will have an opportunity, as you know, to

23   go back over the exhibits, and if you want to have some of the

24   testimony read back to you.  So just because they say this was

25   the evidence doesn't mean that was the evidence.  But again,

1    listen to them.  And remember, what they say is not evidence.

2           All right.  The opening summation for the government

3    will be given by Ms. Fletcher, is that correct?

4           Ms. Fletcher, please.

5           MS. FLETCHER:  Thank you, your Honor.

6           Andrew Owimrin and Shahram Ketabchi committed a

7    shameful, calculated fraud.  Along with their business

8    partners, they stole from some of this country's most

9    vulnerable victims.  Squeezing every last dollar from elderly

10   and retired people with promises of earnings from online

11   businesses that did not exist.

12          This was a long con.  It required that Owimrin and

13   Ketabchi each perform their own part in order to succeed.

14   Owimrin and the other salespeople were the face of the company.

15   They called the victims.  They gave the biz-op pitch.  They

16   assured the victims that they would have to put in no effort

17   themselves, just pay the money and sit back and watch the

18   checks roll in.

19          Owimrin and his partners targeted the most gullible

20   people they could get on their hands on.  Elderly and retired

21   people, with no business experience, who were looking for a way

22   to earn income from home.  And they convinced these people that

23   if they only made a cash investment, that the telemarketing

24   company would take care of the rest.

25          Owimrin played on his victims' emotions -- their hopes

IB58KET6                    Summation - Ms. Fletcher

and their fears about their future, their plans for retirement,
their desire to spend more time with their family.  He took
advantage of these hopes to suit his own needs.  He convinced
them, just hang in there, buy tens of thousands of dollars
worth of products and services to help their nonexistent
businesses succeed.

He took advantage of their lack of business acumen by
using fancy words like "corporate credit" and "search engine
optimization."  But these products and services were nothing
but some boilerplate cookie cutter pamphlet.  A pamphlet and a
string of phone calls designed to keep the victims on the hook
until it was too late to cancel.  And when the victims realized
they had been defrauded, and tried to get their credit card
companies to reverse their charges, the defendants doubled
down.  And that's where Shahram Ketabchi came in.

While Owimrin faced outward and interacted with the
public, Ketabchi was the guy behind the scenes.  He kept the
company running, making sure the e-mail worked, and the
salespeople got paid, and the contracts were mailed out.  He
kept track of the bank accounts and the merchant accounts used
to process the victims' credit cards.  And it was Ketabchi who
fought the chargebacks.  He collected and submitted the bogus
fulfillment documents, insisting to the credit card companies
that the customers got what they paid for, and the online
businesses were real.  When he won a chargeback, that money,

1    money that had been stolen from the customers, was sent back

2    into his company's bank account to keep funding the scheme.

3    And the victim was left without recourse and with thousands of

4    dollars in debt.

5         Now, you have seen this play out over and over again

6    during the course of this trial.  Over the last two weeks, you

7    have seen and heard that evidence.  This summation is the

8    government's opportunity to talk through that evidence and

9    explain to you how it all fits together.  Because now the proof

10   is in.  It's clear, it's consistent, and it is not complicated.

11   Andrew Owimrin and Shahram Ketabchi are guilty as charged.

12        Now, I am going to start by talking to you briefly

13   about the charges.

14        Count One charges the defendants with conspiracy to

15   commit wire fraud.  As Judge Stein has told you, his

16   instructions on the law control.  But I expect he will tell you

17   that someone conspires to commit wire fraud when they agree

18   with others to defraud victims using interstate wires.  I also

19   expect he will tell you that to defraud just means to lie,

20   mislead, or take advantage of someone to get them to give you

21   money.  And that the use of interstate wires includes making

22   phone calls from one state to another.

23        Count Two charges the defendants with conspiracy to

24   commit money laundering.  I expect Judge Stein will tell you

25   that someone conspires to commit money laundering when they

IB58KET6                      Summation - Ms. Fletcher

1    agree with others to move money obtained through other crimes.

2           Here, the defendants are charged with agreeing to

3    commit money laundering in two ways.  First, by wiring, and

4    otherwise moving the proceeds of the telemarketing fraud, in

5    order to promote the telemarketing fraud.  That means to help

6    the telemarketing fraud succeed.  And second, to moving more

7    than $10,000 in crime proceeds.

8           Now, you have seen and heard a lot of evidence in this

9    case, and by now you know that it's pretty straightforward.  As

10   you consider that evidence, I suspect you will see that there

11   is not much that is in serious dispute.

12          There is no serious dispute that Andrew Owimrin and

13   Shahram Ketabchi worked for a telemarketing sales floor where

14   they were supervised by Arash Ketabchi.

15          There is no serious dispute that A1 Business

16   Consultants and Olive Branch Marketing were telemarketing sales

17   floors where employees contacted victims over the phone and

18   sold them so-called business services, like business plans and

19   corporate credit.

20          There is no serious dispute that multiple victims

21   provided A1 and Olive Branch with thousands of dollars each,

22   with the understanding that they would earn money from an

23   at-home Web site or merchant processing business.

24          There is no serious dispute that these victims never

25   made the money they expected, and that some of them fought to

IB58KET6                    Summation - Ms. Fletcher

1    get their money back through chargebacks.

2            Finally, there is no serious dispute that Shahram

3    Ketabchi fought these chargebacks so A1 could keep the money

4    from the sales and keep their merchant accounts open.

5            The evidence is crystal clear on these points.  So I

6    am not going to spend a lot of time on them today.

7            So what is in dispute?  The only issue, and I mean the

8    only issue here, is whether the defendants knew that what they

9    were doing was committing a fraud and a money laundering

10   scheme, when they made the sales and when they fought the

11   chargebacks?

12           The overwhelming evidence in this case and your common

13   sense tell you, of course they did.

14           I am going to walk you through the evidence now, and I

15   will focus you on the parts of the evidence that prove to you

16   beyond any reasonable doubt that the defendants knew exactly

17   what they were doing when they made sales to the victims and

18   fought to keep the victims' money.

19           Andrew Owimrin lied to victims when he said his

20   company would operate the victims' at-home businesses, and the

21   victims didn't have to do anything except watch the money roll

22   in.

23           Andrew Owimrin lied to Jane Thompson to get her to

24   hand over her entire life savings for a so-called merchant

25   terminal business and a phony partnership in A1.

1    Shahram Ketabchi, who, as you now know, goes by Steve,

2    helped his brother Arash to keep that money and to keep the A1

3    merchant accounts open, even though Shahram Ketabchi knew that

4    the customers had been duped when they gave A1 their money.

5    Shahram Ketabchi knew because he saw the complaints

6    that those victims sent to their credit card companies and to

7    regulatory bodies like the New Jersey state attorney general's

8    office.

9    Both of the defendants sat up here, up here, and they

10   lied to you.  They made excuse after excuse, and told lie after

11   lie, in an effort to point the finger at Arash instead of at

12   themselves.  The defendants' words and their actions tell you

13   that they knew they were perpetrating a fraud and a money

14   laundering scheme in three distinct ways:

15   First, you know because victim after victim told you

16   that Andrew Owimrin lied to them to get their money, and the

17   evidence in this case shows he never thought their businesses

18   were real.  In other words, Andrew Owimrin and the other

19   salespeople doubled down on the fraud committed by the coaching

20   floors, coaching floors like Elite and other lead sources that

21   you heard about;

22   Second, you know because Andrew Owimrin and Shahram

23   Ketabchi were aware of this mountain of complaints that the

24   victims made in an effort to get their money back through

25   chargebacks.  It was Shahram Ketabchi's job to double down on

1    the sales floor's lies and to fight to keep the money; and

2              Third, you know because of the implausible lies that

3    these two men told you when they testified before you in this

4    courtroom.

5              Andrew Owimrin doubled down on the lead source fraud.

6    Shahram Ketabchi doubled down on the salesman's fraud.  Now

7    they are both trying to double down on you.

8              Let's take these one by one.  We will start with the

9    lies that Andrew Owimrin told.

10             By now you know that he told the same lies to victim

11   after victim to get them to invest thousands of dollars in

12   bogus business services that he knew did not exist.

13             Now, Andrew started working at Olive Branch in early

14   2014.  You can see Government Exhibit 731, the office in

15   Clifton, New Jersey, where that sales floor was operated.

16             He learned to sell from salespeople like Arash

17   Ketabchi and Chris Wilson and Peter DiQuarto, salespeople who

18   you heard just today were very aggressive, salespeople who you

19   heard in the course of this trial had their calls flagged for

20   doing inappropriate things.  Those calls are in evidence as

21   Defense Exhibit PC-16.

22             Now, Andrew Owimrin learned to sell in this tiny

23   office, with an open sales floor where he could hear Arash

24   loudly selling to clients.

25             Now, Andrew Owimrin didn't have the same style as

IB58KET6                    Summation - Ms. Fletcher

Arash Ketabchi.  You heard today that Arash Ketabchi was a
steamroller.  You also heard Andrew Owimrin speak.  He wasn't a
steamroller.  That wasn't his sale style.  His sale style was
to put a smile on his face and sound like a nice guy so the
customers would trust him.

          This is the office.  Remember that Bill Sinclair told
you that this open room at the bottom of Government Exhibit 710
is an open space, and Arash Ketabchi was loud, so everyone
could hear the sales pitch that he was making in this room.

          This is a photograph of what that sales floor looked
like.

          Government Exhibit 728 is an Instagram post that
Andrew Owimrin made showing himself and other salespeople,
including Christopher Wilson and William Sinclair, on the sales
floor.  It's not a big space.

          Government Exhibit 729 is a photograph of Andrew
Owimrin just in front of Arash Ketabchi, inside that office.

          So he learned to sell from these aggressive
salespeople.  He didn't adopt their style, but he learned from
them.

          Andrew Owimrin sitting at his desk.  And if you take a
look at this Instagram post that is at Government Exhibit 713,
you can see exactly how his sales manager encouraged him.  You
can see the message on Instagram.  "The killer.  50k a week is
a light week for him."  Owimrin doesn't respond that he is not

IB58KET6                    Summation - Ms. Fletcher

1   a killer.  He says, "I've paid attention."

2          Now, Andrew Owimrin was reprimanded several times for

3   making representations in sales calls that he was not permitted

4   to make.  You heard a lot about rules today again from Michael

5   Finocchiaro.  You know that there were rules in place.  But you

6   also know that the salespeople broke those rules, and they

7   broke them consistently.

8          These are just three examples of Andrew Owimrin

9   breaking those rules:  At Government Exhibit 250, at Government

10  Exhibit 251, and Government Exhibit 252 in evidence.

11         You also learned that while these calls were being

12  monitored for some time, ultimately the management of the

13  business decided it wasn't in their interest to monitor calls

14  anymore and it stopped.  And the salespeople, like Andrew

15  Owimrin, were free to make any representations that they

16  wanted, so long as they didn't make them so loud that Bill

17  Sinclair and Michael Finocchiaro heard them.

18         By 2015, Andrew Owimrin was a gifted, savvy

19  salesperson who was making sale after sale.

20         Focusing on his lies.  Andrew Owimrin's lies tell you

21  that he knew that his customers already had a so-called online

22  business.  He knew exactly how to leverage this fact so that

23  the customer would be willing to spend tens of thousands of

24  dollars on his so-called business services.

25         Bill Sinclair told you about this early in this trial.

IB58KET6                    Summation — Ms. Fletcher

1    He told you that the salespeople wanted it to be a warm type of

2    exchange.  They wanted the potential customer to know that the

3    salespeople were affiliated with the company that the customer

4    had already purchased from.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Mr. Finocchiaro told you something similar today.

2     They wanted the customers to be primed for the biz-op sale.

3     You don't have to take Bill Sinclair and Michael Finocchiaro's

4     word for it.  You saw the sales script referring to the sales

5     made by the lead source so the victim knows who you're talking

6     about and they warmed to your sales pitch.

7          By late 2015, Andrew Owimrin knew exactly how to make

8     a sale.  He consistently told customers they would make money

9     from their online businesses if they just bought more services

10    and his company would take care of everything.

11         You heard from Joe an La Morte.  Before Andrew Owimrin

12    spoke with Ms. La Morte, she told you she had made purchases

13    with another website business company.  You can see here on the

14    appointment for her sale, she is listed as already having a

15    internet business, Government Exhibit 502.  She also testified

16    before you that she understood she needed to purchase

17    additional services to get her website to work.

18         She told you that she purchased those services from

19    Andrew Owimrin.  He sold her Youngevity that she heard a lot

20    about especially today, but he also sold her Corporate Credit.

21    Remember what Bill Sinclair told you about Corporate Credit.

22    Corporate Credit didn't exist.  The customers couldn't actually

23    get Corporate Credit because they needed to present two years

24    of financial statements, and none of the customers had

25    financial statements because they didn't have real businesses.

1          So Andrew Owimrin sold Ms. La Morte these services.

2     You'll recall Ms. La Morte told you he initially pitched her

3     $10,000.00 for these services, but she didn't have enough line

4     of credit on her credit card.  So what did he do?  He got on

5     the phone with her, he three-way called her credit card company

6     and helped her open up another credit card with an $8,000

7     limit, at which point magically he was able to reduce the price

8     to $8,500 and maxed out the credit card.

9          Now, unlike a lot of the victims in this case, Ms. La

10    Morte is a savvy New Yorker.  She figured it out when she

11    looked at the contract that it didn't have the promises that he

12    made to her in it.  It didn't mention he was going to get,

13    didn't mention she was going to get checks everybody week,

14    everybody other week, and so she called to cancel.

15         You also heard from Diane Weissenberger.  She was the

16    first witness in this trial, so that has been a couple of weeks

17    now.  Ms. Weissenberger told you she initially purchased some

18    sort of merchant terminal business, and you saw Government

19    Exhibit 403, the lead list that Bill Sinclair got that included

20    Diane Weissenberger's name.  The lead list makes clear she

21    already had 300 leads sold to her.  Those are leads to her

22    so-called merchant terminal business.

23         On September 19th, Andrew Owimrin, then using the name

24    Andrew Owens -- excuse me -- September 17 -- sold her

25    $13,999.00 worth of services including Youngevity, Corporate

IB5JKET7                    Summation - Ms. Fletcher

1    Credit and silver bookkeeping, Government Exhibit 404, and her

2    contract, 152.  See Corporate Credit bookkeeping.

3           Now, she canceled the day after this.  She, after

4    canceling, was asked to sign a COS.  You have seen her

5    testimony about COS.  That is the continuation of services

6    agreement.  Victims were asked to sign the COS to essentially

7    bulletproof any charge-back that the victim may want to

8    initaite after-the-fact.  So when she came on Andrew Owens',

9    Andrew Owimrin's appointment calendar on September 25th, 2015,

10   he saw she had already signed the COS.

11          After this appointment, Andrew Owimrin left Olive

12   Branch Marketing and started working for Arash Ketabchi at A1.

13   He called Diane Weissenberger.  If you take a look at your

14   screen, you can see the portion of Ms. Weissenberger's

15   testimony about what Andrew Owens told her, what she understood

16   she was getting in exchange for her $13,999.00 investment.  It

17   also makes clear that she told him over and over again she was

18   not interested in doing any work for her business.  He assured

19   her she didn't have to, and that she had a one-year goal of

20   making six figures.

21          so After Andrew Owimrin leaves Olive Branch, he joins

22   up with Arash at A1 Business Consultants and he changes his

23   name.  He starts going by Jonathan Stewart and he calls Diane

24   Weissenberger within a number of days to sell her more

25   products.  He sells her on 10-7 additional services including

1    business credit.  Government Exhibit 411 B is the contract for

2    Diane Weissenberger's next purchase, this time from A1 Business

3    Consultants directly, dated October 7, 2015.  When you look at

4    the services he sold to her, you see a business plan and

5    Corporate Credit, Corporate credit again.

6            Andrew Owimrin had just sold Diane Weissenberger

7    Corporate Credit using the phone name Andrew Owens and sold her

8    Corporate Credit days later using a different phone name,

9    Jonathan Stewart.  Ms. Weissenberger told you that she started

10   calling Business Development Center, the company that she

11   thought was affiliated with A1 business over and over again,

12   and no one responded to her.  She also told you she never got

13   any of her money back.

14           You didn't see her in person, but you saw the

15   videotaped deposition of Ms. Charlene Foster.  You saw the

16   contract for Ms. Foster.  You saw it and you heard that Andrew

17   Owimrin sold her $20,000 worth of services in 2015.  In 2015,

18   Ms. Foster was 86 years' old.  Mr. Owimrin sold her services

19   like Corporate LLC, business plan, Corporate Credit, tax prep

20   and a laptop.  He sold her a laptop for an internet business

21   that didn't exist.  He sold her a laptop because she didn't

22   have one.

23           now let's talk for a minute and talk about Ms. Foster.

24   You heard Andrew Owimrin talk about Charlene Foster.  This is

25   Government Exhibit 122.  The words that Andrew Owimrin used in

that conversation, a conversation he didn't know was being
recorded, those words tell you everything that you need to know
about this case.  If you listen to nothing else, listen to
those words.  When Andrew Owimrin talked about Charlene in that
call that we'll play for you in a minute, he didn't talk about
how he was excited to sell her these services for her business.
He didn't say that he was going to talk to her about some new
services for her business he thought she might like.  He said
he was going to put at least 20 grand on the credit card
because Charlene thought that Elite had already charged her and
she wouldn't know any better.  Let's listen to that.

            Ms. Lee, can you play it.

            (Videotape played)

            MS. FLETCHER:  Andrew Owimrin was banking on the fact
that Charlene would be too confused to realize what he had
done.  She wouldn't know the difference that he had charged
$20,000 to her card or if another company had.

            When Andrew Owimrin told the lies that he told the
customers, he knew the businesses weren't real and that the
customers would never make money.  Bill Sinclair told you about
an incident when Ray Quiles talked to the sales floor about a
customer that had made money and he told you that that stood
out because based on the demographic and based on the type of
customers that his sales floor talked to, nobody made money.

            He told you that it was understood that these

1    businesses weren't real, that he didn't have to say it to the

2    sales floor because it was obvious.  He also told you about

3    grant leads.  He told you members of the sales floor sold to

4    people who previously invested in a completely bogus government

5    grant.  Mr. Owimrin admitted that he sold to those grant leads

6    as well.

7           Now, remember Andrew Owimrin's job was the

8    salesperson.  He sat on the phone with victims.  He tried to

9    sell them products.  He heard their voices.  He listened to

10   their questions.  He knew that he was speaking to people who

11   would never be able to operate a successful online business.

12          Now, you saw some of those people in person.  Saw

13   Diane Weissenberger in person.  You saw Jo Ann La Morte in

14   person and you watched the videotaped deposition of Charlene

15   Foster.  Let's look at that for a minute.

16          (Videotape played)

17          MS. FLETCHER:  Now, remember he spoke, Andrew Owimrin

18   spoke to Charlene Foster when she was 86 years' old three years

19   before this videotaped deposition.  He knew full well, speaking

20   to her, she was never going to be make money from an online

21   business.  She didn't have an online business.  She didn't have

22   a laptop before he sold her services.

23          But notwithstanding this, like the other salespeople

24   at Olive Branch, Andrew Owimrin took advantage of the lies the

25   coaches told.  He told the victims they just needed to spend a

IB5JKET7                    Summation - Ms. Fletcher

1    little more money to make their businesses legit and legal.  He

2    doubled-down on the leads versus lies.

3            You heard a lot about Youngevity.  You heard a lot

4    about Youngevity today from Mr. Schmidt and how salespeople

5    were permitted to make earnings claims with respect to

6    Youngevity at the beginning.  There is nothing about Youngevity

7    and the Youngevity business model that excuses the lies that

8    Andrew Owimrin made to his victims.  Youngevity was just

9    another item in the grab-bag of products that Andrew Owimrin

10   was permitted to sell to these victims.  It was great for

11   salespeople because it allowed the salespeople to slip into the

12   sales pitch that the victims could definitely expect a check at

13   some point in the next 60 to 90 days.

14           Importantly, Andrew Owimrin's conversations with the

15   victims you heard from, with Diane Weissenberger, with Charlene

16   Foster and with Jo Ann La Morte, were all well after it was

17   clear that Youngevity was not going to work.  Youngevity

18   started in December of 2014 and customers were promised a check

19   in 90 days.  You heard from Bill Sinclair that he and Michael

20   Finocchiaro started writing their customers checks because the

21   checks weren't coming through.

22           The point I am making here is by the time these sales

23   happened, Andrew Owimrin knows that Youngevity is not what he

24   unusually thought it was.  All of this, all of the victims we

25   have just talked about, all of this predates Jane Thompson.

IB5JKET7                          Summation - Ms. Fletcher

1   Jane Thompson is the whale.  She is the victim with a lot of

2   disposable cash from her retirement fund, who was desperate for

3   a way to earn money from home so that she could spend time with

4   her dying father.

5        Andrew Owimrin sold Jane Thompson every service he

6   could possibly think of:  Website, front-end web services,

7   merchant account setup services, taps services.  You can see

8   the memo lines from her checks, Government Exhibit 904.  Over

9   time, she gave more than $238,000.00 to A1 Business Consultants

10  for different services, including the phoney partnership you

11  heard about.

12       You have seen her checks.  She told you that she made

13  it clear that she did not want to sell anything, and Jonathan

14  Stewart from A1 Business Consultants, who you now know is

15  Andrew Owimrin, told her that she didn't have to.  She says I

16  was very clear I was not going to have to do anything, and

17  Andrew Owimrin told her in response, don't worry about that,

18  you won't have to do anything, you don't have to sell anything.

19  There is nothing you have to do except keep up with the amount

20  of money that is coming in so you can let our tax people that

21  are working for you know how much you made.

22       Now, you heard during Ms. Thompson's testimony a bit

23  about her notes, but you didn't see them.  They're now in

24  evidence at Government Exhibit 165 A.  Her notes match her

25  testimony.  She writes in her notes the date and the time that

1  she spoke to a person, the person she spoke to, and what they

2  talked about.  On December 17th, she and Jonathan Stewart

3  discussed the name of her company and where she should send the

4  check for the $18,997.00.

5      Once he sold her every biz-op product he could think

6  of, he moved on to pitching her this merchant terminal

7  business.  She said he initially wanted her to buy three

8  merchant terminals, but Emily Miller convinced her via text

9  message she should start with one.  Her notes confirm this.

10  She spoke with Jonathan and Emily and decided to only start

11  with one merchant account.

12      Her testimony about what she expected to get from

13  those merchant accounts was unequivocal.  She expected to make

14  money back in 30 days.  Jonathan Stewart told her she'd make

15  money back in 30 days.  You saw his text messages to her.

16  Okay, great, Government Exhibit 172, I just got off the phone

17  with Corporate credit coach, everything looking great for 30

18  business days from today.  She understood she would be getting

19  Corporate credit within 30 days because Jonathan Stewart,

20  Andrew Owimrin, told her that she would.  Again look at her

21  notes, dated when they spoke.

22      Ladies and gentlemen, you listened to two things in

23  this case, Charlene Foster, the way that Andrew Owimrin speaks

24  about Charlene Foster, and the second thing is what Jane

25  Thompson writes in her notes.

1          Now, once there was nothing else to sell her and she

2     still had a lot of money in reserve, Jane Thompson told you

3     that Andrew Owimrin and Arash Ketabchi pitched her on a

4     partnership with A1 Business Consultants, that if she gave them

5     $150,000, she would get a 20 percent stake in the business in

6     return.  She told you that she got a contract that initially

7     laid out the amount of the sale, but omitted the ownership

8     stake.  Government Exhibit 165 A, these are her notes of the

9     conversation about the 20 percent interest in the business.

10    This is a conversation with Jonathan Stewart.

11         This is the first contract she got.  This is her

12    post-it.  You can see what she wrote on here.  Received these

13    in May in 2-25-16.  She got a second contract, April 4th, 2016,

14    apologizing for the clerical error in the contract.  These are

15    her contemporaneous notes of the documents.

16         You know who prepared the contract by documents you

17    saw Friday and today, Government Exhibit 515.  The information

18    from Ms. Thompson's contract is being sent from A1 Business

19    Consultants to Shahram Ketabchi.  He prepared these documents,

20    the initial contract, all in Word on his computer.  And then

21    the response, apologizing for the clerical error of the

22    ownership circulation.  You saw the UPS label this morning.  He

23    may not have spoken to her, but he is the one who gave her

24    this.

25         Andrew Owimrin is the one who got paid for it.  The

$150,000 investment in A1 Business Consultants was on February 5th of 2016, and you can see on February 8th of 2016 Andrew Owimrin gets a $9,500 check from A1 Business Consultants, and he also deposits $3,000 in cash.  That was his commission from the sale.

Now, Bill Sinclair told you that when Andrew Owimrin came back to work for him, he complained about his commission from the Jane Thompson sale.  He thought he should have gotten a 50/50 split with Arash, and then just when you thought it couldn't get any worse, just when you thought they didn't have any more money to take from Jane Thompson, Mr. Owimrin pitched selling her debt consolidation services, another product to try to bleed more money out of her.

Andrew Owimrin told lie after lie to victim after victim.  He knew that these victims didn't have real businesses and he didn't care.  He was focused on lining his own pockets.  So that is the first reason that you know that the defendants are guilty.

The second reason is the charge-backs.  We talked a lot about charge-backs.  You heard about how ordinarily businesses are able to open up a merchant account to accept credit card payments, and you know from your everyday lives that sometimes customers decide they want their money back after making purchase and they ask for a refund, but you heard about the charge-backs in this case, and your common sense

1   tells you that the charge-backs in this case were not the

2   charge-backs initiated by run-of-the-mill customers who change

3   their mind.

4        You heard about how at Olive Branch there were serious

5   problems with charge-backs.  Bill Sinclair told you about how

6   he and Michael Finocchiaro both had their merchant accounts

7   shut down because of too many charge-backs.  Without the

8   ability to process payments, the owners of the company had to

9   lean on their salespeople and their other employees to open up

10  merchant accounts for them.

11       You heard about how Andrew Owimrin couldn't get a

12  merchant account on his own, so he was asked to co-sign on the

13  Element Business Services business checking account.  You saw

14  the signature card.  That is the last page of Government

15  Exhibit 906 A.  He co-signed on that checking account with

16  Masoud Kouchek Manesh.  The purpose of this account was to give

17  Olive Branch Marketing access to the funds that would be

18  flowing into the Element Business Services merchant account

19  from victims.

20       Forensic account Jenna Casanova explained to you how

21  this back account was essentially just a pass-through for the

22  credit card processing payments to Olive Branch Marketing and

23  later to A1.  You can see some of those transactions on your

24  screen at Government Exhibit 906, money comes in from A1

25  Business Consultants to start the account, money comes in from

the credit card processor on July 23 of 2015, and then it is

immediately funneled out to Olive Branch Marketing.  By October

of 2015, once Andrew Owimrin has left Olive Branch Marketing

and is working for ash Ketabchi at A1, the money starts to get

funneled out to A1 Business Consultants.

Now, these transactions, transactions through this

account, these are -- bless you -- these are transactions in

the proceeds of crime.  These are the financial transactions in

the victims' money.  So every time these transactions take

place, there is a money laundering crime.

Now, you heard about how at Olive Branch Marketing

Michael Finocchiaro, who you heard from directly today, was

responsible for charge-backs, charge-backs from clients who

want to cancel.  Think about this for a second.  This is a

co-owner of the company, and the only thing you heard about

that he did was try to keep customers from getting their money

back.  That tells you a lot about how this business operated.

You heard how in 2015 the charge-backs were so bad

that Olive Branch Marketing had to implement a retention plan.

They started holding back a portion of each of the

salespeople's pay to cover the average amount of anticipated

charge-backs for that salesperson.  You also heard that that

didn't do enough to fix the problems caused by the excessive

charge-backs, and so Olive Branch Marketing started holding

back the entire amount of the charge-back if the salesperson

IB5JKET7                    Summation - Ms. Fletcher

1    was responsible for the cancel.

2            Now, you saw what that did to Andrew Owimrin's bottom

3    line.  You see how much money he made from Olive Branch

4    Marketing in July of 2015, more than $8,000.  In August and

5    September and early October, less than $2,500 total, and then

6    he left.  The charge-backs started to hit Andrew Owimrin's

7    bottom line, and he left Olive Branch Marketing to go and work

8    with Arash at A1, at A1, where there were no rules on earnings

9    claims, no cap of $10,000.00 per transaction, and he could just

10   charge $20,000 to Charlene Foster's credit card and nobody

11   would care.

12           You saw some of those charge-backs and complaints

13   yourselves.  These were not just disappointed customers.  These

14   are people who could not possibly have run a business, who were

15   promised they would make money from the business, and were

16   conned into giving their money to Olive Branch and A1.  Who was

17   on the receiving end of these complaints?  Shahram Ketabchi.

18           Joe Freeland submitted a detailed letter of exactly

19   how he was defrauded.  Shahram Ketabchi told you in his

20   testimony he only glanced at this letter, but he looked at

21   everything else very closely.  You saw the documents that he

22   collected and tracked and prepared for the purposes of

23   disputing the charge-back.  You saw his post-its tracking the

24   status on his response and the credit card company's decision

25   on the charge-back.

1        MR. SCHMIDT:  Your Honor, I apologize.  I have an

2   objection to that exhibit, which was issued not for the truth,

3   but for state of mind.  Not this one.

4        THE COURT:  Which one?

5        MS. FLETCHER:  206 B.

6        THE COURT:  Put it up.  (Pause).

7        THE COURT:  All right.  Take it down.

8        MS. FLETCHER:  May I continue, your Honor?

9        THE COURT:  I am looking for the records to 206 B.

10       Proceed.

11       MS. FLETCHER:  Shahram Ketabchi told you he just

12  glanced at Government Exhibit 206 B, but he read all of the

13  other Joseph Freeland charge-back documents carefully.  Read

14  his post-its.  You saw these this morning, and he knew when he

15  won the charge-back, Government Exhibit 234 F, because the

16  funds were credited back into the A1 business account.

17       He also saw other complaints, including an attorney

18  general complaint from --  you saw this on Friday.  She told

19  Elizabeth Andiorio, the investigator from Passaic County, that

20  the loss was a $7,000 loss for a website for a person with no

21  internet.  Shahram Ketabchi, of course, denied seeing this one

22  as well.

23       You also, not in here, but you also saw his response

24  to this.  You saw he actually submitted Ms. Zahn's contract to

25  the investigator.  That is Government Exhibit 517.  In addition

1    to Ms. Zahn, you saw the complaint to regulators by Chris

2    Klevjord, the handwritten her letter she wrote shutting down

3    the account so he couldn't get access to them any more.  Here

4    is the complaint that was found in Shahram Ketabchi's

5    apartment.  When he got that complaint, he responded by

6    emailing Ray Quiles, the fulfillment person, asking for proof

7    of fulfillment for Chris Klevjord, 911, government Exhibit 450.

8           Even though Shahram Ketabchi saw these complaints, he

9    saw victim after victim say that they were being defrauded, he

10   continued to fight to get A1's charge-backs reversed.  This is

11   how he participated in the money laundering conspiracy.  He

12   told Arash that they had to fight the charge-backs and win.

13   This is Government Exhibit 1011.  We saw this this morning.

14          He fought to keep -- this is another example --

15   Government Exhibit 1017, he fought to keep Rita Redding's money

16   even though he saw this driver's license photo attached to her

17   fulfillment documents.  This is not the face of somebody with a

18   successful online business.

19          He fought to get Jeanette Waldrup's money back after

20   she explicitly set forth how he was promised earnings.  He

21   disputed those earnings claims in his response to the credit

22   card company.  He also fought to keep Patricia Cabral's money

23   after her son, who you heard from in this trial, made it clear

24   to A1 Business Consultants that his mother had dementia and he

25   wanted to cancel.  This is an email dated December 4th of 2015.

IB5JKET7                         Summation – Ms. Fletcher

1    It is an email to Shahram Ketabchi, Government Exhibit 512.

2            You heard from David Kandar how serious her condition

3    was at the time.  And notwithstanding that, six days later,

4    Shahram Ketabchi continues to seek proof of fulfillment for

5    Patricia Cabral so he and his brother Arash can keep Ms.

6    Cabral's money.

7            Government Exhibit 441, five days later, he submits

8    Patricia Cabral's charge-back, Government Exhibit 230.  He

9    disputed Diane Weissenberger's charge-back, and Charlene

10   Foster's and Joe Freeland's, and he got paid for it.  There are

11   wires from A1 Business Consultants and cash deposits into his

12   account by his brother at ATM locations in New Jersey and in

13   New York.

14           Now, his notes on the charge-back documents and the

15   fact that he is getting paid to do this work make clear to you

16   that he understood exactly what he was doing.  He understood

17   this flow chart.  He knew how the money flowed.  He knew how

18   once a sale was made, the merchant would deposit money into the

19   sales account, the if a charge-back was initiated, the money

20   would be pulled out, Government Exhibit 711, the flow chart

21   that William Sinclair talked you through.

22           What he was trying to do once the charge-back pulled

23   the money out of the sales account, get the charge-back

24   reversed, get the bank to put the money back in the account.

25   That is how he participated in the money laundering conspiracy.

IB5JKET7                         Summation - Ms. Fletcher

1              Why did he need to fight these charge-backs and win?

2     He wanted to keep the victims' money, obviously, but he also

3     wanted to keep these merchant accounts open.  Too many

4     charge-backs meant the merchant accounts would get shut down,

5     so once the charge-back, he got the money back into the

6     account, there was less of a risk of the merchant shutting down

7     the account.

8              What did that mean?  The business could continue to

9     operate, continue to accept victim payments for additional

10    services for supposed online businesses.  This is how his

11    participation helped to promote the money laundering

12    conspiracy -- excuse me -- promote the underlying telemarketing

13    product.  He relied on all of the tools that Bill Sinclair told

14    you someone must rely on in order to fight the charge-backs.

15             He relied on contracts, Government Exhibit 120; and

16    1103, the Diane Weissenberger contract; and 1104, contract with

17    Charlene Foster; and 1137, the template contract that he

18    maintained on his computer; 1140, the template cardholder

19    continuation of services agreement.  You heard from Bill

20    Sinclair two weeks ago and from Michael Finocchiaro today this

21    was a step in making a charge-back dispute successful from the

22    perspective of the telemarketing company.  If they could get

23    the customer to sign this, they had a much higher likelihood of

24    winning the charge-back.  Diane's continuation of services

25    agreement.

1          Now I want to stop for a moment and talk about

2    Mr. William Sinclair.  You heard him testify in early in this

3    trial and you know he testified pursuant to a cooperation

4    agreement with the government.  As you're considering his

5    testimony, I ask you to think about whether he had a reason to

6    lie or a reason to tell the truth.  He told you how his

7    cooperation agreement worked, and his cooperation agreement is

8    in evidence as Government Exhibit 817.  You can look at it.

9          You'll see that the agreement sets forth what he told

10   you over and over again on the stand.  If he tells the truth,

11   he has a chance at a reduced sentence.  If he lies, his

12   agreement will be ripped up and he will be stuck with his

13   guilty plea and will face a potential 60 years in prison

14   without the benefit of the letter from the government.

15         Now, you had the opportunity to compare his testimony

16   with all of the evidence in this case, including with the

17   testimony you heard today from Michael Finocchiaro.  The

18   question is not whether you like William Sinclair, it is not

19   whether you think he is a good person.  He is not.  He

20   defrauded countless victims over the course of several years.

21         The question is whether you think he is telling the

22   truth, and the other evidence in this case tells you that he

23   was.  Now, you saw Jane Thompson's documents.  You actually

24   held them with your hands, the documents that she received when

25   she was provided with a business plan and provided with a

IB5JKET7                    Summation – Ms. Fletcher

1   Corporate Credit products that she purchased from A1.  Now,

2   what you didn't see, but what is in evidence and I point you to

3   is that the documents that Shahram Ketabchi submitted were for

4   all of the other victims who initiated charge-backs look

5   exactly like the documents that Jane Thompson had.

6        So here is Charlene Foster's documents, Jane

7   Thompson's, Rita Redding's documents, Cabral Enterprises,

8   Patricia Cabral.  These are cookie cutter business plans that

9   these victims each paid thousands and thousands of dollars for.

10       This is the cooperation agreement I just mentioned,

11  Government Exhibit 817.  Now, the last way that you know that

12  the defendants are guilty is the way that both of them sat up

13  here and told you lie after lie and gave you excuse after

14  excuse for their conduct.  They told you implausible lies in

15  hopes that you would be fooled just like their victims were.

16  They're hoping to double-down on you.

17       Now, of course, as Judge Stein has told you, the

18  defendant has no burden in this case.  The government has the

19  burden of proof.  It is a burden that we embrace and it never

20  shifts, but the defendants did testify in this case, and now

21  that they've testified, you're entitled to evaluate their

22  testimony, their truthfulness and their motivations just as you

23  would evaluate the testimony of any other witness who is before

24  you.  When you evaluate the testimony of these two witnesses,

25  you can see how it all fits together.  Both of them have a

motive to lie, and both of them did.

Let's talk through some of the lies that they told you when they testified before you.  Andrew Owimrin told you that it was all Brooke Marcus, Emily Miller and Arash Ketabchi.  They took advantage of Ms. Thompson and he was just a hapless observer unaware of the lies that they were telling.  The evidence and your common sense tells you that this makes no sense.  Jane Thompson's testimony and her notes, which are now before you as Government Exhibit 165 A, are crystal clear.  She says it was Jonathan Stewart who sold her the products.  She said Jonathan Stewart tried to get her to purchase three merchant terminals, and Emily Miller told her no, no, just start with one.

If Brooke Marcus was going -- Brooke Marcus, known as Emily Miller -- was going to make these pitches to Jane Thompson, there was no reason for her to involve Jonathan Stewart, Andrew Owimrin.  She could have done that herself, and there certainly would have been no reason for Jane Thompson to pay all of this money to Andrew Owimrin's company, A1 Business Consultants.

Andrew Owimrin also told you that he didn't know what the Element bank account was.  Remember that you saw the Element Business Services checking account that he was on the signature card for that account, and he didn't know why it was created, but he knew exactly why, and so do you.  Olive Branch

1   needed more merchant accounts because they needed to process

2   more victim payments and they needed someone on the inside with

3   access to those merchant accounts so that Olive Branch

4   Marketing could get access to this money.

5          And they trusted Andrew Owimrin.  He was a good

6   salesman.  They trusted him to join their scheme.  They trusted

7   him to handle their money.  That is why he was the signer on

8   the Element account and that is why when he left Olive Branch

9   Marketing to work for Arash.  He took the account with him.  It

10  was Arash who was continuing to use the Element Business

11  Services account.  Those are some of the lies Andrew Owimrin

12  told you when he testified before you.

13         Shahram Ketabchi showed you, he showed you through his

14  testimony that he will literally tell you any lie that he can

15  think of in order to stay out of trouble and disclaim

16  responsibility for what he did.  He told you that the money

17  from Arash was a gift or a loan or a payment for office work

18  that he didn't think he had to pay taxes on, but he had no

19  choice not to pay taxes anyway because he couldn't pay for it.

20         Excuse after excuse after excuse.  He insisted over

21  and over again he just did simple tasks for his brother and he

22  handled charge-backs only on a limited occasion, but the

23  evidence in this case shows you that he did much, much more.

24         He was his brother's man behind the scenes.  He was

25  his right-hand man.  Look at his own words and email and text,

IB5JKET7                    Summation - Ms. Fletcher

1    and when you do, you will see these are words not of an office

2    filing cabinet who was doing simple tasks.  They are the words

3    of Arash Ketabchi's partner.

4         Now, you saw this email, Government Exhibit 423.  He

5    set up the company's forms for responding to charge-backs.  He

6    told you on the stand he didn't talk to salespeople, but

7    Government Exhibit 1005 makes clear to you that he did.  He is

8    referring to a conversation he had with Andrew about Diane

9    Weissenberger's sale in Government Exhibit 1005.

10        In Government Exhibit 1009, he is talking to his

11   brother Arash about how Andrew is happy he made sales.  Arash

12   expresses concern about the merchant accounts holding the money

13   and Shahram responds with emojis.

14        He told you when he testified before you that he

15   didn't know his brother had used the phone name Zack Peterson

16   until listening to the testimony in this trial, but you know

17   from Government Exhibit 246 that it was Shahram Ketabchi who

18   set up these emails including Arash's email Zack at A1 Business

19   Consultants, along with the mails using the phone name names

20   for Andrew and Reagan Owimrin.

21        He was involved in every aspect of Arash Ketabchi's

22   business.  He had copies of A1's bank records in his apartment,

23   Government Exhibit 212 and 213.  He counseled his brother on

24   several different occasions in text messages, and you have

25   these in evidence.  This is Government Exhibit 1012.  He

IB5JKET7                    Summation - Ms. Fletcher

1    counseled his brother to be careful about linking bank accounts

2    from separate entities because the banks would shut them down.

3    Oh, this one, no, they will link and shut down.

4            Government Exhibit 1013, the same thing.  Shahram

5    tells his brother Arash groski, we need to have a million a

6    month merchant credit lines.  Once you add 10 sales better than

7    Andrew and Reagan, boom.  This is not a man doing simple tasks

8    at the direction of his brother.  His is his brother's partner.

9            Government Exhibit 1018, they talk about A1 Business

10   Consultants being on the match list.  Shahram suggested to his

11   brother, Shahram suggested to his brother they should move

12   their merchant accounts international.  Government Exhibit

13   1014, the same thing.  He is asking for addresses not linked to

14   A1 Business Consultants so that he can create alternate

15   business names.

16           And he tells him that the reason you need alternate

17   business names is for the web when they check us out.  What he

18   is referring to there is the merchants, when the merchants

19   check out the businesses online, they need to show legitimacy.

20           He filled out all of these loan applications and

21   merchant applications for his brother, Government Exhibits 222

22   through 225, including some entities in Manhattan.  He received

23   numerous emails from the credit card processors, pointing out

24   red flags related to the A1 business and Element merchant

25   accounts, emails where the credit card processor talks about

1   throwing Element under the bus and lots of red flags going off

2   with respect to the bank accounts.

3          More emails, 428.  He helped his brother Arash figure

4   out whether the salespeople were getting paid the right amount.

5   He described it to you as just checking his brother's math, but

6   in order for someone to check the math on Government Exhibit

7   243, you have to understand what you're checking.  He

8   understood to reduce the sales amount by the merchant fees and

9   the commissions of the salespeople.  He denied knowing that

10  Elevated Business was another name for A1 Business Consultants,

11  but Government Exhibit 218 was in his apartment.

12         He met with Arash's lead sources.  You saw this

13  photograph, Government Exhibit 714 is a photograph of Shahram

14  Ketabchi sitting right next to Ryan Hult, who Bill Sinclair

15  told you was the person who was responsible for giving Olive

16  Branch nearly all of their leads during the 2014 through 2015

17  time-frame, and you heard how Shahram Ketabchi tried to make

18  excuses about this photo.  He kept referring to Ryan Hult as

19  his brother's acquaintance.  They're sitting next to each other

20  at brunch in Las Vegas.

21         Ryan Hult was in the the only lead source that Shahram

22  Ketabchi had interactions with.  He got leads from Emily, Emily

23  Miller, that is Brooke Marcus.  There is simply no reason for

24  someone in Shahram Ketabchi's position to be interacting with

25  lead sources if he is just a filing cabinet.  Emily Miller

 1    could have sent this lead list to Arash Ketabchi, but she

 2    didn't, she sent it to Shahram.

 3              THE COURT:  Sidebar, please.

 4              (At sidebar)

 5              THE COURT:  Mr. Paul, your client is waving his head

 6    vigorously negatively.  Undoubtedly, you didn't see it, but he

 7    is objecting quite demonstratively.  Please speak to him.

 8              MR. PAUL:  I will.

 9              (In open court)

10              THE COURT:  Proceed.

11              MS. FLETCHER:  Thank you.  He, Shahram Ketabchi, had

12    wire information for Carl Morris.  Government Exhibit 463, this

13    is the lead source based in Arizona who was responsible for

14    creating the wrap program.  Shahram Ketabchi is sending his

15    brother information on how to pay Carl Morris.

16              And, finally, he helped Arash and his fiancee prepare

17    fraudulent documentation to get a credit card for Daniel Quirk.

18    He told you this morning he just transcribed what he told him,

19    and she provided him with her tax returns but he didn't look at

20    them.  That is the most implausible thing you have heard

21    throughout this entire trial.

22              He is the person nominated by his brother to do the

23    dirty work, to send in the paperwork to get what they need, in

24    this case, claiming Mr. Owimrin made $280,000 a year so she

25    could get a line of credit.  You saw her tax returns,

IB5JKET7                      Summation - Ms. Fletcher

Government Exhibit 215.  All of these documents and more show

you that Shahram Ketabchi was his brother's right-hand man.

His statements to you in this courtroom he was just a

filing cabinet, those were lies, just like when he told the

agents who searched his apartment he had nothing to do with his

brother's business.

MR. PAUL:  Objection.  That is not the testimony.

THE COURT:  I am sorry.  Ladies and gentlemen, you

decide what the testimony was.  What these lawyers say the

testimony is may or may not be true, but you decide.

Proceed.

MS. FLETCHER:  These lies were designed to deflect

responsibility away from him in just the same way that he did

when he testified before you, lies designed to blame everything

on Arash Ketabchi, the same type of lies that Andrew Owimrin

told when he testified before you, that it wasn't him, that he

didn't know, that it was all Arash Ketabchi.

But, ladies and gentlemen, the overwhelming evidence

in this case shows you that the defendants knew exactly what

they were doing when they operated this telemarketing, they

knew they were using telemarketing to steal money from victims

and they were committing money laundering by moving those

victims' through their merchant accounts.

Andrew Owimrin was the frontman.  He was the gifted

salesman who sold his customers lie after lie.  Shahram

1   Ketabchi was his brother's right-hand man and behind the

2   scenes.  He worked hard to keep the money that Andrew Owimrin

3   and the other salesmen stole.  Both defendants are guilty as

4   charged.  Thank you.

5           THE COURT:  Thank you, Ms. Fletcher.  Ladies and

6   gentlemen, it is 10 to 5:00.  I don't think it makes sense to

7   start the summation, the next summation.  I will let you go for

8   the evening.

9           I do want everybody to be able to vote if they so

10  choose tomorrow.  You have the opportunity in these two weeks

11  to participate in two of the wonderful aspects of the American

12  experience.  I mean that seriously.  I mean that very

13  seriously.  The right to sit on a jury, the obligation to sit

14  on a jury and the right, and from my standpoint, the obligation

15  to vote for the candidates that you think should represent us.

16          By the same token, all of the legal wrangling is over.

17  There aren't going to be any more delays because the legal

18  issues are resolved.  We are going to have the two defense

19  summations and then we are going to have the government

20  rebuttal summation and then my charge, and you should get this

21  case tomorrow for your deliberation.

22          With that in mind, I'd like to start at the same time

23  as we have been doing, 9:15.  If anybody feels they won't be

24  able to vote with that time schedule, I'll change it.  If you

25  all feel you can vote, again if you decide to, let's start

1  tomorrow at 9:15.  It doesn't look like anyone is objecting.

2  You have been very timely.  See you tomorrow at 9:15.  Keep an

3  open mind.

4          (Jury excused)

5          THE COURT:  All right.  9:15 tomorrow.  We should be

6  able to start my charge either late morning or early afternoon.

7          Ms. Fletcher, my personal recollection that doesn't

8  matter, and I think what I told the jury is correct, it is

9  their recollection is what matters, indeed, Mr. Ketabchi denied

10  saying that he had nothing to do with his brother's business.

11  I think you asked him if he had said that, and I think he said

12  no.

13          MS. FLETCHER:  That's right, your Honor.  The argument

14  was based on Special Agent Giattino's testimony that Shahram

15  Ketabchi denied it.

16          THE COURT:  It is in the record.  In any event,

17  they'll make the determination.

18          MR. SCHMIDT:  Are we going to get a clean copy of this

19  tomorrow or should I leave them here?

20          THE COURT:  You're holding up the charge?

21          MR. SCHMIDT:  Yes.

22          THE COURT:  We can get it to you now.  Let's see.

23          (Off-the-record discussion)

24          THE COURT:  If you want, we can print it and you can

25  take it.

IB5JKET7                       Summation – Ms. Fletcher

1             MR. SCHMIDT:  That is okay.  I am fine with this to

2    take with me and that tomorrow.

3             THE COURT:  When you come in, you'll have clean

4    copies.

5             (Court adjourned until Tuesday, November 6, 2018, at

6    9:15 o'clock am)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          INDEX OF EXAMINATION

2    Examination of:                              Page

3    SHAHRAM KETABCHI

4    Cross By Ms. Fletcher . . . . . . . . . . .1722

5    Redirect By Mr. Paul . . . . . . . . . . .1756

6    Recross By Ms. Fletcher . . . . . . . . .1760

7    Redirect By Mr. Paul . . . . . . . . . . .1763

8    MICHAEL FINOCCHIARO

9    Direct Q. . . . . . . . . . . . . . . . .1765

10   Cross By Ms. Fletcher . . . . . . . . . .1813

11   Cross By Mr. Schmidt . . . . . . . . . . .1823

12   Redirect By Mr. Paul . . . . . . . . . . .1859

13         GOVERNMENT EXHIBITS

14   Exhibit No.                           Received

15    431   . . . . . . . . . . . . . . . . . .1723

16    433   . . . . . . . . . . . . . . . . . .1725

17    438   . . . . . . . . . . . . . . . . . .1727

18    519   . . . . . . . . . . . . . . . . . .1737

19    520   . . . . . . . . . . . . . . . . . .1739

20    533   . . . . . . . . . . . . . . . . . .1741

21    818   . . . . . . . . . . . . . . . . . .1860

22

23

24

25