IB68KET1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA,

        v.                          17 Cr. 00243 (SHS)

ANDREW OWIMRIN, a/k/a "Andrew Owens,"
a/k/a "Jonathan Stewart," and
SHAHRAM KETABCHI, a/k/a "Steve Ketabchi,"

               Defendants.

------------------------------------x

                              November 6, 2018
                              9:30 a.m.

Before:

                    HON. SIDNEY H. STEIN,

                              District Judge
                              and a jury

                    APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
KIERSTEN A. FLETCHER
ROBERT B. SOBELMAN
BENET J. KEARNEY
     Assistant United States Attorneys

SAM A. SCHMIDT
ABRAHAM J. ABEGAZ-HASSEN
     Attorneys for Defendant Owimrin

KENNETH A. PAUL
JACOB MITCHELL
     Attorneys for Defendant Ketabchi

Also Present:
     CHRISTOPHER BASTOS, Detective NYPD and HSI
     CHRISTINE LEE, Paralegal Specialist USAO
     SAMUEL TUREFF, Paralegal

IB68KET1                    Summation – Mr. Schmidt

1              (Trial resumed; jury not present)

2              THE COURT:  Good morning.  The jury is here.  I am

3    having my deputy pass out to counsel the very final jury

4    charge.

5              Mr. Schmidt, you had asked about that.

6              MR. SCHMIDT:  Thank you, your Honor.

7              THE COURT:  The printer put a line in the same place

8    on each page.  Just ignore it.

9              Let's bring this jury in.

10             I remind everyone, lawyers and clients, not to display

11   emotion, not to display negative feelings or positive feelings

12   about what is being said.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Please be seated in the courtroom.

3          Good morning, ladies and gentlemen of the jury.  We

4    now are going to hear the defense summation by Mr. Schmidt on

5    behalf of Mr. Owimrin.

6          Remember, listen to what he has to say, but also

7    remember that you decide what the evidence is.

8          Mr. Schmidt.

9          MR. SCHMIDT:  Good morning, ladies and gentlemen.

10   While they tell us all the time that every vote counts in a

11   general election, this is a little different.  This one you can

12   really picture how every single vote counts, because the

13   government has the burden of proving beyond a reasonable doubt

14   to every single one of you.  And that's a great burden.  And

15   while it may seem unfair for the government to go first and

16   last, and I used to think that, it really isn't.  What it does

17   do is tell you really the significance, the importance, the

18   reality of the presumption of innocence and the burden of

19   proof.  It is real.  It is important.

20          It's important because Andrew Owimrin is represented

21   by me.  I am not a member of a government.  I am not a member

22   of a firm of a thousand people.  I have two young men helping

23   me trying to protect Andrew from the charges brought, not by

24   these very competent intelligent young people, but by the

25   government, with their resources, with their power, and their

1    persuasion.  That's why they go twice, but that's why they have

2    that very, very heavy burden.

3            Everyone's life, including Andrew's, have many

4    chapter.  Each chapter is important to understand who Andrew

5    Owimrin is, what he is capable of doing, what he did do, if the

6    government proved what they said he did.  Each chapter is

7    essential for your understanding to make a determination, not

8    whether Andrew Owimrin was part of Olive Branch Marketing or A1

9    Business Consultants.  Of course he was.  It's not whether he

10   made these sales.  Of course he did.  Obviously, not all the

11   sales that came out were made by Andrew.  For example, the sale

12   made to Patricia Cabral had nothing to do with Andrew, either

13   in the sale or in the aftermath.  But it is important to look

14   at the whole picture.

15           Previously, I talked to you about the drop in the

16   bucket, that over a course of two years you might have thought

17   it was a drop and it was nothing, but by the end of two years

18   you had an overflowing bucket.  So you do have to remember that

19   while obviously events, such as involving Jane Thompson, went

20   over months, that the development of Andrew Owimrin as a

21   telemarketer in the, quote, biz-op's world, took place over a

22   long period of time.

23           And our instincts tell us that when you develop an

24   opinion, an idea, a consciousness of something, you become a

25   fan, that seeing something that doesn't quite go along with

1     that is excused.  It's excused because everything has

2     exceptions, everything doesn't work perfectly right.  But if

3     you're trained and you believed, and if you honestly believed,

4     and you see something a little bit different, it does not make

5     the same impact.  You're looking more for the impact of

6     something that agrees with what is going on, or what you

7     believe is going on.

8            And we are not here to decide whether Andrew Owimrin

9     didn't make a mistake, that he was wrong, that he should have

10    known better.  We are here to decide whether the government has

11    proved beyond a reasonable doubt that he knowingly and

12    intentionally, basically was a fraudster.  Knowingly and

13    intelligently.

14           Now, knowingly to some extent can be objective, but

15    intentionally is personal.  It's personal and different for

16    everybody.  And there is no question in my mind that many of

17    you sitting here, if you were approached on the telephone by

18    anybody who worked in biz-ops, would immediately assume scam.

19    There are some of you that you listened to the phone and it

20    took you a while before you realized you didn't want anything

21    to do with this.  Everybody is different.  The victims are

22    different.  The people who didn't become victims are different.

23    Just as the people who got involved are different.

24           We saw three people who were customers, and I am not

25    going to argue, they were victims of a fraud.  The exact type

IB68KET1                    Summation - Mr. Schmidt

of fraud, maybe I could have a discussion, but that's not
important, it was a fraud.  And we saw the son of one person.

        Now, we saw a very small time frame, very small number
of the people that Andrew came in contact with.  So don't lose
sight that this was the selection by the government to prove
their case.  They picked what they thought was the best, and
they left out the other 97 percent.  And I'm not going to argue
with you that the witnesses have a right to be angry and
aggrieved.  And you saw the anger expressed in different ways.
You saw the way Ms. Thompson expressed her anger, her anger at
anybody sitting at that table, assuming that they must be
involved in this.  You saw how Ms. Weissenberger expressed her
anger.  You saw Mr. Kandar express probably a mixture of anger
and disgust.  I am not going to say they shouldn't.  I can't
tell you how I would feel if my mother would have been in the
same situation.  But we are not here for that.  We are here to
make a determination about all of the evidence -- what they
said, what they said that appears correct, what they said that
appeared mixed up with another company, and the other
evidence -- whether it proves beyond a reasonable doubt that
Andrew Owimrin had the knowledge and had the intent to be a
defrauder.

        I left off Ms. LaMorte when we were talking about
that.  While Ms. LaMorte's testimony had some mistakes, and I
will go over that with you, Ms. LaMorte did not express the

1  anger as the other people did, and probably because she did not

2  lose the $8500 that she could have lost, because she did the

3  smart thing and called her accountant and canceled.  So she is

4  probably not as angry.  But don't forget that she lost money

5  with a person who, unlike Andrew Owimrin, was Mr. Stroud who

6  pushed and pushed and pushed and threatened.

7          Mr. Stroud, he may have been a fraud.  He certainly

8  didn't treat her very well.  Andrew Owimrin did, because he is

9  different.  And that's the kind of way you see how, yes, he can

10  be in the midst of some of these sharks, but he still can be

11  Andrew Owimrin, and he still can believe what he is doing is

12  not a crime, not wrong, until, of course, he sees, like you

13  see, everything put together, things in black and white, that

14  he did not know before, and he sees that this is a fraud.

15          Before we get actually into the case itself, we do

16  need to start with who Andrew Owimrin started out to be,

17  because you can't understand how he could believe that he was

18  doing the right thing unless you know him.

19          So we start out in 1989 when he was born to a mother

20  who emigrated from Greece and a father who emigrated from

21  Jordan.  He had three brothers, but the brothers, the one

22  closest to his age was already six years older.  So these were

23  not just brothers, these are people who he looked up, he

24  followed as a younger brother who is much younger does.

25          He is the person that when his father needed him to

leave school after the tenth grade, he left school after the tenth grade and worked for his father. Does that impact on somebody? Of course it does. It impacts on their education. It impacts on their life experience. It impacts on many things.

He worked for his father when his father could no longer work for the business. He ended up in maintenance and working in restaurants as a busboy, delivery boy. He worked at jobs where you follow the boss, what the boss tells you, or you get into trouble. You don't think beyond what is clear to you in the beginning. If it looks right, you accept it. Unfortunately, he went into a business where listening to his boss has put him here before you, with them trying to convict him of two very serious crimes.

So instead of becoming a police officer, where he would have to wait to go into the school, he went with his cousin and met three men: Bill Sinclair, Michael Finocchiaro and Arash Ketabchi.

Now, for my own sake, and probably yours, I am probably going to call them Bill, Fino and Arash so I get it straight.

Bill Sinclair was con man extraordinaire. Just compare him with Fino. It's just day and night. He can sell anything. He sounds like he can sell anything. As easy it was for him to become the manager of training and quality assurance

1    at The Tax Club, the ease it was to get Andrew Owimrin all

2    excited for this young man to make money, like $80,000 a year,

3    to explain how easy it's going to be, how we will train you,

4    how we will show you how.

5              When he is trained, and obviously not formally

6    trained, but as he testified, he would come over and talk to

7    him about what to do, he watched other people, and he learned

8    his own way to do it.  Now, we certainly know his own way is

9    not the same way as Arash's.  But when you're training somebody

10   and you explain to them what you can't do, you can't make

11   earnings claims, but we want you to -- you can't make earning

12   claims, do they tell you that the reason they don't want you to

13   do earnings claims is not because it's the wrong thing to do,

14   but we want to stay under the radar, we want to be near the

15   line, we want to be in the gray area?  No, of course they don't

16   say that.

17             And when they give you an example of how to talk to a

18   customer, in a way that leaves a positive feeling with the

19   customer that this item will be helpful to them, do they say,

20   look, we are going to explain to you how to really make an

21   earning claim in a different way just so we don't go over the

22   line, we stay in the gray area?  No, they don't do that.  They

23   tell him, this is the way you can do it and this is the way you

24   can't do it.

25             And they had rules and they have forms.  And you will

1   see the forms.  It's in evidence.  We read from one.  The

2   government showed others.  There are people who make mistakes,

3   as Andrew has made mistakes.  Each one of the forms found in

4   the evidence seized by the government about Andrew, eight of

5   them were put in, and some of them are not particularly

6   terrible, they are wrong, but it shows that clearly he is not

7   doing what some of the other guys are doing.  And you can take

8   a look at the form, and we showed one of them during Fino's

9   testimony of DiQuarto, who is not one of the good guys in what

10  he said.

11          Now, again, you sit there, and you saw the room where

12  the government said all this occurred and you saw the desks.

13  And the government is saying, well, of course he had to hear

14  Arash saying everything.  Of course he heard Arash yelling when

15  he was yelling and loud when he was loud.  But that doesn't

16  mean when somebody is making an earnings claim, knowing that

17  they are not supposed to, that they are going to broadcast it

18  in the room.  They are not going to do it.  They are going to

19  do it more quietly or in the bathroom or a closet.  They are

20  not going to broadcast the bad stuff.

21          And yes, Andrew saw the bad stuff.  Andrew made some

22  mistakes.  He was fined.  Other people were fined.  He was

23  warned.  People were warned.  One actually left because of the

24  fines.

25          So from a person who has no experience, not only in

1  telemarketing, but in any kind of sales, who is given the rules

2  and sees how the rules are actually followed, not perfectly,

3  not every single time, but he sees the rules, that reinforces

4  him that there is a right way to do it and the wrong way.  It's

5  not presented as there is the wrong way and less wrong way, as

6  Bill Sinclair tried to show us.  It's presented as the wrong

7  way and the right way.

8        Now, I can't come in here and tell you that the right

9  way that was taught was absolutely right.  I have a tendency to

10  doubt it, but that's not the issue.  The issue is, does he have

11  a good faith reason to believe that the right way was the right

12  way, and he kept it to the right way, that he was doing what he

13  was supposed to be doing?  I don't even want to put the word

14  legal or illegal in it because he is trying to do it the right

15  way.  No one is talking to him about this is a crime, you could

16  get arrested for fraud.  It's the right way or the wrong way.

17  It's what he believes.

18        While it's really hard to prove what somebody

19  believes, his Honor will charge you that there is no magic to

20  it, you have to look at what the person does to find out what

21  they intended and what they knew, and that's absolutely right.

22  So Andrew spoke to you, and I will discuss that later, and

23  explained what he intended.  But from many of his actions, or

24  lack of actions that others did, it's consistent with him in

25  good faith believing what he was doing was not wrong.

IB68KET1                    Summation - Mr. Schmidt

1          One of the important things when you're trying to

2     figure out what a reasonable doubt is, and it sort of explains

3     itself, if what I tell you about this case resonates, makes

4     sense, so it's consistent with what you determine what happened

5     to some degree, well, that's sort of saying to you, then that's

6     a reasonable doubt.

7          More importantly, if you're taking a flight from here

8     to England, and they were working on the plane before you take

9     off, you don't want a mechanic that seems to know what they are

10    doing, or probably knows what they are doing; you want a

11    mechanic that knows what they are doing.  Now, you can't know

12    about anything absolutely, but when was the last time anyone

13    took a flight on what is now -- I forgot the name of the

14    airline down in Florida that crashed with all these oxygen

15    tanks and all these tanks aboard.  They changed their name.

16    They lowered their prices to the very lowest to get people to

17    come on because you don't trust them anymore.  You don't want

18    that.  And when you're deciding, you want the airline, if you

19    have a choice, that has had no mechanical problems that have

20    caused any kind of danger to its passengers.  And that's sort

21    of what you're looking for here.

22          Now, Mr. Tureff testified here, and it was for two

23    reasons.  One was the telephone calls between Emily Miller and

24    Andrew and Andrew and Ms. Thompson.  The other one was to show

25    that no telephone calls were made on his cell phone to the

1  customers, during the period they had his cell phone records,

2  that matched up with the period that he was at Olive Branch.

3  That's all.  But why did we do that?  We did that because you

4  saw -- you will see the complaint that Paul Curtis made about

5  him.  And we know that some people did indeed make earnings

6  claims.

7          Then the government brings out from Bill Sinclair, in

8  his nice way, about, oh, people could avoid these monitoring by

9  using their cell phone.  So that would explain why there is

10 nothing real serious against Mr. Owimrin.  But if you see from

11 his records that we put in, and the testimony, not a single

12 sale that he made, that we had proof of that he made came, from

13 his cell phone, period, up to the point when he moved to A1 for

14 the few weeks they did not have landlines.  But at Olive

15 Branch, none.  He did not do it.

16         He was not sneaky in any way.  He was not Pete

17 DiQuarto.  He was not Chris Wilson.  He did not get customers

18 to get another credit card so he could change the billing from

19 one credit card to the other one so they can't charge back.  He

20 is not one who got the people to send in cash advances and send

21 it in and pay for it so they can't get chargebacks.  He did not

22 tag team with Arash Ketabchi to bulldoze a potential customer.

23 He did not do those things because that is not who he is or how

24 he learned to do that job.

25         And how did he learn to do that job?  He told you when

IB68KET1                     Summation - Mr. Schmidt

1    he answered a couple of questions from the judge.

2              Can everybody see it?

3              Now, that's just not an answer he made up here.  This

4    is how he thinks, how he does.  You can take a look at one of

5    the calendar entries in AO13, where he explained to you, he

6    never sold the logo before.  So what did he do?  He brought

7    somebody over who sold the logo, who knew what to answer, and

8    he split the sale with him.  That's what he does.  That's not

9    what a bad salesman does.  It's somebody who is trying to do it

10   the right way.

11             Now, the government eventually understood what the

12   purpose was of bringing the telephone numbers in.  In its

13   summation it says that, "Management decided that it wasn't in

14   the interest to monitor calls and salespeople like Andrew

15   Owimrin were free to make any representations because no one

16   would hear him as long as he is careful."

17             Two things are wrong with that.  One, it's not

18   terribly clear whether it's a year or two years they had it

19   before they let it go.  They testified that they did not tell

20   the salespeople that they weren't monitoring them anymore

21   either.

22             It is clear that if you came from Tax Club and you

23   knew how all of this worked, like Bill, Mike and Arash and

24   other salespeople, and you knew how all these sales started,

25   and if you knew the limited value of some of the

1    products -- and some of the products seemed absolutely full

2    value, some of them seemed overpriced, and some of them seemed

3    like garbage -- if you knew all of that, you're guilty of a

4    fraud, there is no question about it.  But we are not here to

5    decide what those people did.  We are here to decide -- I think

6    that everyone understands that Andrew came in with no idea.

7    You are really here to decide that if he worked during that

8    period of time that he worked, how could he possibly have not

9    known what was really going on?  You have to ask that question.

10   If you don't ask that question, I don't know what to say,

11   because that's the question that brings us here.

12           You learned how everything worked.  The salespeople

13   made the sales.  We will talk about the sales in a little

14   while, especially the ones where there is more evidence.

15   After they make the sale, what happens to that person, in this

16   case, Andrew?  If it's a credit card, they go to Bill's office

17   to make sure that there is sufficient money in there to close

18   the contract.  Then it goes to compliance.

19           And everybody keeps on calling compliance secretaries.

20   Well, maybe you can call them a secretary, but often

21   secretaries know more about what is going on than their bosses.

22   So they go to a secretary that has a conversation with the

23   customer and goes over step by step of the contract to make

24   sure the customer understands.  And if the customer doesn't

25   understand, it's either the salesman coming in to answer the

IB68KET1                    Summation - Mr. Schmidt

1    questions, or if he is on the phone with somebody else, it's

2    Bill or Fino coming in and answering the questions, and I can't

3    answer for what Bill or Fino said, but Andrew will answer the

4    questions.

5          The first appointment is made with fulfillment.  A

6    welcome, whatever, is given.  And the office then is basically

7    done if everything goes smoothly.  If it's an LLC, the

8    fulfillment people take over.  They make some phone calls to

9    the customer to get the information so that they can get all of

10   the documentation so they can give that information to the

11   person who is going to file that LLC in that state.

12         If it's a business plan, corporate credit, something

13   that requires both a generic booklet, where there is no

14   evidence that he ever saw the booklet, it gets sent out and

15   appointments are made for them to have training with people

16   from fulfillment about the business plan, or how to take step

17   by step of corporate credit.  And even if it takes two years to

18   get corporate credit because the person has nothing to show

19   before that, it takes two years.  If the person is actually

20   running a business, or has run a business in the past, it's

21   obviously going to take much less time.  If the person has

22   really good credit, it's going to take less time.  If

23   everything goes smooth, Andrew doesn't hear from those people

24   anymore.

25         Fino came up and testified that, Oh, we were getting a

1    lot more problems, and it's obviously because they were not

2    being fulfilled properly or sometimes explained to the

3    customers, and it was his job to try to do what is called a

4    save.  He said Andrew is one of the people he asked to do the

5    save.  And it's not a surprise.  You saw the way Andrew talks.

6    But it really was left, at least in my mind, that it was the

7    whole period of time of saves, that included chargebacks, that

8    he would be talking to customers.

9          But on cross-examination it made it clear.  He talked

10   to a few customers that occurred between the third day, for

11   people under 65, to the 14th day of people over 65, if they

12   wanted to cancel, not chargeback, cancel their agreement.  And

13   we know from Ms. LaMorte's testimony that she canceled.  Either

14   Andrew called her, which is probably more likely, or she called

15   him to find out what was going on.  That's what he did.

16         We didn't do this in court here after he got arrested.

17   He didn't have this conversation with her because he thought he

18   was going to get arrested.  This is who he is.  This is the

19   person that Andrew Owimrin is.  This is the antithesis of a

20   fraudulent biz-op salesman.  This is a decent, honest human

21   being who has been pitched and sold by his boss that what he is

22   doing is legal.

23         Don't do that.  That's earnings.  You can't do that.

24   Stay within the guidelines.  Sometimes they are a little wrong.

25   That's the way you do it.  This, I say to all of you, is one

1    very important piece of proof that he is not a person who

2    intends to defraud.  He doesn't even intend to bully anyone

3    doing anything they don't want.

4         If you take a look at the calendars that we put into

5    evidence and he talked about, they are in evidence -- there's

6    about 34 of them, or something like that -- you will see the

7    nature of the customers that he usually speaks to, the way he

8    deals with them.  That's Andrew Owimrin.

9         Now, Bill Sinclair, you saw him on the witness stand.

10   At times he was very good.  At times he was looking like he

11   just didn't want to answer my question.  He wanted to make it

12   sound worse for my client, in a way that really can't be so

13   much contradicted by my client.  All of a sudden they are going

14   to throw the book at him because they think he's lying.  But

15   sometimes he says a little bit too much.

16        So he said Ray Quiles came in, and he came in and told

17   people, you can't make earnings promises, you can't make

18   earning promises.  How many times did Ray Quiles come in to

19   tell salespeople?  Dozens of times.  Let's say three dozen is

20   the number.  I think three dozen is 36.  And we know that in

21   Youngevity that not specific earnings claims, but the general

22   ones of a check within 60 to 90 days, and every two weeks

23   another check, whether right or wrong, was what their bosses

24   told them they could say.  So we are not really talking about

25   those earnings, because those Ray Quiles would not complain

1   about because those were a part of the so-called script.  So we

2   are really talking about before Youngevity.  Youngevity started

3   in about December of 2014.

4          Andrew was there about six months before then.  Now,

5   maybe even the meetings started before with Ray Quiles.  We

6   don't know.  Now, if it started six months before, there are 26

7   weeks in six months.  If Ray Quiles went there 36 times, he was

8   going there three times every two weeks to tell them.

9          And what did even Sinclair say about it?  How

10  regularly were those meetings during 2014, '15?  Well, for a

11  time in that window, we had them on Fridays, but not for the

12  entire time, sometimes we just had them as needed.

13         There is no question that Ray Quiles may have came in

14  and said something, because there were people who did it, and

15  those people were supposedly punished, told that it was wrong.

16  It was reinforced to Andrew, that's wrong, that's right.  It

17  makes it less likely that he is going to think it's obvious

18  that this whole thing is a fraud when they do that.  The more

19  they do that, the more he thinks they are trying to run it the

20  right way.  I'm not saying they did, but it's what he thinks,

21  what this 25-year-old at the time, with a tenth grade

22  education, who has been taught by them, thinks.

23         And notwithstanding Mr. Sinclair's testimony that, oh,

24  training or coaching was separate, or they had to buy it

25  separately, we saw the sales forms from Thoth, and you see that

1    even the basic plan of a business plan comes with two weeks of

2    training, with a document.  You see corporate credit comes with

3    six weeks of training, with other information.

4            Andrew was not part of fulfillment.  Andrew was a

5    salesperson.  He accepted what these things said.  He accepted

6    what was told to him as real.  And the government wants you to

7    say that that's ridiculous.  In Andrew's position, that's what

8    he should have done.  He did not deal with chargebacks in any

9    way.  Oh, yes, he heard sometimes there's a chargeback,

10   somebody is not happy, and he had to pay back his commission,

11   usually in cash for it.  So he knows that to some extent that

12   somebody was unhappy, they didn't want to do it, and you can

13   see in some of the documents why.

14           But he didn't talk to the people who wrote letters to

15   the attorney general or to the credit card company.  He did not

16   deal with that.  He was not involved in any e-mails of any of

17   these discussions, whether at Olive Branch or A1.  The only

18   e-mails we have seen are ones where a list is passed -- lead

19   list is passed on to him, or later on when he passes the lead

20   list to Bill Sinclair.  That's the only times he is in e-mails.

21   We don't see texts about him.

22           So it really comes down to what the witnesses said he

23   said to them, if it was done with the intent to defraud, and we

24   will get to that.

25           So we really have two -- and the reason I am here, and

I am going to be here this long, is because I am defending

Andrew Owimrin really against two frauds.  The first fraud is

he should have known this whole business was a fraud.  And I am

explaining why that is not so, and the government could not

possibly prove that beyond a reasonable doubt for Andrew

Owimrin.  If he knew the breakdown of where the sales went, you

might then have the thought that, hold it, something's not

right here.

         And you know, in the judge's charge for knowledge,

because as I have been saying, and I will keep on saying to

remind you, that he has to knowingly and intentionally commit

the fraud, on the knowingly part, if they prove that he knows

it, that would satisfy the knowing.  None of the government

witnesses said, oh, we told him it was baloney.  They basically

said everybody knew.  Generally, other than those grants, the

ones who knew were the ones who were involved with it before.

It wasn't those new guys who had no background at all, like

Andrew or Reagan.

         So they are going to go to what is called conscious

avoidance.  Conscious avoidance is believing the high

probability of a fact is true, that then gives you the

obligation to see if that fact is true or not.  And if he knew

that the people who sent the leads got 40 percent of the sale,

that the merchants got 15 to 20 or 25 percent of the sale, that

Arash received 2 percent of the sale for any of the

1    salespeople, that the salespeople got 15 percent of the sales,

2    and the fulfillment people only got 10 percent, the people who

3    actually dealt with the product only got 10 percent, then you

4    would be correct if you were going to think that, oh, he

5    consciously avoided checking this out, because how did he get

6    everything done with 10 percent.

7            He did not know that.  He was not told that.  There is

8    no evidence at all.  He thinks this is running like a normal

9    business.  Because he doesn't know any other normal business

10   except for the flooring, pizza and maintenance.  And that gives

11   him no help in knowing what is going on, except for him looking

12   up to these guys that he respects, who he thinks knows it, who

13   are his bosses, who he is enjoying himself there, maybe too

14   much, working there, and he is making decent money.  He's not

15   making $80,000 a year, but he is still making decent money.

16           His trust in these people, though, did cost him

17   something.  And while he is not going to say that it's not his

18   own fault as well, you had these two people, and others, who

19   were using oxycodone.

20           Now, it certainly does not help Andrew doing his job

21   doing lots of pills.  He probably was late.  It certainly may

22   even affect to some extent his judgment for it.  But even in

23   that small area of his life, he is being taken advantage of,

24   without knowing it, by people who are supposed to be taking

25   care of him.  He's asked to pee in a cup so Fino and Arash can

IB68KET1                      Summation - Mr. Schmidt

get drugs and then sell it back to him.  Not tell him, well,
you know, you can go to the same doctor and you can get it
yourself.  No, they are having him do things.  They give him a
few pills, and then they sell it back to him and they make
money on him, and more money and more money, and you heard what
happened.  He lost his home.  He had to borrow money from a
loan shark.  And then his boss helped him by having his uncle
buy the loan and just charging him $1500 a month for a year for
this $8,000 loan.  These are people who are users, who take
advantage of people.  Andrew is a victim of those type of
people.

          Now, I am not saying he is the same kind of victim as
the people who put the money in.  I am saying he is the same
type.  And I tell you, if he had an inheritance before he
started working, Arash would have been all over him to sell him
business opportunities, and he would have fell for it.  That's
the difference between the people who are bad in the industry
from people who are actually trying to do the right thing.

          The government has talked a little bit about grants,
and there is no question that selling somebody a grant that
doesn't exist is fraud.  It can't be anything else.  There is
no evidence that Andrew ever sold a grant.  But what Andrew was
told, and he admitted to you that he knew shortly after he
started working that grants were fraud, what he told you,
basically, is what he understands his business.  His business

1    was they got leads of people who purchased into businesses that

2    were supposed to make money, and that they had the products

3    that were going to help the businesses either do better or be

4    more legitimate or protect the owner -- merchant processing,

5    affiliation Web sites, and drop shipping.

6           Now, a more sophisticated person may have actually

7    looked all this stuff up.  Andrew Owimrin is not that more

8    sophisticated person.  And if you convict him because a more

9    sophisticated person would have done it, then you are making a

10   mistake.

11          He was told, it was explained to him that the people

12   who bought these grant things, it came with one of those

13   entities that had the potential of making money -- the drop

14   shipping, the merchant processing, or the affiliation Web site.

15   And he believed it, and he was selling products for that, just

16   like he was selling for the leads that came from merchant

17   processing, or came from affiliated Web sites, or came from

18   drop shipping.

19          We have heard the witnesses who were victims, who have

20   purchased those things in the past, and that were to them, when

21   they purchased them, real.  And they were as real to Andrew as

22   it was to those people who bought them from other companies.

23          And Andrew sold people, a few times that those lists

24   came through, to try to help their business make money so they

25   could pay off whatever debt and pocket the rest.  And he passed

IB68KET1                        Summation – Mr. Schmidt

1    those on to Bill Sinclair when he was at Arash's, not out of

2    disloyalty, because Arash wasn't selling debt consolidation, he

3    was selling the same biz-op products.  So these could be used

4    by Bill Sinclair, as well as Arash, for those who wanted to

5    consolidate their debt, and he was trying to get in good with

6    Bill so he could come back there.  Now, think of that.

7             (Continued on next page)

1    Now, think of that.  He wants to go back to Bill
2    Sinclair because he thinks Bill Sinclair is absolutely running
3    the company the way it should be.  He has it set up running the
4    company the way it should be, and Arash isn't even doing quite
5    as well as Bill is running it.  That means when he goes back to
6    Bill, he is still sold on the industry, he is still sold that
7    he is not doing bad by what he's doing.

8    Now, the prices of some of the items that he sold just
9    seems a lot.  It seems a lot to me, some of them, some of them
10   not so bad.

11   An LLC costs $125 to file, but most people hire an
12   attorney and accountant to file, and whether it is $900.00 if
13   you look around or $1200 if you go to them, that is not the
14   point.  Search engine optimization, YouTube advertising,
15   marketing, those are real things.  I actually have no idea how
16   much they cost.  I don't know if you know how much they cost,
17   all right, but Andrew knows what they cost because he's selling
18   it.

19   Again it is not right because they're taking 15
20   percent, so obviously -- and the owners are going to take some
21   percent -- so obviously the prices are jacked up than if you
22   search the internet for a company that just did that, and on
23   your own, you may the arrangements and you made the deal, you
24   would probably save 25, 35, 40 or 50 percent.  That is not the
25   crime.  The crime is that the prices were more than they should

1   be if people went out and did it themselves or got legitimate

2   help.  That is not the crime.

3         Well, it might be evidence that, well, he had to know

4   something was wrong.  This is a young man who did maintenance,

5   obviously, for an hourly, he worked for his father, I don't

6   know what he got, and was a busboy in and a pizza delivery guy,

7   right?

8         He has no idea of what these products cost other than

9   they're obviously a little higher than what the people, they

10  went out on their own and did the work, it would cost.  So

11  while the prices sort of are a pain in the back or somewhere

12  because they seemed too high, they're not the proof of him

13  knowing this is a scam, knowing this is wrong, knowing that he

14  should look.

15        In 2014, when he started at -- this was Andrew

16  Owimrin.  He was happy, he was proud, he started to make some

17  money.  (Pause)

18        Now, we now come to the second part, and I am a bit

19  verbose.  I do talk, you can see that.  I do it because I am

20  trying in different ways to have you understand things that

21  sometimes is not easy to understand.  If I was a better

22  speaker, I probably could do it in less time.  I apologize.

23        The second part, the second part is what about the

24  sales that we've heard about?  They don't sound right.  It just

25  gives me -- I don't know the word -- the cooties, that

IB6JKET2                    Summation - Mr. Schmidt

1    listening to these women who were taken for all that money.  It

2    was incredibly uncomfortable.  It was impossible not to be

3    upset listening to them.  I am not asking you not to be.  Now I

4    am asking you to turn the page and start looking at Andrew.

5            No one who is coming back to recall what happened two,

6    three, four years ago, when there was no reason to think they

7    would come to court and have to say what happened, would have

8    perfect memory.  So you can excuse the people who testified

9    that they don't get it absolutely right, but we're fortunate

10   that we have documents to see if they got it right or if their

11   initial statements of what happened sort are skewed towards

12   Andrew's involved, Andrew did this, Andrew, or Jonathan -- I am

13   going to use Andrew because that is his name, and obviously

14   somebody trying to fake their name would not say Andrew Owens

15   instead of Owimrin, right, and give their cell number out that

16   when it comes up on the cell, it says "Andrew Owimrin."

17   Owimrin is not quite as bad as Ketabchi, Ketabchi, which I got

18   wrong a number of times, right, but it is quite understandable

19   why sometimes people use those names.

20           It is important then to see if they're trying to put

21   what happened to them into this one spot that right now has

22   meaning, and the meaning is the case against Andrew Owimrin

23   because he is the one on trial, not the people who sold stuff

24   before to them, but because he's the one on trial.

25           I am not saying this is intentional.  I am not saying

1    that even Jane Thompson who expressed anger and pointed not

2    only to my client, to the co-defendant, he must be involved

3    because he is sitting at that table, there are certain things

4    that are clearly reflected in their notes and is true, and

5    Andrew admits it.  There are other things where it takes sort

6    of an explanation of the notes to get an idea.  The explanation

7    of the notes is where sometimes where mistakes can be made

8    because again you're looking at these years later.

9            I think that Jo Ann La Morte not only was important to

10   show you what kind of person Andrew was every day, but what

11   kind of mistakes that are made under these kind of

12   circumstances.  She did not show the animus.  She is the legal

13   ebilling coordinator.  This is not what the government is

14   trying to say is people have no clue what is going on.  It is

15   clear that sometimes somebody who is older or somebody who is

16   not so old but doesn't quite get it, but can sound like they

17   get it because they want to sound like they get it because they

18   don't want to sound stupid on the phone, they want to sound

19   like they really understand it, might have purchased something

20   that they should not have, but Jo Ann La Morte was not that

21   kind of person.  She clearly understood what she was doing and

22   how she was doing and what she wanted, all right?

23           But when she testified, she testified that Andrew

24   Owimrin was going to sell her -- first, she said that that

25   company, his company, only accepted credit cards.  Now, she

1    also said that that first company, Mr. Stroud said they only

2    took credit cards.  Then on cross-examination, she said ah, I'm

3    not sure about that.  I think he said that.  I'm not sure.

4         Now, I didn't get up and ask the question if you just

5    left it to the government that presents their case because,

6    hey, they're doing their job is their way and they presented

7    that piece, right, and because they're looking for the case

8    against Mr. Owimrin, they put that piece out.  That is why we

9    have a system of attorneys for the defense, because we can look

10   at things differently, and when we look at these things

11   differently, we can see something is not right here because we

12   know, and you can see them in the calendars and you can see

13   them in the testimony of Jane, for example, Jane Thompson, for

14   example, they not only take something other than credit cards,

15   they much preferred taking something other than credit cards.

16   There are no charge-backs.  There is no 15 to 20 percent that

17   is going to the merchant processing.

18        Obviously, they do, they take something other than

19   charge-backs.  She said that she was going to be putting in a

20   website to sell her products.  Now, you saw her contract.  That

21   contract has the exact same wording of every single Youngevity

22   contract has of what is being sold.  What we do know is that

23   Mr. Stroud was going to teach her how to do this, teach her how

24   to use the website and that there were a number of products and

25   they were going to decide which is the best product to put on

1  that website.

2           She took what happened there and put it on Andrew.  He

3  didn't do it because she is out to get Andrew, but this is what

4  happens.  She said that she was going to get money not only for

5  the website they were going to build for her, but for his

6  company's website.  We have seen nowhere that his company has a

7  website that earns money for anybody.  She was mistaken, she

8  was honestly mistaken, but this is what happens when somebody

9  is living their life having contact with multiple people and

10  lose the understanding of which person did what.

11          It happens with her, and she is a small example, an

12  easy example without having to go through, which I will, more

13  to show why she's mistaken.  We're not angry at her.  We

14  understand it, but she makes a mistake.  What happened was she

15  was sold Youngevity with additional products attached to try to

16  sell it and told that the website should be up in a few weeks

17  and that your first check, at this time may have been by 60 or

18  90, I am not sure, and every two weeks thereafter you'll get a

19  check.

20          She's a legal person, and that part was not in there,

21  and so she canceled.  Curiously, there is a contract for Mr.

22  Freeland that is in evidence, and I may or may not have

23  immediate access to that -- thank you -- wonderful technology

24  when it works right, okay?  He was actually promised a refund

25  if he didn't get that check within the first 90 days of

1   activation.  In other words, so it is supposed to be activated

2   quickly.  We honestly know they had a real problem with that

3   for good reason, but once it is activated and you paid for all

4   those other services, the check was guaranteed in 90 days.

5          This is unusual.  If you look at the other contracts,

6   most of them didn't have it, but this is what they were saying.

7   So whether it had it or not, right, we accept full

8   responsibility of this was said, all right?

9          So let's talk about Youngevity.  The government

10  dismissed Youngevity in saying oh, it's just something else.

11  Well, it wasn't just something else to Bill and Mike.  They

12  really thought they were going to have a gold mine, a gold mine

13  for them because they were going to be at the top of the

14  pyramid, right, and they were going to be, oh, my God,

15  legitimate.  They were going to sell something that, indeed,

16  their customers were going to make money.  They didn't get

17  excited to my client like that but, indeed, that is what

18  happened.

19         They were going to get a website, marketing, YouTube

20  promotion, social media promotion, and their customers are

21  going to make money.  Now, I have no doubt that the amount of

22  money that they were going to make was going to be, you know,

23  slow and build up, right, and it probably could take, if these

24  people did nothing, years and many years to get back their

25  money.  If they did something, it would be a lot quicker, but

1    the government kept on having the witnesses testify, kept on

2    saying this is bogus.

3           What did Mike Finocchiaro say when I asked him about

4    making money on Youngevity?  He made money.  He didn't do

5    anything because with the internet stuff, you don't need to do

6    anything.  The product Youngevity is similar to Amway.  You

7    know with Amway, it was sold a lot more, certainly the better

8    product, you put it out and you go to -- I remember a story.

9    My wife told me this.

10          It was some kind of a cosmetics or drinks or

11   something, and she would be getting it from a neighbor who was

12   selling it, and it was one of those kind of Amway things.

13   After six months she started looking online and she started

14   buying it from everybody who was getting out of the business

15   who was selling it at a discount price because they just didn't

16   want to have it any more.

17          Well, that happens.  Certainly people try these

18   businesses, they don't make as much money as they want to, they

19   decide I don't want to put the energy into it, and that's what

20   normal people think.

21          Now, was it the right thing to do to sell to an

22   elderly person who really didn't want to do any work about it?

23   I am not answering that question because that is not the

24   question here.  "Right" is not the question here.  Was it

25   legal?  If you really thought what Andrew Owimrin thought about

IB6JKET2                    Summation - Mr. Schmidt

1    it, was it legal to sell her and say that the company, the

2    company meaning in this case, the fulfillment company, they're

3    doing the stuff for you, they're building it, they're

4    advertising it, you can spend more money down the road for more

5    advertising if you want, but they're doing it, and if they

6    included taxes or bookkeeping on it, there was fulfillment for

7    taxes and bookkeeping.

8          If they wanted to expand, there was Corporate Credit

9    to help them expand to buy the product from Youngevity, right,

10   other than business things so they would not be personally

11   liable.  Now, here is another way the witnesses sometimes don't

12   get it right.  Andrew testified that he thought he sold

13   Charlene Foster Youngevity, and that's why he sold her the

14   things that would match -- help the business afterwards, an

15   upsell.

16         He testified to that because he saw it and saw she was

17   talking about how she is just supposed to go out to the

18   mailbox.  It was wrong.  He made a mistake.  He was confused

19   with her, or he got caught up in what she was saying, okay, if

20   that is what she is saying, that is what I did, right, but he

21   didn't, right?

22         He got a name from a list from a company that sold her

23   a website and a business corporation setup, and that is where

24   he got the lead from, right?  So he was wrong, but she was sold

25   the product before, and that is where he got the lead and that

1    is when he spoke to her.

2           You heard her on there, and she was clearly, she was

3    actually very coherent, but her memory wasn't so good and she

4    admitted it, and Andrew made it clear that if the person

5    sounded like they didn't want it, he wouldn't sell it to her.

6    It is Andrew telling you she didn't sound like that when he

7    sold it to her, and I just want to play that clip over again,

8    the one the government pointed out, and I pointed out that

9    they're trying to make it sound like they're putting one over

10   on Charlene.  Would you play that clip.

11          (Audio played)

12          When he told her that, he testified to that, but more

13   importantly, this is a conversation he is having with Arash

14   Ketabchi.  This is not a sales conversation.  This is not a

15   conversation trying to look at what is best or important; this

16   is talking to one of these aggressive, not great guys who is

17   his boss.  You heard his tone that he was trying to say no, no,

18   that this is okay because of this.  That's the man, that is the

19   man who is now and was Andrew Owimrin.  He was explaining in a

20   tone of voice to his boss why it was all right and we're doing

21   nothing that is a problem.

22          So, yes, it sounds like $20,000, oh, and, yes, $20,000

23   like this, all right, but it is still consistent with what he

24   has been doing.  It may be a mistake and, indeed, probably

25   should have been refunded, but he doesn't control that.  All he

1    knows was a couple of weeks later the money he got for his

2    commission he had to give to Arash Ketabchi, and he had nothing

3    else to do with this.

4              If Andrew was the boss, the money would have went back

5    to her, and we know that she also was confused because Andrew

6    was not the one who said he can go out and you can check the

7    mails, obviously, because he had nothing to do with it.  He

8    didn't sell something that would cause you to do that.

9              She didn't even remember it was her that put the

10   charge-back in only a few weeks afterwards.  The family didn't

11   find out, see the papers until months later.  So she knew that

12   she was getting these phone calls from people who were going to

13   coach her, going to help her, who know the business.

14             She is telling you she's got coaching so she knows the

15   business better, which means she knew that she was paying for

16   something that would give her coaching.  Whether or not she

17   wanted to fully utilize it or not, she basically got the

18   product that maybe she had no use for, maybe civilly she had

19   every single right to get that money back.

20             We are not here in civil court.  We are here in

21   criminal court, and you have to say that he did that because he

22   intended to defraud her of that money, and I am telling you

23   this isn't the evidence that you can use to find that he

24   intended to defraud her.

25             But what we do know, and I have a lot of pages on

1  Youngevity, is that it is clear -- I think I'm going to skip

2  those -- it is clear that Andrew Owimrin thought that this was

3  absolutely legitimate.  This actually was a time where Bill

4  Sinclair and Mike Finocchiaro also thought this was actually

5  legitimate and he could do it, that it would work.  They got a

6  product that they all get money, they all get charge-backs, but

7  the money they will make money and get charge-backs and they'll

8  make more money because everything they sell they get a piece

9  of.

10          If you think you're going to make the money from

11  people they sell they get pieces of, you think they're going to

12  sell.  You think this is going to work.  In fact, it did work

13  for many, many people, and the biggest problem they probably

14  had was that they couldn't get the websites going when they

15  were supposed to because they were supposed to get it in two

16  weeks so the money could flow 60 or 90 days later.  Flow can be

17  a little bit at first, it can be more, it could not nearly be

18  as much as people thought, it is possible, but they thought it

19  was legitimate, and that feeling, that information, that belief

20  was passed onto Andrew Owimrin when he was selling it.

21          We have no defense if you say that selling Youngevity

22  with the promise, as the contract for Mr. Freeland says, that

23  60 to 90 days after it is set up, the website, the first check

24  is going to come, and I submit to you that was no question an

25  honest attempt at sales of Andrew Owimrin.

IB6JKET2                    Summation - Mr. Schmidt

1            Now, we're going to talk about Diane Weissenberger.

2            THE COURT:  Actually, how much longer do you have,

3    sir?

4            MR. SCHMIDT:  About half an hour, 45 minutes.  If you

5    want to take a break now, your Honor --

6            THE COURT:  No.  You really think you have a half

7    hour?

8            MR. SCHMIDT:  I am trying to be honest, your Honor.

9            THE COURT:  Yes, I understand.  I would like you to

10   finish.  Go ahead.

11           MR. SCHMIDT:  Diane Weissenberger --

12           THE COURT:  Is it all right if we keep going, jury?

13           THE JURY:  Yes.

14           THE COURT:  Okay.

15           MR. SCHMIDT:  -- now, she kept her money in.  Let's

16   get one thing clear.  The first sale that was made from the

17   company that Andrew was working at at that time, I am asking

18   you to ignore the names of where the credit cards came out of

19   because they were being used simply so they can charge cards on

20   that, and while, yes, it is sort of not great, I know sometimes

21   I get a credit card, my wife says to me what is that?  And the

22   name means absolutely nothing to me, I will Google it to find

23   out what it was, oh, it is a restaurant.

24           Using a credit card name is not the greatest, but I

25   don't think that means much here.  She bought Youngevity.

IB6JKET2                        Summation - Mr. Schmidt

Nowhere is there anyplace indicated that she did a charge-back

on Youngevity.  There is none whatsoever.  Now, the big issue,

though, is supposedly he is selling twice Corporate Credit.

Well, sloppy is not really a crime, though sometimes we think

it should be a crime.  He was in one company and then he was in

another one, so that can happen.

         But more importantly, the original sale was either

13,999 or 14,999, there is some confusion there whether it was

one or the other.  The records that we have that has been put

in evidence for that sale show a sale at $9,999.00.  She was

not charged for the full amount.  She put in that COS, right,

for -- that's how much was charged for that sale.  She put the

COS for $5,000.00.  That is a refund.

         So basically a third of that sale she did not get

charged for.  One of the three things that here was Corporate

Credit, so if she didn't get charged for it, she didn't get

charged for the Corporate Credit, take it out, then it is not

double-charging on October 7th when Andrew made a sale of that

and some other items.

         Now, this was an unusual case to me because he's at

one company for the first sale and another company.  He has

different names.  That is because he changed his name from one

company because he went to a different company and he did not

want to get confused with the company he was working for

before.  It is also because of all these future sales, but what

1   is clear is that she did not get double-charged for the

2   Corporate Credit.

3            That us not the only thing that happened to her.  She

4   said that Andrew sold her and made a promise that she was going

5   to -- I take that back -- it wasn't a promise.  It was one of

6   those spin things.  She had a goal of a hundred thousand

7   dollars, six figures, in one year.

8            Now, we've heard everybody talk about Youngevity.

9   You've heard the Bill and my talk about it, right, and when

10  asked and pressured, they say some people made 200, 100, 400,

11  $800.00, you know, there is no place where anybody would have

12  room for saying within a year Youngevity is going to make six

13  figures.  It is just ridiculous.  There is no way that the

14  Youngevity salesman could possibly have said that and, in fact,

15  there is no charge-back for that sale.

16           The products he sold when he went to A1 were not

17  products that make you money.  These are products that help

18  whatever is in existence run better and maybe make money easier

19  and protect you.  What we do know from her purchases is that

20  she purchased before anything from Andrew, she purchased things

21  that were related to selling merchant processing.

22           This is one of the things that we get and we can never

23  see.  It is a lead list, right?  And eventually it will get

24  large enough so you can actually read where it says Diane's

25  name on it, right, and it is a lead list which shows Diane

IB6JKET2                      Summation - Mr. Schmidt

1    spent money at a merchant processing company.

2              They'll figure it out.  While we're waiting to figure

3    it out, the information that came out where that she got

4    $7,500, she paid for 700 leads on September 2nd.  $5,000.00 she

5    paid for a thousand leads on September 9th, right?

6              We see sales to Elite, which is billed as Hierarchy

7    and, yes, guess who also is involved in this, a name I want to

8    come back to, Emily Miller, First Trend, Emily Miller, the

9    merchant processing lady.

10             It is clear that what Andrew sold both while he was at

11   Olive Branch and at A1 were the products that he normally sold.

12   He did not sell -- you know, the business plan, et cetera -- he

13   did not sell merchant processing.  He testified he had no idea

14   about it and there is no evidence that he did.  It is the land

15   of Emily Miller sells merchant processing.

16             So while she has a right to be happy, Andrew sold

17   products, one, that she didn't get a cancellation or call back

18   on or the other one was supposed to help her merchant

19   processing.  And again, he does not know that fulfillment --

20   excuse my language -- sucks.  He doesn't get the email from

21   them that is telling them the problems, we are having problems

22   with this person, we are having problems with fulfillment.  He

23   does not get those emails.  He is not part of that, and even

24   though they may say oh, it was a small office, there is no

25   evidence that he got that information.

IB6JKET2                    Summation - Mr. Schmidt

1           Now, we are moving to -- and no personal insult is

2     meant -- the elephant in the room, Jane Thompson.  In reality,

3     Jane Thompson really is only different because of that last

4     sale or the second to last sale, the $149,000 sale that was so

5     big.  That is really the only reason she is different and I'll

6     explain to you why.  She first purchases a whole bunch of

7     stuff.  She has a history of buying things a couple of years

8     earlier where she has a website.  She is getting a bunch of

9     things.

10          Then it comes time where she gets contacted by one of

11    the people at Tristar, I think it is, and they see -- and

12    ultimately, Emily Miller appears.  Can we have Photo 705 up.

13    There she is.  She appears.  You have Jane Thompson who is

14    hesitant, has spent the money.  The name of the first buyer

15    from that company who wants her to spend, Emily comes in and

16    she gets that $50,000 out of her like that, that KB Consultant.

17    Can you put up the KB Consulting check perhaps.

18          What does she actually say about KB Consulting when

19    she's asked?  The transcript.  She says what is KB Consulting?

20    I have no idea.  Was this for merchant terminals?  I think so.

21    Actually, basically she sends the money because Emily told her

22    to.

23          What is really clear, and you can look at her book,

24    and she has that really good book, and you know a lot of that

25    wasn't supposed to -- when that came in, we both agreed to let

IB6JKET2                         Summation - Mr. Schmidt

that in, it helps us.  It helps us show the number of places

where there is, indeed, merchant terminal notes.  Thank you.

You're faster than me.

          These are just an assortment.  It is in evidence and

you'll be able to see it.  This is just an assortment of notes

she has in her books, you can see the different pages of

merchant processing before she has any conversation with Andrew

about it.  The timeline for her is quite important.  So Emily

Miller, right, sells her that $50,000, which is for terminal or

terminal processing or whatever it is, I never learned it, now,

she's doing what apparently this big scam does, moving somebody

who has money over to somebody who else, and, yes, Andrew, this

is one of the few emails he gets that says yes, she has money.

No question about it, he knows she can afford it, all right?

          It could be that she can afford it, but it would be

okay, I have a good one now I can sell good products to, it is

still not fraud because he has the products that he believes

and understands are real.  What does Andrew sell the first

time?  Well, first he talks to her on December 16th.  She

doesn't buy it.  Most of the time as we learned in this, you

talk to the customer right away and you try to make the sale

right away.  Why doesn't she?  Because she talked to Emily

Miller before she wants to spend money, all right?

          And then she spends the money on the 17th, and we know

Emily Miller has been talking to Arash Ketabchi, one of the

IB6JKET2                    Summation - Mr. Schmidt

1    lead people.  That is what he sells.  There is no surprise.

2    This is no shock.  This is the kind of stuff that he sells, and

3    he is clearly selling it to her for her prior businesses

4    because she has a lot of businesses, she has the new business,

5    the merchant processing and the older businesses that she has.

6            Next, and there seems to be -- the next thing she does

7    is speak to fulfillment immediately the next day, and, hey,

8    fulfillment the next day, thank you.  And so she speaks to

9    fulfillment, she is doing and writing out things that are not

10   things that I don't want to do anything at all.  Oh, she

11   doesn't want to have to keep on making phones calls and stuff

12   like that, but she wants to know about the business, she wants

13   to know what is going on.

14           So the next time she has real contact not with Emily

15   Miller, who she speaks to her three, four, five times a day,

16   especially every time that she is thinking about spending

17   money, right?  She really doesn't speak to anybody at A1 until

18   she has this conversation, she has this conversation with

19   Connor and she buys a package of things to make her business

20   better.  These are the kind of things that they sell.  These

21   are the kind of things that they think is real, that would,

22   indeed, help a business.  Is it overpriced?  Yeah, I'm sure,

23   right?  Is it real?  Yeah.  So that is the 29th.

24           So what happens then?

25           THE COURT:  Mr. Schmidt, let's leave that question

1    hanging, what happens then, and I'll give the jury a 10-minute

2    break.  10 minutes, ladies and gentlemen.

3            (Jury excused)

4            THE COURT:  10 minutes, please, and we'll have a

5    sidebar in 10 minutes.

6            (Recess)

7            (At sidebar)

8            THE COURT:  First of all, I've drafted a verdict form,

9    and Ms. Blakely will hand out copies.  Let me know if there is

10   any objection.  I think it is fairly straightforward.

11           Juror No. 13 has been, and when the jury was chosen,

12   he said he had a doctor's appointment on Tuesday and he had to

13   leave by 2:30, and he has raised that a number of times with

14   Ms. Blakely.  Apparently it took him months to get this.  He is

15   No. 13.  I think the jury will get this case either late this

16   afternoon or tomorrow morning.  I think it is appropriate that

17   I let him go at the lunch break.

18           MR. SCHMIDT:  No objection.

19           THE COURT:  There is just a little risk, but we still

20   have No. 14.

21           MR. SCHMIDT:  No objection.

22           MS. FLETCHER:  No objection.

23           MR. PAUL:  No objection.

24           THE COURT:  What I am going to do in an abundance, I

25   won't formally excuse him, but I will explain to him, and you

IB6JKET2                        Summation - Mr. Schmidt

1    will be here, that he doesn't have to come back.

2                MR. SCHMIDT:  Okay.

3                MS. FLETCHER:  On the verdict form, we have actually

4    been exchanging versions of a verdict form and we have an

5    agreed-upon form.

6                THE COURT:  Have you shared it with me?

7                MS. FLETCHER:  We have not.

8                MR. SCHMIDT:  It was going to be a surprise, Judge.

9                MS. FLETCHER:  We do have one we are happy to provide

10   the court.

11               THE COURT:  If you have an agreed-upon form, let me

12   see it, and I won't give you my form, but my form is really

13   good!

14               MS. FLETCHER:  We may prefer your form.

15               THE COURT:  No.  Let me see the agreed-upon form.  If

16   I believe it is accurate, it will be fine.  Can somebody favor

17   me with it now?

18               MS. KEARNEY:  I'll go get it.

19               (Off-the-record discussion)

20               THE COURT:  We're done, Mr. Reporter.

21               (In open court)

22               THE COURT:  All right.  Bring the jury in.

23               (Jury present)

24               THE COURT:  Please be seated.  Mr. Schmidt, you may

25   continue, sir.

1           MR. SCHMIDT:  Thank your Honor.

2           Now, we were talking about the normal things that A1

3    or Andrew were doing, the two packages that were sold were

4    normal packages that he would sell.  We can see even here now

5    the day before, the packet sold by Connor, right, she is still

6    checking out and doing everything related to the package that

7    Andrew sold her.  There is no mistake.  Obviously, not a

8    merchandising processing, nothing to do with it, all right?

9    And then on the 29th we showed you that, that was the other

10   package for the other products, right?

11          It is clear that Ms. Thompson spoke to Emily Miller

12   all the time.  We don't have, unfortunately, those records, but

13   we know from her testimony she spoke to her all the time,

14   especially any time that any kind of money was going to be

15   spent.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1          MR. SCHMIDT:  In fact, she said that, while she was on

2     the telephone on the 29th, that she was speaking to her while

3     she was signing the contract.

4          You see at the bottom she was signing the page.

5          So it is very clear that has constant conversations.

6          Now, December 29, Connor or Reagan sold the last

7     product that A1 sells.  Andrew sold one set of products, Connor

8     sold the other set of products.  They are done.

9          However, it appears that Emily and Arash are not

10    satisfied because they know she still has a lot of money.  So

11    what happens?

12         Let's put up the phone records of Andrew Owimrin and

13    Brooke Marcus.

14         You see.  These are the cell phones.  It doesn't mean

15    it's every single phone call, but after the major stuff is done

16    they are going to be communicating on cell phones.

17         Look at February 4th and 5th.

18         Excuse me.  I take it back.  Look at January 4th and

19    5th on the left-hand side.  Look at all those calls.

20         Why would Emily be trying to talk to Andrew Owimrin at

21    that time?  It's because she has come up with the next plan.

22    Andrew, there is no way, there is no evidence, there is no

23    understanding, there is nothing showing that Andrew Owimrin

24    would come up with a plan to sell merchant processing.  He has

25    never sold merchant processing.  They have showed no evidence

IB68KET3                    Summation - Mr. Schmidt

1    that there was any merchant processing he was involved in.

2              The only time he ever sold a product was Youngevity.

3    So who is coming up with that.  I submit to you based on

4    Andrew's testimony on this and a little bit of Jane that it's

5    Arash and Emily Miller coming up with the idea we have got to

6    sell something else so we can take her money.

7              You know, there is no question in my mind that Emily

8    Miller and likely, but I don't know, Arash Ketabchi were

9    looking now to go after Emily Miller.  Up to that point this is

10   a normal, regular sale for Andrew Owimrin.  But Andrew Owimrin

11   doesn't sell anything.

12             So he gets all of these calls.  And he testified that

13   on the 5th, literally minutes after the last call at 7:28,

14   three minutes, 7:36 he calls Jane Thompson.  Jane Thompson

15   calls him back.  Eight minutes.  That is Andrew Owimrin's

16   feeble attempt to sell merchant processing.

17             Put up his testimony, please.

18             How did that conversation go?

19             One of those conversations where they asked how it

20   went and his answer was:  Bad.  If you can't find it here, you

21   will find it in the transcript.  It went bad.  It went bad

22   because Jane Thompson knew more about merchant processing than

23   Andrew Owimrin.  She has purchased it.  She had many

24   conversations -- and it was in her book.  She had many

25   conversations before and there are ones in her notes after with

1   other people that she had a number of conversations with others

2   about merchant processing and she knew it more.  And that went

3   bad.

4          So what is the result?

5          Please put up Andrew Owimrin/Brooke Marcus telephone

6   calls.

7          There were calls and calls and calls from Emily to

8   Andrew, him returning phone calls, and very likely between

9   Emily and Arash.  Look at all of those phone calls.

10         And what do we have in her notes about conversations

11  that she had with Jonathan Stewart, Andrew Owimrin, subsequent

12  to that date?

13         We have one on January 8th.  It is a reminder to her.

14  It clearly is not the time she spoke to him.  What is she

15  asking about?  The LLC.  What else is she doing?  Fulfillment.

16  That is the stuff that Andrew Owimrin knows about.  That's the

17  stuff that she does.

18         The next time she speaks to him, we have it on the

19  19th of January.

20         Go back and show the list of telephone calls between

21  Andrew -- it's not on it.

22         Obviously the 19th is the call to the landline.

23  Clearly there is not lots of conversations going on, because if

24  you really get somebody and you can't get them on the landline,

25  you give them a call on the cell phone.

1            Go back to that call.

2            So finally they get hold of Andrew and Andrew, with

3    Emily Miller -- Emily Miller is on that phone -- they persuade

4    Jane Thompson to buy a single merchant processing terminal.

5            Now, Ms. Thompson says it's Andrew selling.  And there

6    is no question that Andrew has to initiate that conversation

7    because Emily doesn't want to be the one who is selling it,

8    because she is sort of there but she is not the seller but she

9    is the one who knows what is going on.  She is the one who is

10   having this nice conversation about merchant terminal and how

11   much you can make because Andrew still has no clue about it.

12           Do you have 1193?

13           Here again the conversation -- the testimony.  Again,

14   that's like it.  The calendar is like it.  When he doesn't know

15   what it is, somebody else takes over, and the person who took

16   over here was Emily Miller.

17           I need to go back a second.  I forgot this one.  This

18   is important.

19           After this January 5 telephone call, where Andrew says

20   that it went bad, what does Arash and Emily do?  Emily confirms

21   that Andrew was a mess, and she is saving the phone call

22   because that's what she does.  And Andrew was a mess because he

23   doesn't know damn about merchant processing.

24           Now on January 20, because clearly Andrew is not

25   capable of selling merchant processing, he's not capable of

1    doing beyond what he knew he was able to do, which was to sell

2    those products, the ones he knew he believed were real, the

3    ones he believed would help people, the ones that he believed

4    that was appropriate, Zach Peterson or Arash Ketabchi comes in.

5    And there is a multiple conversation there with everybody.  And

6    he has a conference call on the 20th.

7              Also, if you look on the top also, she is still

8    working out with Steve Blake about those merchant processing

9    things that she is involved with.  And she is still working out

10   on January 26 and January 27 with other people concerning the

11   same kind of stuff, more merchant processing.  She knows the

12   merchant processing field.  She has learned it.  She doesn't

13   know as Emily Miller, but she knows it much better than

14   Jonathan.

15             Then we are up to the February 3rd.  Now, if you look

16   at this, you have some separation here.  Jane Thompson says

17   that it was Andrew Owimrin she talked to about the sale of the

18   business and the money.  Andrew says that he talked to her

19   about the terminals, three, and then gave the phone to Arash.

20   And that is the next portion of it.

21             Now, this is again, without these notes, there is no

22   question that it would be impossible for her to remember who

23   she is speaking to exactly.  It's clear from her testimony that

24   without the notes it would be an impossible timeline.

25             This is the only thing that she has, and this does not

say that she spoke to Andrew Owimrin at that time.  She is
interpreting it.  She is interpreting it because Zach Peterson
is not sitting there, Andrew Owimrin is sitting there, and that
makes it easy.  And I submit to you that she is just wrong.

Now, more importantly, Andrew said he sold three
terminals, $150,000 with all of the normal packages in there.
It's an awful lot of money.  It's tremendous.  It's ridiculous.
$50,000 was a number set by Elite back in the beginning on
September 11, a check that went to BK Marketing or whatever
that company was.  That was what he was told.  $50,000 per
terminal, and that was the number.  And they threw in all the
other things that were sold for the other company.  They put it
all into this company as well that she gets the benefit of it.

He has never dealt like that.  Arash finalizes it and
then he finds out that he also threw in 20 percent of the
business.

Now, I don't know if that was needed for her to make
the deal.  Perhaps.  But what it seems to me is that even if
Andrew learned about that afterwards, A1 Business was making
money.  Arash was making money.  So if he sold 20 percent of
the business, the residuals to her, if Arash was an honest
businessman making an honest deal, she was going to get money
from that.  She was going to get 20 percent basically of the
residuals, which would mean 20 percent of Arash as the owner's
amount.

1    If Arash wasn't an honorable person, we might not even

2  be here because she might have been receiving 2, $3,000 a month

3  or more through the sales of A1.  But we have certainly learned

4  here that Arash Ketabchi is not an honorable man.  And Andrew

5  Owimrin by April wanted to get out of there and work with Bill

6  Sinclair with forwarding stuff and got out of there.

7    But it's easy to say, if you're having a conversation

8  at home, that Andrew did some bad things.  I am not going to

9  argue with that.  I may disagree, but I am not going to argue

10  with you.  That's not what we are here for.  We are here for

11  the government having to prove beyond a reasonable doubt that

12  the things that happened here were not only fraudulent but

13  Andrew joined other people with the knowledge and the intent to

14  defraud people.  Andrew Owimrin did not have that kind of

15  intent.

16    The government did point out one other thing about the

17  last check for $10,000 for income tax.  The previous tax

18  agreement was in existence for the companies that existed

19  before those three terminals.  And actually in Andrew's logic

20  he asked for $30,000 because the terminals were going to be

21  three separate businesses.  So as he believed he was going to

22  charge $10,000 for each business for the taxes, but because he

23  spent so much money he was told you could give it to her for 10

24  or $20,000.  But that was consistent with what he was doing,

25  how he thought it was supposed to run.

1          I know it makes us feel uncomfortable to hear those

2    numbers about it, but that's still what he was taught that he

3    thought was real.

4          Andrew Owimrin testified.  That's part of the case.

5    That's part of what you are going to judge.  He knows he is

6    being accused of the crimes.  He knows that you are going to

7    look at him differently than everybody else because he is

8    accused of the crimes.  But compare him with Bill Sinclair.

9    Even compare Michael Finocchiaro with Bill Sinclair.  Michael

10   wasn't the most forthcoming, but he wasn't Bill Sinclair.  And

11   he agreed with me when I would question him eventually coming

12   to the point of yes.  Bill Sinclair was a completely different

13   animal on the stand.  He was slick.  He was good at answering.

14   He was able to use words.  He was able to spin.  That is a

15   dishonest person.

16         Andrew, and you saw him, the judge asked him

17   questions, it sounded like, and he explained, no, I would sell

18   anything that the company asked me to sell, but if I didn't

19   know about what it was, I would let somebody else do it.  There

20   are so many examples of him testifying in a way that we only

21   hope that people who come before us would talk to us.  And I

22   think that alone should make you comfortable to say this is not

23   a guy who would knowingly and intentionally participate in a

24   fraud.

25         One thing I forgot.  They put in lots of complaints

IB68KET3                    Summation - Mr. Schmidt

from other people for the state of mind of Shahram Ketabchi,

for basically what he saw.  His lawyer will talk about it.  It

didn't come in as to Mr. Owimrin and you're not supposed to

consider it for him, but I want to give an example of one of

them and you can take a look at it.

        Mr. Waldrup, who is Government Exhibit 235.  She made

a complaint and the complaint goes from -- she is talking about

residual income and processing.  And we know that doesn't come

from A1 or Element or any of those companies.  That comes from

something like Tri-Star, and Tri-Star should be familiar to

you.  Tri-Star is another name of the company for Emily Miller.

        So you have someone who is making a claim they want a

chargeback for Element for something that Element had nothing

to do about it.  That's just one example that, going over

everything I noticed it.  There are probably more examples.

        I am thankfully for you just about done.  I covered a

lot.  I tried to cover everything that I thought was important.

Andrew testified, answered my questions, answered the

government's questions, tried to cover everything he could when

he testified.

        The government is going to have that last chance and

they may raise something that I want to so badly get up and

answer, but I can't.  It's not my role to do so.  I'm not

allowed to.  I will get into trouble.

        You should be armed right now with the ability to

IB68KET3                    Summation - Mr. Paul

1    think, what would Mr. Schmidt say if he had an answer for that?

2    You are armed to understand what we are saying that has not

3    been proved, what we are saying is the person who Andrew

4    Owimrin is.  You should be able to answer any question that is

5    raised, whether by the government in their second summation or

6    by another juror in the jury room.

7           The government started out their case saying this is

8    simple.  In some ways there is a lot of simplicity.  It's

9    simple if you make a determination of this case about Andrew

10   Owimrin, whether you think after everything you know that

11   Andrew Owimrin is a shyster, is a fraudster, a person who wants

12   to steal and cheat from little old ladies.  I submit to you

13   that that should be the simple and easy question.  And that

14   question should be there is no way I am persuaded of that.  And

15   then it makes everything so much easier.  You vote not guilty

16   for two of the counts that he is charged with.

17          Thank you very much.

18          THE COURT:  Thank you, Mr. Schmidt.

19          Ladies and gentlemen, now we will hear the summation

20   from Mr. Paul on behalf of Shahram Ketabchi.

21          MR. PAUL:  Good afternoon.  I am sure you will be

22   pleased to note that we are on the homestretch.  So my

23   summation will take us probably to about the lunch break so I

24   only ask that you attempt to listen as carefully as possible.

25   When your stomachs start growling that you try to ignore that.

IB68KET3                      Summation - Mr. Paul

1   It may be difficult.

2           Let me begin my summation by simply joining with the

3   court, and I am sure all counsel, in taking this opportunity to

4   thank you for serving on this jury.

5           Just like you watch us throughout the trial, we watch

6   you.  And I couldn't help but notice that for the most part you

7   have been a very attentive jury.  This is not an easy case to

8   pay attention, be careful to what you're listening to, and

9   applying the evidence as it's presented.  We have told you that

10  there are two trials going on.  As I mentioned in my opening

11  statement, being a juror regarding one trial is difficult

12  enough regarding one defendant, but when you have two separate

13  trials going on, it makes your job that much more challenging.

14          You may also ask for any testimony during this trial

15  that has taken place.  That is your right when you're

16  deliberating.  You will have all of the exhibits available to

17  you as you deliberate.  That is why when trying to review this

18  case and summarize the evidence I have decided to keep my

19  remarks mostly limited to the testimony as presented to you

20  since I am sure you have probably had enough documents to

21  review during the course of this trial without me having to go

22  through them bit by bit.  But you will have that opportunity

23  during the course of your deliberations.

24          I just feel that you have been presented with so many

25  documents and e-mails that if you're like me, your eyeballs

IB68KET3                    Summation - Mr. Paul

must be popping out by now.  So I am going to be showing you
very few documents during my summation and only those to make a
particular point or two.

I will assume you are not terribly sorry to hear any
of that.

In reviewing the trial transcript I started at the
beginning, which I think is appropriate, when Mr. Sobelman gave
his opening remarks on behalf of the government.  Knowing that
what lawyers say is not evidence, nevertheless I wanted to
review what the government was claiming they were going to
prove to you beyond a reasonable doubt, as is their burden of
proof throughout this trial, as you heard and will hear again.

Mr. Sobelman told you that the government was going to
prove -- I emphasize prove -- that Shahram Ketabchi lied to
credit card companies in order to keep the money that
salespeople made.

Where is the proof of that?

I would assume that the government would like to infer
or believe that is true simply based on the documents he
received and forwarded to the merchants.  But as you have
heard, those documents were provided to him from the
fulfillment people.  And after he would gather them, he simply
passed them along to the merchants.  I would submit that is not
proof in and of itself that he knew what was being sold and
provided to the customers may have been based on lies from the

1    salespeople.

2           In fact, as Steven Ketabchi testified himself, he was

3    never privy to anything that took place between the salespeople

4    and the customers and therefore was not aware as to what was

5    specifically agreed to and what was provided beyond what the

6    fulfillment people gave him.

7           In other words, Steven Ketabchi simply knew what the

8    fulfillment people provided to him, usually including tracking

9    numbers showing delivery of products, a signed contract that he

10   would have received from the sales floor where they were kept,

11   and proof that the products contracted were in fact sent to the

12   customers.  He then simply passed these documents along to the

13   merchants.  That's it.

14          Mr. Sobelman went on to claim in his opening that

15   Steven Ketabchi knew, again knew, that the victims had been

16   lied to and that none of them made money.  According to the

17   government's opening, they were going to prove that Steven

18   Ketabchi had blamed the victims.  Those were their words.

19          Where is there any proof of Steven Ketabchi knowing

20   anything beyond what the contract stated as to what the parties

21   agreed to?  Where is there proof that he actually blamed the

22   victims, to use their words?

23          I certainly have not seen or heard any such proof.

24          The government went on to say that Steven Ketabchi

25   knew that the salespeople lied to the victims and took

IB68KET3                    Summation - Mr. Paul

advantage of them.  Where is there any proof of that?  There is

absolutely no evidence of that.  In fact, just the opposite.

Steven Ketabchi never knew what was said or transpired between

the salespeople or the customers.  That much is very clear from

the evidence and the testimony.

        You were told that you will see e-mails between Andrew

Owimrin and Steven Ketabchi discussing the victims who wanted

their money back.  Where is that evidence?  The only

communications we heard that took place between Andrew Owimrin

and Steven Ketabchi was the testimony we heard from Andrew

Owimrin, where he said he communicated with Steven Ketabchi a

few times, and then it was only to pass along Arash Ketabchi's

tax documents and to discuss gift baskets to be handed out to

various customers.

        This simply corroborates evidence of the tasks that

Steven Ketabchi told you he always had done for his brother.

Does that sound like discussions between Owimrin and Ketabchi

about the victims wanting their money back?  I don't believe

so.

        You were also told that you were going to hear from

some -- I emphasize the word "some" -- of the defendants'

partners in crime.  In other words, co-conspirators.  As I

recall, the government only called at this trial one

co-conspirator, who had a cooperation with the government, and

that was Bill Sinclair.

IB68KET3                        Summation - Mr. Paul

1          It was I who called another cooperating witness, who

2     had in fact entered into a cooperation agreement with the

3     government, to the witness stand.  Even though, again, I have

4     absolutely no burden of proving anything since, as you know,

5     that burden always remains with the government.

6          I called Michael Finocchiaro.  And why did I call him

7     as my witness?  I thought it important that you hear from him

8     and hear what role, if any, Steven Ketabchi played in any of

9     this so-called scheme.  As he and Bill Sinclair both testified,

10    it was not much of a role at all, if any.

11         You heard from Michael Finocchiaro that Steven

12    Ketabchi's role was exactly as Steven Ketabchi himself told you

13    in his testimony.  He was given the task of responding to

14    chargebacks by his brother, Arash Ketabchi, when Arash Ketabchi

15    went to start his own floor, namely, A1.

16         Since Steven Ketabchi was so out of the loop regarding

17    this telemarketing business, Arash Ketabchi had told both

18    Michael Finocchiaro and Bill Sinclair to help him learn what

19    had to be done when responding to chargebacks.  Does that sound

20    like someone who is familiar with the business, who knew

21    nothing when it came to anything, including chargebacks when

22    given the task?

23         Does that sound like Steven Ketabchi was anything more

24    than what he told you.  He was equivalent to a low-level clerk.

25    Someone who both Sinclair and Finocchiaro told you had no idea

1    where to even begin in responding to chargebacks.

2            The government would have you believe that since there

3    were complaints from customers that were downloaded onto Steven

4    Ketabchi's computer, along with other documents regarding

5    chargebacks, that somehow Steven Ketabchi must have read these

6    complaints.  Where is there proof of that?

7            The government is asking you to assume things or to

8    conclude that simply because these documents passed through

9    Steven Ketabchi's devices, usually from the fulfillment people,

10   or from the floor making the sale who had the contracts,

11   therefore Steven Ketabchi must have read them and therefore had

12   known as well as understood what those complaints were.  Why?

13   Why is that a fair inference to make, especially after you had

14   the opportunity to listen to Steve Ketabchi and his testimony

15   and, most importantly, closely observed him on the witness

16   stand and evaluated what kind of person he is?

17           He never communicated with the salespeople to learn

18   what was promised to the customers.  And there is no evidence

19   to dispute this.  He was not avoiding speaking with the

20   salespeople to find out what was sold or promised to the

21   customers.  That was simply not something he needed to do.

22   Simply gathering and forwarding documents to the merchants.  He

23   would not ever need to speak to the salespeople about anything,

24   since more than likely that was something that he thought

25   management would or should do.

1    Similarly, Steven Ketabchi never communicated with any

2    customers to find out what their specific complaints were,

3    since that is something he felt was between the telemarketing

4    floor and the customers to work out.

5    Is there any evidence to dispute this?  No.  He spoke

6    to no customers, no potential clients, or victims, as pointed

7    out by the government.

8    You observed my client on the witness stand and you

9    can draw whatever conclusions you want to about Steven

10   Ketabchi.  But clearly I would suggest being on automatic pilot

11   and just literally -- I emphasize literally -- doing what he

12   was told fits exactly within the type of person you saw.

13   That brings me to Bill Sinclair.  The government chose

14   to cut a deal with -- imagine this -- with the ringleader of

15   this entire scam operation.  That's the deal that they cut.

16   The ringleader.

17   He is not some peripheral character who was following

18   what he thought he was supposed to do, or who was gathering

19   papers while in his apartment in California and merely passing

20   them on to the merchant.  No.  Sinclair was the head scam

21   artist or con man.  He and his partner, Michael Finocchiaro,

22   were admittedly engaged for many years in ripping people off,

23   starting in the days as way back as The Tax Club.

24   We learned that Sinclair is facing 60 years'

25   incarceration for his crimes.  We also learned that he is yet

1    to do even one day in jail, except perhaps part of a day he

2    spent while waiting to get bonded out when he was arrested for

3    this case.

4           You can be sure that he is expecting not to have to go

5    to jail for anything close to the 60 years on paper he is

6    facing.

7           This, of course, is thanks to his cooperation with the

8    government.  And once the government submits that magical 5K1

9    letter spelling out how he helped them, he could, conceivably,

10   according to him, receive a probationary sentence.

11          Amazing.  And that is exactly what he is not only

12   hoping for, but expecting.  He has not only conned countless

13   individuals over the many years he has committed the crimes of

14   fraud, but now he hopes to complete his biggest con of all and

15   walk away with little to no jail time.

16          Sinclair is an admitted con man, scam artist,

17   fraudster.  You take your pick.  He has made millions over the

18   years.  We heard that.  Beginning in '08 with The Tax Club he

19   has been engaging in taking advantage of many poor souls who

20   were targeted for any number of reasons, mostly because they

21   had money and they seemed to be easy targets to depart with

22   their money.

23          This guy couldn't decide how to come across to you,

24   the jury, or the judge, Judge Stein, who happens to be his

25   sentencing judge.  On the one hand he admits to selling

1    products that have absolutely no value, such as the grants that

2    we have heard so much about.  And on the other hand he tries to

3    come across that there were so-called lines even he, the

4    biggest scam artist of all, wouldn't cross.

5         The only reason he wouldn't cross them really came

6    down to what we heard, money.  Clearly not because he had any

7    conscience or moral awakening.  He and someone like Michael

8    Finocchiaro, they have no morals.  They have no conscience.

9         Regarding the grants, for example, Sinclair testified

10   that selling them was crossing his so-called imaginary line

11   because he knew the customers were going to get absolutely

12   nothing in return for their investments.  However, crossing the

13   so-called line was not so terrible in his mind if it could make

14   him and his company money.  So what did he do regarding setting

15   up this sham grant program?  He brought some of those

16   characters, who were selling these grants in Arizona, over to

17   his New Jersey office to continue selling this very product.

18        If there was money to be had, he was all in.  If not,

19   he would shut it down.  And it became clear in his testimony he

20   only shut down the grant program, even though it had, according

21   to him, crossed this imaginary line, when there was

22   money -- when money became an issue.  He attempted to sell

23   these grants for a month before shutting the operation down,

24   and that was only due to a money issue.

25        You can be sure if it was a money maker, he would have

1  continued, no matter how many customers were hurt by investing

2  in these grants.

3          You may recall I asked him about other so-called

4  imaginary lines he had, and he told you as an example there was

5  a maximum amount of money to hit any unsuspecting customer up

6  for.  First he said it was $15,000.  That was the maximum.

7  Then when I asked him, well, what about up sales, what does

8  that do?  Well, then we learned it raised it another $10,000.

9  So we are now up to $25,000.

10          Then I asked him about this so-called debt reduction

11  program that we heard about, which he started at Olive Branch.

12  And the figure was then raised to $25,000.

13          Just think about this so-called debt reduction program

14  he initiated, and that tells you the true story about someone

15  like Bill Sinclair.  It is really ingenious if you're someone

16  like Sinclair or Finocchiaro.  Think about it.  From the

17  standpoint of their criminal minds, both Sinclair and

18  Finocchiaro, this was a perfect scam.  Here they had many

19  customers who were people that had already been scammed,

20  already been scammed, by Olive Branch, and have lost in some

21  cases significant amounts of money.

22          So what do they do?  Well, this idea occurs to them

23  that they came up with.  Let's go after these customers again.

24  Why not?  They are in debt.  Thanks to us.  So we will kick

25  them while they are down.  They need to reduce the debt that we

1  caused.  Why not.  Get them for the sale.  Get them up for the

2  up sale.  Put them in debt and go after them again.  That's the

3  kind of people you are dealing with here.  Keep that in mind.

4         This scam that they came up with was just one of many.

5  Because there is no end to it, obviously.  Do you remember the

6  poster I asked Sinclair about that was hanging in his office?

7  The one that was titled Integrity?  Integrity.  I kept

8  thinking, are you kidding me?  This was in your office.  A big

9  poster.  Was this a sick joke?  Or was Sinclair so entrenched

10  in this kind of business of scamming customers that he somehow

11  really thought this was just a regular business, trying to act

12  with integrity?

13         He certainly knew that no matter how many of these

14  so-called ridiculous rules he set up there was no integrity at

15  all involved in the crimes he was committing over many years.

16  Even he couldn't explain the contradiction with this poster and

17  the fraud he was committing.

18         And what did Sinclair tell us about Steven Ketabchi?

19  Not very much.  He thinks he may have met him one time,

20  perhaps, when he saw him in court, but he is not even sure

21  about that.  He confirmed that Steven Ketabchi never worked

22  with Sinclair at The Tax Club, or for him at Olive Branch or in

23  fact anywhere else.  At no time was Ketabchi ever in the

24  office.  As Sinclair testified, Steven only became involved in

25  dealing with chargebacks after Arash Ketabchi split from

IB68KET3                    Summation - Mr. Paul

Sinclair and Olive Branch and thereafter started his own floor
called A1.

According to Sinclair, if Steven Ketabchi had any role
at all to play, it was limited to dealing with chargebacks and
nothing more.  It appeared to Sinclair that Steven had
absolutely no idea how to even begin or deal with chargebacks,
because Steven had reached out to both Sinclair and Finocchiaro
to help them understand what had to be done to contest these
chargebacks.

He also testified that he believed that Steven
Ketabchi had no idea about the pitches his brother, Arash
Ketabchi, was giving to customers.  Or that Arash Ketabchi ever
even told Steven Ketabchi that this operation he was involved
in was a fraud.  Think about that.  According to Bill Sinclair,
given the nature of his contact with Steven Ketabchi, that
Arash Ketabchi had never told Steven Ketabchi that Arash
Ketabchi was in the business of a fraud.  That's exactly what
Steven Ketabchi told you about his knowledge of Arash
Ketabchi's business.

Steven Ketabchi had always thought that his brother
was simply selling products and services and involved in a
legitimate business.  He was never told otherwise.

Ask yourselves, after hearing the testimony, does that
sound like Steven Ketabchi had any knowledge about the fraud
his brother was involved in?  I would submit quite the

1    opposite.

2            The government wants you to infer that Steven Ketabchi

3    must have known this was a fraud based on the documents he

4    received and then forwarded on to the merchants.  You heard

5    what Steven said about these documents.  He saw himself as, as

6    he told the court in response to the judge's own question,

7    merely as a low-level transferor of information from one entity

8    to another.  Gathering and shuffling papers off to the

9    merchants does not make you a knowing participant in a

10   conspiracy to commit wire fraud.  Nor does simply writing form

11   letters in order to respond to chargebacks.  Or discussing with

12   his brother how to set up a model business plan that would

13   work, function and succeed.  None of these make you a knowing

14   participant in a conspiracy to commit wire fraud, as the

15   government would allege.

16           For the most part, it was not Steven Ketabchi's

17   concern as to what was in the papers he received or what the

18   specific complaint from the customer was about.  Because

19   according to him, that was not something he had any power or

20   judgment over.  That was management to deal with and not him.

21           When he happened to read a specific complaint, such as

22   that which was contained in an e-mail to him, that was received

23   from a Brian, claiming that, according to this complaint, the

24   son was complaining that Patricia Cabral was suffering from

25   dementia.  Ketabchi tells you he recalls in this particular

IB68KET3                        Summation - Mr. Paul

1    instance having reached out to his brother to tell him they

2    have to review this and take care of it.  Nevertheless, as we

3    heard, several days later he filed a response to the chargeback

4    dealing with Ms. Cabral.  The government suggests that this

5    shows Steven Ketabchi was callous and only wanted to win a

6    chargeback at whatever cost no matter what.

7         I would suggest that this is further evidence that

8    Steven Ketabchi is the kind of person who is constantly

9    operating on automatic pilot, because, as he saw it, that was

10   his job and he was told by his brother to simply do the job.

11        He wouldn't necessarily recall that when he responded

12   to a particular chargeback relating to Ms. Cabral that was even

13   the same person he discussed with his brother five days

14   earlier.  To him it was just another chargeback to deal with,

15   and he more than likely wouldn't have paid any attention to the

16   name on the chargeback.

17        When you first arrived in this courtroom for the

18   purpose of selection for this trial as the jury, you were told

19   what this case was about.  It was easy from my standpoint to

20   see from that reaction how negatively many responded when told

21   this was a case about telemarketing.  Many in the courtroom

22   responded with a groan.  It was almost worse than you were

23   going to hear a case about murder.  And why was that?  Because

24   most, if not all of us, have been confronted with phone calls

25   from that anonymous voice on the other end, very pleasant

IB68KET3                         Summation - Mr. Paul

voice, trying to sell something to us.  How annoying are these

individuals?  Extremely.

          But one's personal animosity towards telemarketers

cannot cloud your judgment when considering this case.  I say

that because it certainly was not hard to sympathize and feel

terrible for all of the customers who came here and testified

at this trial.  Their stories of how they ended up spending

significant amounts of their money and received little or

nothing in return of what they thought they had agreed to was

simply awful, outrageous, disgusting.  But again, you cannot

let your feelings of empathy for these women interfere with

your job at hand as jurors.  You are here to determine the

facts objectively and apply those facts to the law as Judge

Stein instructs you, without letting your emotions interfere

with your judgment.

          I told you in my opening statement that I probably

would not be asking many questions of any of the victims who

were going to testify at this trial, and clearly I didn't.  And

as you can see from this list of testifying witnesses, one

should be added to this, number 4 would be Ms. Foster, because

she is another one who was a victim of what was going on.

          I told you that I would not have many questions of any

of these people because my client never had any contact with

them, at any time.  There was no evidence presented at this

trial by the government to suggest otherwise.

1    One of these victims, Ms. Jane Thompson, testified.

2    She is someone who lost, unfortunately, a significant amount of

3    money, by willingly agreeing to invest in any number of

4    products or plans where she didn't have to do anything other

5    than wait for the checks to come rolling in.  One cannot help

6    but feel sorry for what Ms. Thompson has been through, having

7    spent and invested her entire 401-k savings.  She is

8    understandably angry, upset, frustrated for allowing herself to

9    be pulled into spending her money with any number of

10   telemarketing companies in addition to A1.

11   But listening to her testimony I was struck about how

12   she allowed her anger to spill over into making improper

13   assumptions about by client.  You may remember that at one

14   point in her cross with Mr. Mitchell she blurted out in anger

15   that she felt that a lot of people conned her, including these

16   two individuals.  Why?  Well, because they are here on trial.

17   That assumption, though I understand was expressed out of anger

18   and frustration by Ms. Thompson, nevertheless is exactly the

19   kind of trap you cannot allow yourselves to fall into.  She can

20   be forgiven for being so angry and upset and wanting to take it

21   out on anyone who may be associated in any way possible with

22   the telemarketing business, but you cannot allow that kind of

23   thinking to infiltrate your decision-making.

24   We know for a fact, notwithstanding Ms. Thompson's

25   expression of anger toward anyone sitting at that defense

1    table, that Steven Ketabchi never had communicated with her or

2    any customer, as I said, at any time.

3         We all remember Ms. Thompson in particular because of

4    the large amount of a check she wrote.  This check that was in

5    the amount of $149,999.  We know this because she testified

6    about it and the government displayed it to you several times.

7    What the government also did in relation to Ms. Thompson's

8    contract with A1 was to introduce exhibits 161 through 163.

9         Could we show Exhibit 163, please, page 6.

10        You have seen this document.  If you notice, you will

11   see that this document indicates that Zach Peterson, who we

12   know is Arash Ketabchi's sales name, looks to be the individual

13   attached to the e-mail of positivefaith@gmail.com, which, as we

14   know, is Steven Ketabchi's personal e-mail account.

15        If we had not presented to you the testimony of

16   Brandon Jelinek, an expert in forensic analysis and IP address,

17   you might well have been left with the wrong impression that it

18   was Steven Ketabchi who had sent this contract to Ms. Thompson.

19        However, as Mr. Jelinek testified, he was in fact able

20   to track down the geolocation of this particular IP address, as

21   shown in the exhibit, and that was found to come from in and

22   around the New York area.  Clearly, clearly, it did not, as you

23   might otherwise have been left with the impression, come from

24   Steven Ketabchi, who at that time, as always, was living and

25   located in California during this time, and not anywhere near

1    New York.

2              Remember, it's not my burden to have to prove anything

3    to you.  But given the exhibits that the government displayed

4    and introduced regarding the contract that was sent to Jane

5    Thompson, and how that might have been very misleading, we were

6    left with absolutely no choice but to present an expert to

7    challenge that possible impression because that clearly would

8    have been a wrong impression left with you by the government.

9              Additionally we learned through Steven Ketabchi's own

10   testimony that he had helped Arash Ketabchi, as he did for

11   almost everything, set up the electronic signature application

12   through Adobe in Arash Ketabchi's name as the user and had used

13   his own e-mail address in that application.  You saw a

14   confirmation of this application by SK-24.  That's up on your

15   screen.  And that is exactly why his e-mail address is

16   displayed in that exhibit for a document Arash Ketabchi clearly

17   had sent under his sales name of Zach Peterson.

18             Mona Ketabchi was called as a character witness.  As

19   you heard, she is a very well educated individual who has her

20   doctorate in psychology and two master's degrees.  She is a

21   licensed clinical psychologist.  What makes her unique is not

22   only did she tell you her opinion of Steven Ketabchi's

23   reputation for honesty and truthfulness being excellent, she

24   told us more.  Of course you may think, well, she is Steven

25   Ketabchi's sister.  I mean, is she going to say anything bad

IB68KET3                          Summation – Mr. Paul

1   about her own brother?  She is only going to say nice things.

2   She is only going to say that he is honest and truthful.  One

3   would expect that.  But she also testified beyond that.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    She testified that Steven Ketabchi has lived a moral

2    and ethical life and has been a role model and father figure to

3    her.  Ms. Ketabchi said both Shahram Ketabchi and Arash

4    Ketabchi are very different in many ways, and that seems

5    obvious from what we know.  She told you that it is an ongoing

6    joke in their family about how Steven Ketabchi and Arash

7    Ketabchi are polar opposites.

8    Steven Ketabchi is very quiet and reserved and Arash

9    Ketabchi is very loud and outgoing.  Given what we've learned

10   in this trial about Arash Ketabchi, that makes sense; and

11   having observed Steven Ketabchi on the witness stand, that

12   would also make sense.

13   She told you about Steven Ketabchi's ongoing

14   relationship over the years with his brother, Arash Ketabchi,

15   and how Steven was like Arash's personal assistant.  Since

16   Arash, according to his sister, tends to delegate a lot of

17   things in his life, coupled with not being very computer savvy,

18   he would rely on Steven to do all of his daily tasks.  She used

19   the examples of booking him a ticket or applying for his

20   insurance, similar to the many tasks Steven Ketabchi testified

21   to on the witness stand as well as the exhibits introduced into

22   evidence by the defense.

23   The exhibits we introduced were just a sampling of the

24   many tasks that were done by Steven Ketabchi and Arash

25   Ketabchi, and they were limited to the time-frame during the

1    period of the charged conspiracy.  These exhibits point out

2    examples of Steven writing letters for Arash regarding his

3    medical condition, another letter for Arash regarding the

4    release of Arash's license plates, or simply applying for Arash

5    and Andrew Owimrin's insurance on their engagement.

6              Let me just go back to Jane Thompson for a minute.

7              Remember Ms. Fletcher, in addition to that exhibit I

8    explained to you was a bit misleading with the email address,

9    Ms. Fletcher said in her summation, and she pointed out

10   documents that were downloaded on Steven Ketabchi's computer

11   referring to a contract by Arash Ketabchi to Jane Thompson.

12             MS. FLETCHER:  Your Honor, objection to this line.

13             MR. PAUL:  I'll move on, your Honor.

14             THE COURT:  All right.

15             MR. PAUL:  That contract, the first contract was in

16   the amount of $9,995.00 and that was sent through Adobe, not

17   sent by the defendant.  That was what we just saw before, that

18   positive faith, that was clearly we know having brought to your

19   attention through an expert that was not from Steven clearly.

20             The second contract was sent to Jane Thompson, and

21   that is the $149,999.00 that we have heard so much about, and

22   that was sent through regular mail, and you were shown by Ms.

23   Fletcher a UPS label that was also downloaded to Steven

24   Ketabchi's computer.  This mailing label had a tracking number,

25   as you can see.  Did the government check perhaps --

1          MS. FLETCHER:  Objection.

2          MR. PAUL:  I don't think I got a sentence out, Judge.

3          MS. FLETCHER:  It is the same objection as the

4     objection to this line, Judge.

5          THE COURT:  Sidebar.

6          (At sidebar)

7          THE COURT:  I am not sure what your objection is.

8          MS. FLETCHER:  Your Honor, the jury will be instructed

9     not to consider investigative steps not taken.  What Mr. Paul

10    is trying to do is argue that the government is being

11    misleading because they didn't take certain investigative steps

12    or didn't present certain evidence.  It is improper for him to

13    do that.

14         THE COURT:  I see.  Just a moment.  I understand.

15         (Pause) Yes, Mr. Paul.  Mr. Paul, you do seem to be

16    starting to say did the government check, trying to verify.

17    Indeed, steps the government took or didn't take --

18         MR. PAUL:  I'll rephrase it, Judge, to say how we all

19    know that we can check a tracking number and determine where it

20    was from.  What is wrong with that?

21         MS. FLETCHER:  The same objection.

22         THE COURT:  Yes.  I do think the only reason you're

23    going to say that, you say that is so that the jury then thinks

24    why didn't the government check the tracking number.

25         MR. PAUL:  Okay.  I'll move on, Judge.

IB6JKET4                    Summation - Mr. Paul

1              (In open court)

2              MR. PAUL:  Would you pull up that exhibit again.

3              You see there is a tracking number there, right?  You

4     also see that the return address is A1 Business Consultants.

5     That is in Wayne, New Jersey, not California.  This mailing

6     label was simply downloaded into Shahram Ketabchi's computer.

7     It is not evidence that he sent this contract or anything else

8     to Jane Thompson merely because he scanned and downloaded a UPS

9     label.  You can take that down.

10             The government, as I told you, called as a witness one

11    co-conspirator who is cooperating with the government; namely,

12    Bill Sinclair, who would, I suggest, certainly not call himself

13    a partner in crime in any respects with Steven Ketabchi.  He

14    can't even be sure if he ever had met Steven Ketabchi, yet

15    alone categorize himself as a partner of any kind.

16             So again though I have absolutely no burden to prove

17    anything to you in this case, I ended up calling Michael

18    Finocchiaro to the stand.  If one is to believe the government,

19    I suppose he is another so-called partner in crime with what

20    was going on.  He also was such a close partner in crime with

21    Steven Ketabchi it is amazing who, too, hardly knew him, my

22    client.  He testified that he wasn't even sure that he ever met

23    Steven Ketabchi, but perhaps maybe at a family barbecue because

24    he knows he hung out with the Ketabchi family; and, therefore,

25    he thinks perhaps Steven was there at one of these barbecues.

1        All he can testify about is that he came to learn from

2   Arash Ketabchi when Arash Ketabchi left Olive Branch that he

3   was attempting to make Steven Ketabchi his charge-back man.  As

4   he pointed out, Finocchiaro came to realize that Steven

5   Ketabchi apparently knew nothing about charge-backs.  That

6   would logically be due to Steven Ketabchi knowing nothing about

7   the telemarketing business.  Finocchiaro was told by Arash

8   Ketabchi to help Steven Ketabchi learn about what to do in

9   order to respond to charge-backs because that was one of the

10   main jobs Finocchiaro did while at Olive Branch.

11        As we heard, Finocchiaro told Steven Ketabchi how to

12   do this.  He told him that one has to gather the signed

13   contracts from the telemarketing fraud just like he did and get

14   the documents from the fulfillment people just like he did, and

15   forward all of these documents on to the merchant with what was

16   a form letter.

17        If there was a tracking number showing the items

18   purchased that actually had been sent out to the customers,

19   then you would include this as well, obviously.  If there was a

20   COS, Continuation of Service, he'd send that as well.  Since

21   Finocchiaro was apparently the smooth-talker in the business,

22   he would also do what he described as saves before respond to

23   go the charge-backs.

24        This was hopefully to avoid, according to him, the

25   customer filing a charge-back at all.  He testified that he

1    does not recall whether he told Steven Ketabchi to try to first

2    save the deal with the customer as he would have done.  In

3    fact, we know that Steven Ketabchi never contacted any

4    customer, so obviously Steven never dealt with any so-called

5    saves.

6              I ask you, having observed Steven Ketabchi on the

7    witness stand, do you honestly believe that he would have even

8    been capable of talking with any customer and try to talk them

9    out of filing a charge-back?  I doubt it.

10             Like Sinclair, Finocchiaro tried to rationalize his

11   scamming by claiming there was a gray area to operate in.  They

12   set up rules to stay off the radar of law enforcement and avoid

13   similar legal problems that were occurring in the Tax Club he

14   was familiar with.  They even hired a lawyer to make it look

15   like they were legitimate.  This was obviously done so if law

16   enforcement closed in on them, they could simply say look, we

17   have a lawyer, we're a legitimate operation.  How more

18   legitimate can you be?  Some people might think otherwise but,

19   nevertheless, they have a lawyer to point to to cover their

20   tracks.

21             What did this retained lawyer do for Olive Branch?

22             Among other things, we heard he handled complaints

23   filed with any number of attorneys general offices and then

24   would, guess what, assume he would do exactly the same things

25   that were done to fight charge-backs.  He would get his hand on

1    the contracts, he would gather the fulfillment documents and

2    fight the claim made by the customer.  Does that sound

3    familiar?

4              MS. FLETCHER:  Objection, your Honor.

5              THE COURT:  Proceed.

6              MR. PAUL:  Thank you.

7              Just like Sinclair, Finocchiaro is facing years and

8    years in jail for his having committed fraud over many years

9    and we learned as well as distributing oxycodone.  He testified

10   that in addition to the fraud he committed, he distributed

11   oxycodone for several years, even sometimes distributed it at

12   Olive Branch.

13             Given his cooperation with the government and this

14   likely magical likely 5K1 letter that will sent to the

15   sentencing Judge by the government, this major con artist also

16   may get little or no jail time for his efforts in helping the

17   government.  Both Sinclair and Finocchiaro were major con

18   artists and have been committing fraud against hundreds of

19   customers for close to a decade, a decade.  These are the

20   people the government chose to cut a deal with and enter into a

21   cooperation agreement.

22             Compare them to Steven Ketabchi --

23             THE COURT:  Excuse me.  Ladies and gentlemen, in

24   regard to the last objection, I do wish to inform you that what

25   that retained lawyer was doing is of no concern of yours.

1          The issue of whether what he was doing was legal or

2     illegal, or permitted or impermissible, or what he was doing

3     period has nothing to do with what your concern is here.  Your

4     concern here is whether the government has proven its case

5     beyond a reasonable doubt against these individuals.

6          That's all.  Proceed.

7          MS. FLETCHER:  Your Honor, the government was about to

8     object to the most recent thing that Mr. Paul said and I

9     thought the court was going to address that.

10         THE COURT:  Let me take a look.  (Pause) Sidebar.

11         (At sidebar)

12         THE COURT:  What is your objection?  He is making the

13    cooperators into the scum of the earth, fairly standard.

14         MS. FLETCHER:  Agreed.  The issue the government has

15    is with Mr. Paul's efforts to question the government's

16    decision to give these individuals cooperation agreements and

17    to invite the jury to compare the culpability of the defendant

18    with these individuals who pled guilty.

19         THE COURT:  Well, yes, he has just done that.

20         MS. FLETCHER:  And that is the problem.

21         THE COURT:  I understand.  (Pause)

22         Your last words, Mr. Paul, were compare the scum of

23    the earth to Steven Ketabchi.

24         MR. PAUL:  I don't think I said that.

25         THE COURT:  No, you did not.

1            MR. PAUL:  I was extending it to my client.

2            THE COURT:  Go ahead.  What is your response?

3            MR. PAUL:  Well, I was simply going to point out that

4    they made deals with, as you pointed out, the scum of the

5    earth, and my client who stands in this trial is involved in

6    this in a limited basis for a matter of a few months and --

7            THE COURT:  Make that argument, but not the comparison

8    to the scum of the earth, alright?

9            MS. FLETCHER:  Or the government's decision-making to

10   offer witnesses cooperation agreements.  We didn't object to a

11   lot of the argument about that, but it is improper.  The

12   government is not on trial here.

13           MR. PAUL:  I am no putting the government on trial.

14   You chose to --

15           THE COURT:  Wait, but Ms. Fletcher is right.

16           You can't make the argument why do they elect to shake

17   hands and enter into a devil's pact with the scum of the earth

18   when my poor guy who is not anywhere near as bad as them face a

19   criminal trial.  You can't make that comparison.

20           MR. PAUL:  I will move on.

21           MS. FLETCHER:  That comparison has already been made

22   in several different ways.  The government would ask for an

23   instruction on that point.  He has already smeared the

24   government's decision to give these people cooperation

25   agreements, called into question our decision not to call one

IB6JKET4                        Summation - Mr. Paul

 1 of the witnesses.  He is absolutely putting the government on

 2 trial here, and it has gone on now long enough that I think the

 3 jury needs an instruction.

 4          MR. PAUL:  What instruction are you suggesting?

 5          THE COURT:  The instruction would be that, "I am

 6 instructing you, ladies and gentlemen, that the decisions of

 7 the government here are not on trial.  It is the defendants who

 8 are on trial."

 9          MR. PAUL:  Okay.  That is fine.

10          (In open court)

11          MR. PAUL:  May I continue, your Honor?

12          THE COURT:  No.  Just a moment.  (Pause)

13          Ladies and gentlemen, I wish to instruct you that the

14 government is not on trial here and its decisions are not on

15 trial.  It is only Mr. Owimrin and Mr. Shahram Ketabchi who are

16 on trial.  The investigative techniques of the government why

17 certain people are on trial here and others are not, whether or

18 not the government gave a cooperation agreement to this person

19 or that person, those things are not your concern.  The actions

20 of the government are not on trial, all right?  The defendants

21 are on trial.  Proceed.

22          MR. PAUL:  Thank you, your Honor.

23          If anything, we get another stretch out of this.  I

24 apologize for some of the interruptions and I hope not to go

25 too far past the lunch hour.

1        We talked about Sinclair and Finocchiaro and their

2   role in this conspiracy.  Steven Ketabchi was brought in by his

3   brother in the fall of 2015 just simply to deal with

4   charge-backs and other tasks such as drafting letters for Arash

5   in order to help his A1 business, and for how long did he do

6   this or engage in these activities?

7        A matter of a few months, that is his involvement.

8   You heard from Steven Ketabchi.  Let me pause for a second

9   because I want to be clear about his testifying.  As you heard,

10  a defendant such as Steven has no obligation -- or

11  Mr. Owimrin -- to testify in their own behalf, but he wanted to

12  because he wanted to explain to you exactly what he was doing

13  for his brother and what was going on in his mind, most

14  importantly, when he was fighting these charge-backs as

15  requested to do so by Arash Ketabchi.

16        How else could you draw any reasonable conclusions as

17  to his thought process if he didn't testify?  Or his knowledge

18  or lack thereof of the fraud being committed?  Or whether it

19  was ever his intention to be part of this wire fraud

20  conspiracy?  And those are two of the elements of the crime of

21  wire fraud that you must find were proven to your satisfaction

22  beyond a reasonable doubt.

23        He told you he thought this was a legitimate business

24  from what he knew from his brother and what Arash had told him

25  about his past employment while selling in telemarketing

1    businesses.  The fact he handled charge-backs and some were

2    actually reversed indicated to him that this was a legitimate

3    business.  Did he ever even attempt to open a merchant account

4    or a bank account to be used in opening up a merchant account?

5    No.  However, he thought it to be part of the business to have

6    more than one merchant account so that you could accommodate

7    the many customers.

8         I'm not sure exactly how you should analyze my client.

9    Let me start by saying that when you are asked to use your

10   common sense, as you are now, in determining the facts of this

11   case based upon the testimony and evidence presented from the

12   witness stand, you also have to evaluate someone by simply

13   observing them.  We always do this in our every day lives when

14   we evaluate someone we meet or in these days evaluating someone

15   who is testifying on the witness stand.  You automatically

16   observe them and draw certain conclusions about them which goes

17   beyond listening to just what they're telling you.  You draw

18   these conclusions about the individual simply by looking at

19   him.

20        For an example, I don't know about you, but in

21   observing Sinclair on the witness stand, I constantly felt like

22   I needed to rush home and take a shower.  That was my

23   observation.  You had an opportunity to watch Steven Ketabchi

24   as he testified, and I ask your forgiveness, Steven, but what I

25   am about to say should come as no surprise to my client because

IB6JKET4                        Summation - Mr. Paul

1   we discussed this before.  For starters, I would classify

2   Steven Ketabchi as a geek, or a nerd.  You would have to agree

3   that he is clearly a bit strange or even odd, to say the least,

4   someone who obviously takes everything -- and I mean

5   everything -- as literally as he does is a bit strange.

6         I don't know whether any of you will go out on a limb,

7   are aware of a classic American series of children's books

8   called Amelia Bedelia.  Amelia Bedelia is the title character

9   of someone who takes everything very literally.  As an example,

10  if you told her that people walk in traffic, she would say to

11  herself, okay and then go walk in traffic.

12        I also tease my wife about like Amelia Bedelia, and

13  that is because when she listens to the GPS voice that gives

14  instructions as you're driving and it says "make a right," she

15  makes a right even if it means driving into someone's driveway.

16  That is literally.

17        We saw a perfect example of how literal Steven

18  Ketabchi's mind works when the judge asked him during his

19  cross-examination the following, and this is from Page 1668 to

20  1669 of the trial transcript:

21        "The Court," talking to my client --

22        "You want a definition of complaint?"

23        "The Witness:  Yes, because there is charge-backs.  It

24  is customer complaints.  I can't respond accurately.

25        "The Court:  Well, what is the universe?

1        "The Witness:  What is the universe?

2        "The Court:  You said there's charge-backs.

3        "The Witness:  I'm not an astronomer, but there's

4   stars and planets.

5        The next question by the court -- and then there were

6   a few more questions by Ms. Fletcher before the court said the

7   following:

8        "The Court:  I now realize what you were saying.  When

9   I was asking what is the universe, I meant what is the universe

10  of complaints that you worked on?

11       "The Witness:  I'm sorry.

12       "The Court:  That's all right.

13       "The Witness:  I'm sorry.  My Star Trek mind."

14       That is literal.

15       We all laughed at that time because it was humorous,

16  but in another sense it is kind of sad.  For someone who takes

17  everything so literally I submit was someone who was simply

18  following instructions to the letter and nothing more or less,

19  so if his brother told him to do something in particular, that

20  is exactly what he would do, nothing more or less.  If he saw

21  himself as simply a paper-pusher, then it was not for him to

22  analyze a complaint that may have been filed.

23       As the court suggested when inquiring of Steven, he

24  saw himself as a low-level transferor of information from one

25  entity to another.  Did Steven get paid by his brother to do

these tasks and answer these charge-backs?  Yes.  He told you
he was getting paid approximately 500 a week and certainly
never received any commission like a salesperson would have
because he was not a salesperson.

His brother, who would periodically send him loans or
gifts to help him pay for his rent and other expenses because
he was unable to keep up with his bills while driving an Uber
and a Lyft, that is what his brother did.  His bank accounts,
as testified to by the government's forensic accountant,
Ms. Casanova, he had both cash deposits as well as deposits
from A1 Business that made into his account in the total amount
of $30,325.00.

The first date of any payment from A1 was on December
8, 2015.  That is months after his brother even opened his 401
(k) and asked Steven to handle the charge-backs.  I asked Ms.
Casanova to subtract the cash deposit totals, leaving the
amount received from A1, and she told us that Steven Ketabchi
was left with a total of approximately $20,000 from A1 over the
course of more than a year.

Given the significant money that these frauds were
making as we heard from Sinclair about the many millions he was
grossing, but certainly not paying his taxes, does the amount
of 20,000 sound like Steven Ketabchi was receiving much more
other than loans from cash paid through the A1 account over the
course of a year?

IB6JKET4                    Summation - Mr. Paul

1           Watching Steven, as you did during his testimony, did

2    this milk-drinking individual strike you as a particular high

3    roller?  Does he strike you of even being capable of doing

4    anything illegal?  Did you hear anything in his cross by the

5    government that even suggested he has ever done anything

6    illegal or wrong in his past?  As he ever committed any crimes?

7    No.  Was there any evidence of him ever having been arrested in

8    this case?  No.  No wonder he is still in shock and suffering

9    for what he is going through after being arrested for this

10   crime.

11          We heard testimony about drugs being used and sold in

12   the case by both Sinclair and Finocchiaro.  Did Steven ever

13   sell or even use any kind of narcotics?  No.  Does he fit into

14   the kind of group you have been hearing about?  No.

15          When you examine Steven and compare him to some of the

16   other characters in this case like Sinclair and Finocchiaro,

17   does he even come within the framework of those individuals and

18   how they think and operate?  I don't believe so.

19          There is a definite disconnect with trying to even

20   imagine fitting Steven into this scheme with the likes of

21   Sinclair, Finocchiaro and his own brother Arash.  In observing

22   Steven and listening to his testimony, should it surprise you

23   he became so unglued as he testified to the experience he had

24   when the agents crashed down his door and rushed into his

25   apartment at 6:00 o'clock in the morning of March 21, 2017 with

1   guns drawn and pointed at his head?  His reaction was such that

2   he was literally, again literally reliving the experience as he

3   told you it happened.

4          You can be sure that as upset as he was on the witness

5   stand, he was just like that if not worse when they barged into

6   his apartment.  He told you that he thought at the time why is

7   this happening to me?  I've never done anything wrong.  Why are

8   you here busting down my door, searching my apartment, pulling

9   guns on me?

10          This is not something he was ever familiar with and

11   has no background in.  When told they were there regarding his

12   brother's business at A1, he told them yes, he was aware of his

13   brother's business because he had done clerical work for him.

14          Keep in mind, this search happened some six months

15   after A1 had shut down.  As you learned, Steven Ketabchi is

16   obsessive about record-keeping and organization.  He kept many

17   backup hard drives because he was so obsessive about his

18   recordkeeping and the storing of documents.

19          If he had known this was an illegal scam business,

20   would he have kept all of these records or destroyed them?

21   Doesn't common sense tell you that he thought this was all

22   legitimate; and, therefore, maintained the treasure trove of

23   documents the government seized and are now trying to use to

24   connect him to this crime?

25          There wasn't even a shredder in his apartment and

IB6JKET4                    Summation - Mr. Paul

1    certainly no evidence of any attempt to destroy any documents.

2    In fact, just the opposite.  He stored them.  He kept them in a

3    safe as backups not only for his own documents, his brother's

4    documents, anything he kept.

5            As he testified several times, he saw him several

6    times over the years of dealing with his brother as his storage

7    or file cabinet where he stored all of his brother's documents

8    amongst his own documents.

9            When the government argues that he had on his devices

10   or in his apartment many documents pertaining to charge-backs,

11   the fact that he remembers acting only on seven charge-backs

12   and as was brought out, an additional two consumer complaints

13   that were not charge-backs, does not mean that he did not have

14   additional documents pertaining to other charge-backs

15   downloaded onto his computer.  These, however, were not

16   charge-backs that he personally dealt with or handled.

17           Out of all the hundreds of sales that we can assume A1

18   made, he dealt with a total of seven charge-backs.  Think about

19   that.  Should that have been some clue in Steven's mind that A1

20   was a fraud business?  If anything, given the few that Steven

21   handled, it was a sign of a legitimate business going on,

22   dealing with a few customers who wanted refunds for any number

23   of reasons.

24           What else suggests that in Steven Ketabchi's mind that

25   A1 was legitimate?  Remember that he testified he personally

IB6JKET4                      Summation - Mr. Paul

1    purchased products from the Youngevity program.  He told you he

2    purchased vitamins and other items to sell through his own

3    business called Vitamin Pros.  Did the government even

4    challenge him on this?  No, because they couldn't.

5            Does the fact that Steven actually purchased items

6    from the Youngevity program and became a customer just like

7    anyone else purchasing these items, show that he thought this

8    business was real and legitimate?  I would suggest to you and

9    submit it does.  He is buying the products sold by the

10   telemarketing company that they're claiming he knew was

11   committing fraud.  It doesn't fit.

12           He is obviously a trusting soul.  Unfortunately, his

13   brother, on the other hand, is clearly a con artist.  So there

14   obviously appears to be at least one bad apple in the family.

15           Arash Ketabchi obviously conned his brother into

16   thinking everything was legitimate, and Steven Ketabchi, being

17   the trusting, gullible person, believed him.  As I told you in

18   my opening remarks, where is Steven Ketabchi throughout this

19   entire time that he is doing this work for his brother?  Is he

20   in any of the offices?  No.  Is he dealing with any of the

21   salespeople or know what they're promising the customers?  No.

22           Is he dealing directly with any of the customers?  No.

23           He is in California, away from any of this business.

24   Remember when I told you that the government had introduced a

25   misleading exhibit regarding the electronic signature for Jane

1    Thompson that displayed the positive email of Steven's, and we

2    had to again bring in an expert to explain this, it was not

3    sent from Steven who was in California and not New York.  Where

4    was it sent from?

5           Ms. Fletcher told you that my client lied at this

6    trial certainly about where he learned about Arash Ketabchi's

7    sales name, Zack Peterson.  Clearly and understandably, you saw

8    how nervous he was.  When he said he learned of it during this

9    trial, that obviously is not correct because he had testified

10   on direct that he knew Arash Ketabchi's sales name was Zack

11   Peterson, and you have seen evidence of it.  He told you that

12   this was a common practice for salespeople to use other names,

13   at least that is what he thought.

14          Ms. Fletcher told you in her summation that Steven

15   Ketabchi also told you lies just like when he told the agents

16   who searched his apartment he had nothing to do with his

17   brother's business.  That is not what occurred.

18          First of all, he told you that when he was informed by

19   the agents they were to conduct a search, they were conducting

20   a search regarding his brother's business at A1, he said, in

21   fact, he did work for A1 doing clerical work for both his

22   brother and his floor in addition to his driving for Uber and

23   Lyft.  She also then showed you a photo.

24          Apparently she thought this was ah-huh, we've got him

25   now, he is associated --.

1            MS. FLETCHER:  Objection.

2            MR. PAUL:  -- with a bad character.

3            THE COURT:  Just a moment.  (Pause)

4            The jury will disregard the statement, "Ah-huh, we've

5    got him now."  Just did regard it.  Move on.

6            MR. PAUL:  Ms. Fletcher showed you this picture taken

7    with Steven Ketabchi and his sister and it is taken in Las

8    Vegas, and if we can see the date on this, I believe the date

9    on this -- thank you -- I am really going blind -- May 3, 2015.

10           By this photo, Ms. Fletcher is attempting to prove

11   that Steven Ketabchi knew who Ryan Hult was and his role with

12   Arash Ketabchi, and we know Ryan Hult is in this photograph and

13   we also know that he played a role with leads for Arash

14   Ketabchi.

15           Now, May 3, 2015, Steven Ketabchi didn't even begin

16   dealing with charge-backs for A1 until October of 2015.  That

17   is six months after this photo was taken.  Steven Ketabchi did

18   try to make excuses about this photo, as Ms. Fletcher argued?

19   What he said is he met this individual and simply was

20   introduced to him as one of Arash Ketabchi's friends or

21   associates.  This was all he knew about it, no more and no

22   less.

23           I suppose the government is attempting to argue

24   through this photo what we call guilt by association.

25   Association with someone that Steven Ketabchi is not familiar

1    with or knows anything about is proof about absolutely nothing.

2             Ms. Fletcher argued that the fact that Steven kept

3    post-its on some documents of the status of the charge-backs he

4    handled was evidence that he also read the complaints such as

5    the one from Joe Freeland.  The fact that he was careful in

6    doing his job and checking the status of what was happening

7    with the charge-backs does not lead one to conclude that he,

8    therefore, read the complaints.  As he told you, the complaints

9    were not something he focused on because that was for

10   management to handle, not him.

11            So one should not draw any inferences from his

12   post-its or notes other than they were what he testified to and

13   that they were updates on the charge-backs he was handling, and

14   this, I would submit, is consistent with his personality of

15   being conscientious about the task at hand and what he was told

16   to do.

17            He received no commission for his work in helping his

18   brother respond to the charge-backs.  As we said, money into

19   his bank account, as even Mona said, was often Arash helping

20   Steven out.  Before this trial I doubt many of us even heard of

21   charge-backs.  I know I haven't.  We certainly have had our

22   fill now.  What we have learned together is that we know that

23   charge-backs or contesting charge-backs is perfectly legal.

24   There is nothing illegal about that.  They are something that

25   is common in many industries, and I would assume that

1    telemarketing has more than their fair share.

2             What I hope you also learn from this trial is that

3    simply because Steven Ketabchi's brother, Arash Ketabchi, was a

4    true scam artist just like Sinclair and Finocchiaro, that does

5    make Steven a scam artist as well.  His brother's criminal

6    behavior in this offense should not spill over to him simply

7    because he's Arash's brother.

8             I don't believe Steven is actually even capable of

9    even attempting to commit a crime, yet alone to knowingly and

10   intentionally participate in this wire fraud and money

11   laundering charge.

12            MS. FLETCHER:  Objection; vouching.

13            THE COURT:  Yes.  Ladies and gentlemen, the views of

14   the lawyers on the believability of any particular defendant,

15   their personal view is not at issue here.  It is what the

16   evidence shows or doesn't show.  A lawyer is prohibited from

17   saying "I believe so and so, I disbelief so and so."that is not

18   to be any part of your calculation.  Proceed.

19            MR. PAUL:  Ask yourselves, after you've observed my

20   client and listened to his testimony, ask yourselves whether

21   this individual is even capable of knowingly and intentionally

22   participating in a fraud.  You ask yourselves.

23            I hate to say it, but Steven Ketabchi is kind of a

24   pathetic pawn used by his brother to do his work for him

25   without Arash even ever leveling with Steven about his business

1    being a fraud, and we heard that from Sinclair and Finocchiaro.

2              In evaluating the evidence or lack of evidence against

3    Steven Ketabchi, please use your common sense and ask yourself,

4    after listening and observing Steven up close, did he strike

5    you as the type of individual who would or even could knowingly

6    or intentionally allow himself to be involved in any kind of

7    fraud.

8              This is a person, I would submit, who is afraid of his

9    own shadow, yet alone participating in a crime.  Listen

10   carefully to Judge Stein's instructions on the law.  Listen to

11   his instructions regarding the presumption of innocence and how

12   Steven Ketabchi, as he sits here now, is presumed innocent.

13   Even when you get up after the Judge's instructions later today

14   and go in to begin your deliberations, that presumption of

15   innocence still remains with him.

16             Listen to the burden of proof always being on the

17   government and how that burden never shifts even if the

18   defense, as we did in this case, put on a case before you.  His

19   Honor will also instruct you on conscious avoidance.  In

20   layman's terms what this means is that one cannot put their

21   head in the sand or turn a blind eye in order to remain

22   ignorant of a material fact to escape the consequences of the

23   criminal law.

24             Here I submit Steven Ketabchi certainly did not put

25   his head in the sand so avoid any criminal consequences because

1    he did not think there were any criminal consequences to avoid.

2    If he chose not to read customer complaints or certain emails,

3    that was because in his mind at the time they did not concern

4    what he was doing or the function he was attempting to perform.

5            Additionally, this charge of conscious avoidance keep

6    in mind only goes to the issue of knowledge.  It does not refer

7    to the intent of someone, which is another most important

8    element that the government must prove beyond a reasonable

9    doubt.  Clearly I would submit that the government has failed

10   to prove either element of the offenses charged among the other

11   elements his Honor will instruct you on.

12           The defendant is charged with money laundering.  Where

13   is the evidence against Steven Ketabchi regarding this?  Listen

14   to the court's instruction on all the elements of this crime

15   that have to be met beyond a reasonable doubt as you must

16   listen carefully to the entire charge that the Judge is going

17   to give you.

18           Now, I am sure Ms. Kearney has the right under the

19   rules to sum up and rebut what we've said.  That is the rules

20   we live by.  So she has the last word.  As you know, lawyers

21   never like to shut up, so we like the last word, but we can't.

22   I can't get up here and argue or suggest to you something in

23   contradiction to what Ms. Kearney is going to talk to you

24   about.  So I ask you, as Mr. Schmidt did, think about how we

25   might respond to the arguments presented on the rebuttal

1    summation because we don't have that chance.

2          Now, in conclusion, and I would just like to say in

3    people-making decisions, we make decisions every day of our

4    lives.  Some are important, some not so important.  Where am I

5    going to eat tonight or make a determination for the sake of

6    issues or decisions we made for our loved ones or others.  Some

7    not so important, some extremely important.

8          I don't know where the decision you're about to make

9    regarding this case concerning my client's guilt or innocence

10   fits in that section.  I do know one thing.  The decision

11   you're going to make is going to be the most important decision

12   that was ever made in Steven Ketabchi's life, so use your time

13   carefully, talk amongst yourselves, try to come to an

14   agreement, evaluate the evidence and apply them as you find the

15   facts to the law as his Honor is going to instruct you.

16         I am confident if you apply the facts as you have

17   found them to be, to the law as Judge Stein will give you, then

18   you will come to only one conclusion that makes any sense, and

19   that is that the presumption of innocence that follows Steven

20   Ketabchi even now and into your deliberations has not been

21   shattered and that the government has failed to prove Steven

22   Ketabchi's guilt beyond a reasonable doubt as to each count of

23   this indictment; and, therefore, I submit to you that your

24   verdict should come back as not guilty to all of the counts

25   charged.  Thank you very much.

1           THE COURT:  Thank you, Mr. Paul.

2           Ladies and gentlemen, be back at 2:20.  Keep an open

3   mind.  We will hear the rebuttal summation of the government

4   and my charge and then you'll have this this case for your

5   deliberation.  Keep an open mind.  2:20.

6           (Jury excused)

7           THE COURT:  Counsel, sidebar.

8           (At sidebar)

9           THE COURT:  Mr. Santoro, when you were chosen for this

10  jury, when you were selected, you indicated you had a doctor's

11  appointment on Tuesday and you had to leave by 2:00.  Is that

12  right?

13          JUROR:  I could probably go to 2:30.  It is 4:45 in

14  Mt. Kisco.

15          THE COURT:  Do you still have that appointment?

16          JUROR:  I do.  I didn't cancel it.

17          THE COURT:  What we're going to do, sir, I am going to

18  let you go to that appointment, all right?  You don't have to

19  come back.  For technical reasons, I am not formally excusing

20  you, but it is purely technical.  You can go to your

21  appointment.  You don't have to come back here.  You don't have

22  to check with the clerk or anything like that.  There is a

23  tiny, tiny, tiny little chance I may have to call you, but

24  realistically you're done, right?

25          JUROR:  Okay.

1           THE COURT:  Please don't discuss this with any other

2      jurors because they haven't reached a conclusion on this case

3      yet and haven't started their deliberations.

4           JUROR:  Okay.  Just to be clear, when you say I'm

5      done, I am coming back after lunch?

6           THE COURT:  No.  You can leave the courthouse, go to

7      your medical appointment and not come back until you're chosen

8      for jury duty again or find yourself in this courthouse for

9      some other reason.

10          JUROR:  Okay.

11          THE COURT:  I and the attorneys and the parties thank

12     you for being available and for being here for the past two and

13     a half weeks.  It is very much appreciated.  Go to your

14     appointment.  Thank you.

15          (Mr. Santoro left the sidebar)

16          THE COURT:  Counsel will stay.  This agreement on the

17     verdict form is fine with the Court, except I would like you to

18     put in, "Dated:  New York, New York, November blank, 2018", and

19     instead of by the foreperson, have 12 signature lines, right?

20          Make that change.

21          MR. SCHMIDT:  I never had that before.

22          MS. FLETCHER:  I think I've got that.

23          THE COURT:  See you at 2:20.

24          (Luncheon recess)

25          (Continued on next page)

IB68KET5

```
 1                          AFTERNOON SESSION

 2                              2:20 p.m.

 3              (Jury not present)

 4              THE COURT:  In thinking about the written charge,

 5     which has been accepted, I am going to tell the jury obviously

 6     to disregard that line that's on every single page that the

 7     printer put on it.  And also I thought that I should say at

 8     some point that there has been evidence of crimes, such as drug

 9     possession and distribution of drugs, and the defendants are

10     only charged with the two crimes in the indictment and they are

11     not on trial for any other crime.

12              MR. SCHMIDT:  Your Honor, we are not making that

13     request.

14              THE COURT:  If you'd not, fine.

15              Mr. Paul, it's not relevant to you, I don't think.

16              MR. PAUL:  It's not.

17              THE COURT:  Then I won't.  But you're waiving your

18     ability to have me say that to the jury.

19              MR. SCHMIDT:  That's what I am doing.

20              THE COURT:  Fine.  I think I can understand the

21     reasoning, but I wanted to offer it to you.

22              MR. SCHMIDT:  I appreciate the offer.

23              THE COURT:  How long is the projected rebuttal

24     summation of the government?

25              MS. KEARNEY:  I think between 30 and 45 minutes.
```

IB68KET5                          Rebuttal - Ms. Kearney

1              THE COURT:  Then I intend simply to go into the

2      charge.

3              (Continued on next page)

1              (Jury present)

2              THE COURT:  Please be seated in the courtroom.

3              Ladies and gentlemen, we now will hear the rebuttal

4    summation on behalf of the government by Ms. Kearney.

5              Ms. Kearney.

6              MS. KEARNEY:  Thank you.

7              Andrew Owimrin is not a well-intentioned kid who is

8    oblivious to the fact that the companies that he worked for

9    were defrauding their customers.  He was a salesman who took

10   advantage of unsuspecting victims selling them nonexistent

11   add-ons for their sham companies.

12             Shahram Ketabchi, he wasn't an ignorant paper pusher

13   who was walled off from his brother Arash's criminal scheme.

14   He was his brother's right-hand man, and he worked diligently

15   to protect that telemarketing scheme's proceeds and to keep

16   that company running.

17             Both of these defendants, they want you to believe

18   that they had no idea that anything they were doing, or

19   anything that was going on around them, was illegal.  But if

20   you consider the evidence that was presented at this trial, and

21   even the defendants' own testimony, you know that is not true.

22             Andrew Owimrin and Shahram Ketabchi were well aware

23   that the salespeople at Olive Branch and at A1 Business

24   Consultants were defrauding victims.  Andrew Owimrin was one of

25   them.  And even though Shahram Ketabchi wasn't working the

IB68KET5                        Rebuttal - Ms. Kearney

1    phones, he was responsible for all sorts of functions at A1

2    that gave him insight into the business.  Their e-mail setup

3    with their phone names, their payroll with the salespeople's

4    commissions, their merchant accounts, and most importantly,

5    their chargebacks.

6            Ladies and gentlemen, as you have heard, and as you

7    will hear again, no defendant has an obligation to put on a

8    case and no defendant has an obligation to testify.  But both

9    of these defendants have, and both of them have testified under

10   oath in front of you.  And so as we go on, as I walk you

11   through this rebuttal case, I am going to point out ways in

12   which their testimony is self-serving, in which it doesn't make

13   any sense, in which it's just a flat-out lie.

14           But first I want to talk to you a bit about some of

15   the distractions that defense counsel have put up for you.

16   What the government has presented to you at this trial, and in

17   summation, is the evidence.  It's the facts.  And that's not

18   what you heard from defense counsel, or from the defendants

19   themselves.  A lot of what you heard was designed to distract

20   you from the evidence.

21           Now, the lawyers at this table back here, they are

22   good lawyers.  They are working hard for their clients.  But

23   they are not magicians.  They can't make the evidence disappear

24   and they can't make the facts anything other than what they

25   are.  And so if you focus on the evidence and on the facts,

1    it's over for the defendants.  And so that's why they have to

2    distract you.  That's why they have to get you to focus on

3    other things.  And let's talk about some ways they are trying

4    to do that.

5          First, you have heard a lot of talk about Youngevity,

6    how it's some sort of special program.  You have heard a lot

7    about the other products that Andrew Owimrin and the other

8    salespeople were selling, the LLCs, the corporate credits, the

9    business plans, the tax prep services, the search engine

10   optimization.  Those were the standard biz-op products.  And

11   Mr. Schmidt has talked at length to you about how Youngevity is

12   different from the rest of biz-op, how the sales reps were

13   allowed to make earnings claims, at least at first when they

14   were selling Youngevity.

15         And Mr. Finocchiaro explained to you that at least

16   initially the expectation was that the customers would get some

17   checks within 60 to 90 days, which is why the rules were a bit

18   different.  But then after that sink or swim, the customer was

19   on his own.

20         But Mr. Finocchiaro also explained to you that

21   Youngevity is just a dressed-up version of the classic biz-op.

22   The sales reps then sold the same empty add-ons, the corp

23   credit, the bookkeeping, the biz plan, as they did to their

24   other leads, the merchant terminals, grant leads.

25         So in essence what Youngevity was, it was its own lead

1    generator.  It was another point of entry into a particular

2    victim, another way to get them on the hook and to get them to

3    spend money.  So in the same way that people at Olive Branch

4    sold biz-op to the grant leads and the merchant terminal leads

5    and the people who signed up for coaching, the sales reps could

6    then pile on biz-op services to the Youngevity customers as

7    well.  And that's because the Youngevity customers, like the

8    other leads, they were primed to want those services.

9            And with Youngevity there is also the added benefit

10   that it was Olive Branch that got to keep the profit from that

11   initial sale, not the lead source.  And it was the Olive Branch

12   sales reps who got to keep that commission.

13           But when they are making the sales, the reps are

14   making no distinctions between Youngevity and other biz-op

15   products.  And they sold them in whatever combination that

16   worked for that customer, for whatever price they were willing

17   to pay.  And you know that from looking at the various

18   contracts, from Jo Ann LaMorte's contract, from Diane

19   Weissenberger's contract, from Joe Freeland's contract.  This

20   is just a hodgepodge of things that they cobbled together to

21   make it hit a certain price point.

22           The important thing for you, though, is they needed a

23   platform to put all of those add-ons on.  It didn't matter what

24   they were because the add-ons were nothing.  They were nothing

25   but some pieces of paper and some weekly phone calls to try to

IB68KET5                         Rebuttal – Ms. Kearney

1    string the customer along and keep them on the hook until it

2    was too late to cancel or chargeback.

3          Now, Mr. Schmidt also spoke to you about how Bill

4    Sinclair and Michael Finocchiaro bought Youngevity themselves.

5    And Mr. Paul talked about how Shahram Ketabchi or Steve

6    Ketabchi bought Youngevity himself.  And that too is a

7    distraction.  There is no dispute that it is technically

8    possible to make money from Youngevity, if you're lucky, and if

9    you know how to do it.

10         Now, Shahram Ketabchi already had a vitamin business.

11   He has got a preexisting market for these products.  He doesn't

12   need help getting his Web site off the ground.  And Bill

13   Sinclair and Michael Finocchiaro, they are essentially bringing

14   in all of the Olive Branch customers under them in the pyramid.

15   The customers then push them closer to the top of the pyramid.

16   So any small amount of money that a customer is getting, those

17   checks in 60 to 90 case days, that benefits Bill Sinclair and

18   that benefits Michael Finocchiaro.

19         I will also point out, ladies and gentlemen, that just

20   like when Bill Sinclair had Ray Quiles's fulfillment team do

21   his LLC, that was real.  The paperwork got filed.  But no one

22   was selling biz-op to Bill Sinclair on top of his $125 LLC.

23         Speaking of Bill Sinclair and Michael Finocchiaro.

24   You have heard a lot about the crimes that other people

25   committed during the course of this trial.  And there is no

1   dispute here that Bill Sinclair and Michael Finocchiaro are

2   criminals.  They have pled guilty to those crimes.

3           You have also heard about a lot of other people.  You

4   have heard about Arash Ketabchi.  You have heard about Brooke

5   Marcus or Emily Miller.  And I think you can probably conclude

6   that they are criminals too.  They defrauded victims just like

7   these defendants.  They made misrepresentations to them on the

8   phone, they sold them empty biz-op plans.  But there is no

9   dispute here that there were other people in this scheme.  And

10  there is no dispute here that Arash Ketabchi was heavily

11  involved.  He was even a leader of this scheme.  It's clear

12  that he was an aggressive, pushy, relentless salesman.  But he

13  is not on trial here.  And that doesn't give any cover to

14  either of these two defendants.

15          If anything, what you know about Arash Ketabchi makes

16  it clear that nothing he was doing, not when he was the sales

17  manager at Olive Branch, not when he was running A1, was

18  remotely legal.  And you can tell that just from Government

19  Exhibit 122.  That's the message that was left on David

20  Kandar's voice mail after Arash Ketabchi thought he had hung

21  up.  And it's in that message that Arash and Andrew Owimrin are

22  discussing charging 20 grand more on to Charlene Foster's

23  credit card.  And that's how Andrew Owimrin and Arash Ketabchi

24  talked when they weren't on the phone with a customer and when

25  they weren't testifying in front of you.

1            Andrew Owimrin knew who Arash Ketabchi was.  He knew

2      how he worked.  He learned from him.  And Arash, he was

3      comfortable with Andrew Owimrin.  Remember, he brought him into

4      Olive Branch.  He took him with him when he left to join A1.

5      And he involved him in his other crimes.  He involved him in

6      his narcotics distribution.  It was Arash who asked Andrew if

7      he could use his urine to pass a urine test and get more

8      oxycodone.

9            So there is no reason to think that Arash Ketabchi,

10     the person who is asking Andrew Owimrin to pee in a cup for

11     him, would somehow roll off the fraudulent part of A1 from

12     Andrew Owimrin.  There is no reason to think that he would need

13     Andrew to think that everything they were doing was on the up

14     and up.

15            I want to make one more point with respect to Shahram

16     Ketabchi.  Even if you believe him, that it was all Arash

17     Ketabchi who was doing the fraud, all Arash and the

18     salespeople, he doesn't have to have committed the wire fraud

19     to be guilty of the money laundering.  Because he knew what

20     Arash and the salespeople were doing.  He saw the paperwork.

21     He saw the documents.  And by fighting those chargebacks, by

22     knowingly and intentionally causing transactions in the

23     proceeds of Arash and Andrew Owimrin and the rest of A1's

24     fraud, he knowingly and intentionally caused those transactions

25     to keep those merchant accounts open and to keep A1 in

IB68KET5                          Rebuttal - Ms. Kearney

1   business.

2              What else is a distraction here, ladies and gentlemen?

3   Andrew Owimrin's phone records.  I think that should be clear

4   to you by now.  They don't show texts.  They don't show

5   three-way calls.  And they don't show any calls he made from

6   his office phone.  So what is the takeaway?

7              Well, he used his cell phone to call some of the

8   victims who testified here.  He talked to Jane Thompson a lot.

9   He talked to Brooke Marcus or Emily Miller a whole lot.

10  Nothing more.  Nothing less.

11             And don't get caught up in the IP address that

12  Mr. Paul spoke to you at length about.  That's the IP address

13  that uploaded Jane Thompson's web service and contract.  It's a

14  red herring.  Either Shahram Ketabchi, who is the owner of the

15  e-mail address that the account is registered to, uploaded the

16  document or someone else at A1 did.

17             Now, I submit it's unlikely that Arash, who apparently

18  can't even type two sentences, is the one who uploaded the

19  document.  But that December 29 contract, that's far from

20  Shahram Ketabchi's only involvement with the fraudulent sales

21  that Owimrin and Arash and the other sales folks at A1 were

22  making.  And it's far from his only involvement in the sales to

23  Jane Thompson.

24             Remember all of the documents that Ms. Fletcher walked

25  you through that were found on Shahram Ketabchi's computer.

1    That sham partnership contract.  The cover letters that went

2    with it.  That shipping label.  And the e-mail alerting Shahram

3    Ketabchi that A1 had just made an $149,999 sale.  And setting

4    up that Adobe account, that's far from Shahram Ketabchi's only

5    involvement in this scheme.

6         You have heard a lot about the chargebacks.  But don't

7    forget that it was Shahram Ketabchi who is the liaison with the

8    merchant processing company.  It was Shahram Ketabchi who set

9    up A1's back office.  It was their e-mail, their Web site,

10   their bank accounts.  And the reason for that Web site that was

11   set up -- you saw that in the text messages -- that is to show

12   legitimacy.  That shows that merchant processers do their due

13   diligence when they do research on what A1 is, why they are

14   getting so many chargebacks.  That makes it look like they are

15   a real company doing real things, not defrauding people.

16        It's Shahram Ketabchi who texted his brother Arash and

17   said that they needed that Web site, that they needed to show

18   legitimacy.  And you know, ladies and gentlemen, that that's

19   because A1 wasn't legit.

20        Shahram Ketabchi was involved in sending lead lists to

21   his brother and in making those payments for those lead lists.

22   You saw the e-mails attaching the spreadsheets of potential

23   victims.  You saw the wire information for how to pay the lead

24   sources.

25        You have also heard that A1 had a secretary for rote

IB68KET5                    Rebuttal - Ms. Kearney

1    tasks.  You heard about Jolaina Aziz.  You heard what she was

2    doing.  You heard about the filing she did, how she compiled

3    the documents.  But when there is something truly important,

4    something that is necessary for the existence of the company,

5    Arash doesn't turn to Jolaina.  He turns to Shahram Ketabchi.

6              Fighting chargebacks is the lifeblood of A1.  If they

7    lose those chargebacks, their merchant accounts get shut down

8    and the company can't take in any more credit card payments,

9    they can't defraud any more victims, and they can't exist.  And

10   that is the task that Arash brought to Shahram Ketabchi.

11             Here is another distraction.  The defense, and

12   especially Mr. Paul, talked about what you don't have, what is

13   not in evidence.  Don't get caught up in that.

14             First, as Judge Stein has already instructed you, the

15   government is not required to use any particular investigative

16   technique, and why the government did or didn't use a

17   particular technique is not before you.

18             Second, Mr. Schmidt made reference to not hearing

19   about the other 97 percent of A1's sales.  But look instead at

20   the evidence you have in front of you.  Look at the victims who

21   did testify.  Look at the e-mails and the documents.  Any of

22   those victims that you have heard from, that is more than

23   enough to find that Andrew Owimrin participated in a wire fraud

24   conspiracy.

25             MR. SCHMIDT:  Objection, your Honor.  Can we approach?

IB68KET5                    Rebuttal - Ms. Kearney

1          THE COURT:  Ladies and gentlemen, the elements of each

2     of the crimes of this conspiracy, to commit wire fraud and

3     conspiracy to commit money laundering, will be set forth by me

4     in the charge and you are to follow that charge on the law.

5          MR. SCHMIDT:  That's not the issue, your Honor.

6          THE COURT:  Sidebar.

7          (At the sidebar)

8          THE COURT:  What is the issue?

9          MR. SCHMIDT:  The issue is she is now referring to

10    documents, most of which has been offered into evidence for the

11    state of mind of Shahram Ketabchi and cannot be used as

12    evidence of any type of guilt for my client.

13         MS. KEARNEY:  I simply stated they should listen to

14    the testimony of the victims who did testify and they should

15    look at the documents that they have seen.

16         MR. SCHMIDT:  The documents that they have seen, a

17    large part of them relating to the customers -- and that's in

18    relation to what she is talking about -- were admitted for

19    Shahram Ketabchi's state of mind only.  That's basically asking

20    them to look at, for my client's guilt, all of the documents,

21    which include all of those documents that were entered into

22    evidence for Shahram Ketabchi's state of mind only.

23         MS. KEARNEY:  They have been instructed on that, your

24    Honor.  I was referring to the contract documents that were in

25    evidence, the e-mails that are in evidence, that are admitted

1   for their truth.

2                THE COURT:  Why don't you say that?

3                MS. KEARNEY:  I will.

4                THE COURT:  Let's move on.

5           When you're saying what you are going to say, say

6   those documents that have been admitted for the truth of what

7   is set forth.

8                MS. KEARNEY:  I will.

9                (In open court)

10               MS. KEARNEY:  Let me specify, ladies and gentlemen.

11  When I told you to look at documents and e-mails and I said

12  that was more than enough to prove Andrew Owimrin's guilt, I

13  want you to look at the documents that have been admitted for

14  their truth.  I want you to look at the documents, the contract

15  documents from these victims, from Diane Weissenberger, from Jo

16  Anne LaMorte.  I want you to look at the e-mails.  I want you

17  to look at the spreadsheets.  If you do that, if you look at

18  those documents, you know that Andrew Owimrin participated in a

19  conspiracy to defraud these people.  You don't need anything

20  more than that.

21          You have also heard a lot about the gray area in which

22  Olive Branch operated, about the steps that Bill Sinclair and

23  Michael Finocchiaro took in order to stay off the radar, to

24  avoid problems with the authorities.

25          Let me be clear.  Those precautions, those rules about

1    what sales reps could or couldn't say on the phone, the

2    monitored calls, the scripts, those weren't about making sure

3    they were running a legal operation.  Bill Sinclair and Michael

4    Finocchiaro have both told you that.  This was about not

5    attracting attention from regulators like the FTC and from law

6    enforcement, like the police and the state attorney general's

7    offices.

8             It was also about making sure that they could keep

9    making money, keep processing payments without interruption,

10   without being flagged as a problematic merchant account.

11            Now, Mr. Schmidt spoke to you about doing things the

12   right way.  The right way isn't about whether something was

13   legal or illegal when it came to Olive Branch and A1.  The

14   right way is about making money and holding onto it.

15            And so when Andrew Owimrin was faced with the choice

16   between staying at Olive Branch where there were some rules and

17   limitations and it was cutting into his commission, and going

18   with Arash to A1, he chose A1.  He could have stayed at Olive

19   Branch.  He was friendly with Mr. Finocchiaro.  He was still

20   buying drugs from him.  But all of those restrictions are

21   cutting into his bank account.  So he left.  And he chose to

22   enter the wild west at A1 where there were no rules, there were

23   no limits, where he could make a $149,000 sale to Jane Thompson

24   in one go.

25            So by the time Andrew Owimrin gets to A1, whatever

IB68KET5                        Rebuttal - Ms. Kearney

1    blinders he had on are off.  To use Mr. Schmidt's metaphor, the

2    bucket is overflowing.  And yet he carries on and he sells to

3    victim after victim after victim and he goes back to Jane

4    Thompson over and over again.

5           Now, the most important protection of the gray area

6    that you heard about is the so-called fulfillment department.

7    And the key to maintaining the appearance of legitimacy is

8    being able to produce documents that back up your transaction.

9    You heard that from Bill Sinclair and you heard that from

10   Michael Finocchiaro.  And so that means you need a signed

11   contract.  And if the customer tries to cancel, it's not the

12   end of the world.  You get a continuation of services agreement

13   and that really locks them in.

14          But what is really useful is what Bill Sinclair called

15   a tangible.  That's something that you can send to the credit

16   card company, or to the attorney general's office, or whoever

17   else comes knocking, that shows that the victim got something.

18          And this whole scheme is designed to look real to the

19   people on the outside.  But if you're on the inside, if like

20   Shahram Ketabchi you look at the documents that are actually

21   being produced, or, if like Andrew Owimrin you are actually

22   talking to the victims, it's obvious that none of this is real.

23          Let's talk about the tangibles first, the documents

24   that fulfillment was sending to the victims.

25          You have seen the business plans and the forms that

IB68KET5                    Rebuttal - Ms. Kearney

1   the victims are supposed to fill out.  It's obvious at one

2   glance that those are complete filler.  You could take a look

3   for yourselves.  They are in evidence.  You can compare Jane

4   Thompson's business plan to Charlene Foster's business plan to

5   Patricia Cabral's business plan.  Except for the name of the

6   company, they are all the same.

7           And you know that that was obvious to Shahram Ketabchi

8   too.  He is a businessman himself.  He told you he has his own

9   business plans for several of his companies.  And I bet they

10  don't look like Jane Thompson's.

11          So Shahram Ketabchi knew that what fulfillment was

12  supplying was completely bogus.  And he knew that because he

13  had all of those documents in front of him.  And you know he

14  knew that because he texts with Arash Ketabchi about it.

15          Now, Mr. Paul didn't show you a single one of these

16  documents.  And he didn't give you a single explanation for any

17  of these documents.  And that's because he knows that when you

18  flip through them, when you look at them, it will be obvious to

19  you, who have only known about this for over a little over two

20  weeks, that they are a sham.

21          Even Jane Thompson, this was a joke, and she told

22  Andrew Owimrin that.  Said this was a joke.  You heard how

23  insistent she was.  You heard how she told him over and over

24  that she wasn't filling out any of these forms, that these

25  forms were useless, that she didn't want to do any of that.

1          But even putting that aside, Andrew Owimrin's claim

2     that he thought that all of his customers were just getting the

3     services they paid for to help build up their web companies,

4     that's just not believable.  Because Andrew Owimrin was the one

5     who spoke to the victims.  There is no way that he believed

6     that Diane Weissenberger or Charlene Foster had an Internet

7     business.  And there is no way that he believes that any amount

8     of coaching or search engine optimization or YouTube videos

9     would make those businesses real.

10         And he knew all about the victims' complaints.  Just

11    think of Jane Thompson.  Remember the conversation she told you

12    about when fulfillment told her that they didn't do Web sites.

13    And she brought that to Andrew Owimrin's attention.  So it's

14    clear, and it was clear to both of these defendants, that none

15    of this was real.  There were no Internet businesses and there

16    was nothing that an LLC had a boilerplate business plan.  Both

17    defendants knew that, and yet they carried on.

18         Mr. Schmidt also talked to you a lot about Andrew

19    Owimrin's demeanor and the sales he didn't make and how nice he

20    was to people on the phone.  Ladies and gentlemen, you know

21    that means nothing.

22         Let's talk first about the sales that didn't happen.

23    Mr. Schmidt showed you some of Andrew Owimrin's calendar

24    entries for the customers that he didn't sell to, customers who

25    were, in Mr. Owimrin's words, broke.  And that made sense.  As

1    Mr. Finocchiaro told you, this is a numbers game.  It's not

2    worth your time to stay on the phone with someone who doesn't

3    have money or who is not going to be convinced or who can't

4    pay.  You have to be strategic with your time.

5         So it makes sense that he would get off the phone with

6    someone who is already crushed under medical bills, or who

7    didn't keep their appointments.  That's not going to get him

8    his commission.

9         Second, Andrew Owimrin's phone persona doesn't alter

10   any of the evidence that he lied to his victims about how much

11   money they could make, about what they would have to do in

12   connection with their businesses, or about how those biz-op

13   products he was peddling could make those businesses

14   profitable.

15        As Ms. Fletcher explained to you in her closing

16   argument, every sales rep has their own style.  Some are

17   steamrollers, like Arash, and some catch more flies with honey,

18   and that's Andrew Owimrin.

19        As a preliminary matter, the fact that other

20   salespeople were aggressive or pushy or not friendly, that's no

21   defense here.  You can be friendly and you can be pleasant and

22   you can still be deceive people.  And that's what Andrew

23   Owimrin did.

24        In fact, it's helpful for him to be nice, to befriend

25   these women.  Part of his MO is he keeps going back to the

1    well.  You saw him do that with Diane Weissenberger.  You saw

2    him do that with Charlene Foster.  And most egregiously you saw

3    him do that with Jane Thompson.  So let's talk about that.

4         First, Diane Weissenberger.  There is no confusion

5    about what contracts she entered or what products she was sold.

6    You can look at the documents yourself.  It's clear what

7    happened here is she had an initial contract for about $14,000

8    and she charged back and she only charged back for about

9    $10,000.  And that's split up into two separate transactions.

10   That's why you see two transactions the.

11        Then Andrew Owimrin sells her again, this time for

12   $15,000.

13        So what we see here is Diane Weissenberger was sold by

14   Andrew Owimrin, who at that time was called Andrew Owens, for

15   her merchant terminal business.  Bill Sinclair told you how she

16   is on the lead list for merchant terminals.  Gets charged back.

17   Continuation of service agreement.  You know the drill.

18        Then Andrew Owimrin, this time Jonathan Stewart, sells

19   her Youngevity and more biz-ops on top of that.

20        So what that means now is that, according to Andrew

21   Owimrin, he thinks Diane Weissenberger has not one, but two

22   functioning Internet businesses, both of which need biz-op.

23        Ladies and gentlemen, that's not a nice guy.  That's a

24   guy who knows a good mark.

25        Now, when Mr. Owimrin testified, he wanted you to

IB68KET5                        Rebuttal - Ms. Kearney

1   believe that he feels, I think his words were, horrible about

2   Jane Thompson.  But he didn't feel so horrible that he didn't

3   take 10 percent of every payment that she made to A1.  And he

4   didn't feel so bad that he didn't go back to her after that

5   sham partnership, after that $150,000 one last time for another

6   $10,000 in tax prep.  And he didn't feel so bad that he didn't

7   brag about that $150,000 sale to Bill Sinclair.  And he didn't

8   feel so bad that he didn't encourage Bill Sinclair to try to

9   sell her debt consolidation.  He didn't feel so bad that he was

10  going to keep partying with Arash in Vegas.

11          Look at those Instagram posts from Andrew Owimrin's

12  account.  Look at the dates of them.  They are in April.

13  That's right after Jane Thompson's sham partnership's last

14  contract.

15          Now, Andrew Owimrin's attempts to sell debt to Jane

16  Thompson is important here.  Mr. Schmidt never even addressed

17  that conversation that Bill Sinclair told you about.  Remember

18  what he said about that $149,000 sale.  Bill Sinclair told you

19  that Andrew Owimrin complained about his commission.  He said

20  he thought he was going to get a 50/50 split with Arash

21  Ketabchi and he was disappointed.

22          That shows just how much work he put into getting that

23  sale, ladies and gentlemen.  If you are just a passive

24  participant, if you were just sitting on that phone learning

25  about merchant terminals, there is no way he could expect a 50

1   percent commission.  He told you himself he is not making more

2   than 10.

3          What else did Bill Sinclair tell you about that

4   conversation?  That Andrew Owimrin told him that Jane Thompson

5   was getting nothing from that investment.  So any kind of story

6   that he thought that A1 was making money and he thought Jane

7   Thompson was getting 20 percent of that is a lie.

8          And after he told Bill Sinclair that, what did he do?

9   He laughed about it.  And then he suggested selling her debt

10  consolidation services.

11         Now, the Andrew Owimrin you saw on that stand, ladies

12  and gentlemen, that's the Andrew Owimrin that the victims spoke

13  to.  He's nice.  He is personable.  He's charming.  But he has

14  an agenda.  He wants you to buy LLCs and corp credit training,

15  whatever that is.  He wants to up-sell you next week for some

16  search engine optimization and some YouTube videos.  He will

17  get on a three-way call with you and get you a new credit card

18  so you can max out that credit limit.  He wants you to believe

19  the story because it benefits him.

20         Now, Mr. Schmidt also talked to you about what he

21  called the mistakes that the victims made when they testified

22  in front of you.  But you know what happened, ladies and

23  gentlemen.  You saw the checks that they wrote.  You saw the

24  credit card bills.  You know where that money went.  It went to

25  A1 and it went into Andrew Owimrin's bank account.

IB68KET5                    Rebuttal - Ms. Kearney

1        Of course these victims were called by lots of

2    different companies.  That is how this scheme worked.  Leads

3    get sent to different companies and different companies try to

4    pitch them on the biz-op.  That's why you heard about the

5    passwords.  They are trying to protect their property.

6        And the pitch that you heard that they make for

7    biz-op, that's designed for plausible deniability.  You never

8    come out with a figure on how much a victim is going to make.

9    You make them suggest that number to you and make them believe

10   that that's what is going to happen.

11       But if you have listened to the victims' testimony,

12   you will hear that on all of the important points they are

13   consistent, and that's because this is pattern, an MO.  This is

14   how A1 and Olive Branch made their sales.

15       But I want to specifically address some of the things

16   Mr. Schmidt said about Jane Thompson.  So I want to take a look

17   at her notes.

18       Ms. Lee, could you put up Government Exhibit 165A.

19       Actually, hold on off that for a second.

20       Let me suggest to you that you take a look at her

21   notes.  That's Government Exhibit 165A.  They are all dated and

22   she told you how she wrote them.  She told you she put the

23   date, the time, the name of the person she was talking to and

24   what they discussed.

25       And I want you to look at the checks that she wrote to

IB68KET5                    Rebuttal - Ms. Kearney

1   A1.  I want you to look at the dates on those checks, the memo

2   lines in the checks, and I want you to compare those checks to

3   her notes, and look at who she spoke to right before she wrote

4   those checks, and look at what they said to her.

5           So let me show you an example of that.

6           Ms. Lee, could you put up page 31 of Government

7   Exhibit 165A, please.

8           Could you zoom in on the top of the left-hand side.

9           Ladies and gentlemen, this is the final call before

10  Jane Thompson committed to the $149,999 partnership interest.

11          This is the call where Andrew Owimrin told you that he

12  talked to her about the merchant terminals but he wasn't really

13  sure what they were, and that he handed off the phone to Zach

14  Peterson and left the room to take another call.

15          But look at the notes.  That's the date, Wednesday

16  February 3.  Jonathan Stewart.  That's Andrew Owimrin.  That's

17  who she spoke with.  4 p.m.

18          And then look at the order that these notes are in.

19  First they discuss Mr. Peterson's offer about the 20 percent

20  stake in A1.

21          Then they discuss the merchant accounts.

22          Andrew Owimrin's story doesn't line up.  It's clear

23  that Jane Thompson talks to Jonathan Stewart before she wrote

24  that check.

25          How else do you know?  His commission.  You have heard

1    a lot about Arash Ketabchi, ladies and gentlemen.  And do you

2    think that Arash Ketabchi would have paid a commission to

3    Andrew Owimrin for work he didn't do?

4            Let me also talk about Emily Miller.  You have heard

5    that she worked for First Trend, or Tri-Star, the company went

6    by a couple of names.  And those companies sold sham merchant

7    terminals to their victims and then they sold those leads to

8    Olive Branch and A1 for the biz-op sale.

9            Look, it's clear that Brooke Marcus, or Emily Miller,

10   is culpable here too.  You heard it from Jane Thompson.  It was

11   Emily who held her hand through this.  It was Emily who

12   introduced her to A1 and Jonathan Stewart.  And it was Emily

13   who kept her on course here.

14           But to suggest that it was Emily Miller who

15   spearheaded the second merchant terminal scheme, the one with

16   A1, that defies logic, ladies and gentlemen.  Emily Miller

17   doesn't need A1 to sell merchant terminals.  First Trend does

18   that.  Michael Goldman does that.  Steve Blake does that.  And

19   they are still calling Jane Thompson.

20           So if Emily wants to sell merchant terminals to Jane

21   Thompson all she has to do is tell Jane Thompson to invest with

22   Steve Blake or Michael Goldman or one of the 15 other companies

23   that is calling Jane Thompson.  And if she does that, then

24   First Trend, Emily's company, gets the whole sale.  They don't

25   have to split it with A1.  They don't have to pay Andrew

1    Owimrin's commission.

2            You also know, ladies and gentlemen, that Jane

3    Thompson never got those taxes done, even though she purchased

4    those services several times over.  And you know she talked to

5    Jonathan about that.  She was insistent, and it is in her

6    notes.

7            But did Jonathan Stewart or Andrew Owimrin take that

8    back to fulfillment and check on what the problem was?  Of

9    course not.  Because he knew what the problem was, ladies and

10   gentlemen.  It's that those tax services weren't coming.  It

11   was an empty promise to keep Jane Thompson engaged and to have

12   access to her so she could keep buying more of these terminals

13   and partnerships and more tax preps until she was done.

14           What happened to Jane Thompson is proof that Andrew

15   Owimrin wasn't trying to do it the right way.  And that's why,

16   ladies and gentlemen, he had to change his story when he told

17   you what happened to her.

18           So you know that Andrew Owimrin's story doesn't make

19   sense.  I want to talk about how Shahram Ketabchi's story

20   doesn't make sense.

21           He wants you to believe that he received all of these

22   documents, he was tasked with the very important responsibility

23   of keeping the merchant accounts in check, of keeping the

24   chargebacks fought, but that he never looked in any of the

25   documents.  He never read them, he never flipped through them,

IB68KET5                       Rebuttal - Ms. Kearney

1    he never saw any of the complaints.

2              But think about how he answered every other question

3    when he was up on that stand.  He said something like, I would

4    have to verify that.  Or I would have to look into that

5    further.  Or I can't be 100 percent sure.

6              So do you really think that he didn't look further

7    into the documents he was submitting, that he didn't verify

8    what he was writing down?  Do you really think that any of

9    those documents that he printed out he never read?  And do you

10   really think that Shahram Ketabchi, who, as he told you, is

11   passionate about customer service, didn't notice any of these

12   complaints?

13             And it's clear that he did.  Because he responded to

14   specific allegations that the victims made.  And you have seen

15   a couple of those, ladies and gentlemen.  For example, take a

16   look at Jeanette Waldrup's complaint.  In that she uses very

17   precise language.  She said she was promised a 2 percent

18   residual.  And he references that in his response.  There is no

19   way he would know what she was complaining about if he didn't

20   look it over.

21             But when Shahram Ketabchi is up against a wall, ladies

22   and gentlemen, when he can't come up with an answer that makes

23   him look just like a human filing cabinet, his reflex is to

24   deny.  It's to push things aside.  It's to claim he didn't have

25   time for any of that.  His instinct is to lie.

1              Ladies and gentlemen, it's clear that this is a

2       massive fraud.  It was perpetrated across the country by

3       employees of Olive Branch and by A1.  Andrew Owimrin was one of

4       those salespeople.  He lied to people on the phone.  He lied to

5       get them to buy things.  He lied to keep them on the hook.  And

6       he lied to prevent them from canceling or charging back their

7       contracts.

8              Shahram Ketabchi facilitated that fraud.  He set up

9       the accounts that they were using to pass the money through.

10      And he made sure that A1 got to keep the proceeds of that fraud

11      by fighting the chargebacks.

12             And that's where the money laundering comes in, ladies

13      and gentlemen.  Shahram Ketabchi agreed with others to conduct

14      financial transactions in criminal proceeds.  That's the

15      victims' money.  And he did that in order to promote the fraud,

16      to keep those merchant accounts open, to keep the money flowing

17      in.

18             And Andrew Owimrin did it too.  Remember we spoke

19      about that Element account.  That account was used to receive

20      and distribute proceeds of those fraudulent sales.

21             This isn't a hard case, ladies and gentlemen.  It's

22      clear what happened here.

23             I ask you to hold these men accountable for their

24      roles in these crimes and to find them guilty as charged.

25             THE COURT:  Thank you, Ms. Kearney.

1          MR. SCHMIDT:  Your Honor, may we approach, please?

2          THE COURT:  Very briefly.

3          Ladies and gentlemen, you can stand and stretch

4    because I am about to read you the charge.

5          (At the sidebar)

6          THE COURT:  Yes, sir.

7          MR. SCHMIDT:  I do this in an excess of caution

8    because I don't have any documents in front of me at this

9    point.  The government in their summation said that Emily

10   Miller did not need to go to A1 for the second sale of merchant

11   processing.  She could have just gone back to Elite and First

12   Trend.

13          It is my understanding that Ms. Miller was fired from

14   First Trend and Elite for giving leads to Mr. Ketabchi instead

15   of Mr. Sinclair.  And the reason why I am cautious is because I

16   don't have a date in front of me because I didn't think of

17   checking the exact date that she left.  My recollection is that

18   it is something like December 2016, but I am not certain.  But

19   I am certain in reviewing the 3500 material for her, but I am

20   sure the government may be more aware of having talked to Ms.

21   Brooke Marcus when she left, when she was fired from First

22   Trend.

23          THE COURT:  Just a moment.  Where are you going?

24   What's your point?

25          MR. SCHMIDT:  They made a statement.  They summed up

IB68KET5                              Rebuttal - Ms. Kearney

1    saying that they did not need --

2              THE COURT:  Brooke Marcus did not.

3              MR. SCHMIDT:  -- Emily Miller did not need to do -- if

4    she wanted to do another deal, she could have done it with A1.

5    She could have done it with First Trend.  She had been fired by

6    First Trend by that time, because already --

7              THE COURT:  Is there evidence in this record of her

8    firing?

9              MR. SCHMIDT:  There is evidence of her saying was

10   leaving First Trend and going to A1, and there is in evidence

11   Ms. Thompson's phone that she changed the name of the company

12   that she worked for to A1.

13             THE COURT:  What is it that you're asking me to do?

14             MR. SCHMIDT:  If the government made a

15   misrepresentation that they are aware of in their argument --

16             THE COURT:  The misrepresentation is?

17             MR. SCHMIDT:  That she could have gone back to A1.

18             THE COURT:  Because the government knows she was

19   already fired by them.

20             MR. SCHMIDT:  That's correct.

21             THE COURT:  Is that in the record, her firing?  I

22   don't remember that to be in the record.

23             MR. SCHMIDT:  It's in the record she is leaving.  I am

24   not talking about the record.

25             THE COURT:  You are talking about their knowledge.

1          Go ahead.

2          MS. KEARNEY:  I have no knowledge of Brooke Marcus's

3  firing.  If you say it's in her 3500, I am happy to take a

4  look.

5          I think what you're referring to, Mr. Schmidt, is that

6  Jane Thompson testified that she thought Emily Miller was

7  changing companies.  But there is no evidence in the record of

8  her firing.  I am unaware of any record of firing.  In fact, if

9  you look at the checks that postdate the Jane Thompson

10  transaction, they are written to the same merchant account as

11  the first checks to First Trend.

12          THE COURT:  I am not going to change anything.

13          MR. SCHMIDT:  I am not attacking Ms. Kearney

14  personally because I don't know if she was going to be the

15  person reviewing Brooke Marcus.  If that information is in the

16  3500 material, they are responsible for it, and that

17  misrepresentation is a serious misrepresentation, whether

18  intentional or not, that would require a mistrial.  That's why

19  I brought it up before we were done.

20          MS. FLETCHER:  I know we are on the same side.  I

21  think what Mr. Schmidt is referring to is in the 3500 material

22  for Bill Sinclair, Bill Sinclair said that he thought that she

23  was fired for stealing leads.  He, as best as we know, he is

24  wrong about that.

25          MR. SCHMIDT:  I am not attacking them personally.

IB68KET5                      Rebuttal - Ms. Kearney

1    This is what I had in my mind and I wanted it resolved.

2              THE COURT:  It's on the record.  I am certainly not

3    going to grant a mistrial on this.  And I am not sure it would

4    be a misrepresentation if this prosecutor is unaware of it

5    being in the 3500 material.  In any event, it doesn't rise to

6    the level of a mistrial for sure.

7              Sir.

8              MR. PAUL:  Because I am hesitant to object during

9    summations, and I should have, but I tend not to do that out of

10   a courtesy.  However, it's my understanding that in listening

11   to Ms. Kearney give her summation, she referred to the fact

12   that I did not introduce or refer to documents because I knew

13   that by presenting documents it would show something negative

14   about my client.  I don't think that's proper comment that

15   could be made as to my knowledge.

16             THE COURT:  I am concerned about that.  I didn't catch

17   that, however.  If that were true, I would be concerned.

18             MS. KEARNEY:  I may have misspoken.  What I meant to

19   say, you weren't able to explain any of the documents.

20             MR. PAUL:  That's not what you said.

21             THE COURT:  What would you like?

22             MR. PAUL:  I would like an instruction to the jury

23   that the fact that Ms. Kearney referred to the knowledge that I

24   may have had behind not introducing documents was improper and

25   should be ignored by the jury.

1          THE COURT:  Do you happen to have that?  Can you show
2    that to me in the record?
3          MR. PAUL:  I am not getting it.
4          THE COURT:  It doesn't rise to that level.  I am not
5    going to give a separate instruction.
6          Just a moment.  Let me think.
7          MR. SCHMIDT:  May I make a suggestion?  In the charge
8    when you basically talk about arguments of counsel, you can say
9    arguments by one counsel of another also isn't evidence.
10         THE COURT:  I think what I will do is something along
11   the lines of what the lawyers say another lawyer knew or didn't
12   know is not relevant.  What is relevant is what the evidence
13   shows and the inferences that are permitted to be drawn.
14         MR. PAUL:  That's fine.
15         MR. SCHMIDT:  That's fine with me.
16         THE COURT:  Government.
17         MS. KEARNEY:  Thank you.  Yes.
18         (Continued on next page)
19
20
21
22
23
24
25

1              (In open court)

2              THE COURT:  Ladies and gentlemen, in summations, I

3       want to remind you that your concern is not what a lawyer or

4       the other lawyer, depend being on who was giving the summation,

5       thought or knew.  That is not your concern.  Your concern is

6       what the evidence showed or didn't show, not what some lawyer

7       thought or didn't think, all right?

8              I am now going to instruct you on the law that you

9       will apply to the facts in this case.  You will determine the

10      facts in accordance with these instructions on the law.

11             I am going to explain first my role and your role, and

12      by and large, we have already been over this at the very

13      beginning two and a half weeks ago.  You have to decide whether

14      or not the guilt of each defendant has been proved beyond a

15      reasonable doubt.  You pass on the fact issues here.  I do not

16      find the facts.  You are the sole and exclusive judges of the

17      facts.  You pass on the weight of the evidence, you determine

18      the credibility of the witnesses, you resolve any conflicts

19      there may be in the testimony, and you draw whatever reasonable

20      inferences you decide to draw from the facts as you determine

21      them to be.

22             You must exercise this great responsibility with

23      fairness and impartiality.  Your decision, as I've said many

24      times, must be based solely on the evidence presented here in

25      court or the lack of evidence.  You must not and are not

IB6JKET6                          Charge

1   permitted to be influenced by bias, prejudice or sympathy by or

2   for any party.

3          You must accept the law as I state it to you in these

4   instructions and you apply it to the facts as you decide them.

5   You cannot substitute your idea of what the law should be for

6   what I tell you the law is because just as you alone, ladies

7   and gentlemen of the jury, find the facts, I alone determine

8   the law, and you must accept the law as I state it to you.

9          For that same reason, if any of the attorneys who have

10  been giving summations to you has stated a legal principle

11  different from any that I'm about to give you in these

12  instructions, it is these instructions you have to follow.

13  Also, ladies and gentlemen, do not single out any one

14  instruction or any one word or phrase or sentence in an

15  instruction as alone stating the law.  I want you -- and you

16  must -- to consider these instructions as a whole.

17         Now, ladies and gentlemen, I am going to give you when

18  you start deliberating a copy of these instructions.  Indeed,

19  if you want, we can make copies for all of you.  It makes no

20  difference.  There are lots of printers here.  It is very easy.

21  The reason I don't give it to you now is I have found that if I

22  were to give each of you a copy of these, people tend to kind

23  of read it blindly, and what I want you to do over the course

24  of the next hour or so is listen and try to understand it.

25         You don't have to worry about specifics because, as I

IB6JKET6                          Charge

1  was stating, of course you think about specifics, but you know

2  what I mean.  Listen to the instructions, think about them.

3  Since you're going to have a copy or as many copies as you

4  want, you will always be able to go back and look specifically

5  at them.

6          I remind you that all parties; that is, the

7  government, the United States of America, and Mr. Owimrin and

8  Mr. Shahram Ketabchi, stand as equals before a jury in the

9  Courts of the United States.  You must disregard any feelings

10 you may have about each of the defendant's races, religions,

11 national origins, sex or age.  You cannot consider any personal

12 feelings you may have about the race, religion, national

13 origin, sex or age of any witness or either of the defendants

14 or anyone else involved in this case, and it is improper for

15 you to allow any feelings you might have about the nature of

16 the crimes charged to interfere with your decision-making

17 process.

18         The fact that the government is a party and the

19 prosecution is brought in the name of the United States does

20 not entitle the government or its witnesses to any greater

21 consideration than that given to either of the defendants.  By

22 the same token, you must not give the government less

23 consideration.  The government and Mr. Owimrin and Mr. Shahram

24 Ketabchi stand on equal footing before you today.  Your verdict

25 must be based solely on the evidence or lack of evidence.

1          Ladies and gentlemen, as I read these instructions to

2     you, you'll see there are certain recurring themes.  Certainly

3     one of them is that your verdict must be based solely on the

4     evidence or lack of evidence.  For the same reasons, the

5     personalities and conduct of each of the lawyers are not in any

6     way in issue.  If you have formed opinions of any kind as to

7     any of the lawyers in this case, favorable or unfavorable, and

8     I imagine you have some views on that, whether you approved or

9     disapproved of their behavior, any opinion you may have as to

10    the lawyers should not enter into your deliberations.

11         Although each of the defendants have been indicted,

12    you must remember that an indictment is simply an accusation.

13    It is not evidence.  When you go into the jury room, I will

14    give you a copy of the indictment as well so you will have it

15    there, but it is not evidence.  It is just a charge.

16         Mr. Owimrin and Mr. Shahram Ketabchi have each pled

17    not guilty to the two charges in the indictment against each of

18    them.  As a result -- and this is another theme -- the burden

19    is on the government to prove the guilt of each defendant

20    beyond a reasonable doubt.  That burden never shifts to the

21    defendants, for the same reason that the law never imposes upon

22    a defendant in a criminal case the burden or duty of calling

23    any witness or producing any evidence.

24         The law presumes each defendant to be innocent of each

25    of the charges against each defendant.  I, therefore, instruct

you, ladies and gentlemen of the jury, that you are to presume

each defendant innocent throughout your deliberations, until

such time, if ever, you as a jury are satisfied that the

government has proven that defendant's guilt, the guilt of the

defendant you are considering beyond a reasonable doubt.

        Mr. Owimrin and Mr. Shahram Ketabchi begin the trial

here with a clean slate.  This presumption of innocence alone

is sufficient to acquit each of the defendants unless you, as

jurors, are unanimously convinced beyond a reasonable doubt of

the guilt of the defendant you are considering after a careful

and impartial consideration of all of the evidence that has

been presented to you.

        If the government fails to sustain its burden, you

must find the defendant you are considering not guilty.  This

presumption of innocence was with each defendant when the trial

began and remains with them now as I speak to you and will

continue with each of the defendants into your deliberations,

unless and until you are convinced the government has proven

their guilt beyond a reasonable doubt.

        Now, you've heard me throughout this trial mention the

phrase "proof beyond a reasonable doubt."  I have said the

government must prove each defendant's guilt beyond a

reasonable doubt.  The question naturally arises, ladies and

gentlemen, what's a reasonable doubt?  The words almost define

themselves.  It is a doubt based upon reason and common sense.

IB6JKET6                          Charge

1   It is a doubt that a reasonable person has after carefully
2   weighing all of the evidence.  It is a doubt that would cause a
3   reasonable person to hesitate to act in a matter of importance
4   in his or her personal life.

5         Proof beyond a reasonable doubt must, therefore, be
6   proof of such a convincing character that a reasonable person
7   would not hesitate to rely and act upon it in the most
8   important of his or her own affairs.  A reasonable doubt,
9   ladies and gentlemen, is not a caprice or a whim, it is not
10  speculation, it is not suspicion, it is not an excuse to avoid
11  performing an unpleasant duty and it is not sympathy.

12        In a criminal case, the burden is at all times on the
13  government to prove guilt beyond a reasonable doubt.  The law
14  does not require that the government prove guilt beyond all
15  possible doubt.  Proof beyond a reasonable doubt is sufficient
16  to convict.  This burden never shifts to the defendants, which
17  means it is always the government's burden to prove each of the
18  elements of the crimes charged beyond a reasonable doubt.

19        If, after a fair and impartial consideration of all of
20  the evidence, you have a reasonable doubt about the guilt of
21  the defendant, it is your duty to acquit that defendant.  On
22  the other hand, if, after a fair and impartial consideration of
23  all of the evidence, you are satisfied of that defendant's
24  guilt beyond a reasonable doubt, you should vote to convict.

25        Now, what is evidence?  You know what evidence is

IB6JKET6                          Charge

1   because I have told it to you starting from the beginning of

2   the trial.  Evidence is primarily the testimony of the

3   witnesses, the exhibits that have been received and the

4   stipulations you've heard, both stipulations of fact and

5   stipulations of evidence.

6            There are two types of evidence:  Direct evidence and

7   circumstantial evidence, and you know that direct evidence is

8   presented when a witness testifies to a fact based on what that

9   witness personally saw, heard or did.  It's a fact that is

10  known to that witness's own knowledge by virtue of what that

11  witness sees, feels, touches or hears, and you know the second

12  type of evidence is circumstantial evidence.  You'll remember

13  the example I gave you.  A person comes into the back of the

14  courtroom, perhaps today or yesterday, and there is a wet

15  umbrella.  You can't look outside because if you turn around,

16  you will see I drew my drapes or drew your drapes.  So you

17  don't know if it is raining outside, but you have direct

18  evidence that the umbrella is wet, so you can infer from that

19  that it's raining outside.

20           It is a reasonable inference to draw, that is all

21  there is to circumstantial evidence, using reasonable common

22  sense to infer to a fact that is not observed -- and you'll

23  remember I also said maybe it is not raining outside, maybe

24  that the witness put the umbrella under a faucet.  Those are

25  issues for you to decide.

1          The law does not value direct above circumstantial

2     evidence or circumstantial evidence above direct.  It is for

3     you to decide how much weight to give any piece of evidence

4     that you accept and for you to reject any piece of evidence

5     that you don't find credible.

6          Circumstantial evidence can be given as much weight as

7     direct evidence.  The law makes no distinction between direct

8     and circumstantial evidence, but simply requires that before

9     convicting the defendant, you, the jury, must be satisfied with

10    that defendant's guilt beyond a reasonable doubt based on the

11    evidence in this case.

12         What is not evidence?  Again I went through that at

13    the beginning of the trial.  An indictment is not evidence.

14    The statements and arguments of the lawyers are not evidence.

15    Anything I've said is not evidence.  Questions put to witnesses

16    are never evidence.  It is only the answer that is evidence.

17         Similarly, if I've directed you to disregard anything

18    a witness said, you must disregard that.  You cannot consider

19    that answer in any way if I've told you to disregard it or for

20    that matter if I've stricken the answer from the record.

21         Don't draw any inference for or against any party by

22    reason of a lawyer's objections or, for that matter, any of my

23    rulings on the objections.  Counsel have an obligation to

24    object if they think a question is being asked that is

25    improper.  Don't hold it against either party because that

IB6JKET6                        Charge

1   party's lawyer was making objections.

2            Don't draw any inference from any of my rulings.  My

3   rulings, as a result of the objections of the lawyers or

4   whatever was discussed at sidebar, have to do with legal

5   matters, and that has nothing to do with your job.  Your job is

6   to determine the facts in this case and whether or not the

7   government has met its burden of proof.

8            Any questions that I may have asked a witness -- and

9   you saw that I did ask questions -- are almost certainly

10  questions that I asked in order to help elucidate things for

11  you that I think may be unclear, but I have no view of the

12  facts of this case, ladies and gentlemen, because that is not

13  my job.  I have no views on the credibility of any witness, the

14  weight of the evidence or how you should decide any issue in

15  regard to the facts.  That is for you.

16           Now, you have heard evidence about testimony seized in

17  connection with a search that was conducted by law enforcement

18  officers.  You will remember that testimony.  Evidence obtained

19  from that search was properly admitted in this case and may be

20  properly considered by you.  Whether you approve or disapprove

21  of how it was obtained by law enforcement officers must not

22  enter into your deliberations.  I now instruct you the

23  government's use of that evidence obtained as a result of a

24  search is entirely lawful.  Therefore, regardless of your

25  personal opinions, you must give that evidence full

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    consideration along with all the other evidence in the case

2    when you're determining whether or not the government has

3    proven each defendant's guilt beyond a reasonable doubt.

4              Now, you've also seen text messages, emails and

5    recordings of telephone conversations that have been admitted

6    into evidence.  I instruct you that all of that evidence was

7    obtained in a lawful manner.  No one's rights were violated.

8    The government's use of that evidence is entirely lawful.  So

9    regardless of any personal views you may have regarding the

10   obtaining of that evidence, you must give that evidence full

11   consideration along with all the other evidence here in

12   determining whether the government has met its burden of proof.

13   What weight you give those materials, if any, is entirely up to

14   you.

15             Now, you will remember that I allowed the government

16   to hand out transcripts prepared by the government containing

17   what the government believes appeared on the recordings that

18   were in evidence.  You know that the transcripts are simply

19   aids to you.  What you heard on the recording, that is

20   important and that is the evidence.  The transcripts are simply

21   to help you understand what the words are.  You will make your

22   own interpretation of what appears on the tapes based on what

23   you heard.  If you believe you heard something different from

24   what appears in the transcripts, what you heard is controlling.

25             Now, you've heard evidence in the form of stipulations

 1   of fact.  We had a number of those.  A stipulation of fact is

 2   simply an agreement among the parties that a certain fact is

 3   true, and you have to regard such agreed facts as true.  You

 4   have also heard stipulations of testimony, which are

 5   stipulations that are an agreement between the parties that if

 6   somebody was called as a witness, that witness would have given

 7   certain testimony.  Again, you must accept as true that witness

 8   would have given that testimony and you consider it as evidence

 9   in this case, but you determine what effect to give that

10   testimony.

11          Now, you also will remember that in a lot of the

12   exhibits that were put up on the screen, there were black marks

13   where words were deleted.  In legal terms, the words were

14   redacted.  "Redacted" is simply a word that means part of the

15   document was taken out.  You must concern yourself only with

16   that part of the document that has been admitted into evidence.

17   Don't consider any possible reason why a part of it was blacked

18   out.  What was blacked out has nothing to do with your

19   consideration.

20          Now, some of the exhibits that were admitted into

21   evidence were in the form of charts and summaries.  You'll

22   remember that as well.  You must consider them as you would any

23   other evidence because I admitted them into evidence.  Now,

24   there were also summary charts and exhibits that were shown to

25   you but were not admitted into evidence, and if I didn't admit

something in evidence, there were simply summaries or analyzes
of documents and testimonies and again were simply aids.  It is
the underlying evidence, the underlying documents that are the
evidence here.

        To the extent that the charge conforms to what you
determine to be the underlying facts, you can accept them.  To
the extent the charts differ from what you determine the
underlying evidence to be, you may reject them, and that goes
for a chart or summary that I said was simply being admitted as
an aid, but not in evidence.  The charts and summaries that I
admitted into evidence are evidence and to be considered by you
along with all the other evidence.

        Now, you had an opportunity to observe all of the
witnesses.  Now you have to decide who you believe.  You have
to decide what part of each witness's testimony to believe.  A
witness could believe that that witness was being truthful, yet
that witness could be mistaken and not able to recall facts
accurately, and a witness could take the oath and still
intentionally testify falsely.

        How do you decide who to believe and who not to
believe and those areas of that witness's testimony that you
believe, what weight to put on it.  I can't give you any hard
and fast rules.  Consider whether the witness told the truth
and whether they knew what they were talking about.

        In doing so, use your common sense, your good judgment

1   and your life's experience.  Again, there are no hard and fast

2   rules, but a good rule is use your common sense, your good

3   judgment, your life's experience.  I may have told you at the

4   beginning of the trial about an experience I had.  I don't

5   remember whether I did or not.

6          Sometimes federal judges have to decide the facts.  In

7   other words, sometimes there are not juries, so I have to

8   decide the facts, I have to decide the credibility of the

9   witnesses.  Again, that is not now.  You're the jury, so you

10  decide the credibility of the witnesses, but I went to a

11  conference by the Federal Judicial Center -- did I tell you

12  this story?  I don't think I did.

13         It was a couple of days long.  The Federal Judicial

14  Center is the arm of the judiciary that handles judicial

15  education, and it was a couple of days, two or three days, and

16  there were a couple of hundred federal judges, and the topic

17  was how to determine the credibility of witnesses, and there

18  were a psychologist up there and there were experts of various

19  sorts that talked to us, and we had even some simulations where

20  sort of like to tell the truth, you know, people were being

21  witnesses and telling stores, and we had these electronic

22  voting things, and we would click if we thought the person was

23  telling the truth or not telling the truth.

24         I can tell you two things:  One is federal judges --

25  and they did a bell curve on who was right and who wasn't -- I

IB6JKET6                          Charge

can tell you two things:  One is federal judges are no

different than the average person in terms of being able to

judge credibility, but more importantly, I learned nothing

during those two or three days.  There really are not rules.

Again electronic voting and psychologists telling us what to

look for.  Every day of your life you decide who you trust and

who to believe and who you don't, whether you're talking to

your children or buying something, getting a cup of coffee,

whatever, however you do that, that is really the core of your

job.

          Use your good judgment, your life's experience and

your common sense.  In that connection, do things to consider

how good an opportunity the witness had to observe or hear what

that witness was testifying about.  A witness can be honest but

mistaken.  How did the witness's testimony impress you?  Do you

think the witness was testifying honestly and candidly?  Was

the witness's direct, the witness's response to the answers

direct?  Do you think they were evasive?  What was the

witness's demeanor?  What was the strength and accuracy of the

witness's recollection?

          Do you think any outside factors affected that

witness's ability to perceive events?  What about the substance

of what they were talking about?  Was the witness

straightforward?  Do you think the witness was trying to hide

something?  How did that witness's testimony compare with other

1    evidence in this case?

2            Was it corroborated by other evidence?  Was it

3    contradicted by other evidence?  If the witness made statements

4    in the past that are inconsistent with that witness's

5    statements during the trial concerning the facts that the

6    witness is questioned about, you can consider that in deciding

7    how much of the witness's testimony to believe.  You can

8    consider whether the witness purposefully made a false

9    statement or perhaps it was an innocent mistake.

10           Consider whether the inconsistency involves what you

11   consider to be an important fact or whether it has to do with a

12   small detail.  Did the witness have an explanation for the

13   inconsistency?  If so, did that explanation appeal to your

14   common sense and your life's experience?

15           Consider whether a witness had any bias, any

16   relationship to a party, any motive to testify falsely or any

17   possible interest in the outcome of the case.  Such a bias or

18   relationship does not necessarily make the witness unworthy of

19   belief, but these are factors that you are able to consider.

20           Take into account any evidence that the witness who

21   testified may benefit in some way from the outcome of the case.

22   Such interest in the outcome creates a motive to testify

23   falsely and may sway that witness to testify in a way that it

24   advances that you witnesses' own interest.  Therefore, if you

25   find that any witness whose testimony you are considering may

1    have an interest in the outcome of the trial, bear that factor

2    in mind when you're evaluating the credibility of the witness's

3    testimony and accept it with great care.

4            But I don't mean to suggest that every witness who has

5    an interest in the outcome of the case will testify falsely.

6    It is for you to decide to what extent, if at all, the

7    witness's interest has affected or colored that witness's

8    testimony.  It is for you, the jury, and for you alone, not the

9    lawyers or any of the witnesses, and not me to decide the

10   credibility of the witnesses who appeared before you and the

11   weight that that testimony deserves.

12           I should tell you, ladies and gentlemen, that the

13   charge, when you get it, every page has a line across it.  That

14   is simply from the printer in my Chambers.  Don't worry about

15   that line.  It has nothing to do with the charge.

16           Now, you have heard evidence during the trial on

17   questioning by lawyers from the witnesses.  Those witness have

18   discussed the facts of the case in their testimony with their

19   lawyers before the witnesses appeared in court.  Although you

20   may consider that fact when you're evaluating a witness's

21   credibility, there is nothing unusual or improper about a

22   witness meeting with lawyers before they testify so that the

23   witness can be aware of the subjects the witness is going to be

24   questioned about and to focus on those subjects, and to have

25   had the opportunity to review the relevant exhibits before

IB6JKET6                          Charge

1   being questioned about them.  Those types of consultations and

2   meetings, ladies and gentlemen, help conserve your time and my

3   time.  Indeed, it would be unusual for a lawyer to call a

4   witness without such consultations.

5       Again, the weight you give to the fact or nature of

6   the witness's preparation for that witness's testimony and what

7   inferences you draw from such preparation and meetings are

8   matters totally within the discretion of the ladies and

9   gentlemen of the jury.

10      You also have heard the testimony of a law enforcement

11  official.  The fact that a witness may be employed as a law

12  enforcement official does not mean that that witness's

13  testimony is necessarily deserving of more or less

14  consideration or greater or lesser weight than that of an

15  ordinary witness.  At the same time, it is legitimate for a

16  defense counsel to try to attack the credibility of a law

17  enforcement witness, on the grounds that witness's testimony

18  may be colored by a personal or professional interest in the

19  outcome of the case.  It is for you to decide whether to accept

20  the testimony of any law enforcement witness and to give that

21  testimony the weight, if any, you find it deserves.

22      I have permitted during this trial for a witness to

23  express that witness's opinions about matters that are in issue

24  and are within that witness's area of expertise.  A witness may

25  be permitted to give an opinion on those matters about which

1     that witness has special knowledge, skill, experience and

2     training, and you'll remember I allowed at least one witness to

3     give opinion testimony.  That testimony is presented to you on

4     the theory that someone who is experienced and knowledgeable in

5     the field is able to assist you in understanding the evidence

6     in reaching an independent decision on the facts.

7          In weighing that evidence, consider that expert's

8     qualificatins, opinions, reasons for testifying and everything

9     else that you would consider in terms of an ordinary witness.

10    Give the opinion testimony the weight, if any, you find it

11    deserves, but don't accept opinion testimony simply because I

12    allowed that witness to testify as to his opinion.  Nor do I

13    want you -- nor are you permitted -- to substitute it for your

14    own reasoned judgment and common sense.

15         You have heard the testimony of witnesses who have

16    pled guilty to charges arising out of facts that were related

17    to the issues in this case, and you'll remember from the

18    summations there was a great deal of presentation by the

19    lawyers about the testimony of the cooperating witnesses.

20         I instruct you that you are to draw no conclusion or

21    inference of any kind about the guilt of the defendants on

22    trial from the fact that a prosecution witness has pled guilty

23    to a similar charge.  The decision of that cooperating witness

24    to plead guilty was a decision personal to that witness, a

25    decision, in other words, that that witness made about his own

1    guilt.  It may not be used by you in any way as evidence

2    against either of the defendants on trial here.  If other

3    people pled guilty, they pled guilty because of their

4    situation.  You can't reason that because somebody else pled

5    guilty, the defendants here are guilty.

6            There is nothing improper, ladies and gentlemen, in

7    the government's use of a cooperating witness.  Don't concern

8    yourself with how you feel about the use of a government

9    cooperator.  Your concern is to decide, as you know, whether

10   the government has proven the guilt of each defendant beyond a

11   reasonable doubt regardless of whether evidence was obtained by

12   use of a cooperating witness.

13           It is the law in federal courts that the testimony of

14   a cooperating witness may be enough in itself for conviction if

15   you find that that testimony establishes guilt beyond a

16   reasonable doubt.  Where a cooperating witness testifies, that

17   testimony should be examined with greater scrutiny than the

18   testimony of an ordinary witness.  You should consider whether

19   the cooperating witness received any benefits or promises from

20   the government or otherwise benefited from his cooperation with

21   the government that would motivate that witness to testify

22   falsely against either of the defendants.

23           It does not follow, however, that simply because a

24   person has admitted to participating in whatever crimes, that

25   that witness is incapable of giving truthful testimony.  I have

1    given you some considerations on credibility.  I am not going

2    to repeat them here.

3              However, I do want to say a few things that you may

4    want to consider when thinking about the testimony of a

5    cooperating witness.  Ask yourselves whether the cooperating

6    witness would benefit more by lying or by telling the truth.

7    Do you think their testimony was made up in some way because

8    they believed or they somehow received favorable treatment if

9    they testify falsely before you?

10             Or do you think they believed their interests would be

11   best served by testifying truthfully?  If you believe that that

12   cooperating witness was motivated by hopes of personal gain, is

13   the motivation one that would cause that witness to lie or was

14   it one that would cause that witness to tell the truth?

15             Did the motivation color that cooperating witnesses'

16   testimony?

17             As with any witness, let me emphasize that the issue

18   of credibility need not be decided in an all-or-nothing

19   fashion.  Even if you find that witness testified falsely in

20   one part, you can still accept that witness's testimony in

21   other parts, or you might disregard all of it.  You know that

22   is true of any of the witnesses you heard.  Look at all the

23   evidence in deciding what credibility and what weight, if any,

24   you will give the cooperating witness.

25             Now, during the trial you heard testimony of witnesses

1    and argument by counsel that the government did not utilize

2    specific investigative techniques and, indeed, I believe I have

3    already charged you on that issue.  You can consider these

4    facts in deciding whether the government has met its burden of

5    proof because you have to look to all the evidence or lack of

6    evidence in deciding whether the defendants are guilty or not.

7          But I'm also instruct you that there is no requirement

8    in the law that the government use any specific investigative

9    technique to prove its case.  Your concern is not what law

10   enforcement techniques were used or what law enforcement

11   techniques were not used.  Here is that theme again, ladies and

12   gentlemen.  Your concern is simply to determine whether or not,

13   on the evidence or lack of evidence, the guilt of each

14   defendant has been proven beyond a reasonable doubt.

15         Shahram Ketabchi called a witness who has given her

16   opinion of his good character.  I believe that was his sister,

17   if I remember correctly.  That testimony is not to be taken by

18   you as the witness's opinion as to whether Shahram Ketabchi is

19   guilty or not guilty.  That is for you to decide, not that

20   witness.  You should consider this character evidence together

21   with all the facts and all the other evidence in the case in

22   determining whether Shahram Ketabchi is guilty or not guilty of

23   the charges against him.

24         Accordingly, if after consideration of all of the

25   evidence, including the sister's testimony about his good

1   character, you find a reasonable doubt has been created, you

2   must acquit him of the charges.  On the other hand, if, after

3   considering all of the evidence, including the evidence from

4   his sister of his character, you are satisfied beyond a

5   reasonable doubt that Shahram Ketabchi is guilty, you should

6   not acquit him merely because you believe him to be a person of

7   good character.

8         Now I have told you this before.  I am going to tell

9   it to you again.  A defendant in a criminal case never has any

10   duty to testify or come forward with any evidence.  This is

11   because the burden of proof beyond a reasonable doubt remains

12   with the government at all times and the defendant is presumed

13   innocent.

14         Here both Mr. Owimrin and Mr. Shahram Ketabchi

15   independently decided to testify, and they were subject to

16   cross-examination just as any other witness.  You should

17   examine and evaluate their testimony just as you would the

18   testimony of any witness with an interest in the outcome of the

19   case.

20         Now, there has been a fair amount of testimony here

21   about people who are not on trial before you.  You may not draw

22   any inference, favorable or unfavorable, toward the government

23   or Mr. Owimrin or Mr. Shahram Ketabchi from the fact that

24   anyone other than those two defendants is not on trial here.

25   You may not speculate as to the reasons why other people are

1   not on trial, all right?  Those matters are wholly outside of

2   your concern and they have no bearing on your function as

3   jurors.

4          I told you earlier that a defendant must have acted

5   knowingly in order to be convicted.  This is true with respect

6   to the objects of the conspiracy charged in Count 1 and in

7   Count 2.  In determining whether each defendant acted knowingly

8   with respect to the objectives of the conspiracy, you may

9   consider whether that defendant closed his eyes to what

10  otherwise would have been obvious to him.  This is what the

11  phrase conscious avoidance refers to.  Then you remember in at

12  least one summation, perhaps in more than one, the lawyer and

13  lawyers were talking about conscious avoidance.

14         As I've told you before, acts done knowingly must be a

15  product of a person's conscious intention.  They cannot be the

16  result of carelessness, negligence or foolishness, but a person

17  may not intentionally remain ignorant of the fact that is

18  material and important to his conduct in order to escape the

19  consequences of criminal law.

20         We refer to this notion of intentionally blinding

21  yourself to what is staring you in the face as conscious

22  avoidance.  An argument by the government of conscious

23  avoidance is not a substitute for proof of knowledge.  It is

24  simply another factor that you, the jury, may consider in

25  deciding what that defendant knew.  Thus, if you find beyond a

IB6JKET6                          Charge

1    reasonable doubt that the defendant you are considering was

2    aware that there was a high probability that a fact was so, but

3    that the defendant deliberately avoided confirming that fact,

4    such as by purposely closing his eyes to it or intentionally

5    failing to investigate, then you may treat this avoidance of

6    positive knowledge as the equivalent of knowledge.

7          You must also keep in mind there is an important

8    difference between intentionally participating in a conspiracy

9    on one hand and knowing the specific object or objects of the

10   conspiracy on the other.  You may consider conscious avoidance

11   in deciding whether the defendant knew the objective or

12   objectives of the conspiracy, that is, whether the defendant

13   reasonably believed that there was a high probability that a

14   goal of the conspiracy was to commit the crimes charged as

15   objects in that conspiracy and deliberately avoided confirming

16   that fact, but participated on the conspiracy anyway.

17         The conscious avoidance cannot be used as a substitute

18   for finding that the defendant intentionally joined the

19   conspiracy in the first place.  It is logically impossible for

20   a defendant to intend and agree to join a conspiracy if he does

21   not actually know it exists, and that's the distinction I am

22   drawing.

23         In sum, if you find that the defendant you are

24   considering believed that there was a high probability that a

25   fact was so, and that that defendant deliberately and

1    consciously avoided learning the truth of that fact, you may

2    find that that defendant acted knowingly with respect to that

3    fact.

4           However, if you find that the defendant actually

5    believed the fact was not so, then you may not find that he

6    acted knowingly with respect to that thing.  You must judge

7    from all the circumstances and all the proof whether the

8    government did or did not satisfy its burden of proof beyond a

9    reasonable doubt.

10          Now, I've been giving you instructions on general

11   matters.  I now am going to turn to the indictment itself.

12   I'll go through what the indictment charges.  I'll go through

13   the elements of each of the two counts in this indictment and

14   then I'll give you some concluding instructions and then you

15   can begin your deliberations if we have time tonight.

16   Otherwise, tomorrow morning.

17          The defendants, Andrew Owimrin, also known as Andrew

18   Owens, and also known as Jonathan Stewart, and Shahram

19   Ketabchi, also known as Steve Ketabchi, have been charged in an

20   indictment, and you know that this indictment is simply an

21   accusation.  It is simply the means that starts a criminal

22   case.  It is not evidence.  It is not proof of guilt.  It

23   creates no presumption.  It permits no inference by you that

24   either of the defendants are guilty.  Give no weight to the

25   fact that there has been an indictment here.  In fact, as you

 1    know, each defendant has pled not guilty.

 2            This indictment -- and again you'll have it in the

 3    room with you, and I will give you as many copies of it as you

 4    want -- has two counts or charges.  Count 1 charges that from

 5    approximately October 2013 up to approximately March 2017, each

 6    of the defendants conspired, that is, agreed with at least one

 7    other person to violate the federal statute that makes it

 8    unlawful to commit wire fraud.  A conspiracy such as that

 9    charged in Count 1 is a criminal agreement to violate the law.

10    It is Count 1, conspiracy to commit wire fraud.

11            Count 2 charges that from the same time period, that

12    is, October 2013 to March 2017, approximately, the defendants

13    agreed with at least one other person to violate the federal

14    statute that makes it unlawful to commit money laundering.  You

15    have to consider each count separately and you have to consider

16    each defendant separately.  When you do retire to deliberate, I

17    am going to give you a verdict form which will help you

18    structure your deliberations; in other words, it will have

19    question one, which you will answer; two, and so forth and you

20    just go right down the verdict form.

21            But you do have to consider each count separately.  I

22    suggest you consider Count 1 first and then Count 2, and you

23    have to consider each defendant separately on each count

24    whether you find the defendant you are considering guilty or

25    not guilty as to one count cannot affect your verdict as to the

1    guilt or non-guilt of that defendant on the other count, right?

2    Each count is separate and each defendant is separate.  All

3    right.  Let me tell you about the elements of Count 1 and Count

4    2.

5            First I'm going to charge you on the law of

6    conspiracy, and you know that Count 1 is conspiracy to commit

7    wire fraud, Count 2 is conspiracy to commit money laundering,

8    so you will apply the elements of conspiracy to each Count 1

9    and Count 2.  Count 1 and Count 2 require proof of a

10   conspiracy; that is, the existence of a conspiracy and the

11   defendant's membership in that conspiracy.  I will unpack that

12   now.

13           A conspiracy is a type of criminal partnership, an

14   agreement of two or more people to join together to accomplish

15   an unlawful purpose.  The crime of conspiracy, which simply

16   means agreement to violate a federal law, is itself a crime;

17   and, hence, Count 1 and Count 2.

18           It is separate and distinct from the actual violation

19   of any specific law, which the law refers to as substantive

20   crimes.  You can find a defendant guilty of the crime of

21   conspiracy even if you find that the substantive crime, which

22   was the object of the conspiracy, was never committed.

23   Congress has deemed it appropriate to make conspiracy by itself

24   a separate crime even if the conspiracy was not successful.  To

25   sustain its burden of proof with respect to an allegation of

1   conspiracy, the government must prove beyond a reasonable doubt

2   the following two elements:

3        First, the government must prove the existence of the

4   conspiracy charged in the indictment, that is, the existence of

5   the agreement or understanding to commit the unlawful objects

6   of the conspiracy;

7        Second, the government must prove that the defendant

8   willfully and knowingly became a member of the conspiracy with

9   the intention of furthering its illegal purpose, that is, with

10  the intention to commit an object of the charged conspiracy.

11       So now let's look at the two elements of conspiracy

12  law.  One is the existence of the conspiracy and two is the

13  membership in a conspiracy.  Was the defendant you are

14  considering a member of the conspiracy?  Again, a conspiracy is

15  an agreement of at least two people to violate a federal law.

16       In order to show that a conspiracy existed, the

17  evidence must show that two or more people in some way or

18  manner, through any contrivance, explicitly or implicitly, that

19  is, spoken or unspoken, came to an understanding to violate the

20  law and to accomplish an unlawful plan.  Express language or

21  specific words are not required to indicate assent or

22  attachment to a conspiracy.  If you find beyond a reasonable

23  doubt that two or more persons came to an understanding,

24  express or implied, to violate the law and to accomplish an

25  unlawful plan, then the government will have sustained its

IB6JKET6                         Charge

1   burden of proof as to this element.

2          To satisfy this element of a conspiracy, namely, to

3   show that a conspiracy existed, the government is not required

4   to show two or more people sat around a table and entered into

5   a solumn pact, orally or in writing, stating they have formed a

6   conspiracy to violate the law and spelling out all the details.

7          Common sense tells you that when people, in fact,

8   agree to enter a criminal conspiracy, much is left to the

9   unexpressed understanding.  It is rare, indeed, that a

10  conspiracy is proven by direct evidence of an explicit

11  agreement.  Conspirators do not generally reduce their

12  agreements to writing or have them notarized before a notary

13  public and they normally don't publicly broadcast they have

14  agreed to violate a federal law.

15         From its very nature, conspiracy is invariably secret

16  in its origin and execution.  In determining whether or not an

17  agreement to violate a federal law existed, you may consider

18  direct and circumstantial evidence.  The old adage actions

19  speak louder than words certainly applies here.  Often the only

20  evidence that is available with respect to the existence of a

21  conspiracy is that of disconnected acts and conduct on the part

22  of the alleged individual co-conspirators.

23         When taken together and considered as a whole,

24  however, these acts and conduct may warrant an inference that a

25  conspiracy existed as conclusively as with direct proof such as

IB6JKET6                          Charge

1    evidence of express agreement.  On this question, you should

2    refer back to my earlier instructions on direct and

3    circumstantial evidence and inferences.

4         In short, as far as the first element of the

5    conspiracy is concerned, the government must prove beyond a

6    reasonable doubt at least two alleged co-conspirators came to a

7    mutual understanding, either spoken or unspoken, to violate the

8    law in the manner charged in Count 1 and Count 2.  If you

9    decide that the government has proven beyond a reasonable doubt

10   that the conspiracy charged in Count 1 or Count 2 existed, then

11   go on to consider the second element of conspiracy law:

12        Did the defendant you are considering participate in

13   the conspiracy knowing its unlawful purpose and in furtherance

14   of its unlawful objective?

15        In order to satisfy this element, the government must

16   prove beyond a reasonable doubt that the defendant you are

17   considering knowingly and willfully entered into the conspiracy

18   with a criminal intent, that is, in order to violate the law

19   and that he agreed to take part in the conspiracy to further

20   promote and cooperate in its unlawful objective.

21        Now, there has been a lot of talk about whether an act

22   is done knowingly and willfully.  An act is done knowingly and

23   willfully if it is done deliberately and purposefully; that is,

24   the defendant's actions must have been his conscious objective

25   rather than a product of a mistake or an accident or negligence

IB6JKET6                        Charge

1   or some other innocent reason.

2           To satisfy its burden of proof that a defendant

3   willfully and knowingly became a member of the conspiracy to

4   accomplish an unlawful objective, the government must prove

5   beyond a reasonable doubt that the defendant you are

6   considering knew that he was a member of an operation or

7   conspiracy to accomplish that unlawful purpose and that his

8   action of joining such an operation or conspiracy was not due

9   to being careless or being negligent, because of a mistake on

10  the part of that defendant.

11          Now, knowledge, you realize, is a matter of inference

12  from proven facts.  I am pleased to be able to tell you that

13  science has not yet figured out a way of looking into

14  somebody's mind and knowing what that person is thinking.  That

15  is something you're to do here based on the evidence in this

16  case.  You do have before you the evidence of acts alleged to

17  have taken place by or with the defendants or in their

18  presence.

19          A defendant's knowledge is essentially a matter of

20  inference that you are permitted to draw from the facts in

21  evidence here.  I do instruct you that to become a member of a

22  conspiracy, the defendant need not have known the identities of

23  all the other members of the conspiracy.  He need not have been

24  appraised of all the activities of the other members.  He need

25  not have been fully informed as to the details or the scope of

1    the conspiracy in order to justify an inference by you of

2    knowledge by that defendant.

3            The duration and extent of a defendant's participation

4    in the conspiracy that you are considering has no bearing on

5    the issue of that defendant's guilt.  He need not have joined

6    the conspiracy in the beginning.  He may have joined it at any

7    time in its progress, and that defendant will still be held

8    responsible for all that was done before he joined the

9    conspiracy and all that was done during the conspiracy's

10   existence while he was still a member.

11           Indeed, each member of a conspiracy may very well

12   perform separate and distinct acts and may perform them at

13   different times.  That makes no difference.  Some conspirators

14   play major roles in a conspiracy and others play minor roles in

15   a conspiracy.  An equal role is not required by law.  In fact,

16   even a single act by the defendant you are considering may be

17   sufficient to draw that defendant within the ambit of the

18   charged conspiracy.

19           However, I do want to caution you that a defendant's

20   mere presence at the scene of a crime does not by itself make

21   him a member of the conspiracy.  A person may know or be

22   friendly with one or more members of a conspiracy and not be a

23   conspirator himself.  I also caution you that mere knowledge or

24   acquiescence, without participation in the unlawful plan, is

25   not sufficient.  What is necessary is that a defendant must

IB6JKET6                          Charge

1    have participated with knowledge of at least some of the

2    purposes or objects of the conspiracy, with the intention of

3    aiding in the accomplishment of those unlawful ends.

4          Once a conspiracy is formed, it is presumed to be

5    continue until either its objective is accomplished or there is

6    some affirmative act of termination by the members.  So, too,

7    once a person is found to be a member of a conspiracy, he is

8    presumed to continue as a member of a conspiracy until a

9    conspiracy is terminated unless it is shown by some affirmative

10   proof that the person withdrew and disassociated himself from

11   it.

12         If you find a conspiracy existed and that the

13   defendant was a member, you may take into account against the

14   defendant any acts or statements made during and in furtherance

15   of the conspiracy and any of his co-conspirators, even though

16   such acts or statements were not made in the presence of the

17   defendant or even if they were made without his knowledge.

18         In sum, in order to find the defendant guilty of

19   conspiracy, you must find that the defendant, with an

20   understanding of the unlawful character of the conspiracy,

21   intentionally engaged, advised or assisted in for the purpose

22   of furthering the illegal undertaking, he thereby becomes a

23   knowing and willing participant in the unlawful agreement; that

24   is to say, a conspirator.  All right.  I have told you about

25   the law of conspiracy.

1            Now lets turn specifically to Count 1, conspiracy to

2    commit wire fraud.  Each defendant is charged in Count 1 with

3    participating in a conspiracy to violate the federal statute

4    that makes it unlawful to commit wire fraud.  Specifically,

5    Count 1 charges that each defendant agreed with at least one

6    other person to commit wire fraud by operating telemarketing

7    schemes that called victims and convinced them to write checks

8    or authorize credit card charges in order to invest in

9    purported home-based businesses.  The elements of Count 1 are

10   the elements I just told you about:

11           First, the existence of a conspiracy, the existence of

12   an agreement or understanding between two or more persons to

13   commit the unlawful acts, object of the charged conspiracy.  In

14   this case, the object is wire fraud;

15           Second, that the defendant you are considering

16   willfully and knowingly became a member of the conspiracy.

17   Remember the first element is did it exist.  The second element

18   is did the defendant become a member.  Yes, they became a

19   member with intent to fulfill its illegal purposes, that is,

20   with the intent to commit wire fraud.

21           All right.  Now let's unpack each of those.  The

22   object of the conspiracy in Count 1, as I told you, is wire

23   fraud.  In order to prove that the defendant you are

24   considering is guilty of the conspiracy in charged in Count 1

25   and conspiracy to commit wire fraud, the government has to

establish beyond a reasonable doubt that that defendant agreed

with others to commit wire fraud.  The elements of wire fraud

are straightforward:

One, that in or about the times alleged in the

indictment, there was a scheme or artifice to defraud others of

money or property by false or fraudulent pretenses,

representations or promises;

Two, that the defendant knowingly and willfully

devised or participated in the scheme or artifice to defraud

with knowledge of its fraudulent nature and with the specific

intent to defraud;

Three, that the scheme was executed by using or

causing others to use the interstate or foreign wires.

If you find beyond a reasonable doubt that the

defendant agreed with at least one other person that those

things be done, then the wire fraud objective will have been

proved.

The first element I've talked about, the wire fraud,

its existence of the scheme or artifice to defraud.  A scheme

or artifice is simply a plan for the accomplishment of an

illegal object.  Fraud is a general term that includes all the

possible means by which someone seeks to gain some unfair

advantage over someone else by means of false representations,

false suggestions, false pretenses or concealing the truth.

The unfair advantage sought can involve money,

IB6JKET6                          Charge

property or anything whatsoever of value.  Therefore, a scheme

to defraud is a plan, device or course of action to deprive

someone else of money or property by means of false or

fraudulent pretenses, representations or promises.  It is a

plan to deprive somebody else of money or property by trick,

deceit, deception, swindle or overreaching.

                    (Continued on next page)

IB68KET7                        Charge

1          THE COURT:  In order to establish a scheme to defraud,

2   the government need not show that the defendant you are

3   considering made a misrepresentation.  A scheme to defraud can

4   exist even if the scheme did not progress to the point where

5   misrepresentations would be made.  In addition even if you find

6   that the statements the government contends were made or

7   contemplated by the defendant in furtherance of the scheme were

8   literally true, you can still find that the first element of

9   wire fraud statute has been satisfied if the statements and/or

10  conduct of that defendant were deceptive.  You may also find

11  the existence of such a scheme if you find that the defendant

12  you are considering knowingly and intentionally conducted

13  himself in a manner that departed from traditional notions of

14  fundamental honesty and fair play in the general business life

15  of society.

16         A scheme to defraud need not be shown by direct

17  evidence, but may be established by all the circumstances and

18  facts in the case.

19         A "pretense, representation or statement" is

20  fraudulent if it was made falsely and with intent to deceive.

21  A statement may also be fraudulent if it contains half-truths

22  or if it conceals material facts in a manner that makes what is

23  said or represented deliberately misleading or deceptive.

24         A false or fraudulent representation or concealment

25  must relate to a material fact or matter.  A material fact is

1    one that would reasonably be expected to be of concern to a

2    reasonable and prudent person in relying upon the

3    representation or statement in making a decision.  That means

4    that, if you find a particular statement or representation

5    false, you must determine whether that statement or

6    representation was one that a reasonable person might have

7    considered important in making his or her decision.  The same

8    principle applies to fraudulent half-truths or omissions, that

9    is, failures to disclose facts.

10           In order to satisfy this first element, the government

11   must also prove that the alleged scheme contemplated depriving

12   another of money or property.  It is not necessary for the

13   government to establish that the that defendant actually

14   realized any gain from the scheme or that any particular person

15   actually suffered any loss as a consequence of the fraudulent

16   scheme.  You must concentrate on whether there was such a

17   scheme, not on the consequences of the scheme.

18           The second element of wire fraud is that the defendant

19   devised or participated in the fraudulent scheme knowingly,

20   willfully, and with the specific intent to defraud.

21           The words "devised" and "participated" are words that

22   you are familiar with and, therefore, I do not need to spend

23   much time defining them for you.  To "devise" a scheme to

24   defraud is to concoct or plan it.  To "participate" in a scheme

25   to defraud means to associate oneself with it with a view and

1    intent toward making it succeed.  While a mere onlooker is not

2    a participant in a scheme to defraud, it is not necessary that

3    a participant be someone who personally and visibly executes

4    the scheme to defraud.

5            In order to satisfy this element, it is not necessary

6    for the government to establish that the defendant originated

7    the scheme to defraud.  It's sufficient if you find that a

8    scheme to defraud existed, even if it was originated by someone

9    else, and that the defendant you are considering, while aware

10   of the scheme's existence, knowingly participated in that

11   scheme to defraud.

12           It is also not required that the defendant

13   participated in or had knowledge of all of the operations of

14   the scheme.  The guilt of a defendant is not governed by the

15   extent of his participation.

16           It also is not necessary that a defendant participated

17   in the alleged scheme from the beginning.  I have told you

18   that.  Someone who comes in at a later point with knowledge of

19   the scheme's general operation, although not necessarily

20   knowing all of its details, and intentionally acts in a way to

21   further the unlawful goals, is a member of the scheme and is

22   therefore legally responsible for all that may have been done

23   in the past to further the criminal objective, as well as all

24   that is done after that person joined the scheme.

25           Even if one defendant participated in the scheme to a

IB68KET7                        Charge

1    lesser degree than other members of the conspiracy, he is

2    nevertheless equally guilty, so long as that defendant became a

3    member of the scheme to defraud knowing its general scope and

4    purpose.

5          A defendant acted with specific intent to defraud if

6    that defendant engaged or participated in the fraudulent scheme

7    with some realization of its fraudulent or deceptive character

8    and with an intention to be involved in the scheme to defraud

9    and to help it succeed with a purpose of causing harm to the

10   victim.  The government need not prove that the intended

11   victims were actually harmed; only that such harm was in fact

12   contemplated.  Actors are presumed to intend the natural and

13   probable consequences of their actions.  So when the necessary

14   result of the actor's scheme is to injure someone else,

15   fraudulent intent may be inferred from the scheme itself.

16         The question of whether someone acted knowingly,

17   willfully, and with specific intent to defraud is a question of

18   fact for you to determine, like any other fact.  This question

19   involves one's state of mind.  As I told you before, direct

20   proof of knowledge, willfulness, and fraudulent intent is

21   almost never available.  It's rare, as I have said, where it

22   can be shown that someone wrote or stated that at a given time

23   he or she committed or intended to commit an act with

24   fraudulent intent.  So I assure you direct proof of fraudulent

25   intent is not required by law.

1          The ultimate facts of knowledge and criminal intent,

2    though subjective, may be established by circumstantial

3    evidence -- and almost always are -- based upon a person's

4    manifestations, words, conduct, acts, and all of the

5    surrounding circumstances disclosed by the evidence and the

6    rational or logical inferences that may be drawn from those

7    circumstances.

8          What is referred to as drawing from circumstantial

9    evidence is no different from what people normally mean when

10   they say, and I have said, "use your common sense."  It means

11   that when you come to decide whether the defendant you are

12   considering possessed or lacked an intent to defraud, you need

13   not limit yourself to just what the defendant said, but you may

14   also look at what that defendant did, what others did in

15   relation to that defendant and, in general, everything that

16   happened.

17         Let me advise you that since an essential element of

18   the crime charged is intent to defraud, it follows that good

19   faith on the part of a defendant is a complete defense to a

20   charge of wire fraud.  A defendant has no burden to establish

21   that he acted in good faith.  The burden, as you know, is on

22   the government to prove fraudulent intent and lack of good

23   faith beyond a reasonable doubt.  Under the antifraud statutes,

24   even false representations or statements or omissions of

25   material facts do not amount to a fraud unless done with

IB68KET7                           Charge

1    fraudulent intent.  And you will remember the lawyers talked

2    about that in their summations.  An honest belief in the truth

3    of the representations made by a defendant is a complete

4    defense, even though the statements may turn out to be

5    inaccurate.  So fraudulent intent is necessary.

6            Now, the third and final element of wire fraud is that

7    interstate or foreign wire facilities were used in furtherance

8    of the scheme to defraud.

9            The requirement of the use of interstate or foreign

10   wire facilities simply means that the wire communication was

11   passed between two or more states as, for example, a wire

12   transfer of funds between New York and some other state, such

13   as New York, California, or a territory, such as the U.S.

14   Virgin Islands, or between the United States and some foreign

15   country.

16           It is not necessary for the defendant you are

17   considering to be directly or personally involved in any wire

18   communication, as long as the communication is reasonably

19   foreseeable in the execution of the alleged scheme to defraud

20   in which the defendant is accused of participating.  In this

21   regard, it would be sufficient to establish this element of the

22   crime if the evidence justifies a finding that the defendant

23   caused the wires to be used by others; and this does not mean

24   that the defendant himself must have specifically authorized

25   others to execute the wire transfer.  When one does an act with

1    knowledge that the use of the wires will follow in the ordinary

2    course of business, or where such use of the wires can

3    reasonably be foreseen, even though not actually intended, then

4    that defendant causes the wires to be used.

5            Is that clear?  The defendant doesn't actually have to

6    have transmitted the wire transmission.  The wire communication

7    requirement is satisfied even if the wire communication was

8    done by somebody with no knowledge of the fraudulent scheme.

9    It can even be done by a victim of the alleged fraud.

10           The use of the wire itself need not be fraudulent.

11   The wire communication need not contain any fraudulent

12   representation, or it doesn't even have to contain a request

13   for money.  It's sufficient if the wire was used to further or

14   assist in carrying out the scheme to defraud.

15           If you find beyond a reasonable doubt that the

16   defendant you are considering agreed with others to commit the

17   offense of wire fraud, as I have just defined it for you,

18   ladies and gentlemen, you should convict that defendant on

19   Count One.

20           Now, we are moving forward.  We are now going to turn

21   to Count Two.

22           Count Two charges each of the defendants with

23   conspiring to engage in money laundering.  To prove a defendant

24   guilty of the conspiracy charged in Count Two, the government

25   has to prove beyond a reasonable doubt each of the same two

IB68KET7                          Charge

1     elements I described with respect to Count One; that is, the

2     existence of the conspiracy and that the defendant you are

3     considering willfully and knowingly became a member of the

4     conspiracy with the intent to further its illegal purposes.

5     And the conspiracy charged in Count Two is conspiracy to commit

6     money laundering.

7              The instructions I provided earlier about what it

8     means to have an unlawful agreement and what it means to

9     knowingly enter into that agreement similarly apply to Count

10    Two.  Keep in mind, you may find a defendant guilty of the

11    crime of conspiring to commit money laundering even if the

12    substantive crime of money laundering was not actually

13    committed.  Conspiracy is a crime, even if the conspiracy is

14    not successful, or even if a defendant itself did not commit

15    the substantive crime.

16             Now, there is an aspect of Count Two, conspiracy to

17    commit money laundering, that is different than Count One,

18    conspiracy to commit wire fraud.

19             Count Two alleges two separate objects.  Remember,

20    Count One alleged only one object, the substantive crime of

21    wire fraud.  Count Two alleges two separate objects.

22             First, it alleges that the defendants agreed to commit

23    money laundering by engaging in financial transactions that

24    involved the proceeds of the wire fraud, that is, the

25    telemarketing fraud, in order to promote the carrying on of the

1    telemarketing fraud.

2           The second object of the money laundering conspiracy

3    is that Count Two alleges that the defendants agreed to commit

4    money laundering by engaging in monetary transactions greater

5    than $10,000 involving the proceeds of the telemarketing fraud.

6           The government does not have to prove that each

7    defendant agreed with others to achieve one of these two

8    alleged objects in order to convict that defendant on Count

9    Two.  The government may, but it is not obliged, to prove both

10   for either defendant and need not prove the same object for

11   both defendants.

12          Here, as I said, there are two alleged objects of the

13   conspiracy, assuming all the other elements of the offense are

14   proved.  If you unanimously agree that object number one was an

15   objective of the conspiracy alleged in Count Two, you may

16   convict even if you disagree on object number two or even if

17   you think object number two was not part of the conspiracy.

18   But, for example, if half of you agree on object number one and

19   half of you disagree, and half of you agree on object number

20   two and the other half disagree, there is no object as to which

21   all of you are in agreement and you cannot convict.  In other

22   words, there are two objects.  In order to convict -- a better

23   way to phrase it is, before you can convict one of the

24   defendants, you have to agree unanimously that at least one of

25   the objects were met.  You can, of course, agree that both

1    objects were met.  You don't have to.  You can agree that one

2    object was met, but it has to be unanimous to agree that an

3    object has been met.

4         There has to be unanimous agreement on at least one

5    object in order to find that the conspiracy existed, but you

6    need not find that both defendants conspired with others to

7    achieve the same object.  You may find that one defendant

8    agreed with a third party to achieve the first object of money

9    laundering conspiracy and find that the other defendant agreed

10   with someone else to achieve the second object of the money

11   laundering conspiracy.

12        If the government fails to prove that at least one of

13   the two objects was a goal of any conspiracy you find to have

14   existed, then you must find the defendants not guilty on Count

15   Two.

16        The first object of Count Two is what is called

17   promotional money laundering.  In order to prove the first

18   object of Count Two, the government must prove beyond a

19   reasonable doubt that the conspirators agreed to accomplish

20   money laundering by:  (1) engaging in financial transactions,

21   (2) involving the proceeds of specified unlawful activity, (3)

22   which the conspirators knew were crime proceeds, and (4) that

23   the conspirators did so with the intent to promote the carrying

24   on of the specified unlawful activity.  I will discuss each of

25   those in more detail.

IB68KET7                    Charge

1      In order to prove the first object of Count Two, the

2  government must prove beyond a reasonable doubt that two or

3  more persons knowingly agreed to conduct a financial

4  transaction.

5      The term "conducts" includes the action of initiating,

6  concluding, or participating in initiating or concluding a

7  transaction.

8      A "transaction" includes a purchase, sale, loan,

9  pledge, gift, transfer, delivery, or other disposition of

10  property.

11      The term "financial transaction" means (1) a

12  transaction involving a financial institution which is engaged

13  in, or the activities of which affect, interstate or foreign

14  commerce in any way or degree, or (2) a transaction which in

15  any way or degree affects interstate or foreign commerce and

16  involves the movement of funds by wire or other means, or

17  involves one or more monetary instruments.

18      A "transaction involving a financial institution"

19  includes a deposit, withdrawal, transfer between accounts,

20  exchange of currency, loan, extension of credit, purchase or

21  sale of any stock, bond, certificate of deposit, or other

22  monetary instrument, use of a safe deposit box, or any other

23  payment, transfer, or delivery by, through, or to a financial

24  institution by whatever means.

25      The term "monetary instrument" includes, among other

things, coin or currency of the United States or any other
country, personal checks, traveler's checks, cashier's checks,
bank checks, money orders, and investment securities or
negotiable instruments in bearer form or otherwise in such form
that title thereto passes upon delivery.

The term "interstate or foreign commerce" means
commerce between any combination of states, territories or
possessions of the United States, or between the United States
and a foreign country. Thus, if you find that the source of
the funds used in the transaction affected interstate commerce,
that is sufficient as well. Or, if you find that the
transaction itself involved an interstate transfer of funds,
that would also be sufficient.

Now, let's turn to the second element of object one.

The second element the government must prove beyond a
reasonable doubt is that the property involved in the agreed
upon financial transaction was the proceeds of some form of
specified unlawful activity, namely, the telemarketing fraud.
The term "proceeds" means any property derived from or obtained
or retained, directly or indirectly, through some form of
unlawful activity, including the gross receipts of such
activity.

The term "specified unlawful activity" means any one
of a variety of offenses defined by the statute. In this case,
the government has alleged that the funds in question here were

1    the proceeds of wire fraud, that is, the telemarketing fraud.

2    I instruct you, as a matter of law, wire fraud falls within the

3    definition of a "specified unlawful activity," but it's for you

4    to determine, based on these instructions, whether wire fraud

5    was in fact committed and whether the funds in question were

6    the proceeds of that alleged unlawful activity.  It is also not

7    necessary that the defendant himself committed the crime or

8    unlawful activity giving rise to the proceeds.  In other words,

9    you don't have to find that the defendant you are considering

10   committed the underlying wire fraud in order to find that

11   defendant guilty of the money laundering conspiracy.

12        The third element the government has to prove beyond a

13   reasonable doubt is that the conspirators agreed to engage in

14   these financial transactions with knowledge that the

15   transaction or transactions involved the proceeds of some form,

16   though not necessarily which form, of unlawful activity that

17   constitutes a felony under state, federal, or foreign law.  The

18   government does not have to prove that the defendant knew the

19   precise nature of that criminal offense, or that the defendant

20   knew that the property involved in the transaction represented

21   the proceeds of any particular "specified unlawful activity" as

22   defined by the statute, such as wire fraud.  The government

23   only has to prove that the defendant knew that the transaction

24   involved the proceeds of some criminal offense.

25        The fourth element the government has to prove beyond

IB68KET7                          Charge

a reasonable doubt is that the conspirators agreed to engage in

these financial transactions with the knowledge that the

purpose of the transaction was to promote the carrying of

specified unlawful activity, namely, the telemarketing fraud.

You are entitled to find from the circumstances surrounding the

financial transactions or attempted financial transactions the

purpose of that activity and the defendant's knowledge and

intent.

          The second object of Count Two charges the defendants

with conspiring to engage in monetary transactions over $10,000

in property derived from specified unlawful activity.  For you

to find the defendants agreed to commit money laundering, with

the second object of Count Two, you must find that the

defendants agreed:

          First, to engage in a monetary transaction in or

affecting interstate commerce.

          Two, that the monetary transaction involved criminally

derived property of a value greater than $10,000.

          Third, that the property was derived from specified

unlawful activity.

          Fourth, that the defendant acted knowingly, that is,

with the knowledge that the transaction involved proceeds of a

criminal offense.

          Fifth, that the transaction took place in the United

States.

IB68KET7                        Charge

1         I remind you that you need not find the defendant had

2    both objectives of Count Two in order to convict that

3    defendant.  It's sufficient if you are unanimous that that

4    defendant you are considering agreed with others to achieve a

5    single one of the two unlawful objectives alleged by the

6    government.

7         The first element that the government must prove

8    beyond a reasonable doubt is that the defendants agreed to

9    engage in a monetary transaction in or affecting interstate

10   commerce.

11        The term "monetary transaction" means the deposit,

12   withdrawal, transfer, or exchange, in or affecting interstate

13   or foreign commerce, of funds or a monetary instrument by,

14   through, or to a financial institution.

15        The term "interstate or foreign commerce" means

16   commerce between any combination of states, territories or

17   possessions of the United States, or between the United States

18   and another country.

19        You must find that the transaction affected interstate

20   commerce in some way, however minimal that may be.  The effect

21   on interstate commerce can be established several ways.  For

22   example, if you find that the source of the funds used in a

23   transaction affected interstate commerce, that's adequate.  Or

24   if you find that the transaction itself involved an interstate

25   transfer of funds, that also is adequate.

1          The second element the government must prove beyond a

2     reasonable doubt is that the defendants agreed to engage in

3     monetary transactions involving criminally derived property

4     having a value of more than $10,000.

5          The term "criminally derived property" means any

6     property constituting, or derived from, proceeds obtained from

7     a criminal offense.  The term "proceeds" has the same meaning I

8     provided previously with respect to the first object of the

9     conspiracy.

10         The government is not required to prove that all of

11    the property involved in the transaction was criminally derived

12    property, but the government must prove that more than $10,000

13    of the property involved was criminally derived property.

14         The third element the government has to prove beyond a

15    reasonable doubt is that the defendant you are considering knew

16    that the property involved in the agreed upon financial

17    transaction or transactions was the proceeds of some form of

18    unlawful activity.

19         The term "specified unlawful activity" has the same

20    meaning I gave you earlier.

21         The government must prove that the defendant knew that

22    the property involved in the transaction represented proceeds

23    from some form, though not necessarily which form, of activity

24    that constitutes a felony under state, federal, or foreign law.

25    I instruct you, as a matter of law, wire fraud is both a

1   criminal offense and specified unlawful activity.

2           The fourth element which the government must prove

3   beyond a reasonable doubt is that the defendant agreed to

4   engage in these financial transactions with knowledge that the

5   transaction or transactions involved property derived from a

6   criminal offense.

7           I instruct you that in a prosecution for an offense

8   under this section, the government is not required to prove

9   that the defendant knew the particular offense from which the

10  criminally derived property was derived, but the government

11  must prove beyond a reasonable doubt that the defendant knew

12  that the transaction involved criminally derived property,

13  which I remind you means any property constituting, or derived

14  from, proceeds obtained from a criminal offense.

15          The fifth element which the government must prove

16  beyond a reasonable doubt is that the agreed upon transaction

17  took place in the United States.

18          Now, in addition to all the -- we are closing up now,

19  ladies and gentlemen.  In addition to the foregoing elements of

20  the offense, you must consider whether the crime charged, or

21  any act in furtherance of the crime charged, occurred within

22  the Southern District of New York.  The Southern District of

23  New York is Manhattan, the Bronx, Westchester, Rockland,

24  Putnam, Sullivan, Orange, and Dutchess Counties.

25          On this issue, and this issue alone, the government

1    need not prove venue beyond a reasonable doubt.  The burden of

2    proof on the government to prove venue is simply by a

3    preponderance of the evidence.  A "preponderance of the

4    evidence" means that the government must prove that simply that

5    it is more likely than not that any act in furtherance of the

6    count that you are considering occurred in the Southern

7    District of New York.  The government will have satisfied its

8    venue obligations in regard to each count if you conclude that

9    it's more likely than not that any act in furtherance of the

10   crime charged occurred within the Southern District of New

11   York.

12        I also note that the defendant need not be the

13   individual who committed or caused the act in furtherance of

14   the conspiracy, and the act may have been committed by a

15   co-conspirator, even if the co-conspirator is not the defendant

16   in this trial.

17        If you find that the government has failed to prove

18   this venue requirement, then you must acquit the defendants of

19   the charge.

20        The indictment alleges that certain acts occurred on

21   or about a specific date.  It does not matter if the evidence

22   at trial indicates that a particular act occurred on a

23   different date.  The law requires only a substantial similarity

24   between the dates and the amounts alleged in the indictment and

25   the dates and amounts established by the evidence.

1              Your sworn duty, ladies and gentlemen, is to determine

2      whether the defendant is guilty or not guilty solely on the

3      basis of the evidence or lack of evidence and these

4      instructions on the law.

5              I tell you again, you are not to be influenced by

6      sympathy or any assumption, conjecture or inference stemming

7      from personal feelings, the nature of the charges, or your view

8      of the seriousness or lack of seriousness of what the

9      government has charged here in the indictment.

10             Under your oath as jurors, you are not to consider the

11     punishment that may be imposed upon either of the defendants,

12     if either of the defendants is convicted.  The duty of imposing

13     a sentence in the event of conviction rests exclusively upon

14     me, ladies and gentlemen.  You are not to consider yourself

15     with what punishment, if any, will result from your decision.

16     Your function is to weigh the evidence in the case and to

17     determine the guilt or nonguilt of each of the defendants

18     solely on the basis of the evidence and the law that I have

19     given you.

20             Each of you is entitled to your own opinion, but you

21     must exchange views with your fellow jurors.  This is the

22     essence of jury deliberation.  It's your duty to discuss the

23     evidence.  If you have a point of view and after reasoning with

24     other jurors it appears that your own judgment is open to

25     question, then of course you should not hesitate in yielding

IB68KET7                          Charge

1    your original point of view if you are convinced that the

2    opposite point of view is really one that satisfies your

3    judgment and conscience.  But you are not to give up a point of

4    view that you conscientiously believe in simply because you are

5    outnumbered or outweighed.  Vote with the others only if you

6    are convinced on the evidence and the facts and the law that

7    that is the correct way to decide this case.

8          Now, you know we have made a record of these

9    proceedings.  As I have told you on a number of occasions, if

10   you want to have any exhibit brought in to the deliberation

11   room, the foreperson should simply send me a note that you want

12   a particular exhibit.

13         Now, be as specific as you can.  If you remember the

14   number, fine, give me the number.  If you don't, just be as

15   specific as you can.  Remember, it may take some time for us to

16   find that exhibit, so be as specific as you can.

17         Similarly, if you want testimony read back, that's

18   slightly different.  The foreperson should send out a note as

19   to what you want and be as specific as you can.  And then we

20   need to find that testimony, and then we are going to bring you

21   back into the courtroom and read that testimony to you.  The

22   reporter will read the testimony.  I do wish to remind you that

23   if you want, for example, testimony of somebody, and that

24   testimony took two days, it may take two days to read it back.

25   That doesn't mean I am not prepared to give you that testimony.

1   I will be.  But just be aware it takes time to both find the

2   testimony and to read the testimony back.  Again, I repeat,

3   feel free to ask for whatever testimony you want.  It's a

4   service that we can offer you.

5            In any note you send me, do not give me any indication

6   of your thinking on any disputed issue.  Don't give me any

7   preliminary vote titles or anything like that.

8            And as I said, you will have the indictment, you will

9   a copy of the charge, you will have a verdict form.  And you

10  will use that verdict form.  It will help structure your

11  deliberations.

12           Once you have reached a verdict -- and your verdict

13  must be unanimous, ladies and gentlemen -- the foreperson

14  should write me a note and say, your Honor, we have reached a

15  verdict.  Also, always date and time the note.  Don't tell me

16  what that verdict is in the note.  Then we will bring you out

17  here and in a rather formal proceeding I will take that verdict

18  with the reporter here.

19           Your verdict must be announced only in open court at

20  the end of your deliberations, and your verdict must be

21  unanimous.

22           You will see at the end of the verdict sheet, after

23  you have answered the various questions -- I think there are

24  five or six -- each of you should sign the verdict sheet and

25  then, as I say, the foreperson should send me a note.

IB68KET7

1      I am going to ask that tomorrow morning -- it's late

2  now.  I don't want to keep you.  It's 5:00.  I want to give you

3  adequate time to vote, if you haven't voted and if you so

4  choose to vote.  For one, I am quite tired so I don't want to

5  keep you here.  But let's meet at 9:15.  There can be no more

6  legal wrangling and there is no more testimony.  When you're

7  all here 9:15, you are going to get this case for your

8  deliberation.  We will have a marshal here and he will be sworn

9  to take you into the deliberation room and leave you alone

10  there and not let anybody come in and interfere with what

11  you're doing.  That's all formal.  I have never had anybody try

12  to enter a deliberation room to interfere with the jury, but

13  it's a nice formalistic statement in the oath of the marshal

14  that impresses upon everybody the importance of jury

15  deliberations.

16      I am going to ask that the jury choose its own

17  foreperson.  If you can't do that, I don't want any

18  disputation.  If you have trouble picking a foreperson,

19  somebody should send me a note and say we can't pick a

20  foreperson.  I will choose a foreperson.  But I think in the

21  first instance the jury can choose its own foreperson.

22      Sidebar, please.

23      (At the sidebar)

24      THE COURT:  Apart from the limited number of

25  objections that were stated, does anyone have any objections to

IB68KET7

1    the charge as given or seek additional charge?

2              MR. PAUL:  No.

3              MR. SCHMIDT:  No.

4              MS. FLETCHER:  No.

5              THE COURT:  I have one infinitesimally small change.

6    On page 58 there was a typo there.  I have deleted the word

7    "is."  So it should read:  In order to prove the first object

8    of Count Two, the government must prove beyond a reasonable

9    doubt that two or more persons knowingly agreed to conduct a

10   financial transaction.

11             MR. SCHMIDT:  No objection.

12             I do have one point.  We reviewed our 3500 material as

13   to Brooke Marcus.  Brooke Marcus makes it clear that she was

14   not supposed to giving leads to Arash Ketabchi from First

15   Trend.  That's why she was fired.  We don't have the specific

16   date that she was fired so I can't say that she was fired on a

17   specific date.  However, considering the argument made by the

18   government that she could have went back to First Trend or

19   Elite and do the deal there instead of A1, I didn't expect

20   that, because I don't think she could --

21             THE COURT:  But you don't know because you don't have

22   the date.

23             MR. SCHMIDT:  Also, the witness testified that she

24   said she was leaving the company, going to a new company, and

25   she changed the name in the phone to A1.  I would have raised

IB68KET7

1    that.  So I am asking your Honor if I could reopen my closing

2    argument for two minutes to make that point.

3              THE COURT:  Government.

4              MS. KEARNEY:  I have no idea what Mr. Schmidt is

5    referring to in the 3500.  If he wouldn't mind pointing it out,

6    perhaps we could respond.  I can say I personally met with Ms.

7    Marcus and she never represented to me that she had been

8    terminated from First Trend or Tri-Star.

9              THE COURT:  Do you have that 3500 material?

10             MR. SCHMIDT:  We have a transcript we made of a

11   two-hour meeting that she had with government agents.

12             THE COURT:  Let me see it.

13             What I would like to do is to tell Juror No. 14 that

14   he doesn't have to come in tomorrow.  That will save a day for

15   him.  He can go back to work.  I am not going to formally

16   excuse him, just in case somebody doesn't show up from the

17   jury, but I would like to save him the day.  Is there any

18   objection?

19             MR. SCHMIDT:  No objection.

20             MR. PAUL:  No.

21             MS. FLETCHER:  No.

22             We also have the updated verdict form, which is the

23   same as the prior one, except the lines and the date.

24             THE COURT:  Let me see it if you have it.

25             (Counsel conferred)

IB68KET7

1          THE COURT:  The first section that we were shown had

2     nothing about a date.

3          The second section, which is what page?

4          MR. TUREFF:  Page 4.

5          THE COURT:  Of an interview that Bastos had with Ms.

6     Marcus, June 21, 2018.

7          MS. KEARNEY:  That's not the date of the interview.

8          THE COURT:  You're right.

9          Go to page 4.

10          THE COURT:  Ms. Marcus says:  "I knew about it

11     probably 2014 because I stopped working for First Trend

12     Marketing and for about six months I worked solely for Arash."

13          MR. SCHMIDT:  The first part indicated that the

14     problem was that she gave leads to Mr. Ketabchi instead of Mr.

15     Sinclair, which was the problem that led her to have to leave.

16          THE COURT:  I don't see that.

17          "How did your relationship kind of dissolve with First

18     Trend?"

19          Marcus says to Arash:  "Actually."

20          Then unidentified female voice says:  "So would they

21     still -- I don't know -- hold you credible?  Would they still

22     hold you as someone that they would trust at this point?"

23          Marcus says:  "Brandon would."

24          Then Detective Bastos says:  "Why did it dissolve?"

25          And Marcus says:  "Because I got some leads to Arash

IB68KET7

1    that should have been sent to Bill Sinclair."

2              Bastos says:  "How did that happen?"

3              Marcus says:  "Because I thought Arash would do a

4    better job out of them, and Jason wanted me to send them to

5    Sinclair, because Sinclair was processing for us and I sent

6    them to Arash."

7              Bastos says:  "And how did Sinclair -- I mean, how did

8    Arash, which way did he tell?"

9              Unidentified female voice says:  "You sent them to

10   Arash?"

11             Ms. Marcus says:  "I sent them to Arash."

12             Bastos joins in and says:  "Oh, you sent them to

13   Arash."

14             Government.

15             MS. KEARNEY:  Can you read the next section, because I

16   think this is some of the confusion.

17             Ms. Marcus is elevated in 2014, which is long before

18   any of the interactions, and, indeed, even before she was

19   working for First Trend and sent that lead list.  If you look

20   at the list, she sent it at the end of the December 2015.  That

21   is when her first conversation is -- when Jane Thompson's first

22   conversation is with Jonathan Stewart.  I think the dates are

23   crossed here.

24             MS. FLETCHER:  She is confusing the dates.

25             THE COURT:  I am not going to reopen it after the

IB68KET7

1    charge has been given for two minutes of an additional

2    summation.

3              Are you moving for a mistrial?

4              MR. SCHMIDT:  I am moving for the mistrial.

5              THE COURT:  Denied.

6              I will just tell them to come back tomorrow and I will

7    have number 14 come to the side.

8              (In open court)

9              THE COURT:  Ladies and gentlemen, enjoy the evening.

10   We will see you tomorrow by 9:15.  Keep an open mind.  You have

11   heard all the testimony.  You have heard the summations.  You

12   haven't started deliberations.  9:15.  If everybody is here, we

13   will begin at 9:15.

14             (Jury exits courtroom)

15             THE COURT:  Mr. Cary, we deliberate only with 12

16   jurors.  I am not going to formally excuse you at this time for

17   the following reason.  If I were to formally excuse you, I

18   could not put you into the deliberating jury if something

19   happened to one of the deliberating jurors.  I can tell you

20   that in 23 years as a judge I have never had to insert someone

21   into a deliberating jury.  Nonetheless, if for some unknown

22   reason somebody doesn't show up tomorrow, or somebody gets sick

23   or if it's something like that, it may be necessary.  But I

24   didn't want you to have to come in tomorrow simply to

25   immediately turn around.  So without excusing you, you don't

IB68KET7

1    have to come tomorrow.  You don't have to report to the jury

2    clerk or anything like that.  I doubt I will need to summon you

3    back, but just in case, my deputy will contact you if we need

4    you.  Again, I really doubt it.  So thank you for your jury

5    service.

6              By the way, don't think for a moment, as one of the

7    lawyers said in the summation, that your service is wasted

8    because the lawyers really do watch the jurors throughout the

9    trial and it is important that you be available in case --

10   especially in a two and a half week trial -- in case somebody

11   has to drop out.  So I, my staff, the lawyers, the parties

12   thank you, sir.  You are not excused, but you may have nothing

13   to do with us in the future.  Thank you.

14             (Juror exits courtroom)

15             THE COURT:  9:15 tomorrow.

16             (Adjourned to November 7, 2018, at 9:15 a.m.)

17

18

19

20

21

22

23

24

25